**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GARY KOOPMAN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>FIAT CHRYSLER AUTOMOBILES N.V., SERGIO MARCHIONNE, RICHARD K. PALMER, and SCOTT KUNSELMAN<br><br>Defendants. | **Civ. Action No: 15-cv-07199-JMF**<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Gary Koopman, Timothy Kidd ("Lead Plaintiffs") and Victor Pirnik (together with Lead Plaintiffs, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fiat Chrysler Automobiles N.V. ("Chrysler" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of purchasers of Chrysler common stock between October 13, 2014 and October 28, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Chrysler is an automotive group that designs, engineers, manufactures, distributes and sells vehicles and components under brand names including Chrysler, Dodge, Fiat, Jeep, and Ram. The Company sells its products in approximately 150 countries. The Company was founded in October 2014 as the result of a merger that completed the integration of Fiat Group Automobiles ("Fiat") and Chrysler LLC.

3. This action involves a series of false and misleading statements and material omissions concerning Chrysler's compliance with federally mandated vehicle safety regulations, as well as Chrysler's internal controls and reported cost of sales, earnings, and earnings before interest and taxes ("EBIT") resulting from its failure to comply with those regulations.

4. Despite Chrysler's repeated assurances to investors and the public that it was substantially in compliance with ***all*** relevant global regulatory requirements and that it "***constantly***" monitored and adjusted operation to maintain compliance, in reality, Chrysler blatantly and willfully disregarded its reporting obligations to its federal manufacturing and safety regulator, the National Highway Traffic Safety Administration ("NHTSA"), and worse yet ignored its obligation to timely inform owners of serious defects to their vehicles, leading to life threatening consequences. Contrary to Chrysler's false assurances to the public, regulators found that Chrysler was "***consistently***" at the "***rear of the pack***" relative to the Company's industry peers when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply ***"unacceptable . . . exacerbat[ing] the risk to motorists' safety."***

5. Chrysler's egregious violations of NHTSA regulations resulted in a total of $175 million in regulatory fines and a €761 million[1] charge for future recall campaign costs in order to timely and properly remedy the safety defects and implement recalls associated with the affected vehicles.

6. Leading up to the Class Period, Chrysler was well aware that NHTSA had significantly intensified its enforcement – increasingly fining automakers for failure to timely issue recalls and failure to timely notify owners of the recalls. For example, in 2010 NHTSA fined Toyota Motor Corporation the maximum penalty of $16.375 million for its failure to notify NHTSA within five days of learning of a safety defect in certain cars. NHTSA fined Toyota another $32.425 million that same year for failure to initiate recalls in a timely manner. Following the fines, NHTSA's then-current Administrator David Strickland stated, "[a]utomakers are required to report any safety defects to NHTSA swiftly, and we expect them to do so."

7. Just before the Class Period, in May 2014, NHTSA fined General Motors $35 million for late reporting of safety defects, which was part of a record-high $126 million in civil penalties assessed by NHTSA in 2014, exceeding the total amount previously collected by the agency during its forty-three year history. NHTSA's May 16, 2014 announcement of the GM Consent Order stated "This reinforces a message this Administration has been sending clearly for the past five years through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers."

8. As David Friedman ("Friedman"), the Administrator for NHTSA stated in his public testimony to the U.S. House of Representatives' Committee on Energy and Commerce, on

[1] Across the Class Period, the average EUR/USD exchange rate was approximately 1.14

April 1, 2014, "This Administration has placed an emphasis on timeliness . . . Because of this emphasis, we believe that all manufacturers in the automobile industry are now paying much closer attention to their responsibility to protect their customers and the driving public."

9. Immediately following these events, Chrysler told investors that it understood that vehicle safety and regulatory compliance was of the utmost importance to NHTSA and investors and that senior management was focused on the issue. On August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, that reported directly to defendant CEO Sergio Marchionne ("Marchionne"), claiming "[t]his action will help intensify the Company's continuing commitment to vehicle safety and regulatory compliance." Throughout the Class Period defendants repeatedly assured investors that the Company was in compliance with all vehicle safety regulations and that the Company had a "robust system in place."

10. Throughout the Class Period, Chrysler and its senior executives named as additional individual defendants also repeatedly asserted to investors that Chrysler's product warranty and recall liabilities (publicly reported at the end of each quarterly financial reporting period as a "critical" financial reporting metric) were accurately stated and that Chrysler's internal controls over financial reporting were effective.

11. As investors in Chrysler would come to learn in a series of partial corrective disclosures beginning in July 2015, however, Chrysler was blatantly and systemically disregarding its obligations to timely report to NHTSA and notify customers of serious safety defects and recalls, preventing safety defects from being remedied. Chrysler also withheld from NHTSA critical information regarding recalls, including reports of deaths and serious injury caused by Chrysler's defective products. Nevertheless, Chrysler continued to reassure investors

that the Company was in compliance with all vehicle safety regulations even after NHTSA Administrator Friedman wrote to Chrysler's CEO Marchionne on November 25, 2015 about Chryslers ongoing compliance failures related to recalls, stating "Chrysler has consistently maintained its position at the rear of the pack" and that "Chrysler's delay in notifying consumers and taking other actions necessary to address the safety defect identified is unacceptable and exacerbates the risk to motorists' safety." Towards the end of the Class Period, Marchionne further admitted that he had been aware of and focusing on Chrysler's need to improve its regulatory compliance since well before the Class Period started.

12. Chrysler repeatedly failed to timely notify owners in several different recalls related to ignition switch defects which caused a vehicle to lose power while it is being driven and also prevented the airbag from deploying. Chrysler's failures are particularly egregious in light of the fact that Chrysler was aware that these types of defects had caused numerous deaths and General Motors had just been fined by NHTSA in July 2014 for failure to timely recall vehicles due to the same defects.

13. Even after NHTSA had criticized the Company's systemic non-compliance, Chrysler falsely informed NHTSA that it had mailed owner notifications of recalls prior to the legal deadline, when in truth the deadline had passed before the notifications were mailed.

14. As the truth of the Company's regulatory violations were revealed, Chrysler stock price tumbled. On Sunday, July 26, 2015, in a Consent Order with Chrysler (the "Consent Order"), NHTSA announced its imposition on Chrysler of a record $105 million fine in connection with the Company's handling of 23 previous recalls affecting more than 11 million vehicles. Chrysler admitted to violating vehicle safety regulations. NHTSA penalties were tied to violations in an array of areas, including misleading regulators, failure to report safety

information to NHTSA, inadequate repairs, and failure to alert affected car owners in a timely manner. NHTSA also forced Chrysler to buy back from customers more than 500,000 vehicles in the largest such action in U.S. history. The Company also had to offer owners of more than a million older Jeeps with rear-mounted gas tanks a chance to trade them in or be paid by Chrysler to have the vehicles repaired. The NHTSA stated, in part:

> ***Fiat Chrysler's pattern of poor performance put millions of its customers, and the driving public, at risk.*** This action will provide relief to owners of defective vehicles, will help improve recall performance throughout the auto industry, and gives Fiat Chrysler the opportunity to embrace a proactive safety culture.

(Emphasis added.)

15. On this news, the Company's stock fell $0.74, or roughly 4.9%, to close at $14.41 on July 27, 2015. This price decline resulted in over a $950 million decline in the Company's market capitalization.

16. On July 30, 2015, defendant Marchionne admitted that he had been aware of Chrysler's compliance failures well before the Class Period:

> "The unfortunate fact is that we as an industry, and ***we in particular as a company, have not always been perfect in complying with these requirements, and over the last year and a half, NHTSA has begun to take a harder look at these technical compliance issues, and frankly we started to do the same thing about the same time.***
>
> ***Over a year ago, we saw that changes were coming, and we began to look more critically at our own governance and process on safety and recall compliance issues, and we had then identified a number of necessary steps to improve.***"

17. On October 28, 2015, Chrysler announced results for Q3 2015, informing investors that the Company recorded "a €761 million pre-tax charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA." Chrysler shares fell $0.69, or 4.7%, to close at $14.72—an $890 million decline in market capitalization-- as investors reacted to news of the recall charge. The market immediately made the connection between the charge

and the Company's regulatory violations for failure to properly conduct recalls. *Bloomberg* reported: "The manufacturer set aside 761 million euros in the quarter for "estimated future recall campaign costs" in North America, where U.S. regulators ordered it in July to buy back vehicles." (emphasis original).

18. On December 9, 2015, after the close of trading, the market learned that NHTSA was fining Chrysler an additional $70 million for its failure to report incidents of death and injury as well as consumer complaints and warranty claims dating back to 2003. Chrysler admitted that the violations "are significant and date back to the inception of the early warning reporting requirements in 2003."

19. The foregoing misconduct contravened the federal securities laws. In particular, during the Class Period, defendants falsely represented that Chrysler was in compliance with all vehicle safety regulations, that it had properly disclosed its warranty and recall liabilities; that Chrysler's internal controls for reporting such a "critical" financial metric each quarter were effective, and that Chrysler prioritized customer safety. As investors began to learn in July 2015, when the true facts began to emerge, none of these repeated assertions were true.

20. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities following the partially corrective disclosures, Plaintiffs and other Class members suffered significant damages.

## JURISDICTION AND VENUE

21. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

23. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's common stock trades on the New York Stock Exchange, located within this District.

24. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

25. Plaintiffs, as set forth in the previously-filed certifications (ECF Nos. 1,16), incorporated by reference herein, purchased Chrysler common stock at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26. Defendant Chrysler is an automotive group that designs, engineers, manufactures, distributes and sells vehicles and components. It offers passenger cars, light trucks, and light commercial vehicles under brand names including Chrysler, Dodge, Fiat, Jeep, and Ram. Chrysler provides retail and dealer financing, leasing, and rental services, as well as engages in media and publishing business. The Company sells its products directly, or through distributors and dealers, in approximately 150 countries. The Company was founded in October 2014 as the

result of a merger that completed the integration of Fiat and Chrysler LLC. On October 12, 2014, the merger was finalized, and on October 13, 2014, the newly merged company's common stock started trading on the NYSE under the ticker symbol "FCAU." Chrysler is a Netherlands corporation with its principal executive offices located at 25 St. James's Street, London SW1A 1HA, United Kingdom.

27. Defendant Marchionne has served at all relevant times as Chief Executive Officer and Executive Director of Chrysler. Marchionne was also a member and the leader of Chrysler's Group Executive Council, which is responsible for managing the operations of Chrysler. Marchionne took the helm at Chrysler in 2008 when the automaker was in serious financial trouble. Marchionne is also an accountant and a lawyer.

28. Defendant Richard K. Palmer ("Palmer") has served at all relevant times as Chief Financial Officer of Chrysler. Palmer was also a member and the leader of Chrysler's Group Executive Council, which is responsible for managing the operations of Chrysler.

29. Defendant Scott Kunselman ("Kunselman") served as Chrysler's head of Vehicle Safety and Regulatory Compliance from August 12, 2014 until October 27, 2015, reporting directly to Defendant Marchionne. Prior to his appointment to head of Vehicle Safety and Regulatory Compliance, Kunselman was in charge of NAFTA Purchasing and Supplier Quality. Prior to that, he was Senior Vice President-Engineering, a position that included oversight of regulatory compliance.

