# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GARY KOOPMAN, TIMOTHY KIDD and
VICTOR PIRNIK, Individually and on Behalf of
All Others Similarly Situated,

               Plaintiffs,

        v.

FIAT CHRYSLER AUTOMOBILES N.V.,
SERGIO MARCHIONNE, RICHARD K.
PALMER, and SCOTT KUNSELMAN,

               Defendants.

No. 15 Civ. 7199 (JMF)

 

# MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Robert J. Giuffra, Jr.
William B. Monahan
Victoria A. Coyle
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2468
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

March 7, 2016

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ............................................................ 1

**THE AMENDED COMPLAINT'S ALLEGATIONS** ............................ 5

    A.    FCA's Global Reserves for Estimated Future Warranty and Recall Costs .......... 5

    B.    FCA's Substantial Compliance with Global Regulations .................... 7

    C.    The NHTSA Inquiry and First Consent Order .................... 8

    D.    FCA Increases Its Estimate of Future Recall and Warranty Costs .............. 9

    E.    The Second NHTSA Consent Order ............................. 9

**ARGUMENT** ......................................................................... 10

**I.**    **THE COMPLAINT ALLEGES NO PARTICULARIZED FACTS TO SUPPORT A COGENT AND COMPELLING INFERENCE THAT ANY DEFENDANT ACTED WITH SCIENTER** ............................... 10

    A.    Plaintiffs Have Not Pled that Defendants Acted with Scienter in Estimating FCA's Future Global Recall and Warranty Costs .......... 11

    B.    Plaintiffs Fail to Allege that Defendants Fraudulently Misstated that FCA Was in "Substantial[] Compliance" with "Global Regulatory Requirements" .................................................... 14

    C.    Plaintiffs Do Not Allege with the Required Particularity that Any of the Individual Defendants Acted with Scienter .................... 16

**II.**   **PLAINTIFFS PLEAD NO ACTIONABLE MISREPRESENTATIONS** .............. 18

    A.    The Amended Complaint Does Not Allege that FCA Misstated Its Global Recall Reserve Estimates .................................... 18

    B.    FCA Did Not Materially Misrepresent that It Was in "Substantial[] Compliance" with "Global Regulatory Requirements" .................... 19

    C.    The Amended Complaint Does Not Allege that the Individual Defendants Made Any Actionable Misstatement in Their Oral Comments .......... 21

        1.   Mr. Marchionne (FCA's and FCA US's CEO) ............... 21

        2.   Mr. Kunselman (FCA US's Former Head of Vehicle Safety and Regulatory Compliance) .................................... 22

        3.   Mr. Palmer (FCA's and FCA US's CFO) .................... 23

**TABLE OF CONTENTS**
**(continued)**

*Page*

III.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION AS A MATTER OF
       LAW ............................................................................................................ 24

IV.   CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*ATSI Commc'ns, Inc.* v. *Shaar Fund*,
   493 F.3d 87 (2d Cir. 2007) ...................................................................... 6, 10, 14

*Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys.* v. *Mechel OAO*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011) ............................................................ 17

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
   506 Fed. Appx. 32 (2d Cir. 2012) ................................................................. 20

*In re Bristol-Myers Squibb Co.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) ............................................................ 24

*Cent. States, S.E. & S.W. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*,
   543 Fed. Appx. 72 (2d Cir. 2013) ................................................................. 25

*In re CIT Grp., Inc. Sec. Litig.*,
   349 F. Supp. 2d 685 (S.D.N.Y. 2004) ............................................................ 13

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ........................................................................ 5

*Compania Embotelladora Del Pacifico* v. *Pepsi Cola Co.*,
   607 F. Supp. 2d 600 (S.D.N.Y. 2009) ............................................................ 25

*Coronel* v. *Quanta Capital Holdings Ltd.*,
   2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ..................................................... 19

*Delta Holdings, Inc.* v. *Nat'l Distillers & Chem. Corp.*,
   945 F.2d 1226 (2d Cir. 1991) ...................................................................... 19

*In re DRDGold Ltd. Sec. Litig.*,
   472 F. Supp. 2d 562 (S.D.N.Y. 2007) ............................................................ 12

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ........................................................... 10, 20, 21, 23

*Fait* v. *Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011) ................................................................... 11, 19

*Foley* v. *Transocean Ltd.*,
   861 F. Supp. 2d 197 (S.D.N.Y. 2012) ............................................................ 14

## TABLE OF AUTHORITIES
### (continued)

*Page(s)*

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................... 23

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) .................................................................... 11

*In re Glenayre Techs., Inc. Sec. Litig.*,
    1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) ........................................................... 10

*Harris* v. *AmTrust Fin. Servs.*,
    2015 WL 5707235 (S.D.N.Y. Sept. 29, 2015) ........................................................ 19

*Herman* v. *Legent Corp.*,
    50 F.3d 6 (4th Cir. 1995) ...................................................................................... 21

*Hinerfeld* v. *United Auto Grp.*,
    1998 WL 397852 (S.D.N.Y. July 15 1998) ............................................................ 13

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d. Cir. 2001) ................................................................................. 11

*In re LaBranche Sec. Litig.*,
    405 F. Supp. 2d 333 (S.D.N.Y. 2005) .................................................................... 11

*Lasker* v. *N.Y.S. Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) ...................................................................................... 21

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .................................................................................. 24

*In re Lions Gate Entm't Corp. Sec. Litig.*,
    2016 WL 297722 (S.D.N.Y. Jan. 22, 2016) ........................................................... 16

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
    2004 WL 376442 (S.D.N.Y. Feb. 27. 2004) ........................................................... 12

*In re MBIA, Inc. Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) ...................................................................... 6

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................................... 24

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) ................................................ 19

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................ 14

*In re Omnicom Grp., Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ................................................ 25

*In re Open Joint Stock Co. Vimpel–Commc'ns*,
    2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ................................................ 16

*P. Stolz Family P'ship* v. *Daum*,
    355 F.3d 92 (2d Cir. 2004) ................................................ 19

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imp. Bank of Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................ 17

*In re PXRE Grp.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ................................................ 17

*Rothman* v. *Gregor*,
    220 F.3d 81 (2d Cir. 2000) ................................................ 6

*S. Cherry St., LLC* v. *Hennessee Grp.*,
    573 F.3d 98 (2d Cir. 2009) ................................................ 11

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ................................................ 12

*In re Sec. Capital Assur. Ltd.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010) ................................................ 17

*Shemian* v. *Research In Motion Ltd.*,
    570 Fed. Appx. 32 (2d Cir. 2014) ................................................ 2

*Shields* v. *Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ................................................ 12, 13, 22

*Slayton* v. *Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ................................................ 12

*Stoneridge Inv. Partners* v. *Scientific–Atl., Inc.*,
    552 U.S. 148 (2008) ................................................ 10

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

*Tamar* v. *Mind C.T.I., Ltd.*,
  723 F. Supp. 2d 546 (S.D.N.Y. 2010) .................................................................. 15

*Teamsters* v. *Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008) ............................................................................... 16

