**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| GARY KOOPMAN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : : : : : | **Civ. Action No: 15-cv-07199-JMF** |
| Plaintiff(s), | : : : | **CLASS ACTION** |
| v. | : : : : : | **OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |
| FIAT CHRYSLER AUTOMOBILES N.V., SERGIO MARCHIONNE, RICHARD K. PALMER, and SCOTT KUNSELMAN | : : : : | |
| Defendants. | : : : | |

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT…………………………………………..……………1

II.  FACTUAL ALLEGATIONS………………………………..…………………..3

    A.  FCA's Background…………………………………………………………3

    B.  FCA's Obligation To Timely Conduct Safety-Related Recalls………………………3

    C.  NHTSA Increases Focus on Compliance and Timeliness of Notifications…………..4

    D.  Defendants Were Personally Involved in NHTSA Compliance………………………5

    E.  Chrysler's Regulatory Violations……………………………………………6

        1.   FCA's Untimely Recalls..................................................................................6

        2.   Chrysler's Untimely Notices of Recalls and Repairs ........................................ 6

        3.   FCA's Failure to Timely Submit Recall Communications .............................. 7

        4.   Chrysler's Failures To Timely and Properly Recall and Repair Vehicles That

           Caught Fire From Low-Speed Rear Impacts ................................................... 7

        5.   FCA's Failure to Timely Recall Vehicles With Defective Takata Air Bags..... 9

        6.   FCA's Failure to Remedy "Axel Lock Up" Defect........................................ 10

        7.   FCA's Failure to Remedy Defective Tie Rods That Cause Loss of Control .. 10

    F.  FCA's Failure to Properly Account For Recalls…………………………………11

    G.  Materially False and Misleading Statements Issued During the Class Period………11

    H.  The Truth Begins to Emerge…………………………………………………12

III. ARGUMENT………………………………………………………..………13

    A.  The Complaint Amply Alleges That Defendants' Statements Concerning

        Compliance Were False and Misleading……………………………………14

i

1.    Defendants' Statements That FCA Was In Compliance with
      "Vehicle Safety" Regulations Were False and Misleading ........................... 15

2.    Defendants' Statements Concerning Compliance Were Not "Puffery" .......... 17

B.  The Complaint Alleges A Strong Inference of Scienter For Defendants'
    Statements Concerning Compliance……………………………………………..19

    1.    Defendants' Actual Knowledge of "Critical" and "Unacceptable" Regulatory
          Violations Supports a Strong Inference of Scienter ....................................... 20

    2.    Defendants' Repeated Discussions of Compliance, Admitted Close Monitoring
          of Compliance Issues to Ensure "Information Flow" and "Accountability"
          And Access to Reports Detailing Violations Supports a Strong Inference of
          Scienter ...................................................................................................... 22

    3.    Kunselman's Abrupt Resignation Supports a Strong Inference of Scienter ... 24

    4.    The Inference of Scienter is At Least as Strong as Any Nonculpable
          Inference ...................................................................................................... 24

C.  The Complaint Adequately Alleges Falsity and Scienter As to FCA's Provision For
    Recalls………………………………………………………………………………25

    1.    Defendants' Provision For Recalls Was Objectively and Subjectively False . 25

    1.    Defendants' Supposed Risk Disclosures Were Themselves False and
          Misleading.................................................................................................... 28

D.  The Complaint Adequately Alleges Loss Causation………………………………..29

IV. CONCLUSION………………………………………………..………………………..31

# TABLE OF AUTHORITIES

**Cases**

*Acito v. IMCERA Group, Inc.*
   47 F.3d 47 (2d Cir. 1995) ................................................................................................ 31

*American Apparel S'holder Litig.*
   2013 WL 174119 ............................................................................................................... 23

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) .......................................................................................................... 14

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007) .......................................................................................................... 14

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*
   506 Fed. Appx. 32 (2d Cir. 2012) ..................................................................................... 19

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*
   866 F. Supp. 2d 223 (S.D.N.Y. 2012) ............................................................................... 17

*C.f. Meyer v. Greene*
   710 F.3d 1189 (11th Cir. 2013) ........................................................................................ 30

*Caiola v. Citibank, N.A.*
   295 F.3d 312 (2d Cir. 2002) ............................................................................................. 15

*City of Austin Police Retirement Sys. v. Kinross Gold Corp.*
   957 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................................... 25

*City of Livonia Employees Ret. Sys. v. Wyeth*
   2010 U.S. Dist. LEXIS 107729 (S.D.N.Y. Sept. 29, 2010) ............................................. 23

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*
   399 F.3d 651 (6th Cir. 2005) ............................................................................................ 19

*City of Pontiac Gen. Employees' Ret. Sys. v. Wal-Mart Stores, Inc.*
   2014 WL 4823876 (W.D. Ark. Sept. 26, 2014) ................................................................ 24

*ECA & Local 134 IBEW Jt. Pension Trust of Chi.*
   553 F.3d .................................................................................................................... 19, 20

*Fait v. Regions Fin. Corp.*
   655 F.3d 105 (2d Cir. 2011)........................................................................ 27

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*
   104 F. Supp. 3d 441 (S.D.N.Y. 2015 .......................................................... 16

*Federal Housing Finance Agency v. UBS Americas, Inc.*
   2012 WL 1570856 (S.D.N.Y. May 4, 2012) ............................................... 15

*Freudenberg v E\*Trade Fin. Corp.*
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................... 30

*Gov't of Guam Ret. Fund v. Invacare Corp.*
   2014 BL 228345 (N.D. Ohio Aug. 18, 2014) .............................................. 21

*IBEW Local Union No. 58 Pension Trust v. Royal Bank of Scotland Grp, PLC*
   783 F.3d 383 (2d Cir. 2015)........................................................................ 17

*In re Able Labs. Sec. Litig.*
   2008 WL 1967509 (D.N.J. March 24, 2008) .............................................. 21

*In re Alstom SA Sec. Litig.*
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................... 23

*In re Am. Int'l Grp., Inc.*
   *2008 Sec. Litig.,* 741 F. Supp. 2d 511 (S.D.N.Y. 2010) ........................... 25

*In re Ambac Financial Group, Inc. Sec. Litig.*
   693 F. Supp. 2d 241 (S.D.N.Y. 2010)................................................... 15, 30

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)......................................................... 23

*In re Barrick Gold Secs. Litig.*
   2015 BL 92331 (S.D.N.Y. Apr. 01, 2015)................................................... 23

*In re Bear Stearns Cos. Inc. Sec., Derivative, and ERISA Litig.*
   763 F.Supp.2d 423 (S.D.N.Y. 2011)........................................................... 15

*In re BioScrip, Inc.*
   95 F. Supp. 3d 711 (S.D.N.Y. 2015)...................................................... 20, 23

*In re CitiGroup Inc. Bond Litig.*
   723 F.Supp.2d 568 (S.D. N.Y. 2010).......................................................... 15

*In re Converium Holding AG Sec. Litig.*
  2006 WL 3804619 (S.D.N.Y. Dec. 28, 2006), *on reconsideration in part,* 2007 WL 1041480
  (S.D.N.Y. Apr. 9, 2007) ......................................................................................................... 27

*In re Cryolife, Inc.*
  2003 WL 24015055 (N.D.Ga. May 27, 2003) ........................................................................ 21

*In re GE Secs. Litig.*
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) .................................................................................... 22

*In re Gen. Elec. Co. Sec. Litig.*
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) .................................................................................... 23

*In re Gentiva*
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................................... 19

*In re Initial Pub. Offering Sec. Litig.*
  544 F. Supp. 2d 277 (S.D.N.Y. 2008) .................................................................................... 29

*In re Loral Space & Commc'ns Ltd.*
  2004 WL 376442 (S.D.N.Y. Feb.27, 2004) ........................................................................... 26

*In re Lucent Techs., Inc. Sec. Litig.*
  217 F. Supp. 2d 529 (D.N.J. 2002) ........................................................................................ 19

*In re Massey Energy Co. Sec. Litig.*
  883 F. Supp. 2d 597 (S.D.W. Va. 2012) ................................................................................ 24

*In re MBIA, Inc., Sec. Litig.*
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) .................................................................................... 23

*In re MF Global Holdings Sec. Litig.*
  982 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) ...................................................................... 17, 26

*In re Omnicom Grp., Inc. Sec. Litig.*
  597 F.3d 501 (2d Cir. 2010) ............................................................................................. 29, 30

*In re ProShares Trust Sec. Litig.*
  728 F.3d 96 (2d Cir. 2013) ..................................................................................................... 14

*In re Sanofi Sec. Litig.*
  87 F. Supp. 3d 510 (S.D.N.Y. Jan. 28, 2015) ........................................................................ 20

*In re Scholastic Corp. Sec. Litig.*
  252 F.3d 63 (2d Cir. 2001) ..................................................................................................... 14

*In re Scottish Re Group Sec. Litig.*
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................ 24

