USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/05/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                    :

VICTOR PIRNIK,                       :

                    Plaintiff,    :           15-CV-7199 (JMF)

                                  :

        -v-                 :        OPINION AND ORDER

                                  :

FIAT CHRYSLER AUTOMOBILES, N.V., et al., :

                                  :

                  Defendants.   :

-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        Plaintiffs in this putative securities fraud class action are investors in Defendant Fiat

Chrysler Automobiles, N.V. ("FCA"), a global car company.  In brief, Plaintiffs bring claims

under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15

U.S.C. §§ 78(b), 78(t)(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240, alleging that

FCA — acting in part through Defendant Sergio Marchionne, the Chief Executive Officer of

FCA's largest subsidiary, FCA U.S.; Defendant Richard Palmer, the Chief Financial Officer of

FCA U.S.; and Defendant Scott Kunselman, the former head of Vehicle Safety and Regulatory

Compliance for FCA U.S. — made false and misleading statements regarding its compliance

with vehicle safety laws and improperly accounted for vehicle recall costs.  Defendants now

move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the operative

complaint.  (Docket No. 42).  For the reasons that follow, Defendants' motion to dismiss is

GRANTED in part and DENIED in part.

## BACKGROUND

The following facts — which are taken from the Second Amended Complaint, documents it incorporates, and matters of which the Court may take judicial notice (including disclosure documents that FCA was required by law to file) — are construed in the light most favorable to Plaintiffs.  *See, e.g.*, *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *see also, e.g.*, *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014).

FCA is a holding company that arose from the 2014 merger of Fiat Group Automobiles ("Fiat Group") and Chrysler Group LLC.  (Docket No. 38 ("SAC") ¶ 31).  FCA's subsidiary in the United States, now known as FCA U.S., is effectively a continuation of Chrysler, the well-known American car company that manufactures motor vehicles under various brand names, including Chrysler, Dodge, Fiat, Jeep, and Ram.  (*Id.* ¶¶ 2, 37).[1]  At all times relevant to this case, Defendant Marchionne was the CEO of FCA U.S. (and before it, Chrysler); Defendant Palmer was the CFO; and Defendant Kunselman was the head of Vehicle Safety and Regulatory Compliance.  (*Id.* ¶¶ 32-34).  (For clarity, and because the distinction between Chrysler and FCA U.S. is immaterial here, the Court will refer to FCA U.S. and Chrysler as simply "Chrysler.")

As a manufacturer of motor vehicles in the United States, Chrysler must comply with the National Traffic and Motor Vehicle Safety Act of 1996 (the "Safety Act"), 49 U.S.C. § 30101 *et seq.*, and its implementing regulations, which are enforced by the National Highway Traffic Safety Administration ("NHTSA").  (SAC ¶ 4).  In the period leading up to the creation of FCA,

---

[1]     The company known as Chrysler was founded in 1925, but "changed its name over the years from DaimlerChrysler AG (1997-2007), Chrysler LLC (2007-2009), Chrysler Group LLC (2009-2014) and FCA US (2014-present)."  (SAC ¶ 37).  These name changes (and related corporate transformations) are not relevant for purposes of this motion and may not be relevant to the case writ large.  Indeed, although the Second Amended Complaint discloses the various corporate forms that preceded FCA U.S., it generally discusses the conduct of "Chrysler" throughout, without ever defining which entity, precisely, is being referenced.

NHTSA conspicuously increased its enforcement of the Safety Act.  (*Id.* ¶ 8-9).  In 2010, for example, NHTSA twice levied on Toyota the maximum fine available for Safety act violations in connection with a high-profile defect involving unintended acceleration.  (*Id.* ¶ 8).  In June 2013, despite initial public resistance by Marchionne, Chrysler itself agreed to recall certain Jeep vehicles equipped with defective fuel tanks that could ignite in low-impact collisions.  (*Id.* ¶¶ 73-74).  The U.S. Secretary of Transportation Ray LaHood recounted in an interview thereafter that Marchionne had agreed to the recall after a meeting with LaHood and NHTSA Administrator David Strickland.  Secretary LaHood stated that, as a result of that meeting and other discussions, Marchionne "knew" that NHTSA was "a no-nonsense organization"; "[t]he thing that really set us on a course where people understood that," he continued, "was the Toyota (sudden-acceleration recalls) — the fact that we fined them the maximum fines twice."  (*Id.* ¶ 75).  Finally, in May 2014, NHTSA fined General Motors ("GM") $35 million, the maximum permitted, for its failure to timely report a defect in the ignition switches of various vehicles.  (*Id.* ¶ 9).  In its Consent Order with GM, NHTSA expressly noted that, in the prior five years, it had fined six different vehicle manufacturers a combined total of $124.5 million.  (*Id.*).

On August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance that would "help intensify the Company's continuing commitment to vehicle safety and regulatory compliance."  (*Id.* ¶ 184).  Defendant Kunselman was assigned to head the office and report directly to Marchionne, "ensuring a high level of information flow and accountability."  (*Id.* ¶¶ 11, 184, 263).  At the time, Chrysler was in the midst of the recall with respect to Jeep fuel tanks.  (*See id.* ¶¶ 72-88).  In addition, Chrysler was one of ten vehicle manufacturers undertaking recalls of vehicles with Takata airbags, which could explode upon deployment, propelling metal fragments and debris into the passenger

compartment.  (*See id.* ¶¶ 89-108).  In combination, that recall "constituted the largest and most complex safety recall in U.S. history with more than 28 million [airbag] inflators under recall in the United States."  (*Id.* ¶ 90).

