# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : : : : |
| Plaintiffs, | : : : |
| v. | : : : |
| FIAT CHRYSLER AUTOMOBILES N.V., SERGIO MARCHIONNE, RICHARD K. PALMER, and SCOTT KUNSELMAN, | : : : : : |
| Defendants. | : : : : |

No. 15 Civ. 7199 (JMF)

(Oral Argument Requested)

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
## THE EMISSIONS-RELATED CLAIMS FROM THE THIRD AMENDED COMPLAINT

Robert J. Giuffra, Jr.
William B. Monahan
Joshua S. Levy
Anil K. Vassanji
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendants*

March 22, 2017

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................. 1

**THE NEW EMISSIONS-RELATED ALLEGATIONS IN THE TAC** ................................. 5

    A.    U.S. Emissions Regulations ................................................. 5

    B.    FCA NV's Alleged Misstatements Regarding Emissions ................... 6

    C.    The EPA's and CARB's NOVs to Volkswagen ......................... 6

    D.    The German Transportation Ministry's "'Volkswagen' Commission of Inquiry" ................................................................ 7

    E.    The EPA's and CARB's NOVs to FCA ................................. 8

    F.    Two Confidential Witness Allegations ............................... 9

**ARGUMENT** ................................................................. 10

**I.**    **PLAINTIFFS HAVE NOT ALLEGED ANY COGNIZABLE MOTIVE TO COMMIT FRAUD** ................................................. 11

**II.**   **THE COMPLAINT ALLEGES NO PARTICULARIZED FACTS TO SUPPORT A COGENT AND COMPELLING INFERENCE THAT ANY DEFENDANT ACTED WITH SCIENTER IN MAKING EMISSIONS DISCLOSURES** ................................................. 12

    A.    Unlike the SAC's NHTSA Allegations, Plaintiffs Have Not Alleged that Defendants Received any Letters, Reports or Other Documents Contradicting Their Challenged Statements Regarding Emissions ........... 13

    B.    Plaintiffs' Conclusory "Confidential Witnesses" Allegations Do Not Support a Strong Inference of Scienter ............................... 15

          1.    CW1's Vague Allegations Do Not Demonstrate Scienter ........... 16

          2.    CW2's Speculative Allegations Do Not Demonstrate the Required Strong Inference of Scienter ........................... 17

    C.    Plaintiffs' Allegations Concerning Individual Defendants' Discussion of General Industry Trends During FCA NV Earnings Calls Do Not Support a Strong Inference of Scienter ............................... 19

    D.    Plaintiffs' Allegations Concerning Volkswagen Do Not Demonstrate Scienter of FCA or the Individual Defendants ........................ 20

**CONCLUSION** ................................................................. 24

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*In re Am. Express Co.*,
2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ....................................................... 17

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ................................................................................ 11

*Campo* v. *Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) ................................................................... 17, 18

*Chambers* v. *Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) .................................................................................. 8

*Chill* v. *Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996) ............................................................................... 12

*In re Citigroup Inc.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ................................................................. 18

*In re DDAVP Direct Purchaser*,
585 F.3d 677 (2d Cir. 2009) ............................................................................... 21

*Deutsche Zentral-Genossenschaftsbank AG* v. *HSBC N. Am. Holdings, Inc.*,
2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) ..................................................... 21

*In re Doral Fin. Corp.*,
563 F. Supp. 2d 461 (S.D.N.Y. 2008) ................................................................. 17

*In re EDAP TMS S.A.*,
2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) .................................................... 20

*In re Flag Telecom Holdings, Ltd.*,
308 F. Supp. 2d 249 (S.D.N.Y. 2004) ................................................... 4, 18, 21, 22

*In re Gentiva*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................. 14

*Glaser* v. *The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................. 16

*Goplen* v. *51job, Inc.*,
453 F. Supp. 2d 759 (S.D.N.Y. 2006) ................................................................. 20

**TABLE OF AUTHORITIES**
**(continued)**

*Page(s)*

*Higginbotham* v. *Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ........................................................ 17

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001) ..................................................... 11, 12

*Koncelik* v. *Savient Pharm., Inc.*,
    2010 WL 3910307 (S.D.N.Y. Sept. 29, 2010) ....................................... 19

*L.L. Capital Partners, L.P.* v. *Rockefeller Ctr. Props, Inc.*,
    939 F. Supp. 294 (S.D.N.Y. 1996) ................................................. 10

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010) .......................................... 16, 17

*Lombardi* v. *Whitman*,
    485 F.3d 73 (2d Cir. 2007) ......................................................... 8

*In re Manulife Fin. Corp.*,
    276 F.R.D. 87 (S.D.N.Y. 2011) .................................................... 14

*In re Merrill Lynch & Co., Inc. Research Reports*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003) .............................................. 23

*In re MRU Holdings*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011) .............................................. 17

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ....................................................... 16

*Patel* v. *L-3 Commc'ns Holdings Inc.*,
    2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ....................................... 14

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) .......................................... 13, 20

*Podany* v. *Robertson Stephens, Inc.*,
    318 F. Supp. 2d 146 (S.D.N.Y. 2004) .............................................. 1

*In re PXRE Grp., Ltd.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ...................................... 3, 15, 19

**TABLE OF AUTHORITIES**
(continued)

*Page(s)*

*S. Cherry St., LLC* v. *Hennessee Grp., LLC,*
  573 F.3d 98 (2d Cir. 2009) ................................................. 11, 12

*In re Sanofi,*
  87 F. Supp. 3d 510 (S.D.N.Y. 2015) ................................... 20

*In re Sanofi,*
  155 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................. 15

*In re Sec. Capital Assurance, Ltd.,*
  729 F. Supp. 2d 569 (S.D.N.Y. 2010) ................................ 20

*Steinberg* v. *Ericsson LM Tel. Co.,*
  2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ................... 13, 19

*Stevelman* v. *Alias Research, Inc.,*
  174 F.3d 79 (2d Cir. 1999) ................................................. 1

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.,*
  531 F.3d 190 (2d. Cir. 2008) .............................................. 15

*Tellabs* v. *Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ........................................................... 11

