# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : | **Civ. Action No: 15-cv-07199-JMF** |
| | : | |
| Plaintiff(s), | : | **CLASS ACTION** |
| | : | |
| v. | : | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY DISMISS THE THIRD AMENDED COMPLAINT** |
| | : | |
| FIAT CHRYSLER AUTOMOBILES N.V., SERGIO MARCHIONNE, RICHARD K. PALMER, and SCOTT KUNSELMAN | : | |
| | : | |
| Defendants. | : | |

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ..................................................................................1

II.  FACTUAL ALLEGATIONS ABOUT THE EMISSIONS VIOLATIONS ......................3

    A.   Sale of the Subject Vehicles Were Critical to Chrysler's Business ............................3

    B.   FCA's Obligation To Comply With Emissions Standards and Disclose All AECDs..4

    C.   EPA and Other Regulators Increase Focus on Emissions Compliance.......................5

    D.   Defendants and Other Executives Were Involved in Emissions Compliance And Aware of The Undisclosed AECDs and Their Illegal Purpose ...................................6

        1.   Chrysler's Emissions Software Was Created By Chrysler With the Assistance of Bosch, Involving Dozens of Chrysler Employees and Executives ..............6

        2.   Chrysler's Emissions Violations...................................................................7

        3.   Marchionne Received Regular Reports and Approved All Emissions Software ....................................................................................................7

        4.   Marchionne Touted His Knowledge of Emissions Regulations and Personally Oversaw An Audit Purporting to Look For the Precise Illegal Software That Chrysler Concealed from the EPA.................................................................10

    E.   Materially False and Misleading Statements Issued During the Class Period ..........12

    F.   The Truth Begins to Emerge ..................................................................................13

III. ARGUMENT.................................................................................................................14

    A.   Defendants Concede Their Statements Of Emissions Compliance Were False.........14

    B.   The Complaint Alleges A Strong Inference of Scienter.............................................15

        1.   The TAC Alleges A Strong Inference of Marchionne's and Chrysler's Scienter ......................................................................................................16

        a)   The Importance of Emissions Compliance and the Subject Vehicles to Chrysler's Business Supports a Strong Inference of Scienter ........................16

        b)   Defendants' False Assurance of No Chrysler "Dieselgate" Supports Scienter ......................................................................................................17

        c)   Marchionne's Detailed Discussions of Emissions Compliance, Review and Personal Approval of All Emissions Software and His "Thorough Audit" of The Illegal Emissions Software Supports a Strong Inference of Scienter .......17

        d)   The Intentional Illegality of Chrysler's Emissions Software Supports Scienter ......................................................................................................20

        e)   The Ease With Which Regulators Found The Illegal Software Following Dieselgate Supports a Strong Inference of Scienter ........................................21

        2.   The TAC Pleads a Strong Inference of Corporate Scienter...........................22

        3.   Defendants' Criticisms of the TAC's CW Allegations Fail ...........................23

i

**IV. CONCLUSION** ........................................................................................................................25

## TABLE OF AUTHORITIES

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ..................................................................................... 25

*City of Livonia Employees Ret. Sys. v. Wyeth*,
  2010 U.S. Dist. LEXIS 107729 (S.D.N.Y. Sept. 29, 2010) ..................................... 18

*Cosmas v. Hassett*,
  886 F.2d 8 (2d Cir. 1989) ...................................................................................... 16

*Defer v. Raymond James Fin., Inc.*,
  654 F.Supp.2d 204 (S.D.N.Y. 2009) ....................................................................... 23

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................ 21, 24, 25

*In re Atlas Air Worlwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y 2004) ....................................................................... 19

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ...................................................................... 22

*In re Cadence Design Sys. Inc. Sec. Litig.*,
  692 F. Supp. 2d 1181 (N.D. Cal. 2010) ................................................................... 18

*In re Carter-Wallace, Inc. Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000) ..................................................................................... 15

*In re Flag Telecom Holdings, Ltd.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004) ............................................................... 20, 24

*In re General Electric Co.*,
  857 F. Supp.2d 367 (S.D.N.Y. 2012) ....................................................................... 19

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 BL 417666 (S.D.N.Y. Dec. 02, 2013) .............................................................. 16

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
  15-CV-2514, 2017 U.S. Dist. LEXIS 24786 (S.D.N.Y. Feb. 22, 2017) ................... 22

*In re Marsh & Mclennan Cos, Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006) ............................................................... 17, 23

*In re MBIA, Inc. Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) ..................................................................... 23

*In re Moody's Corp. Sec. Litig.*,
  599 F.Supp.2d 493 (S.D.N.Y. 2009) ................................................................. 23

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................. 22

*In re Salix Pharms., Ltd.*,
  2016 BL 128983 (S.D.N.Y. Apr. 22, 2016) ........................................................ 22

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ................................................................................ 20

*In re Scottish Re Group Sec. Litig.*,
  524 F.Supp.2d 370 (S.D.N.Y.2007) ............................................................. 18, 24

*In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266 (S.D.N.Y. 2014) .......................... 23

*In re Veeco Instruments, Inc., Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) ....................................................................... 21

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) ............................................................... 23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .................................. 17, 23

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs II*"),
  513 F.3d 702 (7th Cir. 2008) ............................................................................ 22

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .............................................................................. 20

*Pa. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012) ............................................................... 23

*Podany v. Robertson Stephens, Inc.*,
  318 F. Supp. 2d (S.D.N.Y. 2004) ...................................................................... 17

*Reese v. Malone*, 2014 WL 555911 (9th Cir. Feb. 13, 2014) ..................................... 19

*S.E.C. v. Musella*,
  748 F. Supp. 1028 (S.D.N.Y. 1989) .................................................................. 17

*Solow v. Citigroup, Inc.*,
  827 F.Supp.2d 280 (S.D.N.Y. 2011) ................................................................. 23

*Teamsters Local 445 Freight Div. v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) .............................................................................. 22

*Zagami v. Nat. Health Trends Corp.*,
   540 F. Supp. 2d 705 (N.D. Tex. 2008) ..................................................................................... 21

## I.        PRELIMINARY STATEMENT

On October 5, 2016, this Court denied in part Defendants' motion to dismiss Plaintiffs' Second Amended Complaint ("SAC"), holding that Plaintiffs adequately alleged that Chief Executive Officer ("CEO") of Fiat Chrysler Automobiles N.V. ("Chrysler") Sergio Marchionne ("Marchionne") and other Defendants knowingly misled investors as to Chrysler's compliance with vehicle safety regulations. ECF No. 50. Shortly thereafter, the Environmental Protection Agency ("EPA") and other regulators disclosed that Chrysler had also installed illegal emissions software circumventing EPA regulations in at least 104,000 vehicles. Plaintiffs then amended their complaint. Defendants again seek dismissal of claims based on their statements of regulatory compliance.  The Court should once again deny their request.

