USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/1/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
:
VICTOR PIRNIK, :
:
                           Plaintiff, :        15-CV-7199 (JMF)
:
          -v- :        OPINION AND ORDER
:
FIAT CHRYSLER AUTOMOBILES, N.V., et al., :
:
                          Defendants. :
:
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Plaintiffs in this putative securities fraud class action — brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78b(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240 — are investors in Defendant Fiat Chrysler Automobiles, N.V. ("FCA NV"), a global car company. Plaintiffs initially alleged that FCA NV and several officers of its largest subsidiary, FCA U.S. (collectively with FCA NV, "FCA"), made false and misleading statements regarding FCA's substantial compliance with applicable safety regulations and recall reserve estimates. In an earlier opinion, familiarity with which is assumed, the Court granted Defendants' motion to dismiss the claims regarding the recall reserve estimates, but allowed Plaintiffs' claims with respect to safety regulation compliance to proceed. *See Pirnik v. Fiat Chrysler Automobiles, N.V.*, 15-CV-7199 (JMF), 2016 WL 5818590, at *4, *10-11 (S.D.N.Y. Oct. 5, 2016). Thereafter, Plaintiffs amended their complaint, adding claims that Defendants made false and misleading statements regarding FCA's compliance with certain federal and state emissions regulations. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to

dismiss those new claims. (Docket No. 91) For the reasons that follow, the motion is granted, but Plaintiffs are granted leave to amend.

## BACKGROUND

The Court laid out the general background of this action in its prior opinion, *see Pirnik*, 2016 WL 5818590, at *1-4, and will not rehash it here. A few months after the Court's earlier decision, on January 12, 2017, the United States Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") issued Notices of Violation to FCA for failing to disclose certain engine management software that could alter the emissions output in light-duty model year 2014, 2015, and 2016 Jeep Grand Cherokees and Dodge Ram 1500 trucks with 3.0 liter diesel engines. (Docket No. 69 ("Third Am. Compl.") ¶ 29). On this news, FCA's stock dropped $1.35 per share, closing roughly twelve percent below its opening price that day. (*Id.* ¶ 319). Soon thereafter, Plaintiffs sought and were granted leave to amend their complaint to incorporate allegations regarding FCA's purportedly material misrepresentations regarding compliance with emissions regulations. (*See* Docket Nos. 61, 62). The operative complaint (the "Complaint") now alleges that throughout the class period — October 14, 2014, through February 6, 2017 — FCA NV; Sergio Marchionne, the Chief Executive Officer of FCA NV and US; and other individual Defendants repeatedly misled investors as to FCA's compliance with applicable emissions regulations for diesel vehicles. (*See* Third Am. Compl. ¶¶ 193-223, 242-43, 279-82, 302-324). As noted, Defendants now move to dismiss those claims, arguing that the Complaint contains insufficient particularized facts to support a strong inference that Defendants acted with the necessary intent to defraud its investors. (Docket No. 92 ("FCA Mem."), at 1-4).

## APPLICABLE LEGAL STANDARDS

"In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319-20 (S.D.N.Y. 2012) (citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). The Court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because they allege securities fraud, Plaintiffs here must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that scienter — that is, a "defendant's intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).

To satisfy Rule 9(b), a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). A plaintiff may do so by

alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* For an inference of scienter to be "strong," a reasonable person must "deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## DISCUSSION

Defendants move to dismiss the new emissions-related claims on the ground that Plaintiffs fail to allege with particularity facts giving rise to a strong inference of scienter. Notably, although the Complaint could be read to include allegations that Defendants had both the motive and opportunity to commit the alleged fraud (*see* FCA Mem. 11-12 (citing examples)), Plaintiffs do not respond to Defendants' arguments regarding the adequacy of those allegations. That is for good reason, as Plaintiffs fail to allege that any of the Defendants sold shares of FCA stock during the class period. *See Pirnik*, 2016 WL 5818590, at *6 n.3; *see also Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004). To prevail, therefore, Plaintiffs must allege either actual intent or "conscious recklessness — i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).

