**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : | **Civ. Action No: 15-cv-07199-JMF** |
| | : | |
| Plaintiffs, | : | **CLASS ACTION** |
| | : | |
| | : | **FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | : | |
| | : | |
| | : | |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE and ROBERT E. LEE | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendants. | : | |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION .................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................................... 14

III.   PARTIES ................................................................................................................ 14

IV.    SUBSTANTIVE ALLEGATIONS ......................................................................... 18

       A.     Chrysler's Background ................................................................................ 18

       B.     Chrysler's Obligation To Identify Safety-Related Defects And Conduct
              Recalls ........................................................................................................19

       C.     NHTSA Increases Focus on Compliance and      Timeliness of Reporting and
              Notification ................................................................................................ 24

       D.     Chrysler's Vehicle Safety Regulatory Violations ..................................... 25

              1.     Chrysler's Untimely Notices ........................................................... 25

              2.     Chrysler's Failures To Timely and  Properly Recall and Repair Vehicles
                     That Caught Fire From Low-Speed Rear Impacts .................................... 29

              3.     Chrysler's Failure to Timely Recall Vehicles Containing Defective Takata
                     Air Bags ......................................................................................... 35

              4.     Chrysler's Failure to  Remedy "A xel Lock Up" Causing Loss of
                     Control ........................................................................................... 40

              5.     Chrysler's Failure to Remedy Defective Tie Rods That Cause Loss of
                     Control ........................................................................................... 42

              6.     Chrysler's Untimely Recalls ........................................................... 45

              7.     Chrysler's Failure to Notify NHTS    A About  Changes to Notification
                     Schedule .........................................................................................46

              8.     Chrysler's Failure to Submit Recall Communications ............................ 48

              9.     Chrysler's Failure To Provide Other Critical Information ...................... 52

              10.    Chrysler's Failure To Submit Information On Remedy .......................... 56

i

11.     Chrysler's Failure To Report Deaths and Serious Injuries ....................... 58

E.     Chrysler's Failure to Properly Account For Recalls ............................................. 58

1.     Chrysler's Underreporting of Its C osts a nd Lia bilities Rela ted to Vehic le Warranties and Recalls ............................................................................ 58

2.     Relevant Accounting Principles ................................................................. 59

F. Chrysler's       Vehicle Emissions Regulatory Violations............................................ 64

G.     Materially False and Misleading Statements Issued During the Class Period...... 78

H.     The Truth About Chrysler's NHTSA Viol ations Begins to Emerge As Defendants Continue To Make Materially False and Misleading Statements ...................... 103

I.     The Truth About Chrysler's Emissions Violations Begins to Emerge .............. 115

J.     Additional Allegations Demonstrating Falsity and Scienter ............................. 122

Defendants' Had A Strong Motive to    Conceal Chrysler's Mounting and Expected Recall Costs............................................................................. 128

Additional Allegations of Defendants   ' Scienter Concerning Chrysler's Emissions Violations ................................................................................ 130

Chrysler's Creation of  The Eight   Illegal AECD's Along with Dahl, Lee's and Marchionne's Involvem ent W ith T hat Process Supports a Strong Inference of Scienter ...................................................................... 130

The Obvious Illegality of The        Eight AECDs Supports a Strong Inference Of Scienter ................................................................................ 131

Defendants' Failure to   Disclose th e Very Software That Violated Emissions Regulations Supports and Inference of Scienter ............. 132

The VRC Ordering a Secret "Volun tary Recall" through a "Field Fix" of One of The Illegal A ECD In 2015 Demonstrates Defendants' Knew of the Undisclosed AECDs and Their Illegality .............................. 133

The EPA Alerted Defendants in      Mid-2015 That It Had Identified "Defeat Devices" on the Grand Cherokee and Ram 1500............... 138

Marchionne's Adm  ission That Chrysler's Vehicle      s "W  eren't Compliant" When They W ere Launc hed Supports a Strong Inference of Scienter ...................................................................................... 141

Defendants Knew That The Gra nd Cherokee and Ra m 1500 3.0 Liter Diesel Vehicles Were Exceeding NOx Em issions Standards In August 2014 .................................................................................................. 143

Marchionne's Regular Receipt And Approval of Reports Detailing The Status of Em   issions Software    Supports A   Strong Inference of Scienter ........................................................................................... 145

The Involvement of Bos ch In Chrysler's Em issions Scheme Supports A Strong Inference of Scienter ......................................................... 149

Marchionne's Repeated Detailed      Discussio   ns and Assurances Concerning Em  issions Software Create A Strong Inference of Scienter ........................................................................................... 152

V. PLAINTIFF'S        CLASS ACTION ALLEGATIONS ...................................................... 156

    A.     Fraud On The Market Presumption of Reliance ................................................. 158

    B.     Applicability of Presumption of Reliance: Affiliated Ute ................................. 160

        COUNT I ................................................................................. 160

        COUNT II ................................................................................ 163

        PRAYER FOR RELIEF ......................................................... 165

        DEMAND FOR TRIAL BY JURY ........................................ 165

Lead Plaintiffs Gary Koopmann, Timothy Kidd ("Lead Plaintiffs") and Victor Pirnik (together with Lead Plaintiffs, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fiat Chrysler Automobiles N.V. ("Chrysler" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet, including the website of the National Highway Traffic Safety Administration. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of purchasers of Chrysler common stock between October 13, 2014 and May 22, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Chrysler is an automotive group that designs, engineers, manufactures, distributes and sells vehicles and components under brand names including Chrysler, Dodge, Fiat, Jeep, and Ram. The Company sells its products in approximately 150 countries. The Company was founded in October 2014 as the result of a merger that completed the integration of Fiat Group Automobiles ("Fiat") and Chrysler Group LLC.

1

3.      This action involves a series of false      and m isleading statem ents and m aterial omissions concerning Chrysler's com     pliance w ith federally m   andated vehicle safety and emissions regulations, as well as Chrysler's internal controls and reported cost of sales, earnings, and earn ings before in  terest and taxes ("EB    IT"), provis ion for warranty and recalls, and warranty/recall costs resulting from its failure to comply with those regulations.

4.      Despite Chr ysler's rep eated assu rances to inv estors and the  public th at it was substantially in compliance with vehicle safety and emissions regulations and that it "constantly" monitored and adjusted operation to  maintain c ompliance, in reality, Chrysle r (i) b latantly and willfully disregarded its reporting obliga tions to  its federal manufacturing and saf ety regulato r, the National Highway Traffic Safety Adm inistration ("NHTSA"), and, even worse, ignored its obligation to timely inform owners of serious defects to their vehicles and to remedy the defects, leading to life threatening consequences; and (ii)  illegally used undisclosed and hidden software to allow excess diesel em    issions to go undetected and evade em      issions tests.  Contrary to Chrysler's false assurances to the public, regulators repeatedly told Chrysler execu tives that the Company was not in compliance with its regu latory obligations, com plaining that Chrysler was "***consistently***" at the "***rear of the pack***" relative to the Company's industry peers when it came to regulatory com pliance and that Chrysler's delay    in notifying consum ers of safety defects was simply ***"unacceptable . . . exacerbat[ing] the risk to motorists' safety."***

5.      Chrysler's egregious violations of NHTSA  regulations resulted  in a total of $175 million in regulatory fines and a €761 million[1] charge for future recall campaign costs in order to timely and properly remedy the safety defects an d implement recalls associated with the affected vehicles.

---

[1] Across the Class Period, the average EUR/USD exchange rate was approximately 1.14

6.     Additionally, the United States Environmental Protection Agency ("EPA"), the California Air Resources Board ("CARB") as well as agencies in France and Germany have found that Chrysler illegally installed and failed to disclose engine management software in the Company's diesel engines that resulted in illegally high emissions from the vehicles. On May 22, 2017 the Department of Justice ("DOJ") and EPA filed an action against Chrysler for it illegal emissions scheme. The EPA estimates that the cost to Chrysler in fines could be $4.63 billion.

7.     In the years leading up to the Class Period Chrysler had suffered steady and substantial annual increases in the number of cars being recalled for safety defects each year. Indeed in 2013 the number of recalled cars increased over 250% alone, with another 27% increase in units recalled in 2014. Thus, Chrysler knew its liabilities for recalls were growing substantially. Yet it failed to properly account for, or inform investors of, the substantial increase in costs for these recalls.

8.     Chrysler violated accounting principles by failing to review its expected costs of auto recalls at the end of each reporting period and adjust its provision for recall associated expenses to reflect current and readily available information. In particular, Chrysler failed to increase its provision for recall associated expenses in line with the 250% increase in recalled units it experienced in 2013 and the 27% increase on top of that in recalled units in 2014. Chrysler's provisions were also inadequate as a result of the Company's continued failure to timely and properly complete recalls.

9.     Leading up to the Class Period, Chrysler was well aware that NHTSA had significantly intensified its enforcement – increasingly fining automakers for failure to timely issue recalls, timely notify owners of the recalls, and timely remedy the defects. For example, in 2010 NHTSA fined Toyota Motor Corporation the maximum penalty of $16.375 million for its

3

failure to notify NHTSA within five days of learning of a safety defect in certain cars. NHTSA fined Toyota another $32.425 million that same year for failure to initiate recalls in a timely manner. Following the fines, NHTSA's then-current Administrator David Strickland stated, "[a]utomakers are required to report any safety defects to NHTSA swiftly, and we expect them to do so."

10. Just before the Class Period, in May 2014, NHTSA fined General Motors $35 million (the maximum permitted by law) for late reporting of safety defects, which was part of a record-high $126 million in civil penalties assessed by NHTSA in 2014, exceeding the total amount previously collected by the agency during its forty-three year history. NHTSA's May 16, 2014 announcement of the GM Consent Order stated "This reinforces a message this Administration has been sending clearly for the past five years through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers."

11. As David Friedman ("Friedman"), the Administrator for NHTSA stated in his public testimony to the U.S. House of Representatives' Committee on Energy and Commerce, on April 1, 2014, "This Administration has placed an emphasis on timeliness . . . Because of this emphasis, we believe that all manufacturers in the automobile industry are now paying much closer attention to their responsibility to protect their customers and the driving public."

12. Immediately following these events, Chrysler told investors that it understood that vehicle safety and regulatory compliance was of the utmost importance to NHTSA and investors and that senior management was focused on the issue. On August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, that reported directly to defendant CEO Sergio Marchionne ("Marchionne"), claiming "[t]his action will help intensify the Company's continuing commitment to vehicle safety and regulatory compliance."

4

Throughout the Class Period defendants repeatedly assured investors that the Company was in compliance with all vehicle safety regulations and that the Company had a "robust system in place."

13.     Throughout the Class Period, Chrysler and its senior executives named as additional individual defendants also repeatedly asserted to investors that Chrysler's product warranty and recall liabilities (publicly reported at the end of each quarterly financial reporting period as a "critical" financial reporting metric) were accurately stated and that Chrysler's internal controls over financial reporting were effective.

14.     As investors in Chrysler would come to learn in a series of partial corrective disclosures beginning in July 2015, however, Chrysler was blatantly and systemically disregarding its obligations to timely report to NHTSA, notify customers of serious safety defects and recalls, and provide replacement parts, preventing safety defects from being remedied. Chrysler also withheld from NHTSA critical information regarding recalls, including reports of deaths and serious injury caused by Chrysler's defective products.

15.     Nevertheless, Chrysler continued to reassure investors that the Company was in compliance with all vehicle safety regulations even after NHTSA Administrator Friedman wrote two letters directly to Chrysler's CEO Marchionne on November 19 and 25, 2015 about Chrysler's ongoing compliance failures related to recalls. The November 19, letter alerted Marchionne to Chrysler's regulatory failings as to the recall of Jeeps with improperly placed fuel tanks that would burst into flames upon even low impact collisions, stating, "I am concerned about the results of Chrysler's October 2014 recall update reports showing a woeful three percent repair rate out of more than 1.5 million affected vehicles" that it was not the first time NHTSA had warned Marchionne, and that Chrysler's conduct was "unacceptable."

5

16.     In the November 25, 2014 letter, w hich concerned the recall of defective Takata airbags, the larges t recall in histo ry, Friedman stated "Chry sler has con sistently maintained its position at the rear of the pack" and that "Chrysler's delay in notifying consum     ers and taking other actions necessary to address the safety defect identified is unacceptable and exacerbates the risk to motorists' safety."  Towards the end of the Class Period, Marchionne further admitted that he had been aware of and focu    sing on Chrysler's ne ed to im prove its regulatory com pliance since well before the Class Period started.

17.     In each recall addressed by the Novem    ber 19 and 25, 2014 letters, owners of Chrysler v ehicles died as a result of the def    ects while Ch rysler refused to discharge its legal obligations.

18.     Chrysler repeated ly failed to tim   ely no tify owners in several different recalls related to ig nition switch defects which caused a ve hicle to lose power while it is b  eing driven and also prevented the airbag fr om deploying.  Chrysler's failures  are particularly egregious in light of the fact that Chrysler was aware that  these types of defects had caused numerous deaths and General Motors had just been fined by NHT    SA in July 2014 for failure to tim    ely recall vehicles due to the same defects.

19.     Even after NHTSA had cr    iticized the Com  pany's system ic non-compliance, Chrysler falsely informed NHTSA that it had m   ailed owner notif ications of recalls prior to the legal deadline, when in truth the deadline had passed before the notifications were mailed.

20.     Defendants also rep   eatedly ackn owledged that they w    ere well aware that regulators were increasing their focus on e    missions com pliance.  For exam  ple, in Septem ber 2015, The E PA issued a public notice of violation   of the Clean Air Act to Volkswagen, stating that m odel year 2009-2015 VW   and Audi diesel ca  rs included defeat devi  ces - software that

6

permitted th e vehic les to cheat EP A tests and spew illeg ally h igh le vels of the dangerous pollutant nitrogen oxide (or "NOx") into the ai r. On January 4, 2016, the DOJ filed a civil suit against VW seeking $46 billion for Clean Air Act violations, which led to VW spending approximately $35 billion in legal fines, vehicle buybacks and owner compensation.

21. Throughout the Class Period, Defendants re peatedly assured investors that Chrysler was compliant with emissions regulations. And following the VW scandal, Marchionne provided reassurance to investors by telling them point blank that he had investigated Chrysler's compliance on NOx e missions and confirm ed that Chrysler's vehicles did not contain any improper software or defeat device. In truth, C hrysler's d iesel vehicles (Jeep Gran d Cherokee and Ram 1500) contained at leas t 8 pieces of so ftware called auxiliary emission control dev ices ("AECDs") that a lone or in com bination (1) ca uses the vehicles' em issions controls to perform during EPA compliance tests but then shut off during normal operation and use; (2) caused the vehicles to em it illega lly high leve ls of NOx em issions; (3 ) reduced the ef fectiveness of the overall emission control system by disabling key com ponents of th e system; and (4) constituted "defeat devices". While Chrysler disclosed approximately 12 legal AECDs in its application s for certification to the EPA, it intentionally omitted all 8 of the illegal pieces of software.

22. Defendants knew the illegal sof tware wa s in its veh icles. In a ddition to programming and installing the 8 i llegal AECDs, in m id-2015 as regulatory pressure intensified, Defendants' issued a secret "field fix" to remove one of the illegal AECDs. The AECD shut off at highway speed the v ehicles' exh aust gas re circulation ("EGR"), causing NOx e missions to spew into the atm osphere. Defendants concealed th is "field fix" from the public. The sof tware was reprogrammed and a vehicle' s system was autom atically updated w hen the owner brought

the vehicle into th e dealership for a free oil ch ange (or otherwise). The rem aining 7 illegal AECDs remained.

23.     As a confidential witness confirmed, by no later than Summ er 2015, Chrysler's executives were aware that the software in its diesel model vehicles were causing them to exceed the NOx emissions levels that the C ompany had reported to the EPA. "I knew they h ad an issue with the software and were work ing on trying to figure it out" the confidential witness said. "It was a big issue [which] was the number one prio rity all the sudden. … The details were kind of hush hush," said th e witness. "It was a s ecretive m ission if yo u w ill. It wasn't public knowledge."

24.     As Marchionne would later adm it, by no later than September 2015 the EPA had informed him that the EPA had identified the 8 AECDs that it determined were "defeat devices." Between November 25, 2015 and January 13, 2016 Mi chael Dahl (Head of Vehicle Safety and Regulatory Com pliance at FCA Fiat Chrysler Automobiles), who reported directly to Marchionne, communicated with the EPA seve ral times (in person, via em ail and over phone) concerning the 8 AECDs that the E PA had conc luded were defeat devices. On January 7, 2016, the EPA emailed m embers of Dahl's team demanding to have another call with Dahl that sam e day because "I am very concerned about the unacceptably slow pace of th e efforts to understand the high NOx e missions we have observed" in several of Chrysle r's Ecodiesel vehicles, reiterating that "at least one of the AECDs in question appears to me violate EPA's defeat device regulations." Dahl spoke with the E PA on January 8, 2016 and m et in person with the EPA and CARB on January 13, 2016 to discuss these issues. The Ecodiesel is an engine used in the Ra m 1500 and Jeep Grand Cherokee (and only those models) since 2014.

8

25.     Nevertheless, Defendants continued to a    ssure investors that Chrysler was in compliance with emissions regulations and that none of its vehicles had "defeat devices".

26.     As the truth of the Company's regulatory violations were revealed, Chrysler stock price tum bled.  On Sunday, July 26, 2015, in a C       onsent Order with Chrysler (the "Consent Order"), NHTSA announced its imposition o      n  Chrysler of a reco    rd $105 m  illion fine in connection with the  Company's ha ndling of 23  previous recalls affecting more than 11 m illion vehicles.  Chrysler admitted to violating vehicle safety regulations.  NHTSA penalties were tied to violations in an array of areas, including        misleading regulators, failure to report safety information to NHTSA, inadequa te repairs, and f ailure to a lert affected c ar owners in a tim ely manner. NHTSA also forced Chrysler to buy back from customers more than 500,000 vehicles in the larges t such action in U.S. histo  ry. The Co mpany also had to offer owners of more than a million older Jeeps with rear-mounted gas tanks a chance to trade them in or be paid by Chrysler to have the vehicles repaired. The NHTSA stated, in part:

> ***Fiat Chrysler's pattern  of poor performa nce put millions of its customers, and the driving public, at risk.***   This action will pro vide relief to owners of def ective vehicles, will help im prove recall perf ormance throughout the auto industry, and gives Fiat Chrysler the opportunity to embrace a proactive safety culture.

(Emphasis added.)

27.     On this news, the Company's stock fell $0.74, or roughly 4.9%, to close at $14.41 on July 27, 2015.  This price declin  e resulted in  over a $95 0 million decline in the Com pany's market capitalization.

28.     On July 30, 2015, defendant Marchionne admitted that he had been aware of Chrysler's compliance failures well before the Class Period:

> "The unfortunate fact is that we as an industry, and        ***we in particular as a company, have not alw ays been perfect  in complying with these req uirements, and over th e last year and a half, NHTS  A has begun to take a harder look at***

9

*these technical compliance issues, and frankly we started to do the same thing about the same time.*

*Over a year ago, we saw that changes were coming, and we began to look more critically at our own governance and process on safety and recall compliance issues, and we had then identified a number of necessary steps to improve.*"

29.     On October 28, 2015, Chrysler announced results for Q3 2015, informing investors that the Company recorded "a €761 million pre-tax charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA." Chrysler shares fell $0.69, or 4.7%, to close at $14.72—an $890 million decline in market capitalization-- as investors reacted to news of the recall charge. The market immediately made the connection between the charge and the Company's regulatory violations for failure to properly conduct recalls. *Bloomberg* reported: "The manufacturer set aside 761 million euros in the quarter for "estimated future recall campaign costs" in North America, where U.S. regulators <u>ordered</u> it in July to buy back vehicles." (emphasis original).

30.     On December 9, 2015, after the close of trading, the market learned that NHTSA was fining Chrysler an additional $70 million for its failure to report incidents of death and injury as well as consumer complaints and warranty claims dating back to 2003. Chrysler admitted that the violations "are significant and date back to the inception of the early warning reporting requirements in 2003."

31.     On May 23, 2016, it was reported that several tests by the German motor transport authority KBA had found evidence that the exhaust treatment system in some of Chrysler's models would switch itself off after 22 minutes, which is just 2 minutes after the standard 20 minute emissions test normally run by regulators. This was similar to the scheme conducted by Volkswagen where its defeat devices turned themselves of after 23 minutes to cheat the emissions tests. The German tests found a special NOx catalyst which was being switched off

10

after a few cleaning cycles.   This shut down cau sed the dangerous pollutant NOx to be released into the atmosphere a t more than 1 0 times the permitted le vel.  A Germ an newspaper, the Bild am Sonntag reported that Germ any's Federal Mo tor Transportation A uthority determ ined that Chrysler allegedly used illegal  software to m anipulate emissions controls. Germ any's transport ministry also stated that Chrysler refused to cooperate with the investigation after Chrysler was a no show for a meeting scheduled with the German authorities to discuss the violation.

32.     As a result of this news, Chrysler's stock price dropped $0.36, or roughly 5.1%, to close at $6.68 on May 23, 2016.

33.     On January 12, 2017, the EPA and CARB each     issued a notice of violation to Chrysler and FCA US LLC for in  stalling and failing to disclose  engine m anagement software that resulted in increased emissions from the ve hicles.  The m anipulating software was installed in light-duty m odel year 2014, 2015 and 2016     Jeep Grand Cherokees and Dodge Ram    1500 trucks with 3.0 liter diesel engines sold in the United States. As part of the investigation, the EPA found "at least   *eight*  undisclosed pieces  of software tha  t can alter h  ow a vehicle em  its air pollution." "Failing to disclose softw are that affects emissions in a vehicle's engine is a serious violation of the law, which can resu  lt in harm ful pollution in the air we breathe" said Cynthia Giles, assistant administrator for the EPA. " ***This is a  clear a nd serious viola tion of the Clean Air Act***." CARB Chair Mary D. Nichols s tated "***[Chrysler] made the  business decision to skir t the rules and got caught***."  The EPA's disclosure of the noti ce stated "FCA did not disclose the existence of certain auxiliary emission control devices to EP A in its app lications for certificates of conformity for model year 2014, 2015 and 2016 Jeep Grand Cherokees and Dodge Ra m 1500 trucks, ***despite being aware that such     a disclosure was mandatory   ***." The illegal software

allowed 104,000 of Chrysler's diesel-powered vehicles to spew emissions beyond legal limits, which the EPA estimated could cost Chrysler $4.63 billion in fines.

34.     On this news, the Company's stock fell $1.35, or roughly 12%, to close at $9.95 on January 12, 2017.

35.     On February 6, 2017, after the close of trading, French authorities announced they were referring Chrysler for prosecution following an investigation of the levels of emissions of NOx pollutants produced by its diesel vehicles. France's Ministry for the Economy and Finance said the French anti-fraud and consumer affairs agency DGCCRF had wrapped up its probe into Chrysler's cover-up of the emissions produced by some of its diesel vehicles and had sent its conclusions to the department of justice. The anti-fraud agency's investigation examined test results by a third-party laboratory and public sector researchers, as well as internal documents provided by Chrysler. The investigation showed emissions that were several times higher than regulatory limits. For example, Chrysler's Jeep Cherokee emitted eight times the NOx limit and its Fiat 500x emitted almost 17 times the limit in road testing.

36.     On this news, Chrysler's stock price declined $0.50, or roughly 4.6%, to close at $10.27 on February 7, 2017.

37.     On February 7, 2017, after the close of trading, it was disclosed that a report by Italy's transport ministry presented to a European parliamentary committee in October but never officially published revealed that Chrysler's vehicles were allowed to skip key tests for illegal engine software during Italy's main emissions-cheating investigation that occurred in the wake of the Volkswagen "Dieselgate" scandal. While the findings included complete sets of data for eight diesel cars made by Chrysler's competitors (BMW, Ford, Mercedes, Volkswagen and GM),

12

for the Chrysler m odels investigated (including  the Jeep Cherokee) results were m issing for the three tests used to unmask defeat devices by preventing them from detecting the test.

38.     On May 23, 2017, the DOJ announced the fi    ling of a complaint in the Eastern District of Michigan asserting that Defendant Chrysler, FCA US  LLC and other entities violated federal law because of its undisclosed defeat  devices on its Jeep Grand Cherokee an d Ram 1500 diesel vehicles.

39.     On May 23, 2017, as a result of the DOJ laws uit, Chrysler's stock price declined from $10.89 at 9:30 a.m. to $10.32 at 4:00 p.m., a decline of 5.2%, on unusually high volum e of 26,270,000 shares.

40.     Marchionne admitted that Chrysler's previous representations of compliance were false during a July 27, 2017 Q2 2017 earnings ca  ll.  Responding to a question about voluntary updates to Chrysler's software in its diesel vehi cles, Marchionne stated "We are looking at this, if we can do it, and provide an im  provement in air quality, both on CO 2 and NOx, purely as a result of calibration, and we'll do this*. **The important thing is that, within the scheme of things that existed at the time in which we launched these vehicles, we weren't compliant**..*"

41.     The foregoing m isconduct contravened the fede ral securities laws. In particular, during the Class Period, defendants  falsely represented that C hrysler was in compliance with all vehicle safety and em issions regu lations, that it had properly disc  losed its war ranty and reca ll liabilities; that Chrysle r's internal c ontrols for r eporting suc h a "critica l" financial m etric each quarter were effective, and that Chrysler p  rioritized customer safety and  emissions compliance. As investors began to learn in July 2015, when     the true facts began to e  merge, none of these repeated assertions were true.

13

42.     As a result of De fendants' wrongful acts and om issions, and the decline in the market value of the Company's securities following the partially corrective disclosures, Plaintiffs and other Class members suffered significant damages.

## II.        JURISDICTION AND VENUE

43.     The claims asserted herein arise un der Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule     10b-5 prom ulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

44.     This Court has jurisdiction over the subjec t matter of th is a ction pu rsuant to 2 8 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

45.     Venue is proper in this Judicial Distri    ct pursuant to 28     U.S.C. §1391(b) and Section 27 of the Exchange Act     (15 U.S.C. §78aa(c)). Substantia l ac ts in f urtherance of the alleged fraud or the effects of the fraud have occu rred in this Judicial Di strict. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantia l part in this Judicial Distri ct.  Additionally, the Com pany's common stock trades on the New York Stock Exchange, located within this District.

46.     In connection with the acts, transacti ons, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.       PARTIES

47.     Plaintiffs, as set forth in     the previously-filed certi    fications (ECF Nos. 1,16), incorporated by reference herein, purchased Chry sler common stock at artificially inflated prices

during the Class Period, and suffered dam ages as a re sult of the federal s ecurities law violations and false and/or misleading statements and/or material omissions alleged herein.

48.     Defendant Chrysler is an automotive group that designs, engineers, manufactures, distributes and sells vehicles and components.  It    offers passenger cars,  light trucks, and light commercial vehicles under brand nam   es includi ng Chrysler, Dodge, Fiat, Jeep, and Ram    . Chrysler provides retail and deal er financing, leasing, and rental  services, as well as engages in media and publishing business.  The Com pany sells its products directly,  or through distributors and dealers, in approximately 150 countries.  The Company was founded in October 2014 as the result of a m erger that completed the integrat ion of Fiat and Chrysler Group LLC.  On October 12, 2014, the m erger was finalized, and on Oct   ober 13, 2014, the newly m   erged company's common stock started trading on the NYSE under th   e ticker sym bol "FCAU."  Chrysler is a Netherlands corpora tion with its pr  incipal exec utive offices located at 25 St. James's Street, London SW1A 1HA, United Kingdom.

49.     Defendant FCA US L  LC ("FCA US") is th  e Am erican subsidiary of Chrysler. FCA US is headquartered in Auburn Hills, Mich   igan and s old vehicles  worldwide during the Class Period under its flagship Chrysler brand, as well as Dodge, Jeep and Ram Trucks.

50.     Defendant Marchionne has served at all re levant times as Chief Executive Officer and Executive Director of Chrysler as well as  FCA US.  Marchionne was also a m ember and the leader of Chrysler's Group Ex ecutive Council, which is responsib le for managing the operations of Chrysler.  Marchionne took the helm  at Chry sler in 2008 when the au tomaker was in serious financial trouble.  Marchionne is also an accountant and a lawyer.

51.     Defendant Richard K. Palmer ("Palmer") has s erved at all relevant tim es as Chief Financial O fficer of Chrysler.  Palm  er has also  served as Chief Financ ial Offi cer of FCA U  S

since June 2009, where he is responsible for a ll FCA US finance activit ies including corporate controlling, treasury and tax. Palm er was also a m ember and the leader of Chrysler's Group Executive Council, which is responsible for managing the operations of Chrysler.

52.     Defendant Scott Kunselm an ("Kunselman") served as Chrysler's head of Vehicle Safety and Regulatory Compliance from August 12, 2014 until October 27, 2015, which oversaw Chrysler's vehicle safety and emissions compliance, reporting directly to Defendant Marchionne. As part of his position, Kunselm an sat on Chry sler's Vehicle Regulatio ns Committee ("VCR"), which operated above Chrysler's defect inves      tigations departm ent a nd m ade all decisions pertaining to when a defect exis ts and when fi led actions and recalls are neces sary. In these positions, Kunselm an was regu larly informed as to the  status of investigations, rec alls, serv ice bulletins and field actions (or "field fixes"). Kunselman was also responsible, along with Lee (identified b elow) for in forming the Board of  Directors ab out dies el emissions and regulatory issues. Prior to his appointm    ent to head of    Vehicle Safety and    Regulatory Compliance, Kunselman was in charge of NAFTA Purchasing    and Supplier Quality. Prior to that, he wa   s Senior Vice President-Engineering, a position that included oversight of regulatory compliance.

53.     Defendant Michael Dahl ("Dahl") re   placed Kunselm an in Novem ber 2015 as Vehicle Safety & Regulatory Compliance, ta      king on all responsibili   ties that Kunslem  an previously had (e.g. C  hairman of the VRD),    and reporting directly  to Marchionne. Upon replacing Kunselman, Dahl was responsible along  with Lee ( identified below) for informing the Board of Directors about diesel  emissions and regulatory issues. Prior to Nove mber 2015, Dahl was Director of Chrysler's gasoline/diesel engi ne programs and global powertrain coordination, managing all of Chrysler's diesel engine pr         ograms in North Am    erica. Dahl supervised development of the 3.0-liter EcoDiesel V-6 in  the Jeep Grand Cherokee  and Ram 1500. During

16

the Class Period, Dahl was also   the point person (along with  Lee) for the EPA and CARB on

certification of Chrysler's 3.0 diesel engines us ed in the Jeep Grand   Cherokee and Ra m 1500.

Other m embers of Chrysler involved in certifi  cation m eetings with the EPA and CARB were

Mark Chernoby, Steve Mazure, Mark Shost, Emanuele Palma and Kyle Jones.

54.     Defendant Robert E. Lee ("Lee") at all    relevant tim es was Head of Powertra  in

Coordination and a m  ember of  the Group Executive Council ("GE    C"), which is a decision-

making body led by Marchionne, consisting of           executive m    anagement that supported

Marchionne from an operational perspective.  L ee was also Vice Presid ent and Head of Engine

and Electrified Propulsion Engin eering, FCA US, with responsibil ity for directing the design,

development and release of all engines and elect rified propulsion systems for FCA US products.

Lee reported directly to  Marchionne.  He was responsible,   along with Dahl and Kunselm an for

reporting the board of directors on   issues pertaining to diesel em  issions and regu latory issues.

During the Class Period, Lee was also the point person (along with Dahl) for the EPA and CARB

on certification of Chrysler's 3.0 diesel engines used in the Jeep Grand Cherokee and Ram 1500.

55.     Defendant Steve Mazure ("Mazure")     at all tim  es was Senior Manager,

Environmental Cer tification - Veh icle Safety & Regulatory Com pliance for FCA US.  Mazure

submitted to the EPA and CARB, and was res          ponsible for the accuracy of Chrysler's

applications for certific ation (along with E llis D. Jeffers on and Beth Borland) for each 2014,

2015 and 2016 Jeep Grand Cherokee and Ram 1500 3.0       diesel vehicles.  Mazure  reporte    d

directly to Dahl.

56.     The defendants referenced above in ¶¶  50-55 are som etimes collectively referred

to herein as the "Individual Defendants."

17

## IV.        SUBSTANTIVE ALLEGATIONS

### A.        Chrysler's Background

57.        Defendant Chrysler is an automotive group that designs, engineers, manufactures, distributes and sells vehicles and components.  It   offers passenger cars,   light trucks, and light commercial vehicles under brand nam   es includi ng Chrysler, Dodge, Fiat, Jeep, and Ram   . Chrysler provides retail and deal er financing, leasing, and rental  services, as well as engages in media and publishing business.  The Com pany sells its products directly,  or through distributors and dealers, in approximately 150 countries.  The Company was founded in October 2014 as the result of a m erger that completed the integration of Fiat and Chrysler Group LLC.  On October 12, 2014, the m erger was finalized, and on Oct   ober 13, 2014, the newly m   erged company's common stock started trading on    the NYSE under th  e ticker sym bol "FCAU."  Chrysle  r is headquartered in London, U.K.

58.        FCA US is headquartered in Auburn H    ills, Michigan and owned by Chrysler, FCA US is one of the "Big Three" Am         erican  automobile m anufacturers. It sells vehicles worldwide under its flagship Chrysler brand, as  well as the Dodge, Jeep, and Ram Trucks.  FCA US is the company that had previously been  known as Chrysler Corporation, which was founded in 1925.  The company changed its name over the years from DaimlerChrysler AG (1998-2007), Chrysler LLC (2007-2009), Chrysler Group LLC (2009-2014) and FCA US (2014-present).

59.        Specifically, Chrysler Group LLC filed for  Chapter 11 bankruptcy reorganization on April 30,  2009.  On June 10, 20  09, the company emerged from the bankruptcy  proceedings with the U   nited Auto W   orkers pension fund,      Fiat S.p.A., and the U.S. and Canadian governments as principal owners. Over the next     few years Fiat gradua   lly acquired the other parties' shares. On January 1, 2014,  Fiat S.p.A announced a deal to  purchase the rest of Chrysler

18

Group LLC from the United Auto W orkers retiree health trust. The deal was com pleted on January 21, 2014, m aking Chrysler Group LLC a subs idiary of Fiat S.p.A. In May 2014, Fiat Chrysler Automobiles, NV was established by m erging Fiat S.p.A. into the com pany. This wa s completed in August 2014. Chrysler Group LLC remained a subsidiary until December 15, 2014, when it was renamed FCA US, to reflect the Fiat-Chrysler merger.

