**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | **Civ. Action No: 15-cv-07199-JMF** |
| Plaintiffs, | **CLASS ACTION** |
| v. | **FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE and ROBERT E. LEE | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................................. 1

II.  JURISDICTION AND VENUE ......................................................................... 14

III.  PARTIES ........................................................................................................ 14

IV.  SUBSTANTIVE ALLEGATIONS .................................................................. 18

    A.  Chrysler's Background ......................................................................... 18

    B.  Chrysler's Obligation To Identify Safety-Related Defects And Conduct
        Recalls ................................................................................................. 19

    C.  NHTSA Increases Focus on Compliance and Timeliness of Reporting and
        Notification ......................................................................................... 24

    D.  Chrysler's Vehicle Safety Regulatory Violations ................................ 25

        1.  Chrysler's Untimely Notices .................................................... 25

        2.  Chrysler's Failures To Timely and Properly Recall and Repair Vehicles
            That Caught Fire From Low-Speed Rear Impacts .................................... 29

        3.  Chrysler's Failure to Timely Recall Vehicles Containing Defective Takata
            Air Bags ................................................................................... 35

        4.  Chrysler's Failure to Remedy "Axel Lock Up" Causing Loss of
            Control ..................................................................................... 40

        5.  Chrysler's Failure to Remedy Defective Tie Rods That Cause Loss of
            Control ..................................................................................... 42

        6.  Chrysler's Untimely Recalls .................................................... 45

        7.  Chrysler's Failure to Notify NHTSA About Changes to Notification
            Schedule ................................................................................... 46

        8.  Chrysler's Failure to Submit Recall Communications ............. 48

        9.  Chrysler's Failure To Provide Other Critical Information ....... 52

        10.  Chrysler's Failure To Submit Information On Remedy ........... 56

i

11.   Chrysler's Failure To Report Deaths and Serious Injuries ...................... 58

E.   Chrysler's Failure to Properly Account For Recalls............................................. 58

1.   Chrysler's Underreporting of Its Costs and Liabilities Related to Vehicle Warranties and Recalls .............................................................. 58

2.   Relevant Accounting Principles................................................................ 59

F.   Chrysler's Vehicle Emissions Regulatory Violations........................................... 64

G.   Materially False and Misleading Statements Issued During the Class Period...... 78

H.   The Truth About Chrysler's NHTSA Violations Begins to Emerge As Defendants Continue To Make Materially False and Misleading Statements ...................... 103

I.   The Truth About Chrysler's Emissions Violations Begins to Emerge .............. 115

J.   Additional Allegations Demonstrating Falsity and Scienter ............................. 122

Defendants' Had A Strong Motive to Conceal Chrysler's Mounting and Expected Recall Costs............................................................................ 128

Additional Allegations of Defendants' Scienter Concerning Chrysler's Emissions Violations ............................................................... 130

Chrysler's Creation of The Eight Illegal AECD's Along with Dahl, Lee's and Marchionne's Involvement With That Process Supports a Strong Inference of Scienter ............................................................ 130

The Obvious Illegality of The Eight AECDs Supports a Strong Inference Of Scienter ...................................................................... 131

Defendants' Failure to Disclose the Very Software That Violated Emissions Regulations Supports and Inference of Scienter ............. 132

The VRC Ordering a Secret "Voluntary Recall" through a "Field Fix" of One of The Illegal AECD In 2015 Demonstrates Defendants' Knew of the Undisclosed AECDs and Their Illegality ............................... 133

The EPA Alerted Defendants in Mid-2015 That It Had Identified "Defeat Devices" on the Grand Cherokee and Ram 1500............... 138

Marchionne's Admission That Chrysler's Vehicles "Weren't Compliant" When They Were Launched Supports a Strong Inference of Scienter ...................................................................................... 141

Defendants Knew That The Grand Cherokee and Ram 1500 3.0 Liter Diesel Vehicles Were Exceeding NOx Emissions Standards In August 2014.................................................................................................... 143

Marchionne's Regular Receipt And Approval of Reports Detailing The Status of Emissions Software Supports A Strong Inference of Scienter ....................................................................................... 145

The Involvement of Bosch In Chrysler's Emissions Scheme Supports A Strong Inference of Scienter ........................................................ 149

Marchionne's Repeated Detailed Discussions and Assurances Concerning Emissions Software Create A Strong Inference of Scienter ........................................................................................... 152

V.      PLAINTIFF'S CLASS ACTION ALLEGATIONS...................................... 156

        A.      Fraud On The Market Presumption of Reliance ................................ 158

        B.      Applicability of Presumption of Reliance: Affiliated Ute ................. 160

                COUNT I .................................................................... 160

                COUNT II ................................................................... 163

                PRAYER FOR RELIEF ............................................... 165

                DEMAND FOR TRIAL BY JURY .......................... 165

Lead Plaintiffs Gary Koopmann, Timothy Kidd ("Lead Plaintiffs") and Victor Pirnik (together with Lead Plaintiffs, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fiat Chrysler Automobiles N.V. ("Chrysler" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet, including the website of the National Highway Traffic Safety Administration.   Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.        NATURE OF THE ACTION

1.        This is a federal securities class action on behalf of purchasers of Chrysler common stock between October 13, 2014 and May 22, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.        Chrysler is an automotive group that designs, engineers, manufactures, distributes and sells vehicles and components under brand names including Chrysler, Dodge, Fiat, Jeep, and Ram.   The Company sells its products in approximately 150 countries. The Company was founded in October 2014 as the result of a merger that completed the integration of Fiat Group Automobiles ("Fiat") and Chrysler Group LLC.

3.      This action involves a series of false and misleading statements and material omissions concerning Chrysler's compliance with federally mandated vehicle safety and emissions regulations, as well as Chrysler's internal controls and reported cost of sales, earnings, and earnings before interest and taxes ("EBIT"), provision for warranty and recalls, and warranty/recall costs resulting from its failure to comply with those regulations.

4.      Despite Chrysler's repeated assurances to investors and the public that it was substantially in compliance with vehicle safety and emissions regulations and that it "constantly" monitored and adjusted operation to maintain compliance, in reality, Chrysler (i) blatantly and willfully disregarded its reporting obligations to its federal manufacturing and safety regulator, the National Highway Traffic Safety Administration ("NHTSA"), and, even worse, ignored its obligation to timely inform owners of serious defects to their vehicles and to remedy the defects, leading to life threatening consequences; and (ii) illegally used undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.   Contrary to Chrysler's false assurances to the public, regulators repeatedly told Chrysler executives that the Company was not in compliance with its regulatory obligations, complaining that Chrysler was "**_consistently_**" at the "**_rear of the pack_**" relative to the Company's industry peers when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply **_"unacceptable . . . exacerbat[ing] the risk to motorists' safety."_**

5.      Chrysler's egregious violations of NHTSA regulations resulted in a total of $175 million in regulatory fines and a €761 million[1] charge for future recall campaign costs in order to timely and properly remedy the safety defects and implement recalls associated with the affected vehicles.

---

[1] Across the Class Period, the average EUR/USD exchange rate was approximately 1.14

6.      Additionally, the United States Environmental Protection Agency ("EPA"), the California Air Resources Board ("CARB") as well as agencies in France and Germany have found that Chrysler illegally installed and failed to disclose engine management software in the Company's diesel engines that resulted in illegally high emissions from the vehicles. On May 22, 2017 the Department of Justice ("DOJ") and EPA filed an action against Chrysler for it illegal emissions scheme. The EPA estimates that the cost to Chrysler in fines could be $4.63 billion.

7.      In the years leading up to the Class Period Chrysler had suffered steady and substantial annual increases in the number of cars being recalled for safety defects each year. Indeed in 2013 the number of recalled cars increased over 250% alone, with another 27% increase in units recalled in 2014.  Thus, Chrysler knew its liabilities for recalls were growing substantially.  Yet it failed to properly account for, or inform investors of, the substantial increase in costs for these recalls.

8.      Chrysler violated accounting principles by failing to review its expected costs of auto recalls at the end of each reporting period and adjust its provision for recall associated expenses to reflect current and readily available information.  In particular, Chrysler failed to increase its provision for recall associated expenses in line with the 250% increase in recalled units it experienced in 2013 and the 27% increase on top of that in recalled units in 2014. Chrysler's provisions were also inadequate as a result of the Company's continued failure to timely and properly complete recalls.

9.      Leading up to the Class Period, Chrysler was well aware that NHTSA had significantly intensified its enforcement – increasingly fining automakers for failure to timely issue recalls, timely notify owners of the recalls, and timely remedy the defects.  For example, in 2010 NHTSA fined Toyota Motor Corporation the maximum penalty of $16.375 million for its

failure to notify NHTSA within five days of learning of a safety defect in certain cars. NHTSA fined Toyota another $32.425 million that same year for failure to initiate recalls in a timely manner.  Following the fines, NHTSA's then-current Administrator David Strickland stated, "[a]utomakers are required to report any safety defects to NHTSA swiftly, and we expect them to do so."

10.     Just before the Class Period, in May 2014, NHTSA fined General Motors $35 million (the maximum permitted by law) for late reporting of safety defects, which was part of a record-high $126 million in civil penalties assessed by NHTSA in 2014, exceeding the total amount previously collected by the agency during its forty-three year history.  NHTSA's May 16, 2014 announcement of the GM Consent Order stated "This reinforces a message this Administration has been sending clearly for the past five years through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers."

11.     As David Friedman ("Friedman"), the Administrator for NHTSA stated in his public testimony to the U.S. House of Representatives' Committee on Energy and Commerce, on April 1, 2014, "This Administration has placed an emphasis on timeliness . . . Because of this emphasis, we believe that all manufacturers in the automobile industry are now paying much closer attention to their responsibility to protect their customers and the driving public."

12.     Immediately following these events, Chrysler told investors that it understood that vehicle safety and regulatory compliance was of the utmost importance to NHTSA and investors and that senior management was focused on the issue.  On August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, that reported directly to defendant CEO Sergio Marchionne ("Marchionne"), claiming "[t]his action will help intensify the Company's continuing commitment to vehicle safety and regulatory compliance."

Throughout the Class Period defendants repeatedly assured investors that the Company was in compliance with all vehicle safety regulations and that the Company had a "robust system in place."

13.     Throughout the Class Period, Chrysler and its senior executives named as additional individual defendants also repeatedly asserted to investors that Chrysler's product warranty and recall liabilities (publicly reported at the end of each quarterly financial reporting period as a "critical" financial reporting metric) were accurately stated and that Chrysler's internal controls over financial reporting were effective.

14.     As investors in Chrysler would come to learn in a series of partial corrective disclosures beginning in July 2015, however, Chrysler was blatantly and systemically disregarding its obligations to timely report to NHTSA, notify customers of serious safety defects and recalls, and provide replacement parts, preventing safety defects from being remedied.  Chrysler also withheld from NHTSA critical information regarding recalls, including reports of deaths and serious injury caused by Chrysler's defective products.

15.     Nevertheless, Chrysler continued to reassure investors that the Company was in compliance with all vehicle safety regulations even after NHTSA Administrator Friedman wrote two letters directly to Chrysler's CEO Marchionne on November 19 and 25, 2015 about Chrysler's ongoing compliance failures related to recalls.  The November 19, letter alerted Marchionne to Chrysler's regulatory failings as to the recall of Jeeps with improperly placed fuel tanks that would burst into flames upon even low impact collisions, stating, "I am concerned about the results of Chrysler's October 2014 recall update reports showing a woeful three percent repair rate out of more than 1.5 million affected vehicles" that it was not the first time NHTSA had warned Marchionne, and that Chrysler's conduct was "unacceptable."

5

16.     In the November 25, 2014 letter, which concerned the recall of defective Takata airbags, the largest recall in history, Friedman stated "Chrysler has consistently maintained its position at the <u>rear of the pack</u>" and that "<u>Chrysler's delay in notifying consumers and taking other actions necessary to address the safety defect identified is unacceptable and exacerbates the risk to motorists' safety</u>."  Towards the end of the Class Period, Marchionne further admitted that he had been aware of and focusing on Chrysler's need to improve its regulatory compliance since well before the Class Period started.

17.     In each recall addressed by the November 19 and 25, 2014 letters, owners of Chrysler vehicles died as a result of the defects while Chrysler refused to discharge its legal obligations.

18.     Chrysler repeatedly failed to timely notify owners in several different recalls related to ignition switch defects which caused a vehicle to lose power while it is being driven and also prevented the airbag from deploying.  Chrysler's failures are particularly egregious in light of the fact that Chrysler was aware that these types of defects had caused numerous deaths and General Motors had just been fined by NHTSA in July 2014 for failure to timely recall vehicles due to the same defects.

19.     Even after NHTSA had criticized the Company's systemic non-compliance, Chrysler <u>falsely informed NHTSA that it had mailed owner notifications of recalls prior to the legal deadline</u>, when in truth the deadline had passed before the notifications were mailed.

20.     Defendants also repeatedly acknowledged that they were well aware that regulators were increasing their focus on emissions compliance.  For example, in September 2015, The EPA issued a public notice of violation of the Clean Air Act to Volkswagen, stating that model year 2009-2015 VW and Audi diesel cars included defeat devices - software that

permitted the vehicles to cheat EPA tests and spew illegally high levels of the dangerous pollutant nitrogen oxide (or "NOx") into the air. On January 4, 2016, the DOJ filed a civil suit against VW seeking $46 billion for Clean Air Act violations, which led to VW spending approximately $35 billion in legal fines, vehicle buybacks and owner compensation.

21.    Throughout the Class Period, Defendants repeatedly assured investors that Chrysler was compliant with emissions regulations.  And following the VW scandal, Marchionne provided reassurance to investors by telling them point blank that he had investigated Chrysler's compliance on NOx emissions and confirmed that Chrysler's vehicles did not contain any improper software or defeat device. In truth, Chrysler's diesel vehicles (Jeep Grand Cherokee and Ram 1500) contained at least 8 pieces of software called auxiliary emission control devices ("AECDs") that alone or in combination (1) causes the vehicles' emissions controls to perform during EPA compliance tests  but then shut off during normal operation and use; (2) caused the vehicles to emit illegally high levels of NOx emissions; (3) reduced the effectiveness of the overall emission control system by disabling key components of the system; and (4) constituted "defeat devices". While Chrysler disclosed approximately 12 legal AECDs in its applications for certification to the EPA, it intentionally omitted all 8 of the illegal pieces of software.

22.    Defendants knew the illegal software was in its vehicles.  In addition to programming and installing the 8 illegal AECDs, in mid-2015 as regulatory pressure intensified, Defendants' issued a secret "field fix" to remove one of the illegal AECDs.  The AECD shut off at highway speed the vehicles' exhaust gas recirculation ("EGR"), causing NOx emissions to spew into the atmosphere. Defendants concealed this "field fix" from the public.  The software was reprogrammed and a vehicle's system was automatically updated when the owner brought

the vehicle into the dealership for a free oil change (or otherwise).  The remaining 7 illegal AECDs remained.

23.     As a confidential witness confirmed, by no later than Summer 2015, Chrysler's executives were aware that the software in its diesel model vehicles were causing them to exceed the NOx emissions levels that the Company had reported to the EPA. "I knew they had an issue with the software and were working on trying to figure it out" the confidential witness said. "It was a big issue [which] was  the number one priority all the sudden. … The details were kind of hush hush," said the witness.   "It was a secretive mission if you will. It wasn't public knowledge."

24.     As Marchionne would later admit, by no later than September 2015 the EPA had informed him that the EPA had identified the 8 AECDs that it determined were "defect devices." Between November 25, 2015 and January 13, 2016 Michael Dahl (Head of Vehicle Safety and Regulatory Compliance at FCA Fiat Chrysler Automobiles), who reported directly to Marchionne, communicated with the EPA several times (in person, via email and over phone) concerning the 8 AECDs that the EPA had concluded were defeat devices. On January 7, 2016, the EPA emailed members of Dahl's team demanding to have another call with Dahl that same day because "I am very concerned about the unacceptably slow pace of the efforts to understand the high NOx emissions we have observed" in several of Chrysler's Ecodiesel vehicles, reiterating that "at least one of the AECDs in question appears to me violate EPA's defeat device regulations." Dahl spoke with the EPA on January 8, 2016 and met in person with the EPA and CARB on January 13, 2016 to discuss these issues.  The Ecodiesel is an engine used in the Ram 1500 and Jeep Grand Cherokee (and only those models) since 2014.

25.     Nevertheless, Defendants continued to assure investors that Chrysler was in compliance with emissions regulations and that none of its vehicles had "defeat devices".

26.     As the truth of the Company's regulatory violations were revealed, Chrysler stock price tumbled.  On Sunday, July 26, 2015, in a Consent Order with Chrysler (the "Consent Order"), NHTSA announced its imposition on Chrysler of a record $105 million fine in connection with the Company's handling of 23 previous recalls affecting more than 11 million vehicles.  Chrysler admitted to violating vehicle safety regulations.  NHTSA penalties were tied to violations in an array of areas, including misleading regulators, failure to report safety information to NHTSA, inadequate repairs, and failure to alert affected car owners in a timely manner. NHTSA also forced Chrysler to buy back from customers more than 500,000 vehicles in the largest such action in U.S. history. The Company also had to offer owners of more than a million older Jeeps with rear-mounted gas tanks a chance to trade them in or be paid by Chrysler to have the vehicles repaired. The NHTSA stated, in part:

> *Fiat Chrysler's pattern of poor performance put millions of its customers, and the driving public, at risk.*  This action will provide relief to owners of defective vehicles, will help improve recall performance throughout the auto industry, and gives Fiat Chrysler the opportunity to embrace a proactive safety culture.

(Emphasis added.)

27.     On this news, the Company's stock fell $0.74, or roughly 4.9%, to close at $14.41 on July 27, 2015.  This price decline resulted in over a $950 million decline in the Company's market capitalization.

28.     On July 30, 2015, defendant Marchionne admitted that he had been aware of Chrysler's compliance failures well before the Class Period:

> "The unfortunate fact is that we as an industry, and *we in particular as a company, have not always been perfect in complying with these requirements, and over the last year and a half, NHTSA has begun to take a harder look at*

9

*these technical compliance issues, and frankly we started to do the same thing about the same time.*

*Over a year ago, we saw that changes were coming, and we began to look more critically at our own governance and process on safety and recall compliance issues, and we had then identified a number of necessary steps to improve.*"

29.     On October 28, 2015, Chrysler announced results for Q3 2015, informing investors that the Company recorded "a €761 million pre-tax charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA."  Chrysler shares fell $0.69, or 4.7%, to close at $14.72—an $890 million decline in market capitalization-- as investors reacted to news of the recall charge.  The market immediately made the connection between the charge and the Company's regulatory violations for failure to properly conduct recalls.  *Bloomberg* reported: "The manufacturer set aside 761 million euros in the quarter for "estimated future recall campaign costs" in North America, where U.S. regulators underlined ordered it in July to buy back vehicles." (emphasis original).

30.     On December 9, 2015, after the close of trading, the market learned that NHTSA was fining Chrysler an additional $70 million for its failure to report incidents of death and injury as well as consumer complaints and warranty claims dating back to 2003. Chrysler admitted that the violations "are significant and date back to the inception of the early warning reporting requirements in 2003."

31.     On May 23, 2016, it was reported that several tests by the German motor transport authority KBA had found evidence that the exhaust treatment system in some of Chrysler's models would switch itself off after 22 minutes, which is just 2 minutes after the standard 20 minute emissions test normally run by regulators. This was similar to the scheme conducted by Volkswagen where its defeat devices turned themselves off after 23 minutes to cheat the emissions tests. The German tests found a special NOx catalyst which was being switched off

after a few cleaning cycles.   This shut down caused the dangerous pollutant NOx to be released

into the atmosphere at more than 10 times the permitted level.  A German newspaper, the Bild

am Sonntag reported that Germany's Federal Motor Transportation Authority determined that

Chrysler allegedly used illegal software to manipulate emissions controls. Germany's transport

ministry also stated that Chrysler refused to cooperate with the investigation after Chrysler was a

no show for a meeting scheduled with the German authorities to discuss the violation.

32.     As a result of this news, Chrysler's stock price dropped $0.36, or roughly 5.1%, to

close at $6.68 on May 23, 2016.

33.     On January 12, 2017, the EPA and CARB each issued a notice of violation to

Chrysler and FCA US LLC for installing and failing to disclose engine management software

that resulted in increased emissions from the vehicles.  The manipulating software was installed

in light-duty model year 2014, 2015 and 2016 Jeep Grand Cherokees and Dodge Ram 1500

trucks with 3.0 liter diesel engines sold in the United States. As part of the investigation, the EPA

found "at least *eight* undisclosed pieces of software that can alter how a vehicle emits air

pollution." "Failing to disclose software that affects emissions in a vehicle's engine is a serious

violation of the law, which can result in harmful pollution in the air we breathe" said Cynthia

Giles, assistant administrator for the EPA. "***This is a clear and serious violation of the Clean***

***Air Act***." CARB Chair Mary D. Nichols stated "***[Chrysler] made the business decision to skirt***

***the rules and got caught***."   The EPA's disclosure of the notice stated "FCA did not disclose the

existence of certain auxiliary emission control devices to EPA in its applications for certificates

of conformity for model year 2014, 2015 and 2016 Jeep Grand Cherokees and Dodge Ram 1500

trucks, ***despite being aware that such a disclosure was mandatory***." The illegal software

allowed 104,000 of Chrysler's diesel-powered vehicles to spew emissions beyond legal limits, which the EPA estimated could cost Chrysler $4.63 billion in fines.

34.     On this news, the Company's stock fell $1.35, or roughly 12%, to close at $9.95 on January 12, 2017.

35.     On February 6, 2017, after the close of trading, French authorities announced they were referring Chrysler for prosecution following an investigation of the levels of emissions of NOx pollutants produced by its diesel vehicles. France's Ministry for the Economy and Finance said the French anti-fraud and consumer affairs agency DGCCRF had wrapped up its probe into Chrysler's cover-up of the emissions produced by some of its diesel vehicles and had sent its conclusions to the department of justice. The anti-fraud agency's investigation examined test results by a third-party laboratory and public sector researchers, as well as internal documents provided by Chrysler.  The investigation showed emissions that were several times higher than regulatory limits. For example, Chrysler's Jeep Cherokee emitted eight times the NOx limit and its Fiat 500x emitted almost 17 times the limit in road testing.

36.     On this news, Chrysler's stock price declined $0.50, or roughly 4.6%, to close at $10.27 on February 7, 2017.

37.     On February 7, 2017, after the close of trading, it was disclosed that a report by Italy's transport ministry presented to a European parliamentary committee in October but never officially published revealed that Chrysler's vehicles were allowed to skip key tests for illegal engine software during Italy's main emissions-cheating investigation that occurred in the wake of the Volkswagen "Dieselgate" scandal.  While the findings included complete sets of data for eight diesel cars made by Chrysler's competitors (BMW, Ford, Mercedes, Volkswagen and GM),

for the Chrysler models investigated (including the Jeep Cherokee) results were missing for the three tests used to unmask defeat devices by preventing them from detecting the test.

38.     On May 23, 2017, the DOJ announced the filing of a complaint in the Eastern District of Michigan asserting that Defendant Chrysler, FCA US LLC and other entities violated federal law because of its undisclosed defeat devices on its Jeep Grand Cherokee and Ram 1500 diesel vehicles.

39.     On May 23, 2017, as a result of the DOJ lawsuit, Chrysler's stock price declined from $10.89 at 9:30 a.m. to $10.32 at 4:00 p.m., a decline of 5.2%, on unusually high volume of 26,270,000 shares.

40.     Marchionne admitted that Chrysler's previous representations of compliance were false during a July 27, 2017 Q2 2017 earnings call.  Responding to a question about voluntary updates to Chrysler's software in its diesel vehicles, Marchionne stated "We are looking at this, if we can do it, and provide an improvement in air quality, both on CO2 and NOx, purely as a result of calibration, and we'll do this*. **The important thing is that, within the scheme of things that existed at the time in which we launched these vehicles, we weren't compliant**.*."

41.     The foregoing misconduct contravened the federal securities laws. In particular, during the Class Period, defendants falsely represented that Chrysler was in compliance with all vehicle safety and emissions regulations, that it had properly disclosed its warranty and recall liabilities; that Chrysler's internal controls for reporting such a "critical" financial metric each quarter were effective, and that Chrysler prioritized customer safety and emissions compliance. As investors began to learn in July 2015, when the true facts began to emerge, none of these repeated assertions were true.

42.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities following the partially corrective disclosures, Plaintiffs and other Class members suffered significant damages.

## II.     JURISDICTION AND VENUE

43.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

44.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

45.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company's common stock trades on the New York Stock Exchange, located within this District.

46.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

47.     Plaintiffs, as set forth in the previously-filed certifications (ECF Nos. 1,16), incorporated by reference herein, purchased Chrysler common stock at artificially inflated prices

during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

48.     Defendant Chrysler is an automotive group that designs, engineers, manufactures, distributes and sells vehicles and components.  It offers passenger cars, light trucks, and light commercial vehicles under brand names including Chrysler, Dodge, Fiat, Jeep, and Ram. Chrysler provides retail and dealer financing, leasing, and rental services, as well as engages in media and publishing business.  The Company sells its products directly, or through distributors and dealers, in approximately 150 countries.  The Company was founded in October 2014 as the result of a merger that completed the integration of Fiat and Chrysler Group LLC.  On October 12, 2014, the merger was finalized, and on October 13, 2014, the newly merged company's common stock started trading on the NYSE under the ticker symbol "FCAU."  Chrysler is a Netherlands corporation with its principal executive offices located at 25 St. James's Street, London SW1A 1HA, United Kingdom.

49.     Defendant FCA US LLC ("FCA US") is the American subsidiary of Chrysler. FCA US is headquartered in Auburn Hills, Michigan and sold vehicles worldwide during the Class Period under its flagship Chrysler brand, as well as Dodge, Jeep and Ram Trucks.

50.     Defendant Marchionne has served at all relevant times as Chief Executive Officer and Executive Director of Chrysler as well FCA US.  Marchionne was also a member and the leader of Chrysler's Group Executive Council, which is responsible for managing the operations of Chrysler.  Marchionne took the helm at Chrysler in 2008 when the automaker was in serious financial trouble.  Marchionne is also an accountant and a lawyer.

51.     Defendant Richard K. Palmer ("Palmer") has served at all relevant times as Chief Financial Officer of Chrysler.  Palmer has also served as Chief Financial Officer of FCA US

since June 2009, where he is responsible for all FCA US finance activities including corporate controlling, treasury and tax.  Palmer was also a member and the leader of Chrysler's Group Executive Council, which is responsible for managing the operations of Chrysler.

52.     Defendant Scott Kunselman ("Kunselman") served as Chrysler's head of Vehicle Safety and Regulatory Compliance from August 12, 2014 until October 27, 2015, which oversaw Chrysler's vehicle safety and emissions compliance, reporting directly to Defendant Marchionne. As part of his position, Kunselman sat on Chrysler's Vehicle Regulations Committee ("VCR"), which operated above Chrysler's defect investigations department and made all decisions pertaining to when a defect exists and when filed actions and recalls are necessary.  In these positions, Kunselman was regularly informed as to the status of investigations, recalls, service bulletins and field actions (or "field fixes").  Kunselman was also responsible, along with Lee (identified below) for informing the Board of Directors about diesel emissions and regulatory issues. Prior to his appointment to head of Vehicle Safety and Regulatory Compliance, Kunselman was in charge of NAFTA Purchasing and Supplier Quality.  Prior to that, he was Senior Vice President-Engineering, a position that included oversight of regulatory compliance.

53.     Defendant Michael Dahl ("Dahl") replaced Kunselman in November 2015 as Vehicle Safety & Regulatory Compliance, taking on all responsibilities that Kunsleman previously had (e.g. Chairman of the VRD), and reporting directly to Marchionne.  Upon replacing Kunselman, Dahl was responsible along with Lee (identified below) for informing the Board of Directors about diesel emissions and regulatory issues. Prior to November 2015, Dahl was Director of Chrysler's gasoline/diesel engine programs and global powertrain coordination, managing all of Chrysler's diesel engine programs in North America. Dahl supervised development of the 3.0-liter EcoDiesel V-6 in the Jeep Grand Cherokee and Ram 1500.  During

16

the Class Period, Dahl was also the point person (along with Lee) for the EPA and CARB on certification of Chrysler's 3.0 diesel engines used in the Jeep Grand Cherokee and Ram 1500. Other members of Chrysler involved in certification meetings with the EPA and CARB were Mark Chernoby, Steve Mazure, Mark Shost, Emanuele Palma and Kyle Jones.

54.    Defendant Robert E. Lee ("Lee") at all relevant times was Head of Powertrain Coordination and a member of the Group Executive Council ("GEC"), which is a decision-making body led by Marchionne, consisting of executive management that supported Marchionne from an operational perspective.  Lee was also Vice President and Head of Engine and Electrified Propulsion Engineering, FCA US, with responsibility for directing the design, development and release of all engines and electrified propulsion systems for FCA US products. Lee reported directly to Marchionne.  He was responsible, along with Dahl and Kunselman for reporting the board of directors on issues pertaining to diesel emissions and regulatory issues. During the Class Period, Lee was also the point person (along with Dahl) for the EPA and CARB on certification of Chrysler's 3.0 diesel engines used in the Jeep Grand Cherokee and Ram 1500.

55.    Defendant Steve Mazure ("Mazure") at all times was Senior Manager, Environmental Certification - Vehicle Safety & Regulatory Compliance for FCA US.  Mazure submitted to the EPA and CARB, and was responsible for the accuracy of Chrysler's applications for certification (along with Ellis D. Jefferson and Beth Borland) for each 2014, 2015 and 2016 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles.  Mazure  reported directly to Dahl.

56.    The defendants referenced above in ¶¶ 50-55 are sometimes collectively referred to herein as the "Individual Defendants."

IV.      **SUBSTANTIVE ALLEGATIONS**

A.      **Chrysler's Background**

57.      Defendant Chrysler is an automotive group that designs, engineers, manufactures, distributes and sells vehicles and components.  It offers passenger cars, light trucks, and light commercial vehicles under brand names including Chrysler, Dodge, Fiat, Jeep, and Ram. Chrysler provides retail and dealer financing, leasing, and rental services, as well as engages in media and publishing business.  The Company sells its products directly, or through distributors and dealers, in approximately 150 countries.  The Company was founded in October 2014 as the result of a merger that completed the integration of Fiat and Chrysler Group LLC.  On October 12, 2014, the merger was finalized, and on October 13, 2014, the newly merged company's common stock started trading on the NYSE under the ticker symbol "FCAU."  Chrysler is headquartered in London, U.K.

58.      FCA US is headquartered in Auburn Hills, Michigan and owned by Chrysler, FCA US is one of the "Big Three" American automobile manufacturers. It sells vehicles worldwide under its flagship Chrysler brand, as well as the Dodge, Jeep, and Ram Trucks.  FCA US is the company that had previously been known as Chrysler Corporation, which was founded in 1925.  The company changed its name over the years from DaimlerChrysler AG (1998-2007), Chrysler LLC (2007-2009), Chrysler Group LLC (2009-2014) and FCA US (2014-present).

