**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : : : : : | **Civ. Action No: 15-cv-07199-JMF** |
| Plaintiff(s), | : : : : | **CLASS ACTION** |
| v. | : : : : : | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE EMISSIONS-RELATED CLAIMS FROM THE FOURTH AMENDED COMPLAINT** |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE, and ROBERT E. LEE, | : : : : : : : | |
| Defendants. | : : : | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL ALLEGATIONS CONCERNING EMISSIONS VIOLATIONS............................3

    I.    The Trucks' Compliance With Emissions Regulations Was Critical to FCA..........................3

    II.    FCA's Obligation To Comply With Emissions Standards and Disclose All AECDs.............3

    III.    FCA's Emissions Violations .........................................................................................4

    IV.    Defendants Were Aware Of The Undisclosed AECDs, Their Illegal Purpose And That The Trucks Were Emitting Illegal Levels of NOx .........................................................4

        A.    Defendants Were Intimately Involved In The Development, Programming and Certification Of The Trucks' EcoDiesel Engine..........................................................4

        B.    Defendants Were Aware That The Trucks Were Emitting Illegally High Levels Of NOx Because Of The AECDs.................................................................................5

        C.    Director of EPA Emissions Informed Dahl and Marchionne That The Trucks Were Emitting Illegally High Levels Of NOx And Contained Defeat Devices ...........6

    V.    Materially False and Misleading Statements Issued During the Class Period ........................7

    VI.    The Truth Begins to Emerge ........................................................................................8

ARGUMENT ......................................................................................................................9

    I.    The Complaint Alleges A Strong Inference of Scienter ..........................................................9

        A.    Defendants' Actual Knowledge of Emissions Violations Supports A Strong Inference Of Scienter ......................................................................................9

        B.    Dahl's and Lee's Involvement In Designing and Programming the Trucks' Engines and Dahl's and Mazure's Responsibility For The Accuracy of The COC Applications Support A Strong Inference of Scienter ......................................16

        C.    Defendants' Knowledge That the Trucks Were Emitting High Levels of NOx And Of The Removal of AECD#1 Supports a Strong Inference of Scienter .............17

        D.    Additional Facts Demonstrating A Strong Inference of Scienter ...............................19

        E.    The TAC Pleads a Strong Inference of Corporate Scienter ........................................20

        F.    The Statements Of The Confidential Witnesses Should be Credited .........................21

        G.    The Inference Of Scienter Is At Least As Strong As Defendants' Asserted Non-Culpable Inference ..............................................................................22

    II.    The New Defendants Are Liable As "Makers" of False and Misleading Statements and As Control Persons ..................................................................................................23

CONCLUSION....................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) ............................................................22

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
56 F. Supp. 3d 549 (S.D.N.Y. 2014) (Scheindlin, J.) ............................................23

*City of Livonia Employees Ret. Sys. v. Wyeth*,
2010 U.S. Dist. LEXIS 107729 (S.D.N.Y. Sept. 29, 2010) (Sullivan, J.) ..............................20

*City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) (Koeltl, J.) ............................................23

*Cornwell v. Credit Suisse Group*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010) (Marrero, J.) ............................................22

*ECA & Local 134 IBEW Jt. Pension Trust of Chi.*,
553 F.3d 187 (2d Cir. 2009) ............................................................9, 16

*Fialkov v. Alcobra Ltd.*,
2016 U.S. Dist. LEXIS 42633 (S.D.N.Y. Mar. 30, 2016) (Daniels, J.) ..............................19

*General Partner Glenn Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ............................................................13

*Goldman v. Belden*,
754 F.2d 1059 (2d Cir. 1985) ............................................................12

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
2014 U.S. Dist. LEXIS 118061 (N.D. Ohio Aug. 18, 2014) ............................................13

*Honeyman v. Hoys (In re Carter-Wallace, Inc. Sec. Litig.)*,
220 F.3d 36 (2d Cir. 2000) ............................................................9

*In re Alkermes Sec. Litig.*,
2005 U.S. Dist. LEXIS 25826 (D. Mass. Oct. 6, 2005) ............................................15

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) (Marrero, J.) ............................................22

*In re Amylin Pharmaceuticals Securities Litigation*,
2003 U.S. Dist. LEXIS 7667 (S.D. Cal. May 1, 2003) ............................................14

*In re AstraZeneca Sec. Litig.*,
    559 F. Supp. 2d 453 (S.D.N.Y. 2008) (Griesa, J.) ...................................................................17

*In re Atlas Air Worlwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y 2004) (Conner, J.) .........................................................18, 20

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) (Sweet, J.) ....................................................................20

*In re BioScrip, Inc.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) (Nathan, J.) ..........................................................10, 25

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) (Kaplan, J.) ..................................................................21

*In re Cadence Design Sys. Inc. Sec. Litig.*,
    692 F. Supp. 2d 1181 (N.D. Cal. 2010) ...........................................................................16, 17

*In re Carter-Wallace, Inc. Sec. Litig.*,
    150 F.3d 153 (2d Cir. 1998) ....................................................................................................24

*In re Citigroup, Inc.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) (Swain, J.) ...................................................................25

*In re Cryolife, Inc.*,
    2003 U.S. Dist. LEXIS 26170 (N.D. Ga. May 27, 2003) .......................................................13

*In re Delcath Systems, Inc. Securities Litigation*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014) (Schofield, J.) ...............................................................17

*In re EDAP TMS S.A. Sec. Litig.*,
    2015 U.S. Dist. LEXIS 121960 (S.D.N.Y. Sep. 14, 2015) (Schofield, J.) .......................14, 15

*In re General Electric Co.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012) (Holwell, J.) ..........................................................18, 22

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) (Stein, J.) ............................................................20, 21

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011) ...............................................................................14, 17

*In re Marsh & Mclennan Cos, Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) (Kram, J.) ............................................................19, 20

*In re MBIA, Inc. Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) (Karas, J.) ...................................................................21

*In re Medimmune, Inc., Sec. Litig.*,
　　873 F. Supp. 953, 966 (D. Md. 1995) ...................................................................15

*In re Mela Scis. Sec. Litig.*,
　　2012 U.S. Dist. LEXIS 144150 (S.D.N.Y. Sep. 19, 2012) (Briccetti, J.) ..............15

*In re New Century Sec. Litig.*,
　　588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...............................................................20

*In re NovaGold Resources Inc. Securities Litigation*,
　　629 F. Supp. 2d 272 (S.D.N.Y. 2009) (Cote, J.) ..................................................22

*In re Nuvelo*,
　　668 F. Supp. 2d 1217 (N.D. Cal. 2009) ...............................................................14

*In re Salix Pharms., Ltd.*,
　　2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22, 2016) (Wood, J.) ....................20

*In re Scottish Re Group Sec. Litig.*,
　　524 F.Supp. 2d 370 (S.D.N.Y. 2007) (Scheindlin, J.) .....................................16, 21

*In re Viropharma Inc. Securities Litigation*,
　　21 F. Supp. 3d 458 (E.D. Pa. 2014) .....................................................................17

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
　　2017 U.S. Dist. LEXIS 1109 (N.D. Cal. Jan. 4, 2017) .........................................21

*Janus Capital Grp., Inc. v. First Derivative Traders*,
　　564 U.S. 135 (2011) ........................................................................................23, 24

*Kaplan v. Rose*,
　　49 F.3d 1363 (9th Cir. Cal. 1994), cert denied, 516 U.S. 810 (1995) ..................14

*Kiken v. Lumber Liquidators Holdings, Inc.*,
　　155 F. Supp. 3d 593 (E.D. Va. 2015) ...................................................................25

*Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
　　724 F. Supp. 2d 447 (S.D.N.Y. 2010) (Pauley, J.) ...............................................22

*Muzinich & Co. v. Raytheon Co.*,
　　2002 U.S. Dist. LEXIS 26962 (D. Idaho Apr. 30, 2002) ......................................25

*Nielsen v. Rabin*,
　　746 F.3d 58 (2d Cir. 2014) ...................................................................................23

*Novak v. Kasaks*,
　　216 F.3d 300 (2d Cir. 2000) ........................................................................ *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ................................................................................2, 10, 11

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   2016 U.S. Dist. LEXIS 138439 (S.D.N.Y. Oct. 5, 2016) (Furman, J.) ......................... *passim*

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) ...............................................................................13

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ...............................................................................11

*Richman* v. *Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) (Crotty, J.) ...............................................25

*S.E.C. v. Musella*,
   748 F. Supp. 1028 (S.D.N.Y. 1989) (Wood, J.), aff'd, 898 F.2d 138 (2d Cir.
   1990) ....................................................................................................................19

*Sanofi Secs. Litig. v. Meeker*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015) (Engelmayer, J.) ...................................10, 14

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996).............................................................................25

*Solow v. Citigroup, Inc.*,
   827 F.Supp. 2d 280 (S.D.N.Y. 2011) (Sweet, J.).................................................20

*State Universities Ret. Sys. of Illinois v. Astrazeneca PLC*,
   334 F. App'x 404 (2d Cir. 2009) .........................................................................17

*Teamsters Local 445 Freight Div. v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008).................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...........................................................................................9, 23

*Todd v. STAAR Surgical Co.*,
   2016 U.S. Dist. LEXIS 186511 (C.D. Cal. Apr. 12, 2016) .........................12, 15, 24

*Wilkof v. Caraco Pharm. Labs, Ltd.*,
   2010 U.S. Dist. LEXIS 112768 (E.D. Mich. Oct. 21, 2010) .................................12

*Youngers v. Vitrus Inv. Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016) (Pauley, J.) ..............................................15

*Zagami v. Nat. Health Trends Corp.*,
   540 F. Supp. 2d 705 (N.D. Tex. 2008) ...............................................................17

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................................................17

**Statutes**

Clean Air Act ..........................................................................................................3, 4, 7, 8

## PRELIMINARY STATEMENT

On August 1, 2017, granting Plaintiffs an opportunity to amend their emission-related claims, the Court set forth what would be needed to plead scienter:

> [I]f Plaintiffs can allege that the EPA gave notice to high-level FCA officials that the vehicles at issue had unlawful defeat devices (or undisclosed software that the company was required to disclose), their allegations would be much like those that the Court found sufficient with respect to Plaintiffs' allegations regarding compliance with safety-related regulations.

ECF at 13. As to Plaintiffs' allegations regarding safety-related regulations, this Court found that "letters from NHTSA to high-level FCA officials *expressing concerns* with respect to certain FCA recalls adequately established scienter." *Id.*[1]

The Fourth Amended Complaint ("Complaint") has easily met this burden.  Between September 2015 and January 2016, immediately following the revelation of Volkswagen's "Dieselgate", the EPA informed the highest-level executives at FCA that the EPA had concerns about the AECDs on the Company's Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles (the "Trucks") and had observed illegally high levels of NOx emission.  The EPA emphasized that "*at least one of the AECDs in question appears to me violate EPA's defeat device regulations*." ¶¶ 427-429.[2]  By January 7, 2016, the EPA had grown frustrated with FCA's response: "I am *very concerned* about the unacceptably slow pace of the efforts to understand the high NOx emissions we have observed." *Id.* ¶ 429. These communications were with Michael Dahl ("Dahl")—Head of Vehicle Safety and Regulatory Compliance at FCA—who, like Scott Kunselman ("Kunselman") whom he replaced, reported directly to Sergio Marchionne ("Marchionne"). Marchionne later admitted that the EPA had informed him of its "concerns" about the AECDs on the Trucks even earlier: "obviously, we knew that they had concerns.  We have been in dialogue with them now since September 2015. It could have been even earlier." ¶ 422.  Despite the critical importance of this issue to investors in the wake of Dieselgate,

---

[1] Unless otherwise noted, all emphasis has been added.

[2] Unless otherwise noted, all references to "¶" are to the Complaint. ECF 129.

Marchionne nevertheless not only concealed this information but also went out of his way to reassure investors on January 27, 2016 that "we feel comfortable in making the statement that there are no defeat mechanisms or devices present in our vehicles." ¶ 343.  And on February 2, 2016, FCA issued a press release stating that it "has confirmed that its diesel engine applications comply with applicable emissions regulations." ¶ 345.  Defendants knew that making these statements without also informing investors that the EPA believed the Trucks *did* emit illegal levels of NOx and contain defeat devices would mislead investors.  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scienter inferred where defendants "knew facts or had access to information suggesting that their public statements were not accurate"); *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015) ("if  the issuer made the statement . . . with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain").

There is further evidence that Defendants knew the Trucks were emitting illegal levels of NOx as far back as August 2014, instituting various field fixes.  A confidential witness confirmed that by the summer of 2015, the Trucks were still emitting illegal levels of NOx and the Company knew that it was caused by the software in the engines. Robert E. Lee ("Lee"), who reported to Marchionne, assembled a special team to address the issue: "It went all the way up to Bob Lee … That [issue] was the number one priority all of the sudden … The details were kind of hush hush … It was a secretive mission if you will.  It was not public knowledge."  ¶ 241.

Indeed, there is a strong inference that Defendants knew that the Trucks were not compliant when applying for an EPA Certificate of Conformity ("COC").  Dahl and Lee were the executives that developed and programmed the engine in the Trucks. Steve Mazure, who reported to Dahl, was responsible for the accuracy of the COC application, which was required to disclose all AECDs (whether legal or illegal) on the Trucks. Nevertheless, while each COC application for the Trucks (for each model year 2014, 2015 and 2016) disclosed every other AECD on the Trucks, each application omitted the eight AECDs that the EPA determined were defeat devices.  Given all the concealment and misrepresentations that followed, the only

2

plausible inference is that these eight AECDs were omitted from each COC application over a three year period because Defendants knew that the EPA would have concerns about them.

At every turn, Defendants concealed, misled and outright lied about the existence of the AECDs on the Trucks, the Trucks high NOx emissions, and the EPA's concerns about the Trucks. The inference of scienter is not only at least as strong as a non-culpable inference, it is the only plausible inference.

### FACTUAL ALLEGATIONS CONCERNING EMISSIONS VIOLATIONS

I. **The Trucks' Compliance With Emissions Regulations Was Critical to FCA**

During the Class Period, it was critical for the Trucks to comply with emissions regulations. In 2015, 78% of FCA's U.S. sales came from light-duty trucks, delivering 90% of its profit. ¶ 221. FCA described the EcoDiesel engine that powered the Trucks as "Our flagship diesel engine." ¶ 276. Sales of the Trucks were driving FCA's financial success in the U.S. as sales of passenger cars faltered. ¶¶ 223-226. FCA attributed the success of the Trucks to the diesel engine, touting it as "unique" because it was compliant with emissions regulations without sacrificing the characteristics of speed, torque, and the like that consumers value highly. ¶¶ 222, 276. Defendants also acknowledged in FCA's SEC filings that compliance with emissions regulations threatened these profits. *E.g.* ¶ 272. This risk hit fever pitch in September 2015 when the EPA issued a notice of violation ("NOV") of the Clean Air Act to Volkswagen, stating that certain of its diesel vehicles included defeat devices. ¶ 218. On January 6, 2016, the DOJ filed a civil suit against Volkswagen, which resulted in $35 billion in fines and other fees. *Id.*

II. **FCA's Obligation To Comply With Emissions Standards and Disclose All AECDs**

Every auto manufacturer must control NOx emissions in order to meet the EPA's regulatory requirements. The EPA requires every vehicle sold in the U.S. to obtain a COC certifying that a vehicle class conforms to EPA requirements. ¶¶ 208-210. As part of this program, the EPA requires auto manufacturers to disclose in its COC application all auxiliary emission control devices ("AECDs") installed on vehicles. ¶ 213. An AECD is any aspect of the

vehicle that effects the "operation of any part of the emission control system." *Id.* The manufacturer must also include a justification for each AECD "and [a] rationale for why it is not a defeat device." *Id.* A "defeat device" is any piece of software that can "bypass, defeat, or render inoperative" any emissions compliance device/software. ¶ 215. Failure to disclose any AECD, regardless of its legality, is a serious violation of the Clean Air Act. ¶¶ 214-216.

