**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : : : : | **Civ. Action No: 15-cv-07199-JMF** |
| Plaintiffs, | : : : | |
| v. | : : : | |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE and ROBERT E. LEE | : : : : : : | |
| Defendants. | : : : | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................. 2

    Chrysler's False and Misleading Statements Concerning Compliance with Vehicle Safety and Emissions Regulations ................................................................. 2

    The Truth is Partially Revealed But Defendants Continue to Make Misleading Statements ............................................................................................. 4

    The Truth Is Revealed Through a Series of Disclosures ................................... 5

PROCEDURAL HISTORY .............................................................................. 6

ARGUMENT ................................................................................................. 7

    I.    THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23 ....................................................... 7

        A.    The Rule 23(a) Requirements are Satisfied ................................... 8

            1.    The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable ................................................... 8

            2.    Questions of Law or Fact Are Common to the Class ......... 9

            3.    Plaintiffs' Claims Are Typical of the Class ..................... 10

            4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class ................................................................. 11

        B.    The Requirements of Rule 23(b)(3) Are Satisfied ....................... 12

            1.    Common Questions of Law and Fact Predominate .......... 13

                 a.    Chrysler's NYSE Listing is Strong Evidence of Market Efficiency ................................................. 16

                b.    The Five Cammer Factors Confirm Market Efficiency ...................................................... 17

                 c.    Plaintiffs Are Entitled To A Presumption of Reliance Because They Have Demonstrated "Price Impact" .......................................................... 21

i

d.      Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance ... 22

2.      A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy.... 22

II.      POMERANTZ   AND   ROSEN   SATISFY   THE   RULE   23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL ....... 24

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAL High Yield Bond Fund v. Ruttenberg*,
   229 F.R.D. 676 (N.D. Ala. 2005) ..........................................................................15

*Amchem Products, Inc., v. Windsor*,
   117 S. Ct. 2231 (1997) ...............................................................................7, 11, 13

*Amgen v. Conn. Ret. Plans and Trust Funds*,
   133 S. Ct. 1184 (2013) ...............................................................................2, 8, 13

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) ....................................................................................11

*Basic Inc. v. Levinson*,
   108 S. Ct. 978 (1988) .................................................................................14, 16, 17

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) ...........................................................................10, 22

*Califano v. Yamasaki*,
   99 S. Ct. 2545 (1979) ..............................................................................................1

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ................................................................. *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) .....................................................................15, 17, 22

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007) ....................................................................................8

*Cheney v. Cyberguard Corp.*,
   213 F.R.D. 484 (S.D. Fla. 2003) .............................................................................18

*Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*,
   2009 U.S. Dist. LEXIS 71653 (C.D. Cal. Aug. 12, 2009) .......................................11

*Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007) .....................................................................................23

*Cromer Fin. Ltd. v. Berger*,
   205 F.R.D. 113 (S.D.N.Y. 2001) ............................................................................13

*Darquea v. Jarden Corp.*,
    2008 U.S. Dist. LEXIS 17747 (S.D.N.Y. Mar. 6, 2008) ........................................................7

*Dietrich v. Bauer*,
    192 F.R.D. 119 (S.D.N.Y. 2000) ...........................................................................................9

*Dura Pharmaceuticals, Inc. v. Broudo*,
    125 S. Ct. 1627 (2005) ........................................................................................................13

*Dura-Bilt Corp. v. Chase Manhattan Corp*.,
    89 F.R.D. 87 (S.D.N.Y. 1981) .............................................................................................13

*Epifano v. Boardroom Business Products, Inc*.,
    130 F.R.D. 295 (S.D.N.Y. 1990) ..........................................................................................7

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011) ..........................................................................................................8

*Gen. Tel. Co. of Southwest v. Falcon*,
    102 S. Ct. 2364 (1982) ........................................................................................................10

*Haddock v. Nationwide Fin. Services, Inc*.,
    262 F.R.D. 97 (D. Conn. 2009) .......................................................................................9, 10

*Halliburton Co. v. Erica P. John Fund, Inc*.,
    134 S. Ct. 2398 (2014) .............................................................................................15, 16, 21

*In re Agent Orange Prod. Liab. Litig*. MDL No. 381,
    818 F.2d 145 (2d Cir. 1987) ...............................................................................................10

*In re Baldwin-United Corp. Litig*.,
    122 F.R.D. 424 (S.D.N.Y. 1986) ........................................................................................11

*In re Beacon Assoc. Litig*.,
    282 F.R.D. 315 (S.D.N.Y. 2012) ........................................................................................13

*In re Blech Sec. Litig*.,
    187 F.R.D. 97 (S.D.N.Y. 1999) ............................................................................................8

*In re Countrywide Fin. Corp. Sec. Litig*.,
    273 F.R.D. 586 (C.D. Cal. 2009) ........................................................................................18

*In re Diamond Foods, Inc., Sec. Litig*.,
    295 F.R.D. 240 (N.D. Cal. 2013) ........................................................................................22

*In re DVI, Inc. Sec. Litig*.,
    639 F.3d 623 (3d Cir. 2011) ................................................................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2007), *order aff'd in part, vacated in part*,
   574 F.3d 29 (2d Cir. 2009)......................................................................................10

*In re Indep. Energy Holdings PLC, Sec. Litig.*,
   210 F.R.D. 476 (S.D.N.Y. 2002) ............................................................................1, 8

*In re JPMorgan Chase & Co. Secs. Litig.*,
   2015 U.S. Dist. LEXIS 132181 (S.D.N.Y. Sept. 29, 2015)..................................17, 22

*In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*, MDL No. 1658 (SRC),
   2013 WL 396117 (D.N.J. Jan. 30, 2013) ................................................................13

*In re Oxford Health Plans, Inc.*,
   191 F.R.D. 369 (S.D.N.Y. 2000) ............................................................................10

*In re Petrobras Securities Litigation*,
   312 F.R.D. 354 (S.D.N.Y. 2016) ......................................................................24, 25

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) ..............................................................................9

*In re SCOR Holding (Switzerland) AG Litig.*,
   537 F Supp. 2d 556 (S.D.N.Y. 2008)........................................................10, 23, 24

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998) ..............................................................................10

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)....................................................................................11

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)....................................................................................22

*In re Vivendi Universal, S.A.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) .............................................................................8, 9

*In re Winstar Communications Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ............................................................................14

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) .........................................................................2, 23

*In re Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005)...................................................................................18

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ............................................................................16

v

*Lumen v. Anderson*,
    280 F.R.D. 451 (W.D. Mo. 2012) ..................................................................................16, 17

