**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | No. 15 Civ. 7199 (JMF) |
| Plaintiffs, | |
| v. | ORAL ARGUMENT AND EVIDENTIARY HEARING REQUESTED |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US LLC, SERGIO MARCHIONNE, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE, and ROBERT E. LEE, | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Robert J. Giuffra, Jr.
William B. Monahan
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

February 13, 2018

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND .................................................................................................... 6

    A.    FCA's Challenged Statements ........................................................ 6

    B.    NHTSA's Widely Publicized Investigation and Hearing ................... 7

    C.    This Court's Dismissal of Plaintiffs' Claims Over Recall Reserves ................. 10

    D.    Plaintiffs' Emissions-Related Claims ............................................. 10

ARGUMENT ...................................................................................................... 11

I.    THE COURT SHOULD *NOT* CERTIFY A CLASS BECAUSE PLAINTIFFS CANNOT INVOKE THE *BASIC* PRESUMPTION OF CLASSWIDE RELIANCE ................................................................. 11

    A.    None of the Alleged Misrepresentations Impacted FCA's Stock Price When Made ....................................................................... 11

    B.    Neither the Alleged "Corrective Disclosures" about Safety Recalls Nor the Alleged "Corrective Disclosures" about Emissions Impacted FCA's Stock Price When the "Truth" Supposedly Was Revealed ..................... 14

        1.    Plaintiffs Cannot Demonstrate that FCA US's Supposed "Corrective Disclosures" About Safety Recalls Had a Statistically Significant Impact on Its Stock Price ....................................... 14

        2.    Because This Court Dismissed Plaintiffs Claims Concerning the Adequacy of FCA's Reserves for Safety Recalls, Plaintiffs Cannot Rely on Those Claims to Support Class Certification ..................... 16

        3.    Plaintiffs' Emissions-Related "Corrective Disclosures" Did Not Actually Correct FCA's Alleged Misstatements ........................... 17

II.    PLAINTIFFS' PURPORTED CLASSWIDE DAMAGES METHODOLOGY DOES NOT MEASURE DAMAGES ATTRIBUTABLE SOLELY TO THEIR THEORY OF INJURY ................... 21

III.    AT A MINIMUM, ANY PUTATIVE CLASS PERIOD MUST BE SHORTENED ............................................................................... 23

CONCLUSION ................................................................................................... 26

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Alaska Elec. Pension Fund* v. *Pharmacia Corp.*,
   2007 WL 276150 (D.N.J. Jan. 25, 2007) ............................................................................24

*Ark. Teachers Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
   879 F.3d 474 (2d Cir. 2018) ...................................................................................... *passim*

*Basic Inc.* v. *Levinson*,
   485 U.S. 224 (1988) ..................................................................................................... *passim*

*Berks Cty. Emps.' Ret. Fund* v. *First Am. Corp.*,
   734 F. Supp. 2d 533 (S.D.N.Y. 2010) ....................................................................4, 20, 25

*Brzychnalski* v. *Unesco, Inc.*,
   35 F. Supp. 2d 351 (S.D.N.Y. 1999) ...............................................................................1, 23

*Comcast Corp.* v. *Behrend*,
   569 U.S. 27 (2013) ...........................................................................................................4, 21

*Elkind* v. *Liggett & Myers, Inc.*,
   66 F.R.D. 36 (S.D.N.Y. 1975) ...........................................................................................23

*Fait* v. *Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011) ..............................................................................................10

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   903 F.2d 176 (2d Cir. 1990) ..............................................................................................25

*George* v. *China Auto. Sys., Inc.*,
   2013 WL 3357170 (S.D.N.Y. July 3, 2013) ......................................................................25

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ..............................................................................................1, 3, 11

*In re Alstom SA*,
   253 F.R.D. 266 (S.D.N.Y. 2008) .................................................................................24, 25

*In re Am. Int'l Grp., Inc.*,
   265 F.R.D. 157 (S.D.N.Y. 2010) .......................................................................................16

*In re BP P.L.C.*,
   2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ....................................................................23

*Page(s)*

## TABLE OF AUTHORITIES
### (continued)

*In re China Organic,*
  2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013)..........................................................................20

*In re Credit Suisse First Boston Corp.,*
  250 F.R.D. 137 (S.D.N.Y. 2008) ..........................................................................................13

*In re Fed. Nat'l Mortg. Ass'n Sec.,*
  247 F.R.D. 32 (D.D.C. 2008)................................................................................................24

*In re Gentiva,*
  281 F.R.D. 108 (E.D.N.Y. 2012) ..........................................................................................24

*In re Initial Pub. Offering,*
  243 F.R.D. 79 (S.D.N.Y. 2007) ............................................................................................17

*In re Initial Pub. Offering,*
  483 F.3d 70 (2d Cir. 2007)................................................................................................6, 24

*In re Moody's Corp.,*
  274 F.R.D. 480 (S.D.N.Y. 2011) ...............................................................................2, 13, 16

*In re POM Wonderful LLC,*
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014)......................................................................22

*In re SCOR Holding (Switzerland) AG,*
  537 F. Supp. 2d 556 (S.D.N.Y. 2008)...................................................................................24

*In re Smart Techs., Inc.,*
  295 F.R.D. 50 (S.D.N.Y. 2013) ........................................................................................6, 24

*In re Veeco Instruments, Inc.,*
  235 F.R.D. 220 (S.D.N.Y. 2006) ......................................................................................3, 17

*In re Vivendi, S.A.,*
  838 F.3d 223 (2d Cir. 2016)..................................................................................................13

*Mazzei* v. *Money Store,*
  288 F.R.D. 45 (S.D.N.Y. 2012) ........................................................................................1, 23

*Pirnik* v. *Fiat Chrysler Autos., N.V.,*
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)................................................................3, 10, 16

*Pirnik* v. *Fiat Chrysler Autos., N.V.,*
  2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017)............................................................... *passim*

*Page(s)*

### TABLE OF AUTHORITIES
### (continued)

*Pirnik* v. *Fiat Chrysler Autos., N.V.*,
   2017 WL 5312182 (S.D.N.Y. Nov. 13, 2017) ............................................................... *passim*

*Procter & Gamble Pharm., Inc.* v. *Hoffmann-LaRoche Inc.*,
   2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006)........................................................................16

*Turnbow* v. *Life Partners, Inc.*,
   2013 WL 3479884 (N.D. Tex. July 9, 2013) .......................................................................23

*Waggoner* v. *Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)............................................................................................ *passim*

### RULE

Fed. R. Civ. P. 23(b)(3)...................................................................................................... *passim*

### PRESS AND ANALYST REPORTS

Ashley Halsey III, *Fiat Chrysler hit with $70 million federal fine for safety
   reporting failures*,
   Washington Post, Dec. 10, 2015 ..........................................................................................9

Bill Vlasic, *Fiat Chrysler Accused of Neglect in 23 Recalls*,
   N.Y. Times, July 2, 2015 ......................................................................................................8

Chris Woodyard, *Feds order Fiat Chrysler to defend pace of 20 recalls*,
   USA Today, May 18, 2015 ....................................................................................................7

Danielle Ivory, *Regulators to Hold Hearing on Fiat Chrysler Safety Response*,
   N.Y. Times, May 18, 2015 ....................................................................................................7

David Shepardson, *US plans to penalize Fiat Chrysler over delayed recalls*,
   Detroit News, July 2, 2015 ....................................................................................................8

Dee-Ann Durbin*, Fiat Chrysler to pay $70 million fine to U.S. government,*
   St. Louis Post-Dispatch, Dec. 10, 2015 ...............................................................................9

Michael Wayland, *Feds not done probing Fiat Chrysler's recall efforts*,
   Detroit News, July 21, 2015 .................................................................................................8

