**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : : : : : | Civ. Action No: 15-cv-07199-JMF |
| Plaintiffs, | : : | |
| v. | : : : | |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE and ROBERT E. LEE | : : : : : : | |
| Defendants. | : : : | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ............................................................................................ 2

    I.     DEFENDANTS HAVE FAILED TO REBUT THE PRESUMPTON OF RELIANCE BY PROVING LACK OF PRICE IMPACT ................................... 2

          A.     Defendants Have Proffered No Expert Evidence Concerning Price Impact ........................................................................................... 2

          B.     The Price Maintenance Theory of the Case Supports Price Impact ........... 3

          C.     Defendants Fail to Prove the Corrective Events Had Zero Price Impact ... 5

                1.     Defendants Have Failed To Prove The Vehicle Safety Corrective Events Had Zero Price Impact ........................................................ 8

                2.     Defendants Have Failed To Prove the Emissions Corrective Events Had Zero Price Impact .................................................................. 9

    II.     PLAINTIFFS' DAMAGES MODEL COMPLIES WITH *COMCAST* ............... 12

    III.     THERE IS NO BASIS FOR SHORTENING THE CLASS PERIOD ................ 14

    IV.     MR. KOOPMANN IS "ADEQUATE" AND "TYPICAL" ................................ 15

CONCLUSION ........................................................................................ 16

# **TABLE OF AUTHORITIES**

**Page(s)**

<u>**Cases**</u>

*Aranaz v. Catalyst Pharm. Partners Inc.*,
    302 F.R.D. 657 (S.D. Fla. 2014) ............................................................................6

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................2, 6

*Brzychnalski v. Unesco, Inc.*,
    35 F. Supp. 2d 351 (S.D.N.Y. 1999)........................................................................14

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69, 86 (S.D.N.Y. 2015) ........................................................2, 3, 6, 7, 12

*Charron v. Wiener*,
    731 F.3d 241 (2d. Cir. 2013)................................................................................14

*City of Livonia Employees' Ret. Sys. v. Wyeth*,
    284 F.R.D. 173 (S.D.N.Y. 2012) ......................................................................10, 15

*Clark v. Cameron-Brown Co.*,
    72 F.R.D. 48 (M.D.N.C. 1976) ............................................................................14

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..................................................................................1, 12, 13

*Elkind v. Liggett & Myers, Inc.*,
    66 F.R.D. 36 (S.D.N.Y. 1975) ............................................................................14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804, 131 S. Ct. 2179 (2011) (*"Halliburton I"*) ..............................1, 10, 12

*FindWhat Investor Group v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ............................................................................4

*George v. China Auto. Sys., Inc.*,
    2013 U.S. Dist. LEXIS 93698 (S.D.N.Y. July 3, 2013) ..............................................15

*Glickenhaus & Co. v. Household Int'l*,
    787 F.3d 408 (7th Cir. 2015), *reh'g denied* (July 1, 2015)........................................4

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) (*"Halliburton II"*) ..............................................................2

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*
    250 F.R.D. 137, 145 (S.D.N.Y. 2008) .................................................................4

*In re Deutsche Telekom Ag Sec. Litig.*,
    229 F. Supp. 2d 277 (S.D.N.Y. 2002).............................................................14

*In re Diamond Foods, Inc., Sec. Litig.*,
    295 F.R.D. 240 (N.D. Cal. 2013)....................................................................14

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2015 U.S. Dist. LEXIS 128856 (S.D.N.Y Sep. 24, 2015), *rev'd on other grounds*,
    879 F.3d 474 (2d Cir. 2018)...................................................................13, 14

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
    2014 U.S. Dist. LEXIS 32028 (S.D.N.Y. Mar. 11, 2014) ....................................15

*In re Monster Worldwide, Inc. Sec. Litig.*,
    251 F.R.D. 132 (S.D.N.Y. 2008) ....................................................................15

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ................................................................4, 15

*In re Petrobras Sec. Litig.*,
    312 F.R.D. 354 (S.D.N.Y. 2016), *aff'd in relevant part*, 862 F.3d 250 (2d Cir. 2017)...........13

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ......................................................................15

*In re SLM Corp. Sec. Litig.*,
    2012 U.S. Dist. LEXIS 8158 (S.D.N.Y. Jan. 24, 2012) ......................................10

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016).........................................................................4, 8

*Li v. Aeterna Zentaris, Inc.*,
    2018 U.S. Dist. LEXIS 33246 (D.N.J. Feb. 28, 2018) ...........................................3

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).......................................................................................6

*Mazzei v. Money Store*,
    288 F.R.D. 45 (S.D.N.Y. 2012) ......................................................................14

*Pirnik v. Fiat Chrysler Autos.*,
    2017 U.S. Dist. LEXIS 120841 (S.D.N.Y. Aug. 1, 2017) (*"Pirnik II"*) ................10

