# EXHIBIT 10

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------x

GARY KOOPMANN, et al.,      :

    Plaintiffs,      :

  v.      : Civil Action No.

FIAT CHRYSLER AUTOMOBILES   : 15-cv-07199-JMF

N.V., et al.,      :

    Defendants.

-------------x


Videotaped Deposition of Paul Alan Gompers, Ph.D.

Boston, Massachusetts

March 5, 2018

12:01 p.m.


Job No.: 15576

Pages: 1 - 130

Reported By: Alan H. Brock, RDR, CRR

HUDSON REPORTING & VIDEO        1-800-310-1769

---

Page 2

1      Videotaped deposition of Paul Alan Gompers,

2  Ph.D., held at the offices of:

3

4

5  Cornerstone Research

6  699 Boylston Street

7  Boston, Massachusetts 02116

8

9

10

11

12

13      Pursuant to agreement, before Alan H. Brock,

14  RDR, CRR, Notary Public in and for the Commonwealth

15  of Massachusetts.

16

17

18

19

20

21

22

23

24

25

---

Page 3

1          A P P E A R A N C E S

2  ON BEHALF OF PLAINTIFFS:

3    Michael J. Wernke, Esq.

4    Pomerantz LLP

5    600 Third Avenue

6    New York, New York 10016

7    212.661.1100

8    mjwernke@pomlaw.com

9

10    Jonathan Stern, Esq.

11    The Rosen Law Firm

12    275 Madison Avenue, 34th Floor

13    New York, New York 10016

14    212.202.3827

15    jstern@rosenlegal.com

16

17  ON BEHALF OF DEFENDANTS:

18    JOSHUA S. LEVY, ESQ.

19    SULLIVAN & CROMWELL LLP

20    125 Broad Street

21    New York, New York  10004

22    212.558.4000

23    levyjo@sullcrom.com

24

25  ALSO PRESENT: Bob Giannini, Videographer

---

Page 4

1          I N D E X

2

3        EXAMINATIONS

4  PAUL ALAN GOMPERS, Ph.D.

5    MR. WERNKE      6

6

7      EXHIBITS MARKED

8  1   Expert Report of Paul A. Gompers,    7

9     Ph.D., February 13, 2018

10  2   Opinion in Carpenters Pension Trust  56

11     Fund case

12  3   Excerpt from Reference Manual on    59

13     Scientific Evidence, Third Edition

14  4   Supplemental Expert Report of Zachary  126

15     Nye, Ph.D., December 21, 2017

16

17

18

19

20

21

22

23

24

1 (Pages 1 to 4)

Page 5

```
 1        March 5, 2018      12:01 p.m.
 2        P R O C E E D I N G S
 3        THE VIDEOGRAPHER:  Good afternoon.  We
 4  are on the record.  This is the video operator
 5  speaking, Bob Giannini, with court reporter Alan
 6  Brock, with Hudson Court Reporting.  Today's date is
 7  March 5th, 2018.  The time is 12:01 p.m.
 8        We are here at the offices of
 9  Cornerstone Research, located at 699 Boylston
10  Street, Boston, Massachusetts, to take the
11  videotaped deposition of Paul Gompers in the matter
12  of Gary Koopmann et al. versus Fiat Chrysler et al.,
13  Civil Action No. 15-cv-7199-JMF.
14        Will counsel please state their
15  appearance.
16        MR. WERNKE:  Michael Wernke, of
17  Pomerantz LLP, on behalf of the plaintiffs.
18        MR. STERN:  Jonathan Stern, on behalf
19  The Rosen Law Firm, on behalf of plaintiffs.
20        MR. LEVY:  Josh Levy, Sullivan &
21  Cromwell, for defendants and the witness.
22        MR. WERNKE:  And will the court reporter
23  please swear in the witness.
24        PAUL ALAN GOMPERS, PH.D.,
25  being first duly affirmed to testify to the truth,
```

Page 7

```
 1        A. Makes sense to me.
 2        Q. Do you understand that you're testifying
 3  under oath here today?
 4        A. I do.
 5        Q. Is there any reason that you can think of
 6  that you would not be able to testify truthfully and
 7  accurately today?
 8        A. No.
 9        Q. No medication that would impact that at
10  all?
11        A. No.
12        Q. How many hours did you spend working on
13  your report in this case, approximately?
14        A. Yeah, I haven't looked.  60 to 80-ish.
15  That's probably about right.
16        Q. And did you work alone, or do you have like
17  assistants that work with you?
18        A. I had a research team at Cornerstone
19  support me on the matter.
20        Q. And do you know approximately how many
21  hours they spent on the report?
22        A. No.
23        Q. I'm going to hand you what's being marked
24  as Exhibit 1.
25        (Exhibit 1 marked for identification.)
```

Page 6

```
 1  the whole truth, and nothing but the truth, was
 2  examined and testified as follows:
 3               EXAMINATION
 4  BY MR. WERNKE:
 5        Q. Good afternoon.  I'm Michael Wernke.  As we
 6  said, I represent the plaintiffs in this action.
 7           Can you just state your name for the
 8  record.
 9        A. Paul Alan Gompers.
10        Q. And you've had your deposition taken many
11  times before; correct?
12        A. Yes.
13        Q. So we'll just go over a couple of basic
14  ground rules.  I'm sure you're already familiar with
15  them.  First of all, when answering, always try to
16  answer verbally, like a yes or no, rather than
17  shaking your head or nodding.  Do you understand?
18        A. Yes.
19        Q. We'll try our best not to talk over each
20  other.  So please wait until I finish a question
21  before you begin your answer, and likewise I will
22  wait until you completely finish your answer before
23  I begin the next question.  And we can take a break
24  whenever you want.  All I ask is that we wait until
25  you answer any pending questions.  Make sense?
```

Page 8

```
 1        Q. Do you recognize this document?
 2        A. Yes, I do.
 3        Q. And what is this document?
 4        A. It's a copy of my expert report that I
 5  submitted in this matter.
 6        Q. And in your report in one of the appendices
 7  I believe you identified your expert depositions and
 8  testimony in the prior four years -- Appendix B, I
 9  believe.
10        A. Yes.
11        Q. Just going through these, I want to get a
12  general understanding of, for each one of these
13  cases -- or I guess more accurately, can you
14  identify each one of these either depositions or
15  testimony that was for a securities case, identify
16  whether you testified on behalf of the plaintiff or
17  the defendant, and then also whether you gave an
18  opinion on market efficiency, price impact, and
19  whether the opposing parties' proposed damage
20  methodology complies with Comcast.  Do you
21  understand what I mean when I say, first of all,
22  complies with Comcast?  Do you have a general
23  understanding?
24        MR. LEVY:  Objection.
25        A. My understanding as a financial economist
```

Page 9

1    is that what's necessary at the class certification
2    stage is for the plaintiffs to articulate a damages
3    model that can measure damages on a classwide basis
4    consistent with the theory of liability and the
5    alleged facts.
6        Q. And I'll go through these more specifically
7    for each case.  But I guess can you start off by
8    going through and identifying the first action in
9    which it was a securities case?
10       A. Yes.  So as a general matter, I won't
11   remember all of the nuances about whether or not it
12   was a class cert, a loss causation, or damages
13   report, and I won't always remember whether or not
14   the issue dealt with market efficiency, price
15   impact, or Comcast.  I'll do it to the best of my
16   recollection, but for most of these, I haven't
17   reviewed the testimony in quite some time, so
18   especially the ones in the past I won't remember.
19           And the second thing is that for all
20   these matters I've been -- I've offered testimony on
21   behalf of the defendants, but that's only because
22   I've never been asked by the plaintiff to represent.
23   I have no issues representing a plaintiff, but I've
24   never been asked in these matters.
25       Q. Okay, fair enough.  So if you can just go

Page 10

1    down, and we'll hit each one to the best that you
2    can remember.
3        A. So the first one on Page 1 of Exhibit --
4    Appendix B would be the Groupon securities
5    litigation.
6        Q. And do you recall in Groupon if you gave an
7    opinion on market efficiency?
8        A. So, yes, I was brought in as a rebuttal
9    expert in that matter, and I believe that the main
10   focus of my report in that matter was on market
11   efficiency for Groupon, which was a newly public
12   IPO.  So the class period, I believe, started at or
13   right after the IPO.
14       Q. Okay.  Do you recall, did you give any
15   opinion regarding price impact?
16       A. I don't recall.
17       Q. And do you recall whether you gave an
18   opinion as to whether or not the proposed damage
19   methodology complies with Comcast?
20       A. Again, I don't recall.
21       Q. The next one down.
22       A. It would be Kinross Gold, which is two
23   below that.
24       Q. And did you give an opinion on market
25   efficiency?

Page 11

1        A. The exact subject matter of the Kinross
2    Gold, again, I don't recall.  I just haven't
3    reviewed it.
4        Q. The next one down that's a securities case.
5        A. So that would be the Barclays case in the
6    middle of Page 2.
7        Q. The Carpenters v. Barclays?
8        A. That's correct.
9        Q. And do you recall, did you give a market
10   efficiency opinion?
11       A. You know, again, I don't want to speculate.
12   Again, I haven't reviewed Barclays, so I don't
13   recall exactly.  I'm pretty sure it was at the class
14   certification stage, but I haven't reviewed it, so I
15   don't recall exactly what was in the Barclays
16   report.
17       Q. And so you don't recall whether you gave a
18   price impact or a Comcast opinion?
19       A. That's correct.
20       Q. Next one down.
21       A. Goldman Sachs, and in the Goldman Sachs,
22   again, I don't recall whether there was market
23   efficiency arguments.  There was certainly price
24   impact arguments in Goldman Sachs.  And I don't
25   recall if there were Comcast issues.

