UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>FIAT CHRYSLER AUTOMOBILES N.V., FCA US LLC, SERGIO MARCHIONNE, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE, and ROBERT E. LEE,<br><br>Defendants. | No. 15 Civ. 7199 (JMF)<br><br>ORAL ARGUMENT AND EVIDENTIARY HEARING REQUESTED |

**SUR-REPLY IN FURTHER OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Robert J. Giuffra, Jr.
William B. Monahan
Thomas C. White
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

April 6, 2018

In their Reply, Plaintiffs concede that *none* of Fiat Chrysler Automobiles N.V.'s ("FCA") alleged misstatements had any impact on FCA's stock price at the time they were made. (ECF No. 165 at 3–7.) Plaintiffs also do not dispute that (i) none of the purported "corrective disclosures" with respect to their safety recall theory of liability had a statistically significant impact on FCA's share price at the standard 95% confidence level (*id.* at 5–9); and (ii) the share price decline that followed the EPA's announcement of regulatory action against FCA "may have been caused" by market concern with "regulatory action and regulatory risk" (*id.* at 9–12). These undisputed facts are sufficient to carry Defendants' burden of making "any showing," by a preponderance of the evidence, that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014). The preponderance standard is "the lowest standard of proof," and "no more than a tie-breaker." *United States* v. *Gigante*, 94 F.3d 53, 55–56 (2d Cir. 1996).

Plaintiffs' only response is to improperly invoke—for the *first* time in their Reply, *see Harrison* v. *Republic of Sudan*, 838 F.3d 86, 96 (2d Cir. 2016)—a "price maintenance theory," which posits that some unspecified amount of inflation was in FCA's share price from the very beginning of the putative class period. (Reply at 3–4.) But Plaintiffs have no evidentiary support for this assertion, and, in any event, a "price maintenance theory" is legally unavailable unless the defendant made an overly optimistic statement intended to stop a price decline or to convey that the company had met market expectations when it had not. *See Nathenson* v. *Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001).

The Reply also confirms that Plaintiffs have not carried their burden of proving a damages methodology consistent with their theories of liability. *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 35 (2013). Plaintiffs' damages model assumes a constant amount of inflation in FCA's

share price, which will be reverse-engineered by looking at the share price decline on "corrective disclosure" dates. But Plaintiffs concede that some amount of the decline "may have been caused" by market concern with "regulatory action and regulatory risk" (*id.* at 9–10) and offer no methodology to account for this, and further assumed that FCA should have made disclosures at the beginning of the class period about recalls that had not yet occurred (which is impossible).

Finally, the putative class periods must end on (i) July 27, 2015 for the safety recall claims (the first market day after the NHTSA Consent Order) and (ii) January 12, 2017 for the emissions claims (the date of the Notices of Violation ("NOVs")). Plaintiffs point to no new, *material* information that entered the market after these public disclosures; a reasonable investor who purchased thereafter would therefore have known the falsity of the purported misstatements.

## I.     PLAINTIFFS CANNOT INVOKE THE *BASIC* PRESUMPTION OF RELIANCE.

Plaintiffs' Reply confirms that the alleged misstatements had no impact on FCA's stock price when they were made. Defendants need only show that the "misrepresentation[s] did not actually affect the stock's price" by "a preponderance of the evidence." *Ark. Teachers Ret. Sys.* v. *Goldman Sachs Grp., Inc.* 879 F.3d 474, 481 n.5 (2d Cir. 2018). Defendants have carried their limited burden here: neither FCA's general statements of regulatory compliance nor its emissions-related statements had any impact on FCA's stock price when made. (Gompers Report ¶¶ 12–15 Ex. 1; Nye Report Ex. 14B at 1–3, 6, 9.)[1] Plaintiffs' new argument that the alleged misstatements "maintain[ed] inflation already extant in [FCA's] stock price" (Reply at 3–4) rests on the *unproven* assumption that later stock price declines stemmed from challenged

---

[1] Plaintiffs' assertion that Defendants must submit an affirmative event study and may not rely upon evidence Plaintiffs submitted (Reply at 1–3) is contrary to logic and Plaintiffs' own citations. *See Carpenters Pension Tr. Fund* v. *Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015) (Scheindlin, J.) (presumption of reliance may be rebutted by "a properly conducted event study offered into evidence *by either the defendant or the plaintiff*").

