USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/26/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
VICTOR PIRNIK, :
:
                         Plaintiff, :     15-CV-7199 (JMF)
:
              -v- :     <u>OPINION AND ORDER</u>
:
FIAT CHRYSLER AUTOMOBILES, N.V., et al., :
:
                      Defendants. :
:
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In this securities fraud lawsuit, familiarity with which is presumed, investors bring claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(b), 78(t)(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240, against Fiat Chrysler Automobiles, N.V. ("FCA NV"), a global car company; its United States subsidiary, FCA US LLC ("FCA US" and, together with FCA NV, "FCA"); and several officers and employees of the two companies, including Sergio Marchionne, the Chief Executive Officer of FCA US. In brief, Plaintiffs allege that Defendants made false and misleading statements concerning FCA's compliance with both applicable safety regulations and applicable emissions regulations. Earlier this year, Plaintiffs moved, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for class certification. (Docket No. 148). In a "bottom-line" Order entered on June 15, 2018, the Court granted Plaintiffs' motion for reasons to be explained in a forthcoming Opinion. (Docket No. 214). This is that Opinion.[1]

---

[1] On June 25, 2018, Defendants filed a letter asking the Court to vacate its June 15, 2018 Order to ensure that their time to petition for appellate review pursuant to Rule 23(f) of the Federal Rules of Civil Procedure would run from the date on which the Court issued its Opinion

**BACKGROUND**

The Court described the relevant background in several prior Opinions, familiarity with which is presumed, and will summarize it only briefly here. *See Pirnik v. Fiat Chrysler Autos., N.V.*, 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ("*Pirnik I*"); *Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-CV-7199 (JMF), 2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017) ("*Pirnik II*"); *Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-CV-7199 (JMF), 2017 WL 5312182 (S.D.N.Y. Nov. 13, 2017) ("*Pirinik III*"). FCA is a holding company that arose from the 2014 merger of Fiat Group Automobiles ("Fiat Group") and Chrysler Group LLC. (Docket No. 129 ("FAC") ¶¶ 2, 48). As a manufacturer of motor vehicles in the United States, FCA must comply with the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"), 49 U.S.C. § 30101 *et seq.*, and its implementing regulations, which are enforced by the National Highway Traffic Safety Administration ("NHTSA"). (*See* FAC ¶¶ 61-73). FCA must also comply with the Clean Air Act, 42 U.S.C. § 7521 *et seq.*, and its implementing regulations, which are enforced by the Environmental Protection Agency ("EPA"). (*See* FAC ¶¶ 204-16).

Plaintiffs' claims arise from representations — made, between October 2014 and April 2016, in FCA's securities filings and during earnings calls with shareholders — that FCA was in compliance with both safety and emissions regulatory requirements. (*See* FAC ¶¶ 275-76; 314-16; 330; 343; 348-53; *see also* Docket No. 166, Ex. 2 ("Nye Rebuttal"), ¶ 5). Plaintiffs claim that those statements were false and misleading because FCA routinely ignored its obligations to timely inform owners of serious safety defects, failed to provide NHTSA with proper notifications and reports, and illegally used undisclosed and hidden software to allow excess

---

and not the date of the Order. Although this Opinion is being issued before Defendants' deadline to file such a petition, their point is well taken. As the Court did not intend to compromise Defendants' rights to seek appellate review, the Order of June 15, 2018 is hereby vacated.

diesel emissions to go undetected and evade emissions tests. (FAC ¶ 277). Plaintiffs contend that they and other class members were damaged when, unaware of the truth, they purchased FCA securities at artificially inflated prices; they allege that the price of FCA's stock subsequently decreased as a result of partially corrective disclosures beginning in July 2015 and ending in May 2017. (FAC ¶¶ 14, 38, 42, 486, 504).

