# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | No. 15 Civ. 7199 (JMF) |
| Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US LLC, RONALD ISELI AND ALESSANDRO BALDI, AS CO-EXECUTORS FOR THE ESTATE OF SERGIO MARCHIONNE, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE, and ROBERT E. LEE, | |
| Defendants. | |

# DEFENDANTS' MEMORANDUM
## IN SUPPORT OF THEIR MOTION TO
## <u>EXCLUDE THE TESTIMONY OF ANTHONY ANDREONI</u>

December 12, 2018

Robert J. Giuffra, Jr.
William B. Monahan
Thomas C. White
Bradley A. Harsch
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000

*Counsel for Defendants*

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ........................................................................1

**BACKGROUND** ............................................................................................5

    A.    AECD Disclosure Obligations............................................................5

    B.    The May 14, 2012 Meeting Between Chrysler and the EPA................7

    C.    Professor Esty's Report and Opinions ...............................................8

    D.    Mr. Andreoni's Report and Opinions ...............................................10

**LEGAL STANDARD** ....................................................................................12

**ARGUMENT** ................................................................................................12

**I.**    **MR. ANDREONI IS NOT QUALIFIED TO PROVIDE THE OFFERED TESTIMONY** ....................................................................12

    A.    Mr. Andreoni is Not Qualified to Opine on the Federal EPA's Customs and Practices ...................................................................13

    B.    Mr. Andreoni is Not Qualified to Opine on the Federal EPA's Procedural Obligations Under Federal Administrative Law .................16

**II.**    **MR. ANDREONI HAS RENDERED IMPROPER LEGAL OPINIONS**.............................................................................................17

**CONCLUSION** .............................................................................................20

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds,*
   568 U.S. 455 (2013)...........................................................................................................8

*City of New York* v. *FedEx Ground Package Sys., Inc.,*
   2018 WL 4961455 (S.D.N.Y. Oct. 15, 2018) ................................................. 3-4, 12

*Contini* v. *Hyundai Motor Co.,*
   876 F. Supp. 540 (S.D.N.Y. 1995)...............................................................................20

*Daubert* v. *Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) .................................................................................................1, 12, 20

*Fate* v. *Vill. of Spring Valley,*
   2013 WL 2649548 (S.D.N.Y. June 13, 2013) ...................................................... 4-5

*Hygh* v. *Jacobs,*
   961 F.2d 359 (2d Cir. 1992)............................................................................................17

*Kuyat* v. *BioMimetic Therapeutics, Inc.,*
   747 F.3d 435 (6th Cir. 2014) ...........................................................................................2

*Nimely* v. *City of New York,*
   414 F.3d 381 (2d Cir. 2005)...............................................................................4, 12, 17

*Scott* v. *Chipotle Mexican Grill, Inc.,*
   315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................................................17

*SEC* v. *Badian,*
   822 F. Supp. 2d 352 (S.D.N.Y. 2011)...................................................................4, 20

*SEC* v. *Tourre,*
   950 F. Supp. 2d 666 (S.D.N.Y. 2013).......................................................................12

*Snyder* v. *Wells Fargo Bank, N.A.,*
   2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012) ...................................................17, 18

*Solorio* v. *Asplundh Tree Expert Co.,*
   2009 WL 755362 (S.D.N.Y. Mar. 23, 2009) .......................................................12, 15

*United States* v. *Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991)............................................................................ 17, 19-20

*United States* v. *Lumpkin*,
   192 F.3d 280 (2d Cir. 1999)...........................................................................5

*United States* v. *Roldan-Zapata*,
   916 F.2d 795 (2d Cir. 1990)..............................................................4, 14, 17

*United States* v. *Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004)...........................................................................12

### STATUTES AND RULE

42 U.S.C. § 7521 ............................................................................................5

Federal Administrative Procedure Act, 5 U.S.C. § 1001 *et seq*..........................4, 9, 11-12, 16, 19

California Administrative Procedure Act, Cal. Gov't Code § 11340 *et seq*. ......................4, 16, 19

Underground Regulations, Cal. Code Regs. tit. I, § 250 *et seq*.... ...........................11, 19

Fed. R. Evid. 702 .........................................................................................1, 12, 20

### REGULATIONS

40 C.F.R. § 86.409-78...................................................................................5

40 C.F.R. § 86.1803-01.................................................................................5

40 C.F.R. § 90.106.......................................................................................5

40 C.F.R. § 90.107.......................................................................................5

Defendants submit this brief in support of their motion under *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Fed. R. Evid. 702 to exclude the expert report and any purported expert testimony of Anthony Andreoni.

## PRELIMINARY STATEMENT

The Court should exclude the testimony of Anthony Andreoni, an ostensible rebuttal expert offered by Plaintiffs, for two reasons:  (1) Mr. Andreoni is not qualified to testify on the particular *federal* issues addressed by his report and the report of Defendants' expert whose opinions Mr. Andreoni is attempting to rebut, given that Mr. Andreoni's experiences are with *California* agencies and *California* administrative law, not the *federal* Environmental Protection Agency ("EPA") or *federal* administrative law, and (2) his opinions are inadmissible legal conclusions in any event.

