# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff(s), <br><br> v. <br><br> FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE and ROBERT E. LEE <br><br> Defendants. | **Civ. Action No: 15-cv-07199-JMF** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' PROPOSED EXPERT DANIEL C. ESTY**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

THE ESTY REPORT ......................................................................................................... 4

ARGUMENT ..................................................................................................................... 6

  I.   Legal Standard .......................................................................................................... 6

     A.     Esty Does Not Have the Requisite Experience and Qualifications to Opine on the Regulations at Issue or the "Custom and Practice" in the Industry ....................................... 7

     B.     Esty's Opinions That Defendants Did Not Believe FCA Was Violating Emissions Regulations Impermissibly Usurps the Role of the Jury and Should be Excluded .............. 14

     C.     Esty's Opinions  Concerning Regulatory Compliance Are Irrelevant and Not Helpful 22

CONCLUSION ................................................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)......................................................................................... 6

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   No. 09 CIV 3020 SAS, 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ................................... 17

*CoxCom, Inc. v. Chaffee*,
   No. 05 Civ 107, 2006 WL 1793184 (D.R.I. June 26, 2006)................................................... 15

*Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.)*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016)........................................................................... 3

*Daubert v. Merrell Dow Pharm., Inc.*,
   *509 U.S. 579, 592 n.10 (1993)* ..................................................................................... 6, 7

*Fernandez v. Cent. Mine Equip. Co.*,
   670 F.Supp.2d 178 (E.D.N.Y.2009) ............................................................................... 9

*Fleischman v. Albany Med. Ctr.*,
   728 F. Supp. 2d 130 (N.D.N.Y. 2010) .............................................................................. 17

*Highland Capital Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005)....................................................................... 15, 18

*In re Diet Drugs*,
   *No. MDL 1203*, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001) ..................................................... 17

*In re Fosamax Prods. Liab. Litig.*,
   645 F. Supp. 2d 164 (S.D.N.Y. 2009)............................................................................... 3, 17

*In re Rezulin Prod. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)............................................................................. passim

*Kellogg v. Wyeth*,
   No. 2:07-CV-82, 2012 WL 2970621 (D. Vt. July 20, 2012)................................................... 14

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*,
   14 F. Supp. 2d 391 (S.D.N.Y. 1998)............................................................................... 16, 17

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)...................................................... 6, 7

*Levinson v. Westport Nat. Bank,*
   No. 3:09-CV-1955 VLB, 2013 WL 3280013 (D. Conn. June 27, 2013)....................................9

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.,*
   209 F. Supp. 3d 612 (S.D.N.Y. 2016)......................................................................................9

*Malletier v.  Dooney & Bourke, Inc.,*
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)......................................................................................7

*Primavera Familienstifung v. Askin,*
   130 F. Supp. 2d 450 (S.D.N.Y. 2001)....................................................................................15

*Quintanilla v. Komori Am. Corp.,*
   No. 04 CV 5227, 2007 WL 1309539 (E.D.N.Y. May 4, 2007)................................................10

*S.E.C. v. Tourre,*
   950 F. Supp. 2d 666 (S.D.N.Y. 2013)......................................................................................9

*Scott v. Chipotle Mexican Grill, Inc.,*
   315 F.R.D. 33 (S.D.N.Y. 2016) ..............................................................................................22

*SLSJ, LLC v. Kleban,*
   277 F. Supp. 3d 258 (D. Conn. 2017)......................................................................................15

*Taylor v. Evans,*
   No. 94 CIV. 8425 (CSH), 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) ...................................18

*Tyree v. Boston Sci. Corp.,*
   54 F. Supp. 3d 501 (S.D. W.Va. 2014)..................................................................................18

*Tyus v. Urban Search Mgmt.,*
   102 F.3d 256 (7th Cir. 1996), 102 F.3d .................................................................................7

*United States v. Duncan,*
   42 F.3d 97 (2d Cir. 1994) ......................................................................................................15

*United States v. Mejia,*
   545 F.3d 179 (2d Cir. 2008)....................................................................................................7

*United States v. Tin Yat Chin,*
   371 F.3d 31 (2d Cir.2004)........................................................................................................7

*United States v. Williams,*
   506 F.3d 151 (2d Cir. 2007)....................................................................................................6

iii

**<u>Rules</u>**

Fed. R. Evid. 403 ................................................................................................................ 7, 15

Fed. R. Evid. 701 ................................................................................................................... 15

Fed. R. Evid. 702 ......................................................................................................... 6, 7, 15

**<u>Regulations</u>**

40 C.F.R. § 86.094-21(b)(1)(i) ............................................................................................. 11

40 C.F.R. § 86.1809-01 ......................................................................................................... 20

40 C.F.R. § 86.1809-12 ......................................................................................................... 13

40 C.F.R. § 86.1810-09 ......................................................................................................... 20

40 C.F.R. § 86.1844-01(d)(11), (e)(1) - (e)(2), and (g)(3) - (g)(5) ...................................... 20

Class Representatives Gary Koopmann, Timothy Kidd and Victor Pirnik (collectively, "Plaintiffs") submit this memorandum of law in support of their motion to exclude the testimony of Defendants' proposed expert Professor Daniel C. Esty ("Esty"), which has been presented in the Amended Expert rebuttal Report of Daniel C. Esty ("Esty Report," Ex. 1 to the Declaration of Sara Fuks ("Fuks Decl.")[1].

## INTRODUCTION

In *In re Rezulin Prod. Liab. Litig.*, Judge Kaplan references the antecedent to the modern jury trial, "compurgation" or trial by ordeal, where compurgators or "companions" of the accused would swear that that in their opinion the oath of the accused was trustworthy.  309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004).  The compurgator would "not swear to the facts of the case, but merely their judgment that the accused is a credible person."  *Id.*  Defendants offer the expert opinion of Esty, a Yale Law Professor who has held several positions at both the EPA and Connecticut Department of Environmental Protection. Esty, who Defendants engaged at a rate of $1,200 per hour, serves in this case as Defendants' compurgator.

