# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE and ROBERT E. LEE<br><br>Defendants. | **Civ. Action No: 15-cv-07199-JMF** |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE CERTAIN TESTIMONY OF DEFENDANTS' PROPOSED EXPERT JAMES M. LYONS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

LYONS' PROPOSED EXPERT TESTIMONY ................................................. 4

ARGUMENT ...................................................................................................... 5

    A.  Lyons' Opinions Concerning FCA's State of Mind Should be Excluded ........... 6

    B.  The Court Should Exclude Lyons' Irrelevant and Unhelpful Testimony Concerning FCA's Communications with the EPA and CARB .......................... 9

    C.  The Court Should Exclude Lyons' Opinions Concerning the "Three Approaches" for Assessing AECD's/Defeat Devices ............................................................... 13

    D.  The Court Should Exclude Lyons' Criticism of Dr. Atkinson's Description and Analysis of the Eight AECDs ............................................................................. 19

CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Amorgianos v. Amtrak,*
   303 F.3d 256 (2d Cir. 2002) ........................................................................ 5, 19, 20

*Awad v. Merck & Co.,*
   99 F. Supp.2d 301 (S.D.N.Y. 1999).......................................................................... 14

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,*
   No. 09 CIV 3020 SAS, 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ..................................... 6

*CoxCom, Inc. v. Chaffee,*
   No. CIVA 05-107S, 2006 WL 1793184 (D.R.I. June 26, 2006) ............................................. 11

*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)................................................. 4, 5, 14

*Fleischman v. Albany Med. Ctr.,*
   728 F. Supp. 2d 130 (N.D.N.Y. 2010) ......................................................................... 8

*Highland Capital Mgmt., L.P. v. Schneider,*
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) .................................................................... 6, 8, 11

*In re Diet Drugs,*
   No. MDL 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001)...................................................... 6

*In re Fosamax Products Liability Litigation,*
   645 F.Supp.2d 164 (S.D.N.Y.2009).......................................................................... 8

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,*
   593 F. Supp. 2d 549 (S.D.N.Y. 2008), *on reconsideration in part* (June 26, 2008) ............... 15

*In re Mirena IUD Prod. Liab. Litig.,*
   169 F. Supp. 3d 396 (S.D.N.Y. 2016)......................................................................... 15

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)....................................................................... 20

*In re Rezulin Prod. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)..................................................... 2, 6

*Kellogg v. Wyeth*,
   No. 2:07-CV-82, 2012 WL 2970621 (D. Vt. July 20, 2012).................... 16

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*,
   14 F. Supp. 2d 391 (S.D.N.Y. 1998)....................................................... 6, 8

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).................... 5, 19

*Lynch v. Trek Bicycle Corp.*,
   374 F. App'x 204 (2d Cir. 2010).............................................................. 22

*Malletier v.  Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)......................................................... 6

*Perkins v. Origin Medsystems, Inc.*,
   299 F. Supp. 2d 45 (D. Conn. 2004)......................................................... 13

*Primavera Familienstifung v. Askin*,
   130 F. Supp. 2d 450 (S.D.N.Y. 2001)................................................... 3, 10

*Pugliano v. United States*,
   315 F. Supp. 2d 197 (D. Conn. 2004)................................................. 21, 22

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) ............................................................ 11, 13

*SLSJ, LLC v. Kleban*,
   277 F. Supp. 3d 258 (D. Conn. 2017)....................................................... 11

*Taylor v. Evans,*
No. 94 Civ. 8425, 1997 WL 154010, 1997 U.S. Dist. LEXIS 30107, at *5 (S.D.N.Y. Apr.1, 1997) ................................................................................................................................. 8

*Tyree v. Boston Sci. Corp.,*
54 F. Supp. 3d 501 (S.D.W. Va. 2014) .................................................................................. 8

*United States v. Duncan,*
42 F.3d 97 (2d Cir. 1994) .................................................................................................... 10

*United States v. Mejia,*
545 F.3d 179 (2d Cir. 2008) .................................................................................................. 5

*United States v. Williams,*
506 F.3d 151 (2d Cir. 2007) .................................................................................................. 4

*Washington v. Kellwood Co.,*
105 F. Supp. 3d 293 (S.D.N.Y. 2015) .................................................................................. 14

#### **Rules**

Fed. R. Evid. 403 ............................................................................................................... 6, 11

Fed. R. Evid. 701 .................................................................................................................. 11

Fed. R. Evid. 702 ......................................................................................................... passim

#### **Regulations**

40 C.F.R. § 86.1803-01 ........................................................................................................ 18

Class Representatives Gary Koopmann, Timothy Kidd and Victor Pirnik (collectively, "Plaintiffs") submit this memorandum of law in support of their motion to exclude certain testimony of Defendants' proposed expert James M. Lyons ("Lyons"), which has been presented in the Expert Rebuttal Report of James M. Lyons ("Lyons Report[1]," Ex. 1 to the Declaration of Sara Fuks ("Fuks Decl.")).[2]

## **INTRODUCTION**

Defendants proffer Lyons to rebut the testimony of Plaintiffs' expert Dr. Christopher M. Atkinson. Dr. Atkinson is Plaintiffs' expert concerning Defendants' compliance with EPA and CARB emissions regulations during the Class Period, who opined that each of the eight emission control features on the Subject Vehicles were "AECDs" and defeat devices under the relevant regulations, and that FCA violated U.S. emissions regulations.  Notably, in "rebuttal," Lyons does **not** opine that the eight features were not AECDs or defeat devices. Nor does he opine that FCA was in compliance with U.S. emissions regulations.

