# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | No. 15 Civ. 7199 (JMF) |
| Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US LLC, RONALD ISELI AND ALESSANDRO BALDI, AS CO-EXECUTORS FOR THE ESTATE OF SERGIO MARCHIONNE, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE, and ROBERT E. LEE, | |
| Defendants. | |

# DEFENDANTS' MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

Robert J. Giuffra, Jr.
William B. Monahan
Thomas C. White
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

*Counsel for Defendants*

December 12, 2018

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 7

    **A.**    FCA and Its Global Regulatory Requirements ....................................... 7

    **B.**    Chrysler's U.S. Safety Recalls During the Class Period .................... 10

    **C.**    Chrysler's U.S. Emissions Certifications Before and During the Class Period ................................................................................................ 13

    **D.**    The Challenged Statements ................................................................. 19

ARGUMENT ........................................................................................................... 20

**I.**    THE RECORD SHOWS THAT DEFENDANTS DID NOT MAKE ANY ACTIONABLE MISSTATEMENTS ................................................ 21

    **A.**    The Record Shows That FCA's Statements of Substantial Compliance Were Not False or Misleading ........................................ 22

    **B.**    The Record Shows That FCA's Statements Concerning Defeat Devices Were Not False or Misleading ............................................. 28

    **C.**    There Is No Triable Issue as to FCA's Opinion Statements ............... 31

    **D.**    Even Assuming Any Misstatements, The Record Shows They Were Not Material ............................................................................. 33

**II.**    THERE IS NO TRIABLE ISSUE AS TO SCIENTER ............................. 35

    **A.**    There Is No Evidence That Any Defendant Acted with Scienter as to the "Substantial Compliance" Statements ...................................... 36

    **B.**    There Is No Evidence That Any Defendant Acted with Scienter as to the Statements Concerning Defeat Devices .................................... 43

    **C.**    Additional Evidence Refutes Plaintiffs' Speculative Scienter Theory ................................................................................................ 45

**III.**    THERE IS NO TRIABLE ISSUE OVER LOSS CAUSATION FOR FOUR ALLEGED "CORRECTIVE" DISCLOSURES ........................... 49

CONCLUSION ....................................................................................................... 51

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*,
   No. 14 Civ. 7126 (S.D.N.Y. Apr. 3, 2017) ...............................................................23

*Anthem Sports, LLC* v. *Under the Weather, LLC*,
   320 F. Supp. 3d 399 (D. Conn. 2018) ......................................................................32

*Arent* v. *Shalala*,
   70 F.3d 610 (D.C. Cir. 1995) ....................................................................................23

*AUSA Life Ins. Co.* v. *Ernst & Young*,
   206 F.3d 202 (2d Cir. 2000) ......................................................................................46

*Basic Inc.* v. *Levinson*,
   485 U.S. 224 (1988) .............................................................................................21, 34

*Blessing* v. *Freestone*,
   520 U.S. 329 (1997) ...............................................................................................2, 23

*Caldarola* v. *Calabrese*,
   298 F.3d 156 (2d Cir. 2002) ......................................................................................35

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ......................................................................................49

*Cent. States, Se. & Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*,
   543 F. App'x 72 (2d Cir. 2013) .................................................................................49

*Chill* v. *Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996) ......................................................................................35

*City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*,
   2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ...........................................................5

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ......................................................................................22

*Coastal Abstract Serv., Inc.* v. *First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999) ....................................................................................32

*Dalberth* v. *Xerox Corp.*,
   766 F.3d 172 (2d Cir. 2014) ......................................................................................34

*Dobina* v. *Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)................................................................................39, 46

*Dodona I, LLC* v. *Goldman Sachs & Co.*,
132 F. Supp. 3d 505 (S.D.N.Y. 2015)................................................................................21

*Dupler* v. *Berson*,
2010 WL 10827361 (S.D.N.Y. Jan. 29, 2010) ..................................................................47

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..............................................................................................34

*Emps.' Ret. Sys.* v. *Blanford*,
794 F.3d 297 (2d Cir. 2015)........................................................................................1, 4, 36

*Ernst & Ernst* v. *Hochfelder*,
425 U.S. 185 (1976)..........................................................................................................45

*Foley* v. *Transocean Ltd.*,
861 F. Supp. 2d 197 (S.D.N.Y. 2012)..............................................................................48

*Freedman* v. *Value Health, Inc.*,
135 F. Supp. 2d 317 (D. Conn. 2001)..........................................................................44, 47

*Ganino* v. *Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)..............................................................................................34

*Gillis* v. *QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)..............................................................................48

*Glaser* v. *The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................................39

*Grey* v. *Gruntal & Co.*,
1987 WL 11561 (S.D.N.Y. May 21, 1987) ......................................................................47

*Gross* v. *GFI Grp.*,
310 F. Supp. 3d 384 (S.D.N.Y. 2018)..............................................................................50

*Haden* v. *Krupp Asset Mgmt. Corp.*,
776 F. Supp. 1151 (S.D. Miss. 1990)................................................................................23

*Hicks* v. *Baines*,
593 F.3d 159 (2d Cir. 2010)..............................................................................................44

*IBEW Local Union No. 58* v. *Royal Bank of Scotland Grp.*,
783 F.3d 383 (2d Cir. 2015)..........................................................................................3, 32

*In re Apple*,
     886 F.2d 1109 (9th Cir. 1989) .................................................................................46

*In re AstraZeneca*,
     559 F. Supp. 2d 453 (S.D.N.Y. 2008) (Griesa, J.) ...........................................6, 45

*In re Barclays Bank PLC*,
     2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017) ......................................................21

*In re Barclays Bank*,
     2018 WL 6040846 (2d Cir. Nov. 19, 2018)...........................................................41

*In re Moody's Corp.*,
     274 F.R.D. 480 (S.D.N.Y. 2011) .............................................................7, 49, 50

*In re Moody's Corp.*,
     2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013) .......................................................21

*In re N. Telecom Ltd.*,
     42 F. Supp. 2d 234 (S.D.N.Y. 1998)......................................................................30

*In re N. Telecom Ltd.*,
     116 F. Supp. 2d 446 (S.D.N.Y. 2000).............................................................21, 34

*In re New Oriental Educ. & Tech. Grp.*,
     988 F. Supp. 2d 406 (S.D.N.Y. 2013).....................................................................33

*In re Nichols*,
     440 F.3d 850 (6th Cir. 2006) .................................................................................23

*In re Plains All Am. Pipeline, L.P.*,
     307 F. Supp. 3d 583 (S.D. Tex. 2018) ..............................................................23, 26

*In re ProShares Tr.*,
     728 F.3d 96 (2d Cir. 2013)......................................................................................21

*In re PXRE*,
     600 F. Supp. 2d 510 (S.D.N.Y. 2009).....................................................................39

*In re Salomon Analyst Level 3*,
     373 F. Supp. 2d 248 (S.D.N.Y. 2005).....................................................................32

*In re Sanofi*,
     87 F. Supp. 3d 510 (S.D.N.Y. 2015).......................................................................37

*In re Sanofi*,
     155 F. Supp. 3d 386 (S.D.N.Y. 2016)......................................................................44

*In re Smith Barney Transfer Agent*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012)...................................................................49

*In re Symbol Techs.*,
  950 F. Supp. 1237 (E.D.N.Y. 1997) ...............................................................36, 40

*In re Urethane*,
  2013 WL 100250 (D. Kan. Jan. 8, 2013) .............................................................45

*In re Vivendi*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011)..............................................41, 42, 46, 49

*In re Volkswagen*,
  2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ............................................................41

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
  564 U.S. 135 (2011).............................................................................................49

*Kuyat* v. *BioMimetic Therapeutics, Inc.*,
  747 F.3d 435 (6th Cir. 2014) ...............................................................................48

*Lamphere* v. *Brown Univ.*,
  712 F. Supp. 1053 (D.R.I. 1989)..........................................................................23

*LiButti* v. *United States*,
  107 F.3d 110 (2d Cir. 1997).................................................................................45

*Long-Term Capital Holdings, LP* v. *United States*,
  2003 WL 21269586 (D. Conn. May 6, 2003).......................................................24

*Lyons* v. *Lancer Ins. Co.*,
  681 F.3d 50 (2d Cir. 2012)...................................................................................21

*McPherson* v. *N.Y. City Dep't of Educ.*,
  457 F.3d 211 (2d Cir. 2006).................................................................................21

*Omnicare Inc.* v. *Laborers Dist. Council Constr. Indus Pension Fund*,
  135 S. Ct. 1318 (2015)..............................................................................32, 41, 44

*Ortega* v. *Usery*,
  441 F. Supp. 100 (D. Conn. 1977)........................................................................23

*Phillips* v. *Kidder, Peabody & Co.*,
  933 F. Supp. 303 (S.D.N.Y. 1996) .......................................................................47

*Price* v. *Fox Entm't Grp.*,
  499 F. Supp. 2d 382 (S.D.N.Y. 2007)...................................................................29

*Prime Mover Capital Partners* v. *Elixir Gaming Techs., Inc.*,
548 F. App'x 16 (2d Cir. 2013) ......................................................................7, 50

*Richman* v. *Goldman Sachs Grp.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012)....................................................................42

*Rolf* v. *Blyth, Eastman Dillon & Co.*,
570 F.2d 38 (2d Cir. 1978)..................................................................... *passim*

*S. Cherry St., LLC* v. *Hennessee Grp.*,
573 F.3d 98 (2d Cir. 2009)..............................................................................4, 36

*Salahuddin* v. *Goord*,
467 F.3d 263 (2d Cir. 2006)...................................................................................21

*Sagendorf-Teal* v. *Cty. of Rensselear*,
100 F.3d 270 (2d Cir. 1996)..................................................................................30

*Schaffer* v. *Horizon Pharma PLC*,
2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ..........................................................33

*SEC* v. *Shanahan*,
646 F.3d 536 (8th Cir. 2011) .................................................................................46

*SEC* v. *Solucorp Indus., Ltd.*,
274 F. Supp. 2d 379 (S.D.N.Y. 2003)....................................................................35

*SEC* v. *Yorkville Advisors, LLC*,
305 F. Supp. 3d 486 (S.D.N.Y. 2018)....................................................................42

*State Teachers Ret. Bd.* v. *Fluor Corp.*,
654 F.2d 843 (2d Cir. 1981)..................................................................................46

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)..................................................................................36

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................35

*Tongue* v. *Sanofi*,
816 F.3d 199 (2d Cir. 2016).................................................................6, 27, 41, 42

*United States* v. *Gen. Motors Corp.*,
841 F.2d 400 (D.C. Cir. 1988) ...........................................................................5, 38

*United States* v. *Rajaratnam*,
719 F.3d 139 (2d Cir. 2013)..................................................................................35

## Statutes and Regulations

42 U.S.C. § 7525 ...................................................................................................................9

42 U.S.C. § 7401 *et seq.* ......................................................................................................7

49 U.S.C. § 30101 *et seq.* ....................................................................................................7

49 U.S.C. § 30118 ............................................................................................................8, 38

49 U.S.C. § 30120 .....................................................................................................9, 24, 25

20 C.F.R. § 650.4 ...............................................................................................................23

40 C.F.R. § 86.409-78 .........................................................................................................9

40 C.F.R. § 86.1803-01 ...................................................................................................9, 10

40 C.F.R. § 86.1806-17 .......................................................................................................31

40 C.F.R. § 86.1811-04 .........................................................................................................7

40 C.F.R. § 86.1844-01 .........................................................................................................9

40 C.F.R. § 86.1851-01 .......................................................................................................10

40 C.F.R. § 86.1848-01 .........................................................................................................9

45 C.F.R. § 305.20 ...............................................................................................................3

49 C.F.R. § 571.101 *et seq.* ................................................................................................8

49 C.F.R. § 573.6 ......................................................................................................... *passim*

49 C.F.R. § 577.5 ........................................................................................................13, 24, 25

49 C.F.R. § 577.7 .....................................................................................................8, 13, 24, 25

Cal. Code Regs. tit. 13, § 1968.2(k)(1) ...............................................................................31

## Other Authorities

"Feds: Chrysler must expand air bag recall, speed repair," *Detroit News*, Nov. 25, 2014 ................................................................................................................................37

"Feds order Fiat Chrysler to defend pace of 20 recalls," *USA Today*, May 18, 2015 ..................................................................................................................................37

"Feds to Takata: Declare defects," *Detroit News*, Nov. 27, 2014 ....................................37

"U.S. demands wider Takata recall," *Int'l N.Y. Times*, Nov. 28, 2014...........................................37

Restatement (Second) of Torts § 528......................................................................................46, 47

"U.S. regulator to Chrysler's Marchionne: get act in gear on Jeep recall," *Reuters*,
   Nov. 20, 2014......................................................................................................................37

## PRELIMINARY STATEMENT

After years of discovery, it is now clear that there is no admissible evidence sufficient to raise a genuine issue of material fact for trial in this Section 10(b) class action. Although Plaintiffs survived a motion to dismiss, the "pleading standard does not involve applying *the more probing test* used at the summary judgment" stage of a securities action. *Emps.' Ret. Sys.* v. *Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). It is time for Plaintiffs "to put up or shut up"—as the Second Circuit has put it—and "unsupported allegations [will] not create a material issue of fact." *Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 41 (2000).

Plaintiffs claim that Fiat Chrysler Automobiles N.V. ("FCA") and the other Defendants defrauded FCA shareholders by (i) including in FCA's SEC filings the general statement that FCA was "substantially in compliance" with regulations around the globe, and (ii) making a handful of statements in the wake of the Volkswagen ("VW") emissions scandal that FCA's vehicles did not contain "defeat devices" like those VW used.[1] Because Plaintiffs do not have sufficient evidence that that (i) the challenged statements were materially false or misleading, and (ii) Defendants acted with scienter in making each of the statements at issue, the Court should grant summary judgment in favor of Defendants.

*1.   No Actionable Misstatements.*   From day one, the centerpiece of Plaintiffs' case has been their theory that FCA defrauded its shareholders when the Company stated, on page 185 of its November 13, 2014 Registration Statement, that FCA was "substantially in compliance" with "the relevant global regulatory requirements," and then

---

[1] "Defendants" are FCA, FCA US LLC ("Chrysler"), and the Estate of Sergio Marchionne, Scott Kunselman, Michael Dahl, Steve Mazure, and Robert Lee (the "Individual Defendants"). Citations to "56.1 ¶ _" are to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, and citations to "Ex. _" are to the exhibits to the Declaration of Joshua S. Levy, both of which are submitted herewith. All emphasis is added and internal quotation marks are omitted unless otherwise indicated.

repeated that same statement in five subsequent SEC filings through February 2016.  By its terms, however, the statement of "substantial" compliance did not guarantee FCA's *perfect* compliance with each and every one of the innumerable regulations to which it was subject around the world.  In fact, the evidence shows that the instances of non-compliance were relatively few, not only in the aggregate but also when compared against the overwhelming instances of compliance (*i.e.*, "substantial" compliance).

