**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | **Civ. Action No: 15-cv-07199-JMF** |
| Plaintiffs, | **CLASS ACTION** |
| v. | |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE and ROBERT E. LEE | |
| Defendants. | |

EXPERT REPORT OF ROBERT F. HELLMUTH

August 15, 2018

6.     Counsel for Plaintiffs have informed me that the record in this matter continues to be developed.  I expect to review additional facts that may become available through discovery as well as the reports and depositions of other expert witnesses.  The opinions offered in this Report are subject to refinement or revision based on continuing analysis of the documents and information listed above, as well as new or additional information that may be provided to or obtained by me in the course of this matter.

## IV.     Summary of Opinions

7.     Based on my review of the available evidence in this matter and careful analysis of relevant regulations, I conclude that

    i.   FCA was not in compliance with the Safety Act during the Class Period.

    ii.  FCA's processes and internal controls to ensure compliance with vehicle safety regulations were inadequate and ineffective.

    iii. FCA's statements that it was in substantial compliance with relevant global regulatory requirements including vehicle safety regulations were false and misleading.

## V.     FCA's Business

8.     FCA designs, engineers, manufactures, distributes and sells vehicles and vehicle components.  It sells passenger cars, light trucks, and light commercial vehicles under brand names such as Chrysler, Dodge, Fiat, Jeep, and Ram.  FCA has a presence in about 150 countries, selling its products directly or through distributors and dealers. The Company was formed as the result of a merger between Fiat and Chrysler Group LLC in October 2014.

9.     FCA US, one of two main FCA subsidiaries, is headquartered in Auburn Hills, Michigan and owned by FCA. FCA US is one of the "Big Three" American automobile

3

without charge" or for a vehicle, "refund the purchase price, less a reasonable allowance for depreciation." 49 U.S.C. § 301120(c)(1).  "A failure to conduct a repair adequately <u>within 60 days</u> after the consumer presents the item for repair is evidence of a failure to repair within a reasonable time."  **Safety Recall Compendium at 10** (emphasis added).

29.    A manufacturer that violates the Safety Act, or a regulation prescribed thereunder, including the defect and noncompliance notification and remedy requirements, is liable to the Unites States for a civil penalty of not more than $7,000 for each violation. 49 U.S.C. § 30165(a)(1); 49 C.F.R. §578.6(a). A separate violation occurs for each item of motor vehicle equipment and for each failure or refusal to allow or perform a required act. 49 U.S.C. §30165(a)(1); 49 C.F.R. §578.6(a).

30.    NTHSA must conduct a public hearing before NHTSA's Administrator can make a formal determination on whether a manufacturer has complied with the notification and/or remedy requirements. 49 U.S.C. §30118(e); 49 U.S.C. §30120(a).  A public hearing is scheduled whenever the Agency conducts and investigation and believes that there is a violation of the Safety Act.  If NHTSA has a good indication that a manufacturer will probably refuse to take voluntary corrective action, the Associate Administrator of Enforcement makes an "initial" determination of noncompliance. A letter is sent to the manufacturer and a notice is put in the Federal Register notifying the public of the public hearing.  The purpose of the hearing is to present information, views and arguments to the NHTSA panel.  The public hearing is usually chaired by the Associate Administrator or Director of the ODI.  Testimony is given to a panel of NHTSA officials and attorneys and a transcript is taken for the record.  After NHTSA staff makes a presentation of the results of their investigation, the public is invited to make oral

an amended 573 Report to change the population. *Id.* Instead, its amended 573 Reports submitted in December 2014 and March 2015 changed the population back to the initially reported population of 643,618 vehicles. *Id.;* **March 2015 – 573 Report 14V-438;** *Id.*; FCA never explained these changes to NHTSA. *Id.* This was a violation of 49 C.F.R. §573.6(b).

225.    With respect to Recall 14V-438, FCA did not come to learn of the defect at issue until NHTSA opened PE 14-017 – this despite the fact that there were at least 60 CAIRS that identified the defect. Thereby, FCA failed to timely identify a defect. FCA also failed to timely submit to NHTSA copies of recall execution documents, including owner notifications and dealer communications, which were violations of 49 C.F.R. § 573.6 (c)(10) and 49 C.F.R. § 577.5(a). FCA also failed to identify the recall population correctly and/or amend the recall population provided to NHTSA, which was a violation of 49 C.F.R. § 573.6(b). Based on my review of the available evidence in this matter and careful analysis of relevant regulations, I conclude that FCA did not effectuate Recall 14V-438 in compliance with the Safety Act.

### 10.    Recall P57/14V-567

226.    Recall 14V-567, which also involved defective ignition switches, was initiated by FCA by filing a 573 Report with NHTSA on September 16, 2014. **573 Report – 14V-567.** Therefore, the deadline for FCA to send owner notices was November 15, 2014. FCA did not provide estimated dates for sending owner notifications **(573 Report – 14V-567)** prior to mailing its interim notices on November 17, 2014, which was two days past the 60-day deadline. In a November 25, 2014, letter to Lewis, Hartnagel wrote: "Enclosed are representative copies of communications relating to the 2008 model year vehicles involved in the referenced recall. Chrysler Group LLC notified dealers on November 10, 2014 and completed the interim owner notification mailing on November 17, 2014." **FCA-PIRNIK-001033428.** FCA failed to comply

with the 60-day owner notification deadline, which was a violation of 49 C.F.R. § 577.7(a)(1).

