# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : : : : | **Civ. Action No: 15-cv-07199-JMF** |
| Plaintiff(s), | : : : | **CLASS ACTION** |
| v. | : : : : | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SPOLIATION SANCTIONS** |
| FIAT CHRYSLER AUTOMOBILES N.V., RONALD ISELI AND ALLESANDRO BALDI, AS CO-EXECUTORS FOR THE ESTATE OF SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE, and ROBERT E. LEE, | : : : : : : : : | **ORAL ARGUMENT REQUESTED** |
| Defendants. | : : : | |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND .............................................................. 3

    I.      This Litigation ......................................................................................................... 3

    II.     Roger Orteca ........................................................................................................... 4

    III.    The Esty Report ...................................................................................................... 6

    IV.   FCA Has Been Anticipating Litigation Regarding Diesel Emissions Since at Least December 2015 ........................................................................................................ 6

          A.     FCA Knew that the EPA Issued a Notice of Violation Against Volkswagen on September 18, 2015 ...................................................... 6

          B.     FCA Knew on September 25, 2015, that the EPA Intended to Conduct Additional Diesel Testing Potential Defeat Devices ................................. 7

          C.     FCA learned that the EPA Determined that FCA Violated Emissions Regulations by Failing to Disclose AECDs In November of 2015 ........... 8

          D.     FCA Was Aware by December 14, 2015, that they Were Likely to Be Sanctioned by the EPA ....................................................................... 8

ARGUMENT ........................................................................................................................ 10

    I.      FCA's Obligation to Preserve Documents Began Prior to January 19, 2016 ....... 11

    II.     FCA was Grossly Negligent for Destroying Orteca's Documents In January of 2016 ...................................................................................................................... 13

    III.    Orteca's Documents Were Relevant to the Litigation and Cannot be Replaced .. 15

    IV.   Appropriate Sanctions ........................................................................................... 25

CONCLUSION .................................................................................................................... 25

i

# TABLE OF AUTHORITIES

## Cases

*Amusement Indus., Inc. v. Stern*,

    No. 07CIV11586LAKGWG, 2016 WL 4249965 (S.D.N.Y. Aug. 11, 2016) ......................... 19

*Brink's Inc. v. City of New York*,

    717 F.2d 700 (2d Cir. 1983)........................................................................................ 17, 19, 21

*Byrnie v. Town of Cromwell, Bd. of Educ.*,

    243 F.3d 93 (2d Cir. 2001)........................................................................................ 10, 11, 16

*Dahoda v. John Deere Co.*,

    216 F. App'x 124 (2d Cir. 2007) .............................................................................................. 25

*Fitzpatrick v. Am. Int'l Grp., Inc.*,

    No. 10 CIV. 142 MHD, 2013 WL 9948284 (S.D.N.Y. May 29, 2013) .................................. 15

*Fujitsu Ltd. v. Fed. Exp. Corp.*,

    247 F.3d 423 (2d Cir. 2001)...................................................................................................... 11

*Hawley v. Mphasis Corp.*,

    302 F.R.D. 37 (S.D.N.Y. 2014) ........................................................................................ 13, 14

*In re 650 Fifth Ave. & Related Properties*,

    No. 08 CIV. 10934 (KBF), 2017 WL 2214869 (S.D.N.Y. May 18, 2017) ............................. 23

*In re Urethane Antitrust Litig.*,

    No. 04-1616-JWL, 2013 WL 100250 (D. Kan. Jan. 8, 2013) ........................................... 21, 22

*Kirschenbaum v. 650 Fifth Ave.*,

    257 F. Supp. 3d 463 (S.D.N.Y. 2017)..................................................................... 19, 20

*LiButti v. United States*,

    107 F.3d 110 (2d Cir. 1997).................................................................... 18, 19, 20, 21

*McEachron ex rel. McEachron v. Glans*,

    No. 97-CV-885(LEK/DRH), 1999 WL 33601543 (N.D.N.Y. June 8, 1999)........................ 1, 2

*Orbit One Commc'ns, Inc. v. Numerex Corp.*,

    271 F.R.D. 429 (S.D.N.Y. 2010) ........................................................................... 13

*PacifiCorp v. Nw. Pipeline GP*,

    879 F. Supp. 2d 1171 (D. Or. 2012) ....................................................................... 12

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,

    306 F.3d 99 (2d Cir. 2002).............................................................................. 10, 16

*Ronnie Van Zant, Inc. v. Pyle*,

    2017 WL 3721777 n.16 (S.D.N.Y. Aug. 28, 2017) .................................................. 11

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc.*,

    No. 07-CV-5855, 2010 WL 2652412 (D.N.J. July 1, 2010).................................... 12

