# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : : : : | **Civ. Action No: 15-cv-07199-JMF** |
| Plaintiff(s), | : : : | **CLASS ACTION** |
| v. | : : : : | |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, RONALD ISELI AND ALESSANDRO BALDI, AS CO-EXUCUTORS FOR THE ESTAT OF SERGIO MARCHIONNE, RICHARD K. PALMER, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE, and ROBERT E. LEE, | : : : : : : : : : : | |
| Defendants. | : : : | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## PRELIMINARY STATEMENT

The evidence of Defendants' liability for their emissions and vehicle safety compliance statements is not only overwhelming, it is widely undisputed.

- FCA has admitted to widespread violations of the Safety Act in its Consent Order with National Highway Traffic Safety Administration ("NHTSA"). Plaintiffs' vehicle safety expert, Robert Hellmuth ("Hellmuth") (who <u>authored</u> the sections of the CFR at issue) opined that FCA's violations were widespread, and that Defendants' statements of compliance were false. Defendants have not moved to exclude Hellmuth's testimony.

- Plaintiffs' US emissions expert, Dr. Christopher Atkinson ("Dr. Atkinson"), opined that the Subject Vehicles contained eight undisclosed AECDs and defeat devices, and that Defendants' statements of compliance were false. Defendants' expert provides no contrary opinion, Defendants have not moved to exclude any of Dr. Atkinson's testimony, and FCA has admitted that none of the eight features were ever disclosed.

- Plaintiffs' EU emission expert, Dr. Axel Friedrich ("Dr. Friedrich"), opined that FCA's EU vehicles contained defeat devices and that Defendants' statements of compliance were false. Defendants' expert provides no opinion to the contrary.

- Plaintiffs' damages expert, Dr. Zachary Nye ("Dr. Nye"), opined that Defendants' compliance statements were material to investors and that the corrective events caused FCA's stock price decline. Defendants have not moved to exclude Dr. Nye's testimony.

- Discovery has revealed that Defendants Robert Lee ("R. Lee") and Steve Mazure ("Mazure") as well as those in management responsible for identifying and disclosing AECDs and defeat devices (Roger Orteca ("Ortega") and Emanuele Palma ("Palma")) knowingly concealed the AECDs and defeat devices, ████████████████████ ████████████████████████████████████████████████████████ Moreover, Defendants R. Lee, Michael Dahl ("Dahl") and Sergio Marchionne ("Marchionne") knew that the EPA and German regulators found that FCA's vehicles used defeat devices.

- Discovery has also revealed evidence that those in management responsible for recall compliance (David Bernier ("Bernier")) were tracking FCA's widespread non-compliance and that it was reported up to Defendant Scott Kunselman ("Kunsleman"). Through NHTSA's letters and investigations, Defendants Marchionne and Kunselman were also aware that NHTSA believed FCA was violating the Safety Act.

Nevertheless, Defendants argue that Defendants' "substantially in compliance" and "no defeat devices" statements were not misleading or made with scienter as a matter of law.

***First***, Defendants argue that FCA's vehicle safety and emissions violations were not *quantitatively* large. This "quantitative" argument is a disguised materiality argument, which "is particularly well suited for jury determination." *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438,

450 (1976)). Moreover, courts must evaluate the "quantitative" as well as "qualitative" falsity of a statement. Defendants did not misstate a line item on a balance sheet. They misrepresented (i) unlawful conduct (ii) that was discovered by FCA's regulators, (iii) threatened the core of FCA's business, (iv) which Defendants knew would impact FCA's stock price. Courts routinely find that such violations can render "substantial compliance" statements false and misleading.

*Second*, Defendants argue that two of their "no defeat device" statements were limited to EU vehicles and that this Court dismissed all allegations concerning EU emissions. Defendants can point to no Court Order dismissing the EU emissions claims in the operative complaint. This is because the Court denied "Defendants' motion to dismiss Plaintiffs' **emissions-related claims**." (ECF No. 142 at 6). Indeed, the Court never distinguished between US and EU claims in its rulings because ***Defendants' never argued that the EU-related claims should be analyzed separately***. They must live with the results of their tactical gamble. Moreover, as Dahl admitted, a reasonable investor could have understood Defendants' statements to including US vehicles.

*Third*, Defendants assert that their disclosure of the basis for their "no defeat device" statements was their audit precludes scienter. They are wrong. Defendants told investors that they conducted a "thorough audit" of FCA's "compliance teams" as well as all "emission calibrations" in the US and EU and that FCA's vehicles had no defeat devices and complied with all emissions regulations. However, Marchionne and R. Lee both knowing concealed that the "audit" only looked for "a narrow range of misbehavior", defeat devices "that were VW like", nothing more. A jury would easily conclude that Defendants knew that their unconditional assertions of compliance were misleading, especially when they knew the EPA and German regulators were taking "the opposite view." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015) (liability "if the issuer made the statement . . .

with knowledge that the Federal Government was taking the opposite view … [or] "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself").

*Fourth*, Defendants argue that NHTSA's letters to Marchionne and Kunselman cannot demonstrate scienter because the two recalls discussed in the letters were "voluntary" recalls and, thus, FCA was not obligated to comply with the Safety Act. Defendants ignore the fact that FCA expressly agreed to comply with the Safety Act and FCA admitted to violating the Safety Act as to these recalls in the Consent Order.  Even if Defendants believed compliance was not necessary they knew that NHTSA had taken "the opposite view." *Omnicare,* 135 S. Ct. at 1329.

The remainder of Defendants' arguments should be rejected for the reasons stated below.

## FACTUAL BACKGROUND

**I.   FCA's Obligation to Comply with NOx Emissions Regulations**

U.S. and EU regulatory agencies regulate Nitrogen Oxide ("NOx") emissions from diesel motor vehicles.  ¶¶ 7, 283[1].  Auto manufacturer must employ strategies to meet the regulatory limitations.  ¶¶ 8-12.  Pursuant to the Clean Air Act, the EPA and CARB administer a certification program to ensure that new vehicles satisfy emissions standards. To obtain a Certificates of Conformity ("COC") a manufacturer must submit an application for each model year of a vehicle.  ¶ 35.

Manufacturers are required to disclose in their COC applications all auxiliary emission control devices ("AECDs"). ¶ 38.  An AECD is "any element of design" which senses any

---

[1]   Citations to "¶ _" are to Plaintiffs' Local Civil Rule 56.1 Counterstatement of Material Facts, and citations to "Ex. _" are to the exhibits to the Declaration of Michael J. Wernke, both of which are submitted herewith.

"parameter" (e.g. temperature or vehicle speed) "for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." ¶ 38. n.1. Failure to disclose any AECD is a violation of 40 C.F.R. § 86.1844-01(d)(11). ¶¶ 38-39.  For each AECD, the manufacturer must also include a rationale for why it is not a "defeat device." *Id.* A defeat device is any piece of software that can "bypass, defeat, or render inoperative" any emissions compliance device/software (subject to a few narrow exceptions). ¶ 39. The use of a defeat device is illegal under US as well as EU law.  ¶ 288.

## II.   FCA's Obligation to Comply with Vehicle Safety Regulations

NHTSA is charged with ensuring that manufacturers comply with the safety standards contained in the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act").  ¶ 429.  The Safety Act requires a vehicle manufacturer to timely notify NHTSA and vehicle owners if it learns of a safety defect that creates an "unreasonable risk of accidents" or an "unreasonable risk of death or injury in an accident." ¶ 430. For example, manufactures must submit to NHTSA a "573 Report" detailing the defect, recall and remedy "not more than 5 working days after a defect [is identified]." ¶ 432. A manufacturer must also provide notification of the defect to owners within 60 days of the 573 Report (¶ 435), and must provide a remedy within a "reasonable time".  ¶ 442, Ex. 300, at ¶ 28; Ex. 3, at 75:6-18.

Just prior to the Class Period, NHTSA significantly intensified its enforcement of timely administration of recalls.  ¶ 457. NHTSA imposed more civil penalties in 2014 than the total amount imposed during its forty-three-year history.  ¶ 459. NHTSA's Administrator David Friedman testified before the U.S. House of Representatives' Committee on Energy and

Commerce, stating: "This Administration has placed an emphasis on ***timeliness*** … [W]e believe that all manufacturers in the automobile industry are now paying much closer attention. ¶ 460.[2]

I.   **Defendants Concealed That FCA's Diesel Vehicles Contained Secret AECDs and Defeat Devices in Violation of Emissions Regulations**

Controlling NOx is achieved through a combination of (i) "exhaust gas recirculation" ("EGR"), and (ii) "selective catalytic reduction" ("SCR").  ¶¶ 25-27.  EGR reduces the NOx coming out of the engine by replacing some of the intake air with recirculated exhaust gases.  ¶ 25. EGR reduces the fuel economy and performance/power of the vehicle.  ¶ 118. Downstream from the engine SCR reduces the NOx emissions to its elemental nitrogen and oxygen through the use of ammonia contained in diesel emissions fluid ("DEF").  ¶¶ 26-27; 192-194.  This injection of the DEF is referred to as "dosing."  *Id.* DEF is stored in a tank and must be replenished periodically depending on how quickly it is depleted, creating a cost and inconvenience for the owner.  ¶¶ 27, 201.

A.   **FCA Equipped the Subject Vehicles with Hidden AECDs and Defeat Devices**

The Subject Vehicles contained defeat devices that were designed to cheat emissions tests. Defendants' concealed these defeat devices from the EPA, CARB and the public. The individuals with primary responsibility for identifying and disclosing the AECDs and defeat devices were Palma, Orteca and Defendant Mazure .

Palma led the team responsible for calibrating the emissions control system on the Subject Vehicles. ¶ 69.  During the Class Period, Palma reported to Mark Shost (Ex. 27, at 14:3-16) who in turn reported to Defendant Robert Lee.  *Id.*[3]

---

[2] Unless otherwise noted, all emphasis has been added.

[3] Prior to the Class Period, Palma worked for VM Motori, which FCA hired to assist with the emission control systems on the Subject Vehicles. ¶ 69 . Prior to October 28, 2013, FCA owned

5

Orteca, Head of FCA US's Emissions Certification Group, was responsible for identifying and disclosing AECDs and defeat devices on FCA's vehicles. Ex. 52, at 34:21-35:1; Ex. 27, at 30:5-18; Ex. 68, at 44:9-14; Ex. 67 at 134:3-9; Ex. 68 at 111:4-14. Palma's team and Orteca's team worked together on the calibrations and the determination of which features were AECDs and defeat devices. ¶ 69; Ex. 25 at, 41:16-21; 102:11-15; 221:5-14.

Mazure, Head of FCA US' Regulatory Affairs, submitted and signed the COC applications for the Subject Vehicles that contained the information concerning AECDs and defeat devices furnished by Orteca. Ex. 68 at 43:19-45:4. In signing the COC applications, Mazure testified that he was "attesting that we have compiled all the technical information required as part of the requirements for certification." *Id.* at 71:19-21.

### 1.   The T_Engine Feature and EGR Shut-Off At Highway Speeds

The Subject Vehicles were marketed as "EcoDiesel" vehicles that were environmentally friendly but could still balance power, capability and fuel economy.   ¶ 113.   During the development of the model year 2014 Subject Vehicles in late 2011, FCA wanted to be able to market the Subject Vehicles as achieving 30 mpg, setting it as a goal for the program. Ex. 52, at 67:5-15. It became clear to Defendant Lee (Head of FCA US Powertrain, reporting to Defendant CEO Sergio Marchionne (¶ 112-113; Ex. 52, at 116:10-19) that achieving the 30 mpg fuel economy requirement was at "high risk" of failure so Lee assembled a special "Task Force" to achieve 30 mpg.  *Id.* at 168, 183, 72:19-73:1. The team, led by Altermatt and Palma, utilized the "T_Engine" and "EGR Shut-Off at Highway Speeds" features to achieve the 30 mpg mandate. ¶¶ 82; 114-117; 157; Ex. 61.

---

a 50.0% interest in VM Motori. ¶ 64. On October 28, 2013 acquired a 100% interest in VM Motori. ¶¶ 23, 64.  Thereafter, FCA consolidated the engineering groups in the US and the VM Motori group working in North America became part of FCA US. ¶ 64; Ex. 27, at 14:5-12.

