**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| GARY KOOPMANN, TIMOTHY KIDD and VICTOR PIRNIK, Individually and on Behalf of All Others Similarly Situated, | : | **Case No.: 15-cv-07199-JMF** |
| | : | |
| Plaintiff(s), | : | |
| | : | |
| | : | **CLASS ACTION** |
| v. | : | |
| | : | |
| | : | |
| FIAT CHRYSLER AUTOMOBILES N.V., FCA US, LLC, RONALD ISELI AND ALESSANDRO BALDI, AS CO-EXECUTORS FOR THE ESTATE OF SERGIO MARCHIONNE, SCOTT KUNSELMAN, MICHAEL DAHL, STEVE MAZURE and ROBERT E. LEE, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | | |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS REPRESENTATIVES'**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION**
**SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS**

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................. 1

II. SUMMARY OF THE LITIGATION AND PROCEDURAL HISTORY ......................... 2

III. THE SETTLEMENT .......................................................................................................... 7

IV. THE PLAN OF ALLOCATION SHOULD BE APPROVED ........................................ 22

V. THE NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS ........... 23

VI. CONCLUSION ................................................................................................................ 25

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
  No. 07 Civ. 2207 (JGK), 2010 U.S. Dist. LEXIS 79679 (S.D.N.Y. Aug. 5, 2010) ................. 19

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981) ................................................................................................................... 9

*Castagna v. Madison Square Garden, L.P.*,
  No. 09-CV-10211 LTS HP, 2011 WL 2208614 (S.D.N.Y. June 7, 2011) ............................. 16

*Chatelain v. Prudential-Bache Sec., Inc.*,
  805 F. Supp. 209 (S.D.N.Y. 1992) ........................................................................................ 19

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ............................................................................................ passim

*City of Providence v. Aéropostale, Inc.*,
  No. 11 CIV. 7132 CM GWG,
  2014 U.S. Dist. LEXIS 64517 (S.D.N.Y. May 9, 2014) ....................................................... 14

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001) ............................................................................................. 10, 19

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ............................................................................................................... 17

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ........................................................................................................ 23, 24

*Fleisher v. Phoenix Life Ins. Co.*,
  No. 11-cv-8405, 2015 U.S. Dist. LEXIS 121574 (S.D.N.Y. Sept. 9, 2015) ..................... 10, 22

*Grant v. Bethlehem Steel Corp.*,
  823 F.2d 20 (2d Cir. 1987) .................................................................................................... 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ........................................................................................................... 13

*Hefler v. Wells Fargo & Co.*,
  No. 16-civ-05479 (JST), 2018 U.S. Dist. LEXIS 150292 (N.D. Cal. Sept. 4, 2018) .............. 22

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  298 F.R.D. 171 (S.D.N.Y. 2014) ........................................................................................... 25

*In re Am. Bank Note Holographics, Inc.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) .................................................................. 17

*In re AOL Time Warner, Inc.*,
    02 CIV. 5575 (SWK), 2006 U.S. Dist. LEXIS 17588 (S.D.N.Y. Apr. 6, 2006) ................ 14, 19

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012) ......................................................... 14, 18, 20

*In re Citigroup, Inc. Sec. Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013) .................................................................. 12

*In re Crazy Eddie Sec. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) ..................................................................... 21

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    MDL No. 12-2389, 2015 U.S. Dist. LEXIS 152668, at *13 (S.D.N.Y. Nov. 9, 2015) ........... 17

*In re Flag Telecom Holdings*,
    No. 02-CV-3400 (CM) (PED), 2010 U.S. Dist. LEXIS 119702, at *54 (S.D.N.Y. Nov. 5,
    2010) ..................................................................................................... 18

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) .................................................................... 19, 21

*In re Glob. Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................ 16, 17, 18

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    No 12-Civ-8557 (CM), 2014 U.S. Dist. LEXIS 177175 (S.D.N.Y. Dec. 19, 2014) ............... 13

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ....................................................................... 22

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................................................. 21

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ....................................................................... 12

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ......................................................................... 21

*In re NQ Mobile, Inc. Secs. Litig.*,
    No. 13-cv-07608-WHP, 2016 U.S. Dist. LEXIS 189606 (S.D.N.Y. Mar. 11, 2016) ............... 9

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ......................................................................... 22

*In re Paine Webber Ltd. P'ships Litig,*
   171 F.R.D. 104 (S.D.N.Y. 1997) ........................................................................ 10

*In re Rite Aid Corp. Sec. Litig.*,
   146 F. Supp. 2d 706 (E.D.P.A. 2001) ................................................................. 21

*In re Sci. Atlanta, Inc. Sec. Litig.*,
   754 F. Supp. 2d 1339 (N.D. Ga. 2010) ............................................................... 18

*Joel A. v. Giuliani*,
   218 F.3d 132 (2d Cir. 2000) ................................................................................. 9

*Lyons v. Marrud, Inc.*,
   No. 66 CIV. 415, 1972 WL 327 (S.D.N.Y. June 6, 1972) .................................. 10

*Maley v. Del Glob. Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ........................................................... 17, 18

*Menkes v. Stolt-Nielsen S.A.*,
   No. 3:03CV00409(DJS), 2011 WL 13234815 (D. Conn. Jan. 25, 2011) ............. 15

*Pantelyat v. Bank of Am., N.A.*,
   No. 16-cv-8964 (AJN), 2019 U.S. Dist. LEXIS 15714 (S.D.N.Y. Jan. 31, 2019) ... 19

*Parker v. Time Warner Entm't Co.*,
   631 F. Supp. 2d 242 (E.D.N.Y. 2009) ................................................................ 16

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009) ................................................................ 18

*Thompson v. Metro. Life Ins. Co.*,
   216 F.R.D. 55 (S.D.N.Y. 2003) ............................................................... 10, 12, 13

*Vaccaro v. New Source Energy Partners L.P.*,
   No. 15 CV 8954 (KMW), 2017 U.S. Dist. LEXIS 205785 (S.D.N.Y. Dec. 14, 2017).. .... 15, 18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ........................................................................... passim

