**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X
GARY KOOPMANN, TIMOTHY KIDD and      :
VICTOR PIRNIK, Individually and on Behalf  :
of All Others Similarly Situated,    :   Case No. 15-cv-07199-JMF
                                     :
                                     :
Plaintiff(s),    :
                                     :
v.    :
                                     :   **Motion Date: September 5, 2019**
FIAT CHRYSLER AUTOMOBILES N.V.,      :
FCA US, LLC, RONALD ISELI AND        :
ALESSANDRO BALDI, AS CO-             :
EXECUTORS FOR THE ESTATE OF          :
SERGIO MARCHIONNE, SCOTT             :
KUNSELMAN, MICHAEL DAHL, STEVE       :
MAZURE and ROBERT E. LEE,            :
                                     :
Defendants.    :
---------------------------------------------------------- X

**JOINT DECLARATION OF JEREMY A. LIEBERMAN AND LAURENCE M. ROSEN**
**IN SUPPORT OF**
**CLASS REPRESENTATIVES' MOTION FOR: (1) FINAL APPROVAL**
**OF CLASS ACTION SETTLEMENT; AND (2) AWARD OF ATTORNEYS' FEES,**
**REIMBURSEMENT OF EXPENSES,**
**AND AWARDS TO CLASS REPRESENTATIVES**

# TABLE OF CONTENTS

I. SUMMARY ................................................................................................................ 2

II. OVERVIEW OF PLAINTIFFS' CLAIMS ........................................................... 6

III. PROCEDURAL HISTORY ................................................................................. 7

IV. CONTINUED LITIGATION POSED CONSIDERABLE AND SERIOUS RISKS TO
THE CLASS ............................................................................................................ 19

V. THE NOTICE OF THE SETTLEMENT WAS PROPERLY MADE TO THE CLASS 24

    A.    NOTICE ....................................................................................................... 25

    B.    THE PLAN OF ALLOCATION SHOULD BE APPROVED AS IT IS FAIR
        AND REASONABLE .................................................................................. 26

VI. THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE AND
EXPENSES INCURRED WERE NECESSARY TO LITIGATE THIS ACTION .. 29

    A.    The Litigation Expense Application ...................................................... 35

VII. AN AWARD TO THE CLASS REPRESENTATIVES IS WARRANTED ................. 36

We, Jeremy A. Lieberman and Laurence M. Rosen, declare and state, under penalty of perjury, that the following is true and correct to the best of our knowledge, information, and belief:[1]

1.      The Rosen Law Firm, P.A. and Pomerantz LLP are the court-appointed Class Counsel for Class Representatives Gary Koopmann, Timothy Kidd and Victor Pirnik (collectively "Plaintiffs" or "Class Representatives").  Laurence Rosen is the Managing Partner at the Rosen Law Firm, P.A., and I am duly admitted to practice in New York and before this Court. Jeremy Lieberman is Managing Partner at Pomerantz LLP, and I am duly admitted to practice in New York and before this Court. We have personal knowledge of the matters set forth herein and, if called upon, we could and would competently testify thereto.

2.      We submit this Declaration in support of Class Representatives' Motions for: (1) Final Approval of Proposed Class Action Settlement; and (2) Award of Attorneys' Fees, Reimbursement of Expenses, and Awards to Class Representatives, both filed concurrently herewith. The Court preliminarily approved the Stipulation by its Order Preliminarily Approving Settlement and Providing for Notice, dated April 10, 2019 ("Preliminary Approval Order").  ECF No. 356.

3.      The purpose of this Declaration is to set forth the nature of the investigation, litigation, legal briefing and negotiations that led to the Settlement.  In our view, this Declaration demonstrates why the Settlement is fair, reasonable, and adequate and should be approved by this Court, as well as why Class Counsel's fees and expense request and Award to Class Representatives are reasonable and should be approved by the Court.

4.      The Stipulation provides for a cash payment by Defendants $110,000,000 in cash

---

[1] Unless otherwise indicated, all capitalized terms shall have the meanings as set forth in the Stipulation and Agreement of Settlement ("Stipulation"), dated April 5, 2019.  ECF No. 355.

into an interest-bearing escrow account in exchange for the release of all claims asserted by Plaintiffs against Defendants, and completely resolves this Action.

5.    The Court preliminarily approved the Stipulation by its Order Preliminarily Approving Settlement and Providing for Notice, dated April 10, 2019 ("Preliminary Approval Order").  ECF No. 356.

## I. SUMMARY

6.    Beginning from Class Counsel's pre-filing investigation of the action in September 2015, almost four years ago, and continuing throughout, Class Representatives and their counsel have litigated this action vigorously. The Settlement was reached only after Class Counsel:  (a) conducted a lengthy investigation by reviewing and analyzing publicly available information regarding Defendants, including SEC filings, online and newspaper articles, analyst reports, press releases, stock price movements, earnings conference calls, publicly available information on the Department of Transportation website related to FCA's vehicle recalls; (b) drafted a detailed Amended Complaint and then amended the operative complaint three times; (c) consulted with a damages expert to evaluate recoverable losses; (d) consulted with an investigator; (d) fully briefed three motions to dismiss; (e) successfully moved for class certification, which included expert depositions and defending the three Class Representatives' depositions; (f) engaged in comprehensive discovery which included reviewing and analyzing over 3.5 million pages of documents and thirty-six fact and expert depositions, and filing six motions to compel, including a motion to compel filed in the Eastern District of Michigan directed to non-party Robert Bosch LLC; (g) filed a motion to quash Defendants' subpoenas directed to Class Counsel's investigators; (h) filed a successful action for declaratory and injunctive relieved arising out of the USDOT's denial of Plaintiffs' request to depose a former NHTSA employee; (i) submitted opening and

rebuttal reports for five experts and responded to six expert reports Defendants submitted; (j) opposed Defendants' motion for summary judgment; (k) filed a motion for spoliation sanctions pursuant to F.R.C.P. 37; (l) participated in two full-day mediation sessions which took place four months apart; (m) successfully negotiated a $110 million settlement; and (n) finalized the terms of the Stipulation with Defendants.

7.     While Class Counsel believes that the allegations in the Fourth Amended Complaint for Violations of Federal Securities Laws ("FAC") (ECF No. 129) have substantial merit, Class Counsel respectfully submits that the Settlement represents an excellent result for the Class.

8.     The Settlement is the result of extensive arm's-length settlement negotiations among esteemed and experienced counsel. Through two non-consecutive full day mediation sessions in September 2018 and January 2019 before the Hon. Daniel Weinstein (ret.) of JAMS and periodic subsequent correspondence between the parties, the Parties vigorously debated the strengths and weaknesses of the claims and defenses in this Action.  The ability of Class Counsel to reach a compromise in light of the many complex issues present in this Action evidences the skill of representation and the quality of the results.

9.     Even though the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (III) Settlement Fairness Hearing (the "Notice"), and the Proof of Claim and Release Form ("Claim Form") (collectively, the "Notice and Claim Form") was sent to 180,907 potential Class Members, brokers, and other nominees,  the Notice and Claim Form, the Court's Preliminary Approval Order, and the Stipulation were posted online at www.fiatchryslersecuritieslitigation.com, and the Summary Notice of Pendency and Proposed Class Action Settlement ("Summary Notice") was

posted electronically on *PR Newswire* and in print once in *Investor's Business Daily*, no Class Members have objected to the Settlement and only nine Class Members have requested exclusion. *See* Declaration of Matthew Mulvihill Regarding: (A) Mailing Of The Notice And Proof Of Claim; (B) Publication Of The Summary; And (C) Report On Requests For Exclusion, dated August 1, 2019 at ¶¶12, 14, 17-18, 20 ("Mulvihill Decl."), submitted as Ex. 1 hereto).

10.     The Settlement was reached after intense, concentrated and good faith negotiations among experienced counsel with the aid of a nationally regarded mediator, Hon. Daniel Weinstein (ret.) of JAMS.  Likewise, the negotiation and drafting of the Stipulation and supporting documents were time intensive, difficult and hard fought.

11.     The Settlement provides an immediate and certain benefit to the Class and eliminates the significant risks that a smaller recovery—or, indeed, no recovery—might be achieved after a trial and the likely appeals that would follow, which could prolong the Action for years.