30. The defendants referenced above in ¶¶ 27-29 are sometimes collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Chrysler's Obligation To Identify Safety-Related Defects And Conduct Recalls**

31. NHTSA is a federal agency charged with ensuring that manufacturers of motor vehicles comply with the safety standards contained in the National Traffic and Motor Vehicle Safety Act of 1966, codified at 49 U.S. Code Chapter 31 (the "Safety Act"). The Safety Act includes the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD"), which was passed by Congress in 2000.

32. The Safety Act requires a motor vehicle manufacturer to notify NHTSA, and vehicle owners, purchasers and dealers if it "(1) learns [one of] the [manufacturer's] vehicle[s] or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety; or (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard …."[2]

33. The Safety Act further defines "motor vehicle safety" as:

> the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against ***unreasonable risk of accidents*** occurring because of the design, construction, or performance of a motor vehicle, and against ***unreasonable risk of death or injury in an accident***, and includes nonoperational safety of a motor vehicle.[3]

34. If the manufacturer identifies a "defect related to motor vehicle safety," the Safety Act requires manufacturers to implement a remedy, which typically occurs through a recall.[4] Manufacturers are also required, under NHTSA's implementing regulations, to "furnish a report to the NHTSA for each defect in [the manufacturer's] vehicles or in [the manufacturer's] items of original or replacement equipment that [the manufacturer] or the Administrator determines to

[2] 49 U.S.C. §30118(c).

[3] 49 U.S.C. §30102(a)(8).

[4] 49 U.S.C. §30118(c); see also 49 U.S.C. §30119(d) (notification procedures); 49 U.S.C. §30120(a) (remedy specifications).

be related to motor vehicle safety."[5] This is commonly referred to as a "573 Report." NHTSA further requires all such reports to be submitted "not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related."[6] It is critical that vehicle manufacturers commence recalls expeditiously after identifying safety-related defects in their vehicles. The 573 Report is the beginning of the entire recall process. Failing to timely initiate a recall within five working days puts the safety of vehicle owners at risk. This requirement exists so that the public is expeditiously notified of safety risks and that vehicle defects are remedied within a reasonable time. In addition, each manufacturer is required to amend information submitted in a 573 Report within 5 working days after it has new information that updates or corrects information that was previously reported.[7]

35. In each 573 Report, the manufacturer is required to include:

- Identification of the vehicles or items of motor vehicle equipment potentially containing the defect or noncompliance.
- The total number of vehicles or items of equipment potentially containing the defect or noncompliance.
- In the case of a defect, a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with their dates of receipt.
- A description of the manufacturer's program for remedying the defect or noncompliance.
- The estimated date(s) on which it will begin sending notifications to owners, and to dealers and distributors, that there is a safety-related defect or noncompliance and that a remedy without charge will be available to owners, and the estimated date(s) on which it will complete such notifications (if different from the beginning date). If a manufacturer subsequently becomes aware that either the

[5] 49 C.F.R. §573.6(a).

[6] 49 C.F.R. §573.5(b).

[7] *Id.*

beginning or the completion dates reported to NHTSA for any of the notifications will be delayed by more than two weeks, it must promptly advise the agency of the delay and the reasons therefore, and furnish a revised estimate.

- A representative copy of all notices, bulletins, and other communications that relate directly to the defect or noncompliance and are sent to more than one manufacturer, distributor, dealer or purchaser. These copies must be submitted to NHTSA's Recall Management Division not later than 5 days after they are initially sent to manufacturers, distributors, dealers, or purchasers.[8]

36. When a manufacturer files a 573 Report, the manufacturer must also provide notification to owners of the recall. The manufacturer is required to submit a copy of its proposed owner recall notice to NHTSA no fewer than five business days before it intends to begin mailing it to owners.[9] The recall notices to vehicle owners must be furnished no later than 60 days from the date the manufacturer files its 573 Report.[10] In the event that the remedy for the defect or noncompliance is not available at the time of notification, the manufacturer is required to issue a second notification within a reasonable time and in accordance with the above requirements once the remedy is available.[11]

37. Thus, even if a manufacturer does not have parts available to repair a vehicle defect within 60 days, that is not an excuse for delaying owner notices. In such a case, the manufacturer must send what is known as an "interim notice" to owners, informing them of the defect and the associated risk to motor vehicle safety. The reason for this is that owners are entitled to understand the risk of continuing to drive their vehicles, and to be advised of steps they can take to mitigate the risk before having their vehicles repaired. In other words, vehicle owners are entitled to make informed decisions about their safety. Where a manufacturer sends

---

[8] 49 C.F.R. §573.5(c).

[9] 49 C.F.R. § 577.5(a)

[10] 49 C.F.R. § 577.7(a)(1)

[11] 49 C.F.R. § 577.7(a)(1)

an interim notice, it must also send a follow-up owner notice once repair parts are available. That follow-up notice tells vehicle owners when they can schedule a repair with their local dealership. Regardless of whether a manufacturer is prepared to immediately fix vehicles, NHTSA has made clear that 60 days is the absolute deadline to inform a vehicle owner about a recall.

38. Upon receipt of every 573 Report, NHTSA enters it into its Artemis database as investigators in NHTSA's Office of Defect Investigations screen it for completeness, proper scope, timeliness, and effectiveness of the proposed remedy. NHTSA sends an acknowledgement letter and recall summary to the manufacturer, identifying any deficiencies and requesting the manufacturer to supply any missing information.

39. NHTSA carefully reviews recall submissions to ensure that recalls are timely. For recalls involving a safety defect, a manufacturer is required to submit a chronology of all principal events that were the basis for the manufacturer's determination that the defect related to motor vehicle safety. NHTSA uses these chronologies to help determine whether recalls are timely.

40. NHTSA has stated that accurate and timely notices to owners are "critical to ensuring the success of a recall." If vehicle owners do not know about defects in their vehicles they are unknowingly putting themselves at risk of harm every time they drive. Since the inception of the Safety Act in 1966, vehicle manufacturers have been required to notify vehicle owners about safety-related defects in their vehicles. The basic right to know about unreasonable risks to safety existed even before Congress required manufacturers to actually fix those defects. In other words, as NHTSA stated during its July 2, 2015 hearing concerning Chrysler's repeated violations of these regulations, "this notification requirement is not new and Fiat Chrysler should be well aware of its responsibility."

41. NHTSA has made it clear to vehicle manufacturers that when a vehicle manufacturer does not send owner notices in a timely manner, safety is compromised.

42. The Safety Act includes the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD"), which was passed by Congress in 2000. The TREAD Act imposes additional reporting obligations on auto manufacturers, including Chrysler. Specifically, the TREAD Act mandates that manufacturers submit quarterly reports to NHTSA called "Early Warning Reports" (or "EWRs").[12] EWRs must include warranty reports; consumer complaints; property damage claims; and field reports broken down by make, model, and model year and problem category.[13] Manufacturers are also required to submit to NHTSA summaries of each death or injury claim against the manufacturer that concerns a safety-related defect.[14] Moreover, NHTSA's early warning data tracks the number of cases where warranty services are provided on a vehicle, and the part of the vehicle that is associated with the warranty service. However, as NHTSA explained in the December 8, 2015 Consent Judgment (the "Consent Judgment") in which NHTSA fined Chrysler $70 million, Chrysler systemically under-reported vehicle crashes, deaths and injuries tied to its cars and trucks going back to 2003 and continuing through the Class Period, which NHTSA's Administrator explained "represents a significant failure to meet a manufacturer's safety responsibilities."

43. At NHTSA, the ODI is charged with administering TREAD Act requirements and investigating defects brought to NHTSA's attention by either manufacturers or customers and other members of the public.[15]

---

[12] 49 C.F.R. §573.7.

[13] 49 U.S.C. §30166(m)(3)(A)(i); 49 C.F.R. §573.6(c)(2)-(8).

[14] 49 U.S.C. §30166(m)(3)(A)(i).

[15] See description of ODI, https://www-odi.nhtsa.dot.gov/ivoq/

**NHTSA Increases Focus on Compliance and Timeliness of Reporting and Notification**

44. Leading up to the Class Period, NHTSA made it clear to Chrysler and the automotive industry that it had significantly intensified its enforcement of accurate and timely reporting and customer notification of safety defects and recalls.

45. For example, in April 2010 NHTSA fined Toyota Motor Corporation the maximum penalty of $16.375 million for its failure to notify NHTSA within five days of learning of a safety defect in certain cars. NHTSA fined Toyota another $32.425 million in December 2010 for failure to initiate recalls in a timely manner. Following the fines, NHTSA's then-current Administrator David Strickland stated, "[a]utomakers are required to report any safety defects to NHTSA swiftly, and we expect them to do so."

46. Just before the Class Period, in May 2014, NHTSA fined General Motors $35 million for late reporting of safety defects, which was part of a record high $126 million in civil penalties assessed in 2014, which exceeded the total amount collected by the agency during its forty-three year history. NHTSA's May 16, 2014 announcement of the GM Consent Judgment stated "This reinforces a message this Administration has been sending clearly for the past five years through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers."

47. As NHTSA Administrator Friedman stated in his public testimony to the U.S. House of Representatives' Committee on Energy and Commerce, on April 1, 2014:

> <u>This Administration has placed an emphasis on timeliness in order to safeguard the integrity of the process and encourage automakers to aggressively pursue potential safety defects.</u> Since 2009, automakers have paid record fines totaling more than $85 million for lack of timeliness in reporting vehicle safety defect issues to NHTSA. <u>Because of this emphasis, we believe that all manufacturers in the automobile industry are now paying much closer attention to their responsibility to protect their customers and the driving public</u>.

**Chrysler's Untimely Notices**

48. Despite its knowledge of NHTSA's increased focus on timely and accurate reporting, between 2013 and 2015 Chrysler routinely ignored its obligation to timely inform owners of serious safety defects in the cars they were driving, even where Chrysler knew that deaths had occurred as a result of the defects, thereby imperiling its customers' lives, as well as those of other drivers and pedestrians on the road.

49. Chrysler failed to notify owners within the required 60 days in seven recalls. In two additional recalls associated with defective Takata airbags, Chrysler even misled NHTSA about its owner notifications and failed to send recall notices to vehicle owners for months.

50. As discussed below, Chrysler repeatedly failed to timely notify owners in several different recalls related to ignition switch defects. These failures are particularly egregious in light of the fact that these same type of defects had caused numerous deaths and General Motors had just been fined by NHTSA in July 2014 for failure to timely recall vehicles due to the same defects.

51. For example, Recall 14V-373 involved defective ignition switches which caused a vehicle to lose power while being driven. These "moving shutdowns", triggered by a bump in the road or a mere graze of the knee against the defectively loose ignition switches, would cause the Chrysler cars to suddenly shutdown and become unresponsive without any warning. The shutdowns occurred even at highway speed, and power brakes and power steering would no longer function, making the cars dangerously unsafe to control. Significantly, this also meant that the vehicle's airbags could shut off and not work in a crash, compounding the danger to the driver.

52. Chrysler initiated this recall by filing a 573 Report with NHTSA on June 25, 2014. Chrysler's 573 Report did not provide the required dates for sending owner notifications. Under NHTSA regulations, Chrysler was required to notify owners about the recall no later than August 24, 2014. Violating this obligation, Chrysler waited until September 11, 2014 to complete its owner notification mailing nineteen days after the legal deadline.