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................ 2

*Tongue* v. *Sanofi*,
  2016 WL 851797 (2d Cir. Mar. 4, 2016) ............................................................ 12

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .................................................... 16

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) .................................................................. 13

*Zirkin* v. *Quanta Capital Holdings Ltd.*,
  2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ........................................................ 13

## STATUTE & RULE

15 U.S.C. § 78u-5 ........................................................................................... 6, 12

Fed. R. Civ. P. 9(b) ........................................................................................... 22

## PRELIMINARY STATEMENT

In this putative securities class action, Plaintiffs—three individuals who purchased slightly more than 10,000 shares (of the 1.29 billion shares outstanding) of Fiat Chrysler Automobiles N.V. ("FCA")—seek to turn settlements between one of FCA's U.S. subsidiaries and one of FCA's many regulators around the world into securities fraud.  Plaintiffs advance two primary theories of alleged misrepresentations during the putative class period (October 13, 2014 to October 28, 2015):

1.      *"Substantially in Compliance with the Relevant Global Regulatory Requirements"*:  In claiming that FCA stated falsely in its SEC filings between November 2014 and June 2015 that FCA was "*substantially* in compliance with the relevant *global* regulatory requirements," Plaintiffs cite settlements in July and December 2015 between one of FCA's subsidiaries in the United States, Fiat Chrysler Automobiles US LLC ("FCA US"), and the National Highway Traffic Safety Administration ("NHTSA"), a U.S. regulator that is one of many with jurisdiction over aspects of FCA and its subsidiaries' businesses globally.  Those settlements resulted from an inquiry NHTSA opened in May 2015 that concerned primarily the timeliness of FCA US's notifications of certain recalls to vehicle owners and NHTSA.  In those settlements, FCA US acknowledged that it did not comply with a small fraction of the myriad global regulations to which FCA and its affiliates are subject in more than 150 countries in six continents across the world.  (Amended Complaint ("AC") ¶¶ 4, 19, 119-24, 139-40, 149-52.)

2.      *FCA's Forward-Looking Estimates of Its Future Global Recall and Warranty Costs*:  In its SEC filings between October 2014 and June 2015, FCA allegedly misrepresented its global reserves for estimated, future recall and warranty costs.  Plaintiffs' sole support for this claim is that, in October 2015, after FCA US entered into its July 2015 settlement with NHTSA, FCA updated its methodology for projecting future recall and warranty costs to account for

recent developments (as FCA had previously disclosed it might do), resulting in a €761 million increase to FCA's reserve estimates.  (*Id.* ¶¶ 19, 108, 113-16, 125-30, 135-36, 143-46.)

Courts in this Circuit routinely reject "fraud by hindsight" pleading premised, as here, on Defendants' failure to predict the outcome of a regulatory inquiry or the ultimate insufficiency of Defendants' original reserve estimates.  (*See* cases cited *infra* at 11-16.)  The Amended Complaint contains no allegations from confidential witnesses or internal FCA documents showing that Defendants were contemporaneously aware of any information contradicting their statements.  The Court should dismiss the Amended Complaint for each of three independent reasons:

**No Cogent and Compelling Inference of Fraud:**  Plaintiffs fail to allege particularized facts establishing a "strong inference" of scienter under the Private Securities Litigation Reform Act (the "PSLRA"), which the Supreme Court has held must include facts demonstrating a "cogent" and "compelling" inference of fraud.  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007).  Where, as here, Plaintiffs offer no factual allegations that any of the Individual Defendants[1] had a financial motive to commit fraud (such as through insider stock sales), the Amended Complaint must include particularized allegations establishing **conscious recklessness**, *i.e.*, "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Shemian* v. *Research In Motion Ltd.*, 570 Fed. Appx. 32, 36 (2d Cir. 2014).

Here, fatally for their claims, Plaintiffs do not allege any particularized facts showing how or when any of the Individual Defendants learned that FCA was not in "substantial compliance" with the thousands of regulations on a host of topics (*e.g.*, emissions, fuel economy,

---

[1] The Individual Defendants are (a) Sergio Marchionne, FCA's and FCA US's CEO, (b) Richard K. Palmer, FCA's and FCA US's CFO, and (c) Scott Kunselman, FCA US's former head of Vehicle Safety and Regulatory Compliance.

banking) to which FCA is subject in more than 150 countries around the world.  Instead, the Amended Complaint merely alleges that, prior to NHTSA's public announcement in May 2015 that it had opened an inquiry concerning 23 publicly announced FCA US recall campaigns, NHTSA notified FCA US, by letters in November 2014 and February 2015, of concerns with respect to *two* FCA US recalls.  Further, after NHTSA opened its May 2015 inquiry, FCA was not required under the securities laws to predict the outcome of that inquiry, as numerous courts have held in similar circumstances involving ongoing regulatory investigations.  (*See* cases cited *infra* at 15-16.)  Whether concerning the original two recalls referenced in the November 2014 and February 2015 letters, or the 21 additional recalls subject of the May 2015 NHTSA inquiry, isolated inquiries by one regulator in one country concerning a finite number of U.S. regulations on one of many topics subject of global regulation cannot plausibly establish the required strong inference that FCA committed fraud by stating that it was in "substantial[] compliance" with the thousands of "global" regulations to which it is subject.  (*See infra* at 14-16.)

Moreover, FCA expressly warned investors that its forward-looking projections of global costs for future recall and warranty compliance were "estimates" based on a model containing a number of "assumptions," that "changes in the assumptions used could materially affect the results of operations," that the model included "estimates" of future recall actions "primarily based on historical claims experience," and that those "estimates" would change "[a]s actual experience becomes available."  Plaintiffs allege no particularized facts demonstrating that any reserve estimates were inconsistent with contemporaneous data then known to the Individual Defendants, let alone that any Individual Defendant had *actual knowledge* that the estimates were insufficient when made, as required under the PSLRA safe harbor for forward-looking statements.  Plaintiffs also allege no plausible rationale for why Defendants would hide known

recall costs when NHTSA opened its inquiry in May 2015 only to update the reserves to add such costs five months later.  The far more plausible inference is that, after taking into account the recent recall and regulatory trends that resulted in FCA US's first settlement with NHTSA, FCA adjusted its model for estimating recall and warranty costs—*i.e.*, precisely what FCA disclosed it would do in the event of changed circumstances.  (*See infra* at 13-14.)

**No Material Misrepresentation:**  FCA's SEC filings disclosed its methodology for arriving at its future recall and warranty cost estimates, that the estimates were "inevitably imprecise," that actual costs could be "in excess" of such estimates, and that the estimates and underlying assumptions could be updated as additional recall or warranty information became available.  Plaintiffs nowhere allege that FCA's estimates were inconsistent with its fully disclosed reserving methodology or any applicable accounting rule.  Moreover, reserves based on estimates are quintessential forward-looking statements that are not actionable when accompanied, as here, by cautionary language warning of the risks.  FCA expressly disclosed that its statements "regarding . . . reserves . . . [were] forward-looking statements that contain risks and uncertainties" and that "[i]t is reasonably possible that the ultimate cost of these service and recall actions may require [FCA] to make expenditures in excess of (or less than) established accruals over an extended period of time."  (*See infra* at 18-19.)