*In re SFBC Intern., Inc. Sec. & Derivative Litig.*
   495 F.Supp.2d 477 (D.N.J.2007) ..................................................................... 21

*In re Silvercorp Metals, Inc. Sec. Litig.*
   26 F. Supp. 3d 266 (S.D.N.Y. 2014)................................................................ 25

*In re Take-Two Interactive Sec. Litig.*
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................... 23

*In re Van der Moolen Holding N.V. Sec. Litig.*
   405 F. Supp. 2d 388 (S.D.N.Y. 2005)............................................................... 29

*In re Veeco Instruments, Inc. Sec. Litig.*
   235 F.R.D. 220 (S.D.N.Y. 2006) ...................................................................... 27

*In re Vivendi Universal, S.A. Sec. Litig.*
   381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003)…………………………………………………..16

*In re Vivendi Universal, S.A. Sec. Litig.*
   765 F. Supp.2d 512 (S.D.N.Y. 2011)........................................................... 17, 18

*Kleinman v. Elan Corp., plc*
   706 F.3d 145 (2d Cir. 2013)............................................................................. 14

*Lasker v. N.Y.S. Elec. & Gas Corp.*
   85 F.3d 55 (2d Cir. 1996)................................................................................. 19

*Lentell v. Merrill Lynch & Co., Inc.*
   396 F.3d 161 (2d Cir. 2005)......................................................................... 13, 29

*Lin v. Interactive Brokers Grp., Inc.*
   574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008)...................................................... 29

*Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*
   553 F.3d 187 (2d Cir. 2009)............................................................................. 19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*
   797 F.3d 160 (2d Cir. 2015)............................................................................. 29

*Meyer v. JinkoSolar Holdings Co.*
   761 F.3d 245 (2d Cir. 2014)..................................................................... passim

*Novak v. Kasaks*
    216 F.3d 300 (2d Cir. 2000).................................................................. passim

*Nursing Home Pension Fund v. Oracle Corp.*
    242 F. Supp. 2d 671 (N.D. Cal. 2002) .................................................. 19

*Pub. Pension Fund Grp. v. KV Pharm. Co.*
    679 F.3d 972 (8th Cir. 2012). ............................................................... 21

*Reese v. Malone*
    2014 WL 555911 (9th Cir. Feb. 13, 2014) .......................................... 24

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*
    111 F. Supp. 3d 1336 (S.D. Fla. 2015) ................................................ 30

*S. Cherry St., LLC v. Hennessee Group LLC*
    573 F.3d 98 (2d Cir. 2009)................................................................... 24

*Slayton v. American Express Co.*
    604 F.3d 758 (2d Cir. 2010).................................................................. 29

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*
    531 F.3d 190 (2d Cir.2008).................................................................. 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007)....................................................................... 20, 24

*Todd v. STAAR Surgical Company*
    No. CV-14-05263 (C.D. Cal. Apr. 12, 2016) (slip op) ......................... 21

*TSC Indus., Inc. v. Northway, Inc.*
    426 U.S. 438 (1976)............................................................................. 17

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*
    672 F. Supp. 2d 596 (S.D.N.Y. 2009).................................................. 24

*Wilkof v. Caraco Pharm. Labs, Ltd*.
    2010 WL 4184465 (E.D.Mich. Oct. 21, 2010) ...................................... 21

*Zucco Partners, LLC v. Digimarc Corp.*
    552 F.3d 981 (9th Cir. 2009) ............................................................... 22

## I.         PRELIMINARY STATEMENT

This is a federal securities class action on behalf of investors in Fiat Chrysler Automobiles N.V. ("FCA" or the "Company") from October 13, 2014 through October 28, 2015 (the "Class Period"), asserting violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  Defendants are FCA, its Chief Executive Officer ("CEO") Sergio Marchionne ("Marchionne"), its Chief Financial Officer ("CFO") Richard K. Palmer, and its former head of Vehicle Safety and Regulatory Compliance Scott Kunselman ("Kunselman") (collectively, the "Individual Defendants" and, with FCA, "Defendants").

In the wake of significant increased focus on timely compliance with recall regulations by the National Highway Traffic Safety Administration ("NHTSA") which resulted in massive fines to FCA's competitors, Defendants told investors that it had strengthened its already robust compliance structure headed by Kunselman to report directly to Marchionne, so as to "ensur[e] a high level of information flow and accountability."  Defendants repeatedly told investors that FCA was "substantially in compliance" with NHTSA's regulations and that they had adequately reserved for the future cost of recalls for the vehicles FCA had already sold.

In truth, FCA had a "widespread" "pattern" of "systemic" regulatory violations dating back to 2013, in which FCA would delay required owner notification and vehicle repair, thereby illegally delaying and reducing the cost of recalls as well as the Company's recall reserves. The Company's own documents and Defendants' own admissions demonstrate that they were well aware of these violations. Indeed, just prior to the Class Period, NHTSA informed FCA that it had opened numerous investigations into FCA's recalls.  The violations were so severe that the head of NHTSA, David Friedman repeatedly wrote to Marchionne and Kunselman concerning FCA's "unacceptable" conduct as to "critical" compliance issues, stating FCA was "consistently" at the "rear of the pack" relative to its industry peers when it came to compliance.

1

On July 26, 2015, following an "unprecedented" July 2, 2015 hearing into dozens of violations spanning 23 recalls, NHTSA announced a Consent Order against FCA, fining the Company a record-high $105 million and requiring FCA to take numerous measures to ensure timely recall compliance. As a result, FCA shares fell $0.74, or about 4.9%.  Then, on October 28, 2015, a day after Kunselman abruptly resigned, FCA announced that it had to record "a €761 million pre-tax charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA."  FCA shares fell $0.69, or 4.7%.  On December 9, 2015, NHTSA fined FCA another $70 million for failure to report incidents of deaths, injuries and complaints.

In their Motion, Defendants argue that the alleged regulatory violations did not render misleading (or with scienter) their repeated assurances that FCA was "substantially in compliance" with the "relevant global regulatory requirements", because Chrysler is just one of many subsidiaries of FCA and the U.S. and NHTSA are just one of many countries and regulators. This is nonsense.  Chrysler makes up over 90% of FCA's operations, is one of the "Big Three" American automobile manufacturers, and NHTSA was FCA's primary regulator on the critical issue of vehicle safety.  Moreover, the same SEC filings that represented FCA's compliance described in detail NHTSA's regulatory authority and FCA's obligations. Defendants knew that a reasonable investor would view their statements of compliance misleading in light of FCA's widespread regulatory violations.

Defendants also argue that FCA's recall provision was not false and misleading or with scienter because the Complaint fails to allege that Defendants did not follow their disclosed methodology for estimating the provision.  Defendants' argument misses the point.  The Complaint alleges that Defendants had access to information demonstrating that FCA's current recalls (and therefore future recall costs) were skyrocketing, which Defendants did not incorporate into their provision as required by the accounting literature.  The Complaint also provides detailed allegations that Defendants' were knowingly delay owner notifications and repairs, thereby illegally reducing FCA's future recall costs. Under these circumstances falsity

and scienter are adequately alleged.  *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scienter inferred where defendants "knew facts or had access to information suggesting that their public statements were not accurate").

The remainder of Defendants' arguments should be rejected for the reasons discussed below.

## II.     FACTUAL ALLEGATIONS

### A.     FCA's Background

FCA is an automotive company that manufactures and sells motor vehicles. FCA was founded in October 2014 as the result of a merger of Fiat and Chrysler. ¶36. Although technically listed as a subsidiary of FCA, Chrysler makes up over 90% of FCA's operations. Chrysler, which is headquartered in Auburn Hills, Michigan, was founded in 1925 and is one of the "Big Three" American automobile manufacturers. ¶37. Chrysler sells vehicles under its flagship Chrysler brand, as well as the Dodge, Jeep, and Ram. *Id.*  Over 50% of FCA's vehicles shipped are in NAFTA, over 80% of which is the U.S.

### B.     FCA's Obligation To Timely Conduct Safety-Related Recalls

NHTSA is the United States federal agency charged with ensuring that manufacturers of motor vehicles comply with the safety standards contained in the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"), which includes the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD") of 2000. ¶40.

The Safety Act requires a vehicle manufacturer to immediately notify NHTSA if it learns of a defect "related to motor vehicle safety", meaning a defect that creates an "unreasonable risk of accidents" or an "unreasonable risk of death or injury in an accident." ¶42. The Safety Act also requires manufacturers to implement a recall to remedy the defect. ¶43. Because of the serious risk to vehicle owners, it is critical that vehicle manufacturers commence recalls immediately after identifying safety defects in their vehicles. *Id.* As a result NHTSA requires

manufactures to submit a "573 Report" detailing the defect, recall and remedy "<u>not more than 5</u> <u>working days after a defect [is identified].</u>"[1] *Id*.