In October 2014, Chrysler and Fiat Group merged to create FCA, and FCA began trading on the New York Stock Exchange.  (*Id.* ¶ 36).  On November 12, 2014, FCA filed disclosure forms with the Securities and Exchange Commission ("SEC") that contained the following representation (a representation that would be repeated in disclosures through June 2015):

> Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety, end-of-life vehicles, emissions and noise).  *We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products*.  We constantly monitor such requirements and adjust our operations to remain in compliance.

(*Id.* ¶¶ 198, 203, 222, 234, 236 (emphasis added)).  Shortly thereafter, at a United States Senate hearing prompted by the Takata airbag recall, Kunselman stated that Chrysler had "the highest recall completion rate of all major U.S.-market auto makers," that "NHTSA regards [Chrysler's] customer-notification protocols as 'industry-best,'" and that Chrysler's "average per-campaign vehicle volume is among the lowest in the industry — well below the industry average," which was a "testament to [Chrysler's] transparency and demonstrates clearly the robustness of [Chrysler's] fleet-monitoring and [Chrysler's] rapid response when issues arise."  (*Id.* ¶ 200).

Naturally, FCA soon faced questions about the costs of the recalls.  For example, in a January 28, 2015 earnings call, an analyst asked Defendant Palmer if Chrysler had "reflect[ed] the cost of the Takata airbag recall at year end or is this coming in 2015" and to "give . . . some sense of this industrial cost going into 2015, are there likely to be less of a headwind versus 2014"?  (*Id.* ¶ 210).  Palmer answered: "Yes.  We have booked the Takata item in [the fourth quarter of 2014].  In 2015 . . . we expect the industrial cost headwind to be significantly less than

it was in 2014 because of the fact that all these launches with extra content have had a 12-month cycle now.  So, year-over-year, they're in the numbers." (*Id.*).  On the same call, Marchionne said that the prior year's recalls reflected "a changing paradigm for the auto sector" and that Chrysler was "adjusting [its] internal structures to deal with this new state of affairs." (*Id.* ¶ 212).  "It is my expectation," he continued, "that this cost will come down as we progress through reconstitution of the management process of what's going on here." (*Id.*).

Notably, around the time that FCA first filed its regulatory compliance statement with the SEC and Kunselman testified before the Senate, NHTSA Administrator David Friedman sent letters to Chrysler alleging shortcomings with respect to the two high-profile recalls. (*Id.* ¶¶ 14-15).  On October 29, 2014, for example, Administrator Friedman sent what appears to have been a form letter to Steve Williams, Head of Vehicle Safety Compliance and Product Analysis at Chrysler, emphasizing the "critical imperative" of "aggressive and proactive action" to remedy the "defective Takata air bags." (*Id.* ¶ 272; Docket No. 43 ("Monahan Decl."), Ex. 6).  On November 25, 2014, Friedman sent directly to Marchionne a follow-up letter specific to Chrysler.  "Chrysler," Friedman wrote, "has consistently maintained its position at the rear of the pack," and its "delay in notifying consumers and taking other actions necessary to address the safety defect identified is unacceptable and exacerbates the risk to motorists' safety." (SAC ¶ 15; Monahan Decl., Ex. 7).  A letter from Administrator Friedman to Marchionne, dated November 19, 2014, sounded similar notes with respect to the Jeep fuel tank recall.  Specifically, Friedman expressed concern "about the results of Chrysler's October 2014 recall update reports showing a woeful three percent repair rate out of more than 1.5 million affected vehicles," and asserted that Chrysler's actions were "unacceptable." (SAC ¶ 14).  On November 21, 2014, Marchionne and Kunselman each sent a letter in response; Kunselman's letter acknowledged that

Chrysler's actions were "not satisfactory." (*Id.* ¶¶ 87-88).  On February 26, 2015, NHTSA sent a letter to Chrysler regarding a recall with a decidedly lower profile (a transmission issue in a certain model year car); it too highlighted Chrysler's delays in executing the recall and suggested that those delays were at odds with Chrysler's Safety Act duties.  (Monahan Decl., Ex. 8).

Prompted by Chrysler's apparent shortcomings, on May 18, 2015, NHTSA announced that it would hold a public hearing on July 2, 2015, to determine whether Chrysler had complied with its Safety Act duties in connection with twenty prior recall campaigns, including the three discussed in the letters.  (Monahan Decl., Ex. 9).  (NHTSA subsequently expanded its inquiry to include three additional Chrysler recalls, for a total of twenty-three.  (*See* SAC ¶ 241).)  The following day, Chrysler issued a press release titled "NHTSA Recall Scrutiny" indicating that it would respond to, and cooperate with, the regulator.  (Monahan Decl., Ex. 10).  At the July 2, 2015 hearing, NHTSA "found [Chrysler] frequently delayed responding to safety problems, contrary to federal law.  And even when it did order a recall, the feds questioned why repair rates often were so low and slow."  (SAC ¶ 245; *see also id.* ¶¶ 70, 148, 276).