*In re Volkswagen 'Clean Diesel' Mktg., Sales Practices, & Prods. Liab.,*
  2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .......................... 22

*In re Wachovia Equity,*
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................ 19

**STATUTE, REGULATIONS AND RULE**

15 U.S.C. § 78u-4 ................................................................. 11

40 C.F.R. § 86.1803-01 ..................................................... 5, 6, 15

40 C.F.R. § 86.1809-10 ..................................................... 5, 6, 15

40 C.F.R. § 86.1844-01 ..................................................... 5

Fed. R. Civ. P. 9(b) ............................................................ 1, 10

## PRELIMINARY STATEMENT

In January 2017, the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") issued Notices of Violation ("NOVs") to Defendant Fiat Chrysler Automobiles N.V. ("FCA NV") and non-party FCA US LLC ("FCA US"; collectively with FCA NV, "FCA"), alleging that FCA should have disclosed to the EPA and CARB under U.S. emissions regulations that about 100,000 model year 2014 to 2016 vehicles included software features known as Auxiliary Emission Control Devices ("AECDs"). Hoping to capitalize on those NOVs, Plaintiffs now seek to manufacture additional claims for securities fraud in their Third Amended Complaint ("TAC"; ECF No. 69).

This Court should reject Plaintiffs' new emissions-related claims because the TAC contains no particularized facts to support a strong inference that Defendants acted with scienter, as required under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Specifically, the TAC does not allege that the EPA or CARB informed FCA or any of the other Defendants *prior to* any of the challenged statements that FCA had not complied with U.S. emissions regulations. "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany* v. *Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (Lynch, J.) (quoting *Stevelman* v. *Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Having no particularized allegations of prior notice, Plaintiffs instead rely on (i) vague allegations attributed to two "Confidential Witnesses"; (ii) discussions during earnings calls of industry conditions related to widely publicized emissions allegations *against Volkswagen*; (iii) irrelevant excerpts of pleadings filed in a *different* case about *different* vehicles manufactured by Volkswagen in an attempt to plead impermissibly "guilt by association"; and (iv) a report by the German transportation ministry referencing different FCA NV vehicles sold

in Europe and not in the United States, which actually made *no* allegations, let alone findings, that FCA did anything unlawful.  None of Plaintiffs' fraud-by-hindsight allegations pleads, with the required particularity, that *any* Defendant knew or was consciously reckless—a state of mind approximating actual intent—of FCA's alleged noncompliance with U.S. emissions regulations at the time of the challenged statements.

Tellingly, Plaintiffs' allegations here are significantly less particularized than those concerning FCA US's admitted noncompliance with certain regulations promulgated by the National Highway Traffic Safety Administration ("NHTSA") that the Court previously found sufficient to withstand dismissal.  This Court's finding that Plaintiffs adequately pled scienter on those claims rested on the more particularized allegations in Plaintiffs' Second Amended Complaint ("SAC"; ECF No. 38) concerning three letters from NHTSA to Individual Defendants Sergio Marchionne and Scott Kunselman allegedly informing them, *prior to the challenged statements*, that FCA US was not in compliance with NHTSA regulations.  (ECF No. 50 ("MTD Decision") at 17–18 (citing "NHTSA's direct correspondence to FCA's top executives").)  Here, by contrast, Plaintiffs do not point to a single letter or report (internal or external) provided to Defendants (or any other executives involved in FCA's public disclosures) indicating that FCA was not in compliance with any emissions law or regulation.

To try to plead fraud, Plaintiffs rely heavily on speculative assertions that they attribute to two confidential witnesses, who claim that unspecified reports were "forwarded up" from an unnamed "senior manager" through various layers of management whom they speculate would have "forward[ed] these reports to Sergio Marchionne."  (TAC ¶ 366.)  But the TAC does not allege that these confidential witnesses (who appear to be low- or mid-level former FCA US employees) had any personal contact with senior FCA management, including Mr. Marchionne.

Even worse, these allegations are so vague that they do not provide any indication of when or to whom these unspecified reports were sent and, most importantly, do not allege that anything in those unspecified reports was inconsistent with the challenged statements.  Plaintiffs do not allege, for instance, that any of those reports stated that any FCA vehicles, much less the 2014 to 2016 Dodge Ram 1500 pickup trucks and Jeep Grand Cherokee SUVs with diesel engines addressed by the NOVs, released excess emissions or included undisclosed AECDs.  Courts in this Circuit regularly reject such meaningless confidential-witness allegations as a basis to infer scienter.  (*See* cases cited *infra* at 16–19.)

Grasping at straws, Plaintiffs try to plead scienter by asserting that Mr. Marchionne—like anyone else who read the newspaper over the past 18 months—knew generally of *Volkswagen's* emissions issues.  (TAC ¶¶ 382–90.)  These allegations, which say nothing about Mr. Marchionne's knowledge of whether *FCA* vehicles included undisclosed AECDs or had other emissions issues, are plainly not sufficient to plead scienter as a matter of law.  *See, e.g.*, *In re PXRE Grp., Ltd.*, 600 F. Supp. 2d 510, 540–44 (S.D.N.Y. 2009) (Sullivan, J.) (knowledge of facts "the industry was well aware of" that received "widespread publicity," and behavior of defendants' "'competitors' or 'peers,'" "fail to support an inference of fraudulent intent"), *aff'd sub nom. Condra* v. *PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

Similarly, copying and pasting large portions of a complaint filed *against Volkswagen*, as Plaintiffs do in the TAC, does not plead scienter against a different automaker and its executives.  The TAC merely alleges that engines included in Volkswagen's and FCA's vehicles used "computer components" designed by third-party Robert Bosch GmbH ("Bosch").  (*See, e.g.*, TAC ¶ 215.)  Plaintiffs speculate that Defendants somehow knew that these "computer components" designed by Bosch—an outside, third-party vendor—included "defeat devices"

simply because the software developed by Bosch that was included in Volkswagen vehicles allegedly included "defeat devices."[1] But courts in this District routinely reject such attempts to plead "guilt by association," and this Court should do so here because of the absence of any particularized allegation of knowledge by Defendants of any alleged "defeat device" in the "computer components" Bosch designed for FCA. *See, e.g.*, *In re Flag Telecom Holdings, Ltd.*, 308 F. Supp. 2d 249, 261–62 (S.D.N.Y. 2004) (Conner, J.) (dismissing claims where plaintiffs attempted to plead scienter by citing "transactions entered into between unnamed . . . competitors").