Throughout the Class Period (October 14, 2014 through February 6, 2017), Chrysler and Marchionne repeatedly stated that Chrysler's diesel vehicles complied with applicable emissions regulations. Then in the wake of "Dieselgate" – the revelation that Volkswagen ("VW") had installed software in its diesel vehicles to cheat emissions tests – Defendants doubled down on their false assertions of compliance, stating that the Company had conducted a "thorough audit" of its diesel vehicles for any improper software, and assured investors that no such software existed.  In truth, Chrysler had designed and installed at least eight pieces of software in 104,000 light-duty model year 2014, 2015 and 2016 Jeep Grand Cherokees and Dodge Ram 1500 trucks (the "Subject Vehicles"). In violation of a well-known and long established regulation, Chrysler never disclosed this software to regulators because its purpose was to thwart emissions regulations and spew illegally high levels of Nitrogen Oxide ("NOx") into the air.

The truth about Chrysler's widespread violations was disclosed publicly after U.S., German and French regulators began to examine Chrysler's diesel vehicles and immediately found that they contained illegal and undisclosed software. Notably, on January 12, 2017, the EPA and CARB each issued a notice of violation to Chrysler for installing and failing to disclose software that resulted in increased emissions from the Subject Vehicles.  The regulators were clear that the violations were intentional. "***This is a clear and serious violation of the Clean Air Act***," CARB

Chair Mary D. Nichols stated "*[Chrysler] made the business decision to skirt the rules and got caught*." The EPA's Notice of Violation stated "FCA did not disclose the existence of certain auxiliary emission control devices to EPA in its applications for certificates of conformity . . . *despite being aware that such a disclosure was mandatory*." On this news, the Company's stock plummeted $1.35, or roughly 12%, to close at $9.95 on January 12, 2017.

Defendants concede that their statements of emissions compliance were false and misleading each and every time those statements were made. Defendants also do not dispute that the Third Amended Complaint ("TAC" or "Complaint") adequately alleges materiality, reliance, loss causation and economic loss. Rather, Defendants' only argument for dismissal of the emissions-based claims is their assertion that the alleged facts (taken as true) do not create a strong inference that Marchionne or anyone in Chrysler's management was aware that the emissions software was installed on the 104,000 of the Company's top selling diesel vehicles.

The allegations overwhelming support an inference of scienter – that Marchionne and  others in Chrysler's management both "knew facts or had access to information suggesting that [Defendants'] public statements were not accurate"; and (2) "failed to check information they had a duty to monitor" *ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d 187, 199 (2d Cir. 2009). This is demonstrated by (i) the critical importance of the Jeep Grand Cherokee and Ram 1500 to Chrysler's success and that failure to comply with emissions regulations could result in almost $5 billion in fines; (ii) the admitted focus by regulators and Chrysler on diesel emissions software compliance, especially following VW's "Dieselgate"; (iii) the fact that  illegal software was created and installed by Chrysler itself, involving dozens (if not hundreds) of employees; (iv) the fact that the software was intentionally designed to side-step emissions regulations; (v) the fact that Chrysler suspiciously disclosed all other emissions software except the illegal software (a separate violation of law); (vi) the fact that Marchionne received regular reports concerning diesel emissions software and personally approved all such software for installation on Chrysler vehicles; (vii) the fact that Marchionne regularly touted his detailed understanding of emissions regulations and Chrysler's software; (viii) the fact that Marchionne and Chrysler claimed to have conducted a

"thorough audit" for the very kind of undisclosed and illegal software at issue and falsely denied its existence; and (ix) the ease with which regulators found the illegal software following Chrysler's false exculpatory statements.

In short, Defendants request a non-culpable inference even though Chrysler created, designed, installed, tested and approved the purposefully illegal software, placed it in 104,000 vehicles (in the U.S. alone), hid it from regulators, and after the public questioned Chrysler, Defendants claimed to have conducted an audit of their vehicles looking for the very software they created and assured investors such defeat devices did not exist in Chrysler vehicles. The facts here strongly support an inference of scienter.   It is simply impossible that Marchionne and Chrysler management were not aware that illegal software was installed on 104,000 Chrysler vehicles with the specific intent to evade emissions standards.

## II.        FACTUAL ALLEGATIONS ABOUT THE EMISSIONS VIOLATIONS

### A.        Sale of the Subject Vehicles Were Critical to Chrysler's Business

During the Class Period, it was critical for Chrysler's diesel vehicles to comply with emissions regulations. In 2015, 78% of Chrysler's U.S. sales came from light-duty trucks, delivering 90 percent of its profit. ¶210[1].   Indeed, in its SEC filings, Chrysler described the diesel engine that powered the Subject Vehicles as "Our flagship diesel engine" and touted that it "was named one of WardsAuto '10 Best Engines' for 2014." ¶243. Chrysler advertised the Subject Vehicles' diesel engine as compliant with emissions regulations without sacrificing the characteristics of speed, torque, and the like that consumers value highly. ¶¶211, 243.

Marchionne highlighted the importance of the Subject Vehicles and the customers who purchase them: "these tend to be among our most loyal truck owners and also ***due to our unique diesel offering in this heavy-duty truck segment***", explaining that the ability of Chrysler to maintain high mileage and performance for Chrysler's diesel truck (while still complying with emissions regulations) was essential: "We do have the highest mileage of anybody in the pickup

---

[1] All references to "¶" are to Plaintiffs' Third Amended Complaint ("TAC") unless otherwise noted.

truck segment in the U.S. today with diesel. ***I think it's something that certainly has attracted a large portion of the buying public***, not to mention issues about the actual performance of diesel in terms of torque and capability." ¶211.

Sales of the Subject Vehicles were driving Chrysler's financial success. ¶¶212-15. CFO Palmer stated "The Jeep Grand Cherokee had its strongest sales in the U.S. since 2005,  . . .The strong improvement in adjusted EBIT was primarily driven by volume growth, mainly from the Jeep and Ram brands, led by the Jeep Renegade and Cherokee." ¶212. Marchionne discussed Chrysler's shift to "de-focus the passenger car market" in favor of the Subject Vehicles, stating "we need to reutilize those plant infrastructures to try and deal with the development of both Jeep and the Ram brand. . . . the continuation of the ***Cherokee, which as you well know is essential to the development of the brand, especially in NAFTA*** – that these things happen with us ***without us losing any volume in the Jeep or the Ram brand***. ***These are things which are fundamental*** . . ." ¶213. Defendants emphasized the importance of the Subject Vehicles while sales of passenger cars faltered: "Our shipments overall were up 3%, driven by Ram and Jeep offsetting lower shipments of Chrysler 200 and Dart and Journey and Fiat 500 . . . Mix was an important part of the improved margin, because of the increased Jeep and Ram volumes." ¶214. Defendants also acknowledged in Chrysler's SEC filings that compliance with emissions regulations threatened these profits: "…vehicle emission and fuel economy regulations are increasingly

becoming more stringent which will affect our vehicle sales and profitability..." ¶239.

**B.**     **FCA's Obligation To Comply With Emissions Standards and Disclose All AECDs**

U.S. and European regulatory agencies regulate emissions from motor vehicles, including NOx. In the U.S., the Clean Air Act aims to protect human health and the environment by reducing NOx from motor vehicles.  NOx a highly reactive gas that can trigger serious health problems including respiratory problems, damage to lung tissue, and premature death. ¶193.