Plaintiffs fail to do so. On the whole, their allegations boil down to general claims about the importance of certain diesel-engine vehicles to the company, the unremarkable fact that Marchionne received regular reports regarding emissions tests and that the company had audited its vehicles for emissions compliance, FCA's awareness that *other* automobile manufacturers

were facing regulatory scrutiny for using illegal "defeat devices," [1] and vague statements by confidential witnesses that emissions reports were "forwarded up" through "senior" management to reach Marchionne. (*See, e.g.*, Docket No. 96 ("Pls.' Opp'n"), at 2-3). Conspicuously absent, however, are *any* allegations that FCA officials or Marchionne ever received test results, reports, or other communications indicating that FCA vehicles were not in compliance with relevant emissions regulations prior to the EPA's and CARB's notices on January 12, 2017. That dooms Plaintiffs' case for scienter here. *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (dismissing claims where the plaintiffs failed to "specifically identif[y] any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements" (internal quotation marks and citation omitted)); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (dismissing claims where the complaint made "no reference to internal CIBC documents or confidential sources discrediting [the d]efendants' assertions" and the plaintiffs "should, but

---

[1] A "defeat device" is any software that allows a vehicle to "cheat" an emissions test — for example, by turning off the engine's emissions controls after the EPA's testing cycle has finished (i.e., running those controls for only 22 minutes when the emissions test is known to be capped at 20 minutes). (*See* Third Am. Compl. ¶ 27; FCA Mem 3-4). Notably, failure to disclose the existence of emissions-regulating software can violate regulations even if the software does not qualify as a "defeat device," as an automaker must disclose any "element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system" to receive a certificate of conformity to sell that vehicle in the United States. 40 C.F.R. § 86.1803-01. Such software is not considered a defeat device if it falls within certain enumerated exceptions (including, for example, to "protect[] the vehicle against damage"), *id.* §§ 86.1803-01, 86.1809-10, and is then permissible if it is disclosed, *see id.* §§ 86.1844-01(d)(11). As of this motion, no regulatory body has definitively found that FCA vehicles were using illegal "defeat devices." The January 2017 Notices of Violation alleged only that FCA's undisclosed software "may" constitute "defeat devices," subject to further investigation. (Docket No. 93, Ex. 4 at 6; *id.*, Ex. 5 at 2*)*.

[did] not, provide specific instances in which [the d]efendants received information that was contrary to their public declarations"); *Steinberg v. Ericsson LM Telephone Co.*, No. 07-CV-9615 (RPP), 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (dismissing claims where the complaint stated only "generically" that adverse information "was contained in various 'internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports' and 'internal non-public reports' provided to [d]efendants"); *cf. Pirnik*, 2016 WL 5818590, at *2, *7 (denying Defendants' motion to dismiss Plaintiffs' safety-regulation-related allegations in part based on letters from the National Highway Traffic Safety Administration ("NHTSA") expressing concerns with respect to certain FCA recalls, as Defendants assured investors regarding FCA's safety-related compliance and accountability despite "knowledge of the company's noncompliance with respect to at least some recalls").

Plaintiffs point to multiple purported misrepresentations — made in FCA's securities filings and during earnings calls with shareholders — dating from the beginning of the class period in October 2014 through April 2016. (*See, e.g.*, Third Am. Compl. ¶¶ 242-44, 279-82, 302-317, 387-88). But, even on a generous read, the earliest allegation that FCA might have known that it was not in compliance with the emissions regulations at issue is a May 23, 2016 report (the "Report") published by Germany's Transportation Ministry following its investigation of Volkswagen for that company's widespread use of defeat devices (*see id.* ¶¶ 27-28) and excerpts from several news articles examining the implications of that report. (*Id.* ¶ 313). According to Plaintiffs, the Report concluded there was "sufficient evidence of an impermissible defeat device." (*Id.* ¶ 27). In fact, however, that conclusion applied only to Volkswagen; with respect to other car manufacturers, including FCA, the report expressed some

"doubts regarding" the devices used to control emissions, but stated that "further investigation[]" was required. German Federal Ministry of Transport and Digital Infrastructure, *Report by the "Volkswagen" Commission of Inquiry* (May 23, 2016), http://www.bmvi.de/SharedDocs /EN/publications/bericht-untersuchungskommission-volkswagen.html?nn=188294.[2] Specific to FCA, the Report found that the four vehicle models studied all "complied" with emissions regulations during cold tests, but exhibited variations under warmer temperatures — findings that FCA "substantiated" as "necessary to protect the engine from damage," which could make such variances permissible. *See, e.g.*, *id.* at 78 (Fiat Ducato 3.0); *id.* at 90 (Jeep Cherokee 2.0). The Complaint also points to "some evidence" in the Report that "some" FCA models would switch off emissions controls after twenty-two minutes (i.e, only two minutes after the end of the standard EPA twenty-minute emissions test), but the Report ultimately concluded: "As matters stand at present, the field investigations do not indicate any further defeat devices [beyond Volkswagen] that are based on a test cycle recognition." *Id.* at 18.[3]