60.     Although technically listed as a subsidia ry of Chrysler, FCA US m akes up over 90% of Chrysler's operations.  For example, in 2012, 2013 and 2014 Chrysler's net revenue was €83.765 billion, €86.624 billion, an d €96.090 billion, resp ectively.  FCA US's net revenue for 2012, 2013 and 2014 was $65.784 billion, $72.144 billion, and $83.057 billion, respectively.

**B.     Chrysler's Obliga tion To Identify  Safety -Related Defects  And Conduct Recalls**

61.     NHTSA is a federal ag ency charg ed with ensuring that m anufacturers of motor vehicles comply with the safety s tandards contained in th e National Traffic and Motor Veh icle Safety Act of 1966, codified at 49    U.S. Code Chapter 31 (the    "Safety Act"). The Safety Act includes th e Transpor tation Rec all Enhance ment, Accountability  a nd Docum entation Act ("TREAD"), which was passed by Congress in 2000.[2]

62.     The Saf ety Act requ ires a m otor v ehicle m anufacturer to  notify NHTSA, and vehicle owners, purchasers and dealers if it "(1) learns [one of] the [manufacturer's] vehicle[s] or equipment contains a defect and decides in good fa ith that the defect is related to m otor vehicle

---

[2] As p art of its activ ities, NHTSA is ch arged with  writing and  en forcing Fed eral Mo tor  Vehicle Safet y Standards as  well as regu lations for  motor vehicle theft resistance and fuel ec onomy, the latter  under the rubric of the Corporate Ave rage Fuel Econom y (CAFE) system. NHTSA also licenses  vehicle manufacturers and i mporters, allows o r bl ocks t he i mport of  vehicles an d safet y-regulated ve hicle part s, adm inisters t he vehi cle i dentification number ( VIN) sy stem, develo ps the anthropomorphic dummies used in safety testin g, as well as th e test p rotocols themselves, and provi des ve hicle insurance cost information. T he agency has  also asser ted preemptive re gulatory authority over greenhouse gas emissions. Another of NHTSA's major activities is th e creation and maintenance of the data files maintained by the National Center for Statistics and Analysis.

safety; or (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard ….”[3]

63.     The Safety Act further defines “motor vehicle safety” as:

the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against ***unreasonable risk of accidents*** occurring because of the design, construction, or performance of a motor vehicle, and against ***unreasonable risk of death or injury in an accident***, and includes nonoperational safety of a motor vehicle.[4]

64.     If the manufacturer identifies a “defect related to motor vehicle safety,” the Safety Act requires manufacturers to implement a remedy, which typically occurs through a recall.[5] Manufacturers are also required, under NHTSA’s implementing regulations, to “furnish a report to the NHTSA for each defect in [the manufacturer’s] vehicles or in [the manufacturer’s] items of original or replacement equipment that [the manufacturer] or the Administrator determines to be related to motor vehicle safety.”[6] This is commonly referred to as a “573 Report.” NHTSA further requires all such reports to be submitted “not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related.”[7] It is critical that vehicle manufacturers commence recalls expeditiously after identifying safety-related defects in their vehicles. The 573 Report is the beginning of the entire recall process. Failing to timely initiate a recall within five working days puts the safety of vehicle owners at risk. This requirement exists so that the public is expeditiously notified of safety risks and that vehicle defects are remedied within a reasonable time. In addition, each manufacturer is required to amend information

---

[3] 49 U.S.C. §30118(c).

[4] 49 U.S.C. §30102(a)(8).

[5] 49 U.S.C. §30118(c); see also 49 U.S.C. § 30119(d) (notification procedures); 49 U.S.C. § 30120(a) ( remedy specifications).

[6] 49 C.F.R. §573.6(a).

[7] 49 C.F.R. §573.5(b).

submitted in a 573 Rep ort <u>within 5 working days</u> after it h as new info rmation that updates or corrects information that was previously reported.[8]

65.     In each 573 Report, the manufacturer is required to include:

- Identification of the vehicles or item s of motor vehicle equipment potentia lly containing the defect or noncompliance.

- The tota l n umber of vehicl es or item s of equipm ent pote ntially con taining the defect or noncompliance.

- In the case of a defect, a chronology of all principal events that were the basis for the de termination tha t the def ect r elated to motor veh icle saf ety, inc luding a summary of all warranty claim s, fi eld or service reports, and other inform ation, with their dates of receipt.

- A description of the m anufacturer's program for rem edying the defect or noncompliance.

- The estimated date(s) on which it will be gin sending notifications to o wners, and to dealers and distributors, that there is a safety-related defect or noncom pliance and that a rem edy without charge will be available to owners, and the estim ated date(s) on which it will com plete such notif ications (if dif ferent from the beginning date). If a manufacturer subse quently becom es aware that eithe r th e beginning or the completion dates reported to NHTSA for any of the notifications will be de layed by m ore than two weeks, it must promptly advise the agency of the delay and the reasons therefore, and furnish a revised estimate.

- A representative copy of all notices, bu lletins, and other communications that relate directly to the defect or noncom pliance and are sent to m ore than one manufacturer, distributor, dealer or purchaser. These copies must be sub mitted to NHTSA's Recall Managem ent Di vision <u>not later than 5 days</u> af ter they are initially sent to manufacturers, distributors, dealers, or purchasers.[9]

66.     When a m anufacturer files a 573 Report, the m anufacturer m ust also provide notification to owners of the recall. The m anufacturer is required to subm it a copy of its proposed owner recall notice to NHTSA n<u>o fewer than five business days before it intends to</u>

---

[8] *Id.*

[9] 49 C.F.R. §573.5(c).

21

begin mailing it to owners.[10]   The recall notices to vehicle owners must be furnished no later than 60 days from the date the manufacturer files its 573 Report.[11] In the event that the remedy for the defect or noncompliance is not available at the time of notification, the manufacturer is required to issue a second notification within a reasonable time and in accordance with the above requirements once the remedy is available.[12]

67.     Thus, even if a manufacturer does not have parts available to repair a vehicle defect within 60 days, that is not an excuse for delaying owner notices. In such a case, the manufacturer must send what is known as an "interim notice" to owners, informing them of the defect and the associated risk to motor vehicle safety. The reason for this is that owners are entitled to understand the risk of continuing to drive their vehicles, and to be advised of steps they can take to mitigate the risk before having their vehicles repaired. In other words, vehicle owners are entitled to make informed decisions about their safety. Where a manufacturer sends an interim notice, it must also send a follow-up owner notice once repair parts are available. That follow-up notice tells vehicle owners when they can schedule a repair with their local dealership. Regardless of whether a manufacturer is prepared to immediately fix vehicles, NHTSA has made clear that 60 days is the absolute deadline to inform a vehicle owner about a recall.

68.     Upon receipt of every 573 Report, NHTSA enters it into its Artemis database as investigators in NHTSA's Office of Defect Investigations screen it for completeness, proper scope, timeliness, and effectiveness of the proposed remedy. NHTSA sends an acknowledgement letter and recall summary to the manufacturer, identifying any deficiencies and requesting the manufacturer to supply any missing information.

---

[10] 49 C.F.R. § 577.5(a)

[11] 49 C.F.R. § 577.7(a)(1)

[12] 49 C.F.R. § 577.7(a)(1)

22

69.     NHTSA carefully reviews recall submissions to ensure that recalls are timely. For recalls involving a safety defect, a manufacturer is required to submit a chronology of all principal events that were the basis for the manufacturer's determination that the defect related to motor vehicle safety. NHTSA uses these chronologies to help determine whether recalls are timely.

70.     NHTSA has stated that accurate and timely notices to owners are "critical to ensuring the success of a recall." If vehicle owners do not know about defects in their vehicles they are unknowingly putting themselves at risk of harm every time they drive. Since the inception of the Safety Act in 1966, vehicle manufacturers have been required to notify vehicle owners about safety-related defects in their vehicles. The basic right to know about unreasonable risks to safety existed even before Congress required manufacturers to actually fix those defects. In other words, as NHTSA stated during its July 2, 2015 hearing concerning Chrysler's repeated violations of these regulations, "this notification requirement is not new and Fiat Chrysler should be well aware of its responsibility."

71.     NHTSA has made it clear to vehicle manufacturers that when a vehicle manufacturer does not send owner notices in a timely manner, safety is compromised.

72.     The Safety Act includes the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD"), which was passed by Congress in 2000. The TREAD Act imposes additional reporting obligations on auto manufacturers, including Chrysler. Specifically, the TREAD Act mandates that manufacturers submit quarterly reports to NHTSA called "Early Warning Reports" (or "EWRs").[13] EWRs must include warranty reports; consumer complaints; property damage claims; and field reports broken down by make, model, and model year and

---

[13] 49 C.F.R. §573.7.

problem category.[14] Manufacturers are also requ ired to sub mit to NHTSA summaries of each death or injury claim against the m anufacturer that con cerns a safety-related defect.[15] Moreover, NHTSA's early warning data tracks the num ber of cases where warranty serv ices are prov ided on a vehicle, and the part of the vehicle that is associated with the warranty service. However, as NHTSA explained in the Decem ber 8, 2015 Consen t Jud gment (the "Consent Ju dgment") in which NHTSA fined Chrysler $70 million, Chrysler systemically under-reported vehicle crashes, deaths and injuries tied to it s cars and trucks going back to 2003 and continuing through the Class Period, which NHTSA's Administrator explained "represents a significant failure to meet a manufacturer's safety responsibilities."

73.    At NHTSA, the ODI is charged with administering TREAD Act requirements and investigating defects brought to NHTSA's attention by either m anufacturers or custom ers and other members of the public.[16]

### C.    NHTSA Increases Focus on Compliance and Timeliness of Reporting and Notification

74.    Leading up to the Class Period, NHTSA m ade it cl ear to Chrysler and the automotive industry that it had sign ificantly inte nsified its enforcem ent of accurate and tim ely reporting and customer notification of safety defects and recalls.

75.    For exam ple, in April 2010 NHTSA fined Toyota Motor Corporation the maximum penalty of $16.375 million for its failure to notify NHTSA within five days of learning of a safety defect in cert ain cars. NHTSA fined Toyota a nother $32.425 m illion in Decem ber 2010 for fai lure to initiate recalls in a tim ely m anner. Following the fines, NHTSA's then-

---

[14] 49 U.S.C. §30166(m)(3)(A)(i); 49 C.F.R. §573.6(c)(2)-(8).

[15] 49 U.S.C. §30166(m)(3)(A)(i).

[16] See description of ODI, https://www-odi.nhtsa.dot.gov/ivoq/

current Administrator David Strickland stated, "[a]utomakers are required to report any safety defects to NHTSA swiftly, and we expect them to do so."

76.     Just before the Class Period, in May 2014, NHTSA fined General Motors $35 million for late reporting of safety defects, which was part of a record high $126 million in civil penalties assessed in 2014, which exceeded the total amount collected by the agency during its forty-three year history.  NHTSA's May 16, 2014 announcement of the GM Consent Judgment stated "This reinforces a message this Administration has been sending clearly for the past five years through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers."

77.     As NHTSA Administrator Friedman stated in his public testimony to the U.S. House of Representatives' Committee on Energy and Commerce, on April 1, 2014:

> This Administration has placed an emphasis on timeliness in order to safeguard the integrity of the process and encourage automakers to aggressively pursue potential safety defects. Since 2009, automakers have paid record fines totaling more than $85 million for lack of timeliness in reporting vehicle safety defect issues to NHTSA. Because of this emphasis, we believe that all manufacturers in the automobile industry are now paying much closer attention to their responsibility to protect their customers and the driving public.

**D.     Chrysler's Vehicle Safety Regulatory Violations**

**1.     Chrysler's Untimely Notices**

#

78.     Despite its knowledge of NHTSA's increased focus on timely and accurate reporting, between 2013 and 2015 Chrysler routinely ignored its obligation to timely inform owners of serious safety defects in the cars they were driving, even where Chrysler knew that deaths had occurred as a result of the defects, thereby imperiling its customers' lives, as well as those of other drivers and pedestrians on the road.

79.     Chrysler failed to notify owners within the required 60 days in seven recalls. In two additional recalls associated with defective Takata airbags, Chrysler even misled NHTSA about its owner notifications and failed to send recall notices to vehicle owners for months.

80.     As discussed below, Chrysler repeatedly failed to timely notify owners in several different recalls related to ignition switch defects. These failures are particularly egregious in light of the fact that these same type of defects had caused numerous deaths and General Motors had just been fined by NHTSA in July 2014 for failure to timely recall vehicles due to the same defects.

81.     For example, Recall 14V-373 involved defective ignition switches which caused a vehicle to lose power while being driven. These "moving shutdowns", triggered by a bump in the road or a mere graze of the knee against the defectively loose ignition switches, would cause the Chrysler cars to suddenly shutdown and become unresponsive without any warning. The shutdowns occurred even at highway speed, and power brakes and power steering would no longer function, making the cars dangerously unsafe to control. Significantly, this also meant that the vehicle's airbags could shut off and not work in a crash, compounding the danger to the driver.

82.     Chrysler initiated this recall by filing a 573 Report with NHTSA on June 25, 2014. Chrysler's 573 Report did not provide the required dates for sending owner notifications. Under NHTSA regulations, Chrysler was required to notify owners about the recall no later than August 24, 2014. Violating this obligation, Chrysler waited until September 11, 2014 to complete its owner notification mailing nineteen days after the legal deadline.

83.     At that time, Chrysler sent an interim notice to owners of vehicles having defective ignition switches because it did not then have parts available to repair the vehicles. It

26

was not until May 201 5, <u>over eigh t m onths af ter distribu ting the inte rim notice,</u> th at Chrysle r notified owners that they could come in for the repair.

84.      Chrysler was also late in mailing interim owner notices in Recalls 14V-567, 14V-634, 14V-795, and 15  V-115, which involv ed defectiv e ignition switches; sudd  en alternator failure that could result in s    udden vehicle shutdown and fire;      broken springs in the clutch ignition interlock switch that could cause unint ended movement when th e ignition was cranked; and a defective fuel pump relay   that could cause a vehicle to st  all without warning. In one of these recalls, 14V-795, ***Chrysler was aware of a death potentia lly related to the de fect prior to recalling the vehicles***.[17]

85.      Chrysler in itiated Recall 14V-567, a reca   l for defective ignition switches, by filing a 573 Report with NHTSA, on Septem    ber 16, 2014. The deadline for Chrysler to send owner notices in this recall   was Novem ber 15, 2014. Chrysler ag ain did not provide estim ated dates for sending owner notifications prior to  mailing its interim notices on Nove mber 17, 2014, which was <u>two days past the deadline.</u> As of   July 2, 2015, <u>over seven months after distributing the interim notice,</u> vehicle owner s were still a waiting a f ollow-up letter in  this recall, notifying them that they may have their vehicles repaired.

86.      Recall 14V-634 began with Chrysler's    573 Report on October 7, 201  4. At th e time, Chrysler indicated that it planned to  send owner notices on Nove mber 28, 2014. However, on Decem ber 11, 2014  , Chrysler infor med NHTSA that it had     m ailed in terim notices on December 8, 2014, again t<u>wo days after the 60   -day deadline</u>. It was on ly several months later,

---

[17] Written Statement o f Joshua N eff from t he Ju ly 2 , 2015 Pub lic H earing to  Determine Whether Fiat Ch rysler Reasonably Met Its Obligations To Remedy Recalled Vehicles And To Notify NHTSA, Owners, And Purchasers Of Recalls.

between February 27 and April 30, 2015, that Chrysler mailed notices to owners to inform them that they could have their vehicles repaired.

87.     Chrysler initiated Recall 14V-795 with a December 16, 2014 573 Report. That gave Chrysler until February 14, 2015 to mail owner notices. On March 9, 2015, Chrysler falsely informed NHTSA that it had mailed interim owner notifications prior to the deadline, on February 10, 2015. In truth, Chrysler had mailed the interim notices after the deadline had passed.

88.     Chrysler initiated Recall 15V-115 on February 24, 2015. In its 573 Report, Chrysler falsely informed NHSTA it would send owner notifications on April 24, 2015. However, Chrysler did not complete the notification until four days after the deadline, April 29, 2015.

89.     Chrysler initiated Recall 13V-527, involving a defective left tie rod assembly that could result in loss of steering control (*see infra* at 116-126), on November 6, 2013. At that time, Chrysler falsely represented to NHTSA that it would notify owners of the recall in December 2013 prior to the deadline. However, it was only through a letter dated February 4, 2014 that NHTSA learned that Chrysler had not completed its interim notices mailing until January 16, 2014, eleven days past the deadline. It was not until nearly 16 months later that Chrysler notified owners to bring their vehicles in for repair.

90.     Chrysler initiated Recall 14V-635, involving the potential for fire resulting from overheating of electrical connectors of the diesel fuel heater, on October 7, 2014. Chrysler's 573 Report for this recall listed obviously erroneous dates for its planned owner notification mailing. Chrysler gave a beginning date for this mailing that was later than the end date. Moreover, it was only after the deadline had passed that Chrysler informed NHTSA that it had once again issued

28

the deadline by two days. Chrysler  only notified vehicle owners over  four months later, in late April 2015, that they could bring their vehicles in for repair.

91.    In NHTSA's written statem ent from th e July 2, 2015 hearing leading to the Consent Judgment, NHTSA found that

> Fiat Chrysler has a p attern of failin g to tim ely notify vehic le owners o f recalls within a reasonable time. Fiat Chrysler's delays leave vehicle  owners in the dark about defects in their vehicl  es that Fiat Chrysler itse  lf has determ ined pose an unreasonable risk to safety.
>
> Instead of em bracing the im portance of  expeditiously notifying owners about vehicle defects, Fiat Ch  rysler claim ed in its  re cent respon se to  NHTSA that interim notices have caused owner confusion. Dis      missing the im portance of informing vehicle owners about risks to their safety is counter to the Safety Act.

92.    Demonstrating Chrysler's blatant and willful disregard of it reporting ob ligations, Chrysler also refused to notify vehicle owners    for over six m onths about  its recalls of Takata airbag inflators, and outright lie d to NHTS A as to when Chrysler  sent owner notifications even after Administrator Friedman personally wrote defendant Marchionne to  express his frustration at Chrysler's failure to properly  notify owners of defects. Chrysler  refused to notify owners for over six months after filing the 573  Report of the risk of their air  bag inflator rupturing.  Recall 14V-354 (which became a part of  Recall 14V-817) involved Takata ai rbag inflators and the risk of their inflator rupturing.  At the tim e, Chrysler was one of ten vehicl e manufacturers recalling vehicles for defective Takata airbag inflators.  This is discussed further, *infra* at ¶¶110-129.

### 2.    Chrysler's Failures To Timely and Properly Recall and Repair Vehicles That Caught Fire From Low-Speed Rear Impacts

\#

93.    The requirem ent that vehicle m anufacturers rem edy de fects in a tim ely fashion has long been a requirement of the Safety Act.  Manufacturers have a responsibility to make sure that parts are available s o that recall repairs  can be perform ed. NHTSA has m ade clear that no owner of a car or truck with a safety defect should have to wait for years to get the remedy repair

29

completed. No owner should have to make repeated calls to see if repair parts are available so their car can be made safe.

94.     On June 29, 2013, Chrysler filed a report with NHTSA agreeing to recall certain Jeep Grand Cherokees and Jeep Libertys to improve their performance in rear impacts that can result in deadly fires even in low-speed impacts because the fuel tank was placed too far back in the "crush zone" of the vehicles.  NHTSA concluded that the safety risk posed by this defect was clearly unreasonable—dangerous fuel leaks and deadly fires in low-speed impacts.  NHTSA had linked 75 fatalities and 58 injuries to the defect.

95.     This was a very high profile recall, of which Marchionne was personally aware, publicly discussing the status of the recall on multiple occasions..  For example, on June 3, 2013, despite linking 75 fatalities and 58 injuries to the defect and telling Chrysler on June 3, 2013 that 2.7 million vehicles were defective and required recall, Marchionne initially publicly resisted NHTSA's request for the recalls.  Marchionne led the charge against NHTSA, repeatedly saying in the days afterward that the vehicles did not have a safety defect.

96.     According to an interview between Department of Transportation Secretary Ray LaHood conducted by The Detroit News in   June 2013, after NHTSA Administrator David Strickland told LaHood that Chrysler wasn't going to go along with a recall, LaHood said he would call Marchionne. "I said, 'I   want to find out if Sergio is   involved in these decisions,'" LaHood said.  LaHood suggested the three meet in person. 'We need to figure this out," he told Marchionne.  On Sunday, June 9, the three met at the Federal Aviation Administration office at O'Hare International Airport.  "Once he (Marchionne) met with David and I in Chicago, he knew this had to get done," LaHood said. "(Marchionne) didn't realize how serious this was, how serious we were, and the thing was resolved   satisfactorily. .... We pretty much reached an

30

agreement there."   In a deal struck in June 2013,   Marchionne agreed to install trailer hitches on the effected 1.56 million Jeep Liberty sport utility vehicles and Jeep Grand Cherokees to provide added protection.  L   aHood said C  hrysler agreed   to settle the dispute and m    ake fixes partly because NHTSA had shown during the Toyota Moto   r Corp. sudden-acceleration recalls that it put safety first. Toyota paid nearly $70 million in U.S. fines.  "Sergio and David and I had some very frank conversations over the last couple      of weeks, and I think      at the end of those conversations, he knew: This is a no-nonsense organization," LaHood said. "The thing that really set us on a course where people understood that   was the Toyota (sudden-acce leration recalls) -- the fact that we fined them the maximum fines twice."

97.      Pursuant to Recall 13V-252, Chrysler wa s required to recall (1) 1993-1998 Jeep Grand Cherokee; and (2) 2002-2007 Jeep Liberty.      The total potential    number of vehicles affected was 1,560,000.

98.      To assess the value of the rem  edy suggested by Chrysler in  this recall, NHTSA requested that Chrysler provide it with test da   ta showing how the addition of   the trailer hitch changed the rear crash perform   ance of the Li   berty and Grand Cherokee. Chrysler provided compliance test data which, in NHTSA's view, did not address this issue. The agency then requested that Chrysler perform additional testing. Chrysler refused to perform any test.  Because of its concerns about both the risk and the rem  edy, NHTSA perform ed its own tests to evaluate the remedy.

99.      Shortly thereafter, discussions with Chrysler about the remedy campaign revealed that Chrysler did not select a hitch supplie   r until Decem ber 6, 2013 or issue a hitch purchase order until January 29,   2014.  Because of concer   ns th at Chrysler's projected production of replacement parts would not be adequate, NHTSA issued a special order to Chrysler in early July

31

2014 to Reginald Modlin, Director Regulatory Affairs, who reported to Kunselman.  The special order stated "NHTSA is theref ore concerned that Chrys ler doe s not have, and will not have, sufficient production capacity to en sure that enough hitches will b e available to en sure that the recalled vehicles will be rem edied expeditiously. For m any owners, a re call remedy deferred by parts availability easily becomes a defect remedy denied." Among other things, this special order required that Chrysler provide inform     ation  about production capacity, suppliers and recall completion.  Chrysler's response to the special or der indicated that it w ould be increasing hitch production and would have enough hitches in stock to meet demand.

100.    However, after the recall cam    paign wa s officially launched in August 2014, NHTSA received complaints expressing frustration with confusing information from dealerships and parts not being available.  A Chrysler repor t sent to NHTSA in October of 2014 s howed the initial completion rate for the recalls to be very low.

*Chrysler Continues to Ignore Its Legal Obligations Even After Receiving a Warning Letter*

101.    Chrysler's failings were so seriou     s that on Nove    mber 19, 2014, NHTSA Administrator Friedm an wrote a  letter to Defendant Marchionne  sharply criticizing Chrysler's repeated failure to adeq uately effect Recall  13 V-252 of th e 1.56 m illion vehicles  whose fuel tanks m ay r upture if the vehicles are struck fr    om behind, leading to fires even in low-speed crashes.  Friedm an stated " **I am concerned about the resu    lts of Chrysler's October 2014   recall update reports show  ing a w oeful three p ercent repair rate out of more than 1.5    million affected vehicles."  Friedman w rote "to urge [Chrysler] to more aggressively seek   out vehicle owners affected by the recall."**    Noting the extremely low rate of repairs more than a year after the recall was initi     ated, Friedm an directed M archionne that "sign ificantly m ore aggressive steps are required."

32

102.    While Chrysler shirked its legal obligations for more than a year after begrudgingly initiating the recall, the death toll mounted, including the death of a Michigan woman, Kayla White, in a fiery rear-end collision on a Detroit highway in November 2014.[18]

103.    The November 19, 2014 letter was not the first time Administrator Friedman had expressed his dissatisfaction to Marchionne with Chrysler's pace and progress of this recall. As Friedman reminded Marchionne in the November 19, 2014 letter, **NHTSA "has urged Chrysler on multiple occasions** to ramp up production to ensure the company can meet consumer demand for these repairs" yet "NHTSA has received consumer complaints expressing frustration that Chrysler is not fully cooperating . . . owners are being turned away by Chrysler dealerships because of a lack of parts, and, in some cases, are reportedly being told that their vehicles are safe to drive without the remedy." Friedman stated that such conduct was "**unacceptable**".

104.    In the November 19 letter, Friedman demanded that Chrysler work to remedy these violations: "Chrysler must reexamine and accelerate its efforts to repair the recalled vehicles and proactively reach out to their owners . . . ensure that there are no barriers to dealers obtaining parts and setting up appointments when consumers ask for repairs . . . must correct the reported practice of some dealers telling customers that no parts are available when the information you have provided us indicates that is clearly not the case . . . Importantly, Chrysler must ensure that dealerships do not advise owners that there is no risk to driving affected vehicles without the remedy."

105.    Friedman concluded by reminding Marchionne that **"the repair of these vehicles is of critical importance** and must be completed in order for drivers and passengers to be

---

[18] In April 2015, two years after Chrysler reluctantly recalled millions of Jeeps that could catch fire after being rear-ended the company has been ordered to pay $150 million to the family of a four-year-old boy who was killed in one of hundreds of related accidents. The Associated Press reports that a jury in Georgia handed down the verdict after ruling that Chrysler acted with reckless disregard for human life by selling the family a 1999 Jeep with a gas tank mounted behind the rear axle.

adequately protected . . .  **In the str ongest possible terms** I urge you and your dealers to work together to ensure that the safety risk to vehicle owners from this defect is clearly communicated and effectively and expeditiously addressed."

106.    Demonstrating the severity of the situa    tion, Adm inistrator Friedm an i nstructed Defendant Marchionne that any questions m     ust  be directed to Kevin     Vincent ("Vincent"), NHTSA Chief Counsel.

107.    Chrysler's p olicy and p ractice of late not  ifications and dela yed and ineffective repairs, is m uch more serious th an simply dela ying the rem edy and the cost  associated with it. Such practices severely reduce the number of vehicles that ultimately get repaired, increasing the danger to drivers and passengers, an d decreasing the cost of recalls  and warranties to Chrysler. As Vincent would later state in  the special order to Chrysler in July 2015: "For m any owners, a recall remedy deferred by parts availability easily becomes a defect remedy denied."

108.    On Nove mber 21, 2014, Defenda    nt Marchio nne sent a letter in response to Friedman's Novem ber 19 letter, p roviding f orm pl atitudes in f our sen tence respo nse, sta ting: "With respect to your le tter of November 19, be assured Chry sler Group LLC takes seriously its commitment to m otor-vehicle safety. . . Responses    to the item  s raised in your letter will be provided promptly under separate cover."

109.    On November 21, 2014, Defendant Kunselm an sent a separate letter response to NHTSA Adm inistrator Friedm an's Novem ber 19, 2014 letter.  K      unselman acknowledged "[t]hese completion ra tes are not sa tisfactory" and identified actions that Chrysler was allegedly taking to remedy the defect.

34

3. **Chrysler's Failure to Timely Recall Vehicles Containing Defective Takata Air Bags**

#

110.  The Takata airbag recall was pro mpted by the discovery th at Takata air bag inflators installed in vehicles used in areas of high absolute hum idity were rupturing when activated in a crash. The defective inflators, which are supposed to produce gas that fills air bags to protect vehicle occupants in th e event of a crash, would create excess pressure that caused the inflator to explode, sending m etal f ragments f lying into the passeng er com partment, which caused serious injury or death.

111.  The Takata recall constituted the largest and most complex safety recall in U.S. history with more than 28 million inflators under recall in the United States.

112.  Takata filed a def ect report stating that its passenger airbag inflators installed in vehicles tha t were originally sold, or a re currently registered, in Florida, Alabam a, Louisiana, Mississippi, Georgia, Texas, Hawaii, Puerto Rico, Guam, Saipan, Am erican Sam oa are defective. The Safety Act obligated Chrysler to recall its products in these areas.

113.  Ten vehicle m anufacturers, including Ch rysler, initia ted reca ll c ampaigns beginning on June 19, 2014.

114.  Recall 14V -354 (which becam e part of Recall 14V-817 and then 15V-313) involved an extrem ely large num ber of Chrysl er vehicles: (1) Mode l Y ear 2003-2008 Dodge Ram pickups, (2) Model Year 2004-2008 Dodge Du rangos, (3) Model Y ear 2007-2008 Chrysler Aspens, (4) Model Year 2005-2008 Chrysler 300s, (5) Model Year 2005-2008 Dodge Dakota pickups, and (6) Model Year 2006-2 007 Mitsubishi Raider pickups. In total, the recall involved 4,066,732 vehicles.

115.  Acting at the direction and under the overs ight of NHTSA, Chrysler and the other manufacturers regularly met with Takata and NHTSA to coordinate owner notification programs,

35

availability of replacem ent parts, testing of    field inflators and the rep   lacement of defective

inflators.  As was explained in the July 2015 h earing, throughout the proce ss of (1) initiating the

recall, (2) providing inform ation to Takata and NHTSA, (   3) m aking arrangem ents to provide

replacement air bag in   flators, and  (4) collect    inflators fro m t he fi eld for t  esting, Chrysl er

consistently lagged well behind the other nine manufacturers.

116.    For example, while other m anufacturers provided NHTSA with a lis t of affected

vehicles within days or weeks  of filing their initial 573 Reports,  Chrysler did not provide such a

list until seven weeks af ter filing its 573 report.   Similarly, although Chrysler  initially indicated

that it would begin mailing notices to customers in November, it failed to do so.

*Chrysler Continues to Flout Regulations Even After Receiving Multiple Warning Letters*

117.    On October 29, 2014, NHTSA Adm   inistrator Friedm an wrote Steve W  illiams,

Head of Ve hicle Safety Com pliance & Product An  alysis, who reported directly to Defendant

Kunselman, to "em phasize the cr itical im perative" for Chrysler "to prom  ptly and effectively

remedy the serious saf  ety risk posed to cons   umers by defective T   akata air bags." W    hile

acknowledging that some m  easures had been take  n by Chrysler, Friedm  an stated that those

measure were inadequate under Chrysler's legal  obligations: "[M]ore can and should be done as

soon as possible to prevent any further tragedies fr om occurring as a result  of these defective air

bags."  Given "the severity of this issue", Friedman requested specific information from Chrysler

as to what it had and w   ill do to  "ensure veh icles are rem edied as  exp editiously as possib le."

Friedman wrote: "we urge you to take aggressive   and proactive action to  expedite your rem edy

of the recalled veh  icles and to sup   plement Ta kata's testin g with you  r own testing to fully

evaluate the scope and nature of this defect."

36

118.    Despite NHTSA urging Chrysler to "tak e aggressive and proactive" steps to expedite th e rem edy, in a November 5, 2014     response to NHTSA's, W illiams stated th at Chrysler would not even begin m     ailing recall  notices to custom  ers until Decem  ber 19, approximately six months after Chrysler filed its initial 573 report, b ecause the Company would not have replacement parts available prior to that date.   In the November 5, 2014 letter, Chrysler also informed NHTSA  that it was  refusing to recall its veh icles containing the Takata air b ags located in  Alabam a, Louisian a, M ississippi, T exas, Georg ia, Guam , Saipan, Am erican Sam oa, and would only recall its ve hicles in Florida, Hawaii, Puerto Rico and the U.S. Virgin Islands, in direct contradiction of Chrysle r's obligation and the determ ination that th e Takata a irbags were defective.

119.    Fed up with  Chrysler 's com plete disreg ard for NHTSA regulations and   lack of commitment to tim ely, complete and effect yet another recall, on Nove  mber 25, 2014, NHTSA Administrator Friedm an wrote   to Defendant Marchionne once ag     ain, advising that he w    as "extremely concerned about both the geographic scope and the slow pace of [Chrysler's] recalls" involving defective Takata airbag inflators.

> Throughout the proces s of initiating the recall, provid     ing inform ation to both Takata and NHTSA, m     aking arrangem ents to provide replacem     ent air bag inflators and collect inflator s from the field for testing, ***Chrysler has consistently maintained its  positio n at the  re ar of the p  ack***. W hile other m  anufacturers provided N HTSA with a list of affected ve  hicles within days or weeks of filing their initial reports under 49 CFR Part 573 (573 Report), ***Chrysler did not provide such a list until seven     w eeks a fter filing  its 573 repor  t. Similar ly, although Chrysler initially indica ted that it w ould begin mailing notices to  custo mers in November, it failed to do so.***

120.    Referring back to his letter  of October 29, in which he ur ged Chrysler to be m ore aggressive and proactive in its      recall efforts,  Adm inistrator Friedm an criticized  Chrysle r's November 5, 2015 response as well 'as Defendant  Kunselman's testimony at the Senate hearing,

stating that Chrylser would not begin its owner notification program until December 19, pointing

out that this was "approximately six months after Chrysler filed its initial 573 report."

121.    Deputy Adm inistrator Friedm an wrote th at "Chrysler's de lay in notifying

consumers and taking other actions necessary       to add ress the saf ety def ect identif ied is

unacceptable and exacerbates the risk to motorists' safety."

> First, unlike som e other m anufacturers w ho have m ore actively participated in
> these recalls, **Chrysler has had a f ield inciden t where a fragmenting inflator
> injured a c ustomer**. T his dem onstrates th e real world potential for death and
> injury pose d by the Takata inf lators inst alled in the recalled Chrysler vehicles.
> Moreover, **Chrysler's decis ion to delay noti fication until it has rep lacement
> parts deprives its customers of the        ability to take their own informed,
> precautionary measures if they hav e a car with a potentially def ective airbag**.
> This is particularly true where, as in this case, some of the vehicles inv olved may
> have defective passenger side air bags. In such a case, an inform      ed custom er
> could reduce the risk of d eath or in jury by choo sing to leav e the p assenger seat
> unoccupied. **Chrysler's delay deprives them of the knowledge needed to make an
> informed decision**.