59.      Specifically, Chrysler Group LLC filed for Chapter 11 bankruptcy reorganization on April 30, 2009.  On June 10, 2009, the company emerged from the bankruptcy proceedings with the United Auto Workers pension fund, Fiat S.p.A., and the U.S. and Canadian governments as principal owners. Over the next few years Fiat gradually acquired the other parties' shares. On January 1, 2014, Fiat S.p.A announced a deal to purchase the rest of Chrysler

18

Group LLC from the United Auto Workers retiree health trust. The deal was completed on January 21, 2014, making Chrysler Group LLC a subsidiary of Fiat S.p.A. In May 2014, Fiat Chrysler Automobiles, NV was established by merging Fiat S.p.A. into the company. This was completed in August 2014. Chrysler Group LLC remained a subsidiary until December 15, 2014, when it was renamed FCA US, to reflect the Fiat-Chrysler merger.

60.     Although technically listed as a subsidiary of Chrysler, FCA US makes up over 90% of Chrysler's operations.  For example, in 2012, 2013 and 2014 Chrysler's net revenue was €83.765 billion, €86.624 billion, and €96.090 billion, respectively.  FCA US's net revenue for 2012, 2013 and 2014 was $65.784 billion, $72.144 billion, and $83.057 billion, respectively.

**B.     Chrysler's Obligation To Identify Safety-Related Defects And Conduct Recalls**

61.     NHTSA is a federal agency charged with ensuring that manufacturers of motor vehicles comply with the safety standards contained in the National Traffic and Motor Vehicle Safety Act of 1966, codified at 49 U.S. Code Chapter 31 (the "Safety Act"). The Safety Act includes the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD"), which was passed by Congress in 2000.[2]

62.     The Safety Act requires a motor vehicle manufacturer to notify NHTSA, and vehicle owners, purchasers and dealers if it "(1) learns [one of] the [manufacturer's] vehicle[s] or equipment contains a defect and decides in good faith that the defect is related to motor vehicle

---

[2] As part of its activities, NHTSA is charged with writing and enforcing Federal Motor Vehicle Safety Standards as well as regulations for motor vehicle theft resistance and fuel economy, the latter under the rubric of the Corporate Average Fuel Economy (CAFE) system. NHTSA also licenses vehicle manufacturers and importers, allows or blocks the import of vehicles and safety-regulated vehicle parts, administers the vehicle identification number (VIN) system, develops the anthropomorphic dummies used in safety testing, as well as the test protocols themselves, and provides vehicle insurance cost information. The agency has also asserted preemptive regulatory authority over greenhouse gas emissions. Another of NHTSA's major activities is the creation and maintenance of the data files maintained by the National Center for Statistics and Analysis.

safety; or (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard ….”[3]

63. The Safety Act further defines “motor vehicle safety” as:

the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against *unreasonable risk of accidents* occurring because of the design, construction, or performance of a motor vehicle, and against *unreasonable risk of death or injury in an accident*, and includes nonoperational safety of a motor vehicle.[4]

64. If the manufacturer identifies a “defect related to motor vehicle safety,” the Safety Act requires manufacturers to implement a remedy, which typically occurs through a recall.[5] Manufacturers are also required, under NHTSA’s implementing regulations, to “furnish a report to the NHTSA for each defect in [the manufacturer’s] vehicles or in [the manufacturer’s] items of original or replacement equipment that [the manufacturer] or the Administrator determines to be related to motor vehicle safety.”[6] This is commonly referred to as a “573 Report.” NHTSA further requires all such reports to be submitted “not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related.”[7] It is critical that vehicle manufacturers commence recalls expeditiously after identifying safety-related defects in their vehicles. The 573 Report is the beginning of the entire recall process. Failing to timely initiate a recall within five working days puts the safety of vehicle owners at risk. This requirement exists so that the public is expeditiously notified of safety risks and that vehicle defects are remedied within a reasonable time. In addition, each manufacturer is required to amend information

---

[3] 49 U.S.C. §30118(c).

[4] 49 U.S.C. §30102(a)(8).

[5] 49 U.S.C. §30118(c); see also 49 U.S.C. §30119(d) (notification procedures); 49 U.S.C. §30120(a) (remedy specifications).

[6] 49 C.F.R. §573.6(a).

[7] 49 C.F.R. §573.5(b).

submitted in a 573 Report <u>within 5 working days</u> after it has new information that updates or corrects information that was previously reported.[8]

65.   In each 573 Report, the manufacturer is required to include:

- Identification of the vehicles or items of motor vehicle equipment potentially containing the defect or noncompliance.

- The total number of vehicles or items of equipment potentially containing the defect or noncompliance.

- In the case of a defect, a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with their dates of receipt.

- A description of the manufacturer's program for remedying the defect or noncompliance.

- The estimated date(s) on which it will begin sending notifications to owners, and to dealers and distributors, that there is a safety-related defect or noncompliance and that a remedy without charge will be available to owners, and the estimated date(s) on which it will complete such notifications (if different from the beginning date). If a manufacturer subsequently becomes aware that either the beginning or the completion dates reported to NHTSA for any of the notifications will be delayed by more than two weeks, it must promptly advise the agency of the delay and the reasons therefore, and furnish a revised estimate.

- A representative copy of all notices, bulletins, and other communications that relate directly to the defect or noncompliance and are sent to more than one manufacturer, distributor, dealer or purchaser. These copies must be submitted to NHTSA's Recall Management Division <u>not later than 5 days</u> after they are initially sent to manufacturers, distributors, dealers, or purchasers.[9]

66.   When a manufacturer files a 573 Report, the manufacturer must also provide notification to owners of the recall.  The manufacturer is required to submit a copy of its proposed owner recall notice to NHTSA <u>no fewer than five business days before it intends to</u>

---

[8] *Id.*

[9] 49 C.F.R. §573.5(c).

begin mailing it to owners.[10]  The recall notices to vehicle owners must be furnished no later than 60 days from the date the manufacturer files its 573 Report.[11] In the event that the remedy for the defect or noncompliance is not available at the time of notification, the manufacturer is required to issue a second notification within a reasonable time and in accordance with the above requirements once the remedy is available.[12]

67.     Thus, even if a manufacturer does not have parts available to repair a vehicle defect within 60 days, that is not an excuse for delaying owner notices. In such a case, the manufacturer must send what is known as an "interim notice" to owners, informing them of the defect and the associated risk to motor vehicle safety. The reason for this is that owners are entitled to understand the risk of continuing to drive their vehicles, and to be advised of steps they can take to mitigate the risk before having their vehicles repaired. In other words, vehicle owners are entitled to make informed decisions about their safety. Where a manufacturer sends an interim notice, it must also send a follow-up owner notice once repair parts are available. That follow-up notice tells vehicle owners when they can schedule a repair with their local dealership. Regardless of whether a manufacturer is prepared to immediately fix vehicles, NHTSA has made clear that 60 days is the absolute deadline to inform a vehicle owner about a recall.

68.     Upon receipt of every 573 Report, NHTSA enters it into its Artemis database as investigators in NHTSA's Office of Defect Investigations screen it for completeness, proper scope, timeliness, and effectiveness of the proposed remedy. NHTSA sends an acknowledgement letter and recall summary to the manufacturer, identifying any deficiencies and requesting the manufacturer to supply any missing information.

---

[10] 49 C.F.R. § 577.5(a)

[11] 49 C.F.R. § 577.7(a)(1)

[12] 49 C.F.R. § 577.7(a)(1)

69.     NHTSA carefully reviews recall submissions to ensure that recalls are timely. For recalls involving a safety defect, a manufacturer is required to submit a chronology of all principal events that were the basis for the manufacturer's determination that the defect related to motor vehicle safety. NHTSA uses these chronologies to help determine whether recalls are timely.

70.     NHTSA has stated that accurate and timely notices to owners are "critical to ensuring the success of a recall." If vehicle owners do not know about defects in their vehicles they are unknowingly putting themselves at risk of harm every time they drive. Since the inception of the Safety Act in 1966, vehicle manufacturers have been required to notify vehicle owners about safety-related defects in their vehicles. The basic right to know about unreasonable risks to safety existed even before Congress required manufacturers to actually fix those defects. In other words, as NHTSA stated during its July 2, 2015 hearing concerning Chrysler's repeated violations of these regulations, "this notification requirement is not new and Fiat Chrysler should be well aware of its responsibility."

71.     NHTSA has made it clear to vehicle manufacturers that when a vehicle manufacturer does not send owner notices in a timely manner, safety is compromised.

72.     The Safety Act includes the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD"), which was passed by Congress in 2000. The TREAD Act imposes additional reporting obligations on auto manufacturers, including Chrysler. Specifically, the TREAD Act mandates that manufacturers submit quarterly reports to NHTSA called "Early Warning Reports" (or "EWRs").[13] EWRs must include warranty reports; consumer complaints; property damage claims; and field reports broken down by make, model, and model year and

---

[13] 49 C.F.R. §573.7.

problem category.[14] Manufacturers are also required to submit to NHTSA summaries of each death or injury claim against the manufacturer that concerns a safety-related defect.[15] Moreover, NHTSA's early warning data tracks the number of cases where warranty services are provided on a vehicle, and the part of the vehicle that is associated with the warranty service. However, as NHTSA explained in the December 8, 2015 Consent Judgment (the "Consent Judgment") in which NHTSA fined Chrysler $70 million, Chrysler systemically under-reported vehicle crashes, deaths and injuries tied to its cars and trucks going back to 2003 and continuing through the Class Period, which NHTSA's Administrator explained "represents a significant failure to meet a manufacturer's safety responsibilities."

73.     At NHTSA, the ODI is charged with administering TREAD Act requirements and investigating defects brought to NHTSA's attention by either manufacturers or customers and other members of the public.[16]

### C.     NHTSA Increases Focus on Compliance and Timeliness of Reporting and Notification

74.     Leading up to the Class Period, NHTSA made it clear to Chrysler and the automotive industry that it had significantly intensified its enforcement of accurate and timely reporting and customer notification of safety defects and recalls.

75.     For example, in April 2010 NHTSA fined Toyota Motor Corporation the maximum penalty of $16.375 million for its failure to notify NHTSA within five days of learning of a safety defect in certain cars. NHTSA fined Toyota another $32.425 million in December 2010 for failure to initiate recalls in a timely manner. Following the fines, NHTSA's then-

---

[14] 49 U.S.C. §30166(m)(3)(A)(i); 49 C.F.R. §573.6(c)(2)-(8).

[15] 49 U.S.C. §30166(m)(3)(A)(i).

[16] See description of ODI, https://www-odi.nhtsa.dot.gov/ivoq/

current Administrator David Strickland stated, "[a]utomakers are required to report any safety defects to NHTSA swiftly, and we expect them to do so."

76.     Just before the Class Period, in May 2014, NHTSA fined General Motors $35 million for late reporting of safety defects, which was part of a record high $126 million in civil penalties assessed in 2014, which exceeded the total amount collected by the agency during its forty-three year history.  NHTSA's May 16, 2014 announcement of the GM Consent Judgment stated "This reinforces a message this Administration has been sending clearly for the past five years through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers."

77.     As NHTSA Administrator Friedman stated in his public testimony to the U.S. House of Representatives' Committee on Energy and Commerce, on April 1, 2014:

> This Administration has placed an emphasis on timeliness in order to safeguard the integrity of the process and encourage automakers to aggressively pursue potential safety defects. Since 2009, automakers have paid record fines totaling more than $85 million for lack of timeliness in reporting vehicle safety defect issues to NHTSA. Because of this emphasis, we believe that all manufacturers in the automobile industry are now paying much closer attention to their responsibility to protect their customers and the driving public.

**D.      Chrysler's Vehicle Safety Regulatory Violations**

**1.      Chrysler's Untimely Notices**

\#

78.     Despite its knowledge of NHTSA's increased focus on timely and accurate reporting, between 2013 and 2015 Chrysler routinely ignored its obligation to timely inform owners of serious safety defects in the cars they were driving, even where Chrysler knew that deaths had occurred as a result of the defects, thereby imperiling its customers' lives, as well as those of other drivers and pedestrians on the road.

79.     Chrysler failed to notify owners within the required 60 days in seven recalls. In two additional recalls associated with defective Takata airbags, Chrysler even misled NHTSA about its owner notifications and failed to send recall notices to vehicle owners for months.

80.     As discussed below, Chrysler repeatedly failed to timely notify owners in several different recalls related to ignition switch defects.  These failures are particularly egregious in light of the fact that these same type of defects had caused numerous deaths and General Motors had just been fined by NHTSA in July 2014 for failure to timely recall vehicles due to the same defects.

81.     For example, Recall 14V-373 involved defective ignition switches which caused a vehicle to lose power while being driven.   These "moving shutdowns", triggered by a bump in the road or a mere graze of the knee against the defectively loose ignition switches, would cause the Chrysler cars to suddenly shutdown and become unresponsive without any warning. The shutdowns occurred even at highway speed, and power brakes and power steering would no longer function, making the cars dangerously unsafe to control.  Significantly, this also meant that the vehicle's airbags could shut off and not work in a crash, compounding the danger to the driver.

82.     Chrysler initiated this recall by filing a 573 Report with NHTSA on June 25, 2014. Chrysler's 573 Report did not provide the required dates for sending owner notifications. Under NHTSA regulations, Chrysler was required to notify owners about the recall no later than August 24, 2014. Violating this obligation, Chrysler waited until September 11, 2014 to complete its owner notification mailing nineteen days after the legal deadline.

83.     At that time, Chrysler sent an interim notice to owners of vehicles having defective ignition switches because it did not then have parts available to repair the vehicles. It

was not until May 2015, <u>over eight months after distributing the interim notice</u>, that Chrysler notified owners that they could come in for the repair.

84.     Chrysler was also late in mailing interim owner notices in Recalls 14V-567, 14V-634, 14V-795, and 15V-115, which involved defective ignition switches; sudden alternator failure that could result in sudden vehicle shutdown and fire; broken springs in the clutch ignition interlock switch that could cause unintended movement when the ignition was cranked; and a defective fuel pump relay that could cause a vehicle to stall without warning. In one of these recalls, 14V-795, ***Chrysler was aware of a death potentially related to the defect prior to recalling the vehicles***.[17]

85.     Chrysler initiated Recall 14V-567, a recall for defective ignition switches, by filing a 573 Report with NHTSA, on September 16, 2014. The deadline for Chrysler to send owner notices in this recall was November 15, 2014. Chrysler again did not provide estimated dates for sending owner notifications prior to mailing its interim notices on November 17, 2014, which was <u>two days past the deadline</u>. As of July 2, 2015, <u>over seven months after distributing the interim notice</u>, vehicle owners were still awaiting a follow-up letter in this recall, notifying them that they may have their vehicles repaired.

86.     Recall 14V-634 began with Chrysler's 573 Report on October 7, 2014. At the time, Chrysler indicated that it planned to send owner notices on November 28, 2014. However, on December 11, 2014, Chrysler informed NHTSA that it had mailed interim notices on December 8, 2014, again <u>two days after the 60-day deadline</u>. It was only several months later,

---

[17] Written Statement of Joshua Neff from the July 2, 2015 Public Hearing to Determine Whether Fiat Chrysler Reasonably Met Its Obligations To Remedy Recalled Vehicles And To Notify NHTSA, Owners, And Purchasers Of Recalls.

between February 27 and April 30, 2015, that Chrysler mailed notices to owners to inform them that they could have their vehicles repaired.

87.     Chrysler initiated Recall 14V-795 with a December 16, 2014 573 Report. That gave Chrysler until February 14, 2015 to mail owner notices. On March 9, 2015, Chrysler falsely informed NHTSA that it had mailed interim owner notifications prior to the deadline, on February 10, 2015. In truth, Chrysler had mailed the interim notices after the deadline had passed.

88.     Chrysler initiated Recall 15V-115 on February 24, 2015. In its 573 Report, Chrysler falsely informed NHSTA it would send owner notifications on April 24, 2015. However, Chrysler did not complete the notification until four days after the deadline, April 29, 2015.

89.     Chrysler initiated Recall 13V-527, involving a defective left tie rod assembly that could result in loss of steering control (see infra at 116-126), on November 6, 2013. At that time, Chrysler falsely represented to NHTSA that it would notify owners of the recall in December 2013 prior to the deadline. However, it was only through a letter dated February 4, 2014 that NHTSA learned that Chrysler had not completed its interim notices mailing until January 16, 2014, eleven days past the deadline. It was not until nearly 16 months later that Chrysler notified owners to bring their vehicles in for repair.

90.     Chrysler initiated Recall 14V-635, involving the potential for fire resulting from overheating of electrical connectors of the diesel fuel heater, on October 7, 2014.  Chrysler's 573 Report for this recall listed obviously erroneous dates for its planned owner notification mailing. Chrysler gave a beginning date for this mailing that was later than the end date. Moreover, it was only after the deadline had passed that Chrysler informed NHTSA that it had once again missed

the deadline by two days. Chrysler only notified vehicle owners <u>over four months later</u>, in late April 2015, that they could bring their vehicles in for repair.

91.    In NHTSA's written statement from the July 2, 2015 hearing leading to the Consent Judgment, NHTSA found that

> Fiat Chrysler has a pattern of failing to timely notify vehicle owners of recalls within a reasonable time. Fiat Chrysler's delays leave vehicle owners in the dark about defects in their vehicles that Fiat Chrysler itself has determined pose an unreasonable risk to safety.
>
> Instead of embracing the importance of expeditiously notifying owners about vehicle defects, Fiat Chrysler claimed in its recent response to NHTSA that interim notices have caused owner confusion. Dismissing the importance of informing vehicle owners about risks to their safety is counter to the Safety Act.

92.    Demonstrating Chrysler's blatant and willful disregard of it reporting obligations, Chrysler also refused to notify vehicle owners for over six months about its recalls of Takata airbag inflators, and outright lied to NHTSA as to when Chrysler sent owner notifications even after Administrator Friedman personally wrote defendant Marchionne to express his frustration at Chrysler's failure to properly notify owners of defects. <u>Chrysler refused to notify owners for over six months</u> after filing the 573 Report of the risk of their air bag inflator rupturing.  Recall 14V-354 (which became a part of Recall 14V-817) involved Takata airbag inflators and the risk of their inflator rupturing.  At the time, Chrysler was one of ten vehicle manufacturers recalling vehicles for defective Takata airbag inflators.  This is discussed further, *infra* at ¶¶110-129.

## 2.    Chrysler's Failures To Timely and Properly Recall and Repair Vehicles That Caught Fire From Low-Speed Rear Impacts

#

93.    The requirement that vehicle manufacturers remedy defects in a timely fashion has long been a requirement of the Safety Act. Manufacturers have a responsibility to make sure that parts are available so that recall repairs can be performed. NHTSA has made clear that no owner of a car or truck with a safety defect should have to wait for years to get the remedy repair

completed. No owner should have to make repeated calls to see if repair parts are available so their car can be made safe.

94.     On June 29, 2013, Chrysler filed a report with NHTSA agreeing to recall certain Jeep Grand Cherokees and Jeep Libertys to improve their performance in rear impacts that can result in deadly fires even in low-speed impacts because the fuel tank was placed too far back in the "crush zone" of the vehicles.  NHTSA concluded that the safety risk posed by this defect was clearly unreasonable—dangerous fuel leaks and deadly fires in low-speed impacts.  NHTSA had linked 75 fatalities and 58 injuries to the defect.

95.     This was a very high profile recall, of which Marchionne was personally aware, publicly discussing the status of the recall on multiple occasions..  For example, on June 3, 2013, despite linking 75 fatalities and 58 injuries to the defect and telling Chrysler on June 3, 2013 that 2.7 million vehicles were defective and required recall, Marchionne initially publicly resisted NHTSA's request for the recalls.  Marchionne led the charge against NHTSA, repeatedly saying in the days afterward that the vehicles did not have a safety defect.

96.     According to an interview between Department of Transportation Secretary Ray LaHood conducted by The Detroit News in June 2013, after NHTSA Administrator David Strickland told LaHood that Chrysler wasn't going to go along with a recall, LaHood said he would call Marchionne. "I said, 'I want to find out if Sergio is involved in these decisions,'" LaHood said.  LaHood suggested the three meet in person. 'We need to figure this out," he told Marchionne.  On Sunday, June 9, the three met at the Federal Aviation Administration office at O'Hare International Airport.   "Once he (Marchionne) met with David and I in Chicago, he knew this had to get done," LaHood said. "(Marchionne) didn't realize how serious this was, how serious we were, and the thing was resolved satisfactorily. .... We pretty much reached an

agreement there."   In a deal struck in June 2013, Marchionne agreed to install trailer hitches on

the effected 1.56 million Jeep Liberty sport utility vehicles and Jeep Grand Cherokees to provide

added protection.   LaHood said Chrysler agreed to settle the dispute and make fixes partly

because NHTSA had shown during the Toyota Motor Corp. sudden-acceleration recalls that it

put safety first. Toyota paid nearly $70 million in U.S. fines.   "Sergio and David and I had some

very frank conversations over the last couple of weeks, and I think at the end of those

conversations, he knew: This is a no-nonsense organization," LaHood said. "The thing that really

set us on a course where people understood that was the Toyota (sudden-acceleration recalls) --

the fact that we fined them the maximum fines twice."

97.    Pursuant to Recall 13V-252, Chrysler was required to recall (1) 1993-1998 Jeep

Grand Cherokee; and (2) 2002-2007 Jeep Liberty.   The total potential number of vehicles

affected was 1,560,000.

98.    To assess the value of the remedy suggested by Chrysler in this recall, NHTSA

requested that Chrysler provide it with test data showing how the addition of the trailer hitch

changed the rear crash performance of the Liberty and Grand Cherokee. Chrysler provided

compliance test data which, in NHTSA's view, did not address this issue. The agency then

requested that Chrysler perform additional testing. Chrysler refused to perform any test.  Because

of its concerns about both the risk and the remedy, NHTSA performed its own tests to evaluate

the remedy.

99.    Shortly thereafter, discussions with Chrysler about the remedy campaign revealed

that Chrysler did not select a hitch supplier until December 6, 2013 or issue a hitch purchase

order until January 29, 2014.   Because of concerns that Chrysler's projected production of

replacement parts would not be adequate, NHTSA issued a special order to Chrysler in early July

2014 to Reginald Modlin, Director Regulatory Affairs, who reported to Kunselman.  The special order stated "NHTSA is therefore concerned that Chrysler does not have, and will not have, sufficient production capacity to ensure that enough hitches will be available to ensure that the recalled vehicles will be remedied expeditiously. For many owners, a recall remedy deferred by parts availability easily becomes a defect remedy denied." Among other things, this special order required that Chrysler provide information about production capacity, suppliers and recall completion.  Chrysler's response to the special order indicated that it would be increasing hitch production and would have enough hitches in stock to meet demand.

100.    However, after the recall campaign was officially launched in August 2014, NHTSA received complaints expressing frustration with confusing information from dealerships and parts not being available.  A Chrysler report sent to NHTSA in October of 2014 showed the initial completion rate for the recalls to be very low.

*Chrysler Continues to Ignore Its Legal Obligations Even After Receiving a Warning Letter*

101.    Chrysler's failings were so serious that on November 19, 2014, NHTSA Administrator Friedman wrote a letter to Defendant Marchionne sharply criticizing Chrysler's repeated failure to adequately effect Recall 13V-252 of the 1.56 million vehicles whose fuel tanks may rupture if the vehicles are struck from behind, leading to fires even in low-speed crashes.  Friedman stated "**I am concerned about the results of Chrysler's October 2014 recall update reports showing a woeful three percent repair rate out of more than 1.5 million affected vehicles."  Friedman wrote "to urge [Chrysler] to more aggressively seek out vehicle owners affected by the recall."**  Noting the extremely low rate of repairs more than a year after the recall was initiated, Friedman directed Marchionne that "significantly more aggressive steps are required."

32

102.    While Chrysler shirked its legal obligations for more than a year after begrudgingly initiating the recall, the death toll mounted, including the death of a Michigan woman, Kayla White, in a fiery rear-end collision on a Detroit highway in November 2014.[18]

103.    The November 19, 2014 letter was not the first time Administrator Friedman had expressed his dissatisfaction to Marchionne with Chrysler's pace and progress of this recall.  As Friedman reminded Marchionne in the November 19, 2014 letter, **NHTSA "has urged Chrysler on multiple occasions** to ramp up production to ensure the company can meet consumer demand for these repairs" yet "NHTSA has received consumer complaints expressing frustration that Chrysler is not fully cooperating . . .  owners are being turned away by Chrysler dealerships because of a lack of parts, and, in some cases, are reportedly being told that their vehicles are safe to drive without the remedy."  Friedman stated that such conduct was "**unacceptable**".

104.    In the November 19 letter, Friedman demanded that Chrysler work to remedy these violations: "Chrysler must reexamine and accelerate its efforts to repair the recalled vehicles and proactively reach out to their owners . . .  ensure that there are no barriers to dealers obtaining parts and setting up appointments when consumers ask for repairs . . . must correct the reported practice of some dealers telling customers that no parts are available when the information you have provided us indicates that is clearly not the case . . . Importantly, Chrysler must ensure that dealerships do not advise owners that there is no risk to driving affected vehicles without the remedy."

105.    Friedman concluded by reminding Marchionne that **"the repair of these vehicles is of critical importance** and must be completed in order for drivers and passengers to be

---

[18] In April 2015, two years after Chrysler reluctantly recalled millions of Jeeps that could catch fire after being rear-ended the company has been ordered to pay $150 million to the family of a four-year-old boy who was killed in one of hundreds of related accidents. The Associated Press reports that a jury in Georgia handed down the verdict after ruling that Chrysler acted with reckless disregard for human life by selling the family a 1999 Jeep with a gas tank mounted behind the rear axle.

adequately protected . . . **In the strongest possible terms** I urge you and your dealers to work together to ensure that the safety risk to vehicle owners from this defect is clearly communicated and effectively and expeditiously addressed."

106.    Demonstrating the severity of the situation, Administrator Friedman instructed Defendant Marchionne that any questions must be directed to Kevin Vincent ("Vincent"), NHTSA Chief Counsel.

107.    Chrysler's policy and practice of late notifications and delayed and ineffective repairs, is much more serious than simply delaying the remedy and the cost associated with it. Such practices severely reduce the number of vehicles that ultimately get repaired, increasing the danger to drivers and passengers, and decreasing the cost of recalls and warranties to Chrysler. As Vincent would later state in the special order to Chrysler in July 2015: "For many owners, a recall remedy deferred by parts availability easily becomes a defect remedy denied."

108.    On November 21, 2014, Defendant Marchionne sent a letter in response to Friedman's November 19 letter, providing form platitudes in four sentence response, stating: "With respect to your letter of November 19, be assured Chrysler Group LLC takes seriously its commitment to motor-vehicle safety. . . Responses to the items raised in your letter will be provided promptly under separate cover."

109.    On November 21, 2014, Defendant Kunselman sent a separate letter response to NHTSA Administrator Friedman's November 19, 2014 letter.   Kunselman acknowledged "[t]hese completion rates are not satisfactory" and identified actions that Chrysler was allegedly taking to remedy the defect.

### 3.   Chrysler's Failure to Timely Recall Vehicles Containing Defective Takata Air Bags

\#

110.   The Takata airbag recall was prompted by the discovery that Takata air bag inflators installed in vehicles used in areas of high absolute humidity were rupturing when activated in a crash. The defective inflators, which are supposed to produce gas that fills air bags to protect vehicle occupants in the event of a crash, would create excess pressure that caused the inflator to explode, sending metal fragments flying into the passenger compartment, which caused serious injury or death.

111.   The Takata recall constituted the largest and most complex safety recall in U.S. history with more than 28 million inflators under recall in the United States.

112.   Takata filed a defect report stating that its passenger airbag inflators installed in vehicles that were originally sold, or are currently registered, in Florida, Alabama, Louisiana, Mississippi, Georgia, Texas, Hawaii, Puerto Rico, Guam, Saipan, American Samoa are defective.  The Safety Act obligated Chrysler to recall its products in these areas.

113.   Ten vehicle manufacturers, including Chrysler, initiated recall campaigns beginning on June 19, 2014.

114.   Recall 14V-354 (which became part of Recall 14V-817 and then 15V-313) involved an extremely large number of Chrysler vehicles: (1) Model Year 2003-2008 Dodge Ram pickups, (2) Model Year 2004-2008 Dodge Durangos, (3) Model Year 2007-2008 Chrysler Aspens, (4) Model Year 2005-2008 Chrysler 300s, (5) Model Year 2005-2008 Dodge Dakota pickups, and (6) Model Year 2006-2007 Mitsubishi Raider pickups.  In total, the recall involved 4,066,732 vehicles.

115.   Acting at the direction and under the oversight of NHTSA, Chrysler and the other manufacturers regularly met with Takata and NHTSA to coordinate owner notification programs,

availability of replacement parts, testing of field inflators and the replacement of defective inflators.  As was explained in the July 2015 hearing, throughout the process of (1) initiating the recall, (2) providing information to Takata and NHTSA, (3) making arrangements to provide replacement air bag inflators, and (4) collect inflators from the field for testing, Chrysler consistently lagged well behind the other nine manufacturers.

116.    For example, while other manufacturers provided NHTSA with a list of affected vehicles within days or weeks of filing their initial 573 Reports, Chrysler did not provide such a list until seven weeks after filing its 573 report. Similarly, although Chrysler initially indicated that it would begin mailing notices to customers in November, it failed to do so.

*Chrysler Continues to Flout Regulations Even After Receiving Multiple Warning Letters*

117.    On October 29, 2014, NHTSA Administrator Friedman wrote Steve Williams, Head of Vehicle Safety Compliance & Product Analysis, who reported directly to Defendant Kunselman, to "emphasize the critical imperative" for Chrysler "to promptly and effectively remedy the serious safety risk posed to consumers by defective Takata air bags."  While acknowledging that some measures had been taken by Chrysler, Friedman stated that those measure were inadequate under Chrysler's legal obligations: "[M]ore can and should be done as soon as possible to prevent any further tragedies from occurring as a result of these defective air bags."  Given "the severity of this issue", Friedman requested specific information from Chrysler as to what it had and will do to "ensure vehicles are remedied as expeditiously as possible." Friedman wrote: "we urge you to take aggressive and proactive action to expedite your remedy of the recalled vehicles and to supplement Takata's testing with your own testing to fully evaluate the scope and nature of this defect."

36

118.    Despite NHTSA urging Chrysler to "take aggressive and proactive" steps to expedite the remedy, in a November 5, 2014 response to NHTSA's, Williams stated that Chrysler would not even begin mailing recall notices to customers until December 19, approximately six months after Chrysler filed its initial 573 report, because the Company would not have replacement parts available prior to that date.   In the November 5, 2014 letter, Chrysler also informed NHTSA that it was refusing to recall its vehicles containing the Takata air bags located in Alabama, Louisiana, Mississippi, Texas, Georgia, Guam, Saipan, American Samoa, and would only recall its vehicles in Florida, Hawaii, Puerto Rico and the U.S. Virgin Islands, in direct contradiction of Chrysler's obligation and the determination that the Takata airbags were defective.

119.    Fed up with Chrysler's complete disregard for NHTSA regulations and lack of commitment to timely, complete and effect yet another recall, on November 25, 2014, NHTSA Administrator Friedman wrote to Defendant Marchionne once again, advising that he was "extremely concerned about both the geographic scope and the slow pace of [Chrysler's] recalls" involving defective Takata airbag inflators.