## III.    FCA's Emissions Violations

FCA violated the Clean Air act because the Trucks' engines contained eight AECDs that (i) were never disclosed by FCA in its COC application to the EPA and CARB, (ii) caused the vehicles to emit illegal levels of NOx, and (iii) were defeat devices. ¶¶ 229-237. Among the eight undisclosed AECDs were AECD#1 which *completely shut-off the exhaust gas recirculation ("EGR") system (which reduces NOx emissions) anytime the Trucks were travelling at highway speed*. ¶¶ 232-233. AECD#3 *used a timer to shut off the EGR, which does not meet any exceptions to the regulatory definition of "defeat device*." *Id.* Approximately 104,000 FCA vehicles in the U.S. alone contained this undisclosed and illegal software. ¶ 236.

## IV.    Defendants Were Aware Of The Undisclosed AECDs, Their Illegal Purpose And That The Trucks Were Emitting Illegal Levels of NOx

### A.    Defendants Were Intimately Involved In The Development, Programming and Certification Of The Trucks' EcoDiesel Engine

 FCA created all the AECDs contained on the Trucks. ¶ 406. The EcoDiesel engine in the Trucks was developed by Dahl, who was Director of FCA US's diesel engine program prior to November 2015. ¶ 53. At that time, Dahl replaced Kunselman as head of Vehicle Safety & Regulatory Compliance, reporting directly to Marchionne. *Id.* Lee was in charge of programming the engine, reporting to Marchionne. ¶¶ 54, 339. Mazure was Senior Manager, Environmental Certification for FCA US. ¶ 55. Reporting to Dahl, Mazure was responsible for ensuring the accuracy of FCA's COC applications for the Trucks, including the disclosure of all AECDs. *Id.*

Throughout the Class Period, Marchionne repeatedly told investors that emissions compliance was under heightened government scrutiny (¶¶ 478-480, 482, 490), it was of critical

importance to him (¶¶ 479-481), he was personally focused on emissions compliance (¶¶ 477-482), he understood the details of FCA's emissions software (¶¶ 478, 480-481, 483-484) and he was personally involved in assuring emissions compliance and that the Company's emissions software was EPA compliant. ¶¶ 220, 349, 481. On August 12, 2014, FCA announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, headed by Kunselman and *"report[ing] directly to the CEO [Marchionne]"* in order to "intensify the Company's continuing commitment to vehicle safety and regulatory compliance" and "ensuring a high level of *information flow* and *accountability*." ¶¶ 256, 383, 304. In November 2015, Dahl – the developer of the EcoDiesel engine in the Trucks – replaced Kunselman. ¶ 53.

Confidential witnesses that worked on emissions testing during the Class Period confirmed that Lee and Marchionne received regular reports on emissions software and testing, that Marchionne was focused on the EPA's emissions tests, and that he made the ultimate decisions on which emissions software would be installed in FCA's vehicles. ¶¶ 450, 461-462.

### B. Defendants Were Aware That The Trucks Were Emitting Illegally High Levels Of NOx Because Of The AECDs

By August 2014, Defendants were aware that the Trucks were emitting NOx emissions above the legal limits and the limits the Company had represented to the EPA and CARB. ¶¶ 439-449.  While the Company sent Service Bulletins to dealers in response, telling them to update the software on the Trucks or adjust certain components of the emissions system (*see, e.g.* Levy Decl. Ex. 3, 4), those bulletins did not identify any of the AECDs, state that the NOx emissions were too high, or that the vehicles were violating emissions regulations.  ¶ 418.

According to Confidential Witness #3 ("CW3"), a Program Manager of Advanced Powertrain in Auburn Hills, Michigan during the Class Period, management knew by summer 2015 that "they had an issue with the software", which was causing the vehicles to emit more NOx than what FCA was reporting to the EPA. ¶ 423. "Whatever they were reporting on the label, whatever they told the government, they found out they weren't meeting those." *Id.* "It was a big issue," CW3 said of the emissions discrepancy. *Id.* Lee formed a team to address the issue

5

and was pulling engineers and tech specialists from several different departments to work on it. *Id.* "That [issue] was the number one priority all the sudden … It was a secretive mission if you will. It wasn't public knowledge." *Id.*

In 2015, Defendants instituted a secret "field fix" on the Trucks of AECD#1. ¶¶ 239, 415. The field fix was done by updating the vehicle's software, which was done without ever disclosing the existence of AECD#1.  By updating the software, AECD#1 was automatically removed anytime the Trucks were brought into the dealership. ¶¶ 415-421. The field fix, like all recalls and field fixes, was presented to and approved by the Company's Vehicle Regulations Committee ("VRC"), which was chaired by Kunselman (and later Dahl) and included Lee. ¶ 416. However, by limiting its efforts to a "filed fix" as opposed to a full-fledge recall, Defendants were able to conceal the existence of the defeat devices and illegally high NOx emissions. As part of normal reporting procedures established in November 2014, all recalls and field fixes were reported to Marchionne through formal memos that were published "within 48 hours of [the] meeting['s] conclusion." ¶¶ 416, 420.  Nevertheless, the Trucks continued to emit illegally high levels of NOx even after the field fix, which Defendants continued to conceal.

## C.    Director of EPA Emissions Informed Dahl and Marchionne That The Trucks Were Emitting Illegally High Levels Of NOx And Contained Defeat Devices

By no later than September 2015, the EPA had informed Marchionne that it had identified undisclosed AECDs that it had determined were defeat devices. As Marchionne was later forced to admit: "***obviously, we knew that they had concerns.***  We have been in dialogue with them now ***since September 2015***.  It could have been even earlier." ¶¶ 240, 422.

Between September 2015 and January 13, 2016, the EPA's concerns resulted in numerous communications and meetings between Dahl, Mazure and their team and Christopher Grundler – the Director of the EPA Office of Transportation and Air Quality ("EPA Emissions Office") – and his team. ¶¶ 427-433. For example, on November 25, 2015, Dahl, Mazure and others met with the EPA.  At this meeting, the EPA identified several AECDs in the Trucks that the EPA believed "violate EPA's defeat device regulations" concerning NOx emissions. ¶ 427.

6

On January 7, 2016, Byron Bunker, the Director of Compliance for the EPA Emissions Office sent an urgent email (marked as "High Importance") requesting a phone call with Dahl and Mazure for that same day because "I am *very concerned* about the *unacceptably slow pace* of the efforts to understand the high NOx emissions we have observed" from the Trucks, reiterating that "*at least one of the AECDs in question appears to me violate EPA's defeat device regulations.*" ¶ 429. Following additional communications concerning the violations January 8, and 11, 2016, Dahl and his team met in person with the EPA and CARB on January 13, 2016. ¶ 431. None of these meetings, the EPA's concerns about the high levels of NOx, defeat devices or FCA's "unacceptably slow pace" in response, were disclosed to investors.