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)..............................................................................................8

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) .........................................................................................2

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010)......................................................................................8, 9

*Nationwide Life Ins. Co. v. Haddock*,
    460 Fed. Appx. 26 (2d Cir. 2012) ...................................................................................10

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) (Scheindlin, J.) ...................................................13

*Phillips Petroleum Co. v. Shutts*,
    105 S. Ct. 2965 (1985) ................................................................................................1, 7

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)............................................................................................22

*Smilovits v. First Solar, Inc.*,
    295 F.R.D. 423 (D. Ariz. 2013) .....................................................................................16

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*,
    2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006) ................................................15

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)........................................................................................7, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ...................................................................................................23

*UFCW Local 1776 v. Eli Lilly and Co.*,
    620 F.3d 121 (2d Cir. 2010)............................................................................................13

*Vinh Nguyen v. Radient Pharm. Corp.*,
    287 F.R.D. 563 (C.D. Cal. 2012) ...................................................................................18

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)..............................................................................................21

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) .................................................................................9, 10

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ...................................................................................................8

## **Statutes**

Clean Air Act ...........................................................................................................................3, 5

Exchange Act Sections 10(b) and 20(a) (15 U.S.C. §§78j(b) and 78t(a)) ....................6, 10, 13, 22

National Traffic and Motor Vehicle Safety Act of 1966 ...........................................................2, 4

## **Rules**

Federal Rule of Civil Procedure 23 ....................................................................................... *passim*

Rule 10b-5 ................................................................................................................................6, 14

Lead Plaintiffs Gary Koopmann and Timothy Kidd as well as Victor Pirnik ("Plaintiffs") submit this memorandum in support of their motion for class certification pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs seek certification of the following Class:

> All persons and entities who purchased, on a U.S. Exchange or in a transaction in the U.S., Fiat Chrysler Automobiles N.V. ("FCA," "Chrysler" or "the Company") common stock between October 13, 2014 and May 22, 2017, both dates inclusive (the "Fourth Amended Complaint ("FAC") Class Period") excluding Defendants[1], current and former officers and directors of Chrysler and FCA US, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

## PRELIMINARY STATEMENT

This lawsuit is a textbook example of a case warranting class action treatment.  Plaintiffs seek to prove that, like other Class members, they were injured by a common course of misconduct – the issuance of false and misleading statements and material omissions by Defendants concerning Chrysler's compliance with federally mandated vehicle safety and emissions regulations.  The questions of law and fact relevant to the merits – issuance of false and misleading statements, reliance, materiality, scienter, loss causation and economic loss – are identical for each and every member of the putative Class.  Indeed, class action treatment is especially appropriate because many members of the putative Class have relatively small losses, making it unfair and inefficient to force them to vindicate their claims individually.

The use of class action procedures to adjudicate claims under federal securities law has been upheld by the Supreme Court, as well as by the Second Circuit.  *See, e.g., Califano v. Yamasaki,* 99 S. Ct. 2545, 2557 (1979); *Phillips Petroleum Co. v. Shutts,* 105 S. Ct. 2965, 2973 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available."); *In re Indep. Energy Holdings PLC, Sec. Litig.,* 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (Class action treatment is "particularly appropriate" for securities fraud claims, and under

---

[1] "Defendants" refers to Fiat Chrysler Automobiles N.V. ("FCA," "Chrysler" or "the Company"), FCA US LLC ("FCA US"), Sergio Marchionne ("Marchionne"), Scott Kunselman ("Kunselman"), Michael Dahl ("Dahl"), Steve Mazure ("Mazure") and Robert E. Lee ("Lee") collectively. "Individual Defendants" refers to Marchionne, Kunselman, Dahl, Mazure and Lee collectively.

such circumstances courts should err in favor of certifying a class). The Supreme Court has warned against imposing restrictions on certification of federal securities claims where it is not mandated by the text of *Amgen v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1202 (2013) ("We have no warrant to encumber securities-fraud litigation by adopting an atextual requirement of precertification proof of materiality that Congress, despite its extensive involvement in the securities field, has not sanctioned."). Likewise, "the Second Circuit . . . has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co*., 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (citations omitted); *see also In re WorldCom, Inc. Sec. Litig*., 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well financed defendants would leave most investors "without any recourse").

As detailed below, this action satisfies all the requirements for class certification under Rule 23(a): numerosity; commonality; typicality; and adequacy of representation. This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and superiority of a class action over other available methods for adjudication. Thus, class certification is warranted.

## STATEMENT OF FACTS

**Chrysler's False and Misleading Statements Concerning
Compliance with Vehicle Safety and Emissions Regulations**

Chrysler is an automotive group that designs, engineers, manufactures, distributes and sells vehicles and components under brand names including Chrysler, Dodge, Fiat, Jeep, and Ram. ¶ 57.[2] As such, Chrysler is required to comply with vehicle safety standards contained in the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"), which are enforced by The National Highway Traffic Safety Administration ("NHTSA"). ¶ 61. Chrysler

---

[2] Citations to "¶__" refer to paragraphs in the Fourth Amended Complaint ("FAC"). Dkt. 129.

also must comply with emission standards in each country it sells its vehicles. ¶ 200. In the United States, emissions standards are promulgated and enforced by the Environmental Protection Agency ("EPA") pursuant to the Clean Air Act. ¶¶ 206-207.  From the inception of the Class Period on October 13, 2014, Defendants told investors that Chrysler had a robust compliance system and repeatedly stated that the Company was in compliance with vehicle safety and emissions regulations. *E.g.* ¶¶ 12, 15, 21, 276, 292, 314, 343, 345, 353. In reality, Chrysler was (1) completely ignoring its obligations to timely and adequately inform NHTSA and owners of recalls of vehicles containing serious safety defects (¶¶ 78-185); and (2) illegally using undisclosed and hidden software to allow excess diesel emissions to go undetected and evade emissions tests.  ¶¶ 226-248.

Specifically, on August 12, 2014, Chrysler announced the establishment of a new office of Vehicle Safety and Regulatory Compliance, that reported directly to Marchionne, claiming "[t]his action will help intensify the Company's continuing commitment to vehicle safety and regulatory compliance."  ¶ 256.

Beginning on November 13, 2014, and continuing throughout the Class Period, defendants repeatedly assured investors in Chrysler's SEC filings that the Company was in compliance with vehicle safety regulations promulgated by NHTSA as well as emissions standards in the United States and Europe.  ¶¶ 272-276, 281, 286, 301-302, 312, 314, 316, 318, 332, 339, 345, 348-350, 353.  On January 28, 2015, Marchionne further assured investors that the Company had always had a "robust system in place" to deal with recalls, which "we have strengthened [] further".  ¶ 292.  On January 27, 2016, Marchionne told investors "there are not defeat mechanisms or devices present in our vehicles." ¶ 343.