Mike Spector, *Fiat Chrysler Safety Chief to Retire*,
   Wall St. J., Oct. 27, 2015 ......................................................................................................9

Mike Spector, *Regulators Step Up Pressure on Chrysler Over Recalls*,
   Wall St. J., May 18, 2015......................................................................................................7

*Page(s)*

**TABLE OF AUTHORITIES**
**(continued)**

Mike Spector, *U.S. Fines Fiat Chrysler $70 Million for Safety-Reporting*,
   Wall St. J., Dec. 10, 2015 ...........................................................................................9

Stephanie Brinley, *FCA's Senior Quality Executive to Retire, Company Recalls*
   *Ram and Cherokee*,
   IHS Global Insight, Oct 28, 2015 ...............................................................................9

Stephanie Brinley, *US Safety Regulator Likely to Impose Penalties on FCA Over*
   *Recall Handling*, IHS Global Insight, July 3, 2015 ....................................................8

**OTHER AUTHORITIES**

Joseph M. McLaughlin, McLaughlin on Class Actions (14th ed. 2017).......................................19

William B. Rubenstein, Newberg on Class Actions (5th ed. 2018) ............................................23

## PRELIMINARY STATEMENT

Plaintiffs seek to certify a single class of Fiat Chrysler Automobiles, N.V. ("FCA" or the "Company") shareholders based on what the Court has recognized are two distinct theories of liability:  (1) FCA's alleged misstatements regarding FCA US LLC's ("FCA US") "substantial compliance with applicable safety recall regulations"; and (2) FCA's (or its subsidiaries') alleged misstatements about its "compliance with certain federal and state emissions regulations."  *Pirnik* v. *Fiat Chrysler Autos., N.V.*, 2017 WL 3278928, at *1 (S.D.N.Y. Aug. 1, 2017) ("*Pirnik II*").   Because their theories involve different alleged misstatements, different "corrective" disclosures and different time periods, Plaintiffs' putative class must "be split into separate classes," neither of which can "meet all of the elements of Rule 23."  *Mazzei* v. *Money Store*, 288 F.R.D. 45, 56 (S.D.N.Y. 2012) (Koeltl, J.); *see Brzychnalski* v. *Unesco, Inc.*, 35 F. Supp. 2d 351, 353–54 (S.D.N.Y. 1999) (Chin, J.) (approving "creation of two classes").

Under either theory, Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement.  To try to show that common issues predominate over individual issues, Plaintiffs invoke the "fraud on the market" presumption of classwide reliance set forth in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988).  But the record before the Court clearly demonstrates that "the [alleged] misrepresentation[s] did not in fact affect the stock price," which "rebut[s] the presumption of reliance," and defeats class certification here.  *Ark. Teachers Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 879 F.3d 474, 483 (2d Cir. 2018) (quoting *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2414 (2014) ("*Halliburton II*")).

On their safety recall claims, Plaintiffs allege that FCA supposedly misled its shareholders when it generally stated that the Company was "substantially in compliance" with unspecified "global regulatory requirements" in more than 150 countries.  (*E.g.*, Fourth Am. Compl. dated Aug. 15, 2017 ("Compl.") ¶¶ 275, 281, ECF No. 129.)  But *none* of these general

statements had any impact on FCA's stock price when they were made. Indeed, both Defendants' expert, Dr. Paul Gompers of the Harvard Business School, and Plaintiffs' expert, Dr. Nye, found that, on the dates of the alleged misstatements, FCA's stock price either showed no statistically significant change at all, or reacted to unrelated information, such as sales.

On their emissions-related claims, Plaintiffs allege that FCA supposedly misled its shareholders when, in contrast to its more general statements of compliance, FCA specifically stated that its vehicles did not contain "defeat devices." (*E.g.*, Compl. ¶¶ 343, 345, 361); *Pirnik* v. *Fiat Chrysler Autos., N.V.*, 2017 WL 5312182, at *2 (S.D.N.Y. Nov. 13, 2017) ("*Pirnik III*"). The undisputed record again shows that *none* of these alleged misstatements impacted FCA's stock price when they were made. (Ex. 1 (Gompers Report) ¶¶ 12–14, 18.)[1] This Court must therefore deny class certification, because "there is no day when [FCA] is alleged to have made a material misrepresentation that caused a statistically significant increase in the price" when made. *In re Moody's Corp.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (Daniels, J.).

Plaintiffs cannot explain away the conceded lack of any price impact at the time the challenged statements were made (for both their safety recall and emissions-related claims) by invoking the so-called "price maintenance theory"—*i.e.*, that the alleged misstatements supposedly maintained some unspecified artificial inflation in FCA's stock price that would have dissipated had FCA been truthful. *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017). The Second Circuit requires plaintiffs to identify when and how any alleged inflation "would have entered the stock" in order to invoke this theory, *id.* at 104 n.37, but Plaintiffs have made no attempt to do so. In any event, the record demonstrates that not only did FCA's alleged

---

[1] All exhibits referenced herein are attached to the Declaration of Joshua S. Levy dated February 13, 2018, unless otherwise noted.

misstatements have no price impact when they were made, but the purported "corrective disclosures" that Plaintiffs allege revealed the falsity of FCA's challenged statements also did not cause any impact on the Company's stock price. *See Halliburton II*, 134 S. Ct. at 2414 (*Basic* presumption may be rebutted by "evidence that the asserted misrepresentation (*or its correction*) did not affect the market price of the defendant's stock") (emphasis added).

   *First*, as Dr. Gompers explains, Plaintiffs' own expert's analysis shows that none of the safety recall disclosures that Plaintiffs say revealed the truth of FCA US's regulatory noncompliance had a statistically significant impact on FCA's stock price when made. Thus, at a minimum, the Court cannot certify a class based on FCA's generic statements of compliance, including Plaintiffs' safety recall claims.

   *Second*, Plaintiffs cannot rely on any price impact purportedly caused by increases in FCA's safety recall reserves, because this Court has already held that the Company's statements about those reserves are not actionable as a matter of law. To try to show price impact, Plaintiffs cite FCA's October 28, 2015 announcement of a €761 million charge for future recall costs, which they claim caused FCA's stock price to drop. But this Court has twice held that this "disclosure" did not correct any actionable misstatement. *See Pirnik* v. *Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *8–9 (S.D.N.Y. Oct. 5, 2016) ("*Pirnik I*") (FCA's "reserves for product warranties and recalls" are inactionable "opinion"). (*See also* ECF No. 81.) It is black-letter law that Plaintiffs cannot rely upon statements that "are not actionable under the securities laws" to support class certification. *In re Veeco Instruments, Inc.*, 235 F.R.D. 220, 241 (S.D.N.Y. 2006) (McMahon, C.J.).

   *Third*, none of Plaintiffs' ten emissions-related "corrective disclosures" had a price impact that could be attributed to any of FCA's prior statements. These disclosures cannot

have corrected FCA's generic statements of regulatory compliance because, as Plaintiffs themselves assert, "the truth of the Company's regulatory violations were revealed . . . [o]n Sunday July 26, 2015, in a Consent Order" (Compl. ¶ 26), months before any alleged emissions-related disclosures.   Moreover, this Court has repeatedly treated FCA's emissions-related disclosures as separate from its safety-related disclosures and further emphasized that FCA's emissions-related claims are limited to U.S. "federal and state emissions regulations," *Pirnik II*, 2017 WL 3278928, at *1; *Pirnik III*, 2017 WL 5312182, at *1, even though eight of Plaintiffs' ten "corrective" disclosures relate exclusively to FCA's compliance with European regulations. The alleged European disclosures are thus not "corrective disclosures" at all, and any price impact they may have had is irrelevant.