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom. Waggonner v. Barclays PLC,*
875 F.3d 79 (2d Cir. 2017)................................................................................................. *passim*

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)................................................................................................. *passim*

## **Rule**

Fed. R. of Civ. P. 23..........................................................................................................1, 12, 16

## **Other Authorities**

Alon Brav and J.B. Heaton,
*Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*,
903 Wash. U. L. 583, 593 (2016) ..................................................................................................6

Steven Goodman,
*A Dirty Dozen: Twelve P-Value Misconceptions*,
45 Seminars in Hematology 135, 136 (2008) ..........................................................................11

## PRELIMINARY STATEMENT

Defendants have conceded that the Class has satisfied the four requirements of Rule 23(a), the superiority requirement of Rule 23(b)(3), and even that the market for FCA securities was efficient.  As a result, Defendants argue the facially absurd – that the revelations of FCA's violations of vehicle safety and emissions regulations (which resulted in a consent order, EPA notice of violations and DOJ lawsuit) had absolutely zero impact on FCA's stock price. Plaintiffs' expert, Dr. Zachary Nye has concluded – based on his event study and price impact analysis – that the alleged misrepresentations had a price impact on FCA stock. In response, Defendants offer nothing but their own speculation.  Even Defendants' expert, Dr. Paul Gompers, provides no price impact opinion. It was Defendants' burden to prove lack of price impact by a preponderance of the evidence. *Waggoner v. Barclays PLC*, 875 F.3d 79, 101 (2d Cir. 2017). Having failed to proffer any expert evidence, Defendants cannot rebut the presumption of reliance, especially in the face of the overwhelming affirmative evidence of price impact marshalled by Plaintiffs. *See Strougo v. Barclays PLC*, 312 F.R.D. 307, 325 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner*, 875 F.3d 79 ("the defendants in the instant case have not submitted an event study — either analyzing the price impact on the date of the misstatements or on the corrective disclosure date — to prove lack of price impact.").

In their last-ditch challenge to class certification, Defendants advance loss causation arguments under the guise of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), which are inappropriate for resolution on a Rule 23 motion.  *See Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 131 S. Ct. 2179 (2011) ("*Halliburton I*"). Defendants have failed to proffer any evidence suggesting that damages cannot be proven by means of common evidence or involve individualized proof.  Instead, all of Defendants' criticisms concern class-wide issues like the disaggregation of non-fraud factors and the fluctuation of inflation during the Class Period that the Second Circuit has rejected.  *Waggoner*, 875 F.3d at 106.

For the reasons stated below, the remainder of Defendants' arguments should be rejected and Plaintiffs' Motion for Class Certification should be granted.

## ARGUMENT

**I.**   **DEFENDANTS HAVE FAILED TO REBUT THE PRESUMPTON OF RELIANCE BY PROVING LACK OF PRICE IMPACT**

In *Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S. Ct. 2398 (2014) ("*Halliburton II*")*,* the Supreme Court held that defendants could "defeat the [*Basic*] presumption at the class certification stage through evidence that the misrepresentation did not in fact affect the stock price." 134 S. Ct. at 2414. That is, by proving "lack of price impact." *Id*. at 2416.

Being allowed to prove no price impact does not mean that it is easily done. The Supreme Court held that the defendants must "***sever[] the link*** between the alleged misrepresentation and [] the price received (or paid) by the plaintiff." *Basic Inc. v. Levinson*, 485 U.S. 224, 248-249 (1988) (emphasis supplied). In *Halliburton II*, the Justices recognized the defendants' right to prove **zero** price impact will not ordinarily present a serious obstacle to class certification. *See Halliburton II*, 134 S. Ct. at 2417 (Ginsburg J., concurring) ("[I]t is incumbent upon the defendant to show the absence of price impact. The Court's judgment, therefore, should impose no heavy toll on securities-fraud plaintiffs with tenable claims.") (internal citations omitted); *id*. at 2424 (Thomas, J., concurring in the judgment) ("[I]n practice, the so-called 'rebuttable presumption' is largely irrebuttable."). Defendants must prove the absence of any price impact "by a preponderance of the evidence." *Waggoner*, 875 F.3d at 101. They have failed.

### A.   Defendants Have Proffered No Expert Evidence Concerning Price Impact

While not their burden, Plaintiffs have offered expert evidence of price impact. In response, Defendants offer no expert evidence that there is a lack of price impact and thus have done nothing to rebut the presumption of reliance. As the Court held in *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC* in certifying the class:

> In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it. The exception, and this was also made clear in *Halliburton II*, is when defendants present evidence of lack of price impact or that the market was inefficient. In those cases, an event study or other rebuttal evidence is required and class certification becomes a battle of competing expert studies. ***Defendants here chose not to submit their own event study***.