Page 12

1        Q. And the next one down.
2        A. MiMedx.  I think there were market
3    efficiency arguments.  I don't know about price
4    impact or Comcast.
5        Q. Okay.
6        A. And then Barclays is the same as was above,
7    as was Goldman Sachs.
8            Intercept Pharmaceuticals, which would
9    be the one at the top of Page 3.  Again, I haven't
10   reviewed that recently.  I don't recall.  I'm pretty
11   sure that was at the class certification stage.  I
12   don't recall if it was just market efficiency or if
13   there were other issues as well.
14       Q. You recall there was market efficiency?
15       A. Yeah, I'm pretty sure that in Intercept we
16   discussed the issues in market efficiency.
17           NII Holdings, which is the one right
18   below that -- there were market efficiency arguments
19   in the NII Holdings case.  I don't recall whether or
20   not there were additional class certification issues
21   in NII.
22           St. Jude Medical:  Again, I'm just
23   trying to remember what was in the St. Jude Medical
24   report.  There were certainly market efficiency
25   arguments.  I don't remember if there were Comcast

3 (Pages 9 to 12)

Page 13

1    arguments or price impact arguments as well.
2         In Petrobras, right below that, there
3    were a variety of securities, both the equity and a
4    variety of debt issues.  And certainly for the bonds
5    there was -- the major arguments about the bonds
6    were issues of market efficiency.  In Petrobras as
7    well there was a discussion of what the appropriate
8    test was for market efficiency.  I don't recall if
9    there were price impact or Comcast issues.
10        Then we can go two more down, Montage
11   securities litigation.  I don't know if there
12   were -- I can't remember if there were market
13   efficiency arguments.  I don't remember the exact --
14   the exact arguments made in the Montage report.
15        In sort of the Symbol Technologies --
16   that's the next one here -- again, I just haven't
17   read the Symbol Technologies report, wouldn't
18   remember.
19        For Amgen, it wasn't -- I don't believe
20   there were market efficiency arguments in Amgen.
21   There may have been price impact, but again, I don't
22   recall without having reviewed it, you know, in the
23   last couple of years.
24        Comverge would have included market
25   efficiency.  Oh, no, Comverge is actually an

Page 14

1    appraisal action in Delaware, so that's....
2         So now we're down to Big Lots on Page 4.
3    Big Lots did include Comcast arguments.  I think
4    that was the primary issue in the Big Lots report,
5    were damages.
6         So there's AAC Holdings down about two
7    thirds of the way, Kasper versus AAC Holdings, and
8    there were both price impact and Comcast arguments
9    in the AAC Holdings.
10        In the sort of Facebook securities
11   matter there were issues of price impact, and I
12   don't recall if we talked about Comcast or not in
13   the Facebook matter.
14        In the Green Mountain Coffee I believe
15   that we talked at least in rebuttal about the
16   appropriate way to test market efficiency and
17   Comcast issues.
18        Freddie Mac, to the best of my
19   recollection, we talked about primarily on sort of
20   price impact as well as Comcast issues.
21        So that would be the last of the
22   securities matters.
23        Q.  Now, in this case, in your report in this
24   case, are you providing any opinions on whether or
25   not the market for Fiat Chrysler stock was

Page 15

1    efficient?
2         A.  I haven't been asked to address the issue
3    of market efficiency.
4         Q.  Are you providing any opinions on whether
5    or not the alleged misleading statements had a price
6    impact on Fiat Chrysler stock?
7         A.  I haven't been asked to offer price impact
8    opinions.
9         Q.  And so just for the sake of clarity, you
10   also have not been asked to provide an opinion on
11   whether or not the alleged corrective events had an
12   impact on Fiat Chrysler stock.
13        A.  That's correct.  I haven't been asked to
14   offer an opinion on price impact.
15        Q.  Do you know why you weren't asked to
16   provide an opinion on price impact?
17        MR. LEVY:  Objection.
18        A.  I don't know.  That, I would assume, is a
19   legal matter for counsel, in terms of what they
20   wanted me to address.  But I was asked to look
21   specifically at the sort of price reaction on a set
22   of days at the beginning of my report, both the
23   alleged misstatement and omission days, and there
24   were seven additional days that the complaint talks
25   about that I looked at.  And then I was asked to

Page 16

1    address the issues of whether or not Dr. Nye had --
2    had proposed a methodology to address damages on a
3    classwide basis.
4         And so those were the two things that I
5    was specifically asked to look at, and I wasn't
6    asked to look at price impact, nor do I know why.
7         Q.  So let's take a look at Paragraph 4 of
8    Exhibit 1, your report.  Now, in Paragraph 4 you
9    state, "Counsel asked me to evaluate whether Dr. Nye
10   provides sufficient evidence to demonstrate that he
11   could develop a case-wide damages model consistent
12   with Plaintiffs' theory of liability, and to
13   evaluate Dr. Nye's regression results on certain
14   dates in the Fourth Amended Complaint."  Do you see
15   that?
16        A.  Yes.  I believe you misread "class-wide."
17   You said "case-wide."  But it's "class-wide."  But
18   other than correcting "case" to read "class-wide,"
19   you read that correctly.
20        Q.  And you mentioned earlier, as we were just
21   discussing about what you were and weren't asked to
22   provide opinions on, where you state here that you
23   were asked to evaluate Dr. Nye's regression results
24   on certain dates in the fourth amended complaint,
25   what do you mean by "evaluate"?  What were you asked

4 (Pages 13 to 16)

1    to evaluate?
2        A.  I was asked to look at the alleged
3    misstatement dates and to assess whether or not
4    allegedly misstated information was associated with
5    statistically significant stock price increases and
6    then to look at the seven additional dates which Dr.
7    Nye didn't look at, which are part of the fourth
8    amended complaint about, I believe it's under this
9    section, the truth about Fiat Chrysler begins to be
10   known or something like that.  There's seven
11   additional dates that Dr. Nye did not look at, and I
12   just take from his regression model what are the
13   residual returns on those additional dates.
14       Q.  So starting with the alleged misstatement
15   dates -- and you stated you were asked to assess
16   whether or not the allegedly misstated information
17   was associated with a statistically significant
18   stock price increase.  What did you do to perform
19   your analysis?
20       MR. LEVY:  Objection.
21       A.  So I looked at Dr. Nye's regression results
22   and took the residual returns that Dr. Nye
23   calculates on those days, and that's where I have
24   the discussion of the number of, I think it was like
25   two or three negative and statistically significant

1    dates.  There were a number of other negative but
2    not statistically significant; but it ends up that
3    in those 24 dates something like five of them are
4    positive and statistically significant.  And then I
5    do an analysis of those five days to understand if
6    what is moving the stock price up is the information
7    which is allegedly misstated.
8        Q.  So you don't do your own regression here.
9        A.  I have not done my own regression.
10       MR. LEVY:  Objection.
11       Q.  Or your own event study; correct?
12       MR. LEVY:  Same objection.
13       A.  So there's actually two steps to an event
14   study.  So part of an event study is doing a
15   regression analysis to identify the firm-specific
16   component of a daily stock return.
17       The second component of an event study
18   is looking at particular dates and trying to assess
19   what's moving the stock price on a given set of
20   dates.  And so while I don't do my own regression,
21   the analysis of the particular dates I look at is
22   essentially that step of an event study.
23       Q.  Okay, but an event study entails both
24   portions; correct?  The regression as well as this
25   additional analysis?

1        A.  Yes, it's both steps.  And what I've
2    done -- for my analysis of those dates, I just take
3    the residual returns from Dr. Nye's model.  I'm not
4    saying that it's the model I would choose or that
5    it's an appropriate model -- but take his regression
6    model and look at the residual returns on those
7    particular dates.  And so I just adopt that model of
8    residual returns when I discuss the particular
9    events that I look at.
10       Q.  If you could turn to Paragraph 12, Page 4.
11   And the first sentence states, "Exhibit 1 summarizes
12   Dr. Nye's regression results for Fiat's stock price
13   returns following 24 of the 26 alleged misstatements
14   in the Class Period."  Do you see that?
15       A.  Yes.
16       Q.  So if we look back to Exhibit 1, Exhibit 1
17   just contains information from Dr. Nye's analysis;
18   correct?
19       MR. LEVY:  Objection.
20       A.  So what Exhibit 1 has are the residual
21   return from Dr. Nye's regression results, but this
22   tabulation, and putting them together as these 24
23   alleged misstatement dates, is my own grouping of
24   these dates.
25       So the Columns 4 and 5 come directly

1    from Dr. Nye's regression results, and then the
2    tabulation -- because what I was asked to look at is
3    whether or not there was evidence on these
4    misstatement dates that the information that was
5    allegedly misstated caused a statistically
6    significant stock price increase.
7        And so that's the purpose of this
8    analysis.  And all I've done here, rather than doing
9    my own regression results, is to utilize the
10   residual returns from Dr. Nye's regression.
11       Q.  But am I correct that all the information
12   in Exhibit 1 is information taken from Dr. Nye's
13   report?
14       MR. LEVY:  Objection, asked and
15   answered.
16       A.  So what I've taken is Dr. Nye -- Dr. Nye
17   tabulates the headlines, but I've actually reviewed
18   all of this material, because when we go down to
19   the -- when we go down to the five dates that have
20   statistically significant stock price increases, the
21   question on those five days is whether or not the
22   information which is allegedly misstated is what
23   caused the stock price to go up on those days.
24       And so yes, Dr. Nye in his integrated
25   chronology tabulates headlines on various days, but

Page 41

1  do statistical significance is to think about the
2  distribution of the variable we're testing --
3  residual returns.  We typically assume normality.
4  And then this just tells us where we fall in that
5  distribution of normality.
6       Q.  I'm trying to put this a little bit back
7  into the securities context.  So if you have a P
8  value of 5 percent -- let's take a step back.
9           Is it okay if I say a P value of 5
10  percent, that's equivalent to a P value of .05,
11  terminology-wise?
12       A.  I can go with that.
13       Q.  I want to try to get this right.  So if I
14  have a P value of 5 percent, that tells us that
15  there is a 5 percent chance that a residual return
16  of that size or larger would occur as a result of
17  random volatility.
18       A.  Correct.
19       Q.  And the confidence level in that situation
20  would be 95 percent.
21       A.  That's correct.
22       Q.  And similarly, if we had a P value of 20
23  percent, that tells us that there's a 20 percent
24  chance that a residual return of that size or larger
25  would occur as a result of random volatility.

Page 42

1       A.  That's correct, but we would not call that
2  statistically significant -- that there are
3  standards to scientific inquiry within financial
4  economics in which the professional standard is 95
5  percent.
6       Q.  I'm not getting to statistical significance
7  now.  I know at some point a researcher chooses what
8  level they want their statistical significance to be
9  for a test; correct?
10       A.  Well, it's the profession.  I mean, there's
11  a history behind this.  So as statistics sort of
12  became -- permeated scientific research, the
13  question was what is the level of confidence, what
14  is the P value that we want to associate with a
15  result that we believe -- that we believe, and
16  therefore, in order to say that a given result is
17  statistically significant, what level do we need.
18  And within the scientific professions, within social
19  science, within economics, that level is 95 percent.
20           And so when an economist speaks of
21  statistical significance, it's generally the case
22  that they mean 95 percent.  And as I said, I'm
23  unaware of academic research which is published
24  where things -- where the results are only
25  significant at a 90 percent or a P value of .10.