statements made years earlier.  Moreover, courts have allowed a price maintenance theory only in "special circumstances," *Nathenson*, 267 F.3d at 419, where (i) defendants made "an unduly optimistic statement [to] stop[] a price from declining," *Schleicher* v. *Wendt*, 618 F.3d 679, 683 (7th Cir. 2010), or (ii) "the alleged fraudulent statement convey[ed] that the company has met market expectations, when in fact it ha[d] not," *In re Scientific-Atlanta, Inc.*, 571 F. Supp. 2d 1315, 1340–41 (N.D. Ga. 2007).  Neither circumstance exists here.[2]

With respect to Plaintiffs' safety recall claims, Plaintiffs also admit that *none* of the alleged "corrective disclosures" had a statistically significant impact on FCA's stock price at the standard 95% confidence level.  (Reply at 8–9.)  Plaintiffs rely exclusively on "[t]he July 26, 2015 announcement of the NHTSA Consent Order," but concede it was only "statistically significant at the 92.12% confidence level."  (*Id.* at 8.)[3]  Courts in this District reject "return[s] at the 90% confidence level," which are "below the conventional statistical measure of a 95% confidence level," *In re Moody's Corp.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (Daniels, J.);

---

[2] The Second Circuit has allowed a price maintenance theory to proceed where the defendant "made numerous representations to the market suggesting that the course ahead for the company was smooth sailing"—including that "it anticipated maintaining a 'very comfortable . . . credit rating'"—when the company was actually "months away from bankruptcy or insolvency." *In re Vivendi, S.A.*, 838 F.3d 223, 232, 235 (2d Cir. 2016). Similarly, in *Waggoner* v. *Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), the Second Circuit permitted a price maintenance theory where "[i]nvestors were concerned with lack of management honesty and control because, as had happened in the past following the LIBOR scandal, such problems would result in considerable costs related to defending a regulatory action and, ultimately, in the imposition of substantial fines." *Id.* at 106. Plaintiffs do not allege (let alone prove) that the challenged statements here were part of an effort by FCA "to restore its reputation" following "past scandals." *Strougo* v. *Barclays PLC*, 105 F. Supp. 3d 330, 349 (S.D.N.Y 2015) (Scheindlin, J.).

[3] Dr. Nye's attempt to rely on "European trading" (Nye Rebuttal ¶¶ 11, 21, 23–24) is squarely foreclosed by this Court's Order dismissing claims by "purchasers of FCA stock on a foreign exchange." (ECF No. 50 at 24–25.) Plaintiffs also cannot recast dismissed alleged misstatements about recall reserves, *id.* at 18–22, as "corrective event[s]" under a new "materialization of the risk" theory (Reply at 8), because increased reserves "for *future* recall costs" (Nye Rebuttal ¶ 25), are outside the "zone of risk concealed by [alleged] misrepresentations" about *prior* regulatory compliance. *In re Omnicom, Inc.*, 597 F.3d 501, 513 (2d Cir. 2010).

therefore, this statistically *in*significant residual stock price return following the announcement of the NHTSA Consent Order shows *a lack* of price impact (*see* Ex. A (Gompers Decl.) ¶ 4).[4]

## II. PLAINTIFFS DO NOT CARRY THEIR BURDEN OF SHOWING HOW THEY WOULD MEASURE CLASSWIDE DAMAGES UNDER *COMCAST*.

Plaintiffs' Reply confirms that, under *Comcast*, they have "not met their burden of demonstrating . . . a classwide method of awarding relief that is consistent with [their] theor[ies] of liability." *Jacob* v. *Duane Reade, Inc.*, 293 F.R.D. 578, 584 (S.D.N.Y. 2013) (Oetken, J.), *aff'd*, 602 F. App'x 3 (2d Cir. 2015). Contrary to his deposition testimony, Dr. Nye now states that he will now "calculate the amount of [alleged] inflation" in FCA stock using a "constant-dollar method . . . throughout the [putative] Class Period." (Nye Rebuttal ¶ 49; Ex. B (Nye Dep.) at 123:8–25.) Plaintiffs' new damages theory is improper because it was advanced on Reply. It also fails under *Comcast* because it does not set out a methodology for measuring damages attributable *solely* to the alleged fraud. (*See* Defs.' Class Cert. Opp. at 22–23 & n.15 (collecting cases).)[5] As noted above, Plaintiffs concede that the share price declines following regulatory announcements "may have been caused" by market concern with "regulatory action and regulatory risk" (Reply at 9–10), but they proffer no methodology for separating out those