In their motion, Plaintiffs sought to certify the following class:

> All persons and entities who purchased, on a U.S. Exchange or in a transaction in the U.S., Fiat Chrysler Automobiles N.V. ("FCA," "Chrysler" or "the Company") common stock between October 13, 2014 and May 22, 2017, both dates inclusive (the "Fourth Amended Complaint ("FAC") Class Period") excluding Defendants, current and former officers and directors of Chrysler and FCA US, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

(Docket No. 149 ("Pls.' Cert. Mem."), at 1). In addition, they sought appointment of the named Plaintiffs (Gary Koopmann, Timothy Kidd, and Victor Pirnik) as class representatives and appointment of Pomerantz LLP and the Rosen Law Firm P.A. as class counsel. (Docket No. 148, at 1-2). As noted, the Court issued a "bottom-line" Order granting their motion — with one minor modification noted below — on June 15, 2018. (Docket No. 214).

## DISCUSSION

The relevant legal principles are well established. A party seeking class certification must first show, by a preponderance of the evidence, that the requirements of Rule 23(a) — namely, numerosity, commonality, typicality, and adequacy of representation — are satisfied. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). If it does so, the moving party must also demonstrate that the proposed class fits within one of the subdivisions of Rule 23(b). *See, e.g.*, *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Here, Plaintiffs rely on Rule 23(b)(3), (Pls.' Cert. Mem. 2), which requires them to show that (1) "questions of law or fact common to class

3

members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In evaluating whether all of these requirements are met, a court may consider merits issues. *See, e.g., Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013). Nevertheless, a district judge "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006). In other words, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

In this case, there is no dispute — and rightly so — that Plaintiffs satisfy most of the applicable Rule 23 requirements. With one minor exception, for example, Defendants do not dispute that Plaintiffs satisfy the four Rule 23(a) requirements.[2] Nor do they contest that "a class

---

[2] Defendants' sole Rule 23(a) objection — relegated to a footnote — is that Koopman cannot show that he is typical of the class, on the ground that he purchased additional shares of FCA stock on March 27, 2017, "months after the 'truth' of FCA's alleged misstatements was revealed." (Docket No. 160 ("Dfs.' Opp'n"), at 25 n.18). That does not suffice to raise the issue, however. *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived . . . ."); *Levine v. Lawrence*, No. 03-CV-1694 (DRH ETB), 2005 WL 1412143, at *5 (E.D.N.Y. June 15, 2005) ("[F]ailure to adequately brief an argument constitutes waiver of that argument . . . ."). And in any event, the objection is without merit because Koopman's March 27, 2017 purchase was before the final corrective disclosure on May 23, 2017. *See, e.g.*, *In re Arakis Energy Corp. Sec. Litig.,* No. 95-CV-3431 (ARR), 1999 WL 1021819, at *6 (E.D.N.Y. Apr. 27, 1999) (finding that the typicality requirement was satisfied where the plaintiff's "cause of action [arose] from the same factual background as the other class members and there [was] no reason to believe that a defense predicated on his purchase of options late in the class period [would] divert the trial from the main issues"). In fact, even if that were not the case, it would not necessarily render Koopman atypical. *See, e.g.*, *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) ("[N]umerous courts have held [that] the fact that a putative class representative purchased

4

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Instead, Defendants' only arguments against class certification concern the predominance requirement of Rule 23(b)(3), which calls for a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members." Even then, the focus of Defendants' arguments is narrow: For instance, they do not contest that most of the elements Plaintiffs have to prove — including a material omission or misrepresentation; scienter; connection to the purchase or sale of a security; economic loss; and loss causation — can be proved with common evidence. They argue only that common questions do not predominate with respect to proving reliance and that Plaintiffs' damages model fails to satisfy *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). The Court will address each of those arguments in turn.