Plaintiffs submitted Mr. Andreoni's report to attempt to rebut the opinions of Defendants' expert, Professor Daniel C. Esty.  Professor Esty has held a number of senior positions at the federal EPA, including as Special Assistant to the Administrator, Deputy Chief of Staff, and Deputy Assistant Administrator for Policy.  He has also practiced as a regulatory attorney in Washington, D.C., and is now a professor of environmental law and policy at the Yale Law School and Yale School of Forestry and Environmental Studies.  Based on (among other things) his extensive, first-hand experiences with the EPA, Professor Esty has provided an opinion in this case that the measures FCA US LLC ("Chrysler") took to comply with its emissions disclosure requirements to the EPA under the federal Clean Air Act ("CAA") comported with industry norms and practices.  As part of his opinion, Professor Esty explained that the EPA provides guidance to automobile manufacturers not just through the governing statute (the CAA), its implementing regulations, and the EPA's written guidance, but also through *informal unwritten guidance*.  As Professor Esty explained, this informal unwritten guidance is customary at the EPA and a well-

established source of regulatory interpretation.  Indeed, federal law expressly codifies agencies' significant discretion to provide such informal guidance without any formal process.  *See* 5 U.S.C. § 553(b)(3)(A).  As Professor Esty explained, the EPA depends heavily on this informal unwritten guidance to communicate its compliance expectations in technically complex areas (such as emissions disclosures), where the statute, regulations, and written guidance do not provide complete clarity on how to apply these standards to rapidly evolving vehicle technologies.

With this context, and based on his extensive experience (including with the EPA itself), Professor Esty opined that Chrysler undertook a number of measures consistent with industry practice to satisfy its regulatory obligations, including by disclosing to the EPA (at a May 14, 2012 meeting) Chrysler's approach to emissions disclosures during the customary back-and-forth between the EPA and the manufacturer during the vehicle certification process.  Chrysler laid out for the EPA at this meeting its approach for disclosing auxiliary emissions control devices ("AECDs") to the EPA, which involved identifying for the EPA emissions features that met two particular criteria important to the EPA, and asked the EPA if that approach would satisfy Chrysler's overall disclosure obligations, a prerequisite for Chrysler to obtain vehicle certifications.  The EPA approved Chrysler's approach at the May 2012 meeting and subsequently granted multiple certifications to Chrysler over the ensuing years.

Plaintiffs are desperate to keep any mention of this meeting away from the fact-finder because it is a death knell to their emissions claims—and specifically, to the element of scienter at least.  *See, e.g.*, *Kuyat* v. *BioMimetic Therapeutics, Inc*., 747 F.3d 435, 441-42 (6th Cir. 2014) (no scienter where company reasonably believed that its regulator "had approved" its "proposed" approach, and its subsequent statements were "consistent with that interpretation").  In fact, in an earlier attempt to exclude evidence regarding the May 2012 meeting, Plaintiffs told Defendants in November 2018 that Plaintiffs intended to file a "spoliation" motion seeking as

relief the *wholesale* exclusion of *all* evidence and argument about the May 2012 meeting. Although there is no basis for Plaintiffs' claim of spoliation (and Plaintiffs have not made their "spoliation motion" after threatening it more than a month ago), the point for these purposes is the lengths to which Plaintiffs are going to keep the May 2012 meeting from the fact-finder.

Mr. Andreoni's purported expert rebuttal is the latest of Plaintiffs' dubious attempts to avoid the May 2012 meeting and set up a request by Plaintiffs to exclude all mention of the May 2012 meeting from the fact-finder.  Mr. Andreoni has opined that Chrysler could not rely on the informal guidance provided by EPA at the May 2012 meeting because, according to Mr. Andreoni, that guidance is "not customary [or] the sort of thing relied upon by companies" regulated by the EPA.  (Ex. 1 (Andreoni Rpt.) ¶ 21.)  He further opined that this informal EPA guidance was "*insufficient* to provide" Chrysler with "the ability to alter its regulatory compliance behavior," because the EPA purportedly violated procedural requirements, including the alleged requirement to memorialize its guidance in "follow-up documentation" and to circulate it to "all regulated parties."  (Ex. 1 (Andreoni Rpt.) ¶ 21 (emphasis added).)

By Mr. Andreoni's admission, his opinions are based exclusively on his experiences at a *California* agency and on his view that *California* administrative law would forbid *California* agencies from issuing guidance without a "full administrative process involving industry and the public."  (Ex. 1 (Andreoni Rpt.) ¶ 18.)  But the May 2012 meeting was with the *federal EPA*, not a California agency, and Mr. Andreoni admits that he knows little about the EPA, let alone its customs or practices, and let alone federal administrative law.  The Court should not allow Plaintiffs to proffer this unreliable testimony by an unqualified expert, and should exclude Mr. Andreoni's report and testimony for the following two reasons:

*First*, Mr. Andreoni is not qualified to testify on matters of *federal* agency custom and procedure.  "[A] proposed expert witness must be, in fact, an expert in the area *about which*

*he or she intends to testify.*"  *City of New York* v. *FedEx Ground Package Sys., Inc.*, 2018 WL 4961455, at *2 (S.D.N.Y. Oct. 15, 2018) (Ramos, J.) (emphasis added) (citing *Nimely* v. *City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005)).  Mr. Andreoni has no expertise—and admitted at his deposition that he has none—in how the EPA customarily conveys guidance to manufacturers on disclosure issues.  In fact, he is a mechanical engineer whose only regulatory experience has been at a state agency (the California Air Resources Board ("CARB")) in primarily research and technical roles.  These positions did not afford him any view into the EPA's interactions with manufacturers.  Nor has he ever advised a party before the EPA.  Mr. Andreoni also has no legal training or knowledge about the procedures that the EPA must follow in conveying its guidance.  Tellingly, during his deposition, Mr. Andreoni admitted that he was not familiar with the federal Administrative Procedure Act ("Federal APA") that governs the EPA, but instead relied entirely for his opinion on the *California* Administrative Procedure Act ("California APA").  These California experiences do not qualify him to opine on the customs and procedures of a wholly different agency, in a different jurisdiction, subject to different requirements.  *See Nimely*, 414 F.3d at 396 n.11; *United States* v. *Roldan-Zapata,* 916 F.2d 795, 806 (2d Cir. 1990).