The Esty Report is presented by Defendants as a rebuttal to the reports of Plaintiffs' U.S. and European vehicle emissions experts, Dr. Christopher Atkinson and Dr. Axel Friedrich, who each opined that FCA's vehicles contained undisclosed AECDs and defeat devices in violation of emissions regulations. Notably, Defendants have been unable to find any expert to opine that FCA's vehicles did not contain defeat devices or were compliant with emissions regulations. Instead, Professor Esty, despite having absolutely no experience with emission control systems, the relevant emissions regulations, or the AECDs at issue, opines that the Atkinson Report and

---

[1] All references to "Ex." are to exhibits to the Fuks Decl.

the Friedrich Report are "devoid of regulatory perspective." Esty Report ¶ 14.  Under the guise

of this critique, Esty proceeds to navel gaze that regulatory agencies sometimes modify their

interpretation of regulations when applying those regulations on a case-by-case basis.  The

culmination of Esty's speculation is a slew of opinions as to the state of mind of Defendants and

the EPA, the purpose of which is to establish that Defendants did not believe that they were

violating any emissions regulations and, therefore, did not act with scienter. For example, Esty

opines:

- "the evidence does not indicate that any of the FCA senior employees named as defendants in this Action **believed** that FCA's vehicles were not compliant with regulatory custom and practice with respect to AECD disclosures and defeat device requirements at any time during the Class Period" Esty Report. ¶¶ 13, 82, 84;[2]

- "[FCA] undertook steps that it **believed** were consistent with industry custom and practice and with what the EPA excepted for AECD disclosures" *Id.* ¶¶ 14, 82;

- "FCA '**believe[d]** that CARB and EPA are really only interested in AECDs that reduce effectiveness' of emissions controls" *Id.* ¶ 63;

- "FCA **Understood** its AECD Disclosure Practice to Be Consistent with Industry Custom and Practice" p. 39 (heading of section)

- "FCA reasonably **understood** that the EPA was comfortable with its approach to disclosing AECDs as presented in May 2012" *Id.* ¶ 67;

- "FCA came away from its May 2012 meeting with a better **understanding** of **what the EPA was looking for** from FCA with regard to its AECD disclosures" *Id.* ¶ 68;

- "until about 2015, the EPA appeared to **understand and be comfortable with** FCA's approach to compliance" *Id.* ¶ 80;

- "FCA's **understanding** of an AECD's permissibility tracked federal and state regulatory requirements in practice" *Id.* ¶ 82;

- "FCA **attempted to follow** industry custom and practice in its disclosures to regulatory agencies" *Id.* ¶ 82;

- "FCA **intended** to comply with AECD disclosure regulations and benchmark its disclosures with the rest of the industry" *Id.* ¶ 82;

---

[2] Unless otherwise indicated, all emphasis has been added.

2

- "FCA **understood** that '[EPA] did not **want** every calibration feature written in the AECD [application for certification] documentation.'" *Id.* ¶ 52;
- "the current allegations against FCA by the EPA and CARB over alleged failures to disclose AECD's in certain diesel vehicles are tantamount to these agencies accusing FCA of violating regulatory requirements that it would reasonably have not **understood** to have applied at the time that it is alleged do have violated these requirements." *Id.* ¶¶ 13, 83.

It is black letter law that such opinions, which go to Defendants' state of mind and the ultimate issue that the jury must decide – whether Defendants believed FCA was complying with emissions regulations when they assured investors of the Company's compliance – are strictly prohibited. *See Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.),* 169 F. Supp. 3d 396, 486 (S.D.N.Y. 2016) (finding impermissible for experts to opine on the state of mind or motives of corporation); *In re Fosamax Prods. Liab. Litig.,* 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *In re Rezulin Prods. Liab.,* 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).

The remainder of Esty's Report contains opinions designed to bolster the above improper opinions and Defendants' scienter defense.  Esty asserts that despite the clear language of the emissions regulations at issue in this case Defendants were free to disregard it because, he asserts, regulatory requirements are sometimes displaced through "back and forth" "informal norm setting" conversations that take place between a regulator and regulated entity.  *E.g.*, Esty Report ¶¶ 32-33, 51, 62, 72, 74. Without any understanding of how any of the AECDs at issue work Esty then advocates for the cornerstone of Defendants' scienter defense: that in May 2012 FCA employees proposed to certain EPA officials a definition of AECD for disclosure purposes that was much narrower than the regulatory definition, to which the EPA did not object; and that Defendants, therefore, acted innocently in failing to disclose the improper AECDs and defeat devices. Esty Report ¶¶ 51-52; 56-58, 60, 62, 66-68, 72-74, 80, 82-84.  Esty's opinions, which

are no more than his own *ipse dixit* and are premised on speculative assumptions about how the regulatory process works in the most general sense, are inadmissible for several reasons.

Esty is unqualified to provide any opinion on the emissions regulations at issue or the industry "customs" and "norms" because he has absolutely no experience with the regulations, emission control systems, AECDs or defeat devices. Esty provides opinions concerning the level of technicality associated with adherence to the regulations, concluding that the regulations are too technical to be followed literally, without having the slightest idea about the meaning and application of those technical terms and requirements.  Moreover, Esty's opinions concerning how the Clean Air Act and regulations in general must be interpreted are irrelevant and unhelpful because their sole purpose is to bolster his impermissible opinions on Defendants' state of mind.

Professor Esty's expert testimony should be excluded at trial.