Instead, Lyons provides facially improper opinions concerning FCA's state of mind resulting from a meeting in May 2012 in which, Defendants assert, FCA employees proposed to certain EPA officials a definition of AECD for disclosure purposes that was much narrower than the regulatory definition. In essence, Lyons' testimony is an impermissible attempt to place an expert's stamp of approval on Defendants' scienter argument – that FCA's employees believed FCA was in compliance with AECD regulations because they believed that they had an understanding with the EPA that FCA would apply a narrowed AECD definition. For example, Lyons opines that:

---

[1] The Lyons Report references deposition testimony of Michael Berry that was corrected by Mr. Berry in his errata sheet.  Defendants have requested that Plaintiffs attach the errata sheet to Mr. Berry's deposition for accuracy.  Accordingly, Mr. Berry's errata sheet is attached to the Fuks Decl. as Exhibit 2.

[2] All references to "Ex." are to exhibits to the Fuks Decl.

1

- "FCA's interactions with EPA and CARB reflect an attempt by FCA and the agencies to interpret the regulations and define what the agencies expected Chrysler to disclose" (Lyons Report, ¶ 81),

- "Chrysler **relied**[3] on an internal understanding of how to identify AECDs for the purpose of the certification process, developed based on interactions with EPA" (*Id.* ¶ 81), and

- "FCA sought to provide regulators with what it **believed** was the germane information required for certification without overloading the agencies with extraneous information." *Id.* ¶ 81.

It is black-letter law that such opinions are impermissible. Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony. *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004). Lyons' testimony in this regard is nothing more than an endorsement of FCA's one-sided narrative that it supposedly strayed from the statute's AECD disclosure requirements because the EPA assented to it doing so in a May 2012 meeting.

In support of his state of mind analysis, Lyons provides additional opinions concerning the relationship and communications between the EPA and manufacturers during the certification process that could impact how FCA understood the regulations should be applied in practice. For example, Lyons opines that:

- "EPA and CARB certification staff have become much less focused on issuing written guidance and have chosen instead to rely much more on verbal communications with new vehicle and engine manufacturers." (Lyons Report ¶ 77.),

- "[I]t is not unusual for manufacturers to strive for a balance between meeting disclosure obligations while limiting the provision of extraneous or unnecessary information to regulators" (*Id.* ¶ 88),

- "[T]hese emails are typical of efforts by manufacturers to understand agency expectations concerning the information to be disclosed in the regulatory approval process" (*Id.* ¶ 92), and

- "Chrysler's approach to disclosures and discussions with regulators was generally consistent with that of other manufacturers." (*Id.* ¶ 24).

---

[3] All emphasis is added unless otherwise noted.

This testimony should be excluded because whether FCA's communications with the EPA during the certification process were standard in the industry or unique is not an issue in this case. Whether the May 2012 meeting was a normal part of the process or a special exception that the EPA made for FCA is irrelevant to whether FCA believed it was in compliance with the regulations. Rather, Lyons' testimony is clearly an attempt to provide tangential expert testimony to bolster Defendants' scienter defense. When testimony does not aid the fact finder "to understand the evidence or determine a fact in issue" it is inadmissible for such purposes because it "does no more than counsel [for a party] will do in argument, i.e., propound a particular interpretation of [the party's] conduct." *Primavera Familienstifung v. Askin,* 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001).

Critiquing Atkinson's analysis of the eight AECDs, Lyons asserts that there are "three primary approaches" that absolutely must be followed when evaluating whether a calibration feature is an AECD or defeat device (Lyons Report, ¶ 104) and that Dr. Atkinson's analysis is inadequate because he did not follow these approaches precisely as Lyons describes them. *Id*. ¶129. While Lyons champions these three approaches as analytically mandated, he utterly fails to provide any grounds for his assertion. Indeed, at his deposition, Lyons admitted that they are merely the way that he would do it. *See* Deposition Transcript of James M. Lyons, dated October 16, 2018 ("Lyons Tr.") at 54:20-55:25.[4] That is, he made them up. Since there is no mandate in the industry that Lyons' three approaches must be followed, Lyons should be prohibited from testifying that Dr. Atkinson's method of evaluating the eight AECDs is unreliable simply because he may have followed a different method of evaluation.

---

[4] Excerpts from the Lyons Tr. are annexed as Exhibit 3 to the Fuks Decl.

Lyons' critique of Dr. Atkinson's description and analysis of the eight AECDs should also be prohibited because not only did Lyons fail to perform any analysis of the eight AECDs himself, but he admitted that **he does not even understand how the AECDs worked, their function or their purpose**. Lyons Tr. at 45:8-11; 126:2-17; 140:21-24; 141:22-25; 176:12-177:3; 181:3-7; 189:7-9; 189:18-22; 200:15-201:3; 201:15-19; 202:6-21; 203:9-25. Lyons cannot opine that Dr. Atkinson's description and analysis is deficient if he does not even understand what Dr. Atkinson was analyzing. Without conducting any analysis himself or even understanding how each of the eight AECDs worked Lyons has no basis to opine that Dr. Atkinson's description of the AECDs or his methodology for evaluating them was inadequate to reach his conclusions.