At the pleading stage, the Court permitted Plaintiffs' claims to proceed to discovery because Chrysler had admitted to certain violations of the National Traffic and Motor Vehicle Safety Act ("Safety Act") in a July 2015 Consent Order with the National Highway Traffic Safety Administration ("NHTSA").  But the extensive discovery record developed since then has confirmed that the instances of noncompliance with the Safety Act were limited, and that FCA's statements of "substantial" compliance were not false or misleading.  Notably, through their proffered expert, Plaintiffs have cited violations of, at most, *seven* safety recall regulations—almost all of which concerned mere "recordkeeping" requirements (as described by Plaintiffs' expert).  But even as to those seven regulations, the record shows that Chrysler was more than **90% compliant** with each of them.  That is *substantial* compliance.  *See Blessing* v. *Freestone*, 520 U.S. 329, 335 (1997) ("75 percent compliance" is "substantial compliance").

As to Plaintiffs' emissions theory, Plaintiffs rely on the Notices of Violation ("NOVs") issued by environmental regulators in January 2017 as evidence of Chrysler's supposed substantial noncompliance with U.S. emissions regulations.  But even if the facts in those NOVs are accepted as true (FCA has made no admission of noncompliance anywhere), the NOVs asserted violations with respect to just 104,000 vehicles—***far less than 1%*** of FCA's vehicles on the road in the U.S. during the Class Period.  Plaintiffs cannot dispute that ***more than***

**99%** of FCA's vehicles in the U.S. *complied* with U.S. emissions regulations.  That too is *substantial* compliance.

To try to save their case, Plaintiffs cherry-pick three FCA or Chrysler statements made shortly after the VW diesel emissions issues became public on September 18, 2015.  But two of those FCA statements, by their terms, were expressly limited to FCA's European fleet, and this Court has already rejected Plaintiffs' claims based on alleged violations of European environmental regulations (and there is no admissible evidence to support those claims in any event).  (*See* Defendants' contemporaneously submitted *Daubert* brief with respect to Axel Friedrich ("Friedrich *Daubert* Motion").)  Moreover, all three statements—to the effect that FCA or Chrysler senior executives believed that their vehicles did not contain "defeat devices"—must be read in the context of the then-widespread reports that VW had used devices to sense when its diesel vehicles were being tested for emissions in order to trigger the emissions control system to operate in a different mode from how the system operated when the vehicles were being driven on the road by consumers.  Thus, "[FCA] said [that] its vehicles do not use any defeat devices *like those at the centre of an emissions scandal plaguing rival Volkswagen*."  (56.1 ¶ 128.)

This context is critical because there is *no* factual evidence—indeed, even the U.S. environmental regulators have not alleged—that Chrysler used devices that, like VW's "defeat devices," created a "dual"-mode emissions system, one for use in testing and a separate one for use on the road.  Instead, the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") have alleged only that certain software features meet the technical, regulatory definition of "defeat device"—a definition that does *not* denote intentional cheating, and that requires complex engineering judgments to apply.  Taken in

context (as they must be), these challenged statements were not false or misleading even if all of the assertions in the NOVs were accepted as true.

Even assuming, *arguendo*, that the challenged statements were false or misleading, those statements were not material. FCA's alleged noncompliance with the Safety Act implicated a minuscule 0.2% of FCA's assets and revenue, and the alleged noncompliance with emissions regulations implicated fewer than 1% of vehicles. In this Circuit, "a misstatement related to less than 5% of a financial statement"—as here—"carries the preliminary assumption of immateriality," which Plaintiffs cannot overcome. *IBEW Local Union No. 58* v. *Royal Bank of Scotland Grp.*, 783 F.3d 383, 390 (2d Cir. 2015).

2.    ***No Scienter***.  Plaintiffs previously abandoned the theory that Defendants made *intentional* misstatements, and survived Defendants' motion to dismiss only on a "recklessness" theory by citing letters that NHTSA sent to Chrysler that allegedly contradicted the challenged public statements. (Oct. 5, 2016 Order at 5-6, 15-18; ECF No. 50.) But mere access to allegedly contradictory information is not sufficient to avoid *summary judgment*—as opposed to a motion to dismiss—on scienter grounds. *See Emps.' Ret. Sys.*, 794 F.3d at 306. At summary judgment, Plaintiffs must point to admissible evidence that the statements were made with "conscious recklessness—*i.e.*, a state of mind approximating *actual intent*." *S. Cherry St., LLC* v. *Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009). The Court should grant summary judgment because Plaintiffs have no evidence that Defendants or any FCA senior executives (i) believed that the alleged misstatements were false or misleading, or (ii) acted with "conscious recklessness" tantamount to actual fraudulent intent.

At the motion to dismiss stage, Plaintiffs claimed that FCA's "substantial compliance" statements were reckless because NHTSA had sent letters to Chrysler's CEO about

Safety Act violations, which Plaintiffs told the Court were facts contradicting FCA's public statements.  (ECF No. 46 at 1-2, 20-21.)  After years of discovery, the record now shows that Plaintiffs' statement to the Court was not true:  the NHTSA letters did *not* relate to Safety Act compliance *at all*, but instead concerned two vehicle campaigns where neither Chrysler nor NHTSA had declared a safety defect.  As a result, Chrysler was "legally a volunteer" in agreeing to take remedial actions, and had *no obligations under Safety Act regulations*.  *United States* v. *Gen. Motors Corp.*, 841 F.2d 400, 416 (D.C. Cir. 1988).

Moreover, the record contains no evidence that FCA senior executives had nonpublic emissions-related information contradicting FCA's statements of "substantial compliance."  Importantly, shortly after the VW emissions scandal broke, FCA voluntarily conducted an extensive *internal audit* of its emissions systems to determine whether any vehicles used "defeat devices" like those in VW vehicles.  That audit is entirely inconsistent with the notion that any FCA senior executive knew—or consciously avoided knowing—that FCA vehicles employed VW-like dual-mode emissions systems to cheat the emissions certification tests.  *See*, *e.g.*, *City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014) (Gardephe, J.) (audit "tends to undermine any inference of scienter").

After this Court initially dismissed Plaintiffs' emissions-related claims, Plaintiffs survived another dismissal based *solely* on "specific written exchanges" between the EPA and Chrysler in January 2016, in which an EPA official expressed the view that certain Chrysler vehicles "appeared to violate the agency's regulations."  (Nov. 13, 2017 Order at 4; ECF No. 142.)  But the discovery record now shows what Plaintiffs previously failed to plead:  that Chrysler personnel met with EPA staff thereafter and presented data from the internal audit showing that (i) Chrysler's vehicles complied with U.S. emissions regulations, and (ii) the EPA

appeared satisfied with the explanations for the software about which the EPA official had expressed concerns.  In fact, the EPA told Chrysler officials in June 2016 that the EPA "*did not intend to issue a notice of violation*."  (56.1 ¶ 104.)  Plaintiffs have no evidence that any senior FCA executive understood that the EPA had concluded that Chrysler violated emissions regulations (let alone substantially) until the EPA issued its NOV in *January 2017*, which "blindsided" the company.  (56.1 ¶ 107; Ex. 80 (Marchionne Dep.) at 115.)  *See Tongue* v. *Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) (ongoing "dialogue with" regulator "is an integral part of the" regulatory "approval process" and does not support inference of scienter).

Finally, there is still more evidence weighing against scienter.  The record shows that FCA had a robust pre-disclosure process to ensure the accuracy of its public statements, which belies the notion that FCA made the challenged statements "with utter disregard for whether there was a basis for the assertions."  *Rolf* v. *Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47-48 (2d Cir. 1978).  In addition, those responsible for FCA's "substantial compliance" statements did not understand the statements to be warranting *perfect* compliance with each and every regulation to which FCA was subject around the globe, but rather that FCA was substantially in compliance with those regulations as a whole.  (Chernoby Decl. ¶ 5; Nelson Decl. ¶ 7; Palmer Decl. ¶ 6; Veltri Decl. ¶ 5.)  Thus, even though this Court interpreted, at the motion to dismiss stage, the "substantial compliance" statements as stating compliance with *each* relevant regulation governing the company, FCA's senior executives believed their reasonable interpretation at the time, which is fatal to any theory of scienter.  *See In re AstraZeneca*, 559 F. Supp. 2d 453, 471-72 (S.D.N.Y. 2008) (Griesa, J.) (no scienter where there is "nothing whatever to indicate that the statements made did not reflect the honest belief of the authors"), *aff'd*, 334 F. App'x 404 (2d Cir. 2009).

3.     *No Loss Causation*.   The record confirms that, for at least three reasons, there is no triable issue as to loss causation with respect to *four of the seven* alleged "corrective" disclosures:  the July 26, 2015 disclosure of the NHTSA Consent Order, and three reports by or about European regulators on May 23, 2016 (Germany), February 6, 2017 (France) and February 7, 2017 (Italy).  *First*, none of those "corrective" disclosures caused a statistically significant decline in FCA's share price at the required 95% confidence level.  *In re Moody's Corp.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (Daniels, J.).  *Second*, this Court previously dismissed Plaintiffs' claims concerning European emissions regulations, and thus any disclosures about those regulations, and any resulting share price declines, are irrelevant to this case.  *Third*, investors were already aware of the facts underlying Chrysler's noncompliance with safety recall regulations *before* the NHTSA Consent Order became public on July 26, 2015.  *See* App'x A; *Prime Mover Capital Partners* v. *Elixir Gaming Techs., Inc.*, 548 F. App'x 16, 17-18 (2d Cir. 2013) (no "corrective disclosure" where event did not reveal "new information to the market").

## FACTUAL BACKGROUND

**A.     FCA and Its Global Regulatory Requirements**

Through affiliates, FCA sells automobiles in more than 150 countries.  (56.1 ¶ 1.) Chrysler is FCA's wholly-owned U.S. subsidiary.  (56.1 ¶ 3.)  Both FCA and Chrysler are subject, in each country where they operate, to extensive regulations, which run the regulatory gamut from (for instance) Brazilian tax laws to Chinese fuel regulations.  (56.1 ¶¶ 4, 11.)  In the U.S. alone, Chrysler is subject to countless federal, state and local laws and regulations.  (56.1 ¶ 12.)  This case concerns a handful of regulations under just two statutes:  the Safety Act (49 U.S.C. § 30101 *et seq.*) and the Clean Air Act (42 U.S.C. § 7401 *et seq.*).

### 1.      Safety Act Regulations

The Safety Act and its implementing regulations cover a wide range of issues, including research and development, fuel economy, and substantive vehicle safety standards—Federal Motor Vehicle Safety Standards ("FMVSS")—that specify assembly and performance requirements for nearly every component of a vehicle.   *See* 49 C.F.R. §§ 571.101-500. Plaintiffs' claims here focus exclusively on Safety Act regulations governing the recall administration process, which includes notifying dealers and owners of safety-related defects. The regulations at issue comprise just 8% of the Safety Act.  (56.1 ¶¶ 14, 16.)

Given the mischaracterizations in Plaintiffs' motion to dismiss briefs, Defendants must make clear that the Safety Act's recall administration provisions are triggered *only* when (i) the NHTSA administrator initiates a recall, 49 U.S.C. § 30118(b), which did not happen here (56.1 ¶ 17), or (ii) an automobile manufacturer declares a safety defect, 49 U.S.C. § 30118(c).  In these circumstances—and only in these circumstances, at least when it comes to the relevant question of "compliance"—a manufacturer must comply with Safety Act "recordkeeping" requirements (as Plaintiffs' expert Robert Hellmuth called them), including:  (i) submitting a defect report (a "573 Report") to NHTSA within five working days (and timely amending it as appropriate), 49 C.F.R. §§ 573.6(b)-(c); (ii) notifying owners of the defect within 60 days of filing the 573 Report ("60-Day Requirement"), *id.* §§ 573.6(b)-(c); (iii) notifying dealers of the defect "within a reasonable time," *id.* § 577.7;  and  (iv) submitting copies of dealer communications to NHTSA within five days after sending them to dealers, *id.* § 573.6(c)(10). As Plaintiffs' expert acknowledged, incidents of noncompliance with such recordkeeping provisions have been traditionally handled informally between NHTSA and manufacturers. (Ex. 92 (Hellmuth Dep.) at 185, 214; *see also* Ex. 73 (Person Rpt.) ¶¶ 191-94.)

After a safety defect has been declared, a manufacturer must remedy it "within a reasonable time," 49 U.S.C. § 30120(c), which is not defined by NHTSA regulations (Ex. 96 at 157).  If there is no readily available remedy, a manufacturer may have to design, manufacture and test a new part, which can take months (or even years) to do.  (Ex. 73 (Person Rpt.) ¶¶ 1, 44; *see* Ex. 96 (Garris Dep.) at 24, 43, 119.)  Notably, remedying the defect "within a reasonable time" does *not* require manufacturers to attain any particular recall completion rate.  In fact, NHTSA has emphasized that recall completion rates can vary significantly based on, for example, the vehicles' age and parts suppliers' capacity.  (Ex. 35  at 7, 21, 28.)

### 2.    U.S. Emissions Regulations

The Clean Air Act requires manufacturers to obtain a certificate of conformity ("COC") from the EPA for each vehicle model year before the vehicle can be sold in the U.S.  42 U.S.C. § 7525; 40 C.F.R. § 86.1848-01.  In the COC application, manufacturers must provide "a list of all auxiliary emission control devices (AECD) installed on any applicable vehicles."  40 C.F.R. § 86.1844-01(d)(11).  An AECD is any "element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."  40 C.F.R. § 86.1803-01.  The EPA issued this definition in 1972, and applying it to specific emissions systems—particularly today's more technologically advanced software systems—requires significant judgment by manufacturers.  (56.1 ¶¶ 18-19; Ex. 97 (Atkinson Dep. II) at 25-26.)  Indeed, EPA regulations expressly acknowledge that judgments must be made during the certification process, specifying that "[t]he manufacturer shall exercise

good engineering judgment in making all decisions called for under this subpart," which includes disclosure of AECDs.  40 C.F.R. § 86.1851-01(a).[2]

AECDs are permitted unless they constitute "defeat devices"—another defined term in EPA regulations.  Subject to certain exceptions (discussed below), a "defeat device" is an AECD that "[r]educes the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal urban vehicle operation and use."  40 C.F.R. § 86.1803-01.[3]  But even if an AECD meets this standard, it is not a "defeat device" if it satisfies any one of three exceptions:  (i) the conditions under which it reduces the effectiveness of the emissions control system "are substantially included in the Federal emission test procedure"; (ii) "[t]he need for the [AECD] is justified in terms of protecting the vehicle against damage or accident"; or (iii) "[t]he [AECD] does not go beyond the requirements of engine starting or warm-up."  *Id.*  Determining whether a given AECD is a "defeat device" also requires judgment, such as whether a condition is "encountered in normal vehicle operation" or whether a feature is needed to "protect[] the vehicle against damage."  (*See* 56.1 ¶ 19; Ex. 97 (Atkinson Dep. II) at 26; Ex. 87 (Mazure Dep.) at 103, 125-26.)