FCA also failed to timely notify NHTSA of its change in notification schedule, which was a

violation of 49 C.F.R. § 573.6(b).  FCA also failed to submit to NHTSA representative copies of

the owner notices no fewer than five days before mailing them out to owners, which was a

violation of 49 C.F.R. § 577.5(a).  FCA also failed to submit to NHTSA representative copies of

the dealer communications within five days of sending them to dealers, which was a violation of

49 C.F.R. § 573.6(c)(10).

227.    Additionally, FCA also failed to submit to NHTSA a dealer communication about

this recall which it sent to dealers in September 2014.  FCA did not come to learn about this

dealer communication until FCA produced the communication in connection with its response to

the 2015 Special Order.  **Written Statement of Neff Tr. at 11.**  FCA also waited <u>15 days</u> to

submit to NHTSA a copy of the dealer communication it sent to dealers on  November 10, 2014.

These were violations of 49 C.F.R. § 573.6 (c)(10).

228.    As of July 2, 2015, <u>over seven months after distributing the interim notice</u>, vehicle

owners were still awaiting a follow-up letter for this recall, notifying them that they could have

their vehicles repaired.  **FCA-NHTSA Hearing Transcript at 42:8-10; Written Statement of

Neff Tr. at 4.**  Thus, FCA failed to adequately remedy defective vehicles, in connection with

Recall 14V-567, within a reasonable time, which was a violation of 49 U.S.C. §§ 30120(a) and

30120(c).  Internal FCA communications demonstrate that this was once again a result of FCA's

failure to dedicate the proper resources to procuring sufficient replacement parts.  *See* **FCA-

PIRNIK-000830276.**

229.    With respect to Recall 14V-567, FCA failed to comply with the 60-day owner

notification deadline, which was a violation of 49 C.F.R. § 577.7(a)(1).  FCA also failed to

review of the available evidence in this matter and careful analysis of relevant regulations, I conclude that FCA did not effectuate Recall 14V-634 in compliance with the Safety Act.

## 12. Recall P65/14V-635

238.   In Recall 14V-635, the subject vehicles (Ram Trucks) were equipped with a Cummins diesel engine that had a potential for fire resulting from overheating of electrical connectors of the diesel fuel heater. **FCA-PIRNIK-000874083**. FCA filed the 573 Report for this recall on October 7, 2014 and listed obviously erroneous dates for its planned owner notification mailing by listing a beginning date for this mailing that was later than the end date. *Id.*; **Written Statement of Neff Tr. at 4, 12**. Moreover, it was only after the deadline had passed that FCA informed NHTSA that it had <u>missed the deadline by two days</u>. **FCA-PIRNIK-001033885; Written Statement of Neff Tr. at 4, 12**. FCA failed to comply with the 60-day owner notification deadline, which was as a violation of 49 C.F.R. § 577.7(a)(1). FCA also failed to update NHTSA of the changed owner notification schedule, which was a violation of 49 C.F.R. § 573.6(b).

239.   FCA only notified vehicle owners <u>over four months later</u>, in late April 2015, that they could bring their vehicles in for repair. In April 17, 2015, FCA issued a dealer communication. **FCA-PIRNIK-000779624**. However, it was not until May 5, 2015, <u>18 days</u> later, that FCA submitted a copy of the dealer communication to NHTSA. **FCA-PIRNIK-001033866; Written Statement of Neff Tr. at 4, 12.** FCA failed to submit a representative copy of the dealer communication to NHTSA within five days of sending it to dealers, which was a violation of 49 C.F.R. § 573.6(c)(10).

240.   FCA also failed to identify the recall population correctly and/or amend the population provided to NHTSA. FCA's initial Part 573 Report, filed on October 2014, gave a

the population to include those and it grew to 230K.  Now we have this report changing the population back down to 167K.  What is going on?  There is nothing in the chronology section past January 2015 to explain this change (nor the prior change to explain the decision to increase for that matter)." **FCA-PIRNIK-000798936**.  This was a violation of 49 C.F.R. §573.6(b).

252.   With respect to Recall 15V-041 FCA failed to correctly identify the VINs associated with the recall.  It was not until over <u>14 weeks</u> later that FCA updated its 573 Report with the correct vehicle population, which was a violation of 49 C.F.R. § 573.6(b).  Based on my review of the available evidence in this matter and careful analysis of relevant regulations, I conclude that FCA did not effectuate Recall 15V-041 in compliance with the Safety Act.