*Shamis v. Ambassador Factors Corp.*,

    34 F. Supp. 2d 879 (S.D.N.Y.)............................................................................... 1

*Siani v. State Univ. of New York at Farmingdale*,

    No. CV09-407 JFB WDW, 2010 WL 3170664 (E.D.N.Y. Aug. 10, 2010) ........................... 12

*Tate ex rel. Tate v. Bd. of Educ. of City Sch. Dist. of Peekskill*,

    346 F. Supp. 2d 536 (S.D.N.Y. 2004), 346 F.Supp.2d 536 (S.D.N.Y.2004) ............................ 24

*United States v. Adlman*,

    134 F.3d 1194 (2d Cir. 1998) ................................................................................. 12

*United States v. Ianniello*,

    824 F.2d 203 (2d Cir. 1987) ................................................................................. 17

*West v. Goodyear Tire & Rubber Co.*,

    167 F.3d 776 (2d Cir. 1999) ................................................................................. 25

*Zubulake v. UBS Warburg LLC*,

    220 F.R.D. 212 (S.D.N.Y. 2003) ........................................................................... 13

**Statutes**

42 U.S.C. § 7542(a) ..................................................................................... 9, 11

**Rules**

Fed. R. Civ. P. 37 ...................................................................................... 15

Fed. R. Civ. P. 37(e) ................................................................................... 10, 11

Fed. R. Civ. P. 37(e)(1) ................................................................................ 10

Fed. R. Civ. P. 37(e)(2) ................................................................................ 10

Fed. R. Evid. 601 ...................................................................................... 24

Fed. R. Evid. 801(d)(2) ................................................................................ 19

## PRELIMINARY STATEMENT[1]

Central to Plaintiffs' emissions-related claims is that the Subject Vehicles contained eight undisclosed auxiliary emission control devices ("AECDs") that were also illegal "defeat devices", which permitted the Subject Vehicles to cheat EPA emission tests and spew illegal levels of NOx into the atmosphere. One of the key witnesses to FCA's alleged fraud is Roger Orteca ("Orteca"), the head of FCA's Emissions Certification Group, who was responsible for identifying and disclosing the AECDs and defeat devices in the Subject Vehicles. Ex. 2 at 34:21-35:1; Ex. 3 at 30:5-18; Ex. 4 at 44:9-14; Ex. 5 at 134:3-9; Ex. 6 at 111:4-14. Orteca was also one of the primary contacts interacting with the EPA when it began investigating the Subject Vehicles in November 2015 and informed FCA that it discovered the undisclosed AECDs and at least one defeat device. Discovery in this Action has revealed ample evidence of Orteca's knowing concealment of the AECDs and defeat devices. ████████████████████████████████████

████████████████████████████████████████████████

████████ Ex 18.[2]

On August 15, 2018, Plaintiffs served the expert report of Dr. Christopher Atkinson ("Atkinson") in which Atkinson opines, in part, that the eight undisclosed features were AECDs that were required to be disclosed to the EPA and that the AECDs were also defeat devices prohibited by law.

In response, on October 22, 2018, Defendants served the expert report of Daniel Esty ("Esty" and the "Esty Report"), which reveals FCA's asserted scienter defense to the

---

[1] The instant motion is timely. Courts in this circuit have found that spoliation motions are timely if filed "soon after" the close of discovery. *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 886 (S.D.N.Y.) (collecting cases and finding that spoliation motions filed two months after close of discovery are timely); *see also McEachron ex rel. McEachron v. Glans*, No. 97-CV-885(LEK/DRH), 1999 WL 33601543, at *2 (N.D.N.Y. June 8, 1999).

[2] "Ex. _" refers to exhibits to the Declaration of Jonathan Stern. Unless otherwise noted, all emphasis has been added.

overwhelming evidence. Esty opines that FCA believed it was in compliance with AECD disclosure requirements even though FCA did not disclose all AECDs because FCA believed the EPA had agreed during a May 2012 meeting to a more limited disclosure requirement based on a narrower AECD definition created by FCA. Ex. 1. Sergio Marchionne ("Marchionne") identified the purported agreement with the EPA as the "Orteca deal." Ex. 7 at 230:4-5.

Orteca, as the individual responsible for identifying and disclosing AECDs and defeat devices, as well as a point person in the EPA's investigation, is central to the question of whether any agreement as to an alternative AECD definition truly existed with the EPA and the real reason that none of the AECDs or defeat devices were ever disclosed.