The T_Engine feature was originally employed in FCA's vehicles sold in Europe (discussed below).  ¶¶ 109-110.  It was specifically designed to "be used for emission cycle detection" so that the emissions control system "only runs for the emission portion of the drive cycle."  ¶ 109-114; Ex. 42.  The key to the T_Engine's cycle detection is that emissions tests have pre-set conditions.  *See* ¶¶ 32; 48-53; 120; 286-287.  The T_Engine feature detects when the vehicle is on an emissions test cycle based on the temperature (which is regulated by law) and the amount of fuel injected (which is a product of the regulated test procedure).  ¶¶ 97-147. When test cycle conditions are detected the T_Engine invokes alternative engine calibrations that increased EGR and reduced NOx emissions.  ¶ 107.  When test cycle conditions are not detected (meaning the vehicle was being driven in the real world) then the T_Engine invokes other engine calibrations that reduce the EGR to allow greater fuel economy, causing the vehicle to spew NOx emissions.  ¶¶ 120-121.

In order to achieve the 30 mpg mandate FCA also created an AECD that shut-off the EGR whenever the Subject Vehicles reached speeds of 62 mph or higher (the "EGR Shutoff at Highway Speeds). This speed is higher than the maximum speed reached on the emissions portion of the EPA test, but lower than highway speed limits.  ¶¶ 148-163.

Plaintiffs' expert, Dr. Atkinson, concluded that the T_Engine feature and EGR Shutoff at Highway Speeds are each an AECD and defeat device. ¶¶ 98, 154. None of the experts Defendants proffer opine otherwise.  ¶¶ 98, 155.  FCA has admitted that the neither feature was disclosed in FCA's COC applications.  ¶¶ 100, 156.

It was widely acknowledged that both of these features were AECDs that required disclosure and that the T_Engine feature was a cycle detecting defeat device that would never be permitted by the EPA or CARB. *See Generally* ¶¶ 96-163. As one of the managers designing the

Subject Vehicles (to whom Palma reported) stated, "we all know … the egr rate will be managed mainly on t-engine which, ***no matter what Fiat says, a cycle detection***, …for high (or low) HFM temp *we won't have eg r rate s ince it'll b e alr eady cut ou t by t_ engine.*" ¶ 111.   By January 2012, members of the team working on the Subject Vehicles alerted upper management that the T_Engine was illegal, and at the very least, must be disclosed to the EPA.  ¶ 116. Michael Berry ("Berry") at Robert Bosch GmbH ("Bosch") (who was assisting FCA in the calibration) stated to Palma and others, "we have some concerns with getting this past CARB / EPA" because certain aspects of it are a "red flag" and "***If they [EPA/CARB] see it active only during an FTP-75 [EPA emissions test cycle], they will for sure deny this***." ¶ 123.

> "Using this method to alter the engine airflow and EGR rates while on the FTP-75 ***is clea rly a  method of detecting an emiss   ion cycle* . … *This is an  emiss ions defeat device*** and must be clarified to Chrysler AECD…. ***If this method is found to be a cycle detection, CARB / EPA will have serious penalties.***"

¶ 130. Bosch was so uncomfortable with the clearly illegal software that they attempted to distance themselves from it "***to en sure we are  not caught in their w  eb.*" ¶ 135. Berry also warned FCA about the EGR Shutoff at Highway Speeds:  "If you deem that the EGR and Air Mass should be altered based on vehicle speed, ***this must be declared through an AECD* .*"  ¶ 163.

Palma and his team alerted Donald Altermatt ("Altermatt") (the project manager for the Subject Vehicles), Defendant R. Lee as well as Orteca about the T_Engine defeat device concerns raised by Bosch. Ex. 36; Ex. 99; Ex. 27, at 99:13-108:22.   In January 2012, the T_Engine and EGR Shutoff at Highway Speeds were included in a presentation to Defendant Lee (who is an engineer (Ex. 52 at 56:21-57:3; Ex. 53), which addressed how the team would meet his 30 mpg target.  ¶¶ 117-120.  The presentation states that the EGR Shutoff at Highway

Speeds was created specifically to avoid it being active on the emissions test cycle. *Id*. The presentation also states that "***This strategy will require the approval of the EPA***…" ¶ 159.

Nevertheless, Orteca decided to use the T_Engine and EGR Shutoff at Highway Speeds and never disclose it to its regulators. As Palma memorialized in an email at the time:

> [D]uring all the several meetings we're having ***with the people in Chrysler dealing with the certification grou p they basically smile when we tell them our concerns about these strategies*** and they only want a general explanation with no description on how we're actually going to calibrate it. ***They even say they don't think they're going to bring it to the attention of the EPA.***

¶161; ¶ 129 ("we have done so far without anyone in Chrysler raising any objections, ***all these strategies were presented to Bob Lee*** as approved by the cert group."); ¶ 131 (Palma responding to concerns raised by others: "We want to move forward with the tEng."). Palma testified that his references to the "certification group" in his emails referred to Orteca. ¶ 161.

These features were intentionally concealed from the COC applications specifically to mislead FCA's regulators. As a June 2013 email states: "***in the CERT docs tEngine is not mentioned, since if CARB found about that it would be probably considered as cycle beating***." ¶ 142. Even when concerns about T_Engine were raised a year after the 2014 MY Subject Vehicles were on the road (July 2014), Palma dismissed them, stating "***Chrysler knows tEng is the only way to get to 30 mpg, so don't worry about this topic***." ¶ 146.

### 2. Valvetrain Cleaning Routine

FCA also created an AECD that shut off the EGR for five minutes after thirty minutes of driving. ¶ 164. Dr. Atkinson concluded that the Valvetrain Cleaning Routine is an AECD and defeat device. ¶¶ 167-168. None of Defendants' experts opine otherwise. ¶ 167.

Those working on the Subject Vehicles immediately acknowledged that FCA's regulators would have serious concerns about this feature based on a timer (which is a telltale sign of a defeat device). ¶ 174. Indeed, the 30-minute interval was chosen specifically to avoid it being

detected on the EPA emissions test (which is shorter than 30 minutes). ¶ 176 . As a member of the calibration team working on the Subject Vehicles, Michele Padovan, stated, "*30 min before the activation should be   enough to avoid th  e conditio n in any certif  ication cy cle*." *Id.* As Palma stated, "The algorithm has a time after the start of the process of the emission cycles, *clearly it re mains to be seen how to sell it to EPA / CARB.* "  ¶ 173.  Padovan stated, "we need to talk with Chrysler. *I think we should declare it in the AECD* , at that point we would need to declare also that the cleaning starts with a timer … Usually *CARB doe sn't like timers*  for the activation of the algorithms, we need to discuss with Chrysler how to present it." ¶ 174.

Palma brought their concerns to Orteca, who discussed them with Defendant Mazure and the feature was approved.  ¶¶ 175-176.  However, FCA has admitted that it never disclosed the AECD to the EPA for the MY 2014 Subject Vehicles.  ¶ 182.  In mid-late 2015, CARB contacted FCA after it discovered the AECD and informed FCA that *CARB "consider[s] this a time-based defeat device* " and refused to certify any additional vehicles with the calibration. ¶ 188.  Defendants Lee, Kunselman, Mazure and Dahl were all informed that it was a defeat device at that time. *Id.*

### 3.  Online Dosing (or Alternative Precontrol Dosing)

The Subject Vehicles also contained several defeat devices that reduced the conversion efficiency of the SCR system in order to conserve the DEF to reduce the cost and inconvenience to owners, which resulted in increased tailpipe NOx emissions. *See Generally* ¶¶ 192-236.

The control of the DEF dosing in the Subject Vehicles was subject to two distinct mutually exclusive modes of operation: "standard dosing" and "online dosing" (also termed "alternative precontrol" dosing). ¶ 196.  Online Dosing as it functioned on the Subject Vehicles reduces the amount of dosing that occurs to the point that it reduces the effectiveness of the NOx reduction, increasing the NOx emissions. ¶ 198.  Dr. Atkinson concluded that Online Dosing as

used in the Subject Vehicles was an AECD as well as a defeat device. ¶¶ 199-200.   None of

Defendants' experts opine that Online Dosing was not an AECD or defeat device.   ¶ 200.  FCA

has admitted that it never disclosed Online Dosing to the EPA for the Subject Vehicles.  ¶ 202.

      FCA intentionally concealed Online Dosing.  As one FCA employee admitted, "***VM***

***lowers their Urea dosing rates during off c   ycle event to save flu  id  (e.g. steady state @ 65***

***MPH). It is currently not mentioned as an AECD. CHEATERS!***"  ¶ 205.  In a July 2013 email,

Padovan admitted that Online Dosing was programmed to behave differently during emissions

tests than in the real world:

> "In reality, ***we use the online dosing as soon as we can outside of th   e cycle to***
> ***consume less urea.***  Obviously if you close the EGR and make more NOX and
> you are in online dosing, ***there is no chance that the additiona  l NOx you are***
> ***producing is being swallowed by the SCR ....***"

¶ 222.  In another exchange, when asked if Online Dosing was used for legitimate purposes, an

FCA employee stated, "***hahaha you know that it is used for def consumption***   ." ¶ 232.  Yet

another FCA employee stated that Online Dosing is "***A way to reduce dosing when not on FTP***

***[the EPA emissions test]***." ¶ 234.  Even Kasser Jaffri's boss at FCA referred to Online Dosing as

"***essentially a defeat device***."  ¶ 235.

      The impropriety of Online Dosing was raised by Jaffri as early as February 2013.  ¶203.

The issue was raised to Palma, who described the concern: "***the problem is with Kass (Chrysler)***

***who believes this  could be s een by CARB as a cycle bea ting strategy***." *Id.*  As with the other

defeat devices, Orteca's Certification Group was aware of the warnings about Online Dosing and

chose to use it anyway without disclosing it. ¶¶ 203-209. As another person working on the

Subject Vehicles, Georgio Zacchi, said to Palma and others: "***There's no mention of the***

***alternative precontrol in the A ECD, Cert group agreed not to have it, and add it only in case***

***ARB comes back and asks***."  ¶ 203.  Zacchi pointed out that he had previously drafted an AECD

disclosure for Online Dosing but "then I removed it since ***Cert Group did not want it*** ." *Id*. The disclosure that had already been drafted and presented to Orteca admitted that Online Dosing increased NOx and did not occur during the EPA emissions test.  ¶ 209.  There was widespread knowledge that Online Dosing was being improperly concealed. *See* ¶ 221 ("***we are not mentioning online dosing at all***."); ¶ 223 ("***I am convinced everyone knows [Online Dosing] is not transparent in terms of what is written in AECD*** …."); ¶ 224 ("***On-line dosing reduces the conversion efficiency e ffectiveness … This do sing strategy is not off icially declared through AECD to EPA nor CARB*** …"). Later, Jaffri wrote, "***If I worked for EPA, I would jump all over this... I know that the AECD documents are crap*** … I brought this up some time back and I got push back I was told, this is emissions, not OBD, back off. Lol. ***Emissions guys ar e cheaters, and they know it***."  ¶ 227. FCA employees interacting with the EPA and CARB were also told to avoid mentioning it: "***He doesn't know about on-line dosing, so  don't bring it up that's going to get real ugly if you do***." ¶ 231.[4]

### B.   FCA Equipped Its EU Vehicles with Hidden Defeat Devices

The T_Engine feature was originally created for FCA's vehicles in the EU.  ¶ 110. As brazenly detailed in a presentation, the T_Engine feature caused the emissions control system to operate only when testing conditions were detected. ¶ 105. Even then, the emissions control system would effectively shut off shortly after 20 minutes (the length of the EU test cycle). *Id.* Plaintiffs' expert, Dr. Friedrich, tested several of FCA's EU vehicles and concluded that they contained defeat devices which caused the emissions system to run under standard test

---

[4] Dr. Atkinson identified three additional calibration features on the Subject Vehicles that were AECDs and defeat devices related to the defeat devices discussed above. ¶¶ 239, 246, 252-. None of Defendants' experts opine that any of these features is not an AECD or defeat devices. *Id.* FCA has admitted that it never disclosed any of these features.  ¶¶ 240, 247, 253.

conditions but would effectively shut-off and emit NOx at a 10 fold increase if the starting engine temperature was slightly adjusted, demonstrating a cycle detecting defeat device. ¶¶ 299-¶¶. In addition to FCA's own internal documentation, Dr. Friedrich's conclusions are supported by independent government testing done by regulators in Germany, France and the Netherlands. (¶¶ 311-357), as well as an analysis of the software in FCA's EU vehicles discovering programming that shuts off the emissions controls shortly after 20 minutes of engine operation. ¶ 409). None of Defendants' experts opine that there were no defeat devices. ¶ 362. The KBA testified before the European Parliament that FCA's vehicles used illegal defeat devices. ¶¶ 419-420.