## **Statutes**

15 U.S.C. §78u-4(f)(7) ........................................................................... 13, 23, 24

15 U.S.C. § 77z-1(a)(7) ...................................................................................... 24

## **Rules**

Fed. R. Civ. P. 23(c) ................................................................................ 19, 23, 24

Fed. R. Civ. P. 23(e) .................................................................................... 21, 22, 23, 24

Fed. R. Civ. P. 37 .................................................................................................. 2

**<u>Other Authorities</u>**

*Newberg on Class Actions* (5th ed. 2014) ............................................................ 9

## I. INTRODUCTION

Pursuant to Federal Rule of Civil Procedure ("Rule") 23, Class Representatives Gary Koopmann ("Koopmann"), Timothy Kidd ("Kidd"), and Victor Pirnik ("Pirnik" and collectively, "Plaintiffs"), on behalf of themselves and the Class, present for this Court's final approval a $110,000,000.00 cash settlement resolving all claims in this Action against Defendants, as set forth in the Stipulation of Settlement dated April 5, 2019 (the "Stipulation") (ECF No. 355). The $110,000,000.00 Settlement is an excellent result for the Class and is substantively fair under the factors articulated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Plaintiffs estimate that the proposed Settlement provides the Class with approximately 13.75% of the likely recoverable damages, which is more than eight times that of the median settlements for similar securities class actions.[1] The Settlement's merit is further demonstrated by the fact that, to date, no potential Class Members have objected to the Settlement.

The Settlement is entitled to a presumption of fairness because it is the results of arm's-length negotiations between highly experienced counsel which included two non-consecutive full-day mediation sessions in September 2018 and January 2019 before the Honorable Daniel Weinstein (ret.), who requested extensive briefing from the Parties in addition to the submission of mediation statements.

The Settlement followed over three years during which Class Counsel engaged in vigorous litigation, which included: (a) conducting a lengthy investigation by reviewing and analyzing publicly available information regarding Defendants, including SEC filings, online and newspaper articles, analyst reports, press releases, stock price movements, earnings conference calls, and

---

[1] *See, e.g.,* NERA Economic Consulting, *Recent Trends In Securities Class Action Litigation: 2018 Full Year Review*, at 35, figure 27 (finding that the median settlement as a percentage of NERA-defined investor losses between January 1996 and December 2018 for settlements with investor losses of between $600 million and $999 million was 1.6%).

publicly available information on the Department of Transportation website related to FCA's vehicle recalls; (b) drafting a detailed Amended Complaint and then amending the operative complaint three times; (c) consulting with a damages expert to evaluate recoverable losses; (d) consulting with an investigator; (d) fully briefing three motions to dismiss; (e) successfully moving for class certification, which included expert depositions and defending Plaintiffs' depositions; (f) engaging in comprehensive discovery which included reviewing and analyzing of over 3.5 million pages of documents and thirty-six fact and expert depositions, filing numerous motions to compel, including a motion to compel filed in the Eastern District of Michigan directed to non-party Robert Bosch LLC; (g) filing a motion to quash Defendants' subpoenas directed to Class Counsel's investigators; (h) filing a successful action for declaratory and injunctive relieved arising out of the USDOT's denial of Plaintiffs' request to depose a former NHTSA employee; (i) submitting opening and rebuttal reports for five experts and responding to six expert reports Defendants submitted; (j) opposing Defendants' motion for summary judgment; (k) filing a motion for spoliation sanctions pursuant to F.R.C.P. 37; (l) participating in two full-day mediation sessions which took place four months apart; (m) successfully negotiating a $110 million settlement; and (n) finalizing the terms of the Stipulation with Defendants.

Plaintiffs respectfully request that the Court grant final approval of the Settlement, approve the proposed Plan of Allocation, and enter the proposed Final Judgment and Order of Dismissal with Prejudice.

## II. SUMMARY OF THE LITIGATION AND PROCEDURAL HISTORY

This is a federal securities class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against defendants Fiat Chrysler Automobiles N.V., FCA US, LLC (together "FCA" or the

"Company"), Ronald Iseli and Alessandro Baldi, as co-executors for the estate of Sergio Marchionne ("Marchionne" or the "Estate of Marchionne"), Scott Kunselman, Michael Dahl ("Dahl"), Steve Mazure ("Mazure"), and Robert E. Lee ("Lee") (collectively, "Defendants"). Plaintiffs allege that between October 13, 2014 and May 22, 2017, inclusive (the "Class Period"), Defendants misled investors by: (1) asserting that FCA was in compliance with vehicle safety regulations promulgated by the Safety Act and the National Highway Traffic Safety Administration ("NHTSA") while failing to disclose widespread violations of various provisions of the Safety Act involving FCA's failure to timely conduct recalls, notify customers, and remedy safety defects that NHTSA had warned the Company about; (2) underreporting its reserves for product warranties and the cost of recalls; and (3) misleading investors as to FCA's compliance with regulations concerning nitrogen oxide ("NOx") emissions in the Company's diesel vehicles sold in the U.S. and European Union ("EU") by not disclosing that the Company's diesel vehicles utilized undisclosed "AECD" and "defeat devices" that caused the diesel vehicles to perform differently during regulatory tests than in real-world on-road performance.

Plaintiffs allege that the news about these misrepresentations was revealed in a series of seven partial corrective disclosures. First, on July 26, 2015, FCA entered into a Consent Order with NHTSA for violations of the Safety Act in connection with 23 recalls (affecting more than 11 million vehicles) which required FCA, among other things, to pay $105 million and conduct recalls. On this news, FCA's stock price dropped approximately 4.9%. Second, on October 28, 2015, FCA announced that it would record a €671 million charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA. On this news, FCA's stock price dropped approximately 4.7%. Third, on May 23, 2016 it was reported that the German motor transport authority found evidence indicating possible defeat devices on FCA's vehicles.  On this

news, FCA's stock price dropped approximately 5.1%. Fourth, on January 12, 2017 the EPA and CARB each issued a notice of violation to FCA for installing and failing to disclose engine management software. On this news, FCA's stock price dropped approximately 12%. Fifth, on February 6, 2017 French authorities announced they were referring FCA for prosecution concerning NOx emissions. On this news, FCA's stock price dropped approximately 4.6%. Sixth, on February 7, 2017 it was disclosed that Italy permitted FCA's vehicles to skip key tests for illegal engine software.  Seventh, on May 23, 2017 the DOJ announced it filed a complaint in the Eastern District of Michigan asserting FCA violated federal laws regulating emissions. On this news, FCA's stock price dropped approximately 5.2%.