12.     The $110 million settlement represents a significant percentage of Plaintiffs' class-wide damages.  Class Counsel's damages estimate was approximately $800 million.  As compared to this damages figure, the Settlement represents an excellent result: 13.75% of estimated damages. This estimate also assumes that Plaintiffs prevail on every claim and defeat all of Defendants' defenses. Defendants disagreed with this estimation of damages. Defendants contended that even if Plaintiffs could establish liability and damages, the maximum damages would be far less than Class Representatives claim and, that if the matter went to trial and Plaintiffs prevailed, they would only obtain a fraction of their purported maximum damages. This recovery therefore represents an excellent result and is far above the range of typical securities class action settlements.

13.     The Plan of Allocation is fair, reasonable and adequate as it was formulated with

the aid of a damages consultant and distributes the Settlement Fund *pro-rata* to class members pursuant to the principles of *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). Only those shareholders who purchased and continued to hold after a corrective disclosure during the Class Period are compensated. Shareholders are allocated a recognized per share loss of the stock drop based on the amount of such drop. Net gains made from trades during the Class Period are netted out with net losses. Thus, each shareholder is treated fairly and compensated *pro-rata* based on the loss caused by the alleged misconduct.

14.     The requested attorneys' fees are 30% of the Settlement Fund *Net of Expenses*, or $32,205,398.31. This is reasonable and within the range of those awarded in class litigation of this type.  *See* Declaration of Laurence M. Rosen on behalf of The Rosen Law Firm, P.A. Concerning Attorneys' Fees and Expenses ("Rosen Fee Decl.") and Declaration of Michael Wernke on behalf of Pomerantz LLP Concerning Attorneys' Fees and Expenses ("Wernke Fee Decl.") attached hereto as **Exhibits 2 and 3**, respectively.

15.     The requested fee is fair in light of the results achieved, the work performed, the risks involved in the litigation, and similar awards in this type of litigation.  Indeed, this fee request is reasonable considering the excellent result achieved here.

16.     Class Counsel requests reimbursement of case-related expenses of $2,603,672.29. Class Counsel submits that this expense request, advanced by Class Counsel, is also reasonable, fair, and should be approved. These expenses were required and necessary to further the prosecution of this action and are less than the $2,800,000 maximum amount specified in the Notice.

17.     Plaintiffs also request a total award of $45,000 to the three Class Representatives ($15,000 each).   The three Class Representatives each dedicated substantial time and effort

towards this litigation for over three years.  The requested Award requested is more than justified given Class Representatives' commitment to the Class and sacrifice of time.  *See* Exhibits 4-6, Declarations of Gary Koopmann, Timothy Kidd and Victor Pirnik, respectively.

18.     For the reasons set forth herein and in the supporting memoranda filed herewith, this Court should find that the Settlement and Plan of Allocation and request for attorneys' fees, reimbursement of expenses, and award to Class Representatives are fair, reasonable and adequate and should be approved.

## II. OVERVIEW OF PLAINTIFFS' CLAIMS

19.     Plaintiffs' claims are set forth in the FAC (ECF No. 129), which asserts claims against Defendants on behalf of FCA investors during the Class Period.

20.     The FAC alleges that during the Class Period, Defendants misled investors by: (1) asserting that FCA was in compliance with vehicle safety regulations promulgated by the Safety Act and the National Highway Traffic Safety Administration ("NHTSA") while failing to disclose widespread violations of various provisions of the Safety Act involving FCA's failure to timely conduct recalls, notify customers, and remedy safety defects that NHTSA had warned the Company about; (2) underreporting FCA's reserves for product warranties and the cost of recalls; and (3) misleading investors as to FCA's compliance with regulations concerning nitrogen oxide ("NOx") emissions in the Company's diesel vehicles sold in the U.S. and European Union ("EU") by not disclosing that the Company's diesel vehicles utilized undisclosed "AECD" and "defeat devices" that caused the diesel vehicles to perform differently during regulatory tests than in real-world on-road performance.

21.     The FAC alleges that news about these misrepresentations was revealed in a series of seven partial corrective disclosures.  First, on July 26, 2015 FCA entered into a Consent Order

with NHTSA for violations of the Safety Act in connection with 23 recalls (affecting more than 11 million vehicles) which required FCA, among other things, to pay $105 million and conduct recalls. On this news, FCA's stock price dropped approximately 4.9%. Second, on October 28, 2015, FCA announced that it would record a €671 million charge for estimated future recall campaign costs for vehicles sold in prior periods in NAFTA. On this news, FCA's stock price dropped approximately 4.7%. Third, on May 23, 2016 it was reported that the German motor transport authority found evidence indicating possible defeat devices on FCA's vehicles. On this news, FCA's stock price dropped approximately 5.1%.  Fourth, on January 12, 2017 the EPA and CARB each issued a notice of violation to FCA for installing and failing to disclose engine management software. On this news, FCA's stock price dropped approximately 12%. Fifth, on February 6, 2017 French authorities announced they were referring FCA for prosecution concerning NOx emissions.  On this news, FCA's stock price dropped approximately 4.6%. Sixth, on February 7, 2017 it was disclosed that Italy permitted FCA's vehicles to skip key tests for illegal engine software. Seventh, on May 23, 2017 the DOJ announced it filed a complaint in the Eastern District of Michigan asserting FCA violated federal laws regulating emissions. On this news, FCA's stock price dropped approximately 5.2%.

22.     Defendants continue to deny that they committed any acts or omissions giving rise to any liability and/or violation of the law.

### III. PROCEDURAL HISTORY

23.     On September 11, 2015, plaintiff Pirnik filed a securities class action complaint in the Southern District of New York against certain of the Defendants.  ECF No. 1.

24.     By order dated December 9, 2015, the Court appointed Koopmann and Kidd as Lead Plaintiffs and Pomerantz LLP and The Rosen Law Firm, P.A. as Lead Counsel.  ECF No.

24.

25.     Plaintiffs filed the First Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint") on January 22, 2016, alleging violations of Sections 10(b) and 20(a) of the Exchange Act on behalf of FCA investors who purchased FCA common stock between October 13, 2014 and October 28, 2015 (the "Initial Class Period") against FCA, Marchionne, Richard Palmer ("Palmer"), and Kunselman.  ECF No. 28.

26.     On March 7, 2016, Defendants filed a motion to dismiss the Amended Complaint. ECF Nos. 31-33.   On March 29, 2016, Plaintiffs filed the Second Amended Complaint for Violations of the Federal Securities Laws ("SAC"), addressing deficiencies that Defendants alleged in their motion to dismiss (per the Court's invitation in its Order of March 8, 2016).  ECF No. 38.

27.     On April 28, 2016, Defendants filed a motion to dismiss the SAC.  ECF Nos. 42-44. Defendants' motion raised numerous complex issues relating to Plaintiffs' claims.  Defendants argued that the SAC should be dismissed because: (i) the SAC alleged no particularized facts to support a cogent and compelling inference that any Defendant acted with scienter; (ii) Plaintiffs pleaded no actionable misrepresentations; and (iii) Plaintiffs failed to plead loss causation as a matter of law.

28.     On June 3, 2016, Plaintiffs prepared and submitted a detailed 31-page opposition brief to Defendants' motion to dismiss.  ECF No. 46.  In their opposition, Plaintiffs addressed each of the arguments that Defendants raised. In particular, Plaintiffs argued that (i) the SAC amply alleged that Defendants' statements concerning compliance were false and misleading because (a) Defendants' statements that FCA was in compliance with "vehicle safety" regulations were false and misleading and; (b) Defendants' statements concerning compliance were not "puffery;"

8

(ii) the SAC alleged a strong inference of scienter for Defendants' statements concerning compliance because (a) Defendants' actual knowledge of "critical" and "unacceptable" regulatory violations supported a strong inference of scienter; and (b) Defendants' repeated discussions of compliance, admitted close monitoring of compliance issues to ensure "information flow" and "accountability" and access to reports detailing violations supported a strong inference of scienter; (c) Kunselman's abrupt resignation supported a strong inference of scienter; and (d) the inference of scienter is at least as strong as any nonculpable inference; (iii) the SAC adequately alleged falsity and scienter as to FCA's provisions for recalls because (a) Defendants' provisions for recalls was objectively and subjectively false; and (b) Defendants' supposed risk disclosures were themselves false and misleading; and (iv) the SAC adequately alleged loss causation.  Defendants' filed a reply brief on June 24, 2016.  ECF Nos. 47-48.