53. At that time, Chrysler sent an interim notice to owners of vehicles having defective ignition switches because it did not then have parts available to repair the vehicles. It was not until May 2015, over eight months after distributing the interim notice, that Chrysler notified owners that they could come in for the repair.

54. Chrysler was also late in mailing interim owner notices in Recalls 14V-567, 14V-634, 14V-795, and 15V-115, which involved defective ignition switches; sudden alternator failure that could result in sudden vehicle shutdown and fire; broken springs in the clutch ignition interlock switch that could cause unintended movement when the ignition was cranked; and a defective fuel pump relay that could cause a vehicle to stall without warning. In one of these recalls, 14V-795, ***Chrysler was aware of a death potentially related to the defect prior to recalling the vehicles***.[16]

55. Chrysler initiated Recall 14V-567, a recall for defective ignition switches, by filing a 573 Report with NHTSA, on September 16, 2014. The deadline for Chrysler to send owner notices in this recall was November 15, 2014. Chrysler again did not provide estimated dates for sending owner notifications prior to mailing its interim notices on November 17, 2014, which was two days past the deadline. As of July 2, 2015, over seven months after distributing

[16] Written Statement of Joshua Neff from the July 2, 2015 Public Hearing to Determine Whether Fiat Chrysler Reasonably Met Its Obligations To Remedy Recalled Vehicles And To Notify NHTSA, Owners, And Purchasers Of Recalls.

the interim notice, vehicle owners were still awaiting a follow-up letter in this recall, notifying them that they may have their vehicles repaired.

56. Recall 14V-634 began with Chrysler's 573 Report on October 7, 2014. At the time, Chrysler indicated that it planned to send owner notices on November 28, 2014. However, on December 11, 2014, Chrysler informed NHTSA that it had mailed interim notices on December 8, 2014, again two days after the 60-day deadline. It was only several months later, between February 27 and April 30, 2015, that Chrysler mailed notices to owners to inform them that they could have their vehicles repaired.

57. Chrysler initiated Recall 14V-795 with a December 16, 2014 573 Report. That gave Chrysler until February 14, 2015 to mail owner notices. On March 9, 2015, Chrysler falsely informed NHTSA that it had mailed interim owner notifications prior to the deadline, on February 10, 2015. In truth, Chrysler had mailed the interim notices after the deadline had passed.

58. Chrysler initiated Recall 15V-115 on February 24, 2015. In its 573 Report, Chrysler falsely informed NHSTA it would send owner notifications on April 24, 2015. However, Chrysler did not complete the notification until four days after the deadline, April 29, 2015.

59. Chrysler initiated Recall 13V-527, involving a defective left tie rod assembly that could result in loss of steering control, on November 6, 2013. At that time, Chrysler falsely represented to NHTSA that it would notify owners of the recall in December 2013 prior to the deadline. However, it was only through a letter dated February 4, 2014 that NHTSA learned that Chrysler had not completed its interim notices mailing until January 16, 2014, eleven days past

the deadline. It was not until nearly 16 months later that Chrysler notified owners to bring their vehicles in for repair.

60. Chrysler initiated Recall 14V-635, involving the potential for fire resulting from overheating of electrical connectors of the diesel fuel heater, on October 7, 2014. Chrysler's 573 Report for this recall listed obviously erroneous dates for its planned owner notification mailing. Chrysler gave a beginning date for this mailing that was later than the end date. Moreover, it was only after the deadline had passed that Chrysler informed NHTSA that it had once again missed the deadline by two days. Chrysler only notified vehicle owners over four months later, in late April 2015, that they could bring their vehicles in for repair.

61. In NHTSA's written statement from the July 2, 2015 hearing leading to the Consent Judgment, NHTSA found that

> Fiat Chrysler has a pattern of failing to timely notify vehicle owners of recalls within a reasonable time. Fiat Chrysler's delays leave vehicle owners in the dark about defects in their vehicles that Fiat Chrysler itself has determined pose an unreasonable risk to safety.
>
> Instead of embracing the importance of expeditiously notifying owners about vehicle defects, Fiat Chrysler claimed in its recent response to NHTSA that interim notices have caused owner confusion. Dismissing the importance of informing vehicle owners about risks to their safety is counter to the Safety Act.

62. Demonstrating Chrysler's blatant and willful disregard of it reporting obligations, Chrysler also refused to notify vehicle owners for over six months about its recalls of Takata airbag inflators, and outright lied to NHTSA as to when Chrysler sent owner notifications even after Administrator Friedman personally wrote defendant Marchionne to express his frustration at Chrysler's failure to properly notify owners of defects. Chrysler refused to notify owners for over six months after filing the 573 Report of the risk of their air bag inflator rupturing. Recall 14V-354 (which became a part of Recall 14V-817) involved Takata airbag inflators and the risk

of their inflator rupturing. At the time, Chrysler was one of ten vehicle manufacturers recalling vehicles for defective Takata airbag inflators.

**Chrysler Continues to Flout Federal Regulations Even After Receiving Warning Letter From NHTSA**

63. On November 25, 2014, NHTSA Administrator Friedman personally wrote to defendant Marchionne advising that he was extremely concerned about the slow pace of Chrysler's recalls involving defective Takata airbag inflators. Friedman noted in his letter that throughout the process of the recall, as compared with the other affected manufacturers, "Chrysler has consistently maintained its position at the rear of the pack." Deputy Administrator Friedman wrote that "Chrysler's delay in notifying consumers and taking other actions necessary to address the safety defect identified is unacceptable and exacerbates the risk to motorists' safety." He wrote that Chrysler's delay in notifying owners deprived them of the ability to take informed precautionary measures and of the knowledge needed to make an informed decision regarding their vehicles, noting that an informed customer could reduce the risk of death or injury by choosing to leave the passenger seat unoccupied.

64. Following this letter, on December 23, 2014, Chrysler blatantly misrepresented to NHTSA that its owner notification date for the airbag inflator recall was three months earlier—on September 22, 2014. In truth, Chrysler actually had not even begun mailing owner notices until December 5, 2014, completing the mailing on December 16, 2014, well after Deputy Administrator Friedman's letter of November 25, 2014.

65. After Chrysler expanded its recall for Takata airbag inflators, Recall 14V-354 became a part of Recall 14V-817. Chrysler misrepresented to NHTSA that it would to send interim notices to vehicle owners in Recall 14V-817, but it never did. Chrysler told NHSTA on a conference call that it did not want to send interim notices. But, after Frank Borris, director of

ODI, made clear this was unacceptable and told Chrysler that its customers were entitled to know the truth about their vehicles, Chrysler sent a draft interim notice to NHTSA for review. After Recall Management Division staff approved the draft, Chrysler still did not mail the notice. Recall 14V-817 is now a part of an expanded recall, Recall 15V-313. That expanded recall began with Chrysler's 573 Report on May 26, 2015. As of July 2015, Chrysler still had not told NHTSA of any plans to notify the over 4million owners affected by that recall.

66. In NHTSA's written statement from the July 2, 2015 hearing leading to the Consent Judgment, NHTSA found that "[t]hese Takata recalls provide more examples of Fiat Chrysler providing conflicting and blatantly wrong information to the Agency. . . . Recalls obviously cannot be successful if owners do not know about them. Fiat Chrysler's pattern and ongoing failure to notify owners about recalls in a timely manner is concerning."

67. The weaknesses in Chrysler's controls around its vehicle safety compliance also prevented Chrysler from maintaining accurate and reliable information. This manifested itself in reports sent to NHTSA. NHTSA found that discrepancies in information were widespread throughout Chrysler's submissions to NHTSA about its recalls. NHTSA found that Chrysler "repeatedly failed to provide correct information to the Agency on basic issues, such as the date it mailed owner notices . . . [which] could also have much more consequential results for vehicle and driver safety."

**<u>Chrysler's Untimely Recalls</u>**

68. Despite being warned by NHTSA in November 2014, Chrysler improperly waited months before recalling defective vehicles in at least two of the recalls it began in 2015.

69. Chrysler initiated Recall 15V-090 for defective transmissions that could prevent a vehicle owner from putting the vehicle into park on February 10, 2015, an alarming <u>four months</u>

after Chrysler's supplier notified it in October 2014 of a production process issue linked to the transmission shift failures that are the subject of the recall. Moreover, in a February 26, 2015 recall acknowledgment letter, NHTSA's Jennifer Timian ("Timian") notified Chrysler that the recall was untimely, demanding an explanation for the delay. Chrysler did not respond and never made any attempt to explain the timing.

70. Chrysler similarly waited months before recalling vehicles in Recall 15V-290 for trucks that may have tire failures when traveling at high speeds. On January 9, 2015, Chrysler's Vehicle Safety and Regulatory Compliance department, headed by Defendant Kunselman, became aware that certain Chrysler trucks had a maximum governed speed of 106 mph, while the tires on the vehicles were only rated for a maximum of 87 mph. Later that month, on January 27, 2015, Chrysler's Saltillo Truck Assembly Plant came up with a fix—to install an Engine Control Unit calibration with the maximum vehicle speed set point of 87 mph. But Chrysler waited over three months to recall vehicles, filing a 573 Report on May 12, 2015, despite having identified the defect and remedy back in January. Although Timian again notified Chrysler in a June 18, 2015 recall acknowledgment letter of concerns with the timeliness of this recall, as of July 2015, Chrysler still had not responded.

71. In NHTSA's written statement from the July 2, 2015 hearing, NHTSA expressly chastised Chrysler for its refusal to improve its reporting even after the Company had purported to improve its recall process through the creation of its Vehicle Safety and Regulatory Compliance department: "Fiat Chrysler has told NHTSA about changes that it has made to its organization and recall processes since September 2014. However, these two untimely recalls demonstrate that problems persist. Fiat Chrysler's failure to expeditiously recall vehicles with a safety-related defect is deeply concerning."

**<u>Chrysler's Failure to Notify NHTSA About Changes to Notification Schedule</u>**

72. Chrysler also had a pattern of refusing to update NHTSA on critical information about its recalls and the timing of owner and dealer notifications within the required five working days. NHTSA has specific requirements for the information that must be provided in a 573 Report. There is also a requirement to submit an amended 573 Report when key information changes. These requirements are essential to NHTSA's ability to ensure that owners are being told about defects and noncompliances in their vehicles and know how to have them fixed. Additionally, Chrysler failed to promptly provide the reasons for the delay and a revised schedule when its notification schedule is was delayed by more than two weeks.

73. For example, Recall 13V-527 was a recall for a defective left tie rod assembly that could result in loss of steering control. When Chrysler first filed a Part 573 Report for this recall in November 2013, it told NHTSA that it would begin sending owner notices in December 2013. NHTSA only found out that this did not happen when Chrysler sent it a copy of its interim owner notice to NHTSA in February 2014 and said that the notices were not mailed until January 16, 2014. Chrysler did not explain the delay.

74. Recall 14V-373, concerning ignition switch defects, was an expansion of an earlier recall, 11V-139. When Chrysler first notified NHTSA of the new, expanded recall in June 2014, it submitted a 573 Report that indicated that it planned to send owner notices in early July 2014. On July 1, 2014, Chrysler submitted an amended 573 Report that said the Company would mail owner notices in August 2014. August came and went with no update from Chrysler. However, it was not until September 29, 2014, when Chrysler submitted a copy of an interim owner notice that NHTSA learned Chrysler did not mail those notices until September 11, 2014.