The Amended Complaint similarly fails to allege that FCA's statements regarding its "substantial[] . . . compliance with the relevant global regulatory requirements" were false at any relevant time.  Plaintiffs cite a handful of regulations from one federal agency in one of the more than 150 countries across the six continents in which FCA sells vehicles, but such allegations do not plead that FCA was not *substantially* in compliance with its *global* regulatory obligations.  Moreover, in this Circuit, courts have repeatedly rejected efforts to transform a generalized

statement such as this one into securities fraud.  (*See infra* at 20-21.)

**No Loss Causation:**  Plaintiffs have failed to plead a "corrective" disclosure that "reveals to the market the falsity of a prior representation," and the Amended Complaint therefore does not plead loss causation.  Absent allegations that FCA's previous estimates of its global recall and warranty costs were not prepared pursuant to the methodologies disclosed at the time of those estimates—and there are no such allegations in the Amended Complaint—FCA's update in October 2015, after FCA US's first settlement with NHTSA in July 2015, to the assumptions it used for estimating costs could not have *corrected* any previously disclosed estimates.  Similarly, the settlements with NHTSA did not "correct" any misstatement of historical fact by FCA about its "substantial" compliance with "*global* regulatory requirements," since those settlements had nothing to do with any non-U.S. regulations and addressed only a limited number of U.S. compliance issues raised by one of many U.S. regulators with jurisdiction over aspects of FCA's business.  In fact, FCA publicly disclosed the existence and potential adverse outcome of the NHTSA inquiry on May 19, 2015, two months prior to the supposed July 2015 "corrective" disclosure.  Under settled law, Plaintiffs may not rest securities claims on the manifestation of a risk that the company had disclosed to its investors.  (*See infra* at 23-25.)[2]

## THE AMENDED COMPLAINT'S ALLEGATIONS

### A.   FCA's Global Reserves for Estimated Future Warranty and Recall Costs

In its SEC filings during the putative class period, FCA disclosed on a quarterly basis its

---

[2] Separately, the Court should dismiss all claims brought on behalf of purchasers of FCA stock on the Milan Stock Exchange.  FCA is listed on both the New York Stock Exchange and the Milan Stock Exchange.  (Declaration of William B. Monahan, dated March 7, 2016 ("Monahan Declaration"), Ex. 3, at 21, F8.)  The Second Circuit has squarely held that the U.S. securities laws do not apply to claims brought by purchasers of dual-listed stock on non-U.S. exchanges. *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014).

global reserve for estimated future warranty and recall expenses for vehicles sold during the quarter.  (*E.g.*, Ex. 4 at 71-72, 145-46; *see also* Ex. 2.)[3]  FCA also detailed the manner in which it determined its global reserve for future warranty and recall expenses, explaining each quarter that the reserve was "estimated" based primarily on FCA's "historical claims experience":

> [FCA] periodically initiates voluntary service and recall actions to address various customer satisfaction and safety and emissions issues related to vehicles sold. Included in the reserve is the ***estimated cost*** of these service and recall actions. The ***estimated future costs*** of these actions are ***primarily based on historical claims experience for [FCA's] vehicles***.

(*E.g.*, Ex. 3 at 66, F29 (emphasis added).)

FCA disclosed that its global reserves were based on "***estimates and assumptions***" that could change depending on future events and could be updated in the future, including to make "changes in the assumptions," if and when future recall actions occurred and differed from historical experience.  For example:

- "Experience has shown that initial data for any given model year can be volatile.  The process therefore relies upon long-term historical averages until actual data is available.  ***As actual experience becomes available, it is used to modify the historical averages to ensure that the forecast is within the range of likely outcomes***."

- "The ***estimated*** future costs of [recall and warranty] actions are principally based on ***assumptions*** regarding the lifetime warranty costs of each vehicle line and each model year of that vehicle line, as well as ***historical claims experience***."

- "[T]he number and magnitude of additional service actions expected to be approved,

---

[3] On this motion, the Court may consider FCA's SEC filings, analyst reports, documents referenced in or integral to the Amended Complaint, and any other document "upon which [Plaintiffs] relied in bringing the suit."  *Rothman* v. *Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000); *see ATSI Commc'ns, Inc.* v. *Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007); *In re MBIA, Inc., Secs. Litig.*, 700 F. Supp. 2d 566, 575 n.7 (S.D.N.Y. 2010) (Karas, J.); 15 U.S.C. § 78u-5(e).  Defendants include as Exhibits ("Exs.") to the Monahan Declaration the SEC filings and other documents the Court may consider on this motion.  For the Court's convenience, the Appendix attached to the Monahan Declaration as Ex. 2 provides excerpts from each of FCA's SEC filings during the putative class period.

and policies related to additional service actions, are taken into consideration.  Due to the **uncertainty** and **potential volatility** of these **estimated** factors, **changes in the assumptions used could materially affect the results of operations**."

- "**Estimates** of the future costs of [recall] actions are **inevitably imprecise**."

- "The **estimate** of warranty and additional service and recall action obligations is **periodically reviewed** during the year."

- "It is **reasonably possible** that the **ultimate cost** of these service and recall actions may require [FCA] to make expenditures **in excess of (or less than) established accruals over an extended period of time**."

(*Id.* (emphasis added).)

FCA also expressly disclosed to investors that it was facing pending regulatory investigations and recall activity and that recalls were a "Risk Factor," stating that "[a]ny costs incurred . . . from product recalls could materially adversely affect [FCA's] financial condition and results of operations."  (*E.g.*, Ex. 4 at 21-22, 193.)

### B.    FCA's Substantial Compliance with Global Regulations

The seventh largest automaker in the world, FCA sells vehicles in more than 150 countries across every continent except Antarctica and is subject to extensive country-specific regulations in each country.  (Ex. 4 at 57, 185.)  FCA also operates 159 manufacturing facilities in 40 countries, including throughout Europe and elsewhere (*e.g.*, Brazil, Mexico, China).  (*Id.* at 57, 184.)  Each of those jurisdictions imposes its own manufacturing regulations.  (*Id.* at 185.)

Throughout the putative class period, FCA warned investors that its "operations are subject to a variety of environmental laws and regulations," and that its vehicles are subject to "extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety, end-of-life vehicles, emissions and noise)."  (*E.g.*, Ex. 4 at 185.)  In these same disclosures, FCA stated that it was "**substantially** in compliance with the relevant **global** regulatory requirements affecting [its] facilities and products."  (*E.g.*, *id.*

-7-

(emphasis added).)  Contrary to the Amended Complaint's allegations (*see* AC ¶¶ 4, 19, 119-20, 123-24, 139-40, 149-52), FCA's disclosures nowhere stated that it was in "*full* compliance" with all NHTSA regulations (or the regulations of any particular regulatory body in any jurisdiction). Rather, FCA's disclosures expressly identified the broad range of matters subject to regulation by multiple regulators in more than 150 countries, including regulations concerning emissions, fuel economy, energy consumption, water management, waste management, workplace health and safety, and even banking (because FCA subsidiaries provide financing for consumers purchasing vehicles).  (*E.g.*, Ex. 4 at 185-92.)