A manufacturer must also provide notification to owners of the recall. ¶45. The manufacturer is required to submit a copy of its proposed owner recall notice to NHTSA <u>no</u> <u>fewer than five days **before** it intends to mail it to owners</u>. *Id*. In turn, the recall notices must be sent to vehicle owners <u>no later than 60 days</u> from the date of the 573 Report. *Id*. In the event that the parts for the remedy are not available at the time of notification, the manufacturer is required to issue a second notification in accordance with the above requirements once the parts are available. ¶46. Even if a manufacturer does not have the parts available to repair the defect within 60 days, that is not an excuse for delaying owner notices. NHTSA has made clear that <u>60</u> <u>days is the absolute deadline</u> to inform a vehicle owner about a recall. *Id*.

As part of standard procedure, upon receipt of every 573 Report, NHTSA enters it into its "Artemis" database, screening it for completeness, timeliness, and effectiveness of the proposed remedy. ¶47. NHTSA sends an acknowledgement letter to the manufacturer, identifying any deficiencies (*e.g.* untimeliness). *Id*. NHTSA has stated that timely notices to owners, which has been required since the inception of the Safety Act in 1966, are "critical to ensuring the success of a recall." ¶49. As NHTSA stated during its July 2015 hearing, "this notification requirement is not new and [FCA] should be well aware of its responsibility." *Id*.

### C.   <u>NHTSA Increases Focus on Compliance and Timeliness of Notifications</u>

Leading up to the Class Period, NHTSA made it clear that it had significantly intensified its enforcement of timely reporting and owner notification of defects and recalls. ¶53. For example, in April 2010, NHTSA fined Toyota the maximum penalty of $16.375 million for its failure to notify NHTSA within five days of learning of a safety defect. NHTSA fined Toyota another $32.425 million in December 2010 for another timeliness violation. ¶54. NHTSA's then-current Administrator David Strickland emphasized NHTSA's new focus: "[a]utomakers are

---

[1] Unless otherwise noted, all emphasis has been supplied.

required to report any safety defects to NHTSA swiftly, and we expect them to do so." *Id*. NHTSA continued to increase fines against automobile manufactures for untimely reporting. On April 1, 2014, NHTSA's Administrator Friedman testified before the U.S. House of Representatives' Committee on Energy and Commerce, stating:

> This Administration has placed an emphasis on timeliness . . . Since 2009, automakers have paid record fines totaling more than $85 million for lack of timeliness in reporting vehicle safety defect issues to NHTSA. Because of this emphasis, we believe that all manufacturers in the automobile industry are now paying much closer attention . . . .

¶56. In the highest profile action in NHTSA's history, in May 2014, NHTSA fined General Motors $35 million for late reporting an ignition switch defect that caused "moving shutdowns." ¶55. NHTSA imposed a record high $126 million in civil penalties in 2014, which exceeded the total amount collected by the agency during its entire forty-three year history. *Id*. NHTSA's May 16, 2014 announcement of the GM consent judgment stated "This reinforces a message this Administration has been sending clearly for ***the past five years*** through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers." *Id*.

### D.   Defendants Were Personally Involved in NHTSA Compliance

Having fined six other manufactures, NHTSA began investigating FCA. Following the GM fine, NHTSA substantially increased the number of "Recall Queries" for FCA. ¶262. A Recall Query is an investigation into a recall because the scope or remedy is inadequate. *Id*.

Recognizing NHTSA's focus on compliance, FCA reassured investors that Marchionne and Kunselman were personally involved in compliance. ¶263. On August 12, 2014, FCA announced the establishment of a new office of Vehicle Safety and Regulatory Compliance responsible for dealing with NHTSA, headed by Kunselman (who had already been involved in compliance) and "***report[ing] directly to the CEO [Marchioinne]***" in order to "intensify the Company's continuing commitment to vehicle safety and regulatory compliance" and "ensuring a high level of ***information flow*** and ***accountability***." *Id*. Kunselman sat on FCA's Vehicle Regulations Committee, overseeing FCA's defect investigations department and made all

decisions pertaining to when a defect exists and when filed actions and recalls are necessary. ¶34. Kunselman was regularly informed as to the status of investigations, recalls and remedies. *Id*. Kunselman was in regular contact with NHTSA throughout the Class Period. *Id*. For example, Kunselman stated in November 2014 his group had been "actively engaged" with NHTSA since at least early 2014 concerning certain recalls. ¶265.

### E.   Chrysler's Regulatory Violations

Despite its knowledge of NHTSA's increased focus on timely and accurate reporting, during the Class Period, FCA repeatedly and blatantly disregarded its reporting, notification and remedy obligations under the Safety Act.  Of the 75 recalls initiated in 2013 and 2014, FCA violated the Safety Act as to 23, often multiple times as to each recall.

#### 1.   FCA's Untimely Recalls

Ignoring the mandatory 5 day deadline for initiating recalls, in Recall 15V-290, FCA waited <u>over three months</u> after learning of the defect to recall vehicles. ¶129.  In Recall 15V-090, FCA waited <u>four months</u> after its supplier notified it of the defect. ¶128. In Recall 14V-634 – involving a defect where the vehicle's alternator may fail, causing the vehicle to shut down, causing a fire – although NHTSA repeatedly reminded FCA to do so, it waited ***seven months*** after filing its 573 Report to provide any remedy plan. ¶162. NHTSA concluded that these violations are "***hard to fathom*** for a company with as much recall experience as Fiat Chrysler. NHTSA staff should not have to explain and ***repeatedly remind Fiat Chrysler about basic recall requirements*** as we had to do here." ¶163.

#### 2.   Chrysler's Untimely Notices of Recalls and Repairs

FCA failed to timely notify owners of serious safety defects within the required 60 days in at least seven recalls. ¶58. For example, FCA repeatedly failed to timely notify owners in several recalls related to the same ignition switch defect that resulted in the $35 million fine to GM for untimely notification. ¶59. In each of the five recalls related to this defect (14V-373, 14V-567, 14V-634, 14V-795, and 15V-115), FCA mailed owner notices late, as much ***nineteen***

*days*, and did not provide notice that a repair was available until as much as *over eight, nine, and ten months after detecting the defect*. ¶¶60-67.  FCA again ignored the notification deadline for Recalls 14V-635 and 13V-527, and did not notify owners of available repairs until 4 and 16 months later, respectively. ¶¶68-69. At the July 2015 Hearing, NHTSA found that FCA "has a *pattern of failing to timely notify vehicle owners of recalls . . ..*" ¶70

### 3.   FCA's Failure to Timely Submit Recall Communications

In at least eight recalls, FCA not only failed to submit copies of its owner notices to NHTSA at least five days before mailing, FCA only informed NHTSA *after* the mailings had already occurred, sometimes waiting as much as 25, 27, 28 and even *67 days* before notifying NHTSA. ¶143. FCA's assertion that these delays are not significant has been expressly rejected by NHTSA, which has stated "*[t]hese are not insignificant delays*. Fiat Chrysler waited double, triple, and even up to over thirteen times the allowable time under the law to provide these owner notices to NHTSA." ¶144.

Moreover, there were thirty-two dealer communications across twelve recalls that FCA completely withheld from NHTSA *for well over a year*. ¶146. Even with respect to the dealer communications that FCA provided to NHTSA for these twelve recalls, the Company routinely provided them late, waiting as long as 38, 39 and *74 days after* mailing the notice to dealers. ¶147.NHTSA concluded at the July 2015 Hearing that FCA's violations over the previous two years were "*a widespread pattern of missing deadlines*", which was "*unacceptable*." ¶148.

### 4.   Chrysler's Failures To Timely and Properly Recall and Repair Vehicles That Caught Fire From Low-Speed Rear Impacts

FCA's regulatory violations were so severe as to FCA's largest and most high-profile recalls that they resulted in NHTSA's Administrator Friedman sending warning letters to Marchionne and Kunselman.

On June 29, 2013, Chrysler filed a 573 Report (13V-252) with NHTSA recalling Jeep Grand Cherokees and Jeep Libertys which would result in deadly fires even in low-speed rear

impacts because the fuel tank was placed too far back in the "crush zone" of the vehicles. ¶73. NHTSA linked **75 fatalities and 58 injuries** to the defect. *Id*.

Marchionne initially publicly resisted NHTSA's demand for the recalls. ¶74. Thereafter, because Department of Transportation Secretary Ray LaHood "want[ed] to find out if Sergio is involved in these decisions", he and then-current NHTSA Administrator David Strickland met with Marchionne on Sunday June 9, 2013 at O'Hare International Airport. ¶75. According to LaHood, at that meeting, Marchionne finally "realize how serious this was, how serious [NHTSA and DOT] were", agreeing to recall 1.56 million effected vehicles. ¶75.

However, FCA did not order a single repair part until January 29, 2014. ¶78. As a result, NHTSA issued a "special order" to FCA in early July 2014 to Kunselman's direct report, stating that NHTSA was "concerned that Chrysler does not have, and will not have, sufficient production capacity[.]" *Id*. Nevertheless, an FCA report sent to NHTSA in October of 2014 confirmed the completion rate for the recalls to be at a dismal 3%. ¶79.