On Sunday, July 26, 2015, Chrysler entered into a Consent Order with NHTSA (the "First Consent Order"), admitting that it had violated the Safety Act and agreeing to pay a record $105 million fine.  (*Id.* ¶ 19).  Specifically, Chrysler admitted it had failed to timely notify NHTSA and vehicle owners in connection with twenty-three recalls affecting more than eleven million vehicles and that it had failed to adequately remedy defects in connection with three of those twenty-three recalls.  (*Id.*; *see* Monahan Decl., Ex. 11 at 4-5).  FCA's stock price then fell $0.74, or roughly 4.9%, to close at $14.41 on July 27, 2015 — a fall that resulted in over a $950 million decline in the company's market capitalization.  (SAC ¶¶ 20, 244).  On a July 30, 2015 earnings call, Marchionne acknowledged that FCA had "not always been perfect in complying

with [recall] requirements" and that, over the prior "year and a half, NHTSA ha[d] begun to take a harder look at these technical compliance issues, and frankly we [had] started to do the same thing about the same time."  (SAC ¶ 270; Monahan Decl., Ex. 23, at 2).

On October 27, 2015, Chrysler announced Kunselman's resignation.  (SAC ¶ 250).  The next day, FCA announced its results for the third quarter — *i.e.*, the quarter in which NHTSA and Chrysler entered into the First Consent Order.  (*Id.* ¶ 251).  FCA disclosed that it recorded "a €761 million pre-tax charge for estimated future recall campaign costs for vehicles sold in prior periods in [the North American Free Trade Agreement zone]" (which includes the United States).  (*Id.*; Monahan Decl., Ex. 12, at 16).  Prior to this announcement, FCA had disclosed that its "estimated future costs of [service and recall] actions are primarily based on historical claims experience for the Group's vehicles" and that its "process . . . relies upon long-term historical averages until actual data is available."  (*See, e.g.*, Monahan Decl., Ex. 4, at F29).  In announcing the €761 million increase in its reserves, FCA stated that in light of the "recent increases in both the cost and frequency of recall campaigns and increased regulatory activity across the industry in the U.S. and Canada, an additional actuarial analysis that gives greater weight to the more recent calendar year trends in recall campaign experience has been added to the adequacy assessment to estimate future recall costs."  (Monahan Decl., Ex. 12, at 16).  Following the announcement, FCA shares fell $0.69, or 4.7%, to close at $14.72.  (SAC ¶ 252).

On December 8, 2015, NHTSA and Chrysler entered into an amendment to the First Consent Order (the "Second Consent Order").  In it, Chrysler admitted that it had not submitted certain early warning information to NHTSA "due to coding problems in its [early warning] system that failed to recognize when reportable information was received or updated," and because Chrysler "did not update its system to reflect new FCA brands."  (Monahan Decl., Ex.

13, at 2).  Chrysler agreed to pay an additional fine of $70 million.  (*Id.* at 3).  Later the same day, an article titled "One Reason Fiat Chrysler (FCAU) Stock Closed Down Today" explained: "Fiat Chrysler Automobiles (FCAU) stock closed lower by 0.07% to $13.80 on Thursday, after the National Highway Traffic Safety Administration (NHTSA) fined the automaker $70 million for failing to report safety data, including reports of death and injuries, consumer complaints, warranty claims, and other data."  (SAC ¶ 256).

In 2015, Plaintiff Victor Pirnik filed this lawsuit against FCA, Marchionne, Kunselman, and Palmer.  On December 9, 2015, the Court appointed Gary Koopman and Timothy Kidd as Lead Plaintiffs.  (Docket No. 24).  Thereafter, they filed the operative Second Amended Complaint, which alleges that Defendants violated Section 10(b) and Rule 10b-5 by making false and misleading statements and omissions concerning FCA's compliance with regulations and by estimating falsely the quarterly provisions for FCA's warranty and recall reserves.  (*See* SAC ¶¶ 297-307).  Plaintiffs also seek to hold Marchionne, Kunselman, and Palmer liable as "control persons" under Section 20(a) of the Exchange Act.  (*See id.* ¶¶ 308-313).

## LEGAL STANDARDS

"In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319-20 (S.D.N.Y. 2012) (citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)).  The Court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Because they allege securities fraud, Plaintiffs must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy Rule 9(b), a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

## DISCUSSION

As noted, Plaintiffs seek to hold FCA, Marchionne, Kunselman, and Palmer liable for securities fraud under Section 10(b) and Rule 10b-5 and to hold Marchionne, Kunselman, and Palmer liable as "control persons" under Section 20(a). Broadly speaking, Plaintiffs' claims

relate to two categories of statements.  The first category includes statements concerning FCA's compliance with applicable regulations — most notably, FCA's representations of substantial regulatory compliance in its SEC filings, but also oral statements made by Marchionne and Kunselman relating to Chrysler's fulfillment of its safety and recall duties.  The second category includes statements concerning the amount of funds FCA reserved to address its warranty and recall costs, including oral statements by Palmer.