Finally, Plaintiffs distort government and press reports to claim that FCA NV did not comply with European emissions regulations (TAC ¶¶ 312–13) when, in fact, the very reports that they cite state the opposite. Plaintiffs rely principally on a report by the German transportation ministry (TAC ¶¶ 27, 312) that expressly states that "no unlawful defeat device was found in any other vehicle than in certain [Volkswagen] Group vehicles" (Ex. 2 at 119). And the news articles cited in the TAC (TAC ¶ 313) similarly state that, except for Volkswagen, "no other carmaker has been found using the 'defeat device' software" (Ex. 3).

Plaintiffs' newly added emissions claims should be dismissed with prejudice.[2]

---

[1]    The NOVs concerning FCA assert that FCA did not disclose certain AECDs during the vehicle-certification process. AECDs, unlike so-called "defeat devices," are permissible so long as they are disclosed in the certification applications to EPA and CARB. Contrary to Plaintiffs' conclusory allegations that "[t]hese AECDs were illegal" because "[t]he Clean Air Act expressly prohibits defeat devices" (TAC ¶ 221), neither NOV—unlike in the Volkswagen matter— included any determination that FCA used "defeat devices." Rather, the NOVs merely stated that the allegedly undisclosed AECDs "may" or "might" be "defeat devices," subject to further EPA and CARB investigation. (Declaration of Joshua S. Levy, dated March 22, 2017, Ex. 4 at 6; Ex. 5 at 2.)

[2]    The TAC re-pleads all of the claims from the SAC, including those the Court previously dismissed with prejudice concerning (i) FCA NV's recall and warranty reserves; (ii) Plaintiffs' claims on behalf of non-U.S. purchasers; and (iii) all claims against Richard Palmer, FCA's

**THE NEW EMISSIONS-RELATED ALLEGATIONS IN THE TAC**

A.      **U.S. Emissions Regulations**

As an automaker that sells vehicles in the United States, FCA US must comply with U.S. regulations regarding vehicle emissions for, among other things, oxides of nitrogen ("NOx").  (TAC ¶¶ 193–201.)  To obtain the certificates of conformity required to sell vehicles in the United States, FCA US must disclose to the EPA all AECDs installed in the vehicles for which it seeks EPA certification.  (TAC ¶ 202 (citing 40 C.F.R. § 86.1844-01(d)(11)).)  An AECD is an "element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." (*Id.* (citing 40 C.F.R. § 86.1803-01).)[3]

Notwithstanding Plaintiffs' repeated attempts to conflate AECDs with "defeat devices"—for instance, by incorrectly claiming that AECDs constitute "illegal software" (*id.* ¶ 220)—AECDs are permissible under U.S. regulations so long as manufacturers disclose them. (*Id.* ¶ 202 (citing 40 C.F.R. §§ 86.1844-01(d)(11)).)  "Defeat devices," by contrast, are AECDs that "reduce[] the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use."  (*Id.* ¶ 221 (citing 40 C.F.R. §§ 86.1803-01, 86.1809-10).)  "Defeat devices" are not permissible.  40 C.F.R.

---

Chief Financial Officer ("CFO").  For the reasons set forth in its MTD Decision, this Court should again dismiss those claims.  (MTD Decision at 24–26.)  Although the Court previously rejected certain of Defendants' arguments in the MTD Decision, including that FCA NV's statements regarding its "substantial[] compliance with the relevant global regulatory requirements" (*id.* at 4) were inactionable puffery under Second Circuit precedent, Defendants incorporate those arguments herein by reference.

[3]      Because FCA US sells vehicles in California, the company must also comply with CARB's emissions regulations.  FCA NV must similarly adhere to relevant European emissions laws and regulations for vehicles sold in EU Member States.  (TAC ¶¶ 241, 308, 312, 322, 324.)

§§ 86.1803-01, 86.1809-10.  If an AECD falls within one of certain enumerated exceptions, such as to "protect[] the vehicle against damage," then it is not a "defeat device."  *Id.*

### B.      FCA NV's Alleged Misstatements Regarding Emissions

FCA NV disclosed its regulatory obligations regarding emissions in various SEC filings and Annual Reports throughout the extended putative class period (October 13, 2014 to February 6, 2017).  The TAC points to several such filings from fiscal years 2014 and 2015:

- "Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate . . . emissions . . . .  We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products.  We constantly monitor such requirements and adjust our operations to remain in compliance."  (Ex. 6 at 185; Ex. 7 at 27; Ex. 8 at 155–56;  Ex. 9 at 158–59; Ex. 10 at 25.)

- "EPA and CARB regulations require that a vehicle's emissions performance be monitored with [On-Board Diagnostics ('OBD')] systems.  We have implemented hardware and software systems in all our vehicles to comply with the OBD requirements."  (Ex. 6 at 186; Ex. 7 at 28; Ex. 8 at 156; Ex. 9 at 159; Ex. 10 at 25.)

- "In combination with last generation exhaust gases after treatment systems, our diesel engine families comply with Euro 6 emission regulations."  (Ex. 6 at 178; Ex. 7 at 108; Ex. 8 at 149;  Ex. 9 at 152.)

- "[An] audit revealed that all current production vehicle calibrations are compliant with applicable regulations."  (Ex. 11 at 104.)