Every auto manufacturer must control NOx emissions in order to meet the EPA's regulatory requirements. The EPA administers a certification program to ensure that every new motor vehicle satisfies applicable standards. ¶197. Under this program, the EPA issues Certificates

of Conformity (or "COCs") to vehicle manufacturers to certify that a vehicle class conforms to EPA requirements. ¶198. Every motor vehicle sold in the U.S. must have a COC. *Id.* ¶199.

Auto manufacturers are also required to disclose all auxiliary emission control devices ("AECDs") installed on vehicles. ¶202. An AECD is "any element of design which senses temperature, vehicle speed, engine [revolutions per minute], transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." *Id.* The manufacturer must also include "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device." *Id.* Failure to disclose any AECD or provide the required justification is alone a serious violation of the Clean Air Act, which contains both civil and criminal penalties. ¶¶203-05.

It is also a violation of the Clean Air Act for any vehicle to contain any piece of engine management software that can "bypass, defeat, or render inoperative" any emissions compliance device/software. ¶204. This includes software that can circumvent the emissions testing process by turning emissions controls on during the test, and off when the car is in normal use. It is also a violation to render inoperative any emissions compliance device. ¶205.

**C.     EPA and Other Regulators Increase Focus on Emissions Compliance**

During the Class Period, regulatory scrutiny of emissions compliance dramatically increased, especially as to NOx emissions. ¶206. Defendants repeatedly acknowledged they were well aware that regulators were increasing their focus on emissions compliance. ¶¶20-21. Indeed, regulators' and the public's focus on environmental standards caused Chrysler to develop and market the Subject Vehicles which purportedly met these standards.

In September 2015, the EPA issued a public notice of violation ("NOV") of the Clean Air Act to VW, stating that certain of its diesel cars included illegal "defeat devices," *i.e.* software that permitted the vehicles to cheat EPA tests and spew illegally high levels of NOx into the air. ¶207. VW admitted to installing the software in hundreds of thousands of U.S. diesel cars to cheat

emissions tests. *Id.* VW's device was programmed to turn off the vehicles emissions controls after 23 minutes, just after the length of the EPA's emissions tests.  ¶208. This permitted VW's diesel vehicles to appear compliant with NOx emissions regulations during the EPA's tests, when in fact they were not.  *Id.* On January 4, 2016, the DOJ filed a civil suit against VW, which led to VW paying approximately $35 billion in fines, vehicle buybacks, owner compensation and legal fees. ¶207.

The details of VW's emissions scheme and its fallout were well publicized. Marchionne repeatedly discussed the VW scandal and technology used to achieve compliance with emissions regulations with investors and asserted that he had conducted an investigation and audit of Chrysler's vehicles and determined that they were fully compliant with emissions regulations

(which include disclosure of all AECDs and forbid defeat devices). ¶¶209, 306, 386.

**D.    Defendants and Other Executives Were Involved in Emissions Compliance And Aware of The Undisclosed AECDs and Their Illegal Purpose**

**1.    Chrysler's Emissions Software Was Created By Chrysler With the Assistance of Bosch, Involving Dozens of Chrysler Employees and Executives**

All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control ("EDC"). ¶215. Robert Bosch GMBH ("Bosch") tested, manufactured, and sold the EDC system used by Chrysler – Electronic Diesel Control Unit 17 ("ED17"). *Id.* The EDC17 utilized by Chrysler was the same system utilized by VW and Bosch to circumvent EPA emissions standards. ¶217. Bosch worked with Chrysler (as it did with VW) to create a unique set of specifications and software code to manage the vehicles' engine operation. The Dodge Ram 1500 and Grand Cherokee emissions software is a "Bosch EDC17." ¶216.

Bosch tightly controlled development of the control units in vehicles. ¶373. The EDC17 was tailored and adapted by modifying the sophisticated software embedded within the electronic control unit ("ECU"). ¶374-75. Programming this type of complicated emissions control defeat software required close coordination between Chrysler and Bosch and possibly hundreds of employees between the two companies. ¶377. CW2 confirmed that the emissions programming

for the Subject Vehicles involved intentional collaboration between Chrysler and Bosch: "Our people would develop the software, ship it overnight via email over a special network. They'd get it, make modifications or whatever, to prepare it. You'd receive it back the following day, [from Bosch] so you could implement the actual software code into the model." ¶ 381. It is impossible that the illegal software was the work of a small group of low level rogue engineers.

## 2. Chrysler's Emissions Violations

Chrysler violated the Clean Air Act by failing to disclose eight separate AECDs installed in the Subject Vehicles. ¶¶218-22. Those undisclosed AECDs defeated emissions controls and cheated EPA tests. ¶¶219-20. Chrysler's EDC Unit 17 was designed by Chrysler to surreptitiously evade emissions regulations just as VW had done with Bosch. ¶217. Chrysler developed and implemented a specific set of complex software algorithms for implementation in the Subject Vehicles, enabling Chrysler to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates. *Id.* Bosch's EDC Unit 17 enabled Chrysler vehicles to detect when an emissions test was being conducted by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. *Id.* When the EDC Unit 17 detected that the vehicle was on a dynamometer (and undergoing an emission test), the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance to cause a subsequent reduction in emissions to legal levels. Once the EDC Unit 17 detected that the emission test was complete, it would then enable a different "road calibration" mode causing the engine to return to full power, reducing the emissions control systems' performance, and consequently causing the vehicle to spew an illegal amount of NOx emissions into the air. ¶218.

Chrysler violated the Clean Air act because these AECDs (i) were never disclosed by Chrysler to the EPA, (ii) caused the vehicles to emit illegal levels of NOx, and (iii) reduced the effectiveness of the emissions control system by causing the vehicle to emit the legal amount of emissions only when the vehicle was being tested for compliance.¶¶219-20. Approximately 104,000 Chrysler vehicles in the U.S. alone contained this illegal software. ¶222.

## 3. Marchionne Received Regular Reports and Approved All Emissions Software

7

Just prior to the start of the Class Period, Defendants went out of their way to reassure investors that the Company was focused on regulatory compliance and that Marchionne and Kunselman were personally involved in the process. ¶225. On August 12, 2014, FCA announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, headed by Kunselman and "***report[ing] directly to the CEO [Marchioinne]***" in order to "intensify the Company's continuing commitment to vehicle safety and regulatory compliance" and "ensuring a high level of ***information flow*** and ***accountability***." *Id.*

Confidential witnesses that worked on emissions testing at Chrysler during the Class Period confirmed that Marchionne received regular reports on emissions software and testing, was focused on the EPA's emissions test cycles (which examines data to assess polluting emissions and fuel consumption), and that Marchionne made the ultimate decisions on which emissions software would be installed in Chrysler's vehicles. ¶355.

Confidential Witness #1 ("CW1") evaluated vehicles for fuel economy and scheduling emissions testing, and had knowledge of diesel as well as gasoline engine testing.¶356. Confidential Witness #2 ("CW2") worked as a powertrain performance and fuel economy analysis engineer in the vehicle performance and fuel economy and emissions departments at the Tech Center, reporting to John Alexander, FCA director of powertrain development. Alexander reported to Jeffrey P. Lux (head of transmission powertrain for Fiat Chrysler Automobiles (FCA US LLC) -- North America), or Robert (Bob) E. Lee (head of engine, powertrain and electrified propulsion, and systems engineering, for FCA -- North America), who in turn reported directly to Marchionne.¶359. CW2 worked on 3.0 diesel and gas engines on the Jeep Grand Cherokee, and performed computer simulations on fuel efficiency and emissions and analyzed the effect of various factors on fuel economy and emissions.¶360.The propulsion system simulations on which CW2 worked were used to predict the performance of diesel engines. ¶361. CW2 would take EPA-certified fuel consumption and emission data points on a vehicle in production, then simulate on a

computer how the next year's vehicles could be improved either with changes to a software management control system or hardware alterations. ¶363.