Thus, the Report is far from conclusive and provides little or no support for Plaintiffs' claim that Marchionne and other FCA officials "must have known" that FCA cars had illegal

---

[2] Because Plaintiffs rely heavily on the Report, the Court is free to consider it in its entirety. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (stating that, when considering a motion to dismiss, a district court may "consider" a document "where the complaint relies heavily upon its terms and effect" as that "renders the document integral to the complaint" (internal quotation marks omitted)); *Lombardi v. Whitman*, 485 F.3d 73, 75-76 (2d Cir. 2007) (considering the entire contents of a publicly available EPA report that was "invoke[d]" in the complaint to evaluate whether statements were misleading).

[3] The Report does state that "[a]ll manufacturers use defeat devices per the definition set forth in Article 3 of the Regulation (EC) No. 715/2007," but the European definition of "defeat device" (some of which are lawful and some of which are not) appears to be different than the definition of that term in the United States. *Id.* at 119. Additionally, the Report specifically notes that "[t]he allegation of the use of illegal defeat devices in some 3.0-litre engine models, brought forward in the US, *has not been confirmed in this form.*" *Id.* (emphasis added).

7

defeat devices. *See, e.g.*, *Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014) (holding that the plaintiffs "had not sufficiently pleaded scienter based on allegations that [the defendant] 'must have known' that its statements to investors were false"); *Wyche v. Advanced Drainage Sys., Inc.*, 15-CV-5955 (KPF), 2017 WL 971805, at * (S.D.N.Y. Mar. 10, 2017) ("[T]o the extent that [p]laintiff is alleging [d]efendants had access to facts indicating that their representation of the Company's finances was false, his allegation fails. Plaintiff has not identified contemporaneous facts, reports, or statements to which [d]efendants had access and which contained information contrary to the information [d]efendants conveyed to the public."). What is more, the Report did not discuss Jeep Grand Cherokees and Dodge Ram 1500 trucks with 3.0 liter diesel engines — the two kinds of vehicles that were the subjects of the Notices of Violation from the EPA and CARB. And even if the Report were sufficient to establish that FCA, as of May 2016, knew or should have known that some of its vehicles were using defeat devices, the only allegation in the Complaint regarding statements made by FCA after that date is the remarkably vague allegation that, during a July 27, 2016 earnings call, "Marchionne discussed in depth his opinions concerning the emissions regulations in Europe." (Third Am. Compl. ¶ 390). Such conclusory allegations are insufficient to meet Rule 9(b)'s particularity standard.

Plaintiffs' confidential witness allegations do not get them across the goal line either. Confidential Witness 1 merely observed that emissions tests "are super important" to ensure proper certification by the EPA, while Confidential Witness 2 noted that there is "a difficult balancing act" between "emissions, fuel economy and engine performance" and cited pressuring from FCA officials to continually improve performance. (Third Am. Compl. ¶¶ 358, 364). Confidential Witness 2 also stated that he or she was "not surprised" that FCA was being investigated for potential defeat devices because "all auto manufacturers have to cheat." (*Id.*

8

¶ 370). But "confidential source allegations must show that individual defendants *actually possessed* the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) (emphasis added); *see also Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) ("Notably, these [confidential witness] allegations do not establish what specific contradictory information the Individual Defendants received or when they received it . . . . Indeed, if 'detailed' reports were circulated regularly among AMEX's senior management, CW12 should be able to identify the names and contents of these documents, or recount specific meetings at which the Individual Defendants actually received contradictory information. Here again, bland assertions that they 'would have received' such information offer nothing concrete and are not allegations of fact."). Neither of Plaintiffs' confidential witnesses alleges that Marchionne reviewed tests or reports that actually revealed the vehicles at issue were using impermissible defeat devices.