122.    Administrator Friedman informed Marchionne that Chrysler's refusal to reca ll its

vehicles from all the necessary geographic lo   cations was unreasonable and a violation of the

Safety Act.

> **I am also concerned about the geograph   ic areas enco mpassed by Chrysler's
> recall**. Chry sler's p resent in tention is to re   strict its rec all to Flo rida, Hawaii,
> Puerto Rico and the U.S. Virgin Is lands. **This limita tion is unreasonable** given
> the fact that Takata filed a defect      report on Nove mber 10, stating that its
> passenger airbag inflators installed in vehi cles that were originally sold, or are
> currently registered, in southern Geor gia, Guam, Saipan, Am erican Sam oa and
> areas along the coast of Alabama, Louisiana, Mississippi, and Texas, as well as in
> the areas of Chrysler's announced recall,     are defective. Based on the broader
> geographic scope identified by Takata, **Chrysler is obligated under the Safety Act
> to expand its recall to include these additional areas in its current recall**.

123.    Administrator Friedman told Marchionne bluntly that "NHTSA expects Chrysler

to immediately expand the geographic scope of it s recall to, at a m inimum, match the scope of

38

the recall announced by Takata" and "expects Chrysler to provide notification of the recall as soon as possible, and *in no circumstances, later than December 1*".

124.    On November 26, 2014, Defendant Marchionne responded to NHTSA Administrator Friedman's letter once again with a dismissive one paragraph response very similar to Marchionne's response on November 21, stating "With respect to your letter of November 25, be again assured that Chrysler Group LLC takes seriously its commitment to motor vehicle safety. . . . A response to the items raised in your letter will be provided promptly under separate cover."

125.    In a letter also dated November 26, 2014 and referencing Defendant Marchionne's letter, Defendant Kunselman wrote to Administrator Friedman. Despite Friedman's warning that Chrysler's failure to expand its recall to all effected states was a violation of the Safety Act, Kunselman did not agree at that time to expand the recall to the affected areas.

126.    As Joshua Neff of NHTSA testified during the July 2, 2015 hearing, on December 23, 2014, Chrysler blatantly misrepresented to NHTSA that its owner notification date for the airbag inflator recall was three months earlier—on September 22, 2014.  In truth, Chrysler actually had not even begun mailing owner notices until December 5, 2014, completing the mailing on December 16, 2014, well after Deputy Administrator Friedman's letter of November 25, 2014.

127.    After Chrysler eventually expanded its recall for Takata airbag inflators, Recall 14V-354 became a part of Recall 14V-817. Chrysler misrepresented to NHTSA that it would send interim notices to vehicle owners in Recall 14V-817, but it never did.  Chrysler told NHSTA on a conference call that it did not want to send interim notices. But, after Frank Borris,

39

director of ODI, m ade clear this w as unaccep table and to ld Chrysler that its custo mers were entitled to know the truth about their vehicles, Ch rysler sent a draft interim notice to NHTSA for review. After Recall Managem ent Division staff a pproved the draft, Chrysler still did not m ail the notice. Recall 14V-817 becam e part of an expanded recall, Recall 1 5V-313. That exp anded recall began with Chrysler's 573 Report on May 26, 2015. As of the date of the July 2, 2015 hearing, Chrysler still had not told NHTSA of any plans to notify the over 4 m illion owners affected by that recall.

128.    In NHTSA' s written statem ent from th e July 2, 2015 hearing leading to the Consent Judgm ent, NHTSA found that "[t]hese Takata recalls prov ide m ore exa mples of Fiat Chrysler providing conflicting and **blatantly w rong** infor mation to the Agency.  . . .  Reca lls obviously cannot be successful if ow ners do not know about them . Fiat **Chrysler's pattern and ongoing failure to notify owners about recalls in a timely manner** is concerning."

129.    The weaknesses in Chrysler's controls  around its vehicle safe ty compliance also prevented Chrysler from maintaining accurate and reliable information.  This manifested itself in reports sent to NHTSA. NHTSA found that disc repancies in inform ation were widespread throughout Chrysler's subm issions to NHTSA a bout its recalls. NHTSA   found t hat Chrysler "repeatedly failed to provide correct information to the Agency on basic issues, su ch as the date it mailed owner notices . . . [which] could also ha ve much more consequential results for vehicle and driver safety."

### 4.    Chrysler's Failure to Remedy "Axel Lock Up" Causing Loss of Control

\#

130.    Chrysler also failed to pr operly conduct three recalls fo r the sam e defect.  The defect involved a nut that secures  the pinion gear inside the rear  differential. If this nut com es loose, the driveshaft can fall off the vehicle an d differential gears will  clash. In its 573 report,

Chrysler described the safety risk as 'axle lock up' that can cause loss of control or a crash with 'little warning.' If an axle locks up, one or both of the rear wheels will stop turning and skid until the vehicle is stopped. If both rear wheels of a pickup truck suddenly lock up at highway speeds, the driver would almost certainly lose control.

131.    In response to a NHTSA Investigation into the defect, Chrysler filed a 573 report on February 6, 2013, identifying a safety defect in 48,000 Dodge Ram trucks, which initiated Recall 13-V-038. After Chrysler had filed the 573 report, NHTSA conducted additional investigations and found that the pinion nuts were coming loose in other Ram trucks. Chrysler then filed a 573 report in February 2013 and December 2014 to initiate follow-on recalls.

132.    Pursuant to Recall 13-V-038, Chrysler was required to recall (1) 2009 model year Chrysler Aspen; (2) 2009 model year Dodge Durango; (3) 2009-2012 model years Dodge Ram 1500; and (4) 2009-2011 model years Dodge Dakota. The total number of vehicles affected was 278,229.

133.    It was not until nine months after the February 2013 recall began that Chrysler finally informed owners that they should bring their cars into their dealers to have the recall repair performed. During the nine-month period in which Chrysler was presumably stockpiling the parts needed to make the recalled vehicles safe, owners continued to experience pinion nut failures. NHTSA received numerous complaints of drive shafts falling off the Ram trucks on the highway. Other complaints described axles locking up while the trucks were being driven, drivers narrowly avoiding crashes and at least one loss of control.

134.    Although Chrysler reported that it had completed sending notices to owners in November 2013 telling them parts were available and repairs could be completed, NHTSA continued to receive owner complaints that parts could not be found. A complaint filed in June

41

2014 stated that a dealer could not give the owner a date when parts would be available and that contact with Chrysler produced the same response. A complaint filed on July 2014 stated that the owner had been trying to get the repair completed for over six months and could not because of the parts shortage.

135.    In March and May of 2015, over two years after Chrysler filed its 573 report, NHTSA received complaints that dealers could not obtain the recall parts. As Chief of the Integrity Division of NHTSA's Office of Defects Investigation, Scott Yon, later testified in July 2015,

> Review of customer complaints and other documents provided to NHTSA by Chrysler show **that Fiat Chrysler was aware of both the hazards posed by the defect and the difficulties that owners were experiencing in getting their vehicles fixed. Fiat Chrysler documents show that the company confirmed that three crashes, including two with injuries, occurred as a result of pinion nut failure in the eight months after the 573 report was filed**. As is the case with complaints filed with NHTSA, Fiat Chrysler records show that its customers were reporting that their dealers could not get parts to complete the repair as late as April of this year.
> Other Chrysler records confirm that the parts needed to complete the recall repairs were often back ordered or restricted to allow a dealer to repair one vehicle in a week or two vehicles per month.

136.    Mr. Yon further testified: "Unfortunately, the difficulties Fiat Chrysler customers faced in getting recall repairs completed in the pinion nut recall are not an isolated example."

### 5.    Chrysler's Failure to Remedy Defective Tie Rods That Cause Loss of Control

#

137.    Three recalls involving tie rod ends that can fail on large pickup trucks provide another example of how Chrysler's management of recalls puts its customers at increased risks. The three recalls, 13V-527, 13V-528, and 13V-529, encompassed approximately one million Dodge Ram pickup trucks. After receiving information from NHTSA indicating that the tie rods were failing, Chrysler filed 573 reports in early November of 2013 representing Chrysler's

42

conclusion that a defect in these vehicles posed      an unreasonable risk    to safety. The defect consisted of a steering com   ponent known as a tie    rod that can break without w     arning.  As Chrysler described in its 573 report,  if a tie rod end break s, the ability to steer  the vehicle can be lost and the driver can lose control, increasing the risk of a crash.

138.    Pursuant to Recall 13V-527, Chrysler wa s required to recall (1) 2008-2012 m odel years Dodge Ram 4500; and (2) 2008-2012 m odel years Dodge Ram 5500.  The total num ber of vehicles affected was 35,942.

139.    Pursuant to Recall 13V-528, Chrysler was required to recall (1)  2006-2008 model years Dodge Ram 1500; (2) 2003-2008 model years Dodge Ram 2500; and (3) 2003-2008 model years Dodge Ram 3500.  The total number of vehicles affected was 706,664.

140.    Pursuant to Recall 13V-529, Chrysler was  required to recall (1) 2008 m odel year Dodge Ram 1500; (2) 2008-2012 model years Dodge Ram 2500; and (3) 2008-2012 model years Dodge Ram 3500.  The total number of vehicles affected was 265,057

141.    Chrysler sent notice to owners in January 2014 telling them that replacement parts were available and to bring their trucks in for repair.

142.    Nevertheless, NHTSA began to receive a    high volum e of com plaints soon after these no tices were sent.   Because som e of th e recall p arts had defects,  Chrysler h ad stopped shipping parts and, at the end of   2014, told its dealer s to return these rem edy parts from  their stock.  **Chrysler did not notify NHTSA of the prob lem with the replacement parts or tha t dealers had been told to return them.** Instead, NHTSA later learned about this from a dealer.

143.    Even after Chrysler res  olved the s afety problem s with the replacem ent parts, supply was restricted. If they could get parts,    dealers were allowed one set of parts per week. Owners seeking to have the safety defect fixed found themselves 30th in line on a waiting list for

parts. Review of Chrysler customer complaint records confirm that owners of these trucks could not get repairs done. In December of 2014, nearly one year after the notices had been mailed to owners, Chrysler customer service representatives were still informing customers that parts were not available. In May 2015, more than 15 months after notices were sent to bring trucks in for repair, NHTSA received complaints from Ram owners stating parts were not available.

144.    As the parts shortages for these recalls continued, the tie rod ends continued to fail on vehicles out on the highway. As Mr. Yon of NHTSA later testified in July 2015,

> **These incidents were reported to Chrysler, illustrating that the company was aware of the consequences of the defect and the need to have the vehicles fixed.** Responding to a NHTSA inquiry, Fiat Chrysler reported in March of this year that it had received 32 reports of alleged property damage, 2,593 consumer complaints, and 32 reported crashes involving 20 injuries and one fatality related to these recalls. **Although Fiat Chrysler knew or should have known of these accidents,**

145.    Despite the fact that Chrysler knew of these accidents, Mr. Yon recounted that "Chrysler customer service call records show that **at least one customer service agent told owners asking about parts that there had not been any accidents from the tie rod failures.**"

146.    Indeed, Chrysler's conduct was so egregious that on or about October 20, 2014, NHTSA informed Chrysler that it had opened an investigation (Audit Query – AQ14-003) into "the delays in execution of recall campaigns 13V-528 and 13V-529" after receiving more than 1,000 consumer complaints about parts shortages.

147.    Lest there be any dispute that the above examples are isolated incidents and not representative of Chrysler's standard practice, Mr. Yon further testified, "The Agency has encountered numerous instances where Fiat Chrysler has not performed well in making recall repairs."

44

### 6.    **Chrysler's Untimely Recalls**

#

148.    Despite being warned by NHTSA in November 2014, Chrysler improperly waited

months before recalling defective vehicles in at least two of the recalls it began in 2015.

149.    Chrysler initiated Recall 15V-090 for defective transmissions that could prevent a

vehicle owner from putting the vehicle into pa rk on February 10, 2015, an alarm ing <u>four months</u>

after Chrysler's supplier notified it in October 2 014 of a production proce ss issue linked to the

transmission shift failure s that are the subject  of the recall.  Moreover, in a February 26, 2015

recall ackno wledgment letter, NHTSA's Jennifer Ti mian ("Tim ian") notified Chrysler that th e

recall was untimely, demanding an explanation for the delay. Chrysler did not respond and never

made any attempt to explain the timing.

150.    Chrysler similarly waited m onths before recalling vehicles in Recall 15V-290 for

trucks that may have tire failures w hen traveling at high speeds. On January 9, 2015, Chrysler's

Vehicle Safety and   Regulato ry Co mpliance d epartment, headed by Defendant Kunsel m    an,

became awa re that certain Chrysler trucks  had a m aximum governed sp eed of 106 mph, while

the tires on the vehicles were only rated for a  maximum of 87 mph. Later that month, on January

27, 2015, Chrysler's Saltillo Truck    Assembly Plant cam e up with  a fix—to install an Engine

Control Unit calibration with the maxim  um vehi cle speed set point of 87 m  ph. But Chrysler

waited <u>over three months</u> to recall vehicles, filing a 573 Repo rt on May 12, 2015,  despite having

identified the defect and rem edy back in January . Although Tim ian again notified Chrysler in a

June 18, 2015 recall acknowledgment lette r of concerns with the tim  eliness of this recall, as of

July 2015, Chrysler still had not responded.

151.    In NHTSA's written statem ent from th e July 2, 2015 hearing, NHTSA expressly

chastised Chrysler for its refusal to improve  its reporting even after the C ompany had purported

to im prove its recall process    through the creation of its Ve     hicle Safety   and Regulatory

Compliance depar tment: "Fiat Chry sler has told  NHTSA  about changes that it has made to  its

organization and recall processes since Septem   ber 2014. However, these two untim   ely recalls

demonstrate that problem s persist. Fiat Chrys ler's failure to  expeditiously recall vehicles with a

safety-related defect is deeply concerning."

### 7. Chrysler's Failure to Notify NHTSA About Changes to Notification Schedule

\#

152.    Chrysler also had a pattern of refusing   to update NHTSA on critical inform ation

about its recalls and the tim    ing of owner and d    ealer notifications within the required five

working days. NHTSA has specific  requirements for t he information that m ust be provided in a

573 Report. There is also a requ irement to submit an amended 573 Report when key infor mation

changes. The se requirem ents are essential to NHTSA   's a bility to en sure that owners are being

told about defects and noncom   pliances in their vehicles and know    how to have them   fixed.

Additionally, Chrysle r f ailed to  pr omptly pro vide the reasons for th    e delay and a revised

schedule when its notification schedule is was delayed by more than two weeks.

153.    For exam ple, Recall 13 V-527 was a recall   for a defective left tie rod assem   bly

that could result in loss of steering control. W  hen Chrysler first filed a Part 573 Report for this

recall in November 2013, it told NHTSA that it would begin sending owner notices in December

2013. NHTSA only found out that this did not happen when Chrysler sent it a copy of its interim

owner notice to NHTSA in February 2014 and said that the notices were not mailed until January

16, 2014. Chrysler did not explain the delay.

154.    Recall 14V-373, concerning ignition switch     defects, was an expansion of a     n

earlier recall, 11V-139. When Chrysler first notified NHTSA of the new, expanded recall in June

2014, it submitted a 573 Report that indicated that it planned to send owner notices in early Ju ly

46

2014. On July 1, 2014, Chrysler submitted an amended 573 Report that said the Company would mail owner notices in August 2014. August came and went with no update from Chrysler. However, it was not until September 29, 2014, when Chrysler submitted a copy of an interim owner notice that NHTSA learned Chrysler did not mail those notices until September 11, 2014.

155.    Chrysler also failed to update NHTSA on its changed plans for notifying owners and dealers that parts were available for repair. In December 2014, Chrysler submitted an amended 573 Report that said it planned to mail the owner notices on April 13, 2015 and the dealer notices on April 6, 2015. Chrysler submitted two more amended 573 Reports in February 2015 that made no changes to this schedule. Chrysler did not tell NHTSA that the notices were not sent until well after those April dates had passed. Only after NHTSA staff contacted Chrysler about its notification schedule did Chrysler submit an amended 573 Report, on May 4, 2014, to provide new dates. Even then, Chrysler provided no explanation for the delay, as required.

156.    For Recall 14V-749, a recall for a noncompliant instrument cluster, Chrysler never provided NHTSA with any information on its schedule for mailing owner and dealer notices. Chrysler left these fields blank when it submitted its Part 573 Report in November 2014. Rather than telling NHTSA when it planned to send notices, as required, Chrysler submitted a letter on December 16, 2014 stating that it had already mailed the notices.

157.    Chrysler also failed to update NHTSA on changes to its notification schedule in a recall for broken springs in the clutch ignition interlock switch, Recall 14V-795. Chrysler's initial 573 Report in December 2014 said that it planned to mail dealer notices on February 6, 2015 and owner notices on February 13, 2015. Immediately before these notifications were scheduled to begin, Chrysler confirmed these dates in a February 3, 2015 amended 573 Report. However, it was not until Chrysler again amended its 573 Report in May 2015 that NHTSA

47

learned tha t Fiat Chrys ler m issed those m ailing dates and  inste ad m ailed the no tices ov er a

month later in March 2015. Chrysler provided no explanation for the delays to NHTSA.

158.    In NHTSA's written statem ent from th e July 2, 2015 hearing,  NHTSA criticized

Chrysler's blatant disregard for its reporting obligations:

> Fiat Chrysler's repeated failure to provi de accurate and up-to-date inform ation to
> NHTSA m akes it hard f or staf f to trust th e inform ation that Chrysler provides.
> Because Chrysler kept NHTSA out-of-the-loop on its notifications, NHTSA could
> not adequately ensure that owners and   dealers had the info  rmation they needed
> about the safety of their vehicles and when and how the vehicles can be repaired.
>
> It is also disconcerting that Chrysler re      peatedly f ails to explain its delays in
> notifying owners and dealers about recalls  . Without any explanation for a delay,
> NHTSA has  no basis for judging the delay to be reasonable and not simply the
> result of a lack of urgency at Chrysler on safety issues.

## 8.    Chrysler's Failure to Submit Recall Communications

#

159.    Chrysler also repeatedly refused to  submit copies of its reca ll communications to

NHTSA as required. This regulato ry requirement is necessary to keep NHTSA inform  ed about

what Chrysler is telling owners  and dealers about defects and  noncompliances and how they can

have them repaired.

160.    Owner notices are critical to a recall. To      ensure that owners are provided the

necessary infor mation, NHTSA reviews draft owne   r notices before they   are sent. A vehicle

manufacturer is required  to submit a draft to NHTSA no f ewer than five business days before it

intends to begin mailing the notice to owners. H owever, in at least one  recall, 14V-749, a recall

for noncompliance with the safety standard for ve   hicle controls and displays, Chrysler did not

send a draft owner notice to NHTSA for review. In   stead, Chrysler s ent an  unapproved letter to

owners on December 16, 2014.

161.    Chrysler a lso repea tedly refused to      submit representative copies of recall

communications that it sends to owners or dealer   s to NHTSA within five days. Chrysler often

delayed providing NHTSA with copies, and N    HTSA repeatedly  had to  rem ind Chrysler to
submit the copies. In addition, when Chrysler did submit copies of recall communications, it also
routinely entered incorrect information into NHTSA 's recalls portal, such as provid ing the date
that Chrysler submitted a docum ent to NHTSA or  leaving the date blank, rather than providing
the date that Chrysler mailed its notification to owners.

162.    In som e cases, Chrysler left NHTSA       com pletely in the dark about
communications that Chrysler m ade to its deal ers abou t a recall. Thes e communications told
dealers how to repair defects and noncom     pliances and provided other im  portant inform ation
about the recalls.

163.    As NHTSA's written statem    ent from    the July 2, 2015 hearing explained,
"NHTSA ca nnot ensure that vehi cle owners are aware  of defects and noncom pliances in their
vehicles and that they have inform      ation  on how to have those problem    s fixed when a
manufacturer fails to comply with its oblig ation to submit copies of owne r notification letters to
[NHTSA] and to provide correct and com plete information about the notif ications. . . Failure to
submit dealer comm unications to N HTSA as requi red obstructs [ NHTSA]'s ability to evalu ate
whether d ealers have accurate and   com plete in formation necessary to   remedy vehicles. It is
critically important th at the Agency have    tim ely access to these communications—and a
complete set of these communications—so that it can evaluate the remedy and fulfill its statutory
oversight role to ensure that remedies are effective."

164.    In at le ast e ight reca lls, Chrysle r failed to sub mit copies o f its owner notice s to
NHTSA within five days as required.

- In Recall 1 3V-527, Chrysler waited 2<u>8 days t</u>o send NHTSA a copy of its
  interim owner notice and 6 days to send NHTSA its follow-up owner notice.
- For Recall 14V-373, Chrysler waited 1<u>8   days</u> to send NHTSA a copy of its
  interim owner notice.

49

- Chrysler also waited 8 days to send NHTSA a copy of its interim owner notice in Recall 14V-438.

- In Recall 1 4V-634, Chrysler waited 67 days to send NHTSA a copy of its owner notice after it began mailing the notices.

- Chrysler waited 27 days to send NHTSA a copy of its interim owner notice in Recall 14V-795.

- Chrysler also waited 25 days after    it began m ailing interim notices about Recall 15V-046 before sending NHTSA a copy.

- Chrysler waited 12 days to send NHTSA a copy of its owner notice in R ecall 15V-114.

- Chrysler waited 15 days from    the time it began m ailing owner notices in Recall 15V-115 to provide NHTSA with a copy.

165.    NHTSA's written statem ent from the Ju   ly 2, 2015 hearing m    ade clear that "[t]hese are not insignificant de  lays. Fiat Chrysler waited double,   triple, and even up to over thirteen times the allowable time under the law to provide these owner notices to NHTSA."

166.    Chrysler's complete disregard for its compliance obligations is highlighted by the fact that pro viding notification to NHTSA is no t an onerous requirem ent. Many of these recalls involved several hundred thousand vehicle ow  ners. Chrysler simply had to send out one m  ore copy of its owner notices to NHTSA, and yet it repeatedly failed to do that by the legally binding deadline subject to civil penalties.

167.    Chrysler also did no t submit copies of dealer communications within five days as required in at least fourteen reca lls. In many cases, Chrysler simply never provided any copies of certain dealer communications to NHTSA until af ter the Agency began the enforcement action. Specifically, there were thirty-two dealer co   mmunications across twel ve recalls between 2013 and 2015 that Chrysler withheld from the NHTSA until submitting its Special Order response on June 1, 2015, many of which had been sent well over a year prior.

- In Recall 1 3V-252, Chrysler did n  ot provid e NHTSA with t welve separate dealer communications that Chrysler sent  to its dealers in  June, July, August, and December 2014.

50

- In Recall 13V-527, Chrysler never sent NHTSA a copy of a November 2013 dealer communication.

- In Recall 13V-528, Chrysler never sent NHTSA a copy of two April 2014 dealer communications.

- Chrysler never sent NHTSA three dealer communications about Recall 13V-529, sent in November 2013, March 2014, and December 2014.

- Chrysler never sent NHTSA a copy of a December 2014 dealer communication about Recall 14V-373.

- Chrysler never sent NHTSA a copy of four dealer communications about Recall 14V-391 sent in July 2014 and in April and May 2015.

- Chrysler also failed to submit it to NHTSA a dealer communication about Recall 14V567 it sent in September 2014.

- Chrysler never sent NHTSA a copy of a dealer communication Chrysler sent in December 2014 about Recall 14V-795.

- Chrysler never sent NHTSA a copy of a December 2014 dealer communication about Recall 14V-796.

- Chrysler never sent NHTSA a copy of four dealer communications about Recall 15V-090, sent in February, March, and April 2015.

- Chrysler never sent NHTSA a copy of a dealer communication about Recall 15V-115 that Chrysler sent in September 2014.

- Chrysler never sent NHTSA a copy of a March 2015 dealer communication about Recall 15V-178.

168.    Even with respect to the dealer communications that Chrysler did provide to

NHTSA, the Company routinely provided them late.

- In Recall 13V-527, Chrysler waited 10 days to provide a copy of a dealer letter to NHTSA.

- Chrysler waited 38 days to provide a copy of a dealer letter in Recall 14V-373 to NHTSA.

- Chrysler waited 21 days to submit a copy of a dealer letter for Recall 14V-438 to NHTSA.

- In Recall 14V-634, Chrysler waited 10 days to submit one dealer letter to NHTSA and then waited 74 days before submitting a copy of a second dealer letter to NHTSA.

- Chrysler waited 18 days before submitting a copy of a dealer letter to NHTSA about Recall 14V-635.

- Chrysler waited <u>8 days</u> before submitting a copy of a dealer letter about Recall 14V-749.

- Chrysler did not submit a copy of a dealer letter about Recall 14V-795 until <u>17 days</u> later.

- Chrysler waited <u>39 days</u> to submit a copy of a dealer letter about Recall 15V-046, and <u>15 days</u> to submit a copy of a dealer letter about Recall 15V-090.

- Chrysler also waited <u>12 days</u> to submit a copy of a dealer letter about Recall 15V114, and <u>15 days</u> before submitting a copy of a dealer notice about 15V-115 to NHTSA.

169.    Chrysler's failure to provide timely notice persisted between 2013 and 2015 and did not improve following the appointment of Defendant Kunselman as head of Vehicle Safety and Regulatory Compliance. As NHTSA's written statement from the July 2, 2015 hearing concluded, "such a widespread pattern of missing deadlines is unacceptable."

### 9.    Chrysler's Failure To Provide Other Critical Information

#
170.    Chrysler also had a pattern of repeatedly failing to provide NHTSA with other critical information about its recalls that was timely, accurate, and complete. The law requires manufacturers to submit an amended 573 Report when the manufacturer has new or changed information about the recall. This is an important requirement because the mere fact of an amended 573 Report signals to the Agency and to the public that something significant has changed.

171.    One of the critical pieces of information about a recall is the vehicles that are affected. A manufacturer is required to update its Part 573 Report within five working days to update the total number of vehicles potentially containing the defect or noncompliance.

172.    Across multiple recalls, Chrysler failed to correctly, completely, and timely identify the vehicles affected by the recalls.

52

173.    In several recalls, Chrysler submitted letters or quarterly recall reports to NHTSA

that showed an apparent change to the number of vehicles involved in a recall, instead of filing

an amended 573 Report as required. Chrysler never explained the reason for these discrepancies.

- In Recall 1 3V-038, Chrysler's amended 573 Report, submitted on February 13, 2013, listed the potentially affected population as 278,222 vehicles. However, each of the quarterly reports that Chrysler submitted since then listed the affected population as 278,229 vehicles.

- In Recall 13V-527, Chrysler reported to NHTSA in its May 7, 2015 573 Report that the potentially affected population was 36,710. Just days later, Chrysler wrote in a letter that the population was 768 vehicles fewer. Chrysler never filed a 573 Report reflecting a changed population or otherwise explained this discrepancy.

- In Recall 14 V-154, Chrysler's 573 Report, submitted in April 2014, listed a potentially affected population of 64 4,354 vehicles. Without explanation and without submitting an amended 573 Report, Chrysler listed a population of 5,305 fewer vehicles in its July 2014 quarterly report. Again with no explanation, Chrysler's October 2014 quarterly report raised the population back to the initially reported 644,354 vehicles.

- In Recall 14V-373, Chrysler reported a potentially affected population of 525,206 vehicles in its initial 573 Report, submitted July 1, 2014. This number drastically increased by 197,849 vehicles in a September 29, 2014 letter. Chrysler did not amend its 573 Report to reflect this change and, instead, in an amended 573 Report filed in December reverted to the initially reported population of 525,206 vehicles.

- In Recall 14V-438, Chrysler's initial 573 Report in July 2014 stated that the potentially affected population was 643,618 vehicles. Then, in a September 2014 letter, Chrysler said that the population was 4,225 vehicles fewer. Chrysler never submitted an amended 573 Report to change the population. Instead, its amended 573 Reports submitted in December 2014 and March 2015 changed back to the initially reported population of 643,618 vehicles.

- In Recall 14 V-634, Chrysler's initial Part 573 Report in October 2014 gave a potentially affected population of 434,581 vehicles. This number changed slightly, increasing by 13 vehicles, according to a letter Chrysler sent to NHTSA in December 2014. Chrysler did not submit an amended 573 Report for a change to the population and then dropped the number of vehicles back to the original population when it filed an amended 573 Reports in April 2015.

- For Recall 14V-749, Chrysler reported a potentially affected population of zero in its initial 573 Report submitted in November 2014. Although Chrysler did not amend its 573 Report at the time, it reported the population as 11,674 in a December 2014 letter it sent to NHTSA. It was not until April 2015 that

Chrysler reported a potentially affected population in an amended 573 Report, as required. However, the populati on Chrysler reported—11,668 vehicles—was a different population than Chrysler earlier told NHTSA.

- In Recall 14V-795, Chrysler in itially repo rted a po tentially affected population of 66,819 vehicles in its D ecember 2014 573 Report. It reiterated that number in an am ended 573 Report filed in February 2015, but then told NHTSA a different population in a lett er the f ollowing m onth. In its letter, Chrysler decreased th e population by 12,758 vehicles with no explanation. Chrysler th en waited alm ost <u>two more m onths</u> before reporting this new population in an am ended 573 Report that it w as required to subm it within 5 days of knowing of the change.

- In Recall 15V-046, Chrysler's January 2014 573 Report provided a potentially affected population of 753,176 vehicles. Howe ver, in a letter Chrysler sent to NHTSA in March 2015, it listed a populat ion that was 1,416 vehicles fewer. Chrysler never amended its 573 Report.

- In Recall 15V-090, Chrysler delayed filing an amended 573 Report to reflect a population change. There, Chrysler initi ally reported a pote ntially affected population of 25,734 vehicles in its February 2015 573 Report. The next month, Chrysler listed a different population, which was 4,269 vehicles fewer, in a letter it subm itted to NHTSA. Howe ver, Chrysler delayed nearly <u>another month</u> before reporting a changed popul ation in an am ended 573 Report as required.

- In Recall 15V-115, Chrysler reported a potentially affected population of 338,216 vehicles in its initial 573 Report in February 2015. W ithout explanation, it th en increased the population by 33 vehicles according to a letter it sent NHTSA in May 2015. Howeve r, later that same m onth, Chrysler submitted an am ended 573 Report that st ill contained the o riginal population of 338,216 vehicles.

174. The 573 Report is the authoritative source of information about a recall. In these eleven recalls, Chrysler provided different information to NHTSA in letters and quarterly reports than it provided in its 573 Reports. T his buries important information about a recall into routine correspondence, rather than flagging it for NHT SA and the public in an am ended 573 Report as the law requires. Notably, in none of these reca lls did Chrysler actually tell NHTSA in these letters or quarterly reports that there was a change to the vehicle population.

175. As NHTSA has since noted, in som e cases, the changes to the population reflected by the letters was sometimes later reported to th e Agency in a 5 73 Report b ut in other

cases subsequent 573 Reports contained no popul ation change. That leaves NHTSA wondering what information is accu rate. In other cases, the le tters apparently do reflect a tru e change to the vehicle population which Chrysl er la ter repo rted to NHTSA   in an am ended 573 Report as required. However, Chrysler repeatedly delayed well beyond the fi ve day deadline under the law for reporting updated population information.

176.    These inconsistent population numbers    have a significant im   pact on vehicle owners. In the recalls where Chrysler provided a  different population in a letter than  it had in its earlier 573 Report, those letters were cover le    tters accom panying Chrysler's subm ission of a copy of its owner letter. If Chrysler reported    a lower population num ber in that cover letter, it suggests that Chrysler only sent owner letters to    that lower num ber of  vehicle owners. If there was not a true change in the ve hicle population that means Chrysler failed to notify some vehicle owners of the recalls. Obviously, a vehicle owne r who does not know about a recall is subjected to an unreasonable risk of injury due to the defect and cannot have his or her car fixed.

177.    As NHTSA stated in its written statem   ent from the July 2, 2015 hearing, "Fiat Chrysler's repeated subm ission of inconsiste  nt, incorrect, and untim   ely inform ation on the population of its recalls can have a real impact on the effectiveness of those recalls."

178.    In Recall 15V-041, Chrysler failed to corr ectly identify the ve hicle identification numbers (VINs) associated with the recall. This    recall was for a defect that m  ay result in sid e curtain and seat airb ags unexpected ly deploy ing. Oversight by NHTSA's Recall Managem   ent Division, caught about 65,000 vehicles im    pacted by  this recall that Fiat Chrysler had not included in the recall. T  his means that Chrysl er did not notify a significant num   ber of vehicle owners of this defect for over 14 weeks.

55

179.    Chrysler also failed to provide NHTSA    with any inform ation on the vehicles affected by its recall for Takata airb ag inflators, Recall 14V -354, which later becam e a part of Recall 14V-817, for <u>over seven weeks</u>. Chrysler la gged far behind oth er manufacturers recalling vehicle for the same issue in identifying its affected vehicles.

**10.    Chrysler's Failure To Submit Information On Remedy**

#

180.    It is also  critical for NHTSA to have tim ely, ac curate, and com plete information about a manufacturer's remedy plan in other words when and how a manufacturer is going to fix its vehicles. A manufacturer is required to report this information in its 573 Report, including by amending its 573 Report within 5 working days     of confirm ing or changing its rem edy plan. Having access to information on a manufacturer's  remedy plan is essentia l for NHTSA to assess the remedy plan and  to ensure th at a manufacturer is m eeting its  obligation to ad equately repair vehicle defects within a reasonable time.

181.    Chrysler failed to provide tim ely infor mation on its rem edy plan in at leas t two recalls between 2013 and 2015.

182.    As discussed above, Recall 13V-527 is a r  ecall involving a left  tie rod ball stud that could fracture, resulting in the loss of st   eering control. In Chrysler's Nove mber 2013 573 Report, the  Com pany said th at it would rem  edy vehicles by    installing a redesigned tie rod assembly. In March 2013, Chrysler am  ended its  573 Report to indicate that replacem ent of the tie rod was an interim remedy and that vehicle owners would need to have a new steering linkage installed. At that time, Chrysler said it would notify dealers about the fix on April 17, 2015. Well after that date came and went, Chry sler filed an amended 573 Report on May 7, 2015 indicating that it was delaying the dealer notices until May 8, 2015. Since Chrysler had changed the remedy for this recall, it was particularly im   portant for NHTSA to review this communication, which

56

was a technical service bulletin giving dealers specific instructions on how to repair the vehicles. However, as discussed above, Chrysler did not timely provide a copy of that communication to NHTSA.