> Throughout the process of initiating the recall, providing information to both Takata and NHTSA, making arrangements to provide replacement air bag inflators and collect inflators from the field for testing, ***Chrysler has consistently maintained its position at the rear of the pack***. While other manufacturers provided NHTSA with a list of affected vehicles within days or weeks of filing their initial reports under 49 CFR Part 573 (573 Report), ***Chrysler did not provide such a list until seven weeks after filing its 573 report. Similarly, although Chrysler initially indicated that it would begin mailing notices to customers in November, it failed to do so.***

120.    Referring back to his letter of October 29, in which he urged Chrysler to be more aggressive and proactive in its recall efforts, Administrator Friedman criticized Chrysler's November 5, 2015 response as well 'as Defendant Kunselman's testimony at the Senate hearing,

stating that Chrylser would not begin its owner notification program until December 19, pointing

out that this was "approximately six months after Chrysler filed its initial 573 report."

121.    Deputy Administrator Friedman wrote that "Chrysler's delay in notifying

consumers and taking other actions necessary to address the safety defect identified is

unacceptable and exacerbates the risk to motorists' safety."

> First, unlike some other manufacturers who have more actively participated in these recalls, **Chrysler has had a field incident where a fragmenting inflator injured a customer**. This demonstrates the real world potential for death and injury posed by the Takata inflators installed in the recalled Chrysler vehicles. Moreover, **Chrysler's decision to delay notification until it has replacement parts deprives its customers of the ability to take their own informed, precautionary measures if they have a car with a potentially defective airbag**. This is particularly true where, as in this case, some of the vehicles involved may have defective passenger side air bags. In such a case, an informed customer could reduce the risk of death or injury by choosing to leave the passenger seat unoccupied. **Chrysler's delay deprives them of the knowledge needed to make an informed decision**.

122.    Administrator Friedman informed Marchionne that Chrysler's refusal to recall its

vehicles from all the necessary geographic locations was unreasonable and a violation of the

Safety Act.

> **I am also concerned about the geographic areas encompassed by Chrysler's recall**. Chrysler's present intention is to restrict its recall to Florida, Hawaii, Puerto Rico and the U.S. Virgin Islands. **This limitation is unreasonable** given the fact that Takata filed a defect report on November 10, stating that its passenger airbag inflators installed in vehicles that were originally sold, or are currently registered, in southern Georgia, Guam, Saipan, American Samoa and areas along the coast of Alabama, Louisiana, Mississippi, and Texas, as well as in the areas of Chrysler's announced recall, are defective. Based on the broader geographic scope identified by Takata, **Chrysler is obligated under the Safety Act to expand its recall to include these additional areas in its current recall**.

123.    Administrator Friedman told Marchionne bluntly that "NHTSA expects Chrysler

to immediately expand the geographic scope of its recall to, at a minimum, match the scope of

the recall announced by Takata" and "expects Chrysler to provide notification of the recall as soon as possible, and *in no circumstances, later than December 1*".

124.   On November 26, 2014, Defendant Marchionne responded to NHTSA Administrator Friedman's letter once again with a dismissive one paragraph response very similar to Marchionne's response on November 21, stating "With respect to your letter of November 25, be again assured that Chrysler Group LLC takes seriously its commitment to motor vehicle safety. . . . A response to the items raised in your letter will be provided promptly under separate cover."

125.   In a letter also dated November 26, 2014 and referencing Defendant Marchionne's letter, Defendant Kunselman wrote to Administrator Friedman.   Despite Friedman's warning that Chrysler's failure to expand its recall to all effected states was a violation of the Safety Act, Kunselman did not agree at that time to expand the recall to the affected areas.

126.   As Joshua Neff of NHTSA testified during the July 2, 2015 hearing, on December 23, 2014, Chrysler blatantly misrepresented to NHTSA that its owner notification date for the airbag inflator recall was three months earlier—on September 22, 2014.   In truth, Chrysler actually had not even begun mailing owner notices until December 5, 2014, completing the mailing on December 16, 2014, well after Deputy Administrator Friedman's letter of November 25, 2014.

127.   After Chrysler eventually expanded its recall for Takata airbag inflators, Recall 14V-354 became a part of Recall 14V-817. Chrysler misrepresented to NHTSA that it would send interim notices to vehicle owners in Recall 14V-817, but it never did.   Chrysler told NHSTA on a conference call that it did not want to send interim notices. But, after Frank Borris,

director of ODI, made clear this was unacceptable and told Chrysler that its customers were entitled to know the truth about their vehicles, Chrysler sent a draft interim notice to NHTSA for review. After Recall Management Division staff approved the draft, Chrysler still did not mail the notice. Recall 14V-817 became part of an expanded recall, Recall 15V-313. That expanded recall began with Chrysler's 573 Report on May 26, 2015. As of the date of the July 2, 2015 hearing, Chrysler still had not told NHTSA of any plans to notify the over 4 million owners affected by that recall.

128.     In NHTSA's written statement from the July 2, 2015 hearing leading to the Consent Judgment, NHTSA found that "[t]hese Takata recalls provide more examples of Fiat Chrysler providing conflicting and **blatantly wrong** information to the Agency. . . . Recalls obviously cannot be successful if owners do not know about them. Fiat **Chrysler's pattern and ongoing failure to notify owners about recalls in a timely manner** is concerning."

129.     The weaknesses in Chrysler's controls around its vehicle safety compliance also prevented Chrysler from maintaining accurate and reliable information.  This manifested itself in reports sent to NHTSA. NHTSA found that discrepancies in information were widespread throughout Chrysler's submissions to NHTSA about its recalls. NHTSA found that Chrysler "repeatedly failed to provide correct information to the Agency on basic issues, such as the date it mailed owner notices . . . [which] could also have much more consequential results for vehicle and driver safety."

### 4.     Chrysler's Failure to Remedy "Axel Lock Up" Causing Loss of Control

#

130.     Chrysler also failed to properly conduct three recalls for the same defect.  The defect involved a nut that secures the pinion gear inside the rear differential. If this nut comes loose, the driveshaft can fall off the vehicle and differential gears will clash. In its 573 report,

40

Chrysler described the safety risk as 'axle lock up' that can cause loss of control or a crash with 'little warning.' If an axle locks up, one or both of the rear wheels will stop turning and skid until the vehicle is stopped. If both rear wheels of a pickup truck suddenly lock up at highway speeds, the driver would almost certainly lose control.

131.    In response to a NHTSA Investigation into the defect, Chrysler filed a 573 report on February 6, 2013, identifying a safety defect in 48,000 Dodge Ram trucks, which initiated Recall 13-V-038.   After Chrysler had filed the 573 report, NHTSA conducted additional investigations and found that the pinion nuts were coming loose in other Ram trucks. Chrysler then filed a 573 report in February 2013 and December 2014 to initiate follow-on recalls.

132.    Pursuant to Recall 13-V-038, Chrysler was required to recall (1) 2009 model year Chrysler Aspen; (2)  2009 model year Dodge Durango; (3) 2009-2012 model years Dodge Ram 1500; and (4)  2009-2011 model years Dodge Dakota.  The total number of vehicles affected was 278,229.

133.    It was not until nine months after the February 2013 recall began that Chrysler finally informed owners that they should bring their cars into their dealers to have the recall repair performed.  During the nine-month period in which Chrysler was presumably stockpiling the parts needed to make the recalled vehicles safe, owners continued to experience pinion nut failures. NHTSA received numerous complaints of drive shafts falling off the Ram trucks on the highway. Other complaints described axles locking up while the trucks were being driven, drivers narrowly avoiding crashes and at least one loss of control.

134.    Although Chrysler reported that it had completed sending notices to owners in November 2013 telling them parts were available and repairs could be completed, NHTSA continued to receive owner complaints that parts could not be found.  A complaint filed in June

41

2014 stated that a dealer could not give the owner a date when parts would be available and that contact with Chrysler produced the same response. A complaint filed on July 2014 stated that the owner had been trying to get the repair completed for over six months and could not because of the parts shortage.

135. In March and May of 2015, over two years after Chrysler filed its 573 report, NHTSA received complaints that dealers could not obtain the recall parts. As Chief of the Integrity Division of NHTSA's Office of Defects Investigation, Scott Yon, later testified in July 2015,

> Review of customer complaints and other documents provided to NHTSA by Chrysler show **that Fiat Chrysler was aware of both the hazards posed by the defect and the difficulties that owners were experiencing in getting their vehicles fixed. Fiat Chrysler documents show that the company confirmed that three crashes, including two with injuries, occurred as a result of pinion nut failure in the eight months after the 573 report was filed**. As is the case with complaints filed with NHTSA, Fiat Chrysler records show that its customers were reporting that their dealers could not get parts to complete the repair as late as April of this year.
> Other Chrysler records confirm that the parts needed to complete the recall repairs were often back ordered or restricted to allow a dealer to repair one vehicle in a week or two vehicles per month.

136. Mr. Yon further testified: "Unfortunately, the difficulties Fiat Chrysler customers faced in getting recall repairs completed in the pinion nut recall are not an isolated example."

### 5. Chrysler's Failure to Remedy Defective Tie Rods That Cause Loss of Control

\#

137. Three recalls involving tie rod ends that can fail on large pickup trucks provide another example of how Chrysler's management of recalls puts its customers at increased risks. The three recalls, 13V-527, 13V-528, and 13V-529, encompassed approximately one million Dodge Ram pickup trucks. After receiving information from NHTSA indicating that the tie rods were failing, Chrysler filed 573 reports in early November of 2013 representing Chrysler's

conclusion that a defect in these vehicles posed an unreasonable risk to safety. The defect consisted of a steering component known as a tie rod that can break without warning.  As Chrysler described in its 573 report, if a tie rod end breaks, the ability to steer the vehicle can be lost and the driver can lose control, increasing the risk of a crash.

138.    Pursuant to Recall 13V-527, Chrysler was required to recall (1) 2008-2012 model years Dodge Ram 4500; and (2) 2008-2012 model years Dodge Ram 5500.  The total number of vehicles affected was 35,942.

139.    Pursuant to Recall 13V-528, Chrysler was required to recall (1)  2006-2008 model years Dodge Ram 1500; (2) 2003-2008 model years Dodge Ram 2500; and (3) 2003-2008 model years Dodge Ram 3500.  The total number of vehicles affected was 706,664.

140.    Pursuant to Recall 13V-529, Chrysler was required to recall (1) 2008 model year Dodge Ram 1500; (2) 2008-2012 model years Dodge Ram 2500; and (3) 2008-2012 model years Dodge Ram 3500.  The total number of vehicles affected was 265,057

141.    Chrysler sent notice to owners in January 2014 telling them that replacement parts were available and to bring their trucks in for repair.

142.    Nevertheless, NHTSA began to receive a high volume of complaints soon after these notices were sent.  Because some of the recall parts had defects, Chrysler had stopped shipping parts and, at the end of 2014, told its dealers to return these remedy parts from their stock. **Chrysler did not notify NHTSA of the problem with the replacement parts or that dealers had been told to return them.** Instead, NHTSA later learned about this from a dealer.

143.    Even after Chrysler resolved the safety problems with the replacement parts, supply was restricted. If they could get parts, dealers were allowed one set of parts per week. Owners seeking to have the safety defect fixed found themselves 30th in line on a waiting list for

parts. Review of Chrysler customer complaint records confirm that owners of these trucks could not get repairs done. In December of 2014, nearly one year after the notices had been mailed to owners, Chrysler customer service representatives were still informing customers that parts were not available.  In May 2015, more than 15 months after notices were sent to bring trucks in for repair, NHTSA received complaints from Ram owners stating parts were not available.

144.     As the parts shortages for these recalls continued, the tie rod ends continued to fail on vehicles out on the highway.  As Mr. Yon of NHTSA later testified in July 2015,

> **These incidents were reported to Chrysler, illustrating that the company was aware of the consequences of the defect and the need to have the vehicles fixed.** Responding to a NHTSA inquiry, Fiat Chrysler reported in March of this year that it had received 32 reports of alleged property damage, 2,593 consumer complaints, and 32 reported crashes involving 20 injuries and one fatality related to these recalls. **Although Fiat Chrysler knew or should have known of these accidents,**

145.     Despite the fact that Chrysler knew of these accidents, Mr. Yon recounted that "Chrysler customer service call records show that **at least one customer service agent told owners asking about parts that there had not been any accidents from the tie rod failures.**"

146.     Indeed, Chrysler's conduct was so egregious that on or about October 20, 2014, NHTSA informed Chrysler that it had opened an investigation (Audit Query – AQ14-003) into "the delays in execution of recall campaigns 13V-528 and 13V-529" after receiving more than 1,000 consumer complaints about parts shortages.

147.     Lest there be any dispute that the above examples are isolated incidents and not representative of Chrysler's standard practice, Mr. Yon further testified, "The Agency has encountered numerous instances where Fiat Chrysler has not performed well in making recall repairs."

### 6. **Chrysler's Untimely Recalls**

\#

148.    Despite being warned by NHTSA in November 2014, Chrysler improperly waited months before recalling defective vehicles in at least two of the recalls it began in 2015.

149.    Chrysler initiated Recall 15V-090 for defective transmissions that could prevent a vehicle owner from putting the vehicle into park on February 10, 2015, an alarming <u>four months</u> after Chrysler's supplier notified it in October 2014 of a production process issue linked to the transmission shift failures that are the subject of the recall.  Moreover, in a February 26, 2015 recall acknowledgment letter, NHTSA's Jennifer Timian ("Timian") notified Chrysler that the recall was untimely, demanding an explanation for the delay. Chrysler did not respond and never made any attempt to explain the timing.

150.    Chrysler similarly waited months before recalling vehicles in Recall 15V-290 for trucks that may have tire failures when traveling at high speeds. On January 9, 2015, Chrysler's Vehicle Safety and Regulatory Compliance department, headed by Defendant Kunselman, became aware that certain Chrysler trucks had a maximum governed speed of 106 mph, while the tires on the vehicles were only rated for a maximum of 87 mph. Later that month, on January 27, 2015, Chrysler's Saltillo Truck Assembly Plant came up with a fix—to install an Engine Control Unit calibration with the maximum vehicle speed set point of 87 mph. But Chrysler waited <u>over three months</u> to recall vehicles, filing a 573 Report on May 12, 2015, despite having identified the defect and remedy back in January.  Although Timian again notified Chrysler in a June 18, 2015 recall acknowledgment letter of concerns with the timeliness of this recall, as of July 2015, Chrysler still had not responded.

151.    In NHTSA's written statement from the July 2, 2015 hearing, NHTSA expressly chastised Chrysler for its refusal to improve its reporting even after the Company had purported

to improve its recall process through the creation of its Vehicle Safety and Regulatory Compliance department: "Fiat Chrysler has told NHTSA about changes that it has made to its organization and recall processes since September 2014. However, these two untimely recalls demonstrate that problems persist. Fiat Chrysler's failure to expeditiously recall vehicles with a safety-related defect is deeply concerning."

**7.    Chrysler's Failure to Notify NHTSA About Changes to Notification Schedule**

#

152.    Chrysler also had a pattern of refusing to update NHTSA on critical information about its recalls and the timing of owner and dealer notifications within the required five working days. NHTSA has specific requirements for the information that must be provided in a 573 Report. There is also a requirement to submit an amended 573 Report when key information changes. These requirements are essential to NHTSA's ability to ensure that owners are being told about defects and noncompliances in their vehicles and know how to have them fixed. Additionally, Chrysler failed to promptly provide the reasons for the delay and a revised schedule when its notification schedule is was delayed by more than two weeks.

153.    For example, Recall 13V-527 was a recall for a defective left tie rod assembly that could result in loss of steering control. When Chrysler first filed a Part 573 Report for this recall in November 2013, it told NHTSA that it would begin sending owner notices in December 2013. NHTSA only found out that this did not happen when Chrysler sent it a copy of its interim owner notice to NHTSA in February 2014 and said that the notices were not mailed until January 16, 2014. Chrysler did not explain the delay.

154.    Recall 14V-373, concerning ignition switch defects, was an expansion of an earlier recall, 11V-139. When Chrysler first notified NHTSA of the new, expanded recall in June 2014, it submitted a 573 Report that indicated that it planned to send owner notices in early July

2014. On July 1, 2014, Chrysler submitted an amended 573 Report that said the Company would mail owner notices in August 2014. August came and went with no update from Chrysler. However, it was not until September 29, 2014, when Chrysler submitted a copy of an interim owner notice that NHTSA learned Chrysler did not mail those notices until September 11, 2014.

155.   Chrysler also failed to update NHTSA on its changed plans for notifying owners and dealers that parts were available for repair. In December 2014, Chrysler submitted an amended 573 Report that said it planned to mail the owner notices on April 13, 2015 and the dealer notices on April 6, 2015. Chrysler submitted two more amended 573 Reports in February 2015 that made no changes to this schedule. Chrysler did not tell NHTSA that the notices were not sent until well after those April dates had passed. Only after NHTSA staff contacted Chrysler about its notification schedule did Chrysler submit an amended 573 Report, on May 4, 2014, to provide new dates. Even then, Chrysler provided no explanation for the delay, as required.

156.   For Recall 14V-749, a recall for a noncompliant instrument cluster, Chrysler never provided NHTSA with any information on its schedule for mailing owner and dealer notices. Chrysler left these fields blank when it submitted its Part 573 Report in November 2014. Rather than telling NHTSA when it planned to send notices, as required, Chrysler submitted a letter on December 16, 2014 stating that it had already mailed the notices.

157.   Chrysler also failed to update NHTSA on changes to its notification schedule in a recall for broken springs in the clutch ignition interlock switch, Recall 14V-795. Chrysler's initial 573 Report in December 2014 said that it planned to mail dealer notices on February 6, 2015 and owner notices on February 13, 2015. Immediately before these notifications were scheduled to begin, Chrysler confirmed these dates in a February 3, 2015 amended 573 Report. However, it was not until Chrysler again amended its 573 Report in May 2015 that NHTSA

47

learned that Fiat Chrysler missed those mailing dates and instead mailed the notices over a month later in March 2015. Chrysler provided no explanation for the delays to NHTSA.

158.    In NHTSA's written statement from the July 2, 2015 hearing, NHTSA criticized Chrysler's blatant disregard for its reporting obligations:

> Fiat Chrysler's repeated failure to provide accurate and up-to-date information to NHTSA makes it hard for staff to trust the information that Chrysler provides. Because Chrysler kept NHTSA out-of-the-loop on its notifications, NHTSA could not adequately ensure that owners and dealers had the information they needed about the safety of their vehicles and when and how the vehicles can be repaired.

> It is also disconcerting that Chrysler repeatedly fails to explain its delays in notifying owners and dealers about recalls. Without any explanation for a delay, NHTSA has no basis for judging the delay to be reasonable and not simply the result of a lack of urgency at Chrysler on safety issues.

### 8.    Chrysler's Failure to Submit Recall Communications
#
159.    Chrysler also repeatedly refused to submit copies of its recall communications to NHTSA as required. This regulatory requirement is necessary to keep NHTSA informed about what Chrysler is telling owners and dealers about defects and noncompliances and how they can have them repaired.

160.    Owner notices are critical to a recall. To ensure that owners are provided the necessary information, NHTSA reviews draft owner notices before they are sent. A vehicle manufacturer is required to submit a draft to NHTSA no fewer than five business days before it intends to begin mailing the notice to owners. However, in at least one recall, 14V-749, a recall for noncompliance with the safety standard for vehicle controls and displays, Chrysler did not send a draft owner notice to NHTSA for review. Instead, Chrysler sent an unapproved letter to owners on December 16, 2014.

161.    Chrysler also repeatedly refused to submit representative copies of recall communications that it sends to owners or dealers to NHTSA within five days. Chrysler often

48

delayed providing NHTSA with copies, and NHTSA repeatedly had to remind Chrysler to submit the copies. In addition, when Chrysler did submit copies of recall communications, it also routinely entered incorrect information into NHTSA's recalls portal, such as providing the date that Chrysler submitted a document to NHTSA or leaving the date blank, rather than providing the date that Chrysler mailed its notification to owners.

162.   In some cases, Chrysler left NHTSA completely in the dark about communications that Chrysler made to its dealers about a recall. These communications told dealers how to repair defects and noncompliances and provided other important information about the recalls.

163.   As NHTSA's written statement from the July 2, 2015 hearing explained, "NHTSA cannot ensure that vehicle owners are aware of defects and noncompliances in their vehicles and that they have information on how to have those problems fixed when a manufacturer fails to comply with its obligation to submit copies of owner notification letters to [NHTSA] and to provide correct and complete information about the notifications. . . Failure to submit dealer communications to NHTSA as required obstructs [NHTSA]'s ability to evaluate whether dealers have accurate and complete information necessary to remedy vehicles. It is critically important that the Agency have timely access to these communications—and a complete set of these communications—so that it can evaluate the remedy and fulfill its statutory oversight role to ensure that remedies are effective."

164.   In at least eight recalls, Chrysler failed to submit copies of its owner notices to NHTSA within five days as required.

- In Recall 13V-527, Chrysler waited <u>28 days</u> to send NHTSA a copy of its interim owner notice and 6 days to send NHTSA its follow-up owner notice.
- For Recall 14V-373, Chrysler waited <u>18 days</u> to send NHTSA a copy of its interim owner notice.

49

- Chrysler also waited <u>8 days</u> to send NHTSA a copy of its interim owner notice in Recall 14V-438.

- In Recall 14V-634, Chrysler waited <u>67 days</u> to send NHTSA a copy of its owner notice after it began mailing the notices.

- Chrysler waited <u>27 days</u> to send NHTSA a copy of its interim owner notice in Recall 14V-795.

- Chrysler also waited <u>25 days</u> after it began mailing interim notices about Recall 15V-046 before sending NHTSA a copy.

- Chrysler waited <u>12 days</u> to send NHTSA a copy of its owner notice in Recall 15V-114.

- Chrysler waited <u>15 days</u> from the time it began mailing owner notices in Recall 15V-115 to provide NHTSA with a copy.

165.    NHTSA's written statement from the July 2, 2015 hearing made clear that "[t]hese are not insignificant delays. Fiat Chrysler waited double, triple, and even up to over thirteen times the allowable time under the law to provide these owner notices to NHTSA."

166.    Chrysler's complete disregard for its compliance obligations is highlighted by the fact that providing notification to NHTSA is not an onerous requirement. Many of these recalls involved several hundred thousand vehicle owners. Chrysler simply had to send out one more copy of its owner notices to NHTSA, and yet it repeatedly failed to do that by the legally binding deadline subject to civil penalties.

167.    Chrysler also did not submit copies of dealer communications within <u>five days</u> as required in at least fourteen recalls. In many cases, Chrysler simply never provided any copies of certain dealer communications to NHTSA until after the Agency began the enforcement action. Specifically, there were thirty-two dealer communications across twelve recalls between 2013 and 2015 that Chrysler withheld from the NHTSA until submitting its Special Order response on June 1, 2015, <u>many of which had been sent well over a year prior</u>.

- In Recall 13V-252, Chrysler did not provide NHTSA with <u>twelve</u> separate dealer communications that Chrysler sent to its dealers in June, July, August, and December 2014.

50

- In Recall 13V-527, Chrysler never sent NHTSA a copy of a November 2013 dealer communication.

- In Recall 13V-528, Chrysler never sent NHTSA a copy of two April 2014 dealer communications.

- Chrysler never sent NHTSA three dealer communications about Recall 13V-529, sent in November 2013, March 2014, and December 2014.

- Chrysler never sent NHTSA a copy of a December 2014 dealer communication about Recall 14V-373.

- Chrysler never sent NHTSA a copy of four dealer communications about Recall 14V-391 sent in July 2014 and in April and May 2015.

- Chrysler also failed to submit to NHTSA a dealer communication about Recall 14V567 it sent in September 2014.

- Chrysler never sent NHTSA a copy of a dealer communication Chrysler sent in December 2014 about Recall 14V-795.

- Chrysler never sent NHTSA a copy of a December 2014 dealer communication about Recall 14V-796.

- Chrysler never sent NHTSA a copy of four dealer communications about Recall 15V-090, sent in February, March, and April 2015.

- Chrysler never sent NHTSA a copy of a dealer communication about Recall 15V-115 that Chrysler sent in September 2014.

- Chrysler never sent NHTSA a copy of a March 2015 dealer communication about Recall 15V-178.

168.   Even with respect to the dealer communications that Chrysler did provide to NHTSA, the Company routinely provided them late.

- In Recall 13V-527, Chrysler waited <u>10 days</u> to provide a copy of a dealer letter to NHTSA.

- Chrysler waited <u>38 days</u> to provide a copy of a dealer letter in Recall 14V-373 to NHTSA.

- Chrysler waited <u>21 days</u> to submit a copy of a dealer letter for Recall 14V-438 to NHTSA.

- In Recall 14V-634, Chrysler waited <u>10 days</u> to submit one dealer letter to NHTSA and then waited <u>74 days</u> before submitting a copy of a second dealer letter to NHTSA.

- Chrysler waited <u>18 days</u> before submitting a copy of a dealer letter to NHTSA about Recall 14V-635.

- Chrysler waited <u>8 days</u> before submitting a copy of a dealer letter about Recall 14V-749.

- Chrysler did not submit a copy of a dealer letter about Recall 14V-795 until <u>17 days</u> later.

- Chrysler waited <u>39 days</u> to submit a copy of a dealer letter about Recall 15V-046, and <u>15 days</u> to submit a copy of a dealer letter about Recall 15V-090.

- Chrysler also waited <u>12 days</u> to submit a copy of a dealer letter about Recall 15V114, and <u>15 days</u> before submitting a copy of a dealer notice about 15V-115 to NHTSA.

169.    Chrysler's failure to provide timely notice persisted between 2013 and 2015 and did not improve following the appointment of Defendant Kunselman as head of Vehicle Safety and Regulatory Compliance. As NHTSA's written statement from the July 2, 2015 hearing concluded, "such a widespread pattern of missing deadlines is unacceptable."

## 9.      Chrysler's Failure To Provide Other Critical Information

#

170.    Chrysler also had a pattern of repeatedly failing to provide NHTSA with other critical information about its recalls that was timely, accurate, and complete. The law requires manufacturers to submit an amended 573 Report when the manufacturer has new or changed information about the recall. This is an important requirement because the mere fact of an amended 573 Report signals to the Agency and to the public that something significant has changed.

171.    One of the critical pieces of information about a recall is the vehicles that are affected. A manufacturer is required to update its Part 573 Report within <u>five working days</u> to update the total number of vehicles potentially containing the defect or noncompliance.

172.    Across multiple recalls, Chrysler failed to correctly, completely, and timely identify the vehicles affected by the recalls.

52

173.    In several recalls, Chrysler submitted letters or quarterly recall reports to NHTSA

that showed an apparent change to the number of vehicles involved in a recall, instead of filing

an amended 573 Report as required. Chrysler never explained the reason for these discrepancies.

- In Recall 13V-038, Chrysler's amended 573 Report, submitted on February 13, 2013, listed the potentially affected population as 278,222 vehicles. However, each of the quarterly reports that Chrysler submitted since then listed the affected population as 278,229 vehicles.

- In Recall 13V-527, Chrysler reported to NHTSA in its May 7, 2015 573 Report that the potentially affected population was 36,710. Just days later, Chrysler wrote in a letter that the population was 768 vehicles fewer. Chrysler never filed a 573 Report reflecting a changed population or otherwise explained this discrepancy.

- In Recall 14V-154, Chrysler's 573 Report, submitted in April 2014, listed a potentially affected population of 644,354 vehicles. Without explanation and without submitting an amended 573 Report, Chrysler listed a population of 5,305 fewer vehicles in its July 2014 quarterly report. Again with no explanation, Chrysler's October 2014 quarterly report raised the population back to the initially reported 644,354 vehicles.

- In Recall 14V-373, Chrysler reported a potentially affected population of 525,206 vehicles in its initial 573 Report, submitted July 1, 2014. This number drastically increased by 197,849 vehicles in a September 29, 2014 letter. Chrysler did not amend its 573 Report to reflect this change and, instead, in an amended 573 Report filed in December reverted to the initially reported population of 525,206 vehicles.

- In Recall 14V-438, Chrysler's initial 573 Report in July 2014 stated that the potentially affected population was 643,618 vehicles. Then, in a September 2014 letter, Chrysler said that the population was 4,225 vehicles fewer. Chrysler never submitted an amended 573 Report to change the population. Instead, its amended 573 Reports submitted in December 2014 and March 2015 changed back to the initially reported population of 643,618 vehicles.

- In Recall 14V-634, Chrysler's initial Part 573 Report in October 2014 gave a potentially affected population of 434,581 vehicles. This number changed slightly, increasing by 13 vehicles, according to a letter Chrysler sent to NHTSA in December 2014. Chrysler did not submit an amended 573 Report for a change to the population and then dropped the number of vehicles back to the original population when it filed an amended 573 Reports in April 2015.

- For Recall 14V-749, Chrysler reported a potentially affected population of zero in its initial 573 Report submitted in November 2014. Although Chrysler did not amend its 573 Report at the time, it reported the population as 11,674 in a December 2014 letter it sent to NHTSA. It was not until April 2015 that

53

Chrysler reported a potentially affected population in an amended 573 Report, as required. However, the population Chrysler reported—11,668 vehicles—was a different population than Chrysler earlier told NHTSA.

- In Recall 14V-795, Chrysler initially reported a potentially affected population of 66,819 vehicles in its December 2014 573 Report. It reiterated that number in an amended 573 Report filed in February 2015, but then told NHTSA a different population in a letter the following month. In its letter, Chrysler decreased the population by 12,758 vehicles with no explanation. Chrysler then waited almost <u>two more months</u> before reporting this new population in an amended 573 Report that it was required to submit within 5 days of knowing of the change.

- In Recall 15V-046, Chrysler's January 2014 573 Report provided a potentially affected population of 753,176 vehicles. However, in a letter Chrysler sent to NHTSA in March 2015, it listed a population that was 1,416 vehicles fewer. Chrysler never amended its 573 Report.

- In Recall 15V-090, Chrysler delayed filing an amended 573 Report to reflect a population change. There, Chrysler initially reported a potentially affected population of 25,734 vehicles in its February 2015 573 Report. The next month, Chrysler listed a different population, which was 4,269 vehicles fewer, in a letter it submitted to NHTSA. However, Chrysler delayed nearly <u>another month</u> before reporting a changed population in an amended 573 Report as required.

- In Recall 15V-115, Chrysler reported a potentially affected population of 338,216 vehicles in its initial 573 Report in February 2015. Without explanation, it then increased the population by 33 vehicles according to a letter it sent NHTSA in May 2015. However, later that same month, Chrysler submitted an amended 573 Report that still contained the original population of 338,216 vehicles.

174. The 573 Report is the authoritative source of information about a recall. In these eleven recalls, Chrysler provided different information to NHTSA in letters and quarterly reports than it provided in its 573 Reports. This buries important information about a recall into routine correspondence, rather than flagging it for NHTSA and the public in an amended 573 Report as the law requires. Notably, in none of these recalls did Chrysler actually tell NHTSA in these letters or quarterly reports that there was a change to the vehicle population.