## V.   **Materially False and Misleading Statements Issued During the Class Period**

In each of the Trucks' COC applications, which were publicly posted on the EPA website, Mazure represented that the Trucks complied with the Clean Air Act and that all the AECDs on the Trucks were disclosed. ¶¶ 249, 251, 253, 258, 286, 318. Throughout the Class Period, Defendants also repeatedly assured investors that FCA (1) was in compliance with emissions regulations (2) "constantly monitor[s] such requirements and adjust[s] our operations to remain in compliance", and (3) conducted an audit to ensure that all emissions software was disclosed and legal. ¶¶ 272-276, 339, 348-353.

Specifically, during a January 27, 2016 earnings call, Marchionne addressed the issue of software regulating NOx emissions in the wake of Volkswagen's "Dieselgate" scandal. He affirmatively assured investors that he had "audited" the software, all software was disclosed and that none of FCA's vehicles contained defeat devices:

> *[A]fter the advent of dieselgate,* for a lack of a better term, *FCA has undertaken a pretty thorough review and a thorough audit of its compliance teams.* I think we feel comfortable in making the statement that *there are no defeat mechanisms or devices present in our vehicles* … This is an area of heightened concern. . . . *We do have a best practice program to ensure that we* calibrate and *certify properly.*

¶ 343. These assurances were followed by a press release on February 2, 2016 stating "FCA has conducted a thorough internal review of the application of this technology in its vehicles and has

confirmed that its diesel engine applications comply with applicable emissions regulations." ¶ 345. Similarly, FCA's annual report filed with the SEC on February 29, 2016 stated, "all current production vehicle calibrations are compliant with applicable regulations …" ¶ 349. Defendants made other statements concerning FCA's compliance with NOx and diesel emissions regulations on May 23, and September 22, 2016, as well as January 12, 2017 (¶¶ 358, 361, 367), misleading investors into believing that FCA was in compliance with emissions regulations.

## VI.    **The Truth Begins to Emerge**

On January 12, 2017, the EPA and CARB each issued a NOV to FCA for installing and failing to disclose engine management software that resulted in illegal emissions from the Trucks. ¶ 364. The EPA found "at least eight undisclosed pieces of software that can alter how a vehicle emits air pollution." *Id*. The EPA and CARB concluded that FCA intentionally violated emissions regulations. *Id*. "***This is a clear and serious violation of the Clean Air Act***," CARB Chair Mary D. Nichols stated *"**[FCA] made the business decision to skirt the rules and got caught***." *Id.* The EPA's disclosure of the NOV stated "FCA did not disclose the existence of certain [AECDs] to EPA in its applications for certificates of conformity for model year 2014, 2015 and 2016 Jeep Grand Cherokees and Dodge Ram 1500 trucks, ***despite being aware that such a disclosure was mandatory***." *Id.* Moreover, "some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards … than in normal operation and use." *Id.* Despite having been aware of the EPA's conclusion that these AECDs were defeat devices for well over a year, "To date, despite having the opportunity to do so, ***FCA has failed to demonstrate that FCA did not know, or should not have known, that a principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the CAA***." *Id*. Similarly, the EPA concluded "To date, despite having the opportunity to do so, ***FCA has failed to establish that these are not defeat devices**."* *Id.* On this news FCA's stock price dropped 12%. ¶ 366.

On May 23, 2017, the DOJ announced the filing of a complaint asserting that FCA utilized and did not disclose defeat devices on its Trucks.  FCA's stock price declined 5.2%. ¶ 38-39.

## ARGUMENT

### I.   The Complaint Alleges A Strong Inference of Scienter

"[S]cienter can be established by alleging facts to show … strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d 187, 198 (2d Cir. 2009).  Recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ...." *Honeyman v. Hoys (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted).  Specifically, a strong inference of scienter exists where a complaint alleges that the defendants:  (1) "engaged in deliberately illegal behavior"; (2) "knew facts or had access to information suggesting that their public statements were not accurate"; or (3) "failed to check information they had a duty to monitor" *ECA*, 553 F.3d at 199 (citations omitted).  Scienter allegations must be viewed holistically.  The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324. Rather an inference of scienter is sufficient if a reasonable person would deem it "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. If the inferences for and against scienter are in "equipoise," the complaint survives.  *Id.* at 331.

#### A.   Defendants' Actual Knowledge of Emissions
#### Violations Supports A Strong Inference Of Scienter

Scienter is adequately alleged when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such

circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak,* 216 F.3d at 308.

There can be no dispute that Marchionne and his direct reports in charge of emissions compliance, Dahl, Kunselman and Lee, knew that FCA was having serious emissions compliance problems caused by the AECDs on the Trucks.  By August 2014, they knew the Trucks were emitting higher levels of NOx than represented to the EPA.  By the summer of 2015, they knew the software was the cause of the illegally high emissions, creating a dedicated team to address the compliance violation, headed by Lee.  By no later than September 2015, the Director of the EPA's Emissions Office (the highest ranking official) as well as its Director of Compliance repeatedly contacted Marchionne and Dahl because the EPA determined that FCA's Trucks contained defeat devices.  Scienter is adequately alleged.  *Novak*, 216 F.3d at 311.

Defendants' communications with the EPA alone are sufficient to plead a strong inference of scienter. The Supreme Court considered a similar situation in *Omnicare*:

> Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." . . . [*I*]*f the issuer made the statement . . . with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain*.

135 S. Ct. at 1329.[3] In addition to Defendants' actual knowledge that the software on the Trucks was permitting illegally high levels of NOx, the EPA had clearly indicated that it was "taking the opposite view" as to FCA's assertion of compliance and the absence of defeat devices.

Defendants did not merely make general statements of compliance, but rather specifically reassured investors as to NOx emissions compliance, the software, and defeat devices.  It is undeniable that the omitted facts, especially in the immediate aftermath of Dieselgate "conflict

---

[3] Although *Omnicare* addressed whether statements of opinion are misleading, it is instructive as to Defendants' scienter for their non-opinion statement of compliance because "the question of scienter largely turns on the same considerations as those concerning the Defendants' statements of opinion." *In re BioScrip, Inc.*, 95 F. Supp. 3d 711, 732 (S.D.N.Y. 2015) (Nathan, J.); *see Sanofi Secs. Litig. v. Meeker*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (Engelmayer, J.) ("[W]here plaintiffs allege a false statement of opinion, 'the falsity and scienter requirements are essentially identical'").

with what a reasonable investor would take from the statement [of compliance] itself." *Omnicare*, 135 S. Ct. at 1329.   "[B]y making a detailed factual statement, contradicting important data to which [Defendants] had access, a strong inference arises that [Defendants] knowingly misled the public as to its clear meaning." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (internal quotation marks omitted). It is simply implausible to infer that Defendants did not know that their statements to the market were false and misleading (or that their statements presented a ***danger*** of misleading investors). At the very least, Defendants were deliberately reckless in making their statements, and the inference of scienter is equally strong.

The inference of scienter is further strengthened by Dahl's email to the EPA immediately following the February 2, 2016 press release that stated "[FCA's] diesel engine applications comply with applicable emissions regulations." ¶ 345. Attempting to prevent a backlash from the EPA for the false statement, Dahl pointed out that the statement, although referring to all of FCA's diesel vehicles was "released from our European office", asserting that technically "this is not a statement about NAFTA diesels." ¶ 346. This contemporaneous email demonstrates that Defendants knew that the statement would mislead a reasonable investor.