As a result of these statements, investors were misled to believe Chrysler had a robust compliance system and was adhering to critically important vehicle safety and emissions regulations.  Chrysler's stock price increased from $8.95 at the beginning of the Class Period (October 14, 2014) to $15.15 on July 24, 2015.

**The Truth is Partially Revealed But Defendants Continue to**
**Make Misleading Statements**

On Sunday, July 26, 2015, in a Consent Order with NHTSA (the "Consent Order"), Chrysler admitted to multiple Safety Act violations for which NHTSA imposed a record $105 million fine. ¶ 323. NHTSA penalties were tied to violations in an array of areas, including misleading regulators, failure to report safety information to NHTSA, inadequate repairs, and failure to alert affected car owners in a timely manner. *Id.* NHTSA also required the Company to institute additional recalls, repairs and remedies as well as conduct an overhaul of Chrysler's compliance system. ¶¶ 323-325. NHTSA stated, in part:

> ***Fiat Chrysler's pattern of poor performance put millions of its customers, and the driving public, at risk.*** This action will provide relief to owners of defective vehicles, will help improve recall performance throughout the auto industry, and gives Fiat Chrysler the opportunity to embrace a proactive safety culture.

¶ 325 (Emphasis added.)

On this news, the Company's stock fell $0.74, or roughly 4.9%, to close at $14.41 on July 27, 2015 – a market capitalization decline of $950 million. ¶ 326.

On October 28, 2015, Chrysler announced results for Q3 2015, informing investors that the Company recorded "a €761 million pre-tax charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA." ¶ 335. Chrysler shares fell $0.69, or 4.7%, to close at $14.72—an $890 million decline in market capitalization – as investors reacted to news of the recall charge. ¶ 336. The market immediately made the connection between the charge and the Company's regulatory violations for failure to properly conduct recalls. *Bloomberg* reported: "The manufacturer set aside 761 million euros in the quarter for 'estimated future recall campaign costs' in North America, where U.S. regulators ordered it in July to buy back vehicles." (emphasis original). ¶ 336 *See also* ¶¶ 337-338.

Despite the Consent Order with NHTSA, Defendants continued to mislead investors as to the Company's regulatory compliance. During a January 27, 2016 earnings call discussing Q4 2015, Marchionne addressed the specific issue of software on diesel vehicles used to cheat regulatory compliance in the wake of Volkswagen's "Dieselgate" scandal in which Volkswagen

4

used software to cheat diesel emissions tests. ¶ 343. Marchionne assured investors that he had examined the issue and no such software was being utilized by Chrysler and that Chrysler's diesel trucks were in full compliance with emissions regulations: "FCA has undertaken a pretty thorough review and a thorough audit of its compliance teams. . . . [T]here are no defeat mechanisms or devices present in our vehicles. And I think the cars perform in the same way on the road as they do in the lab under the same operating conditions. . . . We do have a best practice program to ensure that we calibrate and certify properly." *Id.* Chrysler made similar statements concerning the Company's compliance and the lack of undisclosed emissions software in its vehicles in a press release issued on February 2, 2016 and in the Company's Annual Report on Form 20-F filed with the SEC on February 29, 2016. ¶¶ 345, 349-353.

**The Truth Is Revealed Through a Series of Disclosures**

On May 23, 2016, it was reported that several tests ran by the German motor transport authority KBA led it to conclude that there was "sufficient evidence of an impermissible defeat device" in some of Chrysler's models. ¶ 356. The scheme was similar to the one conducted by Volkswagen in that Chrysler's emission controls would shut off after 22 minutes, just after the standard length of time of an emissions test. *Id.* As a result of this news, Chrysler's stock price dropped $0.36, or roughly 5.1%, to close at $6.68 on May 23, 2016. ¶ 357.

On January 12, 2017, the EPA and CARB each issued a notice of violation to Chrysler for installing and failing to disclose engine management software that resulted in increased emissions from the vehicles. ¶ 364. "Failing to disclose software that affects emissions in a vehicle's engine is a serious violation of the law, which can result in harmful pollution in the air we breathe" said Cynthia Giles, assistant administrator for the EPA. *Id.* "***This is a clear and serious violation of the Clean Air Act.***" *Id.* CARB Chair Mary D. Nichols stated "***[Chrysler] made the business decision to skirt the rules and got caught***." *Id.* On this news, the Company's stock fell $1.35, or roughly 12%, to close at $9.95 on January 12, 2017. ¶ 366.

On February 6, 2017, French authorities announced they were referring Chrysler for prosecution following an investigation which showed that levels of NOx produced by its diesel vehicles were several times higher than regulatory limits. ¶ 369.  On this news, Chrysler's stock price declined $0.50, or roughly 4.6%, to close at $10.27 on February 7, 2017.  ¶ 370.

On May 23, 2017, the Department of Justice ("DOJ") announced the filing of a complaint in the Eastern District of Michigan asserting that Chrysler, FCA US and other entities violated federal law by illegally selling the non-compliant Subject Vehicles and for not disclosing the eight AECDs in the Company's Certificates of Conformity, which rendered inoperative the Subject Vehicles' emission control system, "causing the vehicles to emit substantially higher levels of NOx during certain normal real world driving conditions than during federal emission tests." ¶ 374.  On this news, Chrysler's stock price declined from $10.89 at 9:30 a.m. to $10.32 at 4:00 p.m., a decline of 5.2%.  ¶ 376.

## PROCEDURAL HISTORY

Plaintiff Victor Pirnik filed a class action complaint on September 11, 2015 alleging violations under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).  Dkt. 1.  On December 9, 2015, this Court issued an Order, appointing Gary Koopmann and Timothy Kidd as Lead Plaintiffs. Dkt. 24.

On March 29, 2016, Plaintiffs filed their Second Amended Complaint ("SAC") concerning Chrysler's failure to comply with vehicle safety regulations and asserting a class period of October 14, 2014 through October 28, 2015 (the "SAC Class Period").  Dkt. 38.  On April 28, 2016, Defendants moved to dismiss the SAC.  Dkt. 44. On October 5, 2016, the Court issued an Opinion and Order, granting in part and denying in part Defendants' motion.  Dkt. 50.