In any event, as Dr. Gompers demonstrates, five of those eight supposedly corrective disclosures had no statistically significant impact on FCA's stock price.  To the extent the remaining two emissions-related disclosures—the January 12, 2017 Notices of Violation ("NOVs") by the EPA and California Air Resource Board ("CARB") and a complaint filed on May 23, 2017 by the U.S. Department of Justice ("DOJ") on behalf of the EPA (the "EPA Complaint")—had any price impact, contemporaneous market analyst reports show that this drop reflected the market's reaction to the "substantial litigation risk" and regulatory uncertainty caused by these actions, not any supposed disclosure of new information inconsistent with FCA's prior statements.   (Expert Report of Zachary Nye dated December 21, 2017 ("Nye Report") Ex. 15 at 128–31, ECF Nos. 151–1 to –2 .)  And any price movement on the day of the EPA Complaint cannot be attributed to FCA's alleged emissions-related misstatements, which even Plaintiffs assert had already been revealed to be false by the EPA NOV issued on January 12, 2017. *See*, e.g., *Berks Cty. Emps.' Ret. Fund* v. *First Am. Corp.*, 734 F. Supp. 2d 533, 540–

41 (S.D.N.Y. 2010) (Kaplan, J.) (denying class certification where information in alleged corrective disclosure "disclosed no new information regarding the NYAG's investigation").

Moreover, the proposed class cannot be certified on the separate ground that Plaintiffs' proposed "methodology" for calculating classwide damages, presented in just two perfunctory paragraphs of their expert's report, does not establish that damages are capable of determination on a classwide basis. Under *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013), "a model purporting to serve as evidence of damages in [a] class action must measure *only* those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35 (emphasis added); (*See infra* at 23 n.15 (collecting cases).)

As Dr. Gompers has demonstrated, Dr. Nye's "general economic framework" provides no analysis of the alleged misstatements or disclosures in this case, and therefore makes no attempt to show how damages could be calculated on a classwide basis consistent with Plaintiffs' theories of liability. Indeed, a model consistent with Dr. Nye's "framework" would assume that FCA could have fully disclosed all of its alleged noncompliance with both safety recall and emissions regulations at the beginning of the class period on October 13, 2014. But FCA obviously could not have disclosed any alleged noncompliance—such as FCA US's supposed failure to provide timely notifications to owners and dealers that it had initiated a recall—*in 2014* for recalls that did not begin until *2015*. Although a damages "model" that merely "failed to account for variations in inflation over time" may satisfy *Comcast*'s requirements, Plaintiffs here must assume the impossible, and therefore cannot "actually measure damages that result from the class's asserted theory of injury," as required by Rule 23(b)(3). *Barclays*, 875 F.3d at 106.

Finally, the class period for any certified class must be shorter than Plaintiffs propose. As a matter of law, any class period can run only "between the time the [alleged] misrepresentations were made and the time the truth was revealed." *Basic*, 485 U.S. at 248 n.27. Any class asserting that FCA's general statements of regulatory compliance were false must therefore end *on July 27, 2015*, because, according to Plaintiffs' own allegations, "the truth of [FCA's] regulatory violations were revealed . . . [o]n Sunday, July 26, 2015 in a Consent Order" between FCA US and the National Highway Traffic Safety Administration ("NHTSA"). (Compl. ¶ 26.) After that date, FCA shareholders "would have known of the alleged 'untruth'" of FCA's general statements of regulatory compliance, and could not have continued to rely upon them. *In re Smart Techs., Inc.*, 295 F.R.D. 50, 58 (S.D.N.Y. 2013) (Forrest, J.) (quoting *In re Initial Pub. Offering*, 483 F.3d 70, 73 n.1 (2d Cir. 2007)). Plaintiffs' putative emissions-related class similarly must end *on January 12, 2017*, when the EPA alleged in a public NOV that certain FCA vehicles may contain "software that can alter how a vehicle emits air pollution," which may be "defeat devices." (*Id.* ¶ 364.) Because any subsequent movements in FCA's stock price could not have been reactions to FCA's supposed statements that its vehicles did not contain "defeat devices," those statements cannot support a claim for securities fraud.

## BACKGROUND

### A.    FCA's Challenged Statements

In the first instance, Plaintiffs challenge FCA's general statement in several SEC filings that it was "substantially in compliance with the relevant global regulatory requirements affecting our facilities and products." (*E.g.*, Compl. ¶¶ 275, 281.) Plaintiffs allege that this representation was "false and/or misleading," because FCA US was not in fact in compliance with certain U.S. safety recall regulations. (*E.g.*, *id.* ¶¶ 277, 282.) Separately, Plaintiffs allege

that FCA made certain more specific statements that its vehicles did not contain "defeat devices," which also purportedly were false or misleading.  (*E.g.*, *id.* ¶¶ 343, 345, 361.)  But, as Dr. Gompers shows, and Plaintiffs' own expert concedes, both FCA's general statements of compliance and its emissions-related statements had "no statistically significant effect on FCA['s] stock price" when made.  (Ex. 2 (Nye Dep.) at 58:18–22;[2] Ex. 1 (Gompers Report) ¶ 12 Ex. 1.)

### B.    NHTSA's Widely Publicized Investigation and Hearing

As an automaker that sells vehicles in the United States, FCA US must comply with U.S. regulations, administered by NHTSA, regarding vehicle safety recalls.  (Second Am. Compl. dated Mar. 29, 2016 ("Safety Recall Compl.") ¶¶ 40–52, ECF No. 38.)

In 2015, NHTSA began publicly examining FCA US's compliance with safety recall regulations.  On May 18, 2015, NHTSA announced it would "hold a public hearing to determine whether automaker Fiat Chrysler has failed to remedy safety defects and issue required notices in 20 recalls."  (Ex. 3 (May 18, 2015 NHTSA Press Release).)  The press widely reported on NHTSA's public announcement, which stated that the "20 recalls cover[] more than 10 million vehicles," and that NHTSA "could require Fiat Chrysler to repurchase or replace affected vehicles."  (Ex. 4 (Mike Spector, *Regulators Step Up Pressure on Chrysler Over Recalls*, Wall St. J., May 18, 2015).)[3]  But, as Dr. Gompers shows, the analysis of Plaintiffs' own

---

[2] (*See also* Ex. 2 (Nye Dep.) at 54:23–55:11, 56:24–57:12, 59:20–60;14, 60:25–61:24, 63:8–17, 68:9–70:4, 70:18–71:17; Nye Report Ex. 14B at 1–3, 6, 9, Ex. 15.)

[3] (*See also*, *e.g.*, Ex. 5 (Danielle Ivory, *Regulators to Hold Hearing on Fiat Chrysler Safety Response*, N.Y. Times, May 18, 2015) ("[T]he nation's top auto safety agency said on Monday that it was trying to determine whether Fiat Chrysler had failed to promptly fix safety defects in millions of recalled vehicles or properly notify owners."); Ex. 6 (Chris Woodyard, *Feds order Fiat Chrysler to defend pace of 20 recalls*, USA Today, May 18, 2015) ("Federal regulators on Monday announced a public hearing July 2 to investigate whether Fiat Chrysler Automobiles has failed to properly carry out 20 recalls involving about 10 million vehicles.").)

expert makes clear that NHTSA's public announcement did not have a statistically significant negative impact on FCA's stock price; indeed, FCA's stock price went up 0.13%. (Nye Report Ex. 14B at 3; Ex. 1 (Gompers Report) ¶ 12 Ex. 1.)