310 F.R.D. 69, 86 (S.D.N.Y. 2015) (emphasis supplied).  As in *Carpenters*, Defendants' expert, Dr. Gompers, has not conducted an event study and provides no opinion on price impact. Lieberman Decl. Ex. 10, Gompers Tr. at 15:7-8 ("I haven't been asked to offer price impact opinions.").  Defendants' non-expert ***speculations*** as to price impact based on their reading of Dr. Nye's market efficiency analysis are wholly inadequate.  Dr. Gompers testified that a market efficiency analysis is not the same as a price impact analysis and that any price impact analysis must be done by an expert.  *Id.* at 124:10-125:21; 125:22-126:12 ("[Q] Does doing a price impact analysis require any kind of expertise? … [A] Well, certainly it would require one to be an expert in financial economics…").  This failure to proffer a supporting expert dooms Defendants' attempt to carry their heavy burden of proving lack of price impact.  *Carpenters*, 310 F.R.D. at 95-97 (defendants' reliance on plaintiffs' proof was insufficient to show lack of price impact); *Strougo*, 312 F.R.D. at 325 ( "the defendants in the instant case have not submitted an event study … to prove lack of price impact."); *Li v. Aeterna Zentaris, Inc*., 2018 U.S. Dist. LEXIS 33246, at *33 (D.N.J. Feb. 28, 2018) (defendants "failed to present any competent evidence demonstrating a lack of price impact" where the defendants' expert "did not perform an independent event study, nor did he perform a price impact assessment" but instead merely "criticized the [plaintiffs' expert] for failing to find, with 95% confidence, price impact of the August 30, 2011 press release.").  Dr. Gompers has provided price impact opinions in numerous other securities cases. Defendants' failure to find any expert willing to sign on to their price impact assertions speaks volumes.

### B.   The Price Maintenance Theory of the Case Supports Price Impact

Ignoring Plaintiffs' theory of the case, Defendants argue that there is no price impact because the misstatements did not cause a statistically significant price increase. Def. Br. at 11-13. However, lack of price movement does not prove the misstatements did not affect the price of FCA 's stock where Plaintiffs' theory of the case is one of price maintenance.  Lieberman Decl. Ex. 11, Nye Rebuttal ¶¶ 4-5; *see Waggoner*, 875 F.3d at 97 ("it is unsurprising that the price of Barclays' ADS did not move in a statistically significant manner on the dates that the

purported misstatements…the Plaintiffs proceeded on a price maintenance theory. That theory, which we have previously accepted, recognizes 'that statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price.'") *citing In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 256 (2d Cir. 2016) (holding that a plaintiff can demonstrate "price impact" by showing either an increase in stock price following a misrepresentation *or* a decline following a corrective event). This is because misrepresentations that falsely confirm market expectations will not lead to an observable change in price. *See, e.g.*, *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011) ("A corollary of the efficient market hypothesis is that disclosure of confirmatory information — or information already known by the market — will not cause a change in the stock price."). But this does not mean misrepresentations have no price impact. The relevant price impact is simply counterfactual:  the price would have fallen had there not been fraud. Even Defendants' expert confirmed that one would not expect FCA's stock price to increase in such a situation.  Gompers Tr. at 93:20-94:23.[1]

Plaintiffs undeniably allege a price maintenance theory. The crux of the Fourth Amended Complaint ("FAC", ECF No. 129) is that FCA publicly confirmed the status quo – that FCA complied with vehicle safety and emissions regulations. Those statements were materially false and misleading as a result of the Company's undisclosed regulatory violations, thereby decreasing the "true value" of the Company's securities and creating the resultant inflation in share price. Common sense dictates that one would not expect a stock price spike at the time the Company simply confirmed the market's expectations that it was in compliance with the law.[2]

---

[1] The cases upon which Defendants rely are inapposite. In *In re Moody's Corp. Sec. Litig.*, the defendants' expert opined that none of the misstatements **or corrective events** were associated with a statistically significant price return.  274 F.R.D. 480, 492 (S.D.N.Y. 2011).  *In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, flatly rejected the price maintenance theory and has been overruled by *Waggoner*. 250 F.R.D. 137, 145 (S.D.N.Y. 2008).

[2] In a price maintenance theory, "plaintiffs are not required to show when inflation entered into the price of [FCA's stock]." *Strougo,* 312 F.R.D. at 325-326; *see Glickenhaus & Co. v. Household Int'l,* 787 F.3d 408, 418 (7th Cir. 2015), *reh'g denied (*July 1, 2015) ("there is no law" that "requires the plaintiffs to prove how the inflation was introduced into the stock price in

### C.      Defendants Fail to Prove the Corrective Events Had Zero Price Impact

In his opening Report, Dr. Nye concluded that "price impact in this case may be demonstrated using the statistically significant Company-specific price declines that occurred on: July 27, 2015; October 28, 2015; May 23, 2016; January 12, 2017; February 6 and 7, 2017; and May 23, 2017, when disclosures made by Fiat Chrysler and/or events caused by the materialization of previously concealed risks corrected the alleged misrepresentations described in the Fourth Amended Complaint." Nye Report ¶ 68 and Exhibit 15. Dr. Nye evaluated these disclosures in even greater detail in his Rebuttal Report, confirming price impact.  Nye Rebuttal ¶¶ 17-45.