Page 43

1           So that's what I'm trying to say.  It's
2  all about what does our profession say we can call
3  statistically significant.
4       Q.  So, you know, we'll get into statistical
5  significance in a little bit.  But my question
6  didn't have anything to do with statistical
7  significance.  So I'll go back.
8           We had said that a P value of 5 percent
9  tells you that there is a 5 percent chance that a
10  residual return of that size or larger would occur
11  as a result of random volatility; correct?
12       A.  Yes.
13       Q.  The confidence level in that situation
14  would be 95 percent.
15       A.  Correct.
16       Q.  And a P value of 20 percent would tell us
17  that there's only a 20 percent chance that a
18  residual return of that size or larger would occur
19  simply as a result of random volatility; correct?
20       A.  That's correct.
21       Q.  And the confidence level in that situation
22  would be 80 percent.
23       A.  Correct.
24       Q.  Now, as to statistical significance, in
25  academic research what's your understanding of what

Page 44

1  statistical significance means?  What's the
2  standard?  And I'm not referring to a percentage.
3  What does it mean for something to be statistically
4  significant?
5       A.  If we want to be metaphysical for a second,
6  if you're an empirical financial economist, you're
7  looking to find results that the profession has a
8  comfort level in believing, and so what's the level
9  of analysis in terms of statistical significance, in
10  terms of a confidence level that provides us a
11  comfort that the evidence that we're bringing
12  forward is, quote, "real."
13           And the statistical literature going all
14  the way back to the earlier part of the 20th century
15  had a debate about this level.  So there was a
16  metaphysical debate about, in order to give us
17  confidence that the results we're finding are
18  actually real, what level of confidence do we need
19  to be able to believe those results?  And that's how
20  we got to this -- the sort of threshold in the
21  literature being 95 percent, that this 95 percent is
22  what's necessary as a profession to believe the
23  results that we're actually finding.
24       Q.  Now, we were talking a moment ago about the
25  P values.  Now, a P value, it doesn't give -- it

11  (Pages 41 to 44)

1  doesn't give the chance or the probability that the
2  null hypothesis is true; correct?
3       A.  That's correct.  The way to think about a P
4  value:  All a P value is is, again, back to sort of
5  the distribution of a variable.  And a P value of
6  .05 says you're at that sort of -- of .05, only 5
7  percent of the observations will have a value of
8  that variable above that cutoff.  So that's what,
9  essentially what a P value is telling you, which is
10  if we have a bell-shaped distribution, if we're
11  doing a two-sided test, that sort of says you have
12  2 1/2 percent in each of those tails, which is, you
13  know, above that threshold -- only 2 1/2 percent of
14  the observations above that threshold in each
15  direction are above that cutoff.
16       Q.  At the P value now let's introduce the idea
17  of statistical significance, not just a P value.  So
18  if we say statistical significance to a 95 percent
19  confidence level, if you get a return -- a residual
20  return and the P value is higher than 5 percent, so
21  the confidence -- sorry, let's strike that, start
22  over.
23            If you do your analysis and you find the
24  residual return is lower than a 5 percent P value,
25  so the confidence level is higher than 95 percent,

1  in that situation the researcher might then say, "We
2  can reject the null hypothesis."  Correct?
3       A.  That's correct, because the typical -- the
4  level -- I mean, this was the whole metaphysical
5  discussion we had just a second ago, which is what
6  level do we feel comfortable saying that our results
7  are real.  And that's where we come to this sort of
8  P value of .05 or a confidence level of 95 percent
9  in order for us to say it's statistically
10  significant.
11       Q.  So in the securities case a residual
12  movement with a P value lower than 5 percent, so a
13  confidence value of higher than 95 percent, the
14  researcher might then conclude he can reject the
15  null hypothesis and say that this residual return is
16  a result of the event in question.
17       A.  That's correct.
18       Q.  But conversely, if you do your analysis and
19  you get a residual return where the P value is
20  higher than 5 percent, so the confidence level is
21  below 95 percent, one then cannot conclude as a
22  result of that that the null hypothesis is true,
23  meaning that the event in question did not have a
24  price impact.
25            MR. LEVY:  Objection.

1       A.  So within the academic literature what we
2  would say is we cannot reject the null hypothesis.
3  So in the former case that you were talking about in
4  which the P value is less than .05, we would reject
5  the null hypothesis.  So we would reject the null
6  hypothesis that the stock price movement was not
7  different from zero.
8            If the P value is higher than .05, then
9  the way we would say it in statistical terms is that
10  we cannot reject the null hypothesis.
11       Q.  So in that situation it would be
12  inappropriate for the researcher to accept the null
13  hypothesis.
14       A.  That's just not --
15            MR. LEVY:  Objection.
16       A.  That's not the way we do statistical tests.
17  We set up a null hypothesis, and we either accept
18  the null hypothesis or we cannot reject the null
19  hypothesis.
20       Q.  So in the instance -- so that's why I'm
21  asking:  So in the instance where somebody did an
22  event study looking at residual returns and the P
23  value is larger than 5 percent -- let's say it's 15
24  percent -- and so the confidence level is 85
25  percent, in that situation it would be improper for

1  the researcher to then conclude "We can accept the
2  null hypothesis."
3            MR. LEVY:  Objection.
4       A.  Let's be precise.  What you would say is
5  that that stock price movement was not statistically
6  significantly different from zero, or we cannot
7  reject the null hypothesis that the stock price
8  movement is, you know, zero.
9       Q.  So if you're reviewing a paper with those
10  specifications and their conclusion was, "Therefore,
11  as a result of a residual movement of 85 percent, we
12  can accept the null hypothesis and that this event
13  did not impact the price"; that would be an
14  inappropriate conclusion?
15       A.  No.  When you read academic papers -- so
16  the statistical inference itself is exactly what we
17  said, which is that we cannot reject the null
18  hypothesis.
19            But when you discuss your results and in
20  discussing the results it would certainly be the
21  case that a researcher would say there is no effect
22  or we don't identify any effect:  I'm totally
23  comfortable with that because of the way you've
24  designed the null hypothesis.  So if you don't
25  reject the null hypothesis, then essentially you're

Page 49

1    saying the null hypothesis is true from a
2    statistical perspective.  You're not rejecting it.
3    So your results -- and in the discussion of the
4    results you would say we find no evidence of an
5    effect or there is no effect.  People would write
6    that in an academic paper.
7        Q.  So it's your understanding as an expert
8    that if one -- if someone says you don't reject the
9    null hypothesis, then you're saying the null
10   hypothesis is true?
11       MR. LEVY:  Objection.
12       A.  No.  What I'm saying is, in terms of the
13   way a financial economist discusses it when they
14   write their paper, you're very precise in the way
15   you discuss it, and you say we don't reject the null
16   hypothesis.  But when you're discussing the sort of
17   real-world implications of that, it is the case that
18   somebody would say we identify no discernible effect
19   of X and therefore, you know, diversity doesn't
20   affect performance or something doesn't affect
21   performance.  People would write that in their
22   papers.
23       Q.  Is that appropriate?  Is that an
24   appropriate conclusion to conclude that therefore
25   the null hypothesis is true?

Page 50

1        MR. LEVY:  Let Dr. Gompers finish his
2    answer.
3        A.  It is certainly appropriate to write it in
4    that way as long as you've been clear as to what the
5    results of your null hypothesis is.
6        Q.  Let's try it another way.  What's a
7    situation -- we can use an event study, a
8    statistical analysis, or securities cases.  Give me
9    a situation in which someone could set up an event
10   study, looking at residual returns and confidence
11   levels, such that they could affirmatively conclude
12   that the null hypothesis is true?
13       MR. LEVY:  Objection, calls for
14   speculation.
15       A.  Remember what you're trying to do here in
16   an event study for securities litigation, is
17   essentially you're trying to do a number of things.
18   One of the things you're trying to do is to assess
19   whether or not the information that you believe was
20   misstated, was fraudulently conveyed to the market,
21   whether or not you can be sure that that information
22   adversely affected investors.
23       In order to conclude that, you set up
24   your null hypothesis that the price reaction -- was
25   the price reaction different from zero.  And so in

Page 51

1    this particular context, in order to be confident
2    that we're identifying something which was caused by
3    the fraudulent information, we're requiring
4    statistical significance in the context of was it
5    different from zero.
6        And therefore, in this particular
7    context, if it's not statistically different -- if
8    it's not statistically significantly different from
9    zero, then you could not assign causality to the
10   misstated or omitted information.
11       And that's the way we design the test.
12   We design a null hypothesis to answer a particular
13   question that we're looking at.
14       Q.  So an event study can't answer the question
15   affirmatively whether the event had no impact on the
16   price.
17       A.  The way we discuss it in terms of
18   statistics, you would say that "I can't reject the
19   null hypothesis."  And certainly in the academic
20   literature, when you discuss the results, people
21   will write that "We do not identify effect, and
22   therefore we don't -- there is no effect."  They
23   will write the papers in that way.
24       But in a statistical sense, the way we
25   approach a particular matter is really important in

Page 52

1    terms of the way we design the null hypothesis.  And
2    in this particular case, if we're talking about
3    specifically for a securities litigation matter,
4    what are we trying to test?  We're trying to test
5    whether or not fraudulently conveyed information
6    harmed investors, and therefore we're testing
7    whether or not we can say that the price movement is
8    different from zero.
9        And therefore, if you cannot reject the
10   null hypothesis, you can't ascribe the price
11   movement to the misstated information.
12       Q.  If you were going to try to prove no price
13   impact, affirmatively try to prove no price impact,
14   how would you set up that study?
15       MR. LEVY:  Objection.
16       A.  It would depend upon the circumstances.
17   I've done price impact analysis in a variety of
18   ways.  And so it would depend upon the facts of the
19   particular matter at hand.
20       Q.  What would the null -- what would the
21   hypothesis be?  Would you still have a null
22   hypothesis or some type of hypothesis?
23       MR. LEVY:  Objection.
24       A.  Again, it would depend upon the facts of
25   the particular matter.