---

[4] Plaintiffs' Reply also confirms that this Court cannot certify a class on their emissions-related claims. Where a company's stock price declines following the filing of a regulatory action premised on previously disclosed factual allegations, the decline "more logically occurred because the market feared that [the] lawsuit" would harm the corporation. *Teachers' Ret. Sys.* v. *Hunter*, 477 F.3d 162, 187–88 (4th Cir. 2007). Dr. Nye's Rebuttal demonstrates that the market reacted to the regulatory and litigation risk faced by FCA, not the truth of Plaintiffs' underlying allegations. (*See, e.g.*, Nye Rebuttal ¶ 41 (Barclays analyst report stating that EPA case "is likely to take a long time . . . and should weigh on FCA's share price for some time").)

[5] It is irrelevant that Dr. Nye's methodology may have been accepted in another case with different facts. (Reply at 13; Nye Rebuttal ¶ 49.) In *Barclays*, Dr. Nye's model measured the stock drop from a regulatory action, which alleged that *the same* statements plaintiffs challenged were "false and misleading." 875 F.3d at 88, 106. Conversely, here, Dr. Nye proposes to measure stock price decreases from regulatory actions based on *conduct unrelated to* FCA's general statements of regulatory compliance or emissions-related statements.

declines from those attributable to the misstatements. In addition, as Dr. Gompers explains, Plaintiffs' assumption of a *constant* amount of inflation contradicts Plaintiffs' liability theories, because it erroneously assumes that FCA could have disclosed the "truth" of its alleged misstatements at the beginning of the class period. (Gompers Decl. ¶ 7.)[6]

### III.  AT A MINIMUM, ANY CLASS PERIODS MUST BE SHORTENED.

Plaintiffs offer no basis for extending any certified class beyond the July 24, 2015 NHTSA Consent Order (for safety recalls) and the January 12, 2017 NOVs (for emissions), which Plaintiffs themselves claim "corrected the alleged misrepresentations." (Reply at 5.) As to safety recalls, Plaintiffs have not shown that subsequent disclosures about recall reserves "revealed new information to the market concerning the alleged fraud" (*id.* at 15), because, as discussed *supra* n.3, Plaintiffs' recall reserve claims are not actionable as either misstatements or disclosures. As to emissions, Plaintiffs rely upon Dr. Nye's assertion that a May 23, 2017 EPA Complaint somehow revealed new information, because it "disclos[ed] that [FCA]'s noncompliance with emissions regulations was more severe than previously revealed (*e.g.*, that the Company had employed defeat devices)." (Nye Rebuttal ¶ 45.) But as this Court recognized, the January 12, 2017 EPA NOV already alleged that "one or more of the undisclosed devices *may* be defeat devices." (ECF No. 121 at 9.) The class period must end once a public disclosure has provided the market with "sufficient notice regarding the facts giving rise" to the allegations. *In re Alstom SA*, 253 F.R.D. 266, 292 (S.D.N.Y. 2008) (Marrero, J.).

---

[6] For example, Dr. Nye's "model" proposes to use any residual stock decrease for the July 24, 2015 NHTSA Consent Order to calculate price inflation "on the first day of the Class Period." (Nye Rebuttal ¶¶ 50–51.) But the Consent Order included recalls that did not begin until *after* the start of the class period, which necessarily could not have inflated FCA's share price as of October 13, 2014. (Gompers Decl. ¶ 8.) Plaintiffs never explain how FCA could disclose—on October 13, 2014—alleged regulatory violations for recalls that had not yet begun, or that any alleged noncompliance *could* result in a July 24, 2015 Consent Order or January 12, 2017 NOVs.

## CONCLUSION

The Court should deny Plaintiffs' motion for class certification or, in the alternative, shorten the putative class period. Defendants also request oral argument and an evidentiary hearing.

Respectfully submitted,

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
William B. Monahan
Thomas C. White
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

April 6, 2018