**A. Reliance**

The first issue — concerning reliance — turns on whether Plaintiffs can avail themselves of the fraud-on-the-market theory. Under that theory, reliance may be presumed (and thus need not be proved on an individual basis) if certain requirements are satisfied — namely, "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2413 (2014) ("*Halliburton II*"); *accord Waggoner v. Barclays PLC*, 875 F.3d 79, 94 & n.25 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018). Of those four requirements, only market efficiency is to be considered at this stage. *See Amgen*, 568 U.S. at 467 (holding that

---

additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not the representative relied on the integrity of the market during the class period . . . ." (internal brackets and citations omitted)).

materiality does not bear on the predominance requirement of 23(b)(3)).  "An efficient market is 'one in which the prices of the [stock] incorporate most public information rapidly.'" *Waggoner*, 875 F.3d at 94 (quoting *Teamsters Local 445 Freight Div. Pension, Fund v. Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008)).  If the plaintiff establishes an efficient market, however, the defendant may rebut the presumption with "evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Halliburton II*, 134 S. Ct. at 2414.  On that front, "[d]efendants bear the burden of persuasion . . . by a preponderance of the evidence." *Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 478 (2d Cir. 2018).  To meet their burden, defendants must "do more than merely produce evidence that *might* result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the stock's price . . . ." *Waggoner*, 875 F.3d at 101.

Defendants wisely do not dispute that Plaintiffs have established that FCA securities traded in an efficient market during the Class Period.  FCA securities were traded on the New York Stock Exchange ("NYSE"), "a paradigmatic efficient market." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 489 n.3 (S.D.N.Y. 2011); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 249 n.29 (1988) (assuming that the shares at issue traded on a "well-developed, efficient, and information-hungry market" when they traded on the NYSE).  And at least four of the five factors commonly used in this Circuit to evaluate market efficiency — the "so-called *Cammer* factors," *In re Petrobras Sec.*, 862 F.3d 250, 276 (2d Cir. 2017) (internal quotation marks omitted); *see Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) — support the same conclusion.  Among other things, the average weekly trading volume of FCA stock on the NYSE during the Class Period was 2.5%, (Docket No. 151, Ex. 1 ("Nye Supp'l Rpt."), ¶ 36), justifying a strong presumption of efficiency, *see Cammer*, 711 F. Supp. at 1293 ("Turnover measured by

6

average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one."); at least twenty-five investment firms followed FCA and more than 750 analysts' reports were published about FCA during the two-and-a-half-year Class Period, (Nye Supp'l Rpt. ¶ 42); trading in FCA stock was facilitated by a designated market maker on the NYSE and institutional ownership, which is an indicator of arbitrage activity, ranged from 61% to 68% of the FCA shares available (*id.* ¶¶ 48, 54-55); and FCA was eligible to file, and did file, simplified filings with the Securities and Exchange Commission. (*Id.* ¶¶ 63-64).[3]

Instead of contesting market efficiency, Defendants seek to rebut the presumption by demonstrating that the alleged misrepresentations and corrective disclosures had no price impact. Notably, however, Defendant did not conduct, or submit, their own event study to show the absence of price impact; instead, they rely on, and criticize, the event study conducted by Plaintiffs' expert, Dr. Zachary Nye. That alone would arguably support rejection of Defendants' arguments at this stage of the proceedings. *See, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 94-95 (S.D.N.Y. 2015) (noting that "the failure of [plaintiffs'] event study to find price movement [did] not prove lack of price impact with scientific certainty" and defendants had "ignore[d] the Supreme Court's invitation to offer their own evidence to prove lack of price impact"). But, in any event, Defendants' criticisms of Dr. Nye's study fall short. Defendants maintain, for example, that none of FCA's alleged misrepresentations "impacted FCA's stock price when they were made." (Dfs.' Opp'n 11-12). But because

---

[3] As Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact. *See Waggoner*, 875 F.3d at 97-98 (concluding that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies" especially when the first four *Cammer* factors provide compelling evidence of efficiency).