*Second*, Mr. Andreoni's report and testimony are "replete with inadmissible generalized statements of law [and] legal conclusions."  *SEC* v. *Badian*, 822 F. Supp. 2d 352, 357 (S.D.N.Y. 2011), *amended on reconsideration in part*, 2012 WL 2354458 (S.D.N.Y. June 20, 2012) (Swain, J.).  His overall conclusion—*i.e.*, Chrysler could not rely on the May 14, 2012 guidance from the EPA—is a legal one and depends on legal opinions.  For instance, Mr. Andreoni claims that Chrysler could not rely on the May 2012 guidance because of his (incorrect) legal opinion that federal law requires EPA guidance to be in writing and circulated to all automakers.  These sorts of legal opinions violate the well-established principle against experts providing

"dissertations on the law" and, more specifically, on a defendant's "compliance with that law." *Fate* v. *Vill. of Spring Valley,* 2013 WL 2649548, at *3 (S.D.N.Y. June 13, 2013) (Oetken, J.) (citations and quotations removed); *see United States* v. *Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (forbidding an expert from "usurp[ing]" the Court's role of instructing the jury on the applicable law and the jury's role of applying that law to the facts).

For either of these independent reasons, this Court should exclude the entirety of Mr. Andreoni's report and testimony.

## BACKGROUND

A.   **AECD Disclosure Obligations**

To certify vehicles for sale in the United States, the CAA and accompanying federal regulations require automakers to submit a list of the AECDs contained in their vehicles to the EPA.  42 U.S.C. § 7521; 40 CFR §§ 90.106 & 90.107(d)(2).  AECDs are defined broadly as any "element of design" that will "activat[e], modulat[e], delay[], or deactivat[e]" the vehicle's emissions control system upon the "element" "sens[ing]" a change in some "parameter."  40 C.F.R. § 86.1803-01.  While AECDs are generally permitted, the subset of AECDS that constitute "defeat devices," or specifically, AECDs that "[r]educe[] the effectiveness of the emission control system" under normal operating conditions, subject to certain exceptions, are not permissible.  40 C.F.R. § 86.409-78(b)(2).[1]  The requirement to disclose AECDs helps to facilitate the EPA's enforcement against the use of improper defeat devices.  *See* 40 C.F.R. §§ 86.1803-01, 86.409-78(b).

---

[1] The full definition of a "defeat device" is an AECD that "[r]educe[s] the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal urban vehicle operation and use," subject to three exceptions.  40 C.F.R. § 86.409-78(b).  Even an AECD that meets this definition is not a "defeat device" if "(i) [s]uch conditions are substantially included in the Federal emission test procedure, or (ii) [t]he need for the device is justified in terms of protecting the vehicle against damage or accident, or (iii) [t]he device does not go beyond the requirements of engine starting or warm-up."  40 C.F.R. § 86.409-78(b)(2)(i)-(iii).

Since the EPA issued these definitions in 1972, the agency has never amended them.  As one of the ways in which the EPA has provided automakers with updated guidance, the EPA has periodically issued informal written guidance, for example, through advisory circulars and guidance letters.  (*See*, *e.g.*, Ex. 5 ("Advisory Circular No. 24-2: Prohibition of Emission Control Defeat Devices - Optional Objective Criteria," *Environmental Protection Agency*, December 6, 1978).)[2]

The EPA also provides automakers with informal *unwritten* guidance on AECD disclosure issues.  (Ex. 2 (Esty Rpt.) ¶¶ 32-33.)  Indeed, the EPA has expressly commented in an advisory circular on the longtime challenge of setting out on paper the "objective criteria" by which all automakers could identify AECDs, and stated that the EPA had to address AECDs using a "case-by-case" review instead.  (Ex. 5 (Advisory Circular No. 24-2) at 1.)  To that end, the agency keeps an open communication channel with automakers as they prepare their vehicle certification applications containing the AECD disclosures.  (*Id.*)  The EPA meets with automakers, comments on their draft submissions, reviews revisions to these drafts, and provides guidance on the automaker's overall compliance approach, until the certification process is complete.  (*See*, *e.g.*, Ex. 6 (FCA-PIRNIK-001252653); Ex. 7 (Mazure Dep.) at 144; *see also* Ex. 2 (Esty Rpt.) ¶ 32.) In addition, the EPA not only provides guidance to an individual automaker, but through a common industry practice of "benchmarking"—where automakers will compare their draft AECD lists to those of other automakers approved by the EPA—the agency effectively can convey its informal guidance on an industry-wide basis.  (Ex. 2 (Esty Rpt.) ¶ 52; Ex. 4 (Esty Dep.) at 137 ("[B]enchmarking" gives automakers a "further point of reference in trying to get clarity on what the existing regulatory expectations are in practice.").)

---

[2] Citations to "Ex. __" are to the exhibits to the Declaration of Sean P. Fulton, which is submitted herewith.

B.      **The May 14, 2012 Meeting Between Chrysler and the EPA**

In 2011, Chrysler began developing light-duty diesel-engine vehicles for the United States.  (Ex. 8 (FCA-PIRNIK-001519264) at -269-71; Ex. 9 (FCA-PIRNIK-002544845) at -854.)  To obtain a certification for these new vehicles, employees in Chrysler's Emissions Certification and Regulatory Affairs group began assembling the required compliance documents and corresponding with EPA certification staff on a regular basis.  (Ex. 7 (Mazure Dep.) at 26-27.)