## THE ESTY REPORT

Through Esty's Report the lynchpin in Defendants' scienter defense comes into clear focus. The provisions of the Clean Air Act that are at the heart of both this case and the EPA's case against FCA provide that all Auxiliary Emissions Control Devices ("AECDs") must be disclosed in a manufacturer's Certification of Conformity ("COC") submitted to the EPA.  In 2017, the EPA sued FCA for failing to disclose all AECDs in the Subject Vehicles, including certain "defeat devices."  Despite the clear statutory language and the EPA's suit against FCA, Defendants assert that there was a meeting with the EPA in May 2012 following which Defendants believed that they only needed to disclose AECDs that met a narrower "alternative" definition of AECD that FCA had created. FCA's alternative definition only required disclosure of AECDs that (i) resulted in "nonlinear" changes; and (ii) "have the possibility of increasing emissions under normal operating conditions" Esty Report ¶ 52.  Despite there being no

4

communications from the EPA agreeing to the alternative definition, and ample evidence demonstrating that no such agreement ever existed (for example, the fact that the EPA sued FCA), Defendants have testified that they believed they were relieved of their obligation to comply with the relevant regulations.

Defendants retained Professor Esty, who has zero experience with emission control systems, AECDs, defeat devices, or the regulations at issue, to provide the following opinions:

- **AECD and defeat device regulations have not kept pace with technological advances:** Professor Esty opines on the history and purpose of the EPA, CARB and EU regulations concerning disclosure of AECDs and the prohibition of defeat devices and opines that they "have not kept pace with rapidly evolving motor vehicle technologies" (Esty Report ¶ 10) and "complying with and assessing compliance with AECD regulations and defeat device requirements has grown increasingly more complicated … given the millions of lines of computer code that underlie the functioning of the modern vehicle *Id*. ¶ 11;

- **The AECD regulations at issue can be modified through informal discussions:** Professor Esty opines that "[r]egulatory agencies often modify their interpretation of their own rules as circumstances 'on the ground' evolve and issues that were unanticipated at the time the rules were written emerge" and "after the Volkswagen defeat device investigation, the EPA and CARB *de facto* amended their regulatory requirements and enforcement norms regarding what vehicle manufacturers should disclose as AECDs, as well as what constitutes a defeat device" *Id*. ¶ 12;

- **Defendants did not act with scienter:** Professor Esty opines that "FCA undertook steps that it **believed** were consistent with industry custom and practice and with what the EPA **expected** for AECD disclosures", "the evidence does not indicate that any of the FCA senior employees named as defendants in this Action **believed** that FCA's vehicles were not compliant with regulatory custom and practice with respect to AECD disclosures and defeat device requirements at any time during the Class Period", "[t]he current allegations against FCA by the EPA and CARB over alleged failures to disclose alleged AECDs in certain diesel vehicles are tantamount to these agencies accusing FCA of violating regulatory requirements that it would **reasonably have not understood** to have applied at the time it is alleged to have violated these requirements" (*Id*. ¶ 13), that the Atkinson Report and Friedrich Report "delve into a level of technical detail about the alleged AECDs that high-level executives at an organization like FCA would not reasonably be expected to have any expertise in. " *Id*. ¶ 14.

None of these so-called "expert" opinions meet the standard for admissible expert testimony.

## ARGUMENT

### I.  Legal Standard

Defendants bear the burden to establish, by a preponderance of the evidence that Esty's testimony satisfies each of the *Daubert* and Fed. R. Evid. 702 standards.  *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993).  The "gatekeeper" role requires the court to conduct a "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002).  *Daubert* and Fed. R. Evid. 702 "mandate the exclusion of ...unreliable opinion testimony."  *Amorgianos*, 303 F.3d at 266.

Under Fed. R. Evid. 702, a "qualified" witness may testify in the form of an opinion if the opinion "rests on a reliable foundation" and is "relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The reliability inquiry requires that (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) the witness "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Amorgianos*, 303 F.3d at 265.  The aim of the "reliability" prong is to exclude expert testimony based on subjective belief or unsupported speculation.  *See Daubert*, 509 U.S. at 589-90.  An "expert" must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

The relevance inquiry of the *Daubert* analysis requires that the expert opinion "will help the trier of fact to understand the evidence or determine a fact in issue[.]"  Fed. R. Evid. 702;

*United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008) ("[t]estimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own").  Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probably than it would be without the evidence."  *Daubert*, 509 U.S. at 587 (quoting Fed. R. Evid. 401); *see also id.* at 591 ("Expert testimony which does not relate to any issue in the case is not relevant…"). Further, even relevant evidence may be excluded if it is prejudicial. Because "expert evidence can be both powerful and quite misleading," the court should "weigh [ ] possible prejudice against probative force under Fed. R. Evid. 403." *Malletier v.  Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 566 (S.D.N.Y. 2007).

### A.  Esty Does Not Have the Requisite Experience and Qualifications to Opine on the Regulations at Issue or the "Custom and Practice" in the Industry

To offer an expert opinion, a witness must be "qualified as an expert by knowledge, skill, experience, training or education." Fed. R. Evid. 702. Courts must focus on whether a witness is shown to have specific expertise in an area at issue that qualifies him as an expert with respect to each opinion offered. *See Kumho Tire Co.*, 526 U.S. at 156; *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir.2004) ("To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."). While expertise may be based on experience or training, "the district court must ensure that it is dealing with an expert, not just a hired gun." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, at 263 (7th Cir. 1996).