## LYONS' PROPOSED EXPERT TESTIMONY

Defendants retained Lyons to "respond to the Expert Report of Christopher M. Atkinson SC.D." Lyons Report, ¶ 11. Lyons provides improper opinions on the following:

- **FCA's state of mind**: Lyons opines that FCA believed that the Company was not required to disclose all AECDs, that FCA relied on certain information in making its disclosure determinations and that FCA was attempting to comply with what it believed the EPA wanted disclosed.  (Lyons Report  ¶¶ 24, 81-88);

- **FCA's communications with regulators were typical in the industry:** Lyons opines that FCA's communications with its regulators and the Company's attempts to understand what was required to be disclosed were consistent with what other manufacturers were doing in the industry.  (*Id.* ¶¶ 89-96);

- **An analysis of calibration features must follow a specific methodology:** Lyons identifies three approaches to evaluating whether a calibration feature is an AECD or defeat device and asserts that any analysis that strays from these approaches is per se inadequate and unreliable. (*Id.* ¶¶ 96-107; 125-126; 164-165; 194; 204; 222; 246; 261; 275);

- **Dr. Atkinson's descriptions and analysis of the eight AECDs is inadequate:** Lyons opines that Dr. Atkinson's description and analysis of each of the eight features is inadequate and unreliable because Dr. Atkinson's description is not "complete" or "thorough" and because Dr. Atkinson did not sufficiently address certain record evidence or explain his analysis. *Id.* ¶¶ 14-23; 161-305.

4

**ARGUMENT**

Defendants bear the burden to establish, by a preponderance of the evidence that Lyons' testimony satisfies each of the *Daubert* and Fed. R. Evid. 702 standards.  *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). The "gatekeeper" role requires the court to conduct a "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002).  *Daubert* and Fed. R. Evid. 702 "mandates the exclusion of …unreliable opinion testimony."  *Amorgianos*, 303 F.3d at 266.

Under Fed. R. Evid. 702, a "qualified" witness may testify in the form of an opinion if the opinion "rests on a reliable foundation" and is "relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  The reliability inquiry requires that (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) the witness "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also Amorgianos*, 303 F.3d at 265.  The aim of the "reliability" prong is to exclude expert testimony based on subjective belief or unsupported speculation.  *See Daubert*, 509 U.S. at 589-90.  An "expert" must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

The relevance inquiry of the *Daubert* analysis requires that the expert opinion "will help the trier of fact to understand the evidence or determine a fact in issue[.]"  Fed. R. Evid. 702; *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008) ("[t]estimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on

his or her own").  Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probably than it would be without the evidence."  *Daubert*, 509 U.S. at 587 (quoting Fed. R. Evid. 401); *see also id.* at 591 ("Expert testimony which does not relate to any issue in the case is not relevant…"). Further, even relevant evidence may be excluded if it is prejudicial. Because "expert evidence can be both powerful and quite misleading," the court should "weigh [ ] possible prejudice against probative force under [Fed. R. Evid.] 403." *Malletier v.  Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 566 (S.D.N.Y. 2007).

### A.     Lyons' Opinions Concerning FCA's State of Mind Should be Excluded

Courts in the Second Circuit have long held that expert opinions on state of mind or intent must be excluded.  *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 14 F. Supp. 2d 391, 398 (S.D.N.Y. 1998) (excluding testimony concerning "the mental processes of the Kidder and M & W people: what they knew, believed, assumed, or understood, on the basis of their own knowledge or communications from others. Again, that evidence must come from the trial testimony of the individuals concerned.").  An expert may not speculate as to the beliefs of others or a particular state of mind held by a party.  *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005); *See also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 554 (S.D.N.Y. 2004) (excluding expert's statements as to intent and motives as "improper musings as to the defendants' motivations") (internal quotations and citations omitted); *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *2 (E.D. Pa. Feb. 1, 2001) (excluding expert testimony regarding corporate intent of defendant and/or what beliefs of FDA officials were on matters upon which they spoke or acted).

Lyons improperly opines that the evidence in this matter demonstrates that FCA subjectively believed that it was in compliance with its AECD disclosure obligations. Lyons'

opinions on what FCA "believed," "understood," "expected" and "relied on" are opinions that go directly to Defendants' state of mind and should be stricken.  Lyons Report, ¶¶ 81-92.  *See. e.g., Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 CIV 3020 SAS, 2011 WL 6288415, at *7–9 (S.D.N.Y. Dec. 15, 2011) (Excluding as impermissible expert opinions that party   "relied blindly," was "untroubled by Fitch's ratings withdrawal", "understood neither the odds nor the game", "hoped for the best" and "appeared to assume" as opinions on state of mind which are inferences left to the finder of fact). Lyons' opinions and discussions with respect to FCA employees' state of mind, particularly with regards to a purported May 2012 meeting with the EPA, is nothing more than an attempt by Defendants to make a scienter argument thorough Lyons' "expert" testimony. Lyons opines:

- "My review of the materials reviewed by Dr. Atkinson suggests that FCA's interactions with EPA and CARB reflect an ***attempt*** by FCA and the agencies ***to interpret*** the regulations and ***define*** what the agencies ***expected*** Chrysler to disclose during the certification process for the Subject Vehicles. These materials suggest that Chrysler ***relied on*** an internal understanding of how to identify AECDs for the purpose of the certification process, developed based on interactions with EPA. These materials suggest also that FCA ***sought*** to provide regulators with what it ***believed*** was the germane information required for certification without overloading the agencies with extraneous information." Lyons Report ,¶81.