## B.    Chrysler's U.S. Safety Recalls During the Class Period

In May 2014, General Motors ("GM") agreed to pay $35 million for failing to timely notify NHTSA of a defective ignition switch in 2.6 million vehicles, which caused at least 124 deaths and 275 injuries.  (Ex. 150; Ex. 31 at 6; Ex. 166.)  As this came to light, Chrysler

---

[2] Exercising judgment and consulting with the EPA is particularly important for AECDs because, taken literally, the requirement to disclose AECDs would require manufacturers to disclose every single piece of engine control software—containing hundreds of pages of calibrations with millions of lines of code—because all calibrations affect, in some way, how the engine combustion process works, and therefore emissions.  (*See* Ex. 93 (Atkinson Dep.) at 69; Ex. 91 (Altermatt Dep.) at 45-46.)

[3] Although the VW emissions scandal has colored the public's understanding of the term, there is no "intent" component to the definition of "defeat device."  *See* 40 C.F.R. § 86.409-78(b).

retained Deloitte Financial Advisory Service, LLP ("Deloitte") to conduct a "review of Chrysler's recall management process."  (56.1 ¶ 20.)  Deloitte found that Chrysler was "leading" the industry in various ways, but also identified "opportunities to advance capabilities." (56.1 ¶¶ 21-22.)  One of Deloitte's recommendations was that Chrysler "[c]reat[e] an independent safety group" with "direct access to the CEO."  (56.1 ¶ 22.)  Chrysler did so on August 12, 2014 when it announced a new office of Vehicle Safety and Regulatory Compliance, led by Senior Vice President Scott Kunselman, who would report directly to CEO Sergio Marchionne.  (56.1 ¶ 23.)

Leading up to announcement of the GM ignition switch issues, NHTSA increased its scrutiny of Chrysler's recall administration process.  (Ex. 81 (Bernier Dep.) at 129-30.)  In June 2013, for example, in response to NHTSA pressure, Chrysler agreed to install free trailer hitches for owners of certain Jeep Liberty and Grand Cherokee vehicles, despite *no finding* by Chrysler or NHTSA that the vehicles were defective.  (56.1 ¶¶ 26, 28; Ex. 78 (Marchionne *Walden* Dep.) at 97, 115-16, 122-23, 126.)  In July 2014, NHTSA issued a special order seeking information about "owner notification letters" and "recall remedy completion rate" for this voluntary service campaign, and Chrysler responded two weeks later.  (56.1 ¶ 27.)  The details of these service campaign administration issues were not escalated to senior Chrysler management. (56.1 ¶ 27.)  In November 2014, NHTSA Deputy Administrator Friedman sent three letters to Mr. Marchionne—one regarding the Jeep trailer hitches and two regarding Takata air bag inflators, which was another service campaign FCA agreed to undertake even though it had *not* declared a defect in the affected vehicle population.  (*Infra* pp. 38-39.)

On May 18, 2015, NHTSA publicly stated that it would hold a public hearing regarding Chrysler's recall administration in connection with 20 (later expanded to 23) recalls.

(56.1 ¶¶ 36-42.)   NHTSA also issued a special order to Chrysler ("Special Order") seeking information about the recalls.  (56.1 ¶ 36.)  Mr. Marchionne and Mr. Kunselman reacted with "concern and disappointment" to the Special Order.   (Ex. 83 (Kunselman Dep.) at 152.)  Chrysler responded to the Special Order on June 1, 2015; the Company acknowledged it was untimely in completing the mailing of owner notifications within 60 days for five campaigns, but emphasized that its "recalls achieve above industry average completion performance" and its "overall completion rate is nearly the best in the industry."  (56.1 ¶¶ 38-39.)  Chrysler stated that it sought "to maintain a positive working relationship with NHTSA," and began negotiating a potential consent order with NHTSA.  (Ex. 127 at -910; Ex. 130 at -931; Ex. 83 (Kunselman Dep.) at 41.)

Chrysler and NHTSA entered into a consent order on July 24, 2015 ("Consent Order").  (56.1 ¶ 43.)   Contrary to Plaintiffs' allegations, NHTSA did not find "widespread" noncompliance with Safety Act regulations.  (Compl. ¶¶ 129, 169.)  Rather, Chrysler admitted that it did not supply a remedy for defective vehicles "within a reasonable time" for just three of its 296 then-outstanding recalls.  (56.1 ¶ 44.)[4]  These three recalls covered approximately 580,000 vehicles—about 2% of all FCA vehicles on the road in the U.S. from 2013 to 2015 (the period when the recalls addressed in the Consent Order were initiated).  (56.1 ¶¶ 2, 45; ECF No. 46 at 16.)  Chrysler also admitted to three general categories of recordkeeping violations, without admitting to violations for any particular recall:  that Chrysler did not (i) "timely notify vehicle owners," (ii) "timely submit copies to NHTSA" of certain communications, or (iii) "provide

---

[4] Two of the recalls concerned tie rods—for one Chrysler had to design and build a new steering linkage, which took months, and for the other Chrysler had to pause the recall to audit and re-inspect thousands of repair parts because some were damaged or defective (Ex. 121 at -401; *see* Ex. 125 at -856; Ex. 122 at -762 to -769)—and the third recall concerned a pinion nut, where the third-party parts supplier had manufacturing delays and production issues and needed to halt shipping and re-inspect parts (Ex. 104 at -856 to -857; Ex. 105 at -608, -612; Ex. 106; Ex. 108).

NHTSA with timely, accurate, and complete information relating to vehicle defects," 49 C.F.R. §§ 577.5, 577.7(a)(1), 573.6.  (56.1 ¶ 43.)  NHTSA publicly released the Consent Order on July 26, 2015, including Chrysler's agreement to pay a civil penalty of (i) $70 million, (ii) $20 million for "Industry Outreach," and (iii) $15 million held in abeyance pending completion of the Consent Order requirements (which Chrysler was not required to pay).  (56.1 ¶ 46.)

**C.      Chrysler's U.S. Emissions Certifications Before and During the Class Period**

**1.      FCA Enters the U.S. Light-Duty Diesel-Engine Market**

In 2011, with gasoline prices over $3.50/gallon, FCA decided to enter the light-duty diesel-engine market in the U.S. to sell vehicles with "improved fuel economy."  (Ex. 99 at -872.)  Diesel vehicles generally provide greater fuel economy, but produce higher NOx emissions (and lower $CO_2$ emissions) than gasoline vehicles.  (56.1 ¶ 50.)  To comply with U.S. emissions standards, diesel vehicles use complex, software-based emissions control systems. (56.1 ¶ 51.)  There are two main emissions control technologies that can be used in diesel vehicles:  Exhaust Gas Recirculation ("EGR") and Selective Catalytic Reduction ("SCR").  (56.1 ¶¶ 52.)  EGR is a more traditional system that inhibits the formation of NOx by recirculating exhaust gas into the combustion chamber, thereby reducing levels of "engine-out NOx."  (56.1 ¶ 53.)  SCR is a newer technology that uses chemical reactions "downstream of the engine" to convert engine-out NOx into other substances to reduce tailpipe emissions.  (56.1 ¶ 54.)  FCA invested millions of dollars to equip its diesel vehicles with *both* types of technologies to comply with U.S. emissions standards.  (56.1 ¶ 55.)

To meet tailpipe emissions standards, the engine control unit ("ECU") and its calibrations must be optimized—a complex process requiring engineering judgment.  (56.1

¶ 56.)[5]  Because increasing EGR can reduce the need for SCR, and vice-versa, the EGR and SCR systems are calibrated with software to work together to meet regulatory standards.  (56.1 ¶ 57.) Thus, calibrations of EGR and SCR cannot be viewed in isolation when assessing tailpipe emissions for compliance.  (Ex. 93 (Atkinson Dep.) at 235-36.)  As Plaintiffs' expert conceded, the interplay of performance, fuel economy and emissions control makes calibrating diesel engines "a remarkably complex process" with nearly "1 million lines of code" that can be calibrated.  (Id. at 63, 69.)

Manufacturers thus often have "certification preview meetings" with the EPA before submitting their COC applications.  (56.1 ¶ 58.)  That happened here:  On May 14, 2012, Chrysler met with the EPA's director of light-duty certification (and others) to discuss Chrysler's COC applications and SCR system.  (56.1 ¶¶ 59-64.)  Chrysler reviewed its understanding of "AECD" and specifically how the regulations applied to its diesel fleet, including by providing "specific examples" of what is not an AECD.  (56.1 ¶ 62.)  EPA officials indicated that they were "happy with" and "concurred" with Chrysler's approach.  (56.1 ¶ 63.)  The EPA, moreover, indicated that they "agreed that they did not want everything in the calibration documented and given to them," because they did not want "reams and reams of data describing all" of Chrysler's "calibration[s]."  (56.1 ¶ 64.)

Chrysler submitted COC applications for model year 2014-2016 Jeep Grand Cherokee and Ram 1500 3.0L diesel vehicles over the period May 2013 to July 2015.  (56.1 ¶ 65.)  Chrysler's powertrain emissions certification group was responsible for the AECD list that accompanied those applications and, in compiling the list, made judgment calls about

---

[5] The ECU is a computer, generally loaded with generic base software when sold to the vehicle manufacturer; it controls (among other things) emissions components and engine performance.  The ECU is "calibrated" by customizing the ECU software based on vehicle-specific performance and emissions profiles.  (See Ex. 70 (Atkinson Rpt.) ¶¶ 25-26; Ex. 97 (Atkinson Dep. II) at 139-40.)

whether software features were or were not AECDs under the regulatory definitions, based on information learned from those responsible for calibrations (including information learned at the May 14, 2012 meeting with EPA).  (Ex. 85 (R. Lee Dep.) at 33.)  The EPA and CARB approved each of Chrysler's applications during the relevant period.  (56.1 ¶ 67.)  To date, Chrysler has sold about 100,000 of these diesel vehicles in the U.S.  (56.1 ¶ 106.)

> **2.      VW NOV and FCA's Robust Internal Review of Its Diesel Calibrations**

On September 18, 2015, the EPA issued an NOV to VW concerning 585,000 VW diesel vehicles, accusing VW of installing a "switch" that "senses whether the vehicle is being tested," which was used to alternate between a "dyno calibration" to pass emissions tests and a "'road calibration' which reduced the effectiveness of the emission control system."  (56.1 ¶ 69.) VW admitted to using these "switch" devices to cheat emissions testing.  (56.1 ¶ 70.)

FCA senior executives were "shocked" at the VW news.  (56.1 ¶ 71; Ex. 80 (Marchionne Dep.) at 52-53, 66; Ex. 85 (R. Lee Dep.) at 193.)  Mr. Marchionne directed Mr. Lee to conduct an internal review to confirm that "there's no VW event in our fleet," meaning a system that "ran one way on test benches, and . . . another way on the road."  (56.1 ¶ 72.)  Mr. Lee testified that, although FCA "had no reason to believe that we had anything that was incorrect or improper," FCA believed this was the prudent course of action because it "shared some engines and some suppliers" that "were reported to have been involved with VW."  (Ex. 85 at 191, 193; 56.1 ¶ 73.)  The review of FCA's fleet of worldwide diesel vehicles involved *more than 700* engineers and analyzed 40 vehicle packages, including 544 engine and 92 transmission calibrations packages, 400 engine algorithms and *over 1.8 million* lines of software code.  (56.1 ¶¶ 74-75; Ex. 85 (R. Lee Dep.) at 214.)  FCA also conducted on-road emissions testing, and obtained from third-party suppliers "emissions compliance statements" and other assurances that

the software supplied did not contain defeat devices.  (56.1 ¶¶ 76-77.)  After completing this review, FCA "found nothing . . . similar at all to what was being reported that Volkswagen was doing."  (Ex. 85 (R. Lee Dep.) at 192-93; 56.1 ¶ 78.)  Mr. Lee presented the results of the review to FCA's Board, including Mr. Marchionne, on October 28, 2015.  (56.1 ¶ 79.)

### 3.   Chrysler's Post-VW Dialogue with the EPA and CARB

In the wake of the VW scandal, on September 25, 2015, the EPA sent public "Dear Manufacturer" letters to all diesel vehicle manufacturers in the U.S. stating that the EPA "may test or require testing of any vehicle" for "the purposes of investigating a potential defeat device."  (56.1 ¶ 80.)  Shortly thereafter, the EPA's Office of Transportation and Air Quality ("OTAQ")—a regulatory, not enforcement, office—initiated a dialogue with Chrysler's technical personnel and requested vehicle data and other information.  (56.1 ¶ 81.)  From September 2015 through January 2016, Chrysler provided the requested information and maintained a dialogue with OTAQ through phone calls, e-mails and in-person meetings.  (56.1 ¶¶ 81-101.)  At no time during this dialogue did the EPA convey any definitive views concerning Chrysler's compliance with environmental laws.  (*Id.*)  Indeed, as discussed below, once Chrysler had the opportunity to address the concerns OTAQ raised about emissions levels and certain software features, OTAQ staff appeared satisfied with Chrysler's responses.

***November 2015 Meetings.***  OTAQ and Chrysler met twice in November 2015.  (56.1 ¶¶ 83-92.)  OTAQ said that its post-VW supplemental testing indicated that the diesel-equipped 2014 Ram 1500s had higher NOx emissions levels when a particular testing cycle was repeated.  (56.1 ¶ 85.)  Chrysler engineers presented different results—showing *decreasing* emissions levels over the same tests—and suggested it was possible that OTAQ's results were

caused by the specific manner in which OTAQ conducted its testing.  (56.1 ¶ 86.)[6]  In response, OTAQ requested additional data from Chrysler to conduct further testing.  (56.1 ¶ 88.)

On November 30, 2015, Byron Bunker, OTAQ's Director of Compliance, called Vaughn Burns in Chrysler's Vehicle Emissions, Certification and Compliance Group expressing "concern[] that [Chrysler's] strategy may constitute a defeat device."  (56.1 ¶ 91.)  This message was relayed to Michael Dahl (Head of Vehicle Safety and Regulatory Compliance), who understood that OTAQ was "asking for our full cooperation in getting this resolved quickly," because they cannot "make an assessment of a defeat device" where "[t]here is no data," so "[f]or me, this was an information-gathering task."  (Ex. 90 (Dahl Dep.) at 92, 95.)