### 16.   Recall R06/15V-046 [Recall Query 14-001]

253.   In Recall 15V-046, a defect in the subject vehicles resulted in unintended front airbag, side curtain airbag and seatbelt pretensioner inadvertent deployments.  **FCA-PIRNIK-000781114.**

254.   On August 9, 2012, NHTSA upgraded PE 11-035 to EA 12-001 in order to investigate allegations of inadvertent or non-crash related air bag deployments in certain vehicles. **EA 12-001.**  At that time, ODI had received 25 consumer reports of air bag inadvertent deployments which resulted in 13 injuries.  *Id.*  As a result, on November 7, 2012, FCA issued safety Recall 12V-527 to address the possibility of an inadvertent air bag deployment (IABD) on MY 02-03 Liberty vehicles built through March 28, 2003 and MY 02-04 Grand Cherokee vehicles built through May 23, 2003.  **ODI Resume RQ 14-001.**  "The remedy consisted of installing an in-line jumper harness with an integrated electrical filter for the circuits that connect to the air bar modules (squib circuits)."  *Id.*  The filter was intended to "eliminate transient electrical spikes to the ORC" which FCA believed were responsible for the IABDs.  *Id.*  After

97

280.   FCA failed to notify owners within the required 60-days in ten recalls. In two of the recalls, which were associated with defective Takata airbag inflators, FCA even misled NHTSA about its owner notifications and refused to send recall notices to vehicle owners for months despite NHTSA demanding that they do so.

- As discussed above, FCA repeatedly failed to timely notify owners in several different recalls related to ignition switch defects. These failures are particularly egregious in light of the fact that this same type of defect had caused numerous deaths and General Motors had just been fined by NHTSA in July 2014 for failure to timely recall vehicles due to the same defects.

    - o Recall 14V-373 involved a defective ignition switch which caused a vehicle to lose power while being driven.  FCA did not complete its owner notification mailing until nineteen days after the legal deadline.  Additionally, it was not until May 2015, over eight months after distributing the interim notice, that FCA notified owners that they could come in for the repair.

    - o In Recall 14V-567, a recall for defective ignition switches, FCA did not complete its owner notification mailing until two days past the deadline. As of July 2, 2015, over seven months after distributing the interim notice, vehicle owners were still awaiting a follow-up letter in this recall, notifying them that they may have their vehicles repaired.

- In Recall 13V-038, FCA did not complete its owner notification mailing until five days after the 60-day deadline.  It was only in November 2013, nine months after the filing of the 573 Report in February 2013, that FCA mailed notices to owners to inform them that they could have their vehicles repaired.

- In Recall 13V-252, FCA did not complete the owner notification mailing until over seven months after filing the 573 Report. The campaign did not officially launch until August 2014, over a year after the 573 Report was filed.

- In Recall 14V-634, FCA did not complete its owner notification mailing until two days after the 60-day deadline. It was only several months later, between February 27 and April 30, 2015, that FCA mailed notices to owners to inform them that they could have their vehicles repaired.

- In Recall 14V-795, FCA falsely informed NHTSA that it had mailed interim owner notifications prior to the deadline, on February 10, 2015. In truth, FCA had mailed the interim notices after the deadline had passed.

- In Recall 15V-115, FCA falsely informed NHSTA it would send owner notifications on April 24, 2015.  However, FCA did not complete the notification until four days after the deadline, April 29, 2015.

- Recall 13V-527 involved a defective left tie rod assembly that could result in loss of steering control. FCA falsely represented to NHTSA that it would notify owners of the recall in December 2013, prior to the deadline. However, it was only through a letter dated February 7, 2014 that NHTSA learned that FCA had not completed its interim notices mailing until January 16, 2014, <u>eleven days past the deadline</u>. It was not until <u>nearly 16 months later</u> that FCA notified owners to bring their vehicles in for repair.

- Recall 14V-635 involved the potential for fire resulting from overheating of electrical connectors of the diesel fuel heater. It was only after the deadline had passed that FCA informed NHTSA that it had <u>missed the deadline by two days</u>. FCA only notified vehicle owners <u>over four months later</u>, in late April 2015, that they could bring their vehicles in for repair.

- Recall 14V-354 (which became part of Recall 14V-817), involved defective Takata airbag inflators. FCA refused to notify vehicle owners <u>for over six months</u> about its recalls of Takata airbag inflators, and lied to NHTSA as to when FCA sent owner notifications even after Friedman personally wrote to Marchionne to express his frustration at FCA's failure to properly notify owners of defects.