Despite Orteca's key importance to the EPA's allegations of undisclosed AECDs and defeat devices in November and December 2015, following Orteca's departure from FCA on January 1, 2016 (Ex. 8), FCA did not retain his documents, instead destroying them in accordance with its normal document retention policy (Ex. 9), which required retention for 18 days. *Id.* Orteca's documents were deleted on or around January 19, 2016.

Spoliation sanctions are appropriate because: (i) Defendants had a duty to preserve Orteca's documents at the time of his departure and were at least grossly negligent for failing to do so, (ii) the documents were relevant to the litigation, and (iii) their destruction was prejudicial to Plaintiffs. At the time Orteca left FCA, the Company was already under investigation by the EPA, which had accused FCA of violating the law by failing to disclose the AECDs and using a defeat device. Indeed, the EPA had threatened subpoenaing the relevant information from FCA and FCA's general counsel was "fully engaged" in preparing responses to the EPA's inquiries. FCA also knew that Orteca's conduct was central to the subject of the EPA's investigation. Because of Orteca's central role in the conduct under investigation, and because Orteca was

centrally involved in the response to that investigation, his documents were clearly relevant to the litigation. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

As a sanction for FCA's spoliation, Plaintiffs request that Defendants be barred from introducing any evidence concerning the alternative AECD definition.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   This Litigation

This action was initially filed on September 11, 2015. Docket No. 1. The initial complaint addressed FCA's misstatements related to deficiencies in their safety recall procedures. Gary Koopman and Timothy Kidd were appointed lead plaintiffs on December 9, 2015. Docket No. 24. Lead Plaintiffs filed the First Amended Complaint on January 22, 2016. A Second Amended Complaint was filed on March 29, 2016. Docket No. 28. Defendants' motion to dismiss the vehicle safety-related claims was denied on October 5, 2016. Dkt. No. 50. A Third Amended Complaint, the first to allege misstatements regarding FCA's diesel emissions, was filed on February 17, 2017. Docket No. 68. Finally, a Fourth Amended Complaint was filed on August 15, 2017. Docket No. 124. A motion to dismiss was denied on November 13, 2017. Docket No. 142.

Plaintiffs allege, in part, that the Subject Vehicles contained eight undisclosed AECDs and "defeat devices" that permitted the Subject Vehicles to cheat EPA emissions testing and spew NOx into the atmosphere in violation of U.S. emissions regulations.

## II.   <u>Roger Orteca</u>

At all relevant times until the end of 2015, Orteca was the Manager of the Emissions Certification group for FCA US. Defendants' Initial Disclosures. Orteca has been identified as the individual responsible for deciding which AECDs to disclose and whether an AECD was a defeat device. Ex. 2 at 34:21-35:1; Ex. 3 at 30:5-18; Ex. 4; Ex. 5 at 134:3-9; Ex. 6 at 111:4-14.

Orteca was responsible for approving the use and non-disclosure of the T-Engine function, one of the undisclosed AECDs and defeat devices at issue in this action. Bosch raised concerns as to the legality of that feature in January of 2012. Ex. 19; Ex. 20. On January 24, 2012, Giorgio Zacchi emailed Michael Berry at Robert Bosch USA a copy of "the T_engine explanation I presented last week to the people taking care of the homologation here in Chrysler." Ex. 20, at 749. The group taking care of homologation at Chrysler was the Certification Group headed by Roger Orteca. Ex. 3 at 123:13-124-13. Berry responded by stating that certain aspects of the T_Engine were "a clear red-flag to CARB", raising concerns that it would not be approved by the EPA or CARB if disclosed as an AECD. Ex. 20, at 749; Ex. 19, at 760. After further analysis, Berry concluded that the T_Engine feature "is clearly a method of detecting an emission cycle" and "is an emissions defeat device". Ex. 46, at 194-195. Emanuelle Palma, senior manager of Diesel Engine Calibration at FCA, proposed that Bosch, as well as VM Motori, present their concerns to Orteca at their standing weekly meeting but Palma made it clear that the certification group, including Orteca, was aware of their concerns and approved the use of T_Engine anyway. Ex. 20. at 746. Palma also specifically recalled meeting with Orteca at the Auburn Hills Tech Center where he informed Orteca that Bosch had concerns about using T_Engine. Ex. 3. at 103:25-106:3. Palma went to Orteca "specifically to reconfirm approval of using tEng." *Id*. at 105:18-19. Orteca was already aware of the T_Engine feature (*id*. at 108:20-22) and "he confirmed that tEngine was a software in the calibration that could be used." *Id.* at 106:1-3.