As Palma's boss in 2011 (Pasini) acknowledged, FCA had been warned that the T_Engine feature in FCA's EU vehicles was a cycle detecting defeat device. ¶ 111.

### C.   Defendants Concealed Findings of Regulatory Investigations

Following the VW scandal in September 2015, the EPA, German regulators, and even Bosch informed FCA that they believed FCA's vehicles violated US and EU emissions regulations by containing undisclosed AECDs as well as defeat devices. ¶¶ 363-428.

### 1.   German Investigation

On November 19, 2015 FCA met with Germany's KBA ("Kraftfahrt Bundesamt", *i.e.* the German Federal Motor Transport Authority) concerning the KBA's investigation into FCA's vehicles sold in the EU and the results of KBA's NOx emissions tests which showed that FCA's vehicles emitted high levels of NOx and were non-compliant with EU regulations. ¶ 411. FCA and KBA communications continued through December 2015. ¶¶ 411-414. The KBA found that the vehicles had a defeat device that caused the exhaust treatment system to switch itself off after 20 minutes, the duration of the emissions test. ¶ 409. This shut down caused NOx to be released into the atmosphere at more than 10 times the permitted level. ¶¶ 409-413.

On December 10, 2015, Defendant Mazure emailed Defendant Dahl (head of compliance who reported directly to Marchionne) stating "***Sergio [Marchionne] is apparently getting daily updates on this diesel defeat investigation in Germany***." ¶ 414. Defendant Lee along with Aldo Marangoni (FCA's EMEA Region – Head of Powertrain Engineering) were also involved in and/or kept informed of the findings of and communications with the KBA, which continued into January and through March 2016.  ¶¶ 415-418.

Marchionne testified that by January 2016 he knew that the KBA had concluded FCA was violating EU emissions regulations, in part because of the existence of the T_Engine feature, even personally meeting with Angela Merkel, Chancellor of German:

> The real thorny issue was Europe because at that time the noise out of Europe was ***incessant***. Our people had interfaces with the regulators in Germany at the time. … ***The Germans really became to be a pain in the butt. It was really ugly stuff***. … [I]f I told you everything else that went on in Europe in terms of the interface with the KBA, ***we would be here for days***.  ***There were pretty ugly meetings going on between counsel and the KBA.    Ugly….We were being accused of cheating*** … I mean, ***it turned into an incredible nightmare***. And Bosch… disclosed the whole pile of stuff to the German authorities to gain their sort of … get a pass….. ***They were disclosing information, saying these guys are in violation. This is the issue of the T_eng stuff.***  ….***I had a meeting with Merkel*** ….*[T]he urgency of the European matter was such that I had to deal with [it].*

Ex. 86. at 150:2-165:23.

## 2.  Bosch Investigation

As Marchionne testified, in late 2015 Bosch confessed to the KBA that FCA used defeat devices, including the T_Engine.  ¶ 423-424.  Specifically, on December 3, 2015, President of Bosch Italy – emailed Alfredo Altavilla (COO of FCA Europe), Aldo Marangoni and Defendant Lee requesting a meeting concerning the emissions controls in FCA's vehicles ¶ 421.  On January 20, 2016, Lee, Altavilla and Marangoni met with Bosch in FCA's offices in Turin (Lee participated by video conference). ¶ 424.  At the meeting Bosch raised its concerns about whether several functions in certain of FCA's diesel vehicles "comply with emission laws and

regulation." *Id.* Bosch told FCA that it believed the Subject Vehicles in the US as well as other vehicles sold in the EU had functions that did not comply with emissions laws and regulations. *Id.* Specifically, Bosch identified the T_Engine feature and Online Dosing as violating US and EU emissions regulations.  *Id.*

Marchionne testified that he was aware in December 2015 that Bosch had done its own internal investigation and was aware of the results of the audits Bosch performed in January.  Ex. 86, at  93:22-94:2; 144:8-19.. He also testified that Defendant Lee or Altavilla updated him on the Bosch meeting. *Id.* at 95:10-17

### 3.  EPA Investigation

Shortly following the VW scandal, the EPA informed FCA that it had violated emissions regulations by not disclosing several AECDs (five of which are discussed in detail above); that the EPA's testing of FCA's vehicles showed higher NOx emissions in real-world and "off-cycle" driving conditions; and that the EPA believed at least one of the undisclosed AECDs was a defeat device.  ¶ 363, Ex. 52, at 213:23-214:2.  By October 2, 2015, FCA knew that the EPA was testing the Subject Vehicles.   ¶ 368.  The EPA contacted FCA and identified features on the Subject Vehicles that the EPA considered AECDs that were never disclosed by FCA, which violated US emissions regulations. ¶ 372. The EPA set a meeting for November 25, 2015 to discuss the undisclosed AECDs.  *Id.*

In advance of the meeting, Defendant Mazure met with Palma and Orteca (the three individuals with detailed knowledge about the various defeat devices discussed above) and discussed their plan to lie to the EPA. ¶ 373. As Mazure wrote to Morrie Lee (Regulatory Affairs): "ok, ***just did some <u>coaching</u> with Palma*** and Hennessey ***and RGO [Roger Orteca]. We can say that maybe the calibration is not as robust in certain conditions but nothing that there should have been an AECD disclosed***." *Id.* Mazure, Morrie Lee, Palma and Orteca met with the

EPA, and the EPA raised its concerns about the T_Engine and other undisclosed AECDs, and informed them "*at least one of the AECDs in    question  appears to me violate EPA's defeat device r egulation.*" ¶ 374. Defendant Lee was provided updates on the meetings and communications Palma, Mazure and Orteca were having with the EPA. ¶ 376.

On November 30, 2015, Defendant Dahl was informed that "Byron Bunker, EPA's Director of Compliance, … [is] *concerned that our strategy may constitute a defeat device  .*" **FCA-PIRNIK-001632116.** ¶ 377. That same day, the EPA requested additional information regarding the T_Engine, Online Dosing, and Valvetrain Cleaning routine but stated "this is a secondary issue to *the defeat device discussion*." ¶ 378. On December 1, 2015, Morrie Lee told Palma "Bunker [EPA] called Vaughn and said the EPA has data that suggests that *we have a defeat device* …" ¶¶379, 395 (Mazure emailing Dahl about "diesel 3.0L *meeting on defeat devices*"). On December 10, 2015, Defendant Mazure emailed Defendant Dahl about another EPA meeting, stating "*All efforts are to prove no defeat d evice but possibly a lack of disclosure of EGR feature.*" ¶ 383.

At the December 14, 2015 meeting, the EPA provided even more data collected from testing and summarized the EPA's five main concerns, identifying all 8 of the undisclosed AECDs. ¶ 386.  In a December 15, 2015 email to Defendant Mazure, Morrie Lee memorialized the escalation of tensions and that the EPA had made up its mind:

> "So we had a bit of a beat down at our first meeting. … And then yesterday they come at us with a whole new set of data. … [T]hey really shifted course and focus on these other *'greater' off-cycle emission excursions*. … My take yesterday was that *they w eren't very interes ted in hearing Palma's re  buttal* to their findings (from our first meeting). … *[W]e are being led by the nose*    … *We should be spanked for not disclosing all the  AECD's that have been mentioned*, but at this point, nothing more."

¶ 387.  Referring to the seriousness of the tone of those at the EPA, Morrie Lee stated "Ball's [EPA] non-verbal disdain is always present." *Id.*

The EPA's concerns were so serious that on January 7, 2016, the EPA demanded a meeting directly with Defendant Dahl because "***I am very concerned about the unacceptably slow pace of the efforts to understand the high NOx emissions we have observed*** … ***at least one of the AECDs in question appears to me violate EPA's defeat device regulation***." *Id.*

Dahl forwarded the EPA's email to Lee, who acknowledged their reliance on information furnished by Palma, the seriousness of the EPA conclusions, that he would inform Marchionne that night: "Ouch. I though Emanuele [Palma] had a dialogue which was on-going. Did we misunderstand EPA's position?...I need to review with Dahl and you before my meeting with SM [Sergio Marchionne] tonight." *Id.* Defendant Marchionne testified that he was kept informed of the status of the EPA investigation. Ex. 86, at 85:22-86:5; 86:23-87:4; 92:7-12; 122:20-123:4, 124:25-125:8.

On January 10, 2016, Defendant Lee texted Marchionne that FCA's general counsel's team was "fully engaged." ¶ 392. On January 11, 2016, Defendant Dahl responded to the EPA's January 7 email (which was drafted with the assistance of FCA's general counsel (Kyle Jones):

> ***FCA takes very seriously*** the concerns your office has raised regarding certain aspects of the emissions control system …***We truly appreciate the significance of your concern*** that NOx emissions during certain operating modes have been identified…***We clearly recognize th at, based on your current understanding, you have concerns that the design and strategies ra ise potentia l compliance issues***…[C]onclusions regarding possible noncompliance of FCA's engine design, especially as ***violating EPA's 'defeat device' regulations***, are conclusions of a legal nature with ***potentially significant regulatory and commercial consequences***.

¶ 393.

## II.  Defendants Concealed Widespread Vehicle Safety Violations

FCA's widespread vehicle safety violations cannot be disputed. On July 24, 2015, FCA entered into a Consent Order with NHTSA, admitting to dozens of separate violations spanning 22 recalls and affecting approximately 11 million vehicles. *See* ¶ 669.  NHTSA fined FCA $105

million and imposed numerous recalls, buybacks, and required FCA to revamp its compliance procedures and install an independent monitor. *Id.*  NHTSA found that FCA Chrysler provid[ed] conflicting and ***blatantly wrong*** information to the Agency (¶ 600), "has a pattern of failing to timely notify vehicle owners of recalls within a reasonable time" (*id*) ,***Fiat Chrysler was aware of both the hazards posed by the  defect and the difficulties that  owners were experiencing in getting the ir vehic les f ixed*** " (*id*), and "such a widespread pattern of missing deadlines is unacceptable." *See* ¶ 600.  As then NHTSA Administrator Rosekind stated, "Fiat Chrysler's pattern of poor performance ***put millions of its  customers, and the driving public,  at risk*** ." ¶ 669.  The details of all of FCA's vehicle safety violations are discussed in detail in the expert report of former NHTSA Administrator Robert Hellmuth, who drafted the relevant Safety Act regulations. Ex. 300.  Hellmuth concluded that FCA's over 100 violations were significant, widespread, and put vehicle owners at a serious risk of injury and death. (Ex. 300, at  ¶¶ 290-291, 303-304, 280, 226, 300, 238, 252, 293, 310, 316, 320, 181, 287).

FCA was well aware of the violations as they were occurring because the Company was systematically tracking them. FCA's Head of Recall Administration, David Bernier began tracking FCA's compliance with Safety Act deadlines in 2013 on an excel spreadsheet that he referred to as his "tracking sheet". ¶ 477.  This sheet shows that between mid-2011 and October 2014 (the start of the Class Period), FCA had missed the 60-day deadline for notifying owners of a recall as to ***36 recalls***. *Id.*  Bernier testified that he recognized in mid-late 2013 that FCA had a pattern of not timely complying with the Safety Act deadlines. *Id.*  These violations were of such significance to management that Bernier's performance "goals" were tied to FCA's ability to meet these deadlines.  *Id.*  Nevertheless, the tracking sheet shows that between June 2013 and December 31, 2014 (shortly after the start of the Class Period), FCA missed the 60-day deadline

alone 18 times. *Id.*  As Hellmuth observed, when the violations from various recalls are layered over a timeline it shows that FCA was in constant and continuous violation of the Safety Act. *See* Ex. 300, Ex. 4.