On September 11, 2015 Victor Pirnik filed the first complaint in this Action in the United States District Court for the Southern District of New York. ECF No. 1. The Court appointed Koopmann and Kidd as lead plaintiffs, and Pomerantz LLP ("Pomerantz") and The Rosen Law Firm, P.A. ("Rosen") as lead counsel on December 9, 2015. ECF No. 24. On January 22, 2016, Plaintiffs filed the First Amended Complaint for Violations of the Federal Securities Laws (ECF No. 28) which Defendants moved to dismiss (ECF Nos. 31-33). In accordance with the Court's invitation to do so, on March 29, 2016, Plaintiffs filed the Second Amended Complaint for Violations of the Federal Securities Laws ("SAC") alleging the false and misleading statements pertaining to FCA's compliance with vehicle safety regulations underreporting of reserves. ECF No. 38.

Defendants moved to dismiss the SAC on April 28, 2016, which Plaintiffs opposed. ECF Nos. 42-44. On October 5, 2016, the Court denied the motion to dismiss as to the alleged misstatements concerning FCA's compliance with vehicle safety regulations. ECF No. 50. The Court granted the motion to dismiss as to the alleged misstatements concerning FCA's reserves

for costs of recalls, deeming them inactionable opinions and dismissed all claims against defendant Richard Palmer.

With the Court's permission, Plaintiffs filed the Third Amended Complaint for Violations of Federal Securities Laws ("TAC") on February 22, 2017. ECF. No. 69. The TAC added the allegations concerning FCA's non-compliance with emissions regulations, expanding the Class Period to its current dates. Defendants filed a motion to dismiss on March 22, 2017, which was fully briefed by the parties. ECF No. 91-93. On August 1, 2017, the Court granted the motion to dismiss the allegations concerning compliance with emissions regulations on scienter grounds, but granted Plaintiffs permission to amend the TAC.  ECF No. 121.

Plaintiffs filed the Fourth Amended Complaint for Violations of Federal Securities Laws ("FAC") on August 24, 2017, adding allegations concerning Defendants' scienter, *inter alia*, and adding defendants Dahl, Mazure, and Lee. ECF No. 129. On September 5, 2017, Defendants filed a motion to dismiss the emissions-related allegations in the FAC, which Plaintiffs opposed.  ECF Nos. 131-133. On November 13, 2017, the Court denied Defendants' motion to dismiss in its entirety.  ECF No. 142.

After Plaintiffs filed the TAC, on March 17, 2017, Plaintiffs filed a motion for class certification. ECF Nos. 85-87. Per the Court's order adjourning the class certification briefing until after the Court's decision on Defendants' motion to dismiss the TAC (ECF No. 111), Plaintiffs filed a new motion for class certification on December 21, 2017. ECF Nos. 148-49, 151. Plaintiffs included with their motion an expert report concerning market efficiency throughout the FAC Class Period. ECF No. 151-1. In opposition, Defendants also submitted an expert report.  ECF Nos. 160-61. Between May 22, 2017 and March 5, 2018, the parties deposed the other party's expert and Defendants deposed each of the Plaintiffs. On June 26, 2018, the Court granted

Plaintiffs' motion for class certification, certifying a class consisting of all persons who purchased, on a U.S. Exchange or in a transaction in the U.S., FCA common stock between October 13, 2014 and May 23, 2017, both dates inclusive, appointing Koopmann, Kidd, and Pirnik as Class Representatives, and appointing Pomerantz and Rosen as Class Counsel. ECF No. 223.

Following the Court's partial denial of Defendants' motion to dismiss the SAC on October 5, 2016 (ECF No. 50), the Parties engaged in extensive discovery, which included, *inter alia*: (1) Plaintiffs' issuance of three sets of interrogatories, one set of requests for admissions, and two sets of requests for production to Defendants; (2) third-party subpoenas, including a petition to enforce the subpoena on Robert Bosch, LLC (initially filed the Eastern District of Michigan, 2:18-CV-11101-VAR-RSW, and later transferred to the Southern District of New York, 1:18-CV-04065-JMF) and the filing of a related action against the United States Department of Transportation ("USDOT") challenging the USDOT's denial of Plaintiffs' request to take the deposition of former NHTSA employee Robert Garris (1:18-CV-03460-JMF); (3) numerous discovery-related letter motions, including letter motions to compel (*see* ECF Nos. 73, 77, 81, 152, 154-55, 180-81, 183-86), a letter motion seeking leave to take 40 depositions and propound additional interrogatories (*see* ECF Nos. 190-91, 194-95, 200), and a letter motion requesting spoliation sanctions (*see* ECF No. 310-12, 325, 327); (4) various other discovery related motions, such as a motion to quash Defendants' subpoenas for documents and testimony related to the confidential witness names in Plaintiffs' complaint (ECF Nos. 221, 228); (5) responses to interrogatories and requests for production from Defendants; (6) review and analysis of over 3.5 million pages of documents from Defendants and third-parties; (7) 36 depositions; and (8) the exchange of opening, responsive, and rebuttal reports from 11 experts.

On December 12, 2018, Defendants filed a summary judgment motion arguing that there was no admissible evidence sufficient to raise a genuine issue of material fact for trial, and that Defendants were thus entitled to summary judgment, because: (1) the record shows that Defendants did not make any actionable misstatements; (2) there is no triable issue as to scienter; and (3) there is no triable issue over loss causation for four alleged "corrective" disclosures.  ECF Nos. 279-87, 302-03.  Defendants concurrently filed two *Daubert* motions.  ECF Nos. 273-78.  On the same date, Plaintiffs filed four *Daubert* motions.  ECF Nos. 289-300.