29.    On October 5, 2016, the Court granted in part and denied in part Defendants' motion to dismiss the SAC.  ECF No. 50.  The Court denied the motion to dismiss as to alleged misstatements concerning FCA's compliance with vehicle safety regulations.  The Court granted Defendants' motion as to alleged misstatements concerning FCA's reserves for cost of recalls deeming them inactionable opinions.  The Court dismissed the claims against Palmer.  On October 26, 2016, Defendants filed their Answers to the SAC, denying all allegations of wrongdoing and liability.  ECF No. 54.

30.    With permission from the Court, Plaintiffs filed the Third Amended Complaint for Violations of Federal Securities Laws ("TAC") on February 22, 2017.  ECF. No. 69.  The TAC added the allegation concerning FCA's compliance with emissions regulations, expanding the Class Period to its current dates.

31.    On March 17, 2017, Plaintiffs' filed a motion for class certification and sought

certification for a class covering the TAC Class Period.  ECF Nos. 85-87.  Plaintiffs attached the expert report of Dr. Zachary Nye ("Nye") Ph.D.  ECF No. 87-1.  Dr. Nye provided opinions on the complex securities-litigation-specific issues of market efficiency.  Dr. Nye opined that: (i) the market for FCA stock was efficient throughout the SAC Class Period and the TAC Class Period, a prerequisite for establishing the "fraud-on-the-market" presumption of reliance in a Section 10(b) class action and the predominance requirement of Rule 23(b)(3); and (ii) damages for investors who purchased FCA stock domestically during the SAC Class Period and the TAC Class Period can be calculated using a method that is common to the Class.

32.     On March 22, 2017, Defendants filed a motion to dismiss the emissions-related allegations in the TAC.  ECF Nos. 91-93. Defendants argued that the FAC should be dismissed because, *inter alia*: (i) Plaintiffs had not alleged any cognizable motive to commit fraud; and (ii) the TAC alleged no particularized facts to support a cogent and compelling inference that any Defendant acted with scienter in making emissions disclosures. On April 25, 2017, Plaintiffs prepared and submitted a 25-page opposition brief to Defendants' motion to dismiss.  ECF No. 96. In their opposition, Plaintiffs argued that: (i) Defendants had conceded that their statements of emissions compliance were false; and (ii) the TAC alleged a strong inference of scienter. Defendants filed a reply brief on May 15, 2017.  ECF Nos. 98-99.

33.     On May 22, 2017, Defendants took the deposition of plaintiff Kidd, which Class Counsel defended.  On May 26, 2017, Defendants filed a letter-motion requesting a continuance of deadlines relating to class certification.  ECF No. 107.  On June 1, 2017, Plaintiffs filed a letter-response to Defendants' letter-motion requesting the continuance (ECF No. 108) and Defendants submitted a reply (ECF No. 110).  On June 2, 2017, the Court entered an Order adjourning the class certification briefing schedule.  ECF No. 111.  The Court extended Defendants' deadline to

file their opposition to Plaintiffs' motion for class certification to two weeks after the Court's decision on Defendants' pending motion to dismiss the TAC.

34.     On June 2, 2017, Defendants took the deposition of plaintiff Pirnik, which Class Counsel defended.  On June 9, 2017, Defendants took the deposition of plaintiff Koopmann, which Class Counsel defended.

35.     On August 1, 2017, the Court granted Defendants' motion to dismiss the emissions-related allegations in the TAC, holding that the TAC failed to adequately allege a strong inference of scienter, but the Court granted Plaintiffs permission to amend the TAC.  ECF No. 121.

36.     On August 24, 2017, Plaintiffs filed the Fourth Amended Complaint for Violations of the Federal Securities Laws ("FAC"), adding allegations concerning FCA's compliance with emissions regulations and Defendants' scienter, and adding Defendants Dahl, Mazure, and Lee. ECF No. 129.

37.     On September 5, 2017, Defendants filed a motion to dismiss the emissions-related allegations in the FAC.  ECF Nos. 131-33.  Defendants argued that the FAC should be dismissed because, *inter alia*: (i) Plaintiffs' new allegations regarding FCA's dialogue with regulators did not support a strong inference of scienter; (ii) Plaintiffs' recasting of a routine "field fix" into an emissions issue did not support a strong inference of scienter; (iii) Plaintiffs' rehashed allegations remained legally insufficient to clear the scienter bar; (iv) Plaintiffs' exceeded the scope of the Court's Order by adding Defendants; and (v) the FAC did not allege that the additional Defendants made any actionable misrepresentations.

38.     On September 21, 2017, Plaintiffs prepared and submitted a 25-page opposition brief to Defendants' motion to dismiss.  ECF Nos. 136-37.  In their opposition, Plaintiffs argued that: (i) the FAC alleged a strong inference of scienter; and (ii) the new Defendants are liable as

"makers" of false and misleading statements and as control persons.  Defendants filed their reply brief on October 5, 2017.  ECF No. 139.

39.     On November 13, 2017, the Court denied Defendants' motion to dismiss the emissions-related allegations in the FAC in its entirety, holding that the FAC adequately alleged scienter.  ECF No. 142.  On December 18, 2017, Defendants filed their Answers to the FAC, denying all allegations of wrongdoing and liability.  ECF No. 147.

40.     On December 21, 2017, Plaintiffs served Defendants with their motion for an order (1) certifying the Action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) as a class action and certifying a Class as defined in the motion papers; (2) appointing Koopmann, Kidd, and Pirnik as Class Representatives; and (3) appointing Pomerantz  and Rosen as counsel for the Class. ECF Nos. 148-49, 151.

41.     On February 2, 2018, Defendants took the deposition of Dr. Nye, which Class Counsel defended.

42.     On February 13, 2018, Defendants served their opposition papers on the class certification motion.  ECF Nos. 160-161. Defendants argued that (i) the Class should not be certified because Plaintiffs cannot invoke the *Basic* presumption of reliance; and (ii) Plaintiffs' purported classwide damages methodology does not measure damages attributable solely to their theory of injury.

43.     On March 5, 2018, Plaintiffs took the deposition of Defendants' expert, Dr. Paul A. Gompers ("Gompers"), which Defendants' counsel defended.

44.     On March 13, 2018, Plaintiffs filed their reply papers on their class certification motion.  ECF Nos. 165-66.  On April 6, 2018, Defendants filed sur-reply papers in further opposition.  ECF No. 178.

45.     On June 26, 2018, the Court granted Plaintiffs' motion for class certification, certifying a class consisting of all persons who purchased, on a U.S. Exchange or in a transaction in the U.S., FCA common stock between October 13, 2014 and May 23, 2017, both dates inclusive, appointing Koopmann, Kidd, and Pirnik as class representatives, and appointing Pomerantz and Rosen as Class Counsel.  ECF No. 223.

46.     Following the Court's partial denial of Defendants' motion to dismiss the SAC on October 5, 2016 (ECF No. 50), the Parties engaged in extensive discovery, which included, *inter alia*: (i) Plaintiffs' issuance of three sets of interrogatories, one set of requests for admissions, and two sets of requests for production to Defendants; (ii) third-party subpoenas, including a petition to enforce the subpoena on Robert Bosch, LLC (initially filed the Eastern District of Michigan, 2:18-CV-11101-VAR-RSW, and later transferred to the Southern District of New York, 1:18-CV-04065-JMF) and the filing of a related action against the United States Department of Transportation ("USDOT") challenging USDOT's denial of Plaintiffs' request to take the deposition of former NHTSA employee Robert Garris (1:18-CV-03460-JMF); (iii) numerous discovery-related letter motions, including letter motions to compel (*see* ECF Nos. 73, 77, 81, 152, 154-55, 180-81, 183-86), a letter motion seeking leave to take 40 depositions and propound additional interrogatories (*see* ECF Nos. 190-91, 194-95, 200), and a letter motion requesting spoliation sanctions (*see* ECF No. 310-12, 325, 327); (iv) various other discovery related motions, such as a motion to quash subpoenas for documents and testimony related to the confidential witness names in Plaintiffs' complaint (ECF Nos. 221, 228); (v) responses to interrogatories and requests of production from Defendants; (vi) review and analysis of over 3.5 million pages of documents from Defendants and third-parties; (vii) 36 depositions; and (viii) the exchange of opening, responsive, and rebuttal reports from 11 experts.