75. Chrysler also failed to update NHTSA on its changed plans for notifying owners and dealers that parts were available for repair. In December 2014, Chrysler submitted an amended 573 Report that said it planned to mail the owner notices on April 13, 2015 and the dealer notices on April 6, 2015. Chrysler submitted two more amended 573 Reports in February 2015 that made no changes to this schedule. Chrysler did not tell NHTSA that the notices were not sent until well after those April dates had passed. Only after NHTSA staff contacted Chrysler about its notification schedule did Chrysler submit an amended 573 Report, on May 4, 2014, to provide new dates. Even then, Chrysler provided no explanation for the delay, as required.

76. For Recall 14V-749, a recall for a noncompliant instrument cluster, Chrysler never provided NHTSA with any information on its schedule for mailing owner and dealer notices. Chrysler left these fields blank when it submitted its Part 573 Report in November 2014. Rather than telling NHTSA when it planned to send notices, as required, Chrysler submitted a letter on December 16, 2014 stating that it had already mailed the notices.

77. Chrysler also failed to update NHTSA on changes to its notification schedule in a recall for broken springs in the clutch ignition interlock switch, Recall 14V-795. Chrysler's initial 573 Report in December 2014 said that it planned to mail dealer notices on February 6, 2015 and owner notices on February 13, 2015. Immediately before these notifications were scheduled to begin, Chrysler confirmed these dates in a February 3, 2015 amended 573 Report. However, it was not until Chrysler again amended its 573 Report in May 2015 that NHTSA learned that Fiat Chrysler missed those mailing dates and instead mailed the notices over a month later in March 2015. Chrysler provided no explanation for the delays to NHTSA.

78. In NHTSA's written statement from the July 2, 2015 hearing, NHTSA criticized Chrysler's blatant disregard for its reporting obligations:

> Fiat Chrysler's repeated failure to provide accurate and up-to-date information to NHTSA makes it hard for staff to trust the information that Chrysler provides. Because Chrysler kept NHTSA out-of-the-loop on its notifications, NHTSA could not adequately ensure that owners and dealers had the information they needed about the safety of their vehicles and when and how the vehicles can be repaired.
>
> It is also disconcerting that Chrysler repeatedly fails to explain its delays in notifying owners and dealers about recalls. Without any explanation for a delay, NHTSA has no basis for judging the delay to be reasonable and not simply the result of a lack of urgency at Chrysler on safety issues.

**<u>Chrysler's Failure to Submit Recall Communications</u>**

79. Chrysler also repeatedly refused to submit copies of its recall communications to NHTSA as required. This regulatory requirement is necessary to keep NHTSA informed about what Chrysler is telling owners and dealers about defects and noncompliances and how they can have them repaired.

80. Owner notices are critical to a recall. To ensure that owners are provided the necessary information, NHTSA reviews draft owner notices before they are sent. A vehicle manufacturer is required to submit a draft to NHTSA no fewer than five business days before it intends to begin mailing the notice to owners. However, in at least one recall, 14V-749, a recall for noncompliance with the safety standard for vehicle controls and displays, Chrysler did not send a draft owner notice to NHTSA for review. Instead, Chrysler sent an unapproved letter to owners on December 16, 2014.

81. Chrysler also repeatedly refused to submit representative copies of recall communications that it sends to owners or dealers to NHTSA within five days. Chrysler often delayed providing NHTSA with copies, and NHTSA repeatedly had to remind Chrysler to submit the copies. In addition, when Chrysler did submit copies of recall communications, it also routinely entered incorrect information into NHTSA's recalls portal, such as providing the date

that Chrysler submitted a document to NHTSA or leaving the date blank, rather than providing the date that Chrysler mailed its notification to owners.

82. In some cases, Chrysler left NHTSA completely in the dark about communications that Chrysler made to its dealers about a recall. These communications told dealers how to repair defects and noncompliances and provided other important information about the recalls.

83. As NHTSA's written statement from the July 2, 2015 hearing explained, "NHTSA cannot ensure that vehicle owners are aware of defects and noncompliances in their vehicles and that they have information on how to have those problems fixed when a manufacturer fails to comply with its obligation to submit copies of owner notification letters to [NHTSA] and to provide correct and complete information about the notifications. . . Failure to submit dealer communications to NHTSA as required obstructs [NHTSA]'s ability to evaluate whether dealers have accurate and complete information necessary to remedy vehicles. It is critically important that the Agency have timely access to these communications—and a complete set of these communications—so that it can evaluate the remedy and fulfill its statutory oversight role to ensure that remedies are effective."

84. In at least eight recalls, Chrysler failed to submit copies of its owner notices to NHTSA within five days as required.

- In Recall 13V-527, Chrysler waited 28 days to send NHTSA a copy of its interim owner notice and 6 days to send NHTSA its follow-up owner notice.
- For Recall 14V-373, Chrysler waited 18 days to send NHTSA a copy of its interim owner notice.
- Chrysler also waited 8 days to send NHTSA a copy of its interim owner notice in Recall 14V-438.
- In Recall 14V-634, Chrysler waited 67 days to send NHTSA a copy of its owner notice after it began mailing the notices.

- Chrysler waited 27 days to send NHTSA a copy of its interim owner notice in Recall 14V-795.
- Chrysler also waited 25 days after it began mailing interim notices about Recall 15V-046 before sending NHTSA a copy.
- Chrysler waited 12 days to send NHTSA a copy of its owner notice in Recall 15V-114.
- Chrysler waited 15 days from the time it began mailing owner notices in Recall 15V-115 to provide NHTSA with a copy.

85. NHTSA's written statement from the July 2, 2015 hearing made clear that "[t]hese are not insignificant delays. Fiat Chrysler waited double, triple, and even up to over thirteen times the allowable time under the law to provide these owner notices to NHTSA."

86. Chrysler's complete disregard for its compliance obligations is highlighted by the fact that providing notification to NHTSA is not an onerous requirement. Many of these recalls involved several hundred thousand vehicle owners. Chrysler simply had to send out one more copy of its owner notices to NHTSA, and yet it repeatedly failed to do that by the legally binding deadline subject to civil penalties.

87. Chrysler also did not submit copies of dealer communications within five days as required in at least fourteen recalls. In many cases, Chrysler simply never provided any copies of certain dealer communications to NHTSA until after the Agency began the enforcement action. Specifically, there were thirty-two dealer communications across twelve recalls between 2013 and 2015 that Chrysler withheld from the NHTSA until submitting its Special Order response on June 1, 2015, many of which had been sent well over a year prior.

- In Recall 13V-252, Chrysler did not provide NHTSA with twelve separate dealer communications that Chrysler sent to its dealers in June, July, August, and December 2014.
- In Recall 13V-527, Chrysler never sent NHTSA a copy of a November 2013 dealer communication.
- In Recall 13V-528, Chrysler never sent NHTSA a copy of two April 2014 dealer communications.

- Chrysler never sent NHTSA three dealer communications about Recall 13V-529, sent in November 2013, March 2014, and December 2014.
- Chrysler never sent NHTSA a copy of a December 2014 dealer communication about Recall 14V-373.
- Chrysler never sent NHTSA a copy of four dealer communications about Recall 14V-391 sent in July 2014 and in April and May 2015.
- Chrysler also failed to submit to NHTSA a dealer communication about Recall 14V567 it sent in September 2014.
- Chrysler never sent NHTSA a copy of a dealer communication Chrysler sent in December 2014 about Recall 14V-795.
- Chrysler never sent NHTSA a copy of a December 2014 dealer communication about Recall 14V-796.
- Chrysler never sent NHTSA a copy of four dealer communications about Recall 15V-090, sent in February, March, and April 2015.
- Chrysler never sent NHTSA a copy of a dealer communication about Recall 15V-115 that Chrysler sent in September 2014.
- Chrysler never sent NHTSA a copy of a March 2015 dealer communication about Recall 15V-178.

88. Even with respect to the dealer communications that Chrysler did provide to NHTSA, the Company routinely provided them late.

- In Recall 13V-527, Chrysler waited <u>10 days</u> to provide a copy of a dealer letter to NHTSA.
- Chrysler waited <u>38 days</u> to provide a copy of a dealer letter in Recall 14V-373 to NHTSA.
- Chrysler waited <u>21 days</u> to submit a copy of a dealer letter for Recall 14V-438 to NHTSA.
- In Recall 14V-634, Chrysler waited <u>10 days</u> to submit one dealer letter to NHTSA and then waited <u>74 days</u> before submitting a copy of a second dealer letter to NHTSA.
- Chrysler waited <u>18 days</u> before submitting a copy of a dealer letter to NHTSA about Recall 14V-635.
- Chrysler waited <u>8 days</u> before submitting a copy of a dealer letter about Recall 14V-749.
- Chrysler did not submit a copy of a dealer letter about Recall 14V-795 until <u>17 days</u> later.

- Chrysler waited 39 days to submit a copy of a dealer letter about Recall 15V-046, and 15 days to submit a copy of a dealer letter about Recall 15V-090.
- Chrysler also waited 12 days to submit a copy of a dealer letter about Recall 15V114, and 15 days before submitting a copy of a dealer notice about 15V-115 to NHTSA.

89. Chrysler's failure to provide timely notice persisted between 2013 and 2015 and did not improve following the appointment of Defendant Kunselman as head of Vehicle Safety and Regulatory Compliance. As NHTSA's written statement from the July 2, 2015 hearing concluded, "such a widespread pattern of missing deadlines is unacceptable."

**Chrysler's Failure To Provide Other Critical Information**

90. Chrysler also had a pattern of repeatedly failing to provide NHTSA with other critical information about its recalls that was timely, accurate, and complete. The law requires manufacturers to submit an amended 573 Report when the manufacturer has new or changed information about the recall. This is an important requirement because the mere fact of an amended 573 Report signals to the Agency and to the public that something significant has changed.

91. One of the critical pieces of information about a recall is the vehicles that are affected. A manufacturer is required to update its Part 573 Report within five working days to update the total number of vehicles potentially containing the defect or noncompliance.

92. Across multiple recalls, Chrysler failed to correctly, completely, and timely identify the vehicles affected by the recalls.

93. In several recalls, Chrysler submitted letters or quarterly recall reports to NHTSA that showed an apparent change to the number of vehicles involved in a recall, instead of filing an amended 573 Report as required. Chrysler never explained the reason for these discrepancies.

- In Recall 13V-038, Chrysler's amended 573 Report, submitted on February 13, 2013, listed the potentially affected population as 278,222 vehicles.

However, each of the quarterly reports that Chrysler submitted since then listed the affected population as 278,229 vehicles.