### C.    The NHTSA Inquiry and First Consent Order

The Amended Complaint alleges that, prior to NHTSA's announcement on May 18, 2015 that it had scheduled a public hearing for July 2, 2015 concerning 20 FCA US recall campaigns, NHTSA notified FCA US of alleged problems concerning a total of *two* of FCA US's recall campaigns.  *First*, on November 25, 2014, NHTSA sent a letter to FCA US in which NHTSA raised concerns with the "slow pace" of **one public recall** involving vehicles with airbags manufactured by Takata Corp.  (AC ¶¶ 63, 178; Ex. 5.)  The letter, and the excerpt on which the Amended Complaint relies regarding FCA US being at the "rear of the pack" relative to other vehicle manufacturers, referred only to this single Takata airbag recall.  (Ex. 5.)  *Second*, on February 26, 2015, NHTSA sent a letter to FCA US concerning a public recall involving a transmission issue affecting **a single model's** ability to shift into "Park."  (AC ¶¶ 69, 93; Ex. 6.)

On May 18, 2015, NHTSA announced a public hearing to be held on July 2, 2015 to determine whether FCA US had complied with certain U.S. regulations in connection with 20 prior public recall campaigns, including the two recall campaigns referenced above.  (Ex. 7.) NHTSA subsequently expanded its inquiry to include three additional FCA US recall campaigns. The next day, FCA US issued a press release disclosing the NHTSA inquiry.  (Ex. 8.)

Following the July 2, 2015 public hearing, FCA US entered into a Consent Order with NHTSA on July 24, 2015 (the "First Consent Order").  In the First Consent Order, FCA US publicly acknowledged that it had violated the National Traffic and Motor Vehicle Safety Act and agreed to pay a civil penalty of $105 million in response to NHTSA's assertions that FCA US had not issued timely notifications to vehicle owners and NHTSA—many late by as little as a few days—in connection with 23 recalls, and that FCA US failed to remedy adequately defects in connection with three of those 23 recalls.  (Ex. 10 at 4-5.)

### D.    FCA Increases Its Estimate of Future Recall and Warranty Costs

On October 28, 2015, FCA announced its results for the third quarter—the same quarter in which NHTSA and FCA US entered into the First Consent Order.  FCA disclosed that in light of the "recent increases in both the cost and frequency of recall campaigns and increased regulatory activity across the industry in the U.S. and Canada, an additional actuarial analysis that gives greater weight to the more recent calendar year trends in recall campaign experience has been added to the adequacy assessment to estimate future recall costs."  (Ex. 11 at 16.)  As a result of this additional actuarial analysis, FCA increased its global reserve for estimated future recall and warranty costs in the U.S. and Canada by €761 million.  (*Id.*)

### E.    The Second NHTSA Consent Order

On December 8, 2015, NHTSA and FCA US entered into an Amendment to the Consent Order (the "Second Consent Order," and together with the First Consent Order, the "Consent Orders").  In the Second Consent Order, FCA US acknowledged that it had not submitted certain early warning information to NHTSA "due to coding problems in its [early warning] system that failed to recognize when reportable information was received or updated," and because FCA US "did not update its system to reflect new FCA brands."  (Ex. 12 at 2-4.)  FCA agreed to pay a civil penalty of $70 million.  (*Id.*)

Neither Consent Order included an admission by FCA US, its affiliates or its employees of any knowing, intentional, reckless or even negligent violation of any NHTSA regulations. Nor did either Consent Order include any reference to the Individual Defendants.

## ARGUMENT

The Amended Complaint alleges a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and a derivative "control person" claim under Section 20(a) of the Exchange Act.[4]   To state a claim under Section 10(b), Plaintiffs must allege:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners* v. *Scientific–Atl., Inc.*, 552 U.S. 148, 157 (2008).

## I.  THE COMPLAINT ALLEGES NO PARTICULARIZED FACTS TO SUPPORT A COGENT AND COMPELLING INFERENCE THAT ANY DEFENDANT ACTED WITH SCIENTER.

To survive this motion to dismiss, Plaintiffs were required to "plead with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," here, "an intent to deceive, manipulate, or defraud."  *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  To do so, Plaintiffs were required to allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns*, 493 F.3d at 99.

---

[4] Because, as demonstrated below, the Amended Complaint fails to state a claim against any Defendant for a primary violation of the Exchange Act, any "control person" claim necessarily fails as a matter of law.  *See ATSI Commc'ns*, 493 F.3d at 108; *In re Glenayre Techs., Inc. Sec. Litig.*, 1998 WL 915907, at *5 (S.D.N.Y. Dec. 30, 1998) (Baer, J.).

Where, as here, "motive is not apparent,"[5] Plaintiffs must "identify[] circumstances indicating conscious behavior by the defendant" and "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). At a minimum, Plaintiffs must allege "*conscious recklessness—i.e.*, a state of mind approximating *actual intent*," where Defendants' conduct "represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *S. Cherry St., LLC* v. *Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis added). Plaintiffs have not done so.

### A.   Plaintiffs Have Not Pled that Defendants Acted with Scienter in Estimating FCA's Future Global Recall and Warranty Costs.

In their Amended Complaint, Plaintiffs allege no particularized facts demonstrating that any reserve estimate included in FCA's SEC filings was inconsistent with FCA's fully disclosed reserving methodology or contemporaneous data then known to Defendants. Moreover, because reserve estimates are projections and subjective opinions of future costs, they are actionable under the PSLRA's safe harbor for forward-looking statements only if made with *actual knowledge* of their falsity. *See Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (legal standard applicable to matters of opinion applies to disclosures of loan loss reserves). The PSLRA safe harbor immunizes forward-looking statements that are not "made with actual knowledge that [they are] false or misleading." *Slayton* v. *Am. Exp. Co.*, 604 F.3d 758, 766 (2d

---

[5] The Amended Complaint includes one passing allegation, unsupported by any factual allegations, claiming that the Individual Defendants sought "to personally benefit from the sale of Chrysler securities from their personal portfolios." (AC ¶ 196.) "The mere allegation of insider sales during the Class Period does not, without more, properly allege motive." *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 354 (S.D.N.Y. 2005) (Sweet, J.); *see also In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (Baer, J.) ("[T]he mere fact that insider stock sales occurred does not suffice to establish scienter.").

Cir. 2010); *see* 15 U.S.C. § 78u-5(c).