On November 19, 2014, Administrator Friedman wrote a letter directly to Marchionne sharply criticizing FCA's repeated failure to conduct this critical recall: "***I am concerned about the . . . reports showing a woeful three percent repair rate out of more than 1.5 million affected vehicles. . . [S]ignificantly more aggressive steps are required.***" ¶80. Friedman reminded Marchionne that **NHTSA "has urged Chrysler on multiple occasions**" about FCA's failures to ensure a timely remedy, yet "NHTSA has received consumer complaints expressing frustration that Chrysler is not fully cooperating . . .  [owners] are reportedly being told that their vehicles are safe to drive without the remedy." ¶82. Friedman stated that FCA's conduct was "***unacceptable***". *Id*. Friedman demanded that FCA work to remedy these violations. Friedman concluded by reminding Marchionne that "***the repair of these vehicles is of critical importance*** . . . ***In the strongest possible terms*** I urge you . . . to ensure that the safety risk to vehicle owners from this defect is clearly communicated and effectively and expeditiously addressed." ¶84.

Demonstrating the severity of the situation, Friedman instructed Marchionne that any questions must be directed to NHTSA's Chief Counsel. ¶85.

On November 21, 2014, Marchionne and Kunselman each sent a letter in response. Kunselman's letter acknowledged that FCA's actions were "not satisfactory". ¶¶87-88.

### 5. FCA's Failure to Timely Recall Vehicles With Defective Takata Air Bags

The Takata airbag recall is the largest safety recall in U.S. history with more than 28 million inflators under recall. ¶90. It was prompted by the discovery that Takata air bag inflators were rupturing in a crashes, sending metal fragments flying, causing serious injury or death. ¶89. The Safety Act obligated FCA to issue a recall. ¶91. Ten vehicle manufacturers, including FCA, initiated recall campaigns beginning on June 19, 2014. ¶92. The recall effected 4,066,732 FCA vehicles. ¶93. Over the next several months, FCA consistently lagged well behind the other nine manufacturers in all aspects of effecting the recall. ¶94. On October 29, 2014, Administrator Friedman again wrote Kunselman's direct report to "*emphasize the critical imperative*" for Chrysler "*to promptly and effectively remedy the serious safety risk . . . [M]ore can and should be done as soon as possible*", emphasizing "the *severity of this issue*". ¶96. Despite NHTSA's urging, in a November 5, 2014 response, Kunselman's report stated that FCA had not sent owner notices and would not begin to do so until December 19, <u>approximately six months after Chrysler filed its initial 573 report</u>. ¶97. He also informed NHTSA that FCA was refusing to recall its vehicles containing the Takata air bags located in numerous states. *Id*.

On November 25, 2014, Friedman wrote again to Marchionne, advising that he was "*extremely concerned* about both the geographic scope and the slow pace of [FCA's] recalls", stating that "Throughout the process . . . *Chrysler has consistently maintained its position at the rear of the pack*." ¶98. Friedman stated in the clearest possible terms "*Chrysler's delay* in notifying consumers and taking other actions necessary to address the safety defect identified *is unacceptable and exacerbates the risk to motorists' safety*." ¶100. Friedman informed Marchionne that FCA's actions were "*unreasonable*" and a violation of the Safety Act:

"***Chrysler is obligated under the Safety Act to expand its recall to include these additional areas in its current recall***." ¶101. Friedman told Marchionne bluntly that FCA must "immediately expand the geographic scope of its recall" and "provide notification of the recall as soon as possible, and in no circumstances, later than December 1". ¶102. On November 26, 2014, Marchionne and Kunselman each wrote a response. ¶¶103-104.

### 6.   FCA's Failure to Remedy "Axel Lock Up" Defect

Chrysler also failed to properly conduct three recalls for the same defect which cause "axle lock up" that can cause loss of control. ¶109. FCA waited nine months to inform owners that a remedy was available. ¶112. However, over two years after identifying the defect, owners continued to complain to FCA and NHTSA that no parts were available. ¶113. As a NHTSA testified at the July 2015 Hearing, "***documents provided to NHTSA by Chrysler***" confirmed that FCA was aware of the violations and that the Company was intentionally restricting the supply of parts necessary for repair, noting that "the difficulties [FCA] customers faced in getting recall repairs completed in the pinion nut recall are ***not an isolated example***." ¶¶114-115.

### 7.   FCA's Failure to Remedy Defective Tie Rods That Cause Loss of Control

Following NHTSA's investigation into the failure of a critical steering component called a "tie rod" on over 1,000,000 Dodge Ram pickup trucks were failing, FCA initiated three related recalls (3V-527, 13V-528, and 13V-529). ¶116. FCA improperly restricted the supply to one set of parts per week per dealer, who each had as many as 30 owners waiting for replacement parts. ¶122. Nearly one year after the notices had been mailed to owners, parts were still not available. *Id.* As a NHTSA agent testified at the July 2015 Hearing, FCA documents revealed that "***the company was aware of the consequences of the defect and the need to have the vehicles fixed.***" ¶123.  Indeed, FCA's conduct was so egregious that ***on October 20, 2014, NHTSA informed FCA that it had opened a formal investigation*** (Audit Query – AQ14-003) into "the delays in execution of recall campaigns". ¶125. "The Agency has encountered ***numerous instances*** where [FCA] has not performed well in making recall repairs." ¶126.

### F.   FCA's Failure to Properly Account For Recalls

FCA's 2014 20-F states that it accrues a provision for recalls, which is done "at the time of sale", based on "the expected costs of warranty obligations *imposed by law*" and that "*[t]he estimated future costs of these actions are based primarily on historical claims experience* for the Group's vehicles. . . . *The estimate of warranty and additional service and recall action obligations is periodically reviewed during the year.*" ¶174.  As discussed in more detail below, *infra* at 25-28, as NHTSA's enforcement increased from 2009 through 2014, the number of recalls initiated by FCA also skyrocketed.  Despite having up to date information as to the need for these recall and repairs (and the associated costs), Defendants did not adequately recognize and update its "provision" for the expected future costs associated with legally complying with FCA's recall obligations.  Defendants ignored the information showing stark increases in recalls, and also used their illegal practices of delaying owner notifications and repairs to illegally delay and reduce the associated costs.  As NHTSA explained: "For many owners, a recall remedy deferred by parts availability easily becomes a defect remedy denied." ¶78.  If FCA had been properly incorporating the information showing dramatic increases in recalls and complying with its legal obligations as it represented it was, its recall provision would have been much higher.

### G.   Materially False and Misleading Statements Issued During the Class Period

Prior to and during the Class Period, Defendants repeatedly assured investors that FCA was in compliance with NHTSA regulations and that FCA had strengthened its compliance function to ensure compliance. For example, FCA's Annual Report filed with the SEC. Under the heading "Vehicle Safety", FCA stated:

> Under U.S. federal law, all vehicles sold in the U.S. must comply with Federal Motor Vehicle Safety Standards . . . promulgated by NHTSA, . . . In addition**,** if a vehicle contains a defect that is related to motor vehicle safety . . . the manufacturer must notify vehicle owners and provide a remedy. . . The compliance of TREAD Act EWR submissions has received heightened scrutiny recently, and resulted in two manufacturers agreeing to pay substantial civil penalties for deficient TREAD Act EWR submissions.

¶221. The Annual Report went on to state:

11

> Our vehicles . . . must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate *vehicle safety*, end-of-life vehicles, emissions and noise). *We are substantially in compliance with the relevant global regulatory requirements* affecting our facilities and products. *We constantly monitor such requirements and adjust our operations to remain in compliance.*

¶222. Defendants repeated these statements of compliance in SEC filings throughout the Class Period – on November 13 and 26 2014, as well as May 19 and June 17, 2015. ¶¶198, 203, 234, 236. Defendants made other statements concerning FCA's compliance, the strength of FCA's compliance system, and enhancements made to the system, misleading investors into believing that FCA was in compliance with vehicle safety regulations. *See* ¶¶184, 200, 212, 222, 224.

Defendants also under reported FCA's provision for warranties and recalls by €761 million, over-reporting its Cost of Sales, EBIT, and net income. *See* ¶¶182, 187.

### H.    The Truth Begins to Emerge

On Sunday, July 26, 2015, following the unprecedented July 2015 Hearing, NHTSA announced a Consent Order and its imposition on the Company of a record $105 million fine in connection with the Company's violations as to 23 recalls, affecting more than 11 million vehicles. ¶241. The Consent Order included an admission by FCA that it failed to timely comply with Safety Act requirements and timely provide effective remedies. *Id*. NHTSA instituted an Independent Monitor to ensure that Chrysler was adequately discharging its regulatory obligations to timely report defects and execute recall campaigns. ¶243. FCA was also required to provide additional remedies for recall campaigns covering approximately 585,000 vehicles. ¶242. Allan Kam, who served as a senior enforcement lawyer for the NHTSA for more than 25 years before he retired in 2000 stated "It is *unprecedented* to have a hearing on so many different recalls from the same manufacturer . . . It's a sign that *there is a systemic issue with Chrysler*." ¶276. On this news, the Company's stock fell $0.74, or roughly 4.9%, to close at $14.41 on July 27, 2015. ¶244.