To state a claim for relief under Section 10(b) and Rule 10b-5 (and, by extension, a claim under Section 20(a)), a plaintiff must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted); *see also, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (noting that a plaintiff must plead a plausible primary violation of Section 10(b) to state a claim for control person liability under Section 20(a)).  Here, three elements are in dispute: whether Plaintiffs adequately plead a material misrepresentation or omission, scienter, and loss causation.  The Court will begin by addressing whether Plaintiffs adequately plead a material misrepresentation or omission and scienter, first in connection with Defendants' statements and omissions regarding its regulatory compliance and then in connection with Defendants' statements about FCA's warranty and recall reserves.  Lastly, the Court will address Defendants' arguments regarding loss causation.

**A.  Defendants' Statements Regarding Regulatory Compliance**

Defendants move to dismiss Plaintiffs' claims relating to FCA's compliance with applicable regulations on two grounds: first, that the statements were not false or constitute

inactionable puffery and, second, that Plaintiffs fail to adequately allege scienter.  The Court will address each argument in turn.

### 1. Falsity

To start, Defendants argue that FCA's statements about regulatory compliance in the company's SEC filings (and the oral statements made by Marchionne and Kunselman to similar effect) were neither false nor misleading.  (Docket No. 44 ("Defs.' Mem.") 24-25).  "[W]hether a statement is misleading depends on the perspective of a reasonable investor: The inquiry . . . is objective."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015) (internal quotation marks omitted).  Courts "consider whether the disclosures and representations, taken together and in context, would . . . misle[a]d a reasonable investor about the nature of the securities."  *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) (internal quotation marks omitted).  "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation."  *Kleinman*, 706 F.3d at 153.  Finally, to the extent relevant here, "[a] statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider in important in deciding how to act."  *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F. 3d 383, 389 (2d Cir. 2015) (internal quotation marks omitted).

Applying those standards here, the Court easily concludes that Plaintiffs plausibly allege actionable and material misrepresentations.  In the sentence primarily at issue, FCA represented from November 2014 through June 2015 that it was "substantially in compliance with the relevant global regulatory requirements affecting [the company's] facilities and products."  (SAC ¶¶ 198, 203, 222, 234, 236).  At the time of those statements, however, FCA was allegedly *not*

"substantially in compliance" with the "regulatory requirements" of the Safety Act; after all, only months later, FCA admitted to widespread noncompliance with those requirements.  *Cf., e.g., Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 143, n.13 (2d Cir. 2010) ("Depending on the problem, its existence in February 2008 may support an inference that it was present six months earlier. This is sufficient to raise [the plaintiffs'] right to relief above the speculative level." (internal quotation marks omitted)).  Defendants do not (and, at this stage of the litigation, could not) argue otherwise.  Instead, emphasizing the vastness of FCA's "global regulatory requirements," Defendants contend that "isolated disputes concerning a handful of regulations with one U.S. regulator do[] not remotely suggest that FCA was not at any time in substantial compliance with the myriad global regulations to which it was subject."  (Defs.' Mem. 24-25).  That argument might have legs if the sentence at issue read that FCA was "substantially in compliance with" *substantially all of* "the relevant global regulatory requirements."  But that is not what it said, nor how it would be interpreted by a reasonable investor, let alone the only interpretation to which the sentence is "susceptible."  *Kleinman*, 706 F.3d at 154.  Instead, a reasonable investor could, and likely *would*, read FCA's statement to mean that the company was substantially in compliance with *all* applicable regulations, including the Safety Act and vehicle safety regulations in the United States.  *See, e.g.*, *Fed. Hous. Fin. Agency Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 563 (S.D.N.Y. 2015) (finding, after a bench trial, that defendants' representations of "general compliance" were misleading because they "indicated that certain immaterial exceptions might exist," not that significant violations existed (internal quotation marks omitted)); *In re Bear Stearns Cos. Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 459 (S.D.N.Y. 2011) (finding defendant's statement that it

was "in compliance with [the SEC's Consolidated Supervised Entity] regulatory capital requirements" to be materially false).

The statement's text and context support that conclusion.  First, the only word qualifying "global regulatory requirements" is "relevant," and the Safety Act is plainly relevant (that is, applicable, to FCA).  Indeed, in the preceding sentence, FCA noted it "must . . . comply with extensive regional, national and local laws and regulations and industry self-regulations (*including those that regulate vehicle safety* . . .)."  (SAC ¶ 198 (emphasis added)).[2]  *See Omnicare*, 135 S. Ct. at 1332 (noting that the reasonable investor interprets a statement "fairly and in context").  Second, a reasonable investor could certainly conclude that the word "substantially" modifies only the words "in compliance."  That is so not only because of grammar and syntax — *i.e.*, the words are next to one another, *see id.* at 1328 (observing that "the reasonable investor expects" an SEC filing to "ha[ve] been carefully wordsmithed") — but also because the law "does not concern itself with trifles" and "substantial" compliance is usually good enough, *Amalgamated Serv. & Allied Indus. Joint Bd., Amalgamated Clothing & Textile Workers Union, AFL-CIO, CLC v. N.L.R.B.*, 815 F.2d 225, 228 (2d Cir. 1987).  In fact, the next sentence equates "substantially in compliance" and "in compliance" — stating "[w]e constantly monitor *such requirements* and adjust our operations to remain *in compliance*" — dropping any qualifying language to the pledged degree of compliance.  Thus, a reasonable investor could have understood FCA to be representing that it was "substantially in compliance," not with *most* requirements in *most* areas, but with *all* "such requirements," including with vehicle safety

---

[2]      In light of that language, the fact that the statement appeared under the heading "Environmental and Other Regulatory Matters" (*see* Defs.' Mem. 25) is of no great significance.

regulations in the United States — particularly when considered in conjunction with Marchionne's and Kunselman's statements on that topic.