### C.      The EPA's and CARB's NOVs to Volkswagen

On September 18, 2015, the EPA and CARB issued widely publicized NOVs to Volkswagen stating that Volkswagen had "manufactured and installed defeat devices in certain model year 2009 through 2015 diesel light-duty vehicles equipped with 2.0 liter engines."  (Ex. 12 at 1; *see also* TAC ¶¶ 20, 207.)  On September 22, 2015, in response to the Volkswagen press

reports, FCA US released a press statement that "FCA U.S. does not use 'defeat devices.'" (TAC ¶ 316; Ex. 13.)[4]

Mr. Marchionne, FCA's CEO, also discussed the Volkswagen NOVs during certain earnings calls.  The TAC challenges statements that Mr. Marchionne made during a January 2016 earnings call (TAC ¶¶ 302–03) when he compared FCA vehicles with the Volkswagen vehicles that were the subject of the EPA's and CARB's NOVs against Volkswagen:

> [A]fter the advent of dieselgate . . . FCA has undertaken a pretty thorough review and a thorough audit of its compliance teams.  I think we feel comfortable in making the statement that there are no defeat mechanisms or devices present in our vehicles.  And I think the cars perform in the same way on the road as they do in the lab under the same operating conditions.

(Ex. 14 at 11; *see also* Ex. 15 at 7 (describing Mr. Marchionne's initial thoughts on Volkswagen's emissions issues and their effect on diesel vehicle sales throughout the industry).)

### D.    The German Transportation Ministry's "'Volkswagen' Commission of Inquiry"

Based on a May 23, 2016 news article, the TAC alleges that the German motor transport authority ("KBA") tested certain FCA NV vehicles in 2016 (after all of the challenged statements referenced in the preceding sections) and purportedly "concluded that there was 'sufficient evidence of an impermissible defeat device.'"  (TAC ¶¶ 27, 312–13.)  In fact, the May 2016 report issued by the German Federal Ministry of Transport and Digital Infrastructure ("BMVI") based on the KBA's testing does *not* state that FCA (or any car manufacturer other

---

[4]      The TAC mistakenly dates this statement as having been made on September 22, *2016* (TAC ¶ 316), when it was actually made on September 22, *2015* (Ex. 13).

than Volkswagen) violated any emissions regulations or included "impermissible defeat devices" in any of their vehicles.  (Ex. 2 at 119–25.)[5]

The BMVI report, entitled "Report by the 'Volkswagen' Commission of Inquiry," followed the German government's investigation of "the allegations made against VW."  (*Id.* at 4.)  This report explained that the KBA had tested emissions levels on certain Volkswagen vehicles, as well as on "53 models" containing European diesel engines manufactured by "other marketable German and foreign manufacturers," including four FCA NV vehicles.  (*Id.* at 4, 32, 70, 78, 90.)  The BMVI reported that the KBA had concluded that Volkswagen used "defeat devices" in certain diesel engine vehicles in Europe (*id.* at 12), but that "*no unlawful defeat device was found in any other vehicle than in certain VW Group vehicles*" (*id.* at 119 (emphasis added)).  The *Fortune* article cited in the TAC similarly emphasized (in a portion of the article from which the TAC does *not* quote) that "*no other carmaker has been found using the 'defeat device' software*."  (Ex. 3 (emphasis added).)  And another press report cited in the TAC quoted (again in a portion not quoted in the TAC) the Italian transportation minister's statement following the BMVI report that FCA NV's vehicles "are all certified [compliant] in Italy."  (Ex. 16.)

E.      **The EPA's and CARB's NOVs to FCA**

On January 12, 2017, the EPA issued an NOV to FCA alleging that FCA failed to disclose eight AECDs in applications for certificates of conformity for approximately 100,000 vehicles (out of the 6.6 million vehicles FCA US sold in the United States from 2014 to 2016).

---

[5]      The Court can consider this report, which is publicly available at http://www.bmvi.de/SharedDocs/EN/publications/bericht-untersuchungskommission-volkswagen.html?nn=188294, on a motion to dismiss because the TAC "relies heavily upon its terms and effect, which renders the document 'integral' to the complaint."  *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see Lombardi* v. *Whitman*, 485 F.3d 73, 75–76 & n.1 (2d Cir. 2007) (considering publicly available government reports on a motion to dismiss).

(Ex. 4 at 1–2.)  The NOV concerned only the model year 2014–2016 Dodge Ram 1500 pickup trucks and Jeep Grand Cherokee SUVs with diesel engines.  (*Id.*)  That same day, CARB also issued an NOV to FCA making similar assertions concerning those same vehicles.  (Ex. 5 at 1–2.)

Even accepting the allegations of the TAC, January 12, 2017 is the first time that any regulator (whether in the U.S. or anywhere else in the world) made any allegations that FCA's vehicle certifications were not in compliance with emissions regulations.  In response to the NOVs, FCA US issued a statement expressing its opinion that "FCA US believes that its emission control systems meet the applicable requirements."  (TAC ¶ 320.)

The TAC misleadingly alleges that the EPA and CARB concluded in the NOVs that the vehicles addressed by the NOVs included "defeat devices."  (TAC ¶¶ 215–23, 354.)  In fact, unlike in the NOVs issued to Volkswagen, neither the EPA nor CARB made that claim.  (*See* Ex. 4 at 6 ("[O]ne or more of the AECDs, whether alone or in combination, *may* be defeat devices." (emphasis added)); Ex. 5 at 2 (investigating whether the allegedly undisclosed AECDs "*might* be considered a defeat device" (emphasis added)); *cf.* Ex. 12 at 1 (Volkswagen "manufactured and installed defeat devices in certain model year 2009 through 2015 diesel light-duty . . . engines").)

## F.    Two Confidential Witness Allegations

The TAC includes a handful of conclusory allegations attributed to two confidential witnesses ("CW1" and "CW2"), whose titles and positions are not alleged but who appear to be former low- or mid-level employees of FCA US who worked in its "Tech Center" in Auburn Hills, Michigan.  (TAC ¶¶ 355–70.)  CW1 supposedly "evaluat[ed] vehicles for fuel economy" and  "schedul[ed] emissions testing" (*id.* ¶ 356), but the TAC does not allege that CW1 actually conducted any emissions testing.  CW1 makes the unremarkable statement that

emissions tests are "super important," because "you have to make sure that the data is accurate, and can be replicated in EPA tests." (*Id.* ¶ 358.) Despite not alleging any contact between CW1 and FCA management, CW1 nonetheless speculates, without any basis, that "data gathered from these engine tests" would be compiled into unspecified "reports," presented to an unnamed "senior manager," "forwarded up" multiple levels through the company, and potentially "then forward[ed]" further up to Mr. Marchionne. (*Id.* ¶ 366.)