According to CW1, EPA emissions and fuel economy testing was a top priority at Chrysler. Explaining how dynamometers were used for EPA testing, CW1 stated: "These critical tests are super important because to certify a car to sell it, the EPA has to say, 'Yeah, we accept the fuel economy numbers.' When we submit to EPA that the vehicle does 20 miles per gallon in the city, and 30 on the highway, it has to do that. If they call you out, you can get in trouble. So, you have to make sure that the data is accurate, and can be replicated in EPA tests." ¶358.

According to CW2, who had detailed knowledge of the simulation tools used by Chrysler during and prior to the Class Period, an improvement in emissions cannot be accomplished without affecting fuel economy and engine performance. ¶362-63. "You are almost out of tricks in the auto industry in how to regulate an internal combustion engine," said CW2, who cited pressure from Alexander and higher-ups who always demanded improvements. CW2 stated that there was a lot of pressure to produce results -- even if the vehicle's improvements weren't quite ready. ¶364.

CW2 explained that "[t]he entire industry is challenged by it (software controlling emissions)" and that Chrysler paid close attention to the so-called "EPA performance cycle," which examines a series of data points to assess fuel consumption and polluting emissions. ¶370. The Clear Air Act required Chrysler to maintain records, perform tests and make reports concerning emissions software and compliance. ¶365. CW1 stated that the data gathered from engine tests was analyzed in a report and ultimately presented to Marchionne. ¶366. CW2 explained that Marchionne was very hands-on and detailed oriented – a hard-nosed executive. "If you presented something and it didn't go well, you could expect to be on the street the next day," said CW2 of Marchionne. ¶369. "You'd better have your facts together. A lot of guys were scared when they'd have to go there to present something. They'd have a huge amount of backup data. If Sergio asked a question, and you didn't know, that was trouble." *Id.* CW1 and CW2 each independently stated that it was Marchionne who would determine which emissions hardware and software would be installed in Chrysler's vehicles.¶¶366-67.

### 4.   Marchionne Touted His Knowledge of Emissions Regulations and Personally Oversaw An Audit Purporting to Look For the Precise Illegal Software That Chrysler Concealed from the EPA

Throughout the Class Period, Marchionne repeatedly told investors that: emissions compliance was under heightened government scrutiny (¶¶383-85,387,305), it was of critical importance to him (¶¶384-86), he was personally focused on emissions compliance (¶¶382-87), he understood the details of Chrysler's emissions software (¶¶383, 385-86, 388-89) and he personally oversaw an audit of Chrysler's diesel emissions software that regulated NOx. ¶¶209, 306, 386. Following news of VW's huge "Dieselgate" scandal in which VW admitted to using software in diesel vehicles to cheat NOx emissions tests, Marchionne addressed the issue, unprompted, in his opening statements to investors on Chrysler's October 28, 2015 Q3 2015 earnings call. He acknowledged that there had been "*a very stiffening environment of regulations and of compliance*" and that the implementation of software that manipulates emissions reading cannot be the result of accident but rather "malfeasance": "There's not a doubt that the problem does exist. I think we cannot confuse the events in terms of their importance. *The origin of this problem was a governance failure. It was not the failure of technology*." ¶383.

During his January 27, 2016 Q4 2015 earnings call, on the heels of the DOJ suing VW, Marchionne stressed the importance of and his focus on emissions compliance. ¶384.  "The other thing that's obviously happened and was absolutely unforeseen was the development of *a much greater degree of consciousness when it comes to emissions and the regulatory environment..*. all these things will require resolution over the next three years or four years and they will have costs, *which we have incorporated in our plan*. . . . I've said this before and I continue to repeat it here, that *I've always viewed the development of our portfolio in the United States as being really driven by the regulatory environment* . . ." *Id*.

During the same call, Marchionne discussed aspects of Chrysler's technologies for achieving emissions compliance, even providing a detailed tutorial.  Discussing Chrysler's "regulatory compliance plan in terms of greenhouse gas on a global scale," Marchionne stated "I think we all know that there is directionally a desire to bring down $CO_2$ emissions. I think as I read some of

the reports that have been issued in connection with FCA, ***there appears to be some concern that we do not have adequate technologies to try and deal with this. So, I'm going to spend a couple of slides trying to reassure you that all the things that are required to try and make the numbers are in fact in place and available***." ¶385. Marchionne discussed these technologies: "as a result of the combination of what I considered to be economically sound acquisitions of credits and ***the rollout of technologies that we're well ahead of the curve in terms of achieving targets that we have throughout the plan***." *Id.* Marchionne specifically discussed how Chrysler's trucks would achieve regulatory compliance, including those that utilized the illegal software: "But as you can see, ***both the current Ram 1500, which today is compliant with 2015 standards***, will in its next incarnation, when the truck gets launched in 2018, meet both the 2018 and the 2022 targets." *Id.*

Marchionne even directly addressed the "important" issue of Chrysler's NOx emissions devices on diesel vehicles, assuring investors that he had conducted a "thorough audit" of Chrysler's emissions devices and their EPA compliance:

> [Chrysler] has been busy and it continues to be busy on optimized methods to achieve the targets. It will continue to do so. . . . I think that after the advent of dieselgate*,* for a lack of a better term, ***FCA has undertaken a pretty thorough review and a thorough audit of its compliance teams.*** I think we feel comfortable in making the statement that ***there are no defeat mechanisms or devices present in our vehicles. And I think the cars perform in the same way on the road as they do in the lab under the same operating conditions. This is an area of heightened concern.*** And so we've put in – we have established now as part of our compliance mechanism training for all emission calibration engineers. ***We do have a best practice program to ensure that we calibrate and certify properly.*** And I think that we will – just to make sure that the system is not going off the reservation, we will carry out random checks of our fleet to ensure that we achieve compliance. ¶386.

During Chrysler's April 26, 2016 Q1 2016 earnings call, Marchionne again demonstrated his focus on emissions regulations and his detailed knowledge of the software, regulations and subtle differences adopted by various regulators: "I think we have been incredibly clear over the last number of quarters about the fact that the regulatory environment has become a lot more stringent . . . there needs to be much better coordination across the national bodies about what it is that has effectively allowed as relevant technology in order to meet an emission standard."387.