Ultimately, aside from the January 2017 Notices of Violations (which, again, are not necessarily as damning as Plaintiffs suggest, as the EPA found only that "one or more" of the undisclosed devices "*may* be defeat devices" and that "further investigation" was necessary (Docket No. 93 ("Levy Decl."), Ex. 4, at 6 (emphasis added))), there are no allegations in the Complaint inconsistent with the alternative inference proffered by FCA: that the company, in good faith, believed these 104,000 vehicles (which constituted less than one percent of its global sales) were in compliance with the law. FCA's disclosure of software other than the devices for which the company is now being prosecuted (*see* Docket 106 (taking judicial notice of the May 23, 2017 prosecution initiated by the Department of Justice against FCA for the alleged use of

9

defeat devices)) provides some common sense support for Plaintiffs' argument. But it is no less (and arguably more) plausible to think that FCA believed itself to be in compliance — as it consistently represented — given the myriad of harsh consequences, financial and otherwise, the company knew it would suffer if the devices were found to be illegal. *See Tellabs*, 551 U.S. at 324 (defining a "strong" inference of scienter as "at least as compelling as any opposing inference one could draw from the facts"). Without any allegations that Marchionne or other FCA officials received contradictory information or knew that the devices were not in compliance prior to statements made during the class period, Plaintiffs' allegations must be dismissed. *Cf., e.g. Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. 16-CV-2942 (SJO), 2017 WL 2378369, *16 (C.D. Cal. May 31, 2017) ("[T]he Complaint alleges not only that these defendants were in a position to receive information about BlueTEC's inability to produce consistent 'clean diesel' emissions, but also that they in fact *did* receive such information, and thus made knowing material misrepresentations to investors."); *In re Volkswagen 'Clean Diesel' Mktg. Sales Practices & Prods. Liab.*, 2017 WL 66281, at *12 (N.D. Cal. Jan. 4, 2017) (finding that a complaint adequately pleaded scienter where it alleged, *inter alia*, that the CEO "received multiple memoranda . . . regarding the Company's unlawful use of defeat-device software"; an "internal whistleblower warned [executives] that the Company was illegally manipulating reported emissions data"; and the software manufacturer "warned [Volkswagen's] top executives . . . that the Company's intended use for its emissions-regulating software was illegal"). Accordingly, Defendants' motion to dismiss must be and is GRANTED.

That said, the Court concludes — with some misgivings — that Plaintiffs should be given a chance to amend their emissions-related claims. It is true that Plaintiffs have amended their complaint three times already. (Docket Nos. 28, 38 & 69). It is true, also, that giving Plaintiffs

10

another opportunity to amend will cause delay, as the Court had stayed briefing of Plaintiff's motion for class certification pending a determination of whether the emissions-related claims would proceed. (Docket No. 111).[4] But "where [a] complaint is deficient under Rule 9(b), leave to amend is usually afforded." *Official Publ'ns, Inc. v. Kable News Co.*, 884 F.2d 664, 669 (2d Cir. 1989) (internal quotation marks omitted). Additionally, the operative complaint is the first in which Plaintiffs included their emissions-related claims. Thus, Defendants' motion — and this ruling — are the first time that Plaintiffs have been confronted with the deficiencies in those claims. And while Plaintiffs were granted an opportunity to amend in response to Defendants' motion to dismiss the earlier claims — and, even more significantly, warned that they would not be granted another opportunity to do so if they declined — Plaintiffs were given no such opportunity and warning here. (Docket No. 34). Thus, this is not a case in which there has been "repeated failure to cure deficiencies by amendments previously allowed." *In re Eaton Vance Mut. Funds Fee Litig.*, 403 F. Supp. 2d 310, 319 (S.D.N.Y. 2005), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007); *see also Sanchez v. ASA Coll., Inc.*, 14-CV-5006 (JMF), 2015 WL 3540836, at *13-14 (S.D.N.Y. June 5, 2015) (granting leave to amend to address Rule 9(b) deficiencies even where the defendant's motion to dismiss an earlier complaint had raised the issue).

Additionally, the Court is not prepared to say on the current record that amendment would be futile. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d

---

[4] Additionally, Defendants suggest that this Court's decision on whether Plaintiffs' emissions-related claims can go forward may affect whether the case is transferred by the Judicial Panel on Multidistrict Litigation to a multidistrict litigation proceeding in the Northern District of California relating to emissions-related claims about certain of FCA's diesel vehicles. (Docket No. 107). Whether that suggestion is accurate or not, granting Plaintiffs leave to amend will obviously defer resolution of that issue too.