183.    Chrysler also failed to timely provide NHTSA with its plan for remedying the safety defect in Recall 14V-634. That recall involves a defect where the vehicle's alternator may rapidly fail, causing the vehicle to shut down and potentially causing a fire. Chrysler filed its initial 573 Report for this recall on October 7, 2014. The Recall Management Division reminded Chrysler in an October 14, 2014 recall acknowledgement letter of its obligation to provide its plan for remedying the safety defect as soon as it has been determined. Over six months later, Chrysler notified vehicle owners that dealers would replace the alternator assembly. NHTSA contacted Chrysler on April 22, 2014 to ask why the Company still had not reported its remedy plan in an amended 573 Report. Although Chrysler staff repeatedly promised they would do so, and NHTSA repeatedly reminded Chrysler to do so, it took Chrysler until May 7, 2014 to file an amended 573 Report including information on its remedy plan.

184.    NHTSA's conclusions concerning these violations demonstrate Chrysler's complete lack of interest in regulatory compliance. As stated by a Senior Safety Recall Analyst at NHTSA at the July 2, 2015 hearing, "Based on my communications with Fiat Chrysler staff, I believe that they did not understand their obligation to include this information in their Part 573 Report. This is hard to fathom for a company with as much recall experience as Fiat Chrysler. NHTSA staff should not have to explain and repeatedly remind Fiat Chrysler about basic recall requirements as we had to do here."

### 11.    Chrysler's Failure To Report Deaths and Serious Injuries

\#

185.    From 2003 through the Class Period, Chrysl    er also had significant failures in early warning reporting. Chrysler failed to report incidents of death and injury that were required to be reported to NHTSA under 49 C.F.R. Se    ction 579.21(b). Specif ically, Chrysler did not report thes e deaths and   injuries because of    failures in the Com   pany's controls: (1) coding deficiencies in Chrysler's ea    rly warning re    porting system that failed to recognize when reportable infor mation was received  or upd ated; and (2) Chrysler 's f ailure to up date its ea rly warning reporting system to reflect new Chrysler brands.  Chrysler also failed to report aggregate data that were required to  be reported to NHTSA under 49 C.  F.R. Section 579.21(c), including property damage claims, customer complaints, warranty claims and  field reports.  Chrysler also failed to provide copies of field reports to       NHTSA, as required under 49 C.F.R. Section 579.21(d).  These failures were also a result of      Chrysler's poor contro  ls – nam  ely, coding deficiencies in Chrysle  r's ea rly w arning repo rting sys tem that f ailed to recogn ize repo rtable information.

186.    NHTSA's investigators found  these discrepancies in re  porting by Chrysler and notified the company in July 2015.

### E.    Chrysler's Failure to Properly Account For Recalls

#### 1.    Chrysler's Underreporting of Its Costs and Liabilities Related to Vehicle Warranties and Recalls

\#

187.    During the Class Period, Chrysler also     underreported its reserves for product warranties and cost of r  ecalls.  This underreporting resulted  di rectly fro m Chrysler's failu re to timely conduct recalls, notify customers and remedy the safety defects.

188.    According to Chrysler's annual report   for the fiscal year  ending December 31, 2014, filed with the SEC on For    m 20-F on Marc  h 5, 2015, expenses related to recalls are

58

included in the line ite m "Cost of sales" in its consolidated income statement. These lin e items are part of the Com pany's Earnings Before In terest and Taxes (EBIT) am ount that is also reflected in its incom e statement. Any expenses related to recalls would affect the Com pany's EBIT. Addi tionally, EBIT flows to the financial statement line items of Net prof it before taxes and Net profit. Therefore, by failing to report n ecessary recalls and rep airs in a tim ely fashion, Chrysler overstated its EBIT, reported net income, and understated its Cost of sales.

### 2.   Relevant Accounting Principles

\#

189.    As a foreign private issuer, during the Cl ass Period, Chrysler prepared its audited financial statements and was required to file th em with the SEC accordi ng to full International Financial Reporting Standards ("IF RS") as issu ed by the International Accounting Standards Board ("IA SB") and its related interpr etations. The f ull IFRS accounting f ramework is substantially similar to U.S. generally accepte d accounting principles ("GAAP") and constitu tes those standards recognized by the public accoun ting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

190.    SEC and NYSE rules and regulations require that public business entities such as Chrysler include audited (or reviewed) financial statements that com ply with either GAAP or IFRS in their annual and quarterly reports filed with the SEC. *See* Se ctions 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

191.    SEC Rule 4-01(a) of Regul ation S-X st ates that "[f]inancial statements filed with the Comm ission which are not prepared in a ccordance with generally accepted accountin g principles will be presum ed to be m isleading or inaccu rate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

192.     Under IFRS, the expected cos    ts associat ed with Chrysler's    au to recalls are accounted and reported for by recogn izing a provision on its bala nce sheet pursuant to IAS 37, *Provisions, Contingent Liabilities and Contingent Assets*.   "A provision is a liability of uncertain timing or amount." IAS 37,   ¶10. "Provisions are recognised as   liabilities … because they are present obligations and it is prob able that an outflow of resources em bodying economic benefits will be required to settle the obligations."  IAS 37, ¶13(a).

193.     A provision shall be recognised when:

(a) an entity has a present obligation (legal or constructive) as a result of a past event;

(b) it is probable that an     outflow of resources em  bodying  economic benefits will be required to settle the obligation; and

(c) a reliable estimate can be made of the amount of the obligation.[19]

IAS, 37 ¶14,

194.     Given Chrysler's historical experience,   it expected a certa   in num ber of autos would be subject to recalls each year.  Based    on its exp erience regarding the lifetim e warranty costs of each vehicle line, as well    as its h istorical claim , it kne w that the costs o  f the recalls would fall into a cer tain range.  Thus, its current and historical e xperience allowed it to es timate reliably the total costs associated with all of its recalls.

195.     Chrysler's 2014 20-F explai  ns how it accrues a provi   sion for recalls and other warranty-related expenses:

> The Group estab lishes accruals [20] for product warranties at the tim   e the
> sale is reco gnized. …. The accrual for product warranties includes th    e

---

[19] "Except in extrem  ely rare c ases, an entity   will be ab  le to dete rmine a range of   possible outcomes and can therefore m ake an estimate of the  obligation that is suf ficiently reliable to use in recognising a provision." IAS 37, ¶25.

[20]  Chrysler refers to "accruals", an   d IAS 37   refers to a "provision" for warranty and recall expense.  These two terms refer to the same liability item on the balance sheet.

expected costs of warranty obligations imposed by law or contract, as well as the expected costs for policy       coverage, recall ac tions and buyback commitments. The estimated future costs of these action   s are principally based on assumptions regarding the lifetime warranty costs of each vehicle line and each m odel year of that vehicl e line, as well as historical claims experience for the Group's vehicles      . In add   ition, the num   ber and magnitude of additional service acti   ons expected to be approved, and policies related to additional service  actions, ar e taken into consider ation. … .

The Group periodically in  itiates voluntary service and recall actions to address various custom er satisfaction,  safety and emissions issues related to vehicles sold. Includ  ed in the accrual is th   e estim ated cost of these service and recall action s. The estimated  future costs of these action  s are based primarily on historical claim s experience for the Grou p's vehicles . Estimates of the future costs of these actions are inevitably imprecise du e to som e uncertainties,  includ ing th e num ber of vehicles affected by a service or recall action. … The estimate of warranty and additional service and recall action obligations is pe   riodically reviewed  during the year. Experience has shown that initial da  ta for any given m  odel year can be volatile; therefore, the process relie  s upon long-term  historical averages until actual data is ava ilable. As a ctual experience becomes available, it is used to modify the histor ical averages to ensure that the f orecast is with in the range of likely outcom  es. Resulting  accruals are then com pared with current spen ding rates to ensure th  at the balan ces are adequate to m   eet expected future obligations.[21]  2014 20-F page 66.

196.    Chrysler's d isclosure statement that it pe riodically reviews its estim ates of costs for recall actions to ensure accu racy is consiste nt with ¶59 of IAS 37, wh ich states: "Provision s shall be rev iewed at th e end of each repo rting period and  adjus ted to  reflect th e curren t bes t estimate."

---

[21]   Warranty costs incurred are generally recorded in the Consolidated income statement as Cost of sales. However, depending on the specific nature  of the recall,  including the significance and magnitude, the Group reports certain of these        costs as Unusual expenses. A      s such, for comparability purposes,  the Group   believes th at  separate identif ication allows u  sers of  the Group's Consolidated financial statem  ents to ta  ke them  into appropriate consideration when analyzing the performance of the Group and assi sts them in understanding the Group's financial performance year-on-year. 2014 20-F page 66.

197.    From 2009 t hrough 2015, Chrysler experienced  a steady and substantial increase in the number of auto recalls that it was forced to issue.  Below is a chart showing the number of individual auto recalls and the   total number of c ars involved  for the recalls from  2009 through 2015.[22]

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Recalls | 23 | 24 | 11 | 13 | 36 | 39 | 42 |
| Recall Change % | | 4.3% | -54.2% | 18.2% | 176.9% | 8.3% | 7.7% |
| Units Recalled | 484,183 | 7,528,604 | 1,8,621 | 4,334,270 | 5,665,884 | 12,940,104 | ,074,448 |
| Units Recall Change % | | 215.7% | -49.1% | 71.4% | 249.7% | 27.3% | 103.3% |
| Change Since 2009 | | 216% | 61% | 176% | 864% | 1127% | 2394% |
| Change Since 2010 | | | -49% | -13% | 205% | 289% | 690% |
| Change Since 2011 | | | | 71% | 499% | 663% | 1451% |
| Change Since 2012 | | | | | 250% | 345% | 805% |

198.    The data shows that in 2013, Chrysler experienced a 250% increase in the number of units recalled.  And Chrysler suffered another 27% increase in units recalled in 2014 on top of the already huge 250% increase in 2013.

199.    Yet for fiscal 2013, Chrysler increased  its provision for warranty expense only by 8%, and in 2014, it increased the provision less than 33%. These 8% and 33% increases in the warranty provision were com pletely inadequate to fund Chrysler's m ounting recall expenses in the face of an overall 3  45% in crease in un its recalled from  2012 to 201 4, a 663% increase in units recalled from 2011 to 2014, and a whopping 1127% increase in  units recalled from 2009 to 2014.

200.    Chrysler management knew the number of recalled vehicles, the approximate cost to repair each vehicle and the nu    mber of vehicles yet to be re    paired. W ith this  inf ormation, Chrysler management was in pos ition to accu rately es timate increm ental warranty e xpense and

---

[22]   The d ata for the chart was sourced  from databases maintained by NHTSA, publicly available at http://www-odi.nhtsa.dot.gov/downloads/ (accessed on March 18, 2016).

the associated liability related to the r        ecalls. And ye    t Chrysler knowingly failed to proportionately increase its prov ision for warranty expense to a  ccount for this known spike in units recalled.

201.    As discussed above, Chrysler is m andated to file a 573 Report with NHTSA "not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be saf ety re lated" tha t identif ies the  work that  is needed to rem   edy the defect and the total number of units affected by the recall.  In addition, the TREAD Act mandates that manufacturers submit quarterly reports to NHTSA called "Ear       ly W arning Reports" that include warranty reports; consumer complaints; property damage claims; and field reports broken down by m ake, model, and model year and problem category.

202.    Thus, Chrysler had available tim ely accurate inf ormation as to the estimated and actual historical costs of its reca lls from which to estab lish an accurate p rovision for contingen t liabilities at all times.  And under ¶59 of IAS 37, Chrysler was required to review its estimates of the cost of auto recalls at the end of each repor  ting period and adjust them to reflect the curren t best estimate resulting from the timely and accurate information at its fingertips.

203.    It wasn't until the end of the third quarter of 2015 – a full year after the dust from merger had settled, when Chrysler f  inally made  an honest reassessm ent of its costs for recalls, which resulted in a change in its estimate for the recall provision of €761 million for the U.S. and Canada for estim ated future recall cam paign costs  for vehicles sold  in periods prior to th e third quarter of 2015.  (2015 Form 20-F page 73).  As further evidence of the magnitude of Chrysler's under-accrual of a liability for pr oduct recalls prior and during th e Class Period,  in fiscal 2015, Chrysler ac crued an ad ditional €4. 7 billion  for warran ty and reca ll provision, inc reasing its n et

provision from €4.84 billion to €6.47 billion after pa ying out €3.3 billion in warranty and recall settlements in 2015. (2015 Form 20-F page F-79).

F.  **Chrysler's Vehicle Emissions Regulatory Violations**

*Chrysler's Obligations Under Vehicle Emissions Regulations*

204.    Nitrogen Oxide (or "NOx") is a family of  highly reactive gas es that play a m ajor role in the atm ospheric reactions with volat ile organic com pounds that  produce ozone in the atmosphere. Breathing ozone can    trigger a variety of health     problems including chest pain, coughing, throat irritation, and congestion. Breat      hing ozone can also worsen bronchitis, emphysema, and asthma, and can lead to prem      ature death. Children are at greatest risk of experiencing negative health im  pacts from  expos ure to ozone. Additionally, recent scientific studies indicate that the direct    health effects of NOx are wo    rse than previously understood, including respiratory problems, damage to lung tissue, and premature death.

205.    U.S. and European regu latory agencies  regulate em issions from  m otor vehicles, including NOx.

206.    For example, in the U.S., Title II of the Clean Air Act (the "Clean Air Act" or the "Act"), as am ended, 42 U.S.C. § 7521 et seq., and   the regulations promulgated thereunder, aim to protect human health and the environm ent by reducing NOx and other pollutants from  mobile sources of air pollution, including motor vehicles.

207.    Section 202(a) of the A ct, 42 U.S.C. § 7521(a), requires the EPA to prom   ulgate emission standards for new m otor vehicles for NO x, and other air pollutants. 40 C.F.R. Part 86 sets em ission standards and test procedures fo   r light-duty motor vehicl es, including e mission standards for NOx. *See* 40 C.F.R. § 86.1811-04.

64

208.    Every auto m anufacturer m ust e mploy vari ous strategies to control tailpipe emissions in order to meet the EPA's regulatory requirements for low NOx emissions.

209.    Light-duty vehicles m ust satisfy em ission standards for certain air pollutants. 40 C.F.R. §§ 86.1811-04, 86.1811-09, 86.1811-10. The EPA a dministers a certification program to ensure that every new motor veh icle introduced into United States commerce satisfies applicable emission standards. 42 U.S.C. § 7521. Under this      program , the EPA issues Certificates of Conformity (or "COCs") to vehicle manufacturers to certify that a vehicle class conforms to EPA requirements and thereby regulates  the introdu ction of ne w m otor vehicle s in to United Sta tes commerce. Every m otor vehicle in troduced into  commerce in the United States m  ust have a COC.

210.    To obtain a COC, a m anufacturer must submit an application to the EPA for each model year and for each test group of vehicles      that it intends to e    nter into  U nited States commerce. 40 C.F.R. § 86.1843-01. A test group is co mprised of vehicles with similar emissions profiles for pollutants regulated under the Act. See, e.g., 40 C.F.R. §§ 86.1803-01, 86.1827-01.

211.    Vehicles are covered by a COC only if      the vehicles are as described in the manufacturer's application for the COC "in all material respects." 40 C.F.R. § 86.1848-10(c)(6).

212.    Section 203(a)(1) of the Act, 42 U.S.C.   § 7522(a)(1), prohibits m anufacturers of new motor vehicles from selling, offering for s ale, introducing into commerce, or delivering for introduction into commerce, or any person from importing into the United States, any new motor vehicle not covered by a COC issued by the      EPA under regulations prescribed by the Act governing vehicle emission standards. It is also a  violation to cause any of the foregoing acts. 42 U.S.C. § 7522(a); 40 C.F.R. § 86.1854-12(a).

65

213.    Auto m anufacturers are also    required to disc lose a ll em issions sof tware. In particular, the m anufacturer m ust disclose a ll auxiliary em ission cont rol d evices ("AECDs") installed on the vehicles. 40 C.F.R. §     86.1844-01(d)(11). 40 C.F.R. § 86.1844-01(d)(11). An AECD is "any elem ent of design w hich senses te mperature, vehicle sp eed, engine [revolutions per m inute], transm ission gear, m anifold vacu um, or any other param eter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 86.1803-01. Th e manufacturer must also incl ude "a justification for each AECD, the parameters they sense and contro l, a detailed justification of each AECD that resu lts in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device." 40 C.F.R. § 86.1844-01(d)(11).

214.    A defeat device is a piece of engine management software designed specifically to circumvent the em issions testing process. It can turn em issions controls on during the test, and off when the car is in normal use. Such systems are banned.

215.    Specifically, Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B), makes it a violation "for any person to m    anufacture or sell, or of fer to se ll, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or rende r inoperative any device or elem ent of design installed on or in a m  otor vehicle or motor vehicle engine in com pliance with regulations under this subchapter, and wh  ere the person knows or should know that such part or component is being offered for sale or inst alled for such use or put to such use." See also 40 C.F.R. § 86.185412(a)(3)(ii).

216.    Similarly, Section 203(a)(3)(A) of the Ac t, 42 U.S.C. § 7522(a)(3)(A), prohibits any person from removing or rendering inoperative any device or elem ent of design installed on

66

a motor vehicle in compliance with the regulations promulgated under Title II of the Act prior to its sale and delivery to the ultimate purchaser. This provision also prohibits any person from knowingly removing or rendering inoperative any device or element of design installed on a motor vehicle in compliance with the regulations promulgated under Title II of the Act after its sale and delivery to the ultimate purchaser. 42 U.S.C. § 7522(a)(3)(A).

***Regulatory Scrutiny of Emissions Compliance Increased
During the Class Period***

217.    During the Class Period, regulatory scrutiny of emissions compliance dramatically increased, especially as to NOx emissions. As discussed below, *infra* ¶¶ 477-485, Defendants repeatedly acknowledged that they were well aware that regulators were increasing their focus on emissions compliance.

218.    Notably, in September 2015, The EPA issued a public notice of violation of the Clean Air Act to Volkswagen, stating that model year 2009-2015 VW and Audi diesel cars included defeat devices - software that permitted the vehicles to cheat EPA tests and spew illegally high levels of NOx into the air. Volkswagen admitted to installing secret software in hundreds of thousands of U.S. diesel cars to cheat exhaust emissions tests and make them appear cleaner than they were on the road. On January 4, 2016, the DOJ filed a civil suit against VW seeking $46 billion for Clean Air Act violations, which led to VW spending approximately $35 billion in legal fines, vehicle buybacks, owner compensation and legal fees.

219.    Volkswagen's device was programmed to turn off the vehicles emissions controls after 23 minutes, just after the length of the EPA's emissions tests. This permitted VW's diesel vehicles to appear to be compliant with NOx emissions regulations during the course of the EPA's tests, when in fact they were not.

220.    The details of Volkswagen's em issions scheme were well publicized and, as discussed below, Marchionne repe atedly discussed the V olkswagen scandal and technology used to ach ieve compliance with emissions regu lations with investors and  asserted that he had conducted an investigation and audi t of Chrysler's vehicles and de termined that they were fully compliant with em issions regulations (which inc lude disclosure of all AECDs and forbid defeat devices).

***The Sale of Diesel Tr ucks, especially the Grand Cherokee
and Ram 1500 Were Extremely Important to Chrysler***

221.    During the Class Period, it wa s of critical im portance th at Chrysler b e able to make its diesel vehicles appear  compliant with em issions regul ations.  In 2015 78 percent of Chrysler's U.S. sales volume came from light-duty trucks, delivering 90 percent of its profit.[23]

222.    In a July 30, 2015 earnings call, discussi ng the vehicles involved in the NHTSA mandated repurchase offer, Marchi onne stated that m any of them  are "work truck s where the owners depend on the truck  for their livelihood", highlighting the significance of the diesel truck to Chrysler: "these tend to be am ong our most loyal truck owners and also  ***due to our unique diesel offe ring in this   heavy-duty truck segment*** ." Marchionne continued, "W e do have the highest mileage of anybody in the pickup truck segment in the U.S. today with diesel. ***I think it's something that certa inly has attrac ted a large portion of the buying public*** , not to m ention issues about the actual performance of diesel in terms of torque and capability."

223.    In a January 27, 2016 earnings call, CFO Palm er stated "The Jeep Grand Cherokee had its strongest sales in the U.S. si nce 2005, and all other Jeep m odels reported all-time record sales in the United      States. . . .T he strong improve ment in adjusted EBIT was

---

[23] http://www.autonews.com/article/20160120/COPY01/301209980/fiat-chrysler-runs-short-on-time-to-fix-emissions-problems-in-u.s.

primarily driven by volum e growth, m ainly from  the Jeep and Ra  m brands, led by the Jeep

Renegade and Cherokee."

224.    During the sam e call, Marchionne discusse  d Chrysler 's s hift to "de-  focus the

passenger car m arket", stating "we need to reu  tilize those p lant infrastructures to tr y and dea l

with the developm ent of both Jeep and th  e Ram brand. . . . the continuation of the  ***Cherokee,***

***which as you well know is essentia  l to the d evelopment of the brand,  especially in NAFTA*** –

that these things happen with us  ***without us los ing any volu me in the J eep or the Ram brand***.

***These are things which are fundamental*** . . ."

225.    In an April 26, 2016 earnings call, Palm  er again em phasized the im portance of

these trucks: "Our shipm ents overall were up   3%, driven by Ra  m and  Jeep offset ting l ower

shipments of Chrysler 200 and Dart and Journey a  nd Fiat 500 . . . Mix was an i  mportant part of

the improved margin, because of the increased Jeep and Ram volumes."

***Chrysler Used Defeat Devices Similar to Volkswagen***

226.    All m odern engines are integrated with    sophisticated com  puter components to

manage the vehicle's operation, such as an el     ectronic diesel control ("EDC"). Robert Bosch

GMBH ("Bosch") tested, m anufactured, and sold  the EDC system  used by Volkswagen as well

as Chrysler. This syste m is m ore formally referred to a s the Electronic  Diesel Control Unit 17

("EDC Unit 17" or "ED 17"). Upon its introduc tion, EDC Unit 17 was publicly-touted by Bosch

as follows:[24]

> EDC17 … controls ever y parameter that is im portant for effective, low-emission
> combustion.
>
> Because th e com puting power and functi  onal scope of the new EDC17 can b    e
> adapted to m atch particular requirem ents, it can be used very flexibly in any
> vehicle segment on all the world 's markets. In addition to  controlling the prec ise

---

[24] See Bosch Press Release, The brain of diesel injection: New Bosch EDC17 engine management system
(Feb. 28, 2006), http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

timing and quantity of injection, exhaust ga s recirculation, and m anifold pressure regulation, it also offers a large num        ber of options such as the control of particulate f ilters or system s for reduc ing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This im  proves the precisi on of injection throughout the vehicle's entire serv ice life. The system    therefore m  akes an im  portant contribu tion to observing future exhaust gas emission limits.

227.    Bosch worked with each vehicle manufacturer that utilized EDC Unit 17 to create a unique set of specifications and   software code to m anage the  vehicles' engine operation. For example, the Dodge Ram 1500 e       missions software is a "Bosch EDC17,"as is the Grand Cherokee.

228.    With respect to Chrys ler's vehicles, however, E DC Unit 17 was also en abled by Bosch and Chrysler to surreptiti ously evade em issions regulations just as Bosch had done with Volkswagen. Bosch and  Chrysler worked tog ether to d evelop and im plement a specific se t of software a lgorithms for im plementation in  the v ehicles, which enab led Chrysler to  adjust fuel levels, exhaust gas recirculation, ai r pressure levels, and even urea  injection rates (for applicable vehicles).[25] When carmakers test their vehicles against EPA emission standards, they place the ir cars on dynamometers (large rollers) and then perform a series of specif ic maneuvers prescribed by federal regulations. Bosch's   EDC Unit 17 gave Chrysler (a   s it did  with Volks wagen) the power to detect test scenarios by monitoring    vehicle speed, acceleratio n, engine o peration, air pressure, and even the position of the steeri       ng wheel. W hen the EDC Unit 17's detec    tion algorithm detected that the ve  hicle was on a dynam ometer (and undergoing an em ission test), additional software code within the EDC        Unit 17 downgraded the engine's power and performance and upgraded the em issions control  systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in  emissions to legal levels. Once the E DC Unit 17

---

[25] See, e.g         ., En        gine        management, Bo     sch Au      to Parts, h         ttp://de.bosch-automotive.com/en/parts_and_accessories/motor_and_sytems/diesel/engine_management_2/engine_control_unit_1 (last accessed Nov. 30, 2016).

detected that the emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently caused the vehicle to spew the full amount of illegal NOx emissions out on the road.[26]

229.   Specifically, Chrysler's diesel vehicles contained at least eight AECDs, none of which were ever disclosed, contravening emissions regulations. These AECD shut-off or reduced key NOx controls – such as exhaust gas recirculation (" EGR"), selective catalyst reduction ("SCR") and diesel exhaust fluid ("DEF") when the vehicles were operating in real world conditions.

230.   EGR is a NOx emissions reduction technique. It recirculates a portion of the engine's exhaust gas back to the engine cylinders. This dilutes the $0_2$ in the incoming air stream, lowers the combustion chamber temperature, thereby reducing the amount of NOx the combustion generates.

231.   SCR is an emissions control technology system that injects DEF through a special catalyst into the exhaust stream. The DEF sets off a chemical reaction that converts NOx into nitrogen, water and tiny amounts of carbon dioxide (natural components of the air we breathe), which is then expelled through the tailpipe.

232.   Each of these controls reduced NOx emissions, and each of the undisclosed AECDs identified below targeted these controls *always with the purpose of increasing emissions*.

- AECD 1 (*Full EGR Shut-Off at Highway Speed*)
- AECD 2 (Reduced EGR with Increasing Vehicle Speed)
- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)

---

[26] Russell Hotten, Volkswagen: The scandal explained, BBC (Dec. 10, 2015), http://www.bbc.com/news/business-34324772.

- AECD 4 (DEF Dosing Disablement during SCR Adaptation)
- AECD 5 (EGR Reduction due to Modeled Engine Temperature)
- AECD 6 (SCR Catalyst Warm-Up Disablement)
- AECD 7 (Alternative SCR Dosing Modes)
- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

233.    These AECDs caused the vehicle to perform    differently w hen the veh icle was being tested for com pliance with the EPA emi ssion standards using the Federal em ission test procedure (e.g. FTP, US06) than in norm al operation and use.  That is, the software detected the differences in conditions between a test proced ure and normal road conditions.  If the vehicle was running during a test, the em issions controls would work.  If th e vehicle detected that it was running in normal operation and use, the emissions controls would shut off. For example:

a) AECD 1 *completely shut-off the EGR system anytime the vehicle was travelling at highway speed*.

b) AECD 3, when combined with either AECD 7 or AECD 8, *disables the EGR system* without increasing the effectiveness of SCR system. Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system. *The AECD 3 uses a timer to shut off the EGR, which does not meet any exceptions to the regulatory definition of "defeat device."*

c) *AECD 5 & 6 together reduce the effectiveness of the NOx emissions control system*, using a timer to discontinue warming of the SCR after treatment system, which reduces its effectiveness.

d) *AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use*. The operation of AECD 1. AECD 2 and/or AECD 5 increase the frequency of occurrence of AECD 4.

e) *AECDs 7 & 8 work together to reduce NOx emissions* during variable-grade and high-load conditions.

234.    One of the effects of Chrysl er's illegal software was that its  vehicles would tur n off their em issions control after 22 m inutes, the time it tak es for a stand ard emissions test. That is, the software was designed to allow vehicl    es to m eet pollution standards under testing

72

conditions, but lets the NOx levels   increase to illegal levels at   high speeds or during extended driving periods.

235.    These AECDs were illegal. The Clean Air  Act expressly prohibits defeat devices, defined as any auxilia ry emission control dev ice "that redu ces the ef fectiveness of the em ission control system under conditions which m ay reasonably be expected to b e encountered in nor mal vehicle operation and use." 40 C.F.R. § 86.1803-  01; see also id. § 86.1809-10 ("No new light-duty vehicle, light-duty truck, m edium-duty passenger vehicle, or com plete heavy-duty vehicle shall be equipped with a defeat    device."). Moreover, the Clean    Air Act prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed    for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application, which lists all aux iliary em ission control dev ices installed in  the veh icle, a jus tification for each, and an explanation of why the control device is not a defeat device.

236.    Moreover, Chrysler ne ver ev en disclosed  (m uch les s jus tified) these  contro l devices in their COC applications, as required by EPA regulations, and Chrysler thereby violated the Clean Air Act ea  ch tim e it so  ld, of fered f or sale, introduced in commerce, or im    ported approximately 104,000 vehicles.  Chrysler's active    concealm ent of these control devices also further dem onstrates D efendants' s cienter. In   each application for COC, Chrysler iden    tified between 13 and 17 legal AECDs, yet each time failed to disclose any of the 8 illegal AECDs that increased NOx emission.  Chrysle r's failure to  disclose the v ery same AECDs that p ermitted its vehicles to cheat the emissions tests is not a coincidence.

237.    Because the COCs were fraudulently obtai  ned, and because Chrysler's vehicles did not conform "in all material respects" to the specifications provided in the COC applications,

73

the vehicles were never covered by a valid COC,   and thus were never legal for sale, nor were they EPA a nd/or CARB com pliant, as represen ted. Chrysler hid these facts from the EPA, CARB and other regulators, its de alers, consum ers, and investors, and it continued to sell and lease the vehicles to the driving public, despite their illegality.

238.   As detailed below, by August 2014, Defenda nts were aware that the Jeep Grand Cherokee and Ram 1500 3.0 diesel v ehicles were emitting NOx emissions above the legal limits and the lim its the Company had represented to    the EPA and CARB.  Even if Defendants somehow were not previously aware of the ver   y AECDs t hey installed on their vehicles, the investigation into the c ause of the high NOx em issions would ha ve a lerted them to the ve ry AECDs that they installed. *See infra* at ¶¶ 439-449.

239.   Indeed, in 2015 Defendants instituted a s ecret "field fix" of AECD#1 on the 2014 Jeep Grand Cherokee and Ra m 1500 3.0 diesel ve hicles.  The field fix involved updating the vehicle's software, which could be done anytime th e vehicle is brought into  the dealership (for servicing, an oil change, or othe rwise).  The field fix, like all    field fixes, was approved by the VRC (whic h included Kunselm an, Lee and (later  ) Dahl) and was reported to Marchionne. If Defendants did not know about the AECDs and thei r illegal impact on NOx e missions then they could not have m ade the decision to rem ove AECD#1 from their vehicles .  Moreover, the fact that Defendants conducted this "f ield fix" secretly without inform ing the public dem onstrates that Def endants knew that the exis   tence of th e AECDs was i  mportant to investors and the public's knowledge of their existence would harm the Company. *See infra* at ¶¶ 415-421.

240.   As Marchionne would later adm it in  a January 12, 2017 interview, by no later than September 2015, the EPA had inform     ed hi m that the EPA had identified undisclosed AECDs that it had determ ined were "d efeat devices." Marchionne stated " ***obviously, we knew***

74

*that they had concerns.  We have been in dial ogue with them now since September 2015.  It could have been even earlier.*"

241.    It was indeed earlier. Confidential Witness #3 ("CW3") was a Program Manager of Advanced Powertrain at Chrysler (the division headed by Lee) from June 2013 through September 2015, located at the Auburn Hills, Michigan facility.  According to CW3, Chrysler was aware that its diesel model vehicles were exceeding the emissions levels that the Company had reported to the EPA by no later than summer 2015. It was CW3's understanding that the vehicles were emitting more NOx than what FCA was reporting to the EPA.  "I knew they had an issue with the software and were working on trying to figure it out," CW3 said. "They knew there was an issue." The issue was that some of the vehicles were exceeding the emissions levels that had been reported to the EPA. "Whatever they were reporting on the label, whatever they told the government, they found out they weren't meeting those," CW3 said.  "It was big issue," CW3 said of the emissions discrepancy. "It went all the way up to Bob Lee." CW3 understood that Lee formed the team and was pulling engineers and tech specialists from several different departments to work on it. From conversations with co-workers, CW3 said many employees "knew something… was going on." "They were pulling guys from other projects," CW3 said. "That (issue) was the number one priority all the sudden." "The details were kind of hush hush," CW3 said. "It was a secretive mission if you will. It wasn't public knowledge." CW3 said no one at FCA, especially not the leadership, was talking publically about the issue and the company's efforts to deal with it.

242.    Following the EPA informing Defendants that it believed Chrysler's Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles contained AECDs that were defeat devices, Chrysler

conducted an audit of its software. Marchionne, Kunselman, Lee, and Dahl (among many others) were all involved in discussions of the issue.

243.    On October 27-28, 2015, ███████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

244.    Between November 25, 2015 and January 13, 2016, Dahl (who had taken over Kunselman's position and reported to Marchionne), communicated with the EPA several times (in person, via email and over phone) concerning the 8 AECDs that the EPA believed were defeat devices. On January 7, 2016, the EPA emailed members of Dahl's team demanding to have another call with Dahl that same day because "I am very concerned about the unacceptably slow pace of the efforts to understand the high NOx emissions we have observed", reiterating that "a t lea st one of the AECDs in qu estion appears to m e violate EPA's defeat device regulations." Dahl spoke with the EPA on January 8, 2016 and met in person with the EPA and CARB on January 13, 2016 to discuss these issues. *See infra* at ¶¶ 427-430.

245.    On January 11, 2016, Dahl emailed Christopher Grundler (Director of the EPA Office of Transportation and Air Quality) stating that "[a]fter identifying these concerns at the November 25, 2015 meeting with my staff, FCA has been engaged in extensive efforts to analyze the issues…We truly appreciate the significance of your concern that NOx emissions during certain operating modes has been identified."

246.    On January 13, 2016, 

247.    Despite (i) Def endants intim ate knowledge of the AECDs, (ii) the high NOx emissions in their Grand Cherokee and Ram   1500  3.0 diesel vehicles, (iii) conclusions by the EPA and CARB that the vehicles contained undi     sclosed defeat devices, and (iv) a purported "audit" of all the software on        their diesel vehicles, Marchionne     continued to assert that Chrysler's vehicles were in full com       pliance   with em issions regulations (which required disclosure of all AECDs and prohibited defeat devices).

248.    Marchionne finally adm itted that all prev ious representations of com pliance were false during a July 27, 2017 Q2 2017 earnings ca  ll.  Responding to a question about voluntary updates to C hrysler's software in its diesel vehi cles, Marchionne stated "We are looking at this, if we can do it, and provide an im  provement in air quality, both on CO  2 and NOx, purely as a result of calibration, and we'll do this*.  **The important thing is that, within the scheme of things that existed at the time in which we la unched these vehicles, we weren't compliant**.  If there is a way to improve that position, we will more than gladly do it.  So we're working at this."