175. As NHTSA has since noted, in some cases, the changes to the population reflected by the letters was sometimes later reported to the Agency in a 573 Report but in other

cases subsequent 573 Reports contained no population change. That leaves NHTSA wondering what information is accurate. In other cases, the letters apparently do reflect a true change to the vehicle population which Chrysler later reported to NHTSA in an amended 573 Report as required. However, Chrysler repeatedly delayed well beyond the five day deadline under the law for reporting updated population information.

176.    These inconsistent population numbers have a significant impact on vehicle owners. In the recalls where Chrysler provided a different population in a letter than it had in its earlier 573 Report, those letters were cover letters accompanying Chrysler's submission of a copy of its owner letter. If Chrysler reported a lower population number in that cover letter, it suggests that Chrysler only sent owner letters to that lower number of vehicle owners. If there was not a true change in the vehicle population that means Chrysler failed to notify some vehicle owners of the recalls. Obviously, a vehicle owner who does not know about a recall is subjected to an unreasonable risk of injury due to the defect and cannot have his or her car fixed.

177.    As NHTSA stated in its written statement from the July 2, 2015 hearing, "Fiat Chrysler's repeated submission of inconsistent, incorrect, and untimely information on the population of its recalls can have a real impact on the effectiveness of those recalls."

178.    In Recall 15V-041, Chrysler failed to correctly identify the vehicle identification numbers (VINs) associated with the recall. This recall was for a defect that may result in side curtain and seat airbags unexpectedly deploying. Oversight by NHTSA's Recall Management Division, caught about 65,000 vehicles impacted by this recall that Fiat Chrysler had not included in the recall. This means that Chrysler did not notify a significant number of vehicle owners of this defect for over 14 weeks.

179.    Chrysler also failed to provide NHTSA with any information on the vehicles affected by its recall for Takata airbag inflators, Recall 14V-354, which later became a part of Recall 14V-817, for <u>over seven weeks</u>. Chrysler lagged far behind other manufacturers recalling vehicle for the same issue in identifying its affected vehicles.

### 10.    <u>Chrysler's Failure To Submit Information On Remedy</u>
\#

180.    It is also critical for NHTSA to have timely, accurate, and complete information about a manufacturer's remedy plan in other words when and how a manufacturer is going to fix its vehicles. A manufacturer is required to report this information in its 573 Report, including by amending its 573 Report within 5 working days of confirming or changing its remedy plan. Having access to information on a manufacturer's remedy plan is essential for NHTSA to assess the remedy plan and to ensure that a manufacturer is meeting its obligation to adequately repair vehicle defects within a reasonable time.

181.    Chrysler failed to provide timely information on its remedy plan in at least two recalls between 2013 and 2015.

182.    As discussed above, Recall 13V-527 is a recall involving a left tie rod ball stud that could fracture, resulting in the loss of steering control. In Chrysler's November 2013 573 Report, the Company said that it would remedy vehicles by installing a redesigned tie rod assembly. In March 2013, Chrysler amended its 573 Report to indicate that replacement of the tie rod was an interim remedy and that vehicle owners would need to have a new steering linkage installed. At that time, Chrysler said it would notify dealers about the fix on April 17, 2015. Well after that date came and went, Chrysler filed an amended 573 Report on May 7, 2015 indicating that it was delaying the dealer notices until May 8, 2015. Since Chrysler had changed the remedy for this recall, it was particularly important for NHTSA to review this communication, which

was a technical service bulletin giving dealers specific instructions on how to repair the vehicles. However, as discussed above, Chrysler did not timely provide a copy of that communication to NHTSA.

183.     Chrysler also failed to timely provide NHTSA with its plan for remedying the safety defect in Recall 14V-634. That recall involves a defect where the vehicle's alternator may rapidly fail, causing the vehicle to shut down and potentially causing a fire. Chrysler filed its initial 573 Report for this recall on October 7, 2014. The Recall Management Division reminded Chrysler in an October 14, 2014 recall acknowledgement letter of its obligation to provide its plan for remedying the safety defect as soon as it has been determined. Over six months later, Chrysler notified vehicle owners that dealers would replace the alternator assembly. NHTSA contacted Chrysler on April 22, 2014 to ask why the Company still had not reported its remedy plan in an amended 573 Report. Although Chrysler staff repeatedly promised they would do so, and NHTSA repeatedly reminded Chrysler to do so, it took Chrysler until May 7, 2014 to file an amended 573 Report including information on its remedy plan.

184.     NHTSA's conclusions concerning these violations demonstrate Chrysler's complete lack of interest in regulatory compliance.  As stated by a Senior Safety Recall Analyst at NHTSA at the July 2, 2015 hearing, "Based on my communications with Fiat Chrysler staff, I believe that they did not understand their obligation to include this information in their Part 573 Report. This is hard to fathom for a company with as much recall experience as Fiat Chrysler. NHTSA staff should not have to explain and repeatedly remind Fiat Chrysler about basic recall requirements as we had to do here."

### 11. Chrysler's Failure To Report Deaths and Serious Injuries

\#

185.     From 2003 through the Class Period, Chrysler also had significant failures in early warning reporting. Chrysler failed to report incidents of death and injury that were required to be reported to NHTSA under 49 C.F.R. Section 579.21(b). Specifically, Chrysler did not report these deaths and injuries because of failures in the Company's controls: (1) coding deficiencies in Chrysler's early warning reporting system that failed to recognize when reportable information was received or updated; and (2) Chrysler's failure to update its early warning reporting system to reflect new Chrysler brands.  Chrysler also failed to report aggregate data that were required to be reported to NHTSA under 49 C.F.R. Section 579.21(c), including property damage claims, customer complaints, warranty claims and field reports.  Chrysler also failed to provide copies of field reports to NHTSA, as required under 49 C.F.R. Section 579.21(d).   These failures were also a result of Chrysler's poor controls – namely, coding deficiencies in Chrysler's early warning reporting system that failed to recognize reportable information.

186.     NHTSA's investigators found these discrepancies in reporting by Chrysler and notified the company in July 2015.

### E. Chrysler's Failure to Properly Account For Recalls

#### 1. Chrysler's Underreporting of Its Costs and Liabilities Related to Vehicle Warranties and Recalls

\#

187.     During the Class Period, Chrysler also underreported its reserves for product warranties and cost of recalls.  This underreporting resulted directly from Chrysler's failure to timely conduct recalls, notify customers and remedy the safety defects.

188.     According to Chrysler's annual report for the fiscal year ending December 31, 2014, filed with the SEC on Form 20-F on March 5, 2015, expenses related to recalls are

58

included in the line item "Cost of sales" in its consolidated income statement. These line items are part of the Company's Earnings Before Interest and Taxes (EBIT) amount that is also reflected in its income statement. Any expenses related to recalls would affect the Company's EBIT.  Additionally, EBIT flows to the financial statement line items of Net profit before taxes and Net profit. Therefore, by failing to report necessary recalls and repairs in a timely fashion, Chrysler overstated its EBIT, reported net income, and understated its Cost of sales.

## 2.    Relevant Accounting Principles

\#

189.    As a foreign private issuer, during the Class Period, Chrysler prepared its audited financial statements and was required to file them with the SEC according to full International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and its related interpretations. The full IFRS  accounting framework is substantially similar to U.S. generally accepted accounting principles ("GAAP") and constitutes those standards recognized by the public accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

190.    SEC and NYSE rules and regulations require that public business entities such as Chrysler include audited (or reviewed) financial statements that comply with either GAAP or IFRS in their annual and quarterly reports filed with the SEC.  *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

191.    SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

59

192.    Under IFRS, the expected costs associated with Chrysler's auto recalls are accounted and reported for by recognizing a provision on its balance sheet pursuant to IAS 37, *Provisions, Contingent Liabilities and Contingent Assets*.   "A provision is a liability of uncertain timing or amount." IAS 37, ¶10.  "Provisions are recognised as liabilities … because they are present obligations and it is probable that an outflow of resources embodying economic benefits will be required to settle the obligations."  IAS 37, ¶13(a).

193.    A provision shall be recognised when:

(a) an entity has a present obligation (legal or constructive) as a result of a past event;

(b) it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation; and

(c) a reliable estimate can be made of the amount of the obligation.[19]

IAS, 37 ¶14,

194.    Given Chrysler's historical experience, it expected a certain number of autos would be subject to recalls each year.  Based on its experience regarding the lifetime warranty costs of each vehicle line, as well as its historical claim, it knew that the costs of the recalls would fall into a certain range. Thus, its current and historical experience allowed it to estimate reliably the total costs associated with all of its recalls.

195.    Chrysler's 2014 20-F explains how it accrues a provision for recalls and other warranty-related expenses:

> The Group establishes accruals[20] for product warranties at the time the
> sale is recognized. …. The accrual for product warranties includes the

---

[19]   "Except in extremely rare cases, an entity will be able to determine a range of possible outcomes and can therefore make an estimate of the obligation that is sufficiently reliable to use in recognising a provision." IAS 37, ¶25.

[20]   Chrysler refers to "accruals", and IAS 37 refers to a "provision" for warranty and recall expense.  These two terms refer to the same liability item on the balance sheet.

expected costs of warranty obligations imposed by law or contract, as well as the expected costs for policy coverage, recall actions and buyback commitments. The estimated future costs of these actions are principally based on assumptions regarding the lifetime warranty costs of each vehicle line and each model year of that vehicle line, as well as historical claims experience for the Group's vehicles. In addition, the number and magnitude of additional service actions expected to be approved, and policies related to additional service actions, are taken into consideration. … .

The Group periodically initiates voluntary service and recall actions to address various customer satisfaction, safety and emissions issues related to vehicles sold. Included in the accrual is the estimated cost of these service and recall actions. The estimated future costs of these actions are based primarily on historical claims experience for the Group's vehicles. Estimates of the future costs of these actions are inevitably imprecise due to some uncertainties, including the number of vehicles affected by a service or recall action. … The estimate of warranty and additional service and recall action obligations is periodically reviewed during the year. Experience has shown that initial data for any given model year can be volatile; therefore, the process relies upon long-term historical averages until actual data is available. As actual experience becomes available, it is used to modify the historical averages to ensure that the forecast is within the range of likely outcomes. Resulting accruals are then compared with current spending rates to ensure that the balances are adequate to meet expected future obligations.[21]  2014 20-F page 66.

196.    Chrysler's disclosure statement that it periodically reviews its estimates of costs for recall actions to ensure accuracy is consistent with ¶59 of IAS 37, which states: "Provisions shall be reviewed at the end of each reporting period and adjusted to reflect the current best estimate."

---

[21]   Warranty costs incurred are generally recorded in the Consolidated income statement as Cost of sales. However, depending on the specific nature of the recall,  including the significance and magnitude, the Group reports certain of these costs as Unusual expenses. As such, for comparability purposes, the Group believes that separate identification allows users of the Group's Consolidated financial statements to take them into appropriate consideration when analyzing the performance of the Group and assists them in understanding the Group's financial performance year-on-year. 2014 20-F page 66.

197.     From 2009 through 2015, Chrysler experienced a steady and substantial increase in the number of auto recalls that it was forced to issue.  Below is a chart showing the number of individual auto recalls and the total number of cars involved for the recalls from 2009 through 2015.[22]

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Recalls | 23 | 24 | 11 | 13 | 36 | 39 | 42 |
| Recall Change % |  | 4.3% | -54.2% | 18.2% | 176.9% | 8.3% | 7.7% |
| Units Recalled | 484,183 | 1,528,604 | 778,621 | 1,334,270 | 4,665,884 | 5,940,104 | 12,074,448 |
| Units Recall Change % |  | 215.7% | -49.1% | 71.4% | 249.7% | 27.3% | 103.3% |
| Change Since 2009 |  | 216% | 61% | 176% | 864% | 1127% | 2394% |
| Change Since 2010 |  |  | -49% | -13% | 205% | 289% | 690% |
| Change Since 2011 |  |  |  | 71% | 499% | 663% | 1451% |
| Change Since 2012 |  |  |  |  | 250% | 345% | 805% |

198.     The data shows that in 2013, Chrysler experienced a 250% increase in the number of units recalled.  And Chrysler suffered another 27% increase in units recalled in 2014 on top of the already huge 250% increase in 2013.

199.     Yet for fiscal 2013, Chrysler increased its provision for warranty expense only by 8%, and in 2014, it increased the provision less than 33%. These 8% and 33% increases in the warranty provision were completely inadequate to fund Chrysler's mounting recall expenses in the face of an overall 345% increase in units recalled from 2012 to 2014, a 663% increase in units recalled from 2011 to 2014, and a whopping 1127% increase in units recalled from 2009 to 2014.

200.     Chrysler management knew the number of recalled vehicles, the approximate cost to repair each vehicle and the number of vehicles yet to be repaired. With this information, Chrysler management was in position to accurately estimate incremental warranty expense and

---

[22]   The data for the chart was sourced from databases maintained by NHTSA, publicly available at http://www-odi.nhtsa.dot.gov/downloads/ (accessed on March 18, 2016).

the associated liability related to the recalls. And yet Chrysler knowingly failed to proportionately increase its provision for warranty expense to account for this known spike in units recalled.

201.    As discussed above, Chrysler is mandated to file a 573 Report with NHTSA "not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related" that identifies the work that is needed to remedy the defect and the total number of units affected by the recall. In addition, the TREAD Act mandates that manufacturers submit quarterly reports to NHTSA called "Early Warning Reports" that include warranty reports; consumer complaints; property damage claims; and field reports broken down by make, model, and model year and problem category.

202.    Thus, Chrysler had available timely accurate information as to the estimated and actual historical costs of its recalls from which to establish an accurate provision for contingent liabilities at all times. And under ¶59 of IAS 37, Chrysler was required to review its estimates of the cost of auto recalls at the end of each reporting period and adjust them to reflect the current best estimate resulting from the timely and accurate information at its fingertips.

203.    It wasn't until the end of the third quarter of 2015 – a full year after the dust from merger had settled, when Chrysler finally made an honest reassessment of its costs for recalls, which resulted in a change in its estimate for the recall provision of €761 million for the U.S. and Canada for estimated future recall campaign costs for vehicles sold in periods prior to the third quarter of 2015. (2015 Form 20-F page 73). As further evidence of the magnitude of Chrysler's under-accrual of a liability for product recalls prior and during the Class Period, in fiscal 2015, Chrysler accrued an additional €4.7 billion for warranty and recall provision, increasing its net

provision from €4.84 billion to €6.47 billion after paying out €3.3 billion in warranty and recall settlements in 2015. (2015 Form 20-F page F-79).

### F.    Chrysler's Vehicle Emissions Regulatory Violations

*Chrysler's Obligations Under Vehicle Emissions Regulations*

204.    Nitrogen Oxide (or "NOx") is a family of highly reactive gases that play a major role in the atmospheric reactions with volatile organic compounds that produce ozone in the atmosphere. Breathing ozone can trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion. Breathing ozone can also worsen bronchitis, emphysema, and asthma, and can lead to premature death. Children are at greatest risk of experiencing negative health impacts from exposure to ozone. Additionally, recent scientific studies indicate that the direct health effects of NOx are worse than previously understood, including respiratory problems, damage to lung tissue, and premature death.

205.    U.S. and European regulatory agencies regulate emissions from motor vehicles, including NOx.

206.    For example, in the U.S., Title II of the Clean Air Act (the "Clean Air Act" or the "Act"), as amended, 42 U.S.C. § 7521 et seq., and the regulations promulgated thereunder, aim to protect human health and the environment by reducing NOx and other pollutants from mobile sources of air pollution, including motor vehicles.

207.    Section 202(a) of the Act, 42 U.S.C. § 7521(a), requires the EPA to promulgate emission standards for new motor vehicles for NOx, and other air pollutants. 40 C.F.R. Part 86 sets emission standards and test procedures for light-duty motor vehicles, including emission standards for NOx. *See* 40 C.F.R. § 86.1811-04.

208.    Every auto manufacturer must employ various strategies to control tailpipe emissions in order to meet the EPA's regulatory requirements for low NOx emissions.

209.    Light-duty vehicles must satisfy emission standards for certain air pollutants. 40 C.F.R. §§ 86.1811-04, 86.1811-09, 86.1811-10. The EPA administers a certification program to ensure that every new motor vehicle introduced into United States commerce satisfies applicable emission standards. 42 U.S.C. § 7521. Under this program, the EPA issues Certificates of Conformity (or "COCs") to vehicle manufacturers to certify that a vehicle class conforms to EPA requirements and thereby regulates the introduction of new motor vehicles into United States commerce. Every motor vehicle introduced into commerce in the United States must have a COC.

210.    To obtain a COC, a manufacturer must submit an application to the EPA for each model year and for each test group of vehicles that it intends to enter into United States commerce. 40 C.F.R. § 86.1843-01. A test group is comprised of vehicles with similar emissions profiles for pollutants regulated under the Act. See, e.g., 40 C.F.R. §§ 86.1803-01, 86.1827-01.

211.    Vehicles are covered by a COC only if the vehicles are as described in the manufacturer's application for the COC "in all material respects." 40 C.F.R. § 86.1848-10(c)(6).

212.    Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), prohibits manufacturers of new motor vehicles from selling, offering for sale, introducing into commerce, or delivering for introduction into commerce, or any person from importing into the United States, any new motor vehicle not covered by a COC issued by the EPA under regulations prescribed by the Act governing vehicle emission standards. It is also a violation to cause any of the foregoing acts. 42 U.S.C. § 7522(a); 40 C.F.R. § 86.1854-12(a).

65

213.    Auto manufacturers are also required to disclose all emissions software. In particular, the manufacturer must disclose all auxiliary emission control devices ("AECDs") installed on the vehicles. 40 C.F.R. § 86.1844-01(d)(11). 40 C.F.R. § 86.1844-01(d)(11). An AECD is "any element of design which senses temperature, vehicle speed, engine [revolutions per minute], transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 86.1803-01. The manufacturer must also include "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device." 40 C.F.R. § 86.1844-01(d)(11).

214.    A defeat device is a piece of engine management software designed specifically to circumvent the emissions testing process. It can turn emissions controls on during the test, and off when the car is in normal use. Such systems are banned.

215.    Specifically, Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B), makes it a violation "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." See also 40 C.F.R. § 86.185412(a)(3)(ii).

216.    Similarly, Section 203(a)(3)(A) of the Act, 42 U.S.C. § 7522(a)(3)(A), prohibits any person from removing or rendering inoperative any device or element of design installed on

66

a motor vehicle in compliance with the regulations promulgated under Title II of the Act prior to its sale and delivery to the ultimate purchaser. This provision also prohibits any person from knowingly removing or rendering inoperative any device or element of design installed on a motor vehicle in compliance with the regulations promulgated under Title II of the Act after its sale and delivery to the ultimate purchaser. 42 U.S.C. § 7522(a)(3)(A).

***Regulatory Scrutiny of Emissions Compliance Increased
During the Class Period***

217.    During the Class Period, regulatory scrutiny of emissions compliance dramatically increased, especially as to NOx emissions. As discussed below, *infra* ¶¶ 477-485, Defendants repeatedly acknowledged that they were well aware that regulators were increasing their focus on emissions compliance.

218.    Notably, in September 2015, The EPA issued a public notice of violation of the Clean Air Act to Volkswagen, stating that model year 2009-2015 VW and Audi diesel cars included defeat devices - software that permitted the vehicles to cheat EPA tests and spew illegally high levels of NOx into the air. Volkswagen admitted to installing secret software in hundreds of thousands of U.S. diesel cars to cheat exhaust emissions tests and make them appear cleaner than they were on the road. On January 4, 2016, the DOJ filed a civil suit against VW seeking $46 billion for Clean Air Act violations, which led to VW spending approximately $35 billion in legal fines, vehicle buybacks, owner compensation and legal fees.

219.    Volkswagen's device was programmed to turn off the vehicles emissions controls after 23 minutes, just after the length of the EPA's emissions tests. This permitted VW's diesel vehicles to appear to be compliant with NOx emissions regulations during the course of the EPA's tests, when in fact they were not.

220.    The details of Volkswagen's emissions scheme were well publicized and, as discussed below, Marchionne repeatedly discussed  the Volkswagen scandal and technology used to achieve compliance with emissions regulations with investors and asserted that he had conducted an investigation and audit of Chrysler's vehicles and determined that they were fully compliant with emissions regulations (which include disclosure of all AECDs and forbid defeat devices).

***The Sale of Diesel Trucks, especially the Grand Cherokee
and Ram 1500 Were Extremely Important to Chrysler***

221.    During the Class Period, it was of critical importance that Chrysler be able to make its diesel vehicles appear compliant with emissions regulations.  In 2015 78 percent of Chrysler's U.S. sales volume came from light-duty trucks, delivering 90 percent of its profit.[23]

222.    In a July 30, 2015 earnings call, discussing the vehicles involved in the NHTSA mandated repurchase offer, Marchionne stated that many of them are "work trucks where the owners depend on the truck for their livelihood", highlighting the significance of the diesel truck to Chrysler: "these tend to be among our most loyal truck owners and also ***due to our unique diesel offering in this heavy-duty truck segment***." Marchionne continued, "We do have the highest mileage of anybody in the pickup truck segment in the U.S. today with diesel. ***I think it's something that certainly has attracted a large portion of the buying public***, not to mention issues about the actual performance of diesel in terms of torque and capability."

223.    In a January 27, 2016 earnings call, CFO Palmer stated "The Jeep Grand Cherokee had its strongest sales in the U.S. since 2005, and all other Jeep models reported all-time record sales in the United States. . . .The strong improvement in adjusted EBIT was

---

[23] http://www.autonews.com/article/20160120/COPY01/301209980/fiat-chrysler-runs-short-on-time-to-fix-emissions-problems-in-u.s.

primarily driven by volume growth, mainly from the Jeep and Ram brands, led by the Jeep Renegade and Cherokee."

224.    During the same call, Marchionne discussed Chrysler's shift to "de-focus the passenger car market", stating "we need to reutilize those plant infrastructures to try and deal with the development of both Jeep and the Ram brand. . . . the continuation of the ***Cherokee, which as you well know is essential to the development of the brand, especially in NAFTA*** – that these things happen with us ***without us losing any volume in the Jeep or the Ram brand. These are things which are fundamental*** . . ."

225.    In an April 26, 2016 earnings call, Palmer again emphasized the importance of these trucks: "Our shipments overall were up 3%, driven by Ram and Jeep offsetting lower shipments of Chrysler 200 and Dart and Journey and Fiat 500 . . . Mix was an important part of the improved margin, because of the increased Jeep and Ram volumes."

***Chrysler Used Defeat Devices Similar to Volkswagen***

226.    All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control ("EDC"). Robert Bosch GMBH ("Bosch") tested, manufactured, and sold the EDC system used by Volkswagen as well as Chrysler. This system is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17" or "ED17"). Upon its introduction, EDC Unit 17 was publicly-touted by Bosch as follows:[24]

> EDC17 … controls every parameter that is important for effective, low-emission combustion.
>
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise

---

[24] See Bosch Press Release, The brain of diesel injection: New Bosch EDC17 engine management system (Feb. 28, 2006), http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.

227.    Bosch worked with each vehicle manufacturer that utilized EDC Unit 17 to create a unique set of specifications and software code to manage the vehicles' engine operation. For example, the Dodge Ram 1500 emissions software is a "Bosch EDC17," as is the Grand Cherokee.

228.    With respect to Chrysler's vehicles, however, EDC Unit 17 was also enabled by Bosch and Chrysler to surreptitiously evade emissions regulations just as Bosch had done with Volkswagen. Bosch and Chrysler worked together to develop and implement a specific set of software algorithms for implementation in the vehicles, which enabled Chrysler to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (for applicable vehicles).[25] When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations. Bosch's EDC Unit 17 gave Chrysler (as it did with Volkswagen) the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels. Once the EDC Unit 17

---

[25]    See, e.g., Engine management, Bosch Auto Parts, http://de.bosch-automotive.com/en/parts_and_accessories/motor_and_sytems/diesel/engine_management_2/engine_control_unit_1 (last accessed Nov. 30, 2016).

detected that the emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently caused the vehicle to spew the full amount of illegal NOx emissions out on the road.[26]

229.    Specifically, Chrysler's diesel vehicles contained at least eight AECDs, none of which were ever disclosed, contravening emissions regulations.   These AECD shut-off or reduced key NOx controls – such as exhaust gas recirculation ("EGR"), selective catalyst reduction ("SCR") and diesel exhaust fluid ("DEF") when the vehicles were operating in real world conditions.

230.    EGR is a NOx emissions reduction technique.   It recirculates a portion of the engine's exhaust gas back to the engine cylinders.  This dilutes the $0_2$ in the incoming air stream, lowers the combustion chamber temperature, thereby reducing the amount of NOx the combustion generates.

231.    SCR is an emissions control technology system that injects DEF through a special catalyst into the exhaust stream. The DEF sets off a chemical reaction that converts NOx into nitrogen, water and tiny amounts of carbon dioxide (natural components of the air we breathe), which is then expelled through the tailpipe.

232.    Each of these controls reduced NOx emissions, and each of the undisclosed AECDs identified below targeted these controls ***always with the purpose of increasing emissions***.

- AECD 1 (***Full EGR Shut-Off at Highway Speed***)
- AECD 2 (Reduced EGR with Increasing Vehicle Speed)
- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)

---

[26] Russell   Hotten,   Volkswagen:   The   scandal   explained,   BBC   (Dec.   10,   2015), http://www.bbc.com/news/business-34324772.

- AECD 4 (DEF Dosing Disablement during SCR Adaptation)
- AECD 5 (EGR Reduction due to Modeled Engine Temperature)
- AECD 6 (SCR Catalyst Warm-Up Disablement)
- AECD 7 (Alternative SCR Dosing Modes)
- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

233.    These AECDs caused the vehicle to perform differently when the vehicle was being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g. FTP, US06) than in normal operation and use.  That is, the software detected the differences in conditions between a test procedure and normal road conditions.  If the vehicle was running during a test, the emissions controls would work.  If the vehicle detected that it was running in normal operation and use, the emissions controls would shut off. For example:

a) AECD 1 *completely shut-off the EGR system anytime the vehicle was travelling at highway speed*.

b) AECD 3, when combined with either AECD 7 or AECD 8, *disables the EGR system* without increasing the effectiveness of SCR system. Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system. *The AECD 3 uses a timer to shut off the EGR, which does not meet any exceptions to the regulatory definition of "defeat device."*

c) *AECD 5 & 6 together reduce the effectiveness of the NOx emissions control system*, using a timer to discontinue warming of the SCR after treatment system, which reduces its effectiveness.

d) *AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use*. The operation of AECD 1. AECD 2 and/or AECD 5 increase the frequency of occurrence of AECD 4.

e) *AECDs 7 & 8 work together to reduce NOx emissions* during variable-grade and high-load conditions.

234.    One of the effects of Chrysler's illegal software was that its vehicles would turn off their emissions control after 22 minutes, the time it takes for a standard emissions test. That is, the software was designed to allow vehicles to meet pollution standards under testing

conditions, but lets the NOx levels increase to illegal levels at high speeds or during extended driving periods.

235. These AECDs were illegal. The Clean Air Act expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; see also id. § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the Clean Air Act prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

236. Moreover, Chrysler never even disclosed (much less justified) these control devices in their COC applications, as required by EPA regulations, and Chrysler thereby violated the Clean Air Act each time it sold, offered for sale, introduced in commerce, or imported approximately 104,000 vehicles. Chrysler's active concealment of these control devices also further demonstrates Defendants' scienter. In each application for COC, Chrysler identified between 13 and 17 legal AECDs, yet each time failed to disclose any of the 8 illegal AECDs that increased NOx emission. Chrysler's failure to disclose the very same AECDs that permitted its vehicles to cheat the emissions tests is not a coincidence.

237. Because the COCs were fraudulently obtained, and because Chrysler's vehicles did not conform "in all material respects" to the specifications provided in the COC applications,

the vehicles were never covered by a valid COC, and thus were never legal for sale, nor were they EPA and/or CARB compliant, as represented. Chrysler hid these facts from the EPA, CARB and other regulators, its dealers, consumers, and investors, and it continued to sell and lease the vehicles to the driving public, despite their illegality.

238.    As detailed below, by August 2014, Defendants were aware that the Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles were emitting NOx emissions above the legal limits and the limits the Company had represented to the EPA and CARB.   Even if Defendants somehow were not previously aware of the very AECDs they installed on their vehicles, the investigation into the cause of the high NOx emissions would have alerted them to the very AECDs that they installed. *See infra* at ¶¶ 439-449.

239.    Indeed, in 2015 Defendants instituted a secret "field fix" of AECD#1 on the 2014 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles.   The field fix involved updating the vehicle's software, which could be done anytime the vehicle is brought into the dealership (for servicing, an oil change, or otherwise).   The field fix, like all field fixes, was approved by the VRC (which included Kunselman, Lee and (later) Dahl) and was reported to Marchionne. If Defendants did not know about the AECDs and their illegal impact on NOx emissions then they could not have made the decision to remove AECD#1 from their vehicles.   Moreover, the fact that Defendants conducted this "field fix" secretly without informing the public demonstrates that Defendants knew that the existence of the AECDs was important to investors and the public's knowledge of their existence would harm the Company. *See infra* at ¶¶ 415-421.

240.    As Marchionne would later admit in a January 12, 2017 interview, by no later than September 2015, the EPA had informed him that the EPA had identified undisclosed AECDs that it had determined were "defeat devices." Marchionne stated "***obviously, we knew***

74

*that they had concerns.  We have been in dialogue with them now since September 2015.  It could have been even earlier.*"

241.    It was indeed earlier. Confidential Witness #3 ("CW3") was a Program Manager of Advanced Powertrain at Chrysler (the division headed by Lee) from June 2013 through September 2015, located at the Auburn Hills, Michigan facility.  According to CW3, Chrysler was aware that its diesel model vehicles were exceeding the emissions levels that the Company had reported to the EPA by no later than summer 2015. It was CW3's understanding that the vehicles were emitting more NOx than what FCA was reporting to the EPA.  "I knew they had an issue with the software and were working on trying to figure it out," CW3 said. "They knew there was an issue." The issue was that some of the vehicles were exceeding the emissions levels that had been reported to the EPA. "Whatever they were reporting on the label, whatever they told the government, they found out they weren't meeting those," CW3 said.  "It was big issue," CW3 said of the emissions discrepancy. "It went all the way up to Bob Lee." CW3 understood that Lee formed the team and was pulling engineers and tech specialists from several different departments to work on it. From conversations with co-workers, CW3 said many employees "knew something… was going on." "They were pulling guys from other projects," CW3 said. "That (issue) was the number one priority all the sudden." "The details were kind of hush hush," CW3 said. "It was a secretive mission if you will. It wasn't public knowledge." CW3 said no one at FCA, especially not the leadership, was talking publically about the issue and the company's efforts to deal with it.

242.    Following the EPA informing Defendants that it believed Chrysler's Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles contained AECDs that were defeat devices, Chrysler

conducted an audit of its software. Marchionne, Kunselman, Lee, and Dahl (among many others) were all involved in discussions of the issue.

243.     On October 27-28, 2015, at the meeting of the Board of Directors of Chrysler (at which Marchionne was in attendance), Kunselman and Lee discussed, according to the minutes of the meeting, "the current regulatory matter involving Volkswagen Group and its use of an emissions testing 'defeat device' in certain of its diesel engines.  They discussed the Company's actions in light of the VW matter including: immediate review of compliance requirements with staff and immediate implementation of internal software and calibration audits."