In response, Defendants assert that the concerns expressed by the EPA to Defendants were merely part of a general "dialogue" that the EPA was having with all manufacturers, that the EPA's determination concerning defeat devices was preliminary, and that Defendants did not have an independent duty to disclose this information.  Def. Br. at 11-15.

Defendants' argument does not address that (i) Defendants knew by August 2014 that the Trucks were emitting high levels of NOx, (ii) Defendants knew by the summer of 2015 that the AECDs were causing the high emissions (Ecodiesel engines are only in FCA's Trucks); or (iii) that the EPA's correspondence also states unequivocally that they had observed "high NOx emissions" in the Trucks.  *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 U.S. Dist. LEXIS 138439, at *25-26 (S.D.N.Y. Oct. 5, 2016) (Furman, J.) (scienter adequately alleged for assurances regarding FCA's safety-related compliance and accountability despite "knowledge of the company's noncompliance with respect to at least some recalls").

11

While Defendants repeatedly refer to their communications with the EPA as an "informal", "preliminary" "dialogue" with FCA's "employees" those characterizations are contradicted by Defendants' actual communications with the EPA. Marchionne and Dahl – the highest echelons of FCA – were informed of the EPA's position in 2015 by the Director of the EPA's Emissions Office as well as the Director of Compliance, who were among the highest ranking officials at the EPA. Marchionne later self-servingly characterized Defendants' communications with the EPA as a "dialogue" following the publication of the EPA NOV in an attempt to down-play the seriousness of the issue. ¶¶ 240, 422.  The September 25, 2015 letter from Byron Bunker of the EPA to all manufacturers submitted by Defendants is a red herring as it does not relate to the EPA's specific concerns as to the Trucks. Instead, it merely provided notice to all manufacturers that the EPA would be testing vehicles under real-world driving conditions. And as Marchionne later admitted, by that time the EPA had already expressed "obvious" "concerns" to him about the Trucks.  *Id.*  Contrary to Defendants' efforts to spin the facts and rewrite history this was no preliminary dialogue. In any event, Defendants' interjection of new "facts" in hopes of confusing the issue cannot be considered on a motion to dismiss. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (the Court's function on a motion to dismiss is not to "weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.").

Scienter is adequately alleged where a company asserting regulatory compliance fails to also disclose preliminary "observations" of potential violations made by even low-level regulatory employees.  *See, e.g. Todd v. STAAR Surgical Co.*, 2016 U.S. Dist. LEXIS 186511, *43 (C.D. Cal. Apr. 12, 2016) (finding scienter adequately alleged for statements of FDA compliance where FDA inspector reported to management potential regulatory violations during routine inspection prior to issuing a Form 483).[4]  Here, scienter is even stronger because the

---

[4] *See also Wilkof v. Caraco Pharm. Labs, Ltd*., 2010 U.S. Dist. LEXIS 112768, at *18-19 (E.D. Mich. Oct. 21, 2010) (scienter adequately alleged where a company represented it was "substantially cGMP compliant" despite receiving Form 483s noting manufacturing problems);

communications were between the highest officials at the EPA and FCA (Marchionne and Dahl), evidencing the seriousness of the violations. *Pirnik*, 2016 U.S. Dist. LEXIS 138439, at \*28 (scienter adequately alleged where director of NHTSA informed Marchionne and Kunselman that he was concerned about the slow pace of the company's recalls). As in the FDA cases, the correspondence "represents a risk that [EPA] may take corrective action against a company, and thus a company is obligated to assess the seriousness of the risk and disclose such information to potential investors if it also represents it is in compliance with [EPA] regulations." *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 982 (8th Cir. 2012).

The cases relied on by Defendants are inapposite as each concerns conversations with the FDA during the FDA-approval process, which entails a well-known back-and-forth process during which the FDA weighs the inherently positives and negatives of the application. Moreover, the alleged false statements in each of the cases were not factual statements of current compliance but rather forward looking statements concerning the defendants' equivocal but optimistic opinions on the likelihood of achieving FDA approval in the future. For example, in *General Partner Glenn Tongue v. Sanofi*, the court found that the defendants' "statement of optimism" of a 90% likelihood of FDA approval was not rendered misleading for failure to disclose that the FDA had expressed concerns about the defendants' use of a single-blind study (rather than double-blind) because (i) the FDA stated that the deficiency could be overcome; (2) investors knew that the "Defendants and the FDA were engaged in a dialogue … about the sufficiency of various aspects of the clinical trials"; (3) investors knew the FDA had a strong preference for double-blind studies and  (4) the "optimistic projections" were accompanied by "numerous caveats to the reliability of the projections."  816 F.3d 199,211-213 (2d Cir. 2016).

---

*In re Cryolife, Inc*., 2003 U.S. Dist. LEXIS 26170, at \*35 (N.D. Ga. May 27, 2003) (denying a motion to dismiss in a case involving a company's receipt of a Form 483 noting preliminary observations at the same time it represented it was "compliant with all FDA regulations"); *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 U.S. Dist. LEXIS 118061, \*13-14 (N.D. Ohio Aug. 18, 2014) (scienter adequately alleged for statements of FDA compliance where an FDA inspector had sent the CEO a letter identifying observations of possible violations).

By contrast, courts find scienter adequately alleged even for projections of FDA-approval where the FDA informs the company of a serious concern **unknown** to investors. "When the FDA tells a company about problems with a product, and the company nonetheless continues to make confident statements about a product, courts have inferred scienter and falsity." *In re MannKind Sec. Actions,* 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011) (internal quotation omitted).[5]

Here, Defendants' assurances of compliance were statements of **current fact**, not optimistic projections. *See Pirnik,* 2016 U.S. Dist. LEXIS 138439, at *17-18.   Moreover, the EPA's statements were not made as part of any inherent "dialogue" during the COC application process. Rather, the EPA contacted Defendants because FCA was violating the law.   Investors had no idea that the EPA was speaking to FCA about the Trucks or that FCA's compliance with emissions standards was in question.   Investors did not even know the AECDs existed, much less that they were disfavored like the single-blind study in *Sanofi*.

Defendants' reliance on *In re EDAP TMS S.A. Sec. Litig*., is likewise misplaced.   2015 U.S. Dist. LEXIS 121960 (S.D.N.Y. Sep. 14, 2015) (Schofield, J.).   In *EDAP*, the court found that defendants' optimistic statements that they believed the FDA approval process was "on track", making continued "progress" and moving "in a timely manner" were nonactionable "puffery" or fell within the PSLRA's safe harbor provision.   *Id.* at *24.   The court also found that the company had no **independent duty** to disclose a Deficiency Letter that raised issues that could weigh against approval.   *Id.* at *31-33.   Cases of this nature are inapposite because

---

[5] *See In re Amylin Pharmaceuticals Securities Litigation,* 2003 U.S. Dist. LEXIS 7667, at *23 (S.D. Cal. May 1, 2003) ("[T]he concerns raised by the FDA in the 1997 meeting were much more significant than a 'bump on the road' and shed serious doubt on the sufficiency of the trials." Accordingly, Defendants were obligated to disclose the FDAs concerns to render their statement not misleading.); *Kaplan v. Rose*, 49 F.3d 1363, 1374 (9th Cir. Cal. 1994) ("Although a prospectus should not bury the shareholders in an avalanche of trivial information, [the study results were] not trivial, as the efficacy and competitiveness of Medstones system was essential to the company's performance.") (citations omitted), cert denied, 516 U.S. 810 (1995)); *In re Nuvelo*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) ("[T]he SAC need not allege that defendants knew SONOMA-2 would fail; the SAC need merely allege that defendants misled investors by omitting to disclose a material *risk* that SONOMA-2 would fail.").