On January 19, 2017, the Court granted Plaintiffs' request to amend the SAC to add allegations concerning Chrysler's emissions scandal. Dkt. 62.  On February 6, 2017, a separately filed action was consolidated into this action. Dkt. 67.  On February 22, 2017, Plaintiffs filed the

TAC, adding allegations concerning Defendants' emissions scandal and extending the class period to be October 14, 2014 through February 6, 2017 (the "TAC Class Period"). Dkt. 69. On March 22, 2017, Defendants moved to dismiss the TAC. Dkt. 92. The Court granted Defendants' motion on August 1, 2017, but granted Plaintiffs leave to amend. Dkt 101.

On August 15, 2017, Plaintiffs' filed the FAC. On September 6, 2017, Defendants moved to dismiss the FAC. Dkt. 132. The Court denied Defendants' motion on November 13, 2017. Dkt.142.

## ARGUMENT

## I. THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Products, Inc., v. Windsor*, 117 S. Ct. 2231, 2245 (1997). In addition, the Court must determine whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3). *Id.* Class actions promote judicial economy by aggregating small claims into one lawsuit. "Class actions ... permit the plaintiffs to pool claims which would be uneconomical to litigate individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co.*, 105 S. Ct. at 2973. "The preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

It is well settled that "[t]here is a strong public policy in favor of private enforcement of the nation's securities laws." *Epifano v. Boardroom Business Products, Inc.*, 130 F.R.D. 295, 298 (S.D.N.Y. 1990). Thus, Courts in the Second Circuit have repeatedly acknowledged that "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally." *Darquea v. Jarden Corp.*, 2008 U.S. Dist. LEXIS 17747, at *12 (S.D.N.Y. Mar. 6, 2008) (citation omitted). In a

securities fraud action, if a court is in doubt as to whether to certify a class action, it should err in favor of certification. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. at 479.

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), Rule 23 is not a "license to engage in free-ranging merits inquiries at the class certification stage." *Amgen*, 133 S. Ct. at 1194-95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195. Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not appropriate to delve into merits issues such as scienter, materiality or loss causation. *See, e.g., Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) ("*Halliburton I*"); *see also Amgen*, 133 S. Ct. at 1193-94.

### A.     The Rule 23(a) Requirements are Satisfied

#### 1.     The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable." Impracticable does not mean impossible, but only that the difficulty of joining all class members make use of the class action appropriate. *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). Further, a plaintiff need not allege the exact number or identity of class members. *See In re Blech Sec. Litig.*, 187 F.R.D. 97 at 103 (S.D.N.Y. 1999). "Joinder is generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010), *citing Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997). "[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76,

83 (S.D.N.Y. 2007) (collecting cases) (citation omitted); *accord Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008).

During the Class Period, the common stock of Chrysler was listed on the New York Stock Exchange ("NYSE") and traded under the ticker symbol "FCAU." *See* Declaration of Jeremy A. Lieberman ("Lieberman Decl.") Ex. 1, Expert Report of Zachary Nye, Ph.D. ("Nye Report"), at ¶ 5.  During the Class Period, the common stock of Chrysler was also listed on the MTA (Mercato Telematico Azionario), Italy's national stock exchange in Milan, and traded under the ticker symbol "FCA."[3] *Id.* During the Class Period, the number of Chrysler shares issued and outstanding ranged from approximately 1.17 billion to 1.54 billion shares.  *Id.* ¶ 36. Also during the Class Period, there were more than 4.5 billion shares of Chrysler purchased and sold on U.S. markets and more than 11.8 billion shares of Chrysler purchased and sold on Italy's MTA.  *Id.* ¶ 38.  Although Plaintiffs have not at this time ascertained the precise number of potential Class members, they believe that there are many thousands of geographically dispersed members of the proposed Class. The precise identity of the members can be readily identified from the securities brokerage and nominee firms' books and records. Clearly, the proposed Class consists of a sufficient number of persons (*i.e.*, more than 40) to make joinder impracticable.  *See Menkes*, 270 F.R.D. at 90.

## 2.   Questions of Law or Fact Are Common to the Class

The Rule 23(a)(2) requirement that "there are questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted." *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995). *See also Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the context of securities fraud litigation"). Commonality "is established so long as the plaintiffs can identify some unifying thread among the [class] members' claims." *Haddock v.*

---

[3]   While purchases on the Milan exchange are excluded from the Class, the trading on the Milan exchange is relevant to whether Chrysler shares traded in an efficient market on the NYSE.

*Nationwide Fin. Services, Inc*., 262 F.R.D. 97, 116 (D. Conn. 2009), *vacated and remanded sub nom. Nationwide Life Ins. Co. v. Haddock*, 460 Fed. Appx. 26 (2d Cir. 2012).  Even a single common legal or factual question will suffice.  *See In re Agent Orange Prod. Liab. Litig*. MDL No. 381, 818 F.2d 145, 166-67 (2d Cir. 1987).

Here, common questions of law and fact include: (i) whether Defendants' statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether the price of Chrysler's stock was artificially inflated during the Class Period; and (iv) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses.  The misstatements were made to the Class as a whole, and injured market participants in the same way. In comparable situations, courts have consistently found the commonality requirement to have been satisfied.  *See, e.g., In re SCOR Holding (Switzerland) AG Litig*., 537 F Supp. 2d 556 (S.D.N.Y. 2008); *Wagner*, 251 F.R.D. at 116; *In re Flag Telecom Holdings, Ltd. Sec. Litig*., 245 F.R.D. 147, 157-158 (S.D.N.Y. 2007), *order aff'd in part, vacated in part*, 574 F.3d 29 (2d Cir. 2009).  Indeed, here, like all Section 10(b) cases, the commonality of the shareholders' claims is self-evident. *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).

### 3.     Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiff be typical of the claims of the class.  The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Southwest v. Falcon*, 102 S. Ct. 2364, 2373 n.13 (1982). "Typicality does not require that the situations of the named representatives and the class members be identical."  *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citation omitted); *see also In re Sumitomo Copper Litig*., 182 F.R.D. 85, 94 (S.D.N.Y. 1998).  A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *In re Flag Telecom Holdings, Ltd. Sec. Litig*., 574 F.3d at 35.  In other words:

> Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investors' perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986) (citations omitted).

Plaintiffs satisfy the typicality requirement. They each purchased Chrysler shares during the same period of time as the putative class members purchased or held their shares. Dkts. 1; 16-2, Ex. B.  Their claims, like those of all other Class members, derive from the same legal theories and the same misrepresentations and omissions.  Accordingly, Plaintiffs' claims are typical of those of the Class.  *Conn. Ret. Plans & Trust Funds v. Amgen, Inc.,* 2009 U.S. Dist. LEXIS 71653, at *14-15 (C.D. Cal. Aug. 12, 2009).