On July 2, 2015, NHTSA held a "public hearing [to] address[] problems associated with 23 different Fiat Chrysler recalls involving millions of vehicles." (Ex. 7 (NHTSA H'rg Tr.) at 13:4–6.) At the hearing, NHTSA highlighted its "concerns with [FCA US's] notifications to owners and to NHTSA about its recalls" and expressly stated that NHTSA would "demand and obtain civil penalties" from FCA US. (*Id.* at 19:11–15, 22:11–13, 87:15–20.) Like its initial announcement, NHTSA's hearing was widely covered in the press, which anticipated NHTSA to "seek stiff penalties against FCA later this month." (Ex. 8 (Bill Vlasic, *Fiat Chrysler Accused of Neglect in 23 Recalls*, N.Y. Times, July 2, 2015).) Financial analysts expected FCA US to "be hit with fines from the National Highway Transportation Safety Administration that . . . may exceed $700 million." (Ex. 9 (Morningstar Equity Research, July 7, 2015) at 1.)[4] Yet, according to Plaintiffs' own expert, the NHTSA hearing had no statistically significant effect on FCA's stock price. (Nye Report Ex. 14B at 4.)

On July 24, 2015, as the market anticipated, NHTSA and FCA US entered into a consent order over safety recall timeliness and notification ("Consent Order"; Ex 13). Even though the market expected fines "exceed[ing] $700 million" under the Consent Order, FCA US agreed to a $105 million dollar civil penalty and to undertake various training, monitoring and

---

[4] (*See also*, *e.g.*, Ex. 10 (Michael Wayland, *Feds not done probing Fiat Chrysler's recall efforts*, Detroit News, July 21, 2015) ("[NHTSA Administrator] Rosekind said . . . a consent order, with Fiat Chrysler 'would be a strong outcome if we could do that.'"); Ex. 11 (Stephanie Brinley, *US Safety Regulator Likely to Impose Penalties on FCA Over Recall Handling*, IHS Global Insight, July 3, 2015) ("NHTSA chief . . . expects his agency to take action against the automaker."); Ex. 12 (David Shepardson, *US plans to penalize Fiat Chrysler over delayed recalls*, Detroit News, July 2, 2015) ("Penalties could include hefty fines, an agreement requiring significant auto safety reforms – or even ordering Fiat Chrysler to buy back unrepaired vehicles.").)

compliance requirements.   (*Id.* at 23–46.)   Because the market had fully accounted for the Consent Order—including the potential for far more severe penalties—as Dr. Gompers explains, Plaintiffs' own expert determined that the Consent Order did not have a statistically significant impact on FCA's stock price.   (Nye Report Ex. 14B at 4, Ex. 15 at 1; Ex. 2 (Nye Dep.) at 72:2–11; Ex. 1 (Gompers Report) ¶ 12 Ex. 1.)

Plaintiffs' other cited instances of publicly disclosed events over safety recalls likewise had no statistically significant impact on FCA's stock price.   On October 27, 2015, FCA US announced that Scott Kunselman, the head of its office of Vehicle Safety and Regulatory Compliance, was retiring, effective November 30.   (Ex. 14 (Oct. 27, 2015 press release); Safety Recall Compl. ¶ 250.)   Mr. Kunselman's retirement received significant press and analyst coverage,[5] but had no statistically significant impact on FCA's stock price; in fact, the price went up by 0.39% (Nye Report Ex. 14B at 5; Ex. 1 (Gompers Report) ¶ 12 Ex. 1).   On December 8, 2015, FCA US entered into a second consent order with NHTSA.   This disclosure too received substantial press coverage,[6] but as Dr. Gomers shows, and Plaintiffs' expert agreed, it had "no statistically significant effect on FCA's stock" price.   (Ex. 2 (Nye Dep.) at 108:16–111:5; Nye Rep. Ex. 14B at 5; Ex. 1 (Gompers Report) ¶ 12 Ex. 1).

---

[5] (*See, e.g.*, Ex. 15 (Stephanie Brinley, *FCA's senior quality executive to retire, company Recalls Ram and Cherokee*, IHS Global Insight, Oct 28, 2015) ("FCA has announced that its senior vice-president of vehicle safety and regulatory affairs will retire on 30 November."); Ex. 16 (Mike Spector, *Fiat Chrysler Safety Chief to Retire*, Wall St. J., Oct. 27, 2015) ("Mr. Kunselman's departure comes as regulators probe the auto maker.").)

[6] (*See, e.g.*, Ex. 17 (Dee-Ann Durbin, *Fiat Chrysler to pay $70 million fine to U.S. government*, St. Louis Post-Dispatch, Dec. 10, 2015) ("[FCA] will pay a $70 million fine to the U.S. government for failing to report safety. . . . [FCA] acknowledged earlier this fall that it failed to provide early warning data to regulators from 2003 onward."); Ex. 18 (Ashley Halsey III, *Fiat Chrysler hit with $70 million federal fine for safety reporting failures*, Washington Post, Dec. 10, 2015) ("The fine announced Thursday came three months after the automaker admitted that for several years, it had not provided data required by law."); Ex. 19 (Mike Spector, *U.S. Fines Fiat Chrysler $70 Million for Safety-Reporting Lapses*, Wall St. J., Dec. 10, 2015) ("The penalty . . . will be added as an amendment to a consent order [FCA] signed in July.").)

### C.    This Court's Dismissal of Plaintiffs' Claims Over Recall Reserves

In their Second Amended Complaint, in addition to their safety recall claims, Plaintiffs alleged that FCA under-accrued for recall reserves because, on October 28, 2015, the Company "recorded a €761 million pre-tax charge for estimated future recall campaign costs." *Pirnik I*, 2016 WL 5818590, at *3; (Safety Recall Compl. ¶ 251.)   This Court expressly dismissed Plaintiff's claims based on recall reserves, because "such reserve estimates are actionable only if they are 'both false and not honestly believed when they were made,'" but "Plaintiffs fail to make that showing" and therefore "do not allege securities fraud."  *Id.* at *8 (quoting *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011)); *see id.* at *9 ("Plaintiffs fail to adequately allege scienter with respect to Defendants' reserve estimates and related statements").   During discovery, this Court again emphasized that "documents concerning Chrysler's 761 million Euro charge for future recall costs. . . . are more directly related to Plaintiffs' claims that were dismissed." (ECF No. 81.)

### D.    Plaintiffs' Emissions-Related Claims

On August 4, 2016, FCA publicly disclosed that it "received inquiries from EPA" and "several European Union member state agencies" "involving diesel emissions," which may "lead to further enforcement actions."  (Ex. 20 (Aug. 4, 2016 Form 6-K) at 27.)  On January 12, 2017, the EPA and CARB "issued Notices of Violation to FCA for failing to disclose certain engine management software that could alter the emissions output" in certain diesel vehicles sold in the United States.  *Pirnik II*, 2017 WL 3278928, at *1.  Shortly thereafter, Plaintiffs amended their complaint to add claims "regarding FCA's compliance with certain federal and state emissions regulations" based on the NOVs.   *Id.*   This Court initially dismissed Plaintiffs' emissions-related claims, holding that Plaintiffs' "conclusory allegations"—including allegations

about "a May 23, 2016 report [] published by Germany's Transportation Ministry" and "the remarkably vague allegation that, during a July 27, 2016 earnings call, [FCA CEO] Marchionne discussed in depth his opinions concerning the emissions regulations in Europe"—"are insufficient to meet Rule 9(b)'s particularity standard." *Id.* at *3. This Court subsequently permitted Plaintiffs' Complaint to survive a motion to dismiss based on alleged communications between FCA US personnel and the EPA, with no mention of any of Plaintiffs' allegations relating to FCA's compliance with European regulations. *Pirnik III*, 2017 WL 5312182, at *2.

## ARGUMENT

## I.     THE COURT SHOULD *NOT* CERTIFY A CLASS BECAUSE PLAINTIFFS CANNOT INVOKE THE *BASIC* PRESUMPTION OF CLASSWIDE RELIANCE.