Unable to find any expert to provide an opinion of lack of price impact, Defendants proffer their own unqualified, unreliable and unscientific analysis of FCA's stock price. Unsurprisingly, it is riddled with errors. The most fundamental of which is their assertion that a residual stock price movement below a 95% confidence level is evidence of lack of price impact. ***This is undeniably wrong***. "[A] failure to find statistical significance at the 95% confidence level does ***not*** allow a researcher to attribute causation to 'random volatility,' and thereby rule out price impact."  Nye Rebuttal ¶ 7. As Dr. Nye cogently explains:

> As an initial matter, it is important to note that the confidence level associated with a given company-specific return is measured as one minus the "*p*-value" of that return, where the *p*-value represents the conditional probability of observing a return as extreme as, or more extreme than, the return at issue … [S]tatistical significance in the context of securities litigation merely indicates that a given company-specific return is a relatively rare occurrence. When testing the null hypothesis of "no price impact," a statistically significant result will have a small *p*-value (*i.e.*, less than 5%, when applying the 95% confidence level), thereby indicating "the observed data are far from what is expected under the null hypothesis—too far to be readily explained by the operations of chance.  That discredits the null hypothesis."  However, while the *p*-value "gives the chance of getting evidence against the null hypothesis as strong or stronger than the evidence at hand," it "does not give the chance that the null is true," nor "the probability that ... the results occurred because of chance."  Indeed, "[a]ccording to the frequency

the first place"). But in any event, as Dr. Nye explains, FCA's stock price was inflated on the first day of the Class Period.  Nye Rebuttal ¶ 51.

theory of statistics, there is no meaningful way to assign a numerical probability to the null hypothesis." Thus, ***Defendants' dismissal of price impact based on a lack of statistical significance at the 95% confidence level is a fundamental statistical error*** since they improperly infer that their null hypothesis, that the alleged misrepresentations had no price impact, is true.

*Id*. ¶¶ 8-9 (emphasis supplied). Even Dr. Gompers agreed that the lack of statistical significance does not permit a researcher to accept the "null hypothesis" that there was no price impact. Gompers Tr. at 46:11-47:19. Courts have agreed: "The failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price." *Carpenters*, 310 F.R.D. at 95; *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 672 (S.D. Fla. 2014) ("Because Defendants have the burden of showing an absence of price impact, they must show that price impact is *inconsistent* with the results of their analysis. Thus, that an absence of price impact is consistent with their analysis is insufficient.") (emphasis in original); *see also* Alon Brav and J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 903 Wash. U. L. 583, 593 (2016) ("Lack of statistical significance does not tell us that it is more probable than not that there was no price impact.") cited favorably by *Carpenters*, 310 F.R.D. at 100 n.100.   The lack of statistical significance is particularly uneventful when studying a single firm as is done in securities litigations. *Carpenters*, 310 F.R.D. at 95 ("In academic research, event studies are almost exclusively conducted with large samples of securities from a number of different firms. ***When the event study is used in a litigation to examine a single firm, the chances of finding statistically significant results decrease dramatically***") (emphasis supplied).[3] As a result, "the [single firm event study] can

_____

[3] Even if it were Plaintiffs' burden to prove price impact by a preponderance of the evidence, Dr. Gompers testified that the 95% confidence level (that a residual return of that size would be expected to occur as a result of random volatility on 5% of the time) does not align with the "more likely than not" burden of proof. Gompers Tr. 83:9-84:13. Rather, scientists use this high statistical significance for the purpose of concluding that an experiment has conclusively establish a "scientific fact" (Gompers Tr. at 86:13-18), a bar much higher than "more likely than not". As Dr. Gompers conceded, even a confidence level of 80% means that one would expect a residual return that high as a result of random volatility only 20% of the time. Gompers Tr. at 43:16-23. *C.f. Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28, 40 (2011), quoting *Basic*, 485 U.S. 224 ("the premise that statistical significance is the only reliable indication of causation

detect very large price impacts reliably, but it cannot detect smaller price impacts reliably." Brav and Heaton, 903Wash. U. L. at 594.