13 (Pages 49 to 52)

Page 77

1    only event study analysis, I would conclude that in
2    both of those circumstances the stock price movement
3    is not statistically significant.
4        Q. And you're not capable of making a
5    determination on your expertise as to whether or not
6    either of those pieces of information -- whether
7    it's more likely or not that it had moved the stock
8    price?
9        MR. LEVY: Objection.
10       A. I'm going to try to be as clear as
11   possible. If the evidence that I'm bringing to bear
12   is an event study analysis, then in an event study
13   analysis I would treat those two days exactly the
14   same and would conclude that they're not
15   statistically significant.
16       Q. So if you were charged, though, with
17   determining whether it was more likely than not,
18   would you do something other than an events study
19   analysis?
20       A. It would depend upon the information
21   available and the circumstances. So there may be
22   circumstances that I would look at additional
23   information, but what I'm telling you is that from
24   an event study standpoint those two days are treated
25   exactly the same.

Page 78

1        Q. Give me some examples of something you
2    might do if you were charged with determining
3    whether or not it was more likely than not that
4    information moved the stock price.
5        MR. LEVY: Objection.
6        A. I'll give the exact same example of a
7    pharmaceutical company, which is, given a piece of
8    information, knowing that the value changes with
9    changes in future cash flows or future systematic
10   risk, can I glean market evidence that those things
11   changed in response to the piece of information that
12   I'm examining?
13       Q. If there's a residual stock price movement
14   and the confidence level is, say, 92 percent -- you
15   do one analysis and the confidence level is 92
16   percent, and take another scenario, the same
17   information and everything, but you did the analysis
18   and the confidence level is 85 percent. Is it more
19   likely in the first scenario that the information
20   moved the stock price? We're talking probabilities;
21   correct?
22       A. But remember, what we're talking about is
23   the P value looks at sort of Type 1 error or the
24   probability at which we can reject the null
25   hypothesis. And so in one case it's .15 and in the

Page 79

1    other case it's .08. Those are the P values related
2    to that distribution and in a statistical test can
3    we reject the null hypothesis? And those just tell
4    you the level at which we can reject the null
5    hypothesis.
6        Q. I understand all that. And to me what that
7    sounds like is that between those two scenarios --
8    the 92 percent confidence level and an 85 percent
9    confidence level -- that you have greater confidence
10   that the information moved the stock price under the
11   92 percent confidence level than you do under an 85
12   percent confidence level. Is that accurate?
13       A. The P value is lower, meaning that you're
14   closer to rejecting the null hypothesis, but you
15   don't reject the null hypothesis. You would not say
16   that either day is statistically significant. The P
17   value speaks for itself. The P value relates to the
18   probability that you're going to reject the null
19   hypothesis. In the one case it's .08. In the other
20   case it's .15.
21       Q. So even if something isn't above the 95
22   percent confidence level -- say it's 94 percent
23   confidence level -- that's still relevant
24   information to assess and to consider.
25       A. I don't know what you mean by relevant for

Page 80

1    whom. The question is the standards of financial
2    economics in terms of the way we think about
3    research which is of the level that is peer-
4    reviewed.
5            We would not call that statistically
6    significant. Whether or not there's other
7    circumstances in which that conclusion is useful and
8    informative, it would depend upon the context, and I
9    can't opine on that. I'm opining as a financial
10   economist.
11           And what I can tell you is if it's
12   .08 -- a P value of .08 or a P value of .15, in
13   neither instance would you call that statistically
14   significant in the financial economics peer-reviewed
15   literature.
16       Q. But nothing magical happens at 95 percent
17   confidence level. It's not like zero degrees water
18   freezing or, you know, something like that?
19       MR. LEVY: Objection.
20       A. It's a standard within the profession, and
21   the P values speak for themselves.
22       Q. So the P values speak for themselves.
23   There's a, as you put it, a standard in the industry
24   or in academics that you say is at 95 percent
25   confidence level. But other than, I guess, the

20  (Pages 77 to 80)

Page 81

1    mathematical or linear difference between 95 percent
2    confidence and 94.999 percent confidence, there's no
3    other distinction, other than just the simple
4    mathematics of probabilities?
5          MR. LEVY:  Objection.
6    A.  So P values run on a continuum.  They're a
7    continuous variable.  There are standards by which
8    the profession operates and when one offers
9    conclusions based on large-sample statistical
10   analyses.  In that case we say something is
11   statistically significant when it has a P value of
12   .05 or smaller.
13         But it is factually correct that the P
14   value is a continuous variable that runs all the way
15   from .00000 all the way to 1.00.
16   Q.  Looking at Exhibit 1, your report, on Page
17   14 -- and we may have discussed this a tiny bit --
18   you state, "The 95 percent confidence level is
19   typically used to perform this statistical test."
20   And then you say, "For example, the Reference Manual
21   on Scientific Evidence indicates that 'in practice,
22   statistical analysts typically use levels of 5
23   percent or 1 percent.  The 5 percent level is the
24   most common in social science, and an analyst who
25   speaks of significant results without specifying the

Page 82

1    threshold probably is using this figure.'"  Do you
2    see that?
3    A.  Yes.
4    Q.  And you reference the Manual on Scientific
5    Evidence.
6    A.  Which is what we looked at earlier.
7    Q.  I believe that's Exhibit 3.
8    A.  Yes.
9    Q.  And can you turn to Page 245 in Exhibit 3,
10   the reference manual.  At the bottom of Page 245, in
11   the second sentence of the bottom paragraph, it
12   states, quote, "The 95 percent confidence level is
13   the most popular, but some authors use 99 percent,
14   and 90 percent is seen on occasion," end quote.  Do
15   you see that?
16   A.  Yes.
17   Q.  Do you agree with it?
18   A.  I agree in the context that I sometimes see
19   90 percent, but I've not seen financial economics
20   peer-reviewed papers published when the significant
21   results that you're looking at are only significant
22   at 90 percent.  I don't know of a single paper
23   that's been published where all of the statistical
24   tests are at the 90 percent level.
25         So I think this is what we had talked

Page 83

1    about earlier, where it's often the case where you
2    might have one star, two stars, and three stars for
3    90 percent, 95 percent, and 99 percent.  The
4    question is what is the level that is typical --
5    what is the level that in fact as an editor or
6    referee that I would require the results be
7    significant at, and that would be the 95 percent
8    level.
9    Q.  And the 95 percent confidence level, it
10   doesn't line up with any particular burden of proof
11   in a litigation.
12         MR. LEVY:  Objection, calls for a legal
13   conclusion.
14   A.  Yeah, I think I was just going -- I don't
15   know as a matter of law, and I'm not offered as a
16   legal expert, I'm offered as a financial economist.
17   And so I'm employing the standards of my profession.
18   And when I do my own work or if I'm reviewing
19   another financial economist's work, I evaluate that
20   in the context of the profession, not the law.
21   Q.  But in your profession -- and I understand
22   you're not here to give any kind of legal opinion.
23   But in your profession, in your knowledge of, you
24   know, where the 95 percent confidence level came
25   from and why it's used, you're not aware of it being

Page 84

1    used because it meets any type of -- it coincides
2    with any kind of legal burden?
3          MR. LEVY:  Same objection.
4    A.  Again, I have no way to offer opinion one
5    way or the other on sort of the legal standard
6    for --
7    Q.  But you're not aware of anything in the
8    literature in statistics, in your area of expertise,
9    that ties these two things together, that says,
10   "This is why we use a 95 percent confidence level"?
11         MR. LEVY:  Same objection.
12   A.  I've seen nothing that speaks to that
13   issue.
14   Q.  And you were talking about the 95 percent
15   level, that you said that usually that's the typical
16   confidence level used in peer-reviewed research.  Is
17   a 95 percent confidence -- is it your opinion that a
18   95 percent confidence level equates to it's more
19   likely than not?
20         MR. LEVY:  Objection.
21   A.  It's interesting that -- and I can't
22   remember what statistician talked about this.  But
23   there was discussion in the early part of the 20th
24   century, and I actually at one point did some
25   digging to try to see this, and I just can't

21 (Pages 81 to 84)

Page 85

1  remember the statistician's name.
2        But it gets back to the sort of 1 in 20
3  that we talked about earlier being sort of a
4  reasonable basis to make and offer kind of
5  conclusions about causality.
6        The standards have been set in the
7  profession primarily since the early 20th century,
8  and that is the standards which are employed.
9    Q.  You're not talking about Ronald Fisher, are
10 you?
11   A.  I don't think it was Ronald Fisher, but I'd
12 have to go back and check.  But there's sort of --
13 at some point I had read a discussion by early
14 statisticians about how the 95 percent confidence
15 interval sort of became the standard.
16   Q.  But you're not aware that it became the
17 standard because that's the level where someone can
18 say, "It's more likely than not"?
19        MR. LEVY:  Objection.
20   A.  As I said, it sort of developed based on
21 early discussions amongst statisticians in the first
22 part of the 20th century, and it's just what's
23 accepted as a matter of sort of the profession.
24   Q.  Is it the result where researchers
25 generally conclude that these results are pretty

Page 86

1  rare?
2        MR. LEVY:  Objection.
3    A.  That's not the way it's typically framed.
4  It's whether or not you can reasonably conclude that
5  the effect you're finding is real.  So think about
6  trying to analyze a particular relationship and the
7  question is is the relationship between these two
8  things real or not.
9        And the way I think about it is that
10 when something is statistically significant at, you
11 know, a P value of .05, I can be reasonably
12 confident that that's something that's real.
13   Q.  So if someone is trying -- a researcher is
14 trying to establish some kind of scientific fact,
15 the 95 percent confidence level is the point where
16 they can say, "This experiment establishes that
17 fact."
18   A.  Correct.
19   Q.  If you were charged with determining
20 statistical significance to equate to different
21 levels of burden of proof -- let's take a step back,
22 and I'm not going to ask you for a legal opinion;
23 don't worry.
24        In the law there's generally three
25 popular levels of burdens of proof, which you may be