7

Plaintiffs rely on a "price maintenance theory," under which "a material misstatement can impact a stock's value by improperly maintaining the existing stock price," *Strougo v. Barclays PLC*, 312 F.R.D. 307, 325 (S.D.N.Y. 2016), *aff'd but criticized sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018) (internal quotation marks and modifications omitted), the absence of such an impact is unexceptional.[4] Moreover, while Defendants claim that Plaintiffs "must identify when and how any alleged inflation would have entered the stock," (Dfs.' Opp'n 13 (internal quotation marks omitted)), Defendants identified no binding precedent requiring such a showing.[5] In any case, Dr. Nye suggests that FCA's price was already inflated by the first day of the Class Period based on misrepresentations that occurred before the Class Period began. (Nye Rebuttal ¶ 51). In other words, inflation entered the stock price when Defendants first misrepresented or omitted material information about their compliance with safety regulations or emissions standards, causing the stock price "to remain higher than it would have been had the statements been truthful," *Glickenhaus & Co. v.*

---

[4]  Although Plaintiffs do not use the term "price maintenance theory" until their reply, their initial submissions make clear that they subscribe to that theory. Dr. Nye's event study, for instance, focuses on the dates of quarterly earnings and corrective disclosures, but not on any of the alleged misrepresentations. (Nye Supp'l Rpt. Ex 15; Pls.' Cert. Mem. 20). Indeed, none of Plaintiffs' class certification submissions suggest that Plaintiffs expected to demonstrate price movement immediately following the alleged misrepresentations. (*See* Pls.' Cert. Mem. 21-22 (arguing that "Defendants' misrepresentations and omissions" had a price impact because "Dr. Nye found that each of the corrective events alleged by Plaintiffs . . . was followed by a statistically significant residual price decline"); Docket No. 165 ("Pls.' Reply"), at 4 ("Plaintiffs undeniably allege a price maintenance theory. The crux of the Fourth Amended Complaint . . . is that FCA publicly confirmed the status quo.")).

[5]  Defendants claim that "[t]he Second Circuit requires plaintiffs to identify when and how any alleged inflation 'would have entered the stock' in order to invoke [a price-maintenance] theory" (Dfs.' Opp'n 2), but cite only to *Waggoner*, 875 F.3d at 104 n.37, in which the defendants asserted that the plaintiffs offered no evidence of how inflation entered the stock and the Second Circuit merely noted that plaintiffs' expert had in fact opined that inflation entered the stock when the defendants first made the alleged material misrepresentations.

*Household Int'l, Inc.*, 787 F.3d 408, 418-19 (7th Cir. 2015) (noting also that a price maintenance theory does not require plaintiffs to identify when inflation entered the stock); *Strougo*, 312 F.R.D. at 325 ("When an omission or misrepresentation prevents a non-inflated price from falling, that omission or misrepresentation introduces inflation into the stock.").

Additionally, Dr. Nye's event study *does* identify abnormal price movements in response to six allegedly corrective disclosures (as one would expect in a "price maintenance" scenario), to wit: (1) the July 26, 2015 announcement of the NHTSA Consent Order, which caused a negative residual return statistically significant at a 92.12% confidence level; (2) the October 28, 2015 announcement of a €761 million pre-tax charge related to future recall campaign costs in North America, which caused a negative residual return statistically significant at a 99.75% confidence level; (3) reports that FCA could be prohibited from selling cars in Germany if evidence that it had disregarded emissions rules was found, which on May 23, 2016 caused a negative residual return statistically significant at a 99.27% confidence level; (4) the January 12, 2017 Notices of Violation of U.S. emissions regulations from EPA and the California Air Resources Board ("CARB"), which caused a negative residual return statistically significant at a 100% level; (5) news of investigations by European regulators into FCA's compliance with emissions standards, which caused a negative residual decline statistically significant at an 86.85% confidence level on February 6, 2017, and at a 95.80% confidence level on February 7, 2017; and (6) the May 23, 2017 announcement of a complaint filed by the Department of Justice ("DOJ") accusing FCA of using software to allow excess emissions in 104,000 diesel vehicles, which caused a negative residual decline statistically significant at a 97% confidence level. (*See* Nye Rebuttal ¶¶ 17-45; Nye Supp'l Rpt. Ex. 15).