On May 14, 2012, the Chrysler and EPA teams met in Ann Arbor, Michigan, and during that meeting, Chrysler presented its approach for identifying and disclosing AECDs to the EPA, as well as a draft of its AECD list.  (Ex. 6 (FCA-PIRNIK-001252653).)  Among the attendees at that meeting was EPA's Vehicle Certification Director, Linc Wehrly.  (Ex. 10 (FCA-PIRNIK-001041564); *see also* Ex. 7 (Mazure Dep.) at 147).)   With an accompanying slide, the Chrysler team set out its approach for disclosing AECDs to the EPA, which was based on two criteria: engine software code that either (i) increased emissions under normal operating conditions or (ii) represented a nonlinear change in the emission control system.   (Ex. 6 (FCA-PIRNIK-001252653); Ex. 11 (FCA-PIRNIK-001251617) at -618.)[3]  The EPA approved:  rather than receive "reams and reams of data describing all" of Chrysler's engine "calibration[s]," the EPA certification officials told Chrysler that they were "happy with" and "concurred" with Chrysler's focus on the two outlined criteria.  (Ex. 6 (FCA-PIRNIK-001252653); Ex. 7 (Mazure Dep.) at 144.)

---

[3] Taken literally, the requirement under the CAA and its implementing regulations to disclose AECDs would require manufacturers to disclose every single piece of engine control software—containing hundreds of pages of calibrations with millions of lines of code—because all calibrations affect, in some way, how the engine combustion process works, and therefore emissions.  (*See* Ex. 12 (Atkinson Dep.) at 69; Ex. 13 (Altermatt Dep.) at 45-46.)

C.      **Professor Esty's Report and Opinions**

One of the issues in this litigation is whether Chrysler complied with its emissions disclosure obligations to the EPA.  Plaintiffs' purported U.S. emissions expert, Dr. Christopher Atkinson, has opined that "FCA's statements concerning its compliance with emissions regulations were false and misleading." (Ex. 14 (Atkinson Rpt.) ¶ 443.)[4]  In response, Defendants' expert, Professor Esty, opined that Chrysler in fact took steps to comply with its emissions disclosures obligations that were consistent with custom and industry practice.  (Ex. 2 (Esty Rpt.) ¶ 14.)  In reaching his opinion, Professor Esty considered, among other things, Chrysler's practice of benchmarking its AECD disclosures to those of other automakers that had undergone certification, as well as Chrysler's reliance on the disclosure approach the EPA approved at the May 14, 2012 meeting.  (Ex. 2 (Esty Rpt.) ¶¶ 14, 52.)  This meeting, Professor Esty explained, comported with the EPA's customary practice of conveying compliance expectations and providing feedback on compliance through informal dialogue.  (Ex. 2 (Esty Rpt.) ¶¶ 32-33.)

Professor Esty's opinion is based on his experience working for the EPA and as a regulatory scholar.  From 1989 to 1993, he was the Special Assistant to the Commissioner, then Deputy Chief of Staff, and finally Deputy Assistant Administrator for Policy at the EPA, where he helped develop and implement the most recent amendments to the CAA in 1990.  (Ex. 2 (Esty Rpt.) App'x A; Ex. 4 (Esty Dep.) at 30.)  He currently teaches and researches environmental law and policy at the Yale Law School and the Yale School of Forestry and Environmental Studies. (Ex. 2 (Esty Rpt.) App'x A.)  He has also practiced as a regulatory attorney in Washington, D.C. (*Id.*)

---

[4] As discussed *infra* at Section II, this concerns an ultimate issue in this case, and it is therefore an improper expert opinion on a question reserved for the fact-finder.  *See Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (plaintiffs bear burden to prove to jury that defendant made a "material misrepresentation or omission").

Drawing on his substantial knowledge and observations about the EPA's customs and practice, Professor Esty set out in his report the general framework for how federal agencies, including the EPA, establish regulatory requirements.  There are four "layers" of requirements: (1) the statute, (2) the implementing regulations, (3) informal written guidance, and (4) informal *unwritten* guidance—or the ongoing "dialogue"—between the regulator and the regulated.  (Ex. 2 (Esty Rpt.) ¶¶ 18-34; Ex. 4 (Esty Dep.) at 196-97.)  Informal dialogue is especially important in "highly technical" areas, like AECD disclosures, where the statutes, regulations, and written guidance do not provide enough "clarity [on how] to comply with the law."  (Ex. 2 (Esty Rpt.) ¶ 33; Ex. 4 (Esty Dep.) at 180.)  As Professor Esty explained, the EPA has wide discretion under the Federal APA, 5 U.S.C. § 553, to create and alter "informal practices and enforcement norms" through this informal dialogue, without "any formal process or any notice to the regulated community."  (Ex. 2 (Esty Rpt.) ¶ 33.)  Each successive "layer" of this four-part framework therefore provides more "specificity" to regulated parties on compliance issues.  (Ex. 4 (Esty Dep.) at 197.)

The May 14, 2012 guidance is a prototypical example of the EPA's informal unwritten guidance.  (Ex. 4 (Esty Dep.) at 124.)   Professor Esty explained that, given the sheer volume of disclosure that would result if the EPA received AECD disclosures based on the literal text of the CAA and its implementing regulations (*see supra* note 3), the EPA customarily agrees to more streamlined approaches to practically control the volume of disclosures and hone in on those that would best serve the agency's enforcement priorities.  (Ex. 4 (Esty Dep.) at 107-08.)  Professor Esty further opined that it was normal and customary that the May 2012 guidance was not in writing.  (Ex. 4 (Esty Dep.) at 122.)  As Professor Esty explained, typically the EPA would follow up in writing after a meeting only if it later developed an objection, but otherwise it would

simply continue working with the manufacturer on the terms discussed.  (Ex. 4 (Esty Dep.) at 122-24, 169-70.)