Professor Esty describes the relevant AECD regulations and regulatory process (Esty Report ¶¶ 16-18)  and then opines that (i) "[r]efinements to the Clean Air Act and the regulations implementing this statute have not kept pace with rapidly evolving motor vehicle technologies

(*Id.* ¶ 19); (ii) "[c]omplying with and assessing compliance with AECD regulations and defeat device requirements has grown increasingly more complicated since the Clean Air Act's passage" (*Id.* ¶ 57); (iii) "[r]egulatory agencies often modify their interpretation of their own rules as circumstances "on the ground" evolve and issues that were unanticipated at the time the rules were written emerge." *Id.* ¶ 74.  In providing the above opinions, Professor Esty also provides numerous opinions concerning the "complexity" and "technical" nature of the AECDs at issue and the "industry custom concerning AECDs, disclosure and how the regulations at issue may or may not be interpreted or implemented through communications between regulators and an original equipment manufacturer ("OEM") during the certification process. *Id.* ¶¶ 21, 48-68; 82-84.

Professor Esty is unqualified to provide the above opinions because he has absolutely no experience working with AECDs or with the regulations at issue, much less how those regulations are implemented or interpreted through communications between regulators at the EPA, CARB, EU and OEMs.

At his deposition, Esty confirmed that he has no experience with emission control systems or the specific regulatory provisions at issue in this case.  *See* Deposition Transcript of Daniel C. Esty dated October 17, 2018 (Fuks Decl., Ex. 2) ("Esty Tr.") 25:5-11, 19-25; 27: 3-25; 28: 21-25; 29: 1-2; 32: 24-25; 33: 1-13; 34: 3-24; 35:25; 36: 2-12; 39: 2-12; 41: 12-23; 42: 10-18; 44: 8-25.

Indeed, Esty, has never performed any work that involved making a determination as to whether something is/is not an AECD or defeat device (Esty Tr. at 28:21-29:2); has never worked with the U.S. or EU emissions regulations at issue (*Id*. at 27:20-28:5); has  never done any work related to Certificates of Conformity ("COC") (*Id.* at; 25:12-25),  has never advised an

OEM in connection with a COC (*Id.* at 24:8-19), has never performed any work involved in determining whether a COC application appropriately disclosed and justified each AECD (*Id.* 25:12-25), and has never participated in the communications between regulators and OEMs concerning AECDs, defeat devices or COCs *Id.* at 32:24-35:12).

Esty's complete lack of experience and absence of any knowledge or experience concerning the regulations at play, the customs in the industry or the emissions control features at issue make him unqualified to provide opinions concerning those issues. *See, e.g., S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (finding expert in general area of structured finance unqualified as expert on synthetic CDOs, holding expertise in structured finance is "so broad a category as to become meaningless when particularized here to synthetic CDO's"); *Levinson v. Westport Nat. Bank*, No. 3:09-CV-1955 VLB, 2013 WL 3280013, at *8 (D. Conn. June 27, 2013) ( "Henning offers opinions that are not based upon his training or experience. Instead he simply cherry picks and restates provisions of the OCC materials and draws conclusions unfounded in his articulated experience or industry practice or other credible basis. His methodology or analysis is not presented. The jury has no way to weigh the reliability and credibility of his opinion. It simply tells the juror what to believe but not why."); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 549 (S.D.N.Y. 2004) ("..no foundation for the view that FDA regulations are 'minimal standards,' for the witnesses cannot characterize - as 'minimal' or otherwise - regulations that they do not know or understand in the first place") *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017); *Fernandez v. Cent. Mine Equip. Co.,* 670 F.Supp.2d 178, 183–84 (E.D.N.Y.2009) (finding expert in drilling accident case not qualified even though he had a B.S. and Masters' degree in mechanical

engineering, was employed with a forensic firm specializing in mechanical engineering, had taught courses in engineering, but had little expertise in geotechnical field, never operated any drilling rigs and never consulted for a drilling company); *Quintanilla v. Komori Am. Corp.,* No. 04 CV 5227, 2007 WL 1309539, at *4 (E.D.N.Y. May 4, 2007) (precluding as not qualified an engineer with no experience with printing presses or design of machine guards, even though he had experience in mechanical design for electronics).

For example, while Esty discusses the alternative definition of AECD that Defendants assert they presented to the EPA in a May 2012 meeting that limited AECDs to "nonlinear" changes that increased emissions, Esty is incapable of making any sense of whether FCA's proposed modification results in a minor or major change to the statute. (Q. "Do you know what 'nonlinear changes, i.e., step functions in parameters' means?   A: Not with any degree of engineering specificity."). (Esty Tr. 129:7-10).

Similarly, Esty opines "flagging and evaluating AECDs has grown increasingly more complicated for vehicle and engine manufacturers since the Act's passage, given the extent to which a vehicle's electronic systems are interconnected." Esty Report ¶ 19.  However, Esty has no idea how complicated or uncomplicated this is because he has no experience with determining whether a function is an AECD that functions as a defeat device or whether a function is an AECD.  Esty Tr. at 32:24-35:12.

In the same vein, Esty opines that "[d]etermining what constitutes an AECD is not, however, a simple or straightforward process given the millions of lines of code that underlie the modern vehicles." Esty Report ¶ 26; *See also Id*. at ¶ 55 (citing the challenge of assessing compliance due to "the millions of lines of code that underlie the modern vehicle."); *Id*. at ¶56 ("many thousands of lines of code that can affect a vehicle's emission systems"; *Id*. at ¶ 60

("…AECDs depend greatly on the calibration of a number of interconnected functions within the vehicle, which makes the code underlying these alleged AECDs even more difficult to isolate for regulatory review"). He also opines that "[a] literal interpretation of EPA's regulations would therefore lead to a tremendous volume of disclosure for a given vehicle because of the many thousands of lines of code that can affect a vehicle's emission systems." *Id*. ¶ 56. However, Esty has no experience working with emission control systems, much less determining whether a feature is an AECD, or how that determination is impacted by the code underlying the AECD. Esty does not even know if the 8 AECDs at issue required the interpretation of millions of lines of code or if that code was required to be disclosed to regulators.