Lyons goes on to opine as to Defendants' "understanding" of what they were required to disclose:

- "Chrysler's Certification Group ***understood*** that only 'nonlinear' strategies or those with 'discontinuities' or 'step functions' qualified as potential AECDs. … Chrysler's Certification Group only ***regarded*** strategies that would result in increased tailpipe emissions in normal driving conditions as AECDs. … Chrysler ***understood*** that it was supposed to avoid timer-based functions." *Id.*  ¶ 83. (emphasis added); *see also Id.* ¶ 84 ("Mazure and other Chrysler attendees left the meeting with the ***understanding*** that the agency approved of their general approach to AECDs.").

After reciting communications that adopt Defendants' theory of the case that FCA was attempting to work with the EPA in good faith concerning AECD disclosure, Lyons opines that:

"these emails are typical of efforts by manufacturers to understand agency expectations concerning the information to be disclosed in the regulatory approval process. My review of the materials leads me to conclude that Chrysler employees sought clarification on the level of information to be provided to agencies, manifested in particular by the efforts to develop a more detailed AECD list." *Id.* at ¶ 92.

In other words, Lyons' ultimate conclusion in this regard is that Defendants believed that they were in compliance with the AECD disclosure provisions at issue in the case.

Lyons' opinions on what Defendants "believed," "understood," "expected" and "relied on" are opinions that go directly to Defendants' state of mind and should be stricken. *Id.* at ¶¶ 81-92. These are for the jury, not an "expert", to determine. *See Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) ("Whether a party acted with objective reasonableness is a quintessential common law jury question. By the same token, juries traditionally decide whether an individual acted knowingly, or willfully, or maliciously, or with specific intent, or with any other relevant state of mind. Thus, this case will present to the jury no new or more demanding task than what juries have always done"); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 168 (N.D.N.Y. 2010), quoting *In re Fosamax Products Liability Litigation,* 645 F.Supp.2d 164, 192 (S.D.N.Y.2009) ("Expert witnesses are not permitted to testify as to the 'knowledge, motivations, intent, state of mind, or purposes' of others."); *See also Tyree v. Boston Sci. Corp.*, 54 F. Supp. 3d 501, 517–18 (S.D.W. Va. 2014), *as amended* (Oct. 29, 2014) ("I will not permit the parties to use experts to usurp the jury's fact-finding function by allowing an expert to testify as to a party's state of mind **or on whether a party acted reasonably.**") (emphasis added); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) (expert's fact narrative from buyer's viewpoint, which included speculations

as to states of mind and motivations of parties, was inadmissible as unhelpful to jury). *Taylor v. Evans*, No. 94 Civ. 8425, 1997 WL 154010, at *2, 1997 U.S. Dist. LEXIS 30107, at *5 (S.D.N.Y. Apr.1, 1997) (holding that expert's "musings as to defendants' motivations" were inadmissible).

Lyons' opinion about Defendants' motivations and the factual narrative of the evidence that supports these opinions are impermissible opinions on state of mind that invade the province of the jury. Accordingly, the Court should exclude the testimony of Lyons reflected in the Lyons Report, ¶¶ 80-92.

### B. The Court Should Exclude Lyons' Irrelevant and Unhelpful Testimony Concerning FCA's Communications with the EPA and CARB

Attempting to buttress his improper opinions about FCA's state of mind, Lyons discusses FCA's creation of its "internal understanding" of what AECDs should be disclosed and FCA's communications with its regulators to conclude that such conduct was consistent with what other manufacturers were doing. For example, Lyons opines:

- "In my experience, **EPA and CARB certification staff have become much less focused on issuing written guidance and have chosen instead to rely much more on verbal communications** with new vehicle and engine manufacturers." *Id.* at ¶ 77.

- "Available evidence in the record shows that, **based on the materials reviewed by Dr. Atkinson, Roger Orteca, head of Chrysler's Emissions Certification group during the development of the Subject Vehicles, developed a set of guidelines** to identify which calibration features should be disclosed as AECDs." *Id.* at ¶ 82.

- "These guidelines or "rules of thumb" were communicated informally between groups at Chrysler and to VM, the entity that I understand had been responsible for the emission calibration of the diesel engines used in the Subject Vehicles. **First, Chrysler's Certification Group understood** that only "nonlinear" strategies or those with "discontinuities" or "step functions" qualified as potential AECDs. [FCA-PIRNIK- 001994115; FCA-PIRNIK-001661066.] **Second, Chrysler's Certification Group only regarded strategies that diesel engines would result in increased tailpipe emissions in normal driving conditions as AECDs**. [FCA-PIRNIK-001994115.] **Finally, Chrysler understood that it was supposed to avoid timer-based functions**. [FCA-PIRNIK-001476726.]." *Id.* at ¶ 83.

- **"My review of the materials also indicates** that Chrysler presented this internal understanding of the AECD requirements to EPA….**I understand that EPA did not voice objections to these rules,** and Mazure and other Chrysler attendees left the meeting with the understanding that the agency approved of their general approach to AECDs." *Id.* at ¶ 84.

- "Based on my experience, **it is not unusual for manufacturers to strive for a balance between meeting disclosure obligations while limiting the provision of extraneous or unnecessary information to regulators**. Dr. Atkinson's analysis of the features at issue disregards this evidence of how Chrysler and how the regulatory agencies interpreted the emissions regulations during the relevant time period." *Id.* at ¶ 88.