*December 2015 Meeting.*  OTAQ and Chrysler met on December 14, 2015 to discuss OTAQ's concerns based on its testing.  (56.1 ¶ 93.)  Chrysler personnel at the meeting testified that they believed they were "working out" at "a technical level through some of [OTAQ's] findings where they were looking for more explanation," which "happens often."  (56.1 ¶ 95.)  OTAQ did not express any conclusions at this meeting, but instead expressed a "willingness to discuss concerns and rationale between design choices."  (56.1 ¶ 94.)

*January 2016 Discussions.*  On January 7, 2016, Mr. Bunker e-mailed Mr. Burns expressing his view that "at least one of the AECDs in question *appears to me* [to] violate EPA's defeat device regulations," and asked "to briefly discuss our concerns today with the intent to schedule a meeting."  (56.1 ¶ 96.)  This message was relayed to Mr. Lee.  (*See* 56.1 ¶ 97; Ex. 85 (R. Lee Dep.) at 221-22.)  On January 10, 2016, Mr. Lee texted Mr. Marchionne:

> EPA has been testing RAM 1500 diesel since November.  They have asked questions and for data.  We have responded on an urgent basis.  At the end of last

---

[6] NOx emissions levels can vary dramatically depending on how a vehicle is driven.  (56.1 ¶ 87.)  The federal testing procedures allow a wide range of NOx emissions depending on the driving conditions in any given test cycle.  *See* 40 C.F.R. § 86.1811-04.

> week their leadership (Bunker and Grundler) provided a list of 5 concerns.  We don't share their opinion and will discuss in detail with them on Wed. [January 13].  Mike Dahl's and Margie [Loeb's] teams are fully engaged.

(56.1 ¶ 98.)  On January 11, 2016, Mr. Dahl asked OTAQ to "reserve conclusion" on whether any strategies constitute "defeat devices" until "we fully and fairly have a mutual understanding of the complex technical facts of our emissions control strategy, of FCA's rationale for the strategies, and a full and complete mutual understanding of [OTAQ's] views."  (56.1 ¶ 99.)

At a January 13, 2016 meeting with OTAQ, Chrysler presented detailed test results and "technical information regarding 3.0 diesel engine," which addressed the "concerns identified by EPA."  (56.1 ¶ 100.)  Mr. Dahl, who attended the meeting, testified that OTAQ was "appreciative of the information" presented, which provided "a much better understanding for how the controls worked," and that OTAQ was "quite satisfied with the results."  (56.1 ¶ 101.)  Mr. Lee texted Mr. Marchionne that same day:

> Good results today at EPA.  Attitude is back to joint tech sharing and resolution. Some small risk of escalation over the next month plus.  Probably 90% back to where we need to be.  Next step is for EPA to huddle with CARB and for us to answer questions which may arise.

(56.1 ¶ 102.)  Mr. Marchionne testified that he took this as "a good sign," and "expect[ed] the process of dialect to resolve the issues."  (56.1 ¶ 103.)

***Post-January 2016 Communications and the January 2017 NOV.***  Chrysler continued its dialogue with OTAQ and, in June 2016, the EPA informed Chrysler that "they did not intend to issue a notice of violation."  (56.1 ¶ 104.)  By November 2016, Chrysler still had not "gotten any information or heard from anyone" that "the EPA was planning to issue a notice of violation."  (56.1 ¶ 105.)

On January 12, 2017, the EPA and CARB issued NOVs alleging that Chrysler did not disclose certain AECDs for its roughly 100,000 diesel Ram 1500 pickup trucks and Jeep

Grand Cherokee SUVs, and that one or more of the AECDs "*may* be defeat devices."  (56.1 ¶ 106.)  FCA was "blindsided" and "shocked that the NOV was issued at all," which "came out of nowhere."  (56.1 ¶ 107; Ex. 80 (Marchionne Dep.) at 115, 119.)  On May 23, 2017, the U.S. Department of Justice ("DOJ"), on behalf of the EPA, filed a civil complaint against FCA alleging that "one of more of the[] undisclosed software features, alone or in combination," met the definition of a defeat device.  (Ex. 162 ¶¶ 2, 50.)  FCA disagrees with the allegations:  its view "was and continues to be that we disclosed everything that was supposed to be disclosed, and that we did not have a defeat device."  (Ex. 80 (Marchionne Dep.) at 129; *see* Ex. 85 (R. Lee Dep.) at 227.)   As shown further below, however, even assuming the allegations are true, summary judgment for FCA is still appropriate here.

### D. The Challenged Statements

Plaintiffs claim that the following public statements were false or misleading:

- *"Substantial Compliance" Statements.*  On November 13, 2014, FCA stated on page 185 of a Registration Statement that: "We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products.  We constantly monitor such requirements and adjust our operations to remain in compliance." (56.1 ¶ 112.)  FCA repeated this statement in SEC filings on November 25, 2014; March 5, May 19 and June 17, 2015; and February 29, 2016.  (56.1 ¶ 112.)  Each filing was subject to rigorous due diligence, including review by multiple committees and subject-matter experts across relevant departments.  (56.1 ¶¶ 116-22.)

- *September 22, 2015 Reuters Article.*  On September 21, 2015, just after the VW NOV, a *Reuters* reporter asked Chrysler Media Relations personnel whether Chrysler had "been using any defeat devices similar to those installed by VW."  (56.1 ¶ 127.)  After consulting with technical and regulatory personnel, Eric Mayne, a Media Relations Manager, responded that "FCA US LLC works closely and continually with the EPA and CARB to ensure its vehicles are compliant with all applicable requirements," and "FCA US does not use 'defeat devices.'"  (56.1 ¶ 127; Mayne

Decl. Ex. 7.)  The next day a *Reuters* article stated:  "The U.S. unit of Fiat Chrysler Automobiles said on Tuesday its vehicles do not use any defeat devices like those at the centre of an emissions scandal plaguing rival Volkswagen." (56.1 ¶ 128.)

- ***January 27, 2016 Earnings Call.***  As described above, FCA conducted a robust internal review of its diesel calibrations after the VW NOV.  On January 27, 2016, Mr. Marchionne discussed the findings of that review on an earnings call:

  > One word *on the European side*.  I think that after the advent of dieselgate, for a lack of a better term, FCA has undertaken a pretty thorough review and a thorough audit of its compliance teams.  *I think we feel comfortable* in making the statement that there are no defeat mechanisms or devices present in our vehicles.  And I think the cars perform in the same way on the road as they do in the lab under the same operating conditions.  (56.1 ¶ 130.)

- ***February 2, 2016 Press Release.***  On February 2, 2016, FCA issued a press release discussing the findings of its internal review as it pertained to Europe:

  > [T]he issue of diesel emissions has been the subject of a great deal of attention, particularly in Europe, where diesel is quite common.  In response to these events, FCA has conducted a thorough internal review of the application of this technology in its vehicles and has confirmed that its diesel engine applications comply with applicable emissions regulations.  In particular:
  >
  > - FCA diesel vehicles do not have a mechanism to either detect that they are undergoing a bench test in a laboratory or to activate a function to operate emission controls only under laboratory testing . . . .
  >
  > - FCA diesel vehicles when tested following the only testing cycle prescribed by European law (NDEC) perform within the regulatory limits and comply with the relevant regulatory requirements.  (56.1 ¶ 131.)

## ARGUMENT

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  To avoid summary judgment, the nonmoving party must show more than "the mere existence of a scintilla of evidence" to support its position.

-20-

*Lyons* v. *Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012).   Instead, it "must point to specific evidence in the record" that would enable a reasonable jury to find in its favor.  *Salahuddin* v. *Goord*, 467 F.3d 263, 273 (2d Cir. 2006).   If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Lyons*, 681 F.3d at 56-57. "[S]peculation alone is insufficient to defeat a motion for summary judgment."  *McPherson* v. *N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006).   Courts in this District routinely grant summary judgment in securities cases.[7]

## I.   THE RECORD SHOWS THAT DEFENDANTS DID NOT MAKE ANY ACTIONABLE MISSTATEMENTS.

A Section 10(b)/Rule 10b-5 violation requires, *inter alia*, proof that the defendant made a misstatement or omission of material fact.  *Basic Inc.* v. *Levinson*, 485 U.S. 224, 238 (1988).   Courts must "consider whether the disclosures and representations, taken together and in context, would have misled a reasonable investor about the nature of the securities."  *In re ProShares Tr.*, 728 F.3d 96, 103 (2d Cir. 2013).   An alleged misrepresentation is material only if there is "a *substantial* likelihood that the disclosure of the [truth] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information already made available."  *Id*. at 102.   The record here confirms that none of the alleged misstatements was false or misleading (Points A-C below), let alone materially so (Point D below).

---

[7] *See In re Barclays Bank PLC*, 2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017) (Crotty, J.) (granting summary judgment for defendants in Section 11 action), *aff'd*, 2018 WL 6040846 (2d Cir. Nov. 19, 2018); *Dodona I, LLC* v. *Goldman Sachs & Co.*, 132 F. Supp. 3d 505 (S.D.N.Y. 2015) (Marrero, J.) (granting summary judgment for defendant in Section 10(b) action); *In re Moody's Corp.*, 2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013) (Daniels, J.) (same); *In re N. Telecom Ltd.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) (Cedarbaum, J.) (same).

A.    **The Record Shows That FCA's Statements of Substantial Compliance Were Not False or Misleading.**

Plaintiffs claim that FCA's statement in six SEC filings from November 2014 to February 2016—"[w]e are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products"—is actionable because of FCA's violations of safety regulations and alleged violations of environmental regulations. (*E.g.*, Compl. ¶¶ 275-77.) As shown below in Point II (on lack of scienter), Plaintiffs do not have evidence to warrant a trial that the responsible FCA senior executives understood when these statements were made that FCA was representing to investors that, overall, FCA was substantially in compliance with the relevant requirements, not that it was in perfect compliance with each and every one of the many individual regulations to which FCA is subject in over 140 countries around the world. (*See* Decls. of Chernoby, Lee, Nelson, Palmer, and Veltri.)  Plaintiffs do *not* claim that the challenged statement, so understood, was false or misleading. (*See* ECF No. 46 at 16.)

Defendants are mindful of the Court's analysis of the "substantially in compliance" statement in its motion to dismiss decision. (Oct. 5, 2016 Order at 12.)  Defendants respectfully submit, however, that the FCA executives' understanding of the statement's meaning is, at the very least, a reasonable interpretation of the statement. (*See infra* at 45-46.) Even assuming, however, that the statement is interpreted to mean that "the company was substantially in compliance with *all* applicable regulations, including the Safety Act and vehicle safety regulations in the United States" (Oct. 5, 2016 Order at 12), the Court should grant summary judgment to FCA because the undisputed facts show that FCA *was* substantially in compliance with the applicable U.S. safety and emissions regulations.[8]

---

[8] Defendants preserve for appeal their previously rejected argument that the statement is immaterial as a matter of law under Second Circuit precedent. (Oct. 5, 2016 Order at 14-15.)  *See, e.g.*, *City of Pontiac*

1.    **There Is No Triable Issue As To FCA's Substantially Compliance with Safety Recall Regulations.**

At the pleading stage, this Court held that Plaintiffs' allegations of noncompliance with safety recall regulations were enough to "plausibly allege" falsity, because Chrysler admitted to violations of safety recall regulations in the July 24, 2015 Consent Order.  (Oct. 5, 2016 Order at 11-12.)   But now, at summary judgment, the discovery record shows that, although Chrysler was not in compliance with certain Safety Act regulations for part of the Class Period (as Chrysler admitted in the Consent Order), the evidence is clear that FCA was "substantially in compliance" with those regulations as of the dates the challenged statements were made.

"Substantial" compliance, by definition, does not mean perfect or complete compliance.  *See In re Plains All Am. Pipeline, L.P.*, 307 F. Supp. 3d 583, 635 (S.D. Tex. 2018) ("substantial compliance with regulatory requirements" does not "implicitly assur[e] absolute compliance").  As this Court has recognized, "'substantial' completion means just that:  that the relevant production is substantially albeit not entirely complete."  *Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*, No. 14 Civ. 7126, ECF No. 416 (S.D.N.Y. Apr. 3, 2017) (Furman, J.).  Courts and regulators have held that "substantial compliance" means "at least 60 percent" "in compliance" in other contexts.[9]  Here, the record shows that Chrysler far exceeded this threshold.

---

*Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

[9] *See Arent* v. *Shalala*, 70 F.3d 610, 612-13 (D.C. Cir. 1995) (quoting 21 C.F.R. § 101.43(c)) (upholding FDA regulation defining "substantial compliance"); 20 C.F.R. § 650.4(b) (60% compliance is substantial compliance); *Ortega* v. *Usery*, 441 F. Supp. 100, 102-03 (D. Conn. 1977) (same); *Blessing*, 520 U.S. at 335 (45 C.F.R. § 305.20 defined "substantial compliance" as "75 percent compliance with most remaining program requirements"); *In re Nichols*, 440 F.3d 850, 861 & n.10 (6th Cir. 2006) (finding debtors' "substantial compliance" with plan based on "85% payment history"); *Haden* v. *Krupp Asset Mgmt. Corp.*, 776 F. Supp. 1151, 1156 (S.D. Miss. 1990) (in construction business, work "was considered substantially complete when 90% was done"); *Lamphere* v. *Brown Univ.*, 712 F. Supp. 1053, 1060 (D.R.I. 1989) (court "would accept 90% of the 'full representativeness' goal as substantial compliance").

In the July 2015 Consent Order, Chrysler admitted that it did not supply a remedy for defective vehicles "within a reasonable time," 49 U.S.C. § 30120(c), for just *three* of its 296 then-outstanding recalls, and those three recalls covered only about *2%* of all FCA vehicles on the road in the U.S. from 2013 to 2015.  (*See supra* at 12.)  Chrysler also admitted to three general categories of "recordkeeping" violations, under 49 C.F.R. §§ 577.5, 577.7(a)(1), and 573.6, without admitting violations for any particular recall.  (*Id*.)  Plaintiffs' Safety Act expert (Mr. Hellmuth) claims that FCA was out of compliance with these three regulations, but asserts more instances of noncompliance than those in the Consent Order.  Specifically, he contends that Chrysler violated six requirements under the Safety Act a total of 101 times.  (*See infra* at 25.)[10] Even if one were to accept Mr. Hellmuth's assertions—despite his admission that his expert report was largely the work of Plaintiffs' counsel[11]—there still is no triable issue of fact as to FCA's substantial compliance.   Because Mr. Hellmuth did not look at FCA's alleged noncompliance *relative to* FCA's compliance with those regulations—an essential step in assessing whether the statement that FCA was "substantially in compliance" was false or misleading—there is no evidence from which a reasonable jury could find that FCA was not "substantially in compliance" with the Safety Act regulations.