281. There are numerous additional examples of FCA failing to timely notify owners of recalls. In 2013, Bernier began tracking FCA's compliance with Safety Act deadlines on all FCA recalls on an excel spreadsheet that he referred to as his "tracking sheet". Bernier Dep. Tr. at 76:19-78:22. This sheet shows that FCA was aware, going back to 2013 when Bernier created the tracking sheet, that it had routinely and systematically failed to meet the 60-day deadline. Between mid-2011 and October 2014 (the start of the Class Period), FCA had missed the 60-day deadline as to 36 recalls. **FCA-PIRNIK-000836522 attaching FCA-PIRNIK-000836523;** *see also* **FCA-PIRNIK-000792214 attaching FCA-PIRNIK-000792216.** As Bernier testified, when the 60-day deadline was codified in 2013, he began tracking to see how FCA's compliance had been up to that date. Bernier Dep. Tr. at 80:23-81:8. The tracking sheet also tracked FCA's compliance with the other Safety Act deadlines, such as the five-day deadline for submitting owner notifications and dealer notifications to NHTSA. *Id.;* Bernier Dep. Tr. at 87:12-97:8. He recognized in mid-late 2013 that FCA had a pattern of not timely complying with the Safety Act deadlines. Bernier Dep. Tr. at 97:9-17. Bernier recognized that the problem was not just in

288.    As Yon testified, the above are not isolated incidents but rather are examples that are representative of FCA's standard practice:   "The Agency has encountered numerous instances where Fiat Chrysler has not performed well in making recall repairs." **FCA-NHTSA Hearing Tr. at 35:11-13.**

### 3.    FCA's Untimely Initiation of Recalls

289.    Despite being warned by NHTSA in November 2014, FCA improperly waited months before recalling defective vehicles in at least two of the recalls it began in 2015.

290.    FCA initiated Recall 15V-090, for defective transmissions that could prevent a vehicle owner from putting the vehicle into park on February 10, 2015, an alarming <u>four months</u> after FCA's supplier notified it in October 2014 of a production process problem linked to the transmission shift failures that were the subject of the recall.  **FCA-PIRNIK-000874141; FCA-NHTSA Hearing Transcript at 44:4-11; Written Statement of Neff Tr. at 6.**  Moreover, in a February 26, 2015 recall acknowledgment letter, Timian notified FCA that the recall was untimely, and demanded an explanation for the delay. FCA did not respond and never made any attempt to explain the delay.  **Written Statement of Neff Tr. at 6.**

291.    FCA similarly waited months before recalling vehicles in Recall 15V-290 for trucks that may have tire failures when traveling at high speeds. On January 9, 2015, FCA's Vehicle Safety and Regulatory Compliance department, headed by Kunselman, became aware that certain FCA trucks had a maximum governed speed of 106 mph, while the tires on the vehicles were only rated for a maximum of 87 mph.   Later that month, on January 27, 2015, FCA's Saltillo Truck Assembly Plant came up with a fix—to install an Engine Control Unit calibration with the maximum vehicle speed set point of 87 mph.  However, FCA waited <u>over three months</u> to recall vehicles, filing a 573 Report on May 12, 2015, despite having identified

the defect and remedy back in January.  **FCA-PIRNIK-001018696 attaching FCA-PIRNIK-001018699; FCA-NHTSA Hearing Transcript at 43:21-45:4; Written Statement of Neff Tr. at 6.**  Although Timian again notified FCA in a June 18, 2015 recall acknowledgment letter of concerns with the untimeliness of this recall, as of July 2015 FCA still had not responded.  *Id.*

292.   In NHTSA's written statement from the FCA-NHTSA Hearing, NHTSA expressly chastised FCA for its refusal to improve its reporting even after FCA had purported to improve its recall process through the creation of the VSRC:  "Fiat Chrysler has told NHTSA about changes that it has made to its organization and recall processes since September 2014. However, these two untimely recalls demonstrate that problems persist. Fiat Chrysler's failure to expeditiously recall vehicles with a safety-related defect is deeply concerning."  **Written Statement of Neff Tr. at 7.**

### 4.    FCA's Failure to Notify NHTSA About Changes to Notification Schedules

293.   FCA also had a pattern of refusing to update NHTSA on critical information about its recalls and the timing of owner and dealer notifications within the required five working days. NHTSA has specific requirements for the information that must be provided in a 573 Report. There is also a requirement to submit an amended 573 Report when key information changes. These requirements are essential to NHTSA's ability to ensure that owners are being told about defects and noncompliances in their vehicles and know how to have them fixed. Additionally, FCA failed to promptly provide the reasons for the delay and a revised schedule when its notification schedule was delayed by more than two weeks.

- Recall 13V-527 was a recall for a defective left tie rod assembly that could result in loss of steering control. In its November 2013 filed Part 573 Report, FCA told NHTSA that it would begin sending owner notices in December 2013. FCA never informed NHTSA of a change to this notification schedule.  On February 2014, FCA sent NHTSA a copy of its

interim owner notice and said that the notices were not mailed until January 16, 2014. FCA did not explain the delay. *Supra* at 30-35.

- Recall 14V-373, concerning ignition switch defects, was an expansion of an earlier recall, 11V-139. FCA filed its 573 Report expanding the recall on June 2014.  At this time, FCA stated that it planned to send owner notices in early July 2014.  FCA corrected this schedule when it filed an amended 573 Report on July 1, 2014, stating that the Company would mail owner notices in August 2014. The owner notices did not go out in August and FCA never informed NHTSA.  It was only on September 29, 2014, when FCA submitted a copy of an interim owner notice, that NHTSA learned that FCA did not mail those notices until September 11, 2014. *Supra* at 75-80.