4

Orteca also knew of and approved the use of "EGR #12", another defeat device that was not disclosed to the EPA. Palma stated that he discussed EGR #12 at an in person meeting with Orteca to ask whether it was allowed. Ex. 3 at 176:14-22. Orteca told Palma that he was going to discuss the issue with Steve Mazure in Regulatory Affairs. *Id.* at 178:8-19. The second discussion occurred when Orteca told Palma that the AECD was allowed and asked Palma to "put together a write-up of the AECD document relative to this function." *Id.* at 177:11-14. Palma testified at his deposition that he warned Orteca that they had not had time to fully study the emissions impact of EGR#12 and that it could have an impact on emissions. *Id.* at 186:16-187:10. Nonetheless, on July 23, 2013, Palma informed his team that FCA had approved EGR #12. Specifically, Palma stated "Orteca is okay with presenting an AECD for the EGR cleaning routine; he rather laughed in our faces, but that's fine." *Id.* at 194:14-17; Ex. 33 (translation). ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Orteca also approved the "Online Dosing" defeat device. On February 28, 2013 Giorgio Zacchi emailed the AECD write up for the disclosure of Online Dosing to Orteca, Borland and Kopinski, in the same format as other AECDs were disclosed, stating, "Please review it and let me know if ok or more explanation needed. … When you approve it, let me know, since I need to communicate [sic] Bosch the need for an additional AECD timer." Ex. 37. The attached write up, in the same form as is done for AECDs disclosed to the EPA, specifically identifies Online Dosing or "alternative pre-control" dosing, admits that "**[a]n increase in NOx emissions could exist,**

**depending on the alternative pre-control DEF dosing calculation strategy**." *Id.* at 759 (emphasis supplied). On March 20, 2013, Kassir Jaffri had a meeting with Orteca, Giorgio Zacchi, Ethan Stiles, Michele Padovan, Riccardo Pettazzoni, Emanuele Palma and Hal Zatorski, the purpose of which was for Jaffri and Zatorski to raise their test results and findings about Online Dosing to Orteca's attention as the head of FCA's Certification Group. Ex. 41 at 134:9-135:4. After that meeting, FCA temporarily decided not to use online dosing, based on a discussion that it could not be justified to prevent it from being considered a defeat device. *Id.* at 143:6-16. However, FCA shortly thereafter changed course and decided to use Online Dosing despite these concerns, but never disclosed it to the EPA or CARB as an AECD. *Id.* at 143:17-145:4.

### III.   **The Esty Report**

The Esty Report was filed to respond to the Atkinson Report.[3]  The Atkinson Report opines that FCA was not in compliance with U.S. emissions regulations, that its processes and internal controls to ensure compliance with emissions regulations were inadequate and ineffective, and that its statements concerning compliance with emissions regulations were false and misleading. The report was based, in large part, on a review of email correspondence and deposition transcripts from FCA current and former employees. Much of the report focuses on the actions of Orteca. The Esty Report responds by opining that FCA's compliance with an alleged verbal agreement with the EPA in 2012 was consistent with industry custom and practice.

### IV.   **FCA Has Been Anticipating Litigation Regarding Diesel Emissions Since at Least December 2015**

####    A.   **FCA Knew that the EPA Issued a Notice of Violation Against Volkswagen on September 18, 2015**

---

[3] The Esty Report also responds to the Expert Report of Dr. Axel Friedrich regarding issues not relevant to this motion.

The EPA issued a Notice of Violation (NOV) related to Volkswagen's use of undisclosed defeat devices on September 18, 2015. The NOV stated that Volkswagen used illegal defeat devices in four-cylinder Volkswagen and Audi diesel cars for model year 2015. The defeat devices existed in software designed to circumvent EPA emissions standards for air pollutants. NOV, United States Environmental Protection Agency, September 18, 2015. *Available at* https://www.epa.gov/sites/production/files/2015-10/documents/vw-nov-caa-09-18-15.pdf.   FCA was immediately aware of the issuance of the NOV against Volkswagen. On the same day it was issued, Frank Krich, a senior regulatory engineer at FCA, sent an email to Vaughn Burns, Steve Mazure, and Morrie Lee forwarding an article discussing the NOV. Ex. 34. Orteca also received an email forwarding information about the NOV that same day. Ex. 35. FCA was well aware of the consequences of such violation. As a "Defeat Device Awareness and Prevention" PowerPoint deck dated November 17, 2015 stated, "In October of 2015, VW admitted to intentionally installing and attempting to disguise a feature which detects when a vehicle is running the FTP and disables some emission features. This affects 480,000 vehicles in the U.S, and as many as 11 million worldwide. VW's CEO resigned, VW's stock price plunged, and legal action is pending for both the company and possibly for individuals involved. Fines could be as high as $18 Billion." Ex. 48.