Bernier testified that he alerted his senior managers each time any type of Safety Act deadline was missed.  ¶ 478.   The tracking sheet was available on FCA's shared drive so "anybody within the vehicle safety office could pull this file up", which Bernier shared with others (*id*), and Kunselman testified that he reviewed the tracking sheet. *Id.* .  Williams (who reported to Kunselman) testified that he had standing weekly meetings with Kunselman, that they communicated daily regarding the status of the recall campaigns (*id.*), and that it was part of Williams' normal practice to be alerted to any Safety Act violation and, in turn, to alert Kunselman if Safety Act deadlines that were missed.  *Id.*

According to Bernier, FCA did not dedicate sufficient resources to Safety Act compliance.  ¶ 474*.*  Bernier testified that from 2013 through 2014, FCA did not provide him with sufficient staff to adequately handle the number of recalls FCA was conducting and it was compromising FCA's ability to comply with the safety regulations.  *Id.*   Bernier raised these concerns to his senior managers.  *Id.*   However, he never received adequate staffing.  *Id.*

NHTSA was unsatisfied with the information that FCA was providing NHTSA regarding its recalls and the progression of those recalls, which resulted in calls with NHTSA increasing to monthly around 2012 and then to weekly in 2013.  ¶ 676.   By the start of the Class Period, NHTSA began taking more formal actions against FCA.

- May 29, 2014 – NHTSA informed FCA that it had opened a formal Recall Query (14-001) into one of FCA's recalls because the remedy did not fix the problem.  ¶ 648.
- June 18, 2014 – NHTSA informed FCA that it had opened another formal Recall Query (14-002) into two recalls because FCA failed to fix the safety defect. ¶ 609. Messrs. Liddane and Chernoby and Marchionne were aware of RQ 14-002. *See* ¶¶ 609-611.

19

- July 2, 2014, NHTSA issued a Special Order to FCA concerning two recalls involving Jeeps with fuel tanks that would rupture and catch fire if the vehicles are struck from behind, even at low-speeds because FCA failed to timely provide a remedy. ¶ 512. Messrs. Williams and Kunselman were aware of the Special Order. *Id.*

- October 21, 2014, NHTSA informed FCA that it had opened an Audit Query (14-003) into two more recalls because of FCA's slow execution. ¶ 540.   Mr. Williams was aware of AQ 14-003. *Id.*

- October 29, 2014 – NHTSA's Administrator Friedman wrote a letter to Williams (who reported to Kunselman), to "emphasize the critical imperative" for FCA "to promptly and effectively remedy the serious safety risk posed to consumers by defective Takata air bags", which FCA had failed to do.  ¶ 586.

- November 19, 2014 – Administrator Friedman wrote a letter to Marchionne concerning the FCA's completion of the recall of the Jeeps with improperly placed fuel tanks (which were the subject of the Special Order), stating, that FCA's conduct was "unacceptable." ¶¶ 517-520.

- November 25, 2014 – Administrator Friedman again wrote to Marchionne stating he was extremely concerned about the slow pace of FCA's recall of the Takata airbags, stating, "*Chrysler's delay in notifying consumers and taking other actions necessary to address the safety defect identified is unacceptab   le and exacer  bates the r  isk to moto  rists' safety*." ¶ 592.

On the Company's the Company's July 30, 2015 earnings call with analysts, following the announcement of the Consent Order, Marchionne admitted that he had been aware of NHTSA's concerns over a year prior and that FCA "had then identified a number of necessary steps to improve." ¶ 686.  Indeed, two internal audits conducted by FCA and Deloitte in mid-2014 identified numerous deficiencies in FCA's recall process. ¶¶ 462-465  However, no substantive changes were made to the recall process and no additional resources were provided. Ex. 304, at 37:19-38:24; 203:3-204:14; Ex. 305, at 24:15-25:7; 27:16-28:2; 285:17-286:7; Ex. 306 at 32:24-33-2; 36:3-37:1-21. The structural change that created Kunselman's position was purely cosmetic. Ex. 306, at 32:23-37:21

## III.   **Defendants' False and Misleading Statements**

Throughout the Class Period, FCA asserted that it had had disclosed all AECDs in its COC applications (¶¶ 688-689), and stated in its SEC filings that it was "substantially in

compliance" with vehicle safety and emissions regulations and "[w]e constantly monitor such requirements and adjust our operations to remain in compliance" ¶¶ 690, 698, 706. And following the VW emissions scandal in September 2015, Defendants repeatedly asserted that (i) FCA had conducted a "thorough" audit looking for any type of defeat device, (ii) FCA's vehicles were in compliance with emissions regulations (iii), FCA vehicles did not contain any defeat devices, and (iv) FCA's vehicles operate the same on the road as during tests. ¶¶ 396, 692, 694.

## IV.    **Defendants' Fraud Caused FCA's Stock Price to Decline**

There were statistically significant residual stock price declines in response to a series of partial corrective events, which revealed that FCA was not in substantial compliance with emissions and vehicle safety regulations. Plaintiffs' expert, Dr. Zachary Nye, opined that these corrective events caused FCA's stock price decline. Ex. 307, at ¶¶ 34, 39, 44, 50, 56, 63.

- July 27, 2015 (disclosure of FCA's Consent Order with NHTSA, $105 million fine and imposing various recall and buy-back obligations) *id*. ¶¶ 24-34;
- October 28, 2015 (disclosure of an unexpected €761 million pre-tax charge related to future recall campaign costs in North America) *id*. ¶¶ 35-39;
- May 23, 2016 (disclosure of Germany's KBA report finding evidence of defeat devices on FCA's vehicles sold in EU) *id*. ¶¶ 40-44;
- January 12, 2017 (EPA and CARB issue NOVs to FCA concerning the 8 undisclosed AECDs and the existence of a defeat device) *id*. ¶¶ 45-50;
- February 6 and 7, 2017 (French authorities announced conclusion of investigation finding FCA violated EU regulations, and it was reported that Italy had permitted FCA to skip key tests for illegal defeat devices) *id*. ¶¶ 51-56;
- May 23, 2017 (DOJ filed a complaint on behalf of EPA accusing FCA of using defeat devices and not disclosing the 8 AECDs). *Id*. ¶¶ 57-63.

Defendants have not moved to exclude Dr. Nye's opinions.

## ARGUMENT

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to

demonstrate the absence of any material, factual issue genuinely in dispute. *American International Group, Inc. v. London American International* Corp., 664 F.2d 348, 351 (2d Cir.1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

## I.   A REASONABLE JURY WOULD HAVE NO DIFFICULTY CONCLUDING THAT DEFENDANTS' STATEMENTS ARE ACTIONABLE

"[W]hether a statement is misleading depends on the perspective of a reasonable investor: The inquiry . . . is objective." *Omnicare,* 135 S. Ct. at 1327 (internal quotation marks omitted). Courts "consider whether the disclosures and representations, taken together and in context, would . . . misle[a]d a reasonable investor about the nature of the securities." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) (internal quotation marks omitted).

### A.  The False and Misleading Statements in FCA's COC
###     Applications Are Actionable

This Court has already held that FCA's COC applications were statements made to investors upon which a securities violation can be based and that Defendant Mazure, who signed the submissions, was a "maker" of the statements. ECF No. 142 at 6.

FCA had a duty to disclose and justify in its COC applications all AECDs and defeat devices in the Subject Vehicles. ¶¶ 35-38. Dr. Atkinson opined that each of the eight features at issue were AECDs and defeat devices. *See, supra* at 7,9,11-12.  FCA has admitted that none of the eight features were disclosed in their COC applications, (Ex. 83), rendering the COC

applications false and misleading.[5] Independent of FCA's affirmative duty to disclose, Mazure testified that he signed the applications "attesting that we have compiled all the technical information required as part of the requirements for certification" (Ex. 68 at 71:19-21), which was clearly false.[6] Indeed, the mere fact that the applications disclosed innocuous AECDs (*see* e.g. ¶ 688), while omitting the eight defeat device AECDs alone demonstrates falsity as well as scienter. *In re Delcath Systems, Inc. Securities Litigation*, 36 F. Supp. 3d 320, 331-332 (S.D.N.Y. 2014) (falsity and scienter alleged where the defendants disclosed data that reflected positively on its product but failed to disclose data that might reflect poorly on its product).[7] [8]

### B. There Is Evidence That Defendants' "Substantially in Compliance" Statements Were False and Misleading

This Court has already held that "a reasonable investor could, and likely would" read FCA's "substantially in compliance" statement to mean that the company was substantially in

---

[5] Failure to disclose information where a regulation created an affirmative duty to disclose renders the omission false and misleading. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-96 (2d Cir. 2016) (Item 303 required disclosure); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 427 (S.D.N.Y. 2011) (Item 503 violation); *Christine Asia Co. v. Yun Ma*, 2017 U.S. App. LEXIS 24647, at *5 (2d Cir. Dec. 5, 2017) (failure to disclose one administrative proceeding is an actionable omission under Item 303)

[6] Mazure's testimony dispenses with Defendants only argument concerning FCA's COC applications (which is relegated to a single sentence in a footnote), that the applications state only that the regulations "apply" to the vehicles. Def. Br. at 31 n.15.

[7] *See In re Intercept Pharms., Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 26442, at *19 (S.D.N.Y. Mar. 4, 2015) (scienter where defendant "chose . . . only to report the positive development, engaging in the sort of selective disclosure that creates a real possibility of misleading investors"); *Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 713 (N.D. Tex. 2008) (disclosing some related party transactions while concealing others supports scienter).

[8] Defendants had a duty to update and correct the false statements in the COC applications filed prior to the Class Period because they were false when made. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 464 (S.D.N.Y. 2013) ("Defendants are correct that the Second Circuit has found pre-Class Period statements to be inactionable. However, Defendants still have a duty to correct "statements that are false at the time they were made, when [a Defendant] learn[s] that its prior statement . . . [i]s untrue.") (collecting cases).

compliance with "the Safety Act and vehicle safety regulations in the United States." ECF No. 50 at 12. Defendants' attempt to reargue this decision should be rejected.

### 1. FCA's Compliance with Vehicle Safety Regulations

There is a triable issue of fact for a jury as to whether Defendants' statements that FCA was "substantially in compliance" with the Safety Act and that "[w]e constantly monitor such requirements and adjust our operations to remain in compliance" were misleading.

As an initial matter, the distinction between "compliance" and "substantially in compliance" upon which Defendants' entire argument rests is one that this Court previously suggested is illusory. ECF No. 50 at 13 (noting that Defendants' compliance statements "equates 'substantially in compliance' and 'compliance' … dropping any qualifying language to the pledged degree of compliance."). The Court can deny Defendants' motion without wading into the fact-intensive analysis of the distinction between "compliance" and "substantial compliance."

Nevertheless, Defendants assert that no jury could find Defendants' "substantially in compliance" statements misleading if it limits its analysis to only "look[ing] at FCA's alleged noncompliance relative to FCA's compliance with those regulations [between 2013 and 2015]", which Defendants now claim is "an essential step in assessing whether the statement that FCA was 'substantially in compliance' was false or misleading. Def. Br. at 24.

This is gamesmanship of the worst kind. During discovery, Plaintiffs moved to compel the production of documents related to all of FCA's recalls between 2013 and 2015 because NHTSA determined that FCA's violations were "widespread", arguing that such documents were "critically relevant" to "whether Defendants' statements of 'substantial compliance' were materially misleading." ECF No. 73 at 2. Defendants opposed Plaintiffs' request as "disproportionate to the claims remaining in this action" (ECF No. 77), and the Court agreed. ECF No. 81. Defendants cannot now obtain summary judgment based on the same information

that was withheld in discovery. *See Landmark Land Company, Inc. v. Sprague*, 701 F.2d 1065, 1070 (2d Cir. 1983) ("The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment"); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) ("[S]ummary judgment should not be granted when he is denied reasonable access to potentially favorable information"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 820 F.Supp.2d 1055, 1061 (N.D. Cal. 2011) (denying summary judgment because motion based on information plaintiffs had been denied during discovery).

Indeed, the declaration of Thomas McCarthy, upon which Defendants' argument is based, must be excluded. McCarthy was never identified in Defendants' Rule 26(a)(1) Initial Disclosures. Ex. 308. Having concealed this witness, Defendants may not be granted summary judgment based on his self-serving affidavit that is uncorroborated by any documentation. *Cope v. Wal-Mart Stores E., LP*, 2017 U.S. Dist. LEXIS 99931, at *27 (D. Conn. June 28, 2017) (excluding affidavit because individual was not previously disclosed); *Sterling Fin. Servs. Co., v. Franklin*, 259 F. App'x. 367, 370 (2d Cir. 2008) (declaration in support of summary judgment "properly credited no weight" because it "was conclusory with no original documentary corroboration"); *Degelman Indus.. Ltd. v. Pro-Tech Welding & Fabrication, Inc*., 2011 U.S. Dist. LEXIS 150188, at *12 (W.D.N.Y. June 8, 2011) (striking affidavit submitted at summary judgment where witness never identified in the defendants' Rule 26(a)(1)(A) disclosures).