On January 18, 2019, Plaintiffs opposed Defendants' motion for summary judgment.  ECF No. 333-41.  Plaintiffs argued that the Court should deny Defendants' motion because: (1) a reasonable jury would have no difficulty concluding that Defendants' statements are actionable; (2) a reasonable jury would easily conclude that Defendants acted with scienter; and (3) there is a triable issue over loss causation for all corrective events.

## III. THE SETTLEMENT

On September 26, 2018, the Parties participated in an in-person full-day mediation before the Honorable Daniel Weinstein, United States District Judge (ret.) of JAMS (the "Mediator"), an experienced mediator specializing in complex civil litigation. Counsel for all parties were present at the mediation, as well counsel for certain of Defendants' insurers. In advance of the mediation session, the Parties exchanged detailed mediation statements addressing liability and damages, attaching numerous exhibits and also submitting the materials to the Mediator. The Parties did not reach agreement at this mediation session. However, the mediator requested the Parties submit supplemental submissions addressing various discrete issues concerning liability and damages, which the Parties did.

A second in-person full-day mediation session before the Mediator took place on January 8, 2019. Both parties submitted Supplemental mediation statements to the Mediator prior to the session. Again, the Parties did not reach an agreement, but continued to negotiate with the assistance of the Mediator. On February 4, 2019, the Parties accepted the Mediator's proposal for a cash settlement of $110 million. Subsequently, the Parties continued negotiations resulting in the terms and conditions set forth in the Stipulation. The Parties finalized and executed the Stipulation on April 5, 2019.  ECF No. 355. Contemporaneous with executing the Stipulation the Parties also executed a supplemental agreement. To protect the Class the Parties have not filed the supplemental agreement with the Court. This is the standard practice in securities fraud class actions. However, the Parties will of course provide the supplemental agreement to the Court should it so request.

Plaintiffs filed a motion for preliminary approval of settlement and accompanying documents on April 5, 2019. ECF Nos. 353-55. On April 10, 2019, the Court issued the Preliminary Approval Order granting approval of the proposed Settlement and directing dissemination of notice to Class Members. ECF No. 356. The Court scheduled the Settlement Fairness Hearing for final approval of the Settlement, attorney's fees and expenses, including reimbursement of Plaintiffs' reasonable costs and expenses, and to hear any objections by Class Members for September 5, 2019 at 3:00 p.m.  *Id.* Defendants have paid $110,000,000 into the Escrow Account for the benefit of the Class, $325,000 of which is earmarked for Notice and Administration Costs.

## THE PROPOSED SETTLEMENT SHOULD BE FINALLY APPROVED

Under Rule 23(e), "[t]he court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses."[2] A court may approve a class action settlement if it is 'fair, adequate, and reasonable, and not a product of collusion.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). In determining whether to approve a settlement, "the Court should consider both the process by which the settlement was negotiated and the substantive fairness of the agreed-upon terms in light of the circumstances of the litigation." *In re NQ Mobile, Inc. Secs. Litig.*, No. 13-cv-07608-WHP, 2016 U.S. Dist. LEXIS 189606, at *6 (S.D.N.Y. Mar. 11, 2016); *Wal-Mart*, 396 F.3d at 116 (similar). "There is a 'strong judicial policy in favor of settlements, particularly in the class context' and 'compromise' is 'encouraged by the courts and favored by public policy.'" *Wal-Mart*, 396 F.3d at 116. Moreover, as noted by both the Supreme Court and the Second Circuit, in determining the fairness of a settlement, courts should "not decide the final merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *Grinnell Corp.*, 495 F.2d at 462 (similar). This is particularly important in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost, and rigor of prolonged litigation. *See* William Rubenstein, Alba Conte, & Herbert B. Newberg, 4 Newberg on Class Actions § 13.44 (5th ed. 2014). The Settlement here is fair, adequate, and reasonable and not a product of collusion and should therefore be approved.

## A.     The Settlement is Entitled to a Presumption of Fairness

"So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement, and great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying

---

[2] The argument herein includes application of the new amendments to Rule 23, effective December 1, 2018, which for the most part overlap with the Second Circuit's *Grinnell* factors, as set forth below.

litigation." *In re Paine Webber Ltd. P'ships Litig,* 171 F.R.D. 104, 125 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997); *see also Fleisher v. Phoenix Life Ins. Co*., No. 11-cv-8405, 2015 U.S. Dist. LEXIS 121574, *17 (S.D.N.Y. Sept. 9, 2015) (courts should give "proper deference to the private consensual decision of the parties" and bear in mind "the unique ability of class and defense counsel to assess the potential risks and rewards of litigation"); *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003) ("A strong presumption of fairness attaches to proposed settlements that have been negotiated at arms-length.").

The Settlement was reached through arm's-length negotiation, which included two non-consecutive all-day mediation sessions, both of which were unsuccessful, before a respected and experienced mediator who is a retired judge. After the second mediation session, with the assistance of the Mediator, the Parties engaged in several rounds of additional telephonic and written discussions resulting in both Parties accepting a mediator's proposal to settle the Action. The arm's length negotiations, though collegial, were adversarial and produced a result that the settling parties have deemed to be in their respective best interests. The arm's-length nature of the settlement negotiations and the involvement of an experienced mediator supports the conclusion that the Settlement is fair and free of collusion. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure").

In negotiating the Settlement, Plaintiffs had the benefit of attorneys who are highly experienced in complex litigation and familiar with the legal and factual issues of the case. *See* Pomerantz Resume, Rosen Law Firm Resume Decl., Exs. 3 to Exhibits 2 and 3 of the Joint Declaration of Jeremy A. Lieberman and Laurence M. Rosen ("Joint Decl."); *see also Lyons v. Marrud, Inc.*, No. 66 CIV. 415, 1972 WL 327, at *2 (S.D.N.Y. June 6, 1972), ("[E]xperienced and

10

competent counsel have assessed these problems and the probability of success on the merits. They have concluded that compromise is well-advised and necessary. The parties' decision regarding the respective merits of their positions has an important bearing on this case."). The efforts of Class Counsel secured a Settlement that provides substantial benefits to the Class, especially considering the expense, risks, difficulties, delays, and uncertainties of litigation, trial, and post-trial proceedings.