47.     Fact discovery was complex and intense. As reflected in the motions to compel referenced above, the Parties had discovery disputes concerning privilege logs, the number of fact depositions that could be taken, the appropriate number of interrogatories, and the scope of document production, among many other issues. Many of the fact depositions took place in Detroit, Michigan where FCA is headquartered.

48.     Initially, the fact discovery cutoff was set for July 18, 2018. However, the Parties requested extensions to the fact discovery cutoff to accommodate the substitution of certain witnesses due to illness, Then, on July 25, 2018 the Parties informed the Court that Sergio Marchionne had passed away before he could be deposed in the Action.  On August 14, 2018 the Court so-ordered the Parties' agreement that Mr. Marchionne's deposition transcript in a separate proceeding concerning matters relevant to this Action would be deemed as if taken in this Action. (Dkt. No. 242).  Fact discovery was then extended again.  On August 24, 2018 the Court denied the Government's motion to quash or modify Plaintiffs' subpoena directed to former DOT employee Robert Garris.  (Dkt. No. 244). Accordingly, the Court extended the discovery so that Plaintiffs could take Mr. Garris's deposition.

49.     In connection with expert discovery, Plaintiffs served Defendants with the expert reports of Zachary Nye, Robert F. Hellmuth ("Hellmuth"), Dr. Chris M. Atkinson ("Atkinson"), SC.D., and Dr. Axel Friedrich ("Friedrich").   Dr. Nye opined on the economic materiality of information to investors, loss causation, and per-share damages.  Dr. Nye concluded that: (i) that the information disclosed during the Class Period corrected Defendants' misrepresentations and proximately caused FCA stock to decline on at least seven distinct trading dates and that these declines reflect the actual losses suffered by investors; (ii) that  the information Defendants allegedly misrepresented and omitted is economically material, and provided the economic

framework for quantifying per-share damages suffered by purchasers of FCA stock during the Class Period. Mr. Hellmuth opined as to FCA's compliance with vehicle safety standards contained in the Safety Act, whether FCA's processes for compliance with vehicle safety regulations were adequate, and on FCA's disclosures concerning its compliance with vehicle safety regulations were adequate. Mr. Hellmuth concluded that: (i) FCA was not in compliance with the Safety Act during the Class Period; (ii) FCA's processes and internal controls to ensure compliance with vehicle safety regulations were inadequate and ineffective; and FCA's statements that it was in substantial compliance with relevant global regulatory requirements including vehicle safety regulations were false and misleading. Dr. Atkinson opined as to FCA's compliance with U.S emissions regulations, on the adequacy of the Company's processes for compliance with emissions regulations, and on the adequacy of the Company's disclosures concerning its compliance with emissions regulations. Dr. Atkinson concluded that: (i) FCA was not in compliance with the U.S. emissions regulations during the Class Period; (ii) FCA's processes and internal controls to ensure compliance with emissions regulations were inadequate and ineffective; and (iii) FCA's statements concerning its compliance with emissions regulations were false and misleading. Dr. Friedrich opined as to FCA's compliance with EU emissions regulations and as to the adequacy of the Company's disclosures concerning its compliance with EU emissions regulations. Dr. Friedrich concluded that: (i) FCA was not in compliance with the EU emissions regulations during the Class Period; and (ii) FCA's statements concerning its compliance with emissions regulations were false and misleading.

50.     In addition to Dr. Gompers, Defendants served Plaintiffs with the rebuttal expert reports of David Bradley ("Bradley"), Daniel C. Esty ("Esty"), James M. Lyons ("Lyons"), Nick Molden ("Molden"), and George H. Person ("Person"). Bradley was asked to respond to certain

opinions expressed by Dr. Nye, in particular, to assess whether the alleged misstatements were pertinent to investment decision-making in general, and whether the alleged misstatements and the alleged corrective disclosures were pertinent to investment decision making for FCA's stock during the Class Period.   Bradley concluded that: (i) Dr. Nye's conclusions that "information allegedly misrepresented and omitted is economically material" and that "there is a substantial likelihood a reasonable shareholder would have considered such information important in making an investment decision during the Class Period" are unsupported and wrong; and (ii) investors, when making investment decisions, would not have viewed, and in fact did not view, FCA's broad and general statements that it was "substantially in compliance with the relevant global regulatory requirements" as important or value-relevant.   Esty was asked to review and respond to the expert reports of Dr. Atkinson and Dr. Friedrich.   Esty concluded that: (i) FCA undertook steps that it believed were consistent with industry custom and practice and with what the EPA expected for AECD disclosures; and (ii) the Atkinson Report and the Friedrich Report are devoid of regulatory perspective; they fail to consider and set their technical evaluation into the broader context under which the regulatory issues at play and Plaintiffs' allegations in this Action should be understood. Lyons was asked to review and respond to the expert report of Dr. Atkinson.   Lyons concluded that: (i) Dr. Atkinson failed to demonstrate that FCA's Subject Vehicles were not in compliance with EPA and CARB emissions regulations during the Class Period: and (ii) Dr. Atkinson failed to prove that any of the calibration features at issue are either AECDs or defeat devices.   Molden was asked to respond to certain opinions expressed in the expert report of Dr. Friedrich.   Molden opined that Dr. Friedrich failed to demonstrate that FCA was not in compliance with EU emissions regulations.   Person was asked to review and respond to the opinions expressed in the expert report of Hellmuth.   Person concluded that: (i) Hellmuth mischaracterizes safety recall requirements and

the recall administration process; (ii) Hellmuth mischaracterizes industry standards and practices regarding safety recalls; (iii) Hellmuth makes incorrect assumptions with regard to FCA's compliance with safety recall regulations; (iv) Hellmuth fails to consider the context surrounding NHTSA's allegations of FCA's noncompliance; and (v) contrary to Hellmuth's assertions, based on his review of the record, FCA's safety recall process is consistent with, and in some cases exceeded, industry standards during the relevant time period.

51.     Plaintiffs served Defendants with rebuttal expert reports from Dr. Atkinson, Dr. Friedrich, Dr. Nye, and Anthony Andreoni ("Andreoni").

52.     On December 12, 2018, Defendants filed a summary judgment motion arguing that there was no admissible evidence sufficient to raise a genuine issue of material fact for trial, and they were thus entitled to summary judgment, because: (i) the record shows that Defendants did not make any actionable misstatements; (ii) there is no triable issue as to scienter; and (iii) there is no triable issue over loss causation for four alleged "corrective" disclosures.  ECF Nos. 279-87, 302-03.  Defendants concurrently filed two *Daubert* motions.  ECF Nos. 273-78.  On the same date, Plaintiffs filed four *Daubert* motions.  ECF Nos. 289-300.

53.     On January 18, 2019, Plaintiffs opposed Defendants' motion for summary judgment.  ECF No. 333-41.  Plaintiffs argued that the Court should deny Defendants' motion because: (i) a reasonable jury would have no difficulty concluding that Defendants' statements are actionable; (ii) a reasonable jury would easily conclude that Defendants acted with scienter; and (iii) there is a triable issue over loss causation for all corrective events.

**Settlement Negotiations**

54.     On September 26, 2018, Class Counsel and Defendants' Counsel participated in a full-day mediation session before the Honorable Daniel Weinstein (Ret.) of JAMS (the

"Mediator").  In advance of that session, the Parties exchanged detailed mediation statements with numerous exhibits, addressing liability and damages, which were submitted to Judge Weinstein. The mediation session ended without the Parties reaching an agreement. At the close of the first mediation session Judge Weinstein requested additional submissions from the Parties concerning discrete issues related to liability and damages which the Parties submitted.