- In Recall 13V-527, Chrysler reported to NHTSA in its May 7, 2015 573 Report that the potentially affected population was 36,710. Just days later, Chrysler wrote in a letter that the population was 768 vehicles fewer. Chrysler never filed a 573 Report reflecting a changed population or otherwise explained this discrepancy.
- In Recall 14V-154, Chrysler's 573 Report, submitted in April 2014, listed a potentially affected population of 644,354 vehicles. Without explanation and without submitting an amended 573 Report, Chrysler listed a population of 5,305 fewer vehicles in its July 2014 quarterly report. Again with no explanation, Chrysler's October 2014 quarterly report raised the population back to the initially reported 644,354 vehicles.
- In Recall 14V-373, Chrysler reported a potentially affected population of 525,206 vehicles in its initial 573 Report, submitted July 1, 2014. This number drastically increased by 197,849 vehicles in a September 29, 2014 letter. Chrysler did not amend its 573 Report to reflect this change and, instead, in an amended 573 Report filed in December reverted to the initially reported population of 525,206 vehicles.
- In Recall 14V-438, Chrysler's initial 573 Report in July 2014 stated that the potentially affected population was 643,618 vehicles. Then, in a September 2014 letter, Chrysler said that the population was 4,225 vehicles fewer. Chrysler never submitted an amended 573 Report to change the population. Instead, its amended 573 Reports submitted in December 2014 and March 2015 changed back to the initially reported population of 643,618 vehicles.
- In Recall 14V-634, Chrysler's initial Part 573 Report in October 2014 gave a potentially affected population of 434,581 vehicles. This number changed slightly, increasing by 13 vehicles, according to a letter Chrysler sent to NHTSA in December 2014. Chrysler did not submit an amended 573 Report for a change to the population and then dropped the number of vehicles back to the original population when it filed an amended 573 Reports in April 2015.
- For Recall 14V-749, Chrysler reported a potentially affected population of zero in its initial 573 Report submitted in November 2014. Although Chrysler did not amend its 573 Report at the time, it reported the population as 11,674 in a December 2014 letter it sent to NHTSA. It was not until April 2015 that Chrysler reported a potentially affected population in an amended 573 Report, as required. However, the population Chrysler reported—11,668 vehicles—was a different population than Chrysler earlier told NHTSA.
- In Recall 14V-795, Chrysler initially reported a potentially affected population of 66,819 vehicles in its December 2014 573 Report. It reiterated that number in an amended 573 Report filed in February 2015, but then told NHTSA a different population in a letter the following month. In its letter, Chrysler decreased the population by 12,758 vehicles with no explanation.

Chrysler then waited almost <u>two more months</u> before reporting this new population in an amended 573 Report that it was required to submit within 5 days of knowing of the change.

- In Recall 15V-046, Chrysler's January 2014 573 Report provided a potentially affected population of 753,176 vehicles. However, in a letter Chrysler sent to NHTSA in March 2015, it listed a population that was 1,416 vehicles fewer. Chrysler never amended its 573 Report.
- In Recall 15V-090, Chrysler delayed filing an amended 573 Report to reflect a population change. There, Chrysler initially reported a potentially affected population of 25,734 vehicles in its February 2015 573 Report. The next month, Chrysler listed a different population, which was 4,269 vehicles fewer, in a letter it submitted to NHTSA. However, Chrysler delayed nearly <u>another month</u> before reporting a changed population in an amended 573 Report as required.
- In Recall 15V-115, Chrysler reported a potentially affected population of 338,216 vehicles in its initial 573 Report in February 2015. Without explanation, it then increased the population by 33 vehicles according to a letter it sent NHTSA in May 2015. However, later that same month, Chrysler submitted an amended 573 Report that still contained the original population of 338,216 vehicles.

94. The 573 Report is the authoritative source of information about a recall. In these eleven recalls, Chrysler provided different information to NHTSA in letters and quarterly reports than it provided in its 573 Reports. This buries important information about a recall into routine correspondence, rather than flagging it for NHTSA and the public in an amended 573 Report as the law requires. Notably, in none of these recalls did Chrysler actually tell NHTSA in these letters or quarterly reports that there was a change to the vehicle population.

95. As NHTSA has since noted, in some cases, the changes to the population reflected by the letters was sometimes later reported to the Agency in a 573 Report but in other cases subsequent 573 Reports contained no population change. That leaves NHTSA wondering what information is accurate. In other cases, the letters apparently do reflect a true change to the vehicle population which Chrysler later reported to NHTSA in an amended 573 Report as

required. However, Chrysler repeatedly delayed well beyond the five day deadline under the law for reporting updated population information.

96. These inconsistent population numbers have a significant impact on vehicle owners. In the recalls where Chrysler provided a different population in a letter than it had in its earlier 573 Report, those letters were cover letters accompanying Chrysler's submission of a copy of its owner letter. If Chrysler reported a lower population number in that cover letter, it suggests that Chrysler only sent owner letters to that lower number of vehicle owners. If there was not a true change in the vehicle population that means Chrysler failed to notify some vehicle owners of the recalls. Obviously, a vehicle owner who does not know about a recall is subjected to an unreasonable risk of injury due to the defect and cannot have his or her car fixed.

97. As NHTSA stated in its written statement from the July 2, 2015 hearing, "Fiat Chrysler's repeated submission of inconsistent, incorrect, and untimely information on the population of its recalls can have a real impact on the effectiveness of those recalls."

98. In Recall 15V-041, Chrysler failed to correctly identify the vehicle identification numbers (VINs) associated with the recall. This recall was for a defect that may result in side curtain and seat airbags unexpectedly deploying. Oversight by NHTSA's Recall Management Division, caught about 65,000 vehicles impacted by this recall that Fiat Chrysler had not included in the recall. This means that Chrysler did not notify a significant number of vehicle owners of this defect for over 14 weeks.

99. Chrysler also failed to provide NHTSA with any information on the vehicles affected by its recall for Takata airbag inflators, Recall 14V-354, which later became a part of Recall 14V-817, for over seven weeks. Chrysler lagged far behind other manufacturers recalling vehicle for the same issue in identifying its affected vehicles.

**<u>Chrysler's Failure To Submit Information On Remedy</u>**

100. It is also critical for NHTSA to have timely, accurate, and complete information about a manufacturer's remedy plan in other words when and how a manufacturer is going to fix its vehicles. A manufacturer is required to report this information in its 573 Report, including by amending its 573 Report within 5 working days of confirming or changing its remedy plan. Having access to information on a manufacturer's remedy plan is essential for NHTSA to assess the remedy plan and to ensure that a manufacturer is meeting its obligation to adequately repair vehicle defects within a reasonable time.

101. Chrysler failed to provide timely information on its remedy plan in at least two recalls between 2013 and 2015.

102. Recall 13V-527 is a recall involving a left tie rod ball stud that could fracture, resulting in the loss of steering control. In Chrysler's November 2013 573 Report, the Company said that it would remedy vehicles by installing a redesigned tie rod assembly. In March 2013, Chrysler amended its 573 Report to indicate that replacement of the tie rod was an interim remedy and that vehicle owners would need to have a new steering linkage installed. At that time, Chrysler said it would notify dealers about the fix on April 17, 2015. Well after that date came and went, Chrysler filed an amended 573 Report on May 7, 2015 indicating that it was delaying the dealer notices until May 8, 2015. Since Chrysler had changed the remedy for this recall, it was particularly important for NHTSA to review this communication, which was a technical service bulletin giving dealers specific instructions on how to repair the vehicles. However, as discussed above, Chrysler did not timely provide a copy of that communication to NHTSA.

103. Chrysler also failed to timely provide NHTSA with its plan for remedying the safety defect in Recall 14V-634. That recall involves a defect where the vehicle's alternator may rapidly fail, causing the vehicle to shut down and potentially causing a fire. Chrysler filed its initial 573 Report for this recall on October 7, 2014. The Recall Management Division reminded Chrysler in an October 14, 2014 recall acknowledgement letter of its obligation to provide its plan for remedying the safety defect as soon as it has been determined. Over six months later, Chrysler notified vehicle owners that dealers would replace the alternator assembly. NHTSA contacted Chrysler on April 22, 2014 to ask why the Company still had not reported its remedy plan in an amended 573 Report. Although Chrysler staff repeatedly promised they would do so, and NHTSA repeatedly reminded Chrysler to do so, it took Chrysler until May 7, 2014 to file an amended 573 Report including information on its remedy plan.

104. NHTSA's conclusions concerning these violations demonstrate Chrysler's complete lack of interest in regulatory compliance. As stated by a Senior Safety Recall Analyst at NHTSA at the July 2, 2015 hearing, "Based on my communications with Fiat Chrysler staff, I believe that they did not understand their obligation to include this information in their Part 573 Report. This is hard to fathom for a company with as much recall experience as Fiat Chrysler. NHTSA staff should not have to explain and repeatedly remind Fiat Chrysler about basic recall requirements as we had to do here."

**<u>Chrysler's Failure To Report Deaths and Serious Injuries</u>**

105. From 2003 through the Class Period, Chrysler also had significant failures in early warning reporting. Chrysler failed to report incidents of death and injury that were required to be reported to NHTSA under 49 C.F.R. Section 579.21(b). Specifically, Chrysler did not report these deaths and injuries because of failures in the Company's controls: (1) coding

deficiencies in Chrysler's early warning reporting system that failed to recognize when reportable information was received or updated; and (2) Chrysler's failure to update its early warning reporting system to reflect new Chrysler brands. Chrysler also failed to report aggregate data that were required to be reported to NHTSA under 49 C.F.R. Section 579.21(c), including property damage claims, customer complaints, warranty claims and field reports. Chrysler also failed to provide copies of field reports to NHTSA, as required under 49 C.F.R. Section 579.21(d). These failures were also a result of Chrysler's poor controls – namely, coding deficiencies in Chrysler's early warning reporting system that failed to recognize reportable information.

106. NHTSA's investigators found these discrepancies in reporting by Chrysler and notified the company in July 2015.

**Chrysler's Underreporting of Its Costs and Liabilities Related to Vehicle Warranties and Recalls**

107. During the Class Period, Chrysler also underreported its reserves for product warranties and cost of recalls. This underreporting resulted directly from Chrysler's failure to timely conduct recalls, notify customers and remedy the safety defects.

108. According to Chrysler's annual report for the fiscal year ending December 31, 2014, filed with the SEC on Form 20-F on March 5, 2015, expenses related to recalls are included in the line item "Cost of sales" in its consolidated income statement. These line items are part of the Company's Earnings Before Interest and Taxes (EBIT) amount that is also reflected in its income statement. Any expenses related to recalls would affect the Company's EBIT. Additionally, EBIT flows to the financial statement line items of Net profit before taxes and Net profit. Therefore, by failing to report necessary recalls and repairs in a timely fashion, Chrysler overstated its EBIT, reported net income, and understated its Cost of sales.

**Marchionne's Denial of Reporting Violations**

109. By late July, the same time the agency was finalizing the Consent Order with Chrysler, NHTSA had informed the Company that it had identified discrepancies in Chrysler's early warning reports of deaths and other serious injuries. Nonetheless, during a July 30, 2015 earnings call with analysts following NHTSA's imposition of the $105 million fine, defendant Marchionne denied the existence of any other reporting violations:

> <Q [Analyst]>: I'm just looking at this NHTSA website, I read the whole raft of recalls have been announced, et cetera. I understand the presentation you gave and the financial impact of that. If we look at all the – everything has been listed there. Are you addressing everything?
>
> <A - Sergio Marchionne>: "***To the best of my knowledge, everything that I've given you so far is comprehensive of every action that's been discussed and undertaken with NHTSA. I am not in knowledge of anything else beyond what's already been booked . . .*** ."

**Materially False and Misleading**
**Statements Issued During the Class Period**

110. On August 1, 2014, Fiat shareholders approved the merger of Fiat into Chrysler. On October 12, 2014, the merger was finalized. The Class Period begins on October 13, 2014, the day on which the newly merged company's common stock started trading on the NYSE under the ticker symbol "FCAU."