Plaintiffs come nowhere close to pleading a strong inference that FCA's recall reserve estimates were *knowingly false when made*.  For instance, Plaintiffs allege no "contradictory internal report," *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004) (Koeltl, J.), or conversation where Defendants learned any contradictory information, *In re DRDGold Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 572 (S.D.N.Y. 2007) (Marrero, J.).  Plaintiffs' sheer speculation that Defendants were "in possession of substantial information that would have caused higher reported costs for warranty claims and recalls" (AC ¶ 116) is "so broad and conclusory as to be meaningless."  *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal because no allegation that "the company's disclosures were inconsistent with current data"); *see San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996) (affirming dismissal where "no showing that defendants' descriptions of [company's] performance were not based on the facts available to the company at the time the statements were made").[6]

In claiming that FCA's global reserves for its estimated future recall and warranty costs must have been fraudulent because FCA increased its reserves in October 2015 (after FCA US's entry in July 2015 into the First Consent Order), Plaintiffs engage in impermissible "fraud by hindsight."  As courts in this District have repeatedly held, in "the absence of particularized allegations that [defendant] was experiencing or internally predicting losses exceeding their set

---

[6] Nor do Plaintiffs allege that FCA knowingly omitted information that would "conflict with what a reasonable investor would take from the statement itself"—namely, that FCA projected future recall costs based primarily on historical averages, and, "[a]s actual experience bec[ame] available," FCA updated its assumptions.  *See Tongue* v. *Sanofi*, 2016 WL 851797, at *11 (2d Cir. Mar. 4, 2016) ("Nowhere in the complaints do Plaintiffs even allege that Defendants' interpretation of the data was irrational or unreasonable . . . .").

reserves, the subsequent disclosures provide no basis to conclude that Defendants recklessly misstated previous reserve levels." *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 362 (S.D.N.Y. 2011) (Sullivan, J.).[7]

Moreover, Plaintiffs do not allege any coherent rationale for why Defendants would have deliberately withheld that FCA's reserve estimates needed to be increased to reflect changing conditions, only then to increase those same estimates five months after NHTSA opened its inquiry. *See Shields*, 25 F.3d at 1130 ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."). The far more plausible inference here is that FCA did precisely *what it disclosed it would do*: using its disclosed methodology, FCA projected its estimated future global recall costs based primarily on "historical averages." (*E.g.*, Ex. 3 at 66.) Then, at the end of the third quarter of 2015—after FCA US had entered into the First Consent Order in July 2015—FCA updated the assumptions it used (as FCA had expressly disclosed it would do[8]) due to "recent increases," culminating in the First Consent Order, "in both the cost and frequency of recall campaigns and increased regulatory activity across the industry." (Ex. 11

---

[7] *See also, e.g.*, *Zirkin* v. *Quanta Capital Holdings Ltd.*, 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009) (Patterson, Jr., J.) ("The relevant inquiry under the Securities Act is not whether the estimate disclosed in the offering documents later turned out to be correct, but rather whether the Company knew or had reason to know, at the time the offering documents were filed, that the statement was untrue."); *In re CIT Grp., Inc. Secs. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) (Sprizzo, J.) (that "defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate" when made); *Hinerfeld* v. *United Auto Grp.*, 1998 WL 397852, at *7-8 (S.D.N.Y. July 15, 1998) (Patterson, J.) ("The failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws.").

[8] FCA previously disclosed (a) that global costs for future recall/warranty compliance were "estimates" based on a model containing a number of "assumptions," (b) that "changes in the assumptions used could materially affect the results of operations," and (c) that the estimates and assumptions would change "[a]s actual experience becomes available." (*E.g.*, Ex. 3 at 66.)

at 16.)  Indeed, this "plausible nonculpable explanation[]," *ATSI Commc'ns*, 493 F.3d at 104, is entirely consistent with Mr. Palmer's statement during the third quarter earnings call, in which he discussed "the continued increased trend in the frequency and size of recall campaigns and the changes in the regulatory and operating environments that have been evolving in recent periods, but which *crystallized for FCA during the third quarter*."  (Ex. 13 at 3 (emphasis added).)

### B.  Plaintiffs Fail to Allege that Defendants Fraudulently Misstated that FCA Was in "Substantial[] Compliance" with "Global Regulatory Requirements."

To support their claim of fraud by a company with global operations subject to extensive regulation in over 150 countries, Plaintiffs speculate that Defendants knew that FCA was not "*substantially* in compliance" with "*global* regulatory requirements" merely because of concerns articulated in two letters from NHTSA (one of many U.S. regulators with jurisdiction over aspects of FCA's business) regarding just *two* U.S. recall campaigns.[9]  These isolated inquiries by one regulator in one country cannot plausibly allege scienter with respect to FCA's statements that it was in "substantial compliance" with "global" regulations.  *See Novak* v. *Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (plaintiff must allege that defendants "knew facts or had access to information suggesting that their public statements were not accurate"); *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 213-14 (S.D.N.Y. 2012) (Buchwald, J.) ("[A] showing of recklessness cannot be premised on information that was not reasonably available to the speaker at the time of the alleged misrepresentations.").  Despite Plaintiffs' fixation on the excerpt from the November 25 NHTSA letter regarding FCA US being "consistently" at the "rear of the pack," that statement (and the entire letter as a whole) referred only to ***the single Takata airbag recall***.  (Ex. 5.)

---

[9] Although the Amended Complaint points to one additional NHTSA letter (AC ¶ 70), that letter was written on June 18, 2015, *after* all of the alleged misstatements regarding FCA's "substantial compliance"—and therefore irrelevant to the issue of scienter.  In any event, that letter concerned just one U.S. recall campaign (regarding tire failures).  (Ex. 14.)

To try to bolster the Amended Complaint's conclusory allegations, Plaintiffs engage in a classic example of "fraud by hindsight" pleading by cutting and pasting statements made by NHTSA at the July 2, 2015 hearing, which occurred *after* FCA made all of its alleged misstatements regarding its "substantial[] compliance" with "global" regulations. The Amended Complaint quotes statements from the hearing regarding the timeliness of FCA US's so-called "573 Reports" related to the 23 individual recalls that were the subject of the First Consent Order. (*See, e.g.*, AC ¶¶ 51, 54-60, 70.)[10] Plaintiffs do not allege facts showing that any of the Individual Defendants—the most senior executives at FCA and/or FCA US—participated in the preparation of these 573 Reports or knew that the reports were submitted late, in some cases by only a *few days or weeks*. (*Id.* ¶¶ 84, 88.) Notably, the Amended Complaint specifically alleges that "NHTSA carefully reviews recall submissions to ensure that recalls are timely" (*id.* ¶ 39); yet, prior to NHTSA scheduling the July 2, 2015 public hearing, that "careful[] review" led to NHTSA notifying FCA US of just *two* instances of potential noncompliance.