Media outlets reported that Kelley Blue Book estimated that the remedies required could cost the automaker more than $900 million. ¶245. Nevertheless, on July 28, 2015, in a press

release discussing the Consent Order, Chrysler stated "*contrary to certain reports, FCA US does not expect that the net cost of providing these additional alternatives will be material to its financial position, liquidity or results of operations*." ¶246.

On the Company's July 30, 2015 earnings call with analysts, Marchionne admitted that both he and NHTSA had been examining FCA's compliance failures for over a year:

> [M]*any of these rules are fairly specific and for the most part they're straightforward*,  . . . The unfortunate fact is that we as an industry, and we in particular as a company have not always been perfect in complying with these requirements, and o*ver the last year and a half, NHTSA has begun to take a harder look at these technical compliance issues, and frankly we started to do the same thing about the same time.*
>
> *Over a year ago, we saw that changes were coming, and we began to look more critically at our own governance and process on safety and recall compliance issues, and we had then identified a number of necessary steps to improve.* ¶270.

On October 27, 2015, Chrysler announced the resignation of Defendant Kunselman. ¶250. The next day, Chrysler announced that the Company recorded "a €761 million [approximately $850 million] pre-tax charge for estimated *future recall campaign costs* for vehicles *sold in prior periods* in *NAFTA*." ¶251. As a result of this news, Chrysler shares fell $0.69, or 4.7%, to close at $14.72.  ¶252. Market analysts immediately made the connection between the charge and the Company's regulatory violations. ¶¶252-254.[2]

## III.    <u>ARGUMENT</u>

To state a claim under Rule 10b-5, Plaintiff must allege that Defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005). Although securities fraud actions are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C.

---

[2] On May 23, 2016, Germany's Federal Motor Transportation Authority accused FCA of cheating emission testing, causing FCA shares to decline 5.2%.  Plaintiffs are investigating this issue and may seek leave to amend the Complaint to include related allegations.

§78u-4, et seq., and Fed. R. Civ. P. 9(b), a plaintiff is not required to plead "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000) ("*Novak*"). In ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At this stage, dismissal is appropriate only where [Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) ("*JinkoSolar*"). Thus, to survive a Rule 12(b)(6) motion, the Complaint need only contain sufficient facts "to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.   The Complaint Amply Alleges That Defendants' Statements Concerning Compliance Were False and Misleading

"[W]hether a statement is misleading depends on the perspective of a reasonable investor: The inquiry is objective." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015) (citation omitted). Courts "consider whether the disclosures and representations, taken together and in context, would . . . misle[a]d a reasonable investor about the nature of the securities." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013).

Moreover, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. Statements of literal truth can become, through their context and manner of presentation, devices which mislead investors. Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted). Thus, when a defendant chooses to make a disclosure about a particular topic, "the representation must be complete and accurate." *JinkoSolar*, 761 F.3d at 250-51; *see Caiola v.*

*Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues.").

**1.  Defendants' Statements That FCA Was In Compliance with "Vehicle Safety" Regulations Were False and Misleading**

Defendants do not dispute that during the Class Period FCA was not in compliance with Safety Act regulations. NHTSA found that from 2013 through 2015 FCA violated numerous regulations, spanning over 23 recalls effecting over 11 million of vehicles. Indeed, FCA admitted to these violations. Nor do Defendants dispute that these violations were material.  They spanned 23 of the 75 recalls initiated by FCA in 2013 and 2014, and resulted in a record-setting $175 million fine by NHTSA, an "unprecedented" public hearing, the resignation of Kunselman and a €761 million charge to earnings, which caused a 10% decline in FCA stock – a reduction in market capitalization of an astounding $1.84 billion.

Therefore, Defendants' repeated statements that FCA was in compliance with "vehicle safety" regulations were false or misleading at the time they were made. FCA was ***not*** in compliance.  Not even close.  *See, e.g., In re Bear Stearns Cos. Inc. Sec., Derivative, and ERISA Litig.*, 763 F.Supp.2d 423, 459 (S.D.N.Y. 2011) (finding defendant's statement that it was "in compliance with CSE regulatory capital requirements" was materially false); *In re CitiGroup Inc. Bond Litig.*, 723 F.Supp.2d 568, 580 (S.D. N.Y. 2010) (ruling that the plaintiff pleaded a material misstatement by alleging that the defendant had falsely represented that its financial statements complied with Generally Accepted Accounting Principles).[3] Importantly, Defendants' statements of compliance were not opinions. Their subjective beliefs are irrelevant.

Defendants nevertheless argue that the statements of compliance were not misleading because they only told investors that FCA was "substantially" in compliance with the "relevant

---

[3] *See, also. In re Ambac Financial Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010) (finding statements of compliance with underwriting standards misleading where defendants did not disclose that those standards had been lowered, because defendants had put the issue "in play"); *Federal Housing Finance Agency v. UBS Americas, Inc*., 2012 WL 1570856, at *2, *20 (S.D.N.Y. May 4, 2012) (statements of compliance with underwriting standards misleading where plaintiff alleged that defendants "serially deviated" from such standards).

global regulatory requirements". Def. Br. at 24-25. While acknowledging that this included U.S. vehicle safety regulations, Defendants argue that the U.S. is merely one country among many and vehicle safety is just one area of regulation, implying that neither are particularly important to FCA. This is absurd. As one of the U.S.'s "big three" car manufactures, no regulation is more important than vehicle safety and no market is more important, than the U.S. Chrysler makes up over 90% of FCA's operations and approximately 50% of FCA's vehicles are sold in the U.S. While Defendants speculate that "global regulations" could also include "banking" regulations, the regulations identified in Defendants' statements are "vehicle safety, end-of-life vehicles, emissions and noise", which are under the purview of NHTSA. Moreover, FCA's disclosures included a detailed discussion of NHTSA, FCA's compliance obligations for recalls under the Safety Act, and even that compliance "has received heightened scrutiny recently, and resulted in two manufacturers agreeing to pay substantial civil penalties[.]" ¶¶221-222.

Defendants' interpretation implies that FCA could have material failures in vehicle safety but as long as they were otherwise complying with all global banking, food safety, and child-labor regulations their statement of "substantial" compliance would not mislead a reasonable investor as a matter of law.  Courts have rejected similar arguments. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 563 (S.D.N.Y. 2015) (following a bench trial, finding that defendants statements of "general" compliance was misleading because it "indicated that certain *immaterial* exceptions might exist", not the existence of material violations). A reasonable investor would have understood Defendants' statement of compliance in the context it was made as meaning that FCA was in substantial compliance with each "relevant" set of regulations, certainly vehicle safety, which was critical to FCA's business. *See Jinkosolar*, 761 F.3d at 250-51. [4]

---

[4] Defendants' argument that the violations were not "substantial" enough to render the statements of compliance misleading is really just a materiality argument in disguise, which "is generally not an appropriate basis on which to dismiss a complaint." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003).

## 2.   Defendants' Statements Concerning Compliance Were Not "Puffery"

"Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *In re MF Global Holdings Sec. Litig.*, 982 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (citations omitted). "[T]he mere fact that a statement uses conclusory, indefinite, and unverifiable terms, rather than expressing a reason in dollars and cents, does not compel a conclusion that it is immaterial as a matter of law." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp.2d 512 (S.D.N.Y. 2011).  The statement must be so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW Local Union No. 58 Pension Trust v. Royal Bank of Scotland Grp, PLC*, 783 F.3d 383, 389-90 (2d Cir. 2015). Because whether a statement is puffery is a materiality analysis, the context in which the statements were made is critical. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

Defendants contend that ***every single one*** of their statements concerning compliance from August 12, 2014 through July 30, 2015 were meaningless "puffery". Def. Br. at 25-28. This is facially suspect. If reliance was unreasonable then why were Defendants constantly reassuring investors of their compliance?

Defendants' direct statements of substantial compliance with "vehicle safety" laws are statements of current existing fact and not puffery. *See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (statement that the defendant was in compliance with "applicable environmental laws" shortly before the Deepwater Horizon explosion could have been material to shareholders).

Defendants likewise challenge the remainder of statements as puffery by removing them from the context in which they were said.  When viewed in context, the materially misleading nature of the statements is evident:

- On August 12, 2014, FCA announced the creation of the new office of Vehicle Safety and Regulatory Compliance, headed by Kunselman, emphasizing that he reported

17

directly to Marchionne, stating it "will help intensify [FCA's] continuing commitment to vehicle safety and regulatory compliance." ¶184. Describing it in a March 9, 2015 SEC filing as "***an important organizational move to amplify our commitment to safety***" that was "***ensuring a high level of information flow and accountability***" and was "a ***focal point for working with*** consumers, ***regulatory agencies*** and other partners ***to enhance safety in real-world conditions.***" ¶224

- On November 20, 2014, at the Senate hearing investigating compliance following the Takata airbag recall, Kunselman stated that "***NHTSA regards our customer-notification protocols as 'industry-best'***'', FCA had "the highest recall completion rate" and that its "average per-campaign vehicle volume is among the lowest in the industry" and that these facts were a "***testament to our transparency and demonstrates clearly the robustness of . . . our rapid response when issues arise.***" ¶200.