FCA's argument that its misrepresentations were merely inactionable puffery fares no better.  That argument has no merit with respect to FCA's specific representation discussed above.  *See, e.g.*, *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 721–22 (S.D.N.Y. 2015) (holding that the statement that "the Company *believes* it is in substantial compliance with all laws, rules and regulations that affects its business and operations," even though an opinion, was actionable (emphasis added)).  And with respect to Marchionne and Kunselman, Defendants do not argue for dismissal on the ground that, under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), the individual defendants did not "make" that statement. *Compare In re UBS AG Sec. Litig.*, No. 07-CV-11225 (RJS), 2012 WL 4471265, at *10 (S.D.N.Y. Sept. 28, 2012) ("Although *Janus* might not necessarily imply that there can be only one 'maker' of a statement in the case of express or implicit attribution, the individual defendants still must have actually 'made' the statements under the new *Janus* standard to be held liable under Section 10(b)." (internal quotation marks and citations omitted)), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014), *with*, *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, No. 11-CV-5026 (JSR), 2012 WL 2866425, at *13-14 (S.D.N.Y. July 13, 2012) (holding that the group pleading doctrine survives *Janus*).  In any event, Marchionne's and Kunselman's "comforting [oral] statements . . . about compliance measures" — viewed in combination with FCA's representation in its SEC disclosures of substantial compliance and the reality of its *non*compliance — "could be found by a trier of fact to be . . . misleading."  *Meyer v. JinkoSolar Holdings Co., Ltd*, 761 F.3d 245, 251 (2d Cir. 2014); *see also, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 573

(S.D.N.Y. 2011) (finding statements concerning the company's "sound financial footing" were not puffery because they were "supported by specific statements of fact regarding Vivendi's resources and financial condition" such as "zero net debt" and "free cash flow"), *aff'd*, — F.3d —, 2016 WL 5389288 (2d Cir. Sept. 27, 2016).  Accordingly, with respect to Defendants' statements concerning FCA's regulatory compliance, Plaintiffs plausibly allege actionable misrepresentations.

## 2.  Scienter

The Court thus turns to the question of scienter.  In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  In their opposition to Defendants' motion, Plaintiffs rely solely on the latter, so they must allege either actual intent or "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).[3]  More specifically, Plaintiffs must allege conduct by

---

[3]        There are allegations in the Second Amended Complaint that could be read to suggest reliance on a motive-and-opportunity theory.  (*See* Defs.' Mem. 12 (citing SAC ¶¶ 279-85, 302)). To the extent that Plaintiffs ever relied on that theory, however, they have abandoned the theory by not responding to Defendants' arguments on the issue.  (*See id.*; Defs.' Reply 3).  That is just as well.  Plaintiffs do not allege that any of the Defendants sold shares of FCA stock during the Class Period.  *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (finding "no personal interest sufficient to establish motive" where "[p]laintiffs [did] not allege that defendants sold stock or profited in any way during the relevant period").  And while they do allege that Defendants had an interest in keeping FAC's stock price high and an opportunity to commit fraud by virtue of their positions, those sorts of generic allegations are insufficient to satisfy the scienter requirement.  *See, e.g.*, *South Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108–09 (2d Cir. 2009) ("[I]n attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of

Defendants, "which is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir. 2001) (quoting *In Re Carter-Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 39 (2d Cir. 2000)). The inquiry is "highly fact-based." *Id.* As a general matter, however, courts have approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (noting as well that "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness" (alterations in original)).

Significantly, in arguing against an inference of scienter, FCA does not really dispute that the Second Amended Complaint alleges that Marchionne and Kunselman had knowledge of the company's noncompliance with respect to at least some recalls. (Defs.' Mem. 17-18). Instead, echoing their arguments with respect to falsity, Defendants merely seek to downplay how "substantial" the known noncompliance was. Thus, for example, FCA emphasizes that NHTSA's letters to Marchionne and Kunselman concerned "just *three* U.S. recall campaigns." (Defs.' Mem. 17 (emphasis in original)). And they note that the November 25, 2015 NHTSA letter "referred only to *the single Takata airbag recall*" (Defs.' Mem. 18 (emphasis in original)) — as if the largest automotive recall in history had involved only one solitary airbag (rather than

corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." (internal quotation marks omitted)).

millions of airbags).  To the extent Defendants are rearguing falsity under the guise of scienter, their argument is without merit for the reasons discussed above; and to the extent they are presenting a materiality argument in disguise, the argument is without merit because materiality "is generally not an appropriate basis on which to dismiss a complaint."  *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003).