CW2 allegedly worked with computer models to assess engine performance. (*Id.* ¶¶ 360–63.) According to CW2, FCA "paid close attention to the so-called EPA performance cycle," and he recalled "pressure . . . from higher-ups who always demanded improvements." (*Id.* ¶¶ 364, 367.) The TAC does not allege that CW2 had any contact with these unidentified "higher-ups" but, rather, that he "report[ed] to John Alexander" who "reported to Jeffrey P. Lux . . . or Robert (Bob) E. Lee . . . who in turn reported directly to Marchionne." (*Id.* ¶ 359.) Despite being at least three levels removed from FCA's senior management in a company that CW2 criticized as an unusually "flat organization"—and alleging no personal contact with senior management—CW2 describes Mr. Marchionne as "hard-nosed" and "detail oriented," and speculates that CEO Marchionne "made the decisions on whether to incorporate hardware or software changes." (*Id.* ¶¶ 367–69.) CW2 also vaguely claims that he "was not surprised that the U.S. Justice Department is investigating Chrysler," and referred to the NOVs issued to Volkswagen to further speculate that "[n]ow all auto manufacturers have to cheat." (*Id.* ¶ 370.)

## ARGUMENT

Scienter "is an essential element of plaintiff's [securities fraud] cause of action." *L.L. Capital Partners, L.P.* v. *Rockefeller Ctr. Props., Inc.*, 939 F. Supp. 294, 299 (S.D.N.Y. 1996) (Kaplan, J.). To plead scienter under the PSLRA and Fed. R. Civ. P. 9(b), the TAC must "'state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind.'"  *Tellabs* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (quoting 15 U.S.C. § 78u-4(b)(2)).  To qualify as "strong," an inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.*

In this Circuit, a plaintiff can establish a strong inference of scienter only by pleading particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Because Plaintiffs have not pled the required strong inference of scienter with respect to their emissions allegations, this Court should dismiss any claims based on those allegations with prejudice.

# I.   PLAINTIFFS HAVE NOT ALLEGED ANY COGNIZABLE MOTIVE TO COMMIT FRAUD.

The Court previously rejected Plaintiffs' motive allegations in the SAC (*see* MTD Decision at 15 n.3), and Plaintiffs' renewed attempt to plead motive and opportunity to commit fraud is also insufficient as a matter of law.

"[I]n attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to . . . sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation."  (MTD Decision at 15 n.3 (quoting *S. Cherry St., LLC* v. *Hennessee Grp., LLC*, 573 F.3d 98, 108–09 (2d Cir. 2009)).)  "[I]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  *Kalnit* v. *Eichler*, 264 F.3d 131, 140 (2d Cir. 2001).  As this Court has previously

held, "those sorts of generic allegations," such as "that Defendants had an interest in keeping [FCA NV's] stock price high and an opportunity to commit fraud by virtue of their positions, . . . are insufficient to satisfy the scienter requirement." (MTD Decision at 15 n.3.)

Having no allegations of insider trading, Plaintiffs' motive allegations based solely on the supposed "importance" of the Jeep and Ram vehicles (well over 90% of which are not even covered by the NOVs, which concern only two diesel-engine models, not the full range of gasoline-engine Jeep and Ram vehicles) are precisely the type of general profit motives that are not sufficient as a matter of law. (TAC ¶¶ 210–14; *see, e.g., id.* ¶ 212 (Richard Palmer, FCA's CFO, stated that "Jeep Grand Cherokee had its strongest sales in the U.S. since 2005" and noted the growth in the "Jeep and Ram brands"); *id.* ¶ 213 (Mr. Marchionne discussed the need to "deal with the development of both Jeep and the Ram brand[s]").)

## II.   THE COMPLAINT ALLEGES NO PARTICULARIZED FACTS TO SUPPORT A COGENT AND COMPELLING INFERENCE THAT ANY DEFENDANT ACTED WITH SCIENTER IN MAKING EMISSIONS DISCLOSURES.

Where, as here, Plaintiffs have not pled a cognizable motive to defraud, Plaintiffs must "identify[] circumstances indicating conscious behavior by the defendant," and "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142; *see Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) (stressing the "significant burden on the plaintiff in stating a fraud claim based on recklessness"). At a minimum, Plaintiffs must allege "*conscious recklessness—i.e.*, a state of mind approximating *actual intent*, and not merely a heightened form of negligence," where Defendants' conduct "represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *S. Cherry St.*, 573 F.3d at 109 (emphasis added). The allegations in the TAC regarding emissions fall far short of this heightened standard.

**A.** **Unlike the SAC's NHTSA Allegations, Plaintiffs Have Not Alleged that Defendants Received any Letters, Reports or Other Documents Contradicting Their Challenged Statements Regarding Emissions.**

The TAC does not allege any specific instances in which Defendants received information that was contrary to their public statements regarding emissions, such as an internal report or a letter from the EPA or CARB containing inconsistent information.  To survive a motion to dismiss, courts in this District routinely require plaintiffs bringing securities-fraud claims to identify specific reports or other information demonstrating that Defendants were aware that their public statements were inaccurate.  *See Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (Pauley, J.) (dismissing securities-fraud claims where plaintiffs did not "provide specific instances in which Defendants received information that was contrary to their public declarations"); *Steinberg* v. *Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (Patterson, J.) ("[T]he Complaint identifies none of this adverse information other than stating, generically, that it was contained in various 'internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports' and 'internal non-public reports' provided to Defendants.").

Thus, in sustaining Plaintiffs' NHTSA-related claims at the pleading stage, this Court held that Plaintiffs had sufficiently alleged that Defendants were aware of nonpublic facts contradicting their public statements because the SAC included detailed allegations regarding "NHTSA's direct correspondence to FCA's top executives"—in particular, three letters NHTSA sent to Messrs. Marchionne and Kunselman—that allegedly contradicted their subsequent statements.  (MTD Decision at 17–18.)  By contrast, the TAC does not allege that any regulator notified any of the Defendants prior to their alleged misstatements of noncompliance with any

emissions regulations, let alone "direct correspondence to FCA's top executives." (*Id.* at 18.)  In fact, the TAC does not claim that the EPA or CARB communicated any concerns to FCA or FCA employees relating to undisclosed AECDs (or the supposed "defeat devices") *prior to the issuance of the NOVs in January 2017*.