Marchionne even discussed with investors the nuances of particular regulations on specific software that could suspend emissions controls - touting his intimate knowledge: "There's a phenomenal level of confusion out there about the degrees of freedom that are associated in the interpretation of that rule, what constitutes effectively *a sound technical reason* for the application or *the suspension of emission controls* in a particular vehicle, because of the fact that there are very strong *technical arguments* that would suggest for the protection of the engine a number of – *a variety of responses are capable of being introduced as part of the software solution that runs these vehicles. I understand all this*." ¶388. Marchionne also explained that the United States has "*very clear rules about what those requirements are and how exceptions to those rules*" because "there's a continuous dialog with both *EPA and CARB* about what is allowed as an exception to the general, zero exception application of the rules." Discussing emissions regulations, Marchionne repeated "we have done our best to meet those standards over time, fully understanding that there were technical limitations associated with our powertrains that we use, and that because of those technical limitations that the rule itself allowed for relief."[2] ¶389.

**E.     Materially False and Misleading Statements Issued During the Class Period**

Throughout the Class Period, Defendants repeatedly assured investors that FCA was in compliance with emissions regulations, that Chrysler had strengthened its compliance function, and even conducted an audit to ensure that all emissions software was disclosed and legal. For example, in a November 13, 2014 SEC filing, Chrysler stated:

> We face a regulatory environment in markets throughout the world where vehicle *emission* and fuel economy regulations are increasingly becoming more stringent which will affect our vehicle sales and profitability. *We must comply with these regulations in order to continue operations in those markets*, including a number of markets where we derive substantial revenue, such as the U.S., Brazil and Europe. . . .
> Under the U.S. Clean Air Act, the Environmental Protection Agency, or EPA, and the California Air Resources Board, or CARB (by EPA waiver), *require emission compliance certification* before a vehicle can be sold in the U.S. . . . In addition, EPA and CARB regulations require that a vehicle's emissions performance be monitored with OBD systems. *We have implemented hardware and software systems in all our vehicles to comply with the OBD requirements*. . . .

---

[2] During Chrysler's July 27, 2016 Q2 2016 earnings call, Marchionne also discussed in depth his opinions concerning the emissions regulations in Europe. ¶390.

> ***Our flagship diesel engine*** is the V-6 3.0 liter Eco-Diesel. Variants of this engine currently power Maserati vehicles, the ***Jeep Grand Cherokee and the Ram 1500. . . . [O]ur diesel engine families comply with Euro 6 emission regulations, which are mandatory as of September 2014. . . .***
>
> Our vehicles . . . must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety, end-of-life vehicles, ***emissions*** and noise). ***We are substantially in compliance with the relevant global regulatory requirements*** affecting our facilities and products. ***We constantly monitor such requirements and adjust our operations to remain in compliance.***

¶ 239-243. Defendants repeated these statements of compliance in SEC filings throughout the Class Period. ¶¶305-310. During a January 27, 2016 earnings call, Marchionne addressed the specific issue of software in diesel vehicles regulating NOx emissions in the wake of VW's "Dieselgate" scandal, assuring investors that he had "audited" the software, that all software was disclosed and no such software was being utilized by Chrysler:

> ***[A]fter the advent of dieselgate,*** for a lack of a better term, ***FCA has undertaken a pretty thorough review and a thorough audit of its compliance teams.*** I think we feel comfortable in making the statement that ***there are no defeat mechanisms or devices present in our vehicles. And I think the cars perform in the same way on the road as they do in the lab under the same operating conditions. This is an area of heightened concern. . . . We do have a best practice program to ensure that we calibrate and certify properly.*** And I think that we will – just to make sure that the system is not going off the reservation, we will carry out random checks of our fleet to ensure that we achieve compliance.

¶ 302. Similarly, in Chrysler's annual report filed with the SEC on February 29, 2016, Chrysler listed increased compliance actions the Company had implemented and stated:

> We conducted an audit of all current production software and emission calibrations. ***The audit revealed that all current production vehicle calibrations are compliant with applicable regulations*** and they appear to operate in the same way on the road as they do in the laboratory under the same operating conditions.

¶ 306. Defendants made other statements concerning Chrysler's compliance with NOx and diesel emissions regulations on May 23, and September 22, 2016, as well as January 12, 2017 (¶¶314, 316, 320), misleading investors into believing that Chrysler was in compliance with emissions regulations.

## F.     The Truth Begins to Emerge

On May 23, 2016, it  was  reported that several tests by the  German motor transport authority

KBA had found evidence that the exhaust treatment system in some of Chrysler's models would switch off after 22 minutes, which is just 2 minutes after the standard 20 minute emissions test normally run by regulators. This was identical to VW's scheme. KBA concluded there was "sufficient evidence of an impermissible defeat device" in Chrysler vehicles. On this news, Chrysler's stock price dropped roughly 5.1%.  In an effort to stem a further stock price decline, Chrysler issued false reassurance to the market stating that "all of its vehicles are compliant with existing emissions rules." ¶314.

On January 12, 2017, the EPA and CARB each issued a NOV to Chrysler for installing and failing to disclose engine management software that resulted in illegal emissions from the Subject Vehicles. ¶29. The EPA found "at least *eight* undisclosed pieces of software that can alter how a vehicle emits air pollution." "Failing to disclose software that affects emissions in a vehicle's engine is a serious violation of the law, which can result in harmful pollution in the air we breathe," said Cynthia Giles, assistant administrator for the EPA. "***This is a clear and serious violation of the Clean Air Act***," CARB Chair Mary D. Nichols stated "***[Chrysler] made the business decision to skirt the rules and got caught***."  *Id.* The EPA's disclosure of the NOV stated "FCA did not disclose the existence of certain auxiliary emission control devices to EPA in its applications for certificates of conformity for model year 2014, 2015 and 2016 Jeep Grand Cherokees and Dodge Ram 1500 trucks, ***despite being aware that such a disclosure was mandatory***." *Id.* The EPA estimated these violations could cost FCA $4.63 billion in fines. *Id.* On this news Chrysler's stock price dropped 12%.

On February 6, 2017, French authorities announced Chrysler would be prosecuted after an investigation found that levels of NOx pollutants produced by its diesel vehicles vastly exceeded the NOx legal limit. On this news, Chrysler's stock price declined 4.6%.

## III.     ARGUMENT

### A.     Defendants Concede Their Statements Of Emissions Compliance Were False

Defendants concede that their statements of emissions compliance were false and misleading

each and every time those statements were made because (1) Chrysler failed to disclose the eight pieces of illegal emissions software; and (2) that same software violated emissions regulations by causing illegal levels of NOx to spew into the air.

**B.      The Complaint Alleges A Strong Inference of Scienter**

"The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Strong circumstantial evidence of reckless conduct gives rise to an inference of scienter if the complaint alleges "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant **or so obvious that the defendant must have been aware of it**." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted) (emphasis supplied).  A strong inference of scienter exists where a complaint alleges that the defendants: (1) "knew facts or had access to information suggesting that their public statements were not accurate"; or (2) "failed to check information they had a duty to monitor" *ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d at 199.