160, 190 (2d Cir. 2015) (holding that a district court may deny leave to amend a complaint on the ground that amendment would be futile).  Perhaps most relevant on that score, on June 20, 2017, Plaintiffs filed a motion asking the Court to take judicial notice of a June 16, 2017 Reuters news report titled "U.S. EPA Suspected Fiat Chrysler of Using 'Defeat Device' in 2015."  (Docket No. 117 ("Pls.' Mot. Judicial Notice"); *see also* Docket No. 118, Ex. A ("Reuters Report")).  The Court plainly cannot take judicial notice of the content of the Reuters Report, let alone rely on judicial notice to deny Defendants' motion to dismiss — substantially for the reasons stated by Defendants in their opposition memorandum of law.  (Docket No. 120).  But in light of the Reuters Report (and unspecified "additional facts that have emerged since the filing of the [Complaint]"), Plaintiffs may be able to allege in an amended complaint additional facts with respect to their emissions-related claims that are sufficient to clear the scienter bar.  (Pls.' Mot. Judicial Notice 3).  In particular, the Reuters Report references a January 2016 email to FCA from Byron Bunker, Director of the EPA's Transportation and Air Quality compliance division, noting that "the EPA had told [FCA] officials at a November 2015 meeting that at least one auxiliary emissions control device on the car maker's vehicles appeared to violate the agency's regulations."  (Reuters Report 2).  According to the Reuters Report, Mike Dahl, head of vehicle safety and regulatory compliance for FCA U.S., responded that the company was "working diligently and understood the EPA's concerns" — even though Bunker's January 2016 email indicated that he was "very concerned about the unacceptably slow pace" of FCA's efforts to explain its high emissions from certain vehicles.  (*Id.*).

Adding these allegations to the Complaint, without more, might not be enough to nudge Plaintiffs' claims across the threshold of validity.  After all, the Reuters Report does not include certain key facts — for instance, which car models the EPA identified as potentially utilizing a

12

defeat device and which FCA officials were at the November 2015 meeting. But if Plaintiffs are able to elaborate on the Reuters Report's findings — with their unspecified "additional facts" or otherwise — those new allegations may be specific enough to show that FCA had "knowledge of facts or access to information contradicting [its] public statements," such that it "knew or, more importantly, should have known that [it was] misrepresenting material facts." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2008). Indeed, if Plaintiffs can allege that the EPA gave notice to high-level FCA officials that the vehicles at issue had unlawful defeat devices (or undisclosed software that the company was required to disclose), their allegations would be much like those that the Court found sufficient with respect to Plaintiffs' allegations regarding compliance with safety-related regulations. *See Pirnik*, 2016 WL 5818590, at *2, *6-7 (finding letters from NHTSA to high-level FCA officials expressing concerns with respect to certain FCA recalls adequately established scienter where the officials continued to assure investors regarding FCA's safety-related compliance and accountability despite "knowledge of the company's noncompliance with respect to at least some recalls"). To the extent Defendants argue that amendment would be futile because the initiation of a formal regulatory investigation — and, by extension, the informal expression of concern by an agency, as is the case here — does not require disclosure under the relevant securities laws (*see* Docket No. 120, at 2-3), the cases it relies on are largely inapposite because Plaintiffs allege securities fraud based on affirmative misrepresentations of compliance, not based on the failure to disclose ongoing government investigations. *See Pirnik*, 2016 WL 5818590, at *7 n.4 (discussing and declining to rely on the same cases for similar reasons). Accordingly, amendment would not necessarily be futile.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss Plaintiffs' emissions-related claims is GRANTED, but Plaintiffs are granted leave to amend those claims; and Plaintiffs' motion for judicial notice is DENIED.

Within **one week** of the date of this Opinion and Order, Plaintiffs shall inform the Court whether they intend to amend their emissions-related claims. Plaintiffs will not be given any further opportunity to amend the Complaint to address the issues raised by the instant motion.

If Plaintiffs choose to amend the Complaint, they must do so within **two weeks** of the date of this Opinion and Order. FCA will have **three weeks** from the filing of any amended complaint to answer or file a new motion to dismiss. In the meantime, the stay with respect to Plaintiffs' class certification motion shall remain in effect. If, however, Plaintiffs decline to amend the Complaint again, then FCA's opposition to the class certification motion shall be due within **two weeks** of Plaintiffs' letter regarding amendment.

The Clerk of Court is directed to terminate Docket Nos. 91, 100, and 116.

SO ORDERED.

Date: August 1, 2017
New York, New York

JESSE M. FURMAN
United States District Judge