G.    **Materially False and Misleading Statements Issued During the Class Period**

249.    On or about May 3, 2013, Mazure, on behalf    of Chrysler, sent to the EPA and CARB Chrysler's application for COC for    the 2014 Jeep Grand Cherokee and R   am 1500 3.0 diesel vehicles, which was publicly posted to       the EPA website ther  eafter.  The   applic ation included separate cover letters to th  e EPA a nd CARB signed by Mazure, each stating that the vehicles co mply with a ll em issions regulations/standa rds (including disclosure of AECDs and meeting NOx em ission standards):  "Chrysler agrees that th  e e xhaust em ission standards listed below and in the app   lication f or ce rtification a pply to bo  th cer tification and in -use vehicles according to the provisions of 40 CFR, Parts        86 and 88, as applicable."  The application purported to disclose in Secti   on 11 the "List of AECD Us     ed  in Test Group", identifying 13 AECDs.

250.    The foregoing representations in ¶ 249 were    materially false and/or m  isleading because, *inter alia* Chrysler was illegally using undisclose d and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

251.    On or about September 25, 2013, Mazure, on be half of Chrysler, sent to the EPA and CARB Chrysler's updated application for  COC for the 2014 Jeep Grand Cherokee and Ra m 1500 3.0 diesel vehicles, which was publicly posted  to the EPA website thereafter.  The updated application included separate cover letters to the EPA and CARB signed by Mazure, each statin g that the v  ehicles com ply with  all em  issions  regulations/standards (i ncluding disclosure of AECDs and m  eeting NOx em  ission standards):   "Chrysler agrees th  at the exh aust em ission standards listed below a nd in the ap plication for  certification apply to bot h certification and in-use vehicles according to the provisions of 40 CFR, Parts 86 and 88, as applicable."  The updated

78

application purported to disclose in Section      11 the "List of AECD Used in Test Group", identifying 13 AECDs.

252.    The foregoing representations in ¶251 were     m aterially fals e and/o r m isleading because, *inter alia* Chrysler was illegally using undisclose d and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

253.    On or about Septem ber 27, 2013, Mazure, on be half of Chrysler, sent to the EPA and CARB Chrysler's second updated applicat ion for COC for the 2014 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles, which was publicly posted to the EPA website thereafter.  The updated application included sepa rate cover letters to the   EPA and CARB signed by Mazure, each stating  that the vehicles comply with        all em issions regulations /standards (includ ing disclosure of AECDs and m eeting NOx e mission st andards):  "Chrysler ag rees that the exhaust emission standards listed below and in the app lication for certification apply to both certification and in-use vehicles according to the provision s of 40 CFR, Parts 86 and 88, as applicable."  The updated application purported to disclose in Sec tion 11 the "List of AECD Used in Test Group", identifying 13 AECDs.

254.    The foregoing representations in ¶ 253 were     materially false and/or m isleading because, *inter alia* Chrysler was illegally using undisclose d and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

255.    On August 1, 2014, Fiat shareholders approved  the merger of Fiat into Chrysler. On October 12, 2014, the m erger was finalized.  The Class P eriod begins on October 13, 2014, the day on which the newly m  erged com pany's common stock started trading on the NYSE under the ticker symbol "FCAU."

79

256.    On August 12, 2014, Chrysler announced the    establishment of a new   office of Vehicle Saf ety and Regulatory Compliance, th    at reported directly to the Com    pany's CEO defendant Marchionn e, claim ing " [t]his action  will he  lp intensif y th e Com pany's continu ing commitment to vehicle safety and regulatory compliance."

257.    The foregoing representation in ¶ 256 was    materially false and/or misleading because it provided in  vestors with  false comfort   that Chrysler would   be able to   adequately respond to and address regulatory   issues from NHTSA's intensif ied enforcem ent efforts, and failed to disclose   tha t Chrysler  was in   bla tant violation of NHTSA'   s  regulations, tha t th e Company consisten tly failed to timely repor t to  NHTSA consum ers vehicle defects, necessary recall campaigns as well as deaths and serious injuries in violation of federal regulations.

258.    On or about Septem ber 12, 2014, Mazure, on be half of Chrysler, sent to the EPA and CARB Chrysler's application for COC for the 2015 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles, which was publicly posted to       the EPA website ther  eafter.  The   applic ation included separate cover letters to th  e EPA a nd CARB signed by Mazure, each stating that the vehicles co mply with a ll em issions regulations/standa rds (including disclosure of AECDs and meeting NOx em ission standards):   "Chrysler agrees that th  e e xhaust em ission standards listed below and in the app   lication f or ce rtification a pply to bo  th cer tification and in -use vehicles according to the provisions of 40 CFR, Parts        86 and 88, as applicable."  The application purported to disclose in Secti   on 11 the "List of AECD Us    ed in Test Group", identifying 14 AECDs.

259.    The foregoing representations in ¶258 were    m aterially fals e and/o r m isleading because, *inter alia* Chrysler was illegally using undisclose d and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

80

260.     On October 29, 2014, Chrysler issued a press release and filed a Form 6-K with the SEC which was signed by defendant Palmer, announcing its financial and operating results for the quarter and nine months ended September 30, 2014 (the "October 29, 2014 6K").  For the quarter, cost of sales was €20.356 million, EBIT was €926 million, and net profit was €188 million, compared to cost of sales of €17.747 million, EBIT of €862 million, and a net profit of €189 million for the same period in the prior year.  For the nine months, cost of sales was €59.694 million, EBIT was €2.157 million, and net profit was €212 million, or €0.132 per share, compared to a cost of sales of €53.706 million, EBIT of €2.542 million and a net profit of €655 million, or €0.036 per share for the same period in the prior year.

261.     The foregoing representations in ¶ 260 were materially false and/or misleading because the estimated future warranty and recall campaign costs for vehicles sold were materially understated by approximately €761 million as a result of the Company's failure to timely and adequately conduct recalls in violation of the accounting and reporting requirements in IAS 37.  Chrysler's failure to properly account for its costs and liabilities related to vehicle recalls caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) in each period than it would have been had Chrysler not been underreporting costs related to vehicle recalls.

262.     On November 5, 2014, Chrysler filed a Form 6-K with the SEC which was signed by defendant Palmer, appending as an exhibit an Interim Report reiterating the Company's previously announced financial and operating results for the quarter and nine months ended September 30, 2015 (the "November 6, 2014 6-K").  The Interim Report filed on November 6, 2014 included unaudited financial statements prepared in conformance with IFRS.  The Interim Report stated that for the nine months, cost of sales was €59.694 million, EBIT was €2.157

81

million, and net profit was €212 m illion, or €0.132 per   share, com pared to a co st of sales  of €53.706 million, EBIT of €2.542 million and a net profit of €655 million, or €0.036 per share for the same period in the prior year.   In additi on to reiterating the previously announced financial results, the Form  6-K s tated "C ost of sales also includes wa   rranty and product-related costs, estimated at the time of sale to dealer networks or to the end customer."

263.    The foregoing representations in ¶ 262 were    materially false and/or m  isleading because the estim ated future warranty and    r ecall cam paign cos ts f or vehicles  sold were materially understated  by approxim ately €761   million and Chrysler was in possession of substantial information that would have caused  higher reported costs an d liabilities f or warranty claims and recalls,  but Chrysler  did not tim ely recall the vehicl es o r p roperly acco unt for the costs of their repairs.

264.    Chrysler's financial s  tatements and notes  thereto included a chart on page 58 reporting the balance for warranty  and recall provision as €3.7   billon and €4.5 billion at fiscal year-end 2013 and Septem ber 30, 2014 respecti vely.  The provisions for 2013 and 2014 were false and misleading because Chrysler had syst    ematically u nder-accrued  its provision for the costs of its product recalls by appro ximately €761  million from at least 2013 throug h the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

265.    On Nove mber 13, 2014, Chrysler filed a    Form F-1/A with the SEC which was signed by defendants Palm    er and Marchionne.    The F-1/A included unaudited financial statements for the 9 m onths ended Septem ber 30, 2014 and audited financial statem ents for the years ended December 31, 2013 and 2012, prepared in conformance with IFRS.

266.    The F-1/A asserted that for the nine    months ended Septem ber 30, 2014, cost of sales was €59.694 million, EBIT was €2.157 m illion, and net profit was €212 m illion, or €0.132

per share, compared to a cost of sales of €53.706 million, EBIT of €2.542 million and a net profit of €655 million, or €0.036 per share for the same period in the prior year.  For the year ended December 31, 2013, cost of sales was reported as €74,326 million, EBIT was €3,002 million, and net profit was €1,951 million, or €0.736 per share.

267.    The foregoing representations in ¶ 266 were    materially false and/or m isleading because Chrysler failed to properly account for its   costs and liabilities rela ted to vehicle recalls which caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) in each period than it would have been had Chrysler not been underreporting costs related to vehicle recalls.

268.    The footnotes to Chrysler's financial st   atements included a chart repo   rting the balance for warranty and recall provision as €4,496 million and €3,656 million at September 30, 2014 and fiscal year-en d 2013 resp ectively. The provisions were false and m isleading because Chrysler h ad systematically und er-accrued its provision for the co sts of its product recalls by approximately €761 million from at least 2013 through the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

269.    The footnotes to Chrysler's financial s      tatements includ ed a chart reporting warranty costs of €2,011 million, for the fiscal year-ended 2013.  The warra nty costs were false and m isleading because Chrysler h  ad system atically under-reported th  e costs of its product recalls by approximately €761 million in violati on of the accounting an d reporting requirements in IAS 37.

270.    In addition, the F-1/A stated "T       he  Group establishes reserves for product warranties at the time the sale is recognized. . . . The reserve  for product warranties includes the expected costs of warranty obligations im posed by law or contract, as well  as the expected costs

83

for policy coverage, recall actions and buyback     commitments. The estim ated future costs of

these actions are principally based on assumptions regarding the lifetime warranty costs of each

vehicle line and each model year of that vehicle lin e, as well as historical claims experience for

the Group's vehicles. . . . The Gr oup periodically initiates voluntary service and recall actions to

address various customer satisfaction, safety a    nd em issions issues related to vehicles sold.

Included in the reserve is the estim ated cost of these service and recall action s. The estim ated

future costs of these actions are based prim arily on historical claim s experience for the Group's

vehicles."

271.    The foregoing representations in ¶ 270 were materially false and/or misleading for

the reasons stated in ¶¶ 267 and 269, and because Chrysler knew at the tim e that its costs and

liabilities related to vehicle warranties and recalls would be substantially higher due to its failure

to conduct timely recalls, notify customers, and remedy safety defects.

272.    Under the heading "Regulation" of th    e F-1/A, Chrysler stated "W    e face a

regulatory environm ent in m arkets throughout th e world where vehicle em    ission and fuel

economy re gulations are increasing ly becom ing m ore stringent which   will affect our vehicle

sales and profitability. ***We must comply with these regulations in orde r to continu e operations

in those markets***, including a n umber of m arkets where we  derive substantial revenue, such as

the U.S., Brazil and Europe."

273.    Regarding the EPA and CARB, Ch  rysler st ated, in part, "Under the U.S. Clean

Air Act, the Environmental Protection Agency, or EPA, and the California Air Resources Board,

or CARB ( by EPA wai ver), require em ission com pliance c ertification bef ore a vehicle can be

sold in the U.S. or in California (and m     any ot her states that have    adopted the California

emissions requirem ents). Both agencies im pose lim its on tailpipe and evaporative em issions of

84

certain smog-forming pollutants from new motor vehicles and engines. . . . In addition, EPA and CARB regulations requ ire th at a v ehicle's em issions perform ance be monitored with OBD systems. *We have imp lemented hardware and software  systems in a ll our vehic les to comp ly with the OBD requirements*."

274.   Regarding European regulations, Chrysl er stated "In E    urope, em issions are regulated by two different entities: the Europe   an Comm ission, or EC, a  nd the United Nations Economic Comm ission for Europe, or UNECE. .    . . In 2011, updated standards, Euro 5, for exhaust emission by cars and light-d uty trucks, became effective. Impending European em ission standards focus particularly on further reducing  emissions from diesel vehicles. The new Euro 6 emission levels . . .  will be effective for new vehicles on September 1, 2014 . . . ."

275.   The Nove mber 13, 2014 For m F-1A further represented "  *Our vehicles and the engines that power them must als  o comply w ith extensiv e regional, national and local laws and regulations and industry self-regulations    (including those that regulate veh  icle sa fety*, end-of-life vehicles,  *emissions* and noise).    *We are substantia  lly in complian  ce with the relevant global regulatory requ irements affe cting our facilities  and products. We constantly monitor such requirements and adjust our operations to remain in compliance.*"[27]

276.   Specifically, the F-1/A stated "Our flagship diesel engine is the V-6 3.0 liter Eco-Diesel. Variants of this engine  currently power Masera ti vehicles, the J eep Grand Cherokee an d the Ram  1500. The North Am   erican version of    our Eco-Diesel Engine was nam    ed one of WardsAuto "10 Best Engines" for 2014. . . . In co  mbination with last generation exhaust gases after tre atment system s, *our diesel engine families co  mply with Euro 6 emiss ion regulations, which are mandatory as of September 2014*."

---

[27] November 13, 2014 Form F-1/A, at 185.

85

277. The foregoing representations in ¶¶ 272-    276 were m aterially false and/or misleading because, *inter alia* Chr ysler: (i) r outinely ign ored its obligations to tim ely inform owners of s erious safety defects; (ii) routinely  notified owners or reca lls past the lega l deadline; (iii) routinely lied to N    HTSA about the tim  eliness of inform  ing owners about recalls; (iv) improperly waited months before recalling defec tive vehicles; (v) failed  to notify NHTSA about critical changes to owne r and de aler recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed   to provide NHTSA with required rem  edy plans for at least two reca lls (viii) f ailed to tim ely or proper ly provide remed ies for defect s; (ix) fai led t o report deaths and s erious injuries to NHTSA as requi  red; and (x) was illeg ally using undisclos ed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

278. On November 20, 2014, defendant Kunselm an provided a statem ent to the Senate Committee on Commerce, Science and Transpo rtation in Washington D.C.  Emphasizing that "I report directly to our com    pany CEO", Kunselm  an stated, "[r]ecalls have been, are and will continue to be an essential m  echanism to safe guard the public. Chrysler  Group prides itself on having the highest recall com pletion rate of a ll major U.S.-market auto makers. NHTSA regards our customer-notification protocol  s as 'industry-best.'"    He went on to st    ate, "Further, our average per-cam paign vehicle volum e is a mong th e lowest in the ind   ustry – well below the industry average. This is testam ent to our tran sparency and demonstrates clearly the robustness of our fleet-monitoring and our rapid response when issues arise."

279. The foregoing representations in ¶ 278 were    materially false and/or m  isleading because Chrysler did no t treat recalls as an im  portant mechanism to safeguard the p ublic and it did not rapidly respond when "issues arise."     Instead, Chrysler:  (i) routinely ignored its obligations to tim ely inform owners of seriou s safety defects; (i i) routinely notified owners or

86

recalls past the legal deadline;  (iii) routinely lied to NHTSA a bout the tim eliness of infor ming

owners about recalls; (iv) im  properly waited m onths before recalling  defective vehicles; (v)

failed to notify NHTSA about criti cal changes to owner and dealer  recall notification schedules;

(vi) failed to subm it am ended 573 reports to  NHTSA; (vii)  f ailed to provide  NHTSA with

required remedy plans for at least two recalls; (viii) failed to timely or properly provide remedies

for defects; and (ix) failed to  report deaths and seri ous injuries to NHTSA as required.  Also,

Friedman wrote letters of October 29 and November 19, 2014 to Kunselman and his direct report

severely c riticizing Chrysle r's reg ulatory co mpliance o n the v ery issue s Kunselm an wa s

addressing.

280.    On Nove mber 26, 2014, Chrysler filed a  Form F-1/A with the SEC which was

signed by defendants Palm  er and Marchionne re   iterating the sam e f alse and m  isleading

unaudited interim and audited financial information and statements identified in ¶¶ 266, 268, and

269, which were false and m isleading and violated  IFRS for the reasons stated in ¶¶ 267, 268,

and 269.

281.    The November 26, 2014 F-1/A repeated th e same statements identified in ¶¶ 269-

276, including the representation " ***Our vehicle s and the  e ngines tha t power the m mus t a lso

comply with extensive  regional,  national and  lo cal laws and regulations and in  dustry self-

regulations (including those that regulate veh  icle sa fety***, end-of-life vehicles,  *emissions* an d

noise).  *We are substan tially in comp liance with the relevant global  regulatory requiremen ts

affecting our facilities and products. We consta ntly monitor such requirements and adjust our

operations to rema  in in compliance.* "  Chrys ler also again rep  resented " ***our diesel engine

families co mply with Euro 6 emission regula    tions, which are mandatory as of September***

*2014*" and "*We have implemented hardware and software systems in all our vehicles to comply with the OBD requirements*."

282.    The foregoing representations in ¶ 281 were    materially false and/or m  isleading because for the reasons stated in ¶ 277, and because defendant Marchionne had received a letters from NHTSA Adm  inistrator Fr iedman on Novem  ber 19 and 25,    2014 stating, in part, that Chrysler was "*consistently*" at the "*rear of the pack*" when it came to regulatory compliance and that Chrysler's delay in notifying consum        ers of safety defects was sim            ply "*unacceptable..exacerbat[ing] the risk to motorists' safety.*"

283.    On Decem ber 4,  2014, Chrysler filed a    Form F-1/A with  the SEC which was signed by defendants Palm   er and Marchionne re    iterating the sam   e f alse and m   isleading unaudited and audited  financial inf ormation and statem ents identified in ¶¶ 266, 268, and 269, which were false and m  isleading and violated  IFRS for the reasons stated in ¶¶ 267, 268, and 269.

284.    On December 12, 2014, Chrysler issued a p ress release and filed with  the SEC (i) a prospec tus on Form  424B4 off ering 87 m illion  shares of the Com pany's comm on stock f or total gross proceeds of approxim ately $4 billion[28]; and (ii) a prospectus on Form 424B4 offering $2.5 billion aggregate amount of the Com  pany's mandatory convertible securi ties (collectively, the "Prospectuses").  Each of the Prospectuses  reiterated the same unaudited interim and audited financial information and statements identified in ¶¶ 266, 268, and 269.

285.    The foregoing representations in ¶ 284 were materially false and/or misleading for the reasons stated in ¶¶ 267, 268, and 269.

---

[28] The two prospectuses Chrysler filed on    December 12, 2014 were for (i) the sale of $957 million of common stock with a $133 million overallotment option, and (ii) the sale of $2.5 billion of convertible notes with a $375 million overallotment option.

286.     On or about December 17, 2014, Mazure, on behalf of Chrysler, sent to the EPA and CARB Chrysler's updated application for COC for the 2015 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles, which was publicly posted to the EPA website thereafter.  The updated application included separate cover letters to the EPA and CARB signed by Mazure, each stating that the vehicles comply with all emissions regulations/standards (including disclosure of AECDs and meeting NOx emission standards):     "Chrysler agrees that the exhaust emission standards listed below and in the application for certification apply to both certification and in-use vehicles according to the provisions of 40     CFR, Parts 86 and 88,   as applicable."  The application purported to disclose in Section     11 the "List of AECD Used in Test Group", identifying 17 AECDs.

287.     The foregoing representations in ¶286 were    materially false and/or misleading because, *inter alia* Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

288.     On January 28, 2015, Chrysler issued a press release and filed a Form  6-K with the SEC which was signed by defendant Palmer, announcing its financial and operating results for the quarter and the fiscal year ended December 31, 2014 (the "January 28, 2015 6-K").  For the fourth quarter, EBIT was €1.07 billion, and net profit was €420 million, or €0.329 per share, compared to EBIT of €460 million, and a net profit of €1.3 billion, or € 0.707 per share for the same period in the previous year.  For the year, EBIT was €3.22 billion, and net profit was €0.6 billion, or €0.465 per share, compared to EBIT of €3 billion, and a net profit of €1.95 billion, or €0.744 per share for 2013.

289.     The foregoing representations in ¶ 288 were    materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle

89

warrantees and recalls which caused its EBIT, and net profit to be higher (and its costs of sales to be lower) than it would ha    ve b een by approxim  ately €761 m  illion had Chrysler not been underreporting costs related to vehicle recalls.

290.    During a January 28, 2015 conference call,    following the release of the quarter and fiscal y ear ended Decem ber 31, 2014 results, in  response to an analyst's question "did you reflect the cost of the T  akata airbag recall at  year end or is this co  ming in 2015?  And can you give us som  e sense of this industrial cost go    ing into 2015, are there likely to be less of a headwind versus 2014 . . .", Defenda    nt Palm er stated flatly "Yes  ."  Palm er later elaborated: "Yes. We have booked the Takata item  in Q4. In 2015, as I said before, we expect the industrial cost headwind to be significantly less than it wa    s in 2014 because o   f the fact that all these launches with extra content have had a 12-m    onth cycle now. So, year-over-year, they're in the numbers."

291.    The foregoing representations in ¶ 290 were    materially false and/or m  isleading because Chrysler's failed to properly accoun    t fo r its costs and liab    ilities related to vehicle warrantees and recalls which caused its EBIT, and net profit to be higher (and its costs of sales to be lower) than it would ha    ve b een by approxim  ately €761 m  illion had Chrysler not been underreporting costs related to vehicle recalls.      The representations were also false and/or misleading for the reasons stated in ¶ 277 (i        )-(ix) and b  ecause d efendant Marchionne had received a letters from  NHTSA Adm inistrator Friedman on Nove mber 19 and 25, 2014 stating, in part, that Chrysler was "  *consistently*" at th e "*rear of the pack* " when it cam e to regulato ry compliance and that C   hrysler's delay in notif  ying consum ers of safety defects was sim    ply *"unacceptable..exacerbat[ing] the risk to motorists' safety."*

90

292.   Defendant Marchionne assured investors that the recalls that had been occurring were an industry-wide phenomenon resulting from a change in regulatory enforcement, rather than a Chrysler-specific deficiency, and affirmatively represented that the Company's internal controls around recalls were industry leading best practices, which would result in a reduction in costs associated with recalls:

> <Q - José Asumendi>: And the final one is to Mr. Marchionne on the quality front. Can you talk a bit about the changes you've done on the management front, on the quality front, and how you are, you have the right structure now to deliver improved at least – to avoid what we had last year in 2015? Thank you.

> <A - Sergio Marchionne>: That's right. Before I answer the question, what do we have last year that I missed?

> <Q - José Asumendi>: You had a few recalls on...

> <A - Sergio Marchionne>: I see, yeah, yeah. Okay.

> <Q - José Asumendi>: Sure.

> <A - Sergio Marchionne>: Well, look, I think I've been public on this recall issue. The recall matter is something which is a reflection of a changing paradigm for the auto sector. ***I think we have made changes while adjusting our internal structures to deal with this new state of affairs. It is my expectation that this cost will come down as we progress through reconstitution of the management process of what's going on here. We had what I consider to be a pretty robust system in place, we have strengthened it further, we have curved it out from the rest of operations. We have set a very, very senior technical person to head up these activities. So I think we're making progress in making sure that at least not only are we dealing with what's on our plate but we're actually becoming much more proactive and identifying potential exposures going forward. So as we do this, I think these numbers will stabilize and we'll see a steady state***.

293.   The foregoing representations in ¶ 292 were materially false and/or misleading because Chrysler had anything but a "robust" system in place for the reasons stated in ¶ 277 (i)-(ix) and because defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "***consistently***" at the "***rear of the pack***" when it came to regulatory compliance and that Chrysler's delay in notifying

consumers of safety defects was simply _**"unacceptable..exacerbat[ing] the risk to moto rists'**_

_**safety."**_

294.   On March 5, 2015, Chrysler issued a pre ss release and filed an Annual Report on Form 20-F with the SEC which was signed by         defendant Palm er, which included audited financial statem ents that reiterated the Com pany's previously announced audited financial and operating results for the fiscal  year ended December 31, 2014 (the  "2014 20-F").  In addition to the same 2014 and 2013 year-end financial inform ation for costs of sales, EBIT and Net profit, announced in the Com pany's January 28, 2014 6-  K, the 2014 20-F reported a net profit of €0.460 per diluted share, compared to a net profit of €0.736 per diluted share for 2013.  The 2014 20-F appended as exhibits sign ed certifications pursuant to  the Sarbanes-Oxley Act of 2002 by defendants Marchionne and Pal mer, stating that th e audited financial infor mation contained in the 2014 20-F was accurate, they had evaluated the effectiveness of the Company's controls and procedures, and disclosed all si gnificant deficiencies and  materi al weaknesses in the design or operation of the inte rnal contro ls a s well as a ny m aterial changes to  the Com pany's inte rnal control over financial reporting.

295.   Chrysler's audited financial statem ents for years 2014 and 2013 were m  aterially false and misleading because Chrysler failed to      properly account for its costs and liabilities related to vehicle recalls, which caused its EBIT , and net profit to be approxim ately higher €761 million (and  costs of sales €761 m  illion lower)  in each p  eriod th an it would have been had Chrysler not been underreporting costs related to vehicle warranties and recalls.

296.   The foregoing representations in ¶ 294 were also m           aterially false and/or misleading because Chrysler's internal control over financial reporting was not effective because of the misstatements to the Company's financial results.

92

297.    The footnotes to Chrysler's audited fina ncial statements included a chart on page F-84 reporting the balance for warranty and recall p   rovision as €3.7 billon and €4.  8 billion at fiscal year-end 2013 and 2014 respectively.  Th  e provisions for 2013 a nd 2014 we re false and misleading because Chrysler had sy  stematically under-accrued its p rovision for the costs of its product recalls by app roximately €761 m illion from at least 2013 throu gh the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

298.    The footnotes to Chrysler's financial st  atements includ ed a chart on p  age F-85 reporting warranty costs of €1.8 billon and €2.0 billio n, and €2.9 billion at fiscal year-end 2012 , 2013 and 2014 respectively.  The   warranty costs for 2013 and 2014   were false and m isleading because Chrysler had    system atically under-r eported the costs of its p       roduct recalls by approximately €761 million since at least fiscal 2013 in violation of the accounting and reporting requirements in IAS 37.

299.    The 2014 2  0-F also  stated, "[t]he accrua   l for product warranties includes the expected costs of warranty obligations im posed by law or contract, as well  as the expected costs for policy coverage, recall actions and buyback      commitments. The estim ated future costs of these actions are p rincipally based o n assumptions regarding the lifetime warranty costs of each vehicle line and each  model year of  that vehicle lin e, as well as  historical claims e xperience for the Group's vehicles. …The Group pe  riodically initiates voluntary service and recall actions to address various customer satisfaction, safety a     nd em issions issues related to vehicles sold. Included in the accrual is the estimated cost of these service and recall action."

300.    The foregoing representations in ¶ 299 were materially false and/or m isleading in because Ch rysler knew or should have known that      the co sts of liabilities related   to vehicle

warranties and recalls would increas e as a direct result of Chrysler's failure to cond uct tim ely recalls, notify customers and remedy safety defects.

301.    Under the heading "Vehicle Safety" in the 2014 20-F, Chrysler stated:

Under U.S. federal law, all vehicles sold   in th e U.S. m ust comply with Federal Motor Vehicle Safety S tandards, or FMVSS pr omulgated by NHTSA, and m ust be certified by their m anufacturer as being in c ompliance with all suc h standards. In addition, *if a v ehicle contains a de fect t hat is rela ted to motor vehic le safety or does not comply with an applicable FMVSS, the manufacturer must notif y vehicle owners and provide a remedy.*      Moreover, the Transportation Recall Enhancement, Accountability, and Docu mentation, or TREAD Act, authorized *NHTSA to establish Early Warning Reporting, or EWR*      , requirem ents for manufacturers to report all claims which involve one or more fatalities or injuries; all incidents of which the m      anufacturer receives actual notice which involve fatalities or injuries which are alleged or proven to have been caused by a possible defect in su ch m anufacturer's m otor ve hicle or motor vehicle equipm ent in the U.S.; and all claim s involving one or m ore fatality or in a f oreign country when the possible defect is in a m      otor vehicl e or motor vehicle equipm ent that is identical or substantia lly sim ilar to a  motor vehicle or m otor vehicle equipm ent offered for sale in th e U.S., as well a s aggregate data on prop erty damage claims from alleged defects in a m otor vehicle or in m otor vehicle equipm ent; warranty claims (including good will); consumer complaints and field reports about alleged or possib le defects. T he rules also re  quire reporting of custom  er satisfaction campaigns, consumer a dvisories, recalls, or other activity involving the repair or replacement of m otor vehicles or item s of m otor vehicl e equipment, even if not safety related.

*The compliance of TREAD Act EWR su      bmissions has received heightened scrutiny recently, and resulted in two manufacturers agreeing to pay substantial civil penalties for deficient TREAD Act EWR submissions*.

302.    The 2014 20-F repeated the same statem      ents identified in ¶¶ 272-276, and included the representation: " *Our vehicles and the engines that power them must a  lso comply with extensive regional, national an d local laws  and regulations and industry self-regulations (including those that regulate vehicle safety*, end-of-life vehicles, *emissions* and noise).  *We are substantially in compli ance with the relevan  t global regula tory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in c ompliance.*" Chrysler again represented "  *our diese l engine families co  mply with*

94

*Euro 6 emission regulations, which   are mandatory as of September 2014   ”,* and " *We have implemented hardware and software systems in     all our   vehicles to   comply with the OBD requirements*." Furthermore, under the heading "M     anaging Vehicle S afety", the 2014 20-F stated, in part:

> At Chrysler, we take transportation safety personally. *Customers trust the quality and safety of our products, and w   e cons tantly do our u  tmost to war rant this confidence.* . . .

> In addition, the safety organizations in     Chrysler's four regions . . . constantly share information and best practices in  order to harm onize design guidelines and processes. *Safety design guidelines are imp lemented from the concept phase of every new model throu gh the relea se of de tailed design sp ecifications to all the providers of sub-systems for the vehicle.*

> Our overall approach recognizes that        saf  er highways, im     proved traffic management and driver education all have a role to play in enhancing safety on the road. *That is why we strive to connect ou  r safety efforts to a collective goal we share with*   our employees,    *drivers, dea lers,* suppliers, law enforcem   ent, *regulators* and researchers.

(emphases added).

303.    The foregoing representations in ¶¶ 301-     302 were m   aterially false and/or misleading because Chrysler:  Chrysler:  (i) ro   utinely igno red its oblig ations to tim ely infor m owners of s erious safety defects; (ii) routinely  notified owners or reca lls past the lega l deadline; (iii) rou tinely lied to N   HTSA about the tim  eliness of inform  ing owners about recalls; (iv) improperly waited months before recalling defec tive vehicles; (v) failed  to notify NHTSA about critical changes to owne r and dea ler recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed   to provide NHTSA with required rem  edy plans for at least two recalls; (viii) failed to tim  ely or properly p rovide remedies for  defects; (ix) failed to report deaths and s erious injuries to NHTSA as requi  red; and (x) was illeg ally using undiscloS ed and hidden software to allow excess diesel em   issions to go undetected and evade em   issions tests.

95

Also defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "*consistently*" at the "*rear of the pack*" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply ***"unacceptable..exacerbat[ing] the risk to motorists' safety."***

304.    On March 9, 2015, Chrysler filed a Form 6-K with the SEC which was signed by defendant Palmer, appending as an exhibit the Company's Annual Report, audited financial statements reiterating the Company's previously announced audited financial and operating results for fiscal year ending December 31, 2014, which were false and misleading for the reasons set forth above. In addition to the information announced in the Company's March 5, 2015 Form 20-F, the March 9, 2015 6-K stated "In 2014 *we made an important organizational move to amplify our commitment to safety*, as FCA US established the new office of Vehicle Safety and Regulatory Compliance. The reorganization created a stand-alone organization led by a senior vice president who reports directly to the CEO of FCA US, *ensuring a high level of information flow and accountability*. This new structure establishes a focal point for working with consumers, regulatory agencies and other partners *to enhance safety in real-world conditions.*"

305.    The foregoing representations in ¶ 304 were materially false and/or misleading because Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; (viii) failed to

timely or properly provide rem edies for de fects;  and (ix) failed to report deaths and serious injuries to NHTSA as required.  Also defenda nt Marchionne had received a letters from NHTSA Administrator Friedm an on Nove mber 19 and  25, 2014 stating, in part, that Chrysler w      as "*consistently*" at the " *rear of the pack* " when it cam e to regulatory com pliance and that Chrysler's delay in notifying consum             ers of safety defects was sim                     ply *"unacceptable..exacerbat[ing] the risk to motorists' safety."*

306.    On April 29, 2015, Chrysler issued a press  release and filed a Form 6-K with the SEC which was signed by defendant Palm er, announc ing its financial and operating results for the first quarter of 2015 (the  "April 29, 2015 6-K").  Costs of  sales was $22.9 billion, EBIT was €792 million and net profit was €92  million, or €0.052 pe r diluted share, com pared to Costs  of sales of $22.1 billion, EBIT of €270 million and a net loss of €173 million, or €0.155 per diluted share, for the same period in the prior year.

307.    The foregoing representations in ¶ 306 were    materially false and/or m isleading because Chrysler's failed to properly account fo r its costs and liabilities related to vehicle recalls which caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) than it would have been had Ch rysler not been underrepo rting costs related to vehicle recalls.

308.    On May 7, 2015, Chrysler filed a Form    6-K with the SEC which was s igned by defendant Palmer, appending as an exhibit an unaudited Interim Report with financial statements prepared in accordan ce with IF RS, reiterating the Com pany's  previously announced financial and operating results for the quarter ended March 31, 2015 (the "May 7, 2015 6-K")

309.    The May 7, 2015 6-K reported that Costs    of sales was $22.9 billion, E BIT wa s €792 million and net profit was €92  million, or €0.052 pe r diluted share, com pared to Costs of

sales of $22.1 billion, EBIT of €270 million and a net loss of €173 million, or €0.155 per diluted share, for the same period in the prior year.

310.    The foregoing representations in ¶ 309 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle recalls which caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) than it would have been had Chrysler not been underreporting costs related to vehicle warranties and recalls.

311.    The footnotes to Chrysler's unaudited financial statements included a chart on page 44 reporting the balance for warranty (and recall) provision as €5.6 billon and €4.8 billion at quarter end March 31, 2015 and fiscal year-end December 31, 2014 respectively. These quarter-end and year-end provisions for were false and misleading because Chrysler had systematically under-accrued its provision for the costs of its product recalls by approximately €761 million from at least 2013 through the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

312.    On May 19, 2015, Chrysler issued a press release, stating "FCA US LLC takes seriously its commitment to provide safe vehicles that meet customer expectations for quality and workmanship. The Company is fully aligned with NHTSA's desire to promote efficient execution of vehicle recalls and enhance completion rates. . . . FCA US will continue to cooperate with NHTSA in its efforts to identify ways in which it can more quickly identify issues, determine fixes and execute campaigns."