244.     Between November 25, 2015 and January 13, 2016, Dahl (who had taken over Kunselman's position and reported to Marchionne), communicated with the EPA several times (in person, via email and over phone) concerning the 8 AECDs that the EPA believed were defeat devices. On January 7, 2016, the EPA emailed members of Dahl's team demanding to have another call with Dahl that same day because "I am very concerned about the unacceptably slow pace of the efforts to understand the high NOx emissions we have observed", reiterating that "at least one of the AECDs in question appears to me violate EPA's defeat device regulations." Dahl spoke with the EPA on January 8, 2016 and met in person with the EPA and CARB on January 13, 2016 to discuss these issues.  *See infra* at ¶¶ 427-430.

245.     On January 11, 2016, Dahl emailed Christopher Grundler (Director of the EPA Office of Transportation and Air Quality) stating that "[a]fter identifying these concerns at the November 25, 2015 meeting with my staff, FCA has been engaged in extensive efforts to analyze the issues…We truly appreciate the significance of your concern that NOx emissions during certain operating modes has been identified."

246.    On January 13, 2016, because Dahl was meeting with the EPA and CARB about Chrysler's defeat devices, Lee reported alone to the Board of Directors of Chrysler (including Marchionne) on the issues of "Emissions and Fuel Efficiency Regulations and Compliance Plans."  He discussed "the current regulatory matter involving Volkswagen Group and its use of an emissions testing 'defeat device' in certain of its diesel engines. He discussed the Company's actions in light of the VW matter including: immediate review of compliance requirements with staff and immediate implementation of internal software and calibration audits.   He then reviewed the audit findings to date in NAFTA and the remaining work to be completed."

247.    Despite (i) Defendants intimate knowledge of the AECDs, (ii) the high NOx emissions in their Grand Cherokee and Ram 1500 3.0 diesel vehicles, (iii) conclusions by the EPA and CARB that the vehicles contained undisclosed defeat devices, and (iv) a purported "audit" of all the software on their diesel vehicles, Marchionne continued to assert that Chrysler's vehicles were in full compliance with emissions regulations (which required disclosure of all AECDs and prohibited defeat devices).

248.    Marchionne finally admitted that all previous representations of compliance were false during a July 27, 2017 Q2 2017 earnings call.  Responding to a question about voluntary updates to Chrysler's software in its diesel vehicles, Marchionne stated "We are looking at this, if we can do it, and provide an improvement in air quality, both on CO2 and NOx, purely as a result of calibration, and we'll do this*. **The important thing is that, within the scheme of things that existed at the time in which we launched these vehicles, we weren't compliant**.  If there is a way to improve that position, we will more than gladly do it.  So we're working at this."

**G.**    **Materially False and Misleading Statements Issued During the Class Period**

249.    On or about May 3, 2013, Mazure, on behalf of Chrysler, sent to the EPA and CARB Chrysler's application for COC for the 2014 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles, which was publicly posted to the EPA website thereafter. The application included separate cover letters to the EPA and CARB signed by Mazure, each stating that the vehicles comply with all emissions regulations/standards (including disclosure of AECDs and meeting NOx emission standards): "Chrysler agrees that the exhaust emission standards listed below and in the application for certification apply to both certification and in-use vehicles according to the provisions of 40 CFR, Parts 86 and 88, as applicable." The application purported to disclose in Section 11 the "List of AECD Used in Test Group", identifying 13 AECDs.

250.    The foregoing representations in ¶ 249 were materially false and/or misleading because, *inter alia* Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

251.    On or about September 25, 2013, Mazure, on behalf of Chrysler, sent to the EPA and CARB Chrysler's updated application for COC for the 2014 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles, which was publicly posted to the EPA website thereafter. The updated application included separate cover letters to the EPA and CARB signed by Mazure, each stating that the vehicles comply with all emissions regulations/standards (including disclosure of AECDs and meeting NOx emission standards): "Chrysler agrees that the exhaust emission standards listed below and in the application for certification apply to both certification and in-use vehicles according to the provisions of 40 CFR, Parts 86 and 88, as applicable." The updated

78

application purported to disclose in Section 11 the "List of AECD Used in Test Group", identifying 13 AECDs.

252.     The foregoing representations in ¶251 were materially false and/or misleading because, *inter alia* Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

253.     On or about September 27, 2013, Mazure, on behalf of Chrysler, sent to the EPA and CARB Chrysler's second updated application for COC for the 2014 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles, which was publicly posted to the EPA website thereafter.  The updated application included separate cover letters to the EPA and CARB signed by Mazure, each stating that the vehicles comply with all emissions regulations/standards (including disclosure of AECDs and meeting NOx emission standards):  "Chrysler agrees that the exhaust emission standards listed below and in the application for certification apply to both certification and in-use vehicles according to the provisions of 40 CFR, Parts 86 and 88, as applicable."  The updated application purported to disclose in Section 11 the "List of AECD Used in Test Group", identifying 13 AECDs.

254.     The foregoing representations in ¶ 253 were materially false and/or misleading because, *inter alia* Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

255.     On August 1, 2014, Fiat shareholders approved the merger of Fiat into Chrysler. On October 12, 2014, the merger was finalized.  The Class Period begins on October 13, 2014, the day on which the newly merged company's common stock started trading on the NYSE under the ticker symbol "FCAU."

256.    On August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, that reported directly to the Company's CEO defendant Marchionne, claiming "[t]his action will help intensify the Company's continuing commitment to vehicle safety and regulatory compliance."

257.    The foregoing representation in ¶ 256 was materially false and/or misleading because it provided investors with false comfort that Chrysler would be able to adequately respond to and address regulatory issues from NHTSA's intensified enforcement efforts, and failed to disclose that Chrysler was in blatant violation of NHTSA's regulations, that the Company consistently failed to timely report to NHTSA consumers vehicle defects, necessary recall campaigns as well as deaths and serious injuries in violation of federal regulations.

258.    On or about September 12, 2014, Mazure, on behalf of Chrysler, sent to the EPA and CARB Chrysler's application for COC for the 2015 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles, which was publicly posted to the EPA website thereafter.  The application included separate cover letters to the EPA and CARB signed by Mazure, each stating that the vehicles comply with all emissions regulations/standards (including disclosure of AECDs and meeting NOx emission standards):  "Chrysler agrees that the exhaust emission standards listed below and in the application for certification apply to both certification and in-use vehicles according to the provisions of 40 CFR, Parts 86 and 88, as applicable."   The application purported to disclose in Section 11 the "List of AECD Used in Test Group", identifying 14 AECDs.

259.    The foregoing representations in ¶258 were materially false and/or misleading because, *inter alia* Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

80

260.    On October 29, 2014, Chrysler issued a press release and filed a Form 6-K with the SEC which was signed by defendant Palmer, announcing its financial and operating results for the quarter and nine months ended September 30, 2014 (the "October 29, 2014 6K").  For the quarter, cost of sales was €20.356 million, EBIT was €926 million, and net profit was €188 million, compared to cost of sales of €17.747 million, EBIT of €862 million, and a net profit of €189 million for the same period in the prior year.  For the nine months, cost of sales was €59.694 million, EBIT was €2.157 million, and net profit was €212 million, or €0.132 per share, compared to a cost of sales of €53.706 million, EBIT of €2.542 million and a net profit of €655 million, or €0.036 per share for the same period in the prior year.

261.    The foregoing representations in ¶ 260 were materially false and/or misleading because the estimated future warranty and recall campaign costs for vehicles sold were materially understated by approximately €761 million as a result of the Company's failure to timely and adequately conduct recalls in violation of the accounting and reporting requirements in IAS 37.  Chrysler's failure to properly account for its costs and liabilities related to vehicle recalls caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) in each period than it would have been had Chrysler not been underreporting costs related to vehicle recalls.

262.    On November 5, 2014, Chrysler filed a Form 6-K with the SEC which was signed by defendant Palmer, appending as an exhibit an Interim Report reiterating the Company's previously announced financial and operating results for the quarter and nine months ended September 30, 2015 (the "November 6, 2014 6-K").  The Interim Report filed on November 6, 2014 included unaudited financial statements prepared in conformance with IFRS.  The Interim Report stated that for the nine months, cost of sales was €59.694 million, EBIT was €2.157

million, and net profit was €212 million, or €0.132 per share, compared to a cost of sales of €53.706 million, EBIT of €2.542 million and a net profit of €655 million, or €0.036 per share for the same period in the prior year.   In addition to reiterating the previously announced financial results, the Form 6-K stated "Cost of sales also includes warranty and product-related costs, estimated at the time of sale to dealer networks or to the end customer."

263.   The foregoing representations in ¶ 262 were materially false and/or misleading because the estimated future warranty and recall campaign costs for vehicles sold were materially understated by approximately €761 million and Chrysler was in possession of substantial information that would have caused higher reported costs and liabilities for warranty claims and recalls, but Chrysler did not timely recall the vehicles or properly account for the costs of their repairs.

264.   Chrysler's financial statements and notes thereto included a chart on page 58 reporting the balance for warranty and recall provision as €3.7 billon and €4.5 billion at fiscal year-end 2013 and September 30, 2014 respectively.   The provisions for 2013 and 2014 were false and misleading because Chrysler had systematically under-accrued its provision for the costs of its product recalls by approximately €761 million from at least 2013 through the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

265.   On November 13, 2014, Chrysler filed a Form F-1/A with the SEC which was signed by defendants Palmer and Marchionne.   The F-1/A included unaudited financial statements for the 9 months ended September 30, 2014 and audited financial statements for the years ended December 31, 2013 and 2012, prepared in conformance with IFRS.

266.   The F-1/A asserted that for the nine months ended September 30, 2014, cost of sales was €59.694 million, EBIT was €2.157 million, and net profit was €212 million, or €0.132

per share, compared to a cost of sales of €53.706 million, EBIT of €2.542 million and a net profit of €655 million, or €0.036 per share for the same period in the prior year.  For the year ended December 31, 2013, cost of sales was reported as €74,326 million, EBIT was €3,002 million, and net profit was €1,951 million, or €0.736 per share.

267.   The foregoing representations in ¶ 266 were materially false and/or misleading because Chrysler failed to properly account for its costs and liabilities related to vehicle recalls which caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) in each period than it would have been had Chrysler not been underreporting costs related to vehicle recalls.

268.   The footnotes to Chrysler's financial statements included a chart reporting the balance for warranty and recall provision as €4,496 million and €3,656 million at September 30, 2014 and fiscal year-end 2013 respectively. The provisions were false and misleading because Chrysler had systematically under-accrued its provision for the costs of its product recalls by approximately €761 million from at least 2013 through the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

269.   The footnotes to Chrysler's financial statements included a chart reporting warranty costs of €2,011 million, for the fiscal year-ended 2013.  The warranty costs were false and misleading because Chrysler had systematically under-reported the costs of its product recalls by approximately €761 million in violation of the accounting and reporting requirements in IAS 37.

270.   In addition, the F-1/A stated "The Group establishes reserves for product warranties at the time the sale is recognized. . . . The reserve for product warranties includes the expected costs of warranty obligations imposed by law or contract, as well as the expected costs

83

for policy coverage, recall actions and buyback commitments. The estimated future costs of these actions are principally based on assumptions regarding the lifetime warranty costs of each vehicle line and each model year of that vehicle line, as well as historical claims experience for the Group's vehicles. . . . The Group periodically initiates voluntary service and recall actions to address various customer satisfaction, safety and emissions issues related to vehicles sold. Included in the reserve is the estimated cost of these service and recall actions. The estimated future costs of these actions are based primarily on historical claims experience for the Group's vehicles."

271.    The foregoing representations in ¶ 270 were materially false and/or misleading for the reasons stated in ¶¶ 267 and 269, and because Chrysler knew at the time that its costs and liabilities related to vehicle warranties and recalls would be substantially higher due to its failure to conduct timely recalls, notify customers, and remedy safety defects.

272.    Under the heading "Regulation" of the F-1/A, Chrysler stated "We face a regulatory environment in markets throughout the world where vehicle emission and fuel economy regulations are increasingly becoming more stringent which will affect our vehicle sales and profitability. ***We must comply with these regulations in order to continue operations in those markets***, including a number of markets where we derive substantial revenue, such as the U.S., Brazil and Europe."

273.    Regarding the EPA and CARB, Chrysler stated, in part, "Under the U.S. Clean Air Act, the Environmental Protection Agency, or EPA, and the California Air Resources Board, or CARB (by EPA waiver), require emission compliance certification before a vehicle can be sold in the U.S. or in California (and many other states that have adopted the California emissions requirements). Both agencies impose limits on tailpipe and evaporative emissions of

certain smog-forming pollutants from new motor vehicles and engines. . . . In addition, EPA and CARB regulations require that a vehicle's emissions performance be monitored with OBD systems. ***We have implemented hardware and software systems in all our vehicles to comply with the OBD requirements***."

274.     Regarding European regulations, Chrysler stated "In Europe, emissions are regulated by two different entities: the European Commission, or EC, and the United Nations Economic Commission for Europe, or UNECE. . . . In 2011, updated standards, Euro 5, for exhaust emission by cars and light-duty trucks, became effective. Impending European emission standards focus particularly on further reducing emissions from diesel vehicles. The new Euro 6 emission levels . . . will be effective for new vehicles on September 1, 2014 . . . ."

275.     The November 13, 2014 Form F-1A further represented "***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, ***emissions*** and noise). ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in compliance.***"[27]

276.     Specifically, the F-1/A stated "Our flagship diesel engine is the V-6 3.0 liter Eco-Diesel. Variants of this engine currently power Maserati vehicles, the Jeep Grand Cherokee and the Ram 1500. The North American version of our Eco-Diesel Engine was named one of WardsAuto "10 Best Engines" for 2014. . . . In combination with last generation exhaust gases after treatment systems, ***our diesel engine families comply with Euro 6 emission regulations, which are mandatory as of September 2014***."

---

[27] November 13, 2014 Form F-1/A, at 185.

277.    The foregoing representations in ¶¶ 272-276 were materially false and/or misleading because, *inter alia* Chrysler:  (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls (viii) failed to timely or properly provide remedies for defects; (ix) failed to report deaths and serious injuries to NHTSA as required; and (x) was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

278.    On November 20, 2014, defendant Kunselman provided a statement to the Senate Committee on Commerce, Science and Transportation in Washington D.C.  Emphasizing that "I report directly to our company CEO", Kunselman stated, "[r]ecalls have been, are and will continue to be an essential mechanism to safeguard the public. Chrysler Group prides itself on having the highest recall completion rate of all major U.S.-market auto makers. NHTSA regards our customer-notification protocols as 'industry-best.'"  He went on to state, "Further, our average per-campaign vehicle volume is among the lowest in the industry – well below the industry average. This is testament to our transparency and demonstrates clearly the robustness of our fleet-monitoring and our rapid response when issues arise."

279.    The foregoing representations in ¶ 278 were materially false and/or misleading because Chrysler did not treat recalls as an important mechanism to safeguard the public and it did not rapidly respond when "issues arise."  Instead, Chrysler:  (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or

recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; (viii) failed to timely or properly provide remedies for defects; and (ix) failed to report deaths and serious injuries to NHTSA as required.  Also, Friedman wrote letters of October 29 and November 19, 2014 to Kunselman and his direct report severely criticizing Chrysler's regulatory compliance on the very issues Kunselman was addressing.

280.    On November 26, 2014, Chrysler filed a Form F-1/A with the SEC which was signed by defendants Palmer and Marchionne reiterating the same false and misleading unaudited interim and audited financial information and statements identified in ¶¶ 266, 268, and 269, which were false and misleading and violated IFRS for the reasons stated in ¶¶ 267, 268, and 269.

281.    The November 26, 2014 F-1/A repeated the same statements identified in ¶¶ 269-276, including the representation "***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, ***emissions*** and noise).  ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in compliance.***"  Chrysler also again represented "***our diesel engine families comply with Euro 6 emission regulations, which are mandatory as of September***

*2014*" and "*We have implemented hardware and software systems in all our vehicles to comply with the OBD requirements*."

282.    The foregoing representations in ¶ 281 were materially false and/or misleading because for the reasons stated in ¶ 277, and because defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "*consistently*" at the "*rear of the pack*" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply "*unacceptable..exacerbat[ing] the risk to motorists' safety.*"

283.    On December 4, 2014, Chrysler filed a Form F-1/A with the SEC which was signed by defendants Palmer and Marchionne reiterating the same false and misleading unaudited and audited  financial information and statements identified in ¶¶ 266, 268, and 269, which were false and misleading and violated IFRS for the reasons stated in ¶¶ 267, 268, and 269.

284.    On December 12, 2014, Chrysler issued a press release and filed with the SEC (i) a prospectus on Form 424B4 offering 87 million shares of the Company's common stock for total gross proceeds of approximately $4 billion[28]; and (ii) a prospectus on Form 424B4 offering $2.5 billion aggregate amount of the Company's mandatory convertible securities (collectively, the "Prospectuses").  Each of the Prospectuses reiterated the same unaudited interim and audited financial information and statements identified in ¶¶ 266, 268, and 269.

285.    The foregoing representations in ¶ 284 were materially false and/or misleading for the reasons stated in ¶¶ 267, 268, and 269.

---

[28]   The two prospectuses Chrysler filed on December 12, 2014 were for (i) the sale of $957 million of common stock with a $133 million overallotment option, and (ii) the sale of $2.5 billion of convertible notes with a $375 million overallotment option.

286.     On or about December 17, 2014, Mazure, on behalf of Chrysler, sent to the EPA and CARB Chrysler's updated application for COC for the 2015 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles, which was publicly posted to the EPA website thereafter.  The updated application included separate cover letters to the EPA and CARB signed by Mazure, each stating that the vehicles comply with all emissions regulations/standards (including disclosure of AECDs and meeting NOx emission standards):    "Chrysler agrees that the exhaust emission standards listed below and in the application for certification apply to both certification and in-use vehicles according to the provisions of 40 CFR, Parts 86 and 88, as applicable."   The application purported to disclose in Section 11 the "List of AECD Used in Test Group", identifying 17 AECDs.

287.     The foregoing representations in ¶286 were materially false and/or misleading because, *inter alia* Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

288.     On January 28, 2015, Chrysler issued a press release and filed a Form 6-K with the SEC which was signed by defendant Palmer, announcing its financial and operating results for the quarter and the fiscal year ended December 31, 2014 (the "January 28, 2015 6-K").  For the fourth quarter, EBIT was €1.07 billion, and net profit was €420 million, or €0.329 per share, compared to EBIT of €460 million, and a net profit of €1.3 billion, or €0.707 per share for the same period in the previous year.  For the year, EBIT was €3.22 billion, and net profit was €0.6 billion, or €0.465 per share, compared to EBIT of €3 billion, and a net profit of €1.95 billion, or €0.744 per share for 2013.

289.     The foregoing representations in ¶ 288 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle

warrantees and recalls which caused its EBIT, and net profit to be higher (and its costs of sales to be lower) than it would have been by approximately €761 million had Chrysler not been underreporting costs related to vehicle recalls.

290.    During a January 28, 2015 conference call, following the release of the quarter and fiscal year ended December 31, 2014 results, in response to an analyst's question "did you reflect the cost of the Takata airbag recall at year end or is this coming in 2015? And can you give us some sense of this industrial cost going into 2015, are there likely to be less of a headwind versus 2014 . . .", Defendant Palmer stated flatly "Yes."  Palmer later elaborated: "Yes. We have booked the Takata item in Q4. In 2015, as I said before, we expect the industrial cost headwind to be significantly less than it was in 2014 because of the fact that all these launches with extra content have had a 12-month cycle now. So, year-over-year, they're in the numbers."

291.    The foregoing representations in ¶ 290 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle warrantees and recalls which caused its EBIT, and net profit to be higher (and its costs of sales to be lower) than it would have been by approximately €761 million had Chrysler not been underreporting costs related to vehicle recalls.  The representations were also false and/or misleading for the reasons stated in ¶ 277 (i)-(ix) and because defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "***consistently***" at the "***rear of the pack***" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply ***"unacceptable..exacerbat[ing] the risk to motorists' safety."***

292.    Defendant Marchionne assured investors that the recalls that had been occurring were an industry-wide phenomenon resulting from a change in regulatory enforcement, rather than a Chrysler-specific deficiency, and affirmatively represented that the Company's internal controls around recalls were industry leading best practices, which would result in a reduction in costs associated with recalls:

<Q - José Asumendi>: And the final one is to Mr. Marchionne on the quality front. Can you talk a bit about the changes you've done on the management front, on the quality front, and how you are, you have the right structure now to deliver improved at least – to avoid what we had last year in 2015? Thank you.

<A - Sergio Marchionne>: That's right. Before I answer the question, what do we have last year that I missed?

<Q - José Asumendi>: You had a few recalls on...

<A - Sergio Marchionne>: I see, yeah, yeah. Okay.

<Q - José Asumendi>: Sure.

<A - Sergio Marchionne>: Well, look, I think I've been public on this recall issue. The recall matter is something which is a reflection of a changing paradigm for the auto sector. *I think we have made changes while adjusting our internal structures to deal with this new state of affairs. It is my expectation that this cost will come down as we progress through reconstitution of the management process of what's going on here. We had what I consider to be a pretty robust system in place, we have strengthened it further, we have curved it out from the rest of operations. We have set a very, very senior technical person to head up these activities. So I think we're making progress in making sure that at least not only are we dealing with what's on our plate but we're actually becoming much more proactive and identifying potential exposures going forward. So as we do this, I think these numbers will stabilize and we'll see a steady state*.

293.    The foregoing representations in ¶ 292 were materially false and/or misleading because Chrysler had anything but a "robust" system in place for the reasons stated in ¶ 277 (i)-(ix) and because defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "***consistently***" at the "***rear of the pack***" when it came to regulatory compliance and that Chrysler's delay in notifying

consumers of safety defects was simply ***"unacceptable..exacerbat[ing] the risk to motorists' safety."***

294.    On March 5, 2015, Chrysler issued a press release and filed an Annual Report on Form 20-F with the SEC which was signed by defendant Palmer, which included audited financial statements that reiterated the Company's previously announced audited financial and operating results for the fiscal year ended December 31, 2014 (the "2014 20-F").  In addition to the same 2014 and 2013 year-end financial information for costs of sales, EBIT and Net profit, announced in the Company's January 28, 2014 6-K, the 2014 20-F reported a net profit of €0.460 per diluted share, compared to a net profit of €0.736 per diluted share for 2013.  The 2014 20-F appended as exhibits signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by defendants Marchionne and Palmer, stating that the audited financial information contained in the 2014 20-F was accurate, they had evaluated the effectiveness of the Company's controls and procedures, and disclosed all significant deficiencies and material weaknesses in the design or operation of the internal controls as well as any material changes to the Company's internal control over financial reporting.

295.    Chrysler's audited financial statements for years 2014 and 2013 were materially false and misleading because Chrysler failed to properly account for its costs and liabilities related to vehicle recalls, which caused its EBIT, and net profit to be approximately higher €761 million (and costs of sales €761 million lower)  in each period than it would have been had Chrysler not been underreporting costs related to vehicle warranties and recalls.

296.    The foregoing representations in ¶ 294 were also materially false and/or misleading because Chrysler's internal control over financial reporting was not effective because of the misstatements to the Company's financial results.

297.    The footnotes to Chrysler's audited financial statements included a chart on page F-84 reporting the balance for warranty and recall provision as €3.7 billon and €4.8 billion at fiscal year-end 2013 and 2014 respectively.  The provisions for 2013 and 2014 were false and misleading because Chrysler had systematically under-accrued its provision for the costs of its product recalls by approximately €761 million from at least 2013 through the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

298.    The footnotes to Chrysler's financial statements included a chart on page F-85 reporting warranty costs of €1.8 billon and €2.0 billion, and €2.9 billion at fiscal year-end 2012, 2013 and 2014 respectively.  The warranty costs for 2013 and 2014 were false and misleading because Chrysler had systematically under-reported the costs of its product recalls by approximately €761 million since at least fiscal 2013 in violation of the accounting and reporting requirements in IAS 37.

299.    The 2014 20-F also stated, "[t]he accrual for product warranties includes the expected costs of warranty obligations imposed by law or contract, as well as the expected costs for policy coverage, recall actions and buyback commitments. The estimated future costs of these actions are principally based on assumptions regarding the lifetime warranty costs of each vehicle line and each model year of that vehicle line, as well as historical claims experience for the Group's vehicles. …The Group periodically initiates voluntary service and recall actions to address various customer satisfaction, safety and emissions issues related to vehicles sold. Included in the accrual is the estimated cost of these service and recall action."

300.    The foregoing representations in ¶ 299 were materially false and/or misleading in because Chrysler knew or should have known that the costs of liabilities related to vehicle

warranties and recalls would increase as a direct result of Chrysler's failure to conduct timely

recalls, notify customers and remedy safety defects.

301.    Under the heading "Vehicle Safety" in the 2014 20-F, Chrysler stated:

Under U.S. federal law, all vehicles sold in the U.S. must comply with Federal
Motor Vehicle Safety Standards, or FMVSS promulgated by NHTSA, and must
be certified by their manufacturer as being in compliance with all such standards.
In addition*, if a vehicle contains a defect that is related to motor vehicle safety
or does not comply with an applicable FMVSS, the manufacturer must notify
vehicle owners and provide a remedy.* Moreover, the Transportation Recall
Enhancement, Accountability, and Documentation, or TREAD Act, authorized
*NHTSA to establish Early Warning Reporting, or EWR*, requirements for
manufacturers to report all claims which involve one or more fatalities or injuries;
all incidents of which the manufacturer receives actual notice which involve
fatalities or injuries which are alleged or proven to have been caused by a possible
defect in such manufacturer's motor vehicle or motor vehicle equipment in the
U.S.; and all claims involving one or more fatality or in a foreign country when
the possible defect is in a motor vehicle or motor vehicle equipment that is
identical or substantially similar to a motor vehicle or motor vehicle equipment
offered for sale in the U.S., as well as aggregate data on property damage claims
from alleged defects in a motor vehicle or in motor vehicle equipment; warranty
claims (including good will); consumer complaints and field reports about alleged
or possible defects. The rules also require reporting of customer satisfaction
campaigns, consumer advisories, recalls, or other activity involving the repair or
replacement of motor vehicles or items of motor vehicle equipment, even if not
safety related.

*The compliance of TREAD Act EWR submissions has received heightened
scrutiny recently, and resulted in two manufacturers agreeing to pay substantial
civil penalties for deficient TREAD Act EWR submissions*.

302.    The 2014 20-F repeated the same statements identified in ¶¶ 272-276, and

included the representation: "*Our vehicles and the engines that power them must also comply

with extensive regional, national and local laws and regulations and industry self-regulations

(including those that regulate vehicle safety*, end-of-life vehicles, *emissions* and noise).  *We are

substantially in compliance with the relevant global regulatory requirements affecting our

facilities and products. We constantly monitor such requirements and adjust our operations to

remain in compliance.*"  Chrysler again represented "*our diesel engine families comply with*

*Euro 6 emission regulations, which are mandatory as of September 2014*", and   "*We have*

*implemented hardware and software systems in all our vehicles to comply with the OBD*

*requirements*."   Furthermore, under the heading "Managing Vehicle Safety", the 2014 20-F

stated, in part:

> At Chrysler, we take transportation safety personally. ***Customers trust the quality
> and safety of our products, and we constantly do our utmost to warrant this
> confidence.*** . . .

> In addition, the safety organizations in Chrysler's four regions . . . constantly
> share information and best practices in order to harmonize design guidelines and
> processes. ***Safety design guidelines are implemented from the concept phase of
> every new model through the release of detailed design specifications to all the
> providers of sub-systems for the vehicle.***

> Our overall approach recognizes that safer highways, improved traffic
> management and driver education all have a role to play in enhancing safety on
> the road. ***That is why we strive to connect our safety efforts to a collective goal
> we share with*** our employees, ***drivers, dealers,*** suppliers, law enforcement,
> ***regulators*** and researchers.

(emphases added).

303.   The foregoing representations in ¶¶ 301-302 were materially false and/or

misleading because Chrysler:  Chrysler:  (i) routinely ignored its obligations to timely inform

owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline;

(iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv)

improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about

critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended

573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least

two recalls; (viii) failed to timely or properly provide remedies for defects; (ix) failed to report

deaths and serious injuries to NHTSA as required; and (x) was illegally using undisclosed and

hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

Also defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "*consistently*" at the "*rear of the pack*" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply ***"unacceptable..exacerbat[ing] the risk to motorists' safety."***

304.    On March 9, 2015, Chrysler filed a Form 6-K with the SEC which was signed by defendant Palmer, appending as an exhibit the Company's Annual Report, audited financial statements reiterating the Company's previously announced audited financial and operating results for fiscal year ending December 31, 2014, which were false and misleading for the reasons set forth above.  In addition to the information announced in the Company's March 5, 2015 Form 20-F, the March 9, 2015 6-K stated "In 2014 *we made an important organizational move to amplify our commitment to safety*, as FCA US established the new office of Vehicle Safety and Regulatory Compliance. The reorganization created a stand-alone organization led by a senior vice president who reports directly to the CEO of FCA US, *ensuring a high level of information flow and accountability*. This new structure establishes a focal point for working with consumers, regulatory agencies and other partners *to enhance safety in real-world conditions.*"

305.    The foregoing representations in ¶ 304 were materially false and/or misleading because Chrysler:  (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; (viii) failed to

timely or properly provide remedies for defects; and (ix) failed to report deaths and serious injuries to NHTSA as required.  Also defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "***consistently***" at the "***rear of the pack***" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply ***"unacceptable..exacerbat[ing] the risk to motorists' safety."***

306.    On April 29, 2015, Chrysler issued a press release and filed a Form 6-K with the SEC which was signed by defendant Palmer, announcing its financial and operating results for the first quarter of 2015 (the "April 29, 2015 6-K").  Costs of sales was $22.9 billion, EBIT was €792 million and net profit was €92 million, or €0.052 per diluted share, compared to Costs of sales of $22.1 billion, EBIT of €270 million and a net loss of €173 million, or €0.155 per diluted share, for the same period in the prior year.

307.    The foregoing representations in ¶ 306 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle recalls which caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) than it would have been had Chrysler not been underreporting costs related to vehicle recalls.

308.    On May 7, 2015, Chrysler filed a Form 6-K with the SEC which was signed by defendant Palmer, appending as an exhibit an unaudited Interim Report with financial statements prepared in accordance with IFRS, reiterating the Company's previously announced financial and operating results for the quarter ended March 31, 2015 (the "May 7, 2015 6-K")

309.    The May 7, 2015 6-K reported that Costs of sales was $22.9 billion, EBIT was €792 million and net profit was €92 million, or €0.052 per diluted share, compared to Costs of

sales of $22.1 billion, EBIT of €270 million and a net loss of €173 million, or €0.155 per diluted share, for the same period in the prior year.

310.   The foregoing representations in ¶ 309 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle recalls which caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) than it would have been had Chrysler not been underreporting costs related to vehicle warranties and recalls.