Plaintiffs allege affirmative misrepresentations of compliance, not the failure to disclose a government investigation. *Pirnik*, 2016 U.S. Dist. LEXIS 138439, at *28 n.4. While not necessary, the court addressed scienter, stating that the defendants could have "planned to remedy the deficiencies, and still thought it would achieve FDA approval." *EDAP*, 2015 U.S. Dist. LEXIS 121960, at *35.  Here, even if Defendants thought they could eventually remedy the violations, their statements of current compliance were still false when made.[6]

Courts have likewise rejected Defendants' argument that scienter fails because they may have believed they could change the EPA's mind (Def. Br. at 11-12) has been rejected by courts. *E.g., STAAR Surgical*, 2016 U.S. Dist. LEXIS 186511, at *43-44 ("Knowledge of FDA observations alone may raise an inference of scienter … If Lead Plaintiff were required to allege that Defendants 'knew a Warning Letter was imminent,' then it would be virtually impossible to establish scienter at the pleading stage.").

Plaintiffs' allegations of scienter here are even stronger than the vehicle-safety claims because the concerns raised by the regulator to Marchionne and Dahl were the very same that led to the EPA's NOV and complaint, which caused FCA's stock price to plummet. *Pirnik*, 2016

---

[6] The rest of the cases cited by Defendants are inapposite for similar reasons. *Youngers v. Vitrus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 518 (S.D.N.Y. 2016) (Pauley, J.) (finding that the *removal* of potentially false statements from a registration statement upon learning that the SEC was investigating the legitimacy of those claims does not support a strong inference of scienter); *In re Mela Scis. Sec. Litig.*, 2012 U.S. Dist. LEXIS 144150, at *24 (S.D.N.Y. Sep. 19, 2012) (Briccetti, J.) (finding that none of the defendants' statements concerning the timeliness of FDA approval were misleading or made with scienter because they were forward looking projections and defendants **disclosed** the FDA's non-approval letter to investors); *In re Alkermes Sec. Litig.*, 2005 U.S. Dist. LEXIS 25826, at *49 (D. Mass. Oct. 6, 2005) (the fact that the FDA requested additional studies during its review process did not render the defendants' statements that they were awaiting FDA approval misleading because they never guaranteed approval and never made any statements about the test results). *In re Medimmune, Inc., Sec. Litig.*, cited by Defendants, supports Plaintiffs.  873 F. Supp. 953, 966 (D. Md. 1995).  While the court found that there was not an obligation to provide constant updates of all FDA communications during the approval process, it found that the plaintiffs adequately alleged scienter as to the defendants' reassurances that the FDA's postponement of the approval hearing was not problematic because defendants concealed that the FDA had told them that approval was at risk.  *Id.* at 967-968.

U.S. Dist. LEXIS 138439, at *26 (scienter adequately alleged where concerns raised by regulator concerned different recalls than those identified in the resulting consent order).

> **B.     Dahl's and Lee's Involvement In Designing and Programming the Trucks' Engines and Dahl's and Mazure's Responsibility For The Accuracy of The COC Applications Support A Strong Inference of Scienter**

It is undisputed that (1) FCA created and installed all the AECDs on the Trucks; (2) the eight allegedly illegal AECDs were on the Trucks; (3) they, like all AECDs, were required to be disclosed to the EPA on the COC application; and (3) while FCA disclosed every other AECD, these eight allegedly illegal AECDS, *and only these eight*, were never disclosed.  The only plausible inference as to why Defendants did not disclose only these eight AECDs is that Defendants knew that the EPA would likely find them to be illegal.  This inference of scienter is strengthened by Defendants' subsequent concealment of emissions violations and the EPA's concerns, which demonstrate Defendants' willingness to mislead investors and evade EPA regulations. Defendants provide no competing inference.

There is a strong inference that Defendants knew about the eight allegedly illegal AECDs from the time FCA submitted its first COC application.  The creation of the AECDs for the diesel engine on the Trucks was a massive endeavor that involved many employees, so their existence could be no secret. Prior to replacing Kunselman, Dahl was Director of FCA's diesel engine programs in the U.S. and was responsible for developing the EcoDiesel engine in the Trucks.  He also managed the certification process with the EPA for the Trucks.  Lee was in charge of the programming of the diesel engines on the Trucks. It was Dahl's and Mazure's responsibility to identify all AECDs on the Trucks and disclose them in the COC application. Defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *ECA*, 553 F.3d at 199. *See, e.g., In re Scottish Re Group Sec. Litig.*, 524 F.Supp. 2d 370, 393–94 (S.D.N.Y. 2007) (Scheindlin, J.) (finding implausible that sophisticated executives actively engaged in the planning of the transactions were ignorant of their tax consequences); *In re Cadence Design Sys.*

16

*Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1191-92 (N.D. Cal. 2010) (holding that an executive officer "was at least deliberately reckless" because "[t]he competing inference, that he worked on these [important] deals and innocently missed the most important details, is less plausible."). Given Defendants' positions and responsibilities, "the nature of the relevant fact was of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *In re MannKind Sec. Actions*, 835 F. Supp. 2d at 808-09 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009)).

Indeed, the inference is even stronger because of Defendants' selective disclosure. *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008) (Griesa, J.) aff'd sub nom.; *State Universities Ret. Sys. of Illinois v. Astrazeneca PLC,* 334 F. App'x 404 (2d Cir. 2009) (strong inference of scienter from allegations that management "is reckless in dealing" with facts that "will necessarily prevent the regulatory approval or the marketing of the drug"); *see Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 713 (N.D. Tex. 2008) (disclosing some related party transactions, while concealing others is evidence of scienter).[7]

Defendants again make the unremarkable point that all AECDs are not necessarily illegal. Aside from the fact that the Complaint adequately alleges that the eight AECDs at issue were illegal (indeed, the EPA and DOJ have filed a complaint stating as much), the failure to disclose any AECD in a COC application is itself illegal.  ¶ 213.

## C. Defendants' Knowledge That the Trucks Were Emitting High Levels of NOx And Of The Removal of AECD#1 Supports a Strong Inference of Scienter

Well before the EPA contacted Marchionne and Dahl in September 2015, Defendants knew the Trucks were violating EPA emission regulations, yet they continued to conceal the

---

[7] *In re Delcath Systems, Inc. Securities Litigation*, 36 F. Supp. 3d 320, 331-332 (S.D.N.Y. 2014) (Schofield, J.) (finding scienter adequately alleged where the defendants disclosed certain data points that reflected positively on its product but failed to disclose comparative data that might reflect poorly on its product); *In re Viropharma Inc. Securities Litigation*, 21 F. Supp. 3d 458 , 465 (E.D. Pa. 2014) (scienter adequately alleged where defendants submitted application to FDA without required components and defendants were involved in the application process).

violations. By August 2014, the VRC, which included Lee and was chaired by Kunselman (and later Dahl) was issuing field fixes in an attempt to address the high NOx emissions. By the summer of 2015, Defendants knew that it was the AECDs that were causing the high emissions and assembled a dedicated team (led by Lee) to address it. The VRC also instituted a secret "field fix" of AECD#1 rather than a recall to avoid the negative publicity. Defendants continued to conceal the AECDs, the high NOx emissions and the removal of AECD#1. Defendants' actual knowledge supports scienter. *Novak*, 216 F.3d at 308.   As to the AECDs specifically, one cannot remove something that one does not know exists.