### 4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met. The focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted).  This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc.*, 117 S. Ct. at 2250 (citation omitted).  It is important to emphasize that "the conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted).

Here, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem Products, Inc.*, 117 S. Ct. at 2250-51, and no actual or potential conflicts exist. Plaintiffs and all Class members have suffered losses from purchasing Chrysler securities at artificially inflated prices. They have been injured by the identical wrongful underlying

misrepresentations and omissions of Defendants.  Each Plaintiff has been actively involved in this litigation and each is willing to serve as a representative party on behalf of the Class and understand their duties as Class representatives. *See* Lieberman Decl. Exs. 2-4. Each Plaintiff is willing and able to prosecute this action on behalf of the Class to a successful conclusion. *Id.*

Moreover, during their depositions, each Plaintiff demonstrated that they understood the allegations, parties, procedural posture and Class Period[4], their obligations as class representatives[5], and that they have been actively participating in the prosecution of the action.[6] Indeed, Plaintiffs even knew the name of the judge presiding over the Action.[7]

Plaintiffs have engaged qualified, experienced and capable attorneys. Proposed Class Counsel are highly experienced in complex class litigation, especially securities fraud actions, and have the ability and willingness to prosecute this action vigorously. *Infra*, at 24-25; Lieberman Decl., Ex. 8-9. Lead Counsel's vigorous pursuit of the Class' interests is well documented in their advancement of the Class' claims before this Court, including, *inter alia*, in their defeat of the Defendants' motions to dismiss.

**B.     The Requirements of Rule 23(b)(3) Are Satisfied**

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication.

---

[4] Lieberman Decl. Ex. 5 (Koopmann Tr.) 8:16-22, 9:11-21, 66:2-12, 66:21-67:3, 71:5-73:4, 81:19-83:13, 102:13-103:14, 103:23-104:8, 109:15-23, 110:11-23; Ex. 6 (Kidd Tr.) 62:16-63:2, 65:16-67:8, 67:15-69:16, 77:3-79:22, ; Ex. 7 (Pirnik Tr.) 9:8-10:23, 18:19-20:13, 93:10-99:25, 105:14-106:8, .

[5] Lieberman Decl. Ex. 5 (Koopmann Tr.) 14:21-15:1, 90:14-91:3, 95:1-97:2, 97:4-8, 99:3-11, 104:17-105:15, 106:11-19; Ex. 6 (Kidd Tr.) 6:16-9:1, 79:23-80:4, 82:25-83:4; Ex. 7 (Pirnik Tr.) 110:6-111:8, 143:4-144:19, 146:16-25, 155:2-9, 159:18-25.

[6] Lieberman Decl. Ex. 5 (Koopmann Tr.), 15:8-17, 16:13-19, 71:5-73:4, 74:9-75:4, 105:16-106:10, 106:23-107:5, 111:15-17, 112:6-9; Ex. 6 (Kidd Tr.) 82:7-22; Ex. 7 (Pirnik Tr.) 10:8-23, 11:3-12:23, 18:19-20:13, 117:13-118:14, 119:17-120:18, 149:20-150:19, 152:10-12, 152:22-153:9.

[7] Lieberman Decl. Ex. 5 (Koopmann Tr.) 109:15-23; Ex. 6 (Kidd Tr.) 83:23-25; Ex. 7 (Pirnik Tr.) 153:23-25.

### 1.   Common Questions of Law and Fact Predominate

"Predominance is a test readily met in certain cases alleging consumer or securities fraud…" *Amchem Products, Inc*., 117 S. Ct. at 2250.   "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *See UFCW Local 1776 v. Eli Lilly and Co*., 620 F.3d 121, 131 (2d Cir. 2010); *see also Dura-Bilt Corp. v. Chase Manhattan Corp*., 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("[T]o allow various secondary issues of plaintiff's claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.").

Plaintiffs will prove, on a common basis, the elements of their Sections 10(b)[8] and 20(a) claims.[9]   "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 131 S. Ct. at 2184.[10]  Here, reliance (or

---

[8] The elements of a claim for securities fraud under Section 10(b) are:  (1) a material omission or misrepresentation; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).

[9] In addition to an underlying Section 10 violation by a controlled entity, Section 20(a) liability requires control of the primary violator by the defendant. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006) (Scheindlin, J.).  Control can be proved class-wide. *See, e.g., In re Beacon Assoc. Litig*., 282 F.R.D. 315, 333 (S.D.N.Y. 2012).

[10] Aside from reliance and damages (as to which individual issues do not defeat predominance), courts routinely find that the other elements can be proved with common evidence. *See In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig*., MDL No. 1658 (SRC), 2013 WL 396117, at *12 (D.N.J. Jan. 30, 2013) ("Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information . . . In addition . . . loss causation for the putative class is also capable of proof through common evidence.  Each class member's claim for relief is based on the same corrective disclosures . . . "); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) ("With one exception, [reliance] there is no dispute that each element necessary to establish liability . . . is common to the class . . . The proof for the claims of misrepresentation or omission, materiality, and [Defendant's] scienter are all based on a common nucleus of facts and a common course of conduct").  Because merits determinations are to be eschewed, the Supreme Court has recently confirmed that neither materiality nor loss causation has to be proved at the class certification stage to trigger *Basic*'s presumption of reliance. *See Amgen*, 133 S. Ct. 1184 at 1195-96 (materiality); *Halliburton*, 131 S. Ct. 2179 at

transaction causation) will be established on a common basis under the "fraud-on-the-market"

theory.  As explained in *Basic Inc. v. Levinson*, 108 S. Ct. 978 (1988):

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Id*. at 989 (citation omitted, alterations in the original). The Court further explained:

> An investor, who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

*Id*. at 992.  To invoke the fraud-on-the market-presumption, "plaintiffs must demonstrate that (1)

the alleged material misstatements were publicly known, (2) that the security traded on an

efficient market, and (3) that the plaintiff purchased his shares between the time the misleading

statement was made and the time the truth was revealed."  *In re Winstar Communications Sec.

Litig*., 290 F.R.D. 437 (S.D.N.Y. 2013).  Plaintiffs demonstrate all three.