To demonstrate predominance, Plaintiffs invoke the *Basic* "fraud on the market" presumption of classwide reliance. Under Supreme Court and Second Circuit precedent, defendants can rebut the *Basic* presumption by demonstrating, by "a preponderance of the evidence," that the "'misrepresentation[s] did not actually affect the stock's price.'" *Goldman Sachs*, 879 F.3d at 484 (citing *Halliburton II*, 134 S. Ct. at 2405). Here, the record is clear that FCA's general statements of regulatory compliance and its emissions-related statements did not impact FCA's stock price, either when they were made or when the truth was supposedly revealed. This lack of price impact "'sever[s] the link' between the misrepresentation and the market price," which "dooms the predominance of class-wide issues under Rule 23(b)(3) and defeats class certification." *Id.* at 483–84 (quoting *Basic*, 485 U.S. at 248).

### A.     None of the Alleged Misrepresentations Impacted FCA's Stock Price When Made.

Plaintiffs allege that FCA made dozens of general representations about the Company's compliance with regulatory requirements around the world (Compl. ¶¶ 249–322), but the undisputed record shows that *none* of those purported misstatements impacted FCA's stock

price when they were made.  Plaintiffs' expert, Dr. Nye, conducted a "regression analysis" to measure "the change in the stock price due to company-specific events" "after accounting for contemporaneous market and industry effects."  (Nye Report ¶¶ 79, 83.)  As Dr. Gompers explains, and Dr. Nye concedes, Dr. Nye's own regression results demonstrate that FCA's general statements of compliance had *no* statistically significant impact on FCA's stock price when made. (Ex. 1 (Gompers Report) ¶¶ 12–15 Ex. 1; Ex 2 (Nye Dep.) at 58:18–22, 63:8–17, 70:2–4, 71:13–17; Nye Report Ex 14B at 1–3, 6, 9.)

For example, in FCA's 2014 Form 20-F, publicly filed on March 5, 2015, the Company stated that "[w]e are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products."  (Compl. ¶ 302.)  But according to Plaintiffs' own expert, this disclosure had "no statistically significant effect on FCA [NV's] stock price." (Ex. 2 (Nye Dep.) at 58:18–22; Nye Report Ex. 14B at 2; Ex. 1 (Gompers Report) ¶ 12 Ex. 1.)

Similarly, FCA's more specific statements that the Company's vehicles did not contain "defeat devices" did not impact FCA's stock price when made:

| Date/Event | Statement | Compl. | Impact? |
|---|---|---|---|
| September 22, 2015 statement[7] | "FCA U.S. does not use 'defeat devices.'" | ¶ 361 | No statistically significant effect on FCA's stock price. |
| January 27, 2016 earnings call | "[T]here are no defeat mechanisms or devices present in our vehicles." | ¶ 343 | No statistically significant effect on FCA's stock price. |
| February 2, 2016 press release | "FCA diesel vehicles do not have a mechanism to either detect that they are undergoing a bench test in a laboratory or to activate a function to operate emission controls only under laboratory testing." | ¶ 345 | No statistically significant effect on FCA's stock price. |

---

[7] The Complaint incorrectly alleges that this statement occurred on September 22, 2016.

(*See* Ex. 2 (Nye Dep.) at 63:8–17 ("[T]here was no statistically significant price change on January 27, 2016."); *id.* at 70:2–4, 71:13–17; Nye Report Ex. 14B at 6, 9; Ex. 1 (Gompers Report) ¶ 12 Ex. 1.)  Indeed, Dr. Nye testified that "in my opinion these misstatements shouldn't have been expected to impact the stock price."  (Ex. 2 (Nye Dep.) at 53:7–54:4.)

Courts in this District routinely deny class certification where, like here, "there is no day when [FCA] is alleged to have made a material misrepresentation that caused a statistically significant increase in the price."  *In re Moody's Corp.*, 274 F.R.D. at 493 (denying class certification); *see, e.g., In re Credit Suisse First Boston Corp.*, 250 F.R.D. 137, 144–45 (S.D.N.Y. 2008) (Preska, J.) (decertifying class where "Defendants' reports had no impact on the price of the stock at the time they were issued").  To try to avoid the clear import of his admissions that the alleged misstatement had no impact on FCA's stock price, at his deposition, Dr. Nye invoked for the first time the so-called "price maintenance" theory.  (Ex. 2 (Nye Dep.) at 52:17–18.)  This theory "posits that statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price."  *In re Vivendi, S.A.*, 838 F.3d 223, 256–58 (2d Cir. 2016).  But the Second Circuit has emphasized that not "all statements unassociated with an increase in inflation necessarily have a 'price impact.'"  *Id.* at 260 n.20.  Instead, plaintiffs must identify when and how any alleged inflation "would have entered the stock."  *Barclays*, 875 F.3d at 104 n.37 ("Dr. Nye opined that inflation would have entered the stock when Barclays marketed 'LX in a way that promised to filter out high frequency predatory trading.'").  Here, unlike in *Barclays*, Dr. Nye has made no attempt to specify when or how any alleged inflation entered FCA's stock—indeed, he testified his position was based solely on "reading the complaint" (Ex. 2 (Nye Dep.) at 52:23–25)—and thus cannot support a price maintenance theory.  (Ex. 1 (Gompers Report) ¶ 15.)

**B.** **Neither the Alleged "Corrective Disclosures" about Safety Recalls Nor the Alleged "Corrective Disclosures" about Emissions Impacted FCA's Stock Price When the "Truth" Supposedly Was Revealed.**

    **1.** **Plaintiffs Cannot Demonstrate that FCA US's Supposed "Corrective Disclosures" About Safety Recalls Had a Statistically Significant Impact on Its Stock Price.**

Plaintiffs allege that FCA misled investors by generally stating it was "substantially in compliance" with applicable regulations, while concealing that it did not fulfill its "obligations to timely and adequately inform NHTSA and owners of recalls of vehicles" (Plaintiffs' Memorandum in Support of Motion for Class Certification dated December 21, 2017 ("Pls.' Br.") at 3, ECF No. 149), but the record demonstrates that there was no price impact when the "truth about Chrysler's NHTSA violations" was supposedly revealed to the market (Compl. at 103).  Plaintiffs cite five public announcements that supposedly revealed FCA US's regulatory noncompliance to the market, not one of which had a statistically significant impact on FCA 's stock price:

| Date(s) | Event | Compl. | Impact? |
|---|---|---|---|
| May 18, 2015 | NHTSA press release and Special Order | ¶¶ 99, 107 | No statistically significant effect on FCA's stock price. |
| July 2, 2015 | NHTSA hearing | ¶¶ 91, 128, 158, 163 | No statistically significant effect on FCA's stock price. |
| July 27, 2015[8] | Consent Order | ¶ 323 | No statistically significant effect on FCA's stock price at the 95% confidence level. |
| October 27, 2015 | Scott Kunselman resignation | ¶ 334 | No statistically significant effect on FCA's stock price. |

---

[8] July 27, 2015 is the first market day after the Consent Order was publicly announced.  (Compl. ¶¶ 323, 326.)

| Date(s) | Event | Compl. | Impact? |
|---|---|---|---|
| December 8, 2015 | Second Consent Order | ¶¶ 341–42 | No statistically significant effect on FCA's stock price. |

In its May 18, 2015 press release and July 2, 2015 hearing, NHTSA publicly announced that FCA US was not in compliance with safety recall regulations for certain recalls and would seek substantial civil penalties. (*See supra* at 7.) But Plaintiffs' expert's own analysis shows that these public announcements had no impact on FCA's stock price whatsoever. (Nye Report Ex. 14B at 3–4; Ex. 1 (Gompers Report) ¶ 12 Ex. 1.) Shortly thereafter, on July 24, 2015, FCA US and NHTSA entered into a Consent Order concerning noncompliance for the exact same recalls. (Ex 10.) As Dr. Gompers explains, Plaintiffs' expert concluded that the July 24 disclosure also had no statistically significant impact on FCA's stock price. (Nye Report Ex. 15 at 1; Ex. 1 (Gompers Report) ¶ 12 Ex. 1.) The market likewise did not react to the retirement of FCA US's head of Vehicle Safety and Regulatory Compliance on October 27, 2015, or a second consent order between FCA US and NHTSA on December 8, 2015. (*See supra* at 9.) Where, as here, "defendants present[] evidence that the market learned the truth" of Plaintiffs' allegations "without any accompanying decline in the price of [FCA] stock," the *Basic* presumption of reliance "completely collapse[s]." *Goldman Sachs*, 879 F.3d at 485–86.