As a result, price impacts resulting from disclosures will often be identified as "insignificant" in an event study.  In an efficient market, a company's stock price will "adjust to new information that even minimally affects the 'present value of the expected cash flows an investor will receive from owning it.'" Nye Rebuttal ¶¶ 14, 24, 46 (citations omitted). Because statistical significance is merely a function of the size of the residual return, by definition, any non-large residual return will be deemed "insignificant" by the test. "Price impact may exist even for fraudulent public statements or revelations of fraud that do not induce a price reaction large enough to qualify as being statistically significant at the 95% confidence level." *Id*. For example, all financial economists agree that information that affects future cash flows of a company have a price impact. *Id*. ¶ 13. If the information affecting future cash flows causes a residual return that is less than the largest 5% of returns from random volatility, it will be deemed insignificant. *Id*. ¶ 15. However, it is folly to conclude that a stock price movement that is only amongst the top 6% -- or even the top 40% -- of returns demonstrates lack of price impact. This is referred to as a "Type II" error. "The failure of an event study to find price movement does not prove lack of price impact with scientific certainty. [Defendants'] do not rule out either Type I or Type II errors."  *Carpenters*, 310 F.R.D. at 95 ("Type I errors are when a study incorrectly rejects a null hypothesis. Type II errors are when a study incorrectly fails to reject a null hypothesis.").

Thus, Defendants' assertion that a lack of statistical significance at the 95% confidence level is evidence of no price impact is untethered to either basic reason or statistical science.

---

… is flawed," and "such a categorical rule would 'artificially exclud[e]' information that would otherwise be considered significant to the trading decision of a reasonable investor.").

**1.    Defendants Have Failed To Prove The Vehicle Safety Corrective Events Had Zero Price Impact**

Performing an event study and price impact analysis, Dr. Nye concludes that both of the alleged vehicle safety corrective events had a price impact on FCA stock. The July 26, 2015 announcement of the NHTSA Consent Order caused a negative residual return that was statistically significant at the 92.12% confidence level, with commentators universally ascribing the decline to the corrective disclosure. Nye Rebuttal ¶¶ 20-24. The October 28, 2015 announcement of a surprisingly large €761 million pre-tax charge related to future recall campaign costs in North America caused a negative residual return that was statistically significant at the 99.75% confidence level, with news outlets attributing the charge and price decline to FCA's violations and the Consent Order. *Id*. at ¶¶ 25-26; FAC ¶¶ 335-338.

Defendants nevertheless argue that the July 24, 2015 Consent Order had no price impact because the statistical significance of the decline in the U.S. was 92.12% rather than 95%. Defendants could find no expert to agree with their assertion. As Dr. Nye explains, a 90% statistical significance is commonly used to show price impact (Ny Rebuttal ¶¶ 12, 13) and price impact is further confirmed by the statistically significant decline at the 99.34% confidence level in European trading. *Id*. ¶ 24. Defendants' other assertions of lack of price impact are fundamentally flawed. Nye Rebuttal ¶¶ 23-24.

Unable to refute the statistically significant decline following the Company's massive accounting charge resulting from the Consent Order, Defendants note that this Court found Defendants' statements about their reserves to be nonactionable. Def. Br. at 10. This does not change the fact that the charge to reserves, which the Company and commentators identified as being a result of FCA's violations, is a materialization of the risk concealed by Defendants' misstatements concerning their compliance with vehicle safety regulations, which the Court held were actionable. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 261-63 (announcements that the company sold off various assets and ratings downgrades were "materialization of the risk" of liquidity problems concealed by defendants' misstatements). Their claim that this corrective

event has been implicitly dismissed from the action is belied by the Court permitting Plaintiffs discovery into the disclosure of the charge. ECF No. 81. Indeed, the market saw the charge as resulting from FCA's vehicle safety violations. Nye Rebuttal ¶¶ 25-26.

Finally, Defendants assert that FCA's vehicle safety violations had zero impact on FCA's stock price because they found four days on which announcements related to vehicle safety compliance did not coincide with residual returns at the 95% confidence level: May 18, 2015, July 2, 2015, October 27, 2015, and December 8, 2015. Def. Br. at 14-15. None of these days are identified by Plaintiffs as corrective events. Therefore, the lack of statistical significance is meaningless. Moreover, as discussed above, the lack of statistical significance is not affirmative evidence of lack of price impact, especially in light of Dr. Nye's uncontroverted expert testimony of price impact. *See also* Nye Rebuttal ¶¶ 6-16.[4]

### 2.    Defendants Have Failed To Prove the Emissions Corrective Events Had Zero Price Impact

Dr. Nye concludes that all five of Plaintiffs' alleged emissions corrective events caused a statistically significant negative impact on FCA's stock price at confidence levels of 99.27%, 100.0%, 98.60% and 97.0%. Nye Rebuttal ¶¶ 27-45.