Page 87

1  aware of even though you're not a legal expert.
2  There's the beyond all reasonable doubt in a
3  criminal case, if you're going to throw someone in
4  jail.  There's a little bit lower standard that you
5  see in civil cases, by clear and convincing
6  evidence.  And then there's another standard, mostly
7  in civil litigation, that's by the preponderance of
8  the evidence, sort of a more-likely-than-not-ish
9  standard.  Have you heard very generally speaking of
10 those three levels?
11   A.  So having watched enough, you know, Law and
12 Order, I am certainly aware of those terms.  What
13 they mean and how they might in some legal
14 interpretation translate into statistics, I have no
15 way of knowing and no way of translating them.
16        So I'm certainly aware of those terms,
17 but I couldn't offer any opinion about what that
18 actually would mean in terms of statistical tests.
19   Q.  And I'm not going to ask you to ascribe a
20 confidence level to any of those.  What I am
21 wondering is, if it makes sense -- and if it
22 doesn't, let me know -- if you were to ascribe
23 statistical -- start over.  If you were to ascribe
24 confidence levels to those burdens of proof, would
25 it make sense to ascribe a higher confidence level

Page 88

1  for determining beyond all reasonable doubt than to
2  clear and convincing evidence and preponderance of
3  the evidence?
4        MR. LEVY:  Objection.
5    Q.  Would the order still exist?
6    A.  I understand that there seems to be an
7  order, but I can't offer an opinion on that.  I'm a
8  financial economist, and like I said, I can offer an
9  opinion based on having watched law and Order, but
10 I'm not sure that I'm the type of person who should
11 be offering the Court an opinion about how that
12 should translate into what I do as a financial
13 economist.
14        So I understand that something is meant
15 about sort of relative order, but how that
16 translates, I just can't offer an opinion.
17   Q.  So you don't have -- you're not able to say
18 whether or not it would make sense, as a
19 statistician, to require a higher level of
20 confidence for a beyond-all-reasonable-doubt
21 standard versus a more-likely-than-not standard.
22 You can't say whether or not you'd use the same
23 confidence level or a different confidence level.
24        MR. LEVY:  Same objection.
25   A.  So I understand that there's some implied

22  (Pages 85 to 88)

1  ranking to those.  How those might translate into
2  what a Court would interpret from an evidentiary
3  perspective I can't say.  It certainly would not
4  necessarily change my analysis in terms of what I
5  say as a financial economist, because that's rooted
6  in my profession.  And I think it's up to the judges
7  and juries to determine how that translates based on
8  the evidence that's provided to them.
9         And so certainly I understand a
10  connotation of some ranking, but beyond that, I just
11  can't say anything else.
12     Q.  So if somebody asked you to prove -- to do
13  an analysis and they say, "Dr. Gompers, we need to
14  be certain" -- forget about litigation for now.
15  Someone comes to you and says, "We want you to do an
16  analysis using an event study, and we need to be
17  absolutely certain.  To publish these results, there
18  can be no doubt, no doubt, it's too important."
19  Would you say, "I recommend using the same
20  confidence level cutoff" as if they said, "We want
21  you to do this analysis, and we just want to be, you
22  know, more likely than not.  It doesn't have to be
23  perfect.  We don't have to be absolutely certain.
24  We just want to be confident that we're going in the
25  right direction.  We have to choose one or the

1  other.  We can't sit on the sidelines here.  We have
2  to go one way or the other."  Would you choose the
3  same confidence level for those two analyses?
4         MR. LEVY:  Objection.
5     A.  So if I were planning to publish a paper, I
6  would use the same confidence level.  In either of
7  those circumstances I would let the data speak and
8  tell them what the data said, but I would still use
9  the same level of statistical significance.  I would
10  say, "These are statistically significant, you know,
11  have a P value of .05 or statistically significant
12  and have a P value of .02" or whatever it is, I
13  would still use the same language and let the person
14  on the other side decide.
15        But if I'm publishing, it's the same
16  sets of standards.
17     Q.  So you'd run your analysis, report the P
18  values and the confidence level, to say, "Hey, you
19  guys have your criteria.  It's in your hands now.
20  I'm just telling you what the results are."
21     A.  And I would only call something
22  statistically significant if it was below a P value
23  of .05.
24     Q.  Okay.
25        MR. WERNKE:  It might make sense to take

1  a short break.  I think we've been going about an
2  hour.
3         THE VIDEOGRAPHER:  The time is 2:28.  We
4  are off the record.
5         (Recess taken.)
6         THE VIDEOGRAPHER:  The time is 2:41.  We
7  are back on the record.
8     Q.  Are you familiar with the phrase "price
9  maintenance theory"?
10    A.  Yes.
11    Q.  And what's your understanding of what a
12  price maintenance theory is?
13    A.  So as I understand it from a matter of
14  financial economics -- not the law, theory of the
15  case -- it's my understanding that a price
16  maintenance theory is one in which the plaintiffs
17  allege that the misstated or omitted information --
18  put it another way -- that had the company said the
19  truth, the stock price would have fallen but by
20  misstating or omitting the information the stock
21  price stayed at the level that it was, essentially.
22    Q.  So the allegation is that there's inflation
23  in the stock price, inflation is introduced, but not
24  as a result of a price increase at the point in time
25  of the statement, the alleged false statement.

1         MR. LEVY:  Objection.
2     A.  It's my understanding that sort of a plain
3  vanilla maintenance case would be that the but-for
4  disclosure would have caused the stock price to
5  decline but because the but-for disclosure wasn't
6  made, the stock price stayed where it was.
7     Q.  Now, what's your understanding of
8  plaintiffs' theory of liability in this case?
9     A.  So -- you're asking me to render a legal
10  opinion.  Certainly Dr. Nye stated in his testimony
11  that he believed that this was a price maintenance
12  case, and I believe that I have a paragraph in my
13  report where I talk about the testimony that Dr.
14  Nye -- that Dr. Nye made at his deposition about
15  just that.
16        Again, I'm not a lawyer, so I can't
17  opine.  But as I read the complaint, I can't tell
18  from the complaint as a financial economist whether
19  or not the theory of liability is price maintenance
20  or not.  I understand that's what Dr. Nye says, but
21  again, I don't have an opinion one way or the other.
22    Q.  But is your understanding -- maybe it's a
23  little bit different question.  Is it your
24  understanding that plaintiffs allege that Fiat
25  Chrysler's stock price was inflated during the class

23  (Pages 89 to 92)

1    period as a result of misstatements concerning their
2    compliance with certain regulations and laws?
3              MR. LEVY:  Objection, calls for a legal
4    conclusion.
5         A.  So it's my understanding that the claims
6    relate to issues around notifications of safety and
7    recall issues as well as allegations around
8    emissions testing and whether or not there was
9    software that allowed Fiat Chrysler to evade or
10   cheat on its emissions tests.
11             So that's my understanding of sort of
12   the broad allegations in the case.  But what I'm
13   saying is, I'm not a lawyer, but as I read the
14   complaint, I can't tell whether or not the
15   allegations are one of price maintenance or
16   inflation caused by what they were saying.  I do
17   understand from reading Dr. Nye's testimony that
18   it's his view that the plaintiff theory is one of
19   price maintenance.
20        Q.  Now, under a price maintenance theory,
21   should one expect significant price changes on dates
22   of misrepresentations concerning the omitted
23   material facts or statements that confirm prior
24   market expectations?
25        A.  So if the information that either comes --

1    so if no information comes to the market, then
2    expectations shouldn't change, and therefore there
3    should be no stock price change.
4              If the information which comes to the
5    market is consistent with prior expectations, so
6    that expectations don't change, then once again we
7    wouldn't expect the stock price to change in either
8    of those two circumstances.
9         Q.  And under a price maintenance theory,
10   inflation can still be introduced into the stock
11   price during one of those scenarios, either where no
12   statement is made or a statement confirms prior
13   expectations.
14        A.  That's correct.  If the expert can show
15   that the information which was known or knowable to
16   the defendant, if it were disclosed in some but-for
17   disclosure, would have caused the stock price to
18   decline in response to that but-for disclosure.  And
19   so that's -- so what you would need to show is that
20   the information which was omitted or misstated, once
21   that was corrected in a but-for disclosure, the
22   price should have fallen in response to that
23   information.
24        Q.  And when would the first day be that
25   inflation be introduced into a stock price in a

1    price maintenance theory?
2              MR. LEVY:  Objection, foundation.
3         A.  Now you're sort of touching on some of the
4    issues related to some of my opinions related to the
5    damages question at the end of my report.
6              So when information -- you have to
7    assess when particular pieces of information are
8    either misstated or omitted.  When did the company
9    know or reasonably should have known this
10   information?  So we look on a particular date, and
11   what is it that was known or knowable on that date
12   related to the allegations about misstatements and
13   omissions; and then we need to assess, if that
14   information was part of a but-for disclosure on that
15   date, how would that have affected the stock price?
16             And so it relates to when a piece of
17   information was known or knowable.
18        Q.  So in the case plaintiffs are alleging that
19   Fiat Chrysler made misrepresentations concerning,
20   you know, omitted material facts at the beginning of
21   the class period, then the price inflation would
22   begin on the first day of the class period under
23   that theory.
24        A.  Well, not necessarily.  And so one of the
25   things that I've discussed in my report is that

1    specific pieces of what is allegedly omitted or
2    misstated only became known to Fiat Chrysler after
3    the beginning of the class period.  So that
4    information -- let's assume for a second that that
5    information was related to inflation.  That
6    inflation could not have come into the stock price
7    because that piece of information was not known or
8    knowable at the beginning of the class period.
9              So it depends upon when that information
10   is available to the company.
11        Q.  But if there is information that was
12   available to the company on the first day of the
13   class period during when the alleged
14   misrepresentation was made, then that would be the
15   day that that -- at least that portion of inflation
16   would come into the stock price.
17        A.  Let me try to be precise.  On a given day
18   in which a piece of information became known or was
19   on that particular date knowable -- let's say
20   February 17th, 2010 -- if something became
21   knowable -- was known or was knowable to the company
22   for the first time on that date and that information
23   you can show was associated with a particular value
24   implication, then it's my understanding that that is
25   the date on which inflation enters into the

1    company's price.
2        Q.  And it's your understanding that in this
3    case, like any securities case, that ultimately it's
4    going to be up to the judge or the jury to determine
5    when the first false statement was made?
6            MR. LEVY:  Objection.
7        A.  It is certainly up to the judge and jury to
8    decide as a matter of law.  A financial economist
9    can certainly provide analysis and opinion which are
10   helpful to the judge and jury to determine matters
11   of law.  And in particular as it would relate to
12   something like when inflation entered into a stock
13   price, I think it's useful for a financial economist
14   to discuss that information which was not known or
15   knowable at the beginning of the class period cannot
16   be associated with inflation at the beginning of the
17   class period.
18       Q.  In Exhibit 1, your report, on Paragraph 25,
19   you have a Footnote 48, and you refer to the case
20   Comcast Corp. v. Behrend.
21       A.  Yes.
22       Q.  So why is it you cite to Comcast here?
23       A.  So it's my understanding, and has been
24   related to me by a variety of attorneys, that this
25   forms a basis for why it's necessary for plaintiffs