Defendants principal response is that many of those alleged corrective disclosures relate to the adequacy of FCA's recall reserves or compliance with European regulations, which the Court previously ruled either inactionable or irrelevant. (Dfs.' Opp'n 16-19). It is true that the Court previously held that Plaintiffs failed to adequately plead scienter with respect to their claim that Defendants misestimated and misrepresented their recall reserves, *Pirnik I*, 2016 WL 5818590, at *9, and concluded that evidence concerning compliance with European regulations did not establish scienter with respect to the alleged misrepresentations concerning compliance with U.S. regulations, *see Pirnik II*, 2017 WL 3278928, at *3. But those holdings do not mean that evidence concerning those matters is wholly irrelevant to Plaintiffs' claims. Defendants also contend that the price impacts identified by Dr. Nye are attributable to factors other than the alleged corrective disclosures. (Dfs.' Opp'n 19-20). But Plaintiffs are not required at this stage to demonstrate that any price impact was due to the prior misrepresentations alone. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) ("*Halliburton I*") (holding that securities fraud plaintiffs need not prove loss causation in order to obtain class certification).

And finally, Defendants note that Dr. Nye's analysis with respect to the July 26, 2014 disclosure shows a price impact statistically significant at a confidence level of only 92.12%, which is below the conventional statistical measure of a 95% confidence level, and that there are other dates on which there should have been a price impact, but for which Dr. Nye's regression model shows an impact at less than a 90% confidence level. (*See* Dfs.' Opp'n 15, 17-18; Nye Supp'l Rpt. Ex. 14; Docket No. 161, Ex. 1 ("Gompers Rpt."), Ex. 1). With respect to the latter point, however, it is Defendants' burden to show, by a preponderance of the evidence, the absence of price impact, and they cannot meet that burden by pointing to a handful of dates and suggesting, without further explanation, that one should have seen price impact on those dates

but did not. As for the former, "statistical significance is simply describing a set of returns that would be unusual to observe if there was no price impact." Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 WASH. U. L. REV. 583, 593 (2015). A confidence level of 92.12% with a *p*-level of 7.88% indicates that the return under study is among the top 7.88% of "normal" returns in terms of absolute magnitude or, in this case, among the bottom 3.94% of the most negative returns. (*See* Nye Rebuttal ¶ 8). That is obviously less comfort than a result that is statistically significant at a confidence level of 95%, but it does not prove the *absence* of price impact. *See, e.g.*, Merritt B. Fox, Halliburton II*: It All Depends on What Defendants Need to Show to Establish No Impact on Price*, 70 BUS. LAW. 437, 459 (2015) (noting that a 95% confidence-level burden "appears to be a heavier burden than the normal probabilities, just better than a 50% chance, required of the moving party to establish its position by the civil liability's preponderance of the evidence rule"); *see also, e.g.*, *Bing Li v. Aeterna Zentaris, Inc.*, No. 14-CV-7081 (PGS) (TJB), 2018 WL 1147082, at *10 (D.N.J. Feb. 28, 2018) (holding that the plaintiffs' expert's report "[did] not demonstrate the absence of a price impact," even though he failed to find price impact with 95% confidence).

In short, because Defendants did not carry their burden of demonstrating the absence of price impact, Plaintiffs are entitled to the presumption of reliance pursuant to the fraud-on-the-market theory. It follows that, with respect to proving reliance, questions affecting individual members of the class do not predominate over questions common to the class.