> ### D.   **Mr. Andreoni's Report and Opinions**

Mr. Andreoni's expert report attempts to rebut one narrow aspect of Professor Esty's opinion.  In particular, Mr. Andreoni claims that Chrysler could not rely on the EPA's guidance from the May 2012 meeting because informal unwritten guidance allegedly is not customary and also constitutes unlawful agency practice.  (Ex. 1 (Andreoni Rpt.) ¶¶ 7, 21.)

Mr. Andreoni has *never* worked at the EPA or any other federal agency for that matter.  (Ex. 1 (Andreoni Rpt.) Rpt. Ex. 1.)  His opinions are based exclusively on his experiences with a *California* state regulator, CARB, where, as a mechanical engineer, he held primarily technical positions.  (*See id.*)  From 1992 to 1999, he worked as an engineer; from 1999 to 2007, as a manager of teams developing environmental technology and advising on the technical aspects of regulations under development; and finally from 2007 to 2010, as a research division chief.  *See id.*  In these roles, his primary exposure to EPA practice involved seeking waivers from the EPA so that CARB could apply "more stringent" California regulations *in lieu of* federal regulations.  (Ex. 3 (Andreoni Dep.) at 23-24, 70, 85-87, 94-95.)  He admitted at his deposition that he did not regularly observe the EPA's interactions with regulated parties, let alone with automakers on AECD disclosures specifically.  (Ex. 3 (Andreoni Dep.) at 29-31, 84-85, 89 (characterizing his "interactions with the EPA as regulator to regulator").)  None of the roles he had at CARB involved interpreting or applying AECD regulations.  (Ex. 3 (Andreoni Dep.) at 11, 13, 15, 17-18, 20, 22.)  Following his employment at CARB, Mr. Andreoni worked at a nonprofit, the California Municipal Utilities Association, where he advised and lobbied on behalf of municipal utilities regarding state regulations.  (Ex. 1 (Andreoni Rpt.) Rpt. Ex. 1.)

Based on these *state*-level experiences, Mr. Andreoni opines that the May 2012 *federal* EPA guidance is "not customary" and "not the sort of thing relied upon by companies." (Ex. 1 (Andreoni Rpt.) ¶ 21.)  While he agrees with Professor Esty that "informal conversations between regulators and regulated entities" to provide clarification on regulatory standards are "customary," Mr. Andreoni claims that the May 2012 guidance is allegedly different in kind because that guidance is allegedly an "alteration of an existing statute or regulation."  (Ex. 1 (Andreoni Rpt.) ¶¶ 7, 21.)  According to Mr. Andreoni, it is not "the custom in any regulated industry" for a regulator at a meeting to authorize a party to "alter its regulatory compliance behavior" in a way that "fail[s]" to comply with the "statute or regulation at issue."  (Ex. 1 (Andreoni Rpt.) ¶ 21.)  Instead, according to Mr. Andreoni, the norm is for agencies to announce standards in writing broadly to all regulated entities so that no single regulated entity receives a special advantage.  (Ex. 1 (Andreoni Rpt.) ¶¶ 7, 21.)

Mr. Andreoni further opines that the May 2012 guidance was legally deficient. (*See*, *e.g*, Ex. 1 (Andreoni Rpt.) ¶ 21 ("[S]uch an informal meeting with a regulator is *insufficient* to provide a company with the ability to alter its regulatory compliance behavior . . . ."); Ex. 3 (Andreoni Dep.) at 103 ("*Legally* I don't think that there is something you can rely upon in an informal information exchange" like the May 2012 meeting) (emphasis added).)  Citing *California's* prohibition against "underground regulation," *see* Cal. Code Regs. tit. I, § 250, he opines that only a regulatory standard that undergoes a "full administrative process," with "all regulated participants providing input," is legally effective.  (Ex. 1 (Andreoni Rpt.) ¶¶ 18, 24.)  Mr. Andreoni also opines that, under the *California* standard, Professor Esty's opinion that the *federal* "Administrative Procedure Act [permits] informal practices and enforcement norms" to be changed "without any formal process" goes entirely "against the grain of a regulatory process." (Ex. 1 (Andreoni Rpt.) ¶ 22.)  However, when shown the relevant *Federal* APA excerpts, 5 U.S.C.

§ 553(b)(3)(A), Mr. Andreoni was forced to acknowledge at his deposition that the Federal APA did not appear to require that informal "interpretative rules" or "guidance" undergo a "rule making process," as he testified the *California* provisions do.  (Ex. 3 (Andreoni Dep.) at 125-27, Dep. Ex. 6-8.)

## LEGAL STANDARD

Federal Rule of Evidence 702 "assign[s] to the trial judge" the "gatekeeping role" of ensuring that only reliable expert testimony is admitted.  *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  The "threshold question" bearing on reliability is whether the "proposed expert is, in fact, an expert in the area in which he or she intends to testify." *FedEx Ground Package*, 2018 WL 4961455, at *2.   The party seeking to introduce the testimony—here, Plaintiffs—bears the burden of satisfying Rule 702's requirements by a preponderance of the evidence.  *SEC* v. *Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (Forrest, J.).