> Q: And do any of these eight alleged AECDs require the interpretation of millions of lines of code?  Do you know?
>
> A: I have testified that the engineering dimension of the alleged AECDs is beyond the scope of my report, and so I don't feel like I am in a good position to answer the question that you are asking.

Esty Tr. 146: 6-13.

In fact, the complexity of the code has nothing to do with FCA's alleged non-disclosure of the eight AECDs at issue here because simply disclosing the *existence* of the AECDs itself is an entirely different matter than disclosing the underlying code - something that was *not* (nor is alleged to have been) required. *See* 40 C.F.R. § 86.094-21(b)(1)(i) (requiring that each application for certification include "description of each [AECD]" and a "justification of each AECD which results in a reduction in the effectiveness of the emission control system"). Of course, Esty does not know this because he knows nothing about emission control systems or the regulations at issue.

Esty also opines that "complying with and assessing compliance requires subjective judgments to be made both by regulated parties (like FCA) and the bodies regulating them (like

11

the EPA)" (Esty Report ¶ 26) and states that "Such informal norm-setting conversations are especially common in circumstances that entail highly technical issues where written statutes, regulations, and even guidance letters cannot (and do not) cover all of the issues and parameters in play." (Esty Report ¶ 33).  Esty's lack of understanding of the "technical issues" he cites make him unqualified to assess whether this is in fact a situation that permits the degree of subjectivity he claims is warranted here.

> Q: So in your opinion, does this informal revision process apply with respect to all U.S. statutes and laws or just the Clean Air Act.?
>
> A: …As I have mentioned in some laws, **in some particular subsections of the law like the one we are focused on, the zone of uncertainty is wider** where the need for judgment is broader, the subjectivity is greater, and as a result you end up with some statutes where this is more of an issue than others.

Esty Tr. 100: 25- 101: 1-3; 101: 6-19.

While Esty testifies that the "zone of uncertainty" is wider with respect to the subsections of the statute at issue in this case, he himself has no experience working with those particular provisions and therefore is unqualified to opine on the degree of "subjectivity" associated with them.  Moreover, Esty's opinion about the "zone of uncertainty" is contradicted by the EPA guidance letters and advisory circulars that Esty himself cites, which demonstrate that the EPA repeatedly confirmed between 1972 and 2014 that an OEM's obligation to disclose all AECDs was not altered.[3]  Indeed, at his deposition Esty confirmed that the statute has not changed as to

---

[3] *See, e.g.,* 1998 "Dear Manufacturer" Letter VPCD-90-08 entitled "Subject: Reminder to Include in the Application for Certification a Description of AECDs Which May Reduce the Effectiveness of the Emission Control System" (cited at Esty Report Appendix C, page 6) (Fuks Dec. Ex. 3); January 19, 2001, EPA "Dear Manufacturer" letter (CCD-01-02 (HD)) titled "Advisory Circular 24-3, p. 6-7 (Ex. 4): "..A manufacturer has a responsibility to describe all AECDs in its application for certification. Thorough disclosure of the presence of such an AECD and its expected impact on emission performance is essential in allowing EPA to evaluate the AECD and determine whether it represents a defeat device. Clearly, any AECD which is not

what AECDs must be disclosed (Esty Tr. 178: 3-7) and a manufacturer is required to comply with the statute.  *Id*. at 56:23-57:4.

When challenged about his lack of experience with emissions controls or the relevant regulations, Esty asserted that his opinions are based on his knowledge of regulatory practice in general, unconnected to emissions control or emissions regulations:

> A: I am testifying as someone who has been a regulator and someone who studies regulation and telling you what the regulatory practice is, what the regulatory reality on the ground is, and it is the case in a number of industries where there has been technological evolution, auto industry among others, that the practice is for the teams within the company that are responsible for regulatory compliance to take guidance from the EPA as to how they should understand the rules and how they should understand the rules in the context of changing technologies.

Esty Tr. 146:24-147:11.  However, without any experience or knowledge about emission control systems, AECDs or the regulations and industry norms concerning them, Esty's opinions about the regulatory processes in general are far too vague to be considered relevant or helpful to the facts of this case.  *See In re Rezulin Prod. Liab. Litig*., 309 F. Supp. 2d 531, 543–44 (S.D.N.Y. 2004) ("Even if expert testimony on the ordinary practices of a profession or trade were appropriate 'to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry,' it still must comport with the reliability and helpfulness requirements of Rule 702. At their core, however, the witnesses' opinions regarding ethical

---

fully identified in the manufacturer's application for certification and for which emissions impacts are not provided cannot be appropriately evaluated by EPA and therefore cannot be determined to be acceptable by EPA."); Dear Manufacturer" letter dated November 24, 2014 (CD-14-19 (LDV/LDT/ICI/LIMO), p. 21 (Ex. 5) ("AECD descriptions List all auxiliary emission control devices (AECD's) used on any applicable vehicles including the sensed and controlled parameters (Refer to EPA's guidance letter, VPCD-98-08).   Include a detailed justification of each AECD which results in a reduction in effectiveness of the emission control system, and rationale why the AECD is not a defeat device (40 C.F.R. § 86.1809-12).").

standards for reporting or analyzing clinical trial data or conducting clinical trials articulate nothing save for the principle that research sponsors should be honest. Even if charitably viewed as a "standard," the testimony nevertheless is "so vague as to be unhelpful to a fact-finder."); *Kellogg v. Wyeth*, No. 2:07-CV-82, 2012 WL 2970621, at *5 (D. Vt. July 20, 2012) ("although Mr. Stewart may testify that metoclopramide is prescribed for periods that greatly exceed the FDA-approved indications, and that patients have suffered adverse reactions, he may not characterize this as common or frequent, without specifically disclosing the facts or data upon which he makes this determination").