- "Based on my experience, **these emails are typical of efforts by manufacturers to understand agency expectations concerning the information to be disclosed in the regulatory approval process**. My review of the materials **leads me to conclude that Chrysler employees sought clarification on the level of information to be provided to agencies, manifested in particular by the efforts to develop a more detailed AECD list**." *Id.* at ¶ 92.

- "Chrysler's approach to disclosures and discussions with regulators **was generally consistent with that of other manufacturers in the era prior to the Volkswagen diesel emissions scandal"**...*Id.* at ¶ 24.

The above opinions are irrelevant and unhelpful. Whether regulators "rely much more on verbal communications", whether or not it is "unusual for manufacturers to strive for a balance meeting disclosure obligations while limiting the provision of extraneous or unnecessary information to regulators", or whether FCA's communications were "typical" of or "consistent with" manufacturers during the Class Period is irrelevant to whether FCA was in compliance with the relevant regulations. Moreover, whether the May 2012 meeting was a normal part of the process or a special exception that the EPA made for FCA is irrelevant to whether FCA believed it was in compliance with the regulations. Rather, Lyons' testimony is clearly an attempt to have an expert act as Defendants' scienter defense mouthpiece under the guise of providing tangential expert testimony. However, when testimony does not aid the fact finder "to understand the evidence or determine a fact in issue" it is inadmissible for such purposes because it is merely placing the expert in the role of counsel in "propounding a particular interpretation [of the

party's] conduct. *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001). "When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). Further, an expert may not assume the role of counsel in making legal arguments. *Highland Capital*, 379 F. Supp. 2d at 469 ("no expert may supplant the role of counsel in making argument at trial"); *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 267–68 (D. Conn. 2017) (stating that Federal Rules of Evidence 701, 702 and 403 "afford ample assurances *against the admission of opinions which would merely tell the jury what result to reach*, somewhat in the manner of the oath-helpers of an earlier day."); *CoxCom, Inc. v. Chaffee*, No. CIVA 05-107S, 2006 WL 1793184, at *8 (D.R.I. June 26, 2006) ("Defendants' counsel, not their expert, is the proper individual to argue legal issues before the Court.").

These opinions serve the sole purpose of supporting Lyons' opinion that Defendants acted reasonably in failing to disclose all of the AECDs on the Subject Vehicles because they acted reasonably in relying on the exchange with the EPA that purportedly occurred at the May 2012 meeting. Because the process by which regulations are interpreted is not an issue in this case, Lyons' testimony in this regard is irrelevant and should be excluded because it "does no more than counsel for [plaintiff] will do in argument, i.e., propound a particular interpretation of [defendant]'s conduct." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (internal citations and quotations omitted).

Additionally, Lyons' opinions are baseless. There is no direct evidence of "how the regulatory agencies interpreted emissions regulations during the relevant time period. At his deposition, Lyons confirmed that he has not seen any evidence that the EPA ever agreed to the

alternative AECD definition. (*See* Lyons Tr. at 109:7-10) ("Q: Did you see any communications in your review of the record with the EPA in which the EPA agreed to this internal AECD definition? A: I didn't."). As Lyons testified, he is unaware of even a single instance in which the EPA or CARB has relieved a manufacture of compliance obligation without putting it into writing.  (Lyons Tr. at 106:19-25) ("Are you aware of any situation in which EPA or CARB has relieved a manufacturer of some type of obligation that it otherwise would have to comply with, but not put that into writing? A: Not with respect to a formal regulatory requirement. I don't think so.")  Lyons' likewise admitted during his deposition, that he was unaware of any instance in which the EPA or CARB ever relieved any original equipment manufacturer ("OEM") of the requirement to disclose any AECD. (Lyons Tr. at 104:22-105:6) ("Q:  Have you had any experience where the EPA or CARB have relieved you or your client of either I guess a specific AECD disclosure requirement? A: As we talked about earlier in the deposition, the information that is required to be submitted has changed over time, but they have never said, you know, you don't have to disclose an AECD. No.").

At his deposition, Lyons also confirmed that he has not seen any evidence that the EPA ever agreed to the alternative AECD definition. (*See* Lyons Tr. at 109:7-10) ("Q: Did you see any communications in your review of the record with the EPA in which the EPA agreed to this internal AECD definition? A: I didn't.").  As Lyons testified, he is unaware of even a single instance in which the EPA or CARB has relieved a manufacturer of compliance obligations without putting it into writing.  (Lyons Tr. at 106:19-25) ("Are you aware of any situation in which EPA or CARB has relieved a manufacturer of some type of obligation that it otherwise would have to comply with, but not put that into writing? A: Not with respect to a formal regulatory requirement. I don't think so.").

Moreover, Lyons admitted during his deposition that he was unaware of any instance in which the EPA or CARB ever relieved any OEM of the requirement to disclose any AECD. (Lyons Tr. at 104:22-105:6) ("Q:  Have you had any experience where the EPA or CARB have relieved you or your client of either I guess a specific AECD disclosure requirement? A: As we talked about earlier in the deposition, the information that is required to be submitted has changed over time, but they have never said, you know, you don't have to disclose an AECD. No.").