---

[10] Mr. Hellmuth claims that FCA did not:  (i) file a 573 Report with NHTSA "not more than 5 working days" after deciding that a vehicle contains a defect, 49 C.F.R. § 573.6(b); (ii) amend its 573 report "within 5 working days after the manufacturer has confirmed the accuracy of the information," *id.*; (iii) provide copies of correspondence with vehicle owners concerning declared defects "no fewer than five (5) Federal Government business days" before mailing, 49 C.F.R. § 577.5(a); and (iv) provide copies of communications with dealers "that relate directly to the defect" "not later than 5 days" after sending, 49 C.F.R. § 573.6(c)(10).  Mr. Hellmuth also opines that in 10 instances, FCA did not "remedy the defect or noncompliance" "within a reasonable time."  49 U.S.C. §§ 30120(a) and (c).

[11] Mr. Hellmuth admitted that he drafted only a small portion of his report, and that the "leg work" was done by Plaintiffs' "law firm."  (Ex. 92 (Hellmuth Dep.) at 72-78.)  Where counsel "[g]host writ[es] a testifying expert's report," the "opinions expressed in an expert report are not the opinions of the expert," and "the expert will not be able to satisfy the requirements of Fed. R. Evid. 702."  *Long-Term Capital Holdings, LP* v. *United States*, 2003 WL 21269586, at *5 (D. Conn. May 6, 2003).

Using "plaintiff-friendly" assumptions for identifying when FCA was required to comply with relevant Safety Act regulations, Thomas McCarthy (Head of Safety Compliance and Product Analysis at Chrysler) tallied the instances where FCA was required to comply with applicable Safety Act regulations. (56.1 ¶ 49; McCarthy Decl. ¶¶ 12-24.)  As summarized in the table below, even accepting as true Mr. Hellmuth's 101 asserted instances of noncompliance, FCA was still *in compliance* over 90% of the time during the relevant period (2013-2015):

| Compliance Requirement (Statute/Regulation) | Number of Times FCA Was Required To Comply with Regulation (McCarthy Decl.) | Hellmuth's Claimed Instances of Noncompliance (Hellmuth Rpt.) | Percentage of Undisputed Compliance |
|---|---|---|---|
| File 573 Report in 5 Days (§ 573.6(b)) | 119 (¶ 14) | 2 (¶¶ 290-91) | **98.3%** |
| Send Dealer Communications in 5 Days (§ 573.6(c)(10)) | 2,725 (¶ 24) | 48 (¶¶ 303-04) | **98.2%** |
| Send Owner Notifications Letters in 60 Days (§ 577.7(a)(1)) | 119 (¶ 14) | 11 (¶ 280) | **98%**[12] |
| Send Draft Owner Notifications 5 Days Before Mailing (§ 577.5(a)) | 164 (¶ 21) | 11 (¶¶ 226, 300) | **93.3%** |
| Amend 573 Report in 5 Days (§ 573.6(b)) | 271[13] | 23 (¶¶ 238, 252, 293, 310, 316, 320) | **91.6%** |
| Remedy Defect in Reasonable Time (§§ 30120(a) and (c)) | 119 (¶ 14) | 10 (¶¶ 181, 287) | **91.6%** |

[12] The record shows that Chrysler "complied with the notice periods, over 98% of the time"—a statement that Plaintiffs' expert conceded he had "no basis to dispute." (56.1 ¶ 48.)

[13] This figure reflects the sum of (i) the 250 times FCA amended its 573 reports related to recalls initiated between 2013 and 2015 (McCarthy Decl. ¶ 17), and (ii) the 23 times Plaintiffs allege that Chrysler should have amended its 573 Reports but did not do so (Ex. 71 (Hellmuth Rpt.) ¶¶ 238, 252, 293, 310, 316, 320).

In addition, except for the ten instances where Mr. Hellmuth claims that FCA did not provide a remedy in a "reasonable time" (bottom row of the table), all of the claimed violations are of Safety Act "recordkeeping" requirements.  (*See* Ex. 33 at 43, 238, 292.)  None of the claimed violations involved the *substantive safety* regulations, such as those governing the proper design of safety equipment, like seatbelts and airbags.  Plaintiffs do not assert a single instance where FCA waited too long to identify and declare a *safety* defect (in contrast to other well-known examples of such claims, like the GM ignition switch recall).  (*See* Ex. 31 at 4; Ex. 29 at 1.)  These undisputed facts confirm that FCA was "substantially in compliance" with the relevant requirements under the Safety Act, despite alleged recordkeeping violations that Mr. Hellmuth conceded "probably in the overall scheme of things aren't that important."  (Ex. 92 at 297-98.)

The recent decision in *In re Plains* is on point.  There, plaintiffs claimed that the defendant oil company's statements in SEC filings—that it was "in substantial compliance" with regulatory requirements governing pipeline safety—were false because defendants did not adequately respond to a pipeline spill, after the EPA sued Plains and obtained a consent decree "requiring Plains to pay significant fines for regulatory violations," "spend $41 million to upgrade more than 10,000 miles of pipeline," and "adopt new safety measures to prevent spills and reduce the impact when they did occur."  *In re Plains*, 307 F. Supp. 3d at 583, 599, 610, 632-35 (S.D. Tex. 2018).  Applying Second Circuit law, the court dismissed the claim, holding that a reasonable investor would understand that "substantial compliance" did not guarantee complete compliance, even with important regulations that could give rise to heavy penalties: "reasonable investors would understand that, for a very large pipeline company, with a huge

network of pipelines, in a heavily regulated industry, notices of regulatory violations are common."  307 F. Supp. 3d at 635 (citing *Tongue*, 816 F.3d at 211).

Here, as in *Plains*, the undisputed facts confirm that FCA, a large, global automotive company in a heavily regulated industry, was "operating in substantial—not perfect, complete, or consistent—compliance with" the applicable Safety Act regulations (and the Clean Air Act regulations, for the reasons discussed immediately below).  *Id.*

### 2.     There Is No Triable Issue As To FCA's Substantial Compliance with Environmental Regulations.

Plaintiffs also challenge FCA's "substantially in compliance" statements because of alleged violations of Clean Air Act regulations with respect to "104,000 of Chrysler's diesel-powered vehicles."  (Compl. ¶ 33.)   But even assuming that Chrysler ran afoul of such regulations with respect to 104,000 vehicles, that would still represent a minuscule fraction of the total population of FCA or Chrysler vehicles on the road at the time of the challenged statements.  There were over 70 million FCA vehicles on the road worldwide in 2014 (56.1 ¶ 2), and Plaintiffs have asserted that "approximately 50% of FCA's vehicles are sold in the U.S."  (ECF No. 46 at 16.)  Thus, assuming 35 million (50% of 70 million) FCA vehicles were on the road in the U.S. during the relevant period, the roughly 104,000 diesel vehicles represented an infinitesimal 0.03% of those vehicles.  Similarly, the roughly 104,000 diesel vehicles represented "less than one percent of [FCA's] global sales" (Aug. 1, 2017 Order at 9; ECF No. 121), and less than two percent of Chrysler's sales, during the Class Period (56.1 ¶ 5).  Because there is no admissible evidence of any similar noncompliance with respect to the rest of FCA's (and

Chrysler's) overall vehicle population,[14] FCA had achieved at least 98-99% compliance with the relevant regulations—clearly "substantial" compliance.  (*See supra* n.12.)

B.   **The Record Shows That FCA's Statements Concerning Defeat Devices Were Not False or Misleading.**

*September 22, 2015* **Reuters** *Article*.  As previously described (*supra* pp. 19-20), on September 21, 2015, shortly after the VW scandal came to light, Chrysler received an e-mail from a *Reuters* reporter stating that "we are trying to establish the impact of the VW saga on other carmakers," and asking, "Has Fiat Chrysler been using any defeat devices similar to those installed by VW?"  (56.1 ¶ 127.)  Eric Mayne, after speaking to Steve Mazure and Bob Lee—both of whom informed him that Chrysler did not use VW-like "defeat devices"—responded to *Reuters* by e-mail, stating that "FCA U.S. does not use defeat devices."  (Mayne Decl. ¶¶ 8, 18-19 Ex. 7.)  On September 22, 2015, *Reuters* published an article stating: "The U.S. unit of Fiat Chrysler Automobiles said on Tuesday its vehicles do not use any defeat devices *like those at the centre of an emissions scandal plaguing rival Volkswagen*."  (56.1 ¶ 128.)  Read "fairly and in context" (Oct. 5, 2016 Order at 13), and even assuming the truth of the assertions made by the EPA more than a year later, this statement was not false or misleading when made.

Although the EPA alleged for the first time a year-and-a-half later, on May 23, 2017, that "one or more" AECDs "alone or in combination with one or more of the others" meet the technical definition of "defeat device," the EPA did *not* allege—and has never alleged—that FCA vehicles contained an intentional, VW-like "defeat device" involving a "switch" or other dual-emission system mechanism that senses whether the vehicle is being tested in order to trigger a different emissions system from the one used during real-world driving.  Indeed, the comprehensive audit FCA undertook shortly after the VW NOV did not unearth "anything that

---

[14] *See* accompanying Friedrich *Daubert* Motion.

was similar at all to what was being reported that Volkswagen was doing."  (56.1 ¶¶ 74-78; Ex. 85 (R. Lee Dep.) at 192-93.)

The most Plaintiffs' proffered expert, Dr. Atkinson, could bring himself to say was that a single internal Chrysler document "has a distinct parallel in that of [VW]."  (Ex. 70 (Atkinson Rpt.) ¶ 250.)  But even he acknowledges that VW used a "steering angle"—*i.e.*, a sensor in the vehicle that detects whether the vehicle is being driven on the road or is being tested for compliance with emissions standards based on whether the vehicle's steering wheel is being turned—to detect "regulatory testing," whereas Chrysler's emissions calibrations are "not explicitly proscribed by regulation."  (*Id.* ¶¶ 98, 250.)  Moreover, regardless of what a single cherry-picked document might say, Dr. Atkinson did not conduct *any* technical review or analysis of emissions calibrations, and thus has no basis to assert that they perform differently in laboratory testing than on the road in real-world driving conditions.  (*See* Ex. 93 (Atkinson Dep.) at 147.)  Plaintiffs' "expert cannot create an issue of fact by rendering an opinion" based on *ipse dixit* that is contrary to both the EPA's position and FCA's internal audit.  *Price* v. *Fox Entm't Grp.*, 499 F. Supp. 2d 382, 386 (S.D.N.Y. 2007) (Scheindlin, J.).

**_January 27, 2016 Earnings Call and February 2, 2016 Press Release_**.  Plaintiffs claim that FCA's statements in a January 2016 earnings call and February 2016 press release that its vehicles did not contain "defeat mechanisms or devices" were false or misleading because "Defendants knew their U.S. diesel vehicles (the Jeep Grand Cherokee and Ram 1500, in particular) were [in] violation of EPA regulations."  (Compl. ¶¶ 343-46.)  But read in context, those challenged statements did not concern "U.S. diesel vehicles" or "EPA regulations" at all; both related only to *European* emissions regulations.  On the earnings call, Mr. Marchionne discussed "defeat mechanisms" "*on the European side*."  (56.1 ¶ 130.)  The press release is

likewise cabined to Europe, referring to "particularly *in Europe*," "*European law* (NEDC)," "[c]urrently *in Europe*" and "*Euro 6* calibrations." (56.1 ¶ 131.) Indeed, the Complaint quotes a February 2, 2016 e-mail from Chrysler to the EPA stating that this press "release [was] out of our *European* office," so "this is *not* a statement about NAFTA diesels." (Compl. ¶ 346.)

As explained more fully in Defendants' Friedrich *Daubert* Motion, this Court dismissed Plaintiffs' European allegations months ago, twice holding that Plaintiffs' emissions-related claims were limited to U.S. "*federal and state* emissions regulations." (Aug. 1, 2017 Order at 1; Nov. 13, 2017 Order at 2.) "[W]hen a court decides upon a rule of law, that decision should continue to govern in subsequent stages of the same case." *In re N. Telecom Ltd.*, 42 F. Supp. 2d 234, 239 (S.D.N.Y. 1998) (Cedarbaum, J.) (quoting *Sagendorf-Teal* v. *Cty. of Rensselear*, 100 F.3d 270, 277 (2d Cir. 1996)). In any event, there is no evidence creating a triable issue of fact on FCA's compliance with European emissions regulations. No regulator in Europe has ever made a determination that FCA did not comply with EU emissions regulations. (*See* Friedrich *Daubert* Motion.) And this Court recognized that the report by German auto regulators that Plaintiffs relied on concluded that its "investigations do not indicate any further defeat devices [beyond Volkswagen] that are based on a test cycle recognition" and "provides little or no support" for Plaintiffs' claims. (Aug. 1, 2017 Order at 7-8.)

Plaintiffs' proffered expert on European emissions regulations, Dr. Axel Friedrich, speculates—based entirely on emissions testing conducted by others and his own legal interpretations, which conflict with those of the regulators whose reports he cites—that FCA violated EU regulations. (*See*, *e.g.*, Ex. 95 (Friedrich Dep.) at 188, 252-54.) As shown in the Friedrich *Daubert* Motion, his opinion is not admissible under settled law. For instance, Dr. Friedrich admitted that he did *not* apply the European regulations as written, and ignored

-30-

relevant exceptions regarding the permissible use of "defeat devices" under EU law, claiming that, even though those exceptions are codified in EU regulations, they are an "illegal statement" and "not legally correct."  (Friedrich Dep. 105-106, 188.)  In fact, there is no dispute that Italy—the *only* European country with jurisdiction over FCA's emissions compliance under EU law—found that FCA's vehicles *complied with* EU emissions regulations.  (56.1 ¶ 132.)   Dr. Friedrich's flawed and inadmissible opinion—the only "evidence" Plaintiffs developed on European emissions issues—does not create a triable issue of fact with respect to the challenged January and February 2016 statements.[15]

### C.      There Is No Triable Issue as to FCA's Opinion Statements.

Defendants are entitled to summary judgment on the challenged emissions-related statements for the independent reason that they are statements of opinion, and there is no evidence that (i) the opinions were not "honestly held" or (ii) FCA omitted facts that "conflict

---

[15] Plaintiffs also did not develop in discovery any evidence of falsity, materiality or scienter as to the grab bag of other statements the Complaint challenged in conclusory fashion.  (*See*, *e.g.*, Compl. ¶¶ 256-57, 273-74, 276-77, 312-13, 332-33, 339-40, 347-52, 354, 356-59, 364-68.)  For example, with respect to FCA's statements about on-board diagnostic ("OBD") systems (*id*. ¶¶ 273, 277, 350, 354), there is no evidence that FCA violated OBD regulations; FCA did not represent that it was in compliance with OBD regulations in any event; and an OBD deficiency does not render a vehicle noncompliant with state or federal regulations.  *See* 40 C.F.R. § 86.1806-17 (EPA may "accept as compliant a vehicle that does not fully meet specific requirements under [the OBD] section"); Cal. Code Regs. tit. 13, § 1968.2(k)(1).  Plaintiffs also challenge Mr. Lee's statements during a December 2015 interview with *WardsAuto*, such as that FCA "looked at 2 million lines of software code" (Compl. ¶ 339), but the record shows that these statements were true (56.1 ¶ 75) and Plaintiffs have no evidence otherwise.  Plaintiffs also challenge Chrysler's January 12, 2017 press release, issued shortly after the NOVs, stating that Chrysler "believes that its emission control systems meet the applicable requirements."  (Compl. ¶¶ 367-68.)  There is no evidence that FCA senior executives did not hold this belief when the statement was made (or to this day for that matter).  The supposedly "comforting oral statements" by Mr. Marchionne and Mr. Kunselman about Chrysler's "commitment to vehicle safety and regulatory compliance" (Oct. 5, 2016 Order at 3, 14 (quoting Compl. ¶ 256)) are inactionable puffery, but they are also true as shown by, for example, the creation of a new Office of Vehicle Safety and Regulatory Compliance headed by a senior executive (Mr. Kunselman) who reported directly to the CEO.  (56.1 ¶¶ 23-24.)  Finally, although Plaintiffs previously alleged that Chrysler's cover letters to the EPA with its COC applications were false (Compl. ¶¶ 249-54, 258-59, 286-87, 318-19), all but two of those letters were sent before the Class Period started, and the letters merely state that certain regulations "apply" to both "certification and in-use vehicles" (56.1 ¶ 66), which is indisputably true.

with what a reasonable investor would understand from the statement itself." *Omnicare Inc.* v.