- With respect to Recall 14V-373, FCA also failed to update NHTSA on its changed plans for notifying owners and dealers that parts were available for repair. In December 2014, FCA submitted an amended 573 Report stating that final owner notices would be mailed on April 13, 2015 and the dealer notices on April 6, 2015. In February 2015, FCA submitted two more amended 573 Reports with the same notification schedule. In April, the notifications were not mailed out and FCA never informed NHTSA.  Only after NHTSA staff contacted FCA about its notification schedule did FCA submit an amended 573 Report, on May 4, 2014, to provide new dates.  FCA provided no explanation for the delay, as required. *Supra* at 75-80.

- Recall 14V-567 involved defective ignition switches. FCA did not provide dates for mailing out the owner interim notification when it filed its 573 Report on September 2014.  FCA did not provide estimated dates for the owner notification mailing prior to mailing out the interim notices.  *Supra* at 83-85.

- For Recall 14V-749, a recall for a noncompliant instrument cluster, FCA did not provide NHTSA with dates for mailing out the owner and dealer notices in its filed 573 Report. FCA's Part 573 Report, filed in November 2014, left these fields blank. FCA did not provide NHTSA with an amended 573 Report with the dates of the notification mailings, instead, FCA submitted a letter on December 16, 2014 stating that it had already mailed the notices. *Supra* at 90-92.

- In Recall 14V-795, a recall for broken springs in the clutch ignition interlock switch, FCA also failed to update NHTSA on changes to its notification schedule.  FCA filed its initial 573 Report in December 2014 and stated that it would mail dealer notices on February 6, 2015 and owner notices on February 13, 2015.  FCA confirmed these dates in a February 3, 2015 amended 573 Report. However, FCA admitted under oath that it had not mailed the notices within the stated time period.  It was only in its May 2015 filed amended 573 Report that FCA informed NHTSA that it has missed those mailing dates and instead mailed the notices over a month later in March 2015.  FCA provided no explanation for the delays to NHTSA. *Supra* at 92-95.

294.    In NHTSA's written statement to the FCA-NHTSA Hearing, NHTSA criticized

FCA's blatant disregard for its reporting obligations:

providing the date that FCA submitted a document to NHTSA, or leaving the date blank, instead of providing the date that FCA actually mailed its notification to owners. **Written Statement of Neff Tr. at 9.**

298.    There were also instances where FCA completely failed to tell NHTSA about communications that FCA sent its dealers about a recall. These were critical communications that conveyed instructions to dealers on how to repair defects and noncompliances and also provided other important information about the recalls. **Written Statement of Neff Tr. at 9.**

299.    As NHTSA's written statement to the FCA-NHTSA Hearing explained, "NHTSA cannot ensure that vehicle owners are aware of defects and noncompliances in their vehicles and that they have information on how to have those problems fixed when a manufacturer fails to comply with its obligation to submit copies of owner notification letters to [NHTSA] and to provide correct and complete information about the notifications. . . Failure to submit dealer communications to NHTSA as required obstructs [NHTSA]'s ability to evaluate whether dealers have accurate and complete information necessary to remedy vehicles. It is critically important that the Agency have timely access to these communications—and a complete set of these communications—so that it can evaluate the remedy and fulfill its statutory oversight role to ensure that remedies are effective." **Written Statement of Neff Tr. at 9-10.**

300.    In at least <u>ten instances</u>, FCA failed to submit copies of its owner notices to NHTSA within five days, as required.

- In Recall 13V-527, FCA waited at least <u>22 days</u> to send NHTSA a copy of its interim owner notice and <u>6 days</u> to send NHTSA its follow-up owner notice.
- In Recall 14V-373, FCA waited <u>18 days</u> to send NHTSA a copy of its interim owner notice.
- In Recall 14V-438, FCA also waited <u>8 days</u> to send NHTSA a copy of its interim owner notice.

- In Recall 14V-634, FCA waited <u>67 days</u> to send NHTSA a copy of its owner notice after it began mailing the notices.

- In Recall 14V-749, FCA sent NHTSA a copy of its owner notices <u>a day after</u> it had mailed them out.

- In Recall 14V-795, FCA waited <u>27 days</u> to send NHTSA a copy of its interim owner notice.

- In Recall 15V-046, FCA waited <u>25 days</u> after it began mailing interim notices before sending NHTSA a copy.

- In Recall 15V-114, FCA waited <u>12 days</u> to send NHTSA a copy of its owner notice.

- In Recall 15V-115, FCA waited <u>15 days</u> from the time it began mailing owner notices to provide NHTSA with a copy.

301.    NHTSA's written statement to the FCA-NHTSA Hearing  made clear that "[t]hese are not insignificant delays. Fiat Chrysler waited double, triple, and even up to over thirteen times the allowable time under the law to provide these owner notices to NHTSA." **Written Statement of Neff Tr. at 10.**

302.    FCA's complete disregard for its compliance obligations is highlighted by the fact that providing notification to NHTSA is not an onerous requirement. A good number of these recalls involved several hundred thousand vehicle owners. All FCA had to do was simply send out one more copy of its owner notices to NHTSA, and yet still, it repeatedly failed to do that by the legally binding deadline subjecting FCA to civil penalties.