**B.     FCA Knew on September 25, 2015, that the EPA Intended to Conduct Additional Diesel Testing Potential Defeat Devices**

On September 25, 2015, the EPA published a letter, signed by Byron Bunker, the Director of the Compliance Division of the Office of Transportation and Air Quality of the EPA, stating that the EPA would perform additional testing of diesel engines to determine whether any cars using diesel engines in the United States deployed defeat devices. Letter, Byron Bunker, United States     Environmental     Protection     Agency,     September     25,     2015.

https://19january2017snapshot.epa.gov/sites/production/files/2015-10/documents/cd-mfr-guid-ltr-2015-09-25.pdf. FCA personnel discussed this letter over email by September 30, 2015. Ex. 44.

### C.   FCA learned that the EPA Determined that FCA Violated Emissions Regulations by Failing to Disclose AECDs In November of 2015

Defendants first learned that the EPA concluded FCA violated emissions regulations by failing to disclose numerous AECDs, which included defeat devices, by late November 2015. The EPA and FCA met to discuss undisclosed AECDs on November 25, 2015, with Steve Mazure, Morrie Lee, Enanuelle Palma, and Orteca attending for FCA. Ex. 10; Ex. 11 at 370. At that meeting, the EPA identified two previously undisclosed AECDs and informed FCA that at least one appears to violate the EPA's defeat device regulation. Ex. 12.

On November 30, Vaughn Burns notified Michael Dahl, both of FCA, that Byron Bunker, the EPA's Director of Compliance, contacted him stating that the EPA was seeking the full cooperation of FCA to get the issue of undisclosed AECDs resolved and was concerned that FCA's strategy "may constitute a defeat device." Ex. 10. Joel Dalton, also of the EPA, contacted Morrie Lee and Steve Mazure on December 3 by email requesting several pieces of follow up information regarding the undisclosed AECDs. Ex. 28. Orteca provided some of the responsive information. *Id.* On December 10, 2015, Steve Mazure emailed Vaughn Burns and Mike Dahl to state that "EPA wants us (and NAFTA PT) back in for a meeting [December 14] to discuss latest data and calibration analysis. All efforts are to prove no defeat device but possibly a lack of disclosure of EGR feature." Ex. 21.

### D.   FCA Was Aware by December 14, 2015, that they Were Likely to Be Sanctioned by the EPA

FCA personnel met again with the EPA on December 14. After that meeting, Morrie Lee emailed Defendant Steve Mazure describing the meeting. He stated that "we should be spanked

for not disclosing all the AECDs that have been mentioned, but at this point, nothing more." Ex. 14. By this, Lee meant, as he explained in his deposition, that FCA's conduct merited a regulatory penalty, but a small one. Ex. 29, 173:10-15. Joel Dalton of the EPA then contacted Lee on December 21, expressing frustration at the slow pace of Defendants' responses to the EPA's inquiries and reiterating the threat, first made by Byron Bunker before Thanksgiving 2015, to issue a "208 letter." Exhibit 13. This was a reference to a "Request for Information under Section 208(a) of the Clean Air Act, 42 U.S.C. § 7542(a), which permits the EPA to compel motor vehicle manufacturers to provide records in order for the EPA to determine whether the manufacturer is in compliance with the Clean Air Act and regulations thereunder.

On January 7, 2016, Byron Bunker emailed FCA to schedule a meeting with Vaughn Burns, Steve Mazure, and Michael Dahl to discuss the "unacceptably slow pace of the efforts to understand the high NOx emissions we have observed from several Dodge Ram 1500 vehicles… As was discussed with your team on November 25, at least one of the AECDs in question appears to me violate EPA's defeat device regulation." Ex. 12. The next day, this email was forwarded to Robert Lee, who stated that he needed to review this with Shost and Michael Dahl before his meeting with "SM" – Sergio Marchione. Ex. 47. Shost responded that he agreed, and that he was working with Steve "Mazure and Kyle (lawyer)." *Id.* Marchionne testified in his deposition that Robert Lee updated him on the communications with the EPA in January of 2016. Ex. 7 at 97:6-12.