Quantitatively, even accepting the McCarthy Affidavit's assertion that FCA administered 296 recalls between 2013 and 2015, and that **only** the 23 recalls identified in the Consent Order violated the Safety Act (despite Plaintiffs being denied discovery to dispute), then 8% of FCA's recalls were noncompliant, which is higher than the 5% "rule of thumb" for determining

"material" noncompliance. *See infra* at 26-28.[9] Moreover, the €761 million charge to earnings for NAFTA recalls FCA took in Q3 2015 following the Consent Order was **64%** of FCA's Adjusted EBIT in NAFTA for the quarter (€1,186 million). ¶ 673.

Defendants' quantitative argument also ignores the qualitative weight of FCA's violations. Unlike the authorities upon which Defendants rely, which involve analyzing "substantial" in terms of completion of a project, Defendants' actions were <u>unlawful acts</u> that failed to properly address defects that, by definition, "create[d] an unreasonable risk of death or injury in an accident" (¶ 592) , including "axel lockup", "moving shutdowns" and fires from improperly placed fuel tanks. ¶¶ 481, 603 [10] A reasonable jury could easily find that FCA's (i) unlawful conduct that (ii) was previously identified by its regulator, (iii) that created risk of death and injury to its customers, (iv) that went to the core of its business (vehicle manufacturing and sales), and (v) caused its stock price to plummet when revealed (Ex. 307, at ¶ 35), rendered Defendants' compliance and monitoring statements false and misleading. *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("failure to disclose then-ongoing and serious pollution violations" could "render[] misleading the comforting statements…about compliance

---

[9] Moreover, there is evidence that during the 2013-2015 there were in fact 29 recalls that were not in compliance with the Safety Act (Exs. 296, 297) raising FCA's noncompliance to almost 9%. The actual percentage of non-compliance is even much likely even much higher since many of the recalls being administered were likely begun prior to 2013 and others did not begin until after the Consent Order in July 2015. For example, there is evidence that there were in fact 36 recalls not in compliance between 2011 and mid-2014, the start of the Class Period, (Exs. 293, 294) which would raise FCA's noncompliance to 12%.  the If the Court is not inclined to strike the McCarthy Affidavit and deny summary judgment, Plaintiffs request an opportunity to take discovery on the information presented in the McCarthy Declaration pursuant to Fed. R. Civ. P. 56(d). Ex. 308.

[10] Defendants misrepresent that "Plaintiffs do not assert a single instance where FCA waited too long to identify and declare a safety defect". Def. Br. at 26. Hellmuth found two instances in which FCA waited too long to identify and declare a safety defect (¶¶ 653, 666), which Defendants admit is a "substantive safety" violation that endangers owners. Def. Br. at 26.

measures" even where the statements "did not guarantee 100% compliance 100% of the time.");

*Omnicare,* 135 S. Ct. at 1329 ("if the issuer made the statement . . . with knowledge that the

Federal Government was taking the opposite view, the investor again has cause to complain.").[11]

[12]

    At bottom, the question of whether the nature and scope of FCA's violations rendered

Defendants' "substantially in compliance" statement misleading is a balancing assessment

similar to that of materiality, which is a quintessential issue for the jury to determine. *Fed. Hous.*

*Fin. Agency Nomura Holding Am., Inc* ., 104 F. Supp. 3d 441 , 563 (S.D.N.Y. 2015) (finding,

after a bench trial, that defendants' representations of "general compliance" were misleading

because they "indicated that certain ***immaterial*** exceptions might exist" (internal quotation

marks omitted)); *In re Petrobras Sec. Litig.* , 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015)

(defendant' assertion of regulatory compliance not immaterial where they failed to disclose a

---

[11] *See also In re Syncor Int'l Corp. Sec. Litig.*, 239 Fed. Appx. 318, 321 (9th Cir. 2007) (falsity and scienter adequately pled for the statement "We <u>believe</u> that we are in <u>substantial compliance</u> with all <u>material</u> laws and regulations applicable to our business" where management was aware of illegal payments to doctors); *In re BioScrip, Inc. Sec. Litig* ., 95 F. Supp. 3d 711, 728-730 (S.D.N.Y. 2015) (falsity adequately pled for the statement "the Company <u>believes</u> it is in <u>substantial compliance</u>" with regulations where management was aware of a single investigation by their regulator.); *Todd v. STAAR Surgical Co.*, 2016 U.S. Dist. LEXIS 186511, *43 (C.D. Cal. Apr. 12, 2016) (material falsity alleged for statements that the company "<u>believes</u> it is <u>substantially in compliance</u>" with FDA regulations where FDA inspector identified potential violations in a single Form 483).

[12] Defendants misleading assert that Hellmuth determined that certain of the violations were "recordkeeping" and, therefore, not significant. The term "recordkeeping" was a term introduced by Defendants' counsel at Hellmuth's deposition. (Ex. 309, at 29:7-8). Hellmuth explained in his Report and at his deposition that these violations put owners at serious risk. ¶ 600. ("in choosing not to mail the owner notifications and imperiled the lives of its customer-vehicle owners"). NHTSA came to the same conclusion. ¶ 685 ("Chrysler's delay in notifying consumers and taking other actions necessary to address the safety defect identified is unacceptable and exacerbates the risk to motorists' safety."). Defendants also misleading assert that Hellmuth testified he had "no basis to dispute" FCA's assertion of 98% compliance. Def. Br. at n.12. That Hellmuth was not asked to provide an opinion on that issue is not evidence in support of Defendants' motion.

bribe payment even if it did not reach the quantitative 5% "rule of thumb" because of qualitative factors, including (i) that act was "unlawful", (ii) it related to the "core of its business", and (iii) the company's share price dropped when news of the falsity emerged.).[13] [14]

## 2.  FCA's Compliance with Emissions Regulations

Plaintiffs have identified ample evidence that many of FCA's vehicles sold throughout the EU contained illegal defeat devices in violation of EU regulations. Defendants do not dispute that these violations rendered Defendants' "substantially in compliance" statements misleading.

Instead, Defendants argue that this Court dismissed Plaintiffs' EU-related allegations. As discussed in Plaintiffs' opposition to Defendants' motion to exclude the testimony of Dr. Friedrich, this is demonstrably false. Importantly, Defendants never distinguished between the US and EU allegations in either of their motions to dismiss, (ECF Nos. 92, 132), and neither did the Court in either Order. ECF Nos. 121, 142. After the Court granting Defendants' first motion to dismiss it granted Plaintiffs' leave to amend, without restriction. ECF No. 142 at 5. The FAC added numerous additional allegations concerning the EU emissions. ECF No. 129, ¶¶ 40, 242-43, 248, 345-46, 355, 356, 360, 363, 372-373, 424-26, 435.  The Court denied Defendants'

---

[13] *See also Reese v. Malone*, 747 F.3d 557, 577-78 (9th Cir. 2014) (statement that management "believes" the company is "in compliance in all material respects" with applicable environmental regulations was false where the company later admitted to violations and "millions of dollars in fines and penalties"); *Burges v. BancorpSouth, Inc.*, 2015 U.S. Dist. LEXIS 89822, at ** 10-15 (M.D. Tenn. July 10, 2015) (statement that company has "complied in all material respects" with regulations was false where the company was not in compliance with 4 banking regulations).

[14] The out-of-Circuit case relied upon by Defendants, *In re Plains All Am.  Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583 (S.D. Tex. 2018) is distinguishable. *First*, it involved a statement of opinion. *Id*. at 633-34. *Second*, only one of the ten notices of violations the company received was relevant to the action and resulted in a fine of only $102,900. *Id*. at 634. *Third*, it involved a motion to dismiss. This Court has already held that, if proven, the violations in the Consent Order establish falsity.The rest of the cases cited by Defendants (Def. Br. at 23 n.9) involve only a quantitative analysis and do not involve either (i) interpretation of whether "substantial compliance" was misleading in a securities action or (ii) because of a parties' illegal conduct.

subsequent motion to dismiss ***in its entirety*** (ECF No. 142 at 6) ("Defendants' motion to dismiss Plaintiffs' __**emissions-related claims**__ is DENIED"), and noted "[i]n light of this conclusion, the Court need not and does not resolve the parties' disputes over whether Plaintiffs' other additions to the FAC suffice to allege scienter." *Id*. at 5 n.1. Plaintiffs are unaware of any case where a court denied a motion to dismiss but "implicitly" dismissed allegations without ever addressing them. When this Court dismisses certain categories of claims in securities cases (including in this Action) it identifies them, following a similar form, stating "GRANTED in part and DENIED in part. Specifically,…".[15] Defendants never sought clarification of the Order and each time Defendants raised the issue tangentially, the Court refused to curtail Plaintiffs' claims. Having made a strategic choice to levy an "all or nothing" attack on Plaintiffs' emissions claims, Defendants cannot now ask the Court rewrite history because their gamble failed.

As for the US-related emissions allegations, Defendants' quantitative argument fails because the financial impact of FCA's violations is sufficient to demonstrate falsity. As a result of FCA's US emissions violations, FCA has agreed to pay approximately $650 million in fines and remedies. (MDL ECF Nos. 484-487), which is 34% of FCA NAFTA's Adjusted EBIT for Q3 2018. ¶ 710 .[16]

---

[15] *See* ECF No. 50 at 24 ("motion to dismiss is GRANTED in part and DENIED in part. Specifically,…"); *Tapia-Matos v. Caesarstone Sdot-Yam, Ltd.*, 2016 U.S. Dist. LEXIS 94734, at *18 (S.D.N.Y. July 20, 2016) (same); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp.3d 550, 563 (S.D.N.Y. 2014) (same);*Atlantica Holdings, Inc. v. BTA Bank J SC*, 2015 U.S. Dist. LEXIS 3209, at *28 (S.D.N.Y. Jan. 12, 2015) (same); *Fixed Income Shares: Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 858 (S.D.N.Y. 2015) (same).

[16] Announcing the Consent Decree, the government official stated "Fiat Chrysler's conduct was ***serious and egregious*** . Its ***deception*** robbed the public of the clean air we work hard to protect and put law-abiding competitors at a disadvantage." ¶ 710. And government officials noted that the Consent Decree does not resolve any potential criminal liability. *Id*.

Moreover, FCA's emissions violations were qualitatively significant because FCA's non-disclosure of AECDs and the use of defeat devices to cheat emissions tests were (i) intentionally unlawful conduct, (ii) being investigated by the EPA and CARB, and FCA's general counsel was "fully engaged", (iii) that jeopardized the core of FCA's business (FCA needed COCs to sell vehicles), and (iv) Defendants knew the disclosure of the violations would cause FCA's stock price to plummet (¶ 393; Ex. 52, at 154 ), which it did when the EPA and CARB NOVs were announced. Ex. 307, at ¶ 45. A jury could easily determine FCA's compliance statements were misleading. *Supra*, at 22-23.

### C.  The False and Misleading Statements Concerning Defeat Devices Are Actionable

In the wake of the VW emissions scandal in late 2015, as investors clamored to know whether FCA could face similar regulatory action, Defendants repeatedly assured investors that (i) all FCA vehicles had undergone a "thorough audit" for any defeat device, (ii) FCA vehicles do not use any defeat devices; (iii) all FCA vehicles operate the same on the road as they do in the laboratory; and (iv) all FCA vehicles comply with emissions regulations.

There is overwhelming evidence that these statements were false and misleading. In addition to the underlying documentary evidence, Plaintiffs' EU emissions expert (Dr. Friedrich) and US emissions expert (Dr. Atkinson) concluded that FCA's vehicles sold in the US and EU contained undisclosed AECDs as well as illegal defeat devices that were designed to cheat emissions tests. *See, supra* at 6-13. They also opine that these violations rendered Defendants' statements false and misleading. *Id.*  Moreover, by January 2016 Defendants were aware that regulators in the US and Europe (as well as Bosch) had made similar findings. *Omnicare*, 135 S. Ct. at 1329.