The Parties and their counsel were eminently knowledgeable about the strengths and weaknesses of the case prior to their agreement to settle. Plaintiffs and their counsel: (a) conducted a lengthy investigation by reviewing and analyzing publicly available information regarding Defendants, including SEC filings, online and newspaper articles, analyst reports, press releases, stock price movements, earnings conference calls, analysts presentations and publicly available information on the Department of Transportation's website related to FCA's vehicle recalls; (b) drafted a detailed Amended Complaint and then amended the operative complaint three times; (c) consulted with a damages expert to evaluate recoverable losses; (d) consulted with an investigator; (d) fully briefed three motions to dismiss; (e) successfully moved for class certification, which included expert depositions and defending Plaintiffs' depositions; (f) engaged in comprehensive discovery which included reviewing and analyzing of over 3.5 million pages of documents, thirty-six fact and expert depositions, filing numerous motions to compel, including a motion for spoliation sanctions and a motion to compel directed to non-party Robert Bosch LLC; (g) filed a motion to quash Defendants' subpoenas directed to Class Counsel's investigators; (h) filed a successful action for declaratory and injunctive relieved arising out of the USDOT's denial of Plaintiffs' request to depose a former NHTSA employee; (i) submitted opening and rebuttal reports for five experts and responded to six expert reports Defendants submitted; (j) opposed Defendants'

motion for summary judgment; (k) filed a motion for spoliations sanctions; and (l) participated in two full-day mediation sessions spanning four months.  Joint Decl. ¶6.

The Settlement does not provide preferential treatment to Plaintiffs or any other Class Members. The proposed Plan of Allocation, which is set forth on pages 23-28 of the Notice and was developed by Plaintiffs' damages expert in consultation with Class Counsel, provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members who submit valid Claim Forms. The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Joint Decl. ¶90. Similar plans have repeatedly been approved by courts in this District.  *See In re Citigroup, Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 386-87 (S.D.N.Y. 2013); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145-46 (S.D.N.Y. 2010).

For all these reasons, the Settlement, which resulted from a thorough arm's-length process, enjoys a presumption of fairness. *See Thompson v. Metro Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003) ("A strong presumption of fairness attaches to proposed settlements that have been negotiated at arms-length.").

### B.    THE SETTLEMENT IS SUBSTANTIVELY FAIR

To evaluate the substantive fairness of a settlement, courts in the Second Circuit consider the nine *Grinnell* factors: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risk of litigation. *Grinnell Corp.*, 495 F.2d at 463. "All nine factors need not be satisfied; the court

must look at the totality of these factors in light of the specific circumstances involved." *In re Hi-Crush Partners L.P. Sec. Litig.*, No 12-Civ-8557 (CM), 2014 U.S. Dist. LEXIS 177175, at *14 (S.D.N.Y. Dec. 19, 2014); *Thompson v. Metro. Life Ins. Co.,* 216 F.R.D. 55, 61 (S.D.N.Y. 2003). The Settlement merits approval under *Grinnell*.

### 1. The Litigation Will be Complex, Expensive, and Long

The proposed Settlement provides the Class with substantial and certain relief, without the delay and expense of motion practice, trial, and post-trial proceedings. Due to the inherent complexity of securities litigation and the stringent requirements imposed by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, 15 U.S.C. §78u-4(f)(7) (PSLRA), amendments to the Exchange Act, as well as supervening case law developments such as the Supreme Court's decision *in Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*"), prosecution of securities-class-action litigation is inherently complex and lengthy.

The complexity of this case is evidenced by the Parties' briefing on summary judgment, which included testimony and reports from experts from both Parties on the issues of: 1) vehicle safety regulations; 2) emissions regulations in the United States; 3) emissions regulations in the EU; 4) legal and regulatory policies and procedures concerning United States emissions regulations; and 5) damages.  Joint Decl. ¶66.

Had Plaintiffs succeeded in opposing Defendants' summary judgment motion, the Action would then be scheduled for trial. Trial undoubtedly would have been expensive, risky and followed by years of appeals even if Plaintiffs secured a judgment. The jury would have had to determine: (i) whether any misrepresentations/omissions were material; (ii) whether Defendants acted with scienter; (iii) whether *Basic's* fraud-on-the market reliance presumption applies; and (iv) the amount of artificial inflation in FCA's stock and how much of the price decline resulted

from each of the alleged curative disclosures. As to materiality Defendants have argued, and would have continued to argue, that the alleged misstatements were not material given that FCA was "more than 90% compliant" with respect to each of the recalls and that the NOV's asserted violations with "far less than 1% of FCA's vehicles on the road."  Joint Decl. ¶60. As to scienter Defendants were adamant that they had no intent to deceive. *Id.* For example, Defendants asserted that during a May 2012 meeting with regulators they proposed an "alternate AECD" definition and that the EPA agreed with that definition.  Additionally, Defendants vigorously asserted that no loss causation existed for at least four out of the seven alleged corrective disclosures.  *Id.*

 In addition to resolving numerous complex securities law issues, the jury would have had to navigate the highly technical scientific evidence concerning AECD's and defeat devices and navigate battles of the experts regarding both vehicle safety and vehicle emissions regulations, as well as market efficiency, loss causation and damages. Not only would recovery be very uncertain, considering the probability of appeals it would inevitably take years to collect.

### 2.    The Reaction of the Settlement Class to the Settlement

The reaction of the Class to the Settlement is a significant factor for the court to weigh when considering its adequacy. *City of Providence v. Aéropostale, Inc.*, No. 11 CIV. 7132 CM GWG, 2014 U.S. Dist. LEXIS 64517, *15-16 (S.D.N.Y. May 9, 2014); *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012). "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart*, 396 F.3d at 118 (citations omitted); *In re AOL Time Warner, Inc.*, 02 CIV. 5575 (SWK), 2006 U.S. Dist. LEXIS 17588, at *36 (S.D.N.Y. Apr. 6, 2006) (finding that the "small number of objections and low percentage of opt-outs here strongly favor the Settlement").