55.    On January 8, 2019, Class Counsel and Defendants' Counsel participated in a second full-day mediation session before Judge Weinstein.  In advance of that session, the Parties exchanged and submitted to the mediator supplemental mediation statements with numerous exhibits, addressing additional factors impacting liability and damages.  The mediation session ended without any agreement being reached.

56.    Following additional conversations between the mediator and the Parties, Judge Weinstein issued a Mediator's, double-blind proposal that the Action settle for $110 million in cash.  Both Parties accepted the Mediator's proposal on February 4, 2019. Subsequently, the Parties continued negotiations resulting in the terms and conditions set forth in the Stipulation.

57.    Plaintiffs filed a motion for preliminary approval of settlement (the "Preliminary Approval Motion"), and accompanying documents, on April 5, 2019.  ECF Nos. 353-55.  On April 10, 2019, the Court issued the Preliminary Approval Order granting approval of the proposed Settlement and directing dissemination of notice to Class Members.  ECF No. 356.  The Court scheduled the Settlement Fairness Hearing for final approval of the Settlement, attorney's fees and expenses, including reimbursement of Plaintiffs' reasonable costs and expenses, and to hear any objections by Class Members, for September 5, 2019, at 3:00 p.m.  *Id.*  Defendants have paid $110,000,000 into the Escrow Account for the benefit of the Class, $325,000 of which is earmarked for Notice and Administration Costs.

## IV. CONTINUED LITIGATION POSED CONSIDERABLE AND SERIOUS RISKS TO THE CLASS

58.     Although Plaintiffs and Class Counsel strongly believe that the claims asserted in this Action are meritorious and that the evidence developed to date supports them, they recognize and acknowledge the substantial expense and duration of continued proceedings that would be necessary to prosecute the Action.  Plaintiffs and Class Counsel are also mindful of the inherent difficulty of proving claims under the federal securities laws and the possible defenses to the claims asserted in this Action, as well as the uncertainties presented by complex litigation.

### Risks of Proving Liability and Damages

59.     The resolution of this action required assessment of many complex issues of fact and law.  Numerous factual and legal questions exist as to liability and damages that have already been subject to lengthy and expensive expert discovery.

60.     Defendants have argued, and would have continued to argue that Plaintiffs cannot prove: (1) that the alleged misstatements were false or misleading; (2) that the alleged misstatements were material given that FCA was "more than 90% compliant" with respect to each of the recalls and that the NOV's asserted violations with "far less than 1% of FCA's vehicles on the road"; (3) that Defendants acted with scienter in making each of the alleged misstatements; and (4) that loss causation exists for at least four of the seven alleged corrective disclosures.

61.     Although Class Counsel believes that they would prevail on all claims, Class Counsel acknowledges that continued litigation would expose the Class to a risk of no recovery, or a much lower recovery.  As demonstrated by Defendants' motions to dismiss and motion for summary judgment, Defendants' vehemently dispute, among other things, that any of the alleged misstatements were false or misleading. In addition, it is well-known that scienter is difficult to prove in securities fraud cases, and the Court here dismissed the TAC, in part, based on scienter

inadequacies.  The jury would have had to determine whether any misrepresentations/omissions were material and whether Defendants acted with scienter.

62.    Plaintiffs would also have to show that the alleged securities violations caused Plaintiffs' losses. Plaintiffs are confident they would successfully establish loss causation, but Defendants have argued that the four of the seven alleged corrective disclosures did not disclose any new information, resulting in no loss causation or damages, and have provided expert testimony supporting their contentions. Further, had the jury decided that not all of the alleged corrective disclosures caused Plaintiffs' losses, the Class' damages would be reduced accordingly.

63.    It is well established that loss causation is a very complicated issue, requiring testimony from financial experts. This essential element is often reduced to a "battle of the experts." A jury's reaction to conflicting expert testimony is unpredictable, and Class Counsel recognized the possibility that the jury could have been swayed by Defendants' experts and awarded little to no damages.

64.    Even if Plaintiffs prevailed at trial, Defendants might have appealed the decision. The appeals process can go on for months or even years, significantly prolonging the Action and jeopardizing any recovery awarded to the Class at trial should Defendants be victorious.

65.    In contrast to the foregoing, the Settlement represents an immediate and certain benefit for the Class.  Class Counsel, having evaluated the substantial risk, time, and expense required to prosecute this Action through trial and appeals, strongly believes that the Settlement is an excellent result for the Class.

**Complexity, Expense and Likely Duration of the Litigation**

66.    The resolution of this Action required the assessment of numerous complex issues of fact and law. Indeed, the complexity of this case is evidenced by the Parties' briefing on

summary judgment, which included testimony and reports from experts from both Parties on the issues of: 1) vehicle safety regulations; 2) emissions regulations in the United States; 3) emissions regulations in the EU; 4) legal and regulatory policies and procedures concerning United States emissions regulations; and 5) damages.

67.     Had Plaintiffs succeeded in opposing Defendants' summary judgment motion, the Action would then be scheduled for trial. Trial undoubtedly would have been expensive, risky and followed by years of appeals even if Plaintiffs secured a judgment. The jury would have had to determine: (i) whether any misrepresentations/omissions were material; (ii) whether Defendants acted with scienter; (iii) whether *Basic's* fraud-on-the market reliance presumption applies; and (iv) the amount of artificial inflation in FCA's stock and how much of the price decline resulted from each of the alleged curative disclosures.

68.     The trial that Plaintiffs would face would be lengthy and complicated. In addition to resolving numerous complex securities law issues, the jury would have had to navigate the highly technical scientific evidence concerning AECD's and defeat devices and navigate battles of the experts regarding both vehicle safety and vehicle emissions regulations, as well as market efficiency, loss causation and damages.  On liability alone, particularly since this is a very technical and complicated action, the trial would have involved substantial attorney and expert time, vigorously contested motions, and the considerable use of judicial resources.

69.     Even assuming that the Class could recover a larger judgment after one or more trials, the delay through the trial(s), post-trial motions and the appellate process would likely deny the Class any recovery for years and the continued costs of prosecution would erode any increased recovery. Moreover, if the case were to go to trial, funds that Defendants could put forth towards a settlement would continue to decrease.

**Stage of Proceedings**

70.     This case was at a very advanced stage procedurally and did not settle until the completion of fact and expert discovery, on the eve of the completion of summary judgment briefing.

71.     By the time the Parties agreed to settle, they had completed fact and expert discovery. Defendants produced, and Plaintiffs had reviewed, over 3.5 million pages of documents, many of them highly technical. The Parties also obtained testimony from witnesses through 36 depositions of Plaintiffs, Defendants, third parties and experts. Indeed, the Parties agreed to settle after Plaintiffs filed their opposition to Defendants' summary judgment motion. Once summary judgment briefing was complete and the Court rendered a decision, a trial date would be set.

72.     Class Counsel has conducted a thorough evaluation of the strengths and weaknesses of the action based upon a thorough assessment of the voluminous documentary evidence and deposition testimony in the case, not to mention extensive legal research and consultation with experts. Class Counsel's thorough investigation and litigation to date and extensive factual and legal research has informed Class Counsel in evaluating the strengths and weaknesses of the action and the challenges the Class would face at trial.  Moreover, Class Counsel was able to marshal the evidence and present a compelling analysis of the action to Defendants and the mediator during settlement negotiations.

**Range of Reasonableness/Ability of Defendants to Withstand a Greater Judgment**

73.     The Settlement provides for a cash recovery of $110,000,000.  In consultation with their experts, Plaintiffs estimate that if they prevailed on all of their claims, based on the Class and Class Period as currently constituted, the likely recoverable damages using the "Two-Trader Model" (also known as the "80/20 Model") would be $800 million. The Settlement thus represents

approximately 13.75% of the potentially most likely recovery. Moreover, the damages computation assumes that 100% of eligible class members file claims. It is more likely that less than 100% will do so (despite efforts made to notify as many eligible claimants as possible, including posting the notice on the Internet). Of course, Defendants will contend that Class Representatives' best-case scenario of Class-wide damages would be less, possibly even zero.