111. On August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, that reported directly to the Company's CEO defendant Marchionne, claiming "[t]his action will help intensify the Company's continuing commitment to vehicle safety and regulatory compliance."

112. The foregoing representation in ¶ 111 was materially false and/or misleading because it provided investors with false comfort that Chrysler would be able to adequately respond to and address regulatory issues from NHTSA's intensified enforcement efforts, and

failed to disclose that Chrysler was in blatant violation of NHTSA's regulations, that the Company consistently failed to timely report to NHTSA consumers vehicle defects, necessary recall campaigns as well as deaths and serious injuries in violation of federal regulations.

113. On October 29, 2014, Chrysler issued a press release and filed a Form 6-K with the SEC which was signed by defendant Palmer, announcing its financial and operating results for the quarter and nine months ended September 30, 2014 (the "October 29, 2014 6K"). For the quarter, cost of sales was €20.356 million, EBIT was €926 million, and net profit was €188 million, compared to cost of sales of €17.747 million, EBIT of €862 million, and a net profit of €189 million for the same period in the prior year. For the nine months, cost of sales was €59.694 million, EBIT was €2.157 million, and net profit was €212 million, or €0.132 per share, compared to a cost of sales of €53.706 million, EBIT of €2.542 million and a net profit of €655 million, or €0.036 per share for the same period in the prior year.

114. The foregoing representations in ¶ 113 were materially false and/or misleading because the estimated future warranty and recall campaign costs for vehicles sold were materially understated by €761 million as a result of the Company's failure to timely and adequately conduct recalls.

115. On November 5, 2014, Chrysler filed a Form 6-K with the SEC which was signed by defendant Palmer, appending as an exhibit an Interim Report reiterating the Company's previously announced financial and operating results for the quarter and nine months ended September 30, 2015 (the "November 6, 2014 6-K"). In addition to the previously announced financial results, the Form 6-K stated "Cost of sales also includes warranty and product-related costs, estimated at the time of sale to dealer networks or to the end customer."

116. The foregoing representations in ¶ 115 were materially false and/or misleading because the estimated future warranty and recall campaign costs for vehicles sold were materially understated by €761 million and Chrysler was in possession of substantial information that would have caused higher reported costs and liabilities for warranty claims and recalls, but Chrysler did not timely recall the vehicles or properly account for the costs of their repairs.

117. On November 13, 2014, Chrysler filed a Form F-1/A with the SEC which was signed by defendants Palmer and Marchionne. In addition to repeating the financial information identified in ¶¶ 113 and 115, Chrysler stated "The Group establishes reserves for product warranties at the time the sale is recognized. . . . The reserve for product warranties includes the expected costs of warranty obligations imposed by law or contract, as well as the expected costs for policy coverage, recall actions and buyback commitments. The estimated future costs of these actions are principally based on assumptions regarding the lifetime warranty costs of each vehicle line and each model year of that vehicle line, as well as historical claims experience for the Group's vehicles. . . . The Group periodically initiates voluntary service and recall actions to address various customer satisfaction, safety and emissions issues related to vehicles sold. Included in the reserve is the estimated cost of these service and recall actions. The estimated future costs of these actions are based primarily on historical claims experience for the Group's vehicles."

118. The foregoing representations in ¶ 117 were materially false and/or misleading for the reasons stated in ¶¶ 114 and 116, and because Chrysler knew at the time that its costs and liabilities related to vehicle warranties and recalls would be substantially higher due to its failure to conduct timely recalls, notify customers, and remedy safety defects.

119. The November 12, 2014 Form F-1A further represented "***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, emissions and noise). ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in compliance.***"[17]

120. The foregoing representations in ¶ 119 were materially false and/or misleading because, *inter alia* Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; and (viii) failed to report deaths and serious injuries to NHTSA as required.

121. On November 20, 2014, defendant Kunselman provided a statement to the Senate Committee on Commerce, Science and Transportation in Washington D.C. Emphasizing that "I report directly to our company CEO", Kunselman stated, "[r]ecalls have been, are and will continue to be an essential mechanism to safeguard the public. Chrysler Group prides itself on having the highest recall completion rate of all major U.S.-market auto makers. NHTSA regards our customer-notification protocols as 'industry-best.'" He went on to state, "Further, our average per-campaign vehicle volume is among the lowest in the industry – well below the

[17] November 13, 2014 Form F-1/A, at 185.

industry average. This is testament to our transparency and demonstrates clearly the robustness of our fleet-monitoring and our rapid response when issues arise."

122. The foregoing representations in ¶ 121 were materially false and/or misleading because Chrysler did not treat recalls as an important mechanism to safeguard the public and it did not rapidly respond when "issues arise." Instead, Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; and (viii) failed to report deaths and serious injuries to NHTSA as required.

123. On November 26, 2014, Chrysler filed a Form F-1/A with the SEC which was signed by defendants Palmer and Marchionne stating repeating the financial information and statements identified in ¶¶ 113 and 115, including the representation: "***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, emissions and noise). ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in compliance.***"

124. The foregoing representations in ¶ 123 were materially false and/or misleading because for the reasons stated in ¶¶ 114 and 116, and because defendant Marchionne had received a letter from NHTSA Administrator Friedman on November 25, 2014 stating that

Chrysler was "***consistently***" at the "***rear of the pack***" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply ***"unacceptable..exacerbat[ing] the risk to motorists' safety."***

125. On December 04, 2014, Chrysler filed a Form F-1/A with the SEC which was signed by defendants Palmer and Marchionne repeating the financial information and statements identified in ¶¶ 113 and 115 and 123.

126. The foregoing representations in ¶ 125 were materially false and/or misleading for the reasons stated in ¶¶ 114, 116 and 124.

127. On December 12, 2014, Chrysler issued a press release and filed with the SEC (i) a prospectus on Form 424B4 offering 87 million shares of the Company's common stock; and (ii) a prospectus on Form 424B4 offering $2.5 billion aggregate amount of the Company's mandatory convertible securities (collectively, the "Prospectuses"). Each of the Prospectuses reiterated the financial information and statements identified in ¶¶ 113 and 115 and 123.

128. The foregoing representations in ¶ 127 were materially false and/or misleading for the reasons stated in ¶¶ 114, 116 and 124.

129. On January 28, 2015, Chrysler issued a press release and filed a Form 6-K with the SEC which was signed by defendant Palmer, announcing its financial and operating results for the quarter and the fiscal year ended December 31, 2014 (the "January 28, 2015 6-K"). For the quarter, EBIT was €1.07 billion, and net profit was €420 million, or €0.329 per share, compared to EBIT of €460 million, and a net profit of €1.3 billion, or €0.707 per share for the same period in the previous year. For the year, EBIT was €3.22 billion, and net profit was €0.6 billion, or €0.465 per share, compared to EBIT of €3 billion, and a net profit of €1.95 billion, or €0.744 per share for 2013.

130. The foregoing representations in ¶ 129 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle warrantees and recalls which caused its EBIT, cost of sales, and net profit to be higher than it would have been by €761 million had Chrysler not been underreporting costs related to vehicle warranties and recalls.

131. During a January 28, 2015 conference call, following the release of the quarter and fiscal year ended December 31, 2014 results, in response to an analyst's question "did you reflect the cost of the Takata airbag recall at year end or is this coming in 2015? And can you give us some sense of this industrial cost going into 2015, are there likely to be less of a headwind versus 2014 . . .", Defendant Palmer stated flatly "Yes." Palmer later elaborated: "Yes. We have booked the Takata item in Q4. In 2015, as I said before, we expect the industrial cost headwind to be significantly less than it was in 2014 because of the fact that all these launches with extra content have had a 12-month cycle now. So, year-over-year, they're in the numbers."

132. The foregoing representations in ¶ 131 were materially false and/or misleading because defendant Marchionne had received a letter from NHTSA Administrator Friedman on November 25, 2014 stating that Chrysler was "***consistently***" at the "***rear of the pack***" when it came to regulatory compliance (in particular as it related to the Takata airbag inflator recall) and that Chrysler's delay in notifying consumers of safety defects was simply ***"unacceptable . . . exacerbat[ing] the risk to motorists' safety."***

133. Defendant Marchionne assured investors that the recalls that had been occurring were an industry-wide phenomenon resulting from a change in regulatory enforcement, rather than a Chrysler-specific deficiency, and affirmatively represented that the Company's internal

controls around recalls were industry leading best practices, which would result in a reduction in costs associated with recalls:

> <Q - José Asumendi>: And the final one is to Mr. Marchionne on the quality front. Can you talk a bit about the changes you've done on the management front, on the quality front, and how you are, you have the right structure now to deliver improved at least – to avoid what we had last year in 2015? Thank you.
>
> <A - Sergio Marchionne>: That's right. Before I answer the question, what do we have last year that I missed?
>
> <Q - José Asumendi>: You had a few recalls on...
>
> <A - Sergio Marchionne>: I see, yeah, yeah. Okay.
>
> <Q - José Asumendi>: Sure.
>
> <A - Sergio Marchionne>: Well, look, I think I've been public on this recall issue. The recall matter is something which is a reflection of a changing paradigm for the auto sector. ***I think we have made changes while adjusting our internal structures to deal with this new state of affairs. It is my expectation that this cost will come down as we progress through reconstitution of the management process of what's going on here. We had what I consider to be a pretty robust system in place, we have strengthened it further, we have curved it out from the rest of operations. We have set a very, very senior technical person to head up these activities. So I think we're making progress in making sure that at least not only are we dealing with what's on our plate but we're actually becoming much more proactive and identifying potential exposures going forward. So as we do this, I think these numbers will stabilize and we'll see a steady state***.

134. The foregoing representations in ¶ 133 were materially false and/or misleading because Chrysler had anything but a "robust" system in place. Marchionne had received a letter from NHTSA Administrator Friedman on November 25, 2014 stating that Chrysler was "***consistently***" at the "***rear of the pack***" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply ***"unacceptable . . . exacerbat[ing] the risk to motorists' safety."***

135. On March 5, 2015, Chrysler issued a press release and filed an Annual Report on Form 20-F with the SEC which was signed by defendant Palmer, and reiterated the Company's

previously announced financial and operating results for the fiscal year ended December 31, 2014 (the “2014 20-F”). In addition to the information announced in the Company’s January 28, 2014 6-K, the 2014 20-F reported a net profit of €0.460 per diluted share, compared to a net profit of €0.736 per diluted share for 2013. The 2014 20-F appended as exhibits signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by defendants Marchionne and Palmer, stating that the financial information contained in the 2014 20-F was accurate, they had evaluated the effectiveness of the Company’s controls and procedures, and disclosed all significant deficiencies and material weaknesses in the design or operation of the internal controls as well as any material changes to the Company’s internal control over financial reporting.

136. The foregoing representations in ¶ 135 were materially false and/or misleading for the reasons stated in ¶130, and because Chrysler’s internal control over financial reporting was not effective because of the misstatements to the Company’s financial results.