FCA US's response to the NHTSA inquiry further refutes any inference of scienter. Immediately after NHTSA disclosed that it had scheduled the public hearing, FCA US issued a press release publicly disclosing NHTSA's inquiry. *See Tamar* v. *Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 557 (S.D.N.Y. 2010) (Berman, J.) (alleged inference of scienter from defendant's knowledge of a fact failed where defendant "disclosed that fact in a press release issued the next day"). Until the NHTSA inquiry was resolved in July 2015, FCA was not required to speculate about the outcome of that pending inquiry, as the "securities laws do not impose an obligation on a company to predict the outcome of investigations." *In re Lions Gate Entm't Corp. Sec. Litig.*,

---

[10] A "573 Report" is a manufacturer's "report to the NHTSA for each defect in [the manufacturer's] vehicles . . . that [the manufacturer] or the Administrator determines to be related to motor vehicle safety." (AC ¶ 34.)

2016 WL 297722, at *7-8 (S.D.N.Y. Jan. 22, 2016) (Koeltl, J).[11]

### C. Plaintiffs Do Not Allege with the Required Particularity that Any of the Individual Defendants Acted with Scienter.

Plaintiffs notably fail to allege with particularity that any of the Individual Defendants had any contemporaneous knowledge that contradicted their alleged misstatements. That failure is dispositive of all claims against all Defendants, as Plaintiffs must plead particularized allegations of scienter with respect to "someone whose scienter is imputable to the corporate defendants." *Teamsters* v. *Dynex Capital, Inc.*, 531 F.3d 190, 197 (2d Cir. 2008).

*First*, Plaintiffs contend that the Individual Defendants' scienter "can be inferred from the frequency and focus of Defendants' discussions of regulatory compliance in press releases, earnings calls and SEC filings." (AC ¶ 166.) The fact that the Individual Defendants frequently discussed regulatory compliance says nothing about whether they had specific knowledge that NHTSA ultimately would determine that FCA US was not in compliance with any regulations. Nor, as explained above, did the securities laws impose on the Individual Defendants the obligation to predict the outcome of the NHTSA inquiry that began in May 2015.

*Second*, Plaintiffs point to the fact that there was an industry-wide increase of scrutiny by NHTSA regarding recalls and that NHTSA had fined certain of FCA's competitors (Toyota and GM) in 2010 and 2014, respectively. (AC ¶¶ 167-69.) But knowledge of a general industry trend or of competitor developments "does not equate to harboring a mental state to deceive,

---

[11] *See also*, *e.g.*, *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) (Sullivan, J.) ("[A]bsent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies."), *aff'd*, 752 F.3d 173 (2d Cir. 2014); *In re Open Joint Stock Co.*, 2006 WL 647981, at *6 (S.D.N.Y. Mar. 14, 2006) (Buchwald, J.) ("[N]one of plaintiffs' allegations suggest why [defendant] should have known that the August 2004 tax inspection would result in any liability.").

manipulate, or defraud." *Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imp. Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); *see also In re Sec. Capital Assur. Ltd.*, 729 F. Supp. 2d 569, 595-96 (S.D.N.Y. 2010) (Batts, J.); *In re PXRE Grp., Ltd., Secs. Litig.*, 600 F. Supp. 2d 510, 539-40 (S.D.N.Y. 2009) (Sullivan, J.) (failure to act in response to "generalized awareness of . . . 'concerns'" in a market or industry not conscious recklessness). Moreover, FCA expressly disclosed increased regulatory scrutiny to investors as "Risk Factors" and "Trends and Uncertainties," stating that "[FCA] and the U.S. automotive industry in general have recently experienced a significant increase in recall activity." (*E.g.*, Ex. 3 at 7, 60.)

*Third*, although Plaintiffs claim that Mr. Kunselman made misstatements at a November 20, 2014 Senate Committee hearing when he stated that FCA "prides itself on having the highest recall completion rate of all major U.S.-market auto makers" and that "NHTSA regards [FCA US's] customer-notification protocols as 'industry-best,'" the two NHTSA letters trumpeted in the Amended Complaint are dated *after* the November 20, 2014 Senate hearing, and neither are addressed to Mr. Kunselman in any event. (*See* Exs. 5 and 6.) Plaintiffs point to the fact that Mr. Kunselman's role at FCA US gave him "oversight of regulatory compliance" and put him in regular contact with NHTSA (AC ¶¶ 170-72), but, as a matter of law, such allegations—*i.e.*, that Mr. Kunselman must have obtained knowledge inconsistent with his alleged misstatements at some unspecified time because of his corporate position—are "entitled to no weight." *Plumbers*, 694 F. Supp. 2d at 300; *see also Bd. of Trustees of the City of Ft. Lauderdale Gen. Employees' Ret. Sys.* v. *Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011) (Sullivan, J.).

*Finally*, Plaintiffs appear to assert that Mr. Marchionne acknowledged having knowledge of FCA's noncompliance when he stated, during a July 30, 2015 earnings call, that FCA "ha[s] not always been perfect in complying with [recall] requirements," and that, "over the last year

-17-

and a half, NHTSA has begun to take a harder look at these technical compliance issues, and frankly we started to do the same thing about the same time."  (AC ¶ 177; Ex. 15 at 2.)  This statement that FCA US was "not . . . perfect" is entirely consistent with FCA's "substantial compliance" disclosures, and it in no way suggests that Mr. Marchionne previously made a statement he knew to be false.

## II.   PLAINTIFFS PLEAD NO ACTIONABLE MISREPRESENTATIONS.

### A.   The Amended Complaint Does Not Allege that FCA Misstated Its Global Recall Reserve Estimates.

Throughout the putative class period, FCA disclosed the existence and size of its global recall reserve estimates and the manner in which it determined—and, when needed, updated—those estimates.  In particular, FCA expressly disclosed that (i) its recall reserves were based on "*estimated* future costs of [recall/warranty] actions" that were themselves "principally *based on assumptions*" derived from "historical averages," (ii) "*changes in the assumptions used* could materially affect the results of operations," (iii) the "ultimate cost of . . . recall actions [could be] in excess of" disclosed amounts, and (iv) "*[a]s actual experience becomes available*, it is used to *modify the historical averages* to ensure that the [reserve] forecast is within the range of likely outcomes."  (*E.g.*, Ex. 3 at 66, F29 (emphasis added).)  The Amended Complaint includes no allegations—none—showing that FCA's reserves were not calculated in the manner disclosed. This failure alone defeats Plaintiffs' claims.[12]

---

[12] *See Fait*, 655 F.3d at 113 ("[D]etermining the adequacy of loan loss reserves is not a matter of objective fact.  Instead, loan loss reserves reflect management's opinion or judgment."); *Delta Holdings, Inc.* v. *Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1250 (2d Cir. 1991) ("Informed guesswork is an accepted basis for determining [loss] reserves."); *CIT*, 349 F. Supp. 2d at 689-90 (statements regarding reserves are "not . . . actionable under the securities laws if they simply represented a failure on the part of defendants to correctly gauge the adequacy of the loan loss reserves"); *Harris* v. *AmTrust Fin. Servs.*, 2015 WL 5707235, at *11 (S.D.N.Y. Sept. 29, 2015)