- On January 28, in response to a question from an analyst asking what the company was doing to ensure compliance with recall regulations, Marchionne stated "[***I]'ve been very public on this recall matter***. The recall matter is something which is a reflection of a changing paradigm for the auto sector.  I think ***we have made changes while adjusting our internal structures to deal with this new state of affairs*** . . . We ***had*** what I consider to be a ***pretty robust system*** in place, we have ***strengthened it further*** . . . We have set a ***very, very senior technical person*** to head up these activities. . . . [A]t least ***not only are we dealing with what's on our plate*** but we're actually becoming much more proactive . . ." Marchionne asserted that because of these compliance safeguards, "***It is my expectation that this cost will come down***" and "I think these numbers will stabilize and we'll see a steady state". ¶ 212.

These statements could mislead a reasonable investor to believe that the Company was in compliance with the Safety Act regulations and that Defendants were carefully monitoring and ensuring that compliance. Defendants' failure to disclose instances of non-compliance "could be found by a trier of fact to be an omission that renders misleading the comforting statements . . . about compliance measures" *JinkoSolar*, 761 F.3d at 251.  In *JinkoSolar*, the Second Circuit held that even though the company never stated it was in compliance with environmental regulations, it was misleading for the company to disclose the relevant regulations and compliance practices implemented while withholding information concerning "existing problems" with its compliance. *Id. See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp.2d 512, 573, 2011 BL 45228, 55 (S.D.N.Y. 2011) (finding statements concerning the company's "sound financial footing" were not puffery because they were "supported by specific statements of fact regarding Vivendi's resources and financial condition" such as "zero net debt" and "free cash flow"); *City*

18

*of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005) (optimistic statements supported by specific facts are not puffery).[5] Here, Plaintiff's allegations are even stronger because the above statements were supplemented by regular assurances that FCA was in compliance with vehicle safety regulations.

Moreover, as discussed in the scienter analysis below (*infra* at 20-24), these statements were not puffery because the Complaint adequately alleges that Defendants' had information indicating that "the opposite was true." *Novak*, 216 F.3d at 315 (statements describing inventory as "in good shape" and "under control" were not puffery).[6]

**B.    The Complaint Alleges A Strong Inference of Scienter For Defendants' Statements Concerning Compliance**

A strong inference of scienter exists where a complaint alleges that the defendants: (1) "knew facts or had access to information suggesting that their public statements were not

---

[5] Marchionne's January 28, 2015 statements concerning costs were not puffery because Marchionne had received multiple letters from Friedman on November 19 and 26 stating that FCA had to significantly *increase* the scope and the manufacturing of replacement parts for its recall, which would *increase* future costs of recalls. ¶¶ 80-85, 98-102. Likewise, Kunselman's November 20, 2014 Senate hearing statements were not puffery because Friedman's October 29 letter criticized both FCA's untimely notification of customers, the scope of the recall, and supply of replacement parts for the Takata recall. ¶96. Moreover, Kunselman also received Friedman's November 19 letter sharply criticizing FCA's compliance.

[6] *In re Lucent Techs., Inc. Securities Litigation*, 217 F. Supp. 2d 529, 558 (D.N.J. 2002) (finding statement that demand for the company's products "remains robust" were actionable where there was a "high level internal report" stating that the company "must improve perception of [its] products . . or risk losing market share."); *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671, 679 (N.D. Cal. 2002) (finding statements that the company's business in 3Q01 was "robust" were actionable where plaintiff alleged that the company "knew from internal reports that it would not be able to meet its 3Q01 projections."). The cases relied on by Defendants are easily distinguishable as they involved much more vague topics unaccompanied by the context here, such as "financial integrity" and "business strategies", *Lasker* v. *N.Y.S. Elec. & Gas Corp.*, 85 F.3d 55, 56-57, 59 (2d Cir. 1996), "risk management processes" and "financial discipline", *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009), and "honesty and integrity." *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 Fed. Appx. 32, 37-38 (2d Cir. 2012). The finding in  *In re Gentiva*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) that statements that the compliance program was "robust" or "best-of-class" were not accompanied by the other factual statements alleged here, which are sufficient under the Second Circuit's subsequent decision in *JinkoSolar.*

accurate"; or (2) "failed to check information they had a duty to monitor" *ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d at 199. Scienter allegations must be viewed holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather an inference of scienter is strong if a reasonable person would deem the inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

### 1. Defendants' Actual Knowledge of "Critical" and "Unacceptable" Regulatory Violations Supports a Strong Inference of Scienter

There can be no dispute that Marchionne and Kunselman personally knew that FCA was having serious compliance problems with NHTSA.  These problems were so severe that they resulted in the head of NHTSA personally writing to Marchionne and Kunselman on multiple occasions to warn them of FCA's non-compliance as to FCA's two largest and most high-profile recalls.  *See supra* at 7-10.  Defendants' receipt of these letters alone is sufficient to plead a strong inference of scienter as to their statements of compliance.  *See Novak*, 216 F.3d at 311.

The Supreme Court considered a similar situation in *Omnicare*, 135 S. Ct. 1318 (2015)

Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." . . . [*I*]*f  the issuer made the statement . . . with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain*.

*Id.* at 1329.  Although *Omnicare* addressed whether statements of opinion are misleading, it is instructive as to Defendants' scienter for their non-opinion statement of compliance because "the question of scienter largely turns on the same considerations as those concerning the Defendants' statements of opinion." *In re BioScrip, Inc.*, 95 F. Supp. 3d 711, 732 (S.D.N.Y. 2015). *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. Jan. 28, 2015) ("[W]here plaintiffs allege a false

20

statement of opinion, 'the falsity and scienter requirements are essentially identical'"") (citation omitted).  Here, NHTSA had clearly indicated that was "taking the opposite view".

Courts routinely find scienter adequately alleged in similar situations in which a company asserting compliance with FDA regulations fails to also disclose "observations" of potential violations during routine facility inspections.  *See, e.g. Todd v. STAAR Surgical Company*, No. CV-14-05263 (C.D. Cal. Apr. 12, 2016) (slip op) (finding scienter adequately alleged for statements of FDA compliance where FDA inspector reported to "management" potential regulatory violations during routine inspection); *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 BL 228345, 6 (N.D. Ohio Aug. 18, 2014) (scienter adequately alleged for statements of FDA compliance where an FDA inspector had sent the CEO a letter identifying "serious" observations of possible violations).[7]  Scienter still exists even where the determination is a non-final determination from a low-level inspector.  *See In re SFBC Intern., Inc. Sec. & Derivative Litig.*, 495 F.Supp.2d 477, 481 n. 2 (D.N.J.2007) ("While the observations contained in a Form 483 report do not constitute a final agency determination regarding the facility's compliance with applicable laws and regulations, corrective action by the inspected company is expected.").  Here, scienter is even stronger, as the letters were directly from the head of NHTSA to Marchionne, rather than a routine form from an inspector.  As in the FDA cases, each letter "represents a risk that [NHTSA] may take corrective action against a company, and thus a company is obligated to assess the seriousness of the risk and disclose such information to potential investors if it also represents it is in compliance with [NHTSA] regulations."  *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 982-983 (8th Cir. 2012).

---

[7] *See also Wilkof v. Caraco Pharm. Labs, Ltd.*, 2010 WL 4184465, at *6 (E.D.Mich. Oct. 21, 2010) (scienter adequately alleged where a company represented it was "substantially cGMP compliant" despite receiving Form 483s noting manufacturing problems); *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *16, 30 (D.N.J. March 24, 2008) (denying a motion to dismiss in a case involving a company's receipt of an FDA warning letter where the defendants represented the company was compliant with FDA requirements); *In re Cryolife, Inc.*, 2003 WL 24015055, at *8 (N.D.Ga. May 27, 2003) (denying a motion to dismiss in a case involving a company's receipt of a Form 483 noting observations at the same time it represented it in was "in compliance with all FDA regulations").

Defendants' argument that these letters only concerned two recalls and thus cannot establish scienter for statements of "substantial" compliance with "global", fails for the same reasons discussed above. *Supra* at 15-16. Moreover, after the Consent Order, Marchionne admitted that he was aware of the same systemic deficiencies in FCA's compliance that led to the Consent Order since before the Class Period. ¶270.