Along the same lines, although it may be true that "Plaintiffs do not allege facts showing that any of the Individual Defendants — the most senior executives at FCA and/or FCA US — participated in the preparation of [FCA's safety reports to NHTSA] or knew that they were submitted late" (Defs.' Mem. 19), Plaintiffs do not need to show that the individual Defendants were *personally involved* with each Safety Act violation or even aware of any *particular* violation.  Instead, it is enough at this stage for Plaintiffs to allege that Defendants were aware of nonpublic facts contradicting their public representations of substantial legal compliance. Plaintiffs do so, given the three deficient recalls about which Defendants appear to concede Kunselman and Marhcionne were aware.  In addition, several other considerations raise a strong inference of knowledge.  For instance, in its announcement that Kunselman, "a very, very senior" individual, would head the new office devoted to vehicle safety and regulatory compliance and report directly to the CEO himself, FCA assured its regulators and (more importantly for present purposes) its investors that, when it comes to ensuring safety, the buck would stop at the C Suite.  (*See* SAC ¶¶ 184, 200, 212, 263).  Additionally, Plaintiffs allege that Defendants "frequent[ly]" discussed "regulatory compliance in press releases, earnings calls and SEC filings" (SAC ¶ 257) and that Marchionne himself stated, in July 2015, that "*over the last year and a half*, NHTSA has begun to take a harder look at these technical compliance issues, and frankly *we started to do the same thing about the same time*."  (SAC ¶ 270 (emphases

added)).  In short, in light of the Court's analysis regarding falsity, NHTSA's direct

correspondence to FCA's top executives, and FCA's self-acclaimed installation of a direct chain

of safety-related information and accountability to those same top executives, Plaintiffs'

allegations raise an inference of scienter as to those individuals that is "cogent and at least as

compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Accordingly, Plaintiffs adequately allege scienter with

respect to the statements concerning legal compliance.[4]

**B.  Defendants' Statements Regarding Recall and Warranty Provisions**

The same cannot be said of Plaintiff's allegations regarding Defendants' statements

relating to FCA's recall reserves.  The Second Circuit has held that "determining the adequacy of

*loan loss* reserves is not a matter of objective fact" but a matter of opinion.  *Fait v. Regions Fin.*

*Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (emphasis added).  As a result, such reserve estimates

are actionable only if they are "both false and not honestly believed when they were made." *Id.*;

*see also City of Omaha v. CBS Corp.*, 679 F.3d 64, 67–68 (2d Cir. 2012) (applying the reasoning

of *Fait*, which affirmed dismissal of section 11 and 12(a) claims, to section 10(b) and 20(a)

claims).  *Fait* involved *loan loss* reserves, but its logic applies equally here — to reserves for

product warranties and recalls — unless Plaintiffs can point to "an objective standard for setting

[warranty] reserves."  655 F.3d at 113.  Like the plaintiffs in *Fait*, however, Plaintiffs fail to do

---

[4]      Defendants also cite, in a single sentence and a footnote (Defs. Mem. 19-20 & n.14), two
cases rejecting securities fraud claims based on alleged omissions concerning government
investigations.  *See In re Lions Gate Entm't Corp. Sec. Litig.*, No. 14-CV-5197 (JGK), 2016 WL
297722, at *6-7 (S.D.N.Y. 2016); *In re UBS AG Sec. Litig.*, No. 07-CV-11225 (RJS), 2012 WL
4471265, at *31 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's &*
*Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).  Those cases are inapposite here as
Plaintiffs allege securities fraud based on affirmative misrepresentations of compliance, not
based on the failure to disclose ongoing government investigations.

so.  Although they cite the International Financial Reporting Standards, those standards required only that FCA's reserve provision be assessed quarterly and adjusted "to reflect the current best estimate."  (Pls.' Opp'n 25).  That is not an "objective standard" in any meaningful sense of the word "objective."  *See, e.g.*, *In re NovaGold Res. Inc.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) ("[T]he word 'estimate' connotes uncertainty.").  Plaintiffs also state, in a footnote and without explanation, that FCA's own reports to NHTSA supply an objective standard.  (Pls.' Opp'n 27 n.5).  Although those reports do contain information about the numbers and types of recalls FCA was undertaking — just as the bank in *Fiat* presumably had information on the numbers and types of the loans it was issuing — that raw data is not itself a formula for estimating adequate recall reserves.  Accordingly, *Fait*'s standards apply here, and Plaintiffs must show that FCA's "opinions" — *i.e.*, its determinations of its reserve provisions — were not only "false" (*i.e.*, inaccurate) but also "not honestly believed when they were made."  655 F.3d at 113; *see also Omnicare*, 135 S. Ct. at 1326-27 (noting that a "statement of opinion does not constitute an 'untrue statement of . . . fact' simply because the stated opinion ultimately proves incorrect."); *see also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) ("[W]here plaintiffs allege a false statement of opinion, the falsity and scienter requirements are essentially identical . . . ." (internal quotation marks omitted)), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