        At most, Plaintiffs selectively quote from a May 2016 news article, published after all but two of the alleged misstatements challenged in the TAC, referring to KBA testing of four FCA NV vehicles.  (TAC ¶¶ 27, 312, 314.)  As a preliminary matter, even if this limited testing could be construed as an "investigation" of FCA, an "investigation 'alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter.'"  *Patel* v. *L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *10 n.31 (S.D.N.Y. Apr. 21, 2016) (Caproni, J.) (quoting *In re Gentiva*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (Spatt, J.)); *see also In re Manulife Fin. Corp.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011) (Keenan, J.) ("[T]he fact that a regulator is fulfilling [its] role cannot be sufficient to allege scienter.").  And the TAC contains no allegations that KBA's testing was reviewed by or delivered to any of the Defendants in any event.

        Moreover, the article itself expressly states that, *except for Volkswagen*, "no other carmaker has been found using the 'defeat device' software."  (Ex. 3.)  The article refers to a report from the German transportation authority that, contrary to the allegations of the TAC (*see* TAC ¶¶ 27, 312), did *not* state that any *FCA* vehicle contained illegal defeat devices.  In fact, the report said *the opposite*:  "no unlawful defeat device was found in any other vehicle than in certain VW Group vehicles."  (Ex. 2 at 119.)  The report focused on Volkswagen (as its title, "Report by the 'Volkswagen' Commission of Inquiry," made clear) and referenced only four

FCA NV diesel vehicles sold in Europe,[6] none of which was the subject of the EPA's or CARB's later NOVs.  (*Id.* at 4, 70, 78, 90.)  Thus, on its face, this report plainly did not put FCA on notice of emissions noncompliance concerning different vehicles sold in the United States, let alone anyplace else.  *See In re PXRE Grp.*, 600 F. Supp. 2d at 542–43 (rejecting inference of scienter based on news articles that described only general risks that "offered no insight whatsoever with respect to the specific alleged problems"); *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("broad reference to raw data" does not "raise[] an inference of scienter").  In fact, in response to this report, the Italian transportation minister publicly stated that FCA NV's vehicles "are all certified [compliant] in Italy."  (Ex. 16.)[7]

### B.   Plaintiffs' Conclusory "Confidential Witnesses" Allegations Do Not Support a Strong Inference of Scienter.

By their own admission (*see* TAC ¶¶ 359, 366), Plaintiffs' two "confidential witnesses" had absolutely *no* direct contact with FCA senior management.  The TAC does not identify any specific reports provided to senior management (by the confidential witnesses or otherwise).  To the extent the TAC references vague and unspecified "reports," Plaintiffs do not

---

[6]   Tellingly, the report found that all four tested FCA NV vehicles fully "complied with the NOx threshold value . . . during the cold NEDC test."  (Ex. 2 at 70; *see also id* at 32, 78, 90.)  The report stated that emissions were "dependent on the outside temperature," and noted that FCA NV "substantiate[d]" that the temperature range "is necessary in order to protect the engine from damage."  (*Id.* at 70; *see also id* at 32, 78, 90)  As noted above, even under U.S. regulations, an AECD is not a "defeat device" if the AECD "protect[s] the vehicle against damage."  40 C.F.R. §§ 86.1803-01, 86.1809-10.

[7]   To the extent the TAC suggests (without pleading any facts) that FCA conducted an internal investigation in advance of either the EPA's or CARB's NOVs or the BMVI report, the TAC contains no allegations that any such internal investigation found anything problematic or contrary to Defendants' public statements.  *See In re Sanofi*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) (Castel, J.) ("[P]laintiffs['] inference of scienter based on the unreported findings of an unreported internal investigation . . . is unreasonable.").

allege that those "reports" contained any information contrary to Defendants' alleged misstatements. Courts in this District regularly reject at the pleading stage such vague, unspecified confidential-witness allegations.

To adequately plead information presented through confidential witnesses, the Second Circuit requires the witnesses to be "described in the complaint with sufficient particularity." *Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). As a result, courts "discount[] scienter allegations" from confidential witnesses unless, unlike here, the allegations "show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient." *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 588–91 & n.12 (S.D.N.Y. 2011) (Holwell, J.) (collecting cases).

### 1. CW1's Vague Allegations Do Not Demonstrate Scienter.

The TAC does not allege that CW1 had any contact with FCA senior management. Nor does CW1 claim that anyone at FCA was provided with information (from CW1 or anyone else) that any FCA vehicles included undisclosed AECDs or "defeat devices." CW1 merely speculates that unspecified reports containing "data from . . . engine tests" *may* have reached Mr. Marchionne. (TAC ¶ 366.) Even if that speculative allegation concerning unspecified reports provided at an unspecified time were entitled to any weight, CW1 does not allege that the "data" showed excess emissions.

These paltry allegations have no probative value with respect to scienter, and provide even less information than those regularly rejected by courts in this District. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*, 724 F. Supp. 2d 447, 461–62 (S.D.N.Y. 2010) (Pauley, J.) (allegations that reports "would have been reported to" senior

management "fail to raise a strong inference" of scienter), *aff'd*, 430 F. App'x 63 (2d Cir. 2011); *In re Doral Fin. Corp.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (Rakoff, J.) (finding allegations of a "confidential informant" to be "so vague as to be meaningless," where plaintiffs alleged that the witness attended meetings where contradictory audit reports were presented, but failed to allege any "time frame" for the meetings or "information regarding how extensively or in what manner the reports were discussed"), *aff'd sub nom. W. Virginia Inv. Mgmt. Bd.* v. *Doral Fin. Corp.*, 344 F. App'x 717 (2d Cir. 2009); *see also In re MRU Holdings*, 769 F. Supp. 2d 500, 516–17 (S.D.N.Y. 2011) (Berman, J.) ("Plaintiffs' reliance on 'confidential witnesses' . . . 'must be discounted' because '[i]t is hard to see how information from anonymous sources could be deemed "compelling" or how [the Court] could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist.'" (quoting *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 756–57 (7th Cir. 2007))).