Here, the TAC adequately alleges facts sufficient to establish a strong inference of scienter as to Marchionne and others in Chrysler's management. This is demonstrated by: (i) the critical importance of the Subject Vehicles to Chrysler's success; (ii) the admitted focus by regulators and Chrysler on diesel emissions software compliance following VW's Dieselgate; (iii) the fact that illegal software was created and installed by Chrysler, involving dozens (if not hundreds) of employees; (iv) the fact that software was intentionally designed to evade emissions regulations; (v) the fact that Chrysler suspiciously disclosed all other emissions software except the illegal software; (vi) the fact that Chrysler's conduct violated the Clean Air Act; (vii) Marchionne's receipt of regular reports concerning diesel emissions software and personal approval of all such software for installation on Chrysler vehicles; (viii) that fact that Marchionne regularly spoke in detail about diesel emissions regulations and Chrysler's software and lauded Chrysler's compliance with the law; (ix) the fact that Marchionne and Chrysler's SEC filings claimed to have

conducted a "thorough audit" for the very kind of undisclosed and illegal software at issue and falsely claimed that such software did not exist; and (x) the ease with which regulators found the illegal software following Chrysler's asserted audit.

    1.   **The TAC Alleges A Strong Inference of Marchionne's and Chrysler's Scienter**

        a)   **The Importance of Emissions Compliance and the Subject Vehicles to Chrysler's Business Supports a Strong Inference of Scienter**

"To fulfill the scienter pleading requirement, a plaintiff may rely on the "core operations doctrine," which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 BL 417666, 26 (S.D.N.Y. Dec. 02, 2013) (finding scienter adequately alleged and that an agreement that affected 18% of revenues was within the "core operations" of the company) citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).

During the Class Period, it was critical that the Subject Vehicles comply with emissions regulations. Chrysler marketed the Subject Vehicles as "clean diesel" which offered a combination of power, efficiency, and environmental cleanliness that competitors could not match, touting that their emissions control system ensures that virtually no particulates and only minimal NOx exit the tailpipe. In 2015, 78% of Chrysler's U.S. sales volume came from light-duty trucks, delivering a whopping 90 percent of its profit. ¶210. Chrysler described the diesel engine that powered the Subject Vehicles as "Our flagship diesel engine, " and the Subject Vehicles as "essential" and "fundamental" – so popular in fact that the Company was shifting away from passenger cars to trucks. ¶¶210, 243. Marchionne stated that the Subject Vehicles' popularity was due to Chrysler's ability to comply with emissions standards while still excelling in "actual performance of the diesel in terms of torque and capability," which are usually compromised through emissions controls. ¶211. The Company also stated that compliance with diesel emissions regulations was critical if Chrysler wanted to continue to sell the Subject Vehicles. ¶¶ 239-43.

The paramount importance of emissions compliance coupled with the importance of the Subject Vehicles to Chrysler's bottom line, and the admitted falsity of Defendants' statements support a strong inference of individual and corporate scienter. *In re Volkswagen "Clean Diesel" Mktg.,*

*Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 66281, at *14 (N.D. Cal. Jan. 4, 2017) ("…'[t]he clean diesel' vehicles were an integral part of Volkswagen's 'Strategy 2018' to become the largest automobile manufacturer in the world.  Given that, it is reasonable to infer that at least some corporate officials knew VW was falsely touting the emissions compliance…The importance and falsity of the emissions-compliance statements gives rise to a plausible inference of VW AG's corporate scienter.").  The centrality of emissions compliance and sales of the Subject Vehicles to the success of Chrysler supports a strong

inference of scienter.

**b)  Defendants' False Assurance of No Chrysler "Dieselgate" Supports Scienter**

In the wake of the VW scandal, Marchionne  intentionally  assuaged  investor  concerns, proclaiming that "there are no defeat device mechanisms present in our vehicles…this is an area of heightened concern." ¶302. Defendants repeatedly assured investors that the Company was fully compliant with EPA standards and had strong safeguards in place to ensure that their vehicles did not and would not contain illegal defeat devices even after German regulators informed Chrysler on May 23, 2016 that there was "sufficient evidence of an impermissible defeat device" in its diesel vehicles.  ¶¶ 312-313.  Defendants' false exculpatory statements in an effort to distance Chrysler from the VW scandal support a strong inference of scienter. *S.E.C. v. Musella*, 748 F. Supp. 1028, 1040 (S.D.N.Y. 1989), aff'd, 898 F.2d 138 (2d Cir. 1990) ("false exculpatory statement evidences consciousness of guilt and has independent probative value of *scienter*").  In an analogous case, Judge Sullivan found that a CEO's comments aggressively supporting the company's business practices following news of a government investigation of misconduct, combined with the rapid discovery of misconduct, constituted strong circumstantial evidence of scienter.[3] *In re Marsh & Mclennan Cos, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006).

**c)  Marchionne's Detailed Discussions of Emissions Compliance, Review and Personal Approval of All Emissions Software and His "Thorough Audit" of The Illegal Emissions Software Supports a Strong Inference of Scienter**

The very  purpose  of  the  undisclosed software  was  to  evade  emissions  regulations.  Given

---

[3] To the extent any of Marchionne's statements could charitably be mischaracterized as statements of opinion this fact supports scienter. *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, (S.D.N.Y. 2004) ("[I]n false statement of opinion cases…the falsity and scienter requirements are essentially identical").

Marchionne's hands-on role under the new compliance structure, which was designed to "ensur[e] a high level of information flow and accountability", scienter can be inferred from Marchionne's: (i) receipt of reports specifically concerning diesel emissions software, (ii) personal approval of all diesel emissions software, and (iii) purported "thorough audit" of Chrysler's diesel vehicles to search for the very illegal software that Chrysler itself designed.   Here Marchionne knew facts and had access to information suggesting his public statements were not accurate. *Novak*, 216 F.3d at 311. Indeed, on May 23, 2016, German regulators informed Chrysler of its violations, yet Marchionne continued to falsely assert Chrysler's compliance (a falsity Defendants now concede). Suspiciously, Chrysler's vehicles (but not their competitors) were allowed to skip key tests for illegal engine software during Italy's emissions-cheating investigation occurring in the wake of Dieselgate.  ¶324.

No reasonable person could infer that Marchionne was unaware of the software's existence or its illegal purpose as he reviewed and personally approved all AECD software and he personally conducted and misleadingly reported on an audit of the vehicles to assure investors there was no illegal software. *See, e.g., In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 393–94 (S.D.N.Y.2007) (finding implausible that sophisticated executives actively engaged in the planning of the transactions were ignorant of their tax consequences); *In re Cadence Design Sys. Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1191-92 (N.D. Cal. 2010) (holding that an executive officer "was at least deliberately reckless" because "[t]he competing inference, that he worked on these [important] deals and innocently missed the most important details, is less plausible.").

Marchionne repeatedly spoke with great authority and proclaimed superior knowledge about emissions compliance and Chrysler's emissions software. ¶¶383-90. Courts have consistently held that if executives speak about a topic of "critical importance," they cannot hide their heads in the sand and ignore crucial information at their fingertips about it. *City of Livonia Employees Ret. Sys. v. Wyeth*, 2010 U.S. Dist. LEXIS 107729, at *6, *18-19 (S.D.N.Y. Sept. 29, 2010).  Where, as here, "facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of

those facts or should have known of them.  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).