313.    The foregoing representations in ¶ 312 were materially false and/or misleading Chrysler was anything but aligned with NHTSA and consistently flouted its directives. Instead, Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects;

98

(ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; (viii) failed to timely or properly provide remedies for defects; and (ix) failed to report deaths and serious injuries to NHTSA as required. Also defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "***consistently***" at the "***rear of the pack***" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply "***unacceptable..exacerbat[ing] the risk to motorists' safety.***"

314.    On May 19, 2015, Chrysler also filed a prospectus on Form F-4 with the SEC, signed by defendants Palmer and Marchionne, which repeated its previously reported financial information, repeated the same statements identified in ¶¶ 272-276, and included the representation: "***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, ***emissions*** and noise). ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in compliance.***" Chrysler also again represented "***our diesel engine families comply with Euro 6 emission regulations, which are mandatory as of September 2014***", and "***We have implemented hardware and software systems in all our vehicles to comply with the OBD requirements***."

99

315.    The foregoing representations in ¶ 314 were    materially false and/or m  isleading because Chrysler: (i) ro utinely ignored its oblig ations to tim ely inform owners of serious safety defects; (ii)  routinely  n otified own ers o r re calls  past the legal deadline;    (iii) routinely lied to NHTSA about the tim eliness of inform ing owners about recalls; (iv) im properly waited m onths before recalling defective vehi cles; (v) failed to notify NHTSA   about critical changes to owner and dealer recall notification sc  hedules; (vi) failed to subm  it am ended 573 reports to NHTSA; (vii) failed to provide NHTSA with required rem edy plans for at least two recalls; (viii) failed to timely or properly provide remedies for defects; (ix) failed to report deaths and serious injuries to NHTSA as required; and (x) was illegally using undisclosed and hidden software to allow excess diesel em issions to go undetected and evade em   issions tests.  Also defendant Marchionne had received a letters from  NHTSA Adm inistrator Friedman on Nove mber 19 and 25, 2014 stating, in part, that Chrysler was "  *consistently*" at th e "*rear of the pack* " when it cam e to regulato ry compliance and that C   hrysler's delay in notif  ying consum ers of safety defects was sim    ply *"unacceptable..exacerbat[ing] the risk to motorists' safety."*

316.    On June 17, 2015, Chr   ysler issued a press release and filed with the SEC a prospectus on Form   424B4 off ering to exchange up to $3 m     illion of  new senior notes f   or previously issued senior not   es.  The prospectuses reitera    ted the Com  pany's previously announced financial and operating results, repeated the same statements identified in ¶¶ 272-276, and includ ed the rep  resentation: " *Our vehicle s and the engines th   at power them must also comply with extensive  regional,  national and  lo cal laws and regulations and in   dustry self-regulations (including those that regulate veh   icle sa fety*, end-of-life vehicles,  *emissions* an d noise).  We are substan tially in comp liance with the relevant global   regulatory requiremen ts affecting our facilities and products. We consta ntly monitor such requirements and adjust our*

100

*operations to rema in in compliance.* ” Chrys ler also again rep resented “ *our diesel engine families co mply with Euro 6 emission regula tions, which are mandatory as of September 2014*”, and “ *We have implemented hardware and softwa re systems in all our vehicles to comply with the OBD requirements*.”

317.    The foregoing representations in ¶ 316 were materially false and/or m isleading because Chrysler: (i) ro utinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely n otified own ers o r re calls past the legal deadline; (iii) routinely lied to NHTSA about the tim eliness of inform ing own ers about recalls; (iv) im properly waited m onths before recalling defective vehi cles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification sc hedules; (vi) failed to subm it amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required rem edy plans for at least two recalls; (viii) failed to timely or properly provide remedies for defects; (ix) failed to report deaths and serious injuries to NHTSA as required; and (x) was illegally using undisclosed and hidden software to allow excess diesel em issions to go undetected and evade em issions tests. Also defendant Marchionne had received a letters from NHTSA Adm inistrator Friedman on Nove mber 19 and 25, 2014 stating, in part, that Chrysler was “ *consistently*” at th e “*rear of the pack* ” when it cam e to regulato ry compliance and that C hrysler’s delay in notif ying consum ers of safety defects was sim ply *“unacceptable..exacerbat[ing] the risk to motorists’ safety.”*

318.    On or about June 25, 2015, Mazure, on behalf of Chrysler, sent to the E PA and CARB Chrysler’s application for COC for the 2016 Jeep Grand Cherokee and R am 1500 3.0 diesel vehicles, which was publicly posted to the EPA website ther eafter. The applic ation included separate cover letters to th e EPA a nd CARB signed by Mazure, each stating that the vehicles co mply with a ll em issions regulations/standa rds (including disclosure of AECDs and

101

meeting NOx emission standards):  "Chrysler agrees that the exhaust emission standards listed below and in the application for certification apply to both certification and in-use vehicles according to the provisions of 40 CFR, Parts 86 and 88, as applicable."  The application purported to disclose in Section 11 the "List of AECD Used in Test Group", identifying 17 AECDs.

319.    The foregoing representations in ¶318 were materially false and/or misleading because, *inter alia* Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

320.    On August 6, 2015, Chrysler filed its semi-annual report for the quarter and six months ended June 30, 2015 on Form 6-K, with financial statements prepared in conformance with IFRS.  The financial statements reported that for the six months ended June 30, 2015, Costs of sales was $48.1 billion, EBIT was €2.14 billion and net profit was €425 million, or €0.264 per diluted share, compared to Costs of sales of $39.4 billion, EBIT of €1.23 billion and a net profit of €24 million, and a loss of €0.012 per diluted share,[29] for the same period in the prior year.

321.    The foregoing representations in ¶ 320 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle recalls which caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) than it would have been had Chrysler not been underreporting costs related to vehicle warranties and recalls.

322.    The footnotes to Chrysler's unaudited financial statements included a chart on page 59 reporting the balance for warranty (and recall) provision as €5.5 billon and €4.8 billion

---

[29]    The earnings per share are a net loss (and net profit positive) because the interest of the parent in the earnings of the business was calculated according to a specific formula that resulted in negative earnings per share to the parent.

at quarter end June 30, 2015 and fiscal year-end December 31, 2014 respectively. The quarter-end and year-end provisions for were false and misleading because Chrysler had systematically under-accrued its provision for the costs of its product recalls by approximately €761 million from at least 2013 through the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

**H.    The Truth About Chrysler's NHTSA Violations Begins to Emerge As Defendants Continue To Make Materially False and Misleading Statements**

323.    On Sunday, July 26, 2015, NHTSA announced a Consent Order and its imposition on the Company of a record $105 million fine in connection with the Company's handling of 23 previous recalls affecting more than 11 million vehicles. The NHTSA penalties were tied to violations in an array of areas, as described above, including misleading regulators, inadequate repairs, and failing to alert affected car owners in a timely manner. The Consent Order included an admission by Chrysler that in three specified campaigns (13V-038, 13V-527 and 13V-529) it failed to timely provide an effective remedy, and that it did not timely comply with various reporting requirements under the National Traffic and Motor Vehicle Safety Act of 1966. NHTSA stated, in part:

> ***Fiat Chrysler's pattern of poor performance put millions of its customers, and the driving public, at risk.*** This action will provide relief to owners of defective vehicles, will help improve recall performance throughout the auto industry, and gives Fiat Chrysler the opportunity to embrace a proactive safety culture.

(Emphasis added.)

324.    Chrysler also agreed under the Consent Order to additional remedies for three recall campaigns (13V-038, 13V-527 and 13V-529) covering approximately 585,000 vehicles. In each of those campaigns, Chrysler was required to offer, as an alternative remedy to owners whose vehicles have not yet been remedied, to repurchase those vehicles at a price equal to the

original purchase price less a reas onable allowance for depreciation plus ten percent.  Chrysler stated that it already fixed approximately 280,000 vehicles.  In addition, Chrysler was required to offer consumer incentives to encourage owners of vehicles subject to certain recalls to participate in the recalls.  For example, ow ners of Jeep Grand Cherokees sold between model-years 1999 to 2004 will be offered a gift card of $100 if they bring their vehicles in for inspection to see if they need to be repaired under recalls included in the consent order. Separately, owners of Jeep Grand Cherokees sold between the 1993 and 1998 mode     l-years m ay qualify for a $1,000 "trade-in incentive" above the fair-market value of the vehicle.

325.    Pursuant to the Consent Order, Chrysler    was also required to "im   prov[e] FC A US's processes and procedures for complying with reporting requirements, making safety-related defect determ ations, reporting defects to NHT    SA, notifying dealers and owners of safety related defects and noncom  pliances, and im proving the p ace and effectiven ess of FCA US's recall campaigns."  NHTSA also required Chrysler to retain and Independent Monitor for at least three years to ensu  re that Chrys ler was adeq  uately dis charging its r  egulatory o bligations to timely and properly report defects and execute recall campaigns.

326.    On this news, the Company's stock fell $0.74, or roughly 4.9%, to close at $14.41 on July 27,  2015—a market capitalization decl  ine of $950 m  illion.  Analysts  reco gnized the impact of this news on the Com pany's stock price.  In one article entitled "Fiat Chrys ler Slapped With Record Fine and    Buyback Program  " the aut hor stated, "The total    cost of the penalty remains to be seen,  but the m arket definitely reacted to the news.    Shares of FCAU are down nearly 5% on the day.  It will be interesting        to see if the settlem  ent has any effect on the company's bottom line in the future."  An analys t with the Autotrader ca r shopping service said "NHTSA made clear w  ith the reco  rd $105   million fine an  d unpreced ented veh icle buyback

requirement against Fiat Chrysler   that it is serious and will     be aggressive  about going after

automaker [that] don't quickly recall vehicles with defects.[30]"

327.    In the wake of the Consent  Order, media outlets reported  that Kelley Blue Book

estimated that the buyback program could cost the automaker more than $900 million, taking the

potential cost, when factoring in   the fine, to more than $1 b    illion.  N evertheless, on July 27,

2015, Chrysler stated "The consent  decree was worked out in the  wake of an unprecedented July

2 hearing that the National Highway Traffic Safety Administration (NHTSA) held to look at how

FCA handled 23 separate recalls. It found the m    aker frequently delayed responding to safety

problems, contrary to federal law. And even wh en it did order a recall, the feds questioned why

repair rates often were so low and slow."

328.    On July 28, 2015, in a press release discussi ng the Consent Order, Chrysler stated

"contrary to certain reports, FCA US does not      expect that the net cost of providing these

additional alternatives will be material to its financial position, liquidity or results of operations."

329.    The foregoing representations in ¶ 329 were    materially false and/or m  isleading

because Chrysler's failed to properly accoun    t fo r its costs and liab   ilities related to vehicle

warrantees and recalls  which cau sed  its EBIT, cost of sales, and ne  t profit to be a t least higher

€761 m illion than it would have b   een had Ch rysler not b  een underreporting  cos ts related to

vehicle warranties and recalls.

330.    During a July 30, 2015 earnings call          with analysts, following NHTSA's

imposition of the $105 m  illion fine, defendant Marc  hionne denied th e exis tence of any other

reporting violations:

---

[30] *See* http://www.latimes.com/business/autos/la-fi-hy-record-fiat-chrysler-fine-20150727-story.html ("W ith rec ord
Fiat Chrysler fine, safety regulators get more aggressive." L.A. Times, July 27, 2015.

<Q [Analyst] >: I'm just looking at this NHTSA website, I read the whole raft of recalls have been announced, et cetera. I understand the presentation you gave and the financial impact of that. If we look at all the – everything has been listed there. Are you addressing everything?

<A - Sergio Marchionn e>: "***To the best of my knowledge, everything that I've given you so far is co mprehensive of every action that's been discussed and undertaken with NHTSA. I am not in knowledge of anything else beyond what's already been booked*** . . . ."

331.    The foregoing representations in ¶ 330 false and misleading because NHTSA had informed Chrysler in late July, the sam e time it was finalizing the Consent Order with Chrysle r, that it had identified discrepancies in Chrysler's early warning reports of deaths and other serious injuries.

332.    On August 6, 2015, Chrysler filed its semi-annual report for Q2 and H1 2015 with the SEC. T herein, Chrysler inco rporated by re ference the risks and un certainties identified in Chrysler's Form F-4 Registration Statem ent, as well as those Risk Factors id entified an d discussed in Item 3 of Chrysler's F orm 20-F filed with the SEC on Ma rch 5, 2015 and in the 2014 Annual Report filed on the sam e day. Chrysle r's Risk Factors in it s Form 20-F in turn referenced Item 4B "Environm ental and Othe r Regulatory Matter", which contained the representations identified in ¶¶ 301-302, above.

333.    The foregoing representations in ¶ 332 were materially false and/or m isleading because Chrysler was illegally u sing undisclosed and hidden software in its v ehicles (including Jeep Grand Cherokee and Ram 1500) to allo w excess d iesel em issions to go un detected an d evade emissions tests.

334.    On October 27, 2015, Chrysler announced the resignation of Defendant Kunselman.

335.     The next day, on October 28, 2015, Chrysler announced results for Q3 2015, informing investors that the Company recorded "a €761 million [approximately $850 million] pre-tax charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA."

336.     Chrysler shares fell $0.69, or 4.7%, to close at $14.72 as investors reacted to news of the recall charge— a market capitalization drop of $890 million. The market immediately made the connection between the charge and the Company's regulatory violations for failure to properly conduct recalls. *Bloomberg* reported: "The manufacturer set aside 761 million euros in the quarter for 'estimated future recall campaign costs' in North America, where U.S. regulators ordered it in July to buy back vehicles." (emphasis original)

337.     Regarding the Company's announcement, the *Detroit Free Press* reported that the charge caused the Company's stock to drop:

> ***The automaker reported its first quarterly loss in more than a year because it took a massive one-time charge to cover the cost of future recalls.*** The company also told Wall Street analysts its profit margins will continue to lag Ford and General Motors as long as its market share of trucks and SUVs is smaller and said has put its strategic plan for Alfa Romeo and Maserati under review. ***All of that unpleasant news caused FCA's stock to sink 69 cents, or 4.7 %, on Wednesday to $14.72 per share***.

338.     Analysts at *Motley Fool*, arrived at similar conclusions. Under the heading "That big special item", an analyst reported "FCA's results were more than offset by a 761 million euro one-time charge to boost FCA's reserves against future recalls, specifically in North America. U.S. regulators hit FCA with a $105 million fine in July for poor management of past recalls, and the company was forced to take on an independent expert to monitor its safety practices."

339.     On December 2, 2015, WardsAuto published an interview with Lee concerning the state of Chrysler's emissions compliance in the wake of the discovery of Volkswagen's illegally rigged diesel engines. Lee was among the executives in charge of the programming of

107

the diesel engines on the Jeep   Grand Cherokee and Ram   1500.  He  said that he ordered his
engineers to scour the engine-c ontrol algorithm for any defe at devices and provided assurance
that the internal audit at Chrysler was extensive.  "We looked at 2 million lines of software code
in the last month, … We 've all been through the sam e exercise. We've all looked and dug and
scraped, and we probably know our system s better in the last month than we've known them for
the last few years. …  It's not ag ainst the rules to have som ething (used for test procedures) that
could be turned into a defeat   device … You're only   guilty if you have used   the defeat device,
which was the case at VW   ." Lee stated  that th e audit was  extens ive. "W hat is ou r software-
control process? Are we as good as  we think we are? This is the  right time to ask that question.
Second, do we have any software that could be misused if you could find the requisite number of
people to make it happen?"

340.    The foregoing representations in ¶ 339 were    materially false and/or m  isleading
because Chrysler was illegally usin  g undisclose d and hidden software to allow excess diesel
emissions to go undetected and evade em     issions tests and the EPA had previously alerted
Defendants that it believed that Chrysler's  Jeep Grand Cherokee and Ram 1500 contained defeat
devices.

341.    On December 9, 2015, after the close of trading, it was announced that NHTSA
had issued an am endment to its July 24, 2015, Cons ent Order with Chrysler. In the am endment,
Chrysler acknowledged significant  failures in early warning repor ting dating to the beginning of
the requirem ents in 2003. Chrysler    failed to report incidents of    death and injury that were
required to be reported to   NHTSA under 49 C.F.R. Section 579.21   (b).  Specifically, Chrysler
acknowledged that it did not re    port these deaths and injuries    because of failures in the
Company's controls: (1) coding deficiencies in    its EWR system  that failed to recog nize when

108

reportable information was received or updated; and (2) Chrysler's failure to update its EWR system to reflect new Chrysler brands.  Chrysler  also failed to report aggregate data that were required to be reported to NHTSA under 49 C.F.R. Section 579.21(c), including property damage claims, customer complaints, warranty claims and field reports.  Chrysler also failed to provide copies of field reports to NHTSA, as required under 49 C.F.R. Section 579.21(d).  These failures were also a result of Chrysler's poor controls – coding deficiencies in Chrysler's EWR system that failed to recognize reportable information.  Chrysler admitted that it failed to submit EWR in compliance with the law and that the violations "are significant and date back to the inception of the early warning reporting requirements in 2003."  As a result of these violations, a third-party audit of Chrysler was conducted,  which is still ongoing. The amendment required Chrysler to pay $70 million in additional civil penalties.

342.    Analysts recognized the impact of the  news on Chrysler's stock price.  For example, an article titled "One Reason Fiat Chrysler (FCAU) Stock Closed Down Today explained "Fiat Chrysler Automobiles (FCAU) stock closed lower by 0.07% to $13.80 on Thursday, after the National Highway Traffic Safety Administration (NHTSA) fined the automaker $70 million for failing to report safety data, including reports of death and injuries, consumer complaints, warranty claims, and other data."

343.    During a January 27, 2016 earnings call discussing Q4 2015, Marchionne addressed the specific issue of software on diesel vehicles used to cheat regulatory compliance in the wake of Volkswagen's "Dieselgate" scandal, assuring investors that he had examined the issue and no such software was being utilized by Chrysler. Stating, "I think it's important to keep this in mind", Marchionne made clear that Chrysler "has been busy and it continues to be busy on optimized methods to achieve the targets. It will continue to do so . . . . I think that **after the**

*advent of dieselgate,* for a lack of a better term , ***FCA has u ndertaken a pretty thorough review and a thorough audit of its compliance teams.*** I think we feel comfortable in m aking the statement that ***there are no defeat mechanisms or devi ces present in our vehicles. And I think the cars perform in the same way on the road as they do in the lab under the same operating conditions. This is an a rea of heightened concern.*** And so we've put in – we have established now as part of our com pliance mechanism training for all em ission calibration engineers. ***We do have a best practice program to ensure that we calibrate and certify properly.*** And I think that we will – just to m ake sure that the system is not going off the reservat ion, we will carry out random checks of our fleet to ensure that we achieve compliance."

344.   The foregoing representations in ¶ 343 were materially false and/or m isleading because Chrysler was illegally usin g undisclose d and hidden software to allow excess diesel emissions to go undetected and evade em issions tests and the EPA had previously alerted Defendants that it believed that Chrysler's Jeep Grand Cherokee and Ram 1500 contained defeat devices.

345.   On February 2, 2016, Chrysler issued a pre ss release, stating "In the past several months the issue of diesel em issions has been the subject of a great deal of attention, particularly in Europe, where diesel is quite common. In response to these events, FCA has conducted a thorough internal review of the application of th is technology in its vehicles and has confir med that its d iesel engine applications comply with applicable emissions regul ations. In particular: FCA diesel vehicles do not have a mechanism to either detect that they are undergoing a bench test in a laboratory or to activate a function to operate em ission controls only under laboratory testing. In other words , although em ission le vels vary depending on driving con ditions, the

emission co ntrol system s of the FCA vehicles    oper ate in th e sam e way und  er th e s ame conditions, whether the vehicle is in a laboratory or on the road."

346.    The foregoing representations in ¶ 345 were    materially false and/or m  isleading because Chrysler was illegally usin  g undisclose d and hidden software to allow excess diesel emissions to go undetected and evade em      issions tests and the EPA had previously alerted Defendants that it believed that Chrysler's  Jeep Grand Cherokee and Ram  1500 contained defeat devices. Because Defendants knew that  investors would read this pr ess release as app lying to all Chrysler d iesel veh icles[31], and becaus e Defendants knew their U.   S. diesel vehicles (the Jeep Grand Cherokee and Ram 1500, in particular) were  violation of EPA  regul ations, Michael Dahl emailed Byron Bunker and Christopher Grundler of  the EPA (cc'ing K yle Jones of Chrysler) on February 2, 2016, immediately afte  r publication of the pr ess release, attem pting to clarify the press release for the EP A (but only the EPA – not  the public), stating:   "Byron, The release out of our European office as we discussed … this is  not a statement about NAFTA diesels.  As you know, the only cycle for EU is NEDC, which is very light vehicle load."

347.    On February 29, 2016, Chrysler issued a pr ess release and filed an Annual Report on Form  20-F with th  e SEC which was sig     ned by defendant Palm   er, and reiterated the Company's previously announced financial and      operating results for the fiscal year ended December 31, 2015 (the "2015 20-F").  The 2015 20-F appended as exhibits signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by de  fendants Marchionne and  Palmer, stating that the financial inform ation contained in the 2014   20-F was accurate and disclosed an  y m aterial changes to the Company's internal control over financial reporting.

---

[31] Indeed, articles referencing the press release did attribute the statements of compliance as applying to all Chrysler  vehicles, including Jeep and Ram.     *See, e.g.*  "Fiat-Chrysler  group m odels gi ven em issions al l-clear", February 3, 2016, http://www.nextgreencar.com/news/7472/fiatchrysler-group-models-given-emissions-allclear/

348.    Under the heading "Regulation", the 2015    20-F stated "We   face a regulatory environment in m arkets throughout the world w here safety, *vehicle emission* and fuel econom y regulations are becom  ing incre asingly str ingent, which  will af fect our vehic  le sale s and profitability. *We must c omply with these regula tions in order to continue operatio ns in thos e markets*, including a number of m arkets where we derive substantia l revenue, such as the U.S., Brazil and Europe. *In the past several years, industry participants in these markets have faced increasing regulatory scrutiny*."

349.    On the issue of e    missions, the 2015    20-F acknowledged that "Governm    ent scrutiny has also increased industr y-wide, and is expected to re  main high, in connection with a recent significant EPA action invo lving the tailp ipe emissions of a competit or's diesel vehicles" and that Chrysler controlled for risks relating  to regulatory compliance concerning em issions by "[e]valuat[ing] on-road versus   laboratory testing to ensure co   mpliance."  Discussing various regulations in detail, the annual report went on to state "in light of recent issues in the automotive industry related to vehicle health  -based emissions, we have take n action to extensively review compliance requ irements. *We con ducted an audit of all     current production so  ftware and emission ca librations. The audit revealed that all current   production vehicle ca librations are compliant with applicable regulations and they appe ar to operate in th e same way on the road as they do   in the lab   oratory un der the sa  me operating conditio  ns. To ensure ongoing compliance, the following improvement actions are in place or in process*:

- Formalized com  pliance training for all software and       em  ission calib  ration engineers

- Established a "best practice" calibration and certification oversight group

- Instituted regular supplier and internal software and calibration audits

112

- Formalized a random, on-road emissions audit testing program"

350.    Under the heading "Autom otive Em issions", the 2015 20-F provided detailed discussions of its regulatory obligations in the United States and Europe as imposed by the EPA, CARB and European regulatory agencies. For example, it stated "Under the U.S. Clean Air Act, the Environm ental Protection Agency, or EPA,    and the California Air Resources Board, or CARB (by EPA waiver), require em ission compliance certification before a vehicle can be s old in the U.S. or in California (and many other stat    es that have adopted the California em  issions requirements). Both a  gencies im pose lim its o n  tailpipe and evaporativ e em issions of certain smog-forming pollutants from  new m otor vehicles  and en gines, and  in som e cases dictate th e pollution control methodology our engines m ust employ." The report s tated "In addition, EPA and CARB regulations require that  a vehicle's em issions perform ance be m onitored with OBD systems. ***We have implemented ha rdware and software  systems in all our vehicles  to comply with the OBD requirements***."

351.    As for Europe, the 2015 20-F stated, in pa  rt, "In Europe, em issions are regulated by two diffe rent entities: the European Comm ission, or EC, and the United Nations Econom  ic Commission for Europe, or UNECE.  . . . W  e m ust dem onstrate th at our vehic les will m eet emission requirements and receive  approval from the appropriate au thorities before our vehicles can be sold in EU Member States. The regulato ry requirements include random testing of newly assembled vehicles an  d a m  anufacturer in -use surveillance program   . EU and UNECE requirements are equivalent in term  s of st ringency and im plementation. In 2011, updated standards for exhaust em ission by cars and light-  duty trucks, called E  uro 5, becam e e ffective. Impending European em ission standards focus part icularly on further reducing em issions from

diesel vehicles. The new Euro 6 emission levels, effective for all passenger cars on September 1, 2015 (one year later for light commercial vehicles). . ."

352.   Under the heading "Diesel eng ines", the annual report stated, " ***research and development activities h ave mainly focused on  passive and active NOx re duction technologies*** and the study of real driving conditions to de      termine optim ized conf igurations f or the nex t generation diesel powertrains. Advanced afte    r-treatment system s f or the reduc tion of NOx emissions are under developm    ent both for pa     ssenger car and light comm      ercial vehicle applications."

353.   The 2015 20-F also stated, "W e manufacture and sell our products and offer our services around the world. [sic] ***with requirements relating to reduced e missions,*** increased fuel economy, . . . ***Our vehicles and the engines that power th em must also  comply with extensiv e regional, national and local laws and regulations      and  industry self-regula tions (in cluding those that regulate emissions*** certification, end-of-life vehicles  and the chem ical content of our parts, noise, and worker health an d safety). In addition, vehicle  safety regulations are becom ing increasingly stric t. ***We are substantially in compliance w     ith the relevant global regulatory requirements affecting our facilities and product  s. We con stantly monitor such re quirements and adjust our operations and processes to remain in compliance***."

354.   The foregoing representations in ¶¶ 349, 350 and 353 were materially false and/or misleading because Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests and the EPA  had previously alerted Defendants that it believed that Chrysler's      Jeep Grand Cherokee and Ra     m 1500 3.0 diesel vehicles contained defeat devices.

114

I.    **The Truth About Chrysler's Emissions Violations Begins to Emerge**

355.    On May 19, 2016 Chrysler cancelled a m eeting with German Transport Minister Alexander Dobrindt to discuss a national i nvestigative commission on e missions, saying that German aut horities have no say over it.  Reac ting to this, Dobrindt stated that "this uncooperative conduct by Fiat is to tally incomprehensible…There  are concrete allegations at issue.  It would be appropriate if Fiat commented to the investigative committee on this."

356.    On May 23, 2016, it was reported that several tests by the German motor transport authority KBA had found evidence that the ex haust treatm ent system  in som e of Chrysler's models would switch itself off a fter 22 m inutes, which is just 2  minutes after the standard 20 minute emissions test norm ally run by regulators.  This was sim ilar to the schem e conducted by Volkswagen where its defeat devices turn ed  themselves of f af ter 23 m inutes to  cheat th e emissions tests. The German tests found a special NOx catalyst which is being switched off after a few cleaning cycles.   This shut do wn caused th e dangerous pollutant NOx to be r eleased into the atmosphere at m ore than 10 times the perm itted level.  A Germ an newspaper, the Bild am Sonntag reported that Germ any's Federal Moto r Transportation Author ity determ ined that Chrysler allegedly used illegal  software to m anipulate emissions controls. Germ any's transport ministry also stated that Chrysler refused to cooperate with the investigation after Chrysler was a no show for a meeting scheduled with the German authorities.

357.    As a result of this news, Chrysler's stock price dropped $0.36, or roughly 5.1%, to close at $6.68.  Various news sources recognized    the im pact of this news on Chrysler's stock price.  In an article titled    "Now Germ any Is Accusing Fiat of  Runni ng Dirty Diesel", Fortune reported that "Shares in Fiat Chrysler . . . fe ll more than 5 percent on Monday after Germ any's Bild newspaper reported that the carm aker could be banned from selling cars in Germ any . . . ."

In an article titled "Fiat Chrysler Shares    Fall on Report of Ger    man Sales Ban Threat", Automotive News reported that "several tests by the German motor transport authority KBA had found evidence that the exhaust treatm ent system  in some of FCA's m odels would switch itself off a fter 22 m inutes.  Em issions tests norm ally run for around 20 m   inutes." "Shares of Fiat Chrysler Automobiles fell 5.1 percent in the U.S. today after Germany's *Bild* newspaper reported that the automaker could be prohibited from  selling cars in Germ any if evidence of disregard of emissions rules was found."

358.    In response to this news, a spoke    sman fo r Chrysler stated "all its vehicles are compliant with existing emissions rules."

359.    The foregoing representations in ¶ 358 were    materially false and/or m  isleading because Chrysler was illegally usin   g undisclose d and hidden software to allow excess diesel emissions to go undetected and evade em      issions tests and the EPA had previously alerted Defendants that it believed that Chrysler's  Jeep Grand Cherokee and Ram  1500 contained defeat devices, and as Marchionne would later admit Chrysler's vehicles "weren't compliant".

360.    On September 1, 2016 Reuters reported that the German government had formally accused Chrysler of using a defeat device to switch off emissions.  In letters sent to the European Commission ("EC") and the Italia n Transport Ministry, Berlin  said that Germany found unusual increases in the em issions of four  Chrysler vehicles and that th e findings proved the "illegal use of a device to switch off exhaust treatm    ent syst ems."  The Ger  man Tr ansport Authority said "Germany does not share the Italian car type      approval authority's opini on that the device to switch off exhaust treatment systems is used to protect the engine."

361.    On September 22, 2016, in the wake of Vo lkswagen's admission that it had used software that deceived U.S. regulators m   easuring  toxic emission in so  me of its diesel cars, a

Chrysler spokesperson stated "FCA U.S. does not use 'defeat devices'" and that it was working closely with the EPA and CARB to "ensure its vehicle s are compliant with all a pplicable requirements."

362.    The foregoing representations in ¶ 361 were materially false and/or m isleading because Chrysler was illegally usin g undisclose d and hidden software to allow excess diesel emissions to go undetected and evade em issions tests and the EPA had previously alerted Defendants that it believed that Chrysler's Jeep Grand Cherokee and Ram 1500 contained defeat devices.

363.    On October 17, 2016 Chrysler's chief tec hnical officer, Harald W ester angered members of the European Parliam ent at a heari ng in Brussels when he questioned the m ethods used to the European governments reporting that Chrysler's diesel cars were emitting far beyond EU limits when drivin g on the ro ad. W ester stat ed, "I have no explanation for these values. These values should not occur." H e also stated that som e of the em issions values reported by national authorities wer e "fantastical." News re ports state that W ester visibly annoyed several members of parliam ent by dodging questions. For exa mple a Dutch parliam entary m ember asked W ester if the Company knew how m uch more nitr ogen oxide was being em itted by its cars, which modulate the emissions filter system after 22 minutes. Wester stated, "more, but still at the lim its." W hen asked "which lim its?" We ster said "the lega l lim its," af ter which the parliament member reminded him that accord ing to Chrysler's legal an alysis only the 2-m inute lab test m atters, "so there is no legal lim it after 20 minutes." W ester stat ed, "I don't know. I think I answered all your questions."

364.    On January 12, 2017, the EPA and CARB each issued a notice of violation to Chrysler an d FCA US for instal ling and failing to disclose engi ne managem ent software that

resulted in increas ed em issions from the vehicl es.  The m anipulating soft ware was installed in light-duty model year 2014, 2015 and 2016 Jeep Gr and Cherokees and Dodge Ra m 1500 trucks with 3.0 liter diesel engines sold in the United States. As part of the investigation, the EPA found "at lea st *eight* undisclosed pieces of software that can   alter how a vehicle em its air pollution." Moreover, "some of these AECDs appear to  *cause the vehicle to per form differently when the vehicle is b eing tested for complia nce with th e EPA emission standards … than in normal operation and use*." "Failing to disclose software that affects emissions in a vehicle's engine is a serious violation of the law, which can result in   harmful pollution in the air we breathe." said Cynthia Giles, assist ant administrator for the EPA. " *This is a clear and serious violation of the Clean Air Act*," CARB Chair Mary D. Nichols stated  *"[Chrysler] made the business decision to skirt the rules and got caught*."  The EPA's disclosure of the notice stated "FCA did not disclose the exis tence of  certain  auxilia ry e mission control dev ices to EPA in its applica   tions f or certificates of conformity for model year 2014, 2015 and 2016 Jeep Grand Cherokees and Dodge Ram 1500 trucks,   *despite being aw are that su ch a disclosure was mandatory*  ." Moreover, despite having been aw are of the E PA's conclusi on that the se AECDs were  defeat devices for well over a year, "To date, despit    e having the opportunity to do so,      *FCA ha s failed to demonstrate that FCA did not know, or should no t have known, that a principal effect of one or more of these AECDs was to bypass, defeat, or  render inoperative one  or more elements of design installed to co  mply with  emissions standards under the CAA      .*" Si milarly, the EPA concluded "To date, despite having the opportunity to do so,      *FCA has failed to es tablish that these are n  ot defea t devices* ."  The illegal software allowed 104,000 of Chrysler's diesel-powered vehicles to spew em issions beyond lega l lim its, which the E PA estim ated could cost FCA $4.63 billion in fines.

118

365.    Even though the EPA requested Chrysler    to provide evidence that the AECDs were not illegal defeat devices and   that Chry sler did not know that the   principal effect of the AECDs was  to evade em issions regulations, C hrysler f ailed to do  so.  The im  plication is tha t Chrysler in tentionally installed the  illega l def eat dev ices as a m  eans o f pretend ing to com ply with EPA regulations while knowingly violating them.

366.    On this news, the Com pany's stock fell $1.35, or roughly 12%, to close at $9.95 on January 12, 2017.

367.    In response to this news, Chrysler stat    ed "FCA US believes that its em    ission control systems meet the applicable requirements."

368.    The foregoing representations in ¶ 367 were    materially false and/or m  isleading because Chrysler was illegally usin   g undisclose d and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

369.    On February 6, 2017, after the close of trad  ing, French authorities announce they were referring Chrysler for pros ecution following an investigation  of the levels of em issions of NOx pollutants produced by its diesel vehicles. Th e Ministry for the Econom y and Finance said the French anti-fraud and consum   er affairs  agency DGCCRF had wra  pped up its probe into Chrysler's cover-up of the em  issions produced by so me of its diesel vehicles and had sent its conclusions to France's departm ent of justice.   The anti-frau d agency's investig ation exam ined test resu lts by a third    -party labo ratory and public   sector research  ers, as well as internal documents provided by Chrysler.  The investiga  tion showed em issions that were several tim  es higher than regula tory lim its. For e xample, Ch rysler's J eep Cherokee e mitted eight tim es the NOx limit and its Fiat 500x emitted almost 17 times the limit in road testing.