311.   The footnotes to Chrysler's unaudited financial statements included a chart on page 44 reporting the balance for warranty (and recall) provision as €5.6 billon and €4.8 billion at quarter end March 31, 2015 and fiscal year-end December 31, 2014 respectively.   These quarter-end and year-end provisions for were false and misleading because Chrysler had systematically under-accrued its provision for the costs of its product recalls by approximately €761 million from at least 2013 through the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

312.   On May 19, 2015, Chrysler issued a press release, stating "FCA US LLC takes seriously its commitment to provide safe vehicles that meet customer expectations for quality and workmanship. The Company is fully aligned with NHTSA's desire to promote efficient execution of vehicle recalls and enhance completion rates. . . . FCA US will continue to cooperate with NHTSA in its efforts to identify ways in which it can more quickly identify issues, determine fixes and execute campaigns."

313.   The foregoing representations in ¶ 312 were materially false and/or misleading Chrysler was anything but aligned with NHTSA and consistently flouted its directives.  Instead, Chrysler:  (i) routinely ignored its obligations to timely inform owners of serious safety defects;

(ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; (viii) failed to timely or properly provide remedies for defects; and (ix) failed to report deaths and serious injuries to NHTSA as required.  Also defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "*consistently*" at the "***rear of the pack***" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply **"*unacceptable..exacerbat[ing] the risk to motorists' safety.*"**

314.   On May 19, 2015, Chrysler also filed a prospectus on Form F-4 with the SEC, signed by defendants Palmer and Marchionne, which repeated its previously reported financial information, repeated the same statements identified in ¶¶ 272-276, and included the representation: "***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, ***emissions*** and noise).  ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations to remain in compliance.***"  Chrysler also again represented "***our diesel engine families comply with Euro 6 emission regulations, which are mandatory as of September 2014***", and "***We have implemented hardware and software systems in all our vehicles to comply with the OBD requirements***."

315.    The foregoing representations in ¶ 314 were materially false and/or misleading because Chrysler: (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; (viii) failed to timely or properly provide remedies for defects; (ix) failed to report deaths and serious injuries to NHTSA as required; and (x) was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.   Also defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "***consistently***" at the "***rear of the pack***" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply ***"unacceptable..exacerbat[ing] the risk to motorists' safety."***

316.    On June 17, 2015, Chrysler issued a press release and filed with the SEC a prospectus on Form 424B4 offering to exchange up to $3 million of new senior notes for previously issued senior notes.   The prospectuses reiterated the Company's previously announced financial and operating results, repeated the same statements identified in ¶¶ 272-276, and included the representation: "***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate vehicle safety***, end-of-life vehicles, ***emissions*** and noise). ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our***

*operations to remain in compliance.*"   Chrysler also again represented "*our diesel engine families comply with Euro 6 emission regulations, which are mandatory as of September 2014*", and "*We have implemented hardware and software systems in all our vehicles to comply with the OBD requirements*."

317.    The foregoing representations in ¶ 316 were materially false and/or misleading because Chrysler:  (i) routinely ignored its obligations to timely inform owners of serious safety defects; (ii) routinely notified owners or recalls past the legal deadline; (iii) routinely lied to NHTSA about the timeliness of informing owners about recalls; (iv) improperly waited months before recalling defective vehicles; (v) failed to notify NHTSA about critical changes to owner and dealer recall notification schedules; (vi) failed to submit amended 573 reports to NHTSA; (vii) failed to provide NHTSA with required remedy plans for at least two recalls; (viii) failed to timely or properly provide remedies for defects; (ix) failed to report deaths and serious injuries to NHTSA as required; and (x) was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.  Also defendant Marchionne had received a letters from NHTSA Administrator Friedman on November 19 and 25, 2014 stating, in part, that Chrysler was "*consistently*" at the "*rear of the pack*" when it came to regulatory compliance and that Chrysler's delay in notifying consumers of safety defects was simply *"unacceptable..exacerbat[ing] the risk to motorists' safety."*

318.    On or about June 25, 2015, Mazure, on behalf of Chrysler, sent to the EPA and CARB Chrysler's application for COC for the 2016 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles, which was publicly posted to the EPA website thereafter.  The application included separate cover letters to the EPA and CARB signed by Mazure, each stating that the vehicles comply with all emissions regulations/standards (including disclosure of AECDs and

meeting NOx emission standards):  "Chrysler agrees that the exhaust emission standards listed below and in the application for certification apply to both certification and in-use vehicles according to the provisions of 40 CFR, Parts 86 and 88, as applicable."  The application purported to disclose in Section 11 the "List of AECD Used in Test Group", identifying 17 AECDs.

319.    The foregoing representations in ¶318 were materially false and/or misleading because, *inter alia* Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

320.    On August 6, 2015, Chrysler filed its semi-annual report for the quarter and six months ended June 30, 2015 on Form 6-K, with financial statements prepared in conformance with IFRS.  The financial statements reported that for the six months ended June 30, 2015, Costs of sales was $48.1 billion, EBIT was €2.14 billion and net profit was €425 million, or €0.264 per diluted share, compared to Costs of sales of $39.4 billion, EBIT of €1.23 billion and a net profit of €24 million, and a loss of €0.012 per diluted share,[29] for the same period in the prior year.

321.    The foregoing representations in ¶ 320 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle recalls which caused its EBIT, and net profit to be approximately €761 million higher (and costs of sales €761 million lower) than it would have been had Chrysler not been underreporting costs related to vehicle warranties and recalls.

322.    The footnotes to Chrysler's unaudited financial statements included a chart on page 59 reporting the balance for warranty (and recall) provision as €5.5 billon and €4.8 billion

---

[29]    The earnings per share are a net loss (and net profit positive) because the interest of the parent in the earnings of the business was calculated according to a specific formula that resulted in negative earnings per share to the parent.

at quarter end June 30, 2015 and fiscal year-end December 31, 2014 respectively.  The quarter-end and year-end provisions for were false and misleading because Chrysler had systematically under-accrued its provision for the costs of its product recalls by approximately €761 million from at least 2013 through the end of the Class Period in violation of the accounting and reporting requirements in IAS 37.

**H.    The Truth About Chrysler's NHTSA Violations Begins to Emerge As Defendants Continue To Make Materially False and Misleading Statements**

323.   On Sunday, July 26, 2015, NHTSA announced a Consent Order and its imposition on the Company of a record $105 million fine in connection with the Company's handling of 23 previous recalls affecting more than 11 million vehicles.  The NHTSA penalties were tied to violations in an array of areas, as described above, including misleading regulators, inadequate repairs, and failing to alert affected car owners in a timely manner.  The Consent Order included an admission by Chrysler that in three specified campaigns (13V-038, 13V-527 and 13V-529) it failed to timely provide an effective remedy, and that it did not timely comply with various reporting requirements under the National Traffic and Motor Vehicle Safety Act of 1966.  NHTSA stated, in part:

> ***Fiat Chrysler's pattern of poor performance put millions of its customers, and the driving public, at risk.***  This action will provide relief to owners of defective vehicles, will help improve recall performance throughout the auto industry, and gives Fiat Chrysler the opportunity to embrace a proactive safety culture.

(Emphasis added.)

324.   Chrysler also agreed under the Consent Order to additional remedies for three recall campaigns (13V-038, 13V-527 and 13V-529) covering approximately 585,000 vehicles. In each of those campaigns, Chrysler was required to offer, as an alternative remedy to owners whose vehicles have not yet been remedied, to repurchase those vehicles at a price equal to the

103

original purchase price less a reasonable allowance for depreciation plus ten percent. Chrysler stated that it already fixed approximately 280,000 vehicles. In addition, Chrysler was required to offer consumer incentives to encourage owners of vehicles subject to certain recalls to participate in the recalls. For example, owners of Jeep Grand Cherokees sold between model-years 1999 to 2004 will be offered a gift card of $100 if they bring their vehicles in for inspection to see if they need to be repaired under recalls included in the consent order. Separately, owners of Jeep Grand Cherokees sold between the 1993 and 1998 model-years may qualify for a $1,000 "trade-in incentive" above the fair-market value of the vehicle.

325.    Pursuant to the Consent Order, Chrysler was also required to "improv[e] FCA US's processes and procedures for complying with reporting requirements, making safety-related defect determinations, reporting defects to NHTSA, notifying dealers and owners of safety related defects and noncompliances, and improving the pace and effectiveness of FCA US's recall campaigns." NHTSA also required Chrysler to retain and Independent Monitor for at least three years to ensure that Chrysler was adequately discharging its regulatory obligations to timely and properly report defects and execute recall campaigns.

326.    On this news, the Company's stock fell $0.74, or roughly 4.9%, to close at $14.41 on July 27, 2015—a market capitalization decline of $950 million. Analysts recognized the impact of this news on the Company's stock price. In one article entitled "Fiat Chrysler Slapped With Record Fine and Buyback Program" the author stated, "The total cost of the penalty remains to be seen, but the market definitely reacted to the news. Shares of FCAU are down nearly 5% on the day. It will be interesting to see if the settlement has any effect on the company's bottom line in the future." An analyst with the Autotrader car shopping service said "NHTSA made clear with the record $105 million fine and unprecedented vehicle buyback

requirement against Fiat Chrysler that it is serious and will be aggressive about going after automaker [that] don't quickly recall vehicles with defects.[30]"

327.    In the wake of the Consent Order, media outlets reported that Kelley Blue Book estimated that the buyback program could cost the automaker more than $900 million, taking the potential cost, when factoring in the fine, to more than $1 billion.  Nevertheless, on July 27, 2015, Chrysler stated "The consent decree was worked out in the wake of an unprecedented July 2 hearing that the National Highway Traffic Safety Administration (NHTSA) held to look at how FCA handled 23 separate recalls. It found the maker frequently delayed responding to safety problems, contrary to federal law. And even when it did order a recall, the feds questioned why repair rates often were so low and slow."

328.    On July 28, 2015, in a press release discussing the Consent Order, Chrysler stated "contrary to certain reports, FCA US does not expect that the net cost of providing these additional alternatives will be material to its financial position, liquidity or results of operations."

329.    The foregoing representations in ¶ 329 were materially false and/or misleading because Chrysler's failed to properly account for its costs and liabilities related to vehicle warrantees and recalls which caused its EBIT, cost of sales, and net profit to be at least higher €761 million than it would have been had Chrysler not been underreporting costs related to vehicle warranties and recalls.

330.    During a July 30, 2015 earnings call with analysts, following NHTSA's imposition of the $105 million fine, defendant Marchionne denied the existence of any other reporting violations:

---

[30] *See* http://www.latimes.com/business/autos/la-fi-hy-record-fiat-chrysler-fine-20150727-story.html ("With record Fiat Chrysler fine, safety regulators get more aggressive." L.A. Times, July 27, 2015.

<Q [Analyst] >: I'm just looking at this NHTSA website, I read the whole raft of recalls have been announced, et cetera. I understand the presentation you gave and the financial impact of that. If we look at all the – everything has been listed there. Are you addressing everything?

<A - Sergio Marchionne>: "*__To the best of my knowledge, everything that I've given you so far is comprehensive of every action that's been discussed and undertaken with NHTSA. I am not in knowledge of anything else beyond what's already been booked__* . . . ."

331.    The foregoing representations in ¶ 330 false and misleading because NHTSA had informed Chrysler in late July, the same time it was finalizing the Consent Order with Chrysler, that it had identified discrepancies in Chrysler's early warning reports of deaths and other serious injuries.

332.    On August 6, 2015, Chrysler filed its semi-annual report for Q2 and H1 2015 with the SEC.  Therein, Chrysler incorporated by reference the risks and uncertainties identified in Chrysler's Form F-4 Registration Statement, as well as those Risk Factors identified and discussed in Item 3 of Chrysler's Form 20-F filed with the SEC on March 5, 2015 and in the 2014 Annual Report filed on the same day.  Chrysler's Risk Factors in its Form 20-F in turn referenced Item 4B "Environmental and Other Regulatory Matter", which contained the representations identified in ¶¶ 301-302, above.

333.    The foregoing representations in ¶ 332 were materially false and/or misleading because Chrysler was illegally using undisclosed and hidden software in its vehicles (including Jeep Grand Cherokee and Ram 1500) to allow excess diesel emissions to go undetected and evade emissions tests.

334.    On October 27, 2015, Chrysler announced the resignation of Defendant Kunselman.

106

335.    The next day, on October 28, 2015, Chrysler announced results for Q3 2015, informing investors that the Company recorded "a €761 million [approximately $850 million] pre-tax charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA."

336.    Chrysler shares fell $0.69, or 4.7%, to close at $14.72 as investors reacted to news of the recall charge—a market capitalization drop of $890 million.  The market immediately made the connection between the charge and the Company's regulatory violations for failure to properly conduct recalls.  *Bloomberg* reported: "The manufacturer set aside 761 million euros in the quarter for 'estimated future recall campaign costs' in North America, where U.S. regulators <u>ordered</u> it in July to buy back vehicles." (emphasis original)

337.    Regarding the Company's announcement, the *Detroit Free Press* reported that the charge caused the Company's stock to drop:

> ***The automaker reported its first quarterly loss in more than a year because it took a massive one-time charge to cover the cost of future recalls.*** The company also told Wall Street analysts its profit margins will continue to lag Ford and General Motors as long as its market share of trucks and SUVs is smaller and said has put its strategic plan for Alfa Romeo and Maserati under review. ***All of that unpleasant news caused FCA's stock to sink 69 cents, or 4.7%, on Wednesday to $14.72 per share***.

338.    Analysts at *Motley Fool*, arrived at similar conclusions.  Under the heading "That big special item", an analyst reported "FCA's results were more than offset by a 761 million euro one-time charge to boost FCA's reserves against future recalls, specifically in North America. U.S. regulators hit FCA with a $105 million fine in July for poor management of past recalls, and the company was forced to take on an independent expert to monitor its safety practices."

339.    On December 2, 2015, WardsAuto published an interview with Lee concerning the state of Chrysler's emissions compliance in the wake of the discovery of Volkswagen's illegally rigged diesel engines. Lee was among the executives in charge of the programming of

107

the diesel engines on the Jeep Grand Cherokee and Ram 1500. He said that he ordered his engineers to scour the engine-control algorithm for any defect devices and provided assurance that the internal audit at Chrysler was extensive. "We looked at 2 million lines of software code in the last month, … We've all been through the same exercise. We've all looked and dug and scraped, and we probably know our systems better in the last month than we've known them for the last few years. … It's not against the rules to have something (used for test procedures) that could be turned into a defeat device … You're only guilty if you have used the defeat device, which was the case at VW." Lee stated that the audit was extensive. "What is our software-control process? Are we as good as we think we are? This is the right time to ask that question. Second, do we have any software that could be misused if you could find the requisite number of people to make it happen?"

340.    The foregoing representations in ¶ 339 were materially false and/or misleading because Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests and the EPA had previously alerted Defendants that it believed that Chrysler's Jeep Grand Cherokee and Ram 1500 contained defeat devices.

341.    On December 9, 2015, after the close of trading, it was announced that NHTSA had issued an amendment to its July 24, 2015, Consent Order with Chrysler. In the amendment, Chrysler acknowledged significant failures in early warning reporting dating to the beginning of the requirements in 2003. Chrysler failed to report incidents of death and injury that were required to be reported to NHTSA under 49 C.F.R. Section 579.21 (b). Specifically, Chrysler acknowledged that it did not report these deaths and injuries because of failures in the Company's controls: (1) coding deficiencies in its EWR system that failed to recognize when

reportable information was received or updated; and (2) Chrysler's failure to update its EWR system to reflect new Chrysler brands.  Chrysler also failed to report aggregate data that were required to be reported to NHTSA under 49 C.F.R. Section 579.21(c), including property damage claims, customer complaints, warranty claims and field reports.  Chrysler also failed to provide copies of field reports to NHTSA, as required under 49 C.F.R. Section 579.21(d).  These failures were also a result of Chrysler's poor controls – coding deficiencies in Chrysler's EWR system that failed to recognize reportable information.  Chrysler admitted that it failed to submit EWR in compliance with the law and that the violations "are significant and date back to the inception of the early warning reporting requirements in 2003."  As a result of these violations, a third-party audit of Chrysler was conducted, which is still ongoing. The amendment required Chrysler to pay $70 million in additional civil penalties.

342.    Analysts recognized the impact of the news on Chrysler's stock price.  For example, an article titled "One Reason Fiat Chrysler (FCAU) Stock Closed Down Today explained "Fiat Chrysler Automobiles (FCAU) stock closed lower by 0.07% to $13.80 on Thursday, after the National Highway Traffic Safety Administration (NHTSA) fined the automaker $70 million for failing to report safety data, including reports of death and injuries, consumer complaints, warranty claims, and other data."

343.    During a January 27, 2016 earnings call discussing Q4 2015, Marchionne addressed the specific issue of software on diesel vehicles used to cheat regulatory compliance in the wake of Volkswagen's "Dieselgate" scandal, assuring investors that he had examined the issue and no such software was being utilized by Chrysler. Stating, "I think it's important to keep this in mind", Marchionne made clear that Chrysler "has been busy and it continues to be busy on optimized methods to achieve the targets. It will continue to do so. . . . I think that **after the**

*advent of dieselgate,* for a lack of a better term, *FCA has undertaken a pretty thorough review and a thorough audit of its compliance teams.* I think we feel comfortable in making the statement that *there are no defeat mechanisms or devices present in our vehicles. And I think the cars perform in the same way on the road as they do in the lab under the same operating conditions.  This is an area of heightened concern.* And so we've put in – we have established now as part of our compliance mechanism training for all emission calibration engineers. *We do have a best practice program to ensure that we calibrate and certify properly.* And I think that we will – just to make sure that the system is not going off the reservation, we will carry out random checks of our fleet to ensure that we achieve compliance."

344.    The foregoing representations in ¶ 343 were materially false and/or misleading because Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests and the EPA had previously alerted Defendants that it believed that Chrysler's Jeep Grand Cherokee and Ram 1500 contained defeat devices.

345.    On February 2, 2016, Chrysler issued a press release, stating "In the past several months the issue of diesel emissions has been the subject of a great deal of attention, particularly in Europe, where diesel is quite common. In response to these events, FCA has conducted a thorough internal review of the application of this technology in its vehicles and has confirmed that its diesel engine applications comply with applicable emissions regulations.  In particular: FCA diesel vehicles do not have a mechanism to either detect that they are undergoing a bench test in a laboratory or to activate a function to operate emission controls only under laboratory testing.  In other words, although emission levels vary depending on driving conditions, the

emission control systems of the FCA vehicles operate in the same way under the same conditions, whether the vehicle is in a laboratory or on the road."

346.    The foregoing representations in ¶ 345 were materially false and/or misleading because Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests and the EPA had previously alerted Defendants that it believed that Chrysler's Jeep Grand Cherokee and Ram 1500 contained defeat devices. Because Defendants knew that investors would read this press release as applying to all Chrysler diesel vehicles[31], and because Defendants knew their U.S. diesel vehicles (the Jeep Grand Cherokee and Ram 1500, in particular) were violation of EPA regulations, Michael Dahl emailed Byron Bunker and Christopher Grundler of the EPA (cc'ing Kyle Jones of Chrysler) on February 2, 2016, immediately after publication of the press release, attempting to clarify the press release for the EPA (but only the EPA – not the public), stating:  "Byron, The release out of our European office as we discussed … this is not a statement about NAFTA diesels.  As you know, the only cycle for EU is NEDC, which is very light vehicle load."

347.    On February 29, 2016, Chrysler issued a press release and filed an Annual Report on Form 20-F with the SEC which was signed by defendant Palmer, and reiterated the Company's previously announced financial and operating results for the fiscal year ended December 31, 2015 (the "2015 20-F").  The 2015 20-F appended as exhibits signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by defendants Marchionne and Palmer, stating that the financial information contained in the 2014 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

---

[31] Indeed, articles referencing the press release did attribute the statements of compliance as applying to all Chrysler vehicles, including Jeep and Ram.  *See, e.g.* "Fiat-Chrysler group models given emissions all-clear", February 3, 2016, http://www.nextgreencar.com/news/7472/fiatchrysler-group-models-given-emissions-allclear/

348.    Under the heading "Regulation", the 2015 20-F stated "We face a regulatory environment in markets throughout the world where safety, *vehicle emission* and fuel economy regulations are becoming increasingly stringent, which will affect our vehicle sales and profitability. *We must comply with these regulations in order to continue operations in those markets*, including a number of markets where we derive substantial revenue, such as the U.S., Brazil and Europe. *In the past several years, industry participants in these markets have faced increasing regulatory scrutiny*."

349.    On the issue of emissions, the 2015 20-F acknowledged that "Government scrutiny has also increased industry-wide, and is expected to remain high, in connection with a recent significant EPA action involving the tailpipe emissions of a competitor's diesel vehicles" and that Chrysler controlled for risks relating to regulatory compliance concerning emissions by "[e]valuat[ing] on-road versus laboratory testing to ensure compliance."   Discussing various regulations in detail, the annual report went on to state "in light of recent issues in the automotive industry related to vehicle health-based emissions, we have taken action to extensively review compliance requirements. *We conducted an audit of all current production software and emission calibrations. The audit revealed that all current production vehicle calibrations are compliant with applicable regulations and they appear to operate in the same way on the road as they do in the laboratory under the same operating conditions. To ensure ongoing compliance, the following improvement actions are in place or in process*:

- Formalized compliance training for all software and emission calibration engineers

- Established a "best practice" calibration and certification oversight group

- Instituted regular supplier and internal software and calibration audits

- Formalized a random, on-road emissions audit testing program"

350.    Under the heading "Automotive Emissions", the 2015 20-F provided detailed discussions of its regulatory obligations in the United States and Europe as imposed by the EPA, CARB and European regulatory agencies. For example, it stated "Under the U.S. Clean Air Act, the Environmental Protection Agency, or EPA, and the California Air Resources Board, or CARB (by EPA waiver), require emission compliance certification before a vehicle can be sold in the U.S. or in California (and many other states that have adopted the California emissions requirements).   Both agencies impose limits on tailpipe and evaporative emissions of certain smog-forming pollutants from new motor vehicles and engines, and in some cases dictate the pollution control methodology our engines must employ." The report stated "In addition, EPA and CARB regulations require that a vehicle's emissions performance be monitored with OBD systems. ***We have implemented hardware and software systems in all our vehicles to comply with the OBD requirements*.*"

351.    As for Europe, the 2015 20-F stated, in part, "In Europe, emissions are regulated by two different entities: the European Commission, or EC, and the United Nations Economic Commission for Europe, or UNECE. . . .   We must demonstrate that our vehicles will meet emission requirements and receive approval from the appropriate authorities before our vehicles can be sold in EU Member States. The regulatory requirements include random testing of newly assembled vehicles and a manufacturer in-use surveillance program. EU and UNECE requirements are equivalent in terms of stringency and implementation.   In 2011, updated standards for exhaust emission by cars and light-duty trucks, called Euro 5, became effective. Impending European emission standards focus particularly on further reducing emissions from

diesel vehicles. The new Euro 6 emission levels, effective for all passenger cars on September 1, 2015 (one year later for light commercial vehicles). . ."

352.    Under the heading "Diesel engines", the annual report stated, "***research and development activities have mainly focused on passive and active NOx reduction technologies*** and the study of real driving conditions to determine optimized configurations for the next generation diesel powertrains. Advanced after-treatment systems for the reduction of NOx emissions are under development both for passenger car and light commercial vehicle applications."

353.    The 2015 20-F also stated, "We manufacture and sell our products and offer our services around the world. [sic] ***with requirements relating to reduced emissions,*** increased fuel economy, . . . ***Our vehicles and the engines that power them must also comply with extensive regional, national and local laws and regulations and industry self-regulations (including those that regulate emissions*** certification, end-of-life vehicles and the chemical content of our parts, noise, and worker health and safety). In addition, vehicle safety regulations are becoming increasingly strict. ***We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products. We constantly monitor such requirements and adjust our operations and processes to remain in compliance***."

354.    The foregoing representations in ¶¶ 349, 350 and 353 were materially false and/or misleading because Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests and the EPA had previously alerted Defendants that it believed that Chrysler's Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles contained defeat devices.

I.      **The Truth About Chrysler's Emissions Violations Begins to Emerge**

355.    On May 19, 2016 Chrysler cancelled a meeting with German Transport Minister Alexander Dobrindt to discuss a national investigative commission on emissions, saying that German authorities have no say over it.   Reacting to this, Dobrindt stated that "this uncooperative conduct by Fiat is totally incomprehensible…There are concrete allegations at issue.  It would be appropriate if Fiat commented to the investigative committee on this."

356.    On May 23, 2016, it was reported that several tests by the German motor transport authority KBA had found evidence that the exhaust treatment system in some of Chrysler's models would switch itself off after 22 minutes, which is just 2 minutes after the standard 20 minute emissions test normally run by regulators. This was similar to the scheme conducted by Volkswagen where its defeat devices turned themselves off after 23 minutes to cheat the emissions tests. The German tests found a special NOx catalyst which is being switched off after a few cleaning cycles.   This shut down caused the dangerous pollutant NOx to be released into the atmosphere at more than 10 times the permitted level.  A German newspaper, the Bild am Sonntag reported that Germany's Federal Motor Transportation Authority determined that Chrysler allegedly used illegal software to manipulate emissions controls. Germany's transport ministry also stated that Chrysler refused to cooperate with the investigation after Chrysler was a no show for a meeting scheduled with the German authorities.

357.    As a result of this news, Chrysler's stock price dropped $0.36, or roughly 5.1%, to close at $6.68.  Various news sources recognized the impact of this news on Chrysler's stock price.  In an article titled "Now Germany Is Accusing Fiat of Running Dirty Diesel", Fortune reported that "Shares in Fiat Chrysler . . . fell more than 5 percent on Monday after Germany's Bild newspaper reported that the carmaker could be banned from selling cars in Germany . . . ."

In an article titled "Fiat Chrysler Shares Fall on Report of German Sales Ban Threat", Automotive News reported that "several tests by the German motor transport authority KBA had found evidence that the exhaust treatment system in some of FCA's models would switch itself off after 22 minutes.  Emissions tests normally run for around 20 minutes." "Shares of Fiat Chrysler Automobiles fell 5.1 percent in the U.S. today after Germany's *Bild* newspaper reported that the automaker could be prohibited from selling cars in Germany if evidence of disregard of emissions rules was found."

358.    In response to this news, a spokesman for Chrysler stated "all its vehicles are compliant with existing emissions rules."

359.    The foregoing representations in ¶ 358 were materially false and/or misleading because Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests and the EPA had previously alerted Defendants that it believed that Chrysler's Jeep Grand Cherokee and Ram 1500 contained defeat devices, and as Marchionne would later admit Chrysler's vehicles "weren't compliant".

360.    On September 1, 2016 Reuters reported that the German government had formally accused Chrysler of using a defeat device to switch off emissions.  In letters sent to the European Commission ("EC") and the Italian Transport Ministry, Berlin said that Germany found unusual increases in the emissions of four Chrysler vehicles and that the findings proved the "illegal use of a device to switch off exhaust treatment systems."  The German Transport Authority said "Germany does not share the Italian car type approval authority's opinion that the device to switch off exhaust treatment systems is used to protect the engine."

361.    On September 22, 2016, in the wake of Volkswagen's admission that it had used software that deceived U.S. regulators measuring toxic emission in some of its diesel cars, a

Chrysler spokesperson stated "FCA U.S. does not use 'defeat devices'" and that it was working closely with the EPA and CARB to "ensure its vehicles are compliant with all applicable requirements."

362.    The foregoing representations in ¶ 361 were materially false and/or misleading because Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests and the EPA had previously alerted Defendants that it believed that Chrysler's Jeep Grand Cherokee and Ram 1500 contained defeat devices.

363.    On October 17, 2016 Chrysler's chief technical officer, Harald Wester angered members of the European Parliament at a hearing in Brussels when he questioned the methods used to the European governments reporting that Chrysler's diesel cars were emitting far beyond EU limits when driving on the road.  Wester stated, "I have no explanation for these values. These values should not occur."  He also stated that some of the emissions values reported by national authorities were "fantastical."  News reports state that Wester visibly annoyed several members of parliament by dodging questions.  For example a Dutch parliamentary member asked Wester if the Company knew how much more nitrogen oxide was being emitted by its cars, which modulate the emissions filter system after 22 minutes.  Wester stated, "more, but still at the limits."  When asked "which limits?" Wester said "the legal limits," after which the parliament member reminded him that according to Chrysler's legal analysis only the 2-minute lab test matters, "so there is no legal limit after 20 minutes."  Wester stated, "I don't know.  I think I answered all your questions."

364.    On January 12, 2017, the EPA and CARB each issued a notice of violation to Chrysler and FCA US for installing and failing to disclose engine management software that

resulted in increased emissions from the vehicles.  The manipulating software was installed in light-duty model year 2014, 2015 and 2016 Jeep Grand Cherokees and Dodge Ram 1500 trucks with 3.0 liter diesel engines sold in the United States. As part of the investigation, the EPA found "at least *eight* undisclosed pieces of software that can alter how a vehicle emits air pollution." Moreover, "some of these AECDs appear to *cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards … than in normal operation and use*." "Failing to disclose software that affects emissions in a vehicle's engine is a serious violation of the law, which can result in harmful pollution in the air we breathe." said Cynthia Giles, assistant administrator for the EPA. "*This is a clear and serious violation of the Clean Air Act*," CARB Chair Mary D. Nichols stated "*[Chrysler] made the business decision to skirt the rules and got caught*."  The EPA's disclosure of the notice stated "FCA did not disclose the existence of certain auxiliary emission control devices to EPA in its applications for certificates of conformity for model year 2014, 2015 and 2016 Jeep Grand Cherokees and Dodge Ram 1500 trucks, *despite being aware that such a disclosure was mandatory*." Moreover, despite having been aware of the EPA's conclusion that these AECDs were defeat devices for well over a year, "To date, despite having the opportunity to do so, *FCA has failed to demonstrate that FCA did not know, or should not have known, that a principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the CAA*." Similarly, the EPA concluded "To date, despite having the opportunity to do so, *FCA has failed to establish that these are not defeat devices*."  The illegal software allowed 104,000 of Chrysler's diesel-powered vehicles to spew emissions beyond legal limits, which the EPA estimated could cost FCA $4.63 billion in fines.

118

365.    Even though the EPA requested Chrysler to provide evidence that the AECDs were not illegal defeat devices and that Chrysler did not know that the principal effect of the AECDs was to evade emissions regulations, Chrysler failed to do so.  The implication is that Chrysler intentionally installed the illegal defeat devices as a means of pretending to comply with EPA regulations while knowingly violating them.

366.    On this news, the Company's stock fell $1.35, or roughly 12%, to close at $9.95 on January 12, 2017.

367.    In response to this news, Chrysler stated "FCA US believes that its emission control systems meet the applicable requirements."

368.    The foregoing representations in ¶ 367 were materially false and/or misleading because Chrysler was illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.

369.    On February 6, 2017, after the close of trading, French authorities announce they were referring Chrysler for prosecution following an investigation of the levels of emissions of NOx pollutants produced by its diesel vehicles. The Ministry for the Economy and Finance said the French anti-fraud and consumer affairs agency DGCCRF had wrapped up its probe into Chrysler's cover-up of the emissions produced by some of its diesel vehicles and had sent its conclusions to France's department of justice. The anti-fraud agency's investigation examined test results by a third-party laboratory and public sector researchers, as well as internal documents provided by Chrysler.  The investigation showed emissions that were several times higher than regulatory limits. For example, Chrysler's Jeep Cherokee emitted eight times the NOx limit and its Fiat 500x emitted almost 17 times the limit in road testing.