In response, Defendants submit several of the Service Bulletins referenced in the Complaint and assert that all field fixes were reported to the EPA and CARB.  None of the Service Bulletins identify AECD#1, state that the Trucks shut-off the EGR system at highway speeds, or that the Trucks were emitting illegal levels of NOx. Instead, each discusses the replacement of hardware (e.g. catalysts, cylinders, DEF).  Moreover, the Service Bulletin that discusses the Malfunction Indicator Lamp illumination states that it was because the code was set "erroneously."  Levy Decl. Ex. 3. at 2. Indeed, as evidenced by the EPA's NOV, the EPA was not previously informed of AECD#1 or its removal. ¶ 415.

Finally, Defendants argue that there is not a strong inference that Marchionne knew of the field fix since Plaintiffs have not uncovered the specific memorandum discussing it.  By doing so, they try to raise Plaintiffs' burden of pleading scienter to an impossible "smoking gun" level. The Complaint identifies in detail that every field fix was approved by the VRC and reported to Marchionne in a memo within 48 hours. Indeed, Defendants have produced numerous such memos in discovery concerning the vehicle-safety recalls. "Plaintiffs are not required, as [Defendant] suggests … to plead the existence of specific internal reports to which each individual had access in order to show the individual defendants knew or should have known that their statements were false." *In re Atlas Air Worlwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y 2004) (Conner, J.); *see In re General Electric Co.*, 857 F. Supp. 2d 367, 395-396 (S.D.N.Y. 2012) (Holwell, J.) (scienter adequately alleged for statements

concerning loan portfolio quality where "underwriting results" were regularly reported to management even though it was uncertain that the credit or bond ratings were included in the reports). Scienter is further strengthened because Marchionne received reports on and personally approved all emissions software installed in the Trucks.

### D.    Additional Facts Demonstrating A Strong Inference of Scienter

*First*, the paramount importance of emissions compliance coupled with the significance of the Trucks to FCA's bottom line support a strong inference of scienter. *See Fialkov v. Alcobra Ltd.*, 2016 U.S. Dist. LEXIS 42633, at *22 (S.D.N.Y. Mar. 30, 2016) (Daniels, J.) ("The majority of courts in the Second Circuit have found that the core operations doctrine may provide support for but not an independent basis of scienter." (citation omitted))."

*Second*, Defendants' false assurances in the wake of Dieselgate in an effort to distance FCA from the scandal, followed by later admissions of non-compliance support an inference of scienter. *S.E.C. v. Musella*, 748 F. Supp. 1028, 1040 (S.D.N.Y. 1989) (Wood, J.), aff'd, 898 F.2d 138 (2d Cir. 1990) ("false exculpatory statement evidences consciousness of guilt and has independent probative value of *scienter*"); *In re Marsh & Mclennan Cos, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) (Kram, J.) (CEO's comments supporting the company's business practices following news of a government investigation of misconduct, combined with the rapid discovery of misconduct, constituted strong circumstantial evidence of scienter).[8]

---

[8] During a July 27, 2017 earning call, Marchionne admitted that "we weren't compliant" with emissions regulations during the Class Period. ¶ 435. Defendants assert that Plaintiffs misrepresented Marchionne's statement. Def. Br. at 3-4, 14-15. This is incorrect. The transcript of the call as reported by both LexisNexis as well as Thomson Reuters states "The important thing is that, within the scheme of things that existed at the time we launched these vehicles, ___we weren't compliant___. If there's a way to improve that position, we will more than gladly do it." Declaration of Michael J. Wernke Ex.1 at 15 and Ex. 2 at 17. Indeed, if Marchionne had said "we were in compliance" then the sentence that follows that statement would make no sense. One cannot improve upon being in compliance. A company is either in compliance or not. Regardless, this factual dispute is not appropriate at the motion to dismiss stage.

19

***Third***, Marchionne detailed discussions of emissions regulations, software and compliance supports his scienter.  If executives speak about a topic of "critical importance," they cannot ignore crucial information at their fingertips about it.  *City of Livonia Employees Ret. Sys. v. Wyeth*, 2010 U.S. Dist. LEXIS 107729, at *6, *18-19 (S.D.N.Y. Sept. 29, 2010) (Sullivan, J.). Where, as here, "facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them.  *In re Atlas Air,* 324 F. Supp. 2d at 489.

***Fourth***, the ease with which the EPA, a third party, found the violations after the Dieselgate announcement supports a strong inference of scienter.  *In re New Century Sec. Litig.*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("the fact that [a] new CEO . . .  discovered the [issues] within months of taking the position is a strong indication that these [misstatements] were obvious enough that a new officer found them quickly."); *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423 , 517 (S.D.N.Y. 2011) (Sweet, J.) (finding scienter where "JPMorgan discovered in the course of one weekend the overvaluation of assets and underestimation of risk exposure"); *In re Salix Pharms., Ltd*., 2016 U.S. Dist. LEXIS 54202, *43-44 (S.D.N.Y. Apr. 22, 2016) (Wood, J.) (finding scienter where "potential acquirers . . . discovered Salix's high inventory levels within days of performing their due diligence.").

### E.      The TAC Pleads a Strong Inference of Corporate Scienter

"[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."  *Teamsters Local 445 Freight Div. v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (citation omitted).  The person who made the statement need not be the person with the requisite scienter. *See Solow v. Citigroup, Inc.*, 827 F.Supp. 2d 280, 291 (S.D.N.Y. 2011) (Sweet, J.). "While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d at 481; *see also In re JP*

*Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (Stein, J.) (attributing knowledge of a Vice Chairman, a Vice President and a Managing Director to the corporate defendant); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 , 443 (S.D.N.Y. 2005) (Kaplan, J.) (attributing the fraudulent behavior of senior management to the corporate defendant).

Here, it required numerous FCA employees to develop, program, install and test the eight AECDs. It is not plausible to infer that some low-level rogue employee had the motive or means to create the AECDs, conceal them from the COC applications as well as the reports to Lee and Marchionne, and remove AECD#1. Rather, the only reasonable inference is that given the importance of the Trucks' emissions compliance someone in management knew. *See, e.g., In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) (Karas, J.) (finding corporate scienter where the company asserted that it had carefully reviewed all CDO's except the alleged illegal ones); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig*., 2017 U.S. Dist. LEXIS 1109, at *839 (N.D. Cal. Jan. 4, 2017) ("'[t]he clean diesel' vehicles were an integral part of Volkswagen's 'Strategy 2018' … it is reasonable to infer that at least some corporate officials knew VW was falsely touting the emissions compliance….").

## F.  The Statements Of The Confidential Witnesses Should be Credited

Defendants incorrectly argue that Plaintiffs have not sufficiently identified CW3.  Def. Br. at 22. Confidential sources are sufficiently identified where they "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possesses the information alleged." *Novak*, 216 F.3d at 314. There is no requirement that confidential witnesses have personal contact with the individual defendants. *See, e.g. In re Scottish re Gp. Sec. Litig.* 524 F. Supp. 2d at 392-93.