In *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989), the court set forth certain

factors as an aid to determine whether the market for any stock is open and efficient:  (1) whether

there "existed an average weekly trading volume during the class period in excess of a certain

number of shares," to wit, 1% for a "substantial presumption" of efficiency, 2% turnover for a

"strong presumption" (*Id*. at 1293); (2) whether "a significant number of securities analysts

followed and reported on [the] company's stock during the class period"; (3) whether the

company's stock "had numerous market makers"; (4) whether "the Company was entitled to file

an S-3 Registration Statement in connection with public offerings or, if ineligible, such

ineligibility was only because of timing factors rather than because the minimum stock

requirements set forth in the instructions to Form S-3 were not met"; and (5) whether "empirical

facts show[ ] a cause and effect relationship between unexpected corporate events or financial

---

2185-86 (loss causation).

releases and an immediate response in the stock price." *Id.* at 1284-87.  The *Cammer* factors, however, are not exclusive, and a plaintiff "is not required to show the existence of each of these factors" to establish market efficiency.  *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 683 (N.D. Ala. 2005) (citations omitted). "The vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than as a checklist.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) (citing *Cammer*, 711 F. Supp. at 1287) (collecting cases).   "If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient." *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*, 2006 U.S. Dist. LEXIS 52991, *43 (S.D.N.Y. Aug. 1, 2006), *aff'd sub nom. Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008).

In *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2410 (2014) (*"Halliburton II"*) the Supreme Court clarified the standard for fraud-on-the-market. *Halliburton II*, 134 S. Ct. 2398. Notably, the Court stated that the three prerequisites to invoking the fraud-on-the market presumption were really proxies for the fact that the misrepresentation or omission affected the market price of the security (*i.e.,* "price impact"). *Id.* at 2415. *Halliburton II* further clarified that a plaintiff can show fraud on the market **either** by providing evidence that the company's stock generally traded on an efficient market, **or** by direct evidence that the misleading statement had a price impact.  *Id*.  Defendants, by the same token, may also show a lack of price impact by direct evidence to rebut the presumption.  *Id.*  The Court *also* confirmed that market efficiency for purposes of the fraud-on-the-market presumption is not tied to any academic strain of market efficiency. *Id.* at 2410 (rejecting notion that efficiency related to "any particular theory of how quickly and completely publicly available information is reflected in market price."). Instead, it is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id.* (quotation and citation omitted). Accordingly, "[d]ebates

15

about the precise degree to which stock prices accurately reflect public information are thus largely beside the point." *Id.*

In short, *Halliburton II's* holds plaintiffs are not **required** to show price impact to obtain a fraud-on-the-market presumption of reliance. Rather, plaintiffs may show that they are entitled to a presumption of reliance through either showing market efficiency *or* direct evidence that the misrepresentation or omission had an impact on the stock's price.

### a. Chrysler's NYSE Listing is Strong Evidence of Market Efficiency

Throughout the Class Period, Chrysler's shares were listed and traded on the most well-developed securities markets in the world: the New York Stock Exchange. Nye Report, ¶¶ 5, 11, 15. Congress, the Supreme Court, and the seminal *Cammer* decision all recognize that such well-developed markets are generally efficient in reflecting publicly-available information in the prices of securities traded on those markets. In *Basic*, the Supreme Court noted that in "drafting [the 1934] Act, Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets. . . .Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. at 246. *See also Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 430-431 (D. Ariz. 2013) (discussing same); *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) ("Basic itself recognized the NYSE as an efficient market"). Similarly, *Cammer* quoted with approval treatise commentary that "there should be a presumption -- probably conditional for class determination -- that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System." 711 F. Supp. at 1292.

"[N]o argument can be made that the [NYSE] is not an efficient market." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008). Accordingly, consistent with

16

*Cammer* and *Basic*, "[m]ost courts to consider the issue have concluded that a stock's listing on the New York Stock Exchange is a strong indication that the market for the stock is efficient." *In re JPMorgan Chase & Co. Secs. Litig.*, 2015 U.S. Dist. LEXIS 132181, *22 (S.D.N.Y. Sept. 29, 2015). *See also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."); *Carpenters Pension Trust Fund of St. Louis*, 310 F.R.D. at 81 ("most courts agree that such listing is a good indicator of efficiency"); *Lumen*, 280 F.R.D. at 459-460 (cases "too numerous to cite… establish the NYSE and NASDAQ are at least entitled to a *presumption* of efficiency — making it incumbent upon Defendants to rebut the presumption.") (emphasis in original).

### b.     The Five Cammer Factors Confirm Market Efficiency

Dr. Nye's holistic analysis of the *Cammer* factors and other indicia of market efficiency demonstrate beyond dispute that Chrysler's common stock traded in an efficient market during the Class Period.

**Factor One – Weekly Trading Volume:** "[A] large weekly volume of stock trades … implies significant investor interest in the company [which] implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. During the Class Period, the average weekly trading volume of Chrysler stock on the NYSE was 2.5%. *Id.* ¶ 36.  Thus, the average weekly reported trading volume of Chrysler stock, during the Class Period exceeds the 2% "strong presumption" of market efficiency in *Cammer.*

**Factor Two – Analyst Coverage:**  Analyst coverage on a stock implies that information about the company is rapidly reflected in the stock price. *Cammer*, 711 F. Supp. at 1286. During the Class Period, at least 25 well-known investment firms followed and published reports on Chrysler.  Nye Report, ¶ 42. More than 750 analysts' reports on Chrysler were issued during the Class Period. *Id.* In addition, during the Class Periods, financial information was further

17

disseminated to investors via media coverage, investor conferences, trade magazines, Company presentations and SEC filings. *Id.* ¶ 43. Specifically, more than 42,000 news articles pertaining to the Company appeared in major U.S. and international news media during the Class Period. *Id.* Furthermore, Chrysler's filings with the SEC were publicly available online during the Class Period at no cost. *Id.* ¶ 45. This volume of news coverage supports an inference that the stock traded on an efficient market. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (524 news items over two years showed efficient market).

**Factor Three – Market Makers and the Potential for Arbitrage:** A market maker is an entity that agrees to purchase or sell securities on demand, to support a liquid market for the shares. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 515 (1st Cir. 2005); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-614 (C.D. Cal. 2009). The number of market-makers is not germane to Chrysler stock because its stock traded on the NYSE during the Class Periods. *See* Nye Report, ¶ 48. Stocks that trade in an "auction market" like the NYSE have a single designated market maker (formerly referred to as a specialist) to maintain a competitive and efficient market, as opposed to multiple market makers found on the over the counter and NASDAQ markets. *Id.* However, the presence of a designated market maker supports a finding of efficiency. *Id. See Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012) (finding that the existence of a designated market maker satisfies *Cammer* Factor 3). In addition, as is the case with all NYSE-listed equities, Chrysler stock also traded on numerous other national securities markets and Alternative Trading Systems ("ATSs") during the Class Period. Nye Report, ¶ 49. There were 159 active market makers trading Chrysler stock during the Class Period, (*Id*), which supports a finding of efficiency. *Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers justifies substantial presumption of efficiency).