To try to certify a class, Plaintiffs also cannot rely on the earlier "July 26, 2014 NHTSA Consent Order" as a supposed "corrective event." (Pls.' Br. at 21) Plaintiffs concede— as they must—that their own expert found that the effect of the Consent Order on FCA's stock price was only "statistically significant at the 92.12% confidence level." (*Id.* at 20 n.12 (citing Nye Report ¶ 69).) As a matter of law, a "negative return at the 90% confidence level . . . is below the conventional statistical measure of a 95% confidence level and therefore is not

sufficient evidence of a link between the corrective disclosure and the price." *In re Moody's Corp.*, 274 F.R.D. at 493 n.11; *see, e.g.*, *In re Am. Int'l Grp., Inc.*, 265 F.R.D. 157, 187 (S.D.N.Y. 2010) (Batts, J.) (defendants "rebutted the fraud-on-the-market presumption," because "at most . . . it has recently become acceptable in the financial economics field generally to *report* results at the 10% level[;] [t]his does not demonstrate, however, that it is consistent with standard methodology in financial economics, or in conducting event studies specifically, to draw conclusions at the 10% level") (emphasis in original), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012).[9]   Because "the market learned the truth" about FCA's supposed misstatements of regulatory compliance "without any accompanying decline in [FCA's] stock," the *Basic* presumption of reliance is rebutted. *Goldman Sachs*, 879 F.3d at 486.

### 2. Because This Court Dismissed Plaintiffs Claims Concerning the Adequacy of FCA's Reserves for Safety Recalls, Plaintiffs Cannot Rely on Those Claims to Support Class Certification.

To try to certify a class, Plaintiffs are left to rely on statements that this Court has already held to be inactionable.  Plaintiffs assert that they can invoke the *Basic* presumption of reliance because "Chrysler's October 28, 2014 announcement of a €761 million charge for recalls" was followed by a "residual price decline" in FCA's stock.  (Pls.' Br. at 21–22 (citing Nye Report ¶ 81).)  But this Court has twice rejected Plaintiffs' claims challenging the adequacy of FCA's reserves for recalls.  *Pirnik I*, 2016 WL 5818590, at *9 ("Plaintiffs fail to adequately

---

[9] Although courts have occasionally credited statistical results at the 90% confidence level, "[i]n most scientific work, the level of statistical significance required to obtain a statistically significant result is set conventionally at .05 or 5%."  *Procter & Gamble Pharm., Inc.* v. *Hoffmann-LaRoche Inc.*, 2006 WL 2588002, at *6 n.17 (S.D.N.Y. Sept. 6, 2006) (Crotty, J.) (citing Federal Judicial Center, Reference Manual on Scientific Evidence 194 (2d ed. 2000)); (*see* Ex. 1 (Gompers Report) ¶ 31 ("The 95% confidence level is typically used to perform this statistical test.")).  Indeed, Dr. Nye himself often only reports his results as the 95% confidence level.  (Ex. 2  (Nye Dep.) at 30:21–24 ("Q.  In your academic work here you refer to the 95 percent confidence level, right?  A.  I do.").)

allege scienter with respect to Defendants' reserve estimates and related statements."); (ECF No. 81 ("documents concerning Chrysler's 761 million Euro charge for future recall costs . . . are more directly related to Plaintiffs' claims that were dismissed")).   But these inactionable statements cannot support class certification as a matter of law.   *See, e.g.*, *In re Initial Pub. Offering*, 243 F.R.D. 79, 85 n.34 (S.D.N.Y. 2007) (Scheindlin, J.) (class certification requires the court to "determin[e] whether a defendant's course of conduct is in its broad outlines actionable") (internal quotation marks omitted); *In re Veeco Instruments, Inc.*, 235 F.R.D. at 241 (excluding statements that "are not actionable under the securities laws" from class period).

### 3.   Plaintiffs' Emissions-Related "Corrective Disclosures" Did Not Actually Correct FCA's Alleged Misstatements.

In their Fourth Amended Complaint, Plaintiffs allege that FCA misled the market by purportedly stating that its vehicle did not contain "defeat devices," while installing "undisclosed" software in certain vehicles that affected "diesel emissions."   (Pls.' Br. at 3 (citing Compl. ¶¶ 226–48).)   Plaintiffs cite ten public announcements that supposedly revealed the "truth about Chrysler's emissions violations" to investors (Compl. at 115), but, as Dr. Gompers shows, and Plaintiffs concede, at least half of these "corrective disclosures" had no impact on FCA's stock price.   To the extent the remainder were accompanied by price movement, those disclosures either concerned irrelevant activities in Europe or reflected market reactions to potential regulatory enforcement actions, and, thus, the price impact could not have been attributable to the alleged misstatements:

| Date(s) | Event | Compl. | Impact? |
|---|---|---|---|
| May 19, 2016 | FCA cancelled meeting with German Transport Minister. | ¶ 355 | No statistically significant effect on FCA's stock price. |

| Date(s) | Event | Compl. | Impact? |
|---|---|---|---|
| May 23, 2016 | Report of German Transport Ministry | ¶¶ 356–57 | "[T]he Report is far from conclusive and provides little or no support for Plaintiffs' claim[s]."  *Pirnik II*, 2017 WL 3278928, at *3. |
| September 1, 2016 | German government sent letters to the European Commission and Italian Transport Ministry | ¶ 360 | No statistically significant effect on FCA's stock price. |
| October 17, 2016 | FCA testimony to European Parliament | ¶ 363 | No statistically significant effect on FCA's stock price. |
| January 12, 2017 | EPA and CARB NOVs | ¶¶ 364–66 | "The market broadly ignored FCA's EPA notification in mid-January."  (Nye Report Ex. 15 at 181.) |
| February 6–7, 2017 | French government referral<br><br>Italian Transport Ministry announcement | ¶¶ 369–71 | Court made no mention of these allegations in its emissions-related decisions.  *Pirnik II*, 2017 WL 3278928; *Pirnik III*, 2017 WL 5312182. |
| March 31, 2017 | German Transport Ministry announcement | ¶ 372 | No statistically significant effect on FCA's stock price. |
| May 17, 2017 | European Commission announcement | ¶ 373 | No statistically significant effect on FCA's stock price. |
| May 22–23, 2017 | EPA Complaint | ¶¶ 374–76 | "These allegations are consistent with those set forth in [the NOV] that EPA issued to FCA US[] and FCA[] on January 12, 2017." (Ex. 21 (EPA Press Release).) |

Eight of these ten disclosures relate exclusively to FCA's compliance with European regulations, which are irrelevant to Plaintiffs' claims.  At the pleading stage, this Court twice held that Plaintiffs' claims were limited to U.S. "federal and state emissions regulations," *Pirnik II*, 2017 WL 3278928, at *1; *Pirnik III*, 2017 WL 5312182, at *1, and only permitted