Defendants argue, again without any expert support, that the EPA's and CARB's issuance of NOVs concerning FCA's emissions violations on January 12, 2018 and the DOJ/EPA filing the lawsuit on May 23, 2018 did not have any price impact on FCA's stock despite immediate negative residual returns of 100.0% and 98.60% (meaning there is 0.0% and 1.40% chance that the movements occurred as a result of random volatility), asserting that the declines were instead in response to the regulatory action and regulatory risk, rather than the violations. Def. Br. at 19-20. Courts have rejected similar attempts to distinguish disclosure of

---

[4] Defendants mistakenly point to the July 2, 2015 public hearing held by NHTSA as evidence of lack of price impact. That day, FCA's stock price had a residual decline of 2.64%, which equates to an 86.06% confidence level. Nye Report Ex. 14B at 3. Thus, one would expect a decline of this size only 13.94% of days as a result of random volatility. This makes it more likely than not that this information had a price impact on FCA's stock price.

violations of law from disclosure of the resulting regulatory action. *C.f. Waggoner*, 875 F.3d at 106 ("the regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered, and the failure to disaggregate the action and fines did not preclude class certification."); *see also* Nye Rebuttal ¶ 35, 44-45. In any event, such arguments go to loss causation, not price impact, and are inappropriate at class certification. *Halliburton I*, 131 S. Ct. at 2186. ("The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory."); *Strougo*, 312 F.R.D. at 329 n.127 ("while defendants presume that disclosure of the NYAG lawsuit is not related to the alleged fraud as a matter of law, I decline to make that determination at this stage in the proceedings. To a large extent, it is a merits-based inquiry relating to loss causation that is not ripe for resolution on class certification."); *see also City of Livonia Employees' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 182 (S.D.N.Y. 2012); *In re SLM Corp. Sec. Litig.*, 2012 U.S. Dist. LEXIS 8158, at *13 (S.D.N.Y. Jan. 24, 2012). "[M]erely suggesting that another factor also contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Waggoner*, 875 F.3d at 105 (rejecting defendants' attempt to parse announcements of violations from announcements of the government's investigation into those violations).[5]

Unable to deny the price impact of the corrective events on May 23, 2016 and February 6-7, 2017 concerning FCA's diesel emissions violations in Europe, Defendants assert that these are not corrective disclosures because this Court dismissed Plaintiffs' claims concerning European diesel emissions violations. Def. Br. at 18-19. This is false. The Third Amended Complaint ("TAC") and FAC both allege that Defendants misrepresented their compliance with

---

[5] Defendants other arguments that FCA had previously disclosed the investigation, that commentators believed that the market "ignored" the January 12, 2015 NOV announcement, and that the disclosure of the DOJ lawsuit provided no "new" information are without merit. Nye Rebuttal at ¶¶ 32-34; 43-45.

U.S. *and European* diesel emissions regulations. *See, e.g.* FAC ¶¶ 274-276. In granting Defendants' motion to dismiss the TAC, this Court only held that Plaintiffs failed to plead scienter. ECF No. 121.[6] Following Plaintiffs' amendments, this Court denied Defendants' motion to dismiss the FAC *in its entirety*. ECF No. 142. Indeed, Defendants never even argued in either motion to dismiss that Defendants' misrepresentations concerning European emissions compliance should be separately analyzed or dismissed, or challenged loss causation in any way. Having made this strategic decision, Defendants cannot now use class certification as a backdoor second bite at the apple. *C.f. Strougo*, 312 F.R.D. at 328 ("were the proposed class inconsistent with the August 2015 Order as a matter of law, it would be appropriate to limit the class as suggested by the defendants. However, at the time of the motion to dismiss, the parties did not ask the Court to consider when statements became material, and I did not make any finding regarding this issue.").

In a sign of desperation, Defendants misleadingly assert that "Dr. Gompers shows, and Plaintiffs concede, at least half of these 'corrective disclosure' had no impact on FCA's stock price." Def. Br. at 17. *First*, Dr. Gompers testified that he is not providing any opinion on price impact. Gompers Tr. at 15:7-8. *Second*, a lack of statistical significance does not prove lack of price impact. *Third*, Plaintiffs have never conceded lack of price impact as to any disclosure. *Fourth*, none of the five additional disclosures lacking statistical significance identified by Defendants are alleged by Plaintiffs to be "corrective disclosures." Moreover, every one of these five additional disclosures concerning FCA's emissions violations resulted in a negative residual return, three at a confidence level greater than 60%. Gompers Report at Ex. 2. This further supports price impact. *See* Steven Goodman, *A Dirty Dozen: Twelve P-Value Misconceptions*, 45 Seminars in Hematology 135, 136 (2008) ("A nonsignificant [effect] … does not make the

---

[6] This Court's statement in *Pirnik v. Fiat Chrysler Autos.,* 2017 U.S. Dist. LEXIS 120841 (S.D.N.Y. Aug. 1, 2017) ("*Pirnik II*"), that a report by the German Transport Ministry "provides little or no support for Plaintiffs' claim that Marchionne and other FCA officials 'must have known' that FCA cars had illegal defeat devices" refers to scienter, not actionable statements or loss causation. ECF No. 121 at 7-8.

null effect [i.e., the hypothesis of no price impact] the most likely. ***The effect best supported by the data from a given experiment is always the observed effect, regardless of its significance***.").