1    to establish that they can develop a damages model
2    at the class certification stage that is capable of
3    measuring damages on a classwide basis.
4            And so I'm not offering a legal opinion
5    on Comcast, and I'm not offering a legal opinion
6    about what Comcast requires.  But it has been
7    conveyed to me that Comcast sets that out as a
8    standard of class certification for plaintiffs.
9        Q.  And have you read the Comcast case?
10       A.  I have at different points in time.  Again,
11   I'm not -- I'm not an attorney or judge, so I can't
12   offer a legal opinion.  But I have on a number of
13   occasions read the Comcast decision.
14       Q.  And you understand that the Comcast
15   decision involves multiple theories of liability?
16   Do you recall that or no?
17           MR. LEVY:  Objection.
18       A.  You'd have to put it back in front of me.
19   I've certainly read it.  I didn't go to law school,
20   so I'm not going to, you know -- I can't offer any
21   sort of opinion on it.  But as I said, I'm very
22   explicit about the way I write Paragraph 25, which
23   is that this is my understanding, this is what's
24   been related to me by attorneys about what Comcast
25   requires at this point.  I'm offering no opinion

1    about what Comcast requires.
2        Q.  I understand.  I understand you're not
3    here -- you're not offering any opinion.  But in
4    your opinion here, your report, there are many times
5    where you talk about showing the plaintiffs' damages
6    model can be consistent with their, quote, "theory
7    of liability," end quote.  And I was just
8    wondering -- and since this opinion is based on your
9    understanding as relayed to you by attorneys of
10   what's required by Comcast, I was just wondering if
11   you recall what Comcast generally had to do with
12   about different theories of liability.
13           MR. LEVY:  Same objection.
14       A.  As I sit here, I can't articulate whether
15   or not that was part of the Comcast decision.
16       Q.  Fair enough.  Are you familiar with the
17   decisions in the Second Circuit, Roach v. T.L.
18   Cannon Corp.?  Does that ring a bell at all,
19   interpreting Comcast?
20       A.  I have not read that, no.
21       Q.  Are you familiar with the case Waggoner v.
22   Barclays by the Second Circuit that deals with in
23   part the requirements under Comcast?  Does that ring
24   a bell at all?
25       A.  No.  I generally don't take it upon myself

1    to read legal opinions.  Because I was asked --
2    because it was related to me that this was a
3    standard, I've certainly read Comcast but don't
4    offer this as a general interpretation of what
5    Comcast actually requires.
6        Q.  In Paragraph 38 of your report on Page 16
7    you state, "Dr. Nye claims that 'although damages,
8    if any, for each individual Class member may vary,
9    the method of calculating damages is common to the
10   Class.'"  Do you see that?
11       A.  Yes.
12       Q.  Do you take issue with that?  Do you
13   provide any opinion or criticize that claim?
14           MR. LEVY:  Objection, vague.
15       A.  So this is not evidence that damages can be
16   calculated in a manner which is consistent with
17   theory of liability and the alleged facts, for the
18   following reason:  that if I said that damages were
19   $50 a share, well, that would be a method that was
20   common to all class members but wouldn't be a
21   damages methodology which was consistent with the
22   theory of liability and the alleged facts of the
23   case.
24           So just because a damages approach is
25   common to all the class members doesn't mean that it

1    is -- it is sort of reasonably based on the
2    principles of financial economics in a way that's
3    consistent with plaintiffs' theory of liability and
4    the alleged facts.
5          And so I would disagree that just
6    because a method is common for all class members
7    that it meets the standard of showing that damages
8    can be calculated.
9    Q.   Okay.  I understand what you're saying
10   there.  But you don't take an issue with this
11   statement.  You're saying that it's not enough for
12   something else, but you don't take issue with this
13   particular statement.  This statement isn't
14   incorrect.
15         MR. LEVY:  Objection.
16   A.   So in order to have a damages model, this
17   is necessary but not sufficient.
18   Q.   And you agree that the damages model
19   proposed by Dr. Nye or discussed by Dr. Nye in his
20   report, that for each individual class member the
21   method for calculating damages is common to the
22   class?
23   A.   Again, that would be a necessary but not
24   sufficient condition to demonstrate that you can
25   reasonably estimate damages on a classwide basis,

1    consistent with the plaintiffs' theory of liability
2    and the alleged facts.  That's the critical point
3    that Dr. Nye ignores when he states this particular
4    sentence.
5    Q.   Paragraph 45, you state, quote, "From an
6    economic perspective, it is necessary to develop and
7    analyze a 'but-for world' in order to demonstrate
8    that a constant dollar inflation band model is
9    applicable to a specific theory of liability and set
10   of facts," end quote.  Do you see that?
11   A.   Yes.
12   Q.   Do you recall, are there other cases in
13   which you've provided a report or testimony of some
14   type in a securities case where you provided a
15   similar opinion in that a but-for world and but-for
16   disclosures need to be determined at the class
17   certification stage?
18   A.   I think you slightly misstated exactly what
19   I'm saying here.  So what you need to show is that
20   the facts of the case and the theory of liability
21   are such that the but-for world meets the particular
22   criteria that I talk about in Paragraph 47, not that
23   you need to articulate each and every but-for
24   disclosure, because if you do that and estimate the
25   price impact, you've actually generated the damages

1    model.
2          So I don't think that it's necessary to
3    actually create the damages model itself.  But as I
4    talk about in the section here, there are specifics
5    to -- when you tie the theory of liability, which
6    you mentioned earlier, which was misstatements and
7    omissions as required, to compliance with safety and
8    recall requirements, as well as violations or the
9    utilization of software to cheat on emissions
10   testing.
11         What is necessary is to show that the
12   facts as alleged by the plaintiffs are such that
13   there's a damages approach that can deal with those
14   issues -- not that you have to calculate it, but
15   there are specifics here.
16         For example, the fact that on the recall
17   front many of the recalls only start after the
18   beginning of the class period.  It's unreasonable to
19   think that Fiat Chrysler at the beginning of the
20   class period could have disclosed "We are going to
21   see that we have issues that we need to do a recall
22   18 months from now."  Similarly, there are issues
23   related to regulatory action, and it would be
24   impossible for Fiat Chrysler at the beginning of the
25   class period to say, "On this particular date the

1    DOJ is going to file a civil action on behalf of the
2    EPA" or that "NHTSA is going to have some action
3    against us."  The most they could do would be to
4    talk about the possibility of those events.
5          So there are specifics to the facts of
6    the case which need to be dealt with which would
7    then say this is the method I would use given the
8    way the facts line up -- not that you have to
9    articulate what the but-for disclosures actually
10   are.
11   Q.   So you don't need to determine the
12   information that should have been disclosed or when
13   it should have been disclosed?
14         MR. LEVY:  Objection, mischaracterizes
15   prior testimony.
16   A.   Well, certainly you need to know when
17   allegedly misstated or omitted information was
18   available to the company.  Certainly you need to
19   articulate what could have been revealed to correct
20   the misinformation or the disclosure.  And certainly
21   you need to articulate a way that you can establish
22   what the price movement in response to that
23   corrective disclosure or that but-for disclosure
24   would have been, but not that you have to say "On
25   February 10th of 2010 the amount of inflation was

26  (Pages 101 to 104)

1    $1.27." You need to be able to articulate, given
2    the nature of the way the facts here become known to
3    Fiat Chrysler, what they would have said and how you
4    would assess what the inflation was over time.
5        Q. But if you need to identify what they
6    should have said and how the inflation would have
7    changed over time, what left is there to do for the
8    damages model? Don't you have everything you need
9    to do the damages model then?
10       A. No, you need to assess the -- you need to
11   actually ultimately run your model, assess how
12   you're going to sort of estimate those damages over
13   time.
14       So, for example, if there's confounding
15   information, articulate a way that you're going to
16   disaggregate how much of the price movement was due
17   to revelations of information which is corrective,
18   as opposed to everything else. And you don't have
19   to do that calculation, but you need to articulate
20   how you're going to disaggregate those pieces of
21   information and that that information is available
22   for you to disaggregate.
23       Q. So are you saying that you need to discuss
24   how information can be disaggregated but you don't
25   have to ascribe actual sort of numbers and

1    percentages to, "Oh, this information on this day
2    was confounding by 50 percent or 60 percent," but
3    you just need to say this is how you go about the
4    method of taking out confounding information?
5        A. That's correct. So in this particular case
6    I've identified a couple of days on which there's
7    confounding information. As a matter of financial
8    economics, in order to be able to ascribe damages,
9    there needs to be a method articulated for, given
10   that there are multiple pieces of information, how
11   are you going to separate those two things out, and
12   so what's the method that you're going to undertake
13   to separate out those pieces of information?
14   Because if you can't, and we know that there's
15   multiple pieces of information on a day, you're not
16   going to be able to reliably assess damages which
17   are due to the misstatements and omissions of the
18   company.
19       Q. So ultimately -- sticking with the
20   confounding information, that ultimately will --
21   that process affects how much inflation existed on a
22   given day of the class period?
23       MR. LEVY: Objection, assumes facts not
24   in evidence.
25       A. Well, let's assume that there's a

1    corrective disclosure date with multiple pieces of
2    information. A method that allows you to apportion
3    the price decline among various pieces of
4    information, some allegation-related and some not,
5    would allow you to say what the inflation on that
6    particular day was that is attributable to
7    allegation-related disclosures.
8        There's another set of questions that
9    you have to think about, which is, as we go back in
10   time, what is the inflation over various periods of
11   time back on particular dates, given the nature of
12   that allegedly misstated or omitted information.
13       Q. In Paragraph 45, where you say, "It is
14   necessary to develop and analyze a 'but-for world,'"
15   what's your basis or support for your conclusion
16   that this is necessary? I just don't see any
17   citation to literature or anything like that. Is
18   there a basis for this?
19       A. So it's the general proposition of what
20   affects the valuation of a particular security,
21   which is, as we've talked about earlier, tied to the
22   expected future revenue and cash flow of the
23   business and the riskiness of the business.
24       And so fundamentally the way to think
25   about this is that we're tying the but-for world to

1    how that information on each date is going to affect
2    investors' expectation for either the risk of the
3    company or its future cash flow and -- its revenue
4    and cash flow.
5        And so there are certainly circumstances
6    under which the value attributable to a given piece
7    of information may change as well as the information
8    on a particular day may not be the same. And so
9    what this says, back to the discussion we were
10   having a second ago, is you need to understand
11   what's known or knowable on a particular date, which
12   would then be translated into the information which
13   should have come to the market, the but-for
14   disclosure, and to have a method to assess what the
15   impact of that would be on the value of the company.
16       Q. And I understand what you're saying here.
17   What I'm wondering is, when you say it's necessary,
18   I'm wondering, you know, what's the basis of you
19   saying this is something that absolutely has to be
20   done. Is that something I can see in the
21   literature? I just don't see any citations here to
22   say this is how you have to conduct this analysis.
23   Or is this your opinion, this is required under
24   Comcast?
25       A. No, no, no.