**B. Damages**

Defendants' second argument — based on *Comcast* — requires only brief discussion. In *Comcast*, the Court held that, "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case" and that "courts must conduct

11

a rigorous analysis to determine whether that is so." *Comcast*, 569 U.S. at 35 (internal quotation marks and citations omitted); *accord Waggoner*, 875 F.3d at 106. Here, Plaintiffs' theory of the case is that Defendants' alleged misrepresentations about FCA's compliance with safety and emissions regulations inflated the value of its stock, that this inflation was removed following a series of corrective disclosures, and that Plaintiffs suffered damages as a result. (FAC ¶¶ 42, 47). Dr. Nye's damages model — which involves determining the change in a security's price caused by a corrective disclosure by isolating price movements specific to FCA through an event study; analyzing, for each day of the Class Period, the amount of inflation in the stock price due to the alleged fraud and then "mechanically calculat[ing] damages on an individual basis" by analyzing a class member's "actual trading activity," (Nye Supp'l Rpt. ¶¶ 74-75, 79) — is sufficiently consistent with that theory. *See, e.g.*, *Waggoner*, 875 F.3d at 105-06 (holding that a damages model satisfied *Comcast* where the plaintiffs alleged harm when defendants' share price significantly dropped after statements about defendants' business practices were shown to be false and plaintiffs' damages model measured that harm by examining the drop in share price after corrective disclosures); *Carpenters*, 310 F.R.D. at 99 (same).

In arguing otherwise, Defendants contend that Dr. Nye's damages model (1) fails to account for the possibility of variation in inflation over time; (2) "rests on flawed assumptions, such as that FCA could have disclosed the 'truth' of its alleged misstatements at the beginning of the class period in a manner equivalent to supposed 'corrective disclosures'"; and (3) does not control for confounding information. (Dfs.' Opp'n 22). The Second Circuit has held, however, that *Comcast* does not require Plaintiffs to account for variations in inflation throughout the class period at the class certification stage. *See Waggoner*, 875 F.3d at 106 ("[E]ven accepting the Defendants' premises that inflation would have varied during the class period in this case and

12

that such variation could not be accounted for, the Defendants' argument fails [under *Comcast*]."). And to the extent Defendants' argument is that Plaintiffs' model fails to account for factual evidence of varied inflation (*see* Gompers Rpt. ¶ 63), that is an argument that goes to the merits of whether Plaintiffs can accurately demonstrate price impact and goes beyond the Rule 23 inquiry. *See Carpenters*, 310 F.R.D. at 99-100 (S.D.N.Y. 2015) ("[W]hether plaintiffs will be able to prove loss causation or measure price impact . . . are questions that go to the merits and not whether common issues predominate."). Similarly, Defendants' second and third challenges go to the question of loss causation (that is, whether Plaintiffs' damages were caused by the alleged fraud alone or by other market factors), and the Supreme Court has held "that loss causation . . . [is a] common question[] that need not be adjudicated before a class is certified." *Amgen*, 568 U.S. at 475 (citing *Halliburton I*, 563 U.S. at 809); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) ("[P]laintiffs are not required to establish loss causation . . . on class certification."). Accordingly, *Comcast* provides no basis to deny Plaintiffs' motion for class certification.

## C. Class Period

The only remaining disputes relate to the relevant class period and whether subclasses are appropriate or necessary. The class period proposed by Plaintiffs begins on October 13, 2014, the day the newly merged Fiat and Chrysler Group's common stock started trading on the NYSE, (FAC ¶ 48), and ends in May 2017 on the day that the DOJ and EPA filed their action against Chrysler for its alleged illegal emissions scheme, (Pls.' Cert. Mem. 1, 6). Defendants, however, claim that the market was fully cured by January 12, 2017, the day the EPA and CARB issued a Notice of Violation for "installing and failing to disclose engine management software that

13

resulted in increased emissions from the vehicles." (FAC ¶ 33). Accordingly, they contend that that the Class Period should not extend beyond that date. (Dfs.' Opp'n 25).