## ARGUMENT

## I.   MR. ANDREONI IS NOT QUALIFIED TO PROVIDE THE OFFERED TESTIMONY.

"[A]s a threshold matter, the Court must first examine whether the proposed witness *qualifies* as an expert[.]"  *Solorio* v. *Asplundh Tree Expert Co.*, 2009 WL 755362, at *2 (S.D.N.Y. Mar. 23, 2009) (Sullivan, J.) (emphasis in original).  To do so, the court "must *compare* the area in which the witness has superior knowledge, education, experience, or skill *with the subject matter of the proffered testimony*." *City of New York*, 2018 WL 4961455, at *2 (*quoting United States* v. *Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)) (emphasis added).  Simply "because a witness [is] qualifie[d] as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13.

The subject matter of Mr. Andreoni's report—namely, that informal unwritten guidance by the federal EPA is neither customary nor lawful—is outside his expertise, and he is therefore not qualified to offer the opinions he has offered in this case.  Mr. Andreoni's opinions about how the EPA customarily conveys regulatory guidance requires, at a minimum, knowledge about the EPA's customs and practices, not the customs and practices of a state agency such as CARB.  His opinions about the lawfulness of the May 2012 guidance also requires knowledge of relevant *federal* administrative law.  Nothing in Mr. Andreoni's background shows that he has these qualifications, and his deposition testimony in this case confirms that he does not.

A.    **Mr. Andreoni is Not Qualified to Opine on the Federal EPA's Customs and Practices.**

Mr. Andreoni has little knowledge or experience with the EPA's customs and practices.  He has never worked at the EPA (or any other federal agency).  (Ex. 3 (Andreoni Dep.) at 107; Ex. 1 (Andreoni Rpt.) Rpt. Ex. 1.)  Nor in any of his state-level positions did he regularly interact with the EPA, let alone observe how the EPA interacted with its regulated parties.  (Ex. 3 (Andreoni Dep.) at 30-31, 84-85, 89.)  He has never represented a regulated entity before the EPA, except once to make a Freedom of Information Act request for a private client—an interaction that plainly does not qualify him to offer an opinion on the very different issue of how the EPA provides guidance to manufacturers on compliance issues (or, more specifically here, on a manufacturer's AECD disclosure obligations).  (Ex. 3 (Andreoni Dep.) at 93-94, 96.)  During his deposition, Mr. Andreoni could recount only a few discrete instances where he *did* interact with the EPA.  Specifically, while at CARB, he would sometimes seek regulatory waivers from the EPA so that CARB could impose more stringent California standards *in lieu of* federal ones.  (Ex. 3 (Andreoni Dep.) at  23-24, 70, 85-87, 94-96.)  But these inter-agency interactions, with the result that CARB and the EPA would regulate *separately* under *different* standards, does not give Mr. Andreoni any

insight on the EPA's interactions with manufacturers, let alone its customs and practices.  (Ex. 3 (Andreoni Dep.) at 89.)  Scraping his memory for other examples, Mr. Andreoni added that he "might [have] talk[ed]" with EPA officials about zero emissions vehicle technology and "probably [about] some rules [pertaining to] climate change."  (Ex. 3 (Andreoni Dep.) at 95-96.)  Even leaving aside the vagueness of these instances, none could transform Mr. Andreoni into an expert on how the EPA customarily conveys guidance to manufacturers.

When pressed on what knowledge he was drawing from to discuss the EPA's customs and practices, Mr. Andreoni necessarily fell back on his *CARB* experiences.  Mr. Andreoni acknowledged that he had "not worked at U.S. EPA," so he could "only give" his "perspective" as "staff and manager *at a regulatory agency [in] California*."  (Ex. 3 (Andreoni Dep.) at 107, 108 (emphasis added).)  At every turn, he reinforced this point.  When asked, for example, how he knew that the EPA guidance given at the May 2012 meeting was "not the sort of thing that is relied upon by companies," Mr. Andreoni said that as "a manager [and] engineer at the Air Board [*i.e.*, CARB]," he personally would not have provided guidance to a regulated entity in this way.  (Ex. 3 (Andreoni Dep.) at 140-41.)  He also stated that he thought that providing informal guidance at a meeting with a single manufacturer was "unusual," because *CARB* would have acted differently and instead would have disseminated the guidance widely.  (Ex. 3 (Andreoni Dep.) at 92-93.)  But Mr. Andreoni's understanding of how a "regulatory agency [in] California" would act does not make him an expert on the customs and practices of an entirely different *federal* agency.  (*See* Ex. 3 (Andreoni Dep.) at 107-08.)  *See*, *e.g.*, *Roldan-Zapata,* 916 F.2d at 805 (holding that a law enforcement agent was not qualified to opine on "whether there should have been a written report memorializing" an incident, and more generally, the "recordkeeping procedures," at an agency in a different region than where he worked).

Plaintiffs may argue that Mr. Andreoni's experiences at CARB qualify him to opine on the EPA's customs and practices because the EPA and CARB sometimes work together, including by communicating about their respective AECD approval processes.  A fundamental problem with this argument, however, is that *Mr. Andreoni* did not have these responsibilities in his particular roles at CARB.  (Ex. 3 (Andreoni Dep.) at 30-31; 89.)  As already discussed, *supra* at pages 13-14, Mr. Andreoni's primary interactions with the EPA at CARB did *not* involve working together on compliance regulation, but actually seeking waivers from the EPA, so that CARB could administer *its own* unique standards instead of federal standards.  (Ex. 3 (Andreoni Dep.) at 23-24, 87, 94-96.)