Similarly, Esty's regulatory experience is far too general to render him qualified to provide an expert opinion in this case.  In *Rezulin,* the court cited Judge Conner's opinion in *Mancuso v. Consolidated Edison* where the court precluded a medical expert from testifying the PCB caused plaintiff's injuries "the Court found that his only relevant experience -exposure, during his medical training, to "many patients [that] had environmental problems" - was insufficient to establish the requisite specialized knowledge regarding the effects of PCBs on "living creatures." *In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004). Similarly, Esty's experience with environmental regulation in general is insufficient to establish the necessary knowledge regarding AECD/defeat device regulations. Because Esty is unqualified to provide an on the specific regulations at issue in this case, his opinions concerning compliance with and interpretation of those regulations should be excluded.  Esty Report ¶¶9-12; 19-34; 51-65; 66-85.

**B.  Esty's Opinions That Defendants Did Not Believe FCA Was Violating Emissions Regulations Impermissibly Usurps the Role of the Jury and Should be Excluded**

When testimony does not aid the fact finder "to understand the evidence or determine a fact in issue" it is inadmissible for such purposes because it is merely placing the expert in the

role of counsel in "propounding a particular interpretation [of the party's] conduct. *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001).  An expert who is merely an advocate of a party's position will not assist the Court or the fact finder in understanding the issue.  "When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).  Further, an expert may not assume the role of counsel in making legal arguments. *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ("no expert may supplant the role of counsel in making argument at trial"); *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 267–68 (D. Conn. 2017) (stating that Federal Rules of Evidence 701, 702 and 403 "afford ample assurances *against the admission of opinions which would merely tell the jury what result to reach*, somewhat in the manner of the oath-helpers of an earlier day."); *CoxCom, Inc. v. Chaffee*, No. 05 Civ 107, 2006 WL 1793184, at *8 (D.R.I. June 26, 2006) ("Defendants' counsel, not their expert, is the proper individual to argue legal issues before the Court.").

The clear thrust of Esty's testimony is to present Defendants' scienter defense. Esty repeatedly opines that Defendants did not believe FCA was violating emissions regulations.

- "the evidence does not indicate that any of the FCA senior employees named as defendants in this Action **believed** that FCA's vehicles were not compliant with regulatory custom and practice with respect to AECD disclosures and defeat device requirements at any time during the Class Period." Esty Report ¶¶ 13, 82, 84;

- "[FCA] undertook steps that it **believed** were consistent with industry custom and practice and with what the EPA expected for AECD disclosures." *Id.*  ¶¶ 14, 82;

- "FCA '**believe[d]** that CARB and EPA are really only interested in AECDs that reduce effectiveness' of emissions controls." *Id.* ¶ 63;

- "FCA **Understood** its AECD Disclosure Practice to Be Consistent with Industry Custom and Practice." p. 39 (heading of section);

- "FCA reasonably **understood** that the EPA was comfortable with its approach to disclosing AECDs as presented in May 2012."  *Id.* ¶ 67;

15

- "FCA came away from its May 2012 meeting with a better **understanding** of **what the EPA was looking for** from FCA with regard to its AECD disclosures." *Id.* ¶ 68;

- "until about 2015, the EPA appeared to **understand and be comfortable with** FCA's approach to compliance." *Id.* ¶ 80;

- "FCA's **understanding** of an AECD's permissibility tracked federal and state regulatory requirements in practice." *Id.* ¶ 82;

- "FCA **attempted to follow** industry custom and practice in its disclosures to regulatory agencies." *Id.* ¶ 82;

- "FCA **intended** to comply with AECD disclosure regulations and benchmark its disclosures with the rest of the industry." *Id.* ¶ 82;

- "FCA **understood** that '[EPA] did not **want** every calibration feature written in the AECD [application for certification] documentation.'" *Id.* ¶ 52;

- "the current allegations against FCA by the EPA and CARB over alleged failures to disclose AECD's in certain diesel vehicles are tantamount to these agencies accusing FCA of violating regulatory requirements that it would reasonably have not **understood** to have applied at the time that it is alleged do have violated these requirements." *Id.* ¶¶ 13, 83.

Indeed, at his deposition, Esty confirmed that the purpose of his testimony was to support

Defendants' position that they did not make the alleged misrepresentations with scienter:

> It is my review of the record, the statements that I can see, the actions taken, the conduct of the company overall, that given the circumstances they faced, the decisions they made are certainly reasonable, ***and beyond that, I would say it would be very hard to conclude that there is any evidence of intentional misrepresentation*** or anything that would lead you to think that this was outside the bounds of company practices that I would expect to see in a large company seeking to follow regulatory requirements in a technically complicated area.

Esty Tr. 212:5-16.

As Esty admitted, he is completely unqualified to opine as to what anyone believed. Esty

Tr. 157:12-13 ("I am in no position to specify what was in anyone's head or what the company

believed…").

Courts in the Second Circuit have long held that expert opinions on state of mind or

intent must be excluded. *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 14 F. Supp.