Indeed, Lyons testified that based on his experience, there was no basis for FCA to believe that the purported May 2012 meeting relieved FCA of its regulatory reporting requirements to report all AECDs per the regulatory definition of AECD. (Lyons Tr. at 121:25-123:12; 123:4-12) ("Q: So there is no understanding that the requirements for enforcement purposes or otherwise for disclosure of AECDs of the definition of a defeat device would change in those circumstances? A: As I think I have said a number of times today, the regulatory requirement and the policies as stated by EPA have remained pretty consistent over time.").

Lyons' opinions about the supposed "process that manufacturers generally followed" and their communications with the EPA and CARB with respect to AECD disclosure are irrelevant and unhelpful, baseless and offered solely for the purpose of proffering FCA's position. Accordingly, the Court should exclude the testimony of Lyons as reflected in the Lyons Report, ¶¶ 24, 77, 80-92.

### C.     The Court Should Exclude Lyons' Opinions Concerning the "Three Approaches" for Assessing AECD's/Defeat Devices

In addition to being relevant, the methodology and data underlying a qualified expert's opinion must also be reliable.  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 42–44 (S.D.N.Y. 2016).  Expert testimony may be considered reliable if:  (1)  the testimony is based on

13

sufficient facts or data; (2) the expert's technique or methodology in reaching the conclusion is considered reliable; and (3) the expert has applied the methodology reliably to the facts of the case. Fed. R. Evid. 702.   Moreover, in order for the testimony to be admissible, all three components of Rule 702's reliability analysis must be met.  *Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45, 53 (D. Conn. 2004) (citing Fed. R. Evid. 702). "Expert testimony must rest on 'more than subjective belief or unsupported speculation, *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 307 (S.D.N.Y. 2015) quoting *Daubert,* 509 U.S. at 599, 113 S.Ct. 2786.   In addition, a "significant consideration is whether research was conducted independently or for the sole purpose of litigation." *Awad v. Merck & Co.*, 99 F. Supp.2d 301, 304 (S.D.N.Y. 1999).

Lyons sets forth what he terms are the "three primary approaches" used to "evaluate the operation of these calibration features [including the alleged AECDs] to determine if they individually or in combination constitute and AECD or defeat device." Lyons Report, ¶ 104. Lyons opines:

- "There are three primary approaches that could be used, typically in conjunction, to evaluate the operation of these calibration features to determine if they individually or in combination constitute an AECD or defeat device." *Id.*  ¶ 104.

- "The first would be to perform a detailed review of the documentation regarding the complete function and operation of the calibration features of the Subject Vehicles and identify specific features that appear to be AECDs or defeat devices. The approach would involve a review of the type of information that is typically submitted during the certification process, as discussed above." *Id.*  ¶ 105.

- "The second, related approach, would be to directly review the code associated with calibrations of the Subject Vehicles and identify specific code sections that represent calibration features that appear to be AECDs or defeat devices like the "acoustic function" that Dr. Atkinson discusses in relation to the VW defeat devices. [Atkinson Report, at ¶ 99.]." *Id.*  ¶ 106.

- "The third approach involves operation of the vehicle while monitoring both emissions and the detailed operation of the emission control system (which in this case would include the function of the EGR system, exhaust temperatures, DEF dosing rates, and SCR catalyst conversion efficiencies) in light of the suspected function of the calibration features. This analysis would be undertaken to confirm that

14

the function does in fact operate in the manner suspected, and to determine whether the function operates on the Federal Test Procedures or meets the other criteria for exemption." *Id.* ¶ 107.

After pronouncing that one of these three supposedly "standard" approaches must be followed, Lyons opines that because Dr. Atkinson failed (in Lyons' opinion) to employ any of these approaches as part of his analysis "Dr. Atkinson provides no reliable basis for his opinions." *Id.* at ¶ 129.

The fatal flaw in Lyons' opinion is his assertion that any analysis of a calibration feature is invalid unless it comports with the precise details of the three approaches he identifies. There is zero support for his assertion that the three methodologies as he identifies them are required by experts in the field. To the contrary, at his deposition, Lyons admitted that he created the criteria for this litigation. Lyons' opinions attacking Dr. Atkinson's methodology lacks any basis in scientific literature or in fact. Lyons provides no support for his conclusion that any one of these three approaches must be employed in order to provide an opinion on or make a determination concerning whether a calibration feature is an AECD and/or defeat device.

First, Lyons cites no academic or industry literature to support his conclusion that the three approaches as he identifies them are the only methods accepted in the industry. Second, he cites no EPA or CARB guidance or directive which states that the regulatory agencies themselves employ any of these approaches in determining whether a feature is an AECD and/or defeat device, or whether or not the feature is disclosed or described to them. Third, Lyons cites no evidence from the record that demonstrates, or even suggests, that Defendants themselves employed any of these approaches to determine what features were AECDs and/or defeat devices. Thus, not only has Lyons failed to demonstrate that there is a "general acceptance" that his three approaches are the only way to evaluate calibration features, he has failed to cite even one instance where it has been identified as an absolute requirement. *See, e.g. In re Mirena IUD*

15

*Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 429–30 (S.D.N.Y. 2016) ("Plaintiffs have not shown that [expert's] proposed mechanism has gained 'general acceptance' within the scientific community…[expert] acknowledged that he is unaware of anyone in the scientific community who agrees with his mechanism…") (internal citation omitted*); In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 593 F. Supp. 2d 549, 568 (S.D.N.Y. 2008), *on reconsideration in part* (June 26, 2008) ("[Expert] cannot name another scientist who has ever employed, much less approved of, such a method… Nor has [expert] attempted to report this method in any peer-reviewed journal or 'in some public way' so that other scientists could offer criticisms or suggestions."). Thus, while a rigid "general" acceptance is not a prerequisite to admissibility Lyons finds himself at a loss in pointing to anyone aside from himself who would mandate application of one of the three approaches he cites in his report. *See Kellogg v. Wyeth*, No. 2:07-CV-82, 2012 WL 2970621, at *5 (D. Vt. July 20, 2012) ("cursory reference to the sources of his opinion do not enable the Court to determine that Mr. Stewart's opinion is based on sufficient facts or data").