*Laborers Dist. Council Constr. Indus Pension Fund*, 135 S. Ct. 1318, 1327, 1329 (2015).

FCA's statements of substantial compliance with environmental regulations and

the absence of VW-like "defeat devices" are opinion statements because, as previously discussed

(*supra* at 14), assessing whether a particular emissions feature is an AECD or a "defeat device"

requires subjective engineering judgment and "depend[s] . . . heavily on the discretionary

choices" of how the regulation is interpreted, including the "choice of assumptions" made in

evaluating the exceptions set forth in the regulation itself.  *In re Salomon Analyst Level 3*, 373 F.

Supp. 2d 248, 251 (S.D.N.Y. 2005) (Lynch, J.).  "Absent a clear and unambiguous ruling from a

court or agency of competent jurisdiction, statements by laypersons that purport to interpret the

meaning of a statute or regulation are opinion statements, and not statements of fact." *Anthem*

*Sports, LLC* v. *Under the Weather, LLC*, 320 F. Supp. 3d 399, 415 (D. Conn. 2018) (quoting

*Coastal Abstract Serv., Inc.* v. *First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)).[16]

There is no evidence that any of the FCA senior executives involved in making

the emissions-related statements did not honestly believe them; indeed, the record shows that

those individuals honestly believed that FCA was substantially in compliance with emissions

regulations and did not use "defeat devices."  (56.1 ¶ 108; Ex. 80 (Marchionne Dep.) at 129;

Ex. 85 (R. Lee Dep.) at 227.)  (*See infra* pp. 40-49 (on scienter).)  Nor is there any evidence that

FCA omitted any material facts that conflicted with the emissions-related statements.   As

explained above, read in context, the challenged statements about "defeat devices" referred to

VW-like devices, and FCA concluded that its vehicles did *not* contain such devices.   Indeed,

---

[16] In this context, courts consider both companies and senior executives to be "laypersons."  *Anthem*, 320 F. Supp. 3d at 405, 415 ("principal" of sporting goods company is a "layperson[]"); *Coastal*, 173 F.3d at 730-31 ("vice-president" of insurer is a "layperson[]").

both the January 27, 2016 earnings call and February 2, 2016 press release expressly refer to FCA's internal audit as the basis for those statements.  (*See supra* at 29-31.)  And Mr. Marchionne's statement during the January 27, 2016 earnings call—"*I think we feel comfortable in making the statement that there are no defeat mechanisms or devices present in our vehicles*" (56.1 ¶ 130)—plainly expresses an opinion.  *See Schaffer* v. *Horizon Pharma PLC*, 2018 WL 481883, at *10 (S.D.N.Y. Jan. 18, 2018) (Furman, J.)  ("statements prefaced with terms such as 'I think', 'we believe', and 'we expect'" "qualify as inactionable opinions").  Such "qualifiers" also render Mr. Marchionne's statement "inactionable puffery."  *UBS*, 752 F.3d at 183.

> **D.    Even Assuming Any Misstatements, The Record Shows They Were Not Material.**

Even assuming that any of the challenged statements was false or misleading, they were indisputably immaterial to FCA as a whole for at least four reasons:

*First*, the alleged "misstatements are not likely to be material" because they "implicate less than 5% of [FCA's] revenue."  *In re New Oriental Educ. & Tech. Grp.*, 988 F. Supp. 2d 406, 422-23 (S.D.N.Y. 2013) (Koeltl, J.).  The record shows that the total cost to FCA of the NHTSA Consent Order—including costs associated with penalties, outreach efforts, buybacks, the monitor and consulting work—was approximately $173 million, which represents a negligible 0.2% of FCA's total assets as of December 31, 2015 (€105 billion) and 0.2% of FCA's revenue in 2015 (€110.6).  (56.1 ¶ 47.)[17]  And the diesel vehicles alleged to be out of compliance with the Clean Air Act comprised a tiny fraction (less than 1%) of FCA's sales during the Class Period.  (*See supra* at 4.)  The Second Circuit routinely rejects on immateriality grounds securities claims based on statements that have impacted similarly small percentages of a company's total assets or revenue.  *See*, *e.g.*, *IBEW*, 783 F.3d at 391 (no materiality where

---

[17] On December 31, 2015, the Euro-USD exchange rate was 1.0859.

undisclosed exposure to asset-backed securities represented "less than 1% of . . . total assets");

*ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d

Cir. 2009) (no materiality where "accounting classification decision that affects less than one-

third of a percent of total assets").

> *Second*, the record shows that the market did not consider FCA's statements of

"substantial compliance" to be material "at the time the alleged misstatement[s] occurred."

*Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000).  Of the nearly *one thousand*

FCA-related analyst reports published during the Class Period, not a single one even mentions

the substantial compliance statements.  (56.1 ¶ 113.)  That the "financial press did not report on

[FCA's] statement[s]" reveals a "lack of interest [among] the financial community" and confirms

that the market viewed the statements as "not material."  *In re N. Telecom*, 116 F. Supp. 2d at

452-53, 461 n.3, 465, 467.  Moreover, "[n]o investor would take such statements seriously in

assessing a potential investment, for the simple fact that almost every [auto manufacturer] makes

these statements."  *ECA*, 553 F.3d at 206.  Indeed, during the Class Period, Ford, GM and

Toyota—three of FCA's main competitors—all made similar statements of "substantial

compliance" in at least *eleven* different public disclosures.  (56.1 ¶¶ 123-26.)

> *Third*, FCA's substantial compliance statements as pertains to Safety Act

regulations did not "significantly alter[] the total mix of information" available to investors.

*Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (quoting *Basic*, 485 U.S. at 231-32).

Chrysler's alleged Safety Act noncompliance was already in the public domain prior to the

NHTSA Consent Order.  (*See* App'x A.)  And the facts underlying the alleged Safety Act

violations were publicly available to investors, in real time, from NHTSA, which "posted all

recall-related materials on its website within one day of receiving those materials."  (Ex. 73

(Person Rpt.) ¶ 80.)  Indeed, Plaintiffs' expert agreed that "if you just do a Google on NHTSA recalls, you'll find everything you ever wanted to know."  (Ex. 92 (Hellmuth Dep.) at 205.)

*Fourth*, FCA's SEC filings included risk disclosures covering safety recall and emissions-related risks that were part of the total mix of available information.  FCA repeatedly disclosed, for example, that it was subject to "numerous legal risks"; that "government investigations are pending against us on a wide range of topics, including vehicle safety [and] emissions"; and that "such matters could have . . . a material adverse effect on our financial condition."  (56.1 ¶¶ 114-15.)  There is no evidence that any investor (let alone any reasonable investor) viewed FCA's statements—including its general "substantially in compliance" statement—as significantly altering the risks of which the market was already aware.

## II.    THERE IS NO TRIABLE ISSUE AS TO SCIENTER.

There is no evidence from which a reasonable jury could find that any defendant acted with scienter—"a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  Plaintiffs abandoned any motive-based scienter theory at the motion to dismiss stage (Oct. 5, 2016 Order at 15 & n.3), which is not surprising given that FCA executives had nothing to gain from perpetrating the massive fraud Plaintiffs allege.  Plaintiffs are thus left with a "recklessness" theory of scienter. (Oct. 5, 2016 Order at 15-16.)[18]  Recklessness in the securities fraud context is not simply a "heightened form of negligence"; rather, it means "*conscious recklessness—i.e.*, a state of mind

---

[18] The absence of a plausible motive to commit fraud remains highly relevant to a recklessness theory of scienter, because Plaintiffs "must show that defendants had a motive for deliberately shutting their eyes to the facts."  *SEC* v. *Solucorp Indus., Ltd.*, 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003) (Conner, J.); *see also Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) (stressing "significant burden on the plaintiff in stating a fraud claim based on recklessness"); *cf. United States* v. *Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) ("To prove reckless disregard for the truth, the defendants [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations.").

approximating *actual intent*."   *S. Cherry St.*, 573 F.3d at 109.   To avoid summary judgment, Plaintiffs must point to "specific facts," *Caldarola* v. *Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002), from which a reasonable jury could conclude that the challenged statements were "without basis and in reckless disregard of their truth or falsity," *Rolf*, 570 F.2d at 47-48.   There are no such facts.

　　　　　Plaintiffs survived Defendants' motion to dismiss by alleging that FCA senior executives had "access to" "information contradicting their public statements." (Oct. 5, 2016 Order at 16-18; Nov. 13, 2017 Order at 3-5.)   But that is no longer enough at summary judgment, where the Second Circuit applies a "*more probing test*" for scienter.   *Emps.' Ret. Sys.*, 794 F.3d at 306; *see Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital*, 531 F.3d 190, 195 (2d Cir. 2008) (distinguishing "pleading rules" from "liability rules" for scienter).   Even "an inconsistency between a company's public statement and information in its internal documents" is not sufficient for "a jury [to] properly find scienter."   *In re Symbol Techs.*, 950 F. Supp. 1237, 1245 (E.D.N.Y. 1997) (Gleeson, J.).   Here, Plaintiffs can point to no admissible evidence supporting a sustainable finding of scienter; indeed, the record now shows that the allegations that got them past the motion to dismiss stage are demonstrably false or simply not probative of scienter at all (Sections II.A and II.B below).   And beyond the *absence* of scienter evidence, the record also contains ample undisputed facts that are entirely inconsistent with any finding of scienter (Section II.C below).

### A.   There Is No Evidence That Any Defendant Acted with Scienter as to the "Substantial Compliance" Statements.

#### 1.   The Alleged Safety Act Violations Are Not Evidence of Scienter.

*November 2014 Letters from NHTSA*.   At the pleading stage, Plaintiffs survived the motion to dismiss by pointing to three November 2014 letters from NHTSA Deputy

Administrator David Friedman to FCA's CEO criticizing Chrysler for its actions in connection with the Jeep service campaign and Takata regional field action.[19]  Plaintiffs contended that this correspondence showed that "Defendants were aware of nonpublic facts contradicting their public representations of substantial legal compliance" from November 2014 through June 2015, when FCA made the last of the "substantial compliance" statements Plaintiffs challenge.  (Oct. 5, 2016 Order at 17.)  After several years of discovery, the record now demonstrates that Plaintiffs survived dismissal at the pleading stage by misrepresenting that those letters had something to do with "compliance."  They did not.

     *First*, as a preliminary matter, the November 2014 letters were released publicly and, in fact, were contemporaneously reported by the press.[20]  Accordingly, this correspondence necessarily did not constitute "nonpublic facts" sufficient to support a finding of scienter.  *See In re Sanofi*, 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015) (Engelmayer, J.) (at the pleading stage, scienter requires that "defendants knew facts or had access to *non-public* information contradicting their public statements"), *aff'd*, 816 F.3d 199 (2d Cir. 2016).[21]

     *Second*, and more fundamentally, the correspondence from Mr. Friedman had no bearing on whether Chrysler was in *compliance* (let alone "substantial compliance") with the Safety Act, because the Act did *not* apply to these campaigns at all.  As discussed *supra pp* 8-9, the relevant Safety Act regulations do not apply as a matter of law until NHTSA or the manufacturer has formally determined that a vehicle "contains a defect related to motor vehicle

---

[19] The remaining letters from NHTSA referenced in the Complaint were sent to an FCA employee who was not involved in the SEC disclosure process. (56.1 ¶ 35.)

[20] *See*, *e.g.*, "U.S. regulator to Chrysler's Marchionne: get act in gear on Jeep recall," *Reuters*, Nov. 20, 2014; "Feds: Chrysler must expand air bag recall, speed repair," *Detroit News*, Nov. 25, 2014; "Feds to Takata: Declare defects," *Detroit News*, Nov. 27, 2014; "U.S. demands wider Takata recall," *Int'l N.Y. Times*, Nov. 28, 2014.

[21] The publicly announced May 2015 Special Order cannot support scienter for the same reason. (Ex. 53 at -110; "Feds order Fiat Chrysler to defend pace of 20 recalls," *USA Today*, May 18, 2015; Ex. 55.)

safety or does not comply with an applicable motor vehicle safety standard."   49 U.S.C.

§§ 30118(a)-(b).  Here, the undisputed facts are that, as of November 2014, neither NHTSA nor

Chrysler had concluded that the Jeeps or the Takata airbag inflators were defective or

noncompliant with a vehicle safety standard.   (56.1 ¶¶ 28, 34.)[22]  Accordingly, in connection

with these voluntary campaigns, Chrysler had no Safety Act recall administration obligations as

a matter of law, as Plaintiffs' expert was forced to concede at his deposition.[23]

There is precedent for manufacturers using the recall process, as here, to conduct

a voluntary campaign without formally declaring a defect.  In *United States* v. *Gen. Motors

Corp.*, 841 F.2d 400 (D.C. Cir. 1998), for example, NHTSA launched an investigation into

brake-related safety issues, and GM agreed to conduct a voluntary service campaign to replace

valves.  *Id.* at 402.   NHTSA later sued, alleging, *inter alia*, that GM did not adequately

administer its voluntary service campaigns under NHTSA regulations.  *Id.* at 403.  The district

court (and, later, the D.C. Circuit) rejected NHTSA's claims because, without a defect

determination by either NHTSA or GM, "[u]nder the regulatory framework established by the

Act, GM never incurred an obligation to conduct either recall."  *Id.* at 416.   GM was thus

"legally a volunteer" and "incurred no obligation to comply with the remedial provisions of the

Act or NHTSA's regulations."  *Id.* at 416.   Here too, Chrysler was "legally a volunteer" with

respect to the Jeep service campaign and the Takata regional field action, and were not subject to

the regulatory requirements of the Safety Act.  As a matter of law, the NHTSA letters therefore

---

[22] The November 2014 letters thus used the term "recall" as a shorthand for the fact that "Chrysler and NHTSA had agreed to utilize their *recall process*" to effectuate the voluntary campaigns.  (Ex. 83 (Kunselman Dep.) at 36, 41.)