303.    FCA also did not submit copies of dealer communications within <u>five days</u> as required in at least <u>fourteen recalls</u>. In many cases, FCA simply never provided any copies of certain dealer communications to NHTSA until after NHTSA began the enforcement action. Specifically, there were <u>thirty-two</u> dealer communications across <u>twelve recalls</u> between 2013 and 2015 that FCA withheld from NHTSA until submitting them as part of their response to the 2015 Special Order, <u>many of which had been sent well over a year prior</u>.

116

- In Recall 13V-252, FCA did not provide NHTSA with <u>twelve</u> separate dealer communications that FCA sent to its dealers in June, July, August, and December 2014.

- In Recall 13V-527, FCA never sent NHTSA a copy of a November 2013 dealer communication.

- In Recall 13V-528, FCA never sent NHTSA a copy of two April 2014 dealer communications.

- In Recall 13V-529, FCA never sent NHTSA three dealer communications sent in November 2013, March 2014, and December 2014.

- In Recall 14V-373, FCA never sent NHTSA a copy of a December 2014 dealer communication.

- In Recall 14V-391, FCA never sent NHTSA a copy of four dealer communications sent in July 2014 and in April and May 2015.

- In Recall 14V-567, FCA also failed to submit to NHTSA a dealer communication it sent in September 2014.

- In Recall 14V-795, FCA never sent NHTSA a copy of a dealer communication it sent in December 2014.

- In Recall 14V-796, FCA never sent NHTSA a copy of a December 2014 dealer communication.

- In Recall 15V-090, FCA never sent NHTSA a copy of four dealer communications it sent in February, March, and April 2015.

- In Recall 15V-115, FCA never sent NHTSA a copy of a dealer communication it sent in September 2014.

- In Recall 15V-178, FCA never sent NHTSA a copy of a March 2015 dealer communication.

304.    Even with respect to the dealer communications that FCA did provide to NHTSA, the Company routinely provided them late. In addition to the thirty-two dealer communications that FCA never provided NHTSA, there were <u>fifteen instances</u> across <u>twelve recalls</u> where FCA failed to provide NHTSA a copy of the dealer communication within five days after sending them to dealers, as required under the law.

- In Recall 13V-527, FCA waited <u>52 days</u> to send NHTSA a copy of a dealer communication sent in December 2013, FCA <u>waited two months</u> to send NHTSA a copy of a dealer notification it sent out on February 2014, FCA also waited <u>10 days</u> to provide a copy of another dealer letter to NHTSA.

117

- FCA waited <u>38 days</u> to provide a copy of a dealer letter in Recall 14V-373 to NHTSA.

- FCA waited <u>21 days</u> to submit a copy of a dealer letter for Recall 14V-438 to NHTSA.

- In Recall 14V-567, FCA waited <u>15 days</u> to submit a copy of a dealer letter to NHTSA.

- In Recall 14V-634, FCA waited <u>10 days</u> to submit one dealer letter to NHTSA and then waited <u>74 days</u> before submitting a copy of a second dealer letter to NHTSA.

- FCA waited <u>18 days</u> before submitting a copy of a dealer letter to NHTSA about Recall 14V-635.

- FCA waited <u>8 days</u> before submitting a copy of a dealer letter about Recall 14V-749.

- FCA did not submit a copy of a dealer letter about Recall 14V-795 until <u>17 days</u> later.

- FCA waited <u>39 days</u> to submit a copy of a dealer letter about Recall 15V-046.

- FCA waited <u>15 days</u> to submit a copy of a dealer letter about Recall 15V-090.

- FCA waited <u>12 days</u> to submit a copy of a dealer letter about Recall 15V-114

- FCA waited <u>25 days</u> before submitting a copy of a dealer notice about 15V-115 to NHTSA.

305.    David Bernier testified that the reason that FCA failed to timely (or ever) submit copies of dealer communications to NHTSA as required by law was because FCA had no process in place for ensuring it was done. There was no individual or group responsible for dealer notifications. Sometimes dealer communications would come from the Recall Group under Bernier and other times they would come from some other group in FCA, like MOPAR. Regardless, there was no process in place for ensuring that the required communication was sent to NHTSA. No individual was tasked with that responsibility.  Bernier Dep. Tr. at 244:2-248:1. While the Deloitte Report in August 2014 also identified this deficiency of lack of documentation and coordination in the recall process, Bernier testified that, other than the reorganization to place Kunselman in charge of regulatory compliance, no changes were made to

118

the recall process and no additional resources were provided by management in 2014. Bernier Dep. Tr. at 38:1-24.