On January 10, 2016, Defendant Robert Lee texted Marchionne that FCA's general counsel's team was "fully engaged." Ex. 22. On January 11, 2016, Dahl, with the assistance of FCA's general counsel, drafted and sent an email response to the EPA. Ex. 17. at 136:9-13. That email noted that "We clearly recognize that based on your current understanding, you have

concerns that the design and strategies raise potential compliance issues…As I am sure you can appreciate, conclusions regarding possible noncompliance of FCA's engine design, especially as violating EPA's 'defeat device' regulations, are conclusions of a legal nature with potentially significant regulatory and commercial consequences." Ex. 16.

## **ARGUMENT**

Under Second Circuit case law, spoliation sanctions are appropriate where the court finds "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107–12 (2d Cir. 2001)or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) *quoting Byrnie v. Town of Cromwell*, 243 F.3d 93, 107–12 (2d Cir.2001). Ordinary negligence is considered a culpable state of mind in the Second Circuit. *Id.*

Under Rule 37(e), spoliation sanctions are appropriate where (i) "electronically stored information that should have been preserved in the anticipation or conduct of litigation" (ii) "is lost because a party failed to take reasonable steps to preserve it," and (iii) "it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Courts are given wide discretion to craft a remedy to cure any resulting prejudice. Fed. R. Civ. P. 37(e)(1). Where a party is found to have intentionally spoliated evidence, more severe sanctions are authorized, including default, or a permissive or mandatory jury instruction that the evidence destroyed was adverse to the spoliating party. Fed. R. Civ. P. 37(e)(2).

The Second Circuit has also recognized the courts' power to impose discovery sanctions pursuant to "its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002). This district has continued to recognize this

inherent authority subsequent to the recent amendment of Rule 37(e). See, e.g., *Ronnie Van Zant, Inc. v. Pyle*, 2017 WL 3721777, at *8 n.16 (S.D.N.Y. Aug. 28, 2017).

**I.   FCA's Obligation to Preserve Documents Began Prior to January 19, 2016**

Spoliation refers to "the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001). Thus, the duty to preserve evidence attaches before litigation begins, and applies "when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). Following the Volkswagen diesel scandal, the EPA began testing FCA vehicles and met with FCA (including Orteca) on November 25, 2015 to discuss undisclosed AECDs that the EPA discovered (Ex. 10; Ex. 11 at 370) and informed FCA that at least one appeared to violate the EPA's defeat device regulation. Ex. 12. Ongoing communications and meetings between FCA and the EPA took place, and on December 21, Joel Dalton of the EPA contacted Morrie Lee, expressing frustration with FCA's responses to the EPA's inquiries and reiterated a threat, previously made in November 2015, to issue a "208 letter" (Ex. 13), which, pursuant to 42 U.S.C. § 7542(a), permits the EPA to compel production of records to evaluate a violation of Clean Air Act. By December 2015, FCA personnel anticipated that they would receive some sort of penalty for failing to disclose AECDs. Ex. 14. On January 7, 2016, Byron Bunker ("Bunker") of the EPA criticized the "unacceptably slow pace of [FCA's] efforts to understand the high NOx emissions we have observed," repeating that "at least one of the AECDs in question appears to me violate EPA's defeat device regulation." Ex. 12. On January 11, 2016, Defendant Michael Dahl, with the assistance of FCA's general counsel, drafted a response stating, "we clearly recognize that … you have concerns that the design and strategies raise potential compliance issues…[C]onclusions regarding possible noncompliance of FCA's engine design, especially as violating EPA's 'defeat device' regulations, are conclusions of a legal nature with

11

potentially significant regulatory and commercial consequences." Ex. 15 at 136:9-13; Ex. 16.