30

Defendants assert that their statements of compliance were not misleading because each was carefully crafted in such a way to be technically true by limiting their statements to the vehicles sold in Europe, and only to the specific defeat devices used by VW. Defendants cannot seek shelter in word games, subtle caveats or nuances that would not be appreciated by the average investor. When a defendant chooses to make a disclosure about a particular topic, "the representation must be complete and accurate." *JinkoSolar*, 761 F.3d at 250-51.

> The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. … Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation.

*Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted). *See  Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1006 (9thCir. 2002) (incomplete statements are misleading if they "affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists").

**September 22, 2015 Re uters Article**. On September 21, 2015, FCA told Reuters "FCA U.S. does not use defeat devices", ¶ 366, which Reuters quoted in a September 22 article. *Id.*

Defendants argue that what they ***meant*** was that FCA did not have any defeat devices exactly like those used by VW. Def. Br. at 28. But this is not what Defendants said. Moreover, there is no basis to think the average investor would understand the nuanced distinction that Defendants are now attempting to draw. The regulations provide a precise definition of "defeat device." There is no distinction in the regulations between illegal defeat devices that alter the emissions control when a test cycle is detected and other types of illegal defeat devices. Even if there were such a distinction the statement was still false because T_Engine and Online Dosing are "cycle detecting" defeat devices. *See, supra* at 6-12.

*January 27, 2016 Earnings Call*. Defendants argue that Marchionne's statement during the earnings call that (i)"FCA has undertaken a pretty thorough review and a thorough audit of its compliance teams", (ii) "there are no defeat mechanisms or devices present in our vehicles" and (iii) "the cars perform in the same way on the road as they do in the lab under the same operating conditions" was not false or misleading because it was prefaced with "on the European side". Def. Br. at 29. *First*, there is ample (and uncontroverted) evidence that FCA's vehicles in Europe did contain defeat devices. *Second*, a reasonable investor would not necessarily understand the statement as Marchionne purposefully carving out US compliance, especially given FCA's September 22, 2015 statement and that the VW scandal occurred in the US. Even Defendant Dahl testified that he could envision that the average listener might think Marchionne's statements included vehicles in the U.S. Ex. 164, at 155:4-10. *Third*, the presentation provided during the earnings call (and filed with the SEC) stated "all current production vehicle calibrations are compliant with applicable regulations and they operate in the same way on the road as they do in the laboratory under the same conditions" (Ex. 491, at 18), which Marchionne testified referred to "*NAFTA regulations, EPA, CARB*, European Commission regulations." Ex. 86, at 145:13-14.[17]

---

[17] While Marchionne prefaced his "no defeat mechanisms or devices" statement with "I think we feel comfortable making the statement", the presentation filed with the SEC contained no such qualification. Ex. 491. Defendants' assertion that all their statements of emissions compliance were opinions is wrong. The Supreme Court has explained that statements of legal compliance that are not prefaced with "I believe" are statements of fact. *Omnicare*, 135 S. Ct. at 1326. *See also Fed. Hous. Fin. Agency v. Nomur a Holding Am., Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015) (statements of compliance with underlying guidelines were statements of fact); *In re Gentiva Sec. L itig.*, 932 F. Supp. 2d 352, 369 (E.D.N.Y. 2013) (statements of compliance with Medicare regulations is a statement of fact) (collecting cases). The cases upon which Defendants rely are easily distinguishable. *In re Salomon Analyst Level 3*, 373 F. Supp. 2d 248, 251 (S.D.N.Y. 2005) (Lynch, J.) ("financial valuation models" that involve "predictions" are statements of opinion); *Anthem Sports, LLC v. Under the Weather, LL C*, 320 F. Supp. 3d 399,

***February 2, 2016 Press Release***  . Defendants similarly argue that the press release addressed exclusively FCA's European emissions compliance. Def. Br. at 30. This is wrong. While the press release highlighted Europe, stating "[i]n the past several months the issue of diesel emissions has been the subject of a great deal of attention, particularly in Europe …", it was not only addressing Europe. Indeed, the press release references the "audit", which covered the US as well as Europe. ¶ 694.  Tellingly, news outlets interpreted the press release as referring to all of FCA's vehicles, stating, "As the VW emissions scandal rolls on, the Fiat Chrysler Automobiles (FCA) group has stated that its cars do not use defeat devices." (Ex. 231).

***February 29, 2016 Annual Report***. On February 29, 2016, FCA filed its Annual Report. In a section discussing US regulations the report states that FCA's "audit of all current production software and emission calibrations…revealed that all current production vehicle calibrations are compliant with applicable regulations, and they appear to operate in the same way on the road as they do in the laboratory under the same operating conditions." ¶ 695. This was false for the reasons described above. *See, supra* at 6-17.

### D.  There Is Evidence That FCA's Statements Were Material

"A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider in important in deciding how to act." *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp.*  , PLC, 783 F. 3d 383, 389

---

415 (D. Conn. 2018) (defendant's assertion that a competitors product was a "patent infringing knockoff" was a nonactionable opinion under the Lanham Act); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co* ., 173 F.3d 725, 731 (9th Cir. 1999) (a defendant's assertion that another company was required under the law to obtain a license in order to conduct certain business was a statement of opinion). Even if Defendants' statements were opinions, they were false and misleading for the same reasons that they were made with scienter.

(2d Cir. 2015). "[T]he Supreme Court has noted that materiality is particularly well suited for jury determination." *Id*. (citing *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 450 (1976)).

Plaintiffs' expert, Dr. Nye, has explained that Defendants' statements were material. Ex. 307, at ¶¶ 12-63. Nevertheless, repeating their arguments concerning the falsity of "substantial compliance", Defendants argue that FCA's violations of law were immaterial as a matter of law because the costs created by the Consent Order and the number of US diesel vehicles implicated by the EPA's NOV "implicate less than 5% of [FCA's] revenue." Def. Br. at 33-35 (citation omitted). This argument should be rejected because other quantitative and ***qualitative*** factors show that Defendants' statements were material. *Supra*, at 5-20[18]

Finally, while Defendants assert that all of FCA vehicle safety noncompliance information was in the public domain, Dr. Nye explained that it was not. Ex. 307, at ¶¶ 17-39 . Also, while Defendants assert that NHTSA generally posts manufacturer communications such as 573 reports to its website that does render the violations of law public. Ex. 300, at 207:15-206:6. As Hellmuth testified, the website only identifies the existence and details of the recalls, *Id*. *See also* Ex. 310 at ¶¶ 80-81, not anytime a deadline is missed. In any event, this is a "truth-

---

[18] The cases upon which Defendants rely are distinguishable because they are involve accounting, not legal compliance. *In re New Oriental Educ. & Tech. Grp* ., 988 F. Supp. 2d 406, 422-23 (S.D.N.Y. 2013) (Koeltl, J.) (accounting fraud case analyzing materiality under SAB No. 99); *IBEW Local Union No. 58 Pension Tr. Fund &   Annuity Fund v. Royal Bank of Scot. Grp.* , 783 F.3d 383, 391 (2d Cir. 2015) (same); *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (same). Even in purely financial cases, the *New Oriental* court acknowledged that a statement can be material based on "qualitative" factors even if immaterial in "quantitative" terms. *New Oriental*, 988 F. Supp. 2d at 423, citing *Litwin v. Blackstone Group, L.P.,*  634 F.3d 706, 717-18 (2d Cir. 2011). Qualitative factors include (1) concealment of an unlawful conduct, (2) significance of the misstatement to the company's operations, and (3) "management's expectation that the misstatement will result in a significant market reaction" *JP Morgan Chase Co* ., 553 F.3d at 198, all of which are present here. Defendants' assertion that the lack of commentary or price increase when FCA asserted compliance demonstrates immateriality (Def. Br. at 34), has already been rejected by this Court because Plaintiffs allege a "price maintenance" fraud. ECF No. 223 at 7-9.

on-the-market" defense for the jury to decide. *Ganino v. Citizens Utils. Co.* , 228 F.3d 154, 167 (2d Cir. 2000).[19]

## II.    A Reasonable Jury Would Easily Conclude That Defendants Acted with Scienter

Scienter is a mental state embracing an intent to deceive, manipulate or defraud. *Aaron v. SEC*, 446 U.S. 680, 686 n. 5 (1980). Direct evidence is not necessary. Rather, scienter can be proven through circumstantial evidence of conscious misbehavior or recklessness. *SEC v. Premier Lin ks, Inc.* , 2017 U.S. Dist. LEXIS 151170, at *15 (E.D.N.Y. Sep. 14, 2017). *See Herman & MacLean v. Huddleston* , 459 U.S. 375, 390 n. 30 (1983) ("[T]he proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence.").

> "[The Second Circuit] has consistently held where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are  squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable."

*Patrick v. Le Fevre* , 745 F.2d 153, 159 (2d Cir. 1984) (citations omitted). Thus, summary judgment should be denied where there exists evidence from which a jury could infer scienter. *In re Vivendi Universal, S.A. Sec. Litig.* , 765 F. Supp.2d 512, 547 (S.D.N.Y. 2011) ("The same evidence of the stark contrast between Vivendi's internal documents and its external statements could equally have supported an inference that Vivendi … acted with scienter at the time it made the public statements"). Scienter may be proven even through the nature of the falsity. *E.g., Lewin v. Lipper Convertibles, L.P.*, 2004 U.S. Dist. LEXIS 8484, at *5 (S.D.N.Y. May 12, 2004) ("[T]he accounting violations alleged are on such a repeated and pervasive scale that, if proven, they could provide strong circumstantial evidence of scienter."). Courts must be "'lenient in

---

[19] FCA's boilerplate risk disclosures also do not make their false statements of compliance immaterial as a matter of law. *See Loritz v. Exide Techs.*, 2014 U.S. Dist. LEXIS 111491, at *20 (C.D. Cal. Aug. 7, 2014) (denying motion to dismiss alleging non-compliance with environmental regulations despite disclosure that it "could not 'be certain that it has been, or will at all times be, in complete compliance with all environmental requirements'" because "it is an issue of fact whether a reasonable investor would consider this boilerplate disclosure sufficient").

allowing scienter issues to withstand summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact. '"*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 , 693 (2d Cir. 2009).

### A.  Motive Concerning the Emissions-Related Statements

Defendants had a clear motive for concealing the various AECDs and defeat devices. FCA marketed the Subject Vehicles as "EcoDiesels" that were emission compliant without sacrificing power and fuel economy. ¶ 113.   Specifically, the mandate was that the vehicles obtain 30 mpg. *See, supra* at 6-9. The T_Engine feature (and others) were the **only** way that FCA's vehicles could achieve this goal. *Id.* . Online Dosing reduced cost and inconvenience to vehicle owners. *See, supra* at 10-12. Defendants also acknowledged at the time of the EPA, KBA and Bosch investigations that disclosure of FCA's defeat devices following the VW scandal would be disastrous for FCA's stock price. Ex. 86, at 55:7-61:9.   This supports and inference of scienter. *See Wedbush Morgan Securities, Inc. v. Robert W. Baird & Co* ., 320 F. Supp. 2d 123, 130 (S.D.N.Y. 2004) ("scienter can be proved through circumstantial evidence establishing facts 'showing a motive for committing fraud and a clear opportunity for doing so.'"); *Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment.").

### B.  Scienter of FCA for Emissions-Related Statements

Defendants ignore the overwhelming evidence of the scienter of the individuals that FCA designated and relied on to identify and disclose AECDs and defeat devices – Orteca, Palma and Mazure (as well as Defendant Lee), which a jury can impute to FCA for each false statement.

It is well-settled that the scienter of a company's agent is imputed to the company, *Teamsters Local 445 Freight Div. P ension Fund v. Dynex Capital Inc.* , 531 F.3d 190, 195 (2d Cir. 2008), and the person whose state of mind is imputed to the corporate defendant need not

also be the person who made the material misstatements at issue. *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372-73 (S.D.N.Y. 2012) (collecting cases); *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 U.S. Dist. LEXIS 42978, at *55 n.37 (S.D.N.Y. Apr. 21, 2016) (collecting cases). Courts have generally found that "'management level' employees can serve as proxies for the corporation." *In re Marsh & McLennan Companies, Inc. Securities Litigation*, 501 F.Supp 2d 452, 482 (2006). In this analysis, courts consider (i) the individual's seniority and (ii) the connection between the individual's role and the fraudulent statements. *See Patel*, 2016 U.S. Dist. LEXIS 42978, at *55 (scienter of individual who was "situated one management level down from the CEO and CFO" could be attributed to the company based on his seniority). The knowledge of more junior employees is attributable to the company if they had direct involvement in the aspect of the business at issue or if they were responsible for furnishing information that led to the misstatements. *See, e.g., In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 408-09 (S.D.N.Y. 2016) (imputing knowledge of employees "at the center" of the illegal scheme, although finding that their scienter had not been demonstrated).