The Class is overwhelmingly in favor of the Settlement. Pursuant to the Preliminary Approval Order, Court-appointed Claims Administrator Epiq disseminated 180,907 Notice Packets to potential Class Members through August 1, 2019.[3]  Epiq also published the Summary Notice on *PR Newswire* and in *Investor's Business Daily*; established and continues to maintain a toll-free telephone number for Class Members; and established and currently maintains a website dedicated to the Settlement. *Id.* at ¶¶14-17.  The deadline for objections and requests for exclusions is August 15, 2019.  As of August 1, 2019 not a single Class Member has objected to the Settlement. *Id.* at ¶20. Only nine Class Members have requested exclusion from the Class.  *Id* at ¶18. These requests for exclusion represent a total of only 7,350 shares of FCA stock, a *de minimis* amount relative to the billions of shares traded during the Class Period.  *Id.*

The Class' favorable reaction supports approving the Settlement. *See Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22-23 (2d Cir. 1987) (finding no abuse of discretion where district court approved settlement with 36% of the class objecting); *Vaccaro v. New Source Energy Partners L.P.*, No. 15 CV 8954 (KMW), 2017 U.S. Dist. LEXIS 205785, at *13 (S.D.N.Y. Dec. 14, 2017) ("The small number of objectors weighs in favor of final approval."); *Menkes v. Stolt-Nielsen S.A.*, No. 3:03CV00409(DJS), 2011 WL 13234815, at *3 (D. Conn. Jan. 25, 2011) ("the complete absence of opposition or exclusion requests favors approval of the proposed settlement").

### 3.       The Advanced Stage of the Proceedings Supports Approval

The advanced stage of the proceedings supports approval of the Settlement. "This factor relates to whether the plaintiffs had sufficient information on the merits of the case to enter into a settlement." *Parker v. Time Warner Entm't Co.,* 631 F. Supp. 2d 242, 259 (E.D.N.Y. 2009), *aff'd*

---

[3] *See* Declaration of Matthew Mulvihill Regarding: (A) Mailing of the Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion ("Mulvihill Decl."), at ¶12 annexed as Exhibit 1 to the Joint Decl.

*sub nom. Lobur v. Parker*, 378 F. App'x 63 (2d Cir. 2010). Extensive discovery ensures the parties had access to sufficient material to evaluate their cases and to assess the settlement given the strengths and weaknesses. *Id.* Here, the proceedings were sufficiently advanced to provide Plaintiffs with a thorough understanding of the strengths and weaknesses of the Class's claims.

By the time the Parties agreed to settle, they had completed fact and expert discovery. Defendants produced, and Plaintiffs had reviewed, over 3.5 million pages of documents. The Parties also obtained testimony from witnesses through 36 depositions of Plaintiffs, Defendants, third parties and experts. Accordingly, the stage of the proceedings and completion of discovery weigh strongly in favor of approving the Settlement. Joint Decl. ¶¶6, 107. Indeed, the Parties agreed to settle after Plaintiffs filed their opposition to Defendants' summary judgment motion.

### 4.   There Are Substantial Risks of Establishing Liability and Damages

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell Corp.*, 495 F.2d at 463; *Wal-Mart*, 396 F.3d at 117. Analyzing these risks "does not require the Court to adjudicate the disputed issues or decide unsettled questions; rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004). In other words, "[i]n assessing the Settlement the Court should balance the benefits afforded to members of the Class and the immediacy and certainty of a substantial recovery for them against the continuing risks of litigation." *Castagna v. Madison Square Garden, L.P.*, No. 09-CV-10211 LTS HP, 2011 WL 2208614, at *6 (S.D.N.Y. June 7, 2011) (citing *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 364 (S.D.N.Y. 2002)). Courts should, therefore, "approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case." *Global Crossing*, 225 F.R.D. at 459.

16

There are substantial risks in prosecuting this Action through trial. Defendants have argued, and would have continued to argue that Plaintiffs cannot prove: (1) that the alleged misstatements were false or misleading; (2) that the alleged misstatements were material given that FCA was "more than 90% compliant" with respect to each of the recalls and that the NOV's asserted violations with "far less than 1% of FCA's vehicles on the road"; (3) that Defendants acted with scienter in making each of the alleged misstatements; and (4) that loss causation exists for at least four of the seven alleged corrective disclosures. Joint Decl. ¶60.

Although Class Plaintiffs believe that they would prevail on all claims, Class Plaintiffs acknowledge that continued litigation would expose the Class to a risk of no recovery, or a much lower recovery. Joint Decl. ¶61. As demonstrated by Defendants' motion for summary judgment, Defendants' vehemently dispute, among other things, that any of the alleged misstatements were false or misleading.  ECF No. 302; *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, MDL No. 12-2389, 2015 U.S. Dist. LEXIS 152668, at *13 (S.D.N.Y. Nov. 9, 2015) ("Because Plaintiffs' ability to establish the liability of Defendants is 'far from certain,' this factor weights in favor of settlement approval.").  Further, it is well-known that scienter is difficult to prove in securities fraud cases. *See In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426 (S.D.N.Y. 2001).

Plaintiffs would also have to show that the alleged securities violations caused Plaintiffs' losses. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005). Establishing loss-causation is a "complicated and uncertain process, typically involving conflicting expert opinion[s]." *Global Crossing*, 225 F.R.D. at 459. Plaintiffs are confident they would successfully establish loss causation, but Defendants have argued that the four alleged corrective disclosures did not disclose any new information, resulting in no loss causation or damages, and have provided expert

testimony supporting their contentions.  ECF No. 302.  *See New Source*, 2017 U.S. Dist. LEXIS 205785, at *16 (noting that "Plaintiffs may have been unable to prove that Defendants' misleading statements were the cause of Plaintiffs' losses"); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 228-29 (S.D.N.Y. 2009) (dismissing claims based on stock drop following press release for failure to "explain why the disclosure on page 8 – as opposed to all other information in the extended 12-page release – caused the price decline"); *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1379-80 (N.D. Ga. 2010) (granting motion for summary judgment because plaintiffs did not disentangle fraud-related and non-fraud-related portions of stock decline). Further, had the jury decided that not all the alleged corrective disclosures caused Plaintiffs' losses, the Class' damages would be reduced accordingly.