74.     The 13.75% recovery here not only falls well within the range of reasonableness, it far exceeds historical average recoveries. *See, e.g.*, Cornerstone Research, *Securities Class Action Settlements: 2018 Review and Analysis* at 6 available at https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2018-Review-and-Analysis (noting that in 2018 the median settlement as a percentage of "simplified tiered damages" between $500 million and $999 million was 3.3%).

75.     Settlement at this time avoids the risks and substantial costs of litigation and provides Class Members with the opportunity to receive an immediate, certain, and substantial recovery. It is, therefore Class Counsel's opinion that the risks involved, balanced against the certainty of the substantial benefits obtained by the Settlement, more than justify approval of this Settlement.

### **Reaction of the Class**

76.     The Class is overwhelmingly in favor of the Settlement. Pursuant to the Preliminary Approval Order, Court-appointed Claims Administrator Epiq disseminated 180,907 Notice Packets to potential Class Members through August 1, 2019. Mulvihill Decl., ¶12. Epiq also published the Summary Notice on *PR Newswire* and in *Investor's Business Daily*; established and continues to maintain a toll-free telephone number for Class Members; and established and currently maintains a website dedicated to the Settlement. *Id.* at ¶¶14-17. The deadline for

objections and requests for exclusions is August 15, 2019.   As of August 1, 2019 not a single

Class Member has objected to the Settlement. *Id.* at ¶20.  Only nine Class Members have submitted

requests for exclusion, with these requests representing a total of 7,350 shares. *Id.*

77.    The Class' favorable reaction supports approving the Settlement.

**V. THE NOTICE OF THE SETTLEMENT WAS PROPERLY MADE TO THE CLASS**

78.    On April 10, 2019, the Court issued the Preliminary Approval Order.  ECF No.

356.

79.    In the Preliminary Approval Order, the Court:

a)    preliminarily approved the Stipulation and the Settlement set forth therein, subject to further consideration at the Settlement Fairness Hearing;

b)    scheduled a Settlement Fairness Hearing for September 5, 2019 at 3:00 p.m. to determine whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate and should be approved; whether a judgment as provided in the Stipulation should be entered; whether the proposed Plan of Allocation should be approved; and to determine any amount of fees and expenses that should be awarded to Class Counsel and to Plaintiffs;

c)    appointed Epiq Class Action & Mass Tort Solutions Inc. ("Epiq" or "Claims Administrator") to supervise and administer the notice procedure as well as the processing of claims;

d)    approved the form and content of the Notice, Summary Notice, and Claim Form;

e)    directed Epiq to take all reasonable efforts to cause a copy of the Notice and Claim Form to be mailed by first-class mail or e-mailed to potential Class Members and approved nominee procedures;

f)    directed copies of the Notice and Claim form to be posted on an Epiq website designated for the Action;

g)    directed Class Counsel, through Epiq, to cause the Summary Notice to be posted over *PR Newswire* and to be published in *Investor's Business Daily* no later than May 10, 2019;

h)    directed Class Counsel to serve on Defendants' counsel and file with the

Court proof of such mailing and publication no later than August 29, 2019;

i)     established procedures and deadlines for Class Members to object to the Settlement, Plan of Allocation, award of attorneys' fees, reimbursement of expenses, or award to Class Representatives and to appear at the Settlement Fairness Hearing; and

j)     established procedures and deadlines for Class Members to submit Claim Forms or seek exclusion.

## A.     NOTICE

80.     Attached hereto as Exhibit 1 is a true and correct copy of the Mulvihill Decl., which sets forth the efforts undertaken by Epiq to mail the Notice and Claims Forms to potential Class Members, to publish the Summary Notice, and to establish the website and Internet notice.

81.     As detailed in the Decl., Epiq mailed or caused to be mailed a total of 180,907 Notice and Claim Forms through first-class mail to potential Class Members, brokers, and other nominees.   Mulvihill Decl. ¶12.   The Summary Notice was posted over *PR Newswire* and published in *Investor's Business Daily* on May 6, 2019.  *Id*. at ¶14.

82.     Additionally, Epiq posted the Notice and Claim Form, the Court's April 10, 2019 Preliminary     Approval     Order,     and     the     Stipulation     on     Epiq's     website, www.fiatchryslersecuritieslitigation.com. Mulvihill Decl. ¶17.

83.     As required by Federal Rule of Civil Procedure 23, due process, and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, 15 U.S.C. §78u-4(f)(7) ("PSLRA"), the Notice: (a) described the nature of the Action; (b) included the definition of the Class; (c) set forth the Class' claims; (d) described the Settlement's terms; (e) disclosed that Class Counsel intends to seek attorneys' fees of up to thirty percent (30%) of the Settlement Fund, plus reimbursement of expenses up to $2,800,000 and compensatory awards for the Class Representatives up to $45,000; (f) advised Class Members of the right to exclude themselves from the Class and the binding effect of not doing so; (g) provided the deadline and procedure for opting-

out of the Settlement or opposing the Settlement, Plan of Allocation, award of attorneys' fees, reimbursement of expenses, or awards to the Class Representatives; (h) provided the date, time, and place of the Settlement Fairness Hearing; (i) summarized the reasons why the Parties are proposing the Settlement; and (j) provided the names, telephone numbers, and addresses of Class Counsel.   Mulvihill Decl., Ex. A.

84.     The notice procedures set forth above satisfied federal due process because they more than adequately apprised the interested parties of the pendency of the Action and afforded them the opportunity to present their objections.

**B.     THE PLAN OF ALLOCATION SHOULD BE APPROVED AS IT IS FAIR AND REASONABLE**

85.     Pursuant to the Preliminary Approval Order, and as explained in the Notice, all Class Members who wish to participate in the Settlement must submit a Claim Form to Epiq postmarked no later than August 28, 2019.  All Class Members who wish to exclude themselves from the settlement must file a request for exclusion by August 15, 2019.

86.     As set forth in the Notice, all Class Members who timely file a valid Claim Form entitling him/her to a recovery of $10.00 or more will receive a distribution of the Settlement proceeds, after deduction of attorneys' fees, expenses, notice/administration expenses, Class Representative awards, and taxes incurred on interest income earned by the gross Settlement Fund. The distribution will be made in accordance with the Plan of Allocation set forth and described in detail in the Notice.

87.     The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund among Authorized Claimants who suffered economic loss as a result of Defendants' alleged fraud, as opposed to losses caused by market or industry factors not related to the alleged fraud.

88.     The Plan of Allocation was formulated by Class Counsel, in consultation with a

well-respected and experienced financial consultant, and was designed to ensure that the distribution of the Settlement Fund was fair and consistent with Plaintiffs' theory of the case, which asserted that there was a decline in the price of FCA common stock purchased on a U.S. Exchange or in a transaction in the U.S. reflecting a disclosure of the truth relating to the alleged misconduct and to ensure that the allocation comported with the federal securities laws, including principles of loss causation and negative causation.

89.     The Plan of Allocation does not compensate losses resulting from "in and out" transactions—losses from sales made prior to revelation of truth.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("But if, say, the purchaser sells the shares before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.").  The Plan of Allocation requires any gains from Class Period transactions to be netted with losses from Class Period transactions, which is rational and reasonable.

90.     Perhaps most importantly, the Plan of Allocation does not discriminate between Class Members in the same position, as each Authorized Claimant will receive a *pro rata* share of the Net Settlement Fund.

91.     Class Counsel and their financial consultant determined that this was the fairest method of allocation of the Net Settlement Fund.

92.     Plaintiffs retained Stanford Consulting Group, Inc., which provides research, analysis, and expert testimony in complex business litigation, particularly securities class actions, to provide advice on potential damages in the Action.

93.     A plaintiff incurs damages when purchasing a share at a price inflated as a result of false or misleading statements and/or omissions, provided that a later curative disclosure of that fraud causes the security price to decline.   Price inflation can be created by material

misrepresentations and/or omissions on or before the purchase date, which remain uncorrected in whole or in part at that date.  Damages are mitigated if the share is later sold, while the price remains inflated, so that the original purchaser receives at sale an offsetting "bonus" equal to the dollar amount of inflation remaining at the sale date.  Price inflation may be measured from changes in security prices, net of market, industry, and other non-fraud-related effects, when the true condition and prospects of the company are partially or fully disclosed; price inflation present at the purchase date may be estimated by measuring the portion of the price decline caused by a curative disclosure.