137. The 2014 20-F also stated, “[t]he accrual for product warranties includes the expected costs of warranty obligations imposed by law or contract, as well as the expected costs for policy coverage, recall actions and buyback commitments. The estimated future costs of these actions are principally based on assumptions regarding the lifetime warranty costs of each vehicle line and each model year of that vehicle line, as well as historical claims experience for the Group’s vehicles. …The Group periodically initiates voluntary service and recall actions to address various customer satisfaction, safety and emissions issues related to vehicles sold. Included in the accrual is the estimated cost of these service and recall action.”

138. The foregoing representations in ¶ 137 were materially false and/or misleading for the reasons stated in because Chrysler knew or should have known that the costs of liabilities

related to vehicle warranties and recalls would increase as a direct result of Chrysler's failure to conduct timely recalls, notify customers and remedy safety defects.

139. The 2014 20-F also stated, ""***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, emissions and noise). ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in compliance.***" Furthermore, under the heading "Managing Vehicle Safety", the 2014 20-F stated, in part:

> At Chrysler, we take transportation safety personally. ***Customers trust the quality and safety of our products, and we constantly do our utmost to warrant this confidence.*** . . .
>
> In addition, the safety organizations in Chrysler's four regions . . . constantly share information and best practices in order to harmonize design guidelines and processes. ***Safety design guidelines are implemented from the concept phase of every new model through the release of detailed design specifications to all the providers of sub-systems for the vehicle.***
>
> Our overall approach recognizes that safer highways, improved traffic management and driver education all have a role to play in enhancing safety on the road. ***That is why we strive to connect our safety efforts to a collective goal we share with*** our employees, ***drivers, dealers,*** suppliers, law enforcement, ***regulators*** and researchers.

(emphases added).

140. The foregoing representations in ¶ 139 were materially false and/or misleading because Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner

and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; and (viii) failed to report deaths and serious injuries to NHTSA as required.

141. On March 9, 2015, Chrysler filed a Form 6-K with the SEC which was signed by defendant Palmer, appending as an exhibit the Company's Annual Report, reiterating the Company's previously announced financial and operating results for fiscal year ending December 31, 2014. In addition to the information announced in the Company's March 5, 2015 Form 20-F, the March 9, 2015 6-K stated "In 2014 ***we made an important organizational move to amplify our commitment to safety***, as FCA US established the new office of Vehicle Safety and Regulatory Compliance. The reorganization created a stand-alone organization led by a senior vice president who reports directly to the CEO of FCA US, ***ensuring a high level of information flow and accountability***. This new structure establishes a focal point for working with consumers, regulatory agencies and other partners ***to enhance safety in real-world conditions.***"

142. The foregoing representations in ¶ 141 were materially false and/or misleading because Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; and (viii) failed to report deaths and serious injuries to NHTSA as required.

143. On April 29, 2015, Chrysler issued a press release and filed a Form 6-K with the SEC which was signed by defendant Palmer, announcing its financial and operating results for the first quarter of 2015 (the "April 29, 2015 6-K"). EBIT was €3.22 billion and net profit was €92 million, or €0.052 per diluted share, compared to EBIT of €3 billion and a net loss of €173 million, or €0.155 per diluted share, for the same period in the prior year.

144. The foregoing representations in ¶ 143 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle warrantees and recalls which caused its EBIT, cost of sales, and net profit to be higher €761 million than it would have been had Chrysler not been underreporting costs related to vehicle warranties and recalls.

145. On May 5, 2015, Chrysler filed a Form 6-K with the SEC which was signed by defendant Palmer, appending as an exhibit an Interim Report reiterating the Company's previously announced financial and operating results for the quarter ended March 31, 2015 (the "May 5, 2015 6-K").

146. The foregoing representations in ¶ 145 were materially false and/or misleading for the reasons stated in ¶ 144.

147. On May 19, 2015, Chrysler issued a press release, stating "FCA US LLC takes seriously its commitment to provide safe vehicles that meet customer expectations for quality and workmanship. The Company is fully aligned with NHTSA's desire to promote efficient execution of vehicle recalls and enhance completion rates. . . . FCA US will continue to cooperate with NHTSA in its efforts to identify ways in which it can more quickly identify issues, determine fixes and execute campaigns."

148. The foregoing representations in ¶ 147 were materially false and/or misleading Chrysler was anything but aligned with NHTSA and consistently flouted its directives. Instead, Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; and (viii) failed to report deaths and serious injuries to NHTSA as required..

149. On May 19, 2015, Chrysler also filed a prospectus on Form F-4 with the SEC, signed by defendants Palmer and Marchionne, which repeated its previously reported financial information and stated in part, "***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, emissions and noise). ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in compliance.***"

150. The foregoing representations in ¶ 149 were materially false and/or misleading because for the reasons stated in ¶ 144 and because Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to

submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; and (viii) failed to report deaths and serious injuries to NHTSA as required..

151. On June 17, 2015, Chrysler issued a press release and filed with the SEC a prospectus on Form 424B4 offering to exchange up to $3 million of new senior notes for previously issued senior notes. The prospectuses reiterated the Company's previously announced financial and operating results, and also stated: "***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, emissions and noise). ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in compliance.***"

152. The foregoing representations in ¶ 151 were materially false and/or misleading for the reasons stated in ¶ 144, and because Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; and (viii) failed to report deaths and serious injuries to NHTSA as required.

## **The Truth Begins to Emerge**

153. On Sunday, July 26, 2015, NHTSA announced a Consent Order and its imposition on the Company of a record $105 million fine in connection with the Company's

handling of 23 previous recalls affecting more than 11 million vehicles. The NHTSA penalties were tied to violations in an array of areas, including misleading regulators, inadequate repairs, and failing to alert affected car owners in a timely manner. The NHTSA stated, in part:

> ***Fiat Chrysler's pattern of poor performance put millions of its customers, and the driving public, at risk.*** This action will provide relief to owners of defective vehicles, will help improve recall performance throughout the auto industry, and gives Fiat Chrysler the opportunity to embrace a proactive safety culture.

(Emphasis added.)

154. Chrysler also agreed under the Consent Order to additional remedies for three recall campaigns covering approximately 585,000 vehicles. In each of those campaigns, Chrysler was required to offer, as an alternative remedy to owners whose vehicles have not yet been remedied, to repurchase those vehicles at a price equal to the original purchase price less a reasonable allowance for depreciation plus ten percent. In addition, Chrysler was required to offer consumer incentives to encourage owners of vehicles subject to certain recalls to participate in the recalls.

155. On this news, the Company's stock fell $0.74, or roughly 4.9%, to close at $14.41 on July 27, 2015—a market capitalization decline of $950 million. Analysts recognized the impact of this news on the Company's stock price. In one article entitled "Fiat Chrysler Slapped With Record Fine and Buyback Program" the author stated, "The total cost of the penalty remains to be seen, but the market definitely reacted to the news. Shares of FCAU are down nearly 5% on the day. It will be interesting to see if the settlement has any effect on the company's bottom line in the future." An analyst with the Autotrader car shopping service said "NHTSA made clear with the record $105 million fine and unprecedented vehicle buyback

requirement against Fiat Chrysler that it is serious and will be aggressive about going after automaker [that] don't quickly recall vehicles with defects.[18]"

156. During a July 30, 2015 earnings call with analysts, following NHTSA's imposition of the $105 million fine, defendant Marchionne denied the existence of any other reporting violations:

> <Q [Analyst] >: I'm just looking at this NHTSA website, I read the whole raft of recalls have been announced, et cetera. I understand the presentation you gave and the financial impact of that. If we look at all the – everything has been listed there. Are you addressing everything?
>
> <A - Sergio Marchionne>: "***To the best of my knowledge, everything that I've given you so far is comprehensive of every action that's been discussed and undertaken with NHTSA. I am not in knowledge of anything else beyond what's already been booked*** . . . ."

157. This statement was false and misleading because NHTSA had informed Chrysler in late July, the same time it was finalizing the Consent Order with Chrysler, that it had identified discrepancies in Chrysler's early warning reports of deaths and other serious injuries.

158. On August 6, 2015, Chrysler filed its semi-annual report for Q2 and H1 2015 on Form 6-K, announcing "a net increase of €721 million in provisions, mainly related to (i) an increase in accrued sales incentives, primarily due to an increase in retail incentives as well as an increase in dealer stock levels as of June 30, 2014 compared to December 31, 2013 to support increased sales volumes in NAFTA, and (ii) ***net adjustments to warranties, including those related to recall campaigns***."

159. On October 27, 2015, Chrysler announced the resignation of Defendant Kunselman.

---

[18] *See* http://www.latimes.com/business/autos/la-fi-hy-record-fiat-chrysler-fine-20150727-story.html ("With record Fiat Chrysler fine, safety regulators get more aggressive." L.A. Times, July 27, 2015.

160. The next day, on October 28, 2015, Chrysler announced results for Q3 2015, informing investors that the Company recorded "a €761 million pre-tax charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA."

161. Chrysler shares fell $0.69, or 4.7%, to close at $14.72 as investors reacted to news of the recall charge—a market capitalization drop of $890 million. The market immediately made the connection between the charge and the Company's regulatory violations for failure to properly conduct recalls. *Bloomberg* reported: "The manufacturer set aside 761 million euros in the quarter for "estimated future recall campaign costs" in North America, where U.S. regulators <u>ordered</u> it in July to buy back vehicles." (emphasis original)

162. Regarding the Company's announcement, the *Detroit Free Press* reported that the charge caused the Company's stock to drop:

> ***The automaker reported its first quarterly loss in more than a year because it took a massive one-time charge to cover the cost of future recalls.*** The company also told Wall Street analysts its profit margins will continue to lag Ford and General Motors as long as its market share of trucks and SUVs is smaller and said has put its strategic plan for Alfa Romeo and Maserati under review. ***All of that unpleasant news caused FCA's stock to sink 69 cents, or 4.7%, on Wednesday to $14.72 per share***.

163. Analysts at *Motley Fool,* arrived at similar conclusions. Under the heading "That big special item", an analyst reported "FCA's results were more than offset by a 761 million euro one-time charge to boost FCA's reserves against future recalls, specifically in North America. U.S. regulators hit FCA with a $105 million fine in July for poor management of past recalls, and the company was forced to take on an independent expert to monitor its safety practices."

164. On December 9, 2015, after the close of trading, it was announced that NHTSA had issued an amendment to its July 24, 2015, Consent Order with Chrysler. In the amendment, Chrysler acknowledged significant failures in early warning reporting dating to the beginning of the requirements in 2003. Chrysler failed to report incidents of death and injury that were

required to be reported to NHTSA under 49 C.F.R. Section 579.21 (b). Specifically, Chrysler acknowledged that it did not report these deaths and injuries because of failures in the Company's controls: (1) coding deficiencies in its EWR system that failed to recognize when reportable information was received or updated; and (2) Chrysler's failure to update its EWR system to reflect new Chrysler brands. Chrysler also failed to report aggregate data that were required to be reported to NHTSA under 49 C.F.R. Section 579.21(c), including property damage claims, customer complaints, warranty claims and field reports. Chrysler also failed to provide copies of field reports to NHTSA, as required under 49 C.F.R. Section 579.21(d). These failures were also a result of Chrysler's poor controls – coding deficiencies in Chrysler's EWR system that failed to recognize reportable information. Chrysler admitted that it failed to submit EWR in compliance with the law and that the violations "are significant and date back to the inception of the early warning reporting requirements in 2003." As a result of these violations, a third-party audit of Chrysler was conducted, which is still ongoing. The amendment required Chrysler to pay $70 million in additional civil penalties.