*(footnote continued . . .)*

Moreover, an estimate of future costs, as here, is a forward-looking statement that is not actionable if accompanied by cautionary language warning of the risks that could lead to adverse results. *See In re NovaGold*, 629 F. Supp. 2d 272, 292-93 (S.D.N.Y. 2009) (Cote, J.); *Coronel* v. *Quanta Capital Holdings*, 2009 WL 174656, at *17-18 (S.D.N.Y. Jan. 26, 2009) (Patterson, J.). "[C]haracterizing a cost figure as an 'estimate' . . . is inherently cautionary, as the word 'estimate' connotes uncertainty." *In re NovaGold*, 629 F. Supp. 2d at 294. Plaintiffs do *not* allege—nor could they—that FCA represented that its recall reserves were sufficient to meet all future recall costs, whether in the United States or globally. Instead, FCA expressly identified its statements "regarding . . . reserves . . . [as] 'forward-looking statements that contain risks and uncertainties'" and that "[i]t is reasonably possible that the ultimate cost of these service and recall actions may require [FCA] to make expenditures in excess of (or less than) established accruals over an extended period of time." (*E.g.*, Ex. 3 at iii, 66.) FCA also expressly disclosed that it was facing pending regulatory investigations and recall activity and identified recalls as a "Risk Factor," stating that "[a]ny costs incurred . . . from product recalls could materially adversely affect [FCA's] financial condition and results of operations." (*E.g.*, Ex. 4 at 21-22, 193.) FCA thus warned "of the specific contingency that lies at the heart of the alleged misrepresentation," *i.e.*, of the risk of increased recall reserves in the future and its potential impact on FCA's results. *P. Stolz Family P'ship* v. *Daum*, 355 F.3d 92, 97 (2d Cir. 2004).

**B.** **FCA Did Not Materially Misrepresent that It Was in "Substantial[] Compliance" with "Global Regulatory Requirements."**

FCA's statement in its SEC filings that it was "*substantially*" in compliance with the

---

(*...continued footnote*)

("difference of opinion regarding the reasonableness of [defendant's] actuarial or accounting assumptions" alleges no misstatement).

relevant *global* regulatory requirements" was not a misstatement, actionable or otherwise.

*First*, Plaintiffs fail even to contend, much less plead with particularity, that FCA was at any time not "substantially in compliance" with its *global* regulatory obligations.  Each of the more than 150 countries in which FCA operates has its own regulations concerning a wide variety of matters, from emissions to banking regulations.  (*See*, *e.g.*, Ex. 4 at 185-92.) Plaintiffs' attempt to equate isolated disputes concerning a handful of regulations with one U.S. regulator does not remotely suggest that FCA was not at any time in substantial compliance with the myriad global regulations to which it was subject.

*Second*, FCA's supposed misstatement appears in a description of FCA's "Industry," under a heading entitled "Environmental and Other Regulatory Matters."  (*E.g.*, Ex. 4 at 185.) This description describes the complex regulatory environment in which FCA operates throughout the world, and states only that FCA is substantially (not "fully," contrary to Plaintiffs' repeated and demonstrably false claim (AC ¶¶ 4, 19, 119-20, 123-24, 139-40, 149-52)) in compliance with those regulations.  This statement represents precisely the sort of vague statement that is "too general to cause a reasonable investor to rely upon [it]."  *JP Morgan*, 553 F.3d at 206; *see also Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 Fed. Appx. 32, 37-38 (2d Cir. 2012) (statements praising corporate defendant's credit-ratings service's "honesty and integrity" inactionable, despite allegations that ratings were a "sham," because of the statements' "generic, indefinite nature" and irrespective of their "scope").[13]

---

[13] The Amended Complaint points to a number of other statements that, as a matter of law, are inactionable puffery:  the establishment of an office of Vehicle Safety and Regulatory Compliance "will help intensify [FCA's] continuing commitment to vehicle safety and regulatory compliance"; FCA "constantly do[es] [its] utmost to warrant [customer] confidence" in "the quality and safety of [FCA's] products"; FCA "strive[s] to connect [its] safety efforts to a collective goal [FCA] share[s] with . . . drivers, dealers . . . [and] regulators"; FCA US is "fully

(*footnote continued . . .*)

C.   **The Amended Complaint Does Not Allege that the Individual Defendants Made Any Actionable Misstatement in Their Oral Comments.**

1.   **Mr. Marchionne (FCA's and FCA US's CEO)**

Plaintiffs challenge Mr. Marchionne's statements during the January 28, 2015 earnings call that FCA had a "pretty robust system in place" for recall compliance, and that FCA was becoming "much more proactive and identifying potential exposures going forward." (AC ¶ 176.)  The statements that the "system" was "pretty robust" and that FCA was becoming "much more proactive" were far too general to convey information on which any reasonable investor would rely.  *See, e.g.*, *JP Morgan*, 553 F.3d at 205-06 (statements "that [defendant] had 'risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process'" and that defendant "would 'continue to reposition and strengthen [its] franchises with a focus on financial discipline'" were inactionable puffery); *Lasker* v. *N.Y.S. Elec. & Gas Corp.*, 85 F.3d 55, 56-57, 59 (2d Cir. 1996) (statements that company "will not compromise its financial integrity" and "[is] convinced our business strategies will lead to continued prosperity" were inactionable puffery).  In any event, Plaintiffs nowhere allege that these statements were false.  Plaintiffs do not allege any facts showing that FCA's compliance program fell short of some "robustness" standard or that FCA was not, in January 2015, becoming "much more proactive" in identifying risks "going forward."  While Plaintiffs insinuate that Mr. Marchionne conveyed some impression that recall issues were behind FCA, he

---

(*...continued footnote*)

aligned with NHTSA's desire to promote efficient execution of vehicle recalls and enhance completion rates"; and "FCA US will continue to cooperate with NHTSA in its efforts to identify ways in which it can more quickly identify issues, determine fixes and execute campaigns." (AC ¶¶ 111-12, 139-40, 147-48; *see Herman* v. *Legent*, 1995 WL 115879, at *4 (4th Cir. 1995) ("Once a statement is determined to be commonplace commercial puffery, our inquiry ends.").) In any event, Plaintiffs fail to allege facts showing that any of these statements were in fact false.

in fact said the opposite:  "But you can't call this.  Every time I read the paper, there is *another recall underway, including some of ours*."  (AC ¶ 175 (emphasis added).)

Plaintiffs also cite Mr. Marchionne's statement during the July 30, 2015 earnings call that, "[t]o the best of my knowledge," the financial statements were "comprehensive of every action that's been discussed and undertaken with NHTSA."  (AC ¶ 156.)  Plaintiffs claim that Mr. Marchionne's statement was misleading because, in "late July" (Plaintiffs are not more specific), NHTSA "identified discrepancies in [FCA US's] early warning reports of deaths and other serious injuries," which ultimately would be the subject of the Second Consent Order in December 2015.  (*Id*. ¶ 157.)  Plaintiffs fail to identify any of the supposed "discrepancies" that NHTSA purportedly brought to FCA US's attention in "late July," and certainly have not identified them with the particularity required by the PSLRA and Rule 9(b).  Nor do Plaintiffs plead facts showing that Mr. Marchionne had actual knowledge of any of these "discrepancies." Absent such allegations, there can be no misstatement, because Mr. Marchionne prefaced his statement by saying "to the best of my knowledge."  *See Shields*, 25 F.3d at 1131.