> **2.  Defendants' Repeated Discussions of Compliance, Admitted Close Monitoring of Compliance Issues to Ensure "Information Flow" and "Accountability" And Access to Reports Detailing Violations Supports a Strong Inference of Scienter**

Given Marchionne's and Kunselman's hands-on roles under the new compliance structure, which was designed to "ensur[e] a high level of information flow and accountability", scienter can be inferred from their access to numerous reports, letters, notifications, inspections and other information concerning the widespread compliance violations. *See Novak*, 216 F.3d at 311 (scienter inferred where defendants "knew facts or had access to information suggesting that their public statements were not accurate"). "[F]alsity may itself be indicative of scienter where it is combined with 'allegations regarding a management's role in the company' that are 'particular and suggest that the defendant had actual access to the disputed information,' and where 'the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009). *See In re GE Secs. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) (same).

The information that Defendants had access to is staggering. As normal procedure, NHTSA notified FCA every time it untimely notified NHTSA or an owner concerning a recall – that's at least 23 times. Moreover, the Complaint details: (1) the notification of an increase in investigations into FCA recalls in mid-2014 (¶262); (2) the July 2014 "special order" (¶78); (3) the additional October 20, 2014 formal investigation (¶125); (4) the October 29 and November 5 correspondence with Friedman (¶96); (5) FCA's own documents revealed that FCA was well

22

aware of its violations. ¶¶114, 123.  Scienter can be inferred from NHTSA's finding that there

was a "widespread" "pattern" of "significant" violations over several years. ¶¶70, 148, 115, 144.[8]

The inference of scienter is further supported by the fact that Defendants repeatedly

spoke about compliance issues throughout the Class Period, touting the new structure, their

personal role, that it was "robust" and its effectiveness on compliance and reducing costs. ¶¶200,

212 .  Marchionne and Kunselman each also asserted that they had been very "public" and

"transparent[]" about FCA's compliance. *Id.*  Courts in this District have repeatedly held that if

executives speak about a topic of "critical importance", they cannot hide their heads in the sand

and ignore crucial information at their fingertips about it. *City of Livonia Employees Ret. Sys. v.*

*Wyeth*, 2010 U.S. Dist. LEXIS 107729, at *6, *18-19 (S.D.N.Y. Sept. 29, 2010).[9]  Where, as

here, "facts that contradict a high-level officer's public statements were available when the

statements were made, it is reasonable to conclude that the speaker had intimate knowledge of

those facts or should have known of them." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,

324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).[10]

---

[8] *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 301 (S.D.N.Y. 2008) (where defendant was a member of the Compensation Committee, he "knew, or was highly reckless in not knowing, that there was rampant improper dating of options"); *In re BioScrip*, 95 F. Supp. 3d at 733 (scienter adequately alleged because  defendants "had access to information suggesting their public statements [concerning regulatory compliance] were not accurate" based on company's receipt of subpoena and pendency of regulatory investigations at that time); *In re Barrick Gold Secs. Litig.*, 2015 BL 92331, 13 (S.D.N.Y. Apr. 01, 2015) (allegations of the existence of negative internal reports demonstrated defendants had "access to information that directly contradicted their public statements that Barrick was complying with all environmental commitments", which was sufficient to plead scienter"); *American Apparel S'holder Litig.,* 2013 WL 174119 at *20-21 ("[I]t strains credulity to infer that the company's management remained completely ignorant of [the company's] immigration compliance problems during the *entire pendency* of the [Immigration and Customs Enforcement Division] investigation.").

[9] *See In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) ("Defendants cannot maintain that its officers repeatedly disclosed the RMBS content of the CDOs-squared to the market, but that none of its officers were aware of the RMBS backing the CDOs-squared); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 460 n.21 (S.D.N.Y. 2005) ("Defendants[ ] cannot simultaneously argue that the vendor financing arrangements were disclosed to the investing public, but that [defendant's] CEO and CFO were unaware of those commitments.").

[10] *See also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("highly improbable" that defendant who publicly described company's finances did not inquire

The vital importance of complying with vehicle safety laws to FCA's business is further evidence of Defendants' scienter. *See In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 621 (S.D.W. Va. 2012) (scienter where company misled market about its disregard for regulatory compliance, which was "an important component for investors to consider").[11]

### 3.   Kunselman's Abrupt Resignation Supports a Strong Inference of Scienter

The "highly unusual and suspicious" resignation of Defendant Kunselman, who abruptly resigned the day before the Company's massive charge after only a year in the position, also constitutes circumstantial evidence of fraud. *See, e.g., In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.76 (S.D.N.Y. 2007) ("[A]lthough not sufficient in and of themselves, [resignations] add to the overall pleading of circumstantial evidence of fraud."); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 603, 608 (S.D.N.Y. 2009).

### 4.   The Inference of Scienter is At Least as Strong as Any Nonculpable Inference

Considering the alleged facts holistically, the most plausible inference is that Defendants were aware of FCA's serious and widespread compliance problems. *See Tellabs*, 551 U.S. at 324. Indeed, it is inconceivable – or severely reckless – that despite the admitted importance of the issue and Defendants' repeated statements concerning compliance that Defendants were somehow ignorant of the problems. *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (extreme departure from the standards of ordinary care where danger of

---

into basis for statements); *Reese v. Malone*, 2014 WL 555911, at *9 (9th Cir. Feb. 13, 2014) ("[T]he inference that Johnson did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement.").

[11] Defendants argue that scienter should not be inferred because FCA promptly disclosed the scheduling of the July 2015 Hearing.  Def. Br. at 19.  The exact opposite is true because FCA only "disclosed" the July 2015 Hearing only ***after*** NHTSA had already announced the July 2015 Hearing. *See City of Pontiac Gen. Employees' Ret. Sys. v. Wal-Mart Stores, Inc.*, 2014 WL 4823876, at *4, 9 (W.D. Ark. Sept. 26, 2014) (holding that the failure to acknowledge suspected corruption until after publication of a New York Times article supported the inference that defendants "were concerned about exposure of their alleged mishandling of the suspected corruption" and "consciously chose to omit" that information from earlier disclosures).

misleading investors was "either known to the defendant or so obvious that the defendant must have been aware of it").[12]

### C.   The Complaint Adequately Alleges Falsity and Scienter As to FCA's Provision For Recalls

As a practical matter, in a §10(b) misstatement of opinion case, the dual inquiries of scienter and "subjective falsity" collapse into one.  *City of Austin Police Retirement Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013), *reconsideration denied* (June 6, 2013); Thus, the analysis of (i) whether FCA's understated its provision for recall expenses, and (ii) whether such understatements were made with scienter, are one and the same.

### 1.   Defendants' Provision For Recalls Was Objectively and Subjectively False

FCA falsely claimed that it prepared its financial statements in accordance with International Financial Reporting Standards, as required by the SEC and NYSE. ¶¶168-169. Financial statements that do not comply with IFRS are presumed to be false and misleading.  17 C.F.R. § 210.4-01(a)(1); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 540 (S.D.N.Y. 2010). Under IFRS, the expected costs associated with FCA's auto recalls for vehicles already sold are accounted for, and reported by, recognizing a provision on its balance sheet pursuant to IAS 37. ¶171. According to IAS 37, ¶59, Chrysler was required to review its provision for warranty and recall expenses quarterly and adjust the provision to reflect the current best estimate. ¶175; IAS 37, ¶38.

Beginning in at least 2010, Chrysler experienced extraordinary increases in the total number of autos subject to recall. Nevertheless, FCA failed to adjust its provision for warranty and recall expense in violation of IAS 37. The chart below shows the year over year increase in recalls and Chrysler's corresponding failure to recognize the dramatic spike – rather its provision

---

[12] Even if the Court determines these allegations are insufficient as to the Individual Defendants, the Complaint adequately pleads scienter with respect to FCA. *See*, *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) ("The fact that Lead Plaintiff failed to allege scienter for the individual Defendants does not preclude a finding of recklessness against [the company].... All that is required is that the pleaded facts create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.").

for warranty and recall expenses remained flat in the face of year over year double and triple digit increases in the number of autos subject to recall.

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Recalls | 23 | 24 | 11 | 13 | 36 | 39 | 42 |
| Recall Change % | | 4.3% | -54.2% | 18.2% | 176.9% | 8.3% | 7.7% |
| Units Recalled | 484,183 | 1,528,604 | 778,621 | 1,334,270 | 4,665,884 | 5,940,104 | 12,074,448 |
| Units Recall Change % | | 215.7% | -49.1% | 71.4% | 249.7% | 27.3% | 103.3% |
| Change Since 2009 | | 216% | 61% | 176% | 864% | 1127% | 2394% |
| Change Since 2010 | | | -49% | -13% | 205% | 289% | 690% |
| Change Since 2011 | | | | 71% | 499% | 663% | 1451% |
| Change Since 2012 | | | | | 250% | 345% | 805% |
| Provision for Warranty Expense | | | | $3,617 | $3,656 | $4,845 | $6,471 |
| Change in Provision % | | | | | 1% | 33% | 34% |

The above chart shows that at the time Chrysler issued its fiscal 2013 financial statements on July 10, 2014, the annual number of cars recalled increased 864% since 2009 and 249.7% since 2012.[13]  Similarly, for fiscal 2014, units recalled were up 1,127% since 2009 and were 27% above 2013. However, FCA increased its provision for warranty/recalls only 1% in 2013 and 33% in 2014.  Thus, it can be "'plausibly inferred' from the facts alleged that the Officers 'knew they were disseminating false and misleading" opinions about [the provision for recalls].'". *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d at 315 (statement of opinion concerning deferred tax asset found subjectively false) (*quoting, Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,* 651 F.Supp.2d 155, 179 (S.D.N.Y.2009)) (statement of opinion subjectively false because Defendants possessed contradictory information).  This is further supported by the detailed allegations that Defendants were illegally delaying and reducing the costs of recalls by systemically delaying owner notifications and repairs.