Plaintiffs fail to make that showing.  The only facts Plaintiffs rely on are that (1) the number of FCA vehicles recalled in the United States increased significantly from 2010 to 2015 and (2) that, while FCA *did* increase its reserve estimates during that period (*see* Defs.' Reply 10), those increases were insufficient, as evidenced by the €761 million adjustment.  (Pls.' Opp'n 26).  Those facts — even when combined with Palmer's statement about the adequacy of

reserves (which Plaintiffs do not even mention in arguing against dismissal (*see* SAC ¶ 210; Pls.' Opp'n 25-29)) or FCA's statement, in July 2015, that it "does not expect that the net cost of providing these additional alternatives will be material to its financial position, liquidity or results of operations" (SAC ¶ 246; *see* Pls.' Opp'n 28) — do not allege securities fraud.[5]  *See, e.g.*, *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("Shields claims that Citytrust filed a document in August 1989 stating that it believed its loan loss reserve was adequate.  Yet the following October it turned out that the reserve was inadequate and that Citytrust would make a significant addition to it.  This technique is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud.  We have rejected the legitimacy of alleging fraud by hindsight." (internal quotation marks omitted)); *NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10-CV-440 (LAK) (HBP), 2012 WL 3191860, at *10 (S.D.N.Y. Feb. 9, 2012) ("Even had [the defendant] stated that it believed its loss reserves were adequate, '[t]hat defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think [the] reserves were adequate at the time the registration statement and prospectus became effective.'" (quoting *In re CIT Grp. Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690–91 (S.D.N.Y. 2004))); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 362 (S.D.N.Y. 2011) ("In the absence of particularized allegations that Wachovia was experiencing or internally predicting losses exceeding their set reserves, the subsequent disclosures provide no basis to conclude that Defendants recklessly misstated previous reserve levels."); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 412

---

[5]      Moreover, as Defendants note without rebuttal (Defs.' Mem. 17 n.10; Defs.' Reply 10 n.8), the July 2015 statement refers only to a specific portion of the costs stemming from the First Consent Order (relating to potentially repurchasing certain vehicles), not to total costs.

(S.D.N.Y.2010) (finding no actionable misstatement of loss reserves where the defendant "*did*

increase its provisions . . . throughout the Class Period" and noting that "a massive increase to

. . . combined loss reserves . . . is not, in itself, an indicator that the previous reserve levels were

inadequate").  Moreover, given that FCA's publicly disclosed methodology for estimating recall

costs was based on "long-term historical averages" (*see, e.g.*, Monahan Decl., Ex. 4, at F29), one

would expect FCA's estimates to be too low if costs drastically increased over a relatively short

time frame.  And as Plaintiffs themselves appear to emphasize, recall enforcement and

corresponding costs underwent just such a drastic increase in the relevant time period.  (*See, e.g.*,

SAC ¶ 244 (quoting an analyst who described NHTSA's fine of Chrysler as a "record fine" and

the vehicle buyback requirement as "unprecedented")).

     In arguing against dismissal, Plaintiffs principally point, again, to the reports that FCA

filed with NHTSA.  (Pls.' Opp'n 26-27 & n.15).  But those reports did not directly "contradict"

FCA's estimates; they were not "internal analyses" of what FCA's estimates should really have

been.  *In re Converium Holding AG Sec. Litig.*, No. 04-CV-7897 (DLC), 2006 WL 3804619, at

\*13 (S.D.N.Y. Dec. 28, 2006), *reconsideration granted in part on other grounds*, 2007 WL

1041480 (S.D.N.Y. Apr. 9, 2007).  In light of FCA's uncontested methodology for estimating

reserve provisions, Plaintiffs fail to explain how the reports "demonstrat[e] the inaccuracy of

[FCA's] public statements," *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*

*Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) — let alone how they demonstrate that FCA's estimates

were not reasonably believed when made, *see Fait*, 655 F.3d at 113.  Plaintiffs also cite a few

cases, but the contrast between the facts of those cases and the allegations here simply

underscores the inadequacies of Plaintiffs' claim.  *See In re Converium*, 2006 WL 3804619, at

\*13 (scienter adequately pleaded where plaintiffs "allege[d] in sufficient detail . . . that the

publicly reported numbers were at odds with Converium's internal analyses" and that the "defendants believed that the internal analyses more accurately reflected the actual financial condition of the company"); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231 (S.D.N.Y. 2006) (scienter adequately pleaded where plaintiffs alleged, among other things, "that defendants had knowledge of or recklessly ignored a series of accounting improprieties, each of which violated [Generally Accepted Accounting Principles] and Veeco's own internal policies," including allegations from confidential witnesses about specific internal incidents where defendants "refused to permit" the updating of financial statements); *see also, e.g.*, *In re Loral Space & Commc'ns Ltd.*, No. 01-CV-4388 (JGK), 2004 WL 376442, at *10-11 (S.D.N.Y. Feb. 27, 2004) (no scienter where allegations regarding reports that purportedly "directly contradicted the defendants' projections" were not pleaded "with sufficient particularity"). Lacking internal analyses, confidential witnesses, or other particularized allegations, Plaintiffs fail to adequately allege scienter with respect to Defendants' reserve estimates and related statements. *See, e.g.*, *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13-CV-8846 (LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) ("The fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published, particularly when the error was a matter of judgment . . . ."). Accordingly, Defendants' motion must be and is granted with respect to claims based on those estimates and related statements.