### 2.     CW2's Speculative Allegations Do Not Demonstrate the Required Strong Inference of Scienter.

The TAC alleges that CW2 "worked as a[n] . . . engineer in the vehicle performance and fuel economy and emissions departments at the Tech Center" at least three levels below senior FCA US management.  (TAC ¶¶ 359–64.)  CW2's speculative allegations regarding Mr. Marchionne, from whom CW2 was three levels removed and had no direct contact, are not sufficient as a matter of law.  *See Campo* v. *Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (discounting allegations from confidential witnesses who had no contact with individual defendants); *Local No. 38*, 724 F. Supp. 2d at 460–61 (allegations of "rank-and-file" confidential witnesses who "had no contact with the Individual Defendants" "fail to raise a strong inference" of scienter); *In re Am. Express Co.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept.

26, 2008) (Pauley, J.) ("Plaintiffs have also failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period."), *aff'd sub nom. Slayton* v. *Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010).

Moreover, the allegations regarding CW2 provide no evidence of wrongdoing by any of the Defendants.  CW2 does not allege any pressure *to commit wrongdoing*, such as by directing that "defeat devices" be installed in any diesel vehicles.  (TAC ¶ 364.)  Instead, CW2 merely alleges that it "could have been" technologically feasible for FCA vehicles "to have released too much nitrogen oxide in the air."  (TAC ¶ 370.)  CW2 does not allege that any information or internal report showing excess emissions, undisclosed AECDs or "defeat devices" was provided to any member of FCA management.  *See Campo*, 371 F. App'x at 217 (confidential witnesses did not "offer[] testimony supporting plaintiffs' allegations that the . . . reports contained information" contradicting alleged misstatements, and "had no knowledge of whether [individual defendants] actually accessed or reviewed the reports"); *In re Citigroup Inc.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (Stein, J.) ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity.").  And CW2 actually cites *Volkswagen* (not FCA) to support his generalized statement that "all auto manufacturers have to cheat."  (TAC ¶ 370); *see In re Flag Telecom Holdings*, 308 F. Supp. 2d at 262 (finding that statements by "an industry insider" regarding conduct by other market participants failed to establish a strong inference of scienter).

*     *     *

"Despite these colorful accusations, however, there is no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period.  The absence of such communication undermines the inference that Defendants recklessly disregarded the truth." *In re Wachovia Equity*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (Sullivan, J.).

C.  **Plaintiffs' Allegations Concerning Individual Defendants' Discussion of General Industry Trends During FCA NV Earnings Calls Do Not Support a Strong Inference of Scienter.**

The TAC claims that Mr. Marchionne's statements during FCA NV earnings calls concerning Volkswagen's emissions issues and the impact of the Volkswagen NOVs on the automotive industry somehow demonstrate Defendants' scienter.  (TAC ¶¶ 382–90.)  It is settled law, however, that knowledge of "industry-wide" concerns, including the behavior of "'competitors' or 'peers,'" "fail to support an inference of fraudulent intent." *In re PXRE Grp.*, 600 F. Supp. 2d at 540–44.

Plaintiffs appear to suggest that because "[Mr.] Marchionne was well-aware of Volkswagen's scandal" and the subsequent "greater degree of consciousness when it comes to emissions and the regulatory environment" (TAC ¶¶ 383–84), he therefore should have known about FCA US's allegedly undisclosed AECDs.  But "[a]n allegation that a defendant merely 'ought to have known' is not sufficient to allege recklessness." *Steinberg*, 2008 WL 5170640, at *12 (internal quotation omitted).  Plaintiffs do not allege "any particularized facts[] demonstrating an egregious refusal to see the obvious." *Koncelik* v. *Savient Pharm., Inc.*, 2010 WL 3910307, at *8 (S.D.N.Y. Sept. 29, 2010) (Daniels, J.).  For example, the TAC alleges that "[Mr.] Marchionne discussed aspects of Chrysler's technologies for achieving emissions compliance in great detail" during an earnings call (TAC ¶ 385), but that allegation offers no

support for the claim that Mr. Marchionne was aware of any information contrary to his challenged statements, such as undisclosed AECDs or an impermissible "defeat device."  The TAC incorrectly alleges that Mr. Marchionne "review[ed] . . . software used to achieve [emissions] compliance" (*id.* ¶ 382), when Mr. Marchionne actually stated that "I think the cars perform in the same way on the road as they do in the lab," noting that FCA instituted "compliance mechanism training for all emission calibration engineers" and a "best practice program to ensure that we calibrate and certify properly" (*id.* ¶ 386).[8]  Plaintiffs' "bare assertions, without any further facts or details, do not adequately demonstrate defendants'" scienter.  *Goplen* v. *51job, Inc.*, 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006) (Haight, J.); *see In re Sec. Capital Assurance, Ltd.*, 729 F. Supp. 2d 569, 596 (S.D.N.Y. 2010) (Batts, J.) ("'[K]nowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate or defraud.'" (quoting *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 300)).

### D.  Plaintiffs' Allegations Concerning *Volkswagen* Do Not Demonstrate Scienter of FCA or the Individual Defendants.

In the end, Plaintiffs actually resort to copying and pasting allegations from a complaint filed against Volkswagen that has nothing to do with FCA.  (TAC ¶¶ 371–76, 378–

---

[8]     Mr. Marchionne's statements on the January 2016 earnings call, including that "*I think* the cars perform in the same way on the road as they do in the lab" and "*I think we feel comfortable in making the statement that there are no defeat mechanisms or devices present in our vehicles*," as well as the statement by an FCA US spokesperson on January 12, 2017 that "FCA US *believes* that its emission control systems meet the applicable requirements" (TAC ¶¶ 320, 386) (emphasis added), are "inactionable expressions of opinion."  *In re EDAP TMS S.A.*, 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015) (Schofield, J.); *see In re Sanofi*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015) (Engelmeyer, J.) ("[S]ubjective statements of opinion are generally not actionable as fraud . . . . The Second Circuit has firmly rejected this 'fraud by hindsight' approach." (collecting cases)), *aff'd sub nom. Tongue* v. *Sanofi*, 816 F.3d 199 (2d Cir. 2016).