The Ninth Circuit's decision in *Reese v. Malone* is strikingly on point. 747 F.3d 557, 571 (9th Cir. 2014). In *Reese*, in the wake of a major environmental disaster in which British Petroleum's ("BP") pipeline spilled 200,000 gallons of oil onto the Alaskan tundra, BP's Senior Vice President Maureen Johnson told the media that BP had inspected the pipeline for corrosion and assured the public of the pipeline's integrity and the results of BP's recent inspection of the pipeline for corrosion, another spill was unlikely.  Five months later, corrosion again caused another spill requiring BP to shut down the Prudhoe Bay oil field.  The Ninth Circuit held Johnson had the requisite scienter for many of the same reasons Marchionne is alleged to have scienter here:  (i) Johnson specifically addressed the corrosion data in her false statement; (ii) In the wake of a crisis that had the potential to repeat itself, Johnson had every reason to review the corrosion data carefully before making her false statement; (iii)  Johnson had a strong motive to lie, as "[t]he revelation that BP ignored red flags would portend serious corporate mismanagement, a portent that would be detrimental both to BP and to Johnson personally."  *Reese v. Malone*, 747 F.3d 557, 571-72 (9th Cir. 2014) ("Johnson 'bridge[d] the [scienter] gap' herself by referencing the data directly. … It is unclear what further facts plaintiffs would need to plead to create a stronger inference that she had access to information she discussed publicly") (citations omitted). "Plaintiffs are not required, as [Defendant] suggests … to plead the existence of specific internal reports to which each individual had access in order to show the individual defendants knew or should have known that their statements were false."  *In re Atlas Air Worlwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y 2004). This is especially true here because Marchionne received reports on **and** personally approved **all** emissions software installed in the vehicles, which by definition includes the eight pieces of illegal and undisclosed software. Therefore, he must have received the reports on and personally approved the illegal software.

Judge Holwell's opinion in *In re General Electric Co.*, 857 F. Supp.2d 367, 395-396 (S.D.N.Y. 2012) is also instructive. There, plaintiff alleged defendant falsely touted the quality of the

company's loan portfolio, which actually contained many loans to subprime loans. *Id.* at 395. Judge Holwell found a strong inference of scienter where confidential witnesses said that "underwriting results" were regularly reported to GE Corporate even though it was uncertain that the credit or bond ratings were included in the reports. *Id.* Bolstering these allegations was the fact that the defendant regularly discussed details concerning the company's loan portfolio and was doing so in the wake of the global financial crisis to reassure investors. *Id*. at 396.

Recasting the Complaint's allegations, Defendants assert that the TAC pleads "guilt by association" by referencing background facts from the Volkswagen complaint concerning Bosch. (Def. Mem. at 20-23). But Defendants do not deny that Chrysler and Bosch similarly worked together on nearly identical emissions software for the Subject Vehicles and that the eight AECD's were illegal because they were undisclosed. Unlike in the cases cited by Defendants, the allegations concerning VW and Bosch are part of the holistic scienter analysis putting the facts in greater context, not the foundation for Plaintiffs' claims.[4]

### d)  The Intentional Illegality of Chrysler's Emissions Software Supports Scienter

Defendants do not dispute that <u>eight</u> undisclosed AECD's were found in the Subject Vehicles in clear violation of the law. Such an intentional violation of the law or even a company's own internal policy supports a strong inference of scienter.  *See, e.g. Novak v. Kasaks*, 216 F.3d 300, 311–12 (2d Cir. 2000)("Defendants knowingly sanctioned procedures that violated the Company's own policy evidenced intent to deceive."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (finding strong inference of scienter where company adopted an accounting standard and then knowingly violated it stating "defendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness."). Just as violations of GAAP support an inference of scienter, so do violations of the Clean Air Act, accompanied by false

---

[4] The cases Defendants cite are not to the contrary. *In re Flag Telecom Holdings, Ltd.*, 308 F. Supp. 2d 249, 261 (S.D.N.Y. 2004) (Def. Br. 4, 18) involved allegations that Flag entered into improper transactions that inflated its revenue. The court found that because there was nothing inherently wrong with reciprocal transactions "plaintiff's task of pleading scienter becomes more difficult." There, the court found that plaintiff's citation to news articles about unnamed telecom companies who entered into illegal swap transactions amounted to pleading guilt by association. The newspaper articles in *Flag* are far more general than the specific allegations concerning Bosch's relationship with Chrysler.

statements of compliance with that law. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 199–200 (S.D.N.Y. 2010) ("GAAP violations, when coupled with evidence of fraudulent intent" provide evidence of scienter.").

Chrysler's disclosure of the AECDs in the Subject Vehicles that did not constitute defeat devices, while at the same time concealing (in violation of law) the eight AECDs that were defeat devices is strong evidence of scienter. *See Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 713 (N.D. Tex. 2008) (disclosing some related party transactions, while concealing others is evidence of scienter).

In working with Bosch to design the EDC Unit 17 to evade emissions regulations, concealing the AECD's and thereby fraudulently obtaining the COC's in connection with each and every one of the 104,000 Subject Vehicles, Defendants not only violated the Clean Air Act but their own system of internal controls, by selling the Subject Vehicles pursuant to fraudulently obtained COC's. And after German regulators announced on May 23, 2016, they had found "sufficient evidence of an impermissible defeat device" in Chrysler's vehicles, Defendants were a no-show for a meeting with German authorities to discuss the violation. ¶27. This knowing failure to maintain sufficient controls in connection with the manufacture and sale of the Subject Vehicles supports a strong inference of scienter. *See In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) ("[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter."); *Varghese v. China Shengou Pharm. Holdings, Inc.*, 672 F.Supp.2d 596, 608 ("[p]laintiffs allege that (1) [the defendant company] had weak internal controls and (2) that the . . . [d]efendants were aware of the problems. Both these allegations support a strong inference of scienter.").

e)   **The Ease With Which Regulators Found The Illegal Software Following Dieselgate Supports a Strong Inference of Scienter**

The existence of Chrysler's improper emissions software was  so obvious  that several regulators in different countries independently discovered it, demonstrating that it is simply not credible to infer that management was unaware of it. Courts routinely find scienter adequately

alleged where improper activity is readily discovered. For example, in *In re New Century Sec. Litig.*, the court found "the fact that [a] new CEO . . . discovered the [issues] within months of taking the position is a strong indication that these [misstatements] were obvious enough that a new officer found them quickly." 588 F. Supp. 1206, 1231 (C.D. Cal. 2008). *See In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423 , 517 (S.D.N.Y. 2011) (Sweet, J.) (finding scienter where "JPMorgan discovered in the course of one weekend the overvaluation of assets and underestimation of risk exposure").[5]" Here, the violations were even more obvious because outside third parties discovered the violations just months after Marchionne claimed that the Company's audit had determined that all of Chrysler's diesel emissions software was compliant and properly disclosed[6].

To be sure, the AECD's were indeed illegal and existed for no other purpose than to act as defeat devices. The KBA report did in fact conclude that Fiat vehicles contained defeat devices. ¶¶27, 312. Defendants' quoted excerpt is highly misleading. The KBA report did not conclude that Fiat vehicles contained no defeat devices. (Def. Br. At 7-8; Levy Dec. Ex. 2). Instead, the KBA Report states that "***Until the publication of this report***, no unlawful defeat device was found in any other vehicle than in certain VW Group vehicles."