119

370.     On this news, Chrysler's stock price d eclined $0.50, or roughly  4.6%, to close at $10.27 on February 7, 2017.

371.     On February 7, 2017, a fter the close of trading, it was disclosed that a report by Italy's transport ministry presented to a European parliamentary committee in October but never officially published revealed that Chrysler's vehicles were allowed to skip key tes ts for illegal engine software during Italy's m ain emissions-cheating investigation that occu rred in the wak e of the Volkswagen "Dieselga te" scandal.  While the findings included complete sets of data f or eight diesel cars made by Chrysler's competitors (BMW, Ford, Mercedes, Volkswagen and GM), for the Chrysler m odels investigated (including  the Jeep Cherokee) results were m issing for the three tests used to unmask defeat devices by preventing them from detecting the test.

372.     On March 31, 2017 Germ  any's transportation m inistry announced that it had found a new defeat device in a C     hrysler car. W hile the transportation m inistry did not give details at the time, a German weekly magazine, Der Spiegel said that recent tests on Fiat's 500X passenger car showed that an exh aust treatment system switched off fi ltering after 90 m inutes, amounting to a defeat device.  In a prior test,    a Fiat vehicle was found to  have switched off its exhaust treatment after 22 minutes.  An emission test cycle in Europe lasts 20 minutes.

373.     On May 17, 2017 the European Commission ("EC ") issued a press release stating that it had decided to launch an inf    ringement procedu re against I taly f or f ailing to f ulfill its obligations under EU vehicle type   -approval legislation with regard   to Chrysler autom  obiles. This represented a formal accus  ation by the European Union's executive arm    that the Italian government allowed Chrysler to sell cars designed to  evade emissions tests.  The EC stated that this formal notice asked Italy to respond to con cerns about "insufficient  action" taken regarding the "emission control strategies employed by Fiat Chrysler."  The press release explained that the

120

current case related to information brought to the EC's attention in the context of a request from the German Transport Authority in September 2016 to mediate between the German and Italian authorities on a "dissent" regarding NOx emissions test results provided by Germany, and technical information provided by Italy, on the emission control strategies employed by Chrysler. The EC stated that it is now "formally asking Italy to respond to its concern that the manufacturer has not sufficiently justified the technical necessity- and thus the legality- of the defeat device used, and to clarity whether Italy has failed to meet its obligations to adopt corrective measures regarding the Chrysler type in question and to impose penalties on the car manufacturer."

374.    On May 23, 2017, the DOJ announced the filing of a complaint in the Eastern District of Michigan asserting that Defendant Chrysler, FCA US and other entities violated federal law because, *inter alia*,

> "Defendants illegally sold or caused the illegal sale of approximately 103,828 diesel-fueled new motor vehicles . . . that do not comply with the [Clean Air] Act. The applications for Certificates of Conformity ("COC") for the Subject Vehicles *did not disclose at least eight software-based features* that affect the Subject Vehicles' emission control system. . . . In addition, one or more of these undisclosed software features, alone or in combination with one or more of the others, *bypass, defeat and/or render inoperative the Subject Vehicles' emission control system, causing the vehicles to emit substantially higher levels of NOx during certain normal real world driving conditions than during federal emission tests*.

375.    Furthermore, "[t]he United States alleges, subject to a reasonable opportunity for further investigation or discovery, that *members of FCA NV management were involved in the process of gathering and/or approving certain information regarding FCA US' submissions as part of its COC applications for the Subject Vehicles*."

376.    On May 23, 2017, Chrysler's stock price declined from $10.89 at 9:30 a.m. to $10.32 at 4:00 p.m., a decline of 5.2%, on unusually high volume of 26,270,000 shares.

121

### J.   Additional Allegations Demonstrating Falsity and Scienter

377.   Leading up to the Class Period, Defenda nts were well aware that NHTSA had significantly intensified its enforcement of regulations regarding timely and accurate reporting of safety defects and recalls. Defenda nts' scienter can be inferred  from the frequency and focus of Defendants' discussions of regul atory com pliance in  pres s releases,  earnings  calls and SEC filings.

378.   In 2010 NHTSA fined Toyota Motor Corp      oration the m  aximum penalty of $16.375 million for its failure to notify NHTSA within fi ve days of learning of a safety defect in certain cars.  NHTSA fined Toyot  a another $3 2.425 m illion for failure  to initiate recalls in a timely m anner.  Following the fines, NHTSA's      then-current Adm inistrator David Strickland stated, "[a]utomakers are required to report any safety defects to NHTSA swiftly, and we expect them to do so."

379.   Just before the Class P  eriod, in Ma y 2014, N HTSA fined General Motors $35 million for late repo rting of sa fety defects, which was part of a record-high $126 m illion in civil penalties assessed in 201 4, which exceeded the total am ount previously collected by the agency during its forty-three year history.  NHTSA  's May 16, 2014 announcem ent of the GM Cons ent Order stated "This reinforces a message this Administration has been sending clearly for the past five years through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers."

380.   As NHTSA Adm inistrator Friedm an stated  in his public testim  ony to the U.S . House of Representatives' Comm   ittee on  Energy and Commerce, on April 1, 2014, "This Administration has placed an e mphasis on tim eliness . . . Be cause of this em phasis, we believe

122

that all manufacturers in the automobile industry are now paying much closer attention to their responsibility to protect their customers and the driving public."

381.    As discussed above in ¶¶ 93-109, Defendant Marchionne personally was very involved with the decision and implementation of the recall of Jeep vehicles with improperly placed fuel tanks that caused deadly fires in even low-impact rear collisions.

382.    Indeed, immediately after NTHSA fined General Motors, it began several preliminary investigations and Recall Queries into Chrysler products and implemented recalls. This was a substantial increase in the number of investigations into Chrysler.  As NHTSA has described, a Recall Query is an investigation opened on a recall because the recall remedy appears inadequate or the scope of the recall appears to be insufficient.

383.    Immediately following these events, Chrysler told investors that it understood that vehicle safety and regulatory compliance was of the utmost importance to NHTSA and investors and that senior management was focused on the issue.  Defendants emphasized their focus on regulatory compliance, that information concerning vehicle safety and regulatory compliance was shared directly with Marchionne and that he was personally accountable for any deficiencies:  On August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, that reported directly to defendant Marchionne, claiming "[t]his action will help intensify the Company's continuing commitment to vehicle safety and regulatory compliance."  Throughout the Class Period defendants repeatedly assured investors that the Company was in compliance with all vehicle safety regulations and that the Company had a "robust system in place."  Defendants Marchionne and Palmer also stressed their focus on recall compliance by repeating in Chrysler's SEC filings: "In 2014 we made an important organizational move to amplify our commitment to safety, as FCA US established the

new office of Vehicle Safety   and Regulatory Com pliance. The  reorganization created a stand-alone organization led by a senior  vice president [defendant Kunselman] who reports  directly to the CEO of FCA US [Marchionne], ensuring a high level of information flow and accountability. This new structure establishes a focal point for  working with consumers, regulatory agencies and other partners to enhance safety in real-world conditions."[32]

384.    Prior to his appointm ent to this new pos ition, Kunselman had been in charge of NAFTA Purchasing and Supplier Quality. P      rior  to that, he was Senior Vice President-Engineering, a position that included oversight of regulatory compliance.  Therefore, even before taking the new position, Kunselman was well aware of Chrysler's reporting deficiencies and lack of controls, which he undoubtedly reported to   senior management, including Marchionne, upon his appointment to the new position in August 2014.

385.    Defendant Kunselm an was in regular contact with regulators at NHTSA throughout the Class Period.  Kunselm   an led the   group at Chrysler that comm  unicated with NHTSA concerning  recalls.  For exam    ple, in  his s  tatement to th  e Senate  Comm ittee o n Commerce, Science and Transportation on November 20, 2014, Kunselman stated that his group had been "actively engaged" with NHTSA sin    ce at least early 2014 re    garding the recall of Takata airbags due to defective inflators.

386.    Defendants Palm er and Marchionne recognized   in SEC filings that they had "a customer fo cused approach" and,  specifically, that "[f] eedback received during the Stakeholder Engagement events held  in 2014 provided confirm ation that custom er services, veh icle quality and vehicle safety are issues of primar y importance to the Group's stakeholders." [33]  "The Group

---

[32] 2014 Form 20-F at 130

[33] 2014 Form 20-F at 129.

124

monitors custom er satisfacti on on a continuous basis and, wh    ere appropriate, develops new customer channels that help contribute to improvements in product safety and service quality."

387.    Defendants Palmer and Marchionne also to ld investors in th eir SEC filings under the head ing "Managing  Vehicle Safety", "we ta  ke transportation safety personally. Custom  ers trust the quality and safety of    our products, and we constantly    do our utm ost to warrant this confidence."

388.    On the Company's October 29, 2014 earni     ngs call with analysts, in which defendants Palmer and Marchionne participated, defendant Marc hionne acknowledged his focus on the increased regulatory scrutiny:

> <Q – [Ana  lyst]>: Thank you. Just want     ed to get your take on what the environment is currently  for the recalls ? Have we gotten pas t the worst of  it? Or do you think that there's going to added   government scrutiny going forward that we'll need to have more?

> <A - Sergio  Marchionn e>: [I]t m ay very  well be that we are peaked or getting very close to a peak. B ut you can't call this . Every time I read  the paper, there is another recall underway, including som e of ours. So I think that the industry m ay have overshot the mark in terms of recall activity. I mean, it may have just gotten hypersensitive. Let's work our way th     rough here and see where this whole exercise ultimately stabilizes."

389.    On the Company's January 28, 2015 earni     ngs call discussing results for the quarter and year ending December 31, 2014, defendants Marchionne and Palmer again discussed their focus on the increased regulatory focus concerning vehicle safety and recalls.

> <Q – [Analyst]: And the final one is to  Mr. Marchionne on the quality front. Can you talk a bit about the ch   anges you've done on the m  anagement front, on the quality front, and how    you are, you have    the right structur  e now to deliver improved at least – to avoid what we had last year in 2015? Thank you.

> <A - Sergio Marchionne>: Well, look, I think I've been public on this recall issue. The recall m atter is som ething which is  a reflection of a changing paradigm  for the auto sector. I think we have m      ade changes while a  djusting ou r intern al structures to deal with this new state of af fairs. It is m y expectation that this cost will come down as we progress through reconstitution of the management process

125

of what's going on here. W e had what I cons ider to be a pretty robust system  in place, we have streng  thened it further, we  have curved it out from  the rest of operations. We have set a very, very se    nior technical pers on to head up these activities. So I think we're m aking progress in m aking sure that at least not only are we dealing with what's on our plat e but we're actu ally becoming much more proactive and identifying pot ential exposures going forw ard. So as we do this, I think these numbers will stabilize and we'll see a steady state.

390.    On the Company's July 30, 2015 earnings call with analysts, following the announcement of NHTSA's $105 million penalty, de   fendant Marchionn e adm itted that he had personally been aware of NHTSA's increased focus on Chrysler's reporting failures:

Now the f irst slide s imply sets out the specif ic tim e requirem ents f or NHTSA reporting and customer notices and recall campaigns, and ***many of these rules are fairly specific and for the most par t they're straightforward***, although there can be questions about the triggering dates      of som e of these requirem ents. The unfortunate fact is that  we as an industry, and  *we in particular as a company, have not always been perfect in comply   ing with these re quirements, and over the last year and a half, NHTSA has be    gun to take a h  arder look at these technical compliance issues,  and frankly we started to  do the same thing about the same time.*

*Over a year ago, we saw that changes were coming, and we began to look more critically at our own governance and pr  ocess on safety a nd recall co mpliance issues, and we had then identified a number of necessary steps to improve. And both before and during our discu        ssions with NHTSA we have been implementing some of the needed improvements that we have identified.*

391.    Moreover, as discussed above, defenda nts Kunselm an and Marchionne becam e specifically aware of Chrysler's   lac k of com pliance with NHT SA's regulations and its poor internal controls when NHTSA Administrator Friedman expressly informed them and their direct report, Stev e Williams, of such violations th  rough letters d ated October 29, November 19 and November 25, 2014.

392.    In the October 29, 2014 letter to Stev      e W illiams, Hea d of Vehicle Safety Compliance & Product Analysis, who reported di     rectly to Defendant Kunselm  an, Friedm an wrote to "emphasize th e critical imperative" fo r Chrysler "to prom ptly and effectively rem edy

126

the serious safety risk posed to consum ers by de fective T akata a ir ba gs." He sta ted tha t th e current m easures taken were inadequate under Chrysler's legal obligations: "[M]ore can and should be done as soon as possible to prevent any further tragedies from occurring as a result of these defective air bags." Friedm an wrote: "we urge you to take aggressive and proactive action to expedite your re medy of t he recalled vehicles and to supplement Takata's testing with your own testing to fully evaluate the scope and nature of this defect."

393. The November 19, letter alerted Marchionne to Chrysler's regulato ry failings as to the recall of Jeeps with im properly placed fuel tanks that would burst into flam es upon even low im pact collisions, stating, "I am concerne d about the results of Chrysler's October 2014 recall update reports sh owing a woeful three p ercent repair rate out o f m ore than 1.5 m illion affected vehicles" that it was not the first time NHTSA had warned Marchionne, and that Chrysler's conduct was "unacceptable."

394. On Nove mber 25, 2014, Friedm an again wr ote to Marchionne to let him know that he was extrem ely concerned about the slo w pace of Chrysler's r ecall of the extrem ely important recall of Takata airbags. Friedm an noted in his letter that throughout the process of the recall, as com pared with the other affected m anufacturers, "C hrysler has consistently maintained its position at the rea r of the pack." Friedm an wrote tha t "Chrysle r's delay in notifying consumers and taking othe r actions necessary to address the s afety defect identified is unacceptable and ex acerbates the risk to m otorists' safety." He wrote that Chrys ler's delay in notifying owners deprives them of the ability to take informed precautionary measures and of the knowledge needed to m ake an infor med decisi on regarding their vehicles, noting that an informed customer could reduce the risk of d eath or injury by choosin g to leave the passenger seat unoccupied.

127

395.    Experts in the field dismissed any assertion that Chrysler's conduct was a result of mistakes, instead stating unequivoc ally that it was intentional    conduct by Chrysler.  Mark R. Rosekind, who beca me Adm inistrator of NH TSA on De cember 22, 2014 concluded "[w]e a re looking at a pattern", confirming that "[w]e've been tracking each of these recalls."

396.    Allan Kam, who served as a senio r enforcement lawyer for the NHTSA for m ore than 25 years before he retired  in 2000 stated "It is unprecedented  to have a hearing on so m any different recalls from  the sam e manufacturer . . .  It's a sign  that there is a system  ic issue with Chrysler."

397.    Indeed, Scott Yon, Chief of the Integrity  Division of NHTSA's Office of De fects Investigation, who exam    ined Ch rysler's co nsumer complain  ts, crash reports and other information relating to the safety consequences of  vehicle defects, as well as th e problems that arose with Chrysler's recall cam paigns, testified that "In my experien ce, **Fiat Chrysler's reca ll performance often differs from that of its peers**. Fiat Chrysler takes a long time to produce the parts need ed to get veh icles fixed. Their dea lers have dif ficulty ge tting parts f or r ecalls. Their customers have trouble getting recall repairs done. Fiat Chrysler's recall remedies sometimes fail to remedy the defects they are supposed to fix."

398.    NHTSA also informed Chrysler in late July 2015, at the very same time they were finalizing th e Consent J udgment that the Com pany was als o under inv estigation fo r failing to report deaths and injuries to the agency as required by law.

**Defendants' Had A Strong Motive to Concea   l Chrysler 's Mountin g and Expected Recall Costs**

399.    Defendants Marchionne, Palm  er and Chry  sler had a strong m   otive to conceal Chrysler's surge in vehicle recalls and the resulting increase in warranty provisions and warranty costs associated with those recalls.

128

400.    Marchionne had a very difficult task in         neg otiating th e m erger tr ansaction amongst var ious constituencies.  Prior to the merger, Chrysler was owned 58.5% by Fiat and 41.5% by UAW Retiree Medical Bene fits Trust, also known as th e VEBA Trust.  The VEBA Trust had the right to force Chrysler to do an initial public offering of Chrysler stock.  To avoid a Chrysler IPO, Marchionne had to negotiate a  price for Fiat to buy out the VEBA Trust's 41.5% interest in Chrysler.

401.    Once Marchionne successfully negotiated     the purchase of the VEBA Trust's shares, he w as required to convince Fiat shareholde rs that a m erger with Chrysler made sense. Then, he was also required to convince the markets that the Fiat / Chrysler merger would create a stronger and better inv estment for public shareholders in order to successf ully complete a listing of the m erged entity's stock on the NYSE.  As   part of Marchionne's co rporate plan, following the merger and listing of Chrysler's stock  on the NYSE on October 13, 2014, Chrysler planned to raise at least a billion dolla rs through the public sale of common stock and alm ost $3.0 billion through the sale of convertible notes.  [34]  This nearly $4.0 billion     in securities offerings was planned for and completed in December 2014.

402.    Marchionne, Palm er and Chrysler had a     strong m otive to  concea l C hrysler's mounting costs and liabilities stemm ing from t he su rge in  vehicle r ecalls, in o rder for them  to convince the m arkets that the Ch  rysler / F iat m erger was a   sound plan, to arouse sufficient interest in the merged company's stock on the NYSE, and to persuade investors to purchase $4.0 billion in new Chrysler securities following the merger.

---

[34]  The two prospectuses Chrysler filed on     December 12, 2014 were for (i) the sale of $957 million of common stock with a $133 million overallotment option, and (ii) the sale of $2.5 billion of convertible notes with a $375 million overallotment option.

403.     Indeed, when Chrysler's stock was first listed on the NYSE, many were skeptical. Reuters reported on October 12, 2014, the day be    fore the NYSE listing, that "Marchionne has picked a difficult moment to woo U.S. investors. The American auto industry is nearing its peak, the European market's recovery from years of decline is proving elusive and weakness persists in Latin America."

404.     One analyst, from ISI Group in London said in an interview with Reuters "it's not the right time to  list an a uto stock anywhere…This is happeni ng in the m iddle of a major prof it warning from Ford and people are still very co   ncerning about GM.  It's going to be tough for Marchionne to conv ince investors."  At the tim  e, Ford had  revise d its profit forecas t, citing in part recall costs in North Am erica.  But accordi ng to Reuters, "March ionne maintains that FCA should not be tied to Ford's wo es, saying its strong position in Br azil gives it an advantage over competitors, and this month reiterated full-year guidance despite market expectations of a cut to forecasts."

405.     Thus, given all the concom itant difficulties Chrysler faced, it was im perative for the success of Chrysler's m   erger, its succe ssful NYSE listing, and the planned sale of $4.0 billion in s   ecurities, th  at Defendants conceal      the surge in vehicle recalls th       at Chrysler experienced in 2013 and 2014, and the resulting in   creases in warranty provisions and warranty costs associated with the increase in vehicle recalls.

**Additional Allegations of Defendants' Scienter Concerning Chrysler's Emissions Violations**

*Chrysler's Creation of The Eight Illegal AECD's Along with Dahl, Lee's and Marc  hionne's Involv ement With* <u>*That Process*</u> <u>*Supports a Strong Inference of Scienter*</u>

406.     As discussed below,  *infra*  ¶¶ 450-476, Chrysler created   all the software for its diesel vehicles, which includes th e AECDs.  As the person who   supervised development of the

130

3.0-liter EcoDiesel V-6 in the Jeep Grand Cherokee and Ram 1500, Dahl knew that the 8 pieces of illegal software were on the vehicles. Moreover, all software (including AECDs) were described in reports that went to Lee and Lux, and which were required to be approved by Marchionne prior to inclusion in any vehicle. Thus, Lee, Lux and Marchionne were also aware of the illegal AECDs.

407.   Prior to replacing Kunselman in November 2015, Dahl was Director of Chrysler's diesel engine programs and global powertrain coordination, managing all of Chrysler's diesel engine programs in North America. Dahl specifically supervised development of the 3.0-liter diesel engine in the Jeep Grand Cherokee and Ram 1500. During the Class Period, Dahl (along with Lee and Mazure) communicated with the EPA and CARB on certification of Chrysler's 3.0 diesel engines used in the Jeep Grand Cherokee and Ram 1500. In this role, Dahl was responsible for installing the AECDs on the vehicles and for reporting those to the EPA and CARB as part of the certification process. This means that Dahl was necessarily informed about the COC submitted to the EPA that disclosed certain AECDs and concealed or omitted the 8 illegal defeat devices. Other members of Chrysler involved in certification meetings with the EPA and CARB were Mark Chernoby, Mark Shost, Emanuele Palma and Kyle Jones.

408.   Lee was Head of Powertrain Coordination and Vice President and Head of Engine and Electrified Propulsion Engineering, FCA US, with responsibility for directing the design, development and release of all engines and electrified propulsion systems for FCA US products. As discussed below, *infra* at ¶¶ 450-465, Lee was regularly updated on all testing of the diesel vehicles and all AECDs installed on them.

*The Obvious Illegality of The Eight AECDs Supports a*
<u>*Strong Inference Of Scienter*</u>

131

409.    As discussed above, *supra* ¶¶ 229-235, each of the 8 illegal AECDs targeted these controls designed to reduce NOx e missions with the effect of *always increasing emissions*. As the EPA determ ined, th ere were no  valid ex ceptions for the existence of these AECDs and Chrysler never provided any evidence of such exceptions.

410.    Specifically, the EPA determined that "some of these AECDs appear to *cause the vehicle to p erform d ifferently when the vehic le is being te sted for co mpliance with the EPA emission standards … than in nor mal operation and use*." CARB concluded " *This is a clea r and serious violation of the Clean Air Act*" and that *"[Chrysler] made the business decision to skirt the rules and got caught*." After over a year of inves tigation, the EPA concluded: "To date, despite having th e opportunity to do so, *FCA has failed to demonstrate that FCA did no t know, or should not have known, that a principal effect of one or more of these AECDs was to bypass, defeat, or render inopera tive one or more elements of design installed to co mply with emissions standards under the CA A*." Sim ilarly, the EPA conclude d "To date, despite having the opportunity to do so, *FCA has failed to establish that these are not defeat devices*."

411.    As Marchionne later admitted, the Grand Cherokee and Ram 1500 diesel vehicles "weren't co mpliant" when they  were m anufactured and s old. W ith the EPA co ncluding an d Chrysler admitting that there was no  valid purpose for these defeat devices, they must have been installed knowingly.

*Defendants' Failure to Disclose the Very Software That Violated*
*Emissions Regulations Supports and Inference of Scienter*

412.    Defendants clearly knew that there was soft ware ins talled in Chrysle r's diese l vehicles that circumvented emissions standards.  Auto m anufacturers are required to disclose all AECDs.  While Chrysler disclosed other, legal, AECDs to its regulators, these 8 illegal AECDs – the very AECDs that circumvented the emissions standards – were never disclosed.  This is not a

132

mere coincidence given Marchionne's admission of the importance of emissions controls during the Class Period and Marchionne's repeated assurances that he had reviewed/audited all the emissions software utilized in Chrysler's vehicles.

413.    Mazure (FCA - North America, Senior Manager - Environmental Certification - Vehicle Safety & Regulatory Compliance) was the point person with the EPA and CARB regarding vehicle certification (along with Ellis D. Jefferson). Mazure reported directly to Dahl. The applications for certification to the EPA for each of the 2014, 2015 and 2016 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles was accompanied by a letter from Mazure dated May 3, 2013, August 21, 2014, and June 8, 2015.

414.    Each of the applications (and supplements thereto) included a "List of AECD Use in Test Group" in Section 11 of the application for certification. Each application purported to disclose all AECDs on the vehicles. For example the application for the 2014 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicle identified 13 AECDs. The application for the 2015 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles identified 17 AECDs. The application for the 2016 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles identified 17 AECDs. While Defendants identified all the legal AECDs in Chrysler's applications for certification to the EPA, Defendants failed to disclose all 8 of the illegal AECDs, which were not identified in any of the applications. Defendants' disclosure or all legal AECDs but none of the illegal AECDs creates an inference that they knew of their existence, that they were illegal, and that they intentionally concealed the illegal EXCDs from the EPA.

*The VRC Ordering a Secret "Voluntary Recall" through a "Field Fix" of One of The Illegal AECD In 2015 Demonstrates Defendants' Knew of the Undisclosed AECDs and Their Illegality*

133

415.    Any claim that Defendants did not know  that the 8 AECD's were on the Jeep Grand Cherokee or Ram 1500 is disproven by Chrysler (as admitted in the EPA January 2017 Notice of Violation) "***institute[ing] a voluntary recall for AECD #1 in 2015, referred to as the 2014 Field Fix" on its 2014 Grand Cherokees and Ram 1500s***. If Defendants did not know about the AECDs and their illegal impact on NOx emissions then they could not have made the decision to remove AECD#1 from their vehicles.   Moreover, the fact that Defendants conducted this recall or "field fix" secretly without informing the public (or informing the EPA until after the EPA identified the AECDs as defeat devices) demonstrates that Defendants knew that the existence of the AECDs was important to investors and the public's knowledge of their existence would harm the Company.

416.    All recalls and field fixes were made and approved by Chrysler's VRC, which was chaired by Kunselman (and later Dahl) and included, among others, Lee, Lux and Chernoby. The VRC met at least once every  month.  According to Chrysler documents produced during discovery concerning the recall/vehicle safety claims, ███████████████████ ███████████ █ ██ █ ███████████████ Thus, these individuals knew of the 2015 field fix to remove the illegal AECD 1 from the 2014 Grand Cherokee and Ram 1500 3.0 diesel vehicles months before the actual field fix was initiated.  It follows,  *a fortiori*, that the members of VRC knew of the  ***existence*** of the illegal AECD 1 well before the "field fix" was initiated.

417.    A recall or "field fix" for software can  be accomplished secretly, without any public knowledge, because it is accomplished by updating or "flashing" the software for the vehicle.  Any time an owner takes their vehicle to the dealership, the first thing the dealership is required to do is hook up the vehicle's Power-train Control Module ("PCM") to the system so

any software updates (whether legal or illegal) can  be installed or "flashed.".  Owners routinely bring their new vehicles to the  dealership because the purchase  of the vehicle routinely includes free oil changes at the dealership      for 2-4 y  ears. Veh icle m anufacturers b enefit from  this arrangement because it allows the manufacturer to update software or replace defective parts that become apparent as the vehicles first hit the streets.

418.    Moreover, between October 2014 and Sept ember 2015, Chrysler had sent several "Service Bulletins" to its dealers relating to defective NOx emissions controls that were causing high NOx emissions for, ***and only for***, its 2014 and 2015 Jeep Grand Cherokee and Ra m 1500 equipped with the 3.0 liter diesel engine.  Servi ce Bulletins are inform ation provided to dealers but not customers.  They alert dealers as to def ects with vehicles that are required to be fixed anytime an owner brings their     vehicle into the dealersh ip.   The first step of the "Repair Procedure" in each Service Bulletin was "The PCM  must be at the lates t calibration level before proceeding with this repair."  This ensured that Ch rysler's secret "field fix" would be applied to all vehicles. For example:

- On October 17, 2014, Chrysler issued    Service Bulletin 18-018-14 REV. D (which revised an earlier bulletin    issued on July 11, 2014) for 2014 Grand Cherokke with the 3.0 liter diesel engi     ne, stating "[t]his bulletin involves selectively erasing and reprogramming the Powertrain Control Module (PCM) with new software."  Among the probl ems were Malfunction Indicator La mp (MIL) illumination for problems with EGR, SCR and NOx performance.

- On November 21, 2014, Chrysler issued  Service Bulletin 18-045-14 for 2014 Grand Cherokee and R  am 1500 with the 3.0   liter diesel engine with the subject "P20EE SCR NOx Cataly  st E fficiency Below Threshold Bank 1", stating "This bulletin invol ves verif ying the proper operation of the D    iesel Exhaust Fluid (DEF) system and, if necessary, replacing the Selective Catalyst Reduction (SCR) Catalyst assembly."

- On March 14, 2015, Chrysler issued        Service Bulletin 18-021-15 (which superseded bulletin 18 -028-14 Rev.  D dated  Decem ber 18, 2014) for 2014 Ram 1500 with the 3.0 liter engine,           stating "[t]his bulletin involves reprogramming the Powertra   in Control Mod  ule (PCM)  with the late   st

available software." Among the probl ems were Malfunction Indicator La mp (MIL) illumination for problems with EGR, SCR and **_NOx performance_**.

- On July 18, 2015, Chrysler issued S ervice Bulletin 09-006-15 for 2014 Grand Cherokee and Ra m equipped with the 3.0  liter diesel engine. W hile it concerned the replacement of engine   cylinder heads, the b ulletin's "Repair Procedure" still s tated "Verify the  PCM is programm ed with the lates t available so ftware. Refer to all app licable p ublished se rvice bulletins f or detailed rep air procedu res and la bor tim es regarding updating the PCM software."

- On September 24, 2015, Chrysler issued  Service Bulletin 18-064-15 (which superseded Service Bulletin 18-045 -14, dated Nove mber 21, 2014) for the 2014 Grand Cherokee and Ram 1500 with the 3.0 liter diesel engine again for "P20EE SCR NOx Catalyst Efficien cy Below Threshold Bank 1" and stating "This bulletin involves replacing the   Selective Catalyst Reduction (SCR) Catalyst ass embly. The Repair Pro cedure s tates "The PCM m ust be at the latest calibration level before proceeding with this repair."

- On February 17, 2016, Chrysler issued Service Bulletin 18-017-16 (which superseded Service Bulletin 18-021-15  Rev. F, dated December 2, 2015) for the 2014 Ram 1500 with the 3.0 liter diesel  engine. The s ubject was "Flash: 3.0L Powertrain Diagnostic and S  ystem Enhancem ents". The Overview stated "This bulletin involves reprog ramming the Powertrain Control Module (PCM) with the latest available software." Am     ong the problem s were Malfunction Indicator Lamp (MIL) illumination for problems with EGR, SCR and NOx performance.

- In April 2016, following on the Serv   ice Bulletins of November 2014 and September 2015 and the instructions   from the EPA and CARB, Chrysler issued "Em issions Recall R69 Selectiv e Catalyst Reduction Cataly st" for the 2014 Grand Cherokee and Ra m 1500 equipped  with a 3.0 liter diesel engine. The purpos e of the recall was to    re place th e SCR catalyst becau  se of "washcoat degradation" which was cau  sing NOx em issions to exceed legal limits.

419.    The above not only demonstrates how Chrysler was able to conduct its secret

"recall" or "f ield fix" f or AECD 1 but it a lso  demonstrates that Chrysl er and specifically the

members of the VRC (including Kunselm an, Da hl, and Lee) were well aware in 2014-2016 of

high NOx emissions on the Jeep Grand Cherokee and Ram 1500 3.0 liter diesel vehicles.

420.    Marchionne was also alerted to the AECD  1 field fix well in advance of it being

instituted. Based on Lead Plaintif   fs' review of docum ents produced  pursuant to discovery

requests relating to their recall/vehicle safety claims, █████████████████████████



████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

421.    The fact th at M archionne was regularly    alerted to a  ll f ield fixes and recall decisions when they were m ade further supports an  inference that they were alerted of the field fix regarding AECD 1. Marchionne must have known of the AECD 1 field fix no later than a few days after the VRC approved the field fix in mid-2015.

*The EPA Alerted Defendants  in Mid-2015 That It Had*
*Identified "Defeat Devices" on the Grand Cherokee*
*and* <u>*Ram 1500*</u>

422.    As Marchionne would later adm  it in  a January 12, 2017 interview, by no later than September 2015, the EPA had inform     ed hi m that the EPA had identified undisclosed AECDs that it had determ  ined were "d efeat devices." Marchionne stated " ***obviously, we knew that they had concerns.  We have been in dial   ogue with them now since September 2015.  It could have been even earlier.***"

423.    It was indeed earlier. C  W3 was a Program  Manager of Advanced Powertrain at Chrysler (the division headed  by Lee) from  June 2013 thro ugh September 2015, located at the Auburn Hills, Michigan f acility.  A ccording to CW 3, Chrys ler was aware that its diesel m  odel vehicles were exceed ing the em issions levels th at the Com pany had repo rted to the EPA by no later than summer 2015. It was CW3's understandi ng that the vehicles were em itting more NOx than what FCA was reporting to the  EPA.  "I knew they had an issue with the software and were working on trying to figure it out," CW  3 said.  "They knew there was an issue." The issue was

138

that some of the vehicles were exceeding the emissions levels that had been reported to the EPA.
"Whatever they were reporting on the label, what ever they told the governm ent, they found out
they weren 't m eeting those," CW3 said.    "It    was big issue," CW    3 sa id of the em    issions
discrepancy. "It went all the way up to Bob Lee." CW3 understood that Lee formed the team and
was pulling engineers and tech specialists from several different departments to work on it. From
conversations with co-workers, CW3 said many employees "knew som ething… was going on."
"They were pulling guys from    other projects,"    CW 3 said. "That (issue ) was the num ber one
priority all the sudden." "The details were kind of hush hush," CW    3 s aid. "It was a secretive
mission if you will. It wasn't public knowledge.    CW3 said no one at FCA, especially not the
leadership, was talking publically about the issue and the company's efforts to deal with it.

424.    Unbeknownst to investors, it was D efendants' communications with the EPA in
mid-2015 concerning the defeat de vices on the Jeep Grand Cher okee and Ram 1500 that led to
Chrysler's purported "audit" of its software.

425.    Following the EPA alerting Chrysler that it had found undisclosed defeat devices,
Lee, Kunselman, Dahl and Marchionne (am ong many others) were all involved in discussions of
the issues.

426.    On October 27-28, 2015, ████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

139

427.    On November 25, 2015, Michael D ahl (Head of Vehicle S afety and Regulatory Compliance at FCA Fiat Chrysler Autom obiles), Steve Mazure (FCA - North Am erica, Senior Manager - Environmental Certification - Vehicle Safety & Re gulatory Compliance) and Vaughn Burns (Head - Vehicle Em issions, Certification and Com pliance a t FCA - North Am erica) and others met with Byron Bunker (O ffice of Transporta tion and Air Quality  Compliance Division Director), Linc W ehrly (Dir ector, Light-Duty Ve hicle Com pliance (he  is responsible for emissions and fuel econom y com pliance for all new light-duty vehi cles)) of the EPA. At this meeting, the EPA identified several AECDs in FC  A's Ecodiesel vehicles  that appeared to the EPA's Director Compliance Division, Office of Transportation and Air Quality, Byron Bunker to "violate EPA's defeat device regulations" concerning NOx emissions.