370.    On this news, Chrysler's stock price declined $0.50, or roughly 4.6%, to close at $10.27 on February 7, 2017.

371.    On February 7, 2017, after the close of trading, it was disclosed that a report by Italy's transport ministry presented to a European parliamentary committee in October but never officially published revealed that Chrysler's vehicles were allowed to skip key tests for illegal engine software during Italy's main emissions-cheating investigation that occurred in the wake of the Volkswagen "Dieselgate" scandal.  While the findings included complete sets of data for eight diesel cars made by Chrysler's competitors (BMW, Ford, Mercedes, Volkswagen and GM), for the Chrysler models investigated (including the Jeep Cherokee) results were missing for the three tests used to unmask defeat devices by preventing them from detecting the test.

372.    On March 31, 2017 Germany's transportation ministry announced that it had found a new defeat device in a Chrysler car. While the transportation ministry did not give details at the time, a German weekly magazine, Der Spiegel said that recent tests on Fiat's 500X passenger car showed that an exhaust treatment system switched off filtering after 90 minutes, amounting to a defeat device.  In a prior test, a Fiat vehicle was found to have switched off its exhaust treatment after 22 minutes.  An emission test cycle in Europe lasts 20 minutes.

373.    On May 17, 2017 the European Commission ("EC") issued a press release stating that it had decided to launch an infringement procedure against Italy for failing to fulfill its obligations under EU vehicle type-approval legislation with regard to Chrysler automobiles. This represented a formal accusation by the European Union's executive arm that the Italian government allowed Chrysler to sell cars designed to evade emissions tests.  The EC stated that this formal notice asked Italy to respond to concerns about "insufficient action" taken regarding the "emission control strategies employed by Fiat Chrysler."  The press release explained that the

120

current case related to information brought to the EC's attention in the context of a request from the German Transport Authority in September 2016 to mediate between the German and Italian authorities on a "dissent" regarding NOx emissions test results provided by Germany, and technical information provided by Italy, on the emission control strategies employed by Chrysler. The EC stated that it is now "formally asking Italy to respond to its concern that the manufacturer has not sufficiently justified the technical necessity- and thus the legality- of the defeat device used, and to clarity whether Italy has failed to meet its obligations to adopt corrective measures regarding the Chrysler type in question and to impose penalties on the car manufacturer."

374. On May 23, 2017, the DOJ announced the filing of a complaint in the Eastern District of Michigan asserting that Defendant Chrysler, FCA US and other entities violated federal law because, *inter alia*,

> "Defendants illegally sold or caused the illegal sale of approximately 103,828 diesel-fueled new motor vehicles . . . that do not comply with the [Clean Air] Act. The applications for Certificates of Conformity ("COC") for the Subject Vehicles *did not disclose at least eight software-based features* that affect the Subject Vehicles' emission control system. . . . In addition, one or more of these undisclosed software features, alone or in combination with one or more of the others, *bypass, defeat and/or render inoperative the Subject Vehicles' emission control system, causing the vehicles to emit substantially higher levels of NOx during certain normal real world driving conditions than during federal emission tests*.

375. Furthermore, "[t]he United States alleges, subject to a reasonable opportunity for further investigation or discovery, that *members of FCA NV management were involved in the process of gathering and/or approving certain information regarding FCA US' submissions as part of its COC applications for the Subject Vehicles*."

376. On May 23, 2017, Chrysler's stock price declined from $10.89 at 9:30 a.m. to $10.32 at 4:00 p.m., a decline of 5.2%, on unusually high volume of 26,270,000 shares.

**J.**     **Additional Allegations Demonstrating Falsity and Scienter**

377.     Leading up to the Class Period, Defendants were well aware that NHTSA had significantly intensified its enforcement of regulations regarding timely and accurate reporting of safety defects and recalls. Defendants' scienter can be inferred from the frequency and focus of Defendants' discussions of regulatory compliance in press releases, earnings calls and SEC filings.

378.     In 2010 NHTSA fined Toyota Motor Corporation the maximum penalty of $16.375 million for its failure to notify NHTSA within five days of learning of a safety defect in certain cars. NHTSA fined Toyota another $32.425 million for failure to initiate recalls in a timely manner.   Following the fines, NHTSA's then-current Administrator David Strickland stated, "[a]utomakers are required to report any safety defects to NHTSA swiftly, and we expect them to do so."

379.     Just before the Class Period, in May 2014, NHTSA fined General Motors $35 million for late reporting of safety defects, which was part of a record-high $126 million in civil penalties assessed in 2014, which exceeded the total amount previously collected by the agency during its forty-three year history.   NHTSA's May 16, 2014 announcement of the GM Consent Order stated "This reinforces a message this Administration has been sending clearly for the past five years through NHTSA investigations and fines that now total $124.5 million dollars across 6 different vehicle manufacturers."

380.     As NHTSA Administrator Friedman stated in his public testimony to the U.S. House of Representatives' Committee on Energy and Commerce, on April 1, 2014, "This Administration has placed an emphasis on timeliness . . . Because of this emphasis, we believe

that all manufacturers in the automobile industry are now paying much closer attention to their responsibility to protect their customers and the driving public."

381.    As discussed above in ¶¶ 93-109, Defendant Marchionne personally was very involved with the decision and implementation of the recall of Jeep vehicles with improperly placed fuel tanks that caused deadly fires in even low-impact rear collisions.

382.    Indeed, immediately after NTHSA fined General Motors, it began several preliminary investigations and Recall Queries into Chrysler products and implemented recalls. This was a substantial increase in the number of investigations into Chrysler.  As NHTSA has described, a Recall Query is an investigation opened on a recall because the recall remedy appears inadequate or the scope of the recall appears to be insufficient.

383.    Immediately following these events, Chrysler told investors that it understood that vehicle safety and regulatory compliance was of the utmost importance to NHTSA and investors and that senior management was focused on the issue.  Defendants emphasized their focus on regulatory compliance, that information concerning vehicle safety and regulatory compliance was shared directly with Marchionne and that he was personally accountable for any deficiencies:   On August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, that reported directly to defendant Marchionne, claiming "[t]his action will help intensify the Company's continuing commitment to vehicle safety and regulatory compliance."  Throughout the Class Period defendants repeatedly assured investors that the Company was in compliance with all vehicle safety regulations and that the Company had a "robust system in place."  Defendants Marchionne and Palmer also stressed their focus on recall compliance by repeating in Chrysler's SEC filings: "In 2014 we made an important organizational move to amplify our commitment to safety, as FCA US established the

123

new office of Vehicle Safety and Regulatory Compliance. The reorganization created a stand-alone organization led by a senior vice president [defendant Kunselman] who reports directly to the CEO of FCA US [Marchionne], ensuring a high level of information flow and accountability. This new structure establishes a focal point for working with consumers, regulatory agencies and other partners to enhance safety in real-world conditions."[32]

384.    Prior to his appointment to this new position, Kunselman had been in charge of NAFTA Purchasing and Supplier Quality. Prior to that, he was Senior Vice President-Engineering, a position that included oversight of regulatory compliance.  Therefore, even before taking the new position, Kunselman was well aware of Chrysler's reporting deficiencies and lack of controls, which he undoubtedly reported to senior management, including Marchionne, upon his appointment to the new position in August 2014.

385.    Defendant Kunselman was in regular contact with regulators at NHTSA throughout the Class Period.  Kunselman led the group at Chrysler that communicated with NHTSA concerning recalls.  For example, in his statement to the Senate Committee on Commerce, Science and Transportation on November 20, 2014, Kunselman stated that his group had been "actively engaged" with NHTSA since at least early 2014 regarding the recall of Takata airbags due to defective inflators.

386.    Defendants Palmer and Marchionne recognized in SEC filings that they had "a customer focused approach" and, specifically, that "[f]eedback received during the Stakeholder Engagement events held in 2014 provided confirmation that customer services, vehicle quality and vehicle safety are issues of primary importance to the Group's stakeholders."[33]  "The Group

---

[32] 2014 Form 20-F at 130

[33] 2014 Form 20-F at 129.

monitors customer satisfaction on a continuous basis and, where appropriate, develops new customer channels that help contribute to improvements in product safety and service quality."

387.    Defendants Palmer and Marchionne also told investors in their SEC filings under the heading "Managing Vehicle Safety", "we take transportation safety personally. Customers trust the quality and safety of our products, and we constantly do our utmost to warrant this confidence."

388.    On the Company's October 29, 2014 earnings call with analysts, in which defendants Palmer and Marchionne participated, defendant Marchionne acknowledged his focus on the increased regulatory scrutiny:

> <Q – [Analyst]>: Thank you. Just wanted to get your take on what the environment is currently for the recalls? Have we gotten past the worst of it? Or do you think that there's going to added government scrutiny going forward that we'll need to have more?

> <A - Sergio Marchionne>: [I]t may very well be that we are peaked or getting very close to a peak. But you can't call this. Every time I read the paper, there is another recall underway, including some of ours. So I think that the industry may have overshot the mark in terms of recall activity. I mean, it may have just gotten hypersensitive. Let's work our way through here and see where this whole exercise ultimately stabilizes."

389.    On the Company's January 28, 2015 earnings call discussing results for the quarter and year ending December 31, 2014, defendants Marchionne and Palmer again discussed their focus on the increased regulatory focus concerning vehicle safety and recalls.

> <Q – [Analyst]: And the final one is to Mr. Marchionne on the quality front. Can you talk a bit about the changes you've done on the management front, on the quality front, and how you are, you have the right structure now to deliver improved at least – to avoid what we had last year in 2015? Thank you.

> <A - Sergio Marchionne>: Well, look, I think I've been public on this recall issue. The recall matter is something which is a reflection of a changing paradigm for the auto sector. I think we have made changes while adjusting our internal structures to deal with this new state of affairs. It is my expectation that this cost will come down as we progress through reconstitution of the management process

125

of what's going on here. We had what I consider to be a pretty robust system in place, we have strengthened it further, we have curved it out from the rest of operations. We have set a very, very senior technical person to head up these activities. So I think we're making progress in making sure that at least not only are we dealing with what's on our plate but we're actually becoming much more proactive and identifying potential exposures going forward. So as we do this, I think these numbers will stabilize and we'll see a steady state.

390.   On the Company's July 30, 2015 earnings call with analysts, following the announcement of NHTSA's $105 million penalty, defendant Marchionne admitted that he had personally been aware of NHTSA's increased focus on Chrysler's reporting failures:

Now the first slide simply sets out the specific time requirements for NHTSA reporting and customer notices and recall campaigns, and *many of these rules are fairly specific and for the most part they're straightforward*, although there can be questions about the triggering dates of some of these requirements. The unfortunate fact is that we as an industry, and *we in particular as a company, have not always been perfect in complying with these requirements, and over the last year and a half, NHTSA has begun to take a harder look at these technical compliance issues, and frankly we started to do the same thing about the same time.*

*Over a year ago, we saw that changes were coming, and we began to look more critically at our own governance and process on safety and recall compliance issues, and we had then identified a number of necessary steps to improve. And both before and during our discussions with NHTSA we have been implementing some of the needed improvements that we have identified.*

391.   Moreover, as discussed above, defendants Kunselman and Marchionne became specifically aware of Chrysler's lack of compliance with NHTSA's regulations and its poor internal controls when NHTSA Administrator Friedman expressly informed them and their direct report, Steve Williams, of such violations through letters dated October 29, November 19 and November 25, 2014.

392.   In the October 29, 2014 letter to Steve Williams, Head of Vehicle Safety Compliance & Product Analysis, who reported directly to Defendant Kunselman, Friedman wrote to "emphasize the critical imperative" for Chrysler "to promptly and effectively remedy

the serious safety risk posed to consumers by defective Takata air bags." He stated that the current measures taken were inadequate under Chrysler's legal obligations: "[M]ore can and should be done as soon as possible to prevent any further tragedies from occurring as a result of these defective air bags." Friedman wrote: "we urge you to take aggressive and proactive action to expedite your remedy of the recalled vehicles and to supplement Takata's testing with your own testing to fully evaluate the scope and nature of this defect."

393. The November 19, letter alerted Marchionne to Chrysler's regulatory failings as to the recall of Jeeps with improperly placed fuel tanks that would burst into flames upon even low impact collisions, stating, "I am concerned about the results of Chrysler's October 2014 recall update reports showing a woeful three percent repair rate out of more than 1.5 million affected vehicles" that it was not the first time NHTSA had warned Marchionne, and that Chrysler's conduct was "unacceptable."

394. On November 25, 2014, Friedman again wrote to Marchionne to let him know that he was extremely concerned about the slow pace of Chrysler's recall of the extremely important recall of Takata airbags. Friedman noted in his letter that throughout the process of the recall, as compared with the other affected manufacturers, "Chrysler has consistently maintained its position at the rear of the pack." Friedman wrote that "Chrysler's delay in notifying consumers and taking other actions necessary to address the safety defect identified is unacceptable and exacerbates the risk to motorists' safety." He wrote that Chrysler's delay in notifying owners deprives them of the ability to take informed precautionary measures and of the knowledge needed to make an informed decision regarding their vehicles, noting that an informed customer could reduce the risk of death or injury by choosing to leave the passenger seat unoccupied.

395.     Experts in the field dismissed any assertion that Chrysler's conduct was a result of mistakes, instead stating unequivocally that it was intentional conduct by Chrysler.  Mark R. Rosekind, who became Administrator of NHTSA on December 22, 2014 concluded "[w]e are looking at a pattern", confirming that "[w]e've been tracking each of these recalls."

396.     Allan Kam, who served as a senior enforcement lawyer for the NHTSA for more than 25 years before he retired in 2000 stated "It is unprecedented to have a hearing on so many different recalls from the same manufacturer . . . It's a sign that there is a systemic issue with Chrysler."

397.     Indeed, Scott Yon, Chief of the Integrity Division of NHTSA's Office of Defects Investigation, who examined Chrysler's consumer complaints, crash reports and other information relating to the safety consequences of vehicle defects, as well as the problems that arose with Chrysler's recall campaigns, testified that "In my experience, **Fiat Chrysler's recall performance often differs from that of its peers**. Fiat Chrysler takes a long time to produce the parts needed to get vehicles fixed. Their dealers have difficulty getting parts for recalls. Their customers have trouble getting recall repairs done. Fiat Chrysler's recall remedies sometimes fail to remedy the defects they are supposed to fix."

398.     NHTSA also informed Chrysler in late July 2015, at the very same time they were finalizing the Consent Judgment that the Company was also under investigation for failing to report deaths and injuries to the agency as required by law.

**Defendants' Had A Strong Motive to Conceal Chrysler's Mounting and Expected Recall Costs**

399.     Defendants Marchionne, Palmer and Chrysler had a strong motive to conceal Chrysler's surge in vehicle recalls and the resulting increase in warranty provisions and warranty costs associated with those recalls.

128

400.    Marchionne had a very difficult task in negotiating the merger transaction amongst various constituencies.  Prior to the merger, Chrysler was owned 58.5% by Fiat and 41.5% by UAW Retiree Medical Benefits Trust, also known as the VEBA Trust.  The VEBA Trust had the right to force Chrysler to do an initial public offering of Chrysler stock.  To avoid a Chrysler IPO, Marchionne had to negotiate a price for Fiat to buy out the VEBA Trust's 41.5% interest in Chrysler.

401.    Once Marchionne successfully negotiated the purchase of the VEBA Trust's shares, he was required to convince Fiat shareholders that a merger with Chrysler made sense. Then, he was also required to convince the markets that the Fiat / Chrysler merger would create a stronger and better investment for public shareholders in order to successfully complete a listing of the merged entity's stock on the NYSE.  As part of Marchionne's corporate plan, following the merger and listing of Chrysler's stock on the NYSE on October 13, 2014, Chrysler planned to raise at least a billion dollars through the public sale of common stock and almost $3.0 billion through the sale of convertible notes.[34]  This nearly $4.0 billion in securities offerings was planned for and completed in December 2014.

402.    Marchionne, Palmer and Chrysler had a strong motive to conceal Chrysler's mounting costs and liabilities stemming from the surge in vehicle recalls, in order for them to convince the markets that the Chrysler / Fiat merger was a sound plan, to arouse sufficient interest in the merged company's stock on the NYSE, and to persuade investors to purchase $4.0 billion in new Chrysler securities following the merger.

---

[34]    The two prospectuses Chrysler filed on December 12, 2014 were for (i) the sale of $957 million of common stock with a $133 million overallotment option, and (ii) the sale of $2.5 billion of convertible notes with a $375 million overallotment option.

403.     Indeed, when Chrysler's stock was first listed on the NYSE, many were skeptical. Reuters reported on October 12, 2014, the day before the NYSE listing, that "Marchionne has picked a difficult moment to woo U.S. investors. The American auto industry is nearing its peak, the European market's recovery from years of decline is proving elusive and weakness persists in Latin America."

404.     One analyst, from ISI Group in London said in an interview with Reuters "it's not the right time to list an auto stock anywhere…This is happening in the middle of a major profit warning from Ford and people are still very concerning about GM.  It's going to be tough for Marchionne to convince investors."  At the time, Ford had revised its profit forecast, citing in part recall costs in North America.  But according to Reuters, "Marchionne maintains that FCA should not be tied to Ford's woes, saying its strong position in Brazil gives it an advantage over competitors, and this month reiterated full-year guidance despite market expectations of a cut to forecasts."

405.     Thus, given all the concomitant difficulties Chrysler faced, it was imperative for the success of Chrysler's merger, its successful NYSE listing, and the planned sale of $4.0 billion in securities, that Defendants conceal the surge in vehicle recalls that Chrysler experienced in 2013 and 2014, and the resulting increases in warranty provisions and warranty costs associated with the increase in vehicle recalls.

**Additional Allegations of Defendants' Scienter Concerning Chrysler's Emissions Violations**

*Chrysler's Creation of The Eight Illegal AECD's Along*
*with Dahl, Lee's and Marchionne's Involvement With*
*That Process Supports a Strong Inference of Scienter*

406.     As discussed below, *infra* ¶¶ 450-476, Chrysler created all the software for its diesel vehicles, which includes the AECDs.  As the person who supervised development of the

3.0-liter EcoDiesel V-6 in the Jeep Grand Cherokee and Ram 1500, Dahl knew that the 8 pieces of illegal software were on the vehicles.   Moreover, all software (including AECDs) were described in reports that went to Lee and Lux, and which were required to be approved by Marchionne prior to inclusion in any vehicle.   Thus, Lee, Lux and Marchionne were also aware of the illegal AECDs.

407.   Prior to replacing Kunselman in November 2015, Dahl was Director of Chrysler's diesel engine programs and global powertrain coordination, managing all of Chrysler's diesel engine programs in North America. Dahl specifically supervised development of the 3.0-liter diesel engine in the Jeep Grand Cherokee and Ram 1500.   During the Class Period, Dahl (along with Lee and Mazure) communicated with the EPA and CARB on certification of Chrysler's 3.0 diesel engines used in the Jeep Grand Cherokee and Ram 1500.   In this role, Dahl was responsible for installing the AECDs on the vehicles and for reporting those to the EPA and CARB as part of the certification process. This means that Dahl was necessarily informed about the COC submitted to the EPA that disclosed certain AECDs and concealed or omitted the 8 illegal defeat devices. Other members of Chrysler involved in certification meetings with the EPA and CARB were Mark Chernoby, Mark Shost, Emanuele Palma and Kyle Jones.

408.   Lee was Head of Powertrain Coordination and Vice President and Head of Engine and Electrified Propulsion Engineering, FCA US, with responsibility for directing the design, development and release of all engines and electrified propulsion systems for FCA US products. As discussed below, *infra* at ¶¶ 450-465, Lee was regularly updated on all testing of the diesel vehicles and all AECDs installed on them.

*The Obvious Illegality of The Eight AECDs Supports a*
<u>*Strong Inference Of Scienter*</u>

409.     As discussed above, *supra* ¶¶ 229-235, each of the 8 illegal AECDs targeted these controls designed to reduce NOx emissions with the effect of ***always increasing emissions***. As the EPA determined, there were no valid exceptions for the existence of these AECDs and Chrysler never provided any evidence of such exceptions.

410.     Specifically, the EPA determined that "some of these AECDs appear to ***cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards … than in normal operation and use***." CARB concluded  "***This is a clear and serious violation of the Clean Air Act***" and that "***[Chrysler] made the business decision to skirt the rules and got caught***."   After over a year of investigation, the EPA concluded: "To date, despite having the opportunity to do so, ***FCA has failed to demonstrate that FCA did not know, or should not have known, that a principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the CAA***." Similarly, the EPA concluded "To date, despite having the opportunity to do so, ***FCA has failed to establish that these are not defeat devices***."

411.     As Marchionne later admitted, the Grand Cherokee and Ram 1500 diesel vehicles "weren't compliant" when they were manufactured and sold. With the EPA concluding and Chrysler admitting that there was no valid purpose for these defeat devices, they must have been installed knowingly.

*Defendants' Failure to Disclose the Very Software That Violated*
<u>*Emissions Regulations Supports and Inference of Scienter*</u>

412.     Defendants clearly knew that there was software installed in Chrysler's diesel vehicles that circumvented emissions standards.  Auto manufacturers are required to disclose all AECDs.  While Chrysler disclosed other, legal, AECDs to its regulators, these 8 illegal AECDs – the very AECDs that circumvented the emissions standards – were never disclosed.  This is not a

mere coincidence given Marchionne's admission of the importance of emissions controls during the Class Period and Marchionne's repeated assurances that he had reviewed/audited all the emissions software utilized in Chrysler's vehicles.

413.    Mazure (FCA - North America, Senior Manager - Environmental Certification - Vehicle Safety & Regulatory Compliance) was the point person with the EPA and CARB regarding vehicle certification (along with Ellis D. Jefferson). Mazure reported directly to Dahl. The applications for certification to the EPA for each of the 2014, 2015 and 2016 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles was accompanied by a letter from Mazure dated May 3, 2013, August 21, 2014, and June 8, 2015.

414.    Each of the applications (and supplements thereto) included a "List of AECD Use in Test Group" in Section 11 of the application for certification.  Each application purported to disclose all AECDs on the vehicles.  For example the application for the 2014 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicle identified 13 AECDs. The application for the 2015 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles identified 17 AECDs.  The application for the 2016 Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles identified 17 AECDs. While Defendants identified all the legal AECDs in Chrysler's applications for certification to the EPA, Defendants failed to disclose all 8 of the illegal AECDs, which were not identified in any of the applications.  Defendants' disclosure or all legal AECDs but none of the illegal AECDs creates an inference that they knew of their existence, that they were illegal, and that they intentionally concealed the illegal EXCDs from the EPA.

*The VRC Ordering a Secret "Voluntary Recall" through a "Field Fix" of One of The Illegal AECD In 2015 Demonstrates Defendants' Knew of the Undisclosed AECDs and Their Illegality*

415.    Any claim that Defendants did not know that the 8 AECD's were on the Jeep Grand Cherokee or Ram 1500 is disproven by Chrysler (as admitted in the EPA January 2017 Notice of Violation) "*institute[ing] a voluntary recall for AECD #1 in 2015, referred to as the 2014 Field Fix" on its 2014 Grand Cherokees and Ram 1500s*. If Defendants did not know about the AECDs and their illegal impact on NOx emissions then they could not have made the decision to remove AECD#1 from their vehicles.  Moreover, the fact that Defendants conducted this recall or "field fix" secretly without informing the public (or informing the EPA until after the EPA identified the AECDs as defeat devices) demonstrates that Defendants knew that the existence of the AECDs was important to investors and the public's knowledge of their existence would harm the Company.

416.    All recalls and field fixes were made and approved by Chrysler's VRC, which was chaired by Kunselman (and later Dahl) and included, among others, Lee, Lux and Chernoby. The VRC met at least once every month.  According to Chrysler documents produced during discovery concerning the recall/vehicle safety claims, starting in November 2014, the VRC met twice a month – "on 1st and 3rd Tuesday of every month."  Thus, these individuals knew of the 2015 field fix to remove the illegal AECD 1 from the 2014 Grand Cherokee and Ram 1500 3.0 diesel vehicles months before the actual field fix was initiated.  It follows, *a fortiori*, that the members of VRC knew of the *existence* of the illegal AECD 1 well before the "filed fix" was initiated.

417.    A recall or "field fix" for software can be accomplished secretly, without any public knowledge, because it is accomplished by updating or "flashing" the software for the vehicle.  Any time an owner takes their vehicle to the dealership, the first thing the dealership is required to do is hook up the vehicle's Power-train Control Module ("PCM") to the system so

any software updates (whether legal or illegal) can be installed or "flashed.".  Owners routinely bring their new vehicles to the dealership because the purchase of the vehicle routinely includes free oil changes at the dealership for 2-4 years. Vehicle manufacturers benefit from this arrangement because it allows the manufacturer to update software or replace defective parts that become apparent as the vehicles first hit the streets.

418.   Moreover, between October 2014 and September 2015, Chrysler had sent several "Service Bulletins" to its dealers relating to defective NOx emissions controls that were causing high NOx emissions for, ***and only for***, its 2014 and 2015 Jeep Grand Cherokee and Ram 1500 equipped with the 3.0 liter diesel engine.  Service Bulletins are information provided to dealers but not customers.  They alert dealers as to defects with vehicles that are required to be fixed anytime an owner brings their vehicle into the dealership.  The first step of the "Repair Procedure" in each Service Bulletin was "The PCM must be at the latest calibration level before proceeding with this repair."  This ensured that Chrysler's secret "field fix" would be applied to all vehicles. For example:

- On October 17, 2014, Chrysler issued Service Bulletin 18-018-14 REV. D (which revised an earlier bulletin issued on July 11, 2014) for 2014 Grand Cherokke with the 3.0 liter diesel engine, stating "[t]his bulletin involves selectively erasing and reprogramming the Powertrain Control Module (PCM) with new software."  Among the problems were Malfunction Indicator Lamp (MIL) illumination for problems with EGR, SCR and NOx performance.

- On November 21, 2014, Chrysler issued Service Bulletin 18-045-14 for 2014 Grand Cherokee and Ram 1500 with the 3.0 liter diesel engine with the subject "P20EE SCR NOx Catalyst Efficiency Below Threshold Bank 1", stating "This bulletin involves verifying the proper operation of the Diesel Exhaust Fluid (DEF) system and, if necessary, replacing the Selective Catalyst Reduction (SCR) Catalyst assembly."

- On March 14, 2015, Chrysler issued Service Bulletin 18-021-15 (which superseded bulletin 18-028-14 Rev. D dated December 18, 2014) for 2014 Ram 1500 with the 3.0 liter engine, stating "[t]his bulletin involves reprogramming the Powertrain Control Module (PCM) with the latest

available software." Among the problems were Malfunction Indicator Lamp (MIL) illumination for problems with EGR, SCR and *NOx performance*.

- On July 18, 2015, Chrysler issued Service Bulletin 09-006-15 for 2014 Grand Cherokee and Ram equipped with the 3.0 liter diesel engine. While it concerned the replacement of engine cylinder heads, the bulletin's "Repair Procedure" still stated "Verify the PCM is programmed with the latest available software. Refer to all applicable published service bulletins for detailed repair procedures and labor times regarding updating the PCM software."

- On September 24, 2015, Chrysler issued Service Bulletin 18-064-15 (which superseded Service Bulletin 18-045-14, dated November 21, 2014) for the 2014 Grand Cherokee and Ram 1500 with the 3.0 liter diesel engine again for "P20EE SCR NOx Catalyst Efficiency Below Threshold Bank 1" and stating "This bulletin involves replacing the Selective Catalyst Reduction (SCR) Catalyst assembly. The Repair Procedure states "The PCM must be at the latest calibration level before proceeding with this repair."

- On February 17, 2016, Chrysler issued Service Bulletin 18-017-16 (which superseded Service Bulletin 18-021-15 Rev. F, dated December 2, 2015) for the 2014 Ram 1500 with the 3.0 liter diesel engine. The subject was "Flash: 3.0L Powertrain Diagnostic and System Enhancements". The Overview stated "This bulletin involves reprogramming the Powertrain Control Module (PCM) with the latest available software." Among the problems were Malfunction Indicator Lamp (MIL) illumination for problems with EGR, SCR and NOx performance.

- In April 2016, following on the Service Bulletins of November 2014 and September 2015 and the instructions from the EPA and CARB, Chrysler issued "Emissions Recall R69 Selective Catalyst Reduction Catalyst" for the 2014 Grand Cherokee and Ram 1500 equipped with a 3.0 liter diesel engine. The purpose of the recall was to replace the SCR catalyst because of "washcoat degradation" which was causing NOx emissions to exceed legal limits.

419. The above not only demonstrates how Chrysler was able to conduct its secret "recall" or "field fix" for AECD 1 but it also demonstrates that Chrysler and specifically the members of the VRC (including Kunselman, Dahl, and Lee) were well aware in 2014-2016 of high NOx emissions on the Jeep Grand Cherokee and Ram 1500 3.0 liter diesel vehicles.

420. Marchionne was also alerted to the AECD 1 field fix well in advance of it being instituted. Based on Lead Plaintiffs' review of documents produced pursuant to discovery requests relating to their recall/vehicle safety claims, as a matter of standard practice, all recalls

and field actions were reported to Marchionne through formal memos. It was established practice that "Minutes [from the VRC meeting] will be published within 48 hours of [the] meeting['s] conclusion" and an "Officer Memo" was distributed to Marchionne immediately following the distribution of the minutes.   While the documents produced in discovery are limited to only those concerning the 22 recalls identified in NHTSA's Consent Order, the Officer Memos including those issues demonstrate that all emissions related "field fixes" were reported to Marchionne prior to implementation.   For example, on June 27, 2014 Reginald Modlin, Director Regulatory Affairs, who reported to Kunselman (and then Dahl upon Kunselman's resignation) sent a memo to Marchionne and Palmer (cc'ing members of the VRC, including Lee, Lux, Kunselman and Chernoby) with the "Re" line of "Field Actions – Vehicle Regulations Committee (VRC)".   The memo begins "Decisions were made at the June 24, 2014 VRC meeting to conduct field actions to address the following issues."   The memo identified a total of 7 "field actions" broken down by the following subjects: (1) "Safety & Noncompliance Recalls" (2) "*Emissions Recalls*"; (3) "Customer Satisfaction Notifications", (4) "Extended Warranty", (5) "Field Action", (6) "Safety Recall Extension".   The memo also included a summary of the issue underlying each field action, the action to be taken, the estimated number of vehicles affected, estimated cost and other information. For example, the emissions recall included a detailed description "Some vehicle equipped with a 6.7L Cummins turbo diesel engine have the T2 and T3 Diesel Particulates Filter (DPF) sensor wiring reversed in the wiring harness causing tailpipe emissions of oxides of nitrogen (NOx) to exceed emissions standard."   A review of the various Officer Memos produced during discovery show that they were sent to Marchionne within a few days of the VRC meeting.   All evidence suggests that this is a routine memo sent to Marchionne and Palmer on a regular basis identifying all recalls and field actions.   For example,

137

the row "Extended Warranty" in the chart summarizing the field actions in this memo identifies zero "number of actions" during the period.  This implies that the memo (and chart) is a standard reporting instrument.  Moreover, the memo is dated only 3 days after the date of the VRC meeting, further supporting the conclusion that it was a standard memo provided to update Marchionne and Palmer as to all decisions made at each VRC meeting.