Here, the Complaint identifies CW3's position, location and employment dates. CW3 was a Program Manager of Advanced Powertrain, located at the Auburn Hills, Michigan facility from June 2013 through September 2015.  Lee was Head of Powertrain Coordination in Auburn Hills.  He was responsible for the programming of the engines in the Trucks, he received reports

on all software, was a member of the VRC and reported on emissions to the board of directors (along with Kunselman and Dahl).  CW3 was in a position to possess the information provided – that CW3's colleagues were being pulled onto a team ran by Lee to address high NOx emissions caused by the software. *See In re General Electric Co.*, 857 F. Supp. 2d at 389 (crediting confidential witnesses that are described by title and employment years: "Both worked as managers within the real estate group, so it is probable that a person in such a position would have information regarding GE's practices with regards to troubled loans"); *Cornwell v. Credit Suisse Group*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (Marrero, J.) (confidential witnesses identified by title and employment year identifying the basis for their statement that "everyone knew" of significant problems with the company's risk management sufficient to support an inference of scienter); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 505 (S.D.N.Y. 2005) (Marrero, J.) (allegations of "widespread internal knowledge" sufficient to support scienter); *In re NovaGold Resources Inc. Securities Litigation*, 629 F. Supp. 2d 272, 300 (S.D.N.Y. 2009) (Cote, J.) ("The confidential witnesses have described widespread knowledge at NovaGold that the Project was over budget and that the Hatch Study's figures were inaccurate.").[9]

### G.  The Inference Of Scienter Is At Least As Strong As Defendants' Asserted Non-Culpable Inference

In order for the Court to find that Plaintiffs have failed to allege scienter, the Court would have to infer that despite Defendants' positions, duties to monitor, the reports and memos they received, as well as their specific knowledge of high NOx emissions, the AECDs and the EPA's concerns, neither they nor anyone in management should have known their statements of compliance could mislead investors. While one may be able to stretch their imagination to make such a non-culpable inference, the Court is not permitted to do so at this stage.  "When ruling on

---

[9] The cases relied on by Defendants are distinguishable. *Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (Pauley, J.) (none of the confidential witnesses asserted that any defendant received information contradicting their public statements); *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (same). Here, CW3 stated that Lee knew of the emissions violations and software.

a motion to dismiss … the Court must … draw all reasonable inferences in the plaintiff's favor." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The inference of scienter is certainly not only at least as strong as a non-culpable inference, it is the only reasonable inference.[10]

## II.    The New Defendants Are Liable As "Makers" Of False and Misleading Statements And As Control Persons

In granting Plaintiffs leave to amend, the Court placed no restriction on what additional facts could be included in the amended complaint.  Rather, the Court stated that Plaintiffs could add "their unspecified 'additional facts' or otherwise…" ECF No. 121 at 13. Through continued investigation, Plaintiffs discovered that several high-level FCA officials (including Dahl, Lee and Mazure) were aware of the diesel emissions violations and the EPA's concerns. This information necessitated adding these individuals and FCA US as defendants as well as additional alleged false statements for which they had scienter.

Defendants argue that none of the new Defendants are "makers" of statements under *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011).  Def. Br. at 23-25.  *Janus* "does not imply that there can be only one 'maker' of a statement" or "alter the well-established rule that a corporation can act only through its employees and agents." *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558 (S.D.N.Y. 2014) (Scheindlin, J.) (citation omitted); *City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 416-417 (S.D.N.Y. 2011) (Koeltl, J.) (finding that two entities and eleven individuals had ultimate authority over same statements).

> Janus addressed only whether third parties can be held liable for statements made by their clients . . . and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability.

---

[10] Citing their own self-serving denials of wrongdoing, Defendants assert that the Court should infer from Plaintiffs' allegations that Defendants at all times believed that the Trucks complied with emissions regulations. Def. Br. at 14-15.  Defendants' denials of wrongdoing are accorded zero weight at the motion to dismiss stage.  Moreover, Defendants' subjective belief is irrelevant.  The question is whether the inference that Defendants knew or should have known their statements could mislead investors is at least as strong as the inference that Defendants should not have known.  *Tellabs*, 551 U.S. at 324; *Novak*, 216 F.3d at 308.

*Barclays*, 56 F. Supp. at n.56 (citation omitted).  Management level officials, like Lee, Mazure and Dahl, are routinely found to be "makers" of statements concerning their area of responsibility.  *E.g., STAAR Surgical*, 2016 U.S. Dist. LEXIS 186511 at *36-37 (vice president in charge of regulatory compliance adequately alleged to be a "maker" of the company's statements of compliance because "it is reasonable to infer that the statements at issue were initially made by Defendant Santos or at least with his advice and consent.").

Defendants argue that Lee's December 2, 2015 statements are not actionable.  Def. Br. at 23.  Lee stated in the wake of Dieselgate that his team scoured the code in the Trucks' engines for any defeat devices and found none.  ¶ 339. This was misleading because he knew of the undisclosed AECDs and of the EPA's determination that defeat devices did exist.

Defendants also assert that the statements made by Mazure in the COC application that the Trucks complied with all EPA emissions regulations and had disclosed all AECDs are not actionable because the Complaint states Mazure signed the applications "on behalf of Chrysler." Defendants' semantics must be rejected.  Mazure signed the statements to the EPA as an official of FCA US, and the phrase "on behalf of" appears nowhere on the application. *See* Levy Decl. Exs. 18 and 19.  An individual is a maker of statements that he signs. *EnergySolutions, Inc.*, 814 F. Supp. 2d at 417.  As discussed above, *Janus* does not apply to individuals signing statements in their capacity as management or spokesperson for the defendant company.

Defendants' argument that their statements of compliance with EPA regulations made in its COC applications are not actionable because they were not specifically directed to investors (Def. Br. at 24) is curious given that similar statements of compliance were included in FCA's periodic reports and in press releases.  ¶¶ 272-276, 348-353.  "As the Supreme Court has noted, 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) (reversing dismissal of § 10(b) claim based on misrepresentations in product advertisements) (quoting *Basic*, 458 U.S. at 247 n.24). It is irrelevant whether the false statements were "made for the purpose or object of influencing the decisions of market

24

participants." *Muzinich & Co. v. Raytheon Co.*, 2002 U.S. Dist. LEXIS 26962, at *9 (D. Idaho Apr. 30, 2002). Defendants' "fraud could be 'in connection with' the sale of securities even if [Defendants] had no intent to influence investors." *Id.*[11]

Finally, Defendants half-heartedly assert in a footnote that Section 20(a) control person liability has not been alleged because Plaintiffs have not alleged "control" as to Dahl, Lee and Mazure. Def. Br. at 25 n.8. Determining an individual defendant's liability as a control person is a "fact-intensive inquiry[ ] [that] generally should not be resolved on a motion to dismiss." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 741 (citation omitted). Control can be established by pleading facts supporting a reasonable inference that the control person "possessed the power to direct or cause the direction of the management and policies" of the primary violator. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (internal quotations omitted). Here, Dahl, Lee and Mazure were all high-level FCA officials that were consulted as to and in a position to control the public statements issued by the Company. "[C]ourts routinely find that 'control person liability' is pled adequately where the defendant has responsibility over an area of the company where the underlying fraudulent conduct occurred." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 610 (E.D. Va. 2015) (collecting cases).

## CONCLUSION

Defendants' motion to dismiss the emissions-related claims should be denied.

Dated:  September 21, 2017                    Respectfully submitted,

---

[11] The cases upon which Defendants rely are inapposite. *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279 (S.D.N.Y. 2012) (Crotty, J.) distinguished acts that deceive a company's own shareholders from those that deceive investors in the securities of another company, not whether statements were primarily directed at investors versus regulators or consumers. Moreover, the court found that the statements **were** directed to the company's own shareholders. In *In re Citigroup, Inc.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (Swain, J.), the court dismissed the claims because the plaintiff failed to identify any false disclosure, instead merely alleging that the company should have conducted its business differently. Here, Plaintiffs have identified false public statements about the Company.

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        mjwernke@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com


**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Co-Lead Counsel for Plaintiffs*


**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

26