The existence of arbitrageurs, who are generally understood to be sophisticated investors who can act rapidly to take advantage of pricing discrepancies and thus ensure that market prices reflect all public information, are the fundamental hallmark of market efficiency. Nye Report, ¶ 50.  During the Class Period, arbitrageurs were not constrained in their ability to short shares of

Chrysler stock. *Id.* ¶ 52. Additionally, institutional holdings of Chrysler stock in U.S. Markets ranged from 61% to 68% of outstanding shares available during the Class Period. *Id.* ¶ 54. During the Class Period, more than 400 institutional investors reported holding the stock at the end of each quarter. *Id.* Furthermore, the fact that institutional holdings, on average, were approximately 14 times the short interest in Chrysler stock in U.S. Markets during the Class Period implies that short selling was not constrained during the Class Period. *Id.* Thus, the fact that trading in Chrysler stock was facilitated by a designated market maker on the NYSE and that arbitrage opportunities could have been exploited during the Class Period are evidence in support of market efficiency. *Id.* ¶¶ 47-55.[11]

**Factor Four – S-3 Eligibility:** The *Cammer* Court found that a Company's eligibility to file a short-form registration statement, *i.e.,* Form S-3, supports a finding of an efficient market. *Cammer*, 711 F. Supp. at 1285. A company is entitled to S-3 registration if the company filed financial reports with the SEC for 12 months and has outstanding float over $75 million. Nye Report, ¶ 60. It is the SEC's view that these S-3 eligible companies—those that disclose financial information to the SEC and issue press releases to the public—have already disseminated information to the marketplace, and, therefore, that the market operates efficiently for them. *Id.* ¶ 61. Form F-3 for foreign issuers in the U.S. is the functional equivalent to Form S-3 us by U.S. issuers and the requirements are essentially identical. *Id.* ¶ 63. Chrysler filed a F-3ASR ("Automatic shelf registration statement of securities of well-known seasoned issuers") on May 9, 2017, which further supports market efficiency. *Id.* ¶¶ 63-64. *See Cammer*, 711 F. Supp. at 1287 ("it would be helpful to allege the Company was entitled to file an S–3 Registration

---

[11] Similarly, the cost of trading and arbitrage opportunity for Chrysler, demonstrated by the "bid-ask" spread, demonstrates that it traded in an efficient market. Nye Report ¶ 59. Bid/ask spreads are a measure of transaction costs and low transaction costs indicate that arbitrage opportunities can be exploited readily. *Id.* ¶ 56. If a security is actively traded and information about the security is readily available, the bid-ask spread will tend to be narrow. During the Class Period, Chrysler stock traded on the NYSE had an average bid-ask spread of 0.10%/0.09%, which was comparable to the average bid-ask spread of a random sample of stocks listed on the NYSE, 0.09%/0.07%. *Id.* ¶ 57. This further supports the conclusion that the Company's common stock traded in an efficient market during the Class Period. *Id.* ¶ 59.

Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S–3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency").

**Factor Five – Cause and Effect Relationship of Unexpected Material News and Stock price:** This factor requires showing that there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in stock price." *Cammer*, 711 F. Supp. at 1286-87. Dr. Nye employed an event study to determine the impact of new material information on Chrysler's stock price. *See* Nye Report, ¶ 67. In an efficient market, it would be expected that the price of a stock would respond to news. *Id.* ¶¶ 65-66. The event study is a multiple step process to test this response. *Id.* ¶ 66. Those steps include: "the *a priori* definition and selection of events to study; identification of a study period; estimation of a regression model to remove noncompany-specific effects from the security's return; testing for statistical significance; and interpretation of empirical results." *Id.* To determine which events to study in his analysis, Dr. Nye relied on a large body of event study literature that has evaluated what types of information affect stock prices. *Id.* ¶ 68. Consistent with this literature, Dr. Nye examined 16 dates during the Class Period consisting of (1) dates on which Chrysler released quarterly earnings, and (2) dates of the corrective disclosures identified in the FAC. *Id.* ¶¶ 67-68. Such news announcements are objective events shown in the academic finance literature to have a material impact on stock prices. *Id.* ¶ 68. Out of the 16 events examined, 10 are associated with a statistically significant Company-specific return at the 95% confidence level. *Id.* ¶ 69.[12] At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time (i.e. 0.8 events out of the 16 events). *Id.* Here, 62.5% of the events examined during the Class Period are associated with statistically significant returns at the 95% confidence level. *Id.* ¶ 69. These results are more than 12 times more frequent than one

---

[12] An additional event is associated with a negative Company-specific return that is statistically significant at the 92.12% confidence level. *Id*. ¶ 69.

would expect from a random sampling of days. *Id.* Moreover, with respect to both Class Periods,

Dr. Nye concluded:

> event dates on which material new *positive* Company-specific news reached the market are associated with a statistically significant *positive* return, and event dates on which material new *negative* Company-specific news reached the market are associated with a statistically significant *negative* return."

*Id.* ¶ 70. Conversely, for the event dates that are associated with a statistically insignificant

Company-specific return, the Company's financial results were in line with expectations, were

mixed and/or were greeted with mixed reactions by analysts, such that the insignificant stock

price reactions are consistent with that expected in an efficient market. *Id.* Based on his analysis,

Dr. Nye concluded that for the Class Period (1) "it is clear that Chrysler's stock price typically

reacted more strongly on the event dates than on non-event dates . . ." (*Id.* ¶ 69); (2) the event

study shows "a strong cause-and-effect relationship existed between the information disclosed in

the event dates and resulting stock price movements" (*Id.* ¶ 70); and (3) Chrysler's stock price

"promptly responded to material, unexpected news" and "the market for [] Chrysler stock was

efficient during the Class Period." *Id.* ¶¶ 70-71.

### c.     Plaintiffs Are Entitled To A Presumption of Reliance Because They Have Demonstrated "Price Impact"

While it is not Plaintiffs' burden at the class certification stage to demonstrate the "price

impact" of Defendants' misstatements (*Halliburton II*, 134 S. Ct. at 2398; *see also Waggoner v.

Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) ("we conclude that a plaintiff seeking to

demonstrate market efficiency need not always present direct evidence of price impact through

event studies"), the Supreme Court in *Halliburton II* stated that doing so is another way –

independent of demonstrating market efficiency – through which plaintiffs may secure the

presumption of reliance under the fraud-on-the-market theory. *Id.* at 2415.  Here, there can be no

doubt that Defendants' misrepresentations and omissions concerning both vehicle safety and

emissions compliance had an impact on Chrysler's stock's price. Indeed, Dr. Nye found that

each of the corrective events alleged by Plaintiffs – the July 26, 2014 NHTSA Consent Order,

Chrysler's October 28, 2014 announcement of a €761 million charge for recalls, the May 23, 2016 finding by German regulators of Chrysler's emissions violations, the January 12, 2017 notice of emissions violations by the EPA and CARB, the February 6, 2017 finding by French authorities of Chrysler's emissions violations, and the May 22, 2017 filing of the DOJ/EPA Complaint – was followed by a statistically significant residual price decline. Nye Report, ¶ 81. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259-260 (2d Cir. 2016) (holding that a plaintiff can demonstrate "price impact" by showing either an increase in stock price following a misrepresentation or a decline following a corrective event).

> **d.      Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance**

Where liability can be proved class-wide, it is "'well-established' Second Circuit precedent that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (citation omitted). This is especially true for securities fraud cases, where the process of computing damages after liability is established is "virtually a mechanical task." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013); (*quoting Blackie*, 524 F.2d at 905). *See Carpenters Pension Trust Fund of St. Louis*, 310 F.R.D. at 74 ("[i]ssues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases."). For this reason, courts do not require a formal damages model to demonstrate that damages can be determined on a classwide basis. Instead, to the extent any evidence is required, an event study like that provided by Dr. Nye (Nye Report, ¶¶ 72-76) will suffice. *See, e.g., In re JPMorgan Chase & Co. Secs. Litig.*, 2015 U.S. Dist. LEXIS 132181, *23-24 Diamond Foods*, 295 F.R.D at 251-52.

> **2.      A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy**

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation. "Together with predominance, the superiority requirement 'ensures that the class will

be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 104 (2d Cir. 2007). Courts have universally recognized the superiority of class actions in cases alleging securities fraud, especially where the fraud-on-the-market presumption applies. *See supra* at 13.

> This Court analyzes four factors in determining the superiority of the class action:
>
> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors weigh in favor of class certification in this case.

The members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive. *In re WorldCom, Inc. Sec. Litig*., 219 F.R.D. at 304 (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered economic loss of *de minimus* value). A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 127 S. Ct. 2499, 2508 n.4, (2007) ("Nothing in the [PSLRA], we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses' — a matter crucial to the integrity of domestic capital markets.") (citations omitted). Moreover, there are thousands of class members. "Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *In re SCOR Holding (Switzerland) AG Litig*., 537 F. Supp.2d at 579. It would also

"risk disparate results among those seeking redress." *Id*. Finally, there is no reason to expect any difficulties in managing this case as a class action. Indeed, class actions of this size and complexity are common.

## II.     POMERANTZ AND ROSEN SATISFY THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL

In confirming its appointment of Lead Counsel as Class Counsel, this Court must consider the factors enumerated in Rule 23(g)(1)(A):

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

Under these criteria, the Pomerantz and Rosen firms are eminently qualified, and this Court should confirm their appointment as Class Counsel in this case. Lieberman Decl. Exs. 8 and 9.

For over eighty years, Pomerantz has been a leader in litigating securities fraud cases on behalf of investors in both class and individual actions, setting important precedents. As lead counsel, the firm has a proven track record of achieving results for classes, recovering over $1 billion dollars on their behalf over the years. *See, e.g. In re Comverse Technology, Inc. Sec. Litig.*, No. 06-cv-1825, Dkt. No. 347 (S.D.N.Y June 24, 2010) ($225 million settlement); *In re Charter Communications, Inc. Sec. Litig.*, No. 02-cv-01186-CAS (E.D. Mo.) ($146.25 million class settlement); *In re Groupon, Inc. Sec. Litig.*, No. 12-cv-02450-CRN (N.D. Ill.) ($45 million settlement); *In re Lumber Liquidators Holdings, Inc. Sec. Litig.*, No. 13-cv-157-AWA, Dkt. No. 204 (E.D. Va. Nov. 17, 2016) ($43 million settlement). Many courts have acknowledged Pomerantz' skill and strength in securities litigation. For example, Pomerantz currently serves as lead counsel in *In re Petrobras Securities Litigation*, No. 14-cv-09662-JSR (S.D.N.Y.), a class action against the Brazilian energy giant Petróleo Brasileiro S.A. – Petrobras, concerning a sprawling collusion and kickback scheme that resulted in over $19 billion in asset impairments and charges. Judge Rakoff applauded Pomerantz's efforts: "[O]n the basis not only of [the Firm's] prior experience but also on the Court's observation of its advocacy over the many

24

months since it was appointed lead counsel, the Court concludes that Pomerantz, the proposed class counsel, is qualified, experienced and able to conduct the litigation." *In re Petrobras Securities Litigation*, 312 F.R.D. 354, 362 (S.D.N.Y. 2016) (internal citation omitted).

Similarly, over the last 15 years, the Rosen firm has become a leader in class action securities litigation. For 2015 and 2016, Institutional Shareholder Services ranked Rosen number two in the nation for the number of securities class action settlements.  Courts have frequently lauded Rosen for the results its attorneys have achieved and their professionalism and dedication to the classes they serve.  For example, in *Lewy v. SkyPeople Fruit Juice, Inc*., No. 10-cv-2700 (S.D.N.Y. 2012), Judge Castel, in approving the settlement achieved by the Rosen Law Firm stated "[T]he representation and the quality of the opposition and lead counsel, are both of very high order.  Plaintiffs' counsel is to be commended for bringing about this favorable result… Again I congratulate and thank counsel for the very professional work they have done in the case, and for the very fine job they achieved for the class.  Thank you."

Here, Lead Counsel have effectively used their experience to vigorously pursue the interests of all Class members including filing factually detailed complaints, mounting a successful defense of the allegations in response to the Defendants' multiple motions to dismiss and engaging Defendants in the discovery process.

**CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiffs as the Class Representatives; (3) appointing Co-Lead Counsel as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: December 21, 2017
New York, New York

25

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Michael J. Wernke
Veronica Montenegro
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
    mjwernke@pomlaw.com
    vmontenegro@pomlaw.com


**POMERANTZ LLP**

Patrick V. Dahlstrom
10 South La Salle Street, Suite
3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com


*Co-Lead Counsel for Plaintiffs*

26