Plaintiffs' emissions-related claims to proceed based on alleged communications between FCA US personnel and the EPA, *Pirnik III*, 2017 WL 5312182, at *1–2, which have no bearing on the truth or falsity of any statements about Europe.  Indeed, this Court expressly rejected Plaintiffs' reliance on a report by the German Transport Ministry, holding that it "provides little or no support for Plaintiffs' claim[s]."  *Pirnik II*, 2017 WL 3278928, at *3.  Thus, Plaintiffs cannot rely on irrelevant statements about European emissions to demonstrate the impact of FCA's alleged misstatements on its stock price.[10]  In any event, as Dr. Gompers shows, according to Plaintiffs' own expert, five of these alleged "corrective disclosures" caused "no statistically significant decline" in FCA's stock price.  (Ex. 2 (Nye Dep.) at 114:9–115:14; Nye Report Ex. 14B at 7, 9–12; Ex. 1 (Gompers Report) ¶ 12 Ex. 1.)[11]

The two remaining alleged corrective disclosures also do not demonstrate that the alleged misstatements had any impact on FCA's stock price.  On January 12, 2017, the EPA and CARB issued NOVs alleging that FCA US did not disclose certain emissions-related software in certain vehicles sold in the United States, "which constituted less than one percent of [FCA's] global sales," and that "one or more of the undisclosed devices may be defeat devices."  *Pirnik II*, 2017 WL 3278928 at *4.  But because FCA had already disclosed the EPA's investigation (Ex. 20 (Aug. 4, 2016 Form 6-K) at 27), "[t]he market broadly ignored FCA's EPA notification in mid-January," as Plaintiffs acknowledge (Nye Report Ex. 15 at 181).  To the extent FCA's stock price reacted to the NOVs at all, market analysts were clear that this reaction was not based on "the merit of the allegations" in the NOVs (*id.* at 129), but the "substantial litigation risk" and

---

[10] *See* 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 5:26 (14th ed. 2017) ("In order to qualify as a corrective disclosure, a disclosure of course must relate to the same subject matter as the alleged misrepresentation it purportedly corrects . . . . A stock price drop caused by some other reason . . . is irrelevant and cannot support a finding that the Rule 23(b)(3) predominance requirement is satisfied.") (collecting cases).

[11] (*See also* Ex. 2 (Nye Dep.) at 113:12–23, 116:16–117:9, 117:15–118:7, 118:12–119:10.)

regulatory uncertainty caused by the NOVs themselves (*id.* at 128, 130 ("As of this time, we do not know what penalties, if any, failure to disclose might carry."); *see* Ex. 1 (Gompers Report) ¶ 84 (Dr. Nye "does not provide any information about the technique that could be used in this case to remove the price impact of confounding information from the stock price declines that occurred on the alleged corrective disclosure dates")).

On May 23, 2017, the DOJ filed a lawsuit on behalf of the EPA based on "allegations [that] *are consistent with* those set forth in [the NOV] that EPA issued to FCA US LLC and FCA NV on January 12, 2017." (Ex. 21 (EPA Press Release) (emphasis added); Nye Report Ex. 15 at 177.) But this lawsuit "disclosed no new information" that had not already been revealed to the market by the EPA NOV five months earlier. *Berks Cty. Emps.' Ret. Fund*, 734 F. Supp. 2d at 540–41 (denying class certification where "the NYAG on November 1, 2007 brought suit," but its investigation "had been disclosed publicly" months earlier).[12] Rather, investors viewed the EPA Complaint as merely "a negotiating tactic on the part of regulators attempting to extract a larger settlement amount." (Nye Report Ex. 15 at 183–84.) Thus, any decline in FCA's stock price on May 23, 2017 was because of investors' concern about the potential regulatory consequences of the EPA Complaint, not any supposed disclosure of new information inconsistent with FCA's prior statements of regulatory compliance. *See*, *e.g.*, *In re China Organic*, 2013 WL 5434637, at *8 (S.D.N.Y. Sept. 30, 2013) (Furman, J.) ("A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure.").

---

[12] In an attempt to manufacture price impact, Plaintiffs resort to mischaracterizing the EPA Complaint and NOV. Specifically, Dr. Nye incorrectly testified that the EPA Complaint was the first "full accusation" that certain FCA vehicles contained "defeat devices," whereas the EPA NOV contained no such allegations. (Ex. 2 (Nye Dep.) at 101:4–12, 102:16–23, 104:9–24.) As this Court recognized, however, the EPA NOV stated that "one or more of the undisclosed devices may be defeat devices." *Pirnik II*, 2017 WL 3278928 at *4. And Dr. Nye admitted that he had no recollection of reviewing the EPA Complaint. (Ex. 2 (Nye Dep.) at 105:15–22.)

Because the record demonstrates no price impact attributable to the alleged misstatements, either when they were made or when the truth was supposedly revealed, Defendants have "sever[ed] the link" between the alleged misstatements and FCA's stock price, and putative class members thus must make individualized showings of reliance that would overwhelm any common issues.  *Goldman Sachs*, 879 F.3d at 483 (quoting *Basic*, 485 U.S. at 248).  As a result, this Court should decline to certify the proposed class.[13]

## II.   PLAINTIFFS' PURPORTED CLASSWIDE DAMAGES METHODOLOGY DOES NOT MEASURE DAMAGES ATTRIBUTABLE SOLELY TO THEIR THEORY OF INJURY.

This Court should not certify a class for the additional reason that Plaintiffs' proffered classwide damages methodology does not, as required by *Comcast*, measure damages resulting solely from Plaintiffs' theory of classwide injury.  *See*, *e.g.*, *Barclays*, 875 F.3d at 105–06 ("*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury.") (internal quotation marks omitted).   Plaintiffs' claim that "mechanical damage tabulations for individual class members will not defeat predominance" (Pls.' Br. at 22) cannot be squared with the Supreme Court's holding in *Comcast*, which requires plaintiffs in a securities action to provide "a model purporting to serve as evidence of damages" that "measure[s] *only* those damages attributable" to their theory of liability.  569 U.S. at 35 (emphasis added).

Plaintiffs try to satisfy their evidentiary burden in a two-paragraph, conclusory discussion of a hypothetical damages calculation in their expert report.  (Nye Report ¶¶ 74–75;

---

[13] Because FCA has carried its burden to show, by "a preponderance of the evidence," that its alleged misstatements had no price impact when they were made (*see supra* Section I.A), *Plaintiffs* bear the burden of showing that any price movement on the dates of supposed "corrective disclosures" was caused by the revelation that FCA's prior statements were false, which they have not established.  *See Goldman Sachs*, 879 F.3d at 485 (defendants need not "conclusively prove a complete absence of price impact") (internal quotation marks omitted).

Ex. 2 (Nye Dep.) at 120:18–121:22 ("Q.  And so you are not actually offering a damages model now?  A.  No . . . it's describing the general economic framework.").)  But their expert's cursory outline of a methodology is inconsistent with Plaintiffs' theories of liability because (i) it does not provide any information about how Plaintiffs would actually calculate damages on a classwide basis in this case, such as "what [FCA] should have disclosed and when it should have disclosed it" (Ex. 1 (Gompers Report) ¶¶ 25–27, 48–54); (ii)  a model consistent with Dr. Nye's "framework" rests on flawed assumptions, such as that FCA could have disclosed the "truth" of its alleged misstatements at the beginning of the class period in a manner equivalent to supposed "corrective disclosures" (*id.* ¶¶ 54–70, 75–82); and (iii) Dr. Nye makes no attempt to explain how he would develop a model to "control for confounding information" unrelated to Plaintiffs' theories of liability (*id.* ¶¶ 23, 83–85, 87–88).