## II.        PLAINTIFFS' DAMAGES MODEL COMPLIES WITH *COMCAST*

In their last-ditch challenge to class certification, Defendants advance additional loss causation arguments, this time under the guise of *Comcast*, which are inappropriate for resolution on a Rule 23 motion.  *See Halliburton I,* 563 U.S. 804, 815 (plaintiffs are not required to prove loss causation at the certification stage).   Defendants fail to proffer any evidence suggesting that damages cannot be proven by means of common evidence or involve individualized proof. Consistent with Plaintiffs' price maintenance theory of the case, Dr. Nye explains that damages for investors who purchased FCA stock during the Class Period can be calculated using an "out-of-pocket" method that is common to the class. Nye Rebuttal ¶¶ 48-54. This satisfies the "minimal scrutiny" the Supreme Court required in *Comcast*.  *See Carpenters*, 310 F.R.D. at 99.

In *Comcast*, an antitrust case, the plaintiffs' damages report relied on four theories of liability, only one of which proceeded on a class-wide basis.  133 S. Ct. at 1431. The Court found there was no proof that the damages were common to the class because the expert's model did not isolate damages caused by the one remaining theory of liability.  *Id.*  at 1434-35. This is a very different case. Plaintiffs' single theory of damages tracks their theory of liability. Moreover, the parties in *Comcast* stipulated that the class could be certified only if damages were measurable "on a class-wide basis" through use of a "common methodology." *Id*. at 1430. There is no such stipulation here.

Nevertheless, Dr. Gompers, attacks Plaintiffs' model because it does not identify (i) the date and content of each "but for" disclosure and the inflation introduced by each; (ii) how differences in the timing, content and environment of the alleged corrective disclosures and the "but for" disclosures would impact the alleged inflation; and (iii) how "confounding "information" could impact the amount of inflation.  Gompers Report at ¶¶ 43-88.

12

In sharp contrast from *Comcast*, nowhere do Defendants assert that Plaintiffs have multiple theories of liability. Indeed, throughout his deposition, Dr. Gompers referred to "the theory of liability" asserted by Plaintiffs. Gompers Tr. at 92:19; 119:15; 119:23; 121:2. *See Strougo*, 312 F.R.D. at 329 n. 135 (the fact that the "plaintiffs allege two distinct schemes" for which their "damages framework must separately account for both" does not preclude class certification).   Moreover, Dr. Gompers testified that each of his critiques concern either how inflation would vary over the Class Period (Gompers Tr. at 113:4-118:18), and/or "disaggregating damages that resulted from the alleged fraud." *Id*. at 118:3-11. The Second Circuit recently rejected these exact same criticisms asserted against a nearly identical damages model proposed by Dr. Nye. Nye Rebuttal ¶¶ 53-54; *Waggoner*, 875 F.3d at 105 (holding Dr. Nye's damages model was sufficient under *Comcast* where defendants "contend that the Plaintiffs' model fails to (1) disaggregate damages that resulted from factors other than investor concern about Barclays' integrity (namely, the New York Attorney General's regulatory action and the potential fines associated with it), and (2) account for variations in inflation in stock price over time."); *id*. at 106 ("we are not persuaded by the Defendants' argument that class certification was improper under *Comcast* because the Plaintiffs' damages model failed to account for variations in inflation over time."); *see also In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 372 (S.D.N.Y. 2016), *aff'd in relevant part*, 862 F.3d 250 (2d Cir. 2017) ("The Court credits Gompers' point that there may be serious difficulties in determining the impact of non-numeric disclosures. But it is not clear that these difficulties will be fatal, and they do not mean that plaintiffs' proposed model does not match their theory of liability"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 128856, at *23-24 (S.D.N.Y Sep. 24, 2015), *rev'd on other grounds*, 879 F.3d 474 (2d Cir. 2018) ("any failure of the methodology to 'disaggregate the losses purportedly attributable to disclosures about government enforcement activities from those that Plaintiffs attribute to the challenged statements,' would not defeat the class's predominance because it would affect all class members in the same manner.") (citations omitted). Significantly, Dr. Gompers admitted that such calculations would not be impossible.

13

Gompers Tr. at 119:6-24. *See In re Goldman Sachs*, 2015 U.S. Dist. LEXIS 128856, at *24 ("Defendants have not suggested that such disaggregation would be impossible to determine.").