1          MR. LEVY:  Objection.
2          A.  It's what's required under sort of
3    financial economics, to understand --
4          So the field of finance is about how
5    information affects value, and information affects
6    value only to the extent that it changes our
7    expectation of systematic risk or the future cash
8    flows of the business.  It's not that you buy a
9    share of Fiat Chrysler to put on the wall like a
10   work of art.  You buy it because you believe it's
11   going to pay you cash flows into the future.
12         And therefore, if what you're trying to
13   find out, which is there's this piece of information
14   which I believe Fiat Chrysler should have told the
15   market, the questions then revolve around, one, what
16   was known that would affect the value of the
17   company, and two, how does that translate into the
18   value of the company, which then gives us the three
19   requirements for, in one particular type of damages
20   approach, a constant-dollar inflation, what would
21   have to be true.
22         And so 45 then flows into Paragraph 47
23   from an understanding of that proposition of
24   information and value.
25         Q.  Right.  I understand what you're saying.  I

1    may not necessarily agree with all of it, but I
2    understand it.
3          What I'm wondering is:  What's your --
4    is there any academic support that this is
5    necessary, this formulation is the way to do it and
6    you can't do it another way?  I don't see any
7    citations here saying, "Hey, this is how you have to
8    conduct this analysis, and this is the only way to
9    conduct it."  And so what I am asking for is can you
10   point to -- what would you point to to say, "This is
11   support for my statement in Paragraph 45"?
12         MR. LEVY:  Objection, asked and
13   answered.
14         A.  So there's no academic paper which has
15   outlined the requirements of the constant-dollar
16   inflation model.  There have been discussions, and I
17   highlight in the Cornell book on estimating damages
18   the sets of issues which are important.
19         The requirements for a constant-dollar
20   inflation model flow directly from the fundamental
21   principles of finance about what affects the
22   valuation of a company's shares or any securities.
23   And so this is based on just those fundamental
24   foundational principles of finance about what
25   determines value.

1          Q.  And is there a citation or something that
2    you have for these for the fundamental principles
3    that show that this is absolutely necessary, that
4    you're talking about here?
5          MR. LEVY:  Same objection.
6          A.  Any basic finance textbook which talks
7    about the relationship between information and
8    expectations will lead to this as a conclusion about
9    what the requirements for a constant-dollar
10   inflation model would be.
11         Q.  Will it talk about a constant-dollar
12   inflation model?  Will it talk about creating a
13   but-for world?
14         A.  No.  As I've just mentioned, it talks
15   about the relationship between how do we assess the
16   relationship between information and value.
17         Q.  In Paragraph 46 you state, "For a proper
18   economic but-for world, an economist needs to
19   specify, among other things, the information that
20   should have been disclosed and when such information
21   should have been disclosed -- as defined by the
22   plaintiffs -- rather than the alleged
23   misrepresentations.  These alternative disclosures
24   are called 'but-for disclosures.'"  I want to ask if
25   you can point to any support in academics or

1    otherwise for your conclusion here that this stuff
2    needs to be specified, or is your answer similar to
3    the answer in Paragraph 45?
4          MR. LEVY:  Objection.
5          A.  The answer will be exactly the same, that
6    the framing of this is to understand how information
7    affects value.  And given the framework that there's
8    information which was not provided to the market,
9    what's necessary is to focus on what was that
10   information and how does that information affect the
11   value of the particular company in question.
12         Q.  And in Paragraph 47, where you refer to
13   the, quote, "three key assumptions," end quote, is
14   there a citation for these -- support for these
15   three assumptions that you identify that are
16   necessary, or is your response similar to what you
17   said about Paragraph 45 and 46?
18         A.  The response will be similar, that what
19   this does is it translates the basis from Paragraphs
20   45 and 46 about the way information affects value
21   into what the particular requirements are if a model
22   that asserts constant-dollar inflation over the
23   class period is to be supportable.
24         And so in order for that -- in order for
25   a constant-dollar inflation model to be supportable

1    based upon what finance says about how information
2    affects expectations and value, these are three
3    requirements that have to be true.
4         Q.  So under 47(a), talking about the
5    assumption, this assumption goes to -- and I know
6    you talk about it in more detail later -- about when
7    inflation would come into the stock price?
8         A.  That's correct.
9         Q.  And your criticism generally speaking -- I
10   know it's not all in Paragraph 47 here -- of Dr. Nye
11   is that because certain information wasn't alleged
12   to have been known to the defendants until after the
13   beginning of the class period, that means the
14   inflation is going to vary over time from the
15   beginning of the class period to the corrective
16   disclosures.
17        MR. LEVY:  Objection.
18        A.  Yes, and let me extend that, because
19   there's two elements to it -- some of which is that
20   information which was allegedly misstated or
21   omitted, that information -- some of that
22   information only becomes known over time.  At the
23   beginning of the class period all that information
24   was not known or knowable to Fiat Chrysler.
25        The second thing is that a number of the

1    corrective disclosure dates deal with regulatory
2    actions against Fiat Chrysler, and those are
3    realizations of risk.  And stock price reactions to
4    the realization of risk are not a measure of how a
5    revelation about the probability of an event
6    happening would impact the stock price.
7         So to be concrete, Fiat Chrysler could
8    not have said, "On a particular date the DOJ is
9    going to file a civil lawsuit on behalf of the EPA
10   against us."  The most they could have said is that
11   "There's some possibility in the future that the DOJ
12   or some regulator is going to take action against
13   us, and there's some probability that will occur."
14   The realization of that probability is not a measure
15   of the possibility of that happening would have
16   affected the stock price.
17        Q.  And the distinction between what comes out
18   in a corrective disclosure and what would have been
19   in what you referred to as the but-for disclosure,
20   the difference in that is going to affect the amount
21   of inflation on a given day?
22        A.  So it will affect both the inflation on a
23   given day as well as the ability to utilize the
24   stock price reaction on the revelation of the
25   realization of that risk as a measure of what the

1    stock price would have been -- what would have
2    happened to the stock price in response to a
3    revelation that the risk existed.
4         Q.  Now, is that part of 47(b) there or is that
5    part of 47(a)?  I understood that to be part of
6    47(a), but I want to make sure we're on the same
7    page.
8         A.  As part of 47(a) -- 47(a) is what
9    reasonably could they have said about potential
10   regulatory action?  When should they have known that
11   regulatory action was a possibility?
12        There is then the issue about how you
13   would go about measuring whether or not the price
14   reaction to a corrective disclosure represents the
15   price reaction to the revelation of that particular
16   information, which is Paragraph (b).
17        So (a) is what you could have revealed,
18   and within Paragraph (b) is understanding the price
19   reaction to that information and whether that would
20   be the same as the price reaction to the corrective
21   disclosure.
22        Q.  And then in Subpoint (c), moving on to Page
23   20, you're stating here that because information can
24   have a different significance given the environment
25   over time, that you need to analyze that --  the

1    difference between when misrepresentations are made
2    and corrective disclosures are made because that,
3    too, can affect the amount of inflation in the stock
4    price on a given day?
5         MR. LEVY:  Objection.
6         A.  That was really close.  So the issue is
7    that the valuation impact of a given piece of
8    information could be different depending upon both
9    industry and macro factors, and I can be pretty
10   concrete here.  Which is like saying that you're a
11   gold company and you have discussions about your
12   production.  The impact of information about
13   production will be higher the higher the price of
14   gold.
15        So the price of gold can affect the
16   value of information for a gold company.  And so
17   that's what I mean by macroeconomic or industry
18   factors can affect the value of a specific piece of
19   information, which may be the same, but impacts
20   value differently depending upon that.
21        Q.  And then ultimately that's going to have an
22   effect on the amount of inflation in a given day.
23        A.  That's correct.
24        Q.  In Paragraph 48 you talk about confounding
25   information.  And here are you saying that because

1    there may exist confounding information unrelated to
2    the fraud that was not disaggregated from, I guess,
3    the residual return, that that can impact the amount
4    of inflation on a given day?
5        MR. LEVY:  Objection.
6        A.  What Paragraph 48 says is something that we
7    had talked about a little while ago, which was if
8    what you're doing is to try and identify the value
9    of a corrective disclosure that's specifically
10   attributable to the information which was either
11   misstated or omitted, if the corrective disclosure
12   date has confounding information unrelated to the
13   fraud, what you need to be able to do is to show
14   that you can have a method which disaggregates how
15   much is due to the fraud-related information and how
16   much is due to confounding information, and as such,
17   be able to ascribe what the value impact on the
18   corrective disclosure date was of the fraud.
19       Q.  And this also would affect the amount of
20   inflation on a given day?
21       A.  It would affect the amount of inflation on
22   the corrective disclosure date, yes.
23       Q.  Now, in Paragraph 47 and 48, which we were
24   just discussing, about the three assumptions and
25   also confounding information, I mean, generally