Plaintiffs have the better of the argument. In a securities fraud class action, "courts are required to cut off the class period on the date of a statement or event that cures the market." *Carpenters*, 310 F.R.D. at 97 (internal quotation marks and brackets omitted). That is, the class period ends on the date "when the full truth has been disclosed to the market." *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 583 (S.D.N.Y. 2008). That did not happen with the January 12, 2017 Notices of Violation. In its Notice of Violation, the EPA alleged that FCA had violated Section 203(a)(1) of the Clean Air Act when FCA did not disclose the existence of "at least . . . eight undisclosed [auxillary emission control devices]" in [its] vehicles. (Docket No. 93, Ex. 4 ("EPA NOV"), at 2). Although the EPA noted that one or two of the auxiliary emission control devices ("AECDs") *could* be defeat devices, the EPA explicitly stated that it was "continu[ing] its investigation" to determine whether any of the AECDs were in fact defeat devices in violation of a separate provision of the Clean Air Act, Section 203(a)(3)(B). (*Id.* at 6). It was not until the filing of its complaint in the Eastern District of Michigan on May 23, 2017, that the EPA explicitly claimed that FCA had installed defeat devices in violation of Section 203(a)(3)(B). (Docket No. 104, Ex. A, ¶ 133). Accordingly, the Court finds that it was reasonable for an investor to be uncertain as to the full extent of FCA's regulatory violations on January 21, 2017. Put differently, because the "full truth" of FCA's alleged regulatory violations, and hence of its alleged misrepresentations, was not disseminated to the market until the DOJ/EPA Complaint, May 23, 2017 marks the end of the Class Period.[6]

---

[6] As the Court noted in its "bottom-line" Order, Plaintiffs appear to have mistakenly referred to May 22, 2017, as the end date of the Class Period. (Docket No. 214).

Finally, the Court sees no reason to divide the class into subclasses. Defendants argue that Plaintiffs' allegations concerning FCA's vehicle safety regulatory violations, on the one hand, and emissions regulatory violations, on the other, involve "distinct (albeit overlapping) misstatements, entirely different 'corrective disclosures,' and differing time periods." (Dfs.' Opp'n 23). The gravamen of Plaintiffs' suit, however, is that Defendants made material misstatements when stating that FCA was "substantially in compliance with the relevant global regulatory requirements affecting [the company's] facilities and products." (*See* FAC ¶¶ 275, 281, 302, 314, 316, 353). And Plaintiffs claim that, at the time of those statements, Defendants were not "substantially in compliance" with the "regulatory requirements" of *either* the Safety Act or the Clean Air Act. (*See e.g.*, FAC ¶ 78 ("Despite its knowledge of NHTSA's increased focus on timely and accurate reporting, between 2013 and 2015 Chrysler routinely ignored its obligation to timely inform owners of serious safety defects . . . ."); *id.* ¶ 238 ("[B]y August 2014, Defendants were aware that the Jeep Grand Cherokee and Ram 1500 3.0 diesel vehicles were emitting NOx emissions above the legal limits . . . .")). Defendants identified no intra-class conflict caused by Plaintiffs' allegations that Defendants' statements of regulatory compliance were false for two different reasons and revealed as such through multiple corrective disclosures. *See In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 109 (S.D.N.Y. 2007) ("The existence of divergent interests is the primary reason to establish subclasses."); *In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp. 2d 277, 283 (S.D.N.Y. 2002) ("[T]he fact that the alleged misconduct relates to two different disclosures does not transform this action into two completely separate lawsuits . . . . Plaintiffs' claims arise out of a common core of facts and legal issues, deal with overlapping or intertwined defendants, and attack various aspects of a uniform course of conduct . . . ."). Thus, the Court certifies a single class.

15

## CONCLUSION

For the reasons stated above, Plaintiffs' motion to certify their proposed class, as amended by this Court, is GRANTED. So too, Plaintiffs' motion to appoint the named Plaintiffs as class representatives and to appoint Pomerantz LLP and the Rosen Law Firm P.A. as class counsel is GRANTED. Further, as noted above, the Court's Order of June 15, 2018 is vacated. Accordingly, Defendants' right to appeal runs from the date of this Opinion and Order.

SO ORDERED.

Dated: June 26, 2018
New York, New York

JESSE M. FURMAN
United States District Judge