Mr. Andreoni also admitted that he did not work on AECD compliance issues whatsoever at CARB.  (Ex. 3 (Andreoni Dep.) at 11, 13, 15, 17-18, 20, 22; *see also* 34-36, 38-39.) Indeed, the first time Mr. Andreoni recalls *ever* studying the EPA's AECD guidance, to which he devotes a third of his report, was only *after* he left CARB.  (Ex. 3 (Andreoni Dep.) at 34-36, 38-39, 42-43.)  In particular, in the wake of Volkswagen, Mr. Andreoni would answer reporters' questions about AECDs and considered AECD guidance then.  (Ex. 3 (Andreoni Dep.) at 34-36, 38-39, 42-43.)  Otherwise, the vast majority of his experience with AECD guidance has been to provide expert litigation support following Volkswagen.  (Ex. 3 (Andreoni Dep.) at 41-43.)  *See Solorio*, 2009 WL 755362, at *2 ("The fact that approximately ninety percent of [proposed expert's] work involves preparation for litigation also casts doubt on his qualifications.").  None of these experiences qualifies him to offer an expert opinion here about how the EPA customarily interacts with, and conveys compliance expectations to, manufacturers such as FCA.

B.    **Mr. Andreoni is Not Qualified to Opine on the Federal EPA's Obligations Under Federal Administrative Law.**

Mr. Andreoni is also  not qualified to opine on the federal procedural law applicable to the EPA or the EPA's alleged noncompliance with that law.  As discussed *infra* in Section II, these opinions are inadmissible legal opinions, but even if they were not, Mr. Andreoni lacks the relevant expertise.  He has no legal training.  (*See* Ex. 1 (Andreoni Rpt.) Rpt. Ex. 1.)  Nothing in his report or deposition suggests that he otherwise has knowledge about federal regulatory procedure.

Mr. Andreoni oscillates between either admitting his lack of knowledge on these federal rules or vaguely referring to his *California* experiences to justify his opinions.  For example, when asked whether his opinion that the May 2012 guidance "can't be enforced" was based on "California law or federal law," Mr. Andreoni could only muster, "I am just talking generally."  (Ex. 3 (Andreoni Dep.) at 122.)  "Enforce[ability]," however, is not a "general[]" matter, but a specific matter rooted in specific law—and, as relevant here, federal law.  In the few instances when Mr. Andreoni *does* reference specific law, he refers exclusively to *California* regulations.  According to Mr. Andreoni, the May 2012 EPA guidance was improper because *California*'s APA and a *California* case may deem the same action by a *California* agency improper.  (Ex. 1 (Andreoni Rpt.) ¶¶ 7, 18, 22.)  Mr. Andreoni otherwise admitted that he had not considered or even "looked" at the applicable federal standards, though he recognizes that federal standards, and not California law, applies to the EPA.  (Ex. 3 (Andreoni Dep.) at 124.)  When shown an excerpt of the federal APA during his deposition, Mr. Andreoni admitted that the standards appeared "different" than those in the California APA, including on the very matter on which he opined.  (Ex. 3 (Andreoni Dep.) at 125-28, Dep. Ex. 8 (5 U.S.C. § 553).)  Specifically, the Federal APA does not require, as Professor Esty's report explains and Mr. Andreoni's report

later claimed was wrong, that "informal practices" and "interpretive rules" undergo a full "rule making process." (Ex. 1 (Andreoni Rpt.) ¶ 22; Ex. 2 (Esty Rpt.) ¶ 33; Ex. 3 (Andreoni Dep.) at 125-28, Dep. Ex. 8 (5 U.S.C. § 553).)

By Mr. Andreoni's own admissions, the EPA and CARB are *unique* in the very matters on which he opines, including the regulatory standards they administer and their procedural obligations. (Ex. 3 (Andreoni Dep.) at 85-87, 94-96, 125-28.) Mr. Andreoni's CARB experiences do not qualify him to opine on the entirely different context of the EPA's procedural obligations under federal law. *See Nimely*, 414 F.3d at 399 n.13 ("[B]ecause a witness [is] qualifie[d] as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."); *Roldan-Zapata*, 916 F.2d at 805 (excluding testimony by law enforcement agent on the "recordkeeping procedures" at an agency in a different region than where he worked).

## II.    MR. ANDREONI HAS RENDERED IMPROPER LEGAL OPINIONS.

Mr. Andreoni also offers improper legal opinions. Second Circuit law "requir[es] exclusion of expert testimony that expresses a legal conclusion." *Hygh* v. *Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992). Accordingly, courts in this district routinely bar "expert testimony that provide[s] legal opinions, legal conclusions, or interpret[s] legal terms." *Scott* v. *Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (Netburn, J.). Although expert testimony may sometimes provide "general background" on legal requirements (subject to an expert's qualifications to offer such an opinion), experts are not permitted to apply these requirements and "give [an] opinion as to whether [the requirements have been] violated" in the instant case. *Snyder* v. *Wells Fargo Bank, N.A.*, 2012 WL 4876938, at *5 (S.D.N.Y. Oct. 15, 2012) (Scheindlin, J.) (citing *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

Mr. Andreoni's report and testimony are replete with inadmissible legal opinion. His central conclusion is that Chrysler could not rely on the May 14, 2012 informal guidance because it is legally deficient.  (*See*, *e.g.*, Ex. 1 (Andreoni Rpt.) ¶ 21.)  He furthermore concludes that companies would not rely on this guidance as matter of custom because the guidance is deficient.    (*See*, *e.g.*, Ex. 1 (Andreoni Rpt.) ¶¶ 7, 21.)  Mr. Andreoni confirmed during his deposition that his opinions are legal in nature.  After being asked whether his opinion is that Defendants are not "legally entitled to rely on" the guidance provided at the May 2012 meeting, he responded, "*Legally* I don't think that there is something you can rely upon in an informal information exchange." (Ex. 3 (Andreoni Dep.) at 103) (emphasis added).)  Likewise, when asked whether his "opinion is the law doesn't allow [Defendants] to rely on feedback [like the May 2012 meeting] from the EPA," Mr. Andreoni responded, "Well, the *law requires* the manufacturers that are in the regulated entities to follow what's being requested.  [The feedback] *needs* to be put in writing."  (Ex. 3 (Andreoni Dep.) at 103 (emphasis added).)