2d 391, 398 (S.D.N.Y. 1998) (excluding testimony concerning "the mental processes of the

Kidder and M & W people: what they knew, believed, assumed, or understood, on the basis of their own knowledge or communications from others. Again, that evidence must come from the trial testimony of the individuals concerned."); *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 CIV 3020 SAS, 2011 WL 6288415, at *7–9 (S.D.N.Y. Dec. 15, 2011) (stating that "There is no dispute that opinions concerning state of mind are an inappropriate topic for expert opinion," excluding as impermissible expert opinions that party "relied blindly," was "untroubled by Fitch's ratings withdrawal", "understood neither the odds nor the game", "hoped for the best" and "appeared to assume" as inferences left to the finder of fact); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 168 (N.D.N.Y. 2010), quoting  *In re Fosamax Products Liability Litigation,* 645 F.Supp.2d 164, 192 (S.D.N.Y.2009) ("Expert witnesses are not permitted to testify as to the 'knowledge, motivations, intent, state of mind, or purposes' of others."); *See also In re Diet Drugs, No. MDL 1203*, 2001 WL 454586, at *2 (E.D. Pa. Feb. 1, 2001) (excluding expert testimony regarding corporate intent of defendant and/or what beliefs of FDA officials were on matters upon which they spoke or acted).

Similarly, Esty's opinion about what Defendants "reasonably understood" is inadmissible because it is for the jury not an expert to determine whether Defendants acted reasonably *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) ( "Whether a party acted with objective reasonableness is a quintessential common law jury question. By the same token, juries traditionally decide whether an individual acted knowingly, or willfully, or maliciously, or with specific intent, or with any other relevant state of mind. Thus, this case will present to the jury no new or more demanding task than what juries have always done"). Likewise, Esty's opinion about what "high-level executives" at FCA "would reasonably be expected to have expertise in" is nothing more than speculation as to Defendants'

knowledge about the undisclosed AECDs at issue. *Tyree v. Boston Sci. Corp.*, 54 F. Supp. 3d 501, 517–18 (S.D. W.Va. 2014), *as amended* (Oct. 29, 2014) ("I will not permit the parties to use experts to usurp the jury's fact-finding function by allowing an expert to testify as to a party's state of mind ***or on whether a party acted reasonably.***"); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) (expert's fact narrative from buyer's viewpoint, which included speculations as to states of mind and motivations of parties, was inadmissible as unhelpful to jury); *Taylor v. Evans*, No. 94 CIV. 8425 (CSH), 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (holding that expert's "musings as to defendants' motivations" were inadmissible).

Esty's speculation concerning the real motives of the EPA, i.e. his opinion that the Volkswagen scandal acted as a "watershed" moment (Esty Report, ¶ 71) and that absent VW, the EPA would not have sued FCA if the VW scandal had not occurred (*id.* ¶¶ 13, 73 ("It is my opinion that absent such an alleged high-profile violation it is unlikely that these events would have otherwise occurred")), are also impermissible opinions on the EPA's state of mind.  When Esty was asked how he reconciles the fact that the EPA's suit against FCA is completely at odds with FCA's explanation that in 2012 the EPA permitted it to alter the AECD disclosure requirements set forth in the statute, Esty simply points to the "intervening watershed moment," citing the Volkswagen case.  Esty Tr. 174:21-25; 175: 6-19.  In concocting an explanation of Defendants' alleged unlawful conduct and the resulting governmental actions against them, Esty impermissibly ascribes motivations to the EPA.  *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 546–47 (S.D.N.Y. 2004) ("Furthermore, plaintiffs' experts propose improperly to assume the role of advocates for the plaintiffs' case by arguing as to the intent or motives underlying the conduct of Warner-Lambert or others, a transgression that has resulted in the exclusion of "expert" testimony as to the "real motive" behind certain business transactions…. Inferences

about the intent or motive of parties or others lie outside the bounds of expert testimony"). In addition to being an impermissible opinion on state of mind, Esty's opinion on the Government's motivations in bringing suit against FCA is pure speculation.

Indeed, Esty's testimony demonstrates that his role in the case is not to educate the jury about an area within his scope of expertise but to serve as a compurgator advocating for Defendants' scienter theory.

When pressed, Esty admitted that there is no evidence that anyone at the EPA confirmed that the supposed understanding FCA came away from the meeting with was sufficient to meet the statute's disclosure requirements. Esty's testimony demonstrates that the EPA did not confirm this because such informal dialogue does not in fact serve to change the law:

> Q: Do you know if there is any evidence in this action between FCA and the EPA where the EPA actually states this understanding?
>
> A: What I would tell you is that the EPA and regulators in general based on my experience as a regulator are not in the business of confirming the specifics that a company might put forward in this regard and there is in fact a hesitation on the part of the regulator to put down in writing or confirm in writing any of these informal discussions for fear that later circumstances will change and they will want to shift the informal guidance that has been provided, a regulatory requirement as they have laid them out.  So as a matter of practice this is not what the EPA would do.

Esty Tr. 132:10-25.  Indeed, Defendants other expert, James Lyons, confirmed that the purported understanding that Defendants had from the May 2012 meeting would not change FCA's disclosure requirements.  *See* Deposition Transcript of James M. Lyons, dated October 16, 2018 (Ex. 6), at 123:4-12.

Esty further confirmed that if FCA had written to the EPA requesting confirmation of the supposedly agreed-to AECD definition the EPA would "cite back to the regulations."  (Esty Tr. 133: 9-13).  In short, Esty's opinion that this agreement existed but could not ever be

19

acknowledged or confirmed by the regulators has no more support than a speculative conspiracy theory Esty conjures to support Defendants' narrative.