Indeed, Lyons has admitted that he created these "required" approaches for this litigation and that he does not know if the regulatory agencies employ any of his precise methods when determining if a "calibration feature" is an AECD and/or defeat device:

> Q. So it is your opinion, is it your opinion that any one of these three, that these are the three methods or approaches that are adequate for determining whether an AECD, whether something is an AECD or a defeat device?
>
> A. I guess I am struggling with your use of determining whether something is an AECD or a defeat device. Do you mean in my opinion or by a regulatory agency?
>
> Q. Well, let's start with your opinion.
>
> A. Yes, this is how I would go about doing that kind of analysis, yes.
>
> Q. What about as for a regulatory agency?

16

> A. You know, regulatory agencies are regulatory agencies. I can't speak for them. These methods are **generally consistent** with what I have observed them to do in evaluating AECDs, **but they get to make up their own mind since they are the enforcement agency** as to what is and what is not in general.

Lyons Tr. at 54:20-55:15.

Lyons' observation that his approaches are "generally consistent" with how regulators evaluate calibration features is a far cry from Lyons' assertion that the precise detailed evaluation he espouses is mandated and any analysis that is different in any way is inadequate. This is especially true since Lyons admitted that regulators are free to use any method they see fit. Ultimately, Lyons was forced to admit that the three approaches merely reflect how *he* "would go about doing that kind of analysis." Lyons Tr. at 55:6-7.

Lyons is unable to point to anything in the record to support his argument that FCA itself followed any of the three approaches in determining whether a feature was an AECD and/or defeat device:

> Q. What is the basis for your determination that Mr. Orteca followed this process for each one of the calibration features?
>
> A. I don't think that is what I said. I said I have a general understanding based on what I have read, and that is my general understanding.
>
> ***
> Q. Did you see any evidence, have you seen any evidence in your review of the documents or otherwise to suggest that Mr. Orteca actually looked at what you describe as detailed descriptions of the calibration features?
>
> A. Mr. Orteca specifically or the people at Chrysler who were responsible for certification?
>
> Q. Let's start with Mr. Orteca.
>
> A. **I'm not sure what information I have seen about what Mr. Orteca specifically did**.
>
> Q. What about other people at FCA?

A. Again, my understanding based on the materials that I have seen as laid out in these paragraphs, **I don't have a recollection of any specific information that any specific individual looked at**.

Lyons Tr. at 57:1-59:16.

Ultimately, Lyons conceded that he was not aware of any evidence that FCA followed one of the "three approaches" but merely assumed or speculated they "would" have:

Q. I am just looking for where you identify information saying I have seen evidence that suggests FCA looked at detailed description of each one of the features.

A. Again, **I'm not sure that I have seen any specific documents**. I have a general understanding based on the material here as to how they did it. **I expect they would have followed that approach** and that the regulators would have, the certification application itself would have required that kind of analysis for preparation, but I can't point you to any specific documents.

Lyons Tr. at 62:15-63:4.

Contrary to Lyons' baseless assumption, the record evidence shows that FCA did not in fact require the extreme detail that Lyons presupposes. For example, in a January 31, 2012 email from Emanuele Palma to Matt Lipkowitz, Marco Forlani, Giorgio Zacchi and various others, discussing the t_Engine "strategy", Palma writes: "I have mixed feelings about this: on the one hand during all the several meetings we're having with the people in Chrysler dealing with the certification group they basically smile when we tell them our concerns about these strategies and **they only want a general explanation with no description on how we're actually going to calibrate it**. **They even say they don't think they're going to bring it to the attention of the EPA.**" FCA-PIRNIK-001530757-FCA-PIRNIK-001530761, at 001530758, (Ex. 4).

The clear purpose of Lyons manufacturing these three approaches that he claims are mandated is to attempt to raise the bar for evaluating calibration features to an unrealistic level. The absurdity of the requirements set by Lyons can be seen through a simple example. Consider

an expert or regulator being informed by a manufacturer that its vehicle has a feature that shuts off the entire emissions control system whenever the vehicle reaches a speed of 20 mph or higher. Without any additional information one can determine that feature meets the definition of an AECD because it has the "purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 86.1803-01. However, according to Lyons it would be impermissible for any expert or regulator to reach that conclusion without first (i) "perform[ing] a detailed review of the documentation regarding the complete function and operation of the calibration features of the Subject Vehicles;" (ii) "directly review the code associated with calibrations;" and/or (iii) "operation of the vehicle while monitoring both emissions and the detailed operation of the emission control system". Lyons Report, ¶¶ 105-107.