[23] *See* Ex. 92 (Hellmuth Dep.) at 311 ("Q.  The point is until [Chrysler] declared a defect, it had no obligations under the Safety Act, correct?  A.  That's correct."); *id* at 259 ("They were not legally bound to do anything [with the Jeeps] because, in fact, the administrator had not made a defect determination."); *see generally id.* at 58 ("The determination of a defect is a very official act and that can only be done by the administrator, basically.").

have no bearing on whether FCA's "substantially in compliance" statements were made with scienter.

> ***Other Deficient Safety Act Scienter Theories.***  Plaintiffs alleged in the Complaint that Mr. "Kunselman's abrupt resignation supports a strong inference of scienter."  (ECF No. 46 at 24; *see* Compl. ¶ 334.)  But Mr. Kunselman resigned to accept a position, for which he was recruited, at Oakland University, and Plaintiffs have no contrary evidence to support their speculation.  (56.1 ¶ 7; Ex. 83 (Kunselman Dep.) at 190-91.)  In any event, it is black-letter law that resignations are "not themselves sufficient" to prove scienter, and Plaintiffs cannot identify any "highly unusual and suspicious" circumstances or "independent facts indicat[ing] that the resignation was somehow tied to the fraud alleged."  *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (Holwell, J.).

> Plaintiffs also alleged that "Chrysler was well aware that NHTSA had significantly intensified its enforcement" based on consent orders with Toyota in 2010 and GM in 2014.  (Compl. ¶¶ 9-11, 74-77, 377-80, 390.)  But "generalized awareness" of "industry-wide" concerns, including the behavior of "'competitors' or 'peers,'" "fail[s] to support an inference of fraudulent intent."  *In re PXRE*, 600 F. Supp. 2d 510, 539-44 (S.D.N.Y. 2009) (Sullivan, J.).

> Finally, Plaintiffs' expert opines that Chrysler's "processes and internal controls to ensure compliance with vehicle safety regulations were inadequate and ineffective."  (Ex. 71 (Hellmuth Rpt.) ¶ 7.)  But to demonstrate recklessness at the summary judgment stage, Plaintiffs must offer evidence that FCA spoke "without investigation and with utter disregard for whether there was a basis for the assertions."  *Rolf*, 570 F.2d at 52.  There is no such evidence.  And in any event, while insufficient internal controls "may give rise to liability" regarding "statements

*about* internal controls," they "do not themselves constitute fraud." *Dobina* v. *Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 249-50 (S.D.N.Y. 2012) (Kaplan, J.).

      **2.**      **The Alleged Clean Air Act Violations Are Not Evidence of Scienter.**

      ***Written Exchanges with the EPA.***    This Court first dismissed Plaintiffs' emissions-related claims on scienter grounds because "[c]onspicuously absent" from the Third Amended Complaint were "any allegations that FCA officials or Marchionne ever received test results, reports, or other communications indicating that FCA vehicles were not in compliance with relevant emissions regulations prior to the EPA's and CARB's notices on January 12, 2017." (Aug. 1, 2017 Order at 5.)  Plaintiffs amended their complaint, using publicly available information, and survived a motion to dismiss by alleging scienter based on "specific written exchanges between the EPA and high-level FCA officials warning the company that its vehicles appeared to be out of compliance." (Nov. 13, 2017 Order at 4 (citing Compl. ¶¶ 428-33).)

      As a preliminary matter, merely pointing to facts arguably contradicting FCA's public statements is not enough to avoid summary judgment.  *See In re Symbol*, 950 F. Supp. at 1245.  But more substantively here, the record shows that these "written exchanges" were part of an ongoing dialogue with the EPA—amidst the EPA's publicly-announced, industry-wide investigation into diesel-engine "defeat devices"—during which the EPA neither concluded that FCA was in violation of emissions regulations nor conveyed any such conclusion to FCA senior executives.  Plaintiffs cannot dispute the following facts that require the Court to grant summary judgment in favor of Defendants:

- On September 25, 2015, the EPA publicly announced an industry-wide investigation into the existence of "defeat devices" (56.1 ¶ 80);

- From September 2015 through January 2016, Chrysler gave EPA the information it requested, and EPA personnel expressed "concern" that a calibration in the 2014 Ram

1500 "*may* constitute a defeat device" or "appears" to violate EPA regulations (56.1 ¶¶ 81-101);

- On January 10, 2016, Mr. Marchionne was informed of the EPA's "concerns" and that Chrysler engineers "don't share their opinion and will discuss in detail with them" (56.1 ¶ 98);

- On January 13, 2016, Mr. Marchionne was informed of "[g]ood results today at EPA. Attitude is back to joint tech sharing and resolution" (56.1 ¶ 102); and

- In June 2016, FCA understood that the EPA "did not intend to issue a notice of violation" (56.1 ¶ 104; Ex. 90 (Dahl Dep.) at 186).

Mr. Marchionne's testimony—that he was completely "blindsided" by the NOVs, which "came out of nowhere" (56.1 ¶ 107; Ex. 80 (Marchionne Dep.) at 115, 119)—is entirely consistent with these events.  Simply put, these exchanges with the EPA are not evidence from which a reasonable jury could find that Mr. Marchionne or anyone at FCA who "actively participated in making, reviewing and/or authorizing the statements," *In re Vivendi*, 765 F. Supp. 2d 512, 545 (S.D.N.Y. 2011) (Holwell, J.), *aff'd*, 838 F.3d 223 (2d Cir. 2016), acted with scienter with respect to the November 2014 to February 2016 "substantial compliance" statements.[24]

For similar reasons, FCA did not have a duty to disclose the non-final views the EPA expressed during this ongoing dialogue.[25]  *See In re Barclays Bank*, 2018 WL 6040846, at

---

[24] This is nothing like the VW situation, where plaintiffs alleged that "the CEO received multiple memoranda regarding the Company's unlawful use of defeat-device software."  (Aug. 1, 2017 Order at 10 (quoting *In re Volkswagen*, 2017 WL 66281, at *12 (N.D. Cal. Jan. 4, 2017)).)

[25] Contrary to the hypothetical described in *Omnicare*, where an issuer might be liable if it makes a statement "with knowledge that the Federal Government was taking the opposite view," 135 S. Ct. at 1329, the dialogue here reflected preliminary views by EPA staff.  As the Second Circuit explained, "[t]he Supreme Court's example of an issuer stating a belief that its conduct is lawful . . . does not imply that the issuer's conduct is, in fact, lawful, but only that the issuer has conducted a meaningful inquiry and has a reasonable basis upon which to make such an assertion."  *Tongue*, 816 F.3d at 214.  That the

*7 (2d Cir. Nov. 19, 2018) (no duty to disclose "expressions of concern[]" by regulators, including "vigorous requests—even if expressed urgently"); *id.* ("interim agency feedback is not material because it does not reflect a binding agency decision and is subject to change"); *Richman* v. *Goldman Sachs Grp.*, 868 F. Supp. 2d 261, 276 (S.D.N.Y. 2012) (Crotty, J.) (no duty to disclose Wells Notice); *SEC* v. *Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 528-29 (S.D.N.Y. 2018) (Daniels, J.) (preliminary questions "do not suffice to constitute the type of conscious disregard of 'extremely obvious' and 'numerous red flags' that normally lead to an inference of scienter").

    ***Other Deficient Emissions-Related Scienter Theories.*** Plaintiffs' expert discusses various e-mails by low- or mid-level FCA employees, Chrysler on-board diagnostic engineers, and personnel from VM Motori and third-party Bosch, apparently suggesting that they evidence scienter. (Ex. 70 (Atkinson Rpt.) ¶¶ 111, 122-43, 231-56.) But none of those individuals was involved in *emissions certifications*. (*See, e.g.*, Ex. 88 (Zatorski Dep.) at 19; Ex. 89 (Berry Dep.) at 68, 104-105; Ex. 86 (Szailer Dep.) at 37-38.) And none was involved in FCA's SEC disclosures. *See In re Vivendi*, 765 F. Supp. 2d at 545 (scienter requires corporate agent who "actively participated in making, reviewing and/or authorizing the statements"). These e-mails therefore cannot demonstrate scienter.

    Plaintiffs' expert also points to a handful of e-mails from CARB to Chrysler in 2014 that use the term "defeat device." (*See, e.g.*, Ex. 70 (Atkinson Rpt.) ¶¶ 203-10.) But as with the exchanges with the EPA, those communications were part of Chrysler's ongoing dialogue with CARB as part of the emissions-control approval process. *See Tongue*, 816 F.3d at 214 (ongoing "dialogue with" regulator does not support inference of scienter). And there is no

---

EPA "disagreed with the conclusion" does not render the statement "mislead[ing] in a manner that is actionable." *Id.*

dispute that CARB *approved* Chrysler's COC application in 2015; plainly, CARB would not have done so if it had concluded in 2014 that those vehicles contained a "defeat device."

Finally, Plaintiffs allege that Chrysler carried out a "secret" field fix in 2015, which allegedly shows culpable knowledge of undisclosed AECDs and emissions issues. (Compl. ¶¶ 415-21.)   The record shows, however, that this campaign was done to replace a degraded piece of hardware (with an accompanying software update), which affected multiple manufacturers.  (56.1 ¶ 68; Ex. 85 (R. Lee Dep.) at 226-27.)  Moreover, contrary to the allegation that this field fix was "secret," Chrysler disclosed the fix in service bulletins, which are publicly available.  (56.1 ¶ 68.)[26]

## B.   There Is No Evidence That Any Defendant Acted with Scienter as to the Statements Concerning Defeat Devices.

Plaintiffs have no evidence of scienter as to the September 22, 2015 *Reuters* article (Compl. ¶¶ 361-62), or (ii) the January 27, 2016 earnings call and February 2, 2016 press release  stating that FCA's vehicles in Europe do not contain "defeat devices" (*id*. ¶¶ 343-46).

*September 22, 2015* **Reuters** *Article.*  FCA Media Relations Manager Eric Mayne sent the e-mail statement that *Reuters* quoted in its September 22, 2015 article—that "FCA US does not use 'defeat devices.'"  (56.1 ¶ 127; Mayne Decl. Ex. 7.)  Plaintiffs have no evidence that Mr. Mayne—whom Plaintiffs elected not to depose—or anyone else at FCA had any intent to defraud when this information was provided to *Reuters*.  In fact, the record shows—and Mr. Mayne's accompanying sworn Declaration confirms—that Mr. Mayne believed this statement was accurate based on his discussions with both technical and regulatory personnel who assured

---

[26] As discussed *supra* at 39, Plaintiffs' assertions that Chrysler's processes are "inadequate and ineffective" (Ex. 70 (Atkinson Rpt.) ¶¶ 412-13)—without any evidence that senior FCA executives were aware of these supposed deficiencies (*see* Ex. 85 (R. Lee Dep.) at 205 ("We have very strong, knowledgeable people, processes that I trusted."))—are also insufficient to establish scienter.

him that Chrysler's vehicles did not contain any "defeat devices" similar to those used by VW. (*See supra* at 19-20.)  Mr. Mayne acted in good faith, and his due diligence investigation before sending the challenged statement to *Reuters* flatly contradicts any theory of recklessness.  *See Rolf*, 570 F.2d at 47-48 (recklessness requires making statement "without investigation and with utter disregard for whether there was a basis for the assertions"); *Freedman* v. *Value Health, Inc.*, 135 F. Supp. 2d 317, 342 (D. Conn. 2001) (no scienter because defendant "had a reasonable basis for the statement he made"), *aff'd*, 34 F. App'x 408 (2d Cir. 2002).[27]

> *January 27, 2016 Earnings Call and February 2, 2016 Press Release.*  The record shows that both of these statements are about *European* emissions regulations and, in any event, were expressly based on the findings of FCA's internal audit of its emissions software. (*See* Ex. 78 (Marchionne Dep.) at 84 (the review "allowed me to make some statements publicly about the fact that we had found no VW look-alike stuff").)  Where, as here, FCA disclosed its "basis for offering the opinion," "an investor cannot state a claim."  *Omnicare*, 135 S. Ct. at 1332.  Indeed, FCA's internal audit did not "uncover any unlawful activity of a material proportion," and instead *confirmed* that FCA vehicles did not contain VW-like defeat devices, so there cannot be scienter.  *In re Sanofi*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016).[28]

---

[27] Plaintiffs' expert speculates about the meaning of an e-mail chain in which Mr. Marchionne reacted to the *Reuters* article (Ex. 70 ¶ 349), but the record shows that Mr. Marchionne had "never" "heard anything" about "potential regulatory issues" regarding emissions at the time of the article (56.1 ¶ 129; Ex. 78 (Marchionne Dep.) at 72).  *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.").

[28] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████         ████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

C.      **Additional Evidence Refutes Plaintiffs' Speculative Scienter Theory.**

Apart from the *absence* of evidence to support a permissible finding of scienter, additional evidence refutes Plaintiffs' scienter theory.  Most fundamentally, it defies logic to suggest that Mr. Marchionne would have put FCA, himself and his well-deserved reputation (including by saving Chrysler from bankruptcy) at risk by defrauding shareholders.  Plaintiffs' expert, Mr. Hellmuth—who worked at NHTSA for nearly 30 years—praised Mr. Marchionne as an industry executive whom he "always thought very highly [of]," describing him as "a brilliant man" who "basically, saved Chrysler."  (Ex. 92 (Hellmuth Dep.) at 136-37.)  As this Court recognized, "it is no less (and arguably more) plausible to think that FCA believed itself to be in compliance—as it consistently represented—given the myriad of harsh consequences, financial and otherwise, the company knew it would suffer if the devices were found to be illegal."  (Aug. 1, 2017 Order at 10.)