306.    FCA's failure to provide timely notice persisted between 2013 and 2015 and did not improve following the appointment of Kunselman as head the VSRC. As NHTSA's written statement to the FCA-NHTSA Hearing concluded, "such a widespread pattern of missing deadlines is unacceptable." **Written Statement of Neff Tr. at 12.**

### 6.    FCA's Failure To Provide Other Critical Information

307.    FCA also had a pattern of repeatedly failing to provide NHTSA with timely, accurate, and complete information respecting critical information about its recalls.  The law requires manufacturers to submit an amended 573 Report when the manufacturer has new or changed information about the recall. This is an important requirement because an amendment to the 573 Report signals to the Agency and to the public that something significant has changed.

308.    One of the critical pieces of information about a recall is the volume of vehicles affected. A manufacturer is required to amend the filed 573 Report within <u>five working days</u> to update the total number of vehicles potentially containing the defect or noncompliance.

309.    FCA failed to correctly, completely, and timely identify and update the total number of vehicles affected by the recalls across many of the recalls.

310.    In <u>twelve recalls</u>, FCA submitted letters or quarterly recall reports to NHTSA that showed a change in the number of vehicles affected by a recall, instead of filing an amended 573 Report as required. FCA never explained the reason for these discrepancies to NHTSA.

- In Recall 13V-038, FCA's amended 573 Report, submitted on February 13, 2013, listed the potentially affected population as 278,222 vehicles. However, each of the quarterly reports that FCA submitted since then listed the affected population as 278,229 vehicles.

- In Recall 13V-527, FCA's May 7, 2015 573 Report listed the potentially affected population as 36,710. Days after this filing, FCA wrote to NHTSA in a letter that the population was 768 vehicles fewer. FCA never filed a 573 Report reflecting a changed population or otherwise explained this discrepancy.

- In Recall 14V-154, FCA's 573 Report, submitted in April 2014, listed a potentially affected population of 644,354 vehicles. In its July 2014 quarterly report, without explanation and without submitting an amended 573 Report, FCA listed a population of 5,305 fewer vehicles. Again with no explanation, FCA's October 2014 quarterly report raised the population back to the initially reported 644,354 vehicles.

- In Recall 14V-373, FCA initial 573 Report, submitted July 1, 2014, reported a potentially affected population of 525,206 vehicles. In a September 29, 2014 letter to NHTSA, FCA drastically increased the number by 197,849 vehicles. FCA did not amend its 573 Report to reflect this change and, instead, in an amended 573 Report filed in December reverted to the initially reported population of 525,206 vehicles.

- In Recall 14V-438, FCA's initial 573 Report in July 2014 stated that the potentially affected population was 643,618 vehicles. Then, in a September 2014 letter, FCA said that the population was 4,225 fewer vehicles. FCA never submitted an amended 573 Report to change the population.   Instead, its amended 573 Reports, submitted in December 2014 and March 2015, changed the population back to the initially reported population of 643,618 vehicles.

- In Recall 14V-634, FCA's initial 573 Report, filed in October 2014, listed potentially affected population of 434,581 vehicles. According to a letter FCA sent to NHTSA in December 2014, this number changed slightly, increasing by 13 vehicles. FCA did not submit an amended 573 Report for a change to the population and then dropped the number of vehicles back to the original population when it filed an amended 573 Report in April 2015.

- In Recall 14V-635, FCA's 573 Report, filed on October 2014, reported a potentially affected population of 314,704 vehicles.   FCA increased the population of affected vehicles to 314,735 in a December 2014 letter sent to NHTSA.   FCA waited until May 2015 to submit an amended 573 Report reflecting the affected population change to 314, 737 vehicles.  Additionally, the number of vehicles affected increased even further to 315,325 in FCA's amended 573 Report submitted on February 23, 2016.   FCA provided no explanation as to the discrepancy in these numbers.

- In Recall 14V-749, FCA reported a potentially affected population of zero in its initial 573 Report submitted in November 2014. FCA reported the population as 11,674 in a December 2014 letter it sent to NHTSA, but FCA did not amend its 573 Report at the time.  In was only in April 2015 that FCA reported a potentially affected population in an amended 573 Report.

However, the population FCA reported—11,668 vehicles—was a different population than FCA had earlier told NHTSA.

- In Recall 14V-795, FCA's December 2014 573 Report reported a potentially affected population of 66,819 vehicles. FCA reiterated that number in an amended 573 Report filed in February 2015. In a letter FCA sent to NHTSA the following month, FCA reported a different population. FCA decreased the population by 12,758 vehicles without providing an explanation. FCA then waited almost <u>two more months</u> before reporting this new population in an amended 573 Report.

- In Recall 15V-046, FCA's January 2014 573 Report provided a potentially affected population of 753,176 vehicles. However, in a in March 2015 letter FCA sent to NHTSA, it listed a population that was 1,416 fewer vehicles. FCA never amended its 573 Report.

- In Recall 15V-090, FCA's February 2015 573 Report initially reported a potentially affected population of 25,734 vehicles. In a letter sent the next month to NHTSA, FCA listed a different population, which was 4,269 fewer vehicles. It was not until <u>a month</u> that FCA reported the changed population in an amended 573 Report, as required.