FCA has admitted that it anticipated litigation prior to destroying Orteca's documents by invoking the work product privilege for documents concerning the EPA's investigation into the Subject Vehicles prior to January 19, 2016, including a January 13, 2016 meeting with the EPA. Ex 17. Defendants' privilege log identifies 39 communications concerning FCA meetings with the EPA, which were designated as privileged on the basis of work product. Ex. 17. While many of these entries are undated, there are four entries related to correspondence regarding a meeting dated January 13, 2016. A party can only invoke the work product protection if it "anticipated litigation" at the time the document was created. *United States v. Adlman*, 134 F.3d 1194, 1198 (2d Cir. 1998) (work product protection applies to documents prepared "in anticipation of litigation"). FCA had a duty to preserve Orteca's emails and documents given his key position. However, FCA failed to send out **any document hold notification** prior to the deletion of Orteca's documents. Ex. 9. *PacifiCorp v. Nw. Pipeline GP*, 879 F. Supp. 2d 1171, 1190 (D. Or. 2012) (party that successfully resisted motion to compel is judicially estopped from claiming it did not anticipate litigation by the date of the creation of the work-product documents for purposes of a spoliation motion); *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc.*, No. 07-CV-5855, 2010 WL 2652412, at *5 (D.N.J. July 1, 2010); *See Siani v. State Univ. of New York at Farmingdale*, No. CV09-407 JFB WDW, 2010 WL 3170664, at *5 (E.D.N.Y. Aug. 10, 2010) (noting that parties accused of spoliation "have cited no authority that would countermand the common sense conclusion" that invoking the work product privilege implies that litigation was reasonably foreseeable for spoliation purposes).

Subsequent to the filing of Plaintiffs' letter motion on spoliation, Defendants provided an amended privilege log rescinding these designations, and claiming that the earlier work product

designations were the result of an associate erroneously referencing non-final work product designations for the relevant documents. Exhibit 31. This is curious since a claim of privilege is an affirmative designation. Even accepting that the designation utilized was not the "final" designation no document could be even preliminarily designated as work product unless there was reason to believe that FCA anticipated litigation at that time (either based on the associate's knowledge of the facts or, more likely, as a result of a specific conversation with FCA). Plaintiffs suggest that, given that the privilege log was only amended in response to the spoliation letter motion and given the lack of dates on the log, the Court should review all documents on the log concerning the EPA's investigation into FCA's emissions compliance that predate the destruction of Orteca's documents on January 19, 2016, if the Court determines that the question of the timing of the work product designation is relevant to this spoliation motion.[4]

## II.   FCA was Grossly Negligent for Destroying Orteca's Documents In January of 2016

"[A] 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) (citation omitted). "This standard protects the innocent litigant from the destruction of evidence by a spoliator who would otherwise assert an 'empty head, pure heart' defense." *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438 (S.D.N.Y. 2010). "Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Id.* In the Second Circuit, a "company's failure to institute any of the 'widely-recognized steps to preserve' data is an important consideration for a court when evaluating culpability." *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 49 (S.D.N.Y. 2014).

---

[4] Plaintiffs suggested to Defendants that the parties stipulate to the Court's review of the relevant documents in resolving this motion. Defendants did not agree.

FCA's document retention policy required it to retain Orteca's documents for 18 days after Orteca's retirement. Ex. 42. FCA told the EPA that it destroyed Orteca's documents in accordance with its retention policy. Ex. 11. Because Orteca resigned on January 1, 2016, Orteca's documents were therefore destroyed on January 19, 2016. This conduct was at least negligent. At the time FCA destroyed the documents, FCA was aware of numerous facts that should have made any reasonable person aware that Orteca's documents would be relevant to potential litigation with the government and shareholders. By January of 2016 FCA was aware that Volkswagen received a NOV for failing to disclose alleged defeat devices in diesel engines. FCA had already conducted an internal audit to determine if it had deployed defeat devices. FCA had been told by the EPA that the EPA believed FCA had used defeat devices. FCA was responding to informal requests for documents from the EPA and the EPA had threatened FCA with service of a formal regulatory subpoena.

But FCA's culpability goes well beyond the ordinary case of failure to institute a litigation hold given Orteca's role in the litigation. Orteca was one of the individuals who was assisting in responding to the EPA's inquiries. *Hawley v. Mphasis Corp.*, 302 F.R.D. at 49 (failure to preserve documents of former employee who would clearly be significant in subsequent litigation supported finding of gross negligence). This is because Orteca was central to the conduct the EPA was investigating, and Orteca was one of the small group of FCA employees actively working on responding to the EPA at the time of his departure. Orteca periodically sent out a list of "top issues" to his team, and on December 10, 2015, Orteca sent out his last Top Issue Email, which identified "Diesel Surveillance" by the EPA as a top issue, and stated "They feel we have an AECD that we did not expose" and "to me this falls into the category of all calibrations are AECDs." Ex. 38. Orteca was responsible for the decision not to disclose the questioned AECDs and defeat devices

to the EPA in the first place, and was part of the team tasked with responding to the EPA's inquiry. According to FCA, its defense in this matter depends on claiming that it followed not the letter of the law but a verbal guidance allegedly *expressed to* and *implemented by* Orteca. Ex. 1. Yet, in possession of all of this information, FCA deleted Orteca's electronic files, and neither Orteca nor anyone else at FCA made any effort to attempt to identify documents relevant to the EPA investigation that should be preserved. Defendants' misconduct therefore goes well beyond merely failing to institute a litigation hold. The only two plausible explanations for this behavior are that Defendants did not bother to review Orteca's files before destroying them, which would, under the circumstances, be grossly negligent (given Orteca's key role in identifying and disclosing AECDs and defeat devices to the EPA), or that they did know what was in these files, and destroyed them intentionally. In either case, the records were destroyed with a "culpable state of mind".