Even under a narrower view adopted by other courts, scienter can be established through:

[a]ny individual agent who authorized, commanded, **furnished information for**, **prepared** (including suggesting or contributing language for inclusion therein **or omission therefrom**), **reviewed**, or approved the statement in which the misrepresentation was made before its utterance or issuance.

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476-477 (6th Cir. 2014), quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).[20]

---

[20] The above is consistent with the fundamental concepts of agency. Restatement (Second) of Agency § 268 cmt. d (where an "agent consciously and purposely fails to reveal [] information [to the principal], the principal may be liable because, under the circumstances, the conduct of the agent has the same effect as if the agent had personally acted and were himself guilty of the fraudulent or other tortious conduct"). "[T]he principal is liable … because the agent had scienter and intended the principal to make the misrepresentation." *Knurr v. Orbital ATK, Inc.*, 294 F.

Here, Orteca and Palma were responsible for identifying and disclosing AECDs and defeat devices. *See, supra* 5-13. Whenever anyone wanted information concerning AECDs or defeat devices Orteca and Palma were the persons consulted. *Id.* . Orteca provided the disclosures in the COC applications to Mazure, who submitted them to the EPA and CARB (*Id.*), and all Palma and Orteca involved in furnishing information for the "audit" and to FCA's officers concerning the EPA investigation in late 2015. ¶ 364. There are numerous emails demonstrating that Orteca, Palma and Mazure knew that T_Engine, Online Dosing, Reduced EGR at Highway Speeds, and the Valvetrain Cleaning Routine were AECDs and/or defeat devices and intended to conceal them. ¶¶ 96-191. Their seniority and direct involvement is sufficient to impute their scienter to FCA. *See Naye v. Boyd*, 1986 U.S. Dist. LEXIS 18910, at ** 2-4, 13-17 (W.D. Wash. Oct. 20, 1986) (denying summary judgment for the company where a there was evidence of scienter for a vice president of a division who was "the principal source of information" on the relevant issue, even though he did not write the challenged statements); *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876 (W.D. Tex. 2014) (scienter established where an office manager knowingly provided false information to superiors that was ultimately included in various statements); *Speakes v. Taro Pharm. Indus* ., 2018 U.S. Dist. LEXIS 163281 (S.D.N.Y. Sep. 24, 2018) (holding that corporate scienter adequately alleged for VP of Sales and Marketing who did not make the statements but was in charge of the area involving the alleged fraud); *Knurr*, 294 F. Supp. 3d 498 (corporate scienter pled where "lower-level employees" in a division acted with scienter when furnishing false information to corporate officers that was included in public statements).

---

Supp. 3d 498 (E.D. Va. 2018); *see Lewy v. Skypeople Fruit Juice* , Inc., 2012 U.S. Dist. LEXIS 128416, at *48 (S.D.N.Y. Sep. 7, 2012) ("The *respondeat superior* theory of liability remains viable in securities fraud cases despite the statutory enactment of … Section 20(a)").

Importantly, when deposed by written question (upon agreement by the Parties), 

Imputing the scienter of Orteca, Palma and Mazure to FCA furthers the "ultimate purpose of the 1934 Act" because "corporations that willfully permit or encourage the shielding of bad news from management will potentially be liable." *Omnicare*, 769 F.3d at 477; *id*. at 475. FCA structured its disclosure process to silo incriminating information from management interacting with regulators and the public. Despite Orteca's Certification Group's clear regulatory purpose of identifying and disclosing AECDs and defeat devices (Ex. 68, at 44:9-45:4) it was part of Powertrain (under Defendant Lee), not Regulatory Affairs, (¶ 258). Orteca provided the disclosure information to Regulatory (Ex. 68 . at 26:5-27:2; 44:15-19), and it was Regulatory that interacted with the EPA and CARB. *Id*. Mazure testified that he relied on Orteca and never reviewed the applications. Ex. 68 at 58:14-21; 60:2-4; 70:25-72:10. Mark Shost (who reported to Defendant Lee) admitted this was done to give Regulatory Affairs plausible deniability:



> The benefit of not being in regulatory is the cert group works with the calibration and controls team when discussing what is acceptable especially if nuanced, as acceptable. … These discussions probably can't occur with regulatory since regulatory should never be placed in a compromised position as they have to represent the company to the agencies

Ex. 161.[23]

### C.  Scienter as to FCA's COC Applications

As discussed above, Orteca, Palma and Mazure were responsible for identifying and disclosing AECDs and defeat devices in the COC applications. They knew that AECDs and defeat devices were being concealed from the COC applications. There scienter can be imputed to FCA and a jury could infer that Mazure (who signed the applications) as well as FCA acted with scienter. *See In re Vivendi.* , 765 F. Supp.2d at 547 (denying summary judgment because contrast between internal documents and external statements permitted an inference of scienter).

### D.  Scienter as to "Substantially in Compliance" Statements

A jury could easily infer scienter for Defendants' "substantially in compliance" and that "[w]e … adjust our operations to remain in compliance" emissions statements. *First*, FCA's scienter can be inferred from Orteca, Palma and Mazure who were the source of all AECD and defeat device information. *Second*, FCA's scienter can be inferred from the seniority and involvement of Lee, Dahl and Kunselman (each reported to Marchionne). Lee assembled the "Task Force" to obtain 30 mpg, and was aware that the T_Engine feature and the EGR Shutoff at Highway Speeds were AECDs and defeat devices.  *See, supra* 5-10. Lee, Kunselman, and Dahl were also aware that CARB determined that an AECD on the MY14 Subject Vehicles was a

---

[23] The adverse interest exception does not apply because (i) Orteca, Mazure and Palma were acting within the scope of their authority, and (ii) courts have rejected the application of the adverse interest exception in the securities context, when innocent third parties are involved. *See, e.g., In re ChinaCast Educ. Corp. Sec. Litig* ., 809 F.3d 471, 472 (9th Cir. 2015)  ("having a clean hands plaintiff eliminates the adverse interest exception in fraud on the market suits.").

defeat device. ¶ 188. They and Marchionne also knew that the EPA and KBA had taken "the opposite view" on FCA's compliance. *Id. Omnicare*, 135 S. Ct. 1318, 1329.[24] *Patel*, 2016 U.S. Dist. LEXIS 42978, at *55 (corporate scienter for individual "one management level down from the CEO").

Defendants argue that the communications from the EPA in late 2015 cannot establish scienter because "FCA had no duty to disclose the non-final views the EPA…." Def. Br. at 41. The cases upon which Defendants rely are inapplicable as they concern whether Items 102, 303 and 503 create an <u>affirmative</u> duty to disclose preliminary discussion with regulators.[25] Where, as here, defendants affirmatively asserts regulatory compliance, failure to disclose even preliminary finding by a regulator is sufficient to infer scienter, as this Court has already held. ECF No. 50.[26] It "represents a risk that [EPA] may take corrective action against a company, and thus a company is obligated to assess the seriousness of the risk and disclose such information to

---

[24] Although *Omnicare* addressed whether statements of opinion are misleading, as this Court recognized "where plaintiffs allege a false statement of opinion, the falsity and scienter requirements are essentially identical" ECF No. 50 at 19 (citation omitted).

[25] *In re Barclays Bank*, 2018 WL 6040846, at *7 (2d Cir. Nov. 19, 2018) (Items 303 and 503 do not create duty to disclose "expressions of concern" by regulators); *Richman v. Goldman Sachs Grp*., Inc., 868 F. Supp. 2d 261, 276 (S.D.N.Y. 2012) ("Plaintiffs failed to show that Defendants had an obvious duty to disclose their receipt of Wells Notices. Regulation S-K, Item 103"); *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 528-29 (S.D.N.Y. 2018) (failure to disclose "baseless" "speculation" "guesstimates" insufficient to demonstrate scienter).

[26] *See also STAAR Surgical*, 2016 U.S. Dist. LEXIS 186511, at*43 (scienter alleged for statements that the company "<u>believes</u> it is <u>substantially in compliance</u>" where FDA inspector reported potential regulatory violations during routine inspection prior to issuing a Form 483); *Wilkof v. Caraco Pharm. Labs, Ltd*., 2010 U.S. Dist. LEXIS 112768, at *18-19 (E.D. Mich. Oct. 21, 2010) (scienter alleged where a company represented it was "<u>substantially cGMP compliant</u>" despite receiving Form 483s noting manufacturing problems); *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 U.S. Dist. LEXIS 118061, *13-14 (N.D. Ohio Aug. 18, 2014) (scienter alleged for statements of "<u>substantial compliance</u>" with FDA regulations where an FDA inspector sent CEO a letter identifying possible violations).

potential investors if it also represents it is in compliance with [EPA] regulations." *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 982 (8th Cir. 2012).

A jury could also easily infer scienter for statements that FCA was in compliance with the Safety Act and that "[w]e constantly monitor such requirements and adjust our operations to remain in compliance."  FCA's Head of Recall Administration, David Bernier tracked all of FCA's violations. *See, supra*  at 18-20. It was his standard practice to report violations to management, and it was Williams' practice to discuss any violations with Kunselman. *Id* . Kunselman reviewed Bernier's "tracking sheet" of violations. *Id.* Two internal audits (presented to Marchionne) identified numerous deficiencies in FCA's recall process. *Id.* However, no substantive changes were made to the recall process. *Id.* Bernier, Williams and Kunselman were also aware of NHTSA's various formal investigations (Audit Queries, Recall Queries and Special Orders). *See, supra* at 19-20. NHTSA's Administrator Friedman twice directly informed Marchionne and Kunselman of NHTSA's view that FCA was not complying with its obligations under the Safety Act. ¶¶  517-519. A jury could easily infer scienter for FCA, Kunselman and Marchionne.

Defendants argue that no jury could find scienter because the Jeep fuel tank and Takata air bag recalls were "voluntary". Def. Br. at 37-38. Defendants omit the fact that FCA expressly agreed to comply with the Safety Act in conducting the Jeep fuel tank recall campaign.  ¶ 499. Hellmuth concluded that this created a regulatory obligation that FCA violated. ¶ 528. Even Defendants' expert agreed that this could be a violation. Ex. 3, at 149:14-19. Indeed, FCA asked NHTSA for extensions of the deadlines (¶501), demonstrating their understanding of a regulatory obligation. Moreover, FCA admitted their regulatory obligations (and violations) in the Consent Order, which included both of these recalls. Ex. 314.  Friedman's letters specifically

reference FCA's obligations under the Safety Act. ¶¶ 517, 584 ("Chrysler is obligated under the Safety Act to expand its recall") and Marchionne, Kunselman and Williams knew that NHTSA (at its highest level) was "taking the opposite view", *Omnicare*, 135 S. Ct. 1318, 1329. [27]

Defendants also submit affidavits from various members of FCA's disclosure committee concerning their purported understanding of the "substantially in compliance" statement. Def. Br. at 22-28, 35-42. Tellingly absent is an affidavit from Marjorie Loeb (General Counsel), who was the <u>only</u> member of the disclosure committee who "consulted with the vehicle safety office as necessary to verify the accuracy of the substantially compliant statement." Ex. 324 at Tr. 85:12-19. *See also Id* . 89:5-25; 91:9-17; 96:23-97:13; 99:11-22. Since there is ample evidence that those who would be responsible for providing Loeb information on Safety Act and Clean Air Act violation were aware of significant violations a jury could easily infer scienter as to FCA.