Moreover, both loss causation and damages disputes have already resulted in a "battle of the experts" and a "jury could be swayed by experts for the Defendants, who [c]ould minimize the amount of Plaintiffs' losses."  *In re Bear Stearns*, 909 F. Supp. 2d at 268; *see also In re Flag Telecom Holdings*, No. 02-CV-3400 (CM) (PED), 2010 U.S. Dist. LEXIS 119702, at *54 (S.D.N.Y. Nov. 5, 2010) ("The jury's verdict . . . would . . . depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable."); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002) (noting that a "jury could be swayed by experts for the Defendants, who would minimize the amount of Plaintiffs' losses"). Accordingly, the certain and immediate relief Settlement affords in light of the risks of establishing liability, loss causation, and damages supports approval of the Settlement.

### 5.   The Risks of Maintaining Class Action Status Through Trial

The risks of maintaining the Action as a class action through trial also supports approval of the Settlement. While the Court has certified the Class here, that does not obviate the risk of de-certification at a later date.  An "order that grants or denies class certification may be altered or

amended before the final judgment" under Rule 23(c)(1)(C). *See also Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07 Civ. 2207 (JGK), 2010 U.S. Dist. LEXIS 79679, at *12 (S.DN.Y. Aug. 5, 2010) ("Because there is a real risk that class certification may not be granted, or, if granted, it may later be rejected on appeal or decertified, the Court concludes that this factor also weights in favor of approving the proposed settlement."); *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification.  This factor indicates that settlement is advantageous to the class at this time.").  Accordingly, the risks and uncertainties of maintaining the class action status supports approval of the Settlement.

### 6.      Defendant's Ability to Withstand a Greater Judgement

A defendant is not required to "empty its coffers before a settlement can be found adequate." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 162 (S.D.N.Y. 2011). Courts in the Second Circuit have "explicitly acknowledged that the defendants' ability to withstand a higher judgment . . . standing alone, does not suggest that the settlement is unfair." *D'Amato*, 236 F.3d at 86; *Pantelyat v. Bank of Am., N.A.*, No. 16-cv-8964 (AJN), 2019 U.S. Dist. LEXIS 15714, at *21-22 (S.D.N.Y. Jan. 31, 2019) (similar). The Court must weigh this factor "in conjunction with all of the *Grinnell* factors, most notably the risk of the class prevailing and the reasonableness of the settlement fund." *In re AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *42.  With this in mind, the Settlement clearly represents a good compromise between the parties, and it should be finally approved.

### 7.      The Settlement Amount is Reasonable in Light of the Best Possible Recovery and the Attendant Risks of Litigation

Courts typically analyze the last two *Grinnell* factors together. *See Grinnell Corp.*, 495 F.2d at 463.  In so doing, courts "consider[] and weigh[] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether

the proposed settlement is reasonable." *Id.* at 462.   A court's "determination of whether a settlement amount is reasonable in light of the best possibl[e] recovery does not involve the use of a mathematical equitation yielding a particularized sum." *In re Bear Stearns*, 909 F. Supp. 2d at 269. Instead, the Second Circuit has held "[t]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart*, 396 F.3d at 119. In fact, the Second Circuit has stated that "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  *Grinnell Corp.*, 495 F.2d at 455 n.2.

The Settlement provides for a recovery of $110,000,000. In consultation with their experts, Plaintiffs estimate that if they prevailed on all of their claims, based on the Class and Class Period as currently constituted, the likely recoverable damages using the "Two-Trader Model" (also known as the "80/20 Model") would be $800 million. Joint Decl. ¶73. The Settlement thus represents approximately 13.75% of the potentially most likely recovery. *Id.* Moreover, the damages computation assumes that 100% of eligible class members file claims. *Id.*  It is more likely that less than 100% will do so (despite efforts made to notify as many eligible claimants as possible, including posting the notice on the Internet).  *Id.*

The 13.75% recovery here not only falls well within the range of reasonableness, it far exceeds historical average recoveries. *See, e.g.*, *Giant Interactive*, 279 F.R.D. at 163 ("the average settlement in securities class actions ranges from 3% to 7% of the class' total estimated losses"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483 n.130 (S.D.N.Y. 2009) (citing a law review article finding that "the ratio of securities class action settlements to investors' economic losses has ranged over recent years between two and three percent"); *In re Rite Aid*

*Corp. Sec. Litig.*, 146 F. Supp. 2d 706 at 715 (E.D.P.A. 2001) (citing studies indicating that the average securities fraud class action settlement since 1995 has resulted in a recovery of 5.5% – 6.2% of estimated losses); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (approving settlement that was one-sixth of the potential recovery); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 328 (E.D.N.Y. 1993) (approving settlement that was 10% of estimated maximum recovery).

### 8. The Settlement Meets All the Requirements of Rule 23(e)

Rule 23(e), as recently amended, lists four factors for a court to consider in determining fairness:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's-length; (C) the relief provided for the class was adequate, taking into account: (i) the cost, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23 (e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e).

Sections A, B, and C (i-ii) are addressed herein. The proposed fee award (Section C (iii)) is discussed in the accompanying Motion for Attorneys' Fees, which demonstrates that Class Counsel's request for 30% of the Settlement Fund is fair and reasonable. With respect to the identification of agreements pursuant to Rule 23(e)(3) (Section C (iv), the Stipulation notes that the parties have entered into a Supplemental Agreement, as is the standard practice in securities fraud class action settlements. *See* Stipulation at ¶32. The Supplemental Agreement provides Defendants with the option to terminate the Settlement if Class Members who meet certain criteria exclude themselves from the Class. *Id.* To protect the Class, the Supplemental Agreement is confidential. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 948 (9th Cir. 2015);

*Hefler v. Wells Fargo & Co.*, No. 16-civ-05479 (JST), 2018 U.S. Dist. LEXIS 150292, at *23 (N.D. Cal. Sept. 4, 2018) (approving confidentiality of opt-out termination agreement to "'avoid the risk that one or more shareholders might use this knowledge to insist on a higher payout for themselves by threatening to break up the Settlement'"). Finally, as discussed in Section IV below, the Plan of Allocation treats all Class Members equitably.