94.     In this Action, the actual loss suffered by a Class Period purchaser is readily observed as the portion of the FCA-specific price decline—net of market and industry effects—caused by the revelation of fraud on: July 27, 2015; October 28, 2015; May 23, 2016; January 12, 2017; February 6, 2017; February 7, 2017; and May 23, 2017.  Accordingly, as demonstrated in the following table, if a share of FCA common stock was sold before July 27, 2017 (the earliest Corrective Disclosure Date), the Recognized Loss for that share is $0.00, and any loss suffered is not compensable under the federal securities laws:  Likewise, if a share of FCA common stock was both purchased and subsequently sold between two consecutive Corrective Disclosure Dates, the Recognized Loss for that share is $0.00.

| Table 1 | | |
|---|---|---|
| Artificial Inflation in FCA Common Stock | | |
| From | To | Per-Share Price Inflation |
| 10/13/20141 | 7/26/2015 | $3.85 |
| 727/2015 | 10/27/2015 | $3.37 |
| 10/28/2015 | 5/22/2016 | $2.54 |
| 5/23/2016 | 1/11/2017 | $2.20 |
| 1/12/2017 | 2/5/2017 | $1.11 |
| 2/6/2017 | 2/6/2017 | $0.81 |
| 2/7/2017 | 5/22/2017 | $0.42 |
| 5/23/2017 | Thereafter | $0.00 |

95.     Furthermore, in accordance with the "Limitation on Damages" provisions of the PSLRA (15 U.S.C. §78u-4(e)), damages on a share purchased during the Class Period and held as of the close of the 90-day period subsequent to the Class Period (the "90-Day Lookback Period") cannot exceed the difference between the purchase price paid for the common stock and the average price of the common stock during the 90-Day Lookback Period.  Damages on shares purchased during the Class Period and sold during the 90-Day Lookback Period cannot exceed the difference between the purchase price paid for the share and the rolling average price of the common stock during the portion of the 90-Day Lookback Period elapsed as of the date of sale.

96.     Additionally, under the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005), damages are assessed only for shares purchased during the Class Period and retained through the alleged curative disclosure—shares purchased during the Class Period and sold before the alleged curative disclosure do not incur damages.

97.     There have been no objections to the Plan of Allocation.  Plaintiffs respectfully submit that it is fair, reasonable, and adequate and should be approved by the Court.

## VI. THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE AND EXPENSES INCURRED WERE NECESSARY TO LITIGATE THIS ACTION

98.     The percentage of recovery method for compensating attorneys in common fund cases is preferred and appropriate.  First, it is consistent with the Second Circuit case law, as set forth in the accompanying Memorandum of Law in Support of Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Award to Class Representatives ("Fee Brief"). Second, it is consistent with practices of the private marketplace where contingency attorneys are customarily compensated on a percentage of the recovery method. Third, it provides Class Counsel with a strong incentive to achieve a maximum possible recovery in a reasonable amount of time. Fourth,

use of the percentage method decreases the burden imposed upon the Court by the "lodestar" method and assures that Class Members do not experience undue delay in receiving their share of the settlement.

99.     Class Counsel have represented the Class on a wholly contingent basis for over three and a half years, not receiving any payment for their service or the expenses incurred in prosecuting this Action against Defendants and negotiating the Settlement.  Throughout this time, Class Counsel's dedication to recovering a favorable result for the Class has been expensive and challenging.

100.    The Notice informed Class Members that Class Counsel would apply for attorneys' fees in the amount of thirty percent of the Settlement Fund, plus reimbursement of expenses up to $2,800,000, and awards to Class Representatives up to $45,000 in total.

101.    Class Counsel requests that the Court award a fee of thirty percent of the net Settlement Fund (less expenses and award to Class Representatives) (the "Settlement Fund Net of Expenses"), or $32,205,398.31, plus accrued interest. As discussed in the Memorandum of Law in Support of Class Counsel's Motion for an Award of Attorneys' Fees, Expense Reimbursement, and Compensatory Awards for Class Representatives filed concurrently herewith, the requested fee is within the range of reasonable fees awarded in common-fund cases.

102.     In addition, in light of factors, including the excellent result achieved for the Class, the skill required, the quality of work performed, and the risk of pursuing claims on a contingency basis, a thirty percent fee *net of expenses* is justified and should be approved.

103.    From its inception, Class Counsel has aggressively litigated this action. Class Counsel's experience in securities class action litigation allowed them to identify complex issues involved in this action and to formulate strategies to effectively and efficiently prosecute a

litigation of this complexity. Additionally, Class Counsel submits that their reputation as attorneys able and willing to see a meritorious case through trial and appeals assisted in the Settlement negotiations. As set forth in detail in the firm resumes, attached as Exhibit 3 to the Wernke Decl. and Exhibit 3 to the Rosen Decl., both firms are nationally-recognized class-action firms with extensive experience litigating and negotiating settlements as lead or co-Counsel in complex securities class actions.

104.   The quality of legal services performed by Class Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants were represented by very able and zealous counsel, Sullivan & Cromwell, LLP ("S&C"). S&C possesses significant experience in complex securities litigation and is a highly respected and reputable firm. S&C spared no effort in the defense of its clients. In the face of this opposition Class Counsel were nonetheless able to develop a case that was sufficiently strong to settle the Action on terms that were favorable to the Class.

105.   As discussed above, Class Representatives and their counsel faced significant risks in pursuing this action. In fact, this was not an action where any recovery was assured. Adding to these risks, Class Counsel has received no compensation and incurred significant out-of-pocket expenses during the time the action has been pending for over three years. Their fees are totally contingent and dependent upon a successful result and an award by this Court. Class Counsel respectfully submits that the outstanding Settlement was primarily the result of their persistence, hard work, and skill.

106.   Attached hereto as Exhibits 2 and 3 are declarations from both Class Counsel firms in support of an award of attorneys' fees and litigation expenses.  Included within both declarations is a schedule summarizing the hours and lodestar of both firms from the inception of the case

through August 1, 2019, and a summary of expenses by category.  No time expended in preparing the application for fees and reimbursement of expenses has been included.

107.    Collectively, Class Counsel have expended approximately 44,359.52 hours in the investigation and prosecution of the Action, which Class Counsel submit were reasonable and reflect their commitment to aggressively pursuing compensation for the Class, while avoiding unnecessary duplication of tasks.  Class Counsel's time includes time spent on:  (a) conducting a lengthy investigation by reviewing and analyzing publicly available information regarding Defendants, including SEC filings, online and newspaper articles, analyst reports and presentations, press releases, and earnings conference calls; (b) carefully drafting the detailed Amended Complaint filed on January 22, 2016 (ECF No. 28); (c) researching and drafting the SAC filed on March 29, 2016 (ECF No. 38) in response to Defendants' motion to dismiss the Amended Complaint; (d) researching and drafting the TAC filed on February 22, 2017 (ECF No. 69) in response to Defendants' motion to dismiss the SAC; (e) researching and drafting the FAC filed on August 24, 2017 (ECF No. 129) in response to Defendants' motion to dismiss the TAC; (f) opposing and prevailing against Defendants' various motions to dismiss; (g) consulting with a damages expert to evaluate recoverable losses; (h) consulting with investigators; (i) thoroughly researching the securities laws; (j) successfully moving for class certification, which included expert depositions and defending Plaintiffs' depositions; (k) engaging in comprehensive discovery, which included fact and expert depositions (a total of 36 depositions), reviewing and analyzing over 3.5 million of pages of documents, the exchange of reports from 11 expert witnesses, and various discovery-related letter motions and motions to squash subpoenas; (l) opposing Defendants' motion for summary judgment motion including opposing Defendants' two *Daubert* motions and filing four *Daubert* motions; (m) preparing for and participating in two

full day mediation sessions; (n) successfully negotiating a $110 million settlement; and (o) finalizing the terms of the Stipulation with Defendants.