165. Analysts recognized the impact of the news on Chrysler's stock price. For example, an article titled "One Reason Fiat Chrysler (FCAU) Stock Closed Down Today explained "Fiat Chrysler Automobiles (FCAU) stock closed lower by 0.07% to $13.80 on Thursday, after the National Highway Traffic Safety Administration (NHTSA) fined the automaker $70 million for failing to report safety data, including reports of death and injuries, consumer complaints, warranty claims, and other data."

**ADDITIONAL ALLEGATIONS DEMONSTRATING FALISTY AND SCIENTER**

166. Leading up to the Class Period, Defendants were well aware that NHTSA had significantly intensified its enforcement of regulations regarding timely and accurate reporting of

safety defects and recalls. Defendants' scienter can be inferred from the frequency and focus of Defendants' discussions of regulatory compliance in press releases, earnings calls and SEC filings.

167. In 2010 NHTSA fined Toyota Motor Corporation the maximum penalty of $16.375 million for its failure to notify NHTSA within five days of learning of a safety defect in certain cars. NHTSA fined Toyota another $32.425 million for failure to initiate recalls in a timely manner. Following the fines, NHTSA's then-current Administrator David Strickland stated, "[a]utomakers are required to report any safety defects to NHTSA swiftly, and we expect them to do so."

168. Just before the Class Period, in May 2014, NHTSA fined General Motors $35 million for late reporting of safety defects, which was part of a record-high $126 million in civil penalties assessed in 2014, which exceeded the total amount previously collected by the agency during its forty-three year history. NHTSA's May 16, 2014 announcement of the GM Consent Order stated "This reinforces a message this Administration has been sending clearly for the past five years through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers."

169. As NHTSA Administrator Friedman stated in his public testimony to the U.S. House of Representatives' Committee on Energy and Commerce, on April 1, 2014, "This Administration has placed an emphasis on timeliness . . . Because of this emphasis, we believe that all manufacturers in the automobile industry are now paying much closer attention to their responsibility to protect their customers and the driving public."

170. Immediately following these events, Chrysler told investors that it understood that vehicle safety and regulatory compliance was of the utmost importance to NHTSA and investors

and that senior management was focused on the issue. Defendants emphasized their focus on regulatory compliance, that information concerning vehicle safety and regulatory compliance was shared directly with Marchionne and that he was personally accountable for any deficiencies: On August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, that reported directly to defendant Marchionne, claiming "[t]his action will help intensify the Company's continuing commitment to vehicle safety and regulatory compliance." Throughout the Class Period defendants repeatedly assured investors that the Company was in compliance with all vehicle safety regulations and that the Company had a "robust system in place." Defendants Marchionne and Palmer also stressed their focus on recall compliance by repeating in Chrysler's SEC filings: "In 2014 we made an important organizational move to amplify our commitment to safety, as FCA US established the new office of Vehicle Safety and Regulatory Compliance. The reorganization created a stand-alone organization led by a senior vice president [defendant Kunselman] who reports directly to the CEO of FCA US [Marchionne], ensuring a high level of information flow and accountability. This new structure establishes a focal point for working with consumers, regulatory agencies and other partners to enhance safety in real-world conditions."[19]

171. Prior to his appointment to this new position, Kunselman had been in charge of NAFTA Purchasing and Supplier Quality. Prior to that, he was Senior Vice President-Engineering, a position that included oversight of regulatory compliance. Therefore, even before taking the new position, Kunselman was well aware of Chrysler's reporting deficiencies and lack of controls, which he undoubtedly reported to senior management, including Marchionne, upon his appointment to the new position in August 2014.

---

[19] 2014 Form 20-F at 130

172. Defendant Kunselman was in regular contact with regulators at NHTSA throughout the Class Period. Kunselman led the group at Chrysler that communicated with NHTSA concerning recalls. For example, in his statement to the Senate Committee on Commerce, Science and Transportation on November 20, 2014, Kunselman stated that his group had been "actively engaged" with NHTSA since at least early 2014 regarding the recall of Takata airbags due to defective inflators.

173. Defendants Palmer and Marchionne recognized in SEC filings that they had "a customer focused approach" and, specifically, that "[f]eedback received during the Stakeholder Engagement events held in 2014 provided confirmation that customer services, vehicle quality and vehicle safety are issues of primary importance to the Group's stakeholders."[20] "The Group monitors customer satisfaction on a continuous basis and, where appropriate, develops new customer channels that help contribute to improvements in product safety and service quality."

174. Defendants Palmer and Marchionne also told investors in their SEC filings under the heading "Managing Vehicle Safety", "we take transportation safety personally. Customers trust the quality and safety of our products, and we constantly do our utmost to warrant this confidence."

175. On the Company's October 29, 2014 earnings call with analysts, in which defendants Palmer and Marchionne participated, defendant Marchionne acknowledged his focus on the increased regulatory scrutiny:

> <Q – [Analyst]>: Thank you. Just wanted to get your take on what the environment is currently for the recalls? Have we gotten past the worst of it? Or do you think that there's going to added government scrutiny going forward that we'll need to have more?

[20] 2014 Form 20-F at 129.

<A - Sergio Marchionne>: [I]t may very well be that we are peaked or getting very close to a peak. But you can't call this. Every time I read the paper, there is another recall underway, including some of ours. So I think that the industry may have overshot the mark in terms of recall activity. I mean, it may have just gotten hypersensitive. Let's work our way through here and see where this whole exercise ultimately stabilizes."

176. On the Company's January 28, 2015 earnings call discussing results for the quarter and year ending December 31, 2014, defendants Marchionne and Palmer again discussed their focus on the increased regulatory focus concerning vehicle safety and recalls.

<Q – [Analyst]: And the final one is to Mr. Marchionne on the quality front. Can you talk a bit about the changes you've done on the management front, on the quality front, and how you are, you have the right structure now to deliver improved at least – to avoid what we had last year in 2015? Thank you.

<A - Sergio Marchionne>: Well, look, I think I've been public on this recall issue. The recall matter is something which is a reflection of a changing paradigm for the auto sector. I think we have made changes while adjusting our internal structures to deal with this new state of affairs. It is my expectation that this cost will come down as we progress through reconstitution of the management process of what's going on here. We had what I consider to be a pretty robust system in place, we have strengthened it further, we have curved it out from the rest of operations. We have set a very, very senior technical person to head up these activities. So I think we're making progress in making sure that at least not only are we dealing with what's on our plate but we're actually becoming much more proactive and identifying potential exposures going forward. So as we do this, I think these numbers will stabilize and we'll see a steady state.

177. On the Company's July 30, 2015 earnings call with analysts, following the announcement of NHTSA's $105 million penalty, defendant Marchionne admitted that he had personally been aware of NHTSA's increased focus on Chrysler's reporting failures:

Now the first slide simply sets out the specific time requirements for NHTSA reporting and customer notices and recall campaigns, and ***many of these rules are fairly specific and for the most part they're straightforward***, although there can be questions about the triggering dates of some of these requirements. The unfortunate fact is that we as an industry, and ***we in particular as a company, have not always been perfect in complying with these requirements, and over the last year and a half, NHTSA has begun to take a harder look at these technical compliance issues, and frankly we started to do the same thing about the same time.***

> ***Over a year ago, we saw that changes were coming, and we began to look more critically at our own governance and process on safety and recall compliance issues, and we had then identified a number of necessary steps to improve. And both before and during our discussions with NHTSA we have been implementing some of the needed improvements that we have identified.***

178. Moreover, as discussed above, defendant Marchionne became specifically aware of Chrysler's lack of compliance with NHTSA's regulations and its poor internal controls when NHTSA Administrator Friedman expressly informed him of such on November 25, 2014. On November 25, 2014, Friedman personally wrote to defendant Marchionne to let him know that he was extremely concerned about the slow pace of Chrysler's recall of the extremely important recall of Takata airbags. Friedman noted in his letter that throughout the process of the recall, as compared with the other affected manufacturers, "Chrysler has consistently maintained its position at the <u>rear of the pack</u>." Friedman wrote that "<u>Chrysler's delay in notifying consumers and taking other actions necessary to address the safety defect identified is unacceptable and exacerbates the risk to motorists' safety</u>." He wrote that Chrysler's delay in notifying owners deprives them of the ability to take informed precautionary measures and of the knowledge needed to make an informed decision regarding their vehicles, noting that an informed customer could reduce the risk of death or injury by choosing to leave the passenger seat unoccupied.

179. NHTSA also informed Chrysler in late July 2015, at the very same time they were finalizing the Consent Judgment that the Company was also under investigation for failing to report deaths and injuries to the agency as required by law.

## <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

180. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Chrysler securities during the Class Period (the "Class"); and were damaged

upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

181. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Chrysler securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Chrysler or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

182. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

183. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

184. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Chrysler;

- whether the Individual Defendants caused Chrysler to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Chrysler securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

185. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FRAUD ON THE MARKET PRESUMPTION OF RELIANCE

186. The market for Chrysler's securities was an efficient market during the Class Period for the following reasons, among others::

- Chrysler's stock met the requirements for listing ,and was listed and actively traded on the NYSE, a highly efficient market;

- As a regulated issuer, Chrysler field periodic reports with the SEC and/or NYSE ;

- Chrysler regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major news wire services and through wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts including Barclays Capital, Credit Suisse and Morgan Stanley;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Chrysler securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts;
- Unexpected material news concerning Chrysler was rapidly reflected in Chrysler's share price.

187. Based upon the foregoing, the market for Chrysler's securities promptly digested current information regarding Chrysler form all publicly available resources and reflected such information in Chrysler's share price. Accordingly, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

188. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Chrysler securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Chrysler securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

189. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: AFFILIATED UTE**

190. Neither Plaintiffs nor the Class need prove reliance—either individually or as a class—because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Against All Defendants For Violations of**
**Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

191. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

192. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

193. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Chrysler securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Chrysler securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

194. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Chrysler securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Chrysler's finances and business prospects.

195. By virtue of their positions at Chrysler, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant

knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

196. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Chrysler securities from their personal portfolios.

197. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Chrysler, the Individual Defendants had knowledge of the details of Chrysler's internal affairs.

198. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Chrysler. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Chrysler's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Chrysler securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Chrysler's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Chrysler securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

199. During the Class Period, Chrysler securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Chrysler securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Chrysler securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Chrysler securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

200. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

201. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the**
**Exchange Act Against The Individual Defendants)**

202. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

203. During the Class Period, the Individual Defendants participated in the operation and management of Chrysler, and conducted and participated, directly and indirectly, in the conduct of Chrysler's business affairs. Because of their senior positions, they knew the adverse non-public information about Chrysler's misstatement of income and expenses and false financial statements.

204. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Chrysler's financial condition and results of operations, and to correct promptly any public statements issued by Chrysler which had become materially false or misleading.

205. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Chrysler disseminated in the marketplace during the Class Period concerning Chrysler's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Chrysler to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Chrysler within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Chrysler securities.

206. Each of the Individual Defendants, therefore, acted as a controlling person of Chrysler. By reason of their senior management positions and/or being directors of Chrysler, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Chrysler to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Chrysler and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

207. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Chrysler.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: January 22, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael J. Wernke*

Jeremy A. Lieberman
Michael J. Wernke
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*