### 2.    Mr. Kunselman (FCA US's Former Head of Vehicle Safety and Regulatory Compliance)

Plaintiffs contend that various comments Mr. Kunselman made at a November 20, 2014 Senate Committee hearing were false or misleading in some amorphous respect never explained in the Amended Complaint.  Mr. Kunselman allegedly stated that FCA US "prides itself on having the highest recall completion rate of all major U.S.-market auto makers," that "NHTSA regards [FCA US's] customer-notification protocols as 'industry-best,'" that FCA US's "average per-campaign vehicle volume is among the lowest in the industry—well below the industry average," and that the preceding statements were a "testament to [FCA US's] transparency and demonstrate[] the robustness of [FCA US's] fleet monitoring and [FCA US's] rapid response

when issues arise."  (AC ¶ 121.)  Plaintiffs nowhere explain through particularized pleading (or otherwise) why or how any of these statements were misleading or actionably so.  The Consent Orders do not show or imply that FCA US did not have "the highest recall completion rate of all major U.S.-market auto makers" or that its "average per-campaign vehicle volume [was] among the lowest in the industry."  Moreover, these statements represent inactionable puffery.  *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) ("The Court finds that the descriptions at issue here—that the compliance program was 'robust' or 'best-of-class'" are "commonplace statements too general to cause reliance by a reasonable investor."); *JP Morgan*, 553 F.3d at 205-06 ("[Defendant's] statement that it 'set the standard for best practices in risk management techniques' . . . is so general that a reasonable investor would not depend on it.").

### 3.    Mr. Palmer (FCA's and FCA US's CFO)

Plaintiffs allege that, during the January 28, 2015 earnings call to discuss FCA's results for the fourth quarter, Mr. Palmer stated—in response to a question whether FCA had already "reflect[ed] the cost of the Takata airbag recall"—that FCA had "booked the Takata item in Q4," and that he "expect[ed] the industrial cost headwind to be significantly less than it was in 2014 because of the fact that all these launches with extra content have had a 12-month cycle now." (AC ¶ 131; Ex. 16 at 15-16.)  Plaintiffs have not pled that either statement was false.  *First*, Plaintiffs have not pled any facts suggesting that the costs of the Takata recall were not booked in the fourth quarter.  (*See also* Ex. 17 at 6 (disclosing EBIT reflected "higher warranty and recall costs").)  *Second*, there are no allegations suggesting that Mr. Palmer did not subjectively "expect[]" (as required to plead an actionable misrepresentation concerning his statement of belief, *see supra* at 16-18) that the "industrial cost headwind" would lessen significantly. Notably, even if the November 25, 2014 NHTSA letter concerning only one U.S. recall could

have any bearing on a "headwind" affecting FCA's global industrial costs (which it could not), the Amended Complaint does not plead that Mr. Palmer saw or was aware of that letter—which was not addressed to the Mr. Palmer (the CFO)—at the time he made his alleged misstatement.

## III.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION AS A MATTER OF LAW.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  To plead loss causation, Plaintiffs must allege that the alleged "misstatement or omission *concealed* something from the market that, when disclosed, negatively affected the value of the security."  *Id*. at 173 (emphasis added).  A decline in the stock price following a public announcement of "bad news" cannot, without more, establish loss causation.  *In re Bristol-Myers Squibb Co.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008) (Crotty, J.).

The three alleged "corrective disclosures"—the July 2015 First Consent Order, the October 2015 announcement of the additional €761 million reserve estimate, and the December 2015 Second Consent Order—were not corrective disclosures as a matter of law for two reasons:

*First*, the disclosures were not "corrective" of any misstatement because they did not "reveal[] to the market the falsity of a prior representation."  *In re Moody's*, 274 F.R.D. 480, 487 (S.D.N.Y. 2011) (Daniels, J.).  As explained above (*see supra* at 18-19), FCA applied new assumptions to account for recent trends when it updated its reserve estimate for future costs in October 2015.  Plaintiffs have pled no facts to show that the *original* estimates were "corrected"; in fact, Plaintiffs have nowhere pled that those original estimates were calculated other than in accordance with the disclosed methodology used at the time.  Likewise (*see supra* at 19-20), the Consent Orders did not "correct" any prior statement by FCA about its "substantial compliance" with "global" laws and regulations, but merely related to a handful of regulations from one federal agency in one of the more than 150 countries in which FCA sells vehicles.  Plaintiffs

therefore fail to allege any "then-undisclosed fact with regard to the specific misrepresentations alleged." *Cent. States* v. *FHLMC*, 543 Fed. Appx. 72, 74 (2d Cir. 2013).

*Second*, FCA US issued a press release two months ***before*** the supposedly "corrective" First Consent Order expressly disclosing the NHTSA inquiry.   Thus, from FCA's own disclosure, the market knew about the potential risks associated with NHTSA's inquiry and factored the uncertainty of the outcome into the share price.   *See In re Omnicom Grp. Secs. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (no loss causation for previously disclosed matters because the market "at all times promptly digested and reflected in its share price all public information").   In fact, published analyst reports acknowledged that the NHTSA inquiry was "potentially negative" on FCA's financial outlook and could result in "higher Y/Y [year-over-year] recall costs," potentially threatening FCA's return on sales.  (Ex. 9 at 7.)[14]  Any stock price reaction to the later Consent Orders did not reflect a price reaction to a "correction" of some prior misrepresentation, but merely a reaction to the adverse outcome of the NHTSA inquiry, which was not a *concealed* risk.  *See Omnicom*, 597 F.3d at 512 ("corrective disclosure" requires new information, not simply "a negative characterization of already-public information").

## CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.[15]

---

[14] Analysts also stressed at the time FCA increased its reserve estimates in October 2015 that the market had "already anticipated incremental costs for recalls under the higher-scrutiny regulatory environment."  (Ex. 18 at 1.)  In fact, several analysts had previously predicted that FCA might face additional costs that could easily run into the "hundreds of millions of dollars," reaching as high as $800 million, $1 billion or even $1.5 billion.  (*Id.*; Ex. 19 at 2; Ex. 20 at 1.)

[15] Any request for leave to amend should be denied.  "A party cannot wait to see how he would fare on [a] prior motion to dismiss before seeking leave to amend based on facts that were available before the motion was decided."  *Compania Embotelladora Del Pacifico* v. *Pepsi Cola Co.*, 607 F. Supp. 2d 600, 603 (S.D.N.Y. 2009) (Rakoff, J.).

Respectfully submitted,


    /s/ Robert J. Giuffra, Jr.
Robert J. Giuffra, Jr.
William B. Monahan
Victoria A. Coyle
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2468
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

March 7, 2016