Defendants, citing *In re Loral Space & Commc'ns Ltd.* , assert that the Complaint does not allege any contradictory internal report indicating that its estimates for the costs of recalls

---

[13] This chart is alleged in ¶¶176-177 of the Complaint.  Data source is NHTSA databases. The warranty provision is sourced from FCA's Form 20-F filed December 11, 2014. There was a typo in ¶177. The increase in warranty provision from 2012 to 2013 was not 8%, it was only 1%.

was actually higher.  2004 WL 376442, at *11 (S.D.N.Y. Feb.27, 2004).  But the Complaint does allege that Defendants had access to 573 Reports and EWRs detailing the scope, number and true costs of the vehicle recalls FCA was experiencing, which they submitted to NHTSA and gave them a clear picture of the true anticipated costs. ¶¶175, 180. Thus, FCA had accurate information from which to establish an accurate provision. ¶181. This distinguishes this case from those cited by Defendants. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir.2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.") (*quoting Novak*, 216 F.3d at 309).  *See also In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231 (S.D.N.Y. 2006) (Recklessness found where defendants "ignored the dramatic increase in [the company's] warranty costs".).[14]

        This case more resembles *In re Converium Holding AG Sec. Litig.* , where Judge Cote held scienter was adequately alleged against defendant officers and the issuer for misrepresenting loss reserves where the "publicly reported numbers were at odds with Converium's internal analyses".  2006 WL 3804619, at *13 (S.D.N.Y. Dec. 28, 2006), *on reconsideration in part,* 2007 WL 1041480 (S.D.N.Y. Apr. 9, 2007).   Here, the Complaint states a claim based on recklessness because it "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements" as to the provision for recalls.  *Novak*, 216 F.3d at 308.  Defendants either "failed to review or check information that they had a duty to monitor" such as the Form 573 and EWRs or else knowingly ignored that contradictory information when updating the provision each quarter. *Id*. at 308-309.[15]

---

[14] Defendants claim that their provision was based "upon *long-term historical averages* until actual data is available." and were therefore justified in ignoring the drastic increase in vehicle recalls beginning in 2009. Def Br. at 14-15.   But both the language Defendants quote and IAS 37, ¶59 require Defendants to review and update the provision quarterly to reflect the actual volume of recalls Chrysler is experiencing. ¶175.

[15] Defendants' reliance on *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) fairs no better. The Court made clear that had plaintiff been able to "point to an objective standard for setting loan loss reserves" its decision might very well have been different. *Id*.  Here, the 573 Reports and EWRs provide precisely that information. ¶44. Plaintiffs are not proposing an

Defendants contend that they only discovered that FCA's provision had been inadequate requiring the €791 million charge in the end of third quarter 2015, because it was only then they realized NHTSA was increasing enforcement of regulations governing recalls.  Def. Br. At 16-17. This contradicts Marchionne's statement on July 30, 2015, where it admitted that Defendants had been aware well for more than a year (i.e. before July 2014), that NHTSA was cracking down - that "changes were coming" and that FCA must improve its "governance and process on safety and recall compliance issues".  ¶21 Defendants' requested inference of non-culpability is also not plausible given the overwhelming increase in vehicle recalls – a whopping 2,394% - since at least 2009 (¶176) and Defendants' repeated prior acknowledgements of NHTSA's increased enforcement efforts.¶21 Further evidence of Defendants' bad faith in connection with Defendants' disclosure of the costs of Chrysler's recalls is their false statement on July 28, 2015 following the $105 million consent order, that "contrary to certain reports, FCA US does not expect that the net cost of providing these additional alternatives will be material to its financial position, liquidity or results of operations."  ¶246.  Yet just three months later Chrysler took a €791 million charge for having understated its costs of recalls. ¶251

### 1. <u>Defendants' Supposed Risk Disclosures Were Themselves False and Misleading</u>

Seeking to insulate themselves from liability, Defendants pepper their motion with reference to number of generic risk disclosures stating, for example, that FCA was subject to particular laws governing its operations and that there was a risk that it might be subject to regulatory action and the possibility that the ultimate cost of recalls may require greater expenditures. *See* Def. Br. at 7-8. As discussed above, *supra* at 20-24, these generic disclosures were misleading and inadequate because Defendants were well aware of increased regulatory enforcement, FCA's compliance violations, and were in possession of up to the minute

---

alternative methodology for FCA to account for the provision.  Instead, through ignoring the increased volume of recalls and illegally delaying and reducing the costs of recalls Defendants' accounting *judgment* was made consciously in violation of IAS 37, ¶59.

information that showed the skyrocketing rate of recalls over five years. "[N]o amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred." *Lin v. Interactive Brokers Grp., Inc.,* 574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008); *see Slayton v. American Express Co.,* 604 F.3d 758, 772 (2d Cir. 2010) (defendants must demonstrate that their cautionary language was "not boilerplate and conveyed substantive information"). Defendants' omission of these specific known facts from their risk disclosures rendered those disclosures meaningless and misleading.[16] *See JinkoSolar*, (disclosure of legal obligations and risks misleading where company did not also disclose compliance problems).

### D.    The Complaint Adequately Alleges Loss Causation

A "complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 183, 187 (2d Cir. 2015) ("the vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8.") (citations omitted).  The complaint must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173. This is typically done either by pleading that the truth was disclosed (i.e., a finding of a violation of law, contrary to prior representations of compliance) or that the concealed risk materialized (i.e. a fine imposed as a result of violations of law or an accounting charge is taken to cover the violations) causing a decline in the stock price. *In re Initial Pub. Offering Sec. Litig.,* 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).

Citing *Omnicom*, Defendants contend that the July 26, 2015 Consent Order and the October 28, 2015 announcement of the € 791 million charge to increase the provision for recalls

---

[16] *See also In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F. Supp. 2d 388, 415 (S.D.N.Y. 2005) (statements purporting to warn that business "could" be negatively impacted "if" it failed to comply with industry regulations were materially misleading where the company was violating industry regulations at the time it issued warnings).

were not new information, but merely a "negative characterization of already-public information." *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 512 (2d Cir. 2010). Defendants assert that the "relevant truth" was first disclosed on May 18, 2015 when the NHTSA announced the July 2, 2015 public hearing. Def. Ex. 9. Defendants contend that this "disclosed the potential risks associated with NHTSA's inquiry and factored the uncertainty of the outcome into the share price." Def. Br. at 30. This argument fails on all levels. The news of an inquiry by NHTSA alerted investors only to the fact that Chrysler "might have violated the law."  It wasn't until the July 26, 2015 Consent Order that the market learned (i) that FCA had extensively violated the law, and (ii) of the fines and obligations imposed as a result of FCA's violations. It was only after disclosure of the € 791 million charge on October 28, 2015 that the market finally learned of the true financial cost for the recalls required by the Consent Order and FCA's continued timely compliance. Here, unlike in *Omnicom*, the Consent Order contained materially new information, rather than being a "negative characterization of already-public information." 597. F.3d at 512. *C.f. Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("the disclosure of an SEC investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not 'reveal[ ] to the market the pertinent truth' of anything, and therefore does not qualify as a corrective disclosure.");  *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1381 (S.D. Fla. 2015) (finding that the announcement of an FTC investigation was not a corrective disclosure, but the later announcement constituted a corrective disclosure). *See also In re Ambac,* 693 F. Supp. 2d at 257-58 (disclosure of mark-to-market loss and credit impairment charge are corrective disclosures); *Freudenberg v E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202-03 (S.D.N.Y. 2010) (loss causation found when company increased its provision for loan losses because defendants concealed the risks and true performance of the loans).[17]

---

[17] Defendants also assert that the July 27 and October 28, 2015, stock drops following the Consent Order and announcement of the €791 million charge are not corrective disclosures, because there were no false statements to correct.  This is simply a repackaging of Defendants' falsity arguments and should be disregarded.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss should be denied. In the alternative, Plaintiffs respectfully request leave to amend in the event that the Court finds that the Complaint falls short of any applicable pleading standards. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995).


Dated:   June 3, 2016

Respectfully submitted,

**POMERANTZ LLP**


*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com
          mgorrie@pomlaw.com
          mjwernke@pomlaw.com


**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Co-Lead Counsel for Plaintiffs*


**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen
Phillip Kim
Sara Fuks

31

275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*