## C. Loss Causation

Finally, with respect to the surviving claims concerning Defendants' statements about substantial compliance, the Court addresses the argument that Plaintiffs fail to allege loss causation. (Defs.' Mem. 29-30; Defs.' Reply 12). "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v.*

*Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (defining loss causation as "a causal connection between the material misrepresentation and the loss").  The loss causation requirement "exists because private securities fraud actions are 'available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'"  *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 510 (2d Cir. 2010) (quoting *Dura Pharm.*, 544 U.S. at 345).  A misstatement or omission "is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations [or omissions] alleged by a disappointed investor."  *Lattanzio*, 476 F.3d at 157 (internal quotation marks and alterations omitted).  To plead loss causation, a plaintiff must allege that the alleged "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

Plaintiffs' allegations satisfy those standards at this stage of the litigation.  Indeed, they plausibly allege at least two "corrective disclosures" that "negatively affected the value of the security," *Lentell*, 396 F.3d at 173: the First Consent Order, in which FCA admitted that it had violated the Safety Act and agreed to pay a substantial fine (after which the value of FCA's stock declined by roughly 4.9% (SAC ¶ 244)); and the Second Consent Order, in which FCA admitted to additional violations of the Safety Act and paid another substantial fine (after which the value of FCA's stock declined by .07% (*id.* ¶ 256)).  Other than rehashing their unpersuasive arguments concerning falsity (Defs.' Mem. 29), Defendants' sole argument on loss causation is that the Consent Orders were not corrective disclosures because Chrysler had issued a press release when NHTSA announced the July 2015 public hearing.  (Defs.' Mem. 30).  That

argument is meritless.  Chrysler's four-sentence, boilerplate press release did not come close to fully revealing the information contained in the Consent Orders.  It did not, for example, disclose the fact that the company had violated the Safety Act in twenty-three recall campaigns, let alone the ramifications of those violations — for example, that Chrysler would enter into a settlement with its regulator admitting to widespread violations and agreeing to various costly conditions including payment of large fines and appointment of an independent monitor.  In short, given the allegations in the Second Amended Complaint, a factfinder could certainly find that the First and Second Consent Orders were corrective disclosures and not merely "negative characterization[s] of already-public information," *In re Omnicom*, 597 F.3d at 512.  Accordingly, Defendants' loss causation arguments are unavailing.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Specifically, Plaintiffs' claims based on Defendants' statements regarding FCA's substantial compliance with applicable regulations survive, but their claims based on Defendants' reserve estimates and related statements are dismissed.  It follows that the claims against Palmer, which concern only the latter, must also be and are dismissed.

Two issues remain.  First, Defendants' request, in a footnote, that the Court "dismiss all claims brought on behalf of purchasers of FCA stock on the Milan Stock Exchange."  (Defs.' Mem. 6 n.2).  As Defendants point out, "[t]he Second Circuit has squarely held that the U.S. securities laws do not apply to claims brought by purchasers of dual-listed stock on non-U.S. exchanges."  (*Id.* (citing *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d 173 at 181)).  Plaintiffs offer no counter-argument in their opposition and have thus abandoned any such claims.  *See, e.g.*, *Simon v. City of N.Y.*, No. 14-CV-8391 (JMF), 2015 WL 4092389, at *2

(S.D.N.Y. July 6, 2015) (citing cases).  In any event, in light of the clear Second Circuit precedent on the issue, Defendants' request is granted and any claims in this putative class action brought on behalf of purchasers of FCA stock on a foreign exchange are dismissed.

Second, in a single boilerplate sentence at the end of their opposition brief, Plaintiffs request leave to amend in the event that the Court finds that the Second Amended Complaint falls short in any way.  (*See* Pls.' Opp'n 31).  The Second Circuit has held that a motion under Rule 15(a) of the Federal Rules of Civil Procedure — which the Court construes Plaintiffs' request to be — "should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("leav[ing] unaltered" prior case law on denial of leave to amend, including the rule that "leave may be denied where amendment would be futile").  At the same time, "the grant or denial of an opportunity to amend is within the discretion of the District Court." *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011).  Applying those principles here, the Court concludes that Plaintiffs should not be granted leave to file what would amount to their *fourth* complaint.  First, in light of *Fait* and the legal standards discussed above, any amendment would likely be futile. Second, in granting leave to file the operative complaint, the Court expressly warned Plaintiffs that they would not be given another opportunity to address the problems alleged in Defendants' motion to dismiss (*see* Docket No. 34), and they give no indication that they possess facts that could cure those problems. *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) (holding that the plaintiff's failure to remedy the complaint's deficiencies identified by an earlier motion to dismiss "is alone sufficient grounds to deny leave

to amend"); *see also, e.g.*, *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (affirming

the district court's denial of leave to amend in part because of the previous opportunities that the

plaintiff had received to amend the complaint).

The Clerk of Court is directed to terminate Docket No. 42 and to terminate Defendant

Richard Palmer as a party.


SO ORDERED.

Date:   October 5, 2016
         New York, New York

JESSE M. FURMAN
United States District Judge