79.)  Plaintiffs' attempt to fill the glaring gaps in the TAC by making speculative allegations lifted from the Volkswagen complaint is contrary to Second Circuit precedent that "guilt by association is impermissible."  *In re DDAVP Direct Purchaser*, 585 F.3d 677, 695 (2d Cir. 2009).  Plaintiffs were required to "plead circumstances providing a factual basis for scienter for *each defendant.*"  *Id.* (emphasis added).

Courts in this District routinely reject "what is essentially a 'guilt by association' argument."  *In re Flag Telecom Holdings*, 308 F. Supp. 2d at 262 (dismissing claims where plaintiffs attempted to plead scienter against telecommunications company accused of using swap transactions to manipulate revenue results by citing different "transactions entered into between unnamed telecom competitors"); *Deutsche Zentral-Genossenschaftsbank AG* v. *HSBC N. Am. Holdings, Inc.*, 2013 WL 6667601, at *14 (S.D.N.Y. Dec. 17, 2013) (Torres, J.) ("Defendants' knowledge via guilt-by-association theory fails as a matter of law and as a matter of common sense. . . .  Plaintiffs' knowledge of the practices of UBS proves nothing about its knowledge of the practices of the HSBC Defendants, who are unrelated to UBS, in the concrete case at hand.").

Although quoting from *Volkswagen* pleadings alleging that *Volkswagen* worked with Bosch to evade U.S. emissions requirements, the TAC does not allege a single fact showing that *FCA or any of the Individual Defendants* participated in, or were aware of, any such scheme.  (*See* TAC ¶¶ 370–81.)  Instead, the TAC peppers its Volkswagen allegations with mentions of FCA in order to advance its impermissible guilt-by-association theory of scienter.  For example, the TAC baldly asserts that unspecified "evidence" in the Volkswagen case "already proves that Bosch played a critical role in the scheme to evade U.S. emissions requirements for diesel vehicles, including Volkswagen and Chrysler vehicles"—but the TAC points to no such

"evidence" regarding FCA.  (*Id.* ¶ 371.)   The TAC similarly refers to "[t]he defeat devices employed by Volkswagen and Chrysler," but cites only the complaint against Volkswagen, with no citation to any documents or specific allegations regarding FCA.  (*Id.* ¶ 375.)  The TAC also points to allegations in the Volkswagen matter that Bosch sent correspondence to Volkswagen "expressly demand[ing] that Volkswagen indemnify Bosch for anticipated liability arising from the use of the Bosch-created 'defeat device'" (*id.* ¶ 372), but the TAC contains no allegations that Bosch sent any similar correspondence to FCA (*see id.* ¶¶ 378–79).  At most, the TAC alleges the unremarkable fact that FCA vehicles included software manufactured by Bosch, "the world's leading manufacturer of diesel injection systems," including "engine control units and sensors."  (Ex. 17.)

Plaintiffs cannot satisfy the stringent pleading requirements of the PSLRA by repeating verbatim allegations from someone else's complaint about a different automaker's conduct.[9]  Thus, in *In re Flag Telecom Holdings*, Judge Conner rejected allegations of scienter regarding improper swap transactions based on (i) "articles discussing swap transactions entered into between *unnamed telecom competitors*"; (ii) "statements made by an industry

---

[9]      If anything, Plaintiffs' reference to the Volkswagen litigation supports dismissal of the claims against FCA.  In the Volkswagen securities litigation, Judge Breyer found that plaintiffs had sufficiently pled scienter because (i) Volkswagen's CEO, Martin Winterkorn, "received *multiple memoranda* . . . regarding the Company's unlawful use of defeat-device software," which he "took home to read as part of his 'weekend suitcase'"; (ii) "Bosch *warned* [Volkswagen's] top executives, including Winterkorn, that the Company's intended use for its emissions-regulating software was illegal"; and (iii) "an internal whistleblower *warned* [Volkswagen executives] that the Company was illegally manipulating reported emissions data." *In re Volkswagen 'Clean Diesel' Mktg., Sales Practices, & Prods. Liab.*, 2017 WL 66281, at *12 (N.D. Cal. Jan. 4, 2017) (emphasis added).   The TAC's scienter allegations—*i.e.*, Mr. Marchionne may have received unspecified reports from someone at some unspecified time, none of which is alleged to have included information regarding excess emissions, undisclosed AECDs or any "defeat device"—are not remotely close to those alleged in the Volkswagen securities litigation.

insider . . . that acknowledge such improper swap transactions were a serious issue in the telecom industry"; (iii) allegations in a different complaint alleging that *another company* may have "entered into an improper swap transaction with [defendant]"; and (iv) congressional testimony from *another company* about that company's misconduct.  308 F. Supp. 2d at 262 (emphasis added); *see also In re Merrill Lynch & Co., Inc. Research Reports*, 273 F. Supp. 2d 351, 374 (S.D.N.Y. 2003) (Pollack, J.) ("characterizations of snippets of e-mails and conclusions of the New York Attorney General submitted in a regulatory proceeding for an *ex parte* injunction" do not "constitute well-pleaded facts"), *aff'd sub nom. Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).[10]

---

[10]    In its ruling on Defendants' motion to dismiss the SAC, the Court dismissed all claims against CFO Palmer with prejudice.  (MTD Decision at 24–26.)  The TAC contains no new alleged misstatements by Mr. Palmer, and Plaintiffs do not include him as a Defendant in their motion for class certification (ECF No. 86 at 1 n.1); all claims against Mr. Palmer should therefore remain dismissed with prejudice.  The TAC also contains no new alleged misstatements by Mr. Kunselman; to the extent Plaintiffs seek to bring additional claims against Mr. Kunselman in the TAC (despite not mentioning him at all in their new allegations), those new claims should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all emissions-related claims from the TAC with prejudice.

Respectfully submitted,

/s/ Robert J. Giuffra, Jr.
Robert J. Giuffra, Jr.
William B. Monahan
Joshua S. Levy
Anil K. Vassanji
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

March 22, 2017