## 2. The TAC Pleads a Strong Inference of Corporate Scienter

A plaintiff may plead a strong inference of scienter against a corporate entity without doing so against any one individual defendant. *See In re iDreamSky Tech. Ltd. Sec. Litig.*, 15-CV-2514, 2017 U.S. Dist. LEXIS 24786, *19 (S.D.N.Y. Feb. 22, 2017) (internal citations omitted). "[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Teamsters Local 445 Freight Div. v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008).[7] "All that is required [to plead corporate scienter] is

---

[5] *See also In re Salix Pharms., Ltd.*, 2016 BL 128983, 15 (S.D.N.Y. Apr. 22, 2016) (finding scienter where "potential acquirers . . . discovered Salix's high inventory levels within days of performing their due diligence.").
[6] Defendants' tortuous argument that AECD's themselves are not illegal defeat devices is a distinction without a difference. Chrysler's AECD's at issue were not disclosed to regulators and therefore were illegal. Given that Defendants were well aware of: (1) their obligations to disclose all AECD's and (2) the AECD's at issue, the only reasonable explanation for failing to disclose the AECDs is that they were in fact illegal defeat devices.
[7] Citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs II*"), 513 F.3d 702, 710 (7th Cir. 2008).

that the pleaded facts create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014). Courts in this jurisdiction consistently affirm that the person who made the statement need not be the person with the requisite scienter. *See Solow v. Citigroup, Inc.*, 827 F.Supp.2d 280, 291 (S.D.N.Y. 2011) (noting that plaintiff "need not identify specifically the individuals at Citigroup who acted with scienter in order to plead scienter with respect to Citigroup").[8] "While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp.2d 452, 481 (S.D.N.Y. 2006).

Here, it required dozens, if not hundreds, of Chrysler employees to develop, program, install and test the intentionally illegal emissions software. Thus, there is no plausible inference the illegal software was installed and concealed from the COC disclosures by some small band of low-level rogue employees. Rather, the only reasonable inference is that given the importance of the vehicles to Chrysler's profits and the importance of emissions compliance at least one person in management knew of the software – if not when it was designed, tested and approved then certainly following the "thorough audit." *See, e.g., In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) (finding corporate scienter where the company asserted that it had carefully reviewed all CDO's except the alleged illegal ones: Lead Plaintiff has adequately alleged that MBIA's officers had knowledge of and access to non- public information regarding the RMBS collateral within the CDOs-squared that contradicted their public statements."); *In re Volkswagen*, 2017 WL 66281, at *14  ("it is reasonable to infer that at least some corporate officials knew VW was falsely touting the emissions compliance….").

### 3. Defendants' Criticisms of the TAC's CW Allegations Fail

---

[8]  *See also Defer v. Raymond James Fin., Inc.*, 654 F.Supp.2d 204, 212 (S.D.N.Y. 2009); *In re Moody's Corp. Sec. Litig.*, 599 F.Supp.2d 493, 516 (S.D.N.Y. 2009); *Pa. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 545 (S.D.N.Y. 2011).

Faced with the plethora of allegations supporting Defendants' knowledge of Chrysler's illegal and undisclosed defeat devices Defendants resort to attacking the TAC's CW allegations. "In accordance with the Supreme Court's instruction in *Tellabs*, CW's information must be viewed together. "*Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197-98 (S.D.N.Y. 2012). Rather than looking at the CW's information collectively, as *Tellabs* instructs, Defendants dissect both CW's testimony separately. Defendants assert that CW1 only "speculates" that Marchionne received reports containing data from engine tests. In reality, CW1 explained that CW1 worked with dynamometers to perform emissions testing that produced very data which was gathered and analyzed in reports forwarded first to the heads of transmission powertrain and engine powertrain and then to Marchionne who would personally decide whether to incorporate hardware or software changes based upon the data in the reports. ¶356. Defendants assert that CW2 had no contact with the Individual Defendants. But there is no requirement that confidential witnesses have personal contact with the Individual Defendants. *See, e.g. In re Scottish re Gp. Sec. Litig.* 524, F. Supp. 2d 370, 392-93 (S.D.N.Y.2007) (crediting confidential witnesses who "occupied positions that would have allowed for relevant hands-on experience in various parts of the Company" relevant to plaintiffs' claims).[9]  Moreover, the fact that the CWs' statements corroborate each other and are

---

[9] Defendants' cases are distinguishable.  *Campo v. Sears Holdings Corp.* 371 F.Appx 212, 217 (2d Cir. 2010), does not hold that CW's must have direct contact with the individual defendants. The CW's in Sears testified that they had *no* reason to believe that the defendants had access to the information at issue. In  *Local No. 38 v. Am. Exp. Co.,, Co.* 724 F. Supp. 2d 447 (S.D.N.Y. 2010) many of the CW's were employed by outside contractors, and that none of the CW allegations established what contradictory information defendants received.  Here, CW1 states that data gathered from engine tests utilizing dynamometer's to simulate driving conditions were compiled in reports forwarded to either the head of transmission or engine powertrain which were then forwarded to Marchionne who decided whether or not to incorporate hardware or software changes in emissions or fuel efficiency in Chrysler's vehicles.  ¶¶362- 56. This receipt of this specific data coupled with Marchionne's repeated statements demonstrating his knowledge of and involvement in Fiat's compliance with, and sensitivity to, emissions standards supports an inference of scienter.  *In re Citigroup, Inc.* 753 F. Supp. 2d 206, 245, (S.D.N.Y. 2010) stands only for the proposition that allegations information was "generally known" in a company, standing alone, are insufficient to plead scienter.  In re *Flag Telecom Holdings, Inc.* 308 F. Supp. 2d 249, 261 (S.D.N.Y. 2004), the court refused to credit the vague  CW allegations that employees questioned the ethics of the swap transactions where the CW's did not identify whether the specific transactions that formed the basis for the complaint were improper or which transactions he was actually referring to.

corroborated by the other evidence lends to their weight. *Freudenberg v. E*TRADE Financial Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010).

IV.     __CONCLUSION__

Defendants' Motion to Partially Dismiss the TAC should be denied. Alternatively, Plaintiffs request leave to amend should the Court find the TAC lacking in any respect. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995).


Dated:   April 25, 2017                                  Respectfully submitted,


                                                         **POMERANTZ LLP**


                                                         */s/ Jeremy A. Lieberman*
                                                         Jeremy A. Lieberman
                                                         Michael J. Wernke
                                                         J. Alexander Hood II
                                                         Marc Gorrie
                                                         600 Third Avenue, 20th Floor
                                                         New York, New York 10016
                                                         Telephone:  (212) 661-1100
                                                         Facsimile:   (212) 661-8665
                                                         Email:  jalieberman@pomlaw.com
                                                                 ahood@pomlaw.com
                                                                 mgorrie@pomlaw.com


                                                         **POMERANTZ LLP**
                                                         Patrick V. Dahlstrom
                                                         10 South La Salle Street, Suite 3505
                                                         Chicago, Illinois 60603
                                                         Telephone:  (312) 377-1181
                                                         Facsimile:   (312) 377-1184
                                                         Email:  pdahlstrom@pomlaw.com

                                                         *Co-Lead Counsel for Plaintiffs*


                                                         **THE ROSEN LAW FIRM, P.A.**

                                                         */s/ Laurence M. Rosen*

25

Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*