428.    Between Novem ber 25, 2015 and Ja  nuary 7, 2016, Dahl and his staff communicated regularly about the EP A's finding of defeat devices.   As Dahl stated in a January 11, 2016 email, "[we] have communicated throughout that time with your team, and have sought to respond to your inquiries transparently, and as rapidly as possible under the circumstances."

429.    On January 7, 2016, Bunker of the EPA sent   an urgent email (m arked as "High Importance") to Burns (cc'ing Wehrly) requesting a phone call with  Burns, Mazure and Dahl for that v ery sam e day because "I  am  very concerned about the    *unacceptably slow p ace* of the efforts to understand the high NOx e     missions  we have observed" from    several of FCA's Ecodiesel vehicles, reiterating that "*at least one of the AECDs in  question appears to me violate EPA's defeat device regulations.*"   The purpose of the call was "L inc and I would like to briefly discuss our concerns today with  the intent to schedule a meeting where FCA can com e prepared to brief EPA and CARB in detail on the AECDs in  question."   Bunker coped at the bottom of the email 40 CFR 1803-01, the definition of "Defeat device".

140

430.    On January 8, 2016, the EPA had a call with    Dahl and his team  to discuss the issue of the defeat devices.

431.    On January 11, 2016, Dahl em  ailed Christ opher Grundler (Director of the EPA Office of Tr ansportation and Air Qu ality) stati ng that "[a]fter id entifying these con cerns at the November 25, 2015 meeting with m    y staff, FCA has been engage    d in extensive efforts to analyze the issues…W e truly appreciate the si  gnificance of your concern that NOx em   issions during certain operating modes has been identified."

432.    On January 13, 2016, Dahl and his team met in person with the EPA and CARB.

433.    On January 13, 2016, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████

*Marchionne's Admission That    Chrysler's Vehicles*
*"Weren't Compliant" When They Were L        aunched*
<u>*Supports a Strong Inference of Scienter*</u>

434.    Despite (i) Def  endants intim ate knowledge of the AECDs, (ii) the high NOx emissions in their Grand Cherokee and Ram    1500  3.0 diesel vehicles, (iii) conclusions by the EPA and CARB that the vehicles contained undi    sclosed defeat devices, and (iv) a purported "audit" of all the software on        their diesel vehicles, Marchionne    continued to assert that

141

Chrysler's vehicles were in full com     pliance  with em issions regulations (which required disclosure of all AECDs and prohibited defeat devices).

435.    Marchionne finally admitted that all prev ious representations of com pliance were false during a July 27, 2017 Q2 2017 earnings ca ll.  Responding to a question about voluntary updates to Chrysler's software in its diesel vehi cles, Marchionne stated "We are looking at this, if we can do it, and provide an im provement in air quality, both on CO 2 and NOx, purely as a result of calibration, and we'll do this*. **The important thing is that, within the scheme of things that existed at the time in which we la unched these vehicles, we weren't compliant**.  If there is a way to improve that position, we will more than gladly do it.  So we're working at this."

436.    The Com pany's actions  with respe ct to its illegal em     issions sof tware f urther evidences that all of its prev     ious repres entations of compliance were false.      The Com  pany "updated" its em issions software  in its 2017 vehicles as a basi  s to "fix" the DOJ's and EPA's allegations of excess emissions.  Following the filing of the DOJ Complaint, FCA US announced that it developed "updated emissions software calibrations" and filed for diesel vehicle emissions certification for its 2017 m  odel year Jeep Gra nd Cherokee and Ra m 1500 diesel vehicles and stated that "subject to the perm   ission of the  EPA and CARB, FCA US intends to    insta ll the **same modified emissions software in 2014-2016 MY Jeep Grand Cherokee and Ram 1500 diesel vehicles…FCA expects that  the installation of these u pdated performance calibrations will improve the 2014-2016 MY vehicles emissions performance…**"

437.    On July 28, 2017 the EP A and CARB approve d the 2017 diesel ve hicles with the updated software for sale after it had subjected the     vehicles to "intense sc rutiny" with tests to prevent th e use of  illeg al def eat de vices.  News outlets re  ported tha t it could tak e weeks of

months for the EPA to sign off on the testing and      then approval of Chrysler's plan to use th  e

software in the 2017 diesels to update the 2014-2016 vehicles.

438.    Marchionne's adam ant denials of any non-  compliance even after purporting to

have conducted a thorough audit of all software in 2015 strongly suggests that Marchionne knew

all along (even before the audit) that the vehicl     es "weren't com pliant". There is no credible

explanation for how Defendants could design the AECDs, know the vehicles were spewing NOx,

be alerted to software problem s, have the EPA a nd CARB conclude they are defeat devices, and

conduct an audit of the software and not be aware of any non-com      pliance.  Having lied about

compliance following these events implies that Marchionne knew all along about Chrysler's non-

compliance. Further, Defendants' "fix" of the so ftware and request to re gulators for perm ission

to use the modified software   in its 2014-2016 vehicles is ta   ntamount to an adm ission of non-

compliance.

*Defendants Knew That The Grand Cherokee a   nd Ram
1500 3.0 Liter Diesel Vehicles Were Exceed     ing NOx*
<u>*Emissions Standards In August 2014*</u>

439.    Moreover, Defendants were aware that  the 2014 Grand Cherokee and Ra m 1500

equipped w ith the 3.0 liter di   esel engines  were exceedin g EPA and CARB NOx em     ission

standards at least as early as August 4, 2014. Chrysl   er's investigation into  the illegal levels of

NOx em issions creates  a strong   inference th  at Defendants were aware of the AECDs that

increased the vehicles' NOx emissions.



143



449.    In April 2016, following on the Serv    ice Bulletins of Nove    mber 2014 and September 2015 and the instructions from     the EPA and CARB, Chrysler    issued "Em issions Recall R69 Selective Catalyst  Reduction Catalyst" for the 20 14 Grand Cherokee and Ra m 1500 equipped with a 3.0 liter diesel engine.  The purpose of the recall was to replace the SCR catalyst because of "washcoat degradation" which was causing NOx emissions to exceed legal limits.

*Marchionne's Regular Receipt And Approval of Reports Detailing The*
*Status of Emissions Software Supports A Strong Inference of Scienter*

450.    Confidential witnesses that worked on em   issions testing at  Chrysler during the Class Period confirm ed that Marchionne receiv  ed regular reports on em   issions software and testing, was focused on the EPA's em    issions test  cycles, and that he (Marchionne) m    ade the ultimate de cisions on whether to incorpor    ate em issions sof tware or hardware in   Chrysler' s vehicles.

451.    Confidential Witness #1 ("CW 1") worked at  Chrysler's Auburn Hills, M ichigan Tech Center during the Class     Period evaluating vehicles for fuel econom    y and scheduling emissions testing, and had knowledge of diesel as well as gasoline engine testing.

452.    As part of the testing, CW1 would work with a dynamometer, or "dyno" for short, which were used to m easure force, torque or power on both diesel and gasoline engines. In these tests a vehicle's tires spin, but    the vehicle does not go anywhere  .  F or em issions tes ting, th e dynos were used to provide sim  ulated road loading of either    the engine or powertrain. Som  e dynos, which were built into the floor at the Tech Center, could simulate a car driving at 40 miles

145

per hour, for instance. A hose placed in a car's exhaust pipe collects emissions. The vehicle is run at city or highway cycles to simulate driving in those conditions.

453.    According to CW 1: "These critical tests are super important because to certify a car to sell it, the EPA ( Environmental Protection Agency) has to say, 'Yeah, we accept the fuel economy numbers.' When we submit to EPA that the vehicle does 20 miles per gallon in the city, and 30 on the highway, it has to do that. If they call you out, you can get in trouble. So, you have to make sure that the data is accurate, and can be replicated in EPA tests."

454.    Confidential Witness #2 ("CW2") also worked at the High Tech Center in Auburn Hills, Michigan during the Class Period. CW 2 worked as a powertrain performance and fuel economy analysis engineer in the vehicle performance and fuel economy and emissions departments at the Tech Center, reporting to John Alexander, FCA director of powertrain development. Alexander reported to Jeffrey P. Lux (head of transmission powertrain for Fiat Chrysler Automobiles (FCA US) -- North America), or Robert (Bob) E. Lee (head of engine, powertrain and electrified propulsion, and systems engineering, for FCA -- North America), who in turn reported directly to Marchionne.

455.    CW2 worked on 3.0 diesel and gasoline- powered engines on the Jeep Grand Cherokee and Dodge Durango, and performed computer simulations on fuel efficiency, emissions and other powertrain issues that were incorporated in vehicles. CW 2 analyzed such factors as the effects of vehicle weight, tire weight, size and air pressure on engine performance, plus stop-and-go driving conditions on the highway or in a city, on fuel economy and emissions.

456.    The propulsion system simulations on which CW2 worked were used to predict the performance of diesel engines, transmissions, electric drive systems, batteries, fuel cell systems, and similar components. According to CW2, prior to the Class Period, Chrysler used

146

an in-house simulation tool based on METLAB,  which is a "technical co mputing" language for

engineers, and Simulink, which provides a platform for engineers to model complex engineering

problems with a varied degree of com   plexity in  a virtual environm ent. The sim ulations were

developed by a single    person within FCA -- Graham    Br ooks.  "The software definitely had

growing pains," CW2 said.

457.    The older software was known technically as "PMAT," and was a "      powertrain

matching" and optimization tool designed to simula te vehicle performance. It was superseded by

another software tool introduced in 2014 to help develop vehicles in the 2015-2016 models.

458.    As part of everyday responsibilities,    CW2 would generally take EPA-certified

fuel consumption and em   ission data points on    a vehicle in production, then simulate on a

computer how the next year's vehicles could be     im proved either with changes to a software

management control system   or hardware alterati  ons. "It's a projection t   ool. It shows what is

predicted to happen in a road test," CW2 explained.

459.    CW2 stated that it's a difficult balanc    ing act, as em  issions, fuel econom  y and

engine perform ance are linked to    gether such  that an improvem   ent in em   issions can't be

accomplished without affecting also affecting fu  el economy and engine perform ance. "You are

almost out of tricks in the auto  industry in how to regulate an in ternal combustion engine," said

CW2,   *who cited pressure from Alexander and higher-ups who always demanded*

*improvements*. CW 2 stated that there was a lot of pressure to produce results -- even if the

vehicle's improvements weren't quite ready.

460.    Section 208(a) of the Clean Air Act, 42    U.S.C. § 7542(a), requi res that "[e]very

manufacturer of new moto r vehicles . . . establish and m aintain records, perform  tests . . . m ake

reports, and provide information the Administrator may reasonably require to determine whether

147

the manufacturer or other person has acted or is acting in compliance" with Part A of Title II of the Act.

461.    CW1 explained that data gathered from these engine tests would be analyzed in a report and presented to a senior m anager. The re port would then get forwarded up to Jeffrey P. Lux or Robert E. L ee, where decisions woul d be m ade along the way on whether to m ake changes to the hardware or soft ware im pacting em issions or fuel efficiency. T his process worked the sam e on the gasoline engine side of the benchm arking business as the diesel side . Lux and Lee would then forward these reports to Sergio Marchionne, who would make decisions on whether to incorporate hardware or software changes in em issions or fuel efficiency in Chrysler's vehicles.

462.    CW2 stated that Chry sler paid clos e attention to the so- called "EPA perform ance cycle," which exam ines a series of data po ints to as sess fuel co nsumption and polluting emissions, and also stated that Marchionne m ade the decisions on whether to incorporate hardware or software changes in emissions or fuel efficiency in Chrysler's vehicles.

463.    CW2 laid som e of the blam e on the fact  that Chrysler was a "flat o rganization" with not m uch m iddle m anagement "fat" between hi mself, director Alexa nder, vice presidents Lee and Lux, and Marchionne, whom he described as a hard-nosed executive.

464.    CW2 explained that Marchionne was very  hands-on and detail oriented. "If you presented something and it didn't go well, you could expect to be on the street the next day," said CW2 of Marchionne. "You'd better  have your facts together. A lo t of guys were scared when they'd have to go there to present som ething. They'd have a huge amount of backup data. If Sergio asked a question, and you didn't know, that was trouble."

148

465.    CW2 was not surprised that the U.S. Justice Department is investigating Chrysler over its a lleged f ailure to disclos e sof tware th at violated em ission standards. "No, I' m not surprised by this. The entire indus try is challenged by it (software controlli ng emissions). Now, all auto m anufacturers have to cheat," said   CW2, who pointed to sim ilar revela tions wher e Volkswagen AG conspired with th e com pany that design ed their em issions controls, Robert Bosch GmbH ("Bosch") – the sam e company that designed Chrysler's emissions controls. "It' s standard." CW 2 suggested that the dangerous    release of pollution from Grand Cherokees and Ram 1500s could have been tri ggered by m aking changes in software coding em bedded in the electronic brains, or software m anagement control systems, of 104,000 vehicles thought by the EPA to have released too much nitrogen oxide into the air.

*The Involvement of Bosch In Chrysler's Emissions Scheme*
<u>*Supports A Strong Inference of Scienter*</u>

466.    Discovery of Bosch has just begun in a       separate c ivil ca se, but the evidence contained in publicly av ailable pleadings in *In re Volkswagen "Clean  Diesel" Marketing, Sales Practices, and Products  Liability Litigation*, No. 3:15-m d-02672-CRB (N.D. Cal.) ("VW  Clean Diesel Litigation") already proves that Bosch played a critical   role in the schem e to evade U.S. emissions requirem ents for diesel vehicles, incl uding Volkswagen and Chrysler vehicles.  All paragraphs that contain citations to docum ents prefixed "V W-MDL2672" are drawn from  the publicly-available Volk swagen-Branded Franc hise Dealer Am ended and Consolidated Class Action Complaint in the VW Clean Diesel Litigation, Dkt. No. 1969 ("VW Dealer Complaint").

467.    According to pleadings in the VW  Clean Diesel Litigation, ***in 2008, Bosch wrote Volkswagen and expre  ssly deman ded that Vo  lkswagen indemnif y Bosch for anticipa   ted liability ar ising fro m th e use of  th e Bosch-cr eated "defeat device" (Bosch's words), which***

149

**Bosch knew was "prohibited pursuant to … US Law**   ."[35]   Volkswagen apparently refused to indemnify Bosch, but Bosch nevertheless continue d to develop the so-called "akustikfunktion" (the code nam e used for the defeat device) fo r Volkswagen for another seven years. VW Clean Diesel Litigation pleadings set forth that during that period, Bosch concealed the defeat device in communications with U .S. regulators once questi ons were raised abo ut the em ission control system, and went so far as to actively lobby lawmakers to promote Volkswagen's "Clean Diesel" system in the U.S. Bosch's efforts, taken to     gether with Bosch's ac  tual knowledge that the "akustikfunktion" operated as an  illegal defeat device, demons  trate that Bosch was a knowing and active participant in Volkswagen's emissions scandal.

468.     Bosch tightly controlled development of the control units in vehicles, and actively participated in the development of the defeat device for Volkswagen.

469.     Bosch m ade clear that the EDC17 was not     one-size-fits-all. Instead, it was a "[c]oncept tailored for all vehicle classes and markets" that could "be adapted to match particular requirements [and] … be used very flexibly in  any vehicle segment on all the world's markets." The EDC17 was tailored and adapted by m odifying the sophisticated software em bedded within the electronic control unit ("ECU"). Bosch manufactured, developed, and provided the ECU and its base of software to Volkswagen as well as Chrysler.

470.     All Bosch ECUs, including the EDC17,     run on com plex, highly proprietary engine management software over which Bosch exerts near-total control. In fact, the software is typically locked to pr event customers, like Vo lkswagen and Chrysler, from making significant changes on their own. The defeat devices em ployed by Volkswagen and Chrysler were jus t such a software change—one that would allow m odifications to the vehicle's e mission control to turn

---

[35] VW-MDL2672-02570091 (English translation) (emphasis added).

on only under certain circum stances—that Volkwagen or Chrysler could not have m ade without Bosch's participation.[36]

471.    Unsurprisingly, then, at least one car company engineer has confirmed that Bosch maintains absolute control over its software as part of its regular business practices:[37]

> I've had many arguments with Bosch, and they certainly ow n the dataset software and let their custom ers tune the cu rves. Before each dataset is released    it goes back to Bosch for its own validation.
>
> Bosch is involved in all the development we ever do. They insi st on being present at all our physical tests and they log a ll their own data, so  someone somewhere at Bosch will have known what was going on.
>
> All software routines have to go through   the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure ….
>
> The car company is *never* entitled by Bosch to do something on their own.

472.    Thus, Defendants cannot argue that the existence  of the illeg al software was the work of a s mall group of rogue engineers. To    arrange this type of complicated programm ing required coordination between Chrysler and Bo sch and possibly hundreds of employees between the two companies.

473.    As the Dealer Complaint alleges, Bosch expressed similar concerns that use of the defeat device it had created fo r Volkswagen would vio late U.S. law. Thes e concerns culm inated in a June 2, 2008 letter from       Bosch to Volk   swagen's Thorsten Schm idt in which Bosch demanded t hat Volkswagen indemnify Bosch for    any liability arising  f rom the creation of  a "defeat device," as Bosch itself ca lled it in English. Through the le tter, Bosch sought to clarify the roles and responsibi lities of Volkswagen and Bosch rega rding the developm ent of the EDC

---

[36] VW Dealer Complaint ¶ 79

[37] Michael Taylor, EPA Investigating Bosch over VW Diesel Cheater Software, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheatersoftware/.

17, and demanded that Volkswagen indemnify Bosch for any legal exposure arising from work on the defete device:[38]

> The further development [of the EDC17] requested by your company will result, in addition to the already existing possibility of activating enriched data manually, **in an additional path for the potential to reset data to act as a "defeat device."** We ask you to have the attached disclaimers executed by your company.

474.     The letter uses the words "defeat device" in English, and further explained that

**"[t]he usage of a defeat device is prohibited pursuant to … US Law (CARB/EPA)**     (see definition footnote 2)."[39]

475.     The complaint filed by the DOJ against Volkswagen similarly alleges that Bosch communicated with Volkswagen about programming the illegal software.

476.     CW2 confirmed that Chrysler worked     with Bosch to program     its vehicles, including the Grand Cherokees     and Ram 1500s and that it was possible that the release of emissions could have been triggered by making changes in software coding embedded in the software management control system  . CW2 also confirmed that the programming involved collaboration between Chrysler an d Bosch: "Our people would develop     the software, ship it overnight via email over a special network. They'd get it, m ake modifications or whatever, to prepare it. You'd receive it back the following day, so you could implement the actual software code into the model."

*Marchionne's Repeated Detailed Discussions and A     ssurances*
*Concerning Emissions Software Create A Strong Inference of Scienter*

477.     Further demonstrating Marchionne's scie     nter are his repeated an     d detailed discussions of the importance of compliance with  emissions regulations,  his focus on achieving

---

[38] VW-MDL2672-02570091 (English translation) (emphasis added).

[39] Id. at 92 (emphasis added).

compliance, his review of the soft    ware used   to achieve com  pliance, and his assurances of

compliance. In addition to the statements identified above in Chrysler's SEC filings, Marchionne

routinely addressed these issues during earnings calls.

478.    For example, Marchionne was well-aware of Volkswagen's scandal involving the

implementation of software to m  anipulate em issions readings.  On   October 28, 2015, during

Chrysler's Q3 2015 earnings call,   Marchionne addressed the issu  e unprompted in his opening

statements to investors, acknowledging that th    e im plementation of soft ware that m  anipulates

emissions reading cannot be the result of accident but rather "malfeasance": "There's not a doubt

that the problem  does exit. I think we cannot conf   use the events in term  s of their im portance.

***The origin of this prob  lem was a governance   failure. It was not the failure of technology***   . I

think that there was nothing that I have read or    that I know that would suggest that diesel as a

means of providing combustion for our units is either  in danger or should be elim inated because

of the potentia l ***malfeasance*** of an agent in the m    arket."  Marchionne again recognized the

importance of compliance with emissions regulations: "I think the Volkswagen story and the cost

associated with what I consider to    be ***a very stiffening environment of regulations and of***

***compliance*** only m akes that thesis [ of consolidation] more valid today than it even was back  in

April 9." He also discussed Ch   rysler's preference for selling la  rger vehicles th e need for the

Company to im  plement effective em  issions t echnology for it to compete in that m      arket:

"technology will com pensate f or the size.  I thi  nk tha t th ese vehicles  will r  equire additiona l

technology on the powertrain side to compensate for the emission status . . ."

479.    During his January 27, 2016 Q4 2015 earni    ngs call, Marchionne  repeated the

importance of and his focus on em     issions comp liance.  "The other     thing that's obviously

happened and was absolutely unf   oreseen was the develop  ment of a much greater deg   ree o f

153

consciousness when it comes to emissions and the regulatory environment. Some of them which were caused by the in dustry, some of which I think a r esult of som ething which has been brewing within the system, especially in the EMEA side now for a number of years. But all these things will require resolution over the next three years or four years and they will have costs, which we have incorporated in our plan. . . . I've sa id this before and I continue to repeat it here, that I've always viewed the developm ent of our portfolio in the Unite d States as being rea lly driven by the regulatory environment . . ."

480.    During the sam e call, Marchionne discusse d aspects of C hrysler's technologies for achieving em issions com pliance in gre at deta il. For exam ple, discussin g Chrysler's "regulatory compliance plan in terms of greenhouse gas on a global scale", Marchionne stated "I think we all know that there is directionally a desire to bring down $CO_2$ emissions. I think as I read some of the reports that have been issued in connection with FCA, ***there appears to be some concern that we do not have adequ ate technologies to try and deal with this. So, I'm going to spend a couple of s lides trying to reassure you that all the things that are required to try and make the numbers are in fact in place and available*** ." Marchionne went on to discuss these technologies: "as a result of th e combination of what I consid ered to be econom ically sound acquisitions of credits and ***the rollout of tech nologies th at we're well ahead of the curve in terms of a chieving targets that we have throughout the plan*** ." Marchionne went on to discuss details of how Chrysler's truc ks would achieve regulatory co mpliance, in cluding those tha t utilized the illegal softwa re: "But as you can see, ***both the current Ram 1500, which today is compliant with 2015 standards*** , will in its next incarnation, wh en the truck g ets launched in 2018, meet both the 2018 and the 2022 targets."

154

481.    Marchionne even directly addressed the sp    ecific issue of   software o   n diesel vehicles used to cheat regulatory compliance in the wake of Volkswagen's "Dieselgate" scandal, assuring investors that h e had exam ined the issu e and no such software was being utilized by Chrysler. S tating, "I think it's im   portant to ke ep this in m  ind", Marchionne m ade clear that Chrysler "has been busy and it continues to be busy on optimized methods to achieve the targets. It will continue to do so. . . . I think that *after the advent of dieselgate,* for a lack of a better term, *FCA has undertaken a pretty thorough review and a thorough au dit of its compliance teams.* I think we feel comfortable in m   aking the statem ent that  *there are no defeat mechanisms or devices present in our vehicles.  And I think the cars perform in the same way on the road as they do  in the lab   under the  sa me ope rating co nditions.  This  is an  area  of heigh tened concern.* And so we've put in – we have establishe d now as part of our com pliance mechanism training for all em ission calibration engineers. *We do have a best practice program to ensure that we calibrate and certify properly.*    And I think tha  t we will – jus  t to m ake sure tha t the system is not going off the reservation, we will    carry out random  checks of our fleet to ensure that we achieve compliance."

482.    During Chrysler's April 26, 2016 Q1      2015 earnings call, Marchionne again discussed the issue of e    missions regulatio n and technology.  Marchionne, discussing the "regulatory environment" stated "I  think we have been incredibly clear over the last num  ber of quarters abo ut the fact that the regu   latory enviro nment has becom e a lot m  ore stringent . . ." Discussing em  issions specifically, Marchionne    stated   "there n    eeds to be m    uch better coordination across the national bodie s about what it is  that has ef fectively allowed as re levant technology in order to meet an emission standard."

483.     Marchionne went on to discuss in de      tail th e em issions standards and the technology involved: "T here's a phenom enal level  of confusion out there about the degrees of freedom that are associated in the interpretation of  that rule, what constitutes effectively a sound technical reason for the application or the suspension of emission controls in a particular vehicle, because of the fact that   there are v ery strong technical ar guments that would sug gest for the protection of the engine a number of – *a variety of responses are capable of being introduced as part of the s oftware solution that runs these ve hicles. I understand all this* ." Marchionne also acknowledged his understanding that the United States has "  *very clear rules about what those requirements are and how exceptio ns to those rules*" because "there's a continuous dialog with both  **EPA and CARB**  about what is allowed as an excep      tion to the general, zero exception application of the rules."

484.     Discussing emissions regulations, Marchionne repeated "we have done our best to meet those standards over tim     e, fully understa   nding that there were      technical lim itations associated with our powertrains that we use, and   that because of those technica l limitations that the rule itself allowed for relief."

485.     During Chrysler's July 27, 2016 Q2 2016 ear nings call, Marchionne discussed in depth his opinions concerning the emissions regulations in Europe.

## V.     <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

486.     Plaintiffs brings this action as a class     action pursuant to Federal Rule of Civil Procedure 2 3(a) and  (b )(3) on  beh alf of a Cla   ss, consisting of all th   ose who purchased or otherwise acquired Chrysler securities during th e Class Period (the "Class"); and were dam aged upon the revelation of the alleged corrective di          sclosures. Excluded from   the  Class are defendants herein, the officers and directors of   the Company, at all relevant tim es, members of

their imm ediate fam ilies and their legal rep resentatives, heirs, succes sors or ass igns and any entity in which defendants have or had a controlling interest.

487.    The m embers of the C lass are so num erous that joinder of all m embers is impracticable.  Throughout the Class Period, Chry sler securities were actively traded on the NYSE.  While the exact num ber of Class members is unknown to Plaintiffs at this tim e and can be ascertained only through appropr iate discovery, Plaintiffs belie ve that there are hundreds or thousands of m embers in the proposed Class.   Record owners and other m embers of the Clas s may be identified from records maintained by Chrysler or its transf er agent and may be notified of the pendency of this action by m ail, using the fo rm of notice sim ilar to that customarily used in securities class actions.

488.    Plaintiffs' claim s are ty pical of the clai ms o f t he me mbers o f t he C lass a s al l members of the Class are sim ilarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

489.    Plaintiffs will f airly and adequately protec t th e inte rests of the m embers of the Class and has retained counsel co mpetent and experienced in cla ss and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

490.    Common questions of law and fact exist as to all m embers of the Class and predominate over any questions solely affecting individual members of the Class.  Am ong the questions of law and fact common to the Class are:

- whether th e federal se curities laws were violated by defendants' acts as alleged herein;

- whether statem ents m ade by defendants to the investing public during the Class Period m isrepresented m aterial fact s about the business, operations and management of Chrysler;

157

- whether the Individual Defendants caused Chrysler to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Chrysler securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

491.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

A.   **Fraud On The Market Presumption of Reliance**

492.   The market for Chrysler's securities was an efficient market during the Class Period for the following reasons, among others::

- Chrysler's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

- As a regulated issuer, Chrysler field periodic reports with the SEC and/or NYSE ;

- Chrysler regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major news wire services and through wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts including Barclays Capital, Credit Suisse and Morgan Stanley;

158

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Chrysler securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts;

- Unexpected material news concerning Chrysler was rapidly reflected in Chrysler's share price.

493. Based upon the foregoing, the market for Chrysler's securities promptly digested current information regarding Chrysler form all publicly available resources and reflected such information in Chrysler's share price. Accordingly, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

494. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Chrysler securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Chrysler securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

495. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

159

**B.        Applicability of Presumption of Reliance: Affiliated Ute**

496.     Neither Plaintiffs nor the Class need prove   reliance—either individually or as a class—because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not      a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972).  All that is      necessary is that the facts withheld be material in the sense tha t a reasonab le investor might have consider ed the om itted information important in deciding w hether to bu y or sell th e subject sec urity.  Defendants omitted material information in the ir Class Period statements in vi olation of a duty to disclose such inf ormation, as detailed above.

<div align="center">

**COUNT I**

**(Against All Defendants For Violations of
Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

</div>

497.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

498.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

499.     During the Class Period, defendants engage d in a plan, schem e, conspiracy and course of conduct, pursuant to which they knowingl y or recklessly engaged in acts, transactions, practices and courses of business which operate d as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material f acts nec essary in ord er to m ake the s tatements made, in ligh t of the c ircumstances under which they were m ade, not m isleading; a nd employed devices, schem es and artifices to defraud in connection w ith the purchase and sale  of securities.  Such schem e was intended to,

and, throughout the Class Period, di d: (i) deceive the investing   public, including Plaintiffs and other Class m embers, as alleged her ein; (ii) ar tificially inflate and m aintain the m arket price of Chrysler securities ; and  (iii) cau se Plaintiffs and other m  embers of the Class to purchase or otherwise acquire Chrysler securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

500.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or  indirec tly in the pr eparation and/or issuan ce of th e quarterly and annual reports, SEC filings, press releas   es and other s tatements and docum ents described above, including statements m ade to securities   analysts and the m  edia that were designed to influence the market for Chrysler securities.  Su ch reports, filings, releases and statem ents were materially false and m isleading in that they f ailed to disc lose m aterial adverse  information and misrepresented the truth about Chrysler's finances and business prospects.

501.    By virtue of their positions at Chry sler, defendants had act ual knowledge of the materially false and m isleading statem ents and  material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for th e truth in th at they failed or refused to a scertain and disclose such facts as would rev eal th e m aterially fals e and m isleading natu re o f the statements m ade, although such facts were readily available to defe ndants.  Said acts and om issions of defendants were comm itted willfully or with reckless disreg ard for the truth.  In addition, each defendant knew or r ecklessly d isregarded th at m aterial f acts were  being m  isrepresented o r om itted a s described above.

161

502.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit fr om the sale of Chrysler securities from their personal portfolios.

503.    Information showing that defendants acted  knowingly or with reckless disregard for the tru th is pecu liarly within def endants' kn owledge and control.  As  the senior m anagers and/or directors of Chrysler, the Individua      l Defendants had knowledge of the details of Chrysler's internal affairs.

504.    The Individual Defendants are liable both   directly and indir ectly for the wrongs complained of herein.  Because of their pos         itions of co ntrol and a  uthority, th e Individua l Defendants were able to and did, di  rectly or indirectly, con trol the content of the statem ents of Chrysler.  As officers and/or    directors of a publicly-held co mpany, the Individual Defendants had a duty  to dissem inate tim ely, accurate, and  trut hful inform ation with resp ect to  Chrysler's businesses, operations, future financial condition      and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Chrysler securities was arti ficially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Chry      sler's business and financial condition which were concealed by defendants, Plaintiffs and      the other mem bers of t he Class purchased o  r otherwise acquired Chrysler securi ties at artificially inflated pr ices and relied upon the price of the securities, the integrity of  the market for the securities an d/or upon statem ents dissem inated by defendants, and were damaged thereby.

505.    During the Class Period, Chrysler securities were traded on an active and efficient market.  Pl aintiffs and the other m  embers of  the Class, rely ing on the m  aterially f alse and misleading statem ents describ ed h erein, which  the defendants m ade, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Chrysler securities at pr ices artificially inf lated by de fendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities , or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true v alue of Chr ysler securities was substantially lower than the prices pa id by Plaintiffs and the other m embers of the C lass. The m arket price of Chrysler securities declined sharply upon public disclosure of the fa cts alleged herein to the injury of Plaintiffs and Class members.

506.    By reason of the conduc t alleged herein, defendant s knowingly or recklessly, directly or indirectly, have   violated Section 10(b) of th e Exchange Act and Rule 10b-5 promulgated thereunder.

507.    As a direct and proximate result of defe ndants' wrongful c onduct, Plaintiffs and the other members of t he Class suffered dam ages in connection with thei r respective purchases, acquisitions and sales of the Com pany's securities during th e Class Period, upon the disclosu re that the Co mpany had been diss eminating m isrepresented financial s tatements to the inves ting public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

508.    Plaintiffs repeat and reallege each and every allegatio n contained in the foregoing paragraphs as if fully set forth herein.

509.    During the Class Period, th e Individual Defendants part icipated in th e operation and m anagement of Chrysler, an d conducted and participated, dire ctly and indirectly, in the

163

conduct of Chrysler's business affairs.  Because of their senior  positions, they knew the adverse

non-public information about Chrysler's m    isstatement of incom  e and expenses and false

financial statements.

510.    As officers and/or directors of a        publicly owned com   pany, the Individual

Defendants had a duty to dissem      inate accurate    and truthful inform   ation with respect to

Chrysler's financial condition and results of op      erations, and to correct prom    ptly any public

statements issued by Chrysler which had become materially false or misleading.

511.    Because of their positions of control a        nd authority as    senior officers,    th e

Individual Defendants were able   to, and did, control the contents    of the various reports, press

releases and  public filin gs which Chrysler diss  eminated in the m  arketplace du ring the Clas s

Period concerning Chrysler's re sults of operations.  Throughout  the Class Period, the Individual

Defendants exercised their power and authority to  cause Chrysler to engage in the wrongful acts

complained of herein. The Individual Defenda      nts therefore, were "controlling persons" of

Chrysler within th e m eaning of  Section 20(a) of the Exchange     Act.  In this capa   city, the y

participated in the unlawful conduct alleged wh       ich artificially inflated   the market price of

Chrysler securities.

512.    Each of the Individual Defendants, ther    efore, acted as a controlling person of

Chrysler.  By reason of their senior m    anagement positions and/or being   directors of Chrysler,

each of the Individual Defendants had the power to  direct the actions of, and exercis ed the same

to cause, Chrysler to engage in the unlawful act s and conduct complained of herein.  Each of the

Individual Defendants exercised  control ov er the general o perations of Chrysler and possessed

the power to control the specifi  c activities which com prise the prim ary violations about which

Plaintiff and the other members of the Class complain.

164

513.    By reason of the above conduct, the Indi vidual Defendants are  liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Chrysler.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.    Determining that the instant action m  ay  be maintained as a class action under Rule 23 of the Federal Rules of Civil Proce          dure, and  certifying Plaintiffs as the Class representatives;

B.    Requiring defendants to pay dam   ages sust ained by Plaintiffs   and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other m  embers of the Class prejudgm  ent and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 15, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com

165

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

166