421.    The fact that Marchionne was regularly alerted to all field fixes and recall decisions when they were made further supports an inference that they were alerted of the field fix regarding AECD 1. Marchionne must have known of the AECD 1 field fix no later than a few days after the VRC approved the field fix in mid-2015.

*The EPA Alerted Defendants in Mid-2015 That It Had Identified "Defeat Devices" on the Grand Cherokee and Ram 1500*

422.    As Marchionne would later admit in a January 12, 2017 interview, by no later than September 2015, the EPA had informed him that the EPA had identified undisclosed AECDs that it had determined were "defeat devices." Marchionne stated "***obviously, we knew that they had concerns.  We have been in dialogue with them now since September 2015.  It could have been even earlier.***"

423.    It was indeed earlier. CW3 was a Program Manager of Advanced Powertrain at Chrysler (the division headed by Lee) from June 2013 through September 2015, located at the Auburn Hills, Michigan facility.  According to CW3, Chrysler was aware that its diesel model vehicles were exceeding the emissions levels that the Company had reported to the EPA by no later than summer 2015. It was CW3's understanding that the vehicles were emitting more NOx than what FCA was reporting to the EPA.  "I knew they had an issue with the software and were working on trying to figure it out," CW3 said. "They knew there was an issue." The issue was

that some of the vehicles were exceeding the emissions levels that had been reported to the EPA. "Whatever they were reporting on the label, whatever they told the government, they found out they weren't meeting those," CW3 said. "It was big issue," CW3 said of the emissions discrepancy. "It went all the way up to Bob Lee." CW3 understood that Lee formed the team and was pulling engineers and tech specialists from several different departments to work on it. From conversations with co-workers, CW3 said many employees "knew something… was going on." "They were pulling guys from other projects," CW3 said. "That (issue) was the number one priority all the sudden." "The details were kind of hush hush," CW3 said. "It was a secretive mission if you will. It wasn't public knowledge." CW3 said no one at FCA, especially not the leadership, was talking publically about the issue and the company's efforts to deal with it.

424.    Unbeknownst to investors, it was Defendants' communications with the EPA in mid-2015 concerning the defeat devices on the Jeep Grand Cherokee and Ram 1500 that led to Chrysler's purported "audit" of its software.

425.    Following the EPA alerting Chrysler that it had found undisclosed defeat devices, Lee, Kunselman, Dahl and Marchionne (among many others) were all involved in discussions of the issues.

426.    On October 27-28, 2015, at the meeting of the Board of Directors of Chrysler (at which Marchionne was in attendance), Kunselman and Lee discussed, according to the minutes of the meeting, "the current regulatory matter involving Volkswagen Group and its use of an emissions testing 'defeat device' in certain of its diesel engines. They discussed the Company's actions in light of the VW matter including: immediate review of compliance requirements with staff and immediate implementation of internal software and calibration audits."

427.    On November 25, 2015, Michael Dahl (Head of Vehicle Safety and Regulatory Compliance at FCA Fiat Chrysler Automobiles), Steve Mazure (FCA - North America, Senior Manager - Environmental Certification - Vehicle Safety & Regulatory Compliance) and Vaughn Burns (Head - Vehicle Emissions, Certification and Compliance at FCA - North America) and others met with Byron Bunker (Office of Transportation and Air Quality Compliance Division Director), Linc Wehrly (Director, Light-Duty Vehicle Compliance (he is responsible for emissions and fuel economy compliance for all new light-duty vehicles)) of the EPA. At this meeting, the EPA identified several AECDs in FCA's Ecodiesel vehicles that appeared to the EPA's Director Compliance Division, Office of Transportation and Air Quality, Byron Bunker to "violate EPA's defeat device regulations" concerning NOx emissions.

428.    Between November 25, 2015 and January 7, 2016, Dahl and his staff communicated regularly about the EPA's finding of defeat devices.  As Dahl stated in a January 11, 2016 email, "[we] have communicated throughout that time with your team, and have sought to respond to your inquiries transparently, and as rapidly as possible under the circumstances."

429.    On January 7, 2016, Bunker of the EPA sent an urgent email (marked as "High Importance") to Burns (cc'ing Wehrly) requesting a phone call with Burns, Mazure and Dahl for that very same day because "I am very concerned about the *unacceptably slow pace* of the efforts to understand the high NOx emissions we have observed" from several of FCA's Ecodiesel vehicles, reiterating that "*at least one of the AECDs in question appears to me violate EPA's defeat device regulations.*"  The purpose of the call was "Linc and I would like to briefly discuss our concerns today with the intent to schedule a meeting where FCA can come prepared to brief EPA and CARB in detail on the AECDs in question."  Bunker coped at the bottom of the email 40 CFR 1803-01, the definition of "Defeat device".

430.    On January 8, 2016, the EPA had a call with Dahl and his team to discuss the issue of the defeat devices.

431.    On January 11, 2016, Dahl emailed Christopher Grundler (Director of the EPA Office of Transportation and Air Quality) stating that "[a]fter identifying these concerns at the November 25, 2015 meeting with my staff, FCA has been engaged in extensive efforts to analyze the issues…We truly appreciate the significance of your concern that NOx emissions during certain operating modes has been identified."

432.    On January 13, 2016, Dahl and his team met in person with the EPA and CARB.

433.    On January 13, 2016, because Dahl was meeting with the EPA and CARB about Chrysler's defeat devices regarding NOx, Lee reported alone to the Board of Directors of Chrysler (including Marchionne) on the issues of "Emissions and Fuel Efficiency Regulations and Compliance Plans."   He discussed "the current regulatory matter involving Volkswagen Group and its use of an emissions testing 'defeat device' in certain of its diesel engines. He discussed the Company's actions in light of the VW matter including: immediate review of compliance requirements with staff and immediate implementation of internal software and calibration audits.  He then reviewed the audit findings to date in NAFTA and the remaining work to be completed."

*Marchionne's Admission That Chrysler's Vehicles "Weren't Compliant" When They Were Launched* <u>*Supports a Strong Inference of Scienter*</u>

434.    Despite (i) Defendants intimate knowledge of the AECDs, (ii) the high NOx emissions in their Grand Cherokee and Ram 1500 3.0 diesel vehicles, (iii) conclusions by the EPA and CARB that the vehicles contained undisclosed defeat devices, and (iv) a purported "audit" of all the software on their diesel vehicles, Marchionne continued to assert that

Chrysler's vehicles were in full compliance with emissions regulations (which required disclosure of all AECDs and prohibited defeat devices).

435.    Marchionne finally admitted that all previous representations of compliance were false during a July 27, 2017 Q2 2017 earnings call.  Responding to a question about voluntary updates to Chrysler's software in its diesel vehicles, Marchionne stated "We are looking at this, if we can do it, and provide an improvement in air quality, both on CO2 and NOx, purely as a result of calibration, and we'll do this*. **The important thing is that, within the scheme of things that existed at the time in which we launched these vehicles, we weren't compliant**.  If there is a way to improve that position, we will more than gladly do it.  So we're working at this."

436.    The Company's actions with respect to its illegal emissions software further evidences that all of its previous representations of compliance were false.  The Company "updated" its emissions software in its 2017 vehicles as a basis to "fix" the DOJ's and EPA's allegations of excess emissions.  Following the filing of the DOJ Complaint, FCA US announced that it developed "updated emissions software calibrations" and filed for diesel vehicle emissions certification for its 2017 model year Jeep Grand Cherokee and Ram 1500 diesel vehicles and stated that "subject to the permission of the EPA and CARB, FCA US intends to install the **same modified emissions software in 2014-2016 MY Jeep Grand Cherokee and Ram 1500 diesel vehicles…FCA expects that the installation of these updated performance calibrations will improve the 2014-2016 MY vehicles emissions performance…**"

437.    On July 28, 2017 the EPA and CARB approved the 2017 diesel vehicles with the updated software for sale after it had subjected the vehicles to "intense scrutiny" with tests to prevent the use of illegal defeat devices.  News outlets reported that it could take weeks of

months for the EPA to sign off on the testing and then approval of Chrysler's plan to use the software in the 2017 diesels to update the 2014-2016 vehicles.

438.    Marchionne's adamant denials of any non-compliance even after purporting to have conducted a thorough audit of all software in 2015 strongly suggests that Marchionne knew all along (even before the audit) that the vehicles "weren't compliant". There is no credible explanation for how Defendants could design the AECDs, know the vehicles were spewing NOx, be alerted to software problems, have the EPA and CARB conclude they are defeat devices, and conduct an audit of the software and not be aware of any non-compliance.  Having lied about compliance following these events implies that Marchionne knew all along about Chrysler's non-compliance. Further, Defendants' "fix" of the software and request to regulators for permission to use the modified software in its 2014-2016 vehicles is tantamount to an admission of non-compliance.

*Defendants Knew That The Grand Cherokee and Ram 1500 3.0 Liter Diesel Vehicles Were Exceeding NOx Emissions Standards In August 2014*

439.    Moreover, Defendants were aware that the 2014 Grand Cherokee and Ram 1500 equipped with the 3.0 liter diesel engines were exceeding EPA and CARB NOx emission standards at least as early as August 4, 2014. Chrysler's investigation into the illegal levels of NOx emissions creates a strong inference that Defendants were aware of the AECDs that increased the vehicles' NOx emissions.

440.    On August 4, 2014, when the defect limit of greater than 25 (the internal number of reported defects for Chrysler to formally determine a defect exists) confirmed defects was exceeded, an Emissions Defect Information Report ("EDIR") was submitted to the EPA, alerting the EPA of the issue on the Grand Cherokee.

143

441.    In November 2014, a Service Bulletin was distributed to alert FCA US dealers of the issue for both 2014 Grand Cherokee and Ram 1500 vehicles.

442.    In February 2015, the 2014 Ram 1500 was added to a revised EDIR and the EPA was apprised of the fix for both vehicles.

443.    On April 10, 2015, a required Field Information Report ("FIR") was filed with CARB when the warranty rate reached the 4% reporting level.

444.    On July 10, 2015, a follow-up Emissions Information Report ("EIR") was filed with CARB indicating that washcoat durability of the catalysts exhibited various levels of degradation

445.    The week following the EIR submission, CARB contacted the FCA US Compliance group to discuss the extent of the SCR Failures in the Grand Cherokee and Ram 1500 with 3.0 liter diesel engines as detailed in the November 21, 2014 Service Bulletin. FCA US engineering provided information that projected nearly 100% of the SCRs would fail within the warranty period. CARB asked that FCA US employ a Rapid Response Transmittal ("RRT") and then report on a quarterly basis on the progress of the SCR replacement for six quarters. CARB explained that if the replacement rate slowed, they may request further action.

446.    On September 24, 2015 RRT 15-093 was initiated to replace existing SCRs on the vehicles with the new SCRs that have an improved washcoat.

447.    November 18, 2015 Chrysler met with the EPA to discuss the issue of the high NOx emission on the Grand Cherokee and Ram 1500 with 3.0 liter diesel engines.  The EPA requested that FCA US performed a Voluntary Emissions Recall to fix the remaining vehicles after four of the four EPA surveillance vehicles without the SCR/calibration fix in the RRT failed emissions at their testing facility.  None of those vehicles illuminated the MIL.

144

448.    On December 15, 2015, there was a VRC Meeting (attended by Dahl, Lee and Lux) in which they discussed Catalyst Washcoat Degradation issue and the events occurring to date.

449.    In April 2016, following on the Service Bulletins of November 2014 and September 2015 and the instructions from the EPA and CARB, Chrysler issued "Emissions Recall R69 Selective Catalyst Reduction Catalyst" for the 2014 Grand Cherokee and Ram 1500 equipped with a 3.0 liter diesel engine.  The purpose of the recall was to replace the SCR catalyst because of "washcoat degradation" which was causing NOx emissions to exceed legal limits.

*Marchionne's Regular Receipt And Approval of Reports Detailing The*
*Status of Emissions Software Supports A Strong Inference of Scienter*

450.    Confidential witnesses that worked on emissions testing at Chrysler during the Class Period confirmed that Marchionne received regular reports on emissions software and testing, was focused on the EPA's emissions test cycles, and that he (Marchionne) made the ultimate decisions on whether to incorporate emissions software or hardware in Chrysler's vehicles.

451.    Confidential Witness #1 ("CW1") worked at Chrysler's Auburn Hills, Michigan Tech Center during the Class Period evaluating vehicles for fuel economy and scheduling emissions testing, and had knowledge of diesel as well as gasoline engine testing.

452.    As part of the testing, CW1 would work with a dynamometer, or "dyno" for short, which were used to measure force, torque or power on both diesel and gasoline engines. In these tests a vehicle's tires spin, but the vehicle does not go anywhere.   For emissions testing, the dynos were used to provide simulated road loading of either the engine or powertrain. Some dynos, which were built into the floor at the Tech Center, could simulate a car driving at 40 miles

per hour, for instance. A hose placed in a car's exhaust pipe collects emissions. The vehicle is run at city or highway cycles to simulate driving in those conditions.

453.    According to CW1: "These critical tests are super important because to certify a car to sell it, the EPA (Environmental Protection Agency) has to say, 'Yeah, we accept the fuel economy numbers.' When we submit to EPA that the vehicle does 20 miles per gallon in the city, and 30 on the highway, it has to do that. If they call you out, you can get in trouble. So, you have to make sure that the data is accurate, and can be replicated in EPA tests."

454.    Confidential Witness #2 ("CW2") also worked at the High Tech Center in Auburn Hills, Michigan during the Class Period.  CW2 worked as a powertrain performance and fuel economy analysis engineer in the vehicle performance and fuel economy and emissions departments at the Tech Center, reporting to John Alexander, FCA director of powertrain development. Alexander reported to Jeffrey P. Lux (head of transmission powertrain for Fiat Chrysler Automobiles (FCA US) -- North America), or Robert (Bob) E. Lee (head of engine, powertrain and electrified propulsion, and systems engineering, for FCA -- North America), who in turn reported directly to Marchionne.

455.    CW2 worked on 3.0 diesel and gasoline-powered engines on the Jeep Grand Cherokee and Dodge Durango, and performed computer simulations on fuel efficiency, emissions and other powertrain issues that were incorporated in vehicles. CW2 analyzed such factors as the effects of vehicle weight, tire weight, size and air pressure on engine performance, plus stop-and-go driving conditions on the highway or in a city, on fuel economy and emissions.

456.    The propulsion system simulations on which CW2 worked were used to predict the performance of diesel engines, transmissions, electric drive systems, batteries, fuel cell systems, and similar components.  According to CW2, prior to the Class Period, Chrysler used

146

an in-house simulation tool based on METLAB, which is a "technical computing" language for engineers, and Simulink, which provides a platform for engineers to model complex engineering problems with a varied degree of complexity in a virtual environment. The simulations were developed by a single person within FCA -- Graham Brooks. "The software definitely had growing pains," CW2 said.

457.    The older software was known technically as "PMAT," and was a "powertrain matching" and optimization tool designed to simulate vehicle performance. It was superseded by another software tool introduced in 2014 to help develop vehicles in the 2015-2016 models.

458.    As part of everyday responsibilities, CW2 would generally take EPA-certified fuel consumption and emission data points on a vehicle in production, then simulate on a computer how the next year's vehicles could be improved either with changes to a software management control system or hardware alterations. "It's a projection tool. It shows what is predicted to happen in a road test," CW2 explained.

459.    CW2 stated that it's a difficult balancing act, as emissions, fuel economy and engine performance are linked together such that an improvement in emissions can't be accomplished without affecting also affecting fuel economy and engine performance. "You are almost out of tricks in the auto industry in how to regulate an internal combustion engine," said CW2, *who cited pressure from Alexander and higher-ups who always demanded improvements*. CW2 stated that there was a lot of pressure to produce results -- even if the vehicle's improvements weren't quite ready.

460.    Section 208(a) of the Clean Air Act, 42 U.S.C. § 7542(a), requires that "[e]very manufacturer of new motor vehicles . . . establish and maintain records, perform tests . . . make reports, and provide information the Administrator may reasonably require to determine whether

147

the manufacturer or other person has acted or is acting in compliance" with Part A of Title II of the Act.

461. CW1 explained that data gathered from these engine tests would be analyzed in a report and presented to a senior manager. The report would then get forwarded up to Jeffrey P. Lux or Robert E. Lee, where decisions would be made along the way on whether to make changes to the hardware or software impacting emissions or fuel efficiency. This process worked the same on the gasoline engine side of the benchmarking business as the diesel side. Lux and Lee would then forward these reports to Sergio Marchionne, who would make decisions on whether to incorporate hardware or software changes in emissions or fuel efficiency in Chrysler's vehicles.

462. CW2 stated that Chrysler paid close attention to the so-called "EPA performance cycle," which examines a series of data points to assess fuel consumption and polluting emissions, and also stated that Marchionne made the decisions on whether to incorporate hardware or software changes in emissions or fuel efficiency in Chrysler's vehicles.

463. CW2 laid some of the blame on the fact that Chrysler was a "flat organization" with not much middle management "fat" between himself, director Alexander, vice presidents Lee and Lux, and Marchionne, whom he described as a hard-nosed executive.

464. CW2 explained that Marchionne was very hands-on and detail oriented. "If you presented something and it didn't go well, you could expect to be on the street the next day," said CW2 of Marchionne. "You'd better have your facts together. A lot of guys were scared when they'd have to go there to present something. They'd have a huge amount of backup data. If Sergio asked a question, and you didn't know, that was trouble."

148

465.     CW2 was not surprised that the U.S. Justice Department is investigating Chrysler over its alleged failure to disclose software that violated emission standards.  "No, I'm not surprised by this. The entire industry is challenged by it (software controlling emissions). Now, all auto manufacturers have to cheat," said CW2, who pointed to similar revelations where Volkswagen AG conspired with the company that designed their emissions controls, Robert Bosch GmbH ("Bosch") – the same company that designed Chrysler's emissions controls.  "It's standard." CW2 suggested that the dangerous release of pollution from Grand Cherokees and Ram 1500s could have been triggered by making changes in software coding embedded in the electronic brains, or software management control systems, of 104,000 vehicles thought by the EPA to have released too much nitrogen oxide into the air.

*The Involvement of Bosch In Chrysler's Emissions Scheme*
*Supports A Strong Inference of Scienter*

466.     Discovery of Bosch has just begun in a separate civil case, but the evidence contained in publicly available pleadings in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) ("VW Clean Diesel Litigation") already proves that Bosch played a critical role in the scheme to evade U.S. emissions requirements for diesel vehicles, including Volkswagen and Chrysler vehicles.  All paragraphs that contain citations to documents prefixed "VW-MDL2672" are drawn from the publicly-available Volkswagen-Branded Franchise Dealer Amended and Consolidated Class Action Complaint in the VW Clean Diesel Litigation, Dkt. No. 1969 ("VW Dealer Complaint").

467.     According to pleadings in the VW Clean Diesel Litigation, ***in 2008, Bosch wrote Volkswagen and expressly demanded that Volkswagen indemnify Bosch for anticipated liability arising from the use of the Bosch-created "defeat device" (Bosch's words), which***

149

*Bosch knew was "prohibited pursuant to … US Law*."[35]   Volkswagen apparently refused to indemnify Bosch, but Bosch nevertheless continued to develop the so-called "akustikfunktion" (the code name used for the defeat device) for Volkswagen for another seven years. VW Clean Diesel Litigation pleadings set forth that during that period, Bosch concealed the defeat device in communications with U.S. regulators once questions were raised about the emission control system, and went so far as to actively lobby lawmakers to promote Volkswagen's "Clean Diesel" system in the U.S. Bosch's efforts, taken together with Bosch's actual knowledge that the "akustikfunktion" operated as an illegal defeat device, demonstrate that Bosch was a knowing and active participant in Volkswagen's emissions scandal.

468.   Bosch tightly controlled development of the control units in vehicles, and actively participated in the development of the defeat device for Volkswagen.

469.   Bosch made clear that the EDC17 was not one-size-fits-all. Instead, it was a "[c]oncept tailored for all vehicle classes and markets" that could "be adapted to match particular requirements [and] … be used very flexibly in any vehicle segment on all the world's markets." The EDC17 was tailored and adapted by modifying the sophisticated software embedded within the electronic control unit ("ECU"). Bosch manufactured, developed, and provided the ECU and its base of software to Volkswagen as well as Chrysler.

470.   All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control. In fact, the software is typically locked to prevent customers, like Volkswagen and Chrysler, from making significant changes on their own. The defeat devices employed by Volkswagen and Chrysler were just such a software change—one that would allow modifications to the vehicle's emission control to turn

---

[35] VW-MDL2672-02570091 (English translation) (emphasis added).

on only under certain circumstances—that Volkswagen or Chrysler could not have made without Bosch's participation.[36]

471.    Unsurprisingly, then, at least one car company engineer has confirmed that Bosch maintains absolute control over its software as part of its regular business practices:[37]

> I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves. Before each dataset is released it goes back to Bosch for its own validation.

> Bosch is involved in all the development we ever do. They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.

> All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure ….

> The car company is *never* entitled by Bosch to do something on their own.

472.    Thus, Defendants cannot argue that the existence of the illegal software was the work of a small group of rogue engineers. To arrange this type of complicated programming required coordination between Chrysler and Bosch and possibly hundreds of employees between the two companies.

473.    As the Dealer Complaint alleges, Bosch expressed similar concerns that use of the defeat device it had created for Volkswagen would violate U.S. law. These concerns culminated in a June 2, 2008 letter from Bosch to Volkswagen's Thorsten Schmidt in which Bosch demanded that Volkswagen indemnify Bosch for any liability arising from the creation of a "defeat device," as Bosch itself called it in English. Through the letter, Bosch sought to clarify the roles and responsibilities of Volkswagen and Bosch regarding the development of the EDC

---

[36] VW Dealer Complaint ¶ 79
[37] Michael Taylor, EPA Investigating Bosch over VW Diesel Cheater Software, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheatersoftware/.

17, and demanded that Volkswagen indemnify Bosch for any legal exposure arising from work on the defeat device:[38]

> The further development [of the EDC17] requested by your company will result, in addition to the already existing possibility of activating enriched data manually, *in an additional path for the potential to reset data to act as a "defeat device."* We ask you to have the attached disclaimers executed by your company.

474.    The letter uses the words "defeat device" in English, and further explained that *"[t]he usage of a defeat device is prohibited pursuant to … US Law (CARB/EPA)* (see definition footnote 2)."[39]

475.    The complaint filed by the DOJ against Volkswagen similarly alleges that Bosch communicated with Volkswagen about programming the illegal software.

476.    CW2 confirmed that Chrysler worked with Bosch to program its vehicles, including the Grand Cherokees and Ram 1500s and that it was possible that the release of emissions could have been triggered by making changes in software coding embedded in the software management control system.   CW2 also confirmed that the programming involved collaboration between Chrysler and Bosch: "Our people would develop the software, ship it overnight via email over a special network. They'd get it, make modifications or whatever, to prepare it. You'd receive it back the following day, so you could implement the actual software code into the model."

*Marchionne's Repeated Detailed Discussions and Assurances*
*Concerning Emissions Software Create A Strong Inference of Scienter*

477.    Further demonstrating Marchionne's scienter are his repeated and detailed discussions of the importance of compliance with emissions regulations, his focus on achieving

---

[38] VW-MDL2672-02570091 (English translation) (emphasis added).

[39] Id. at 92 (emphasis added).

compliance, his review of the software used to achieve compliance, and his assurances of compliance. In addition to the statements identified above in Chrysler's SEC filings, Marchionne routinely addressed these issues during earnings calls.

478.    For example, Marchionne was well-aware of Volkswagen's scandal involving the implementation of software to manipulate emissions readings.  On October 28, 2015, during Chrysler's Q3 2015 earnings call, Marchionne addressed the issue unprompted in his opening statements to investors, acknowledging that the implementation of software that manipulates emissions reading cannot be the result of accident but rather "malfeasance": "There's not a doubt that the problem does exit. I think we cannot confuse the events in terms of their importance. *The origin of this problem was a governance failure. It was not the failure of technology*. I think that there was nothing that I have read or that I know that would suggest that diesel as a means of providing combustion for our units is either in danger or should be eliminated because of the potential *malfeasance* of an agent in the market."  Marchionne again recognized the importance of compliance with emissions regulations: "I think the Volkswagen story and the cost associated with what I consider to be *a very stiffening environment of regulations and of compliance* only makes that thesis [of consolidation] more valid today than it even was back in April 9."  He also discussed Chrysler's preference for selling larger vehicles the need for the Company to implement effective emissions technology for it to compete in that market: "technology will compensate for the size. I think that these vehicles will require additional technology on the powertrain side to compensate for the emission status . . ."

479.    During his January 27, 2016 Q4 2015 earnings call, Marchionne repeated the importance of and his focus on emissions compliance.  "The other thing that's obviously happened and was absolutely unforeseen was the development of a much greater degree of

consciousness when it comes to emissions and the regulatory environment. Some of them which were caused by the industry, some of which I think a result of something which has been brewing within the system, especially in the EMEA side now for a number of years. But all these things will require resolution over the next three years or four years and they will have costs, which we have incorporated in our plan. . . . I've said this before and I continue to repeat it here, that I've always viewed the development of our portfolio in the United States as being really driven by the regulatory environment . . ."

480.    During the same call, Marchionne discussed aspects of Chrysler's technologies for achieving emissions compliance in great detail.  For example, discussing Chrysler's "regulatory compliance plan in terms of greenhouse gas on a global scale", Marchionne stated "I think we all know that there is directionally a desire to bring down $CO_2$ emissions. I think as I read some of the reports that have been issued in connection with FCA, *there appears to be some concern that we do not have adequate technologies to try and deal with this. So, I'm going to spend a couple of slides trying to reassure you that all the things that are required to try and make the numbers are in fact in place and available*."  Marchionne went on to discuss these technologies: "as a result of the combination of what I considered to be economically sound acquisitions of credits and *the rollout of technologies that we're well ahead of the curve in terms of achieving targets that we have throughout the plan*." Marchionne went on to discuss details of how Chrysler's trucks would achieve regulatory compliance, including those that utilized the illegal software: "But as you can see, *both the current Ram 1500, which today is compliant with 2015 standards*, will in its next incarnation, when the truck gets launched in 2018, meet both the 2018 and the 2022 targets."

481.    Marchionne even directly addressed the specific issue of software on diesel vehicles used to cheat regulatory compliance in the wake of Volkswagen's "Dieselgate" scandal, assuring investors that he had examined the issue and no such software was being utilized by Chrysler. Stating, "I think it's important to keep this in mind", Marchionne made clear that Chrysler "has been busy and it continues to be busy on optimized methods to achieve the targets. It will continue to do so. . . . I think that *after the advent of dieselgate,* for a lack of a better term, *FCA has undertaken a pretty thorough review and a thorough audit of its compliance teams.* I think we feel comfortable in making the statement that *there are no defeat mechanisms or devices present in our vehicles. And I think the cars perform in the same way on the road as they do in the lab under the same operating conditions.   This is an area of heightened concern.* And so we've put in – we have established now as part of our compliance mechanism training for all emission calibration engineers. *We do have a best practice program to ensure that we calibrate and certify properly.* And I think that we will – just to make sure that the system is not going off the reservation, we will carry out random checks of our fleet to ensure that we achieve compliance."

482.    During Chrysler's April 26, 2016 Q1 2015 earnings call, Marchionne again discussed the issue of emissions regulation and technology.   Marchionne, discussing the "regulatory environment" stated "I think we have been incredibly clear over the last number of quarters about the fact that the regulatory environment has become a lot more stringent . . ." Discussing emissions specifically, Marchionne stated "there needs to be much better coordination across the national bodies about what it is that has effectively allowed as relevant technology in order to meet an emission standard."

483.    Marchionne went on to discuss in detail the emissions standards and the technology involved: "There's a phenomenal level of confusion out there about the degrees of freedom that are associated in the interpretation of that rule, what constitutes effectively a sound technical reason for the application or the suspension of emission controls in a particular vehicle, because of the fact that there are very strong technical arguments that would suggest for the protection of the engine a number of – *a variety of responses are capable of being introduced as part of the software solution that runs these vehicles. I understand all this*."  Marchionne also acknowledged his understanding that the United States has "*very clear rules about what those requirements are and how exceptions to those rules*" because "there's a continuous dialog with both *EPA and CARB* about what is allowed as an exception to the general, zero exception application of the rules."

484.    Discussing emissions regulations, Marchionne repeated "we have done our best to meet those standards over time, fully understanding that there were technical limitations associated with our powertrains that we use, and that because of those technical limitations that the rule itself allowed for relief."

485.    During Chrysler's July 27, 2016 Q2 2016 earnings call, Marchionne discussed in depth his opinions concerning the emissions regulations in Europe.

## V.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

486.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Chrysler securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

487.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Chrysler securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Chrysler or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

488.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

489.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

490.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Chrysler;

- whether the Individual Defendants caused Chrysler to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Chrysler securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

491. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

A.    **Fraud On The Market Presumption of Reliance**

492. The market for Chrysler's securities was an efficient market during the Class Period for the following reasons, among others::

- Chrysler's stock met the requirements for listing ,and was listed and actively traded on the NYSE, a highly efficient market;

- As a regulated issuer, Chrysler field periodic reports with the SEC and/or NYSE ;

- Chrysler regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major news wire services and through wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts including Barclays Capital, Credit Suisse and Morgan Stanley;

158

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Chrysler securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts;

- Unexpected material news concerning Chrysler was rapidly reflected in Chrysler's share price.

493.    Based upon the foregoing, the market for Chrysler's securities promptly digested current information regarding Chrysler form all publicly available resources and reflected such information in Chrysler's share price.  Accordingly, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

494.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Chrysler securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Chrysler securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

495.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## B.     Applicability of Presumption of Reliance: Affiliated Ute

496.     Neither Plaintiffs nor the Class need prove reliance—either individually or as a class—because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

497.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

498.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

499.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to,

and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Chrysler securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Chrysler securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

500.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Chrysler securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Chrysler's finances and business prospects.

501.    By virtue of their positions at Chrysler, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

502.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Chrysler securities from their personal portfolios.

503.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Chrysler, the Individual Defendants had knowledge of the details of Chrysler's internal affairs.

504.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Chrysler.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Chrysler's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Chrysler securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Chrysler's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Chrysler securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

505.     During the Class Period, Chrysler securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Chrysler securities at prices artificially inflated by defendants' wrongful conduct.   Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Chrysler securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Chrysler securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

506.   By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

507.   As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

508.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

509.   During the Class Period, the Individual Defendants participated in the operation and management of Chrysler, and conducted and participated, directly and indirectly, in the

conduct of Chrysler's business affairs.  Because of their senior positions, they knew the adverse non-public information about Chrysler's misstatement of income and expenses and false financial statements.

510.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Chrysler's financial condition and results of operations, and to correct promptly any public statements issued by Chrysler which had become materially false or misleading.

511.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Chrysler disseminated in the marketplace during the Class Period concerning Chrysler's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Chrysler to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Chrysler within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Chrysler securities.

512.    Each of the Individual Defendants, therefore, acted as a controlling person of Chrysler.  By reason of their senior management positions and/or being directors of Chrysler, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Chrysler to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Chrysler and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

513.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Chrysler.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   August 15, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*