For example, a model consistent with Dr. Nye's "framework" would assume that "the *entire* alleged 'truth' could have been disclosed by [FCA] before or at the beginning of the Class Period," but that is impossible for all 23 recalls in the Consent Order, several of which did not begin until *after* the class period began.  (*Id.* at ¶¶ 59–63.)[14]  It is likewise impossible for FCA to have disclosed alleged noncompliance with emissions regulations in October 2014, before many of the cars subject to the NOVs were even manufactured.  Such a "model" fails to satisfy *Comcast* and therefore cannot support class certification here.  *See*, *e.g.*, *In re POM Wonderful LLC*, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (expert improperly "assumed that 100% of . . . price difference was attributable to Pom's alleged

---

[14] This case is thus unlike *Barclays*, which permitted class certification where the defendants claimed only that "Plaintiffs' damages model failed to account for variations in inflation over time." 875 F.3d at 106.  Here, by contrast, Plaintiffs' model would assume the impossible:  that FCA should have disclosed supposed noncompliance with safety recall regulations in October 2014 for recalls that did not begin until 2015.

misrepresentations . . . . This damages 'model' does not comport with *Comcast*'s requirement that class-wide damages be tied to a legal theory.").[15]

### III.   AT A MINIMUM, ANY PUTATIVE CLASS PERIOD MUST BE SHORTENED.

Not only are Plaintiffs unable to invoke the *Basic* presumption of reliance or to provide a viable damages model, but their putative class period is too long.  Plaintiffs propose a single class period purporting to cover both their safety recall and emissions-related claims (Compl. ¶ 1), but these claims allege distinct (albeit overlapping) misstatements, entirely different "corrective disclosures," and differing time periods.  Thus, if the Court certifies on both theories of liability, "the single class offered by the plaintiff should be split into separate classes."  *Mazzei*, 288 F.R.D. at 56.   Indeed, courts in this District routinely approve the "creation of two classes."  *Brzychnalski*, 35 F. Supp. 2d at 354; *see also Elkind* v. *Liggett & Myers, Inc.*, 66 F.R.D. 36, 39 (S.D.N.Y. 1975) (Cannella, J.) (rejecting single class period in securities class action where there were "two separate and distinct classes"); 3 William B. Rubenstein, Newberg on Class Actions § 7:27 (5th ed. 2018) ("A class action may encompass multiple classes if [there are] two distinct groups.").

Any class based on FCA's general statements of regulatory compliance must end *on July 27, 2015*, the first market day after the Consent Order was publicly announced.  (Compl. ¶¶ 323, 326.)   "When a publicly available 'corrective disclosure', such as a [Consent Order], provides information that allows an efficient market to adjust, then this marks the end of the

---

[15] *See also In re BP P.L.C.*, 2013 WL 6388408, at *15–17 (S.D. Tex. Dec. 6, 2013) (following *Comcast*, denying certification where plaintiffs did not explain how they "propose[d] to use an event study to calculate class members' damages, and how that event study w[ould] incorporate—and, if necessary, respond to—the various theories of liability"); *Turnbow* v. *Life Partners, Inc.*, 2013 WL 3479884, at *15–17 (N.D. Tex. July 9, 2013) (following *Comcast*, denying class certification where plaintiffs did not show how they will "clearly measure" the damages "resulting from the particular injury on which Plaintiffs' liability action is premised").

class period." *In re Gentiva*, 281 F.R.D. 108, 114 (E.D.N.Y. 2012) (Spatt, J.); *see In re SCOR Holding (Switzerland) AG*, 537 F. Supp. 2d 556, 583 (S.D.N.Y. 2008) (Cote, J.) ("It is appropriate to end the class period when the market was 'cured,'—*i.e.*, when the full truth has been disclosed to the market and the natural market forces have had a reasonable period of time to receive, digest and reflect the bad news in the market price of the security."). Plaintiffs allege that FCA misstated its general regulatory compliance, and "the truth about Chrysler's NHTSA violations" was revealed by the Consent Order, which was publicly announced on Sunday, July 26, 2015. (Compl. at 103.) Any subsequent movement in the price of FCA stock therefore cannot be attributable to FCA's alleged misstatements of general compliance and provides no basis for class treatment. This Court must accordingly limit any class based on those statements to *October 13, 2014 to July 27, 2015*, *i.e.*, "between the time the [alleged] misrepresentations were made and the time the truth was revealed." *Basic*, 485 U.S. at 248 n.27; *see, e.g., In re Smart Techs., Inc.*, 295 F.R.D. at 58 (cutting off class period on day of corrective disclosure because "[a]ny investor who purchased after the . . . corrective disclosure would have known of the alleged 'untruth or omission at the time of his or her acquisition of the security'") (quoting *In re Initial Pub. Offering*, 483 F.3d at 73 n.1); *In re Alstom SA*, 253 F.R.D. 266, 292 (S.D.N.Y. 2008) (Marrero, J.) (shortening class period because public disclosure provided market with "sufficient notice regarding the facts giving rise" to the allegations).[16]

---

[16] *See also In re Fed. Nat'l Mortg. Ass'n*, 247 F.R.D. 32, 39–41 (D.D.C. 2008) (ending class period on date of disclosure that "severed the link between the alleged misrepresentations and the stock price, even though additional information regarding the [subject matter of the alleged misstatements] came to light"); *Alaska Elec. Pension Fund* v. *Pharmacia Corp.*, 2007 WL 276150, at *3–4 (D.N.J. Jan. 25, 2007) (shortening class period because the curative disclosure was "substantial, widely-reported, and contradicted the Defendants'" alleged misrepresentations).

Similarly, any class based on FCA's statements regarding its use of "defeat devices" must end *on January 12, 2017*, when the EPA and CARB publicly issued the NOVs. (Compl. ¶ 33.)   Plaintiffs claim that the NOVs fully disclosed the truth of FCA's alleged misstatements that its vehicles did not contain "defeat devices," because they alleged that FCA installed software in certain of its vehicles that allegedly caused them "to perform differently" during emissions "than in normal operation and use," and therefore may be "defeat devices." (*Id.* ¶ 364.)  To the extent Plaintiffs attempt to rely on FCA's generic statements of regulatory compliance on their emissions-related claims, Plaintiffs themselves concede that the alleged falsity of those statements was revealed by the Consent Order over a year before the NOVs.  (*Id.* ¶ 26.)  And the NOVs provided the market with "sufficient notice regarding the facts giving rise" to Plaintiffs' emissions-related claims and must mark the end of the emissions class period.  *In re Alstom SA*, 253 F.R.D. at 292.[17]   As the EPA itself stated, and Plaintiffs acknowledge, the subsequent EPA Complaint's allegations were "consistent with those set forth in [the NOVs]" (Ex. 21 (EPA Press Release); Nye Report Ex. 15 at 177), and thus "disclosed no new information" that had not already been disclosed to the market by the EPA NOV five months earlier. *Berks Cty. Emps.' Ret. Fund*, 734 F. Supp. 2d at 540–41.[18]

---

[17] As discussed *supra* at 10–11, Plaintiffs' subsequent European allegations provided no new, relevant information.

[18] In addition, Plaintiff Gary Koopmann cannot serve as a class representative in this case.  Mr. Koopmann purchased additional shares of FCA stock on March 27, 2017 (Ex. 22 (Koopmann0022))—months after the "truth" of FCA's alleged misstatements was revealed—and "[a] named plaintiff who has engaged in a post-disclosure purchase" is neither adequate nor typical and therefore "cannot represent the class."  *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *5–7 (S.D.N.Y. July 3, 2013) (Forrest, J.) (citing *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification or, in the alternative, shorten the putative class period.  Defendants also request oral argument and an evidentiary hearing on Plaintiffs' motion.

Respectfully submitted,

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
William B. Monahan
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

February 13, 2018