## III.      THERE IS NO BASIS FOR SHORTENING THE CLASS PERIOD

Subclasses are required when an intra-class conflict that goes to the heart of the litigation warrants two separate sets of representation for discreet groups of class members. *Charron v. Wiener*, 731 F.3d 241, 250 (2d. Cir. 2013). Defendants identify no intra-class conflict. Instead, Defendants argue that because their statements of regulatory compliance were false for two reasons and were revealed at different times during the Class Period, subclasses are warranted. Def. Br. at 23. This is wrong. Courts routinely certify a single class with multiple types of misstatements and multiple corrective disclosures. *In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp. 2d 277, 283 (S.D.N.Y. 2002) (certifying class and declining to create subclasses despite the fact that involved separate sets of misstatements that were revealed to be false at different times); *Clark v. Cameron-Brown Co.*, 72 F.R.D. 48, 59 (M.D.N.C. 1976) (multiplicity of misstatements does not require sub-classing); *see also In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 255 (N.D. Cal. 2013) (no need to create multiple subclasses despite multiple corrective disclosures).[7] A single class period is particularly appropriate here because the alleged fraud centers on one theme: Defendants' failure to disclose rampant regulatory violations.

Finally, Defendants argue that their proposed vehicle safety class period should end on July 27, 2017 and their proposed emissions class period should end on January 12, 2015 because, they assert, the disclosures on these days fully revealed the truth concerning the vehicle safety and emissions issues, respectively, and subsequent alleged corrective events on October 28, 2015

---

[7] *Mazzei v. Money Store*, 288 F.R.D. 45, 56 (S.D.N.Y. 2012) is inapposite. It involved Truth in Lending Act violations for charging five different types of excessive fees, and the Court created a sub-class for each type of fee charged. *Brzychnalski v. Unesco, Inc.,* did not even address the merits of sub-classing, but simply noted that the creation of a state-law subclass would not deprive the court of supplemental jurisdiction. 35 F. Supp. 2d 351, 354 (S.D.N.Y. 1999). In *Elkind v. Liggett & Myers, Inc.*, the court found two subclasses were necessary because plaintiffs advanced two causes of action, one based on defendants' misstatements and the other based on other defendants tipping insider information. 66 F.R.D. 36, 41 (S.D.N.Y. 1975).

(FCA's recall charge), February 6-7, 2017 (referral to Paris prosecutor and report on Italian emissions tests) and May 23, 2017 (filing of DOJ/EPA lawsuit) are not valid corrective disclosures.  Def. Br. at 23-25.  *First*, Defendants continued to make false statements concerning vehicle safety compliance after the July 27, 2015 disclosure (FAC ¶¶ 328-333) and emissions compliance after the January 12, 2017 disclosure. FAC ¶¶ 367, 368.  *Second*, if Defendants believed that any of the alleged corrective events were not valid, they should have advanced these arguments during one of their three motions to dismiss.  It is improper to do so now.  *See Strougo*, 312 F.R.D. at 328 (refusing to adjust the class period based on arguments that should have been advanced during the motion to dismiss). In any event, these disclosures revealed new information to the market concerning the alleged fraud.  Nye Rebuttal ¶¶ 25-26, 36-45.

## IV.      MR. KOOPMANN IS "ADEQUATE" AND "TYPICAL"

In a footnote, Defendants challenge the adequacy and typicality of Gary Koopmann (but not Timothy Kidd or Victor Pirnik) because he purchased additional shares of FCA on March 27, 2017, after earlier corrective disclosures and before the last one on May 23, 2017. Def. Br. at 25 n. 18. Arguments advanced in footnotes should be rejected and are considered waived.  *In re MF Glob. Holdings Ltd. Inv. Litig.*, 2014 U.S. Dist. LEXIS 32028, at *17-18 (S.D.N.Y. Mar. 11, 2014). Moreover, the one case cited by Defendants, *George v. China Auto. Sys., Inc.*, 2013 U.S. Dist. LEXIS 93698 at *8–10 (S.D.N.Y. July 3, 2013), is an outlier and easily distinguishable because ***all*** of the proposed class representatives purchased additional shares ***after*** the class period, including a purchase immediately upon the corrective disclosure, and because the particular pattern of post class period trades allowed them to raise a unique defense of non-reliance. Here, only Mr. Koopmann made an additional purchase and it was ***during*** the Class Period. Post disclosure purchases during the Class Period do not render a representative inadequate.  *In re Monster Worldwide, Inc. Sec. Litig.,* 251 F.R.D. 132, 135 (S.D.N.Y. 2008); *quoted in In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 46 (S.D.N.Y. 2012); *see also City of Livonia Employees' Ret. Sys.,* 284 F.R.D. at 179; *In re* Moody's, 274 F.R.D. at 480, 488.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiffs as Class Representatives; (3) appointing Co-Lead Counsel as Class Counsel; and (4) granting such other relief as the Court may deem just and proper.

Dated: March 13, 2018
New York, New York

**POMERANTZ LLP**
*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Michael J. Wernke
Veronica V. Montenegro
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
        mjwernke@pomlaw.com
        vmontenegro@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com

16

*Co-Lead Counsel for Plaintiffs*

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
Email:  peretz@bgandg.com

*Attorneys for Lead Plaintiffs*

17