1    speaking, does all of this go towards just like
2    disaggregating the fraud -- let me start over.
3        In Paragraphs 47 and 48, when we're
4    talking about these assumptions and the confounding
5    information, do all of these points basically go to
6    disaggregating damages that resulted from the
7    alleged fraud from, I guess, residual stock price
8    movements from -- as a result of other factors, and
9    the fact that that's going to impact the inflation
10   during the class period?
11       A.  So 48 goes specifically to that.  47 is a
12   little different.  47 says how do we take and
13   determine what the inflation was going back prior
14   into the class period?  48 is about the corrective
15   disclosure date.  47 is about understanding how do
16   we get inflation on earlier days of the class
17   period?  How can we assess how far back that
18   inflation goes and how big it is?
19       We've already talked about 47(a) is
20   about you can't disclose something that you didn't
21   know at the time and wasn't knowable.  47(b) is
22   whether or not what was disclosed at the corrective
23   disclosure is what could have been disclosed earlier
24   in the class period, and the example you just talked
25   about earlier, we just talked about earlier, was

1    revelation of a risk of an event versus the actual
2    event occurring.  And then (c), which is slightly
3    different, is, if that information came to the
4    market earlier, would the price impact be the same
5    as it was on the corrective disclosure?
6        Q.  Now, are you saying in Paragraph, I guess,
7    47 and 48 -- and I know you get into the details
8    later in your report -- but in your report are you
9    saying that doing the analysis that you talk about
10   here in Paragraph 47 and 48 and that you discuss
11   later on, that it's impossible to do this analysis
12   or just that your criticism is that Nye has not done
13   it in his report?
14       A.  So what I'm saying here is that you have to
15   wrestle with the case-specific facts and the theory
16   of liability here.  I find some difficulties here
17   that I'm not sure how you would deal with it.  I'm
18   not saying for sure it's impossible because I
19   haven't been asked to do it.  But there are some
20   nontrivial issues that require at least some
21   exposition about how you would deal with them given
22   the specifics of the case, and Dr. Nye hasn't even
23   wrestled with the theory of the case or the facts to
24   try and assess how he would deal with them.
25       And so that's really what I'm saying,

1    that there's no evidence that Dr. Nye has presented
2    "Here's how I would approach these things, and
3    here's how I would deal with the particular issues
4    that stem from the information that was allegedly
5    misstated or omitted and when it occurred over time,
6    as well as the confounding information."
7        And so those are the critical
8    elements -- not that I'm saying that it's for sure
9    impossible, but I see difficulties for sure.
10       Q.  In your report, just for example, and I'm
11   just picking a paragraph, but Paragraph 50, since
12   we're on this page, in the bottom, the last phrase,
13   you refer to throughout your report "Plaintiffs'
14   theory of liability and the facts in this case."  Do
15   you see that?
16       A.  Yes, it's the last sentence in Paragraph
17   50.
18       Q.  And you recall you use that phrase
19   throughout your report?  Do you recall that?
20       A.  Correct.
21       Q.  Is there, in your mind, in using this
22   phrase, is there a distinction between plaintiffs'
23   theory of liability, on the one hand, and the facts
24   in this case?
25       A.  The facts of the case go to inform the

30  (Pages 117 to 120)

1    theory of liability.  So again, it's my
2    understanding the theory of liability here is that
3    there are misstatement/omissions about two key areas
4    that Fiat Chrysler perpetrated:  one related to the
5    safety recalls, in which Fiat Chrysler didn't inform
6    the regulators in a timely way, misestimated the
7    cost of the recalls, didn't undertake the recalls in
8    a proper way.  So there's the recall-related set of
9    issues.
10          And then on the emissions side there's
11   allegations that Fiat Chrysler perpetrated fraud by
12   having a software system that allowed it to cheat
13   regulators -- I think it's what the plaintiffs call
14   a defeat device -- and essentially get around
15   emissions regulations.
16          And so given that, the facts of the case
17   are different.  So the facts as alleged by the
18   plaintiffs would entail what specific recalls are at
19   issue, when does plaintiff allege that Fiat Chrysler
20   knew or should have known about these particular
21   recalls; related to emissions, when did Fiat
22   Chrysler know that it was allegedly using the
23   software -- and a whole set of issues that the facts
24   of the case inform the information that Fiat
25   Chrysler could have revealed related to the fraud.

1          MR. WERNKE:  Let's take a short break.
2    I think we're getting near the end.
3          THE VIDEOGRAPHER:  The time is 3:33.
4    We're off the record.
5          (Recess taken.)
6          THE VIDEOGRAPHER:  The time is 3:45.  We
7    are back on the record.
8    Q.  Generally speaking, it's your understanding
9    here that Dr. Nye did an event -- not an event
10   study, but he did his analysis for the purposes of
11   determining whether or not the market for Fiat
12   Chrysler stock was efficient.  Correct?
13         MR. LEVY:  Objection.
14   Q.  That was the purpose of his study?
15         MR. LEVY:  Objection, foundation.
16   A.  I understand that he was submitting his
17   report as a basis for class certification, and one
18   of the requirements for class certification, in
19   order for you to invoke -- again, my understanding
20   is that in order for you to invoke the presumption
21   of reliance, you need to show that the market for
22   that security was efficient.
23   Q.  And I don't want to get into details here.
24   But generally speaking, you have an understanding of
25   the analysis that Dr. Nye did to come to his

1    conclusions?
2    A.  I do.
3    Q.  The regression and everything that goes
4    with that.  Correct?
5    A.  I do.
6    Q.  Is that -- is what he did, the analysis
7    that he did, his analysis, is that an appropriate
8    analysis to use to determine whether there has been
9    no price impact on the stock from particular
10   disclosures?
11         MR. LEVY:  Objection.
12   A.  One set of analyses one might do in terms
13   of looking at price impact might be to look at an
14   event study.  How one would approach it here I don't
15   know, because I wasn't asked to do an affirmative
16   price impact analysis.
17         So an event study may be helpful in
18   examining price impact, but there may be other
19   methods that one would look at to assess price
20   impact, and which ones one would affirmatively use
21   here I don't know.  I wasn't asked, so I didn't do
22   it.
23   Q.  Is there anything, looking at Dr. Nye's
24   analysis here, that makes you think that by itself,
25   as it is, it's sufficient for evaluating whether or

1    not there's price impact?
2          MR. LEVY:  Objection.
3    A.  I don't know.  I'd have to look at it in
4    the context of understanding whether or not he did
5    enough to show price impact.  As I said, I have no
6    opinion one way or the other on price impact.  I
7    just haven't looked at it.  But certainly an event
8    study can be helpful in terms of determining price
9    impact.
10   Q.  Is the analysis one would do to determine
11   market efficiency the same analysis as one would do
12   to determine whether or not there's price impact?
13   A.  So when you do an event study for market
14   efficiency, the question you're asking is whether or
15   not the market is rapidly and fully incorporating
16   new value-relative information.  So it's examining
17   price reaction to information and making sure those
18   price reactions are appropriate given the
19   information.
20         Now, when you use a price -- when you do
21   an analysis of price impact, you can use the same --
22   if you're doing an event study, you can use the same
23   regression model, but you then have to assume that
24   the market's efficient, because then what you're
25   looking at is the price movements, and the

1  assumption would be that the price movements
2  appropriately reflect the information which is
3  coming to the market.
4         So you can have -- event studies can be
5  helpful in determining market efficiency when you
6  look at the information and see is it being
7  appropriately incorporated into the stock price --
8  or, if you assume market efficiency, you can say,
9  okay, is this piece of information causing stock
10  price movements assuming market efficiency?
11      Q.  But the analysis for determining whether or
12  not there's price impact would go beyond the
13  information that's simply in Dr. Nye's market
14  efficiency analysis.  Would you need more
15  information than what's in his analysis?
16      A.  It's -- again, it's possible.  I've done
17  other price impacts and looked at a variety of sets
18  of information.  I wasn't asked to do it here, so I
19  don't know what additional information, if any, I
20  might look at if I were to do a price impact
21  analysis.  I just haven't done it here.
22      Q.  Does doing a price impact analysis require
23  any kind of expertise?
24         MR. LEVY:  Objection.
25      A.  Well, certainly it would require one to be

1  an expert in financial economics and understanding
2  how one can interpret a variety of both price
3  movements or information which might affect value
4  and to assess what pieces of information may be
5  moving the value of a given company and whether or
6  not the information which is alleged to have been
7  omitted or misstated is what caused the price of the
8  company to actually move.
9         So finance is fundamentally focused on
10  an assessment of value and how information may
11  affect value.  And so price impact certainly
12  requires that knowledge.
13         (Exhibit 4 marked for identification.)
14      Q.  You're being handed what has been marked as
15  Exhibit 4.  It's titled Supplemental Expert Report
16  of Zachary Nye, dated December 21st, 2017.  Do you
17  recognize this?
18      A.  Yes.
19      Q.  And what is this?
20      A.  This is the report that he issued in this
21  matter as it would relate to issues he thought were
22  relevant to class certification, and in particular
23  an analysis of market efficiency.
24      Q.  And this is excerpted.  I didn't include
25  all of his exhibits.  I did include Exhibit 15 in

1  the back, which I'd like you to turn to now.
2         MR. LEVY:  Object to the extent this is
3  excerpted.
4      Q.  In Exhibit 15 you see on the event date
5  going down four rows to July 26, 2015, where the
6  event states, "NHTSA fined FCA $105 million for
7  violations in 23 recalls."  Do you see that?
8      A.  Yes.
9      Q.  And the impact date is July 27th, 2015?
10      A.  Yes.
11      Q.  And the confidence level of that is 92.12
12  percent?
13      A.  That is correct.
14      Q.  And you're not providing any opinion on
15  whether or not this demonstrates price impact, are
16  you?
17      A.  I don't have a price impact opinion, so I
18  have no opinion one way or the other.
19      Q.  And similarly, moving down a couple of
20  rows, on October 28, 2015, referring to the Q3 2015
21  earnings release, and you see that it has a
22  confidence level there of 99.75 percent?
23      A.  Yes.
24      Q.  Is that sufficient to show price impact,
25  that information?

1      A.  Again, I haven't done a price impact
2  analysis, so I have no opinion one way or the other.
3      Q.  And if I went through the other alleged
4  corrective disclosures that he analyzes in his
5  chart, am I correct that your response would be the
6  same, that you're not providing an opinion, so you
7  don't have an opinion one way or the other?
8      A.  That's correct.
9         MR. WERNKE:  No further questions.
10         MR. LEVY:  Nothing further.
11         THE VIDEOGRAPHER:  The time is 3:54.
12  This concludes the deposition.  We are off the
13  record.
14         (The deposition concluded at 3:54 p.m.)
15
16
17
18
19
20
21
22
23
24
25

32  (Pages 125 to 128)