In his report, Mr. Andreoni is explicit that he sets out a legal standard and then applies it to a key event specific to this case, the May 2012 meeting. (Ex. 1 (Andreoni Rpt.) ¶¶ 19-21.)  This kind of legal analysis is plainly forbidden. *See Snyder*, 2012 WL 4876938, at *5 (experts may not "give [an] opinion as to whether [legal requirements have been] violated").  Specifically, after "outlin[ing]" the "circumstance[s]" of the May 2012 meeting, Mr. Andreoni opined in the next paragraph of his report:

> In my experience and in my opinion, such an informal meeting with a regulator is *insufficient* to provide a company with the ability to alter its regulatory compliance behavior . . . .  [C]ustom in any regulated industry, including the automotive industry, does not support *alteration of an existing statute or regulation* based upon a meeting with a regulator with respect to something so fundamental as a statutory/regulatory definition, and the disclosure requirements under that definition, especially without any follow-up document of such a change being issued for all regulated parties.

(Ex. 1 (Andreoni Rpt.) ¶ 21 (emphasis added).)  Mr. Andreoni, in other words, has usurped the roles of the Court and the jury and concluded that Chrysler could not rely on the May 2012 guidance "to alter" and satisfy its "regulatory compliance" because the guidance is allegedly defective procedurally.

Mr. Andreoni offers variants of these legal opinions close to *50 times* in his report and deposition.[5]  For example, Mr. Andreoni:

- opined that the legal effect of the May 2012 guidance is that it "can't be enforced" or relied upon because of its alleged procedural deficiencies (Ex. 1 (Andreoni Rpt.) ¶¶ 21-22; Ex. 3 (Andreoni Dep.) at 122);

- opined extensively on the procedural requirements that the EPA must follow, stating that "[i]f the U.S. EPA has to make a change to an existing rule," then the EPA "would have to go through a formal rule making process," yet also admitting it was "not clear if that's [*i.e.*, formal rule making] the case," upon being shown an excerpt of the Federal APA (*e.g.*, Ex. 3 (Andreoni Dep.) at 125-28);

- opined that that the Federal APA requires agencies to put informal guidance in writing, even though he later admitted that he did know or look up the applicable federal administrative law (as opposed to California administrative law) (Ex. 3 (Andreoni Dep.) at 79-80, 124); and

- repeatedly applied California's standards to critique Professor Esty's report, opining, for instance, that the May 2012 guidance may be an improper "underground regulation" under *California's* APA (Ex. 1 (Andreoni Rpt.) ¶¶ 4, 21).

Mr. Andreoni of course disclaimed at his deposition that he was "providing a legal opinion." (Ex. 3 (Andreoni Dep.) at 122.) He claimed instead that he was "just talking generally" based on his "experience." (Ex. 3 (Andreoni Dep.) at 122, 144.) But Mr. Andreoni cannot offer *de facto* legal opinions by recasting them as opinions about "industry practice." *See Bilzerian*, 926

---

[5] *See* Ex. 1 (Andreoni Rpt.) ¶¶ 4, 7, 18, 19, 21, 22, 23, 24, 28; Ex. 3 (Andreoni Dep.) at 48:13-15, 50:16-17, 65:6-8, 65:16-18, 66:2-4, 67:9-12, 69:16-19, 70:12-15, 75:21-25,76:12-16, 77:22-24, 80:4-9, 82:22-24, 83:16-19, 84:20-23, 97:18-22, 101:14-18, 103:6-8, 103:12-14, 115:18-21, 118:15-20, 121:25, 122:8-11, 123:5-7, 127:10-13, 127:25-128:7, 133:5-9, 135:16-20, 136:25-137:3, 137:17-18, 146:4-7, 146:8-10, 146:18, 147:4-10, 147:15-20, 149:21-24.

F.2d at 1295.  His opinions go far beyond observations about what the EPA and other federal agencies do as a matter of practice (a topic on which, as explained above, he is not qualified to opine), and instead assert what they *must* do under the law—and he even goes so far as to assert that the EPA violated the law.  (*See*, *e.g.*, Ex. 1 (Andreoni Rpt.) ¶ 21; Ex. 3 (Andreoni Dep.) at 122 (the May 2012 guidance "can't be enforced because it's not interpreted and shared with all the manufacturers").)  *See also Badian*, 822 F. Supp. 2d at 357 (excluding an expert's opinion that was "replete with inadmissible generalized statements of law, legal conclusions and conclusory statements," including opinions about a party's compliance with SEC rules); *Contini* v. *Hyundai Motor Co.*, 876 F. Supp. 540, 543 (S.D.N.Y. 1995) (Koeltl, J.) (holding that experts will not be allowed to testify regarding the "meaning" of an automotive safety standard or "whether . . . [Defendant] violated or complied with the standard").

## CONCLUSION

Mr. Andreoni has provided a series of opinions in this case about federal law that he is not qualified to make and that are, in any case, improper legal opinions.  The Court should exclude the testimony and opinions of Mr. Andreoni under Federal Rule of Evidence 702 and *Daubert*.

December 12, 2018                          Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
William B. Monahan
Thomas C. White
Bradley A. Harsch
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*