Further, Esty ignores the evidence in the record that demonstrates that the EPA did not permit Defendants to change the AECD disclosure requirements. For example, on September 5, 2012, Mr. Robert Shaw – the FCA employee who also attended the May 2012 meeting and purported to have shown the EPA a slide with the "alternative" AECD definition – emails the members of FCA's Emissions Certification Group Messrs. Gerald Kopinski and Roger Orteca and Ms. Beth Borland, a write-up "Summary of EPA and ARB AECD Regulations" drafted by him. FCA-PIRNIK-001994107 (Ex. 7) attaching FCA-PIRNIK-001994108 (Ex 8). The document contained verbatim language from the relevant AECD and defeat device regulations: 40 C.F.R. § 86.1844-01(d)(11), (e)(1) - (e)(2), and (g)(3) - (g)(5), 40 C.F.R. § 86.1809-01, 40 C.F.R. § 86.1810-09, 40 CFR and 86.1844-01(d)(11), (e)(1) - (e)(2), and (g)(3) – (g)(5). FCA-PIRNIK-001994108 (Ex. 8). The document also contained verbatim an "ARB Diesel Guidance" that CARB's Mr. Lucky Benedict had sent FCA on February 29, 2012. (FCA-PIRNIK-001994049) (Ex. 9). *Id.* Tellingly, neither the email nor the attached AECD Regulations document contained the internal narrowed AECD definition. Additionally, in a 2013 presentation **by the EPA** that FCA received expressly titled "AECD Reporting", the EPA clearly defined the applicable definition of AECD and what needed to be disclosed. (FCA-PIRNIK-002705926 (Ex. 10) attaching FCA-PIRNIK-002705938 (Ex. 11). The presentation repeated the regulatory definition of AECD and noted "Almost all AECDs reduce the effectiveness of the emission control system" and pointed to AECD guidance in VPCD-98-13 and Advisory Circular 24-3. (Ex. 11 at 940). The presentation further explicitly identifies "EGR modulation" and "SCR

dosing control" as "Typical AECDs". *Id.* at 941). It also identifies "Dual Maps" as AECDs. *Id.* at 944).

Moreover, Morrie Lee ("Lee"), a member of FCA's certification group responsible for issuing COC's wherein AECDs are disclosed, (who claimed to have attended the May 2012 meeting during which Defendants assert the "alternative" definition was mentioned by FCA) writes to Joel Dalton (who also attended the May 2012 meeting) at the EPA on September 30, 2015, asserting that FCA had always been following the regulatory definition of AECD for disclosure purposes:

> Even before VW, we were working on the subject topic to be disseminated to all calibrators. An excerpt from out flow chart and essentially and quote from the regs, is the following:  Does the feature sense any parameter (including timer based deactivations) with the result of 1) activating, deactivating, modulating or delaying the operation of any part of the emission control system (exhaust or evap) or 2) impacting the fuel economy of the vehicle in any way.  In our flow chart, answering yes to the question indicates that the feature is an AECD.

FCA-PIRNIK-001622311-1622313, at 1622312-313 (Ex. 12). Lee asks Dalton if there was any more recent guidance as to what AECDs should be disclosed.  Joel Dalton writes back to him and says "***No, I don't think there is more up-to-date guidance***." FCA-PIRNIK-001622311-1622313, at 001622312 (Ex. 12).   Following Lee's request, Steve Mazure chastises Lee for asking the EPA "what to put on the AECD list" bemoaning the fact that "[y]ou ask and [the EPA] will say *__all__*." FCA-PIRNIK-001622402-FCA-PIRNIK001622404. (Ex. 13).

Esty's conclusions concerning the May 2012 meeting and FCA's "understanding" of what was required to be disclosed are further undermined by the fact that the EPA has sued FCA for failure to disclose all AECDs as required by the regulations.

Because there is zero evidence that the EPA ever agreed to Defendants' alternative AECD definition Esty's opinions do no more than recount a narrative of Defendants' version of the case.

Esty's opinions about what Defendants "knew", "believed" and "understood" and Esty's opinions about the impetus for the EPA's suit against FCA, as well as Esty's factual narrative of the evidence that supports these opinions, are impermissible opinions on state of mind which invade the province of the jury.  Esty Report ¶¶ 13-14; 51-60; 62-74; 80-84.

## C. Esty's Opinions Concerning Regulatory Compliance Are Irrelevant and Not Helpful

In order to buttress his impermissible argument on Defendants' state of mind, Esty provides opinions on how the Clean Air Act, and regulations in general, are interpreted.  He does so solely to provide a plausible explanation for Defendants' actions consistent with his conclusion that they did not act with scienter.

Esty opines that the Clean Air Act should not be interpreted literally (Esty Report, ¶ 56), that the Clean Air Act provisions are often amended on an *ad hoc* basis *id.* ), that the Clean Air Act can be amended informally *id.* ¶63), that engine software forecloses the ability to follow the provisions of the Clean Air Act literally *id.* ¶57), and that the EPA and CARB "de facto amended" the Clean Air Act in 2015. *Id.* ¶74. These opinions are all irrelevant and unhelpful because they serve the sole purpose of supporting Esty's impermissible opinion that Defendants did not believe they were violating emissions regulations by failing to disclose the 8 AECD's on the Subject Vehicles because they acted reasonably in relying on the exchange with the EPA that purportedly occurred at the May 2012 meeting.  Esty's testimony should be excluded because it "does no more than counsel for [plaintiff] will do in argument, i.e., propound a particular interpretation of [defendant]' s conduct" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48

(S.D.N.Y. 2016) (internal citations and quotations omitted). Esty should be precluded from providing testimony reflected in the following paragraphs of his report. Esty Report ¶¶ 9-12; 19; 26-27; 32-34; 51; 55-60; 61-64; 66-84.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court exclude Esty's testimony as reflected in the entirety of the Expert Rebuttal Report of Professor Daniel Esty.


Dated: December 12, 2018

New York, New York


**POMERANTZ LLP**
*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Michael J. Wernke
Veronica Montenegro
600 Third Avenue, 20th
    Floor
New York, New York
    10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com




**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim

Sara Fuks
Jonathan Stern
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com


*Co-Lead Counsel for Plaintiffs and
the Class*

24