Lyons' opinions concerning the "three primary approaches" to determining whether a function constitutes an AECD/defeat device and his criticisms of the Atkinson Report that flow therefrom are wholly unsupported.  Accordingly, the Court should exclude Lyons' testimony reflected in the following paragraphs: Lyons Report, ¶¶ 96-107; 125-126; 164-165; 194; 204; 222; 246; 261; 275.

### D.     The Court Should Exclude Lyons' Criticism of Dr. Atkinson's Description and Analysis of the Eight AECDs

In determining whether expert testimony has a sufficiently reliable foundation a district court considers the factors of reliability identified in Rule 702, that is: (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265–66 (2d Cir. 2002), citing Rule 702. "In short, the district court must 'make certain that an expert,

19

whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265–66 (2d Cir. 2002), quoting *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167.

Addressing Dr. Atkinson's description and analysis of each of the eight control features in Subject Vehicles, Lyons provides numerous criticisms. Lyons opines that "Dr. Atkinson's opinions are not actually supported by the evidence he provides in his report" (Lyons Report ¶ 161) because, in part, Lyons asserts, Dr. Atkinson does not provide a "thorough" or "complete" "description of the function." *Id*. ¶¶ 164, 194, 204, 222, 246, 261, 275, 283, 284. Lyons also opines that Dr. Atkinson's opinions are unfounded because he did not specifically address certain evidence that Lyons suggests does not support Dr. Atkinson's conclusions. *Id*. ¶¶ 161-292.

Lyons' opinions concerning the sufficiency of Dr. Atkinson's description and analysis of the eight features is wholly unreliable because, as Lyons repeatedly admitted, **<u>Lyons does not even understand the details of how any of the eight AECDs or features worked, their function, or purpose</u>**. Lyons Tr. at 126:2-17; 141:8-10; 176:12-177:3; 179:22-180:3; 188:25-189:9; 200:15-201:3; 202:6-12; 203:9-16.   Lyons testified that:  (i) he did not perform any assessment of the eight calibration features; (ii) he did not review the eight calibration features; (iii) he failed to provide a complete description of the understanding of the respective features' functionality and purpose; (iv) he performed no scientific/engineering analysis of how the calibration features function and/or impact emissions; (v) he performed no independent scientific/engineering assessment or analysis of emissions data; and (vi) he did not observe or document the operation and performance of any of the calibration features at issue. Lyons  Tr. at 44:10-46:16; 177:8-19; 180:20-181:7; 189:14-22; 201:8-19; 202:17-21; 203:21-25; 207:9-208:7.

In short, Lyons cannot evaluate whether Dr. Atkinson's description or analysis of the eight features is adequate or whether Dr. Atkinson's opinions are supported by the evidence if Lyons has done no analysis himself and does not even understand how the eight features work. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.   Where an expert's data and methods are insufficient, the resulting opinions cannot be relied upon.  *See Amorgianos*, 303 F.3d at 267, citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994) (holding that where a "flaw in the expert's investigative process…is large enough that the expert lacks 'good grounds' for his or her conclusions," the court should exclude the testimony)..

Lyons' testimony demonstrates that his opinions and critiques concerning Dr. Atkinson's analyses and conclusions are founded upon his taking issue with the fact that Dr. Atkinson failed to conduct certain analyses that Lyons himself has not conducted.  Lyons cannot opine on any alleged shortcomings in Atkinson's methodology when he did not perform any of the analyses that he opines Atkinson should have performed. For example, Lyons cannot possibly know that a more detailed description of any of the eight features is required to determine if they are AECDs if he does not know what level of detail is necessary to reach such a conclusion for each of the eight features.  Moreover, because Lyons admitted that he does not even understand how any of the eight features or AECDs work and did not attempt to analyze any of the eight AECDs at issue in the case, his assertion that the methodology Dr. Atkinson used to arrive at his conclusions is deficient is baseless.

Finally, because Lyons performed no independent research on the subject of his expert testimony, his testimony is unreliable. *See, e.g. Pugliano v. United States*, 315 F. Supp. 2d 197,

201 (D. Conn. 2004) (excluding expert testimony as unreliable where expert did no independent research on the subject of his testimony).  Lyons' testimony and conclusions must be excluded because they are not "generated by a reliable methodology and are not based on a reliable foundation, but are merely the product of [..] subjective belief and unsupported speculation [and are] are inadmissible."  *Pugliano*, 315 F. Supp. 2d 197, 199; *see also Lynch v. Trek Bicycle Corp.*, 374 F. App'x 204, 206 (2d Cir. 2010) ("[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert") (citation and internal quotation marks omitted).

Lyons' assessment in this regard serves no purpose other than to set the stage for Defendants to attempt to exclude Dr. Atkinson's opinions based upon Lyons' invented and improper standard.  Accordingly, the Court should exclude the Lyons testimony as reflected in the Lyons Report, ¶¶ 111, 124, 126, 129, 161-305.

**CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that the Court exclude the Lyons testimony as reflected in paragraphs 24, 77, 80-92, 96-107, 125-126, 164-165, 194, 204, 222, 246, 161-305 of the Lyons Report.

Dated: December 12, 2018
New York, New York

**POMERANTZ LLP**
*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Michael J. Wernke
Veronica Montenegro
600 Third Avenue, 20th Floor
New York, New York

10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email:
jalieberman@pomlaw.com


**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite
3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Sara Fuks
Jonathan Stern
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com


*Co-Lead Counsel for Plaintiffs and
the Class*