In addition, although Plaintiffs argued that the "substantial compliance" statements represented "substantial compliance with *each* 'relevant' set of regulations" (ECF No. 46 at 16), the evidence shows that this is *not* how FCA understood the statement when made, and that is what matters in assessing scienter.  *In re AstraZeneca*, 559 F. Supp. 2d at 471-72 (no scienter where there is "nothing whatever to indicate that the statements made did not reflect the honest belief of the authors").  Specifically, FCA employees who "actively participated in



making, reviewing and/or authorizing" these statements, *In re Vivendi*, 765 F. Supp. at 545, including the CFO who signed the SEC filings, understood the statement to mean that "while FCA may not have been in compliance with each and every of the many regulations to which it is subject around the globe, it was substantially in compliance with those regulations as an overall whole." (Chernoby Decl. ¶ 5; Nelson Decl. ¶ 7; Palmer Decl. ¶ 6; Veltri Decl. ¶ 5.) Plaintiffs have never contended that, so understood, these statements were false when made (*see* ECF Nos. 46, 136), and there is no record evidence to support such a finding in any event. *See Dobina*, 909 F. Supp. 2d at 251-52 (dismissing securities action on scienter grounds where defendants lacked "*any contemporaneous basis* to believe that the information they related was incorrect"); *see also In re Apple*, 886 F.2d 1109, 1119 (9th Cir. 1989) ("[P]laintiffs have produced no evidence that the statement was anything other than an honest mistake.").

Thus, even assuming that the "substantial compliance" statements should be interpreted as Plaintiffs argued (and as the Court accepted in its decision denying the motion to dismiss as to those statements), the FCA executives' understanding of the statements' meaning is not unreasonable—and certainly cannot properly be characterized as a "reckless" interpretation of the statements. There is also no evidence that the makers of the statements were acting in anything "other than in good faith." *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 206 (1976); *see also State Teachers Ret. Bd.* v. *Fluor Corp.*, 654 F.2d 843, 849-50 (2d Cir. 1981) (no scienter where actions "were made in . . . good faith").[29]

---

[29] Further, even if the FCA executives' understanding of the statements' meaning is viewed as unreasonable or negligent (which would not be warranted here), that understanding still refutes scienter. "A representation that is *believed to state the truth* but which because of negligent expression states what is false is a negligent but *not a fraudulent misrepresentation*." RESTATEMENT (SECOND) OF TORTS § 528. "Since the liability for a fraudulent misrepresentation requires that the maker be conscious that he is misleading its recipient, it follows that a representation of a fact that the maker believes to be true does *not become fraudulent* by reason of its being so carelessly or incompetently expressed as to be

Moreover, FCA had a robust pre-disclosure process to verify the accuracy of the "substantial compliance" statements in its SEC filings, and that the responsible executives relied on that process in good faith.  (56.1 ¶¶ 133-41.)  FCA obtained input and verification from multiple committees reflecting the views of every relevant department in the company, including subject-matter experts about vehicle safety and emissions.  Every relevant department at FCA also submitted sub-certifications updating or confirming the accuracy of the portions of the SEC filings for which they were responsible.  (*See supra* at 47.)  This also defeats scienter because it refutes the notion that the challenged statements were made "without any belief as to [their] truth" or "investigation" and "with utter disregard for whether there was any basis for the assertions."  *Rolf*, 570 F.2d at 45, 47-48; *see Dupler* v. *Berson*, 2010 WL 10827361, at *4, *6 (S.D.N.Y. Jan. 29, 2010) (statement is reckless if it is "without any knowledge" or basis); *Phillips* v. *Kidder, Peabody & Co.*, 933 F. Supp. 303, 308, 318-20 (S.D.N.Y. 1996) (Francis, J.) (no scienter in view of "due diligence" process), *aff'd*, 108 F.3d 1370 (2d Cir. 1997).[30]

Finally, the following facts, over which there can be no material dispute, are also flatly inconsistent with intentional wrongdoing or deliberate and conscious recklessness:

---

misleading."  *Id.* cmt. A; *see, e.g.*, *AUSA Life Ins. Co.* v. *Ernst & Young*, 206 F.3d 202, 220-22 (2d Cir. 2000) (applying Restatement (Second) to scienter analysis).

[30] In *Phillips*, for example, the Court found that the defendant's "falsely optimistic" statements were not reckless because the defendant had conducted extensive due diligence, and the plaintiff failed to identify "specific facts" showing that the diligence was "egregious."  933 F. Supp. at 308, 318-20. Here, FCA's pre-disclosure process provided those involved approving the SEC filings with "a reasonable basis for the statement[s] [they] made," which precludes any finding of recklessness or knowing misconduct.  *See Freedman*, 135 F. Supp. 2d at 342 (no scienter because defendant "had a reasonable basis for the statement he made," which "was consistent with reasonably available data"); *see also Grey* v. *Gruntal & Co.*, 1987 WL 11561, at *14 (S.D.N.Y. May 21, 1987) (Leisure, J.) (no recklessness where defendant "investigated the stocks he recommended to plaintiff" and "there was some factual basis . . . for [defendant's challenged] assertion that said stocks were relatively secure and risk-free"); *SEC* v. *Shanahan*, 646 F.3d 536, 544 (8th Cir. 2011) ("Depending on others to ensure the accuracy of disclosures to purchasers and sellers of securities—even if inexcusably negligent—is not severely reckless conduct that is the functional equivalent of intentional securities fraud.").

- **The Post-VW Audit.**   After the VW NOV, FCA immediately launched its own investigation to confirm "that there's no VW event in our fleet."  (56.1 ¶ 72; Ex. 78 (Marchionne Dep.) at 61.)   This internal audit "*undermines* any inference that [FCA] acted with an intent to deceive, manipulate, or defraud." *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 211, 214 (S.D.N.Y. 2012) (Buchwald, J.).

- **FCA's Investment in SCR Technology.**   FCA invested heavily in cutting-edge SCR technology in order to reduce NOx emissions and comply with emissions regulations. (*See supra* p. 13.)   "It would have made no economic sense for defendants to invest," particularly so heavily, if they intended to cheat emissions tests as part of a fraud scheme. *Gillis* v. *QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589  (S.D.N.Y. 2016) (Engelmayer, J.).

- **May 2012 Meeting with EPA.**   Chrysler met with the EPA in May 2012, and the EPA indicated it was "happy with" and "concurred with" Chrysler's approach to AECD disclosures for its entry into the light-duty diesel-engine market.   (*See supra* at 14-15.) That Chrysler affirmatively sought the EPA's blessing on its approach to AECD disclosures ahead of time is inconsistent with a fraud theory.  *See Kuyat* v. *BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 441-42 (6th Cir. 2014) (no scienter where company reasonably believed that its regulator "had approved" its "proposed" approach, and its subsequent statements were "consistent with that interpretation").

- **Deloitte Audit and Recommendations.**   FCA retained Deloitte to conduct an audit of its vehicle recall processes in 2014, and implemented the recommendations of that report. (*See supra* at 10-11.)   This audit (like the pre-VW audit) "*undermines* any inference" that FCA acted fraudulently or recklessly.  *Foley*, 861 F. Supp. 2d at 214.

*         *         *         *

In sum, the overwhelming record evidence flatly contradicts Plaintiffs' claim that Defendants intentionally, or with consciousness recklessness, deceived investors.[31]

---

[31] Plaintiffs bring claims against five Individual Defendants.  As discussed, there is no evidence that Mr. Marchionne or Mr. Lee was aware of any alleged noncompliance prior to the challenged statements, and both were surprised and taken aback by the EPA's NOV.   (*See supra* at 19.)  There also is no evidence of scienter as to Messrs. Kunselman, Dahl and Mazure, but because there is no evidence that they "actively

## III.   THERE IS NO TRIABLE ISSUE OVER LOSS CAUSATION FOR FOUR ALLEGED "CORRECTIVE" DISCLOSURES.

To establish loss causation, Plaintiffs must prove "that the market reacted negatively to a corrective disclosure of the fraud" or "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014).   There is no triable issue as to loss causation with respect to four of the seven alleged "corrective" disclosures:  the July 27, 2015 disclosure of the Consent Order, and three reports by or about European regulators on May 23, 2016 (Germany), February 6, 2017 (France) and February 7, 2017 (Italy).

The Consent Order does not support loss causation because it did not cause a statistically significant drop in FCA's share price at the required 95% confidence level (Ex. 72 (Gompers Rpt.) ¶ 58; Ex. 69 (Nye Rpt.) ¶ 27).   *See In re Moody's*, 274 F.R.D. at 493 n.11 ("[A] significant negative return at the 90% confidence level . . . is not sufficient evidence of a link between the corrective disclosure and the price.").[32]   It is not surprising that FCA's share price did not decrease by the statistically required amount following the Consent Order because "all relevant information was already available to investors," including the risks associated with FCA's noncompliance.  *Cent. States, Se. & Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg.*

---

participated in making, reviewing and/or authorizing" the challenged statements, they could not "supply[] [FCA's] scienter for those statements" in any event.  *In re Vivendi*, 765 F. Supp. 2d at 545, 546.   They also cannot have primary liability as "makers" of the statements.  *Janus Capital Grp.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011).   They also cannot have secondary "control person" liability because there is no evidence that they exercised "actual control" over FCA or its disclosures.  *See In re Smith Barney Transfer Agent*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012) (Pauley, J.) ("[T]o incur Section 20(a) liability as a consequence of" someone else's primary violation, "he must not only have control over the primary violator," but must have "exercised *actual* control over the matters at issue.").   (56.1 ¶ 9.)

[32] The loss causation standard differs from the standard required to demonstrate market inefficiency by showing lack of price impact in order to rebut the fraud on the market presumption of reliance in opposing class certification.  Thus, in that context, this Court recognized that a price change that was not significant at the 95% confidence level "does not prove the *absence* of price impact" sufficient to rebut the presumption.  (ECF No. 223 at 11.)  The standard is different here on summary judgment.

*Corp.*, 543 F. App'x 72, 75, 77 (2d Cir. 2013); *see* App'x A (listing prior public disclosures). Because the Consent Order did not result in the "revelation of new information to the market," it was not a "corrective disclosure." *Prime Mover*, 548 F. App'x at 17-18.  Further, Plaintiffs make no attempt to quantify what portion of the share price decline stemmed from "changes in investors' expectations of future regulatory costs" (Ex. 72 (Gompers Rpt.) ¶ 82), as opposed to the revelation of supposed noncompliance, and therefore cannot carry their burden to prove loss causation.  *See Gross* v. *GFI Grp.*, 310 F. Supp. 3d 384, 398-99 (S.D.N.Y. 2018) (Pauley, J.).[33]

The alleged European "corrective" disclosures also do not establish loss causation for the reasons set forth in the Friedrich *Daubert* Motion, including because the Court has already found that FCA's compliance with European emissions regulations is irrelevant in this action and because there is no admissible evidence of any noncompliance with respect to EU emissions regulations (and therefore nothing to "correct").  (*See supra* at 30-31.)  But even if they were relevant, neither the May 23, 2016 German report, nor the February 6 and 7, 2017 regulatory events in France and Italy, caused a statistically significant drop in FCA's share price at the required 95% confidence level, after correction for Plaintiffs' expert's methodological flaws. *See In re Moody's*, 274 F.R.D. at 493 n.11.[34]

---

[33] On December 8, 2015, NHTSA and Chrysler amended the Consent Order to add an additional violation related to certain reporting requirements under the TREAD Act, for which Chrysler agreed to an additional $70 million penalty.  (Ex. 34 ¶¶ 4, 6-7.)  Plaintiffs have abandoned any attempt to show that this "corrected" any prior statement by FCA.  (*See* Ex. 94 (Nye Dep.) at 41-42.)

[34] Dr. Nye's flawed methodology finds that the February 7, 2017 price decline was statistically significant at the 95% confidence level.  (Ex. 72 (Gompers Rpt.) ¶ 89.)  But Dr. Nye failed to select a proper "control period" to establish the "typical level of stock price volatility" by which to measure price changes on the dates of "corrective" events.  (Ex. 72 (Gompers Rpt.) ¶ 24.)  Dr. Nye himself admits that he "didn't run a test" to ascertain the proper level of volatility.  (Ex. 69 (Nye Dep.) 141-142.)  Because "Dr. Nye's control period is not representative of the stock price volatility in the later part of the Class Period," his "event study analysis is flawed and unreliable."  (Ex. 72 (Gompers Rpt.) ¶ 27.)  Had Dr. Nye's methodology been sound, "he would have found that Fiat Chrysler's residual stock price return on February 7, 2017 was not statistically significant at the 95% confidence level."  (Ex. 72 (Gompers Rpt.) ¶ 161.)

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment.

Respectfully submitted,

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
William B. Monahan
Thomas C. White
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

December 12, 2018

**Appendix A**

| Date | Notice to Investors |
|---|---|
| May 18, 2015 | NHTSA announced Special Order directed at Chrysler, notifying investors of "public hearing to determine whether [Chrysler] failed to remedy safety defects and issue required notices." (Ex. 54 at -895.)<br><br>News outlets reported NHTSA investigation into "whether Fiat Chrysler Automobiles has failed to properly carry out 20 recalls involving about 10 million vehicles." (Ex. 52.) |
| May 19, 2015 | NHTSA Administrator Rosekind holds press conference highlighting NHTSA's "concerns" about Chrysler's "slow completion rates, slow or inadequate notifications to consumers, faulty remedies, improper actions by dealers and more." (Ex. 55 at -112.) |
| June 22, 2015 | NHTSA posted supplemental notice of the July 2, 2015 hearing to the Federal Register, "tentatively concluded" that Chrysler was noncompliant with certain safety recall provisions, identified facts supporting that conclusion, and identified additional recalls to address at the hearing. (Ex. 154).) |
| July 2, 2015 | NHTSA holds hearing concerning Chrysler's compliance with recall regulations and "tentatively concluded" that Chrysler had<br>• "not remedied vehicles in a reasonable time";<br>• "not adequately remedied vehicles";<br>• "not notified vehicle owners about recalls in a timely manner"; and<br>• "not submitted information to NHTSA about its recalls that is timely, correct, complete, and in the required form." (Ex. 156 at 6.) |
| July 2, 2015 | The day of the hearing, news outlets began reporting that<br>• NHTSA "will move quickly to take action in response to [Chrysler's] mishandling of recalls involving up to 11 million vehicles" (Ex. 56 at -431); and<br>• Chrysler will be required to pay "a total fine of more than $800 million," "hundreds of millions of dollars in fines," "millions in fines," "fines of $35 million in each of the recalls," or "millions of dollars, potentially by the end of July." (Ex. 57 at -441; Ex. 58 at -422 to -423; Ex. 59 at -434; Ex. 60 at -445; Ex. 61 at -438.) |
| July 3, 2015 | "NHTSA chief . . . expects his agency to take action against the automaker." (Ex. 62 at -799.) |
| July 7, 2015 | Analysts predicted that Chrysler could "be hit with fines from the National Highway Transportation Safety Administration that . . . may exceed $700 million." (Ex. 63 at 1.) |
| July 21, 2015 | "[NHTSA Administrator] Rosekind said . . . a consent order, with Fiat Chrysler 'would be a strong outcome if we could do that.'" (Ex. 64 at -446.) |
| July 21, 2015 | NHTSA said "recent actions and consent order agreements by NHTSA could be used with Fiat Chrysler, including hefty fines that not only go into the government's general fund but benefit vehicle safety programs and agencies." (Ex. 65 at -446.) |