- In Recall 15V-115, FCA's filed February 2015 573 Report listed a potentially affected population of 338,216. In a letter sent to NHTSA in May 2015, FCA it increased the population by 33 vehicles, without providing any explanation. Later that month however, FCA submitted an amended 573 Report that still contained the original population of 338,216 vehicles.

311.   The 573 Report is the authoritative source of information about a recall. In these twelve recalls.  FCA provided different information to NHTSA in letters and quarterly reports than it provided in its 573 Reports. Rather than flagging for NHTSA and the public the changed information, this buries important information about a recall into routine correspondence.  This is not what the law requires.  Notably, in none of these recalls did FCA actually tell NHTSA in these letters or quarterly reports that there was a change to the vehicle population.  Rather, NHTSA would have had to compare the vehicle populations in the correspondence to that in the 573 reports to reveal that FCA was not providing the required information.

312.   As NHTSA has since noted, in some cases, the changes to the population reflected by the letters was sometimes later reported to the Agency in a 573 Report, but in other cases subsequent, 573 Reports contained no population change. That left NHTSA to wonder

### 7.   FCA's Failure To Submit To NHTSA Information On Remedies

319.   It is also critical for NHTSA to have timely, accurate, and complete information about a manufacturer's remedy plan, particularly, when and how a manufacturer is going to fix its vehicles. This information is required information that must be reported by a manufacturer in its 573 Report.  The manufacturer is not only required to report the remedy plan in its initial 573 Report but must also amend its 573 Report within five working days of confirming or changing its remedy plan. It is imperative for NHTSA to have access to information respecting a manufacturer's remedy plan in order to assess the remedy plan so it can ascertain that a manufacturer is meeting its obligation to adequately repair the vehicles affected by the defect within a reasonable time.

320.   FCA failed to provide timely information on its remedy plan in at least two recalls between 2013 and 2015.

- Recall 13V-527 is a recall involving a defective left tie rod assembly that could fracture, resulting in the loss of steering control. FCA's November 2013 573 Report said that it would remedy vehicles by installing a redesigned tie rod assembly. FCA filed a correction to the 573 Report on March 2013, indicating that the replacement of the tie rod was an interim remedy and that vehicle owners would need to have a new steering linkage installed.  At that time, FCA said it would notify dealers about the fix on April 17, 2015. FCA did not notify dealers on that date and instead filed an amended 573 Report on May 7, 2015 stating that it was delaying the dealer notices until May 8, 2015. Thus, NHTSA never had an opportunity to review the dealer communications.  Since FCA had changed the remedy for this recall, NHTSA's review of the dealer communication was particularly important to NHTSA.  This communication consisted of a technical service bulletin giving dealers specific instructions on how to repair the vehicles – this was information that NHTSA needs to review. However, as discussed above, FCA did not timely provide a copy of that communication to NHTSA. *Supra* at 57-63.

- Recall 14V-634 is a recall that involved sudden alternator failure which could result in sudden vehicle shutdown and fire.  On October 7, 2014, FCA filed its initial 573 Report for this recall and did not include the remedy plan. October 14, 2014, the RMD reminded FCA in a recall acknowledgement letter of its obligation to provide its plan for remedying the safety defect as soon as it has been determined.  Over six months later, FCA notified vehicle owners that dealers would replace the alternator assembly.  NHTSA contacted

FCA on April 13, 2015, April 22, 2015 and April 29, 2015 to ask why the Company still had not reported its remedy plan in an amended 573 Report. Despite repeatedly promising to do so, and despite repeatedly being reminded to do so by NHTSA, it took FCA until May 7, 2014 to file an amended 573 Report including information on its remedy plan. *Supra* at 85-88.

321.    NHTSA's conclusions concerning these violations demonstrate FCA's complete disregard for its legal obligations related to regulatory compliance.  As stated by Neff in NHTSA's written statement  to the FCA-NHTSA Hearing:  "Based on my communications with Fiat Chrysler staff, I believe that they did not understand their obligation to include this information in their Part 573 Report. This is hard to fathom for a company with as much recall experience as Fiat Chrysler. NHTSA staff should not have to explain and repeatedly remind Fiat Chrysler about basic recall requirements as we had to do here."  **Written Statement of Neff Tr. at 16.**

322.    Notably, while at a public Hearing, the manufacturer can present any material or make statements concerning its position on the matter, at the FCA-NHTSA Public Hearing, the Company representative, Kunselman, did not make any rebuttal and acknowledged that the Agency raised legitimate questions about the Company's failures.  **FCA-NHTSA Hearing at 77-83.**

### D.    FCA's Admission Of Widespread Violations In The Consent Order

323.    My conclusions are further supported by the admissions of FCA in the Consent Order.

324.    On Sunday, July 26, 2015, NHTSA announced a Consent Order and its imposition on the Company of a record $105 million fine in connection with the Company's handling of 23 previous recalls affecting more than 11 million vehicles.  The NHTSA penalties were tied to violations in an array of areas, as described above, including misleading regulators,