III.   <u>Orteca's Documents Were Relevant to the Litigation and Cannot be Replaced</u>

Documents are "relevant" where "*Fitzpatrick v. Am. Int'l Grp., Inc.*, No. 10 CIV. 142 MHD, 2013 WL 9948284, at *9 (S.D.N.Y. May 29, 2013)." *Fitzpatrick v. Am. Int'l Grp., Inc.*, 2013 WL 9948284, at *9 (S.D.N.Y. May 29, 2013). While the recent amendments to Rule 37 has required the Court to make a finding of prejudice before imposing sanctions, "[t]he rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair." Fed. R. Civ. P. 37, Advisory Committee Note to 2015 Amendment. When evidence is destroyed by gross negligence, "that fact alone may constitute sufficient evidence from which a reasonable fact finder could conclude that the withheld or destroyed evidence was unfavorable to the non-compliant party." *Id.* When a party was merely negligent, the innocent party must "produce some evidence suggesting that a document

or documents relevant to substantiating [its] claim would have been included among the destroyed files." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001). "Courts must take care not to 'hold[] the prejudiced party to too strict a standard of proof ... because doing so 'would . . . allow parties who have . . . destroyed evidence to profit from that destruction.'" *Res. Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002).

FCA's gross negligence warrants an inference that the deleted documents were relevant. Even if Defendants were merely negligent, there is ample evidence suggesting that Orteca's documents would support Plaintiffs' claims. For example, when the calibration team told Orteca about their concerns that the "T_Engine" feature was "*a clear-flag*", they said that the certification *they don't' think they're going to bring it to the attention of the EPA*." Ex. 19, at 758, 760; Ex. 20, at 748; Ex. 3 at 40:15-21. *See supra*, at 7-8. There is also evidence demonstrating no alternative AECD definition was ever agreed to. On September 30, 2015, Morrie Lee, (who attended the May 2012 meeting) wrote to EPA's Dalton (who also attended the May 2012 meeting), asserting that FCA had always been following the regulatory definition of AECD for disclosure purposes. Ex. 20. Lee asked Dalton if there was any more recent guidance as to what AECDs should be disclosed. Dalton replied, "***No, I don't think there is more up-to-date guidance***." *Id.*, (emphasis supplied). Defendant Steve Mazure chastised Lee for asking the EPA "what to put on the AECD list" bemoaning the fact that "[y]ou ask and [the EPA] will say **_all_**." *Id*. In addition, Orteca was one of the people tasked with responding to the EPA's inquiries and FCA's director of Powertrain, Mark Cerny, confirmed on December 13, 2015, that he was one of the right people to be responding to the EPA's inquiry. Ex. 39. Given that Orteca was considered one of the key people to respond to the EPA's inquiry while he remained in the company, it follows that he had relevant information

16

to that inquiry. The fact that the EPA has issued a Notice of Violation and filed a lawsuit against FCA for failure to disclose these AECDs is additional strong evidence that there never was an agreement to disclose a narrower set of AECDs based on an "alternative" definition.













## IV.    <u>Appropriate Sanctions</u>

Sanctions should be designed to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (citation omitted). When evidence critical to an issue in a case is spoliated, an appropriate sanction is to preclude testimony or evidence in support of that issue. *Dahoda v. John Deere Co.*, 216 F. App'x 124, 126 (2d Cir. 2007). Prohibiting Defendants from proffering evidence that FCA believed the EPA had agreed to an alternative AECD definition, which FCA then applied, would satisfy all of these functions.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that the motion for spoliation sanctions be granted.

Dated:   January 4, 2019                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Stern
Jonathan Stern
Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jstern@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

**POMERANTZ LLP**
Jeremy A. Lieberman
Michael J. Wernke
Veronica Montenegro

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
          mjwernke@pomlaw.com
vvmontenegro@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Co-Lead Counsel for Plaintiffs*