### E. Scienter As to the Defeat Device Misstatements

#### 1. September 22, 2015 Reuters Article

Prior to issuing the unequivocal statement that "FCA US does not use 'defeat devices'" Eric Mayne (FCA's manager of media relations) was provided information from Defendants Lee, Kunselman and Mazure, with Lee and Mazure specifically stating that FCA's vehicles did

---

[27] Defendants argue that the NHTSA letters to Marchionne and Kunselman are not evidence of scienter because the letters were "nonpublic." Def. Br. at 37. This is a thinly-veiled "truth-on-the-market" argument for the jury. *Ganino*, 228 F.3d at 167. The public availability of a couple obscure news articles does not go to Defendants' state of mind, especially since Defendants did not make the disclosure. *In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig.*, 298 F. Supp. 2d 544, 559 (E.D. Tex. 2004) ("The fact that the documents were publicly available … does not mean that Defendants did not act with scienter when they made knowing misrepresentations to investors."); *Chao Sun v. Daqing Han* , 2015 U.S. Dist. LEXIS 170005, at *52 (D.N.J. Dec. 21, 2015) ("nor is the Court aware of any cases[] holding that 'red flags' that are disclosed to the public cannot, as a matter of law, result in an inference of scienter.").The single case upon which Defendants rely, *In re Sanofi* , 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015), does not discuss the public versus non-public distinction.

not use defeat devices. ¶¶ 365-266[28] Lee was aware of at least two of the defeat devices (T_Engine and EGR Shutoff at Highway Speeds). ¶ 79.  They were all aware that CARB determined that the Valvetrain Cleaning Routine on the MY14 Subject Vehicles was a defeat device. *See, supra* at 9-10.  Mazure testified that he relied on Orteca concerning the existence of defeat devices.  *Id.* Moreover, Marchionne chastised the Senior Vice President for Communications for the statement, stating "Are you out of your goddam mind?", "You should be fired for such stupidity" and "[I]ssue nothing else without my approval." ¶ 366. This also supports and inference of scienter. *Omnicare*, 769 F.3d at 476 (corporate scienter can be established through the state of mind of "Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation **after** its utterance or issuance . . . .") (citation omitted).[29]

### 2.   January 27, 2016 Earnings Call; February 2, 2016 Press Release; February 29, 2016 Annual Report

In addition to AECD and defeat device violations already known by Orteca, Palma, Mazure, Lee, Dahl and Kunselman prior to the EPA and German investigations, by January 2016, they and Marchionne knew that the EPA, German regulators (and Bosch) had concluded that FCA's vehicles violated US and EU emissions regulations by containing undisclosed AECDs and defeat devices.  *See, supra* at 13-17.  Marchionne testified that he knew investors had an interest in any defeat devices and if FCA "suggest[ed] that there may have been a defeat device" he "would expect it to have a negative implication on share price." ¶ 390.  Marchionne,

---

[28] Lee, Kunselman and Mazure are "makers" of the statement because it was "initially made by [them] or at least with [their] advice and consent." *STAAR Surgical*, 2016 U.S. Dist. LEXIS 186511 at *36-37. *See Carpenters Pension Trust Fund of St. Louis v. B arclays PLC*, 56 F. Supp. 3d 549, 558 (S.D.N.Y. 2014) (there can be more than one "maker" of a statement).

Dahl and Lee knew that FCA's general counsel was "fully engaged" with the EPA investigation (¶ 392), and Marchionne was receiving updates from Lee. ¶ 390.  Indeed, one of the defeat devices identified by EPA, Germany, and Bosch was the T_Engine (¶ 424), the same "cycle detecting" defeat device that was presented to Lee during the development of the Subject Vehicles. ¶¶ 119-120.

During the January 27, 2016 earnings call, Marchionne asserted that FCA conducted "a thorough audit of its compliance teams", "there are no defeat mechanisms or devices" and "the cars perform in the same way on the road as they do in the lab under the same operating conditions." ¶ 692. The slides provided with the call, which Lee drafted (Ex. 86, at 173:25-174:4), also said the audit revealed full compliance and no defeat devices.  The February 2, 2016 press release and February 29, 2016 Annual Report made similar compliance representations. (¶¶ 694, 695).  A jury could infer scienter based on the same evidence discussed above (from Lee, Kunselman, Mazure, Palma and Orteca).  Moreover, all these individuals and Marchionne knew that FCA's regulators had taken "the opposite view", *Omnicare*, 135 S. Ct. at 1329.

Defendants argue that there can be no scienter because Defendants disclosed that the basis of their statements was the "audit." Def. Br. at 44. *First*, Defendants cannot hide behind the asserted findings of a "thorough audit of its *compliance teams*" when the compliance teams and those furnishing information for the audit (R. Lee, Orteca, and Palma) have actual knowledge of defeat devices and undisclosed AECDs. In particular, Orteca, Mazure and Palma were involved in the discussions with the EPA in late 2015, furnishing information to Lee and Dahl.  ¶¶ 374-389 . They also furnished information to Lee for the "audit." ¶ 363.  *Second*, Defendants knew that a reasonable investor would still interpret these statements as meaning the EPA and Germany had not taken the "opposite view." *Third*, Defendants misrepresented that FCA did a

46

"thorough audit" of FCA's "compliance teams" and "emission calibrations" that was sufficient for findings as to (i) any defeat device; (ii) operation on-road compared to laboratory; and (iii) regulatory compliance. However, Marchionne and Lee both knew that the "audit" only looked for "a narrow range of misbehavior", defeat devices "that were VW like" nothing more. Ex. 52, at 193:10-16; Ex. 86, at 67:16-68:11; 141:21-142:12. A broader audit was not done until a year later. Ex. 52, at 194:3-15. A jury would easily conclude that Defendants knew their broad assertions of compliance would mislead a reasonable investor. *Omnicare*, 135 S. Ct. at 1329 (liability if defendant "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself"). Indeed, Lee had previously advised against asserting that vehicles operate the same on the road as in the lab because it could mislead investors. ¶ 365.  He was right.

Defendants claim that scienter is refuted by citing to a single email from May 2012 in which (¶¶ 274-275) Shaw (who reported to Orteca) claimed that he presented an alternative AECD definition to the EPA and that they seemed "happy" with it.  ¶ 277. This email does not alter the significance of the numerous emails from *before* and *after* the date of the meeting showing that FCA wanted to conceal these defeat devices from EPA and CARB. *See* ¶¶ 262-282. Moreover, there is zero evidence that the EPA or CARB ever agreed to this definition. Rather, there is ample evidence from after May 2012 that shows that FCA employees understood that the EPA continued to require FCA to disclose all AECDs under the regulations, including a presentation from the EPA.  ¶ 279.  Indeed, in 2015, Morrie Lee represented to the EPA officer that was in the May 2012 meeting that FCA had always been following the regulatory definition of AECD and the EPA confirmed that definition still applied. Following the communication,

Mazure chastised Lee for asking the EPA "what to put on the AECD list" bemoaning the fact that "[y]ou ask and [the EPA] will say *all*." ¶¶ 366-371; *see also*; Ex. 385 ("The regulation technically states we are required to identify **ALL** AECDs. … **Internally**, we have decided to only report those AECDs…").  Finally, the defeat devices were required to be disclosed even under the "alternative" AECD definition. Atkinson Rebuttal, ¶¶ 99-124.

**III.**   **There Is a Triable Issue Over Loss Causation For All Corrective Events**

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 172 (2d Cir. 2005) (citations omitted).  Loss causation may be established by (1) a corrective disclosure or (2) a materialization of a concealed risk.  *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).  Loss causation is a fact-based inquiry" *Lentell*, 396 F.3d at 174, that "is a matter of proof at trial". *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009) (discussing the myriad of factors that go into a causation analysis).

Plaintiffs' expert, Dr. Nye, conducted an event study, analyzing each alleged corrective event, removing non-fraud factors from FCA's stock movements, analyzing news and analyst reports, and concluded that the "the Company-specific return on each of the [] dates was proximately caused by the release of information that corrected prior alleged misstatements and omissions."  Ex. 307 at ¶ 17.  In so doing, Dr. Nye found that all seven of Plaintiffs' alleged corrective events on July 27, 2015, October 28, 2015, May 23, 2016, January 12, 2017, February 6 and 7, 2017 and May 23, 2017 caused a statistically significant negative impact on FCA's stock price at confidence levels of 92.12%, 99.75%, 99.27%, 100.0%, 98.60% and 97.0%. *Id.* at ¶¶ 27, 35, 43, 45, 51, 58. Defendants have not moved to exclude Dr. Nye's testimony.

Defendants argue that the Court should rule as a matter of law that the July 24, 2015 Consent Order did not cause any price decline because the statistical significance of the decline in the U.S. was 92.12% rather than 95%. As Dr. Nye explains, a 90% statistical significance is commonly used in the academic literature to show causation. *Id.* ¶¶ 29-33. *See also* Ex. 313, at ¶¶ 32-37. Causation is further confirmed by the statistically significant decline at the 99.34% confidence level in European trading (Ex. 307 at ¶¶ 25, 28, 34; Ex. 313, at ¶ 34)[30], and that analyst reports and news outlets attributed the decline to the Consent Order. Ex. 307, at ¶ 27.[31] Defendants' expert, Dr. Gompers, admitted that confidence levels move along a continuum and that nothing magical happens at the 95% level. Ex. 386, at 80:16-81:15. Thus, there is no reason to conclude that the 95% level proves loss causation and 92.12% precludes it, especially given the additional evidence supporting causation. *See Ma trixx Initia tives, Inc. v. Sira cusano*, 563 U.S. 27, 28, 40 (2011) ("the premise that statistical significance is the only reliable indication of causation … is flawed," and "such a categorical rule would 'artificially exclud[e]' information that would otherwise be considered significant to the trading decision of a reasonable investor.") (citation omitted).[32]

---

[30] The slightly lower statistical significance in the US can be explained by the European market closing prior to ameliorating misrepresentations made by FCA. Ex. 307, at ¶ 28.

[31] Defendants assert that the Consent Order contained no new information, and Dr. Nye did not remove the price decline stemming from "changes in investors' expectations of future regulatory costs" as opposed to the revelation of the fraud. Def. Br. at 49-50. Dr. Nye identifies the new information investors learned from the Consent Order. Ex. 307, at ¶¶ 24-27, Nye Rebuttal Report ¶¶ 44-54. Defendants' distinction is illusory because FCA's increase in regulatory costs was a result of its non-compliance and is inextricably intertwined with the alleged fraud. Nye Rebuttal Report ¶¶ 7-13. *See Waggoner v. Barclays PLC* , 875 F.3d 79, 106 (2d Cir. 2017) ("the regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered").

[32] *See also Glickenhaus & Co. v. Household Int'l*, 787 F.3d 408, 418 (7th Cir. 2015), *reh'g denied (*July 1, 2015) (finding that a "leakage" model that ascribed all residual price declines to the fraud regardless of any statistical significance sufficient "[i]f the plaintiffs' expert testifies that no firm-specific, nonfraud related information contributed to the decline in stock price").

Defendants also argue that the EU-related corrective events are not evidence of loss causation because (i) Plaintiffs' EU-related claims were dismissed from the Action, and (ii) they do not coincide with a decline at a 95% confidence level under Defendants' expert's model. **First**, the Court never dismissed Plaintiffs' EU allegations. Even if it had, the stock drops related to EU disclosures still signaled to investors the likelihood of compliance violations in the US (especially since both used T_Engine), as market commentators expressly observed. Ex. 307, ¶¶ 53-54. **Second**, even Dr. Gompers' analysis (which Dr. Nye refutes (Ex. 313, at ¶¶ 21-31)) shows a decline at a 93% confidence level on February 7 and a two day decline at the 95.43% confidence level. Ex. 313, at ¶¶ 23, 87.[33] Defendants' criticism is a dispute between experts for the jury to decide.[34]

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Dated:   January 18, 2019

Respectfully submitted,

**POMERANTZ LLP**

_/s/ Jeremy A. Lieberman_

---

[33] Defendants incorrectly assert (without any citation) that Dr. Gompers analysis shows a decline below a 95% confidence level on May 23, 2016. It does not.

[34] The case upon which Defendants rely is inapposite. *In re Moody's Corp. Sec. Litig.*, is a pre-*Halliburton I* and *Halliburton II* class certification opinion that improperly held that Defendants rebutted the presumption of reliance because a negative return was at a 90% confidence level. 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011). The *Moody's* analysis is no longer good law.

Jeremy A. Lieberman
Michael J. Wernke
Veronica V. Montenegro
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
          mjwernke@pomlaw.com
          vvmontenegro@pomlaw.com


**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Co-Class Counsel*


**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: sfuks@rosenlegal.com

*Co-Class Counsel*