In sum, the Settlement is fair, reasonable, and adequate under Rule 23(e) and the *Grinnell* factors, supporting Plaintiffs' request for final approval of the Settlement.

## IV. THE PLAN OF ALLOCATION SHOULD BE APPROVED

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized—namely, it must be fair and adequate. When formulated by competent and experienced counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis. Such a reasonable plan may consider the relative strength and values of different categories of claims." *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012) (citations, brackets, and internal quotation marks omitted). Pro-rata distributions have "frequently been determined to be fair, adequate, and reasonable." *Fleisher*, 2015 U.S. Dist. LEXIS 121574, at *42 (collecting cases).

The proposed Plan of Allocation, which was developed by Class Counsel in consultation with a damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms. Joint Decl. ¶¶88, 92. A recognized-loss amount will be calculated for each purchase or acquisition of FCA common stock during the Settlement Class Period listed on the Claim Form and for which adequate documentation is provided. The calculation of recognized-loss amounts is based on the difference between the amount of estimated alleged artificial inflation in FCA common stock on the purchase

date and the amount of estimated alleged artificial inflation on the sale date. *Id.* at ¶93. The sum of the recognized-loss amounts for all of a Claimant's purchases of Fiat common stock during the Class Period is the Claimant's recognized claim ("Recognized Claim"), and the Net Settlement Fund will be allocated to Authorized Claimants on a pro rata basis based on the relative size of their Recognized Claims.  *Id.* at 89.

Class Counsel submits that the Plan of Allocation fairly and rationally allocates the proceeds of the Net Settlement Fund among Class Members based on the losses they suffered on transactions in Fiat common stock attributable to the conduct alleged. Moreover, the Plan of Allocation is set forth in the Notice, and to date no objections to the Plan have been received from any Class Members. *Id.* at ¶ 62. Accordingly, the Plan of Allocation is fair and reasonable and should be granted final approval for the purpose of administering the Settlement.

## V. THE NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS

Courts "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Rule 23(e)(1). Notice must be the "best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974).

The Notice of the proposed Settlement to the Class Members satisfied the requirements of Rules 23(c)(2) and 23(e), as well as requirements under the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, 15 U.S.C. §78u-4(f)(7) ("PSLRA") and the Due Process Clause of the Constitution. Due process and Rule 23(c)(2) direct that the notice be "the best notice that is practicable under the circumstances." Rule 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974).  Rule 23(e) directs "notice in a reasonable manner." Rule 23(e)(1); *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 114 (2d Cir. 2005)

(under Rule 23(e), notice must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings").

Both the substance of the Notice and the means of dissemination satisfies these standards. The Court-approved Notice includes all the information required by Rule 23(c)(2)(B) and the PSLRA, 15 U.S.C. §§ 77z-1(a)(7), 78u-4(a)(7), including the following: (i) an explanation of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) the Parties' reasons for proposing the Settlement; (vi) the fees and expenses to be sought by Class Counsel, administrative costs, and awards to Plaintiffs; (vii) the rights of Settlement Class Members, including the right to accept, opt out, or object to the Settlement, Plan of Allocation, or the requested attorneys' fees or expenses; (viii) the process for filing a proof of claim; (ix) the necessary information for any Settlement Class Member to examine the Court records should they desire to do so; (x) instructions to securities brokers and other nominee holders for forwarding the Notice to those persons for whom the nominees held shares in street name, and (xi) the binding effect of a judgment on Settlement Class Members.

The Notice program was carried out by the Court-approved Claims Administrator, Epiq Class Action & Mass Tort Solutions Inc. ("Epiq"), a third-party claims administrator nationally recognized for notice and claims administration, under the supervision of Class Counsel.  In accordance with the Court's Preliminary Approval Order, Epiq mailed a total of 1,524 copies of the Notice and the Proof of Claim and Release (collectively the "Claim Packet") beginning on April 30, 2019. Mulvihill Decl., ¶7. The names, addresses, and e-mail addresses (if available) of Class Members were obtained from listings provided to Epiq by FCA's U.S. transfer agent and

Epiq's proprietary database of names of the most common banks, brokerage firms, nominees, and known third-party filers. *Id.* at ¶¶4-5. Additional Notice Packets were mailed and/or e-mailed after Epiq received notice of potential Class Members from nominees, brokers, and telephone and/or e-mail requests. *Id.* at ¶9. As of August 1, 2019 Epiq has mailed and a total of 180,907 Notice Packets to potential Class Members, brokers, and nominees. *Id.* at ¶12. Epiq also arranged for the Summary Notice to be published electronically on *PR Newswire* on date and in print in the *Investor's Business Daily* on May 6, 2019. *Id.* at ¶14. In addition, Epiq established and continues to maintain a toll-free telephone number for Class Members to call and obtain information, as well as a website, www.FiatChryslerSecuritiesLitigation.com, providing, among other things, copies of the Stipulation and related documents, and the date for the Court's Settlement Fairness Hearing. *Id.* at ¶¶15-17.

This combination of individual first-class mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and posted on the internet, was "the best notice … practicable under the circumstances." Rule 23(c)(2)(B); *see In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182 (S.D.N.Y. 2014).

## VI. CONCLUSION

Based on the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval of the Settlement and enter the proposed Final Judgment and Order of Dismissal with Prejudice.

Dated: August 1, 2019                                     Respectfully submitted,

                                                          **POMERANTZ LLP**

                                                          */s/ Jeremy A. Lieberman*
                                                          Jeremy A. Lieberman

Michael J. Wernke
Veronica V. Montenegro
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
mjwernke@pomlaw.com
            vvmontenegro@pomlaw.com

-and-

Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**

*/s/Laurence M. Rosen*
Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827
Email:  lrosen@rosenlegal.com
pkim@rosenlegal.com
            sfuks@rosenlegal.com

*Co-Class Counsel for Plaintiffs*

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Email:  peretz@bgandg.com

*Additional Counsel for Plaintiffs*

26