108.    Applying the normal hourly rates of Class Counsel to the hours expended in the Action yields a lodestar amount of 1.40.  The calculation of lodestar is set forth below and further explained in the Declarations of Laurence Rosen and Michael Wernke Concerning Attorneys' Fees and Expenses, attached hereto as Exhibits 2 ("Rosen Fee Decl.") and 3 ("Wernke Fee Decl."), respectively.

### THE ROSEN LAW FIRM, P.A.

| Attorney (Years Practicing Law) | Hourly Rate | Cumulative Hours | Lodestar Value |
|---|---|---|---|
| Laurence Rosen (P) (30) | $975 | 476.3 | $464,392.50 |
| Phillip Kim (P) (17) | $850 | 59.06 | $50,201.00 |
| Erica Stone (A) (6) | $650 | 19.6 | $12,740.00 |
| Sara Fuks (C) (14) | $800 | 2,010.25 | $1,608,200.00 |
| Zachary Halper (A) (4) | $525 | 84.91 | $44,577.75 |
| Brent LaPointe (A) (9) | $725 | 120.54 | $87,391.50 |
| Jonathan Stern (A) (11) | $725 | 883.3 | $640,392.50 |
| ChristopherWilliams(SA)(30) | $450 | 2,804.50 | $1,262,025.00 |
| Joseph Guglielmi (SA)(37) | $450 | 2150 | $967,500.00 |
| Jephte Lanthia (SA) (5) | $400 | 751.25 | $300,500.00 |
| Frederic Leslie (SA) (48) | $450 | 629.5 | $283,275.00 |
| Wendy Mui (SA) (5) | $400 | 901.75 | $360,700.00 |
| Lloyd Donders (SA) (17) | $450 | 2329.5 | $1,048,275.00 |
| Ryan Weber (SA) (12) | $450 | 821.00 | $369,450.00 |
| Jo Na Williams (SA) (8) | $400 | 392 | $156,800.00 |
| Robert Valenti (SA) (15) | $450 | 899.75 | $404,887.50 |
| Kris Drum (SA) (12) | $450 | 862.5 | $388,125.00 |
| Charles Pietrofesa (SA) (12) | $450 | 972 | $437,500.00 |
| Mahima Achutan (SA) (12) | $400 | 2299.5 | $919,800.00 |
| Frank Kalamajka (SA) (24) | $450 | 2279.27 | $1,025,671.50 |
| Turquoise Young (SA) (9) | $400 | 2150.8 | $860,320.00 |
| Karen Tucci (SA) (20) | $450 | 156 | $70,200.00 |
| Alexandria Lynn (SA) (11) | $450 | 62 | $27,900.00 |
| Christopher Mullane(SA)(14) | $450 | 87.5 | $39,375.00 |
| Adam Allen (SA) (27) | $450 | 396.5 | $178,425.00 |
| Valerie Bruce (SA) (19) | $450 | 1570 | $706,500.00 |

| | | | |
|---|---|---|---|
| Lorie Whitfield (SA) (20) | **$450** | **121.6** | **$54,720.00** |
| Jamie Gordon (SA) (23) | **$450** | **528.8** | **$237,960.00** |
| **ATTORNEY TOTALS:** | | **26,819.68** | **$13,007,704.25** |
| | | | |
| | | | |
| **PARALEGAL** | | | |
| Jingjing Lin (PL) | **$250** | **13.26** | **$3,315.00** |
| Aleksandra Ryshina (PL) | **$250** | **6.63** | **$1,657.60** |
| Zachary Stanco (PL) | **$250** | **9.4** | **$2,350.00** |
| **PARALEGAL TOTALS:** | | **29.29** | **$7,322.50** |
| **OVERALL TOTALS:** | | **26,848.97** | **$13,015,026.75** |

Partner (P), Counsel (C), Associate (A), Staff Attorney (SA) Paralegal (PL).

## POMERANTZ LLP

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| **Partners** | | | |
| Jeremy A. Lieberman | 350.30 | $950.00 | $332,785.00 |
| Michael J. Wernke | 2,440.60 | $750.00 | $1,830,450.00 |
| | | | |
| **Of Counsel / Associates** | | | |
| Alex Hood | 49.70 | $500.00 | $24,850.00 |
| Veronica Montenegro | 3,175.95 | $600.00 | $1,905,570.00 |
| Laura Perrone | 2,392.10 | $575.00 | $1,375,457.5 |
| Samir Sidi | 2,622.00 | $550.00 | $1,442,100.00 |
| Marc Gorrie | 159.20 | $525.00 | $83,580.00 |
| Mary Jose | 60.10 | $550.00 | $33,055.00 |
| Richard Ortiz | 596.00 | $450.00 | $268,200.00 |
| Allison Tierney | 3,160.00 | $475.00 | $1,501,000.00 |
| Kendall James | 1,294.60 | $450.00 | $582,570.00 |
| Lina Franco | 1,210.00 | $450.00 | $544,500.00 |
| | | | |
| **TOTAL LODESTAR** | **17,510.55** | | **$9,924,117.50** |

**Class Counsel Total Hours:**    44,359.52

**Class Counsel Total Lodestar:** $ 22,939,144.25

### Lodestar Multiplier Analysis

Gross Settlement Amount:           $110,000,000
Settlement Amount Net of Expenses (Gross Settlement Amount less Expenses and Awards
to Class Representatives):                $107,351,327.71

Requested Fee Percentage:    30% of Settlement Amount Net of Expenses
Requested Fee:               $32,205,398.31

Total Lodestar:              $22,939,144.25

Multiplier:                  1.40


109.    Class Counsel worked 44,359.52 hours on the litigation. Class Counsel's total

lodestar is $22,939,144.25. The requested fee of thirty percent (30%) of the Settlement Amount

Net of Expenses is $32,205,398.31 which represents a multiplier of 1.40 to Class Counsel's

lodestar. We believe that this multiplier is fair and reasonable based on the risks of the litigation,

the quality of the representation and the results obtained. As discussed in further detail in the Fee

Memorandum, the requested multiplier is well within the range, and is on the low end of fee

multipliers typically awarded in comparable securities class actions involving significant

contingency fee risk in the Second Circuit.

### A.    The Litigation Expense Application

110.    Class Counsel incurred $2,603,672.29 of unreimbursed expenses to prosecute this

action. This amount is less than the $2,800,000 amount set forth in the Notice.  Substantial

expenses included: (1) retention of one expert in connection with class certification and retention

of five experts in connection with expert discovery, each of whom was deposed and drafted

opening and rebuttal expert reports; (2) investigator fees incurred in connection with the filing of

the complaints; (3) discovery database fees in connection with hosting the millions of pages of

documents Defendants produced in discovery; (4) travel expenses and deposition fees in

connection with the numerous depositions in the action, the bulk of which took place in Detroit,

Michigan; (5) mediation fees; and (6) online legal research.  These expenses are further itemized

in the accompanying Wernke and Rosen Declarations. All of the expenses incurred were necessary

to prosecute this action effectively.

### VII. AN AWARD TO THE CLASS REPRESENTATIVES IS WARRANTED

111.    The Notice advised Class Members that the Class Representatives would seek a

collective award of no greater than $45,000.

The Class Representatives seek a collective award in the amount $45,000, consisting of $15,000

each to Koopmann, Kidd, and Pirnik.  These awards are justified in light of their efforts and lost

time in this Action.  Plaintiffs regularly communicated and met with Class Counsel regarding the

posture and progress of the case, reviewed filings and transcripts, reviewed and/or discussed all

significant decisions in the Action; (e) produced documents in response to Defendants' discovery

requests; (f) traveled and sat for depositions; (g) conferred with Class Counsel about litigation

and settlement strategies and  (g) provided authorization to Class Counsel for the range to be

sought in the settlement negotiations. *See* Ex. 4 (Koopmann Decl.), Ex. 5 (Kidd  Decl.), Ex. 6

(Pirnk Decl.).

112.    The relatively modest request for an award in the amount of $45,000 total to

compensate Class Representatives in this Action for their time and service to the Class, as well as

to function as an inventive to serve as class representative is reasonable.

*** 

36

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 1, 2019

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 1, 2019

*/s/ Laurence M. Rosen*
Laurence M. Rosen